KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
AMANDA K. BONN (270891)
abonn@susmangodfrey.com
CATRIONA LAVERY (310546)
clavery@susmangodfrey.com
CHELSEA SAMUELS (315257)
csamuels@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL (*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, <br><br>   Plaintiffs, <br><br>  v. <br><br>ATLANTIC SPECIALTY INSURANCE COMPANY, <br>   Defendant. | Case No.: 2:16-cv-4435-PA-MRW <br><br>The Honorable Percy Anderson <br>Dept. 9A <br><br>**REVISED JOINT LIST OF DEPOSITION TESTIMONY TO BE OFFERED AT TRIAL** <br><br>Trial Date: February 18, 2020 |

1  Pursuant to this Court's Minute Order dated January 17, 2020, Dkt. 212,
2  Plaintiffs Universal Cable Productions LLC and Northern Entertainment
3  Productions LLC, together with Defendant Atlantic Specialty Insurance Company,
4  submit the following list of deposition designations, counter-designations, and their
5  associated objections and responses.

6  The parties currently intend to submit the following testimony to be played
7  on videotape or a computer. However, trial preparation continues, and the parties
8  reserve the right to either read the testimony or present the witness live.

9  In addition to the designations below, Plaintiffs are considering designating
10 portions of the deposition of Defendant's former insurance industry expert
11 Anthony Clark.  The parties learned on January 28, 2020, that Mr. Clark had
12 passed away just days before. *See* Dkt. 247.

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**A.**    **Plaintiffs' Deposition Designations** ..................................................6

    1.    Crosby, Dennis (30(b)(6))—May 17, 2017 ....................................7

    2.    Crosby, Dennis—May 17, 2017 .................................................. 10

    3.    Gooley Wolf, Teresa—February 8, 2017 ..................................... 36

    4.    Gutterman, Daniel—February 3, 2017 ........................................ 111

    5.    Johnson, Pamela (Vol. 1)—May 8, 2017..................................... 191

    6.    Johnson, Pamela (Vol. 2)—May 9, 2017..................................... 273

    7.    Wanda, Phillips—May 31, 2017.................................................. 282

    8.    Williams, Peter—February 1, 2017 ............................................. 325

    9.    Williams, Peter (30(b)(6))—May 19, 2017 ................................. 370

**B.**    **Defendant's Deposition Designations** ............................... 411

    1.    Adams, Malika—May 4, 2017.................................................... 412

    2.    Binke, Mark—May 25, 2017 ...................................................... 432

    3.    Crosby, Dennis (30(b)(6))—May 15, 2017 ................................. 479

    4.    Crosby, Dennis—May 17, 2017 ................................................. 479

    5.    Duffy, Sean—May 11, 2017 ....................................................... 482

    6.    Ford, Kurt—May 17, 2017 ......................................................... 493

    7.    Garber, Andrea—April 14, 2017 ................................................ 530

    8.    Gutterman, Daniel—February 3, 2017 ........................................ 576

    9.    Johnson, Pamela (Vol. 1)—May 8, 2017..................................... 588

    10.    Johnson, Pamela (Vol. 2)—May 9, 2017..................................... 642

    11.    McCarthy, Thomas—June 1, 2017 .............................................. 748

    12.    Phillips, Wanda—May 31, 2017.................................................. 801

    13.    Smith, Stephen (Vol. 1)—April 18, 2017 ................................... 810

    14.    Smith, Stephen (Vol. 2)—April 19, 2017 ................................... 913

15. Weiss, Susan—April 18, 2017 ....................................................... 937

16. Williams, Peter—February 1, 2017 ............................................... 958

17. Williams, Peter (30(b)(6))—May 19, 2017 ................................... 972

18. Wolf, Teresa Gooley—February 8, 2017 ...................................... 992

DATED:  February 7, 2020          SUSMAN GODFREY L.L.P.

*/s/ Amanda Bonn*
KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
AMANDA K. BONN (270891)
abonn@susmangodfrey.com
CATRIONA LAVERY (310546)
clavery@susmangodfrey.com
CHELSEA SAMUELS (315257)
csamuels@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: (310) 789-3100
Fax: (310) 789-3150

JACOB W. BUCHDAHL (*pro hac vice*)
jbuchdahl@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs*

*/s/ Marc J. Shrake*
MARC J. SHRAKE
FREEMAN MATHIS & GARY, LLP
550 South Hope Street, Suite 2200
Los Angeles, CA 90071-2631
Tel: (213) 615-7039
-and-

MICHAEL KEELEY (*pro hac vice*)
JOHN R. RIDDLE (*pro hac vice*)
TONI SCOTT REED (*pro hac vice*)
CLARK HILL STRASBURGER PLC
901 Main Street, Suite 6000
Dallas, TX 75202
Tel: (214) 651-4718

MELINDA R. BURKE (*pro hac vice*)
MARTIN DISIERE JEFFERSON AND
WISDOM LLP
9111 Cypress Waters Boulevard, Suite 250
Dallas, TX 75019
Tel: (214) 420-5500
Fax: (214) 420-5501
burke@mdjwlaw.com

*Attorneys for Defendant*

### Attestation Regarding Signatures

I, Amanda Bonn, attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

By: */s/ Amanda Bonn*
Amanda Bonn

# PLAINTIFFS' DEPOSITION DESIGNATIONS

| Plaintiffs' Designation of Dennis Crosby 30(b)(6) | Objection & Response |
|---|---|
| Plaintiffs' Designation of Dennis A. Crosby (30)(b)(6), May 17, 2017<br><br>Page 5<br>9  Q   Do you recognize the document marked<br>10      Exhibit 1?<br>11  A   I do not. I have never seen it.<br>12  Q   I want you to turn to the pages marked 11<br>13      and 12.  And I'd like you to read to yourself the<br>14      topics marked 48 and 49 and let me know when you're<br>15      done.<br>16  A   (Witness reviews document.)<br>17      48 and 49, correct?<br>18  Q   Yes.<br>19  A   I've read them.<br>20  Q   Have you been designated to testify on<br>21      behalf of Atlantic in response to those topics?<br>22  A   Yes, I have.<br><br>Page 6<br>18  Q   When was the decision not to renew the<br>19      NBC Universal policy made?<br>20  A   I'm unsure of the exact date, but it was<br>21      roughly a month before the expiration date of the<br>22      NBC Universal policy.<br>23  Q   Who made the decision?<br>24  A   Peter Williams.<br>25  Q   Did you approve Peter's decision? | Defendant's Objections: (6:18-25) Policy and underwriting issues are not relevant; confusing; prejudicial FRE 401;403<br><br>Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at |

| Plaintiffs' Designation of Dennis Crosby 30(b)(6) | Objection & Response |
|---|---|
| | 1150; CACI 2332. |
| Page 7<br>1   A   Yes, I did.<br>2   Q   What was Peter's decision based on?<br>3   A   The actuarial and underwriting work we<br>4       did around the profitability of NBC<br>        Universal. | Defendant's Objections:<br>(7:1-4) Policy and underwriting issues are not relevant; confusing; prejudicial<br>FRE 401;403<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 10<br>16   Q   I recall from your prior testimony that<br>17       you referenced a figure in connection with the NBC<br>18       Universal account over the 2013, 2014 and 2015<br>19       period, and let me know if this is accurate. I<br>20       recall you said that over that period OneBeacon had<br>21       paid NBC Universal more in claims than it had<br>22       received from NBC Universal in premiums; is that<br>23       right?<br>24   A   Yes, it is.<br>25   Q   And the ratio that you stated was for | Defendant's Objections:<br>(10:16-25) Premium, loss ratios are not relevant, prejudicial, and a waste of time<br>FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 11 | Defendant's Objections: |

| Plaintiffs' Designation of Dennis Crosby 30(b)(6) | | | Objection & Response |
|---|---|---|---|
| 1 | | every $100 OneBeacon received in premiums, it paid | (11:1-3) Premium, loss ratios are not relevant, prejudicial, and a waste of time |
| 2 | | $130 in claims to NBC Universal; is that right? | FRE 401, 403 |
| 3 | A | Over time, yes, that is correct. | |
| | | | Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| Plaintiffs' Designation of Dennis A. Crosby, May 17, 2017<br><br>Page 5<br>3    Q    Good morning, Mr. Crosby.<br>4    A    Good morning.<br>5    Q    Please spell your name for the record.<br>6    A    Dennis, D-E-N-N-I-S, Crosby, C-R-O-S-B-Y.<br>Page 6<br>19   Q    Okay. Where do you work?<br>20   A    Alpharetta, Georgia.<br>21   Q    For what company?<br>22   A    OneBeacon Insurance Group.<br>23   Q    What is your title?<br>24   A    Executive vice president.<br>25   Q    Anything else to that title?<br><br>Page 7<br>1    A    No.<br>2    Q    Okay. Are you the head of a department?<br>3    A    I'm responsible for the business aspect<br>4         of what OneBeacon does, the revenue generating<br>5         businesses.<br>6    Q    What does OneBeacon do?<br>7    A    Specialty property and casualty<br>8         insurance.<br>9    Q    What does it mean that you're responsible<br>10        for the revenue generating part of what OneBeacon<br>11        does?<br>12   A    I allocate capital, I help with strategy<br>13        for the businesses and the operational aspect of<br>14        them, including their P&Ls, profit -- their profit<br>15        and loss statements.<br>16   Q    You're one of the people responsible for | |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 17 making sure that OneBeacon is a profitable<br>18 business; is that fair?<br>19 A Yes. | |
| <u>Page 11</u><br>17 Do you have any responsibility in<br>18 connection with underwriting at<br>OneBeacon?<br>19 A Yes, I do.<br>20 Q And what is your responsibility?<br>21 A I'm responsible for strategy, P&L, profit<br>22 and loss, of the businesses that we have.<br>23 Q And when you say "businesses that we<br>24 have," are you referring to the different<br>divisions<br>25 within OneBeacon that write insurance for<br>different | <u>Defendant's Objections</u>:<br>(11:17-25) Profit and loss<br>not relevant to claim<br>decision; prejudicial; waste<br>of time FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201). |
| <u>Page 12</u><br>1 industries; is that fair?<br>2 A Yes.<br>3 Q One such industry is the entertainment<br>4 industry?<br>5 A Yes. | <u>Defendant's Objections</u>:<br>(12:1-5) Profit and loss not<br>relevant to claim decision;<br>prejudicial; waste of time<br>FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201). |
| <u>Page 13</u><br>13 Q And does OneBeacon have any goals or<br>14 benchmarks in terms of profitability of a<br>15 particular business?<br><br>17 A Yes. | <u>Defendant's Objections</u>:<br>(13:13-15, 17) Profit and loss<br>not relevant to claim<br>decision; prejudicial; waste<br>of time FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| | motive. See Oppo to MIL 2 (Dkt 201). |
| Page 16 | Defendant's Objections: |
| 7  What are those goals or benchmarks? | (16:7-22) Profit and loss not |
| 8  We like for our businesses to run between | relevant to claim decision; |
| 9  what we call a 10 percent -- 10 to 12 percent | prejudicial; waste of time |
| 10  return on equity. So that means the capital that I | FRE 401, 403 |
| 11  give them. | |
| 12  Q  Is that true for all of the divisions | Plaintiff's Response: |
| 13  within OneBeacon, 10 to 12 percent? | Relevant to bad faith and |
| 14  A  That is correct. | motive. See Oppo to MIL 2 |
| 15  Q  And for what time period has that been | (Dkt 201). |
| 16  the goal? | |
| 17  A  Clarify, please. | |
| 18  Q  Is that the goal this year? | |
| 19  A  Yes. | |
| 20  Q  Has that been the goal since 2010 -- | |
| 21  A  Yes. | |
| 22  Q  -- if you know? | |
| | |
| Page 19 | Defendant's Objections: |
| 1  Q  Okay. Does OneBeacon have an | (19:5, 9-10,) Profit and loss |
| 2  entertainment division today? | not relevant to claim |
| 3  A  Yes. | decision; prejudicial; waste |
| 4  Q  Was the entertainment division profitable | of time FRE 401, 403 |
| 5  for the year 2016? | |
| | |
| 9  A  Entertainment had a history of not being | |
| 10  profitable in aggregate. | Plaintiff's Response: |
| | Relevant to bad faith and |
| | motive. See Oppo to MIL 2 |
| | (Dkt 201). |
| | |
| Page 20 | Defendant's Objections: |
| 5  Q  Did the entertainment division meet the | (20:5-7, 10, 12-13, 15, 17- |
| 6  10 to 12 percent return on equity goal for | 24) Profit and loss not |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 7      the year 2016? <br><br> 10   A   No. <br><br> 12   Q   What was the return on equity for the <br> 13      entertainment division for 2016? <br><br> 15   A   I don't recall. <br><br> 17   Q   How about 2015, did the entertainment <br> 18      division meet the 10 to 12 percent return on equity <br> 19      goal for 2015? <br> 20   A   No. <br> 21   Q   Same question 2014? <br> 22   A   No. <br> 23   Q   Same question 2013? <br> 24   A   No. | relevant to claim decision; prejudicial; waste of time FRE 401, 403 <br><br><br> <u>Plaintiff's Response</u>: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| <u>Page 107</u> <br> 15   Q   Mr. Crosby, do you recognize the document <br> 16      marked Exhibit 2? <br> 17   A   I do. <br> 18   Q   What is it? <br> 19   A   It's an update on the status of OBE at <br> 20      the beginning or so of February of '16. <br> 21   Q   Is this a PowerPoint presentation? <br> 22   A   Yes. <br> 23   Q   And was it presented at a meeting? <br> 24   A   Yes, it was. <br> 25   Q   Who attended the meeting at which it was | <u>Defendant's Objections</u>: (107:15-25) Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time: object to exhibit 2 and 3   FRE 401, 403 <br><br> <u>Plaintiff's Response</u>: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| <u>Page 108</u> <br> 1      presented? <br> 2      A   Mike Miller, CEO, myself, Jeff Richardson <br> 3      and Joe, the leader of OBE. <br> 4   Q   Joe Fitzgerald? | <u>Defendant's Objections</u>: (108:1-25) Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time: object to exhibit 2 and |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 5  A  Correct. | 3  FRE 401, 403 |
| 6  Q  And this meeting occurred on or about<br>7      February 17th, 2016? | |
| 8  A  That's correct. | Plaintiff's Response:<br>Relevant to bad faith and |
| 12  A  What was the purpose of the meeting? | motive. See Oppo to MIL 2 |
| 13  A  We had become -- we had started really | (Dkt 201). |
| 14      working on the profitability of the<br>      entertainment | |
| 15      portfolio, and this was basically a recap of the | |
| 16      things that were in works and also slated to be | |
| 17      done relative to how we'd set up the plan rolling | |
| 18      into 2016. | |
| 19  Q  Was NBC Universal discussed? | |
| 20  A  It's on one of the pages.     No specific | |
| 21      account was discussed. It was<br>      informational. | |
| 22  A  Do you recall discussing NBC Universal at | |
| 23      the meeting? | |
| 24  A  No, I do not. | |
| 25  Q  Do you know which page NBC Universal or | |
| | |
| Page 109 | Defendant's Objections: |
| 1      pages NBC Universal is referenced? | (109:1-25) Profit and loss |
| 2  A  I believe I can find them.  It appears to | not relevant to claim |
| 3      be on Page 14 of the PowerPoint. | decision; unfair prejudicial; |
| 10  Q  And the reference states: NBC Universal | confuses issues; waste of |
| 11      - 3 year WP $4.4 million/Losses $6.0<br>      million. Do | time: object to exhibit 2 and<br>3  FRE 401, 403 |
| 12      you see that? | |
| 13  A  I do. | |
| 14  Q  What does WP stand for? | Plaintiff's Response: |
| 15  A  Written premium. | Relevant to bad faith and |
| 16  MR. KEELEY: Dan, pardon the | motive. See Oppo to MIL 2 |
| 17      interruption, you had asked for copies of the | (Dkt 201). Exhibits 2 and 3 |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 18    PowerPoint showing the redactions. I've got copies<br>19    of them.<br>20  MR. HAYES: Okay. Let's introduce<br>21    Exhibit 3. This is the document I've been handed<br>22    which, according to counsel, shows the redactions<br>23    made on the PowerPoint that's been marked<br>24    Exhibit 2.<br>25    (Deposition Exhibit 3 marked.) | relevant to bad faith, are business records, statements by party opponent, and authentic as they were produced from Defendant's files. |
| Page 111<br>7  Q  Let me make sure I understand what this<br>8     is, Mr. Crosby. This PowerPoint is a discussion of<br>9     the OneBeacon Entertainment Group in particular; is<br>10    that right?<br>11  A  That is correct. | Defendant's Objections: (111:7-11) Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time ; FRE 401, 403<br><br>Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 114<br>3  Q  Okay. I want you to look at 6988. It's<br>4     titled Message to the Team. Do you see that?<br>5  A  Yes, I do.<br>18  Q  On Page 6988 at the top it says Message<br>19    to the Team. Directly underneath Message to the<br>20    Team, it says, Underwriting Comes First. What does<br>21    that mean to you?<br>22  A  Risk selection and pricing comes first.<br>23  Q  When you say "risk selection," what do<br>24    you mean?<br>25  A  Underwriting. | Defendant's Objections: (114:3-25) Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time ; FRE 401, 403<br><br>Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| Page 115<br>1  Q    Selecting which risks to insure?<br>2  A    Correct. | Defendant's Objections:<br>(115:1-12) Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time ;<br>FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 116<br>16  Q    Last line, Bottom-line over Topline -<br>17        Profitability is the Goal. What does that mean?<br>18  A    The entertainment business needed to be<br>19        in a position to make money at OneBeacon.<br>20        Historically, they had not. So the bottom line,<br>21        the amount of money we make, versus just growing<br>22        the business unprofitably.<br>23  Q    So selecting accounts that would be<br>24        profitable as opposed to just trying to grow the<br>25        gross number of accounts in the entertainment | Defendant's Objections:<br>(116:16-25) Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time; FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 117<br>1        division; is that accurate?<br>2  A    Yes.<br>10  Q    I want to make sure I understand what you<br>11        mean when you say that the entertainment division<br>12        was not profitable. Do you mean that OneBeacon | Defendant's Objections:<br>(117:1-25) Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time; FRE 401, 403<br><br>Plaintiff's Response: |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 13    literally did not make a profit at all on the<br>14    entertainment policies that it wrote?<br>15  A  For three years straight, that is<br>16    absolutely correct.<br>17  Q  So for three years straight, OneBeacon<br>18    actually lost money on those policies?<br>19  A  That's correct.<br>20  Q  And which three years were those?<br>21  A  '13, '14, '15.<br>22  Q  And that changed in 2016?<br>23  A  Barely, yes. | Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 121<br>6  Q  Did you look at the profitability of the<br>7    film/TV segment?<br>8  A  Yes.<br>9  Q  Was it profitable?<br>10  A  No.<br>11  Q  What action, if any, did you decide to<br>12    take with respect to that specific segment?<br>13  A  Well, we looked at the -- we looked at<br>14    the entire book and looked at the performance<br>15    account by account.<br>16  Q  Meaning insured by insured?<br>17  A  Correct.<br>18  Q  And then what did you do?<br>19  A  Took action, non-renewed some, raised<br>20    rates on some. | Defendant's Objections:<br>(121:6-20) Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time; FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 125<br>4  Q  The NBC Universal account was not<br>5    renewed, correct?<br>6  A  Correct. | Defendant's Objections:<br>(125:4-6)<br>Policy nonrenewal not relevant; prejudicial; waste of time<br>FRE 401, 403 |

17

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| | Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 126<br>25  Q    So let's go back to the page marked 6970. | Defendant's Objections: (126:25)Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time; FRE 401, 403 |
| | Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 127<br>1   A    In Exhibit 3?<br>2   Q    Yes. And again, referring to this<br>3         reference to NBC Universal - 3 year<br>           Written Premium<br>4         4.4 million/losses 6.0 million.Am I correct in<br>5         assuming that that means over a three-year period<br>6         OneBeacon received premiums from NBC Universal in<br>7         the amount -- in the amount of $4.4 million, but<br>8         paid out on claims to NBC Universal in the amount<br>9         of $6 million?<br>10  A    That is correct.<br>11  Q    And the three-year period at issue is<br>12        what, if you know?<br>13  A    We talked about '13, '14, '15.<br>14  Q    I just want to make sure we're on the<br>15        same page. When you said 2013, 2014 and 2015 | Defendant's Objections: (127:1-22, 25) Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time; FRE 401, 403<br><br>Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 16     before, I understood you to mean that those were<br>17     the three years that the entertainment division in<br>18     general was not profitable; is that right?<br>19   A   That is correct.<br>20   Q   But it also happens to be the three years<br>21     that the NBC Universal account was not profitable,<br>22     was that right?<br><br>25   Well, it also happens to be the | |
| Page 128<br>1     three-year period referenced on Page 6970; is that<br>2     correct?<br>3   A   Appears to be, yes. | Defendant's Objections:<br>(128:1-3) Profit and loss not relevant to claim decision; unfair prejudicial; confuses issues; waste of time;<br>FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 147<br>7   Q   Mr. Crosby, do you recognize the document<br>8     marked Exhibit 4?<br>9   A   Yes.<br>10   Q   What is it?<br>11   A   It appears to be a notice around the Big<br>12     Dig, a notice of claim and a claim position that<br>13     was sent to me by Sean Duffy out of claims who I<br>14     sent to Peter -- who I sent to Peter Williams who<br>15     ran entertainment at the time.<br>16   Q   Do you recall receiving this email?<br>17   A   Honestly, I do not. | Defendant's Objections:<br>(147:7-25) Communication not relevant to reasonableness of claim decision or any other remaining issue.<br>FRE 147, 148, 149, 150, 151, 152<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| **Page 149**<br><br>22   BY MR. HAYES:<br>23   Q   Why did you send this email to Peter<br>24        Williams?<br>25   A   He was the president of the entertainment | Defendant's Objections: (149:1-8, 13-14. 18-19. 22-25) Communication not relevant to reasonableness of claim decision or any other remaining issue.<br>FRE 401, 403<br><br>Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| **Page 150**<br>1        group.<br>2    Q   Why did you send this email to Peter<br>3        Williams?<br>4    A   Because he was the president of the<br>5        entertainment group.<br>6    Q   Any other reason?<br>7    A   No.<br>20   Q   Have you ever spoken to Sean Duffy about<br>21       the Dig claim?<br>22   A   Yes.<br>23   Q   When?<br>24   A   Don't recall. | Defendant's Objections: (150:1-25) Communication not relevant to reasonableness of claim decision or any other remaining issue.<br>FRE 401, 403<br><br>Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| **Page 152**<br>1    Q   Did you have any conversations with Sean<br>2        Duffy at any time regarding the Dig claim,<br>         yes or<br>3        no?<br><br>5    A   Yes.<br>6    BY MR. HAYES:<br>7    Q   How many?<br>8    A   I don't recall. | Defendant's Objections: (152:1-3, 5-8) Communication not relevant to reasonableness of claim decision or any other remaining issue; waste of time.<br>FRE 401, 403<br><br>Plaintiff's Response: Relevant to bad faith and |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| | motive. See Oppo to MIL 2 (Dkt 201). |
| Page 156 | Defendant's Objections: |
| 2  Q   Do you recognize the document marked | (156:2-25) Communication |
| 3        Exhibit 5? | not relevant to |
| 4  A   It appears to be the same document as | reasonableness of claim |
| 5        Exhibit 4 without my forwarding, so, yes, I do | decision or any other remaining issue; waste of time. |
| 6        recognize this document. | FRE 401, 403 |
| 7  Q   Did you send the email at the top of | |
| 8        Exhibit 5 to Sean Duffy on July 23rd, 2014? | |
| 9  A   Yes. | |
| 10 Q   Here you say: Thanks, looks good to me. | Plaintiff's Response: |
| 11      What were you referring to? | Relevant to bad faith and |
| 12 A   Claim position. | motive. See Oppo to MIL 2 |
| 13 Q   So is it correct that you reviewed the | (Dkt 201). |
| 14      decision to deny the Dig claim? | |
| 15 A   With the correspondence that you've given | |
| 16      me, yes. | |
| 17 Q   And do you recall reviewing the decision | |
| 18      to deny the Dig claim? | |
| 19 A   I recall reviewing these emails around | |
| 20      the decision to deny the Dig claim. | |
| 21 A   Do you recall reviewing anything else | |
| 22      other than the email chain marked Exhibit 5 and the | |
| 23      email chain marked Exhibit 4 and any attachments to | |
| 24      those emails? | |
| 25 A   No, I do not. | |
| Page 199 | Defendant's Objections: |
| 1  Q   Do you recognize the document marked | (199:1-25) (186:7-25) |
| 2        Exhibit 10? | Nonrenewal profitability not |
| 3  A   Yes. | relevant to reasonableness to |
| 4  Q   What is it? | claim decision or any other |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 5  A   It's a document from me to my boss, Mike <br> 6        Miller, about a meeting I had with Peter and his <br> 7        underwriters on the 4th of June. <br> 8  Q   And why were you reporting this meeting <br> 9        to Mr. Miller? <br> 10 A   Because it was significant. <br> 11 Q   What was discussed during the meeting? <br> 12 A   With Mr. Miller? <br> 13 Q   No, with Peter and his underwriting <br> 14        leadership. <br> 15 A   That we had a plan in place and it was <br> 16        time to execute the plan. <br> 17 Q   Plan for what? <br> 18        Moving on the casino business, looking at <br> 19        the accounts that were unprofitable, all the things <br> 20        that we have talked about heretofore to move <br> 21        forward with. <br> 22 Q   Including the entertainment division as a <br> 23        whole? <br> 24 A   Correct. That's what this was, a meeting <br> 25        with the entertainment division in whole. | remaining issues, prejudicial; confuses issues; waste of time; FRE 401, 403 <br><br> Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 200 <br> 1  Q   Including the film and TV segment of the <br> 2        entertainment division? <br> 3  A   Correct, all of the underwriters in <br> 4        entertainment were there. | Defendant's Objections: (200:1-4-25) Nonrenewal profitability not relevant to reasonableness to claim decision or any other remaining issues, prejudicial; confuses issues; waste of time; FRE 401, 403 <br><br> Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| Page 203<br>23  Q   Let's talk about the good meeting with<br>24        Peter and his underwriting leadership<br>             referenced in<br>25        the first sentence of the email marked<br>             Exhibit 10, | Defendant's Objections:<br>(203:23-25) Underwriting/<br>profitability not relevant to<br>reasonableness to claim<br>decision or any other<br>remaining issues, prejudicial;<br>confuses issues; waste of<br>time; FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201). Underwriting,<br>communications re same<br>relevant to bad faith. See<br>UCP v. Atlantic, 929 F.3d at<br>1150. |
| Page 207<br>4  Q   What was discussed?<br>5  A   I was just reading Exhibit 10 to see<br>6        exactly what is here.    It's basically next<br>             steps<br>7        with entertainment.<br>18  Q   And what specific things were you looking<br>19        at?<br>20  A   Every segment within entertainment.<br>21        Including film and TV?<br>22  A   Correct.<br>23  Q   And what were you looking to do with<br>24        respect to that segment?<br>25  A   Cull the bad accounts, raise rates on the | Defendant's Objections:<br>(207:4-25) Underwriting/<br>profitability not relevant to<br>reasonableness to claim<br>decision or any other<br>remaining issues, prejudicial;<br>confuses issues; waste of<br>time; FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201). Underwriting,<br>communications re same<br>relevant to bad faith. See<br>UCP v. Atlantic, 929 F.3d at<br>1150. |
| Page 208<br>1        medium size -- medium accounts that<br>             weren't | Defendant's Objections:<br>(208:8-25) Underwriting/<br>profitability not relevant to |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 2  performing.  And keep the good ones.<br>3  Q  Which of those three buckets did the NBCU<br>4  account fall into?<br>5  A  We didn't bucket them that way. We were<br>6  looking at them. We had no buckets. We were just<br>7  trying to look at accounts by accounts.<br>8  But we were looking at everything we<br>9  could look at to see who was performing and who<br>10  wasn't, what account was performing and who wasn't,<br>11  and why.<br>12  Q  Okay. Was the NBC Universal account a<br>13  bad account, a medium account or a good account?<br>14  A  From an underwriting perspective, it was<br>15  a bad account.<br>16  Q  Why?<br>17  A  130 percent combined ratio over three<br>18  years.<br>19  Q  You qualified what you said by saying<br>20  "from an underwriting perspective." Was it a good<br>21  account from any other perspective?<br>22  A  Not that I can see.<br>23  Q  What did you mean when you said "from an<br>24  underwriting perspective"?<br>25  A  130 combined. For every dollar we took | reasonableness to claim decision or any other remaining issues, prejudicial; confuses issues; waste of time; FRE 401, 403<br><br>Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). Underwriting, communications re same relevant to bad faith. See UCP v. Atlantic, 929 F.3d at 1150. |
| Page 209<br>1  in premium, we paid out a dollar and 30 cents --<br>2  or, excuse me, $130 in claims.<br>3  Q  For every hundred dollars you took in --<br>4  A  We paid out --<br>5  Q  -- you paid out 130?<br>6  A  -- 130, correct. And that's on top of | Defendant's Objections: (209:1-10, 13-25) Underwriting/ profitability not relevant to reasonableness to claim decision or any other remaining issues, prejudicial; confuses issues; waste of |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 7        a -- of an SIR where NBC took risk. | time; FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). Underwriting, communications re same relevant to bad faith. See UCP v. Atlantic, 929 F.3d at 1150. |
| Page 213<br>6  Q  So in the first sentence of the second<br>7      paragraph you write:   For today, I want you to know<br>8      we are not offering a renewal on NBC. Do you see<br>9      that?<br>10  A  Uh-huh.<br>11  Q  Yes?<br>12  A  Yes, I do.<br>13  Q  Does that mean that as of June 4th, 2015,<br>14      OneBeacon had made the decision not to renew the<br>15      NBC Universal account?<br>16  A  With the information I had at hand at<br>17      that time, yes, I believe that was the best<br>18      solution.<br>19  Q  That was your decision not to renew?<br>20  A  No, I just said in aggregate of talking<br>21      about this and looking at the scenarios, we talked<br>22      about it, it was the best solution.<br>23  Q  Understood.<br>24      From your perspective --<br>25  A  Uh-huh. | Defendant's Objections:<br>(213:6-25) Underwriting/ profitability not relevant to reasonableness to claim decision or any other remaining issues, prejudicial; confuses issues; waste of time; FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). Underwriting, communications re same relevant to bad faith. See UCP v. Atlantic, 929 F.3d at 1150. |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| Page 214 | Defendant's Objections: |
| 1  Q  -- I understood that -- I understand | (214:1-21, 25) Underwriting/ |
| 2     that's what you're saying.  But my question is, was | profitability not relevant to reasonableness to claim |
| 3     that your decision? | decision or any other |
| 4  A  It was our decision. | remaining issues, prejudicial; |
| 5  Q  Who's "our"? | confuses issues; waste of |
| 6  A  Peter and me. | time; FRE 401, 403 |
| 7  Q  To the extent you disagreed with that | |
| 8     decision, you could have overruled Peter; is that | Plaintiff's Response: |
| 9     correct? | Relevant to bad faith and |
| 10 A  That is correct. | motive. See Oppo to MIL 2 |
| 11 Q  So in terms of the ultimate decision | (Dkt 201). Underwriting, |
| 12    maker on whether or not to renew the NBC Universal | communications re same |
| 13    account, that's you, right? | relevant to bad faith. See UCP v. Atlantic, 929 F.3d at |
| 14 A  I want Peter, the head of the -- the | 1150. |
| 15    president of the entertainment unit to make the | |
| 16    decisions he needs to make.   I can remind him | |
| 17    constantly of here are the numbers and here's what | |
| 18    they look like. | |
| 19 Q  Okay.  But ultimately, it's your | |
| 20    decision, right? | |
| 21 A  Yes. | |
| | |
| 25 Q  And do you know whether or not Peter had | |
| | |
| Page 215 | Defendant's Objections: |
| 1     made any proposals to NBC Universal as of June 4th, | (215:1-16) Underwriting/ |
| 2     2015? | profitability not relevant to |
| 3  A  I do not know. | reasonableness to claim |
| 4  Q  When you say "this could get noisy," what | decision or any other |
| 5     do you mean? | remaining issues, prejudicial; |
| 6  A  Aon, it's NBC, it's a big account. | confuses issues; waste of time; FRE 401, 403 |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| | <u>Plaintiff's Response:</u> Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). Underwriting, communications re same relevant to bad faith. See UCP v. Atlantic, 929 F.3d at 1150. |
| <u>Page 217</u><br>2   Q   You say here: It needs a 5MM SIR and a<br>3         1.8M in premium to stand a chance of<br>            profitability.<br>4         What does that mean?<br>5   A   The SIR NBC Universal need to go from<br>            2.1<br>6         to $5 million and we needed $8 million --<br>            $1.8<br>7         million of premium on top of that.<br>8   Q   Per year?<br>9   A   Per year.<br>10   Q   For the relationship to be profitable<br>11         from OneBeacon's perspective, correct?<br>12   A   That is correct. And we knew through<br>13         Peter, you know, through what the market<br>            had been<br>14         saying is that, you know, that the broker at<br>15         Aon/Ruben already had a $4 million SIR<br>            with a 1.4<br>16         premium quote in hand.<br>17         And on an account like this, regardless<br>18         of the size, we're not in the -- we're not in<br>            the<br>19         business of negotiating.  We'll say what we<br>            need,<br>20         and if you like it, great; if you don't, you<br>            just<br>21         need to find another market. | <u>Defendant's Objections:</u><br>(217:2-25) Underwriting/ profitability not relevant to reasonableness to claim decision or any other remaining issues, prejudicial; confuses issues; waste of time; FRE 401, 403<br><br><u>Plaintiff's Response:</u><br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). Underwriting, communications re same relevant to bad faith. See UCP v. Atlantic, 929 F.3d at 1150. |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 22  Q  What does that mean you're not in the<br>23      business of negotiating?<br>24  A  On this kind of situation. When we're in<br>25      a bad situation with 130 percent combined,<br>        when<br><br>Page 218<br>1      we've lost this much money, we've done the<br>2      analysis, this is the money and the SIR<br>        attachment<br>3      that we need to make money here. This is<br>        our<br>4      quote. We're not going to go back and forth<br>        and<br>5      talk about bump it 500 or take it down 200.<br>        We're<br>6      not doing that. This is the number.<br>7  Q  You say here currently 2.1 million SIR<br>8      and 1.8 million. Does that mean 1.8 million<br>        in<br>9      premium?<br>10  A  Correct.<br>11  Q  Continuing: Even at our pricing, we<br>12      think there is a 20 percent handle of using<br>        through<br>13      the SIR. What does that mean?<br>14  A  It looks like it's a spell check.<br>15      20 percent risk of basically some issues<br>        being<br>16      within the SIR.   There's frequency within<br>        an SIR<br>17      layer, and you just -- there are -- there are<br>18      situations you've just got to be aware of<br>        because<br>19      they ultimately break through the SIR.<br>20  Q  So what this means is you assess there to<br>21      be a 20 percent risk that going forward the<br>        SIR has<br>22      pierced? | Defendant's Objections:<br>(218:1-25) Underwriting/<br>profitability not relevant to<br>reasonableness to claim<br>decision or any other<br>remaining issues, prejudicial;<br>confuses issues; waste of<br>time; FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201). Underwriting,<br>communications re same<br>relevant to bad faith. See<br>UCP v. Atlantic, 929 F.3d at<br>1150. |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 23  A    Yes.<br>24  Q    And that is based on analysis done by<br>25        Michael Larson; is that right?<br><br>Page 219<br>1   A    Yes.<br>2   Q    And then you say here: We know the<br>3        broker has a 4 million SIR/1.4 million premium<br>4        quote in hand.    That's what you already referred<br>5        to; is that right?<br>6   A    Correct.<br>7   Q    The second paragraph here, wherein, there<br>8        are several redactions, does that relate in any way<br>9        to NBC Universal?<br>10  A    It does not.<br>11  Q    Okay. Third paragraph: We have done the<br>12        right thing here and I know we have done the work<br>13        to understand these accounts. When you say, "we<br>14        have done the right thing here," what do you mean?<br>15  A    By getting off of them and not increasing<br>16        terms any way or shape or form.<br>17  Q    You mean the right thing from a<br>18        profitability standpoint; is that right?<br>19  A    Yes.<br>20  Q    Then you say: Messaging to the brokers<br>21        is that we have lost a great deal of money on these<br>22        accounts and we need SIRs that are way out of our<br>23        comfort zone.    Do you see that?<br>24  A    Yes, I do.<br>25  Q    What does that mean? | Defendant's Objections:<br>(219:1-25) Underwriting/ profitability not relevant to reasonableness to claim decision or any other remaining issues, prejudicial; confuses issues; waste of time; FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). Underwriting, communications re same relevant to bad faith. See UCP v. Atlantic, 929 F.3d at 1150. |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| Page 220 | Defendant's Objections: |
| 1  A   Just what it says. | (220:1-14) Underwriting/ |
| 2  Q   What does "messaging to the brokers" | profitability not relevant to |
| 3       mean? | reasonableness to claim |
| 4  A   To Susan Weiss and others. You know, | decision or any other |
| 5       SIRs are complicated tools in insurance, you know, | remaining issues, prejudicial; confuses issues; waste of |
| 6       and they're not for the faint of heart. | time; FRE 401, 403 |
| 7       And you know, our company was built on | |
| 8       middle market business and the entertainment | Plaintiff's Response: |
| 9       business kind of got a little out of sorts by doing | Relevant to bad faith and motive. See Oppo to MIL 2 |
| 10      these large, large entities on an SIR basis. | (Dkt 201). Underwriting, |
| 11      They're very difficult to manage, very | communications re same |
| 12      difficult to price. Sometimes you get them right, | relevant to bad faith. See UCP v. Atlantic, 929 F.3d at |
| 13      sometimes you get them wrong. With NBC, we got it | 1150. |
| 14      wrong, bad. | |
| | |
| Page 229 | Defendant's Objections: |
| 12  Q  Do you recognize the document marked | (229:12-25) Not relevant to |
| 13      Exhibit 11? | reasonableness of claim |
| 14  A   Yes. | decision or remaining issues |
| 15  Q   What is it? | FRE 401 |
| 16  A   It's an email from Peter to me after he | |
| 17      had been informed about the Big Dig -- Big Dig | |
| 18      claim interpretation by the claim department. | Plaintiff's Response: |
| 19  Q   When you say "Big Dig claim," what do you | Relevant to bad faith and motive. See Oppo to MIL 2 |
| 20      mean by that? | (Dkt 201). |
| 21  A   It's what Theresa -- Theresa Gooley sent. | |
| 22      Production shutdown on the Dig. The Dig, sorry. | |
| 23  Q   I'm specifically asking you what you mean | |
| 24      by the characterization "Big Dig claim"? | |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 25   A   Oh, I'm sorry. I misspoke. I meant the<br><br>Page 230<br>1        Dig claim.<br>2   Q   Okay.<br>3   A   Not the Big Dig claim.<br>4   Q   Okay. So with respect to Exhibit 11, you<br>5        recall receiving this email from Peter<br>          Williams?<br>6   A   Not specifically. | Defendant's Objections:<br>(230:1-6) Not relevant to reasonableness of claim decision or remaining issues FRE 401<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 232<br>20   Q   Okay. So are you certain that the<br>21        overall profitability of the NBC Universal<br>          account<br>22        was not considered in deciding whether or<br>          not to<br>23        deny the Dig claim?<br>24   A   150 percent certain.<br>25   Q   How are you certain? | Defendant's Objections:<br>(232:20-25) Not relevant to reasonableness of claim decision or remaining issues FRE 401<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 233<br>1   A   I'm responsible for the P&L.  My<br>2        reputation, what I do, yes, that would never,<br>          ever<br>3        happen.<br>4   Q   Well, I thought you had nothing to do<br>5        with the decision to deny the Dig claim?<br>6   A   I get paid for the P&L, not the claim<br>7        department. The claim department is<br>          responsible<br>8        for handling claims, that's what they do,<br>          right? I<br>9        don't exert influence or authority.    Or<br>          anyone in<br>10       the underwriting organization doesn't assert | Defendant's Objections:<br>(233:1-4, 26-24) Not relevant to reasonableness of claim decision or remaining issues FRE 401<br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
|       any<br>11    amount of authority over the claim<br>      department.<br>12  Q  As a matter of fact, you don't know what<br>13     was considered in deciding to deny the Dig<br>      claim;<br>14     isn't that right?<br><br>16  BY MR. HAYES:<br>17  Q  Is that right or wrong?<br><br>19  A  Is what right or wrong?<br>20  BY MR. HAYES:<br>21  Q  My statement that you do not know what<br>22     was considered in deciding whether to deny<br>      the Dig<br>23     claim?<br>24  A  You are absolutely --<br><br>Page 234<br>1  A  You're absolutely correct. Because I'm<br>2     not in the claim department and I don't control<br>3     what the claim department does.<br>4  BY MR. HAYES:<br>5  Q  Does the claim department have access to<br>6     data that would show the profitability of a<br>7     particular account?<br><br>10  A  I can't answer that.<br>11  BY MR. HAYES:<br>12  Q  Was Peter Williams involved in the<br>13     decision whether or not to deny the Dig<br>      claim?<br><br>16  A  We have been through this a number of<br>17     times, that the underwriting staff has absolutely<br>18     no control over whether a claim is paid or | Defendant's Objections:<br>(234:1-7, 10-13, 16-21, 23-25) Not relevant to reasonableness of claim decision or remaining issues FRE 401<br><br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| denied, <br> 19    none whatsoever. <br> 20  BY MR. HAYES: <br> 21  Q    Was he involved in the decision? <br><br> 23  A    Same comment. He's not involved in the <br> 24        claim process. It's impossible for him or me to <br> 25        influence the payment or not payment of a <br>          claim. <br><br> Page 235 <br> 1   BY MR. HAYES: <br> 2   Q    Did he in this case? <br><br> 4   BY MR. HAYES: <br> 5   Q    Do you know? <br> 6   A    I -- I have explained to you as much as I <br> 7        know as a senior leader and executive of this <br> 8        company. I have nothing else to give you around <br> 9        what you're asking. <br> 10  Q    Because you don't know, right? <br><br> 13  BY MR. HAYES: <br> 14  Q    Is that right? <br><br> 16  A    I'm not involved in the claim process, <br> 17        nor are they in the underwriting process. <br> 18  BY MR. HAYES: <br> 19  Q    So you don't know whether or not <br> 20        Mr. Williams exerted any influence in the decision <br> 21        whether or not to deny the Dig claim; is that <br> 22        correct? <br><br> 24  A    Again, underwriters and claim people | <br><br><br><br><br><br><br><br><br><br> Defendant's Objections: <br> (235:1-2, 4-10, 13-14, 16-22, 24-25) Not relevant to reasonableness of claim decision or remaining issues FRE 401 <br><br><br><br><br> Plaintiff's Response: <br> Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 25      don't mix.<br><br>Page 236<br>1    BY MR. HAYES:<br>2    Q    Are you aware that they mixed in this<br>3          case?<br><br>6    THE WITNESS: You know, now, I need a<br>7          break.<br>8    MR. KEELEY: All right.<br>9    BY MR. HAYES:<br>10   Q    No. Are you aware that they mixed in<br>11         this case? We're not off the record.<br>12   MR. KEELEY: We're going to take a break.<br>13         (Whereupon, the Witness and Mr. Keeley<br>14         and Mr. Paar leave the deposition<br>              proceeding, which<br>15         continued as follows:)<br>16   MR. HAYES: Did we go off the record?<br>17   VIDEO TECHNICIAN: No, we're on the<br>18         record.<br>19         Do you want to stay on?<br>20   MR. HAYES: No, we can go off now.<br>21   VIDEO TECHNICIAN: Off the record. The<br>22         time 4:50.<br>23   (Recess taken.)<br>24   VIDEO TECHNICIAN: Back on the record,<br>25         5:00.<br><br>Page 237<br>1    THE WITNESS: Before we get started,<br>2          could I say something, please, do you<br>              mind?<br>3    MR. HAYES: Sure.<br>4    THE WITNESS: I would like to apologize<br>5          to counsel and the folks in the room. I get<br>6          emotional a little bit about my company<br>              and my own<br>7          reputation. I have been doing this a long | Defendant's Objections:<br>(236:1-3, 6-25) Not relevant to reasonableness of claim decision or remaining issues FRE 401<br><br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201).<br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objections:<br>(237:1-25) Not relevant to reasonableness of claim decision or remaining issues FRE 401<br><br><br>Plaintiff's Response:<br>Relevant to bad faith and |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
|     time.<br>8    So to you I apologize.<br>9    I understand what you are trying to do.<br>10    I hope you appreciate where I'm coming from and,<br>11    you know, we can go from here, but I apologize.<br>12  MR. HAYES: Thank you.<br>13  THE WITNESS: You're welcome.<br>14  MR. HAYES: This is going to be<br>15    Exhibit 12.<br>16    (Deposition Exhibit 12 marked.)<br>17  BY MR. HAYES:<br>18    Q  Mr. Crosby, do you recognize the email<br>19    marked Exhibit 12?<br>20 A  Yes, I do.<br>21 Q  What is it?<br>22 A  It's a note from Peter back to me talking<br>23    about the three things that I wanted information<br>24    on. It looks like I've already got information<br>25    from Jennifer on a couple of things. And Peter | motive. See Oppo to MIL 2 (Dkt 201). |
| Page 238<br>1    just confirmed that.<br>2 Q  You say in your November 7 email dated --<br>3    or timestamped 8:42 a.m. --<br>4 A  Uh-huh.<br>5 Q  -- I am impressed I have already heard<br>6    from Jennifer.  Do you recall what you were<br>7    referring to there?<br>8 A  Jennifer was -- according to Peter,<br>9    Jennifer had already started working on 2 and 3. I<br>10    believe that was stated in another exhibit or in<br>11    this exhibit. I can't recall it specifically. | Defendant's Objections: (238:1-23) Not relevant to reasonableness of claim decision or remaining issues FRE 401<br><br>Plaintiff's Response: Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Dennis A. Crosby | Objection & Response |
|---|---|
| 12 Q   So your -- <br> 13 A   Oh, yeah, no problem, 2 and 3 I just <br> 14       completed my own review and in prep for potential <br> 15       renewal. <br> 16       So Jennifer sent me the information on <br> 17 Nos. 2 and 3, the actuarial analysis. That's what <br> 18       that's referring to. <br> 19 Q   So you were impressed that he addressed <br> 20       -- that she addressed what you had asked them to <br> 21       address promptly, is that the -- the gist of your <br> 22       email? <br> 23 A   Correct. | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| Plaintiffs' Designation of Theresa A. Gooley Wolf, February 8, 2017 | |

Page 6

21  Q.  Good morning, Ms. Gooley.  Could you please
22       state your full name and address for the
23       record.
24  A.  Sure.  It's Theresa Anne, A-N-N-E, Gooley,
25       G-O-O-L-E-Y, Wolf, W-O-L-F.  And you want my

Page 7

1        home address?
2   Q.  Actually, business address is fine.
3   A.  I don't -- I can't --
4   Q.  Okay.  Who do you work for?
5   A.  I work for Travelers, and it's in St. Paul,
6        Minnesota.

Page 16

18  Q.  Okay. I believe you indicated you joined
19       OneBeacon entertainment in November of 2010;
20       is that correct?

23        THE WITNESS: Yeah, I went -- yes,
24       I went to OneBeacon in November 2010.
25        MS. COYOCA: Okay.

Page 17

1   BY MS. COYOCA:
2   Q.  And what was your position when you were
3        first hired at OneBeacon?
4   A.  Again in claims. I was the vice-president of
5        claims, so initially I oversaw the -- the
6        financial institution group and what --
7        what -- what is called the government risk

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 8　　　　group and then the energy group. | |
| | |
| Page 18 | |
| 1　Q.　And when you say you oversaw the financial | |
| 2　　　　institution group or the energy group, | |
| 3　　　　et cetera, what do you mean by the words | |
| 4　　　　"oversaw"? | |
| 5　A.　Each of -- each of those divisions within | |
| 6　　　　OneBeacon had a claim manager and so I | |
| 7　　　　oversaw that claim manager. | |
| 18　Q.　Other than the three groups that you've | |
| 19　　　already mentioned, what other groups did you | |
| 20　　　oversee? | |
| 21　A.　I oversaw the technology group, and the | |
| 22　　　accident and health group, and the | |
| 23　　　entertainment group. I just want to make | |
| 24　　　sure I'm not missing one. And the | |
| 25　　　environmental group or excess and surplus. | |
| | |
| Page 20 | |
| 18　Q.　Okay. Focusing on the entertainment group -- | |
| 19　A.　Perfect. | |
| 20　Q.　-- what was the -- who did you oversee at the | |
| 21　　　entertainment group? | |
| 22　A.　Pamela Johnson. | |
| 23　Q.　Okay. What was Pamela Johnson? | |
| 24　A.　She was the -- the claim manager, I'm not | |
| 25　　　sure if that was the exact title, but the | |
| | |
| Page 21 | |
| 1　　　　claim manager of the entertainment group. | |
| | |
| Page 22 | |
| 5　Q.　And how long did you oversee the | |
| 6　　　entertainment group, from what period of time | |
| 7　　　until the end? | |
| 8　A.　I oversaw it through December of 2015. | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| When<br>9     I started -- let's see, Pamela came in 2012.<br>10    I think I started probably in 2013.<br><br>Page 25<br>10  Q.  You indicated that Pamela Johnson would<br>11      assign the claim. What did you mean by that?<br>12  A.  My recollection is if -- when the claim came<br>13      in, she'd look at the claim and she'd<br>14      determine which of the claim handlers should<br>15      handle the particular claim.<br><br><br><br>Page 29<br>5      So to your knowledge, how long has<br>6      Danny Gutterman worked for OneBeacon?<br>7  A.  I think he started sometime in 2013. I think<br>8      that's right. I think it would have been --<br>9      it was in the spring or early summer, I<br>10     believe, that he started.<br><br>19  Q.  And did Mr. Gutterman, to your knowledge,<br>20      have any insurance experience prior to going<br>21      to work for OneBeacon?<br>22  A.  I don't believe he did.<br>Page 31<br>10  Q.  This case concerns a claim regarding the<br>11      television show Dig. You're aware of that,<br>12      are you not?<br>13 A. Yes.<br><br>Page 38<br>5    Q.  Okay. Other than the Dig claim, can you<br>6      recall any other instance while you were<br>7      working for OneBeacon where you or anyone<br>8      working for you considered the potential<br>9      applicability of the war exclusion? | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 10 A. Not that I'm aware of.<br>11 Q. Prior to working for OneBeacon, did you have<br>12 any circumstances pursuant to which you were<br>13 reviewing the potential applicability of the<br>14 war exclusion to a claim?<br>15 A. No.<br><br>Page 61<br>23 Q. When a claim is being investigated and<br>24 coverage is being assessed, do you think it's<br>25 important to go back to the underwriter?<br><br>Page 62<br>1 A. No.<br>2 Q. Why not?<br>3 A. Because when you look at coverage, the<br>4 language of the policy is clear and<br>5 unambiguous. You apply the law -- you apply<br>6 the -- the policy as it is written and you<br>7 investigate and look at the facts.<br><br>Page 63<br>21 Q. And before we take a break, you left<br>22 OneBeacon in December 2015; is that correct?<br>23 A. That's correct.<br><br>Page 72<br>17 BY MS. COYOCA:<br>18 Q. Again, focusing just on entertainment<br>19 first-party claims, were there circumstances<br>20 pursuant to which outside counsel's coverage<br>21 opinion would be sought?<br>22 A. There may be occasions where we would ask for<br>23 a coverage opinion, yes. | Defendant's Objections:<br>(72:5-10, 13-25) Referenced attorney and legal opinion; not relevant; privilege; FRE 401, 403, 502<br><br>Plaintiffs' Response:<br>Relevant to bad faith; mere reference to attorney or legal |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| | opinion not privileged. Relevant to failure to investigate. CACI 2332. |

<u>Page 93</u>
10          MS. COYOCA: I actually want to
11      move on to a new exhibit number, and I
12      believe we're on Exhibit 31. So Exhibit 31
13      will be an e-mail chain, and it's labeled
14      Bates control ATL001571 through 1572.
15          (Whereupon, Exhibit 31 was
16          marked for identification.)
17          THE WITNESS: (Reviews document.)
18      I've finished looking at it.
19          MS. COYOCA: Okay.
20  BY MS. COYOCA:
21  Q.  Actually, before you -- I ask you about this
22      document, when is the first time you heard
23      about the Dig claim?
24  A.  I think that -- I'm trying to remember if
25      it -- I think it was the day after Aon

<u>Page 94</u>
1       provided OneBeacon with formal notice of
        the
2       claim.
3   Q.  And how did you hear about it?
4   A.  From Pamela.
5   Q.  Did she call you, send you an e-mail, ask for
6       a meeting?
7   A.  I think -- I think this might have been how
8       she let me know about it.
9   Q.  Okay. And by, "This," you mean Exhibit 31,
10      the e-mail exchange?
11  A.  Yes.
12  Q.  Okay. So do you recall any conversations or
13      communications with Ms. Johnson prior to
14      receipt of the e-mail exchange that's
15      contained in Exhibit 31?
16  A.  I don't recall any conversations before this

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 17      e-mail, no.<br><br>Page 99<br>20   Q.   Did you consider all claims adjusters or<br>21          handlers that were involved in claims<br>22          relating to the entertainment industry to be<br>23          of equal value -- or, excuse me, equal<br>24          quality?<br><br>Page 100<br>2             THE WITNESS: They all had their<br>3          strengths. Some had more experience than<br>4          others and so some necessarily needed more<br>5          mentoring.<br>6    BY MS. COYOCA:<br>7    Q.   At the time that -- that Danny Gutterman was<br>8          assigned to the Dig claim in 2014, how long<br>9          had Mr. Gutterman been at the company?<br>10   A.   I think he'd been there about a year, but,<br>11          again, I can't remember the exact dates.<br>12   Q.   Did you consider a one-year period of<br>13          experience to be an experienced claims<br>14          adjuster?<br>15   A.   It depends. I mean, it really depends. You<br>16          know, they may have a significant amount of<br>17          experience in a particular area, they may<br>18          have come with more experience, but, again,<br>19          it depends. In this particular case, though,<br>20          Pamela worked with Danny the entire time,<br>21          so...<br>22   Q.   Okay. But -- but separate and apart from<br>23          Ms. Johnson, I'm just asking with respect to<br>24          Mr. Gutterman, did you consider his one year<br>25          of experience as a claims adjuster to be<br><br>Page 101<br>1          having significant experience?<br><br>4             THE WITNESS: I think it's a good | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Counter:<br>102:10-16; 103:1-9<br><br>Plaintiffs' Response: |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 5      base. I mean, he can always learn more, like<br>6      everybody.<br>7   BY MS. COYOCA:<br>8   Q.   But one-year period of time adjusting claims,<br>9          you would consider to be a good base to<br>10         develop claims handling expertise?<br>11  A.   Correct. He might -- yeah.<br>12  Q.   Would you consider one year to be sufficient<br>13         to hold one's self out to be an experienced<br>14         claims adjuster?<br>15  A.   Could be.<br>16  Q.   Do you think that there is a qualitative<br>17         difference in terms of expertise if one has<br>18         been a claims handler for 20 years versus one<br>19         who has been doing it for one year?<br>20  A.   I think someone who has been doing it for<br>21         20 years is clearly seeing a lot of<br>22         variations of claims and, yeah, I mean, they<br>23         have more experience.<br>24  Q.   Who was responsible for assigning<br>25         Mr. Gutterman to the claim? Was it just<br><br>Page 102<br>1         Ms. Johnson?<br><br>4              THE WITNESS: It would have been<br>5         Mrs. -- it would have been Pamela, yes.<br><br>DEFENDANT'S COUNTER:<br>10  Q. What was Mr. Gutterman's role in the<br>11  adjusting of the Dig claim?<br>12  MS. SCOTT REED: Objection; form,<br>13  foundation, calls for speculation.<br>14  THE WITNESS: I think Danny had a<br>15  more limited role in that. I think Pamela is<br>16  the one that truly handled the claim.<br><br>Page 103<br>DEFENDANT'S COUNTER: | Not necessary for completeness. Counter is separate question and answer. 102:12-13 is attorney objection. |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 1 Q. At any point in time that you were involved<br>2 with the claim, did you gain an understanding<br>3 of what it exactly is that Mr. Gutterman was<br>4 doing?<br>5 A. I know that he was looking at different<br>6 outside, you know, articles, things like<br>7 that. But my primary correspondence --<br>8 communication -- my communication was with<br>9 Pamela.<br>END DEFENDANT'S COUNTER<br>Page 103 (cont.)<br>23   Q.   Directing your attention to the first e-mail<br>24         in the chain of Exhibit 31, which is the<br>25         July 16 e-mail from Pamela Johnson to<br><br>Page 104<br>1         Theresa Gooley, "Active War Exclusion, Are<br>2         you available for a short call," it indicates<br>3         that it was sent at 1:44 p.m. Do you see the<br>4         e-mail?<br>5   A.   I do.<br>6   Q.   Do you recall receiving the e-mail?<br>7   A.   I do now. I mean, I wouldn't have remembered<br>8         an e-mail that long ago, but...<br>9   Q.   Do you have any reason to believe that you<br>10        didn't receive it at or about the time it<br>11        indicates it was sent?<br>12  A.   No.<br>13  Q.   In the e-mail Ms. Johnson makes reference to<br>14        the fact that, "An imminent peril claim has<br>15        been made by NBC stemming from a production<br>16        that was shut down due to the rocket fire<br>17        into Tel Aviv and Jerusalem." Do you see<br>18        that?<br>19  A.   I do.<br><br>Page 105 | |

44

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 4   Q.   There's a reference in the e-mail in the<br>5         second to the last line to the, "Israeli<br>6         Hamas conflict." Do you see that?<br>7   A.   I do.<br>8   Q.   At or about this time frame in July 2014,<br>9         what was your understanding of what Hamas<br>          was<br>10        or is?<br>11  A.   It's an organization or a -- in the<br>12        Middle East in the Gaza Strip.<br>13  Q.   And, again, just focusing back on July 16,<br>14        did you know anything further about Hamas<br>15        other than it was an organization in the<br>16        Middle East in Gaza Strip?<br>17  A.   I mean, you know, just general things that<br>18        you hear in the news, et cetera.<br>19  Q.   Right. That's what I'm trying to get at.<br>20        What was your general understanding based<br>          on<br>21        news sources of what Hamas is?<br>22  A.   Well, just what I said, it's in the<br>23        Middle East, I mean...<br>24  Q.   Okay. Did you -- did you know what kind of<br>25        activities Hamas engaged in?<br><br>Page 106<br>3         THE WITNESS: They -- I mean,<br>4         yeah, generally, they engage in quite a few<br>5         different activities.<br>6   BY MS. COYOCA:<br>7   Q.   What activities were you aware of as of July<br>8         2014 that Hamas engaged in?<br>9   A.   Just, you know, the bombing and the conflict<br>10        back and forth within Israel.<br><br>Page 109<br>25  Q.   Got it. You responded the next day on<br><br>Page 110 | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 1　　　　July 17; is that correct?<br>2　　A.　Yes.<br>3　　Q.　Between your written response, the e-mail<br>4　　　　response on July 17, and the time Ms. Johnson<br>5　　　　sent the e-mail on July 16, did you have any<br>6　　　　communications with her about the Dig claim?<br>7　　A.　My guess is that we did.<br>8　　Q.　Your guess. Do you specifically recall<br>9　　　　having communications with her about it?<br>10　A.　I know that we talked about it.<br>11　Q.　So it's your belief that prior to the time<br>12　　　that you sent the July 17 e-mail, you had a<br>13　　　conversation with Ms. Johnson about the Dig<br>14　　　claim; is that correct?<br>15　A.　I -- I would -- yes, that would be my belief<br>16　　　based on -- based on the type of claim that<br>17　　　she's talking about, yes.<br>18　Q.　Okay. And do you recall specifically having<br>19　　　the conversation?<br>20　A.　I -- I can't recall specifically, no.<br><br>Page 120<br>20　Q.　Did Ms. Johnson ever tell you that she was<br>21　　　looking at how the U.S. government was<br>22　　　characterizing the conflict?<br><br>Page 121<br>1　　　　　THE WITNESS: I don't recall<br>2　　　　having a conversation about that, no.<br><br>4　　Q.　Did you ever ask Ms. Johnson, Let's look at<br>5　　　how the U.S. government is treating the<br>6　　　conflict?<br>7　　A.　No, I don't think I did.<br>8　　Q.　Did Ms. Johnson ever tell you that she had<br>9　　　looked at any U.S. government websites, such | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 10    as the Secretary of State or White House<br>11    press briefings or anything of that nature in<br>12    terms of how the U.S. government looked at<br>13    Hamas?<br>14  A.  I don't -- I don't -- I don't remember that.<br>15    I don't recall, no.<br>16  Q.  Did you ever direct Ms. Johnson to go and<br>17    investigate how the U.S. government viewed<br>18    Hamas?<br>19  A.  No.<br><br><br>Page 125<br>1  Q.  Ms. Gooley, before we took a break for lunch<br>2    we were talking about the conversation, the<br>3    very first conversation that you had with<br>4    Ms. Johnson concerning the claim. And I<br>5    believe you indicated that that conversation<br>6    occurred after you received the e-mail chain<br>7    that's set forth in Exhibit 31; is that<br>8    right?<br><br><br>Page 129<br>7  Q.  All right. I want to -- I want to talk about<br>8    section 3-1 on page 3083, "War, Including<br>9    Undeclared or Civil War." Do you see that<br>10    exclusion?<br>11  A.  Yes. Yes, I do.<br>12  Q.  Did you have conversations with Ms.<br>      Johnson<br>13    about the potential applicability of<br>14    exclusion 3 -- section 3.1?<br>15  A.  Yes.<br><br>Page 130 | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 13        With respect to exclusion 1, "War,<br>14        Including Undeclared or Civil War," you<br>15        reviewed that exclusion with Ms. Johnson; is<br>16        that correct?<br>17   A.   That's correct.<br>18   Q.   And did you -- you conclude personally that<br>19        exclusion 1 applied to the Dig claim?<br>20   A.   Yes, I believe it does.<br>21   Q.   And did you make the decision that the claim<br>22        should be denied on the basis of exclusion 1?<br>23   A.   We made the decision that the claim should be<br>24        denied based on the exclusions, that was one<br>25        of them.<br><br>Page 131<br>1    Q.   Okay. When you say, "We," who is we?<br>2    A.   Pamela and I.<br>3    Q.   Anyone else?<br>4    A.   Ultimately, Sean signed off on it as well.<br>5    Q.   And by Sean do you mean Sean Duffy?<br>6    A.   Yes. Excuse me. Yes.<br><br>17   Q.   Now, in terms of deciding whether or not<br>18        exclusion 1 -- I'm just going to call them 1,<br>19        2, 3, 4 as they're set forth on page 3083.<br>20        In terms of exclusion 1 and making the<br>21        decision that it applied, did you look at<br>22        whether or not Hamas was a sovereign<br>        entity?<br>23   A.   Pamela looked at -- at Hamas and what --<br>        how<br>24        Hamas was considered, in what -- in terms of,<br>25        you know, it being part of the government,<br><br>Page 132<br>1         governing the Gaza Strip, the activities it<br>2         was involved in, including, you know,<br>3         providing social services, having its own | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 4      military, political office, things of that<br>5      nature.<br>6  Q.  But my question to you is, specifically, did<br>7      you come to a conclusion that Hamas was a<br>8      sovereign entity?<br>9  A.  Hamas governs Gaza.<br>10  Q.  Okay. But I'm asking you for the -- the<br>11     label, if you -- if you put one on it, did<br>12     you conclude that Hamas was a sovereign<br>13     entity?<br>14  A.  We didn't put a sovereign label on it.<br>15  Q.  Did you conclude that it was a<br>16     quasi-sovereign entity?<br>17  A.  We concluded that it was an entity that<br>18     governed Gaza.<br>19  Q.  Was it your understanding that Hamas needed<br>20     to govern Gaza in order for the war exclusion<br>21     to apply?<br>22  A.  No.<br><br><br>Page 135<br>6    BY MS. COYOCA:<br>7  Q.  What I'm asking you is, in your view, in<br>8     order to find that this exclusion, the term<br>9     war has been met, is it necessary that those<br>10    hostilities that you referenced, do they have<br>11    to occur between a sovereign government and<br>12    another sovereign government or a sovereign<br>13    government and a quasi-sovereign<br>       government?<br>14  A.  No.<br><br><br>Page 142<br>3  Q.  In Ms. Johnson's investigation of the facts<br>4     and circumstances concerning the claim, did | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 5     she investigate whether or not Hamas was a<br>6     terrorist organization?<br><br>9         THE WITNESS: She -- she did look<br>10    at Hamas, yes.<br><br>12  Q.  But did she look to see whether or not Hamas<br>13     had been designated as a terrorist<br>14     organization by the U.S. government?<br>15  A.  I don't --<br><br>18         THE WITNESS: I don't believe she<br>19     looked at whether the U.S. government<br>20     designated Hamas as a terrorist organization.<br>21  BY MS. COYOCA:<br>22  Q.  Did you ask Ms. Johnson to consider whether<br>23     or not Hamas was a terrorist organization in<br>24     the context of reviewing the claim?<br>25  A.  No.<br><br>Page 143<br>1  Q.  To your knowledge, is there any terrorism<br>2     exclusion in this policy?<br>3  A.  I don't believe there is a terrorism<br>4     exclusion.<br>5  Q.  Did you ever ask Ms. Johnson to research and<br>6     look at the issue of whether the activities<br>7     could be characterized as being terrorist<br>8     activities as opposed to a war?<br>9  A.  No.<br>10  Q.  Did you direct anyone at OneBeacon that was<br>11    involved in the management of the claim or<br>12    the handling of the claim, to investigate<br>13    whether or not these acts in Israel<br>14    constituted terrorist acts as opposed to a<br>15    war?<br>16  A.  No.<br>17  Q.  Did you ask Ms. Johnson to look at the status | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 18      of Hamas as designated by Israel?<br>19   A.   No, I did not.<br><br><br><br><u>Page 151</u><br>16   Q.   You indicated you did not discuss<br>17          exclusion 3; is that correct?<br><br>20          THE WITNESS: I imagine that we<br>21          discussed it. I think we -- and I'm -- just<br>22          let me read through it, whether or not they<br>23          believed it was applicable. (Reviews<br>24          document.)<br>25          I'm sure we talked about it and we<br><br><u>Page 152</u><br>1          came -- and it wouldn't have appeared to be<br>2          applicable to the NBC claim.<br><br>24   Q.   Were you involved in any -- any telephone<br>25          conferences or any conversations with<br><br><u>Page 153</u><br>1          Peter Williams as to the Dig claim?<br>2    A.   I imagine I was.<br>3    Q.   Do you recall any specifics?<br>4    A.   No.<br>5    Q.   Why do you imagine that you would have had<br>6          conversations with Peter Williams about the<br>7          claim?<br>8    A.   Because it's a big claim and NBC is a big<br>9          account and he would want to know the status<br>10         of it, because I know that NBC would contact<br>11         Peter directly, along with Pamela, and so we | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 12      would want to keep him abreast of -- of<br>13      everything.<br><br>Page 158<br>12   Q.   Did you review the policy in order to<br>13         determine whether or not there was any<br>14         terrorism coverage under the policy?<br>15   A.   I reviewed the policy to try to understand<br>16         what coverage was provided.<br>17   Q.   I'm asking specifically did you review it for<br>18         purposes of trying to determine if there was<br>19         terrorism coverage under the policy?<br>20   A.   No.<br><br>Page 166<br>1    Q.   Now, you indicated that you reviewed the<br>2         coverage opinion letter before it went out;<br>3         is that right?<br>4    A.   I reviewed the letter drafted by Pamela?<br>5    Q.   Yes.<br>6    A.   Yes, I reviewed that before it went out.<br>7    Q.   Did you have any changes that you wanted made<br>8         to the letter?<br>9    A.   I think I had one minor change that was<br>10        non-substantive.<br><br>Page 168<br>16   Q.   Okay. Now, as of July 28, was the insured,<br>17        NBC Universal, had they already been told<br>18        that the claim was going to be denied on the<br>19        basis of the war exclusion?<br>20   A.   Yes, that's my understanding.<br><br>Page 169 | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 18 Q. And is it -- do you know how the <br> 19 communication was delivered? In other words, <br> 20 by e-mail, telephone call, in-person meeting, <br> 21 do you know? <br> 22 A. I -- my understanding was via telephone. <br> 23 Q. And do you know when that telephone <br> 24 conversation took place? <br> 25 A. I think it was the evening of the 17th. <br><br> Page 170 <br> 1 Q. So by the evening of the 17th, the decision <br> 2 already had been made that the claim should <br> 3 be denied? <br> 4 A. Based on the -- yeah, that we believed it was <br> 5 not covered. <br> 6 Q. And I believe you indicated previously that <br> 7 you first received notice about the claim the <br> 8 day after Aon had tendered the claim; is that <br> 9 right? <br> 10 A. I think Aon tendered it to OneBeacon on <br> 11 Tuesday, so the 15th, I believe, of July, and <br> 12 Pamela sent me an e-mail on the 16th. So, <br> 13 yeah, the day after. <br> 14 Q. Okay. So between July 15 and July 17, the <br> 15 investigation was done, the legal analysis <br> 16 was completed, a decision was made to deny <br> 17 the claim on the basis of the war exclusion; <br> 18 is that correct? <br><br> 22 THE WITNESS: By the 17th we <br> 23 believed we had enough information based on <br> 24 our investigation to make the decision to <br> 25 deny the claim. | |

53

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| Page 171 <br> 7  Q.  Did you ever ask Ms. Johnson if she had <br> 8      consulted with any experts on the <br> 9      Middle Eastern region with regard to the <br> 10     facts and circumstances about this claim? <br> 11 A.  I never asked her that, no. <br> 12 Q.  Do you know if she did consult with any <br> 13     Middle East experts before making the <br> 14     decision to recommend to deny the claim? <br> 15 A.  She did not consult with any -- anyone from <br> 16     the Middle East. |  |
| Page 172 <br> 8  Q.  Okay. But beginning with the time frame on <br> 9      the 17th when Aon and NBC Universal was told <br> 10     that the claim was going to be denied on that <br> 11     basis, at that point in time, no opinion had <br> 12     been received from outside coverage counsel; <br> 13     is that correct? <br> 14 A.  That's correct. | Defendant's Objections: <br> Object (172:8-19) <br> Reference to legal opinion; privilege, relevance, prejudicial; FRE 401, 402 , 503 <br><br> Plaintiffs' Response: <br> Relevant to bad faith; mere reference to legal opinion not privileged. Relevant to failure to investigate. CACI 2332. |
| Page 180 <br> 19 Q.  Can you recall any other instances in any <br> 20     entertainment claims that you reviewed while <br> 21     you were at OneBeacon where a coverage <br> 22     determination was made in two days? <br><br> 25         THE WITNESS: I'm not aware of any |  |
| Page 181 <br> 1      claim. <br> 2  BY MS. COYOCA: <br> 3  Q.  Would you consider two days to be a <br> 4      relatively expedited time frame? <br> 5  A.  I would think that's, yes, fairly expedited. | Defendant's Objections: <br> Object (181:24-25) <br> Reference to legal opinion; privilege, relevance, prejudicial; FRE 401, 402 , 503 |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 6  Q.  Okay. Turning to Exhibit 33 and the<br>7       attachment to Exhibit 33, is this the draft<br>8       of Ms. Johnson's letter with respect to the<br>9       Dig claim that you reviewed before it was<br>10     sent out?<br>11  A.  May I have a moment to look at it, please?<br>12  Q.  Sure. Absolutely.<br>13  A.  (Reviews document.) This is the letter<br>14     Pamela sent to me.<br>15  Q.  The draft letter?<br>16  A.  Yes.<br><br>Page 188<br>14  Q.  I'd like to show you the final version of the<br>15     letter. It's already been marked as<br>16     Exhibit 18. Let me know when you're ready<br>17     for questions.<br>18  A.  Okay. (Reviews document.) I'm ready.<br>19  Q.  Okay. Turning to page 5 of the letter<br>20     labeled Bates control 98, there is a heading<br>21     entitled -- under, "Analysis," entitled,<br>22     "Terrorism coverage." Do you see that?<br>23  A.  I do.<br>24  Q.  Do you agree with the statements that<br>25     Ms. Johnson is making in this paragraph?<br><br>Page 189<br>1  A.  I'm -- I don't think those -- those<br>2    statements are correct in terms of the<br>3    terrorism coverage.<br>4  Q.  And why not?<br>5  A.  Because I think -- I have to look at the<br>6    earlier OneBeacon reference, the terrorism<br>7    endorsement.<br>8  Q.  And are you specifically referring to the,<br>9    "Coverage for certified acts of terrorism,<br>10   caps on losses"?<br>11  A.  I'd have to see it. Yes.<br>12  Q.  That would be page ATL 3120. | Plaintiffs' Response:<br>Relevant to bad faith; mere reference to legal opinion not privileged. Relevant to failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 13  A.  Yes.<br>14  Q.  Okay. So you said that you don't believe<br>15      that the statements are correct in terms of<br>16      the terrorism coverage. What do you think is<br>17      incorrect about the statements?<br>18  A.  Well, the -- when you look at the endorse --<br>19      or the endorsement, I'm looking at, it says,<br>20      "Any exclusion of terrorism in this coverage<br>21      part or policy or attached to such covered<br>22      part or policy by endorsement is hereby<br>23      amended." The policy doesn't have a<br>24      terrorism exclusion, so there's nothing to<br>25      amend --<br><br><br>Page 190<br>1  Q.  Okay.<br>2  A.  -- so it's really not applicable.<br>3  Q.  So it's not applicable at all?<br>4  A.  This endorsement isn't, no.<br><br>Page 192<br>7  Q.  I believe you previously testified, though,<br>8      that there's no terrorism exclusion in the<br>9      policy?<br>10  A.  I didn't see one, no.<br>11  Q.  Okay. Assuming no other exclusion is<br>12      applicable, that there is just an act of<br>13      terrorism which causes a loss under the<br>14      imminent peril extra expense coverage part,<br>15      would that claim be covered?<br><br>19      THE WITNESS: So independent of<br>20  any exclusions or conditions or provisions,<br>21  would a single act of terrorism be<br>22  potentially covered under the imminent peril?<br>23      MS. COYOCA: Yes.<br>24      THE WITNESS: Yes -- |  |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|

Page 193

1          THE WITNESS: -- potentially.

3    BY MS. COYOCA:
4    Q.   Is there any requirement under the policy
5         that that claim be a certified act of
6         terrorism as is defined under the
7         endorsement, Coverage for Certified Acts of
8         Terrorism, Cap on Losses?
9    A.   I don't think so.
10   Q.   Is there any requirement under the terms of
11        the policy that the act of terrorism be
12        certified by the U.S. Secretary or the -- by
13        the U.S. Secretary of the Treasury in order
14        for it to be a covered claim?
15   A.   There's -- there's nothing under the -- under
16        the body of the policy that says an act of
17        terrorism has to be certified by the
18        U.S. government.
19   Q.   Is the statement that Ms. Johnson made in the
20        letter that begins, begin quotes, "Moreover,
21        the U.S. Secretary of the Treasury has not
22        certified the events as acts of terrorism,"
23        period, "Thus, we do not believe that
24        terrorism coverage would apply," period
          close
25        quote; is that a correct statement?

Page 194

3          THE WITNESS: The -- the first
4          statement, "Moreover, the U.S. Secretary of
5          the Treasury has not certified the events as
6          acts of terrorism," is a correct statement.
7          The second statement, "Thus, we do not
8          believe the terrorism coverage would apply,"
9          we -- we don't -- we believe that -- we do
10         not believe -- well, there is -- is that
11         correct that we don't believe the terrorism
12         coverage would apply? We believe that the
13         events of this claim are excluded by the war

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 14     or warlike exclusion.<br>15  BY MS. COYOCA:<br>16  Q.  But I'm asking you to please confine your<br>17     analysis just to the provision that I'm<br>18     talking about, which is the terrorism<br>19     coverage paragraph, and specifically, the<br>20     conclusion that the terrorism coverage does<br>21     not apply because of provisions of the<br>22     endorsement coverage for certified acts of<br>23     terrorism, cap on losses. Do you believe<br>24     that that's a correct statement to be making<br>25     to the insured?<br><br>Page 195<br>3          THE WITNESS: I think that there<br>4     is no terrorism -- I think that to the extent<br>5     that there's no terrorism coverage for the<br>6     facts of this claim, so with that --<br>7     consistent with that, that's -- that's true.<br>8  BY MS. COYOCA:<br>9  Q.  Well, but I'm asking specifically about the<br>10     invocation of the requirements that the act<br>11     has to be part of an effort to coerce or<br>12     influence the U.S. government and that the<br>13     U.S. Secretary of Treasury has to certify the<br>14     act as terrorism, are either of those<br>15     requirements, in order for there to be<br>16     coverage under this policy for an act of<br>17     terrorism, that's separate and apart from<br>18     what's being addressed in the endorsement?<br><br>21          THE WITNESS: I don't think so.<br>22  BY MS. COYOCA:<br>23  Q.  When you were reviewing the letter, did you<br>24     tell Ms. Johnson that you thought that her<br>25     discussion of terrorism coverage was not<br><br>Page 196<br>1     correct? | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 2   A.   No. | |
| 3   Q.   Why not? | |
| 4   A.   Because my focus, when I reviewed the letter, | |
| 5        was on the war or warlike exclusions. | |
| 6   Q.   Did you read the entire letter before it went | |
| 7        out? | |
| 8   A.   I did. | |
| 9   Q.   Did you read the portion on terrorism | |
| 10       coverage? | |
| 11  A.   I'm sure I did. | |
| 12  Q.   Did you think to yourself at the time that | |
| 13       you reviewed it, That's not correct? | |
| 14  A.   No. | |
| 15  Q.   If you had focused on it, would you have | |
| 16       asked her to rewrite this paragraph? | |
| | |
| 19       THE WITNESS: If I thought it was | |
| 20       incorrect, I would have asked her to redraft | |
| 21       it, yes. | |
| 22  BY MS. COYOCA: | |
| 23  Q.   Looking to the prior page of the letter, | |
| 24       page 4, and it's labeled ATL 97, there is a | |
| 25       sentence that reads, near the end of the | |
| | |
| Page 197 | |
| 1        page, "The policy contains coverage for | |
| 2        certified acts of terrorism." Do you see | |
| 3        that? | |
| 4   A.   I see that. | |
| 5   Q.   Do you believe that the only coverage under | |
| 6        the policy is for certified acts of terrorism | |
| 7        as that term is defined in the endorsement? | |
| 8   A.   I'd have to run through the policy again. | |
| 9        (Reviews document.) | |
| | |
| 12       THE WITNESS: So on this, though, | |
| 13       I mean what -- what's being cited is -- is | |
| 14       the endorsement and we talked about the fact | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 15       that it -- or the endorsement is not<br>16       applicable, so -- so I apologize, can you ask<br>17       me your question again?<br>18           MS. COYOCA: Right.<br>19  BY MS. COYOCA:<br>20  Q.  What I'm asking is: Do you believe that the<br>21       only coverage under the policy as to<br>22       terrorism is for certified acts of terrorism<br>23       as it's defined in that endorsement?<br><br>Page 198<br>1         THE WITNESS: Again, this is an<br>2       endorsement that modifies -- that provides<br>3       certain coverage in the event of an<br>4       exclusion, there's not -- that exclusion<br>5       doesn't exist, so I'm not sure that the<br>6       endorsement -- the endorsement is not<br>7       applicable.<br>8  BY MS. COYOCA:<br>9  Q.  So it shouldn't have been referenced in the<br>10      letter at all?<br>11  A.  Correct.<br>12  Q.  Turning to page 6 of the letter, there's a<br>13      paragraph that begins, "Appleman on<br>14      insurance"; do you see that paragraph?<br>15  A.  I do.<br>16  Q.  Can you please read that paragraph out loud?<br>17  A.  Yes. "Appleman on insurance discusses<br>18      exclusions for war, including the meaning of<br>19      war and similar terms. War is," paren, "a<br>20      course of hostility," paren, "between,"<br>21      paren, "states or state-like entities,"<br>22      period, close paren. "To constitute a<br>23      de facto state, a group must have," paren,<br>24      "significant attributes of sovereignty,"<br>25      close paren, "and the application of this<br><br>Page 199<br>1       exclusion is fact specific," double paren. | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|

16      The question I'm asking is: Do you agree
17      with the sentence, "War is a course of
18      hostilities between states or state-like
19      entities"?

22          THE WITNESS: No, I don't.
23  BY MS. COYOCA:
24  Q.  Do you think that statement is incorrect?
25  A.  I think that's -- I think the statement is

Page 200
1       too limited.
2   Q.  Did you point that out to Ms. Johnson when
3       you were reviewing the letter?
4   A.  I don't recall that I did.
5   Q.  Could you please read the sentence that
6       begins, "Black's Law Dictionary"?
7   A.  "Black's Law Dictionary defines a," paren,
8       "war," close paren, "as," paren, "hostile
9       conflict by means of armed forces," comma,
10      "carried on between nations," comma, "states
11      or rulers," comma, "or sometimes between
12      parties within the same nation or state,"
13      period, close paren.
14  Q.  Do you believe that statement is correct?

17          THE WITNESS: Yeah, I mean, that's
18      correct that's -- that's how Black's Law
19      Dictionary defines war.
20  BY MS. COYOCA:
21  Q.  Do you believe that's the correct definition
22      of war?

25          THE WITNESS: I believe that's one

Page 201
1       of the definitions of war, yes.
2   BY MS. COYOCA:

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 3   Q.   Do you believe there are others? | |
| 4   A.   Yes. | |
| 5   Q.   Are they recited or cited in this letter? | |
| 6   A.   There's a -- she said, "A leading dictionary | |
| 7            of international law defines an act of war as | |
| 8            the use of force or other action by one state | |
| 9            against another which they acted against | |
| 10          recognizes as an act of war either by the use | |
| 11          of retaliatory force or declaration of war. | |
| 12          Another dictionary defines an act of war as a | |
| 13          measure of force which one party, using | |
| 14          military instruments as power, implements | |
| 15          against another party in an international | |
| 16          armed conflict." | |
| 17                So there's -- she cites -- recites | |
| 18          Appleman, Black's Law Dictionary, a | |
| 19          dictionary of international and comparative | |
| 20          law, and The Handbook of Humanitarian | |
|              Law and | |
| 21          Armed Conflicts. | |
| 22   Q.   Okay. Do you believe that the definitions | |
| 23          which she's cited in their totality, all of | |
| 24          them that are contained in the letter, do you | |
| 25          believe that they're the correct definitions | |
| | |
| Page 202 | |
| 1            of the term war? | |
| | |
| 4                THE WITNESS: I believe all these | |
| 5            encompass what war could be. | |
| 6   BY MS. COYOCA: | |
| 7   Q.   Are there other definitions of war that you | |
| 8            think should have been cited here that are | |
| 9            not cited here? | |
| 10   A.   Not that I can recall right now. | |
| 11   Q.   Did you ask Ms. Johnson to delete any | |
| 12          references to war being hostility between | |
| 13          states or state-like entities? | |
| 14   A.   No, I did not. | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 15   Q.   At the time you were reviewing those words,<br>16        did you think that they were correct?<br>17   A.   I think -- I thought that's one -- that is<br>18        one possible definition of war, yes.<br><br>Page 209<br>4     Q.   The statement that, "Although Gaza or<br>5          Palestine is not a recognized nation at least<br>6          by most of the world, it does have some<br>7          indicia of sovereignty"; do you see that<br>8          statement?<br>9     A.   I do.<br><br>Page 210<br>11   Q.   At the point in time that you reviewed the<br>12        coverage denial letter, did you know what<br>13        indicia were necessary in order to meet the<br>14        standard of semi-sovereignty?<br><br>18             THE WITNESS: Based on what we<br>19        cited, we believe that that is what -- that<br>20        indicated it was indicia of sovereignty.<br><br>Page 212<br>22   Q.   What sources did you look at in order to<br>23        determine whether or not the factors that<br>24        were recited were sufficient to meet the<br>25        standard for semi-state-like sovereignty?<br><br>Page 213<br>4             THE WITNESS: Again, Pamela and I<br>5          had discussions about her research, about<br>6          what she looked at, and then ultimately we<br>7          reached conclusions.<br>8     BY MS. COYOCA:<br>9     Q.   Did you read any case authority?<br>10   A.   Not that I recall. | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 11  Q. Did you read the Zanotti article? | |
| 12  A. No. | |

Page 214

15  Q.    The two grounds that I see that are invoked
16         in the July 28 letter is subparagraph 1 of
17         the war exclusions and subparagraph 2. I do
18         not see the third or fourth subparagraphs
19         invoked. Do you -- do you agree?

22              THE WITNESS: We -- yeah, we -- we
23         reference the -- the first prong of the war
24         exclusion and then we reference paragraph 1
25         and paragraph 2, warlike action by a military

Page 215

1          force.
2     BY MS. COYOCA:
3     Q.    Was the third prong of the exclusion,
4          "Insurrection, revolution, rebellion,"
5          et cetera, was that referenced in the letter?
6              MS. SCOTT REED: Objection to
7          form, vague and ambiguous.
8              THE WITNESS: The third prong
9          isn't referenced.
10    BY MS. COYOCA:

Page 216

16  Q.    With respect to the fourth prong, begin
17         quotes, "Any weapon of war, including atomic
18         fission or radioactive force, whether in time
19         of peace or war," close quotes, under the
20         Analysis section of Ms. Johnson's July 28
21         letter does she invoke the fourth prong as a
22         grounds on which OneBeacon is denying the Dig
23         claim?

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| Page 217 | |
| 1        THE WITNESS: It's cited -- I | |
| 2        mean, she cites it in the policy piece. But | |
| 3        in terms of the analysis, she -- analysis she | |
| 4        focuses just on the first paragraph and the | |
| 5        second paragraph of the war, what I refer to | |
| 6        as the war exclusions. | |
| 7    BY MS. COYOCA: | |
| 8    Q.   Did you speak to Ms. Johnson as to why she | |
| 9        did not address the third prong of the war | |
| 10       exclusions in the Analysis section of the | |
| 11       denial letter? | |
| 12   A.   I don't recall that conversation, no. | |
| 13   Q.   Did you ever tell Ms. Johnson that the third | |
| 14       prong should also be invoked as a grounds for | |
| 15       exclusion of the Dig claim? | |
| 16   A.   The third prong? | |
| 17   Q.   Yes. | |
| 18   A.   Or the third paragraph? | |
| 19   Q.   The third paragraph of the war exclusions, | |
| 20       subparagraph 3. | |
| 21   A.   No. | |
| 22   Q.   Was OneBeacon denying the claim on the basis | |
| 23       of the third paragraph, subparagraph 3 of the | |
| 24       war exclusions? | |
| 25   A.   The paragraph that begins, "Insurrection, | |
| | |
| Page 218 | |
| 1        rebellion, revolution"? | |
| 2    Q.   Yes. | |
| 3    A.   No. | |
| 4    Q.   Did you ever tell Ms. Johnson that she should | |
| 5        address the fourth prong of the war exclusion | |
| 6        with respect to any weapon of war in the | |
| 7        Analysis section of the coverage denial | |
| 8        letter? | |
| 9    A.   We discussed the fourth prong, but I don't | |
| 10       recall telling her to expressly include | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 11     the -- it in the analysis of the coverage<br>12     position.<br>13  Q.  In the coverage denial letter, is OneBeacon<br>14     relying on the fourth prong, the fourth --<br>15     the subparagraph 4 of the war exclusions in<br>16     denying the Dig claim?<br>17  A.  Yes, OneBeacon would be. The fourth prong<br>18     says, "Any weapon of war," so any weapon of<br>19     war necessarily would be included in any<br>20     warlike action by a military force, war<br>21     including undeclared war, any weapon of war<br>       I<br>22     think would -- would fall within that, and in<br>23     here it would -- warlike action, again,<br>24     you're using a weapon of war, so it would be<br>25     included within 1 and 2.<br><br>Page 219<br>1  Q.  Why wasn't it specifically addressed in the<br>2     Analysis section of the policy?<br>3  A.  I think part of it is because it's --<br>4     implicitly would be included, but we<br>5     highlighted two of the provisions.<br>6  Q.  Is it your practice in reviewing coverage<br>7     denial letters to not recite all of the<br>8     provisions on which the insurer is denying<br>9     coverage?<br><br>13      THE WITNESS: It is not our<br>14     practice to not -- to not cite all<br>15     exclusions, at the same time, we reference<br>16     the exclusions. When we cite we highlight<br>17     exclusions. We may not hit every possible<br>18     variation of an exclusion. But in this case,<br>19     like I mentioned, paragraph 4, "Any weapon of<br>20     war," if it's a war or warlike action, it<br>21     would include a weapon of war. | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 22 BY MS. COYOCA: <br> 23 Q. Did you ever have any discussions with <br> 24     Ms. Johnson about the fact that the third and <br> 25     fourth prongs of the war exclusions were not <br><br> Page 220 <br> 1     addressed in the coverage denial letter? <br><br> 6 Q. Do -- did you ever have any discussions with <br> 7     Ms. Johnson about the fact that the third and <br> 8     the fourth prongs of the war exclusions were <br> 9     not addressed in the coverage denial letter? <br><br> 14       THE WITNESS: So, again, the -- <br> 15     the third paragraph I don't think is <br> 16     applicable, and so necessarily we wouldn't <br> 17     have included it in the letter. <br> 18     The fourth paragraph is applicable, <br> 19     but based on the analysis of the application <br> 20     of war, including undeclared or civil war and <br> 21     warlike actions by a military force, that <br> 22     would include the use of any weapon of war. <br> 23 BY MS. COYOCA: <br> 24 Q. Did you ever ask Ms. Johnson about the fact <br> 25     that the fourth prong of the war exclusion <br><br> Page 221 <br> 1     was not explicitly addressed in the Analysis <br> 2     section of the July 28th coverage denial <br> 3     letter? <br><br> 7       THE WITNESS: I -- I didn't ask -- <br> 8     I never asked her about whether or not the <br> 9     fourth was addressed, because we cited it, <br> 10     and again it was -- would be part of the <br> 11     analysis, it would be necessarily included by <br> 12     paragraph 1 and 2. <br><br> 14 BY MS. COYOCA: | Defendant's Objections: <br> Object (221:14-25) <br> Attorney allegations and arguments, relevance hearsay, foundation FRE 401, 403, 801, 802 <br><br> Plaintiffs' Response: <br> Relevant to bad faith; proper cross-examination; offered for non-hearsay purpose; foundation present; statement of party opponent. |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 15 Q. I want to show you a document that's already<br>16     previously been marked as Exhibit 19 to the<br>17     Gutterman deposition. Please let me know<br>18     when you're ready for questions.<br>19 A. Okay. Thank you. I'll read through it.<br>20 Q. Thanks.<br>21 A. (Reviews document.)<br>22 Q. Are you ready for questions?<br>23 A. Yes.<br>24 Q. Have you seen this letter before?<br>25 A. Yes. | Relevant to failure to investigate. CACI 2332. |
| Page 222<br>1 Q. When did you see it?<br>2 A. I would have seen it after Pamela received<br>3     it.<br>4 Q. Did you ever discuss it with Pamela?<br>5 A. I'm sure that we did discuss it, yes.<br>6 Q. Do you recall any of your discussions about<br>7     the letter?<br>8 A. I don't specifically recall the discussions.<br>9 Q. Do you have any general recollections of<br>    your<br>10     discussions?<br>11 A. My general recollection would be we would<br>12     have -- we would have gone through the<br>13     arguments and that Pamela would have<br>    pulled<br>14     the cases and read the case law and looked at<br>15     the arguments raised in the letter.<br>16 Q. With respect to the second paragraph of the<br>17     letter, talking about OneBeacon's willingness<br>18     to cover expenses associated with the initial<br>19     one-week postponement; do you see that?<br>20 A. I do.<br>21 Q. Were you aware that OneBeacon had agreed<br>    to<br>22     cover the first one week push cost -- or<br>23     postponement costs? | Defendant's Objections:<br>Object (222:1-23)<br>Attorney allegations and arguments, relevance hearsay, foundation FRE 401, 403, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; proper cross-examination; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|

Page 223

2        THE WITNESS: I -- I knew that
3     OneBeacon had agreed to offer 3 to 350 for
4     the first -- first week.
5  BY MS. COYOCA:
6  Q.  How did you become aware of that?
7  A.  Pamela would have told me.
8  Q.  What did she tell you about that?
9  A.  I just recall when it initially came in, it
10    came in as a postponement claim and that --
11    that initially, you know, to the extent that
12    NBC only postponed it for a week estimate and
13    then began -- or resumed filming, estimated
14    losses associated with that were between 3
15    and 350.
16  Q.  And what did she tell you with regard to
17    OneBeacon's willingness to cover 300 to
18    350,000 of those costs?

22        THE WITNESS: Again, I -- I think
23    that it was initially based on the
24    understanding that it was a postponement
25    claim, that it would only be a one-week

Page 224

1    postponement of shooting, and then thereafter
2    when it became clear, I think OneBeacon
3    simply wanted to make a concession to NBC and
4    continue to offer the 3 to 350 for the claim.
5  BY MS. COYOCA:
6  Q.  Specifically, did Ms. Johnson tell you how
7    OneBeacon's willingness to pay 3 to 350 for
8    the initial one-week postponement, how that
9    was ever conveyed to the client?

13        THE WITNESS: I -- I don't

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 14    remember or recall how that was conveyed to<br>15    NBC.<br>16   BY MS. COYOCA:<br>17   Q.   Did you ever -- were you ever told that<br>18    Mr. Williams had made the statement that<br>19    OneBeacon would cover 300 to 350 of the<br>20    initial postponement costs?<br><br>24      THE WITNESS: I -- I wasn't aware<br>25    if Peter made any statement like that.<br><br>Page 225<br>1   BY MS. COYOCA:<br>2   Q.   Was it your understanding that Ms. Johnson<br>3    had indicated to NBC Universal and Aon that<br>4    OneBeacon would cover 300 to 350,000 of the<br>5    initial one-week postponement costs?<br><br>9      THE WITNESS: I understand that<br>10    Pamela offered to -- to cover 300 to 350 for<br>11    the initial week postponement.<br>12   BY MS. COYOCA:<br>13   Q.   When was that offer conveyed?<br>14   A.   I don't remember.<br>15   Q.   Why was --<br><br>19      THE WITNESS: Yes. Sorry. I -- I<br>20    said I don't remember. I just -- I don't --<br>21    I'm just referring to the letter that -- that<br>22    Pamela sent out dated July 28th and the<br>23    conclusion. She states, "Although we cannot<br>24    cover the extra expense associated with the<br>25    production move to another country to<br><br>Page 226<br>1    complete the production, based on our long<br>2    relationship with NBC, we're willing to cover<br>3    the expenses associated with the initial | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 4     postponement as a courtesy," and then she<br>5     references a budget and the costs associated<br>6     with the initial postponement.<br>7   BY MS. COYOCA:<br>8   Q.   Is it your understanding that this was the<br>9         first time that there was ever any indication<br>10        by OneBeacon that it would cover the initial<br>11        one-week postponement costs?<br>12  A.   I think that it -- there was an indication<br>13        before that, but I don't have a -- a specific<br>14        recollection as to when.<br>15  Q.   And do you know who provided that indication<br>16        to Aon or NBC Universal?<br>17  A.   I don't.<br>18  Q.   On what basis did OneBeacon decide that it<br>19        was willing to pay the one-week initial<br>20        postponement costs?<br><br>25            THE WITNESS: Again, I'm just<br><br>Page 227<br>1            going to -- I -- I don't know the earlier<br>2            conversations, but as detailed in the<br>3            July 28th letter, Pamela indicates that based<br>4            on our long relationship, we're willing to<br>5            cover the expenses associated -- associated,<br>6            excuse me, with the initial postponement as a<br>7            courtesy. So at least as of July 28th, that<br>8            was the basis, as a courtesy given the<br>9            existing relationship with NBC.<br>10  BY MS. COYOCA:<br>11  Q.   Are you aware of any other grounds as to why<br>12        OneBeacon was willing to pay the initial --<br>13        or to cover, to cover the expenses associated<br>14        with the initial postponement?<br><br>18            THE WITNESS: Again, I think | |

71

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 19    when -- when the claim initially claim to<br>20    Peter it -- he thought it would be simply a<br>21    postponement for a week and then reconvene or<br>22    resume the filming. And based on that, it's<br>23    my understanding we thought potentially 3 to<br>24    350 would be the expenses incurred by NBC to<br>25    postpone the production.<br><br>Page 228<br>1     BY MS. COYOCA:<br>2  Q.  Was it OneBeacon's position that the initial<br>3     postponement costs of 300 to 350, whatever<br>4     the original estimate was, that those were a<br>5     covered expense under extra -- under the<br>6     extra expense coverage of the policy?<br>7  A.  I think initially when the claim first came<br>8     in, it appeared that it might be based on the<br>9     postponement. But then, clearly, by<br>10    July 28th when the letter was issued,<br>11    OneBeacon took the position that those<br>12    weren't covered, but again, as a courtesy<br>13    would -- would provide NBC with reimbursement<br>14    for those expenses it incurred during that<br>15    first week.<br>16  Q.  What do you base your understanding that<br>17     initially when the claim first came in it<br>18     appeared that it might be based on the<br>19     postponement? What do you -- what do you<br>20     base your understanding of that statement?<br>21  A.  My understanding is that when it initially<br>22     came in, that's how -- that's how it was<br>23     described by NBC.<br>24  Q.  I'm actually directing your attention to the<br>25     statement that -- that it appeared the claim<br><br>Page 229 | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|

1  might be covered based on the postponement.

10 Q. You indicated previously that I asked you was

11  it OneBeacon's position that the initial
12  postponement costs of 300 to 350, whatever
13  the original estimate was that those were a
14  covered expense under extra -- under the
15  extra expense coverage of the policy. And
16  you indicated, "I think initially when the
17  first came" -- "when the claim first came in,
18  it appeared that it might be based on the
19  postponement, but then clearly by July 28th
20  when the letter was issued, OneBeacon took
21  the position that those weren't covered, but
22  again as a courtesy would -- would provide
23  NBC with reimbursement for those expenses it

24  incurred during that first week."
25    And my question to you is: As that

Page 230

1  first portion of your response when you say,
2  "I think initially when the claim first claim
3  in, it appeared that it might be based on the
4  postponement," what did you base that
5  statement on?
6 A. I -- I'm looking back at the letter, but I
7  also -- my recollection was that, again, it
8  was a moving -- kind of a moving target, and
9  NBC postponed it and wanted to see how -- how

10  the -- how it went forward between Israel and
11  Hamas before making -- you know, and then
12  ultimately decided that for the safety of NBC
13  they needed to pull out of -- pull out of
14  Israel.
15 Q. If the -- if only postponement had occurred
16  and no relocation was necessary, would that

73

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 17    be a covered claim?<br><br>23        THE WITNESS: Are you asking me if<br>24    they just postponed it for a week and<br>25    continued filming after a week would that<br><br>Page 231<br>1    potentially be covered?<br>2  BY MS. COYOCA:<br>3  Q.  Yes, I'm asking you would it be covered?<br><br>5        THE WITNESS: If they postponed it<br>6    for a week and continued to film -- no, the<br>7    war exclusion would apply.<br>8  BY MS. COYOCA:<br>9  Q.  Why --<br>10       THE WITNESS: Exclusions, excuse<br>11    me, plural.<br>12  BY MS. COYOCA:<br>13  Q.  Why would the -- why then did you believe<br>14    that the postponement costs initially<br>15    appeared that it would be covered?<br><br>18       THE WITNESS: Initially, when it<br>19    came in and as the facts were developing, it<br>20    was early on. And at that point the facts<br>21    escalated to what was war. And so the facts<br>22    developed over that period of time beginning<br>23    in June running through into August. But<br>24    initially when it came in, it wasn't clear if<br>25    the -- there would be a cease fire, if there<br><br>Page 232<br>1    would be just that initial hostility, so that<br>2    was based on our initial impression.<br>3  BY MS. COYOCA:<br>4  Q.  The -- the initial impression that at some<br>5    point prior to whatever escalation you're<br>6    referring to, that it -- it wasn't clear |  |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 7　　whether it was a war, when do you date that<br>8　　period of time to?<br><br>13　　　　THE WITNESS: What I'm saying is<br>14　　that based on all the facts, at that point we<br>15　　didn't -- things were continuing to develop<br>16　　in Israel. It was escalating and when --<br>17　　then when we looked at the totality of the<br>18　　facts over the period of time, we reached the<br>19　　conclusion that the war-related exclusions<br>20　　would apply.<br>21　BY MS. COYOCA:<br>22　Q.　When you said, "What I'm saying is that based<br>23　　on all the facts, at that point we didn't --<br>24　　things were continuing to develop in Israel,"<br>25　　what point in time were you referring to when<br><br>Page 233<br>1　　you say, "At that point," in that response?<br>2　A.　When they initially were speaking with Peter.<br>3　　It would have been in, like, around<br>4　　July 11th. NBC itself characterized it as a<br>5　　postponement claim as well.<br>6　Q.　At that point in time when the initial<br>7　　discussions were had with Peter -- by the<br>8　　way, at the time the discussions were had<br>9　　around July 11, did -- were you aware that<br>10　　those conversations were going on?<br>11　A.　No.<br>12　Q.　When did you become aware of them?<br>13　A.　I -- when Pamela reached out to me.<br>14　Q.　Okay. So during that initial period, did<br>15　　OneBeacon believe that the events that were<br>16　　happening in Israel at that point in time,<br>17　　that they constituted a war?<br><br>22　　　　THE WITNESS: Again, at -- at that | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 23   point we were, you know, still monitoring<br>24   what was going on and what was going on<br>25   between Israel and Hamas and so -- and<br><br>Page 234<br>1   whether there would be a cease fire, which<br>2   was shortly thereafter, I think it was<br>3   short -- there appeared there might be. We<br>4   wanted to see how the -- how it -- how it<br>5   played out as it were in terms of what was<br>6   going on between Israel and Hamas.<br>7  BY MS. COYOCA:<br>8  Q.  I understand that you're indicating that<br>9     OneBeacon wanted to see how it played out,<br>10   but the question that I'm asking you, and it<br>11   may be that no determination was made, but<br>12   I'm asking you: Initially when the claim was<br>13   first discussed around July 11 with<br>14   Mr. Williams, did OneBeacon consider the<br>15   hostilities that were going on at that point,<br>16   did they consider those hostilities to be a<br>17   war?<br><br>21       THE WITNESS: Yeah, I -- again, I<br>22   wasn't part of those conversations, but<br>23   OneBeacon hadn't engaged in all its research<br>24   at that point either.<br><br>Page 235<br>1  BY MS. COYOCA:<br>2  Q.  But regardless of whether you were involved,<br>3     I understand you do not think you were or you<br>4   were not, did you ever subsequently learn<br>5   that at that point in time around July 11,<br>6   that OneBeacon considered the situation in<br>7   Israel to be a war?<br><br>11       THE WITNESS: I never -- there -- | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 12      I don't recall anything -- or learning <br> 13      anything indicating that we thought it was -- <br> 14      it was a war on July 11th. <br> 15  BY MS. COYOCA: <br> 16  Q.  Did you ever hear anything that indicated to <br> 17       you that OneBeacon did not consider the <br> 18       situation as it existed in Israel around <br> 19       July 11, that it was not a war? <br> 20  A.  I think at -- at July 11th, when we initially <br> 21       found out about the claim we needed to find <br> 22       out more information about everything that <br> 23       was going on and also what went on in the <br> 24       subsequent events to make that <br>         determination. <br> 25  Q.  Is the fact that the hostilities escalated <br><br> Page 236 <br> 1       after July 11, does that factor in at all in <br> 2       terms of OneBeacon's conclusion that there <br> 3       was a war that existed? <br><br> 7           THE WITNESS: When we looked at <br> 8       all the facts, we concluded there was war, <br> 9       including the events subsequent to July 11th. <br> 10  BY MS. COYOCA: <br> 11  Q.  But I'm asking specifically about the <br> 12       escalation of hostilities. Was the <br> 13       escalation of hostilities one of the factors <br> 14       that led OneBeacon to conclude that it was a <br> 15       war? <br><br> 19           THE WITNESS: Again, it was all <br> 20       the facts included within that is -- yeah, <br> 21       you could say the escalation, the sending of <br> 22       the ground troops, the -- you know, the war <br> 23       planes, the missiles launched back and forth, <br> 24       the number of missiles launched back and <br> 25       forth. Again, it's the totality of the | |

77

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| Page 237<br>1     circumstances.<br><br>Page 238<br>7     If the circumstances in Israel, as<br>8     they existed in Israel as of July 11,<br>9     whatever had transpired before had in fact<br>10    transpired, but nothing developed subsequent<br>11    after July 11, would OneBeacon still have<br>12    concluded that those factual circumstances as<br>13    they existed as of July 11, did those<br>14    constitute a war?<br><br>19    THE WITNESS: I think on July 11th<br>20    when initially Peter had the conversation<br>21    with Andrea and Susan, I assume, perhaps at<br>22    that point we just received notice, so we<br>23    would have had to look at all the facts,<br>24    including the facts rising -- the facts<br>25    leading up to the events and the facts | Defendant's Objections:<br>Object (238:19-25)<br>Attorney allegations and<br>arguments, relevance<br>hearsay, foundation FRE<br>401, 403, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; proper<br>cross-examination; offered<br>for non-hearsay purpose;<br>foundation present;<br>statement of party opponent.<br>Relevant to unreasonable<br>denial of claim and failure<br>to investigate. See CACI<br>2332. |
| Page 239<br>1     subsequent to the events. So I don't know<br>2     whether we would have concluded it was a war<br>3     or not or it was not a war.<br>4   BY MS. COYOCA:<br>5   Q.  Turning back to Exhibit 19, my August 13,<br>6      2014, letter to Ms. Johnson.<br>7   A.  Yes.<br>8   Q.  On the third page of the letter there is a<br>9      reference to -- in the -- in the second to<br>10     last paragraph on the page, there's a<br>11     reference to, "The U.S. Department of State<br>12     County reports on terrorism"; do you see<br>13     that?<br>14  A.  Sorry, third page, which paragraph, please?<br>15  Q.  Page 3.<br>16  A.  Yup. | Defendant's Objections:<br>Object (239:1-25)<br>Attorney allegations and<br>arguments, relevance<br>hearsay, foundation FRE<br>401, 403, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; proper<br>cross-examination; offered<br>for non-hearsay purpose;<br>foundation present;<br>statement of party opponent.<br>Relevant to unreasonable<br>denial of claim and failure<br>to investigate. See CACI<br>2332. |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 17  Q.  Bates label 89.<br>18  A.  Yup.<br>19  Q.  Fourth paragraph down.<br>20  A.  Okay. I see that.<br>21  Q.  Did you ever review this county reports on<br>22       terrorism that had been issued by the<br>23       U.S. Department of State?<br>24  A.  I didn't personally review it, no.<br>25  Q.  Did Ms. Johnson? | |
| Page 240<br>1  A.  I don't --<br><br>4       THE WITNESS: I don't know whether<br>5       she did or not.<br>6  BY MS. COYOCA:<br>7  Q.  Did you ask Ms. Johnson to review it?<br>8  A.  I asked Pamela to review the arguments in<br>      the<br>9       letter, including case law, and then draft a<br>10      response.<br>11  Q.  But did you ask her to review specifically<br>12      this authority that was cited in the letter,<br>13      which is not a case --<br><br>16       THE WITNESS: I didn't -- I don't<br>17      recall asking her to look at -- from a<br>18      statement from the U.S. Department of -- or<br>19      U.S. State Department, excuse me.<br>20  BY MS. COYOCA:<br>21  Q.  Turning to page 4, in the paragraph that<br>22      begins, "Indeed, there is longstanding and<br>23      ample authority," in that paragraph there's a<br>24      reference to a U.S. Department of State<br>25      County reports -- oh, I'm sorry let me take | Defendant's Objections:<br>Object (240:1, 16-21)<br>Attorney allegations and<br>arguments, relevance<br>hearsay, foundation FRE<br>401, 403, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; proper<br>cross-examination; offered<br>for non-hearsay purpose;<br>foundation present;<br>statement of party opponent.<br>Relevant to failure to<br>investigate. CACI 2332. |
| Page 241<br>1       that back and try over.<br>2       There is a reference to a | Defendant's Objections:<br>Object (241:1-7)<br>Attorney allegations and |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 3     publication entitled, "U.S. Department of the<br>4     Treasury Press Center from the Office of<br>5     Public Affairs," from August of 2003. Do you<br>6     see that reference?<br>7  A.  I do.<br>8  Q.  Did you review the Treasury Department<br>9     statement or article from the Office of<br>10    Public Affairs that came out in August of<br>11    2003?<br>12  A.  I did not.<br>13  Q.  Did you ask Ms. Johnson to?<br>14  A.  I didn't specifically ask her to, no.<br>15  Q.  Do you know if she did?<br>16  A.  I don't know whether she did or not.<br>17  Q.  On the next page, on page 5, there's a<br>18    reference to -- right before the paragraph<br>19    heading number 4, to a European council --<br>20    excuse me, "European Union Foreign Affairs<br>21    Council, Foreign Ministers Meeting Report";<br>22    do you see that?<br>23  A.  I do.<br>24  Q.  Did you review that European Foreign Affairs<br>25    Council Report?<br><br>Page 242<br>1  A.  I did not.<br>2  Q.  Did you ask Ms. Johnson to?<br>3  A.  I did not specifically ask her, no.<br>4  Q.  Do you know if she did?<br>5  A.  I don't know.<br>6  Q.  Did you review -- you personally review any<br>7    of the case authority that was cited in the<br>8    letter?<br>9  A.  I did not.<br>10  Q.  Did you ask Ms. Johnson to?<br>11  A.  I did.<br>12  Q.  And did she share with you her views after | arguments, relevance hearsay, foundation FRE 401, 403, 801, 802<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith; proper cross-examination; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 13      reading those cases? | |

13      reading those cases?
14   A.   I'm sure that she did, yes.
15   Q.   How are you sure? Why are you sure?

18        THE WITNESS: Because I asked her
19      to look at it, and she would have looked at
20      it and then we would have a -- we would have
21      had a discussion.
22   BY MS. COYOCA:
23   Q.   Do you recall specifically having a
24      discussion about the Pan American case?
25   A.   I don't.

Page 243
1   Q.   Do you believe that you did?
2   A.   I would think we did.
3   Q.   Do you recall anything at all specifically
4      about the Pan American case?
5   A.   Other than what you cite in your letter, no,
6      not -- not right now.
7   Q.   Did you ever ask Ms. Johnson how or why it is
8      that the Pan American case did not apply to
9      this situation?
10   A.   I don't know whether I asked her that express
11      question, but when she reviewed the case law,
12      we necessarily would have a discussion
13      whether we believed it applied, whether we
14      believed it was by a new precedent, whether
15      we believed it would change our opinion as to
16      the applicability of the war exclusion.
17   Q.   And what about the Holiday Inn case,
18      Holiday Inn vs. Aetna Insurance, did you
19      review that case?
20   A.   I did not.
21   Q.   And did you ask Ms. Johnson to?

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 22  A.   Yes.<br>23  Q.   Did you discuss her analysis of the case?<br>24  A.   I don't have any recollection of it. But,<br>25        again, I would imagine that we had that<br><br>Page 244<br>1        discussion.<br>2  Q.   Did you ask Ms. Johnson for her specific<br>3        analysis as to why Holiday Inn's was<br>4        inapplicable to the situation?<br>5  A.   I wouldn't have asked her why it was or<br>6        wasn't inapplicable. I would have asked her<br>7        to tell me what -- she read the case and<br>8        whether she believes that is -- what the<br>9        proposition of the case is, whether it -- if<br>10       it's contrary to our position, you know,<br>11       whether we need to -- to look at it again,<br>12       so...<br>13  Q.  Did you discuss the request for<br>14       reconsideration of the denial with anyone<br>15       other than Ms. Johnson?<br>16  A.  I think it was probably Pamela and I.<br>17  Q.  Did you discuss the request for<br>18       reconsideration with Sean Duffy?<br>19  A.  I don't recall discussing it with him, no.<br>20  Q.  Did you discuss the request for<br>21       reconsideration of the denial with outside<br>22       coverage counsel?<br>23  A.  I don't recall having a discussion with<br>24       outside coverage counsel, no.<br>25  Q.  Do you know if there was a discussion with<br><br>Page 245<br>1        outside coverage counsel concerning the<br>2        request for reconsideration?<br>3  A.   I don't know whether Pamela did or did not.<br>4  Q.   Did you ever tell Ms. Johnson that she should<br>5        run the re -- request for reconsideration of<br>6        the denial letter by outside coverage | <br><br><br><br><u>Defendant's Objections:</u><br>Object (244:1-25)<br>Attorney allegations and<br>arguments, relevance<br>hearsay, foundation FRE<br>401, 403, 801, 802<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith; proper<br>cross-examination; offered<br>for non-hearsay purpose;<br>foundation present;<br>statement of party opponent.<br>Relevant to failure to<br>investigate. CACI 2332.<br><br><br><br><br><br><br><br><br><br><br><u>Defendant's Objections:</u><br>Object (245:1-9)<br>Reference to legal opinion,<br>relevance, attorney client;<br>FRE 401, 403, 502<br><br><u>Plaintiffs' Response:</u> |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 7      counsel?<br>8  A.  I don't -- I don't remember asking her that,<br>9      no.<br>10  Q.  Did you ever discuss the August 13, 2014,<br>11      request for reconsideration of the denial<br>12      with Peter Williams?<br>13  A.  We may have had a discussion, Peter, Pamela<br>14      and I, but again, I don't recall anything --<br>15      any specific discussion.<br>16  Q.  When you say you may have had a discussion,<br>17      what do you base that on?<br>18  A.  I -- I just don't know. I -- I can't tell<br>19      you whether we did or did not.<br>20  Q.  Separate and apart from the discussion, did<br>21      you ever have any conversations with<br>22      Mr. Williams about any of the grounds that<br>23      were cited in the reconsideration letter as<br>24      to the analysis and as it was applied to this<br>25      claim?<br><br>Page 246<br>3        THE WITNESS: Are you asking me<br>4      whether I had discussions with Peter just<br>5      about the policy language and the application<br>6      of it to the facts?<br>7  BY MS. COYOCA:<br>8  Q.  No, I'm -- I'm specifically asking with<br>9      respect to the grounds that are set forth in<br>10      the August 13, 2014, letter requesting that<br>11      OneBeacon reconsider its denial of the claim.<br>12      Did you ever discuss those grounds that were<br>13      cited in the letter with Mr. Williams?<br>14  A.  I don't recall.<br>15  Q.  Were you involved in drafting a response to<br>16      the August 13, 2014, letter?<br>17  A.  Pamela would have drafted it and I would<br>18      have -- would have looked at it, but I didn't<br>19      draft it. | Relevant to bad faith; mere reference to legal opinion or attorney-client communications not privileged. Relevant to failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 20  Q.  Do you specifically recall reviewing a draft<br>21      of the reply?<br>22  A.  I don't specifically recall it, but I would<br>23      assume that I did.<br>24  Q.  How would you have received a copy of the<br>25      draft? Would it have been by e-mail?<br><br>Page 247<br>1  A.  I would guess, yes.<br>2  Q.  Do you recall if you proposed any revisions<br>3      to the reply letter?<br>4  A.  I don't -- I don't remember, no.<br>5  Q.  With respect to the discussion that is set<br>6      forth on page 5 of the August 13, 2014,<br>7      letter, under section 4, "The certified acts<br>8      of terrorism coverage cap endorsement does<br>9      not preclude coverage the claim"; do you see<br>10     that section?<br>11  A.  I do.<br>12  Q.  Did you discuss this section of the letter<br>13     specifically with Ms. Johnson?<br>14  A.  I don't -- I don't recall the discussion, but<br>15     I imagine we did, because we addressed it in<br>16     the -- in the responsive letter.<br>17  Q.  Did you -- did Ms. Johnson tell you that she<br>18     thought that the analysis of the August 13<br>19     letter was incorrect and that, in fact, the<br>20     endorsement did apply?<br>21  A.  I -- I don't recall that -- given that we<br>22     subsequently withdrew it, I don't think she<br>23     would have said that the endorsement<br>       applied.<br>24  Q.  Did you ever ask her why she had originally<br>25     invoked the endorsement when it didn't<br>       apply?<br><br>Page 248<br>3        THE WITNESS: I may have. I don't<br>4     recall. | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 5   BY MS. COYOCA: | |
| 6   Q.   Was there any disagreement between the two of | |
| 7        you as to whether the certified acts of | |
| 8        terrorism cap on losses endorsement did or | |
| 9        did not apply? | |
| 10  A.   I don't think there was. | |
| 11  Q.   Did you ever gain an understanding as to why | |
| 12        it is that Ms. Johnson invoked the certified | |
| 13        acts of terrorism cap on losses endorsement | |
| 14        in the initial denial letter? | |
| | |
| 17        THE WITNESS: No, I don't | |
| 18        remember. | |
| | |
| Page 249 | |
| 2   BY MS. COYOCA: | |
| 3   Q.   Did you ever have a conversation with | |
| 4        Ms. Johnson as to whether an entity that had | |
| 5        been designated by the U.S. government as a | |
| 6        terrorist organization could also be | |
| 7        considered a semi-sovereign state? | |
| | |
| 11        THE WITNESS: I don't -- yeah, I | |
| 12        don't remember ever having a discussion on | |
| 13        that particular issue. | |
| 14  BY MS. COYOCA: | |
| 15  Q.   Did you ever ask Ms. Johnson for legal | |
| 16        authority for the proposition that a | |
| 17        terrorist organization could also be | |
| 18        considered a semi-sovereign state? | |
| | |
| 22        THE WITNESS: Pamela did the | |
| 23        research, and based on her research and | |
| 24        analysis, again, we came to the conclusion | |
| 25        that -- that Hamas could be considered a | |
| | |
| Page 250 | |
| 1        quasi. And so did I expressly ask her that, | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 2   no. But based on our research, we reached | |
| 3   that conclusion. | |
| 4   BY MS. COYOCA: | |
| 5   Q.   I'm specifically focusing, though, on whether | |
| 6   you ever asked her for legal authority on | |
| 7   that specific proposition? | |
| 8   A.   No, I didn't. | |
| 9   Q.   Did you ever look for any legal authority for | |
| 10   the proposition that an entity that was a | |
| 11   terrorist organization could also be | |
| 12   considered a semi-sovereign? | |
| | |
| 16        THE WITNESS: No, I did not. | |
| 17        MS. COYOCA: Okay. | |
| 18   BY MS. COYOCA: | |
| 19   Q.   I want to go to a document that was | |
| 20   previously marked as Exhibit 20, and it's a | |
| 21   September 9, 2014, letter from Pamela Johnson | |
| 22   to Lucia Coyoca, and it's labeled Bates | |
| 23   control ATL000705 through 708. | |
| 24        And just let me know when you're | |
| 25   ready for questions, Ms. Johnson. Excuse me, | |
| | |
| Page 251 | |
| 1        Ms. Gooley. | |
| 2   A.   Okay. | |
| 3   Q.   Thank you. | |
| 4   A.   You're welcome. (Reviews document.) | |
| 5   Q.   Ready for questions? | |
| 6   A.   Yes. | |
| 7   Q.   Have you seen this letter before? | |
| 8   A.   Yes. | |
| 9   Q.   When did you first see it? | |
| 10   A.   I -- my guess is I -- I would have seen it | |
| 11   before it went out, so I can't tell you | |
| 12   exactly what day that was, but it would have | |
| 13   been before -- it would have been either on | |
| 14   September 9th, depending on when it went | |

86

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| out,<br>15    or before that.<br>16  Q.  Now that you've reread the letter, do you<br>17      recall if you had any changes or revisions<br>18      for the letter?<br>19  A.  I don't recall any changes.<br>20  Q.  Did you discuss the letter with Ms. Johnson<br>21      before it was sent?<br>22  A.  I think I would have discussed it before it<br>23      was drafted, and then, yeah, we would have<br>24      had a discussion before it went out.<br>25  Q.  So after it was drafted you believe you had a<br><br>Page 252<br>1      discussion with her as well?<br>2   A.  I would -- yes, yes, because I would have<br>3       looked at it and let her know if I had<br>4       revisions or not.<br><br>21  Q.  So this is a letter that Ms. Johnson sent to<br>22      Ms. -- to myself, correct?<br>23  A.  Correct.<br>24  Q.  All right. And you pointed out that the<br>25      header of each of the pages appears to<br><br>Page 253<br>1      indicate that they're all page 3, correct?<br>2   A.  Correct.<br>3   Q.  All right. So -- so looking at the Bates<br>4       control label numbers, 708, the last page of<br>5       the letter, the paragraph that begins, "You<br>6       seem to assert"; do you see that?<br>7   A.  I do.<br>8   Q.  Could you please read that sentence out loud?<br>9   A.  "You seem to assert that a government that is<br>10      deemed to be a terrorist organization cannot<br>11      have sufficient sovereignty to fall within<br>12      the war exclusion."<br>13  Q.  Okay. Focusing specifically on legal | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 14    authority, did you look at any legal<br>15    authority to support that proposition?<br><br>Page 254<br>5  Q.  Did you look at any legal authority for the<br>6      proposition that a government that is deemed<br>7      to be a terrorist organization can also have<br>8      sufficient sovereignty to fall within the war<br>9      exclusion?<br><br>13      THE WITNESS: I don't recall<br>14    looking at anything specific, but what it's<br>15    stating is that a terrorist organization can<br>16    still be -- can be a sovereignty, and then it<br>17    refers to North Korea and Saddam Hussein,<br>18    which are --<br>19      MS. COYOCA: Right.<br>20      THE WITNESS: Yeah.<br>21  BY MS. COYOCA:<br>22  Q.  I see the words that are written there, but<br>23     what I'm specifically asking is: Did you<br>24     read any cases that stood for that<br>25     proposition that you just indicated?<br><br>Page 255<br>1  A.  I myself did not read any cases.<br>2  Q.  Did you ask Ms. Johnson to research and<br>3     provide some legal authority for the<br>4     proposition?<br>5  A.  For the proposition in the first sentence?<br>6  Q.  Yes, that a terrorist organization could also<br>7     have sufficient sovereignty to fall within<br>8     the war exclusion?<br><br>20  A.  Whether I asked her for authority --<br>21  Q.  Yes.<br>22  A.  -- as whether or not a terrorist organization<br>23     can be a sovereignty or fall within the war<br>24     exclusion? |  |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 25  Q.  Yes. | |

Page 256
1  A.  No.
2  Q.  Further on in that paragraph, beginning with
3        the sentence, "Further, as explained above";
4        do you see that?
5  A.  I do.
6  Q.  Could you read that portion of the paragraph
7        through to the conclusion of the paragraph?
8  A.  Sure. "Further, as explained above, the
9        Israeli government participated in the
10       conflicts and invaded Gaza. There is no
11       question that the Israeli government is
12       identified by the majority of the world
13       governments as a legitimate sovereign, not a
14       terrorist organization."
15  Q.  Is it OneBeacon's position, based on your
16       understanding, that in order for the war
17       exclusion to -- to apply, it was sufficient
18       for there to be only one sovereign
        government
19       involved in the hostilities?
20  A.  Are you talking about the prong 1 of the war
21       exclusion, war or --
22  Q.  Prong 1.
23  A.  War -- I mean, prong 1, I don't -- I don't
24       think one necessarily has to be -- whether
25       it's sufficient to just have one as a

Page 257
1        sovereignty?
2  Q.  Uh-huh.
3  A.  It could be, yes.
4  Q.  Is it OneBeacon's position that it is
5        sufficient to meet the definition of war, as
6        used in the first prong of the exclusion, if
7        only one of the entities is a quasi
8        sovereign?

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 13     THE WITNESS: I think OneBeacon's<br>14    position is outlined in this letter and also<br>15    in the earlier letter as to why the<br>16    war-related exclusions apply.<br>17     MS. COYOCA: Right.<br>18  BY MS. COYOCA:<br>19  Q.  I'm just trying to gain an understanding of<br>20    why there was a reference made to just the<br>21    Israeli government being involved in the<br>22    hostilities. Do you know why she used that<br>23    language as opposed to discussing that there<br>24    were two parties involved in the hostilities<br>25    in those particular sentences? | |
| Page 260<br>11     MS. COYOCA: Exhibit 35 is an<br>12    e-mail exchange that's labeled Bates control<br>13    AONNBCU0000079.<br>14    (Whereupon, Exhibit 35 was<br>15    marked for identification.)<br>16    THE WITNESS: (Reviews document.)<br>17  BY MS. COYOCA:<br>18  Q.  Let me know when you're ready for<br>      questions.<br>19  A.  I'm ready.<br>20  Q.  Okay. So there are three e-mails that appear<br>21    on this Exhibit 35. You are not, I don't<br>22    believe, indicated as a to, from or a cc.<br>23    However, in the middle e-mail from<br>24    Susan Weiss sent Friday, October 10, to<br>25    Andrea Garber, Kurt Ford, the subject line | Defendant's Objections:<br>Object (260:11-25)<br>Relevance; hearsay;<br>foundation; prejudicial; FRE 401, 403, 801, 803<br><br>Plaintiffs' Response:<br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent;<br>discussing business record.<br>Relevant to failure to<br>investigate. CACI 2332. |
| Page 261<br>1     reads, "Forward Theresa Gooley's contact";<br>      do<br>2    you see that?<br>6     THE WITNESS: (Reviews document.) | Defendant's Objections:<br>Object (261:1-2, 6-25)<br>Relevance; hearsay;<br>foundation; prejudicial; FRE 401, 403, 801, 803 |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 7    The e-mail dated October 10th just indicates,<br>8    "FYI," that they received a call from me, and<br>9    that -- or, excuse me, that Susan received a<br>10   call from me and she -- and then I had<br>11   asked -- and I asked her to call me back.<br>12       MS. COYOCA: Right, that's the<br>13   e-mail that I'm speaking about.<br>14       THE WITNESS: Yeah, right.<br>15       MS. COYOCA: Okay.<br>16 BY MS. COYOCA:<br>17 Q.  So with respect to that e-mail, is it<br>18    correct, do you believe that you made a phone<br>19    call to Ms. Weiss on October 10?<br>20 A.  Yeah, if -- I mean, I don't recall it, but if<br>21    it's in there, yeah, I imagine that I did.<br>22 Q.  And do you know why you were calling<br>23    Ms. Weiss?<br>24 A.  I don't -- I don't specifically know. But<br>25    when I'm looking at Kurt Ford, I'm thinking | <u>Plaintiffs' Response:</u><br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent;<br>discussing business record.<br>Relevant to failure to<br>investigate. CACI 2332. |
| <u>Page 262</u><br>1    that it probably had something to do with the<br>2    Slap claim.<br>3 Q.  So you think that this October 10th call<br>4    concerned the Slap claim, not Dig?<br>5 A.  Again, I -- I don't remember, but I thought<br>6    Kurt Ford was the director of Slap, of the<br>7    mini series Slap.<br>8 Q.  Okay.<br>9       MS. COYOCA: I want to mark as<br>10   Exhibit 36 an e-mail chain that is labeled<br>11   AONNBCU0003533 through 3534.<br>12      (Whereupon, Exhibit 36 was<br>13      marked for identification.)<br>14 BY MS. COYOCA:<br>15 Q.  Let me know when you're ready for<br>     questions.<br>16 A.  Okay. (Reviews document.) I'm done reading | <u>Defendant's Objections:</u><br>Object (262:1-25)<br>Relevance; hearsay;<br>foundation; prejudicial; FRE<br>401, 403, 801, 803<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent.<br>Relevant to failure to<br>investigate. CACI 2332. |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 17      it.<br>18  Q.  Okay. So I want to direct your attention to<br>19      the first e-mail in the chain, which would be<br>20      the last in the document, the one that was<br>21      sent from Susan Weiss, Monday, October 13,<br>22      2014, at 12:53 p.m., to Andrea Garber and<br>23      Kurt Ford cc'ing Deborah Kizner, subject,<br>24      "Dig claim." Do you see that?<br>25  A.  Yes. | |
| Page 263<br>1  Q.  Okay. In that e-mail Ms. Weiss makes<br>2      reference to a phone -- a game of phone tag<br>3      that she had been playing with you and that<br>4      she had finally connected with you that<br>5      particular morning. Do you see that?<br>6  A.  I do.<br>7  Q.  Is that -- is that accurate, do you believe<br>8      you had a conversation with Ms. Weiss on<br>9      October 13?<br>10  A.  I don't recall it, but I'm sure -- I imagine<br>11      if it -- she indicates it in the e-mail, it<br>12      happened, yes.<br>13  Q.  Okay. And then beginning with the sentence,<br>14      "She apologized profusely for this claim<br>15      going sideways," could you please read that<br>16      -- the rest of that paragraph out loud?<br>17  A.  Beginning with, "She apologized," or just<br>18      after that?<br>19  Q.  Beginning with, "She apologized."<br>20  A.  "She apologized profusely for this claim<br>21      going sideways and very much wanted to get<br>22      things back on track. I told that the<br>23      meeting with Peter was a step in the right<br>24      direction. I told her that I felt litigation<br>25      was a last resort for NBC and most probably | Defendant's Objections:<br>Object (263:1-25)<br>Relevance; hearsay;<br>foundation; prejudicial; FRE<br>401, 403, 801, 803<br><br>Plaintiffs' Response:<br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent.<br>Relevant to failure to<br>investigate. CACI 2332. |
| Page 264<br>1      OBI, and she agreed. I said I felt it would | Defendant's Objections:<br>Object (264:1-11, 14-25) |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 2     be good thing to get around a table and start<br>3     a dialog, and again she agreed. She thought<br>4     Peter would be out of the office" --<br>5  Q.  Oh, that's okay.<br>6  A.  All right.<br>7  Q.  Okay. So did you have a conversation with<br>8     Ms. Weiss on or about October 13 where you<br>9     indicated to Ms. Weiss that you wanted to get<br>10    the claim -- the claim back on track or the<br>11    relationship back on track?<br><br>14        THE WITNESS: I'm -- I don't -- I<br>15    mean, I -- I obviously had a conversation. I<br>16    mean, this is Susan's characterization of the<br>17    conversation. I do remember there were some<br>18    concerns that NBC raised, and so I imagine<br>19    that was what our discussion was about.<br>20 BY MS. COYOCA:<br>21  Q.  What concerns do you recall NBC raising?<br>22  A.  I think that NBC had some concerns with<br>23    Pamela.<br>24  Q.  And what concerns were those?<br>25  A.  I -- I think, if I recall, you know, there is | Relevance; hearsay; foundation; prejudicial; FRE 401, 403, 801, 803<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to failure to investigate. CACI 2332. |
| <u>Page 265</u><br>1     a lot of strong personalities, and -- and<br>2     Pamela has a strong personality, and so I<br>3     think they may have taken offense at some<br>4     things.<br>5  Q.  Do you recall any specifics?<br>6  A.  Nothing specific, no.<br>7  Q.  Who conveyed to you that there were concerns<br>8     about Ms. Johnson?<br>9  A.  You know, I don't recall. I would -- I would<br>10    assume it was Susan and -- that's what I<br>11    would assume.<br>12  Q.  Did you apologize during the call of the<br>13    claim going sideways? | <u>Defendant's Objections:</u><br>Object (265:1-25)<br>Relevance; hearsay; foundation; prejudicial; FRE 401, 403, 801, 803<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 14  A.  I'm sure I apologized if they were offended<br>15       by the behavior of OneBeacon.<br>16  Q.  Got it. Did you indicate that you wanted to<br>17       get things back on track during the call?<br>18  A.  I'm sure that I -- yeah, I'm sure that what I<br>19       said is, you know, let's see if we can, you<br>20       know, get this thing, exactly that words,<br>21       back on track and see if we can build the<br>22       relationship again.<br>23  Q.  Okay. At that point in time, the<br>24       conversations that were going on around<br>25       October 13, did you think that one of the | |
| Page 266<br>1       ways to get the -- the relationship back on<br>2       track would be to pay some amount on the Dig<br>3       claim? | Defendant's Objections:<br>Object (266:1-3, 6-17)<br>Relevance; hearsay;<br>foundation; prejudicial; FRE<br>401, 403, 801, 803 |
| 6           THE WITNESS: When I think back to<br>7       that period of time in, you know, the<br>8       relationship and the issues, I don't think my<br>9       thought was to pay something on the Dig<br>10      claim, but to do what I could on my end to<br>11      make sure that -- that we worked with NBC on<br>12      existing claims, the -- the -- you know,<br>13      sitting around the table is to actually maybe<br>14      personally sit down with NBC and discuss Dig<br>15      as well and -- but I don't think at any time<br>16      my thought to get it on track was to pay the<br>17      Dig claim. | Plaintiffs' Response:<br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent.<br>Relevant to failure to<br>investigate. CACI 2332. |
| Page 276<br>15          MS. COYOCA: I want to mark as<br>16      Exhibit 37 an e-mail with Bates control<br>17      ATL002459.<br>18          (Whereupon, Exhibit 37 was | Defendant's Objections:<br>Object (276:15-25)<br>Nonrenewal, not relevant;<br>prejudicial  FRE 401, 402,<br>801, 802 |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 19    marked for identification.)<br>20    THE WITNESS: I've read the<br>21    e-mail.<br>22  BY MS. COYOCA:<br>23  Q.  Do you recognize this document?<br>24  A.  I -- I mean, I don't remember it, but it -- I<br>25    obviously sent it to Peter.<br><br>Page 277<br>1  Q.  Do you have any reason to believe that you<br>2    did not send the e-mail on or about the date<br>3    that's reflected, March 9?<br>4  A.  No.<br>5  Q.  Okay. Why were you sending Mr. Williams the<br>6    e-mail?<br>7  A.  I -- I -- I honestly can't remember why. I<br>8    was -- obviously, it must have had something<br>9    to do with NBC, but I don't remember why I<br>10    was sending the e-mail.<br>11  Q.  Do you recall if it had anything to do with<br>12    the Dig claim?<br>13  A.  I don't.<br>14  Q.  Do you recall if it had anything to do with<br>15    efforts to streamline the claims process?<br>16  A.  It may have. I -- I simply don't recall. I<br>17    apologize.<br>18  Q.  I'm entitled to probe your recollection, so I<br>19    just want to ask a few follow-up questions.<br>20    Do you know if the e-mail was being<br>21    sent in order to discuss NBC Universal and<br>22    renewal of the policy?<br>23  A.  I know it -- that was not why -- I would not<br>24    have reached out to Susan to discuss renewal<br>25    of the NBC policy.<br><br>Page 278<br>1  Q.  Okay.<br>2    MS. COYOCA: I want to mark as | Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201).<br><br>Defendant's Objections:<br>Object (277:1-25) Nonrenewal, not relevant; prejudicial  FRE 401, 402, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201).<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objections:<br>Object (278:1-4) Nonrenewal, not relevant; |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 3    Exhibit 38 an e-mail exchange that's got<br>4    Bates control label ATL002435 through<br>     2431. | prejudicial  FRE 401, 402, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 279<br>10       So can you please turn to the e-mail<br>11    that begins on page 2436 from Susan Weiss to<br>12    Theresa Gooley, Daniel Gutterman with a cc to<br>13    Deborah Kizner on -- it's dated November 5 at<br>14    5:08 p.m.<br>15  A.  Okay.<br>16  Q.  Do you have it?<br>17  A.  Yes.<br>18  Q.  Okay. In this e-mail Ms. Weiss makes<br>19    reference to a discussion that was had the<br>20    prior -- the day before, "Yesterday"; do you<br>21    see that?<br>22  A.  Yes.<br>23  Q.  Do you recall discussing the NBC Universal TV<br>24    claims process on November 4th?<br>25  A.  I don't have a specific recollection, but if | Defendant's Objections: Object (279:10-25) Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 280<br>1    it's referenced in there, then I believe we<br>2    had that discussion.<br>3  Q.  Do you recall when the meeting actually took<br>4    place concerning the Dig claim?<br>5  A.  It was the 3rd. | Defendant's Objections: Object (280:1-25) Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 6  Q.  Okay. So did you meet in person with<br>7       Ms. Weiss on NBC Universal separate and apart<br>8       from the -- the Dig larger meeting?<br>9  A.  We went with her to the Dig meeting and<br>10      talked to her then and talked to her after.<br>11      I can't remember if we had a subsequent<br>12      meeting the following day.<br>13 Q.  So what was the purpose in discussing the<br>14      claims process, from your perspective?<br>15 A.  I think the purpose, again, is -- I think<br>16      with an insured and insurer it's like a<br>17      bordereau, you're always trying to balance<br>18      how much information you need with the<br>19      imposition it places on the client. And in<br>20      this case, I think NBC was -- was getting a<br>21      little bit upset because of a number of<br>22      questions that OneBeacon was asking, so I was<br>23      trying to get -- get together with Susan and<br>24      see if we could talk about the claims process<br>25      again and put something in place that was | 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201); Oppo to MIL 3 (Dkt 202). |
| Page 281<br>1       agreeable to everybody.<br>2  Q.  Okay. In the -- the second page of this<br>3       e-mail, the one that's labeled 2437, there's<br>4       a paragraph that reads, "One last thing"; do<br>5       you see that?<br>6  A.  I do.<br>7  Q.  Can you read that paragraph out loud?<br>8  A.  Yes. "One last thing, on October 10th,<br>9       Pamela advised in an e-mail, also forwarded<br>10      to you, that she would begin issuing payments<br>11      the following week on the 2012 claims that<br>12      had been audited and accepted. We have not<br>13      received any of those payments yet. See my<br>14      earlier e-mail sent to you today." | Defendant's Objections:<br>Object (281:1-25) Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201); Oppo to MIL 3 |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 15 Q. Do you recall discussing with Ms. Weiss in<br>16 November of 2014 that there were payments<br>17 that were still outstanding on 2012 claims<br>18 that had not yet been paid?<br>19 A. I don't recall the specific discussion, but I<br>20 know there were -- there were outstanding<br>21 payments for the 2012 claims.<br>22 Q. Do you know why those payments had not yet<br>23 been made?<br>24 A. I know that it took a long time to get the<br>25 information on these particular -- on the<br><br>Page 282<br>1 particular claims. I believe they were both<br>2 Sandy and -- and the Smash claims. And so<br>3 when we had buttoned it all up, which I think<br>4 was the fall of 2014, then we were going to<br>5 start issuing payment, so --<br>6 Q. Okay. So I just want to make sure I<br>7 understand.<br>8 When you refer to Sandy, are you<br>9 referring to claims that were made as a<br>10 result of Hurricane Sandy that occurred in<br>11 2012?<br>12 A. Yes.<br>13 Q. And there were production claims that were<br>14 made as a result of Hurricane Sandy; is that<br>15 correct?<br>16 A. That's my recollection, yes.<br>17 Q. And, ultimately, in order for there to be a<br>18 payout on those claims, that means that<br>19 NBC Universal would have had to have exceeded<br>20 its retention amount for the 2012 policy<br>21 year; is that correct?<br>22 A. That's my understanding, yes.<br>23 Q. You also referred to the Smash claim. What<br>24 was the Smash claim? | (Dkt 202).<br><br><br><br><br><br><br><br><br><br>Defendant's Objections:<br>Object (282:1-25)<br>Nonrenewal, loses, other<br>claims; not relevant,<br>prejudicial; hearsay,<br>foundation FRE 401, 403,<br>801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent.<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201); Oppo to MIL 3<br>(Dkt 202). |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 25  A.  I think they were -- I think they were<br><br>Page 283<br>1    plural. I don't -- I -- I vaguely think it<br>2    may have -- may have had to do with just<br>3    delays in production, and I think it involved<br>4    one -- one of the actresses and some sickness<br>5    as well.<br>6  Q.  Okay. And did one of the Smash claims have<br>7    to do with a delay in production associated<br>8    with a death in the family of the one of the<br>9    actors as well?<br>10  A.  I -- I don't remember the specifics.<br>11  Q.  In order for there to be -- and, I'm sorry,<br>12    the Smash claims, were those also<br>13    attributable to the 2012 policy year?<br>14  A.  If I recall that's -- yes, they fell in the<br>15    2012.<br>16  Q.  Okay. And, again, in order to -- for the<br>17    claims to be paid out on -- by OneBeacon,<br>18    NBC Universal would have had to have exceeded<br>19    it's self-insured retention for that policy<br>20    year; is that correct?<br>21  A.  That's correct.<br>22  Q.  Did OneBeacon pay out on any claims prior to<br>23    the claims that were asserted for the 2012<br>24    policy year?<br>25  A.  I don't know.<br><br>Page 284<br>1  Q.  Did you look at the totality of claims that<br>2    had been asserted by NBC Universal going back<br>3    to the inception of the first policy as of<br>4    January 1, 2010, forward, in the work that<br>5    you were doing with respect to the Dig claim? | **Defendant's Objections:**<br>Object (283:1-25)<br>Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, 801, 802<br><br>**Plaintiffs' Response:**<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201); Oppo to MIL 3 (Dkt 202).<br><br><br><br><br><br><br><br><br><br>**Defendant's Objections:**<br>Object (284:1-25)<br>Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, 801, 802 |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 6   A.   I wouldn't have looked at the other claims,<br>7         no.<br>8   Q.   Did you look at whether or not OneBeacon<br>         had<br>9         exceeded its self-insured retention? Excuse<br>10        me.<br>11           Would -- would you -- did you look<br>12        at whether or not NBC Universal had<br>         exceeded<br>13        its self-insured retention in any of the<br>14        policy years prior to the 2013 -- I'm sorry,<br>15        the 2014, 2015 policy?<br>16   A.   Are you asking me just generally if I looked<br>17        at --<br>18   Q.   No. In the -- in the context of the work<br>19        that you did on Dig, did you ever look at<br>20        whether or not NBC Universal had met or<br>         was<br>21        close to or exceeded its self-insured<br>22        retention for that policy year?<br>23   A.   No.<br>24   Q.   In Ms. Weiss's e-mail to you and to<br>25        Danny Gutterman, she indicates that there is | <u>Plaintiffs' Response:</u><br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent.<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201); Oppo to MIL 3<br>(Dkt 202). |
| <u>Page 285</u><br>1         a quarterly log that was attached to the<br>2         e-mail. Do you see that?<br>3    A.   Let's see.<br>4    Q.   I'm looking at the sentence that reads, "Due<br>5         to the transition of Andrea moving to the<br>6         risk management side." Do you see that?<br>7    A.   Oh, yes, yes. Oh, yes, yes, she indicates<br>8         that she attached it for our review.<br>9    Q.   Did you review the NBC Universal claims<br>         log<br>10        that was attached to the e-mail?<br>11   A.   My guess is that I did. I don't have any<br>12        specific recollection today.<br>13   Q.   If you look at the document number, which is | <u>Defendant's Objections:</u><br>Object (285:1-25)<br>Nonrenewal, loses, other<br>claims; not relevant,<br>prejudicial; hearsay,<br>foundation FRE 401, 403,<br>801, 802<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent.<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2 |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 14    out of order from the e-mail, that reads<br>15    ATL002429, at the title -- the title reads,<br>16    "2014-6/30/2015 NBCU TV claims-OneBeacon last<br>17    updated 11/3/14"; do you see that?<br>18  A.  I do.<br>19  Q.  Do you recognize this document?<br>20  A.  Yeah, it looks like a spreadsheet that had<br>21    the NBC claims.<br>22  Q.  Is it your understanding that this is the<br>23    document that was attached to the e-mail that<br>24    Ms. Weiss referenced?<br>25  A.  I don't know whether this is the document. | (Dkt 201); Oppo to MIL 3<br>(Dkt 202). |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| Page 286<br>1     It -- it looks similar to the -- to the<br>2     documents that -- that -- or it looks<br>3     similar, excuse me, to the spreadsheet that<br>4     outlines the existing claims, so most likely.<br>5  Q.  In the cover e-mail that Ms. Weiss sent, in<br>6     the second paragraph she indicates, begin<br>7     quotes, "NBCU TV has always wanted to have<br>8     their claims loosely monitored by OBE. And<br>9     early in the relationship it was agreed with<br>10    Peter and Michael Arevalo that they would<br>11    only be interested in looking closely at<br>12    claims that exceeded 250,000," close quotes.<br>13    Do you see that?<br>14  A.  I do.<br>15  Q.  Who is the Peter that's referenced in the<br>16    e-mail? Is that Peter Williams?<br>17  A.  Yes.<br>18  Q.  Okay. And who is Michael Arevalo?<br>19  A.  It's Michael Arevalo, but Michael Arevalo<br>20    worked in the entertainment group initially.<br>21    I'm trying to think, his role has kind of<br>22    changed. I think he was a claim handler at<br>23    one point and then moved over to the<br>24    underwriting side.<br>25  Q.  Did you agree with Ms. Weiss's statement<br>      that | Defendant's Objections:<br>Object (286:1-25)<br>Nonrenewal, loses, other<br>claims; not relevant,<br>prejudicial; hearsay,<br>foundation FRE 401, 403,<br>801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent.<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201); Oppo to MIL 3<br>(Dkt 202). |
| Page 287<br>1     was made in that first sentence that there<br>2     had been this agreement with Peter and<br>3     Michael?<br><br>6       THE WITNESS: I mean, I -- I -- I<br>7     had no personal knowledge whether there --<br>8     there was or wasn't an agreement, but I would<br>9     take her at her word.<br>10  BY MS. COYOCA:<br>11  Q.  Did you ask Peter Williams about that | Defendant's Objections:<br>Object (287:1-3, 6-25)<br>Nonrenewal, loses, other<br>claims; not relevant,<br>prejudicial; hearsay,<br>foundation FRE 401, 403,<br>801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith;<br>offered for non-hearsay |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 12      statement? | purpose; foundation present; |
| 13  A.  I don't recall asking him expressly about | statement of party opponent. |
| 14      that statement, no. | Relevant to bad faith and |
| 15  Q.  Were you seeking somehow to change that | motive. See Oppo to MIL 2 |
| 16      process when you were discussing the claims | (Dkt 201); Oppo to MIL 3 |
| 17      review process with Ms. Weiss? | (Dkt 202). |
| 18  A.  I think that -- yeah, I think we were -- | |
| 19      loosely monitored, I think that we felt like | |
| 20      we weren't getting enough information and | |
| 21      enough information in a timely fashion, and | |
| 22      so I think we wanted -- again, we wanted to | |
| 23      balance the interest of NBC, but also those | |
| 24      of OneBeacon to get timely -- timely and | |
| 25      meaningful information so we can analyze | |
|         the | |
| Page 288 | Defendant's Objections: |
| 1      claims as well. | Object (288:1-25) |
| 2  Q.  The e-mail that follows is an e-mail that | Nonrenewal, loses, other |
| 3      appears to be from you to Susan and Danny - | claims; not relevant, |
|        - | prejudicial; hearsay, |
| 4      Daniel Gutterman cc'ing Deborah Kizner sent | foundation FRE 401, 403, |
| 5      on Friday 11/7/2014 at 12:03 a.m.; do you | 801, 802 |
|        see | |
| 6      that? | Plaintiffs' Response: |
| 7  A.  I do. | Relevant to bad faith; |
| 8  Q.  Did you write this e-mail? | offered for non-hearsay |
| 9  A.  I assume so, yes. | purpose; foundation present; |
| 10  Q.  In the e-mail, in the -- in the middle | statement of party opponent. |
| 11      paragraph, you indicate -- well, I'm sorry, | Relevant to bad faith and |
| 12      why don't you just read the -- the paragraph | motive. See Oppo to MIL 2 |
| 13      beginning with, "As you indicated." | (Dkt 201); Oppo to MIL 3 |
| 14  A.  "As you indicated, OneBeacon would like to | (Dkt 202). |
| 15      continue to receive specific notice of those | |
| 16      claims which are greater than 250,000 or | |
| 17      claims that have other indicia that warrant | |
| 18      specific notice. If NBC would be good | |
|        enough | |
| 19      to continue to provide notice of these claims | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 20   directly to Danny Gutterman, and now at<br>21   Lucy Lopez, that would be great."<br>22 Q. Okay. With respect to the reference to<br>23   claims that are greater than 250,000, was it<br>24   your intent to continue to focus on -- have<br>25   OneBeacon focus on those claims that<br>       exceeded | |
| **Page 289**<br>1   that amount --<br><br>3 BY MS. COYOCA:<br>4 Q. -- as opposed to lower value claims?<br><br>7      THE WITNESS: I think my intent<br>8   is, A, I wanted -- we wanted information on<br>9   claims that were greater than 250,000, or, B,<br>10   claims that have other indicia that warrant<br>11   specific notice, so that being it may be<br>12   greater than 2, it may be less, but given the<br>13   particular facts, they should let OneBeacon<br>14   know about it.<br>15 BY MS. COYOCA:<br>16 Q. What other indicia were you referencing that<br>17   would warrant specific notice?<br>18 A. It really depends. I mean, I think you get<br>19   that sixth sense for something that may or<br>20   may not end up being a very significant<br>21   claim, and -- and so that's what we're<br>22   looking at. Again, you know it when you see<br>23   it.<br>24 Q. Are you done?<br>25 A. I am. | Defendant's Objections:<br>Object (289:1, 3-4, 7-25)<br>Nonrenewal, loses, other<br>claims; not relevant,<br>prejudicial; hearsay,<br>foundation FRE 401, 403,<br>801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent.<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201); Oppo to MIL 3<br>(Dkt 202). |
| **Page 290**<br>1 Q. Okay. When you referenced -- when you<br>   used<br>2   the words, "Other indicia," to Ms. Weiss, did<br>3   you have -- had you had a conversation with | Defendant's Objections:<br>Object (290:1-23)<br>Nonrenewal, loses, other<br>claims; not relevant,<br>prejudicial; hearsay, |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 4     her previously about what you were referring<br>5     to?<br>6  A.  I don't -- I don't recall if I had a<br>7     conversation. Again, I wanted the -- I<br>8     wanted the category to be broad in terms of<br>9     particular claims that, A, warrant, I use<br>10     other indicia, or would cause me to pause for<br>11     some reason or another. We want to know<br>12     about those and we want to know about them<br>13     right away.<br>14  Q.  At some point during the policy period that<br>15     involves the Dig claim, the January 1, 2014,<br>16     through June 30, 2015, policy, did it become<br>17     apparent to you that the amount of claims was<br>18     going to exceed the self-insured retention on<br>19     the policy?<br>20  A.  I -- I don't remember. I don't.<br>21  Q.  Do you remember flagging that as an issue and<br>22     wanting to discuss it with Ms. Weiss?<br>23  A.  I -- no, I don't remember.<br><br>Page 291<br>9         MS. COYOCA: I want to mark as<br>10     Exhibit 39 an e-mail exchange that is dated<br>11     June 1st and June 2nd, 2015, and it's got<br>12     Bates label ATL002495 through 2496.<br>13         (Whereupon, Exhibit 39 was<br>14         marked for identification.)<br>15         THE WITNESS: (Reviews document.)<br>16     I've read it.<br>17  BY MS. COYOCA:<br>18  Q.  Ready for questions?<br>19  A.  Yes, I am.<br>20  Q.  Okay. The first e-mail in this exchange<br>21     appears to be the one from Wanda Phillips<br>22     that was sent to Peter Williams on June 1st<br>23     at 9:37 a.m.; do you see that? | foundation FRE 401, 403, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201); Oppo to MIL 3 (Dkt 202).<br><br><br><br><br><br><br><br><br><br>Defendant's Objections:<br>Object (291:9-25) Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201); Oppo to MIL 3 |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 24  A.  Yes. Yes, yes, uh-huh.<br>25  Q.  Okay. At the very end of that e-mail | (Dkt 202). |
| Page 292<br>1       Ms. Phillips indicates, "Will Theresa be<br>2       available from claims on Tuesday, or Danny?<br>3       Who else should be in invited if anyone"; do<br>4       you see that?<br>5  A.  Yes, I do.<br>6  Q.  Mr. Williams responds and says, "Yes,<br>       Theresa<br>7       and Danny and Steve from claims." Do you<br>       see<br>8       that?<br>9  A.  I do see that.<br>10 Q.  And then Wanda Phillips' response to Peter,<br>11      and she also references Steve and Theresa.<br>12      Do you see that?<br>13 A.  I do. I do.<br>14 Q.  Okay. Are these references to Theresa<br>15      references to you, do you know?<br>16 A.  Yes, they are.<br>17 Q.  Okay. Does this refresh your recollection<br>18      that you were involved in conversations or<br>19      meetings in which renewal was discussed?<br>20 A.  This does.<br>21 Q.  Okay. What do you recall about this pre,<br>22      pre-meeting which took place before the<br>23      meeting with NBCU and Aon?<br>24 A.  I -- I -- I don't -- I actually really don't<br>25      recall anything about the pre, pre-meeting. | Defendant's Objections:<br>Object (292:1-25)<br>Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201); Oppo to MIL 3 (Dkt 202). |
| Page 293<br>1  Q.  Why were you invited, do you know?<br>2  A.  I think I was out there already out in L.A.,<br>3       but I -- I -- because underwriting invited us<br>4       to come, so...<br>5  Q.  Do you know why underwriting invited you<br>       and | Defendant's Objections:<br>Object (293:1-25)<br>Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, 801, 802 |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 6     others from claims to come? | |
| 7  A.  I -- I don't -- I mean, I assume that Wanda<br>8      invited us in the event there were questions<br>9      about claims. | Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201); Oppo to MIL 3 (Dkt 202). |
| 10  Q.  Did you attend the pre-meeting as well as the<br>11      meeting with NBCU and Aon? | |
| 12  A.  I don't remember a pre-meeting. If we had<br>13      one I would have been there. I vaguely<br>14      remember a meeting with Aon. | |
| 15  Q.  Okay. According to my reading of this e-mail<br>16      exchange, I believe there actually were three<br>17      meetings that were being discussed. There<br>18      was a meeting internally of OneBeacon folks,<br>19      and then there was going to be a meeting with<br>20      Susan Weiss of OneBeacon folks, and Susan<br>21      Weiss before the meeting with NBCU and Aon<br>22      and OneBeacon. Is that your recollection as<br>23      well? | |
| 24  A.  I'm not -- I guess -- I'll read through this<br>25      again. I -- I was thinking it was one -- two | |
| Page 294 | Defendant's Objections: |
| 1     meetings, a pre-meeting and then a meeting<br>2     with Aon and NBC, but not -- | Object (294:1-25)<br>Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, 801, 802 |
| 3  Q.  Okay. Well, let's just walk through it. | |
| 4  A.  That's fine. | |
| 5  Q.  So -- so beginning with the paragraph that<br>6      says, "Basically, she is asking for a<br>7      heads-up on renewal terms"; do you see that? | |
| 8  A.  I do. | Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201); Oppo to MIL 3 |
| 9  Q.  Okay. I'm sorry, before that, the paragraph<br>10     before that says, "Susan has requested a<br>11     pre-meeting before meeting with NBC." Do you<br>12     see that? | |
| 13  A.  I do, I do. Okay. | |
| 14  Q.  All right. And then in Mr. Williams' e-mail | |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 15    he indicates, "Should we have a pre-meeting<br>16    to discuss their pre-meeting."<br>17  A.  Yes, okay.<br>18  Q.  And Ms. Phillips responds, "Yes, Peter, an<br>19    OBE pre-meeting is wise to have before<br>20    meeting with NBCU and Aon." Do you see<br>      that?<br>21  A.  I do, yes.<br>22  Q.  Okay. So does this refresh your recollection<br>23    that there were actually three different<br>24    meetings?<br>25  A.  It sounds like it, yes.<br><br>Page 295<br>1  Q.  All right. So what do you recall, if<br>2    anything, specifically about the first<br>3    meeting, which would have been the meeting<br>4    internal to just OneBeacon people before<br>5    meeting with Aon?<br>6  A.  I don't recall anything really with respect<br>7    to that.<br>8  Q.  Do you recall presenting any information with<br>9    respect to claims during that internal<br>10   OneBeacon meeting?<br>11  A.  I don't recall, no.<br>12  Q.  Do you know for a fact, do you recall<br>13   specifically that the meeting took place?<br>14   And I'm referring now to the internal to<br>15   OneBeacon meeting.<br>16  A.  I -- I don't remember. Peter is indicating<br>17   he'd like one. I assume one took place, but<br>18   I simply can't remember --<br>19  Q.  Okay.<br>20  A.  -- whether or not it did.<br>21  Q.  Do you recall the meeting that took place<br>22   with OneBeacon people and Aon, but not<br>23   NBC Universal?<br>24  A.  I -- I -- I vaguely remember sitting down | (Dkt 202).<br><br><br><br><br><br><br><br><br><br>Defendant's Objections:<br>Object (295:1-25)<br>Nonrenewal, loses, other<br>claims; not relevant,<br>prejudicial; hearsay,<br>foundation FRE 401, 403,<br>801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith;<br>offered for non-hearsay<br>purpose; foundation present;<br>statement of party opponent.<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201); Oppo to MIL 3<br>(Dkt 202). |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| 25      with Susan.<br><br>Page 296<br>1   Q.   What do you recall about that meeting?<br>2   A.   Again, I don't -- I don't recall much. Maybe<br>3         Peter went through the terms of the renewal<br>4         or the quote. But, again, that's me<br>5         guessing. I just don't remember.<br>6   Q.   Do you know if NBC Universal -- excuse me, if<br>7         OneBeacon renewed NBC Universal's policy<br>8         after expiration on June 30, 2015?<br>9   A.   Yes.<br>10   Q.   It was renewed?<br>11   A.   No, it wasn't renewed.<br>12   Q.   It was not renewed.<br>13         So when you indicate that Mr.<br>14         Williams would be going through terms for<br>15         renewal, was it your understanding as of<br>16         June 2nd, 2015, that OneBeacon was discussing<br>17         renewing the policy?<br>18   A.   I -- my understanding is that they were<br>19         discussing renewal under certain terms.<br>20   Q.   Is it your understanding that it was<br>21         NBC Universal that made the decision that it<br>22         no longer wanted to be insured by OneBeacon,<br>23         or was it OneBeacon's decision that it no<br>24         longer wanted to insure NBC Universal?<br>25   A.   I think ultimately NBC -- or, excuse me,<br><br>Page 297<br>1         OneBeacon decided that it no longer wanted to<br>2         continue that relationship. | Defendant's Objections:<br>Object (296:1-25)<br>Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, 801, 802<br><br>Plaintiffs' Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201); Oppo to MIL 3 (Dkt 202).<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objections:<br>Object (297:1-2)<br>Nonrenewal, loses, other claims; not relevant, prejudicial; hearsay, foundation FRE 401, 403, 801, 802 |

| Plaintiffs' Designation of Theresa A. Gooley Wolf | Objection & Response |
|---|---|
| | Plaintiffs' Response: Relevant to bad faith; offered for non-hearsay purpose; foundation present; statement of party opponent. Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201); Oppo to MIL 3 (Dkt 202). |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Plaintiffs' Designation of Daniel Spencer Gutterman<br>February 3, 2017<br><br>Page 8<br>20  Q.   Good morning, Mr. Gutterman.<br>21  A.   Good morning.<br>22  Q.   Please spell your full name for the<br>23         record.<br>24  A.   Daniel Spencer Gutterman, D-A-N-I-E-L<br>25  S-P-E-N-C-E-R G-U-T-T-E-R-M-A-N.<br>Page 32<br>25  Q.   Were you tasked with researching whether<br><br>Page 33<br>1         the conflict between Israel and Hamas at<br>          the time of 2  the claim was a war?<br>3   A.   I was tasked with obtaining information 4<br>          about what was going on over there.<br>5   Q.   By who?<br>6   A.   My supervisors.<br>7   Q.   Who were they?<br>8   A.   Pamela Johnson and Peter Williams.<br>9   Q.   Anyone else?<br>10  A.   No.  Not that I can recall.<br>11  Q.   Was there a chain of command among the<br>          12  three of you?<br>13  A.   Yes.  Pam was my -- was my direct<br>14         supervisor.<br><br>Page 35<br>17         You're a current employee of who?<br>18  A.   One Beacon Entertainment.<br>19  Q.   Are you certain that's the entity that is<br>20         your employer?<br>21  A.   Yes.<br>22  Q.   Okay. And how long have you been<br>          employed<br>23         by One Beacon Entertainment?<br>24  A.   Since 2013. | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Page 37<br>16  Q.  Do you recognize the document marked<br>17        Exhibit 1?<br>18  A.  Yes.<br>19  Q.  What is it?<br>20  A.  It is the NBCUniversal Media Motion<br>21  Picture/Television Producers Portfolio<br>      Declarations<br>22  policy.<br>23  Q.  Is this the policy that you understand at<br>24        issue in this case?<br>25  A.  Without reviewing all of it, it appears to<br><br>Page 38<br>1        be.<br>2  Q.  Okay. I want you to turn to the page<br>3        marked ATL 3083.<br>4  A.  Yes.<br>5  Q.  You referred to four exclusions; correct?<br>6  A.  Yes.<br>7  Q.  Are the four exclusions that you referred<br>8        to on this page?<br>9  A.  Yes.<br><br>Page 45<br>7  Q.  Just to be clear, I'm asking: If you were<br>8        tasked with giving your best definition of<br>      what war<br>9        is, what would you say?<br>10  A.  It's really -- it's hard to define it. I<br>11        just know it when I see it. It's -- again, when<br>12        reviewing for -- when reviewing the articles and<br>13        information I found online during this time period,<br>14        it -- everything I saw was a war. |  |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Page 64 <br> 20 Q. Which claims do you not discuss with your <br> 21 supervisors? <br> 22 A. Noncomplex claims that don't involve any <br> 23 question of liability or coverage. <br> 24 Q With respect to the DIG claim at issue in <br> 25 this case, did you discuss your opinion as to <br><br> Page 65 <br> 1 coverage with your supervisors? <br> 2 A. I don't remember a specific conversation. <br><br> 8 Q. Was this a complex claim? And by "this" I <br> 9 mean the DIG claim. <br> 10 A. Yes. <br> 11 Q. Did you discuss your coverage opinion with <br> 12 respect to the DIG claim with your <br> supervisor? <br><br> 15 THE WITNESS: I don't recall a specific <br> 16 conversation. <br><br> Page 89 <br> 7 Let's start <br> 8 talking now about your employment at <br> OneBeacon. <br> 9 Okay? <br> 10 A. Okay. <br> 11 Q. What is your title today? <br> 12 A. Senior entertainment investigator. <br> 13 Q. What was your title when you began? <br> 14 A. The same. <br> 15 Q. Has it ever been different? <br> 16 A. No. <br> 17 Q. Do you have an understanding of what your <br> 18 job duties are as senior entertainment claims <br> 19 investigator? <br> 20 A. Yes. | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| **Page 91** <br><br> 20    When you adjust a claim -- and when I say <br> 21    "adjust a claim," I mean perform your duties as a <br> 22    claims adjuster, and what you said was, investigate <br> 23    the claim, determine coverage, if applicable, issue <br> 24    payment; right? Is that consistent? <br> 25  A.  Yes. | |
| **Page 110** <br> 14  Q.  Do you as a matter of practice engage <br> 15    outside independent adjusters in a consulting <br> 16    capacity when the claim involves an issue that <br> 17    you've never dealt with? <br> 18  A.  Yes | Defendant's Objections: <br> (110:14-18) Referenced to independent adjuster and/or Graham Henderson not relevant; confusing; waste of time; FRE 401, 403 <br><br> Plaintiff's Response: <br> Relevant to bad faith and failure to investigate. CACI 2332. |
| **Page 111** <br> 17    Do you have the time period between when <br> 18    you got notice of the DIG claim as a starting point <br> 19    and the September letter from OneBeacon in which <br> 20    OneBeacon reaffirmed its decision to deny coverage? <br> 21    Do you have that time period in mind? <br> 22  A.  Yes. <br> 23  Q.  Okay. At any time during that time <br> 24    period, did OneBeacon use an independent outside <br> 25    adjuster in connection with the DIG claim? | Defendant's Objections: <br> (111:17-25)Referenced to independent adjuster and/or Graham Henderson not relevant; confusing; waste of time; FRE 401, 403 <br><br> Plaintiff's Response: <br> Relevant to bad faith and failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| **Page 112**<br>1   A.   Would you define what is an independent<br>2           outside adjuster.<br>3   Q.   No. We've been talking about independent<br>4           outside adjusters for 20          minutes. I<br>             want you to use<br>5           the same definition you've been using.<br>6   A.   Then using that definition, no.<br>7   Q.   Okay. Is there another definition of<br>8           "independent outside adjuster" that you would<br>             would use<br>9           which would change your answer?<br>10  A.   No.<br>11  Q.   Okay. Why not?<br>12  A.   Why not what?<br>13  Q.   Why didn't OneBeacon use an independent<br>14          outside adjuster in connection with the DIG<br>             claim?<br>15  A.   The facts of the loss that were presented<br>16          to us didn't necessarily warrant that.<br>17  Q.   Had you ever dealt with the application of<br>18          a war exclusion to a claim before?<br>19  A.   No.<br><br>**Page 141**<br>21  Q.   Okay. Back to the DIG claim.<br>22          You testified that OneBeacon did not<br>23          consult an outside independent insurance adjuster on<br>24          the DIG claim; correct?<br>25  A.   Correct.<br><br>**Page 142**<br>12  Q.   At any point during the process, did you<br>13          suggest that OneBeacon seek the opinion of an<br>14          outside insurance adjuster who had applied the war | Defendant's Objections:<br>(112:1-19) Referenced to independent adjuster and/or Graham Henderson not relevant; confusing; waste of time; FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. CACI 2332.<br><br><br><br>Defendant's Objections:<br>(142:1-25) Object as to attorney client privilege relevance; prejudicial; FRE 401, 403, 502 |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 15    exclusion?<br>16   A.   No.<br>17   Q.   Why not?<br>18   A.   The facts of the loss didn't warrant it.<br>19   Q.   Okay. When you say "facts of the loss,"<br>20      what do you mean?<br>21   A.   We were initially provided by the broker<br>22      and the insured an e-mail from the head of security<br>23      from NBC in Israel. Based upon that e-mail, as well<br>24      as the conversation with the broker and the insured,<br>25      it -- as well as also doing research thereafter, | Plaintiff's Response:<br>Relevant to bad faith; mere reference to outside counsel not privileged. Relevant to bad faith and failure to investigate. CACI 2332. |
| Page 143<br>1      there was no need for -- an independent adjuster<br>2      wouldn't have been -- I use independent adjusters to<br>3      create estimates and to talk with insureds about<br>4      their property. I don't ever use them in a<br>5      situation like this.<br><br>14   Q.   I'm just asking what you mean. Because<br>15      one of the facts of the loss, at least what I'm<br>16      understanding from you is, what caused the loss;<br>17      right? Is that right?<br>18   A.   Yes and no. I mean, there's also to<br>19      the -- I don't use independent adjusters --<br>20   Q.   Well, that's not my question.<br>21   A.   -- for coverage.<br><br>24   Q.   That's -- that's not my question. I just<br>25      want to make sure we're on the same page | Defendant's Objections:<br>(143:1-5)<br>Object as to attorney client privilege  relevance; prejudicial; FRE 401, 403, 502<br><br>Plaintiff's Response:<br>Relevant to bad faith; mere reference to outside counsel not privileged. Relevant to bad faith and failure to investigate. CACI 2332.<br><br>Defendant's Objection:<br>(143:14-21, 24-25)<br>Use of independent adjuster not relevant; prejudicial; waste of time; FRE 401, 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Page 144 <br> 1  When you say "facts of the loss," does <br> 2  that include whether or not the loss in this case <br> 3  was caused by a war? <br> 4  A.  I don't understand the question because it <br> 5  doesn't relate to the first question that you asked. <br> 6  I use independent adjusters -- I don't use <br> 7  independent adjusters for -- I've never used an <br> 8  independent adjuster for determining if war was <br> 9  involved. <br> 10  Q.  Well, you said before that the facts of <br> 11  the loss didn't warrant it. I thought that's what <br> 12  you said; right? <br> 13  A.  That sounds right. Yes. <br> 14  Q.  Okay. And all I'm asking is: Since <br> 15  OneBeacon had never considered, to your knowledge, a <br> 16  war exclusion to -- application of a war exclusion <br> 17  to a claim other than this Thailand case, I want to <br> 18  know if you consider whether or not there was a war <br> 19  that caused this loss, whether or not that's a fact. <br><br> 22  THE WITNESS: This was a war. I'm not <br> 23  really sure I understand the question. <br><br> Page 145 <br> 8  Q.  Did you feel at the time you were involved <br> 9  in the review of the DIG claim, did you feel at any <br> 10  time that you needed to consult anybody on the | Defendant's Objections: <br> (144:1-19) <br> Use of independent adjuster not relevant; prejudicial; waste of time; FRE 401, 403 <br><br> Plaintiff's Response: <br> Relevant to bad faith and failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 11      question whether or not the loss was caused by a | |
| 12      war? | |
| 13    A.   My supervisors. | |
| 14    Q.   At one point you felt you needed to | |
| 15      consult your supervisors on the question whether or | |
| 16      not the loss was caused by a war? | |
| 17    A.   I didn't need to consult with them. They | |
| 18      came up with that completely independent of me. | |
| 19      I'm sorry. I think I'm lost in the | |
| 20      questioning. I'm not sure I understand it. | |
| 21    Q.   You were involved in the DIG claim; right? | |
| 22    A.   Yes. | |
| 23    Q.   You did research; right? | |
| 24    A.   Yes. | |
| 25    Q.   What research did you do? | |
|   | |
| Page 146 | |
| 1    A.   I had conversations with the broker, the | |
| 2      insured, reviewed the e-mail that was sent to us, | |
| 3      looked online at multiple different websites. | |
| 4    Q.   Okay. At any point during that process, | |
| 5      did you feel the need to consult with somebody else | |
| 6      on the question whether or not the loss was caused | |
| 7      by a war? | |
| 8    A.   I don't remember specific conversations. | |
| 9      But I'm sure I had conversations with Pamela and/or | |
| 10      Peter where they described -- I mean, we were all | |
| 11      discussing what had we found from our research. | |
| 12    Q.   And what had you found from your research? | |
| 13    A.   Primarily that this was a war. Everything | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|

14     that we were seeing showed that there was missiles

15     that were being shot from Palestine into Israel;

16     that a ground offensive was a possibility and

17     eventually, I believe it occurred; that -- that

18     tanks were mobilizing. I mean, the ground -- the

19     armies were mobilizing at borders.

20   Q.   Why did it matter that there was a ground

21     offensive?

Page 147

2   Q.   Why did it matter that there was a ground

3     offensive possible?

4   A.   Well, you asked me what -- what research I

5     had done. That was what we'd found.

6   Q.   Right. You said that this was a war, and

7     then you started to list the reasons why; right?

8   A.   Why it's a war?

9   Q.   Right.

10   A.   Oh, I was just telling you this is some of

11     the research we'd found.

12   Q.   Right. Well, what relevance does the fact

13     that there was a ground offensive possible have to

14     this determination of whether or not it's a war?

15   A.   All those constitute a war, to me.

16   Q.   All of what constitute a war to you?

17   A.   All those examples that I lined up after I

18     said this is a war.

19   Q.   Ground offensive; right?

20   A.   (No audible response.)

21   Q.   "Yes"?

Page 148

18   Q.   Okay. So based on all of that research,

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 19     in your opinion, at the time the DIG claim was made<br>20     and reviewed by OneBeacon, your opinion was the loss<br>21     was caused by a war?<br>22  A.  No. Not instantaneously.<br>23  Q.  I didn't say "instantaneously."<br>24     After you conducted the research before<br>25     OneBeacon denied the claim, at some point between<br><br>Page 149<br>1     the time you got notice of the claim and OneBeacon's<br>2     denial, your research led you to believe that the<br>3     loss was caused by a war.<br>4  A.  Yes.<br>5  Q.  Okay. And you just identified all the<br>6     reasons why you came to that conclusion; right?<br>7  A.  Yes.<br>8  Q.  And can you think of any other reasons?<br>9  A.  No.<br>18  Q.  Okay. Do you remember if you discussed<br>19     your opinion of whether or not the loss was caused<br>20     by a war with Pamela or Peter?<br>21  A.  I don't recall a specific conversation.<br>22     No.<br>23  Q.  Okay. Did you ever consider whether or<br>24     not Hamas was a sovereign?<br>25  A.  Did I personally?<br><br>Page 150<br>1  Q.  Yes. In your research into whether or not<br>2     the loss was caused by a war.<br>3  A.  I don't know if I did or not.<br>4  Q.  Did you ever consider whether or not Hamas | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 5      had indicia of sovereignty in that research? | |
| 6   A.  Please define "indicia." | |
| 7   Q.  Did you ever consider whether Hamas was in | |
| 8      any way like a sovereign nation in that research? | |
| 9   A.  I did not. | |
| 10  Q.  Why not? | |
| 11  A.  My involvement in this claim was it was | |
| 12     assigned to me. But eventually this claim was | |
| 13     almost dealt with primarily by Pam- -- by Pamela. | |
| 14     And so that type of research would have been handled | |
| 15     at that point by her. | |
| 16  Q.  Did you ever seek to determine in your | |
| 17     research whether or not Hamas was a terrorist | |
| 18     organization? | |
| 19  A.  I don't recall. | |
| 20  Q.  Did you ever seek to determine in your | |
| 21     research whether the loss at issue was caused by | |
| 22     terrorism? | |
| 23  A   I don't recall. | |
| 24  Q.  Did anybody at OneBeacon ever seek to | |
| 25     determine whether the loss at issue in connection | |
| | |
| Page 151 | |
| 1      with the DIG claim was caused by terrorism? | |
| | |
| 4   Q.  If you know. | |
| 5   A.  We eventually had a conversation with the | |
| 6      broker and the insured a few days later where they | |
| 7      said they disagreed with -- in our conversation we | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 8    had told them, meaning Pamela had told them, that<br>9    the war exclusion could potentially apply. They<br>10   brought up that they disagreed with it because<br>11   Hamas -- their -- in their opinion, Hamas was not a<br>12   sovereign state. And so at that point I'm sure<br>13   research was done by Pamela.<br>14  Q.  After that conversation did you -- did you<br>15   do any research into whether or not Hamas was a<br>16   sovereign state?<br>17  A.  I don't recall.<br>18  Q.  Did you do any research into whether or<br>19   not Hamas had things about it that were similar to a<br>20   sovereign state?<br>21  A.  I don't recall.<br>22  Q.  Did you do any research into whether or<br>23   not Hamas was a terrorist organization after this<br>24   call that you just described?<br>25  A.  Any time after this call or during this<br><br>Page 152<br>1    time period up until litigation that we're still in?<br>2  Q.  That time period.<br>3  A.  Okay. I don't recall.<br><br>Page 153<br>17  Q.  Okay. So at that time period, between the<br>18   time you received notice of the DIG claim and the<br>19   time it was denied, do you recall doing any research<br>20   into whether or not war required a dispute | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| and | |
| 21  conflict between sovereign nations? | |
| 22  A.  I don't recall. | |
| 23  Q.  Do you recall doing any research into | |
| 24  whether or not the acts that caused the loss in this | |
| 25  case were terrorist acts? | |
| | |
| Page 154 | |
| 1  A.  I don't recall. | |
| 2  Q.  Do you recall doing any research into | |
| 3  whether or not Hamas was a terrorist organization? | |
| 4  A.  I don't recall. | |
| 5  Q.  Do you recall whether or not anybody at | |
| 6  OneBeacon did any such research? | |
| 7  A.  Again, I'm sure as soon as we had that | |
| 8  conversation and they brought it up, that would have | |
| 9  been a time when we went back and started looking at | |
| 10  what they were talking about, if not before then. | |
| 11  Q.  Would have been. | |
| 12  But do you have any personal knowledge of | |
| 13  anybody at OneBeacon doing any research into whether | |
| 14  or not war requires a conflict between two | |
| 15  sovereigns? | |
| 16  A.  I don't. No. | |
| 17  Q.  Do you have any personal knowledge of | |
| 18  anybody at OneBeacon doing any research under the | |
| 19  question whether the acts that caused the loss at | |
| 20  issue in this case were acts of terrorism? | |
| 21  A.  I don't know. | |
| 22  Q.  Do you have any personal knowledge | |
| 23  regarding whether or not anybody at OneBeacon did | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 24    any research into the question whether or not Hamas<br>25    is a terrorist organization?<br><br>Page 155<br>1  A.  I don't know.<br>2  Q.  At the time of the DIG claim, what was<br>3    your opinion as to whether or not Hamas was a<br>4    terrorist organization?<br>5  A.  I don't know if I had one.<br><br>14  Q.  What was your role, again, in connection<br>15    with the adjusting of the DIG claim?<br>16  A.  It initially came to me. Pamela and I had<br>17    a conversation with the broker and the insured,<br>18    doing research online, sending that research back<br>19    and forth between Pamela and I, as well as Peter, I<br>20    believe; having another conversation thereafter.<br>21    But ultimate decisions of coverage were done by<br>22    Pamela.<br>23  Q.  Were you responsible for determining<br>24    coverage?<br>25  A.  In certain claims, yes.<br><br>Page 156<br>1    Are you asking about this particular<br>2    claim?<br>3  Q.  I'm asking about the DIG claim.<br>4    Were you responsible for determining<br>5    coverage?<br>6  A.  No.<br>7  Q.  Not at all?<br>8  A.  No. | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| <u>Page 157</u><br>3  Q.  Okay. And your recommendation in<br>4       connection with the DIG claim at the time it was<br>5       made and prior to its ultimate denial was that it<br>6       should be denied because it's excluded by the war<br>7       exclusion?<br><br>10  THE WITNESS: I had been working there for<br>11     around a year at that point. I completely defaulted<br>12     to my supervisor and Peter, who had significantly<br>13     more experience than I did. I don't think I ever --<br>14     I certainly didn't give a recommendation. It was<br>15     just my own thought process, this seems like a war.<br>16  Q.  You expressed that opinion?<br>17  A.  I don't recall if I did or did not.<br><br><br><u>Page 161</u><br>11  Q.  Well, did you help in the determination of<br>12     coverage in connection with the DIG claim?<br>13  A.  I don't remember if I had conversation --<br>14     well, yes, because we were sending each other back<br>15     and forth the articles which helped in the process<br>16     of determining if there was coverage or not.<br>17  Q.  Did you do anything else to help in the<br>18     determination of coverage?<br>19  A.  I reviewed the policy.<br>20  Q.  Did you render your opinion based on your<br>21     review of the policy? | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 22  A.   I don't recall if I did or not.<br>23  Q.   Did you do anything else other than review<br>24        the policy and circulate website links?<br><br>Page 162<br>3      THE WITNESS: I do not recall if I did or<br>4        did not.<br><br><br>Page 169<br>20  Q.   So if I were to define the universe of<br>21        people at OneBeacon who adjust first-party extra<br>22        expense claims in the entertainment space for the<br>23        time period starting when you began at OneBeacon<br>24        until today, that universe is you, Pamela Johnson,<br>25        and Steve Baltzell?<br><br>Page 170<br>1  A.   Correct. I've actually -- I've remembered<br>2        also Theresa Gooley was involved in claims that --<br>3        in -- that were extra expense claims as well. And<br>4        Peter certainly was always there to help us.<br>5  Q.   What does that mean, "always there to help<br>6        us"?<br>7  A.   He had 30 years of claims experience. So<br>8        we certainly used him as a sounding board.<br>9  Q.   So we've got you, Pamela Johnson, Steve<br>10       Baltzell, Theresa Gooley, Peter Williams.<br>11       Anybody else?<br>12  A.   Currently Aaron Stone.<br><br><br>Page 172 | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 15  Q.  Okay. What would you do if you had a<br>16       question about the scope of coverage?<br>17  A.  Usually I discuss it with my supervisors<br>18       and then discuss it with the underwriters to see<br>19       what their intent was. And then depending on where<br>20       we go from there, discussing it with the brokers and<br>21       ultimately discussing it with the insureds,<br>22       assuming, of course, we already have facts of loss<br>23       and we know that there's certainly a question that<br>24       coverage is not -- that an exclusion could<br>25       potentially apply.<br><br>Page 174<br>2     BY MR. HAYES:<br>3   Q.  Part of the discussion with the insured<br>4        is, "Why do you think there's coverage?"<br>5        Is that accurate?<br>6   A.  No.<br>7   Q.  Okay.<br>8   A.  Not necessarily. I mean, again, sometimes<br>9        the insureds understand that there is an issue, and<br>10       then there's other times when the insureds just<br>11       don't -- don't get it. And then you say, "Okay.<br>12       Well, explain to me."<br>13       So, yes, occasionally there will be times<br>14       when I've brought up, "Okay. Explain to me more do<br>15       why you believe that there's coverage for this."<br>16  Q.  Okay. And if it's a situation where you<br>17       say, "Why do you believe there is coverage | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| for<br>18   this," what do you do with the information they give<br>19   you?<br>20   A.   Review the policy again to see how we<br>21   determine -- basically, redo everything I did the<br>22   first time around. Again, speak with my<br>23   supervisors, speak with the underwriters, and then<br>24   speak again with the broker.<br>25   We really want to find coverage. I mean, | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Page 175 | |
| 1      that's -- I was taught that from Peter and from | |
| 2      Pamela over and over and over again. So if we can | |
| 3      find it, we'll do so. We want people to -- we want | |
| 4      to find coverage. | |
| | |
| 15   Q.   So if finding coverage is your objective | |
| 16        in every case, how do you go about achieving that | |
| 17        objective? | |
| 18   A.   Look through every aspect of the policy, | |
| 19        make sure that there's no other -- other policies | |
| 20        that are out there, see if any other coverage could | |
| 21        potentially apply, see if there's any endorsements | |
| 22        that are out there that we didn't necessarily know | |
| 23        about; and, again, speaking with the underwriters. | |
| 24        Maybe there's things that we missed. | |
| 25        And when I said "word for word," I meant | |
| | |
| Page 176 | |
| 1      that colloquially. I don't know if they -- again, | |
| 2      it's been three years. But it was -- always the | |
| 3      basis was, you -- your goal is to try and find | |
| 4      coverage. | |
| 5    Q.   That was from the moment you stepped in at | |
| 6        OneBeacon; right? | |
| 7    A.   I mean, not the moment I stepped in. But, | |
| 8        like, within days of being there. I don't remember | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 9     the exact time period. | |

| | |
|---|---|
| Page 180<br>8  Q.  Okay. So in your effort to find coverage,<br>9     do you ever do any research?<br>10  A.  In what regards?<br>11  Q.  Any -- any regard. Any research that you<br>12     think might help the case for the insured.<br>13  A.  Beyond reviewing the policy?<br>14  Q.  Yes. Like Internet research, for example.<br>15  A.  Nothing is popping in my head. I don't<br>16     know.<br><br>DEFENDANT'S COUNTER:<br>17  Q. But if the goal is to find coverage and<br>18  you thought you could find something on the Internet<br>19 that might support the claim for coverage, would you<br>20 do it consistent with that objective?<br>**21  A. Would I?**<br>22  Q. Yes.<br>23    **MR. KEELEY:** Objection. Vague.<br>**24 BY MR. HAYES:**<br>25  Q. What you said was, "We really want to find<br><br>DEFENDANT'S COUNTER:<br>Page 181<br><br>1 coverage"; right?<br>**2  A. If -- if it helped, yes, I would look<br>3 online.**<br>4  Q. If you thought it would help to look<br>5 online for evidence supporting the insured's<br>6 position, you would do it?<br>**7  A. Yes.**<br>END DEFENDANT'S COUNTER<br><br><br>Page 189<br>17  Q.  Do you recognize the document that's been<br>18     marked Exhibit 15? | Defendant's Counter:<br>180:17-25<br>181:1-7<br><br>Plaintiff's Response:<br>Not necessary for completeness. Counter is separate question and answer. 180:23 improperly includes attorney objection. |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 19  A.   Yes.<br>20  Q.   What is it?<br>21  A.   General Claims Practices.<br>22  Q.   When did you first see this document?<br>23  A.   I don't remember.<br><br>Page 190<br>2        Are these rules that apply to the<br>3        adjusting of claims at OneBeacon?<br>4   A.   I believe so. Yes.<br>5   Q.   Are these rules in effect at OneBeacon<br>6        today?<br>7   A.   I don't know.<br>8   Q.   Were these rules in effect at OneBeacon<br>9        when you started?<br>10  A.   I don't know.<br>11  Q.   Were these rules in effect at OneBeacon at<br>12       the time of the DIG claim?<br>13  A.   I don't know.<br>14  Q.   Have you ever reviewed these rules?<br>15  A.   Yes.<br>16  Q.   When?<br><br>22  THE WITNESS: I don't know.<br><br>Page 192<br>16  Q.   Okay. Do you remember whether you<br>17       reviewed it prior to the DIG claim?<br>18  A.   I do not.<br>19  Q.   Do these rules set forth in Exhibit 15<br>20       apply to you?<br>21  A.   Yes.<br><br>Page 193<br>10  Q.   Do you have any reason to believe that the<br>11       General Claims Practices set forth in<br>          Exhibit 15 did<br>12       not apply to the DIG claim? | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 14   THE WITNESS: No. | |
| | |
| 16   Q.   Okay. Look at Exhibit 16. | |
| 17         Do you recognize that document? | |
| 18   A.   Yes. | |
| 19   Q.   What is it? | |
| 20   A.   Core Principles. | |
| 21   Q.   When was the first time you saw this | |
| 22         document? | |
| 23   A.   I don't know. | |
| 24   Q.   Before the DIG claim or after? | |
| 25   A.   I don't recall. | |
| | |
| Page 194 | |
| 1    Q.   Have you ever read it? | |
| 2    A.   Yes. | |
| 3    Q.   When? | |
| 4    A.   Right now. | |
| 5    Q.   You never read it before today? | |
| 6    A.   Yes. | |
| 7    Q.   When? | |
| 8    A.   I don't recall. | |
| 9    Q.   Before or after the DIG claim? | |
| 10   A.   I don't recall. | |
| | |
| 18   Q.   Do these Core Principles apply to you | |
| 19         today, referring to Exhibit 16? | |
| 20   A.   Yes. | |
| 21   Q.   Did they apply to you when you started at | |
| 22         OneBeacon? | |
| 23   A.   Yes. | |
| 24   Q.   Did they apply to you at the time of the | |
| 25         DIG claim? | |
| | |
| Page 195 | |
| 1    A.   Yes. | |
| | |
| Page 196 | |
| 18   Q.   So best recollection, the day that you | |

132

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 19     first received notice of the DIG claim was July 15,<br>20     2014?<br>21  A.  Yes. It was either that or the day<br>22     before. I don't remember exactly.<br>23  Q.  Do you remember how you received notice<br>24     the first time?<br>25  A.  There was a chain of e-mails that got to<br><br>Page 197<br>1     me.<br>2  Q.  So the e-mail was the first time you<br>3     received notice?<br>4  A.  As I recollect, yes.<br><br>Page 198<br>6    MR. HAYES: This is going to be<br>7     Exhibit 17.<br>8     (Exhibit 17 was marked<br>9     for identification.)<br>10  MR. HAYES: This is going to be<br>11    Exhibit 18.<br>12    (Exhibit 18 was marked<br>13    for identification.)<br><br>16  Q.  Do you recognize the document marked<br>17     Exhibit 17?<br>18  A.  Yes.<br>19  Q.  What is it?<br>20  A.  E-mails from Pamela to the broker and the<br>21     insured and cc'ing myself and then an e-mail from<br>22     the insured to Pamela, the broker, and cc'ing myself<br>23     regarding coverage determination.<br>24  Q.  Okay. Now, I want you to look at the<br>25     e-mail dated July 28 at 10:56 a.m. from Pamela | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Page 199<br>1      Johnson to Susan Weiss and others.<br>2      Do you see that link?<br>3  A.  Yes.<br>4  Q.  And do you see there is reference to a<br>5      corrected version that's attached?<br>6  A.  Yes.<br>7  Q.  And that corrected version is the<br>8      corrected version of a coverage<br>       determination letter<br>9      from OneBeacon.<br>10    Is that your understanding?<br>11 A.  Looking at this, yes.<br>12 Q.  And I want you to look at Exhibit 18.<br>13    Do you recognize that document?<br>14 A.  Yes.<br>15 Q.  What is it?<br>16 A.  It's Pamela Johnson's denial letter to<br>17    Andrea Garber.<br>18 Q.  Does this appear to you to be the<br>19    attachment to the e-mail on Exhibit 17<br>      dated<br>20    July 28, 2014, at 10:56 a.m. from Pamela<br>      Johnson?<br>21 A.  It does.<br><br><br>Page 200<br><br>17 Q.  Do you recognize the letter marked<br>18    Exhibit 19?<br>19 A.  Yes.<br>20 Q.  What is it?<br>21 A.  It appears to be the response from the<br>22    insured to Pamela Johnson. I'm sorry. From<br>      Lucia<br>23    Coyoca of Mitchell Silberberg & Knupp to<br>      Pamela<br>24    Johnson. | Defendant's Objections:<br>(200:17-19) and to exhibit 19<br>as it is hearsay; not<br>authenticated; not relevant;<br>foundation, prejudicial FRE<br>401, 403, 601, 801, 802<br><br><br>Plaintiff's Response:<br>Relevant to bad faith; offered<br>for non hearsay purpose;<br>foundation present;<br>admission by party |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| | opponent; exhibit is business record, self-authenticating, and a Defendant-produced document. |
| Page 201 | Defendant's Objections: Object to exhibit 19 as it is hearsay; not authenticated; not relevant; foundation, prejudicial FRE 401, 403, 601, 801, 802 |
| 23  Q.  Do you recognize the letter marked | |
| 24       Exhibit 20? | |
| 25  A.  Yes. | |
| | |
| | Plaintiff's Response: Relevant to bad faith; offered for non hearsay purpose; foundation present; admission by party opponent; exhibit is business record, self-authenticating, and a Defendant-produced document. |
| Page 202 | |
| 1  Q.  What is it? | |
| 2  A.  It appears to be Pamela Johnson's response | |
| 3       to Ms. Coyoca. | |
| . | |
| 11  Q.  Okay. So the DIG claim comes in on | |
| 12       July 15, 2014, as far as you know; right? | |
| 13  A.  As far as I'm aware, yes. | |
| 14  Q.  And you received that claim from the | |
| 15       Canton system, I think you said? | |
| 16  A.  I don't remember exactly how I got it. I | |
| 17       think it came in -- there had been a process for a | |
| 18       long time where a -- the broker could send claims | |
| 19       directly to the claims department. So I think | |
| 20       that's what happened in this instance. | |
| 21  Q.  Okay. But it was sent to you? | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 22  A.  Eventually, yes.<br>23  Q.  And when you received the claim, what did<br>24       you understand your role to be in terms of adjusting<br>25       the claim?<br><br>Page 203<br>1  A.  Speaking with the insured, speaking with<br>2       the broker, reviewing the e-mail that had been sent<br>3       to them from the head of security at NBC,<br>4       investigating the claim, investigating and searching<br>5       online for what was going on over there, and help in<br>6       the determination of coverage. And if there --<br>7       yeah.<br>8  Q.  And how was it that you were going to help<br>9       in the determination of coverage? What was your<br>10      understanding at the time you received the claim?<br>11  A.  Reviewing the facts of the loss, dealing<br>12      with the research that we had done, and then<br>13      applying it to the policy.<br>14  Q.  You said "reviewing the facts of the<br>15      loss."<br>16      What were the facts of the loss in<br>17      connection with the DIG claim?<br>18  A.  The e-mail that had been sent to us by the<br>19      head of NB- -- head of NBC security in Israel and<br>20      then the information that was eventually provided to<br>21      us by the broker and the insured.<br>22  Q.  Anything else?<br>23  A.  No.<br>24  Q.  What was the information provided by the | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 25     broker and the insured?<br><br>Page 204<br>1  A.  I don't remember the specific<br>2       conversation.<br>3  Q.  Did you receive that information orally or<br>4       in writing?<br>5  A.  I believe it was orally. Well, the<br>6       initial e-mail with the head of security came in<br>7       writing from them to us.<br>8  Q.  Right.<br>9  A.  But there was a -- a conversation<br>10      thereafter that we had, which was an oral<br>11      conversation.<br>12  Q.  And do you remember what information was<br>13      provided by the broker and the insured in that<br>14      conversation?<br>15  A.  Not really, no.<br>16  Q.  Anything about it?<br>17  A.  No.<br>18  Q.  Okay. So you reviewed the facts of the<br>19      loss, and you've told me what you consider to be the<br>20      universe of the facts of the loss; right?<br>21  A.  Are we still talking about the day we<br>22      received it?<br>23  Q.  I want to know what your understanding was<br>24      at the beginning when you received the claim of what<br>25      your role would be in adjusting the claim.<br><br>Page 205<br>1      Okay?<br>2  A.  Uh-huh.<br>3  Q.  My understanding from your testimony was<br>4      that when you received the claim, you | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| understood | |
| 5     your role to be, one, review the facts of the loss; | |
| 6     two, review the research that you did; and, three, | |
| 7     applying that research to the policy. | |
| 8     That's what you understood at the time | |
| 9     that you -- your role would be in adjusting the | |
| 10    claim? | |
| 11  A.  Well, as well as speaking with the insured | |
| 12    and the broker. Yes. Sorry. I didn't realize that | |
| 13    that wasn't one of the ones. | |
| 14  Q.  When you received the claim, what did you | |
| 15    understand would be the research that would need to | |
| 16    be conducted? | |
| 17  A.  Googling websites, news sites, to | |
| 18    determine -- to just get a better understanding of | |
| 19    what was going on over there. | |
| 20  Q.  When you say "understanding of what was | |
| 21    going on over there," what do you mean exactly? | |
| 22  A.  I don't recall my exact headspace. But I | |
| 23    don't believe I really had a very good understanding | |
| 24    at that time period of what was occurring in Israel | |
| 25    at that time. | |
|   | |
| Page 206 | |
| 1  Q.  You mean what physically was occurring on | |
| 2    the ground? | |
| 3  A.  Yes. | |
|   | |
| 23  Q.  Why did you need to know what was going on | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 24   to evaluate the claim?<br>25 A. Research is always beneficial.<br><br>Page 207<br>7 Q. So you weren't looking for anything in<br>8    particular? You were just looking for anything out<br>9    there relating to the situation in Israel as it was<br>10   unfolding?<br>11 A. I guess that's a fair statement. Yes.<br>12 Q. Were you -- were you using search terms?<br>13   How did you search for the information?<br>14 A. I have no idea what I did then.<br>15 Q. You have no idea what you did on the<br>16   Internet to search for information?<br>17 A. At that time, no, I don't recall.<br>18 Q. Did you use Google?<br>19 A. I don't recall. I'm -- my main word<br>20   search sites are Yahoo!, Google, and Bing, and<br>21   barely ever Bing. So Google is my main one.<br>22 Q. And did you search using keywords?<br>23 A. I don't recall.<br><br>Page 208<br>11 Q. Okay. So what did you mean when you said<br>12   "apply it to the policy"?<br>13 A. Determining what, if any, coverages the<br>14   facts of the loss could apply to.<br><br>18 Q. You applied the facts and the research to<br>19   the policy with the guiding principle that, "we,"<br>20   meaning OneBeacon, "really want to find coverage."<br>21 A. Yes. | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Page 215<br>12  Q.  You said you also applied facts, research<br>13        to the policy; correct?<br>14  A.  Uh-huh.<br>15  Q.  You did that -- "yes"?<br>16  A.  Yes.<br>20  Q.  Did you form any conclusions through your<br>21        application of the facts and the research to the<br>22        policy or opinions?<br>23  A.  I don't recall. It's been three years.<br>24        But that would be the typical claims process.<br>25  Q.  Okay. And if you had formed an opinion or<br><br>Page 216<br>1          a conclusion, you would have communicated that<br>2          opinion or conclusion to Pamela; right?<br><br>5    THE WITNESS: I don't recall in this<br>6          claim. But that would be a typical process.<br><br>23  Q.  Was it terrorism? Was terrorism the cause<br>24        of the loss?<br><br>Page 217<br>1    THE WITNESS: No.<br><br>3    Q.  Could it have been the cause of the loss?<br><br>6    THE WITNESS: No.<br><br>8    Q.  Why not?<br>9    A.  Everything that I saw, the missiles<br>10        shooting from Palestine to Israel, the missiles<br>11        shooting from Israel to Palestine, MSNBC writing, | |

140

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 12    "This is a war," everything -- I mean, tanks,<br>13    soldiers, this -- that -- was a war. It<br>14    wasn't -- it wasn't a terrorist act.<br>15  Q.  There's no facts or evidence that would<br>16    suggest the loss was caused by terrorism?<br><br>19  THE WITNESS: When I think of terrorism, I<br>20    think of 9/11. I think of the Boston Marathon. I<br>21    think of Oklahoma City. This was not terrorism.<br><br>23  Q.  That opinion that you've just articulated,<br>24    you don't recall whether you ever communicated that<br>25    to Pamela or Peter at any point prior to the<br><br>Page 218<br>1    July 28, 2014 denial letter; is that your testimony?<br>2  A.  That's correct.<br><br>12  Q.  What was Pamela's role in the adjustment<br>13    of the DIG claim?<br>14  A.  She was doing very similar things as I was<br>15    and also doing her research and investigation. And,<br>16    as you can see, she was also the one that wrote the<br>17    opinions and cover letters -- coverage letters.<br>18  Q.  She was responsible for making the<br>19    ultimate coverage decision?<br>20  A.  I don't know.<br>21  Q.  What was Peter's role?<br>22  A.  He was the president of OneBeacon Entertainment.<br>24  Q.  What was his role in connection with the<br>25    DIG claim? | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Page 219 | |
| 1   A.   Providing his opinion. | |
| 2   Q.   Did he make the ultimate decision | |
| 3        regarding whether or not there was | |
|          coverage? | |
| 4   A.   No. I don't think that would have been | |
| 5        his role. | |
| 6   Q.   Who did? | |
| 7   A.   It was Pamela. But I don't know if she | |
| 8        consulted with anyone above her as well. | |
| | |
| Page 220 | Defendant's Objections: |
| 13   THE REPORTER: Exhibit 21? | See Defendant's objections |
| 14   MR. HAYES: Yes. | to Plaintiffs' exhibit 21, |
| 15        (Exhibit 21 was marked | incorporate herein. |
| 16        for identification.) | |
| | |
| 18   Q.   Do you recognize the document that's been | Plaintiff's Response: |
| 19        marked Exhibit 21? | See Plaintiffs' response to |
| 20   A.   Without reading line for line, yes. | Defendants' objections to |
| 21   Q.   What is it? | exhibit 21, incorporated |
| 22   A.   It appears to be our electronic file. | herein. Relevant to bad faith, |
| 23   Q.   This is the electronic file that OneBeacon | admission by a party |
| 24        opens for every new claim? | opponent, business record. |
| 25   A.   Yes. | |
| | |
| Page 221 | |
| 1   Q.   And this is the one that pertains to the | |
| 2        DIG claim? | |
| 3   A.   It appears that way. Yes. | |
| 4   Q.   Was there a paper file that corresponded | |
| 5        with the DIG claim? | |
| 6   A.   Not that I can recall. | |
| | |
| 15   Q.   Mr. Gutterman, we went over what your | |
| 16        understanding of your role in adjusting the DIG | |
| 17        claim would be. I anticipate this is going to be | |
| 18        duplicative. But I just want to make sure we | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 19     know what you actually did in adjusting the DIG claim. | |
| 20     Okay? | |
| 21   A.   Okay. | |
| 22   Q.   It may be completely co-extensive with | |
| 23     what you've already testified to, but I just want to | |
| 24     make sure we have that clear understanding on the | |
| 25     record. | |
| | |
| Page 222 | |
| 1     Okay? | |
| 2     My understanding is that, in connection | |
| 3     with adjusting the DIG claim, you actually reviewed | |
| 4     the facts of the loss, which included information | |
| 5     from the broker and the insured and the letter from | |
| 6     NBC security; is that correct? | |
| 7   A.   The e-mail. Yes. | |
| 8   Q.   The e-mail from security; is that correct? | |
| 9   A.   Yes. | |
| 10   Q.   You researched using Google and the | |
| 11     Internet. | |
| 12   A.   I don't remember if it was Google. But, | |
| 13     yes, it was using the Internet. | |
| 14   Q.   Okay. You talked to the insured and the | |
| 15     broker. You collected facts from them; yes? | |
| 16   A.   I believe so. I don't remember that | |
| 17     conversation. But that's what we would have -- I'm | |
| 18     sure that's what we would have done on the 15th. | |
| 19     Yes. | |
| 20   Q.   Okay. And you took the facts of the loss | |
| 21     that we just discussed, whatever facts you may have | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 22    learned in conversations from the -- with the<br>23    insured and the broker and whatever research you did<br>24    on the Internet, you took all that, and you applied<br>25    it to the policy to determine whether there was<br><br>Page 223<br>1    coverage.<br>2    A.  I don't recall if I did that specifically<br>3        in regards to DIG. But, again, that would be our<br>4        normal claims process.<br>5    Q.  You don't know whether or not you took the<br>6        facts of the loss, the research that you did, what<br>7        you learned from the insured, and applied it to the<br>8        policy to determine whether there was coverage?<br>9    A.  I don't specifically remember if I did<br>10       that. But that's exactly what I would do in every<br>11       single claim.<br>12   Q.  Do you have any reason to believe you did<br>13       not do that in connection with the DIG claim?<br>14   A.  No.<br>15   Q.  Did you do anything else other than what<br>16       I've just summarized in connection with the<br>17       evaluation of the DIG claim?<br>18   A.  I believe we had another conversation with<br>19       them again. But that's probably -- you're saying<br>20       the same thing. But I don't want to put words in<br>21       your mouth. I believe we had another |  |

144

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 22     conversation with the broker and the insured a few days later or<br>23     a couple of days later. But that was, again,<br>24     fact-finding.<br>25  Q.  So we've got two conversations with the<br><br>Page 224<br>1     insured and the broker.<br>2  A.  Correct.<br>3  Q.  Anything else that you remember actually<br>4     doing besides what I've just summarized in<br>5     connection with the evaluation of the DIG claim?<br>6  A.  Well, I would continue to put information<br>7     into the system, our CWS system, which is this.<br>8  Q.  Would you characterize that as a -- like a<br>9     clerical task, just inputting information?<br>10  A.  For this claim, I would say "yes."<br>11  Q.  Anything else that you did in connection<br>12     with the DIG claim?<br>13  A.  Nothing comes up to my mind now.<br>14  Q.  And you did all of this with the goal of<br>15     finding coverage; right? Your fact-finding, your<br>16     research, your application of the same to the<br>17     policy, all of that was done with a goal of finding<br>18     coverage; right?<br><br>21  THE WITNESS: Yes.<br><br>Page 225<br>10  Q.  Do you recognize the document marked<br>11     Exhibit 12.<br>12  A.  Yes.<br>13  Q.  What is it?<br>14  A.  An e-mail chain. | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 15  Q.  I want you to look at the page marked<br>16  ATL 1102.<br>17  A.  Okay.<br>18  Q.  Do you see the e-mail from Lucy Lopez to<br>19       OBE Claims with a cc to you and Pamela<br>         Johnson?<br>20  A.  Yes.<br>21  Q.  It's dated July 15, 2014, at 10:25 a.m.?<br>22  A.  Yes.<br>23  Q.  Is that the e-mail pursuant to which you<br>24       first became aware of the DIG claim?<br>25  A.  It appears so. Yes.<br><br>Page 226<br>10  Q.  I want you to look at the page marked<br>11       ATL 1105 and ATL 1104.<br>12  A.  Okay.<br>13  Q.  This is an e-mail from Randi Richmond at<br>14       NBCUniversal to Andrea Garber with a<br>         copy to Mark<br>15       Binke and Kurt Ford dated July 14, 2014, at<br>16       12:44 p.m.<br>17       Do you see that?<br>18  A.  Yes.<br>19  Q.  And this e-mail was forwarded to you,<br>20       among other portions of the chain, on July<br>         15, 2014,<br>21       at 10:25 a.m.?<br>22  A.  It appears that way. Yes.<br>23  Q.  And the e-mail from Randi Richmond to<br>24       Andrea Garber and others itself forwards an<br>         e-mail<br>25       from Stephen Smith, head of security for<br>         Europe,<br><br>Page 227<br>1        International Security & Crisis<br>         Management for<br>2        NBCUniversal International; is that<br>         correct? | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 3  A.  Yes.<br>4  Q.  Is that the e-mail from NBC Security that<br>5      you referred to in your prior testimony which was<br>6      part of the facts of the loss that you reviewed?<br>7  A.  Yes.<br>8  Q.  And did you review that e-mail from NBC<br>9      Security upon your receipt of the e-mail at page<br>10     ATL 1102?<br>11  A.  I don't recall if I did or didn't. But<br>12     I'm sure I would have.<br>13  MR. HAYES: This is going to be<br>14     Exhibit 22.<br>15     (Exhibit 22 was marked<br>16     for identification.)<br>17  BY MR. HAYES:<br>18  Q.  Do you recognize the document marked<br>19     Exhibit 22?<br>20  A.  Yes.<br>21  Q.  What is it?<br>22  A.  An e-mail chain.<br>23  Q.  I want you to look at the e-mail on page<br>24     ATL 1392 --<br>25  A.  Okay.<br><br>Page 228<br>1  Q.  -- from Pamela Johnson to Peter Williams<br>2     and a cc to you dated July 15, 2014, at 5:58 p.m.<br>3     Do you see that e-mail?<br>4  A.  Yes.<br>5  Q.  The e-mail says, "Let's do the call at<br>6     2:00" eastern "and use my conference call<br>7     number . . . "<br>8     Do you see that?<br>9  A.  Yes.<br>10  Q.  Do you understand from reviewing this<br>11    document what call that e-mail is referring | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| to? | |
| 12   A.   No. | |
| 14        I want you to look down at the e-mail at | |
| 15        the bottom of the page, July 15, 2014, at | |
|          8:48 p.m. | |
| 16        from Pamela Johnson. | |
| 17        "I suggest we have a call about this | |
| 18        tomorrow. Danny and I had a conversation with | |
| 19        Susan and Andrea today about what the | |
| 20        production's plans were, but we didn't make any | |
| 21        representations about whether there was | |
| 22        coverage but we also did not alert them that | |
| 23        this might not be a covered claim." | |
| 24        Do you see that? | |
| 25   A.   Yes. | |
| | |
| Page 229 | |
| 1    Q.   Does that refresh your recollection that | |
| 2         the first conversation you had with NBCUniversal | |
| 3         about the DIG claim was on July 15, 2014? | |
| 4    A.   Yes. | |
| 5    Q.   And who was present on that call? | |
| 6    A.   Pamela Johnson, myself, Susan Weiss, and | |
| 7         Andrea Garber, based upon this e-mail. | |
| 8    Q.   And do you recall what was discussed? | |
| 9    A.   I do not, beyond what the e-mail says. | |
| 10   Q.   Is the e-mail an accurate representation | |
| 11        of what was discussed? | |
| 12   A.   I don't recall what was discussed. So I | |
| 13        will go by what the Pamela -- Pamela's e-mail says. | |
| 14   Q.   Do you have any reason to believe that | |
| 15        what Pamela says in her July 15, 2014 e-mail at | |
| 16        8:58 p.m. regarding that call is in any way | |
| 17        incorrect? | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 18  A.  No.<br>19  Q.  Did NBCUniversal mention terrorism in that<br>20       call?<br>21  A.  I don't recall.<br>22  Q.  That was the first of two calls you can<br>23       recall in which you were a party and NBCUniversal<br>24       was also a party; is that right?<br>25  A.  I believe I was involved in two calls.<br><br>Page 230<br>1       Yes.<br>2  Q.  Okay. And that was the first one?<br>3  A.  I believe so. Yes.<br>4  Q.  Now, if you look back at that first<br>5       reference, "Let's do the call at 2:00" eastern "and<br>6       use my conference call number," and you also look<br>7       down at the part where Pamela says, "I suggest we<br>8       have a call about this tomorrow," does that refresh<br>9       your recollection that you, Pamela Johnson, and<br>10      Peter Williams had a call about the DIG claim on<br>11      July 16, 2014?<br>12  A.  It does not.<br>13  Q.  Did you ever have a call with Peter<br>14      Williams and Pamela Johnson about the DIG claim?<br>15  A.  I don't recall.<br>16  Q.  You don't recall whether or not you ever<br>17      had a call about the DIG claim with Pamela Johnson,<br>18      Peter Williams, and yourself?<br>19  A.  That's correct. I do not recall.<br>20  Q.  Okay. Are there any documents that might | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 21    refresh your recollection on that point that you can<br>22    think of?<br>23  A.  No.<br>24  Q.  If you had a call, would you have taken<br>25    notes?<br><br>Page 231<br>1   A.  Potentially.<br>2   Q.  Would those notes have been in<br>3     handwriting?<br>4   A.  Potentially.<br>5   Q.  And if you had taken notes, where would<br>6     they be today?<br>7   A.  I don't know.<br>8   Q.  If you had created a paper file in<br>9     connection with the DIG claim, would they be in that<br>10    file?<br>11  A.  Potentially, yes.<br>12  Q.  And if you had created a paper file in<br>13    connection with the DIG claim, that file would be at<br>14    your office here in L.A.; right?<br>15  A.  Potentially, yes.<br><br>17    Exhibit 23.<br>18    (Exhibit 23 was marked<br>19    for identification.)<br>20  BY MR. HAYES:<br>21  Q.  Do you recognize the document marked<br>22    Exhibit 23?<br>23  A.  Yes.<br>24  Q.  What is it?<br>25  A.  An e-mail chain.<br><br>Page 232<br>1   MR. HAYES: This is going to be<br>2    Exhibit 24.<br>3    (Exhibit 24 was marked | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 4        for identification.) | |
| 5    BY MR. HAYES: | |
| 6    Q.   Do you recognize the document marked | |
| 7         Exhibit 24? | |
| 8    A.   Yes. | |
| 9    Q.   What is it? | |
| 10   A.   It appears to be a -- an invitation for a | |
| 11        conference call. | |
| 12   Q.   I want you to look at Exhibits 23 and 24 | |
| 13        together, review those documents, and tell me | |
| 14        whether these documents together refresh your | |
| 15        recollection that on July 17, 2014, you had the | |
| 16        second of two calls with NBCUniversal regarding the | |
| 17        DIG claim. | |
| 18   A.   Yes. | |
| 19   Q.   Do you recall anything that was discussed | |
| 20        on that July 17 call? | |
| 21   A.   Not more than what was described by Susan | |
| 22        Weiss. | |
| 23   Q.   I'm not sure what you mean. | |
| 24   A.   Upon reading this, now I'm -- we -- we | |
| 25        must have discussed the situation in Israel. | |
| | |
| Page 233 | |
| 1    Q.   What did you discuss? | |
| 2    A.   I don't recall. | |
| 3    Q.   You don't recall anything about the | |
| 4         conversation? | |
| 5    A.   I believe that they were telling us that | |
| 6         more things were occurring in Israel and that they | |
| 7         were potentially going to be moving at that point. | |
| 8    Q.   Did the -- strike that. | |
| 9         Do you recall anything else about that | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 10       conversation, what you said, what Pamela said, what<br>11       anybody at NBCUniversal said, anything at all?<br>12  A.  No.<br><br><br><br>Page 237<br>1       NBCUniversal on July 22, 2014?<br>2  A.  That's correct.<br><br>17  Q.  You don't recall a telephone conversation<br>18      in which OneBeacon told representatives of<br>19      NBCUniversal that the DIG claim would be denied?<br>20  A.  No.<br>21  Q.  You weren't on one of -- that call if it<br>22      happened?<br>23  A.  I'm not saying that. I could have been.<br>24      I don't recall it.<br>25  Q.  Okay. Let's go back to Exhibit 12.<br><br>Page 238<br>1       So I want you to have in your mind the<br>2      telephone conversation that you had with<br>3      NBCUniversal on July 15, 2014.<br>4      Do you have that call in mind?<br>5  A.  Okay.<br>6  Q.  That's the same day you received notice of<br>7      the claim; right?<br>8  A.  Yes.<br>9  Q.  Now I want you to look at the e-mail at<br>10      the top of the page marked 1102. It's dated<br>11      July 15, 2014, at 4:14 p.m., and it's from you to<br>12      Peter Williams.<br>13      Do you see that? | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 14  A.  On the second page? | |
| 15  Q.  Yeah. It's marked 1102. | |
| 16  A.  Yes. | |
| 17  Q.  Do you see that e-mail? | |
| 18  A.  I do. | |
| 19  Q.  Please read that e-mail into the record. | |
| 20  A.  "Hi Peter - | |
| 21      "Per the below, you spoke with Andrea | |
| 22      Garber / Susan Weiss about this. | |
| 23      "Any chance you happened to suggest that | |
| 24      they push for more than just the week, since | |
| 25      the crew needs to be advised at least one week | |
| | |
| Page 239 | |
| 1       in advance for a push and since a ground war | |
| 2       still might occur (per the support from CBS | |
| 3       News from 2 days ago.)" | |
| 4       And then there is a link. Would you like | |
| 5       me to read the link? | |
| 6   Q.  No. | |
| 7   A.  "Best regards. | |
| 8       "Danny Gutterman." | |
| 9   Q.  Can you recall whether you sent this | |
| 10      e-mail before or after your phone conversation with | |
| 11      NBCUniversal on July 15? | |
| 12  A.  I can't recall. | |
| 13  Q.  Why did you send this e-mail to Peter Williams? | |
| 14 | |
| 15  A.  To ask him whether or not he suggested | |
| 16      that they push for more than just the week since the | |
| 17      crew needs to be advised at least one week in | |
| 18      advance for a push and since the ground war still | |
| 19      might occur. | |
| 20  Q.  Why did you want to know that? | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 21  A.  To determine whether or not the -- why | |
| 22       would I need to know that? When there's extra | |
| 23       expense claims, we always try and find out whether | |
| 24       or not crew is being held on or not. | |
| 25  Q.  What does that mean, "held on"? | |

Page 240

| | |
|---|---|
| 1   A.  They're still being paid without actually | |
| 2        doing any work. If an actress gets sick and there's | |
| 3        not enough time to tell the crew, then you have to | |
| 4        pay the crew for the next day. | |
| 5   Q.  So I'm not clear what that means in the | |
| 6        context of this e-mail. | |
| 7        Why did you want to know if he happened to | |
| 8        suggest that they push for more than just the week? | |
| 9   A.  Based upon the e-mail that -- well, let me | |
| 10       put this -- I don't recall writing this 'cause it | |
| 11       was over two years ago, two and a half years ago. | |
| 12       But -- and so I don't know my exact head space at | |
| 13       that particular time period. | |
| 14       But if I was to venture to say, it's based | |
| 15       upon reading the e-mail from Stephen Smith, the head | |
| 16       of security Europe at NBC and -- as well as looking | |
| 17       at this video which shows -- which says that the | |
| 18       clash between Israel and the Palestines [sic] is | |
| 19       ground war -- is ground war next. | |
| 20  Q.  So at the time you wrote this e-mail, | |
| 21       July 15, 2014, at 4:14 p.m., was there a war | |

154

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 22       in Israel? | |

Page 241

| | | | |
|---|---|---|---|
| 2 | Q. | In your opinion. | |
| 3 | A. | I don't recall if I thought that there was | |
| 4 | | at that point or not. I think that was the only | |
| 5 | | video I had seen, and I don't remember what that | |
| 6 | | video looks like. | |
| 7 | Q. | Why was it relevant that a ground war | |
| 8 | | still might occur? Why did you write that? | |
| 9 | A. | 'Cause it had to do with the escalation | |
| 10 | | possibility. | |
| 11 | Q. | What does that mean, "because it had to do | |
| 12 | | with the escalation possibility"? | |
| 13 | A. | It didn't appear that what was occurring | |
| 14 | | over there was going to deescalate, only escalate. | |
| 15 | | And that's also what was told to us by the head of | |
| 16 | | security. | |
| 17 | Q. | My question is: Why did you want to know | |
| 18 | | if Peter had told them to push for more than a week | |
| 19 | | because a ground war still might occur? What's the | |
| 20 | | connection? | |
| 21 | A. | If the -- it's a way of saving the | |
| 22 | | production money. If they can let the crew know | |
| 23 | | early enough on, they may be able to let the crew go | |
| 24 | | so they don't have to pay for the crew for that time | |
| 25 | | period. | |

Page 242

| | | | |
|---|---|---|---|
| 1 | Q. | I want you to go back to the e-mail marked | |
| 2 | | ATL 1105. | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 3    A.    Okay. | |
| 4    Q.    If you look at the very last line of | |
| 5        Stephen Smith's e-mail, he says, "Personnel based in | |
| 6        country in relation to this production should make | |
| 7        arrangements to leave." | |
| 8        Do you see that? | |
| 9    A.    Yes. | |
| 10    Q.    So he was already recommending that | |
| 11        personnel based in country should make arrangements | |
| 12        to leave. | |
| 13    A.    Okay. | |
| 14    Q.    So why -- why is it relevant that a ground | |
| 15        war still might occur? We've already got an e-mail | |
| 16        from security saying that the situation requires | |
| 17        personnel to leave. | |
| | |
| 20      THE WITNESS: This doesn't definitively | |
| 21        state whether those arrangements were made or not. | |
| 22        This is just a -- it's a suggestion. I mean, I was | |
| 23        asking Peter to find out, based upon this | |
| 24        conversation he had with Susan Weiss and Andrea | |
| 25        Garber, was that brought up. | |
| | |
| Page 243 | |
| 6    Q.    Did you think the personnel should leave | |
| 7        because of the situation? | |
| 8    A.    I don't -- I don't recall at that | |
| 9        particular moment what I was thinking. | |
| 10    Q.    On July 15, 2014, at 4:14 p.m., when you | |
| 11        apparently gathered from the Internet that a ground | |
| 12        war might occur, did you think the | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| personnel should<br>13     leave at that point?<br>14   A.   They had to do what was prudent<br>15     safetywise.<br>16   Q.   But wasn't NBCUniversal security on the<br>17     ground in Israel in the best position to decide what<br>18     was prudent?<br><br>21     THE WITNESS: They were -- the in- -- the<br>22     information we were receiving was from them, as well<br>23     as what we were getting from online.<br>24   BY MR. HAYES:<br>25   Q.   Was the existence or non-existence of a<br><br>Page 244<br>1     ground war part of the facts that you considered<br>2     when applying the policy language?<br>3   A.   Me personally?<br>4   Q.   Yes.<br>5   A.   At this particular time?<br>6   Q.   Yes.<br>7   A.   I don't -- I don't really think that I was<br>8     thinking about the policy at that point. I don't<br>9     know.<br>10   Q.   Did the existence or non-existence of a<br>11     ground war factor into your analysis of the policy<br>12     at any time?<br><br>15     THE WITNESS: Yes.<br>16   BY MR. HAYES:<br>17   Q.   When?<br>18   A.   I don't remember the exact date.<br>19   Q.   And how did it factor into your analysis<br>20     of whether or not the loss was covered in connection | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 21     with the DIG claim?<br>22  A.  Ground war is one portion -- one aspect of<br>23     war.<br>24  Q.  The fact that a ground war was occurring,<br>25     if it was, would have been a fact that would have<br><br>Page 245<br>1     suggested the loss was not covered.<br>2     Is that accurate pursuant to what your<br>3     understanding was and opinion was at the time?<br>4  A.  It would be one of others. Yes.<br><br>Page 246<br>2  Q.  If NBCUniversal had moved the production<br>3     of DIG after a ground war started, would the extra<br>4     expenses incurred in connection with that move been<br>5     a loss that was covered or not?<br>6  A.  It still would not have been covered.<br>7  Q.  Would the fact that a ground war was<br>8     already occurring have affected the analysis?<br>9  A.  It was one portion of it.<br><br>14     Do you know NBCUniversal moved the DIG<br>15     production out of Israel?<br>16  A.  No.<br>17  Q.  At the time you wrote this e-mail,<br>18     July 15, 2014, at 4:14 p.m., did you know that the<br>19     policy included the war exclusion?<br>20  A.  I don't recall.<br>21  Q.  Do you recall why you searched the<br>22     Internet to find the CBS News article copied in this<br>23     e-mail? | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 24   A.   To provide my supervisor more information <br> 25        probably. <br><br> Page 247 <br> 1   Q.   Who was your supervisor? Peter? <br> 2   A.   I'm sorry. To provide Peter, yes, my -- <br> 3        more information. <br> 4   Q.   Did you have a conversation with Peter <br> 5        about your e-mail? <br> 6   A.   I don't remember. <br> 7   Q.   When you say "push for more than just a <br> 8        week," what does that mean? Does that mean push the <br> 9        production and stay on-site? What did you mean by <br> 10       "push"? <br> 11   A.   I think that I just meant that they <br> 12       weren't going to be working for another week. <br> 13   Q.   Where would they be physically? <br> 14   A.   I don't know. | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Page 248<br><br>22  Q.  What did you mean when you said "ground war"?<br>24  A.  Again, it's over two and a half years ago so I don't know exactly what I meant when I wrote | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|

Page 249

1       this e-mail. But Stephen Smith brought up "ground

2       campaign," and CBS News brought up "ground war." So

3       I was just utilizing, I guess, words that had been

4       presented to me.

5   Q.  But at some point during your analysis,

6       you determined that whether or not there was a

7       ground war was a relevant fact in determining

8       whether or not there was coverage?

9   A.  I don't know.

10  Q.  You don't know whether or not you thought

11      the occurrence of a ground war was a relevant fact

12      in determining whether there was coverage?

13  A.  I did not make the ultimate decision. But

14      if you're asking my opinion, that would have come

15      into play.

16  Q.  The occurrence of a ground war would have

17      come into play in the coverage determination?

18  A.  Yes.

19  Q.  How?

20  A.  The word "war" is right there.

21  Q.  So how would it have come into play?


24      THE WITNESS: The word "war" is right

25      there.


Page 250

2   Q.  What do you mean when you say "the word

3       'war' is right there"?

4   A.  "Since a ground war," is what I wrote when

5       CBS News wrote "war," these are . . . . . .

6   Q.  How would the presence of a ground war

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 7     have affected the analysis of whether or not the DIG<br>8     claim was covered?<br><br>11  THE WITNESS: A ground war is one aspect<br>12     of war.<br>13  BY MR. HAYES:<br>14  Q.  So that fact would have weighed in favor<br>15     of denial of coverage; right?<br>16  A.  I don't know if it did at that specific<br>17     time. But when we did additional research, and I<br>18     saw the missiles being shot from Israel to Palestine<br>19     and from Palestine to Israel and the war planes and<br>20     the ground troops lining up and Israel calling up<br>21     50,000 guards -- 50,000 of their reservists,<br>22     that's -- ground war is only one piece of what was<br>23     many, many aspects that looked like war.<br>24  Q.  But it's a piece that suggests -- that suggests that the loss is not covered, to you;<br>25     <br><br>Page 251<br>1     right?<br>2  A.  Yes.<br>3  Q.  Okay. I want you to look at the document<br>4     marked Exhibit 22.<br>5     This is an e-mail from you to yourself<br>6     dated July 16, 2014.<br>7     Do you see that?<br>8  A.  Yes.<br>9  Q.  Can you read what it says.<br>10  A.  "Look up war exclusion. Look up war<br>11     definition."<br>12  Q.  And do you remember whether or not you had<br>13     spoken orally to Pamela Johnson or Peter | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Williams<br>14      before you wrote this note to yourself?<br>15   A.   I do not.<br>16   Q.   Why did you write this note to yourself?<br>17   A.   'Cause I believed it was relevant to the<br>18      claim.<br>19   Q.   Did somebody instruct you to look up "war<br>20      exclusion"?<br>21   A.   Not that I can recall.<br>22   Q.   Did somebody instruct you to look up "war<br>23      definition"?<br>24   A.   No. Not that I can recall.<br>25   Q.   But you're saying that you did these<br><br>Page 252<br>1      things because you thought it was relevant to the<br>2      claim?<br><br>6   Q.   Did you do these two things? Did you look<br>7      up "war exclusion"?<br>8   A.   Yes.<br>9   Q.   Did you look up "war definition"?<br>10   A.   I don't recall.<br>11   Q.   Why did you look up "war exclusion"?<br>12   A.   'Cause it was relevant to the claim.<br>13   Q.   Why was it relevant to the claim?<br>14   A.   'Cause from the previous article that we<br>15      were just discussing, the word "ground war" came up,<br>16      and so it made me look at the war exclusion.<br>17   Q.   So when you read the article that said<br>18      "ground war," you immediately thought the war<br>19      exclusion might apply?<br><br>23   Q.   That is right?<br>24   A.   No.<br>25   Q.   How -- how soon after you read the article | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|

Page 253
1      that said "ground war" did you start
       thinking the
2      war exclusion might apply.
3   A.  I don't recall.
4   Q.  But it was sometime after you read the
5       article referenced on Exhibit 12, page 1102,
6       sometime after you read that article that you
7       thought the war exclusion might apply?

11  Q.  Is that right?

13  THE WITNESS: I don't recall.

18  Q.  The sequence is you read the news article
19      cited on the page marked 1102 of Exhibit
        12.
20  A.  Yes.
21  Q.  Then at some point after your reading that
22      article, you determine that the war
        exclusion might
23      be an issue for the DIG claim.

Page 254
1   THE WITNESS: It appears to be that way.
2       Yes.

Page 255
3   Q.  Okay. How did you look up "war
4       exclusion," if you did?
5   A.  In the policy.
6   Q.  So you went to the policy, and you read
7       the war exclusion.
8   A.  I don't recall if I did. But at some
9       point I would have done that, yes.
10  Q.  Did "look up war exclusion" mean anything
11      other than reading the war exclusion in the
        policy?

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 12  A.  Not that I can recall. No. | |
| 13  Q.  Did that mean research how the war | |
| 14      exclusion is applied? | |
| 15  A.  No. I think it just meant read what the | |
| 16      war exclusion in the policy means. | |
| 17  Q.  Okay. If you go back to Exhibit 12, first | |
| 18      page, 1101, the last e-mail in that chain is the | |
| 19      part of the policy that contains the war exclusion; | |
| 20      right? | |
| 21  A.  Yes. | |
| 22  Q.  And that was e-mailed to you on July 16, | |
| 23      2014; right? | |
| 24  A.  It appears that way. Yes. | |
| 25  Q.  Do you know if that e-mail reached your | |
| | |
| Page 256 | |
| 1      "in" box before or after you wrote the note, "Look | Defendant's Counter: 256:14-23 |
| 2      up war exclusion"? | |
| 3  A.  From looking at these time stamps, it | Plaintiff's Response: |
| 4      appears that it came afterwards. | Not necessary for |
| 5  Q.  Okay. So after you received this e-mail | completeness. Counter is |
| 6      from Pamela Johnson with the part of the policy that | separate question and answer. |
| 7      includes the war exclusion, did you go back to the | |
| 8      actual policy and read the war exclusion? | |
| 9  A.  I don't recall. | |
| 10  Q.  Did you read the entire policy at any | |
| 11      point during your involvement in the evaluation of | |
| 12      the DIG claim? | |
| 13  A.  I don't recall. | |
| | |
| DEFENDANT'S COUNTER: | |
| 14  Q. Did you read any part of the policy other | |
| 15 than the war exclusion? | |
| 16  **A. Yes.** | |
| 17  Q. What part? | |

165

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 18   A. Well, if you look two days before the one 19 that you're talking about with the "look up the war 20 exclusion," I actually pointed out the general 21 conditions as well as extra expense and what it 22 covers and excludes. So I was bringing up coverage 23 of what is covered, not just exclusions. END DEFENDANT'S COUNTER<br><br><br>Page 257<br>14   When you say, "Please review the general 15   conditions as Pamela pointed out," was the war 16   exclusion one of those general conditions? 17 A.  I'm going to look at the policy, if that's 18   okay. 19 Q.  Sure. 20 A.  Yes, it is.<br><br><br><br><br>Page 261<br><br>13 Q.  Okay. Okay. Go back to Exhibit 22, 14   please. I want you to look at the page marked 1392. 15   And this is your e-mail -- I'm sorry. This is the 16   e-mail from Pamela Johnson to you and Peter Williams 17   on the page marked 1392. And Pamela says: 18   "I suggest we have a call about this 19   tomorrow. Danny and I had a conversation with 20   Susan and Andrea today about what the 21   production's plans were, but we didn't make any | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 22    representations about whether there was<br>23    coverage but we also did not alert them that<br>24    this might not be a covered claim. If this is<br>25    going to be an issue, we need to alert them<br><br>Page 262<br>1    right away. Peter, when are you available<br>2    tomorrow?"<br>3    When Pamela says "if this is going to be<br>4    an issue," what is she referring to?<br><br>8  Q.  Do you have an understanding of what she<br>9    was referring to?<br>10  A.  I don't recall what I was thinking at that<br>11    time when I read that e-mail.<br>12  Q.  When she says, "We did not alert them that<br>13    this might not be a covered claim," do you have any<br>14    idea what she was referring to when she said that?<br>15  A.  I don't recall that -- anything specific<br>16    about that. But obviously now that we're looking at<br>17    this claim, it obviously was probably about the war<br>18    exclusion.<br>19  Q.  Okay. Let's go back to Exhibit 22.<br><br>Page 263<br>2  Q.  Now let's look at "Look up war<br>3    definition."<br>4    Do you see that note?<br>5  A.  Yes.<br>6  Q.  What does that mean?<br>7  A.  I'm guessing I was saying to remind myself<br>8    to look up the war definition.<br>9  Q.  Did you look up the war definition?<br>10  A.  I don't recall if I did or did not.<br>11  Q.  What does that mean, "look up war<br>12    definition"? In the dictionary? On the | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| Internet?<br>13     What does that mean?<br>14   A.   I don't remember what I wrote to myself.<br>15   Q.   Why did you want to look up the war<br>16       definition?<br>17   A.   To see how it pertained to this claim.<br>18   Q.   To see how the war definition affected the<br>19       analysis of whether or not the loss was<br>       covered?<br>20   A.   I -- yes.<br>21   Q.   And did you look up the definition of<br>22       "war"?<br><br>25     THE WITNESS: I don't recall.<br><br>Page 264<br>11   Q.   Did you ever look up the definition of<br>12       "terrorism"?<br>13   A.   I don't -- I don't recall doing so. No.<br>14   Q.   Did you ever do any Google searches aimed<br>15       at determining what terrorism was or what<br>       terrorism<br>16       meant?<br>17   A.   Not that I remember.<br>18   Q.   Why not?<br>19   A.   Nothing we were seeing looked like<br>20       terrorism, and I never had a terrorism claim<br>       before.<br>21       So I don't think it came into my head.<br><br>Page 265<br>6   Q.   Rockets fired by Hamas into Israel doesn't<br>7       look like terrorism to you? Is that what<br>       you're<br>8       saying?<br>9   A.   Yes.<br>10   Q.   What is terrorism, in your mind?<br>11   A.   As I said before, I think it's -- it's<br>12       hard to define it. It's much easier to say I<br>       know | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 13  it when I see it, and that would be Oklahoma City,<br>14  Boston Marathon, what happened in Orlando.<br>15  That's -- that's terrorism.<br>16  Q.  Well, is Israel a victim of terrorism?<br><br>18  THE WITNESS: Yes. They have been the<br>19  victim of terrorism.<br><br>21  Q.  From who?<br>22  A.  People that strap on suicide bombing vests<br>23  and go into cafes and buses.<br>24  Q.  Is Hamas involved in that conduct?<br><br>Page 266<br>2  THE WITNESS: I don't know.<br><br>4  Q.  What about Israeli teenagers being<br>5  kidnapped by Hamas? Would that be terrorism, in<br>6  your mind?<br><br>9  THE WITNESS: I guess so.<br><br>11  Q.  You say you know it when you see it,<br>12  terrorism, that is; right?<br>13  A.  Yes.<br>14  Q.  Okay. Do you think the U.S. Government is<br>15  in a position to know terrorism when it sees it?<br>16  A.  Yes.<br>17  Q.  Who is in a better position to know<br>18  terrorism when they see it, you or the U.S.<br>19  Government?<br>20  A.  The U.S. Government.<br>21  Q.  Who is in a better position, you or John<br>22  Kerry?<br>23  A.  John Kerry.<br>24  Q.  Did you ever search the Internet or search | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 25     any resource to determine what the United States<br><br>Page 267<br>1     Government's position was on the conduct in Israel<br>2     perpetrated by Hamas, whether or not that was<br>3     terrorism? Did you ever look and see what the U.S.<br>4     Government thought?<br>5  A.  Yes.<br>6  Q.  When?<br>7  A.  I don't recall.<br>8  Q.  Was it before or after OneBeacon denied<br>9     the claim on July 28, 2014?<br>10  A.  After.<br>11  Q.  Not before?<br>12  A.  Correct.<br>13  Q.  Okay. When you looked to see what the<br>14     U.S. Government thought about the conduct, what did<br>15     you find?<br>16  A.  About what?<br>17  Q.  Whether or not the U.S. Government thought<br>18     the acts perpetrated by Hamas on Israel constituted<br>19     terrorism?<br><br>21  THE WITNESS: You mean that specific time<br>22     period? I don't -- no, I did not look that up. I'm<br>23     sorry.<br><br>25  Q.  You said you didn't try to determine what<br><br>Page 268<br>1     the U.S. Government thought about Hamas's conduct | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 2     prior to the July 28, 2014 denial letter; is that | |
| 3     correct? | |
| 4  A.  Correct. | |
| 5  Q.  But you also said that at some point after | |
| 6     the denial letter, you did seek to determine what | |
| 7     the U.S. Government thought; right? | |
| 8  A.  I don't recall. I'm sorry. | |
| 9  Q.  You don't recall whether or not you did | |
| 10     that? | |
| 11  A.  Look that up, no, I don't recall if I did | |
| 12     or not. | |
| 13  Q.  Okay. Why didn't you seek to determine | |
| 14     what the United States Government thought of Hamas's | |
| 15     conduct prior to the July 28, 2014 denial? | |
| 16  A.  I really wasn't involved in the claim that | |
| 17     much at that point. | |
| 18  Q.  The claim came to you. | |
| 19  A.  Yes. But as we discussed earlier, at some | |
| 20     point Pamela became the lead person that was running | |
| 21     this claim. She was the one at that particular time | |
| 22     period that if she was looking things up. | |
| 23  Q.  But at some point you were the one | |
| 24     searching the Internet for information pertinent to | |
| 25     the coverage decision; right? | |
| | |
| Page 269 | |
| 1  A.  When we were trading e-mails back and | |
| 2     forth, I don't think that that was what we were | |
| 3     looking for. We were just trying to get | |
| 4     information. | |
| 5  Q.  Well, that's my precise question. | |
| 6     Why weren't you looking for what the U.S. | |
| 7     Government's position was on Hamas's | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| conduct prior<br>8    to deciding whether or not the acts that resulted in<br>9    the loss were terrorism or war?<br><br>12  THE WITNESS: I didn't. I don't know what<br>13    the answer is.<br>14  BY MR. HAYES:<br>15  Q.  Well, I know you didn't. The question is<br>16    why you didn't.<br>17    Why didn't you?<br><br>19  THE WITNESS: I didn't.<br><br><br>Page 274<br>1    Exhibit 1.<br>2  A.  Oh. Okay.<br>3    Which would you like me to read?<br>4  Q.  Just the first sentence, "Any exclusion of<br>5    terrorism."<br>6  A.  "Any exclusion of terrorism in this<br>7    Coverage Part or Policy, or attached to such<br>8    Coverage Part or Policy by endorsement, is<br>9    hereby amended to the effect that such<br>10    exclusion does not apply to a 'certified act of<br>11    terrorism.'"<br>12  Q.  So is there an exclusion of terrorism in<br>13    the policy?<br>14  A.  It does not appear that there is. No.<br>15  Q.  So this TRIA endorsement that amends any<br>16    exclusion of terrorism in the policy doesn't matter<br>17    because there isn't an exclusion of terrorism in the<br>18    policy.<br>19    Would you agree?<br>20  A.  I'd agree with that.<br>21  Q.  Okay. So whether or not the loss was | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 22      caused by terrorism was an important question in<br>23      determining coverage; right?<br><br>Page 275<br>2   Q.   Or was it not?<br>3   A.   It was to Pamela because she brought it<br>4      up.<br>5   Q.   Okay. And what did you do, if anything,<br>6      to determine whether or not there was any evidence<br>7      to support the position that the loss at issue was<br>8      caused by terrorism?<br><br>11    THE WITNESS: I don't recall if I did<br>12      anything.<br><br>Page 276<br><br>15    MR. HAYES: This is going to be<br>16      Exhibit 26.<br>17      (Exhibit 26 was marked<br>18      for identification.)<br>19   BY MR. HAYES:<br>20   Q.   Take a look at the document marked 26, and<br>21      let me know if it you've ever seen it before.<br>22   A.   I have never seen this before.<br>23   Q.   Okay. I want you to look at the page<br>24      marked 3 of 4.<br>25   A.   Yes.<br><br>Page 277<br>1   Q.   And there's some -- there's some<br>2      statements attributed to Secretary Kerry, and I want<br>3      you to read the part that starts, "But Hamas" into | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objections:<br>(276:21-25) Not relevant, foundation, waste of time FRE 401, 403, 601, 801, 802<br><br>Plaintiff's Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present. Relevant to unreasonable denial of claim and failure to investigate.<br><br>Defendant's Objections:<br>(277:1-17) Not relevant, foundation, waste of time FRE 401, 403, 601, 801, 802 |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 4    the record.<br>5    Do you see that?<br>6  A.  Yes.<br>7    "But Hamas is trying to" assist -- "insist<br>8    that as a reward for their terrorist behavior,<br>9    things be decided ahead of time, and we support<br>10    Israel and international community's right not<br>11    to be extorted by terrorism."<br>12  Q.  Had you seen that statement by Secretary<br>13    Kerry prior to July 28, 2014, how, if at all, would<br>14    that have affected your opinion as to whether or not<br>15    the DIG claim was covered?<br>16  A.  I don't recall ever seeing that. So I<br>17    can't say how it would have affected it or not. | Plaintiff's Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present. Relevant to unreasonable denial of claim and failure to investigate. |
| Page 279<br>19  Q.  I want you to -- so we have it clean on<br>20    the record, I want you to read that portion again,<br>21    I'll read it.<br>22    "But Hamas is trying to insist that as a<br>23    reward for their terrorist behavior, things be<br>24    decided ahead of time, and we support Israel<br>25    and international community's right not to be | Defendant's Objections:<br>(279:19-25)<br>Exhibit 26 is hearsay; relevance FRE 401, 403, 801, 802<br><br>Plaintiff's Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present. Relevant to unreasonable denial of claim and failure to investigate. |
| Page 280<br>1    extorted by terrorism."<br>2    Does that statement by Secretary Kerry<br>3    change your opinion as to whether or not the acts<br>4    perpetrated by Hamas on to Israel constituted | Defendant's Objections:<br>(280:1-11, 15-19) hearsay; relevance; foundation FRE 401, 403, 602801, 802 |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 5      terrorism?<br>6   A.   No.<br>7   Q.   And what is your opinion?<br>8   A.   This was war.<br>9   Q.   So despite the fact that Secretary Kerry<br>10      characterizes the acts as terrorism, you maintain it<br>11      was war, not terrorism?<br><br>15   Q.   Is that right?<br>16   A.   Yes.<br>17   Q.   Okay. But as you said before, Secretary<br>18      Kerry is in a better position to assess whether or<br>19      not the acts are, indeed, terrorism or war; right?<br><br>22   Q.   Is that correct?<br>23   A.   Yes.<br>24   Q.   Okay. You testified that Pamela Johnson<br>25      thought the distinction whether the acts were<br><br>Page 281<br>1      terrorism or war was an important one; right?<br><br>4      THE WITNESS: Based upon that she brought<br>5      it up in her denial letter, yes.<br>6   BY MR. HAYES:<br>7   Q.   Okay. So going back to what you said<br>8      earlier, from day one you were told, "We try to find<br>9      coverage wherever possible"; right?<br>10  A.   Yes.<br>11  Q.   So if there was a chance that the loss at<br>12      issue was caused by terrorism, that's something that<br>13      you, in keeping with that objective, should see if | Plaintiff's Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present. Relevant to unreasonable denial of claim and failure to investigate. |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 14     there's support for; right?<br><br>16  THE WITNESS: Yes. We would look for<br>17     everything.<br><br>24  Q.  If there was a chance that the loss at<br>25     issue in connection with the DIG claim was<br>       caused by<br><br>Page 282<br>1     terrorism, in keeping with your objective,<br>2     OneBeacon's objective to try to find<br>       coverage<br>3     wherever possible, you would look for<br>       evidence that<br>4     the loss was caused by terrorism; right?<br>5  A.  Yes.<br>6  Q.  Okay. And you also said that, on<br>7     occasion, under certain circumstances, you<br>       consult<br>8     with outside independent insurance<br>       adjusters on<br>9     occasion; right?<br>10  A.  Yes.<br>11  Q.  Okay. If you had the opportunity to<br>12     consult with the United States Government<br>       on the<br>13     issue whether the acts that caused the loss<br>       at issue<br>14     in this case constituted terrorism, would<br>       you take<br>15     that opportunity?<br><br>18  THE WITNESS: Yes.<br><br>Page 283<br>1     Should you have, at the very beginning,<br>2     when terrorism was raised by Pamela,<br>       sought the<br>3     counsel of, through your research, the | Defendant's Objections:<br>(283:18-25: hearsay;<br>relevance; foundation FRE<br>401, 403, 801, 802 |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 4     United States<br>    Government on the question whether or not the acts<br>5     at issue in this case constituted terrorism?<br><br>9    THE WITNESS: We did, I believe,<br>10     everything correctly for this claim.<br><br>18   BY MR. HAYES:<br>19  Q.  Do you recognize the document marked<br>20     Exhibit 27?<br>21  A.  Yes. No. Do I recognize it, no. I've<br>22     never seen this before.<br>23  Q.  Okay. I'm going to read what it says.<br>24     "The United States strongly condemns the<br>25     kidnapping of three Israeli teenagers and calls | Plaintiff's Response:<br>Relevant to bad faith; offered for non-hearsay purpose; foundation present. Relevant to unreasonable denial of claim and failure to investigate. |
| Page 284<br>1     for their immediate release. Our thoughts and<br>2     prayers are with their families. We hope for<br>3     their quick and safe return home. We continue<br>4     to offer our full support for Israel in its<br>5     search for the missing teens, and we have<br>6     encouraged full cooperation between the Israeli<br>7     and Palestinian security services. We<br>8     understand that cooperation is ongoing.<br>9     "We are still seeking details on the<br>10     parties responsible for this despicable<br>11     terrorist act, although many indications point<br>12     to Hamas' involvement. As we gather this<br>13     information, we reiterate our position that<br>14     Hamas is a terrorist organization known for its<br>15     attacks on innocent civilians and which has<br>16     used kidnapping in the past." | Defendant's Objections:<br>(284:21, 24-25) hearsay; relevance; foundation FRE 401, 403, 601, 602, 801, 802<br><br><br>Plaintiff's Response:<br>Relevant to bad faith; offered for non hearsay purpose; foundation present. Relevant to unreasonable denial of claim and failure to investigate. |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 17    Do you see that?<br>18  A.  Yes.<br>19  Q.  Does that statement from John Kerry change<br>20    your opinion as to whether the conduct that caused<br>21    the loss in this case was terrorism?<br><br>24  THE WITNESS: Actually, going back to 26,<br>25    3 of 4, when he's calling it terrorism acts, he very | |
| <u>Page 285</u><br>1    well could be talking about kidnapping three Israeli<br>2    teenagers, which I do believe is an act of<br>3    terrorism. | <u>Defendant's Objections:</u><br>(285:1-3, 24-25) hearsay; relevance; foundation FRE 401, 403, 602801, 802 |
| 5  Q.  Okay.<br>6  A.  It may not in any way involve what was at<br>7    that point, I believe, missile rockets and tanks and<br>8    stuff along those lines.<br>9  Q.  What about missile rockets fired on<br>10    innocent civilians? Is that terrorism?<br><br>18    Rockets fired at innocent civilians, is<br>19    that terrorism?<br><br>22  THE WITNESS: No. That's an act of war.<br><br>24  Q.  Okay. But, again, in keeping with your<br>25    objective to find coverage wherever possible, should | <u>Plaintiff's Response:</u><br>Relevant to bad faith; offered for non hearsay purpose; foundation present. Relevant to unreasonable denial of claim and failure to investigate. |
| <u>Page 286</u><br>1    you have researched what John Kerry thought about<br>2    Hamas and its activities prior to denying the claim? | <u>Defendant's Objections:</u><br>(286:1-18) hearsay; relevance; foundation FRE 401, 403, 602, 801, 802 |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 3   A.   Again, I felt like we did everything <br> 4        necessary for this claim. <br> 5   Q.   But this is a very specific question. <br> 6        In keeping with your objective to find <br> 7        coverage wherever possible, should you have <br> 8        researched what Secretary Kerry thought about Hamas <br> 9        and its activities prior to denying the claim? <br> 10  A.   Again, I think everything we did was <br> 11       correct. <br> 12  Q.   Should you have sought to determine what <br> 13       Secretary Kerry thought about Hamas and its <br> 14       activities prior to denying the claim? <br> 15  A.   No. <br> 16  Q.   Why not? <br> 17  A.   The -- from the videos that we'd seen, <br> 18       everything looked like a war. | Plaintiff's Response: <br> Relevant to bad faith; offered for non hearsay purpose; foundation present. Relevant to unreasonable denial of claim and failure to investigate. |
| Page 287 <br> 4.   Q.   Mr. Kerry, Secretary Kerry, thinks Hamas <br> 5        is a terrorist organization known for its attacks on <br> 6        civilians, innocent civilians. <br> 7        Does that affect in any way your opinion <br> 8        as to whether or not the acts committed by Hamas in <br> 9        connection with the DIG claim constitute acts of <br> 10       terrorism? <br><br> 13  THE WITNESS: No. <br><br> 15  Q.   It doesn't affect your opinion at all? <br> 16  A.   No. <br><br> Page 288 <br> 3   Q.   Mr. Gutterman, I want to return to your <br> 4        testimony a little bit earlier regarding what | Defendant's Objections: <br> (287:4-10) hearsay; relevance; foundation FRE 401, 403, 602, 801, 802 <br><br> Plaintiff's Response: <br> Relevant to bad faith; offered for non hearsay purpose; foundation present. Relevant to unreasonable denial of claim and failure to investigate. |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| you do<br>5      at OneBeacon, what OneBeacon does in pursuit of this<br>6      objective to want to find coverage.<br>7      Okay?<br>8      I recall you testified that if an insured<br>9      mentions a fact that bears on the coverage<br>10    determination in a way that would suggest there is<br>11    coverage, here's some things you said OneBeacon<br>12    would do.<br>13    Redo everything you did the first time in<br>14    determining whether or not there was coverage, talk<br>15    to the insured about why they think there's<br>16    coverage, talk to underwriting about what<br>17    OneBeacon's understanding was at the time the policy<br>18    was agreed to, and do additional research on the<br>19    Internet to see whether there was support for the<br>20    insured's position.<br>21    Is that all correct?<br>22  A.  Would you read the first one again, please.<br>23<br>24  Q.  Redo everything you did to make the<br>25    determination, the preliminary determination that<br><br>Page 289<br>1      there was no coverage.<br>2   A.  I don't know if we -- I don't think we would redo everything that we did. But we would<br>3<br>4      certainly review every -- all the information that<br>5      we've received both before and after any new | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 6      information came to light.<br>7   Q.  Okay. So you'd talk to the insured about<br>8      why they think the information weighs in favor of<br>9      coverage?<br>10  A.  Typically, yes.<br>11  Q.  You'd talk to underwriting about what<br>12     their understanding was at the time the policy was<br>13     put into effect?<br>14  A.  Yes.<br>15  Q.  You'd do research to see if there was any<br>16     support for the insured's position?<br>17  A.  Yes.<br>18  MR. HAYES: Okay. This is going to be<br>19     Exhibit 28.<br>20     (Exhibit 28 was marked<br>21     for identification.)<br>22  BY MR. HAYES:<br>23  Q.  Do you recognize the document marked 28?<br>24  A.  Yes.<br>25  Q.  What is it?<br><br>Page 290<br>1   A.  Actually, I -- I -- I don't know. It<br>2     doesn't say it was from me. It appears that it was<br>3     from me.<br>4   Q.  Well, it says, "Best regards, Danny<br>5     Gutterman"; right?<br>6   A.  Correct. But in the "From" line, it<br>7     doesn't have my name.<br>8   Q.  Okay. The e-mail starts:<br>9     "Hi Pamela -<br>10    "I'm going to put the following into the<br>11    CWS notes, if you're okay with it."<br>12    What does that mean, "CWS notes"?<br>13  A.  That is our electronic file system.<br>14  Q.  That's Exhibit 21; right? | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 15   A.   Yes.<br>16   Q.   And then you say in this e-mail to Pamela:<br>17         "Pamela Johnson and I had a conference<br>18         call with Andrea Garber of NBC and Susan Weiss<br>19         of AON.<br>20         "Andrea Garber stated said the production<br>21         decided to move the production as the situation<br>22         in Israel has not improved and does not appear<br>23         that it will.<br>24         "Pamela Johnson told them that we have<br>25         reviewed the policy and it appears that the war<br><br>Page 291<br>1         exclusion will potentially apply here."<br>2         Do you see that?<br>3   A.   Yes.<br>4   Q.   Does that refresh your recollection that<br>5         you had a conversation with Andrea Garber and Susan<br>6         Weiss in which Pamela Johnson told them that the war<br>7         exclusion will potentially apply here?<br>8   A.   That -- yes. That reminds me of that.<br>9   Q.   Okay. The notes go on:<br>10        "She told them that the production push<br>11        appears to be covered as it occurred before<br>12        Hamas's rejection of the cease fire and Israel<br>13        then stating that they will be going forward<br>14        with all force."<br>15        Do you see that?<br>16   A.   Yes.<br>17   Q.   Do you remember that part of the<br>18        conversation?<br>19   A.   No.<br>20   Q.   Then you say: | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 21　　"Andrea and Susan stated that they did not<br>22　　believe that Hamas can be considered a<br>23　　government and are considered by the U.S. to be<br>24　　a terrorist organization."<br>25　　Do you see that? | |

<u>Page 292</u>

1　A.　Yes.

2　Q.　Do you recall Andrea and Susan saying that
3　　in the phone call?

4　A.　No.

5　Q.　Okay. Do you have any reason to believe
6　　that Exhibit 28 is not a true and correct copy of
7　　notes that you wrote to yourself or to Pamela
8　　memorializing a phone call that you had with Andrea
9　　and Susan at NBCU?

10　A.　I don't know when these were written
11　　because Pamela was to longer working July 3, 2016.
12　　So I don't know when these were written.

13　Q.　Do you have any reason to believe that
14　　these notes do not accurately reflect the content of
15　　a conversation that you and Pamela had with Andrea
16　　and Susan?

17　A.　No. I have no reason.

18　Q.　Okay. Are these notes in the DIG claim
19　　file marked Exhibit 21?

20　A.　It does not appear that they are.

21　Q.　Why not?

22　A.　Again, I'm not sure when this was -- were
23　　taken. It doesn't say it was from me. I don't know
24　　if this was a draft. I don't -- I don't know why
25　　this was not put in.

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|

Page 293

1  Q.  Did Pamela tell you to keep them out of
2       the file?
3  A.  No. Not that I recall.
4  Q.  Do you have any idea why these notes
5       aren't in the file?
6  A.  No. But, again, I don't know when they
7       came from. This says July 3, 2016, and she was no
8       longer with the company.
9  Q.  Okay. But you testified that reading
10      these notes refreshed your recollection that you
11      were a party to a phone call with Pamela Johnson,
12      Andrea Garber, and Susan Weiss; right?
13 A.  Yes.
14 Q.  Okay. Do you see here at the bottom it
15      says:
16      "Andrea and Susan stated that they do not
17      believe Hamas can be considered a government
18      and are considered by the U.S. to be a
19      terrorist organization"?
20      In keeping with OneBeacon's policy to do
21      what they can to find coverage, did you research
22      whether or not there was support for that contention
23      that Hamas was a terrorist organization and not a
24      government?
25 A.  I personally did not.

Page 294

1  Q.  Did anybody?
2  A.  I don't know.
3  Q.  Why not?
4  A.  I don't know why I did not.

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|

18  Q.  Should somebody have researched whether,
19       quote, "Hamas can be considered a
          government," or,
20       quote, "considered by the U.S. to be a
          terrorist
21       organization"? Should somebody have
          researched
22       those issues after NBCU, OneBeacon's
          insured,
23       brought them up? Should somebody have
          researched
24 them to determine whether or not there was
          support
25       for those contentions?

Page 295
1   A.  I don't know if anyone did or not. I did
2       not.
3   Q.  Should somebody have researched that?
4   A.  Yes. But it doesn't change the fact that
5     it was a war.

9    MR. HAYES: This is going to be
10     Exhibit 29.
11     (Exhibit 29 was marked
12     for identification.)
13 BY MR. HAYES:
14  Q.  Do you recognize the e-mail chain marked
15     Exhibit 29?
16  A.  Yes.
17  Q.  What is it?
18  A.  It appears to be an e-mail chain.
19  Q.  Is this an e-mail chain that you
20 participated in?
21  A.  Yes.
22  Q.  I want you to look at the initiating
23     e-mail on page ATL 1549.
24  A.  Okay.
25  Q.  It says:

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|

Page 296
1       "Hi Wanda -
2       "Please confirm that NBCU's 'DIG' was
3       declared. Also, please advise if the Israel
4       portion was approved. I see the Toronto part
5       was in ImageNow."
6       Do you see that?
7    A.   Yes.
8    Q.   What did you mean by that, those three
9       sentences?
10   A.   Whether -- sorry. "Please confirm that
11      NBCU's DIG was declared," asking her whether or not
12      the production had been declared by the
13      production -- to the broker and the broker declared
14      it to us.
15   Q.   Okay. Why did you want to know that?
16   A.   If it had not been declared, there is
17      potential that we wouldn't have covered any claim
18      that came from it just because it wouldn't have been
19      a declared production.
20   Q.   Okay. Then the next sentence is, "Also,
21      please advise if the Israel portion was approved."
22      Why did you ask that question?
23   A.   Because the claim was about Israel.
24   Q.   Why did you want to know whether or not it
25      was approved, the Israel portion?

Page 297
1    A.   Just to confirm that it was.
2    Q.   Okay. Wanda responds:
3       "The production was . . . declared, and we
4       approved the filming in Israel with terms."

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 5     Do you see that?<br>6  A.  Yes.<br>7  Q.  And you ask:<br>8     "Thank you for the response!<br>9     "What were the terms?"<br>10    Do you see that?<br>11  A.  Yes.<br>12  Q.  And then she responds:<br>13    "We approved filming in East Jerusalem and<br>14    Tel Aviv. NBC Security team is to remain<br>15    involved and continue working with production.<br>16    We required that production work with the local<br>17    production company Keshet and coordination with<br>18    the local police."<br>19    Do you see that?<br>20  A.  Yes.<br>21  Q.  What does that mean to you?<br>22  A.  Those were the terms that Wanda, as the<br>23    underwriter, agreed to with the broker.<br>24  Q.  How does that bear on the coverage<br>25    determination, if at all?<br><br>Page 298<br>1  A.  It didn't.<br>2  Q.  Why not? Why did you ask what the terms<br>3    were?<br>4  A.  Because they potentially could have<br>5    beared [sic] on -- on the claim.<br>6  Q.  But these terms did not, in your opinion?<br>7  A.  No.<br>8  Q.  Why did OneBeacon require that the<br>9    production work with local production company Keshet<br>10   in coordination with the local police?<br>11  A.  I don't know. I don't deal with the<br>12    underwriting side. |  |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 13  Q.  Why did OneBeacon require that the NBC<br>14       Security team remain involved?<br>15  A.  I don't know. I don't work with the<br>16       underwriting side.<br>17  Q.  Did you ask Wanda in connection --<br>18  A.  No.<br>19  Q.  You did not?<br>20  A.  Not that I recall, no.<br>21  Q.  Did you have any conversations with<br>         Wanda<br>22       outside of the four corners of Exhibit 29?<br>23  A.  Not that I can recall.<br>24  Q.  Did you have any -- did you call her on<br>25       the phone?<br><br>Page 299<br>1   A.  Not that I can recall.<br>2   Q.  Did you follow up with any other questions<br>3        in response to her last e-mail on Exhibit 29?<br>4   A.  Not that I can recall.<br><br>19  Q.  The e-mail from Wanda says that<br>         OneBeacon<br>20       required NBCU to coordinate with local<br>         police. It<br>21       also says that OneBeacon required NBC to<br>         remain<br>22       involved -- the NBC Security team to<br>         remain involved<br>23       and continue working with production.<br>24       Do you see that?<br>25  A.  Yes.<br><br>Page 300<br>1   Q.  Do you have any idea why OneBeacon<br>2        required the NBC Security team to remain<br>         involved in<br>3        the --<br>4   A.  No.<br>5   Q.  -- DIG production? | |

188

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 6  A.  I did not.<br>7  Q.  And you didn't seek to find out why?<br>8  A.  No.<br>9  Q.  But if the reason why was OneBeacon was<br>10      worried about the hostilities in the region<br>11      affecting the production, that would have been<br>12      relevant; right?<br><br>15  Q.  That would have been relevant to your<br>16      coverage determination; right?<br><br>18  THE WITNESS: I'm not sure.<br><br>20  Q.  If you were trying to achieve the<br>21      OneBeacon objective of finding coverage, wouldn't<br>22      you want to know why OneBeacon required NBC Security<br>23      to remain involved and whether or not OneBeacon had<br>24      terrorism on its mind when it made that requirement?<br><br>Page 301<br>2  THE WITNESS: I don't know. That<br>3      doesn't -- that's a hypothetical that I'd never<br>4      thought about until you just asked it.<br><br>16  Q.  Okay. I want you to go back to<br>17      Exhibit 15.<br><br>Page 302<br>5      "Determine the need for outside vendors to<br>6      assist in the investigation, such as surveyors,<br>7      attorneys, engineers, accountants, fire<br>8      experts, salvor, etc., and assign<br>9      responsibility to such vendors, when<br>10     appropriate." | |

| Plaintiffs' Designation of Daniel Gutterman | Objection & Response |
|---|---|
| 11      Who determined the need for outside<br>12      vendors?<br>13   A.   That would have been Pamela.<br>14   Q.   Okay. Did she determine whether or not an<br>15      independent adjuster who had dealt with a war<br>16      exclusion or a terrorism exclusion should be<br>17      consulted?<br>18   A.   I don't know.<br>19   Q.   Okay. Did that question ever come up, to<br>20      your knowledge?<br>21   A.   Not that I can recall.<br>22   Q.   Okay. Look at page 7. It says:<br>23      "All claims-related communications,<br>24      written and oral, should be documented in the<br>25      claims file. This includes, but is not limited<br><br>Page 303<br>1      to, electronic communications, such as e-mail,<br>2      as well as paper communications and notes of<br>3      oral communications."<br>4      Was that procedure followed?<br>5   A.   Again, I don't know what that one that is<br>6      that you showed me earlier. But besides that, yes. | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|

Plaintiffs' Designation of Pamela A. Johnson, Volume 1, May 8, 2017:

Page 7

22   Q.   Good morning, Ms. Johnson. As we just
23           indicated off the record, my name is
24           Lucia Coyoca, and I represent the plaintiffs
25           in this matter.

Page 8

1                    Could you please state your full
2            name and address for the record?
3      A.   My name is Pamela Ann Johnson.

Page 12

2      Q.   Where did you go to law school?
3      A.   I went to the University of Minnesota.
4      Q.   Did you graduate?
5      A.   I did.
6      Q.   What year?
7      A.   1992.

Page 13

7      Q.   Have you ever had a license to practice law?
8      A.   I have.

Page 21

15   Q.   What did you do for OneBeacon or
16           Atlantic Specialty?
17   A.   I was the claim lead for the entertainment
18           insurance group.
19   Q.   What were your responsibilities as claim lead
20           for the entertainment insurance group?
21   A.   At what period in time?
22   Q.   When you first began working there.
23   A.   When I first began working there, I was to be
24           the face of OBE, OneBeacon Entertainment,
25           interact with brokers, provide any assistance

Page 22

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 1    needed with regard to legal matters to the<br>2    underwriters and handle complex claims.<br>3  Q.  Did your responsibilities change over time?<br>4  A.  They did.<br>5  Q.  When did they change?<br>6  A.  After I had been there for about a year.<br>7  Q.  What did you do for OneBeacon<br>      entertainment<br>8    after about a year?<br>9  A.  They reorganized the claim division within<br>10    OneBeacon and asked me to move into a<br>11    management role supervising specific claim<br>12    handlers working on OneBeacon<br>      entertainment<br>13    claims.<br><br>Page 24<br>18  Q.  When did you leave OneBeacon<br>      entertainment?<br>19  A.  I left OneBeacon entertainment in 2015. Is<br>20    that right? Yeah.<br>21  Q.  So you were with OneBeacon entertainment from<br>22    2012 until approximately 2015; is that<br>23    correct?<br>24  A.  Yes.<br><br>Page 25<br>9  Q.  Who was your supervisor when you first began<br>10    working for OneBeacon entertainment?<br>11  A.  Judy Lamble.<br>12  Q.  And did that supervisor change over time?<br>13  A.  Yes.<br>14  Q.  Who was the next supervisor that you had?<br>15  A.  Theresa Gooley.<br>16  Q.  Did you have any other supervisors?<br>17  A.  No.<br><br>Page 26 | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 23  Q.  And you left -- why did you leave OneBeacon<br>24      entertainment in 2015?<br>25  A.  OneBeacon entertainment reorganized and they<br><br>Page 27<br>1      downsized, particularly in the entertainment<br>2      group, and they gave the claim lead<br>3      responsibilities to the same person who was<br>4      also acting as the claim lead and continued<br>5      to act as the claim lead for public sector.<br>Page 34<br>11  Q.  In your view, is it important to understand<br>12      all of the facts that potentially gave rise<br>13      to a claim?<br>14  A.  Of course.<br><br>Page 35<br>11  Q.  In your view, is it important to gain a<br>12      thorough understanding of the factual<br>13      circumstances that give rise to a claim<br>14      before making any coverage determination?<br><br>17          THE WITNESS: Of course.<br><br>19  Q.  When you were reviewing production policies<br>20      with Peter Williams, did you ever review the<br>21      war exclusions with him?<br>22  A.  Well, we went over the entire policy. We did<br>23      not spend any particular amount of time<br>24      talking about the war exclusion though, no.<br>25  Q.  Do you recall any specific conversations with<br><br>Page 36<br>1      Mr. Williams concerning the war exclusion?<br>2  A.  No. | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 10       MS. COYOCA: This has previously<br>11   been marked, but I assume we're going to be<br>12   marking in seriatim fashion according to<br>13   Mr. Keeley's indication at the last<br>14   deposition, so I'll mark this document, the<br>15   general claims practice, which is Bates<br>16   labeled ATL 735 through 744, as Exhibit 1.<br><br>Page 37<br>15       MS. COYOCA: Yeah, it's Exhibit 1.<br>16       (Whereupon, Exhibit 1 was<br>17       marked for identification.)<br>19  Q.  Ms. Johnson, have you seen this document<br>20     before?<br>21  A.  I have.<br>22  Q.  What is it?<br>23  A.  It says, "General Claims Practices," and it<br>24     is an explanation of claims processing and<br>25     general claims practices.<br><br>Page 38<br>1  Q.  When did you first see this document?<br>2  A.  I believe it was provided to me when I first<br>3     came to OneBeacon. I'm not absolutely sure,<br>4     but I think it was.<br>5  Q.  Who provided it to you?<br>6  A.  Judy Lamble.<br>7  Q.  When you are reviewing claims, do you look at<br>8     all potential coverages that might apply to a<br>9     claim?<br><br>12       THE WITNESS: Yes, I try to do<br>13     that.<br><br>15  Q.  When you are reviewing a claim, do you<br>16     consider -- just as your practice, do you<br>17     consider the position of the insurer and the<br>18     position of the insured and investigate both<br>19     positions in making a coverage | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| determination? | |

23     THE WITNESS: I consider my job to
24   be to look for insurance coverage if it can
25   be found for the insured. And if there's an

Page 39
1      ambiguity in the policy, the tie goes to the
2      policyholder. My job is to find coverage if
3      it exists.
5   Q.  Could you please turn to page 2, which is
6      ATL 736.
7   A.  (Complies.)
8   Q.  Under 2, "Claim file documentation, paper and
9      electronic," do you see that reference?
10  A.  I do.
11  Q.  Were there claim files maintained for each
12     claim that you were involved with while you
13     were at OneBeacon entertainment?
14  A.  Yes.
15  Q.  What information was kept in the claims file?
18     THE WITNESS: Generally speaking,
19     you would want communications with the
20     insured to be in there. You would want
21     information provided by the insured to be in
22     there. A copy of the policy should be in --
23     in the file, notes of anyone exterior to the
24     company that you talked about with regard to
25     the claim and that sort of thing.

Page 40
2   Q.  Were there notes kept with respect to
3      internal communications regarding a claim?
6      THE WITNESS: I would say that
7      would depend on the claim file.
9   Q.  What would it depend on?
12     THE WITNESS: Well, there's no
13     requirement that we have to document every
14     internal discussion that we have and nor
15     would it necessarily be appropriate to do so.

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|

Page 46

7   Q.   Turning your attention back to page 2, or
8       736, there is a second bullet point at the
9       top of the page which indicates, "Determine
10     the need for outside vendors to insist in the
11     investigation." Do you see that?
12   A.   I do.

Page 48

21   Q.   My question, though, to you is if there was
22     ever an area where you retained an outside
23     vendor -- excuse me, if there was ever a
24     claim where there was an outside vendor that
25     you considered retaining because the

Page 49

1      circumstances of the claim involved an area
2      of expertise that was not within your frame
3      of knowledge?

6         THE WITNESS: Sure. Sometimes we
7      hire forensic accountants. Sometimes -- I
8      remember one instance in which we had to hire
9      an engineer. Again, when we're -- when we're
10     dealing with some of the intricacies of how
11     budgeting works in the film industry, there
12     are certainly people who have more experience
13     than I do in that area and sometimes we would
14     hire one of them. So there are a variety of
15     circumstances in which you would hire someone
16     from the outside.

18   Q.   Were there any limitations with respect to
19     your authority to be able to retain an
20     outside vendor with a particular area of

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 21     expertise while you were working for<br>22     OneBeacon entertainment?<br><br>25         THE WITNESS: No, I don't think | |
| Page 50<br>1     so.<br>3   Q.   Before you hired an outside vendor, were you<br>4       required to consult with your supervisor<br>5       about the fact that you intended to hire a<br>6       third-party vendor to assist in the<br>7       investigation of a claim?<br>8   A.   No.<br>9   Q.   Could you please turn to page 4, which is<br>10      page 738.<br><br>18   Q.   I'm referring to the second bullet point<br>19      under number 4, "Coverage Determination," the<br>20      bullet point that reads, begin quotes, "When<br>21      appropriate, the adjuster may consider<br>22      referring the claim for review by coverage<br>23      counsel or consult appropriate legal<br>24      resources, including internal claims legal<br>25      resources," close quotes? | Defendant's Objections:<br>(50:18-25) Reference to coverage counsel; not relevant, prejudicial; RE 401, 403.<br><br>Plaintiffs' Response:<br>Relevant to bad faith and failure to investigate. See CACI 2332. |
| Page 51<br>1   A.   Yes, I do see that.<br>2   Q.   Were there any limitations on your authority<br>3      with respect to making a decision about<br>4      obtaining a claim review by coverage counsel?<br>5   A.   No.<br><br>Page 52<br>25   Q.   Could you please turn back to page 3, 737. | Defendant's Objections:<br>(51:1-5, 9-12, 15-16) Reference to coverage counsel; not relevant, prejudicial; RE 401, 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith and failure to investigate. See CACI 2332. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| Page 53 | |

Page 53
1  A.  (Complies.)
2  Q.  There is a reference there to an,
3      "Investigation Plan." Do you see that?

10         MS. COYOCA: It is the third open
11      bullet point, "Investigation Plan."

16  Q.  What is an investigation plan?
17  A.  That would be where the claim handler sets
18      forth how they plan to investigate the claim.
19  Q.  While you were working at OneBeacon
20      entertainment, with respect to the
21      individuals that -- the claims handlers that
22      you oversaw, did you have a practice of
23      requiring an investigation plan from each
24      individual?
25  A.  I would say that it would depend on the kind

Page 54
1      of claim it was. I mean, there are some
2      claims where the -- what you're going to do
3      is perfectly obvious and the fact -- and I
4      wouldn't necessarily require them to
5      articulate that in writing in a claim file,
6      especially if they had called me and spoken
7      to me about what their investigation plan
8      was.
9         So did I -- did I want them to have
10      an investigation plan, of course, I wanted
11      them to investigate the claim and they
12      should, you know, go where the investigation
13      leads them.
14         Did I require them to necessarily
15      put something in writing and put it in the
16      claim -- in a claim file, no, not
17      necessarily.

Page 56
8  Q.  Could you please turn to page 736, which is

198

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 9      page 2. | |
| 10  A.  (Complies.) | |
| 11  Q.  Looking at the heading number 2, "Claim File | |
| 12      Documentation, Paper and Electronic," the | |
| 13      first bullet point reads, begin quotes, | |
| 14      "Claims personnel should document the claim | |
| 15      file in such a way to provide a complete | |
| 16      understanding of activities with respect to | |
| 17      the claim," close quote. Do you see that? | |
| 18  A.  I do. | |
| 19  Q.  How did you meet that criteria with respect | |
| 20      to legal analysis that was performed in terms | |
| 21      of making a coverage determination if there | |
| 22      was not a practice of putting the information | |
| 23      into the claims file? | |
| | |
| Page 57 | |
| 1         THE WITNESS: Well, the note in | |
| 2      the claim file might read nothing more than, | |
| 3      "Conducted research into case analysis, | |
| 4      legal" -- you know, "Legal analysis of the | |
| 5      claim," something to that effect, that -- | |
| 6      that fulfills that, it says that this is one | |
| 7      of the things that we did with regard to the | |
| 8      evaluation of the claim. | |
| | |
| Page 58 | Defendant's Objections: |
| 12  Q.  Could you please turn to page 740. | (58:12-13) Reference to |
| 13  A.  (Complies.) | reserves; not relevant, |
| 14  Q.  Under the item number 6, "Reserving," there | prejudicial; FRE 401, 403 |
| 15      is a first bullet point that indicates, | |
| 16      "Reserves should be timely established based | Plaintiffs' Response: |
| 17      on exposure in light of the totality of the | Relevant to bad faith and |
| 18      circumstances presented by the individual | motive. See Oppo to MIL 2 |
| 19      claim." Do you see that? | (Dkt 201). |
| 20  A.  I do. | |
| 21  Q.  Were you responsible for setting reserves | |
| 22      during the period of time that you were | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 23      working for OneBeacon entertainment? | |
| | |
| <u>Page 59</u> | <u>Defendant's Objections:</u> |
| 1            THE WITNESS: I was in charge of | (59:1-8, 11-19, 21-25) |
| 2      setting reserves on a claim that I personally | Reference to reserves; not |
| 3      handled as a claim professional. | relevant, prejudicial; FRE |
| 4    BY MS. COYOCA: | 401, 403 |
| 5    Q.  Was there a practice, best practice | |
| 6      established at OneBeacon entertainment as to | <u>Plaintiffs' Response:</u> |
| 7      the timing of when a claim should first be | Relevant to bad faith and |
| 8      reserved? | motive. See Oppo to MIL 2 |
| | (Dkt 201). |
| 11            THE WITNESS: It should reserve | |
| 12      within the first 30 days with regard to the | |
| 13      indication of whether it is a potentially | |
| 14      covered claim or not, and then as you gather | |
| 15      more information within 30 days of gathering | |
| 16      information that affects your determination | |
| 17      of the potential damages involved and | |
| 18      exposure on a covered claim, you should | |
| 19      adjust the reserve accordingly. | |
| | |
| 21   Q.  With the first part of your response you | |
| 22      indicated, begin quotes, "It should reserve | |
| 23      within the first 30 days with regard to the | |
| 24      indication of whether it is a potentially | |
| 25      covered claim or not." I want to understand | |
| | |
| <u>Page 60</u> | <u>Defendant's Objections:</u> |
| 1      your response. | (60:1-25) Reference to |
| 2      Are you indicating that a reserve | reserves; not relevant, |
| 3      should be set within the first 30 days | prejudicial; FRE 401, 403 |
| 4      irrespective of whether the claim was a | |
| 5      covered claim? | <u>Plaintiffs' Response:</u> |
| 6    A.  Yes, that is what I am saying. However, I'm | Relevant to bad faith and |
| 7      not saying that it should be reserved to | motive. See Oppo to MIL 2 |
| 8      exposure. In other words, what the potential | (Dkt 201). |
| 9      damages are affiliated with the claim if it's | |
| 10      not a covered claim. If it's not a covered | |
| 11      claim, you would enter a signal reserve | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 12    indicating that it's not a covered claim.<br>13  Q.  What do you mean by a, "Signal reserve"?<br>14  A.  Well, there -- there's signal reserves that<br>15    indicate this is a covered claim, but I don't<br>16    know what the damages are yet, or there is a<br>17    signal reserve that says I don't know, I<br>18    don't think that this is a covered claim and,<br>19    therefore, I'm not entering a specific dollar<br>20    amount.<br>21      It's to give an indication to the<br>22    underwriters in the event that a claim is<br>23    coming up for renewal, with regard to what's<br>24    going on with the claim.<br>25  Q.  And final bullet point in number 6 it | |
| Page 61<br>1    indicates, begin quotes, "Claims personnel<br>2    must obtain appropriate authority before<br>3    making reserve decisions in excess of their<br>4    authority." Do you see that?<br>5  A.  I do.<br>6  Q.  What was your authority during the period<br>7    that you were working at OneBeacon?<br><br>10      THE WITNESS: I don't remember<br>11    exactly. It was between 750 and a million, I<br>12    think. I think that's right.<br><br>14  Q.  So am I correct that anything above a million<br>15    you believe you needed to go to others in the<br>16    company in order to obtain their consent<br>17    before settling a claim in that amount?<br>18  A.  Yes. | Defendant's Objections:<br>(61:1-7, 10-12, 14-18)<br>Reference to reserves; not relevant, prejudicial; FRE 401, 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 72<br>23  Q.  Now, when I asked you about obtaining an<br>24    outside coverage opinion, you indicated that<br>25    you don't have any specific criteria as to | Defendant's Objections:<br>(72:23-25) Reference to reserves; not relevant, prejudicial; FRE 401, 403<br><br>Plaintiffs' Response: |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| | Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| <u>Page 73</u><br>1    when you would go seek one out when you were<br>2    working at OneBeacon entertainment, but one<br>3    circumstance might be if you were traveling a<br>4    lot and didn't have time to do research,<br>5    another circumstance would be if claims legal<br>6    did not have time; is that correct?<br>7  A.  Yes, that's correct.<br>8  Q.  Are there any other circumstances that you<br>9    can identify where you would seek outside<br>10    coverage counsel opinion with respect to a<br>11    claim while you were working at OneBeacon<br>12    entertainment?<br><br>15       THE WITNESS: I think I stated<br>16    before if when I did the research I thought<br>17    that there was conflicting opinions or<br>18    conflicting information that -- that dealt<br>19    with the specific language of the policy,<br>20    that might be an instance in which I would<br>21    ask for an outside opinion. I don't<br>22    specifically recall any time that that<br>23    happened when I asked for an outside opinion,<br>24    but that would be a circumstance in which I<br>25    would have.<br><br><u>Page 90</u><br>7  Q.  Ms. Johnson, when is the first time you heard<br>8    about the Dig claim?<br>9  A.  I think that it was on a telephone call<br>10    with Danny Gutterman, Andrea Garber and<br>11    Susan Weiss on July 10th, 2014.<br>12  Q.  You believe that phone call took place on | <u>Defendant's Objections:</u><br>(73:1-12, 15-25) Reference to reserves; not relevant, prejudicial; FRE 401, 403<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 13      July 10, 2014?<br>14   A.   I think that's right. I could be mistaken<br>15      about the date.<br>16   Q.   And the participants in the call were<br>17      Danny Gutterman, Andrea Garber, Susan Weiss<br>18      and yourself?<br>19   A.   That's correct.<br>20   Q.   Why were you having the call?<br>21   A.   Danny called me and he said that NBC had a<br>22      claim that they wanted to discuss and could<br>23      we talk about it, you know, in other words,<br>24      could he conference me in. Or he may have<br>25      already conferenced me in, I don't remember.<br><br>Page 91<br>1        That wasn't uncommon. I mean, if<br>2      there's a -- in entertainment claims,<br>3      especially first-party claims, things are<br>4      very fast moving. You can't allow a<br>5      production to sit around and wait. If they<br>6      have something that they have that they need<br>7      an answer to, you need to get on it as<br>8      quickly as possible.<br><br>23   Q.   At that point in time, had a claim been<br>24      formally tendered to OneBeacon?<br>25   A.   I don't know.<br><br>Page 92<br>1   Q.   Was it your understanding during the course<br>2      of the call that the claim had previously<br>3      been discussed with anyone else at OneBeacon?<br>4   A.   I think that either Andrea or Susan mentioned<br>5      that they had talked to Peter.<br>6   Q.   What was discussed during the call?<br>7   A.   They explained that the situation -- that --<br>8      in Israel had become too dangerous for their<br>9      cast to resume filming there. They had been | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 10      on hiatus between the pilot and the shooting<br>11      of the initial season, which is not uncommon,<br>12      and they were supposed to start shooting<br>13      again and they wanted to push for a week. In<br>14      other words, they wanted to delay starting<br>15      production for a week to see whether or not<br>16      the situation deescalated.<br>17  Q.  Did they explain to you why the situation in<br>18      Israel had become dangerous?<br>19  A.  They told me that -- that Hamas was lobbing<br>20      rockets into Tel Aviv and Jerusalem, which<br>21      were the two cities in which they had<br>22      locations for shooting.<br>23  Q.  Did they say anything further with respect to<br>24      the situation that was creating an unsafe<br>25      circumstance for the production to proceed?<br><br>Page 93<br>1  A.  No, that's what we talked about in terms<br>2      of -- of safety or lack of safety, was that<br>3      the fact that there was increased rocket fire<br>4      and their security team had told them that it<br>5      had become unsafe.<br>Page 94<br>13  Q.  Did Ms. Garber or Ms. Weiss discuss the<br>14      amount of costs that might potentially be<br>15      incurred that would be associated with the<br>16      push?<br>17  A.  I asked them what their usual production<br>18      costs were for a week of filming just to get<br>19      sort of an estimate of -- of how much it<br>20      would cost if they had to push, and I think<br>21      they told me $350,000, which was not uncommon<br>22      for an NBC production.<br><br>Page 95<br>22  Q.  My question, though, is: Did you ask them<br>23      the question as to what the estimated cost<br>24      would be for pushing production for one | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| week?<br>25   A.   I -- I don't remember.<br><br>Page 96<br>1   Q.   Did Ms. Weiss or Ms. Garber indicate what<br>2         would happen after one week?<br>3   A.   As I recall, we were talking about whether or<br>4         not -- this was a fast-moving situation and<br>5         we wanted to see whether it would<br>           deescalate.<br>6         So we had -- we had agreed that we would talk<br>7         again shortly after seeing what -- what was<br>8         continuing to happen.<br>9   Q.   Is there anything else that Ms. Garber or<br>10        Ms. Weiss told you during that July 10 phone<br>11        call?<br>21        I think what I recall is that<br>22        they -- that, you know, primarily what we<br>23        were talking about is is everybody safe. And<br>24        so I think what they were telling me is they<br>25        thought that everyone was already out,<br><br>Page 97<br>1         because that was our primary concern, is<br>2         everyone -- you know, have they left Israel,<br>3         are they still on the ground, if they need to<br>4         leave, you know, what -- what arrangements<br>5         have you made with regard to that.<br>6             And I think, because they were on<br>7         hiatus, that either everyone or almost<br>8         everyone was already gone or had not<br>9         returned, depending on how you look at it.<br><br>19   Q.   What was your response, if any, to the<br>20        description of the need for a push?<br>21   A.   Well, I don't think that I responded one way<br>22        or another. I agreed with them that given<br>23        the information they had, it sounded like a<br>24        dangerous situation and that we wanted to see<br>25        what was going to happen next. | Defendant's Counter:<br>(96:21-25)<br><br>Plaintiffs' Response:<br>Defendant's counter is already included in designation. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| Page 109 | |
| 2   Q.   After your conversation with Ms. Weiss and | |
| 3          Mr. Gutterman, what did you do next? | |
| 4   A.   Well, I was sitting in a car outside a | |
| 5          restaurant, so I think I probably drove | |
| 6          either home or to another location. | |
| 7   Q.   What did you do next with the claim after you | |
| 8          drove home? | |
| 9   A.   I would assume that I began to research the | |
| 10         situation in Israel to see exactly what was | |
| 11         going on there to determine whether or not | |
| 12         the claim was potentially covered. | |
| Page 118 | |
| 14   Q.   You indicated that shortly after having that | |
| 15         phone call with Ms. Garber and Ms. Weiss, you | |
| 16         believe that you began researching; is that | |
| 17         correct? | |
| 18   A.   Yes. | |
| 19   Q.   What did you research? | |
| 20   A.   I wanted to know what was happening in | |
| 21         Israel. And they said that it was -- that, | |
| 22         you know, it was a dangerous situation and | |
| 23         they said that they thought it was imminent | |
| 24         peril, and so I needed to collect information | |
| 25         to see whether or not it actually did fall | |
| | |
| Page 119 | Defendant's Counter: |
| 1          within the coverage grant for imminent peril | (119:20-25, 120:1-12) |
| 2          and whether there were any exclusions that | |
| 3          applied. | Plaintiffs' Response: |
| 4   Q.   What did you do to research the situation in | Defendant's counter is |
| 5          Israel? | irrelevant, waste of time. |
| 6   A.   I looked at news reports, I read articles, I | 402, 403. Not necessary for |
| 7          looked at newspaper articles and, you know, a | completeness. |
| 8          variety of -- of -- I don't know what you | |
| 9          would call them. Not academic articles, | |
| 10         because I don't think that that's what they | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 11    would be called, but articles or -- or white<br>12    papers written by, for example -- for<br>13    example, the CRS, the Congressional Research<br>14    Service that works specifically for<br>15    U.S. Congress.<br>16  Q.  Did you begin that research the same day that<br>17    you had the conversation with Ms. Weiss and<br>18    Ms. Garber?<br>19  A.  I think did, yes.<br><br>DEFENDANT'S COUNTER:<br>20  Q. Now, you indicated you were in a restaurant<br>21  parking lot when you first took that first<br>22  phone call and then you drove home; is that<br>23  correct?<br>24  A. I don't remember specifically where I went<br>25  after that, but I probably went home.<br><br><br>Page 1201   Q. Was it an evening when you took the phone<br>2  call?<br>3  A. I don't remember the exact time.<br>4  Q. Did you begin your research, though, when you<br>5  went home or did you wait until the next day?<br>6  A. I think I actually started looking at stuff<br>7  that night. As I said, these are very<br>8  fast-moving claims, so you can't sit around<br>9  and wait.<br>10  Q. Now, you indicated you also had to review the<br>11  coverage; is that correct?<br>12  A. Yes.<br>END DEFENDANT'S COUNTER<br><br>Page 120 (cont.)<br>13  Q.  What did you do to review the coverage?<br>14  A.  I looked at the policy.<br>15  Q.  Anything else? | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 16  A.  Well, the policy is what indicates what the<br>17      coverage is, so, no, that's what I did. I<br>18      looked at what the policy said.<br>19  Q.  Did you look at anything else, though, in<br>20      order to be able to analyze the coverage?<br>21  A.  Well, I think I just told you a variety of<br>22      things that I did.<br>23  Q.  Right. You indicated that in order to<br>24      investigate the factual situation in Israel<br>25      you looked at news reports, news articles,<br><br>Page 121<br>1      you read articles, newspaper articles, and<br>2      white papers, such as the Congressional<br>3      Research Service.<br><br>6          THE WITNESS: I looked at a lot of<br>7      different things. They certainly encompassed<br>8      the things that I've told you. I probably<br>9      looked at other things besides that that I<br>10      don't recall as I sit here today.<br><br>25  Q.  Okay. And in order to determine whether or<br><br>Page 122<br>1      not it falls within the scope of the coverage<br>2      grant in the first instance, did you look at<br>3      anything other than the factual circumstances<br>4      versus -- excuse me, in terms of the various<br>5      articles and, et cetera, that you reviewed<br>6      and the insurance policy?<br>7  A.  That's what I recall doing.<br>8  Q.  Did you look at the imminent peril coverage?<br>9  A.  Yes.<br>10  Q.  Under the extra expense portion of the<br>11      policy?<br>12  A.  That's correct.<br>13  Q.  Did you come to a conclusion as to whether<br>      or<br>14      not the situation that had been described | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 15     constituted imminent peril?<br>16  A.  Based on the information that I had at the<br>17     time, what -- what you always try to<br>18     determine in an imminent peril situation is<br>19     first was this unexpected.<br>20         In other words, based on the<br>21     information that the -- that the production<br>22     has before they go into the situation versus<br>23     what the situation is at the time that they<br>24     are saying that they have a claim, is the<br>25     behavior or whatever is going on, you know,<br><br>Page 123<br>1     has -- has that -- is that unexpected to the<br>2     degree that you think that keeping people<br>3     there would be unconscionable.<br>4         So that's what I was looking at,<br>5     what was the situation before we went in, and<br>6     then what was the situation at the time we<br>7     had the phone call and they decided to push.<br><br>Page 124<br>12  Q.  When did you reach your conclusion that the<br>13     situation did in fact constitute imminent<br>14     peril?<br>15  A.  Well, it didn't take me very long to reach<br>16     that conclusion. I mean, I don't think I<br>17     reached it that night. I continued to have<br>18     conversations with Danny. We both were doing<br>19     research and exchanging information with each<br>20     other with regard to what we had found. But<br>21     certainly within a few days.<br><br>Page 129<br>7  Q.  Did you -- to the best of your recollection,<br>8     did you consult any other materials in order<br>9     to determine what the situation was prior to<br>10     the time the claim arose? | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 11   A.   I know I looked at travel warnings. <br> 12   Q.   Where did you get the travel warnings from? <br> 13   A.   I looked at the State Department's warnings <br> 14         that they put out with regard to warning U.S. <br> 15         citizens about dangerous areas of travel. <br> 16   Q.   Any other source other than U.S. State <br> 17         Department? <br> 18         A. Yup, I looked at a variety of other countries <br> 19   as well. We looked at the United Kingdom. I <br> 20         think I looked at Australia, and probably a <br> 21         few more. <br> <u>Page 130</u> <br> 9    Q.   With respect to the communications you had <br> 10         with Danny Gutterman about his investigation <br> 11         of the claim, do you recall directing him to <br> 12         look at any particular sources of <br> 13         information? <br> 14   A.   As I sit here today, I don't remember. Maybe <br> 15         I did. <br> 16   Q.   Maybe you did, maybe you didn't, you just <br> 17         don't remember? <br> 18   A.   I don't recall. <br> 19   Q.   Did you and Mr. Gutterman develop an <br> 20         investigation plan for the claim? <br> 21   A.   Well, when you say, "Develop an investigation <br> 22         plan," we began an investigation, so it's not <br> 23         as though we sat down and said, "This is what <br> 24         we need to know." We already knew what we <br> 25         needed to know when we started to investigate | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| <u>Page 131</u><br>1       it, what happened prior to the time that the<br>2       shooting started and what happened in<br>3       shooting -- I mean, principal photography --<br>4       and what happened in between the time that<br>5       they -- before they got there and what was<br>6       happening at the time they made the claim.<br>7  Q.  I understand the steps that you began to take<br>8       to investigate the claim. What I want to<br>9       know is: Before the investigation began, did<br>10      you and Mr. Gutterman discuss an<br>11      investigation plan?<br>12  A.  Well, I think what I've already testified is<br>13      that I began the investigation myself that<br>14      night, and that I don't recall whether or not<br>15      I spoke with Mr. Gutterman before I started<br>16      doing that.<br>17  Q.  Did you and Mr. Gutterman develop an<br>18      investigation plan before beginning the<br>19      investigation?<br>20  A.  I think I've already told you.<br>21  Q.  Please answer my question.<br><br>25         THE WITNESS: Did I sit down<br><br><u>Page 132</u><br>1       and -- and have a conversation about him,<br>2       "These are the steps we need to take," no,<br>3       "One, two, three," no, I did not do that.<br><br>19  Q.  Do you have a general recollection of<br>20      speaking with Mr. Williams shortly --<br>21      sometime shortly after the claim arose?<br>22  A.  Yes.<br>23  Q.  What did you discuss with him?<br>24  A.  I don't recall specifically, except for the<br>25      fact that he needs to be aware of claims that | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| Page 133 | |

Page 133

1    come in, what we're thinking about in terms
2    of coverage, because the most important
     thing
3    in dealing with any production claim is
4    if -- if you even have any inkling that a
5    claim might have some kind of coverage
6    problem, you need to let the insured know
7    that up -- upfront, because you don't want
8    them to be relying upon insurance coverage
     as
9    they are making their creative decisions.
10  Q.  Did you discuss with Mr. Williams, during
11       that first phone call you had with him after
12       the claim first arose, that there might be a
13       coverage problem?
14  A.  Well, we had an exchange of e-mails, I
15       believe, where I related to him what had
16       happened in the phone call.
17  Q.  Other than having an exchange of e-mails, as
18       you sit here today, do you recall discussing
19       that there might not be coverage for the
20       claim?
21  A.  Sometime short -- shortly thereafter, I'm
22       sure we did.
23  Q.  Did you ever have a telephone call with him
24       to discuss it?
25  A.  I'm sorry, I just don't remember. I mean,

Page 134

1    that would be likely because, you know, the
2    protocol was if you think that there's going
3    to be something that -- that is going to
4    have -- that is potentially not covered, you
5    want to tell Peter first, and then you want
6    to tell the broker.

25  Q.  Okay. Before that next conversation with

Page 135

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 1      Ms. Garber and Ms. Weiss when you were<br>2      investigating the claim, you've given me<br>3      certain materials that you consulted,<br>4      articles, white paper, et cetera, newspaper<br>5      articles, you've also indicated you looked at<br>6      the insurance policy. Are there any other<br>7      documents that you can recall reviewing?<br>8  A.   I looked at case law.<br>9  Q.   What case law did you look at?<br>10 A.   I looked at any case that I could find that<br>11     interpreted the war exclusion.<br>12 Q.   Do you recall the names of any of those<br>13     cases?<br>14 A.   The Pan Am case, the Holiday Inn case.<br>15 Q.   Other than Pan Am and Holiday Inn, do you<br>16     recall any other cases?<br>17 A.   I think I had also looked at -- looked at<br>18     what had been said about the -- you know, the<br>19     9/11 attack.<br><br>Page 136<br>1  Q.   What did you look at with respect to what had<br>2     been said about the 9/11 attacks?<br>3  A.   I can't tell you specifically as I sit here<br>4     today.<br>5  Q.   Did you read any cases with respect to 9/11?<br>6  A.   Perhaps. As I said, I looked at any case law<br>7     I could find that interpreted the war<br>8     exclusion.<br>9  Q.   Did you review any articles that discussed<br>10     the insurance company's response -- excuse<br>11     me, the insurance industry's response to the<br>12     9/11 attacks in terms of application or<br>13     non-application of the war exclusion?<br>14 A.   Well, I -- I don't recall if I -- if I<br>15     actually read anything about that. I just<br>16     don't remember. | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 22 Q. Right. What I'm trying to find out is what<br>23     you looked at with respect to the 9/11<br>24     attacks. And I believe your testimony is you<br>25     can't recall if you looked at case authority<br><br>Page 137<br>1     and you can't recall if you looked at<br>2     articles about the industry response; is that<br>3     correct?<br>4 A. Well, what my testimony was is I -- when I<br>5     was looking at case law, I was looking at any<br>6     case that was available on Westlaw that<br>7     interpreted the war exclusion, because I<br>8     wanted to see how it had been interpreted in<br>9     the past, which is what I usually do in the<br>10    instance of any kind of a denial, I always<br>11    want to see if there's other -- if there's<br>12    case law out there that -- that interprets a<br>13    particular language that's contained in the<br>14    policy to make sure that my interpretation is<br>15    consistent with case law.<br>16 Q. Right. What I'm focused on is the 9/11<br>17    attacks. You indicated that you reviewed<br>18    something with respect to the 9/11 attacks.<br>19 A. Yes, and I don't -- I can't tell you as I sit<br>20    here today exactly what it was.<br>21 Q. Okay. Now, prior to beginning your<br>22    investigation of the factual circumstances in<br>23    Israel, did you know what Hamas was?<br>24 A. I knew of the existence of Hamas, yes.<br>25 Q. What did you understand Hamas to be?<br><br>Page 138<br>1 A. A Palestinian organization.<br>2 Q. Anything else that you understood at the time<br>3    the claim first came in?<br>4 A. Well, I know that Susan Weiss considered it<br>5    to be a terrorist organization, because<br>6    that's what she said. I didn't have an<br>7    opinion one way or another with regard to | |

214

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 8　　　that.<br><br><u>Page 140</u><br>5　Q.　My question to you, though, is: As of<br>6　　　July 15, 2014, when you were first<br>7　　　investigating the claim, did you know whether<br>8　　　or not the U.S. Government recognized the<br>9　　　existence of a separate state of Palestine?<br><br>13　　　　THE WITNESS: I don't think that<br>14　　　they did, no.<br><br>16　Q.　Okay. But my question is of your knowledge<br>17　　　as of July 15, 2014.<br>18　A.　No, I think at that time that I don't think<br>19　　　that the U.S. was recognizing Palestine as a<br>20　　　separate state.<br>21　Q.　That was your understanding?<br>22　A.　Yes.<br><br><u>Page 141</u><br>24　Q.　As of July 15, 2014, before you began your<br>25　　　investigation, did you have an understanding<br><br><u>Page 142</u><br>1　　　as to whether the U.S. Government recognized<br>2　　　a separate state of Gaza?<br><br>5　　　　THE WITNESS: I don't believe they<br>6　　　did.<br><br>DEFENDANT'S COUNTER;<br>8　Q. As of July 15, 2014, did you have an<br>9　　　understanding as to what the Palestinian<br>10　　　Authority was?<br>11　A. I'm sorry, I'm not sure what you're asking.<br>12　Q. I want to know the state of your knowledge,<br>13　if you knew as of July 15, 2014, before you | <u>Defendant's Counter:</u><br>142:8-19<br><br><u>Plaintiffs' Response:</u><br>Defendant's counter is a separate question and answer.  Witness's answer to the question in Defendant's counter is non-responsive. Not necessary for completeness. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 14  began your investigation, did you know what<br>15  the Palestinian Authority was?<br>16  A. Well, I certainly knew that there was a<br>17  Palestinian government, an elected<br>18  Palestinian government, and that controlled<br>19  the region of Gaza and had for some time.<br>END DEFENDANT'S COUNTER<br><br>Page 151<br>20  Q.   Before you began your investigation in July 7<br>21         of 2014, did you know that Hamas had been<br>22         designated as a terrorist organization by the<br>23  U.S. Government since 1997?<br><br><br>Page 152<br>2             THE WITNESS: I don't know that I<br>3         knew they had given it that specific<br>4         designation, but that was not a surprise.<br>5         Frequently, Hamas was referred to, you know,<br>6         in media as a terrorist organization.<br><br>8  Q.   As part of your research, did you ever look<br>9         at the U.S. Government's designation of<br>10        Hamas's status as a terrorist organization?<br>11  A.   It was one of the things that --<br><br>15             Yes, that was one of the things that<br>16         I came across is that the U.S. designated it<br>17         as a terrorist organization.<br><br>19  Q.   How did you come across that?<br>20  A.   I don't remember where I read that. I mean,<br>21         there -- there were -- I mean, there was so<br>22         many different things that I looked at that I<br>23         can't tell you for sure. It might have been<br>24         in the -- the Zanotti white paper that I<br>25         read. It could have been in any one of a | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| Page 153 | |
| 1　　　variety of -- of things that I looked like -- | |
| 2　　　looked at, in a newspaper article, a magazine | |
| 3　　　article, I'm just not sure. | |
| 4　Q.　Did you ever look at any U.S. Government | |
| 5　　　websites in terms of the list of terrorist | |
| 6　　　organizations to determine whether or not | |
| 7　　　Hamas was on it? | |
| 8　A.　Well, I looked at the travel website. And I | |
| 9　　　can't tell you as I sit here today whether or | |
| 10　　not on the travel website it specifically | |
| 11　　said that Hamas was a terrorist organization | |
| 12　　or not. | |
| 13　Q.　But other than U.S. Government travel | |
| 14　　websites, did you look at any U.S. Government | |
| 15　　website that listed all of the organizations | |
| 16　　that the U.S. Government considered to be | |
| 17　　terrorist organizations? | |
| | |
| 20　　　THE WITNESS: I don't recall | |
| 21　　looking at a website that specifically said | |
| 22　　that, had that particular list that you're | |
| 23　　referring to. | |
| | |
| 25　Q.　Did you ask Danny Gutterman to look at the | |
| | |
| Page 154 | |
| 1　　　U.S. Government websites for lists of -- | |
| 2　　　excuse me -- terrorist organizations to see | |
| 3　　　if Hamas was on it? | |
| | |
| 6　　　THE WITNESS: No, I did not. | |
| | |
| 8　Q.　Did Danny Gutterman ever tell you that he had | |
| 9　　　looked at U.S. Government websites to find | |
| 10　　the list of designated terrorist | |
| 11　　organizations to see if Hamas was on it? | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 14            THE WITNESS: Not that I recall.<br><br>Page 167<br>1   Q.   In your research, did you form any<br>2          conclusions as to whether Fatah and Hamas did<br>3          form an affiliation in June of 2014?<br>4   A.   Well, they said that they were forming an<br>5          affiliation. That's the best answer I can<br>6          give you.<br>7   Q.   When you were doing your research in July of<br>8          2014, did you do any separate research as to<br>9          Hamas's status as a terrorist organization<br>10        according to the U.S. Government?<br><br>13            THE WITNESS: I'm not sure what<br>14        you mean by status. I knew that the<br>15        United States viewed Hamas as a terrorist<br>16        organization based on their charter.<br><br>18  Q.   What was your understanding as to what was in<br>19        Hamas's charter that made the U.S. Government<br>20        consider it to be a terrorist organization?<br>21  A.   Well, part of the charter of Hamas, as far as<br>22        I understand it, is that it wants the -- it<br>23        will never acknowledge Israel and it wants<br>24        the destruction of Israel.<br>25  Q.   Anything else?<br><br>Page 168<br>1   A.   Well, it wants to reclaim its homeland. It<br>2          claims that Israel is actually Palestinian<br>3          territory.<br>4   Q.   Anything else?<br>5   A.   That's all I can recall at this moment.<br><br>Page 169 | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 15 Q. During your investigation you came to a<br>16     conclusion that the U.S. considered Hamas to<br>17     be a terrorist organization; is that correct?<br>18 A. Yes.<br><br>22 Q. Did you do any investigation or perform any<br>23     analysis with respect to the impact of that<br>24     status as a terrorist organization on the<br>25     claim itself?<br><br>Page 170<br>3        THE WITNESS: Based on what was<br>4     happening in Israel and the Gaza strip at the<br>5     time of the claim, whether or not Hamas was a<br>6     terrorist organization was not relevant to my<br>7     analysis.<br><br>9 Q. Was there a terrorism exclusion on the<br>10    policy?<br>11 A. Well, I'm not sure what you mean by a<br>12    terrorism exclusion. There was nothing<br>13    specifically in the policy that said acts of<br>14    terrorism are excluded.<br>15       But, certainly, the fact that there<br>16    was a war exclusion if the terrorist act also<br>17    involved warlike weapons, was part of an<br>18    insurrection, I mean, war and terrorism are<br>19    not usually exclusive, you can have the same<br>20    things happening, you can have terrorist acts<br>21    during acts of war. So I didn't see those as<br>22    mutually exclusive things.<br>23       So if -- if the terrorist attack<br>24    also involved one of the criteria that is<br>25    found in the war exclusion, then the claim<br><br>Page 171<br>1    would be excluded.<br>2       If it did not, then there's a<br>3    potential for coverage depending on the other | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 4   surrounding circumstances and whether or not | |

4      surrounding circumstances and whether or not
5      the circumstances fall within the coverage
6      grant in the first place.
7  Q.  You said you're not sure of what I mean by a
8      terrorism exclusion. Have you ever reviewed
9      a policy that contained a terrorism
10     exclusion?
11  A.  I might have, but as I sit here today, I
12     wouldn't be able to tell you what the
13     language is. And since you haven't given me
14     that language, I can't analyze that.
15  Q.  But to the best of your recollection, did you
16     ever see in the NBCUniversal policy an
17     exclusion that was labeled terrorism
18     exclusion?
19  A.  I did not.
20  Q.  When you were performing your analysis as to
21     whether the situation in Israel was a covered
22     claim or not, did you take into consideration
23     at all one way or the other the fact that
24     Hamas was designated as a terrorism
25     organization by the U.S. Government?

Page 172
1  A.  I think I've already answered that question.
2     But, yes, I knew that that's how the U.S.
3     viewed it. But given the circumstances
4     surrounding what was happening in Israel at
5     the time of the claim, whether or not Hamas
6     was viewed as a terrorist organization by the
7     U.S. Government was not relevant in
8     determining whether or not the claim was
9     covered.
10  Q.  When you were analyzing the claim and making
11     a claim determination, was it important to
12     your analysis that you understand the meaning

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 13      of the term, "War," as it's used in the war<br>14      exclusion?<br>15  A.  Well, I mean, I think that -- yes, certainly<br>16      it is. Yes.<br>17  Q.  Okay. Did you consider what the definition<br>18      of terrorism was when you were performing<br>19      your analysis?<br>20  A.  Whose definition of terrorism?<br>21  Q.  Any definition within the insurance industry<br>22      context.<br>23  A.  Well, I mean, I think that there are over a<br>24      hundred definitions of terrorism, depending<br>25      on who you ask. It usually means that you're<br><br>Page 173<br>1      targeting a civil population for the purpose<br>2      of coercing that population to influence or<br>3      coerce its government into changing its<br>4      position.<br>5           That's sort of a common<br>6      understanding of some of the facts -- some of<br>7      the factors that need to be included in a<br>8      definition of terrorism.<br>9           However, I don't think that that<br>10      definition necessarily applies today, and the<br>11      reason that I don't think it applies today<br>12      is, for example, in the 9/11 circumstance,<br>13      Al Qaeda was not trying to coerce the<br>14      American people into having its government<br>15      take any position whatsoever, they were just<br>16      trying to frighten people and trying to bring<br>17      down the government.<br>18           So I would not say that -- and that<br>19      was certainly considered an act of terrorism<br>20      that does not fall within the<br>21      usually-accepted definition.<br>22  Q.  As part of the usually-accepted definition,<br>23      wouldn't you also include that there has to<br>24      be the utilization of violent means in order<br>25      to try to coerce the government to change its | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
| --- | --- |

Page 174
1          position?

6              THE WITNESS: Yes, violence is
7          usually considered to be a component of
8          terrorism.

10   Q.   So in the context of the analysis that you
11         were performing in July of 2014 with respect
12         to the Dig claim, did you look at whether the
13         acts that were taking place in Israel at the
14         time, whether or not those could be
15         considered acts of terrorism?

19             THE WITNESS: That was certainly
20         the position that Susan Weiss took. I didn't
21         see what was happening in Israel to be --
22         whether it was defined as an act of
23         terrorism, it was still an act of war or
24         warlike actions or an insurrection,
25         rebellion, et cetera. It still fell within

Page 175
1          that definition based on the actions that
2          were taking place no matter what you called
3          it.

Page 181
6    Q.   You indicated in your research. Did you
7          perform research as to what constituted an
8          act of terrorism in connection with your
9          analysis of the Dig claim?
10   A.   I believe I did.
11   Q.   What did you do?
12   A.   The same things that I've already described
13         to you.
14   Q.   Did you -- did you review cases that
15         specifically addressed the definition of
16         terrorism?

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 17  A.  I'm sure I might have done that as a -- as a<br>18       Westlaw search. I don't recall as I sit here<br>19       today.<br>20  Q.  Did you review cases that talked about the<br>21       intersection between terrorism and war?<br><br>24       THE WITNESS: Well, I think that<br>25       they talked about that in the Pan Am case.<br><br>Page 182<br>2   Q.  Other than the Pan Am case?<br>3   A.  And I think they talked about that in the --<br>4        in the Twin Towers, the 9/11 cases as well.<br>5   Q.  When you say, "The 9/11 cases," what cases<br>6        are you referring to?<br>7   A.  I'm sorry, I don't remember their names. If<br>8        you'd like to show me a case and ask if I<br>9        looked at it, I'd be happy to tell you yes or<br>10       no.<br>11  Q.  Did you review any cases that you can<br>12       remember the specific name of in the context<br>13       of doing your research as to the Dig claim<br>14       that discussed the intersection between<br>15       terrorism and acts of war other than the<br>16       specific cases you've just referenced?<br><br>19       THE WITNESS: I may have. I don't<br>20       remember exactly what the Wilkinson case<br>         said<br>21       about that, and there may have been other<br>22       cases that I looked at. I mean, this was<br>23       quite a while ago, I don't remember every<br>24       single case I read.<br><br>Page 183<br>1   Q.  As part of your analysis, did you come to any<br>2        conclusions as to whether the acts of -- that<br>3        were in controversy in the summer of 2014,<br>4        did you come to any conclusions as to<br>         whether | Defendant's Objections:<br>(182:11-16) Assumes facts<br>not in evidence; hearsay;<br>foundation FRE 401, 403,<br>801, 802<br><br>Plaintiffs' Response:<br>Offered for non-hearsay<br>purpose; statement of party<br>opponent; relevant to bad<br>faith; unclear what fact not<br>in evidence Defendant is<br>objecting to; general events<br>of 9/11 subject to judicial<br>notice; no facts assumed—<br>proper cross-examination.<br><br><br><br>Defendant's Objection:<br>(183:18-22) Cumulative;<br>argumentative<br><br>Plaintiffs' Response:<br>Relevant to bad faith; not |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 5    they were acts of terrorism?<br><br>8       THE WITNESS: I don't know that I<br>9    reached a specific conclusion. I mean, the<br>10   reason that I was taking a look at that was<br>11   because Susan Weiss and Andrea Garber both<br>12   continued to say that this could not -- the<br>13   war exclusion could not apply because this<br>14   was an act of terrorism. What I determined<br>15   is whether it was an act of terrorism or not,<br>16   the war exclusion still applied.<br><br>18  Q.  Do you recall, as you sit here today, if you<br>19      ever came to a conclusion as to whether the<br>20      acts in the summer of 2014 constituted acts<br>21      of terrorism?<br>22  A.  I just answered that question.<br><br>Page 184<br>1  Q.  I'm asking do you recall one way or the<br>2      other?<br>3  A.  I just answered that question.<br>4  Q.  Can you please answer the question.<br><br>7       THE WITNESS: Could you please<br>8    read back the -- my answer to the question.<br>9      (Whereupon, the requested portion<br>10     was read by the court reporter.)<br>11 BY MS. COYOCA:<br>12  Q.  I'm asking you if you specifically recall<br>13     coming to a conclusion one way or the other<br>14     as to whether the acts constituted acts of<br>15     terrorism?<br><br>18       THE WITNESS: What I recall is<br>19    that however you labeled them, the war<br>20    exclusion still applied.<br><br>22  Q.  Okay. Again, Ms. Johnson, I think I'm | argumentative. Relevant to failure to investigate.<br><br><br><br><br><br><br><br><br><br><u>Defendant's Objections:</u><br>(184:1-4, 7-9, 22-25)<br>Cumulative; argumentative<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith; not argumentative. Relevant to failure to investigate. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 23    entitled to an answer to my question.<br>24        Do you recall -- if the answer is<br>25    you don't recall that's -- that's fine, | |
| Page 185<br>1    that's your answer. But I'd like to know, do<br>2    you recall if you reached a conclusion as to<br>3    whether these acts in the summer of 2014<br>4    constituted acts of terrorism?<br><br>8        THE WITNESS: Ms. Coyoca, I've<br>9    already given you the best answer I can to<br>10    your question.<br><br>12  Q.  Do you recall is a yes or no question.<br><br>20  Q.  Do you recall coming to a conclusion one way<br>21    or the other?<br><br>24        THE WITNESS: All I can do is tell<br>25    you that when I was doing my analysis, I | Defendant's Objections:<br>(18:1-4. 24-25) Cumulative; argumentative<br><br>Plaintiffs' Response:<br>Relevant to bad faith; not argumentative. Relevant to failure to investigate. |
| Page 186<br>1    looked at the definitions of terrorism<br>2    because Susan and Andrea were convinced that<br>3    if it was an act of terrorism, it could not<br>4    also be an act of war. And what I determined<br>5    is regardless of whether it was an act of<br>6    terrorism, the war exclusion still applied.<br><br>8  Q.  In the context of coming to your conclusions<br>9    in the summer of 2014 that the claim was<br>10    excluded by the war exclusions, did you think<br>11    it was important to understand the status of<br>12    Hamas as it was viewed by the U.S.<br>13    Government?<br><br>18        THE WITNESS: As part of my<br>19    analysis, I did not specifically go out to | Defendant's Objections:<br>(186:1-6) Cumulative; argumentative<br><br>Plaintiffs' Response:<br>Relevant to bad faith; not argumentative. Relevant to failure to investigate. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 20      find whether or not the U.S. had defined<br>21      Hamas as a terrorist organization.<br>22          What I looked at was the activity<br>23      between Hamas and Israel, and then I made a<br>24      determination based on the activity between<br>25      these two entities that this was war, a<br><br>Page 187<br>1      warlike action or an insurrection or<br>2      rebellion.<br><br>4   Q.   In the context of your analysis that you<br>5      performed in the summer of 2014, did you look<br>6      at whether Hamas was a sovereign entity?<br><br>9          THE WITNESS: Yes, I did.<br><br>11  Q.   Did you come to a conclusion?<br>12  A.   My conclusion was is that they were a<br>13      quasi-sovereign nation, and perhaps a<br>14      sovereign nation depending on how you define<br>15      that term.<br>16  Q.   In the summer of 2014 when you were<br>17      performing your analysis, did you believe<br>18      that Hamas needed to be either a sovereign or<br>19      quasi-sovereign entity in order for the<br>20      hostilities between Israel and Hamas to<br>21      constitute war?<br>22  A.   Not necessarily.<br><br>DEFENDANT'S COUNTER:<br><u>23  Q.  Why not?</u><br><u>24  A.  Well, we'ver been fighting a war in</u><br><u>25  Afghanistan for quite a long time against the</u><br><br>DEFENDANT'S COUNTER:<br><u>Page 188</u><br><u>1  Taliban. We call it a war. It's defined as</u><br><u>2  a war by our government and every other</u> | <u>Defendant's Counter:</u><br>187:23-25; 188:1-7<br><br><u>Plaintiffs' Response:</u><br>Not necessary for completeness. Counter is separate question and answer.  Plaintiffs' counter-counter designation: 188:8-11, 15-16.<br><br>Objection to Counter-Counter Designation (Pamela Johnson 188:8-11, 15-16) – Lack of foundation, assumes facts not in evidence, misstates the witness' testimony. Question asks what legal authority Ms. Johnson consulted to determine that actions against Taliban equated to war against the state of Afghanistan. However, Ms. Johnson never stated that she believed war against the Taliban constituted war against the state of Afghanistan. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 3  government in the world. The Taliban do not<br>4  control any particular territory in<br>5  Afghanistan, they are not the government of<br>6  Afghanistan, they are not a sovereign nation,<br>7  and yet we still have a war.<br>END DEFENDANT'S COUNTER<br><br>PLAINTIFFS' COUNTER COUNTER:<br>8 Q. What legal authority did you consult in order 14:33:18<br>9 to conclude that the actions against the 14:33:21<br>10 Taliban in Afghanistan were a war against the 14:33:25<br>11 state of Afghanistan?<br><br>15 THE WITNESS: I didn't consult any 14:33:37<br>16 legal authority for that.<br>END PLAINTIFFS'S COUNTER COUNTER<br><br>Page 189<br>10       What I'm asking you is:<br>11       In order for the acts in the summer of 2014<br>12       to constitute war, what authority did you<br>13       review in order to decide that Hamas's status<br>14       as a sovereign or quasi-sovereign was not<br>15       essential for a war to exist?<br><br>18       THE WITNESS: And I think the --<br>19       the court in the Holiday Inn case opined with<br>20       regard to that.<br><br>22 Q.   Okay. So what is -- what is your<br>23       understanding of the holding of<br>24       Holiday Inns?<br>25 A.   You'd have to show me the case and allow me<br><br>Page 190<br>1       to review it. I'm not going to tell you what<br>2       I think the holding is off the top of my | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Counter:<br>190:17-20, 24,25; 191:1-8 |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 3        head. <br> 4   Q.   Well, do you believe that Holiday Inn stands <br> 5        for the proposition that one of the parties <br> 6        that's engaged in the fighting need not be a <br> 7        sovereign or quasi-sovereign in order for a <br> 8        state of war to exist? <br><br> 11          THE WITNESS: As I said, if you <br> 12        want me to opine regarding the holdings in <br> 13        Holiday Inn, I'd appreciate the opportunity <br> 14        and the courtesy of the reviewing the case <br> 15        before I answer questions about it. <br><br> DEFENDANT'S COUNTER: <br> 17   Q. In making your coverage determination in the <br> 18   summer of 2014, did you consider it important <br> 19   to understand the relationship between Hamas <br> 20   and Fatah? <br> 24   THE WITNESS: Well, I did discover <br> 25   what the relationship was between those two <br><br> Page 191 <br> 1        parties in the research that I was doing. I <br> 2        don't know that I thought that that was <br> 3        something that I absolutely positively had to <br> 4        understand to make a determination as to <br> 5        whether the war exclusion applied. The war <br> 6        exclusion applies to -- to what is actually <br> 7        happening, not necessarily the label that <br> 8        you're putting on it. <br> END DEFENDANT'S COUNTER <br><br> PAGE 191 (CONT.) <br> 10   Q.   When you were doing your work and your <br> 11        analysis in the summer of 2014, did you think <br> 12        that the status of the parties that were <br> 13        engaged in the fighting was relevant to the <br> 14        analysis of whether a war existed? | Plaintiffs' Response: <br> Not necessary for completeness. Counter is separate question and answer. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 17　　　　THE WITNESS: Are you -- you're<br>18　　talking about the legal status, what -- can<br>19　　you give -- can you make your question a<br>20　　little more precise?<br><br>22　Q.　The status as it's been designated by the<br>23　　U.S. Government.<br><br>Page 192<br>1　　　　THE WITNESS: I think you asked me<br>2　　before, and I'll answer again, the fact that<br>3　　the U.S. Government thought that Hamas was a<br>4　　terrorist organization did not affect my<br>5　　determination as to whether or not the war<br>6　　exclusion applied.<br><br>8　Q.　Right, I understand that. You've testified<br>9　　to that several times. What I'm asking you<br>10　　though, was it relevant to your analysis?<br><br>14　　　　THE WITNESS: I already testified<br>15　　that I did not think it was relevant.<br><br>Page 195<br>5　Q.　Who first raised the war exclusion as between<br>6　　yourself and Mr. Gutterman?<br>7　A.　I don't remember.<br>8　Q.　Between the -- what you indicated was a<br>9　　Monday when you believe you may have had the<br>10　　first conversation with Ms. Weiss and<br>11　　Ms. Garber, and the Thursday, did you have<br>12　　any conversations with Mr. Williams with<br>13　　respect to potential applicability of the war<br>14　　exclusion?<br><br>17　　　　THE WITNESS: Yes. | Defendant's Counter:<br>196:9-25; 197:1-25; 198:1-5<br><br>Plaintiffs' Response:<br>Not necessary for completeness. Counter is separate question and answer sequence.  Answers in counter are speculative and lack foundation. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 18   BY MS. COYOCA:<br>19   Q.   When did you speak with him?<br>20   A.   I don't remember specifically.<br>21   Q.   Did you have more than one conversation?<br>22   A.   Again, I don't remember specifically. I<br>23        think it's probable that we had more than one<br>24        conversation.<br>25   Q.   What did you discuss?<br><br>Page 196<br>1   A.   Whether or not the war exclusion applied.<br>2   Q.   What did you tell Mr. Williams?<br>3   A.   I don't remember specifically what I told<br>4        him. I'm sure that what I was relaying is<br>5        the information we had found in our research.<br>6   Q.   Did you tell Mr. Williams that you believed<br>7        that the war exclusion applied?<br>8   A.   Yes.<br><br>DEFENDANT'S COUNTER:<br>9     Q. Did you tell him what part of the war<br>10   exclusions you believed applied?<br>11   A. I don't think that I narrowed it down to just<br>12   one aspect of it, because more than one<br>13   aspect could potentially apply.<br>14   Q. Did you discuss with him -- well, what -<br>15   what parts of the war exclusion did you -- do 1<br>16   you recall discussing with him?<br>17   A. I think that -- that we talked about whether<br>18   or not it was war, if it wasn't war, it was<br>19   at least warlike action, and if -- if in fact<br>20   that it was just an uprising within Israel,<br>21   it would still be considered an insurrection<br>22   and that the weapons they were using were<br>23   weapons of war.<br>24   Q. And you recall discussing with Mr. Williams<br>25   that -- your position that the weapons that<br><br>DEFENDANT'S COUNTER:<br>Page 197 | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|

1 were being used were weapons of war; is that
2 correct?
3 A. Well, tanks, air bombings, rockets, yes, I
4 consider those to be weapons of war.
5 Q. My question to you is: Did you tell that to
6 Mr. Williams during that conversation?
7 A. Well, I think that I explained to him what
8 was happening in Israel.
9     Q. My question is: Did you specifically tell
10     Mr. Williams that you believed the weapons of
11     war, including atomic fission or radioactive
12     force, exclusion applied to the Dig claim?
13 A. I don't know if we specifically -- if I said
14     that to him specifically. I know that was
15     talked about the first four categories of the
16     war exclusion
17 Q. Do you recall specifically discussing the
18     insurrection, rebellion or revolution, third
19     prong of the war exclusion, with Mr. Williams
20     during that period between the Monday when
21     you say the conversation first occurred and
22     the Thursday when the second conversation
23     occurred with Ms. Weiss and Ms. Garber?
24 A. I probably did, because I was looking at all
25     four of those -- those prongs of the war

DEFENDANT'S COUNTER:

Page 198

1    exclusion, but I don't remember specifically
END DEFENDANT'S COUNTER

PAGE 198 (CONT.)
2  Q.  What did Mr. Williams tell you in response?
3  A.  He didn't disagree with the analysis that we
4      had made. He agreed that the war exclusion
5      applied.
6  Q.  Did he tell you what part of the war
7      exclusion he believed applied?
8  A.  I don't remember.

14  Q.  Did you have -- during that four-day period
15      between the Monday and the Thursday, did
       you
16      have any conversations with Ms. Gooley
       about
17      the potential application of the war

231

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 18     exclusion?<br>19  A.  I probably did. I mean, I would not have<br>20     been raising it with the policyholder without<br>21     talking to her about it. I -- I -- I don't<br>22     think that I would have done that without<br>23     discussing it with her, because I would want<br>24     to know whether on an enterprise basis there<br>25     has been interpretations of that particular<br><br>Page 199<br>1     exclusion in other departments.<br>2  Q.  What did Ms. Gooley tell you?<br>3  A.  With regard to what?<br>4  Q.  With respect to whether or not, on an<br>5     enterprise basis, there had been other<br>6     interpretations of the exclusion.<br>7  A.  She didn't know. She was going to look into<br>8     it.<br>9  Q.  Did she ever get back to you?<br>10  A.  Yes.<br>11  Q.  What did she tell you?<br>12  A.  She said that there had not been any other<br>13     interpretations from the information she<br>14     could gather. You have to remember what<br>15     OneBeacon existed long before Theresa or I<br>16     ever came to that organization. It's a very<br>17     old company.<br><br>Page 200<br>22  Q.  Did you tell anyone at OneBeacon that you<br>23     believed you needed to consult with an expert<br>24     on the Middle East, and specifically Hamas<br>25     and Israel, before making a claim<br>Page 201<br>1     determination?<br>2  A.  I did not.<br>3  Q.  Did you consider consulting with an<br>4     individual who would have expertise in this<br>5     area rather than coming to your own<br>6     conclusions? | Defendant's Objections:<br>(201:16-20) Reference to legal consultation; privilege, not relevant, prejudicial; 401, 403, 501, 502, 801, 802<br><br>Plaintiffs' Response: |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 7   A.   No.<br>8   Q.   Did you consider speaking with a military<br>9        expert in order to consult with him or her<br>10      about whether the acts that were occurring in<br>11      Israel constituted war?<br><br>14          THE WITNESS: I did not.<br><br>16   Q.   Did you consult with internal legal -- the<br>17      legal department as to whether your analysis<br>18      was correct?<br>19   A.   I don't remember if I consulted with claim<br>20      legal or not.<br><br>Page 203<br>9          MS. COYOCA: I'd like to mark<br>10      as -- I believe we're now on Exhibit 3, an<br>11      e-mail chain that is Bates-labeled ATL<br>       000304<br>12      through 309.<br>13         (Whereupon, Exhibit 3 was<br>14         marked for identification.)<br><br>23   Q.   Ms. Johnson, have you seen this document<br>24      before?<br>25   A.   I have.<br><br>Page 204<br>1   Q.   What do you understand it to be?<br>2   A.   It looks like it's an e-mail chain of e-mails<br>3      exchanged between me, Danny Gutterman and<br>       Peter Williams.<br>4      Peter Williams.<br>5   Q.   I want to direct your attention to the e-mail<br>6      that's on page 306. It's the e-mail from<br>7      Lucy Lopez to Daniel Gutterman and<br>8      Pamela Johnson?<br>9   A.   Yes, I see it.<br>10   Q.   It says, "New claim. Danny, this should be<br>11      coming your way. See policy attached." | Relevant to bad faith; offered for non hearsay purpose; consideration of legal consultation not privileged. Relevant to failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 12  A.  Yes.<br>13  Q.  The e-mail is sent as of Tuesday, July 15,<br>14      2014. Did you speak with Ms. Weiss and<br>15      Ms. Garber before the claim had been sent to<br>16      OneBeacon from Ms. Weiss?<br>17  A.  I don't know the answer to that. I was<br>18      unaware of the claim at the time that I had<br>19      that discussion with them.<br>20  Q.  Well, did you have the conversation with them<br>21      prior to you receiving this e-mail from<br>22      Ms. Lopez?<br>23  A.  I had not seen this e-mail at the time I had<br>24      the conversation with them.<br><br>Page 205<br>12  Q.  The next e-mail in the chain is from<br>13      Danny Gutterman indicating, "Hi, Peter. Per<br>14      the below, you spoke with Andrea Garber and<br>15      Susan Weiss about this. Any chance you<br>16      happen to suggest that they push for more<br>17      than just the week since the crew needs to be<br>18      advised at least one week in advance for a<br>19      push and since a ground war still might occur<br>20      per this report from CBS News two days ago."<br>21      Do you see that?<br>22  A.  I do.<br>23  Q.  Did you -- have you seen this e-mail before?<br>24  A.  Yes, I have seen it before.<br><br>Page 206<br>1      sent?<br>2  A.  I don't -- I'm not -- it doesn't look like --<br>3      well, let me see. (Reviews document.) I<br>4      can't tell if he sent this to me, if he<br>5      copied me on it. I see that the response<br>6      that Peter sent was copied to me, so it had<br>7      the e-mail chain, so I assume that I must | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 8  have looked at it at some point, yup.<br>9 Q. Did you have a conversation with<br>10  Mr. Gutterman before the July 15, 2014,<br>11  e-mail was sent about the potential<br>12  applicability of the war exclusion?<br>13 A. Not that I recall.<br>14 Q. Do you know why Mr. Gutterman was<br>   suggesting<br>15  that the production company push for more<br>16  than just a week because a ground war still<br>17  might occur?<br><br>21   THE WITNESS: I have no idea why<br>22  he was asking that.<br><br>24 Q. Did you talk to Mr. Gutterman about the<br>25  e-mail after you saw it?<br><br>Page 207<br>18 Q. Why would the fact that, within quotes, "A<br>19  ground war still might occur," close quotes,<br>20  be relevant to the analysis that he was<br>21  performing as of July 15?<br><br>Page 208<br>1   THE WITNESS: Well, he was<br>2  investigating the claim, and obviously one of<br>3  the things they needed -- that he needed to<br>4  think about is whether or not there was going<br>5  to be a deescalation.<br><br>7 Q. Was Mr. Gutterman looking for ways to<br>   support<br>8  an argument that the war exclusion might<br>9  apply?<br>10 A. Absolutely not.<br><br>14 Q. Did you have a conversation with<br>15  Mr. Gutterman at or about the 15th telling<br>16  him to look for ways that the war exclusion | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 17      might apply? | |
| 18   A.   Absolutely not. | |
| 19   Q.   When is the first time you recall discussing | |
| 20      the war exclusion with Mr. Gutterman? | |
| 21   A.   As I told you, I can't be specific about -- | |
| 22      it probably happened the day after we had the | |
| 23      conversation with Susan and Andrea. | |
| 24   Q.   In the e-mail that was sent by you at | |
| 25      8:48 p.m., you indicate, begin quote, "I | |
| | |
| Page 209 | Defendant's Counter: |
| 1      suggest we have a call about this tomorrow. | 210:13-25 |
| 2      Danny and I had a conversation with Susan and | |
| 3      Andrea today about what the production's | Plaintiffs' Response: |
| 4      plans were, but we didn't make any | Not necessary for |
| 5      representations about whether there was | completeness. Counter is |
| 6      coverage, but we also did not alert them that | separate question and |
| 7      this might be a covered claim." Do you see | answer. |
| 8      that? | |
| 9   A.   Yes, I do. | |
| 10   Q.   Does this refresh your recollection that your | |
| 11      conversation with Ms. Weiss and Ms. Garber | |
| 12      occurred on July 15? | |
| 13   A.   That appears to be the case, yes. | |
| 14   Q.   At the time you sent this e-mail, what did | |
| 15      you believe potentially might make this be a | |
| 16      noncovered claim? | |
| | |
| 19       THE WITNESS: This -- what I said | |
| 20      in my e-mail does not indicate that I thought | |
| 21      that it might not be covered. | |
| 22   BY MS. COYOCA: | |
| 23   Q.   I'm asking you. | |
| 24   A.   No, what I was doing is merely relaying to | |
| 25      Peter what took place during the | |
| | |
| Page 210 | |
| 1      conversation. And as I -- as I've explained, | |
| 2      you know, when -- one of the things that is | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|

3     most important in production claims is if you
4     think there's going to be any issue with
5     regard to coverage, you need to alert the
6     insured right away. At this point we were in
7     the middle of doing an investigation. It
8     could be that it turns out not to be covered.
9     I was still trying to figure out what the
10     status was before they even got there, so
11     that is the reason why this -- this e-mail
12     reads the way it does.

DEFENDANT'S COUNTER:
13     Q. When you said the words, begin quotes, "That
14     this might not be a covered claim," close
15     quotes, what did you mean?
16     A. Well, I'd like to read the whole sentence.
17     "Danny and I had a conversation with Susan
18     and Andrea today about what the production's
19     plan were" -- "plans were, but we didn't make
20     any representations about whether there was
21     coverage, but we also did not alert them that
22     this might not be a covered claim. If this
23     is going to be an issue, we need to alert
24     them right away. Peter, when are you
25     available tomorrow?"

END DEFENDANT'S COUNTER

Page 211
1     Q.   What did you mean when you said that you
             did
2           not alert them that this might not be a
3           covered claim?

6           THE WITNESS: Well, as I
7     previously explained, if there is going to be
8     a coverage issue, you want to alert the
9     production as soon as you can. And so one of
10     the things that's always important to Peter
11     is to make sure we haven't made any
12     representations about whether there is
13     coverage until after we have done an
14     investigation.

237

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 16 Q. What reasons, if any, did you have in mind as<br>17      to why this might not be a covered claim at<br>18      the time you wrote this e-mail -- | |
| 21 Q. -- if any? | |
| 24          THE WITNESS: I don't know that I<br>25      did have any -- have -- have any information. | |
| Page 212<br>1      I might have. I can't tell just by reading<br>2      this e-mail where I was in my research and<br>3      what my thought process was. I can't tell<br>4      you just by looking at that, I can't tell. | |
| 6 Q. As of Tuesday evening, July 15, had you<br>7      looked at the war exclusion?<br>8 A. When I wrote this e-mail?<br>9 Q. Uh-huh.<br>10 A. I don't know.<br>11 Q. In Mr. William's response to you, with a cc<br>12      to Mr. Gutterman, he indicates, begin quotes,<br>13      "Why it is not a covered claim? They have<br>14      imminent peril, unless you are going to<br>15      invoke the war exclusion," close quotes.<br>16      What did you understand him to be saying in<br>17      this e-mail to you?<br>18 A. I -- what I understood him to be saying is<br>19      that -- that he was misinterpreting what I<br>20      had said in -- in my previous e-mail. I<br>21      wasn't saying that it was not -- that it was<br>22      necessarily not a covered claim. I was just<br>23      relating to him what we had talked about in<br>24      the conversation with Susan and Andrea.<br>25 Q. Did you write back to him and say, "You're | |
| Page 213<br>1      misinterpreting, I'm not indicating that I<br>2      think the war exclusions apply, I haven't<br>3      come to any conclusions yet" -- | |

238

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 4    A.   I don't think I did. I don't even know if we<br>5          corresponded any more that night. Let me<br>6          take a look.<br>7    Q.   Ms. Johnson, you really need to let me finish<br>8          asking the question.<br>9    A.   I'm so sorry. Please go ahead, Ms. Coyoca.<br>10   Q.   Did you write back to him and indicate that<br>11         he had misinterpreted what you were saying in<br>12         your e-mail?<br>13   A.   No. At that point we were setting up a call.<br>14   Q.   You responded back and set up the call for<br>15         2 p.m. eastern time; is that correct?<br>16   A.   That's what the e-mail says.<br><br>Page 218<br>2    Q.   Did you subsequently have a telephone<br>3         conversation with Mr. Williams and<br>4         Mr. Gutterman on the 16th?<br>5    A.   I believe we did.<br>6    Q.   Was there anyone on the call aside from<br>7         yourself and Mr. Gutterman and Mr.<br>         Williams?<br>8    A.   Not that I recall.<br><br>22   Q.   What did you tell Mr. Williams during the<br>23        course of that conversation?<br><br>Page 219<br>1        THE WITNESS: I'm sorry, I can't<br>2        recall specifically what I told him.<br>DEFENDANT'S COUNTER:<br>   4 Q. Do you recall generally?<br>   5    A. Well, generally, we talked about what I just<br>   6      told you, what was the situation in Israel,<br>   7      and the fact that the policy contains the war<br>   8      exclusion, and the information that we had<br>   9      found about the situation in Israel both<br>   10     before NBC went there and what the current<br>     11   situation was.<br>END DEFENDANT'S COUNTER | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Counter:<br>(219:12-16) 219:4-11, 12-21<br><br>Plaintiffs' Response:<br>Not necessary for completeness. Counter is separate question and answer. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| PAGE 219 (CONT.)<br>12  Q.   Did you tell Mr. Williams that you believed<br>13        the war exclusion applied?<br>14  A.   I don't know if I said that specifically to<br>15        him then. I probably indicated that I<br>16        thought that it was probable.<br>DEFENDANT'S COUNTER:<br>  17  Q. Did you tell him what part of the war<br>  18      exclusions you thought were probably going to<br>  19      apply?<br>  20   A. I don't recall. I don't think I would have<br>    21   been specific.<br>END DEFENDANT'S COUNTER<br>PAGE 219 (CONT.)<br>24  Q.   Did Mr. Gutterman contribute in any way to<br>25        the conversation?<br><br>Page 220<br>1   A.   I'm sure he did. I can't tell you<br>2         specifically what he said as I sit here<br>3         today.<br>4   Q.   Did Mr. Gutterman agree with your conclusion<br>5         that the war exclusion most likely applied?<br>6   A.   I believe so, yes.<br>7   Q.   Did Mr. Williams respond to you during that<br>8         phone conversation in any way?<br>9   A.   I'm sure he did.<br>10  Q.   Do you recall anything about what he said to<br>11        you in response?<br>12  A.   I don't recall specifically what he said in<br>13        that conversation, no.<br>14  Q.   Do you recall his position generally with<br>15        respect to the application of the war<br>16        exclusion during this time period?<br>17  A.   He thought that the war exclusion applied.<br>18  Q.   Did Mr. Williams ask you what you had done in<br>19        order to come to this conclusion?<br>20  A.   I don't know if he asked me, but I certainly | Defendant's Counter:<br>(219:24-220:21) 220:22-25;<br>221:1-24<br><br>Plaintiffs' Response:<br>Not necessary for completeness. Counter is separate question and answer. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 21      told him.<br>DEFENDANT'S COUNTER:<br>22 Q. What did you tell him that you had done in<br>23      order to form this conclusion that the war<br>24      exclusions applied?<br>　25   A. I think I told him about the research that we<br><br>DEFENDANT'S COUNTER:<br>Page 221<br><br>1  had been conducting, what the situation was<br>2      on the ground, what the basis of the<br>3      situation was on the ground, what Israel was<br>4      saying with regard to Operation Protective<br>5      Edge, the actual activities of both the<br>6      Israeli Army and Hamas on the ground.<br>7  Q. What did you tell him with respect to what<br>8      Israel -- Israel was saying with regard to<br>9      Operation Protective Edge?<br>10   A. Well, I think that at this point in time --<br>11      well, I can't be sure of the exact -- the<br>12      exact time. But at some point in time, I<br>13      know that they were readying their troops to<br><br>14      take tanks across the Gaza border, that they<br><br>15      had put 18,000 troops on the ground, that<br>16      they were conducting air strikes and there<br>17      was still rockets coming across in the other<br><br>18      direction, some of which were being captured<br>19      by Iron Dome, others which were not, and that<br>20      a cease fire had been proposed by Egypt, that<br>21      Hamas had turned it down, and that the<br>22      Israeli prime -- Netanyahu had said, you<br>23      know, when the answer -- "When they won't<br><br>　24   agree to a cease fire, our response is fire."<br>END DEFENDANT'S COUNTER<br><br>Page 236<br>4            MS. COYOCA: I'd like to mark as<br>5      Exhibit 7 an e-mail dated 7/16/2014 from<br>6      Pamela Johnson to Pamela Johnson labeled<br>7      Bates control ATL 001529 to 1530.<br>8            (Whereupon, Exhibit 7 was | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 9        marked for identification.)<br>10   BY MS. COYOCA:<br>11   Q.   Ms. Johnson, do you recognize this e-mail?<br>12   A.   It appears to be an e-mail that I sent to<br>13        myself.<br>14   Q.   Okay. Do you have -- do you recall sending<br>15        yourself this e-mail?<br>16   A.   No, not specifically I don't.<br><br>Page 237<br>1     Q.   One of the links lists to Wikipedia; do you<br>2          see that?<br>3     A.   I do.<br>4     Q.   What did you search for in the Google search<br>5          engine in order to reach that Wikipedia site?<br>6     A.   Well, certainly something with regard to<br>7          Hamas.<br>DEFENDANT'S COUNTER<br>  8    Q. Did you ever search for any other terms when<br>  9        you were doing your research?<br>10    A. Oh, I'm sure I did. As I sit here today, I<br>11        can't tell you what they were. But, I mean,<br>12        I spent many hours looking at this and doing<br>13        searches online.<br>14    Q. And the many hours took place from what time<br>15        period, from when to when?<br>16    A. From when we first talked to Susan and Andrea<br>17        until we talked to them again and made them<br>18        aware that we thought that the war exclusion<br>19        might apply. I continued to do research<br>20        after that just to see if there were changes<br>21        in conditions, because, as you know, it was a<br>22        quickly moving situation. And, you know, I<br>23        can't tell you specifically when I stopped<br>24        doing research about it, but I continued to<br>25        do some for quite some time.<br>END DEFENDANT'S COUNTER<br><br>Page 245<br>1        trap.<br><br>8            MS. COYOCA: -- Exhibit 9, a | Defendant's Counter:<br>237:8-25<br><br>Plaintiffs' Response:<br>Not necessary for completeness. Counter is a separate question and answer. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 9     document from Westlaw that's labeled Bates<br>10   control ATL 001635 through 1686.<br><br>14  Q.  Ms. Johnson, do you -- do you recognize<br>15     Exhibit 9?<br>16  A.  It's an e-mail sent from Westlaw to myself.<br>17  Q.  Did you search in Westlaw for the case that's<br>18     attached to this?<br><br>21        THE WITNESS: Well, it appears<br>22    that what I did is a search for insure in the<br>23    same paragraph -- insured, insure, insuring<br>24    in the same paragraph as war or warlike in<br>25    the same paragraph as exclusion, exclude or<br><br>Page 246<br>1    excluded, the same paragraph as Israel.<br><br>3  Q.  But you believe you conducted that search; is<br>4     that right?<br>5  A.  Yes.<br>6  Q.  Did you conduct -- well, first of all, did<br>7     you read and review this Holiday Inns case at<br>8     the time that you were considering the claim?<br>9  A.  Yes, I did.<br>10  Q.  Is there a reason why this particular case<br>11     was kept and not any of the other cases that<br>12     you reviewed?<br>13  A.  No, I'm sure that there wasn't. And there<br>14     may have been other cases that I kept that I<br>15     didn't print out. And I also conducted --<br>16     sometimes when I was doing research I would<br>17     conduct the research on my home computer<br>18     because it got better Wi-Fi than my work<br>19     computer, so it's perfectly possible that I<br>20     actually looked at this case before and then<br>21     determined that I wanted to send it to myself<br>22     through the work e-mail. | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| <u>Page 253</u><br>19  Q.  When you were doing your analysis, did you<br>20       consider Holiday Inns to be authoritative<br>21       with respect to the definition of war?<br><br>24         THE WITNESS: I think there was<br>25       authoritative within that particular case.<br><br><u>Page 254</u><br>1       There were other cases that had other<br>2       interpretations, and I think that the<br>3       Holiday Inn court might have been -- might<br>4       have been citing the Pan Am case when they<br>5       did their analysis, but I'd have to read<br>6       through the court -- through the case to make<br>7       sure.<br><br><u>Page 255</u><br>14  Q.  On page 7, under number 1, "War," that first<br>15       sentence reads, beginning quotes, "Having<br>16       reviewed English and American cases,"<br>         comma,<br>17       "505 F.2d at 1012-1015," comma, "the<br>         Second<br>18       Circuit concluded in Pan Am that," begin<br>19       single quotes, "war is a course of hostility<br>20       engaged in by entities that have at least<br>21       significant attributes of sovereignty," close<br>22       single quotes, close quotes.<br>23        When you did your analysis, did you<br>24       agree with that definition of war that was<br>25       set forth in Holiday Inns as quoting from<br><br><u>Page 256</u><br>1       Pan Am?<br><br>7         THE WITNESS: I certainly<br>8       recognize that that's what the course was<br>9       saying that the definition of war was. They<br>10       also then go down to say that there is a | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 11    different definition of war, and then yet a<br>12    third definition of war all in that same<br>13    page.<br><br>15  Q.  What definition of war did you apply when<br>16    analyzing the claim?<br>17  A.  I looked at each one of them.<br>18  Q.  In your view, what is the controlling<br>19    definition?<br><br>25      THE WITNESS: Well, if you let me<br><br>Page 257<br>1    take a look at my letter, I can tell you. I<br>2    think I cited what I thought was<br>3    authoritative in there, so...<br>4    Without looking at the letter, I<br>5    can't tell you specifically what I thought.<br>6    But you also have to keep in mind that the<br>7    date on this is, let's see, 1983, so before<br>8    the war on terror, before a variety of other<br>9    terroristic actions, so I'm not sure that a<br>10    court today would necessarily say that even<br>11    for insurance purposes these definitions are<br>12    applicable.<br><br>14  Q.  Do you know if Holiday Inns has been<br>15    overturned?<br>16  A.  It hasn't, to the best of my knowledge.<br>17  Q.  Do you know if Pan Am has been<br>     overturned?<br>18  A.  Not to the best of my knowledge.<br>19  Q.  I believe you've indicated you had a second<br>20    conversation with Ms. Garber and Ms. Weiss on<br>21    Thursday of the same week in which you had<br>22    talked?<br>23  A.  That's correct.<br>24  Q.  And based on the calendar that I looked at,<br>25    I'm going to represent to you that that was | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|

Page 258

1        July 17.

2   A.   Okay.

3   Q.   Does that sound wrong to you in any way?

4   A.   No. It's just a couple of days after our

5        first conversation and before our next

6        conversation was supposed to occur.

7   Q.   Who was on the call?

8   A.   Danny, myself, Susan and Andrea. I don't

9        think that Peter was on the call. He may

10       have been, but I -- I'm not sure if he was on

11       the call or not.

12  Q.   What was discussed during the call?

13  A.   We discussed the fact that given the fact

14       that the situation had not deescalated as NBC

15       had hoped, they had decided to move their

16       production.

17           In that conversation we also

18       informed them that we were looking at the

19       applicability of the war exclusion to the

20       situation. They objected to the idea that

21       this could be considered a war, because Hamas

22       is a terrorist organization and, therefore,

23       you could not have a war with a terrorist

24       organization.

25           And they asked when we would have a

Page 259

1        final decision and we gave them -- I think

2        that we gave them a date as quickly as we

3        could. I don't remember if they asked for

4        the date or if -- if we just told them a

5        date. I know that they wanted a response as

6        quickly as humanly possible.

21  Q.   Did you tell them that in all likelihood the

22       exclusion would be applied?

23  A.   I probably didn't go that far, because we

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 24    were still taking a look at it.<br>25  Q.  After the call did you tell Ms. Gooley that<br><br>Page 260<br>1    you had told Ms. Weiss and Ms. Garber that<br>2    the -- you had told them that the -- in all<br>3    likelihood, the claim would be denied?<br><br>6    THE WITNESS: Well, I certainly<br>7    put them on notice that we could be denying<br>8    the claim, because that's the -- that's the<br>9    thing that's important when you're dealing<br>10   with a production is that you -- as I've<br>11   said before, you want to put them on notice<br>12   as quickly as possible if you think that<br>13   there's a possibility that a claim is going<br>14   to be denied.<br>15  BY MS. COYOCA:<br>16  Q.  But my question is: Do you recall after the<br>17       call telling Ms. Gooley that you told the<br>18       insured that in all likelihood the war<br>19       exclusion would be applied?<br>20  A.  I'm sorry I just don't remember.<br>21  Q.  Do you recall telling Ms. Gooley after the<br>22       call with Ms. Weiss and Ms. Garber that you<br>23       had told them the claim would be denied?<br>24  A.  I don't recall saying that to her, no.<br>25  Q.  During your discussion with regard to the<br><br>Page 261<br>1    potential applicability of the war exclusion,<br>2    did you respond to any of the comments that<br>3    were being made by Ms. Weiss or Ms. Garber as<br>4    to the fact that Hamas was a terrorist<br>5    organization?<br><br>9    MS. COYOCA: I'm referring to the<br>10   July 17 call.<br>11   THE WITNESS: I don't recall what | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 12    I said in response to that.<br><br>23  Q.  Right. But during that July 17 call, did<br>24    you -- do you recall responding in any way to<br>25    their characterization of the acts as being<br><br>Page 262<br>1    terrorist acts other than acts of war?<br><br>4       THE WITNESS: I'm sorry, I don't<br>5    remember.<br><br>Page 263<br>15  Q.  The e-mails and the initial submission of the<br>16    claim, I'll represent to you, was on Tuesday,<br>17    July 15, not on Monday. But you had<br>18    testified that you believed you had -- you<br>19    might have had conversations on Monday?<br>20  A.  It sounds like I was confusing Monday. It<br>21    was Tuesday.<br><br>Page 264<br>4  Q.  Okay. So from Tuesday, July 15, to Thursday,<br>5    July 17 when you told the insured that the<br>6    war exclusion potentially would apply, did<br>7    you feel that that was enough time for you to<br>8    conduct your analysis of this issue?<br>9  A.  Well, it would have to be, because they<br>10    wanted an answer.<br>11  Q.    Did you feel pressured by the insured to do<br>12    the research and get an answer out as quickly<br>13    as possible?<br>14  A.  I don't know that pressure is the correct<br>15    term. Whenever you're dealing with a<br>16    production that is going to shut down for any<br>17    reason and for any period of time, time is of<br>18    the essence to them, because time is money.<br>19    They have to be -- they have to know what -- | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|

20   if they're going to, you know, tell people
21   not the to come back to work. They have to
22   know exactly what the deal is. You know, and
23   what we always advise them is do what is
24   prudent even if you didn't have insurance,
25   what would you do in that situation. But

Page 265

1   they -- you know, in spite of the fact that
2   that's what we tell them, they still want to
3   know as quickly as possible if the money is
4   going to be coming from the insurance
5   company. So, yes, they said that they wanted
6   an answer and that they wanted it very
7   quickly. I -- I'm not sure that I would say
8   I felt pressured. I would say that I knew
9   that they wanted an answer quickly.
10  Q.  Did you feel -- excuse me.
11   Did you feel you had sufficient time
12   to conduct the research and do the analysis
13   and give the insured a response in that
14   two-day period of time?

17     THE WITNESS: Yes.

19  Q.  Did you feel that your analysis was rushed?

22     THE WITNESS: I wouldn't -- I
23   wouldn't define it as rushed. I would define
24   it as working very hard for many hours over a
25   short period of time.

Page 266

2  Q.  But not withstanding the fact that you worked
3   hard for a short period of time to reach your
4   conclusion, you felt you had reached the
5   right conclusion; is that right?

8     THE WITNESS: I did.

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 22  A.  We discussed the conditions on the ground in<br>23      Israel and we discussed the war exclusion and<br>24      its applicability to that situation, I<br>25      believe, and their relocation efforts, and<br><br>Page 267<br>1      then they wanted to know when they would get<br>2      a letter giving them their final<br>3      determination. And even though under<br>4      California law I have 40 days to produce that<br>5      to them, that would not have been appropriate<br>6      in this situation.<br>7  Q.  Anything else you can recall discussing?<br>8  A.  That's all I can recall. | |
| Page 268<br>5  Q.  Ms. Johnson, did you have -- were there any<br>6      conversations during the phone call about<br>7      obtaining a coverage opinion?<br><br>12      THE WITNESS: Yes. Actually, it<br>13  was Susan Weiss.<br>14  BY MS. COYOCA:<br>15  Q.  What was Susan Weiss?<br>16  A.  She asked me whether or not we had obtained<br>17      an outside legal opinion.<br>18  Q.  What did you tell her?<br>19  A.  I told her no.<br>20  Q.  Did Ms. Weiss indicate to you that she had<br>21      had conversations with Peter Williams the<br>22      prior day about obtaining an outside opinion? | Defendant's Objections:<br>(268:5-7, 12-22)<br>Reference legal opinion; not relevant; prejudicial, privilege FRE 401, 403, 501, 502<br><br>Plaintiffs' Response:<br>Relevant to bad faith; whether Defendant obtained outside legal opinion not privileged. Relevant to failure to investigate. CACI 2332. |
| Page 269<br>5      THE WITNESS: I can't recall if<br>6  she told me whether or not she had talked to<br>7  Peter about it, but she made it quite clear<br>8  to me that she thought we needed to get an | Defendant's Objections:<br>(269:5-9, 11, 15-16, 18-19, 23-24)<br>Reference legal opinion; not relevant; prejudicial, |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 9      outside opinion.<br><br>11  Q.  How did you respond?<br><br>15      THE WITNESS: I don't remember<br>16   what my response was.<br><br>18  Q.  Did you tell her that you disagreed that a<br>19      legal opinion was needed?<br><br>23      THE WITNESS: I'm sorry, I don't<br>24   recall.<br><br>Page 270<br>7  Q.  Did you give them a date certain by which<br>      you<br>8      would get back to the insured with the final<br>9      decision?<br>10  A.  I think that Susan asked us to get back to<br>11      them by the 21st, which I think was the<br>12      following Monday.<br>13  Q.  And did you get back to them by Monday the<br>14      21st?<br>15  A.  Well, as I recall, we couldn't get back to<br>16      them on the 21st and so we gave them<br>17      something on 22nd. I think that's right.<br>18  Q.  Why couldn't you get back to them by the<br>19      21st?<br>20  A.  I don't remember. I think that I had not<br>21      finished the letter.<br><br>Page 271<br>18  Q.  Do you recall telling them that you would get<br>19      back to them with a final decision, but that<br>20      the letter would not be forthcoming until<br>21      some period of time after that?<br>22  A.  That would make sense. I don't know if I<br>23      said that, but that would make sense.<br><br>Page 273 | privilege FRE 401, 403, 501, 502<br><br>Plaintiffs' Response:<br>Relevant to bad faith; whether Defendant obtained outside legal opinion not privileged. Relevant to failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 6   Q.   Ms. Johnson, do you recall when you told the<br>7         insured and Aon that Atlantic was going to<br>8         deny the claim on the basis of the war<br>9         exclusion?<br>10  A.   It was very shortly after the call that we<br>11        had with Susan and Andrea, within a week.<br><br>Page 274<br>2   Q.   Who was responsible for the ultimate<br>          decision<br>3         to deny the claim?<br>4   A.   Me.<br><br><br><br>Page 278<br><br>15                         I'm going to<br>16        show the witness a client [sic] that's<br>17        already been labeled Exhibit 25.<br><br>19  Q.   Do you recognize this e-mail, Ms. Johnson?<br>20  A.   I do.<br>21  Q.   Based on this exchange of e-mails between<br>22        Mr. Gutterman, Ms. Garber, Ms. Weiss and<br>23        yourself, it appears that a call was arranged<br>24        for 4:00 p.m. pacific time on July 22nd to<br>25        discuss the Dig claim; is that correct?<br><br>Page 279<br>1   A.   That's correct.<br>2   Q.   Does this refresh your recollection that that<br>3         call to convey to the insured that the claim<br>4         had been denied on the basis of the war<br>5         exclusion took place on July 22nd?<br>6   A.   That's what it appears to convey.<br>7   Q.   Do you have any reason to believe it did not<br>8         occur on the 22nd? | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 9  A.  No.<br>10  Q.  Who was on that call?<br>11  A.  Well, it looks like the participants would<br>12      have been me, Susan, Andrea and Danny.<br><br>19  Q.  How long did the call last?<br>20  A.  I don't recall.<br>21  Q.  Was it an hour long?<br>22  A.  Oh, no, it was a short call.<br>23  Q.  What was discussed?<br>24  A.  We gave them our final decision that we<br>25      thought that the war exclusion applied, they<br><br>Page 280<br>1      were unhappy.<br><br>20  Q.  Did you indicate to them that the costs of<br>21      the one-week push would be covered?<br>22  A.  I don't remember if I told them that or not. | Defendant's Objections:<br>(280:20-25)<br>Reference legal opinion; not relevant; prejudicial, privilege FRE 401, 403, 501, 502<br><br>Plaintiffs' Response:<br>Relevant to bad faith; that Defendant obtained outside legal opinion not privileged; any privilege waived. Relevant to failure to investigate. CACI 2332. |
| Page 282<br>22  Q.  What do you recall, if anything, as to how<br>23      Ms. Weiss responded to your statement that<br>24      the claim was going to be denied or was<br>25      denied on the basis of the war exclusion?<br><br>Page 283<br>1  A.  All I recall is that she was unhappy.<br>Page 284<br>9                         This has<br>10      previously been marked as Exhibit 65. If you | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 11      could just give a copy to the witness,<br>12      please. Thank you.<br><br>19  Q.  Ms. Johnson, do you recognize this<br>        document?<br>20  A.  I do.<br>21  Q.  I want to direct your attention to the center<br>22      e-mail on page 3240 from you to Susan Weiss<br>23      with a cc to Andrea Garber and Daniel<br>24      Gutterman. It indicates, "Andrea and Susan,<br>25      Profuse apologies, but I will not be able to<br><br>Page 285<br>1      get the coverage letter to you until Monday.<br>2      Despite my best efforts, I could not complete<br>3      it today." Do you recall sending this<br>4      e-mail?<br>5  A.  I do.<br>6  Q.  Had you previously told Ms. Weiss and<br>7      Ms. Garber that you were going to get the<br>8      coverage denial letter out that week?<br>9  A.  That's certainly what it appears from this<br>10     e-mail, yes.<br>11  Q.  Did you receive -- receive Ms. Weiss's<br>12     response?<br>13  A.  I did. She said, "It's imperative that we<br>14     receive this on Monday morning. NBCU has<br>15     been asking about this on a regular basis and<br>16     we told them they'd be receiving the opinion<br>17     letter by the end of this week. Thank you,<br>18     Susan."<br>19  Q.  Did you feel that your analysis in the<br>20     coverage denial letter was being impaired by<br>21     the fact that you were being asked to<br>22     complete it in a short time frame?<br><br>25          THE WITNESS: No.<br><br>Page 286 | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objections: |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 2 Q. Did you feel that you had enough time to be<br>3 able to write the coverage denial letter<br>4 given the time circumstances that were at<br>5 play?<br>6 A. Well, clearly, I didn't get it to them by the<br>7 end of the week, which it looks like that's<br>8 what they wanted. So I can't tell you as I<br>9 sit here today why that happened. It could<br>10 have been because there was another emergent<br>11 case that I was dealing with. I just -- I<br>12 simply don't remember, so...<br>13 Q. But I take it you don't feel that the<br>14 analysis was in any way affected by the fact<br>15 that you were being asked to complete it in<br>16 relatively short order; is that right?<br>17 A. No. | (286:21-25) Attorney client privilege; not relevant; FRE 401, 403, 501, 502<br><br>Plaintiffs' Response: Relevant to bad faith; not privileged. Relevant to failure to investigate. CACI 2332. |
| 21 Q. I want to show you a document that's<br>22 previously been marked as Exhibit 33.<br>23 Ms. Johnson, do you recognize the<br>24 document?<br>25 A. I do. | |
| Page 287<br>1 Q. Did you send the cover e-mail that is dated<br>2 Monday, July 28, 2014?<br>3 A. I did.<br>4 Q. The letter is being sent -- excuse me, the<br>5 e-mail with the attachment is being sent to<br>6 Theresa Gooley and Peter Williams; is that<br>7 right?<br>8 A. That's correct.<br>9 Q. Who is the cc, Christopher Paar?<br>10 A. Chris Paar is the claim legal guy. | Defendant's Objections: (287:1-10) Attorney client privilege; not relevant; FRE 401, 403, 501, 502<br><br>Plaintiffs' Response: Relevant to bad faith; purpose; not privileged. Relevant to failure to investigate. CACI 2332. |
| Page 289<br>22 Q. Did Ms. Gooley provide any input with<br>respect<br>23 to the letter before it was sent out? | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 24  A.  I think she might have changed one phrase,<br>25      but I couldn't tell you what phrase it was.<br><br>Page 290<br>1  Q.  Okay. I'm going to show you Exhibit 34<br>2      that's previously been marked.<br>3      Does this refresh your recollection<br>4      as to whether Ms. Gooley had any<br>        suggestions<br>5      or changes?<br>6  A.  Yes.<br>7  Q.  What was her change?<br>8  A.  It says, "Please see my edits. My only<br>9      revision is in the first paragraph of the<br>10     letter."<br>11 Q.  And if you turn to the first page of the<br>12     letter, that first paragraph, what was<br>13     Ms. Johnson's change?<br>14 A.  You mean Ms. Gooley?<br>15 Q.  Oh, excuse me. I apologize. Yes,<br>16     Ms. Gooley's change.<br>17 A.  Well, I'll have to compare it to the<br>18     previous letter to make that determination, I<br>19     don't know off the top of my head.<br>20     (Reviews document.)<br>21     It doesn't appear that there were<br>22     any changes, that I can tell.<br>23 Q.  Okay. In the second to last sentence of the<br>24     first paragraph in your draft, the sentence<br>25     reads, "Our decision is based on information<br><br>Page 291<br>1      gathered about the situation in Israel, case<br>2      law, treatises and consultation with<br>3      counsel." Do you see that?<br>4  A.  She added the consultation with counsel. She<br>5      just changed it to a different sentence that<br>6      said, "We also consulted with counsel."<br><br>24     MS. COYOCA: Okay. I'm going to | |

256

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 25　　　provide as the next in order a document<br><br>Page 292<br>1　　　that's labeled AONNBCU0003085 through<br>　　　3093.<br>2　　　　　(Whereupon, Exhibit 12 was<br>3　　　　　marked for identification.)<br><br>24　Q.　Ms. Johnson, the first page of Exhibit 12 is<br>25　　　an e-mail. Do you recognize this e-mail?<br><br>Page 293<br>1　A.　Yes.<br>2　Q.　Did you send it?<br>3　A.　I did.<br>4　Q.　Why did you send it?<br>5　A.　Because it is our obligation to send a<br>6　　　written coverage determination to our<br>7　　　policyholders.<br>8　Q.　So the purpose of the communication was to<br>9　　　convey the coverage determination; is that<br>10　　correct?<br>11　A.　Yes.<br>12　Q.　In the first sentence it reads, "Attached is<br>13　　our coverage determination describing in<br>14　　detail why the exclusion for war or warlike<br>15　　actions precludes coverage for the extra<br>16　　expense associated with NBCU's decision to<br>17　　move its production of Dig out of Israel to<br>18　　another country." Do you see that?<br>19　A.　I do.<br><br>Page 303<br>11　Q.　In -- on the top of page 3088, the third line<br>12　　into that first paragraph reads, begin<br>13　　quotes, "I informed you that we were<br>14　　seriously considering whether the exclusion<br>15　　for war and warlike actions would preclude<br>16　　coverage for the claim," period, close<br>17　　quotes. Do you see that? | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 18  A.  Yup.<br>19  Q.  Does that statement refresh your recollection<br>20       that you indicated during the Thursday,<br>21       July 17 call, that Atlantic was seriously<br>22       considering rejecting the claim on the basis<br>23       of the war exclusions?<br>24  A.  That's what it says. | |

Page 312

| | |
|---|---|
| 10  Q.  On page 3 of -- excuse me. On page<br>11       Bates-labeled 3090 of the letter, under,<br>12       "Analysis," there's a paragraph heading<br>13       titled, "Imminent Peril." Do you see that?<br>14  A.  I do.<br>15  Q.  In that paragraph you indicate, "Based on<br>16       Mr. Smith's e-mail to the production of what<br>17       we know about the present conflict, we<br>18       believe that the extra expenses that will be<br>19       incurred to move the production out of Israel<br>20       will be due to imminent peril." Do you see<br>21       that sentence?<br>22  A.  I do. | |

Page 313

| | |
|---|---|
| 2   Q.  You further went on to say, begin quotes,<br>3        "Rockets launched towards areas where<br>         filming<br>4        was taking place would no doubt reasonably<br>5        constitute a certain immediate and impending<br>6        danger of such probability and severity to<br>7        person or property that it would be<br>8        unreasonable or unconscionable to ignore."<br>9        Do you see that?<br>10  A.  I do.<br>DEFENDANT'S COUNTER:<br>11   Q. Do you have any reason today to suggest to<br>12       you that your analysis as of July 28, 2014,<br>13       that certain immediate and impending danger<br>14       of such probability and severity existed that<br>15       it would be unreasonable or unconscionable to<br>16       ignore, do you have any reason to suggest<br>17       that that analysis was incorrect as of<br>18       July 28, 2014? | Defendant's Counter:<br>313:11-25; 314:1-3<br><br>Plaintiffs' Response:<br>Not necessary for completeness. Counter is separate question and answer.  313:19-20 includes attorney objection. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|

19       MS. REED: Objection; compound.
20    Objection; vague and ambiguous.
21       THE WITNESS: I think you need to
22   take the paragraph as a whole. And what we
23   knew about the present conflict was that
24   there was a war going on. So, yes, I thought
   25  there was imminent peril due to war. Rockets

DEFENDANT'S COUNTER
Page 314

  1    being launched was certainly an element to
  2    that and that was the element that they were
  3    complaining about.
END DEFENDANT'S COUNTER

Page 316
18  Q.  The next heading under, "Analysis," is,
19      "Terrorism Coverage." Do you see that?
20  A.  Yes.
21  Q.  You indicate, "The terrorism coverage should
22      not apply, because under its terms the act
23      must be part of an effort to coerce or
24      influence the United States population or
25      government." Do you see that sentence?

Page 317
1  A.  I do.
2  Q.  What provision of the policy were you
3     referring to in this sentence?
4  A.  I was referring to the TRIA coverage. It
5     says, "Coverage for certified acts of
6     terrorism."
7  Q.  So was it your belief as of July 28, 2014,
8     that the TRIA endorsement to the policy
9     extended afforded coverage to the insured
10    under certain terms?
11  A.  Yes.
12  Q.  Is it your understanding that the only
13     coverage for terrorism, acts of terrorism in
14     the policy that is in dispute, would be for
15     those acts that meet the certified acts of

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 16    terrorism TRIA endorsement?<br><br>19       THE WITNESS: And it's not a<br>20    conclusion I'm willing to -- to reach. Each<br>21    claim would be considered on its face. As to<br>22    whether or not the -- the coverage for<br>23    terrorism existed in other situations, as I<br>24    sit here today, I haven't been confronted<br>25    with that situation or analyzed it, so I<br><br>Page 318<br>1    can't give you an answer.<br><br>Page 329<br>23  Q.  And in your view, is the TRIA endorsement, is<br>24    it a coverage grant?<br>25  A.  No, it's a carveout.<br><br>Page 330<br>1  Q.  Why did you invoke the TRIA endorsement in<br>2    the July 28 denial letter?<br>3  A.  Because Susan Weiss continued to say that<br>4    this was a terrorist act and terrorism was<br>5    covered, so I pointed out the coverage<br>6    for -- for terrorism referred to a certified<br>7    act of terrorism.<br><br>18  Q  Is it your position today that as of July 28,<br>19    you believed that the only coverage for<br>20    terrorism under this policy would be if the<br>21    act was a certified act of terrorism under<br>22    the terms of the TRIA endorsement?<br>25       THE WITNESS: Not necessarily.<br><br>Page 331<br>2  Q.  Do you believe you were wrong in invoking the | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 3　　　　TRIA endorsement in the July 28 letter?<br><br>6　　　　THE WITNESS: I don't think I was<br>7　　invoking it. I was referring to -- I was<br>8　　referencing that because of Susan Weiss's<br>9　　continued claim that this was an act of<br>10　　terrorism, so I wanted to point her toward<br>11　　the portion of the policy that refers to<br>12　　terrorism and why it does not apply here.<br><br>24　Q.　Well, again, is it your position that only<br>25　　certified acts of terrorism are covered under<br><br>Page 332<br>1　　the terms of this NBCUniversal policy?<br>2　A.　No.<br><br>6　Q.　No, that is not your position?<br>7　A.　That is not my position.<br>8　Q.　Okay. And are acts of terrorism, just assume<br>9　　it is an act of terrorism, if they fall<br>10　　within the coverage grant of a provision of<br>11　　the policy, are they excluded because they<br>12　　are terrorism?<br><br>17　　　　THE WITNESS: Not necessarily.<br>DEFENDANT'S COUNTER:<br>　20　　　　MS. REED: Same objections, and<br>　21　　objection that that's vague and ambiguous.<br>　22　　　　THE WITNESS: There can be acts of<br>　23　　terrorism that fall within the war exclusion,<br>　24　　there can be acts of terrorism that would not<br>　25　　the fall within the war exclusion, so -- or<br><br>DEFENDANT'S COUNTER:<br>Page 333<br>　1　any other exclusion. For example, if you're<br>　2　　filming in Israel and, you know, a crazed<br>　3　　fanatic runs onto the set and shouts<br>　4　　something in support of their cause and stabs | Defendant's Counter: 332:20-25; 333:1-6<br><br>Plaintiffs' Response: Not necessary for completeness. Counter is separate question and answer.  332:20-21 is attorney objection. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 5    the star, well, that doesn't fall within the<br>6    war exclusion, that would be covered.<br><br>END DEFENDANT'S COUNTER | |
| Page 338<br><br>5   Q.   So if two individuals were engaged in a fight<br>6      over religious differences, would that be a<br>7      war?<br>8   A.   No. It has to be -- it has to involve<br>9      military force.<br>10   Q.   And where did you form the understanding that<br>11      in order to constitute war, it had to involve<br>12      military force?<br>13   A.   Well, I think in most of the -- most things<br>14      that I looked at, that was one of the<br>15      indications that it needed to be between at<br>16      least one military. I mean, if you take a<br>17      look at the war in Afghanistan, again, the<br>18      Taliban may not the have a specific organized<br>19      Army, but they certainly have a militia that<br>20      they are using against American troops and<br>21      Afghani troops there, as -- as are Al Qaeda.<br>22   Q.   How do you define a military force? What is<br>23      your understanding of the term? | Defendant's Objections:<br>(338:5-23) Hypothetical; no foundation, not relevant; prejudicial; waste of time 401, 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith; not hypothetical; foundation present.  Relevant to unreasonable denial of claim and failure to investigate. CACI 2332. |
| Page 339<br>1       THE WITNESS: I think that you<br>2      would have to -- to say that they are<br>3      individuals who are bound to work together,<br>4      that they are using -- are using some type of<br>5      weaponry, that they are working in concert in | Defendant's Objections:<br>(339:1-6, 3-8, 14-18, 20-23) Hypothetical; no foundation, not relevant; prejudicial; waste of time 401, 403 |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 6       large groups to advance a particular cause.<br><br>8   Q.   And would you consider a gang such as the<br>9       Crips or the Bloods in Los Angeles to be a<br>10      military force?<br><br>14        THE WITNESS: Well, we certainly<br>15      make reference to gang wars, you know, that's<br>16      in the popular parlance for sure, but I don't<br>17      know that I would say that they are a<br>18      militia.<br><br>20   Q.   Actually, I'm asking about military force,<br>21      not necessarily a militia. Would you<br>22      consider them to be a military force?<br>23   A.   Not necessarily, no.<br><br>Page 340<br>1   Q.   But you indicated that in common parlance<br>2      there is a reference to gang wars; is that<br>3      correct?<br>4   A.   Sure. You hear that on the news and other<br>5      places.<br>6   Q.   Would you consider the reference to gang wars<br>7      on the news to mean that an actual war is<br>8      taking place?<br><br>12        THE WITNESS: No, not necessarily.<br><br>Page 345<br>12   Q.   At the time that you were analyzing the claim<br>13      and determining that it should be denied on<br>14      the basis of the war exclusion, did you<br>15      consider what NBCUniversal understood the<br>16      word "war" to mean at the time it entered<br>17      into its insurance policy with Atlantic in<br>18      January of 2010? | Plaintiffs' Response:<br>Relevant to bad faith; not hypothetical; foundation present; statement of party opponent.  Relevant to unreasonable denial of claim and failure to investigate. CACI 2332.<br><br><br><br><br><br><br><br>Defendant's Objections:<br>(340:1-8) Hypothetical; no foundation, not relevant; prejudicial; waste of time 401, 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith; not hypothetical; foundation present; statement of party opponent.   Relevant to unreasonable denial of claim and failure to investigate. CACI 2332. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 22     THE WITNESS: I do not. That's<br>23    not the standard. | |
| <u>Page 348</u><br>6  Q.  What about if the word has a special meaning<br>7      according to the usage that it's been given<br>8      in the insurance industry –<br><br>11  Q.  -- does that enter into the interpretation<br>12      analysis?<br><br>17     THE WITNESS: Well, I think you<br>18    can see from my letter that I cited several<br>19    different sources that talked about how the<br>20    word "war" has been interpreted.<br><br>22  Q.  Is that a yes?<br><br>24     THE WITNESS: The answer is what<br>25    it is.<br><br><u>Page 349</u><br>2  Q.  If the word has a special meaning according<br>3      to usage that it's been given in the<br>4      insurance industry, does that special meaning<br>5      usage come into play in the interpretation of<br>6      the provision in the insurance contract?<br><br>11     THE WITNESS: It is certainly<br>12    something that we would look at. That<br>13    doesn't mean that that -- that particular<br>14    definition governs all.<br><br>16  Q.  In terms of the common man understanding,<br>is | <u>Defendant's Objections:</u><br>(17-20, 22, 24-25) Hearsay;<br>foundation; counsel's<br>statements; not relevant<br>FRE 401, 403, 801, 802<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith;<br>offered for non hearsay<br>purpose; proper cross-<br>examination; foundation<br>present; statement of party<br>opponent. Relevant to<br>unreasonable denial of claim<br>and failure to investigate.<br>CACI 2332. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 17    that the common man understanding at the time<br>18    of contracting or the common man<br>19    understanding at the time a claim arises?<br><br>22        THE WITNESS: At the time of<br>23    contracting.<br><br>Page 350<br>12  Q.  Ms. Johnson, I'd like to show you another<br>13      document which we will need to mark as the<br>14      next in order. It's Bates-labeled ATL 00217<br>15      through 222.<br>16        (Whereupon, Exhibit 13 was<br>17        marked for identification.)<br><br>19  Q.  Ms. Johnson, do you recognize the e-mail that<br>20      was sent by you on September 30, 2014?<br>21  A.  I do.<br>22  Q.  And the attachment to this e-mail is a letter<br>23      dated December 19th; do you see that?<br>24  A.  I do.<br>25  Q.  Did you write the letter?<br><br>Page 351<br>1  A.  I did.<br>2  Q.  When you had written the letter on<br>3      September 19th, did you send it to -- to me?<br>4  A.  That was certainly my intent. I think I<br>5      actually did, yes.<br>6  Q.  Huh. Do you have -- did you go back and<br>7      check to see whether you had any record of<br>8      having sent it to anyone other than<br>9      Ms. Weiss?<br>10  A.  No. At the time this was brought to my<br>11      attention, it was not in a period that I<br>12      could review that, so I just sent it along.<br>13  Q.  What work did you, if any, in order to<br>14      develop the analysis that's set forth in this | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 15    letter? | |
| 16  A.  I reviewed your letter, I looked at the case | |
| 17    law that you included in your letter, I -- | |
| 18    that the war was ongoing, so I continued to | |
| 19    stay apprised of what had happened, I -- I | |
| 20    kept myself apprised of what had happened | |
| 21    through August, and that the -- these | |
| 22    specific facts that are contained in the | |
| 23    third paragraph of the letter that says that, | |
| 24    "During the conflict which extended until | |
| 25    August 26th, 2014, 2,143 Palestinians and 69 | |
| | |
| Page 352 | |
| 1    Israelis were killed, Israel struck 500" -- | |
| 2    "5,283 targets in Gaza, Hamas fired 4,564 | |
| 3    rockets into Israel and more than 50,000 | |
| 4    thousand buildings in Gaza were damaged or | |
| 5    destroyed," that's information that I | |
| 6    gathered after -- after the war had come to | |
| 7    its conclusion. | |
| 8  Q.  Is it your position or was it your position | |
| 9    in September of 2014 that the size and scope | |
| 10    of the hostilities was a factor in | |
| 11    determining whether or not something | |
| 12    constituted a war? | |
| | |
| 15    THE WITNESS: Well, I think that | |
| 16    the fact that so much damage was done | |
| 17    certainly supports the idea that it was a | |
| 18    war. It is not the only factors to be | |
| 19    considered, however. | |
| | |
| 21  Q.  But in your -- in your view, it was a factor | |
| 22    to be considered in developing an opinion | |
| 23    with respect to whether or not a war existed? | |
| | |
| Page 353 | |
| 1    THE WITNESS: It couldn't have | |
| 2    been, because we denied the claim before we | |
| 3    were aware of these facts. | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|

5   Q.   But my question to you is: Is the size and
6        scope of the hostilities, in your view, a
7        factor to be considered in construing whether
8        or not something constitutes a war?

12       THE WITNESS: Well, I think the
13       fact that I included it in my letter back to
14       you was an indication that we thought that
15       that was something you should take into
16       consideration in saying that the war
17       exclusion did not apply.
18  BY MS. COYOCA:
19  Q.   And what is your authority for the position
20       that the size or scope of the hostilities is
21       relevant to the analysis of whether or not a
22       series of hostile interactions constitutes
23       war?

25       THE WITNESS: Common sense.

Page 354
5   A.   There might be other relevant documents that
6       would state the same thing. As I sit here
7       today, I can't remember them.
8   Q.   Did you see any case analysis that the size
9       and scope of the hostilities is not a factor
10      to be considered in determining whether or
11      not something constitutes a war?

14      THE WITNESS: I don't recall.

16  Q.   On page 3 -- no, I'm sorry, this is also
17      all -- all pages are page 3.
18      On the Bates label ATL002220, in the
19      paragraph that begins subparagraph 1 of the
20      war exclusion, you indicate about
21      three-quarters of the way down, within
22      quotes, "Here Israel, which is indisputably a

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 23      sovereign government, invaded Gaza to protect<br>24      its people from a continuing attack from the<br>25      military arm of Hamas," close quote.<br><br>Page 355<br>1            Was it your position as of September<br>2      of 2014 that the fact that Israel was a<br>3      sovereign government was enough to bring the<br>4      hostilities into the definition of what<br>5      constitutes war –<br><br>8    Q.   -- i.e., that there was only one sovereign<br>9          entity?<br><br>13           THE WITNESS: To tell you exactly<br>14      the reason why this was included in the<br>15      letter, I would have to see your letter to<br>16      see what -- how I was writing responsively to<br>17      what you said.<br><br>19   Q.   But separate and apart from what you were<br>20      writing in response to, I'm asking you the<br>21      question of, as you did your analysis as to<br>22      whether this was a covered claim or not a<br>23      covered claim, did you believe that it was<br>24      sufficient for purposes of meeting the war<br>25      definition however it's defined that one of<br><br>Page 356<br>1            the entities is a sovereign?<br><br>5            THE WITNESS: I don't know how I<br>6      considered that.<br><br>8    Q.   Did you interpret Pan Am as meaning that only<br>9      one entity that's involved in the hostilities<br>10      needs to be a sovereign? | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objections:<br>(356:20-25) Whether Saddam Hussein or any others are terrorist is not relevant; waste of time FRE 401, 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith. Relevant to unreasonable |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 11  A.  Without reviewing the case, I can't tell you<br>12  how I interpreted it.<br>13  Q.  What about Holiday Inns, was it your<br>14  interpretation that if -- if one of the<br>15  fighting parties amongst multiple parties was<br>16  a sovereign entity, the hostilities would<br>17  then constitute war?<br><br>20  THE WITNESS: Well, Ms. Coyoca,<br>21  without actually reviewing what the case<br>22  says, I can't tell you what I thought the<br>23  holding was or what the interpretation that<br>24  one should take away from the definition of<br>25  war is. | denial of claim and failure<br>to investigate. CACI 2332. |
| Page 357<br>2  Q.  On page 2222, which is the last page of the<br>3  letter, the paragraph at the very beginning<br>4  of the top page of that -- at the top of the<br>5  page, you indicate, begin quotes, "You seem<br>6  to assert that a government that is deemed to<br>7  be a terrorist organization cannot have<br>8  sufficient sovereignty to fall within the war<br>9  exclusion. That is not correct. For<br>10  example, the governments of North Korea and<br>11  Saddam Hussein era, Iraq were called<br>12  terrorists, but no one would argue that they<br>13  are not sovereign states or that the war<br>14  exclusion would not apply to conflicts<br>15  involving them," close quotes. Do you see<br>16  that?<br>17  A.  I do.<br>18  Q.  Do you know whether or not as of September of<br>19  2014, North Korea was listed as a terrorist<br>20  organization by the U.S. Government or a<br>21  state sponsor of terrorism?<br><br>24  THE WITNESS: I don't know. | Defendant's Objections:<br>(357:1-21) Whether Saddam<br>Hussein or any others are<br>terrorist is not relevant;<br>waste of time FRE 401, 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith.<br>Relevant to unreasonable<br>denial of claim and failure<br>to investigate. CACI 2332. |

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|

<u>Page 358</u>

1    Q.   What about Saddam Hussein era, Iraq, do you
2         know whether or not Iraq at that point in
3         time was designated as a terrorist
4         organization or as a state sponsor of
5         terrorism?

8              THE WITNESS: By who?
9              MS. COYOCA: By the U.S.
10        Government.
11             THE WITNESS: I -- I don't know.

13   Q.   At the time that you wrote the letter in
14        September of 2014, did you know the
15        difference between a designation as a
16        terrorist organization by the U.S.
          Government
17        versus a designation by the U.S. Government
18        as a state sponsor of terrorism?

22             THE WITNESS: I did not view the
23        United States designation of either country
24        as determinative in this particular
25        determination.

<u>Page 359</u>

2    Q.   Regardless of whether it's ultimately
3         determinative, did you consider the position
4         of the U.S. Government in terms of its
5         designation of Hamas as a terrorist
6         organization, did you consider that to be a
7         factor to be taken into consideration at all?

11             THE WITNESS: As I previously
12        stated, I did not think that the U.S.
13        designation of Hamas as a terrorist
14        organization was relevant to determining
15        whether or not the war exclusion applied.

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|

17  Q.  Did you believe, though, that the
18      U.S. Government's designation of an entity as
19      being a terrorist organization or a state
20      sponsor of terrorism or simply a recognized
21      state with which the U.S. Government has
22      diplomatic relations, did you believe that
23      any of that analysis was relevant to
24      determining whether or not the conflict was a
25      war?

Page 360
4          THE WITNESS: Well, those are all
5      political designations based on the U.S.'s
6      relationship with those particular countries.
7      So, no, that -- that in and of itself is not
8      necessarily relevant.

10  Q.  So you believe that an insurance company
11      should make an independent determination
12      separate and apart from what the
13      U.S. Government determines as to the status
14      of an entity that is potentially involved in
15      a claim with the war exclusion?

19          THE WITNESS: In this instance,
20      what I was trying to determine was what
        were
21      the actual facts of what was happening on the
22      ground in Israel, not whether or not the two
23      parties involved were terrorist
24      organizations.

Page 361
1   Q.  My question, though, to you was did -- was
2       that part of your analysis, whether or not
3       the events constituted war, when you were
4       analyzing what was happening on the ground,
5       as part of your analysis did you consider the
6       designation by the U.S. Government as to

| Plaintiffs' Designation of Pamela Johnson, Vol. 1 | Objection & Response |
|---|---|
| 7     these entities?<br><br>10     THE WITNESS: Well, as I<br>11   previously stated, I -- I knew that the U.S.<br>12   viewed Hamas as a terrorist organization<br>13   based on their charter. So I was aware of<br>14   that, however, that did not change my opinion<br>15   as to whether or not Hamas could be<br>16   considered quasi-sovereign or some other form<br>17   of -- of state that could potentially engage<br>18   in a war. | |

| | Plaintiffs' Designation of Pamela Johnson, Vol. 2 | Objection & Response |
|---|---|---|
| 1 | | |
| 2 | Plaintiffs' Designation of Pamela A. Johnson, Volume 2, May 9, 2017 | |
| 3 | | |
| 4 | Page 467 | |
| 5 | 7   Q.   By July the 16th, do you have any | |
| 6 | 8         recollection about your observation on the<br>9         potential applicability of the war exclusion? | |
| 7 | 10   A.   Well, at that point I was clearly considering<br>11         them, because I wouldn't have sent them | |
| 8 | 12         otherwise. | |
| 9 | 13   Q.   And do you recall your thought process by<br>14         that point in time? | |
| 10 | 15   A.   Well, at that point I had already started | |
| 11 | 16         looking at what was actually happening in<br>17         Israel at this time and what had led up to | |
| 12 | 18         the current conditions in Israel.  And it | |
| 13 | 19         appeared to me that what was happening was<br>         a | |
| 14 | 20         war or warlike action certainly. | |
| 15 | Page 470 | |
| 16 | 4   Q.   What facts had you gathered that caused you | |
| 17 | 5         to analyze the warlike actions provision as<br>6         you did? | |
| 18 | 7   A.   Does it look like a war, does it talk like a | |
| 19 | 8         war, does it walk like a war.  All of these<br>9         indicia were there, so this was a warlike | |
| 20 | 10        action. | |
| 21 | 11   Q.   Did you consider the provision about warlike<br>12        to be broader than war? | |
| 22 | 13   A.   Yes. | |
| 23 | 14   Q.   And why was that? | |
| 24 | 15   A.   Because the way that -- the definition of<br>16        war, as set forth in a variety of -- of | |
| 25 | 17        places, sometimes means that you have to | |
| 26 | 18        actually have two separate sovereigns that<br>19        are -- are attacking each other. | |
| 27 | 20             And, clearly, in this situation, not<br>21        everyone would recognize Hamas as a | |
| 28 | sovereign | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 2 | Objection & Response |
|---|---|
| 22      state or as a separate entity, in spite of<br>23      the fact that the UN Assembly in 2012 had<br>24      recognized Palestine as a nonmember observer<br>25      state.  So, you know, there could be push<br><br>Page 471<br>1      back with regard to is this really a war.<br>2           It's not a declared war, but one of<br>3      the things that the case law talked about is<br>4      that it doesn't have to be a declared war.<br>5      For example, there's the Korean conflict, we<br>6      obviously talk about that as the Korean war<br>7      even though there was no declared war during<br>8      that conflict.<br>9   Q.  Do all definitions of war require the<br>10      participation of a sovereign?<br>11  A.  No, not necessarily.  Or it could also -- it<br>12      could also mean a sovereign just on one side,<br>13      a quasi-sovereign on the other, or simply<br>14      another entity on the other side.<br>15  Q.  What facts had you gathered that affected the<br>16      way that you were interpreting Part 3 of the<br>17      war exclusions?<br>18  A.  Well, Part 3, insurrection, rebellion,<br>19      revolution, usurped power in some instances<br>20      are defined as sort of the ramping up to a<br>21      war by entities that are all contained in the<br>22      same country.  So these are sort of what --<br>23      what you're leading up to to a civil war or<br>24      to a rebellion within the same country.<br>25           In other words, these are two -- the<br><br>Page 472<br>1      citizenry within the same country, one aspect<br>2      of the citizenry is rising up against the<br>3      government.<br><br>Page 481: | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 2 | Objection & Response |
|---|---|
| 2      Q. Did Ms. Gooley ever indicate to you that she<br>3 disagreed with any of the analysis you<br>4 performed?<br>5 A. No. All of us agreed that the war exclusion<br>6 applied. We did not even think this was a 12:20:49<br>7 close call.<br>8 Q. How confident did you feel in the analysis<br>9 that you performed?<br>10 A. I felt very confident.<br>11 Q. When the decision was eventually made to deny<br>12 the claim, are you the person who made the<br>13 decision?<br>14 A. I am. | |
| Page 499<br><br>13   Q.   Would you please describe the involvement<br>            you<br>14         had with the larger NBCUniversal<br>            relationship<br>15         on claims?  Were you directly involved in<br>16         other large claims that were submitted on the<br>17         various policies?<br>18   A.   Yes.  As -- as I explained, after Sandy,<br>19         there were several productions that were<br>20         shutdown for a period of time, and those, you<br>21         know, were claims that we paid quite a bit of<br>22         money on.And then there was cast -- a<br>23         couple of cast claims that involved two<br>24         different stars on a scripted production, and<br>25         we paid a substantial amount of money on | Defendant's Objections:<br>(499:13-25) Other claims<br>are not relevant<br>FRE 401, 402<br><br>Plaintiffs' Response:<br>Relevant to bad faith and<br>motive. See Oppo to MIL 2<br>(Dkt 201). |
| Page 511<br>17   Q.   To your knowledge, Ms. Johnson, was there<br>            any<br>18         filming of the television production Dig that<br>19         was scheduled to take place in the Gaza<br>20         strip?<br>21   A.   No, not to my knowledge.<br>22   Q.   To your knowledge, Ms. Johnson, was there<br>            a<br>23         unity government agreement entered into in<br>24         June of 2014 between Hamas and Fatah? | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 2 | Objection & Response |
|---|---|
| Page 512<br>2          THE WITNESS:  Well, as I<br>3          previously testified, in -- in the research<br>4          that I did I did learn that Hamas and Fatah,<br>5          who were two separate factions within the<br>6          Palestinian government, had come together to<br>7          try to form some kind of agreement between<br>8          each other in June.<br><br>Page 513<br>1     Q.   You did not spend a lot of time looking into<br>2          whether or not a unity agreement had been<br>3          entered into between Fatah and Hamas in June<br>4          of 2014; is that correct?<br><br>7          THE WITNESS:    I did not spend a<br>8          lot of time looking at that, no. I knew<br>9          that -- that tensions had -- had increased<br>10          between Israel and -- and Hamas and Fatah<br>11          based on the fact that they were forming that<br>12          agreement, but -- but -- but beyond that, I<br>13          did not look at it with any specificity.<br><br>15    Q.   During your direct examination -- or, excuse<br>16          me, during your cross-examination by Ms. Reed<br>17          this morning, you testified that you had<br>18          reviewed several articles and looked at<br>19          various types of information online by<br>23          THE WITNESS:  I did a lot of<br>24          online research.<br><br>Page 524<br>6     Q.   Ms. Johnson, did the article that you<br>7          reviewed that's set forth in Exhibit 236,<br>8          which is 4487 --<br>9     A.   I'm looking at the exhibit.<br>10    Q.   -- did that article refer to the<br>11          Hamas/Israeli conflict as being a war? | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 2 | Objection & Response |
|---|---|
| 12  A.   So this was on July 9th, two days after<br>13         Israel had started Operation Protective Edge.<br>14         (Reviews document.)  I do not see a reference<br>15         to it as being a war.<br>16  Q.   Can you please take a look at page 5 of 9 in<br>17         the article that's Bates labeled ATL004491.<br>18  A.   (Complies.)  I'm looking at that page.<br>19  Q.   Can you please read aloud the sentence that<br>20         appears right below the type in bold, "Read<br>21         more, Israel prepares for escalation amid<br>22         exchange of rocket fire"?<br>23  A.   "The military said it was seeking to retrieve<br>24         stability to the residents of southern<br>25         Israel, eliminate Hamas's capabilities and<br><br>Page 525<br>1          destroy terror infrastructure operating<br>2          against the state of Israel and its<br>3          civilians."<br><br>15  Q.   Well, you would agree with me, would you not,<br>16         that this indicates that the military said<br>17         that one of its goals was to destroy the<br>18         terror infrastructure?  It says that, does it<br>19         not?<br><br>22            THE WITNESS:  That's part of what<br>23         it says, certainly.<br><br>Page 526<br>12  Q.   Could you please tell me where in this<br>13         article it refers to the Israeli/Hamas<br>14         conflict as constituting a war?<br><br>18            THE WITNESS:  Well, I mean, I can<br>19         sit here and read this whole thing, but I'm<br>20         assuming that because you're asking me that,<br>21         that it does not say that it is a war. | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 2 | Objection & Response |
|---|---|
| 23  Q.  Well, I -- I would just like your knowledge.<br>24      As of July of 2014 when you were reviewing<br>25      the article, did you believe that this<br><br>Page 527<br>1       article made reference to a war?<br>2   A.  Well, I'll sit here and read the entire<br>3       article and we'll see.     This is dated the 8th<br>4       of July, 2014.  (Reviews document.)<br>5           This article states that with regard<br>6       to Israel, that, "The Army is preparing for<br>7       all possible scenarios, including an invasion<br>8       of a ground" -- "or a ground operation."<br>9           Hamas said that, "The massacre of<br>10      children is a horrendous war crime and all<br>11      Israelis have now become legitimate targets<br>12      for resistance."  So in that sense, they were<br>13      referring to it as war in that quote.<br>14          But does the article itself<br>15      characterize it as a war, no, it does not.<br><br>Page 528<br>3   Q.  Could you please take a look at Exhibit 237.<br>4       And that's the article that appears at<br>5       ATL00442.<br>6   A.  Yes, I'm looking at it.<br>7   Q.  Can you please tell me where in this article<br>8       it refers to the Israeli/Hamas conflict as<br>9       being a war?<br><br>13          THE WITNESS: (Reviews document.)<br>14      This article refers to the fact that the<br>15      state department spokesman Jen Psaki said<br>16      that, "Israel has the right to defend itself,<br>17      but that no one wants to see a ground war."<br>18      (Reviews document.)<br>19          The article that we just referred to<br>20      is dated July 15th, 2014, so the reference<br>21      that I made to war is the only use of that<br>22      word in this article that I could find in my |  |

| Plaintiffs' Designation of Pamela Johnson, Vol. 2 | Objection & Response |
|---|---|
| 23      brief review of it at this time. | |
| 25   Q.   As of July 15, that was the date that | |
| Page 529 | |
| 1         NBCUniversal submitted the claim to | |
|           Atlantic; | |
| 2         is that correct? | |
| 3   A.   That's correct. | |
| 7   Q.   On page 2 of 7 of that article, just slightly | |
| 8         past midway down there is a quote from the | |
| 9         Ezzedine Al-Qassam Brigades.  It begins, | |
| 10        "They will not dream." Do you see that? | |
| 11  A.   Yes. | |
| 12  Q.   Could you please read that aloud? | |
| 13  A.   It says, "They will not dream of a calm if | |
| 14        they do not stop their aggression towards our | |
| 15        people, said Ezzedine Al-Qassam" -- "said the | |
| 16        Ezzedine Al-Qassam Brigades statement, and | |
| 17        stop attempting to break our unity | |
| 18        government." | |
| 19  Q.   Actually, I'm not sure that's exactly what | |
| 20        the quote reads.  What I see the words | |
| 21        appearing as being, "They will dream of a | |
| 22        calm if they do not stop their aggression | |
| 23        towards our people," close quotes, "The | |
| 24        Ezzedine Al-Qassam Brigades statement | |
|           said," | |
| 25        begin quotes, "And stop attempting to break | |
| Page 530 | |
| 1         our unity government," close quotes.  Is that | |
| 2         correct? | |
| 3   A.   Yes, you read it correctly. | |
| 4   Q.   There's a reference here to the unity | |
| 5         government, is there not? | |
| 6   A.   There is. | |
| 7   Q.   So does this refresh your recollection that | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 2 | Objection & Response |
|---|---|
| 8      as of the date of this article, there was in<br>9      fact a unity government that had been agreed<br>10     to between Hamas and Fatah?<br><br>14          THE WITNESS:  That is what they<br>15     say the statement said.  The previous article<br>16     that you had me look at referred to it as a<br>17     tentative agreement.<br><br>19  Q.  Do you know one way or the other as to<br>20     whether the unity agreement had been --<br>21     excuse me, a unity government had been agreed<br>22     to between Hamas and Fatah as of<br>23     June 30, 2014?<br><br>Page 531<br>1          THE WITNESS:  I think I've already<br>2     answered that question.  Can I tell you with<br>3     absolute certainty whether they had agreed to<br>4     that, no, I cannot.<br><br>Page 550<br>20  Q.  Ms. Johnson, do you know the date of the<br>21     Israel ground incursion into Gaza?<br>22  A.  The exact date of the ground incursion I<br>23     believe was either the 16th or the 17th.  I<br>24     can't be sure, but they were -- they were<br>25     leading up to that.  They were amassing their<br><br>Page 551<br>1     troops, they were saying that they were going<br>2     to do the incursion.  And I think actually in<br>3     the last segment that we watched with<br>4     Chris Hayes it shows that they actually were<br>5     starting to invade.<br>6  Q.  Is it your position that the ground incursion<br>7     occurred on July 16?<br><br>10          THE WITNESS:  I'm sorry, I don't | |

| Plaintiffs' Designation of Pamela Johnson, Vol. 2 | Objection & Response |
|---|---|
| 11    remember specifically. If you have something<br>12    you would like to give me to refresh my<br>13    recollection, I would be happy to look at it. | |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| Plaintiffs' Designation of Wanda Phillips, May 31, 2017 | |

Page 5

9   Q.   Good morning, Ms. Phillips.
10   A.   Good morning.
11   Q.   As I indicated, my name is Lucia
12        Coyoca, and I represent the plaintiffs in this
13        matter. Could you please state your full name
14        and address for the record.
15   A.   My name is Wanda Lide Phillips. My
16        address is 56 Locust Street, Jersey City, New
17        Jersey, 07305.


Page 14

1   Q.   Okay. So you originally went to work
2        for EBI, and at some point EBI was purchased by
3        OneBeacon. Is that correct?
4   A.   That's correct.
5
8   Q.   What did you do for the company?
9   A.   I was an underwriter there as well.
10   Q.   Again specializing in entertainment
11        risks?
12   A.   That's correct.
13   Q.   What was your final position with
14        OneBeacon before you left?
15   A.   Underwriting, senior underwriting
16        manager.


Page 19

16   Q.   Now you indicated that to some degree
17        your business, excuse me, your job
18        responsibilities included development of new

**Defendant's Objections:**
(19:16-25) Policy negotiations, underwriting, communications with NBC regarding same not relevant

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 19    business. Is that correct?<br>20  A.  That's correct.<br>21  Q.  Did you work on the NBC Universal<br>22    matter?<br>23  A.  Yes.<br>24  Q.  What was your role?<br>25  A.  I was the underwriter. | to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br><br>Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 20<br>1  Q.  You were the underwriter for their<br>2    television production portfolio insurance?<br>3  A.  That's correct.<br>7  Q.  How did you come to be involved in<br>8    the NBC Universal account?<br>9  A.  I was approached by one of their<br>10    brokers at Aon/Albert G. Ruben.<br>11  Q.  Who approached you?<br>12  A.  George Walden.<br>13  Q.  Approximately when did Mr. Walden<br>14    approach you?<br>15  A.  Again, I can't be 100 percent sure of<br>16    the dates but around 2009.<br>17  Q.  What did Mr. Walden talk to you about<br>18    when he first approached you about NBC<br>      Universal?<br>19  A.  The initial conversations were geared<br>20    to would we have an interest in taking a<br>      look at<br>21    their program from the standpoint of being<br>      the | Defendant's Objections: (20:1-23) Policy negotiations, underwriting, communications with NBC regarding same not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 22      underwriter or the carrier for the television<br>23      portfolio.<br><br>Page 48<br>19   Q.   Do you specifically recall that there<br>20         were multiple drafts going back and forth<br>           prior<br>21         to the time the final policy was issued?<br>22   A.   I remember seeing different drafts. | Defendant's Objections:<br>(48:19-22) Policy<br>negotiations, drafts not<br>relevant to any of Plaintiffs'<br>claims for breach of the<br>contract or duty of good faith<br>or damages; this testimony is<br>a waste of time; causes<br>confusion; is prejudicial.<br>Undisputed the Policy was<br>issued subject to terms and<br>conditions.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting,<br>communications re same<br>relevant to bad faith and<br>failure to investigate. See<br>Oppo to MIL 2 (Dkt 201);<br>UCP v. Atlantic, 929 F.3d at<br>1150; CACI 2332. |
| Page 59<br>7   Q.   So you have indicated that television<br>8         shows or declared productions were added<br>           to the<br>9         policy on a show by show basis. Is that<br>           correct?<br>10   A.   That's correct.<br>11   Q.   And how did that process work?<br>12   A.   Each television production would have<br>13         a separate declaration. That declaration<br>           would<br>14         be submitted to me to review to determine<br>           if we<br>15         were in agreement to provide the same | Defendant's Objections:<br>(59:7-25) Policy<br>negotiations, underwriting<br>discussions not relevant to<br>any of Plaintiffs' claims for<br>breach of the contract or duty<br>of good faith or damages;<br>this testimony is a waste of<br>time; causes confusion; is<br>prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 16      coverages that was in the master policy for that individual | communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 17      production. | |
| 18   Q.   And if a television production was | |
| 19      submitted to you, typically where would that | |
| 20      submission come from? | |
| 21   A.   The broker, Aon. | |
| 22   Q.   Okay. And if there was a production | |
| 23      that OneBeacon did not want to insure, did it | |
| 24      have that option to decline? | |
| 25   A.   Absolutely. | |
| Page 60 | Defendant's Objections: |
| 7   Q.   Did OneBeacon also have the | (60:1-25) Policy negotiations, underwriting discussions not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. |
| 8      opportunity to, if it chose to, request that | |
| 9      there be modifications to the master policy terms | |
| 10      in order to accept an insured production, a | |
| 11      production as an insured production? | Fed. R. Evid. 401; 403 |
| 12   A.   So what we would do is if there was a | |
| 13      declaration in which we wanted to change the | |
| 14      terms, the terms would be changed for that | |
| 15      particular declaration. We wouldn't change the | |
| 16      master policy wording. | Plaintiff's Response: |
| 17   Q.   Got it. So, if there was a | Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 18      particular production that posed whatever risks | |
| 19      that OneBeacon might have a concern about, | |
| 20      OneBeacon could ask NBC Universal to accept | |
| 21      different terms as to that particular production? | |
| 22      Is that correct? | |
| 23   A.   So we would explain to Aon, who would | |
| 24      then explain to NBC, that we are willing to | |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 25     provide this coverage so it could be in the form | |
| _Page 61_ | _Defendant's Objections:_ |
| 1     of a sub-limit instead of the standard limits or | (61:1-11) Policy negotiations, underwriting discussions not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. |
| 2     we could impose endorsement wording that would | |
| 3     provide excluded terms or we would not insure the | |
| 4     production at all. | |
| 5   Q.   So amongst other modifications, there | |
| 6     could be modification to the sub-limit? Is that | |
| 7     correct? | Fed. R. Evid. 401; 403 |
| 8   A.   There could be a modification to the | |
| 9     limit provided, meaning instead of the limit that | _Plaintiff's Response:_ Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 10     is on the blanket or the master policy, we would | |
| 11     offer less of a limit so we call it a sub-limit. | |
| _Page 63_ | _Defendant's Objections:_ |
| 1   Q.   Now again focusing on this period | (63:1-25) Discussions regarding losses, Policy negotiations, underwriting, profitability, premiums not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. |
| 2     prior to the inception of the policy on | |
| 3     January 1, 2010, do you recall any internal | |
| 4     discussions that you were privy to where there | |
| 5     was a discussion about the level of profitability | |
| 6     that OneBeacon hoped to obtain on the NBC | |
| 7     Universal policy? | Fed. R. Evid. 401; 403 |
| 8   A.   Well, we wouldn't have wrote it if we | |
| 9     didn't think so. We had conversations where we | |
| 10     looked at the previous losses to determine | _Plaintiff's Response:_ |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 11    what kind of premium we would need in order for the<br>12    account to be profitable.<br>13  Q.  When you say you looked at the<br>14    previous losses to determine premium so that you<br>15    could try to ensure that the account would be<br>16    profitable, are you talking about looking at the<br>17    previous losses based on the prior 2009 year, the<br>18    year prior to the 2010 policy incepting?<br>19  A.  That year and years back from there.<br>20  Q.  And in terms of the discussions about<br>21    how to set the premium, were you involved in<br>22    those discussions?<br>23  A.  Yes.<br>24  Q.  And again looking at the setting of<br>25    the premium level, was there any particular | Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 64<br>1    percentage of profitability that OneBeacon was<br>2    looking to achieve in insuring NBC Universal for<br>3    its television production risks?<br>4  A.  Yes, we were looking at a minimum of<br>5    a 60 percent loss ratio, and we thought that the<br>6    60 percent would be sufficient because the<br>7    account was also written what we consider to be<br>8    net to us, which means we do not pay the broker<br>9    any commission. | Defendant's Objections: (64:1-9) Discussions regarding losses, Policy negotiations, underwriting, profitability, premiums not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiff's Response: Negotiations, underwriting, communications re same |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 15  Q.   When you say a minimum of 60 percent<br>16         loss ratio, what do you mean by that?<br>17  A.   In order for the account to be<br>18         considered profitable for the expenses associated<br>19         with it, we would need to run at a loss ratio of<br>20         60 percent or less.<br>21  Q.   And if losses went higher than<br>22         60 percent, that would impact the profit return<br>23         that OneBeacon would be receiving. Isn't that<br>24         right?<br>25  A.   That's correct. | relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332.<br><br>Defendant's Objection:<br>(64:15-25)<br>Policy negotiations, underwriting, profitability, premiums not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 65<br>3          MS. COYOCA: And if the court<br>4          reporter could please hand Exhibit 405 to<br>5          Ms. Phillips.<br>6   Q.   Ms. Phillips, have you seen this<br>7          document before?<br>8   A.   I would have to read it to determine.<br>9   Q.   Please do. Please let me know when<br>10         you are ready for questions.<br>11  A.   Okay. I am finished reading.<br>12  Q.   With respect to the e-mail that<br>13         appears at the top of page 5968, the e-mail | Defendant's Objections:<br>(65:3-25) Pricing, premiums, Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial; additionally exhibit contains hearsay |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| that<br>14     is dated Saturday, November 21, 2009, sent at<br>15     8:48 p.m. from George Walden to Martin Ridgers<br>16     and Wanda Phillips. Do you see that e-mail?<br>17   A.   Yes.<br>18   Q.   Did you receive this e-mail on or<br>19     about November 21, 2009?<br>20   A.   I have no reason to think I didn't.<br>21     I don't remember it.<br>22   Q.   Okay. Thank you. So you have no<br>23     reason to believe you didn't receive it at this<br>24     time. Is that right?<br>25   A.   Yes. | regarding statements by Mr. Walden and others on behalf Plaintiffs or its representatives.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Relevant to bad faith; statement of party opponent; offered for non-hearsay purpose; exhibit is business record, presumed authentic because it was produced from Defendant's files, and a statement of party opponent. Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 66<br>1   Q.   Okay. With respect to item 6, Mr.<br>2     Walden indicates the target pricing for insurance<br>3     premium is 10 cents. Do you see that?<br>4   A.   Yes.<br>5   Q.   What is that in reference to, to your<br>6     understanding?<br>7   A.   That is the rate against the<br>8     1 billion that you referred to in production<br>9     costs.<br>10   Q.   And the 10 cents rate, how was that<br>11     determined, to your knowledge?<br>12   A.   Well, in this e-mail from George or<br>13     in general?<br>14   Q.   I am asking you in general first.<br>15   A.   This appears that George is saying | Defendant's Objections:<br>(66:1-25) Pricing, premiums, Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial; additionally exhibit contains hearsay regarding statements by Mr. Walden and others on behalf Plaintiffs or its representatives.<br>Fed. R. Evid. 401; 403 |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 16     he's looking for a 10 cents rate.<br>17  Q.  Do you know where it came from,<br>18     though, prior to this e-mail?<br>19  A.  No.<br>20  Q.  Had you been involved in any<br>21     discussions where the rate was discussed in terms<br>22     of the rate to be applied per $100 production<br>23     costs in calculating how much the premium would<br>24     be?<br>25  A.  I was involved in discussions. I | Plaintiff's Response:<br>Relevant to bad faith; statement of party opponent; offered for non-hearsay purpose; exhibit is business record, presumed authentic because it was produced from Defendant's files, and a statement of party opponent. Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 67<br>1     don't know if they were before or after the date<br>2     of this e-mail, but yes, I was involved in<br>3     discussions.<br>4  Q.  Okay. What do you recall about those<br>5     discussions?<br>6  A.  Pretty much determining what we would<br>7     need from a premium standpoint, and that premium<br>8     would be based on what the terms and conditions<br>9     are provided, so what sort of SIR the client<br>10    would take again to get to that 60 percent or<br>11    less loss ratio.<br>12  Q.  Okay. When you say determining what<br>13    we would need from a premium standpoint and what<br>14    the premium would be based on, in terms of the<br>15    terms and conditions provided, can you please | Defendant's Objections:<br>(67:1-25) Pricing, premiums, Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial; additionally exhibit contains hearsay regarding statements by Mr. Walden and others on behalf Plaintiffs or its representatives. Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Relevant to bad faith; statement of party opponent; |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 16    explain to me how OneBeacon would determine what<br>17    would be needed from a premium standpoint?<br>18  A.  So we would determine the trend from<br>19    the past history of what the losses looked like<br>20    in order to determine what their present loss<br>21    ratio would be. We would look at where those<br>22    losses were driven from, meaning what sections of<br>23    the policy. We would then determine what sort of<br>24    deductibles we would need to put in place to<br>25    maybe reduce some of those losses. We would add | offered for non-hearsay purpose; exhibit is business record, presumed authentic because it was produced from Defendant's files, and is a statement of party opponent.  Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| <u>Page 68</u><br>1    a load for expenses and then determine based on<br>2    all of that what sort of loss ratio would be<br>3    acceptable for the account to be profitable.<br>4  Q.  Okay. I want to make sure I<br>5    understand this. So when you say you are looking<br>6    at the trend from past history, are you referring<br>7    to looking at the trend of losses over the past<br>8    whatever period of years in order to make some<br>9    kind of assessment as to what the loss ratio<br>10    might present or be in the coming year?<br>11  A.  Very similar to that, so we need to<br>12    know what the losses were and what the premium<br>13    was in order to determine what the loss ratio is. | <u>Defendant's Objections</u>: (68:1-13) Pricing, premiums, Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial; additionally exhibit contains hearsay regarding statements by Mr. Walden and others on behalf Plaintiffs or its representatives.<br>Fed. R. Evid. 401; 403<br><br><u>Plaintiff's Response</u>: Relevant to bad faith; |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| | statement of party opponent; offered for non-hearsay purpose; exhibit is business record, presumed authentic because it was produced from Defendant's files, and is a statement of party opponent.  Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 88<br>12  Q.  Got it. Thank you. Ms. Phillips,<br>13      are you aware of whether or not there is a<br>14      terrorism exclusion on the NBC Universal policy,<br>15      the one that first incepted on January 1, 2010?<br>16  A.  My understanding is there is no<br>17      terrorism exclusion. The exclusion is the<br>18      countries in which, going back to this, so there<br>19      should be an exclusion on the policy and an<br>20      endorsement form that is a country exclusion.<br>21  Q.  During the negotiations of the policy<br>22      that preceded the January 1, 2010 policy, do you<br>23      recall if there were any discussions about having<br>24      a terrorism exclusion on the policy?<br>25  A.  I don't recall that. | Defendant's Objections: (88:12-25) Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Further, there is no foundation for admission and it calls for a legal conclusion.<br>Fed. R. Evid. 401; 403; 602.<br><br>Plaintiff's Response: Relevant to bad faith; statement of party opponent; does not call for legal conclusion; offered for non-hearsay purpose. Negotiations, underwriting, communications re same relevant to bad faith and |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| | failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 89<br>1  Q.  Just skip forward in time. As to<br>2      the -- there was an NBC Universal policy issued<br>3      by OneBeacon for the policy period from<br>4      January 1, 2014 to June 30, 2015. Is that right?<br>5  A.  I don't remember if it was written 18<br>6      months from the beginning or maybe it was<br>7      negotiated and then added, but yes.<br>8  Q.  Okay. So the policy that incepted,<br>9      though, on January 1, 2014, that is the one I<br>10     want to ask you a question about. Do you have<br>11     that one in mind?<br>12  A.  Yes.<br>13  Q.  Do you know if there was a terrorism<br>14     exclusion on that policy?<br>15  A.  I don't believe there was. | Defendant's Objections: (89:1-25) Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Further, there is no foundation for admission and it calls for a legal conclusion.<br>Fed. R. Evid. 401; 403; 602<br><br>Plaintiff's Response: Relevant to bad faith; statement of party opponent; does not call for legal conclusion. Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| Page 90<br>1   Q.   Okay. Can you please explain to me<br>2          what is a TRIA endorsement?<br>3   A.   Pretty much providing coverage for an<br>4          act that is certified underneath the federal<br>5          definition of TRIA, but it has to happen in the<br>6          U.S.<br>7   Q.   Okay. So I want to make sure I<br>8          understand. In order for the TRIA endorsement to<br>9          apply, there has to be a certified act of<br>10         terrorism, which is something that is defined<br>11         according to the Terrorism Risk Insurance Act, is<br>12         that correct?<br>13  A.   That's correct.<br>14  Q.   And at least as part of that<br>15         definition, the terrorist act needs to occur in<br>16         the United States, is that right?<br>17  A.   That's correct. | Defendant's Objections:<br>(90:1-25) Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Further, there is no foundation for admission and it calls for a legal conclusion.<br>Fed. R. Evid. 401; 403; 602<br><br>Plaintiff's Response:<br>Relevant to bad faith; statement of party opponent; does not call for legal conclusion; foundation present. Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 91<br>12  Q.   Thank you. Just to be clear, if the<br>13         act of terrorism doesn't occur in the United<br>14         States, it is your testimony that has nothing to<br>15         do with TRIA, the Terrorism Risk Insurance Act.<br>16         Is that correct?<br>17  A.   Right. TRIA is in the U.S. | Defendant's Objections:<br>(91:1-17) Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| | prejudicial. Further, there is no foundation for admission and it calls for a legal conclusion.<br>Fed. R. Evid. 401; 403; 602<br><br><br>Plaintiff's Response:<br>Relevant to bad faith; statement of party opponent; does not call for legal conclusion; foundation present.  Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 205<br>22   Q.   Thank you. At some point in time<br>23         did you or were you involved with the declaration<br>24         of the television show Dig to the NBC Universal<br>25         policy issued by Atlantic? | Defendant's Objections:<br>(205:1-7, 12-25)<br>Record objections.  Policy negotiations, Deponent's interpretation not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403; 601.<br><br>Plaintiff's Response:<br>Relevant to bad faith; not speculative. Negotiations, underwriting, communications re same |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| | relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 206<br>1   A.   Yes.<br>2   Q.   What was your involvement in that<br>3        regard?<br>4   A.   Prior to NBC declaring Dig going<br>5        through the normal channels in which they sent us<br>6        a declaration and they tell us how many episodes<br>7        and what the cost is going to be, prior to an<br>8        official declaration, I received a telephone call<br>9        from Andrea Garber stating that this was on the<br>10       slate discussions to be produced. They weren't<br>11       100 percent sure where it was going to be filmed,<br>12       but it is likely that it would be filmed in<br>13       Jerusalem. | Defendant's Objections: (206:1-25) Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br>Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 207<br>2   Q.   When Ms. Garber called you about this<br>3        potential television show that was going to be<br>4        shot in Israel, what did she tell you about the<br>5        production, to your recollection?<br>6   A.   From what I could recall, there<br>7        wasn't a lot of details just yet. It wasn't what<br>8        they would call given the green light yet, which<br>9        means to go ahead and film the production, | Defendant's Objections: (207:1-25) Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403 |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| but it<br>10   was with creative and it was something that they<br>11   were looking at, looking at doing.<br>12   I remember us making a joke and<br>13   saying we don't understand why they can't just<br>14   film it on a desert, they all look alike, but<br>15   from that conversation what was said is that I<br>16   would need her to get additional details before<br>17   we could determine, you know, what, if anything,<br>18   we would be willing to do if there would be any<br>19   extra exclusions, so on and so forth.<br>20   In the meantime, what we did was we<br>21   had in speaking with Peter Williams, the manager<br>22   at the time for sure at that point, we involved<br>23   our risk control team, and our risk control was<br>24   talking with NBC's risk control and security team<br>25   to get an idea of what was planned. | Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 208<br>1   Q.   Okay. You made reference to a need<br>2        for additional details before a determination<br>3        could be made as to adding Dig to the policy. Is<br>4        that right?<br>5   A.   Yes.<br>6   Q.   What additional details were you<br>7        looking for specifically?<br>8   A.   Filming details. Are you going to be<br>9        there to film one episode or are you | Defendant's Objections:<br>(208:1-25)<br>Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403 |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| filming 15<br>10  episodes? Are you going to be there for a week<br>11  or are you going to be filming for three months?<br>12  Are you filming on a closed set or are you<br>13  filming, you know, in the middle of the street?<br>14  Have you been granted permission to do this? How<br>15  many people will be involved? We wanted to have<br>16  underwriting information particularly on the<br>17  plans for filming this production.<br>18  Q.  Ultimately, did you receive the<br>19      information that you were looking for?<br>20  A.  We did.<br>21  Q.  Was there any information that you<br>22      specifically had been looking for that NBC<br>23      Universal refused to provide?<br>24  A.  I don't recall that.<br>25  Q.  Is there any other information that | Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 209<br>1  you needed in order to make the determination<br>2  that you felt you could not ask for from NBC<br>3  Universal?<br>4  A.  No, not the case.<br>5  Q.  Now earlier you made reference to the<br>6      fact that you involved our risk control team. Do<br>7  you recall that?<br>8  A.  I did say our. I don't work there<br>9      any more. OneBeacon's risk control team at the<br>10  time, yes, I do.<br>11  Q.  Okay. To whom were you referring? | Defendant's Objections:<br>(209:1-25)<br>Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 12  A.  Chuck Reddington, who contracted the<br>13      workout to John Smith. Peter Williams also was<br>14      heavily involved because he had past experience<br>15      from the claims standpoint, with the location<br>16      that they were filming and NBC's security team<br>17      provided a lot of the information that we needed<br>18      as far as how the cast and crew would be secured,<br>19      where they would be living, so we ultimately made<br>20      a decision that with the current SIR on the<br>21      policy, if there was a terrorist attack, let's<br>22      just say a car bombing, something of that nature,<br>23      we felt that the security team in place was<br>24      experienced and would be able to get their team<br>25      out of harm's way. | relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| <u>Page 210</u><br>1      We made a decision that they could<br>2      lose a day or two of filming but the SIR that<br>3      they currently had in place would cover those,<br>4      and we were able to grant coverage.<br>5  Q.  And was OneBeacon able to grant<br>6      coverage without modifying any of the terms of<br>7      the policy?<br>8  A.  That's correct.<br>9  Q.  Was there a different sub-limit put<br>10     on the Dig production?<br>11 A.  I don't recall a sub-limit provided.<br>12 Q.  Was there any exclusionary language | <u>Defendant's Objections:</u> (210:1-25)<br>Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br><u>Plaintiff's Response:</u><br>Negotiations, underwriting, communications re same |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 13    added to address specifically the Dig production?<br>14  A.  I don't recall any exclusions being<br>15    added.<br>16  Q.  Were both of those options available<br>17    to OneBeacon at the time that it made the<br>18    decision to add Dig as an insured production to<br>19    the policy? Could it have added either of those<br>20    things?<br>21  A.  We could have added exclusions or<br>22    sub-limits or we could have decided not to cover<br>23    it at all.<br>24  Q.  To your knowledge, what was Mr.<br>25    Reddington, Chuck Reddington's position with | relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 211<br>1    OneBeacon?<br>2  A.  His position?<br>3  Q.  Yes.<br>4  A.  He was manager of some sort of risk<br>5    control department.<br>6  Q.  Specifically what did he do with<br>7    respect to assessing the Dig potential risk?<br>8  A.  My understanding is he evaluated the<br>9    information we received from the independent<br>10    contractor John Smith as well as evaluated the<br>11    information we received from NBC's security team.<br>12  Q.  Is Mr. Reddington the individual who<br>13    made the decision that from the security<br>14    standpoint, Dig did not pose an impediment to<br>15    OneBeacon insuring it?<br>16  A.  Mr. Reddington evaluated all of the | Defendant's Objections: (211:1-25)<br>Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 17       information and gave us his opinion.<br>18   Q.   Did Mr. Reddington make a<br>19       recommendation one way or the other?<br>20   A.   He wouldn't give a recommendation of<br>21       underwriting. He would pretty much just lay out<br>22       the facts as they are and his opinion of the risk<br>23       would be favorable or this is not a risk that he<br>24       would recommend we continue with.<br>25   Q.   Now you indicated that he evaluated | |
| Page 212<br>1       information received from John Smith. Is that<br>2       correct?<br>3   A.   That's correct.<br>4   Q.   Are who is John Smith?<br>5   A.   John Smith is an independent<br>6       contractor who OneBeacon used for risk control<br>7       and risk assessments as well.<br>8   Q.   What organization is Mr. Smith with?<br>9   A.   Media Safety.<br>10   Q.   What is Media Safety?<br>11   A.   The name of his company.<br>12   Q.   What does Media Safety do?<br>13   A.   Risk assessments.<br>14   Q.   Does it do risk assessments in<br>15       situations where there is potential physical<br>16       violence involved?<br>17   A.   There can be various, so if there is<br>18       a festival, crowd control, security exits. It is<br>19       for safety of cast and crew, so he will evaluate<br>20       and help with suggestions on how to make a risk<br>21       better.<br>22   Q.   When was Mr. Smith retained for this | Defendant's Objections:<br>(212:1-25)<br>Record objections. Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 23      purpose?<br>24   A.   Sometime during the discussions.<br>25   Q.   What did Mr. Smith do in order to | |
| <u>Page 213</u><br>1      assess the potential safety risks to cast and<br>2      crew?<br>3   A.   In addition to researching the areas<br>4      in which the client said they would be filming,<br>5      he had conversations with the NBC production team<br>6      as well to understand better exactly what they<br>7      would be doing. He was able to provide us with<br>8      documentation regarding the production studios in<br>9      which they would be using. So there was just<br>10     various details regarding the planning of this<br>11     production.<br>12   Q.   Did Mr. Smith ever provide any kind<br>13     of written assessment of the potential security<br>14     risks?<br>15   A.   I believe he did.<br>16   Q.   Did you receive a copy of that?<br>17   A.   I don't recall exactly. I don't<br>18     recall. The channel in which he worked was he<br>19     would send it to Chuck Reddington, so I can't say<br>20     for sure if I received a copy.<br>21   Q.   But it is your best recollection that<br>22     you believe that he did prepare such a written<br>23     assessment. Is that correct?<br>24   A.   I would think he did. | <u>Defendant's Objections:</u><br>(213:1-25)<br>Record objections. Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br><u>Plaintiff's Response:</u><br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 25  Q.   And it is possible that you received | |
| Page 214 | Defendant's Objections: |
| 1         a copy at some point from Mr. Reddington? | (214:1-25) |
| 2  A.    I don't recall seeing a copy from | Record objections.  Policy negotiations, underwriting |
| 3         him. | not relevant to any of |
| 4  Q.    Now did Mr. Reddington ever send you | Plaintiffs' claims for breach |
| 5         or anyone else at OneBeacon, to your knowledge, | of the contract or duty of good faith or damages; this |
| 6         an e-mail or a memo or a document that contained | testimony is a waste of time; causes confusion; is |
| 7         his assessment of the potential security risks? | prejudicial. FRE 401; 403 |
| 8  A.    I don't remember if he actually sent | |
| 9         a document. I do remember conversations with | Plaintiff's Response: |
| 10        myself and Peter and Chuck where we agreed that | Negotiations, underwriting, communications re same |
| 11        we would be able to move forward after evaluating | relevant to bad faith and failure to investigate. See |
| 12        what we thought the potential risks were. | Oppo to MIL 2 (Dkt 201); |
| 13  Q.   Did you have more than one | UCP v. Atlantic, 929 F.3d at |
| 14        conversation in which the issue of the security | 1150; CACI 2332. |
| 15        assessment and the filming of Dig in Israel was | |
| 16        considered and discussed? | |
| 17  A.   We had more than one conversation. | |
| 18  Q.   During the course of those | |
| 19        discussions, and I am focusing on after Mr. | |
| 20        Reddington had taken the input from Mr. Smith and | |
| 21        Mr. Smith had done his research and had talked to | |
| 22        whomever he talked to at NBC Universal, did | |
| 23        anyone from OneBeacon ever voice an opinion that | |
| 24        you are aware of that the production | |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 25     should not<br>be declared to the policy? | |
| <u>Page 215</u><br>1   A.   No. I think we, at that point we<br>2       granted coverage that they could.<br>3   Q.   Right, but my question is before that<br>4       decision was made to grant coverage, did you hear<br>5       or did anyone ever tell you, no, I don't think we<br>6       should do this?<br>7   A.   Again, that is kind of what we were<br>8       looking into, is this something we should do, so<br>9       that is where the whole process started, so it<br>10      wasn't like they said we are going to film here<br>11      and we said okay, that is fine. We wanted<br>12      details to determine if that was acceptable.<br>13   Q.   Right, I understand, but what I am<br>14      saying is after all that assessment work was done<br>15      and all the information was in, I am trying to<br>16      determine whether or not there was any internal<br>17      disagreement, for example between yourself, Mr.<br>18      Williams, as to whether Dig should be added as an<br>19      insured production?<br>20   A.   I don't recall anything of that<br>21      nature.<br>22   Q.   To the best of your recollection, the<br>23      consensus was that, yes, the Dig production could<br>24      be added as an insured production to the policy. | <u>Defendant's Objections</u>:<br>(215:1-25)<br>Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br><u>Plaintiff's Response</u>:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 25      Is that correct? | |
| <u>Page 216</u><br>1    A.   We agreed to add it, yes. | <u>Defendant's Objections:</u><br>(216:1)<br>Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br><u>Plaintiff's Response:</u><br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| <u>Page 220</u><br>1        (Exhibit 423, Document bearing Bates<br>2        numbers AON NBCU 0003622 through 3625, was<br>3        so marked for identification, as of this<br>4        date.)<br>5    Q.   Ms. Phillips, can I please direct<br>6        your attention to the first e-mail in time on<br>7        this chain. It is beginning on page 3624, and it<br>8        is an e-mail from Andrea Garber to you cc'ing<br>9        Debbie Kizner and Susan Weiss dated December 3rd,<br>10        2013, sent at 2:03 p.m. Do you see that?<br>11   A.   Yes.<br>12   Q.   Do you recall receiving this e-mail?<br>13   A.   I don't recall receiving it, but I | <u>Defendant's Objections:</u><br>(220:1-25)<br>Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br><u>Plaintiff's Response:</u><br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 14   have no reason to think I didn't.<br>15  Q.  Okay. Is it your belief that you had<br>16     a conversation with Ms. Garber before she sent<br>17     this e-mail to you?<br>18  A.  Yes, it is. | Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 221<br><br>23  Q.  Got it. You responded to Ms.<br>24     Garber's December 3rd e-mail that same day. Is<br>25     that correct? | Defendant's Objections: (221:1-25)<br>Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 222<br>1  A.  It appears so. Yes.<br>2  Q.  Do you have any reason to believe<br>3     that you did not provide this e-mail or send this<br>4     e-mail?<br>5  A.  No, I do not.<br>6  Q.  You asked her for information or an<br>7     idea of the budget and the insurable production<br>8     cost. Do you see that?<br>9  A.  Yes.<br>10  Q.  Why did you need the budget and the | Defendant's Objections: (222:1-25)<br>Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403 |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 11      insurable production cost?<br>12   A.   To determine if we were to move<br>13      forward, what sort of limits we would be insuring<br>14      or providing coverage for.<br>15   Q.   Did Ms. Weiss -- excuse me. Did Ms.<br>16      Garber or Ms. Weiss provide you with that<br>17      information?<br>18   A.   I am sure they had to.<br>19   Q.   In fact, Ms. Garber responds and<br>20      indicates that she is going to ask for that<br>21      information and provide it to you, correct?<br>22   A.   Yes.<br>23   Q.   Then there is a subsequent e-mail<br>24      again on December 3rd indicating the gross<br>25      production budget of approximately 25 million for | Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 223<br>1      the project, and that this was a preliminary<br>2      estimate, a preliminary amount for the pilot plus<br>3      five one-hour episodes. Is that correct?<br>4   A.   Yes.<br>5   Q.   And you responded to her e-mail that<br>6      same day as well, is that correct?<br>7   A.   That's correct. | Defendant's Objections: (223:1-7)<br>Record objections.  Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br>Plaintiffs' Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 225 | Defendant's Objections: |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 9   Q.  In the context of this e-mail, do you<br>10       recall having any discussions with Mr.<br>         Williams<br>11       about the suggestion that the Dig<br>         production was<br>12       going to be submitted as an insured<br>         production<br>13       under the policy?<br>14  A.  Well, I forwarded the bottom<br>15       information to him as well so he would<br>         have that<br>16       information as much as I had at that point<br>         to<br>17       start the discussions.<br>18  Q.  Okay. Did you then subsequently have<br>19       a conversation with Mr. Williams about<br>         the<br>20       production?<br>21  A.  I had conversation with him. I mean<br>22       I don't know if it immediately followed me<br>         saying<br>23       this to him, but I involved him pretty much<br>         as<br>24       soon as I knew of it after I got the formal<br>25       e-mail. | (225:1-25) Record objections.  Further Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br><br>Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 226<br>1   Q.  During this time period, end of 2013,<br>2        beginning of 2014, was it your practice to<br>3        contact Mr. Williams about every<br>         production that<br>4        NBC Universal was seeking to add as an<br>         insured<br>5        production to the policy?<br>6   A.  No.<br>7   Q.  Why did you choose to forward<br>8        information about this Dig potential<br>         production<br>9        to Mr. Williams? | Defendant's Objections: (226:1-25) Record objections.  Further Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403 |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 10  A.  For the same reason they wanted me to<br>11        know about it, where it was filming, what was<br>12        taking place.<br>13  Q.  But if you could, please, what was<br>14        that reason, to your understanding?<br>15  A.  The primary reason is because they<br>16        were filming in Jerusalem and Tel Aviv.<br>17  Q.  And from your standpoint, were you<br>18        considering the fact that they would be filming<br>19        in Jerusalem to potentially present some<br>20        additional risk that would need to be<br>21        specifically considered by OneBeacon in making<br>22        its decision?<br>23  A.  I thought that filming in Jerusalem<br>24        and Tel Aviv could have some issues from a<br>25        terrorist standpoint, so we needed to assess it, | Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 227<br>1        yes.<br>2        MS. COYOCA: I want to mark as an<br>3        additional exhibit, I believe we are on<br>4        Exhibit 424, an e-mail labeled AON NBCU<br>5        0001747.<br>6        (Exhibit 424, Document bearing Bates<br>7        number AON NBCU 0001747, was so marked for<br>8        identification, as of this date.)<br>9  Q.  Ms. Phillips, this is an e-mail dated<br>10       December 13, 2013. Do you see that?<br>11  A.  Eyes are fading. Sorry.<br>12       December 13. Yes.<br>13  Q.  It is from Andrea Garber to you with<br>14       a cc to Deborah Kizner and Bernadette. Do you | Defendant's Objections:<br>(227:1-25) Record objections.  Further Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 15      see that?<br>16   A.   Yes.<br>17   Q.   In this e-mail Ms. Garber indicates<br>18      that she is confirming a discussion that had<br>19      taken place earlier in that day, December 13,<br>20      regarding coverage for Dig under the renewal<br>21      policy beginning January 1, 2014. Do you see<br>22      that?<br>23   A.   Yes.<br>24   Q.   Okay. Do you recall having<br>25      received -- excuse me. Do you recall having a | failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 228<br>1      call with Ms. Garber about the decision to add<br>2      Dig as an insured production on the 13th?<br>3   A.   I don't recall. I mean we had<br>4      conversations about it, yes.<br>5   Q.   Okay. Do you have any reason to<br>6      believe that you did not have such a call?<br>7   A.   No.<br>8   Q.   Okay. In the e-mail, Ms. Garber<br>9      advises that "You are not inclined to charge<br>10      additional premium beyond our standard rate and<br>11      are similarly not inclined to place coverage<br>12      limits beyond our standard terms on this<br>13      production at this time."<br>14      Do you see that?<br>15   A.   Yes.<br>16   Q.   Had you discussed with Ms. Garber<br>17      that the assessment had been done and a decision<br>18      had been made that no change in terms was going | Defendant's Objections: (228:1-25) Record objections. Further Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br>Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 19      to be required? | |
| 20  A.  That is what this says, yes. | |
| 21  Q.  Okay. She also indicates "Regarding | |
| 22      the work in Jerusalem, you would like to be kept | |
| 23      apprised of what production is doing and what | |
| 24      ongoing precautions are being taken to ensure the | |
| 25      safety of cast, crew and property." | |
| __Page 229__ | __Defendant's Objections:__ |
| 1      Do you see that? | (229:1-25) Record |
| 2  A.  Yes. | objections.  Further Policy |
| 3  Q.  What had you discussed with Ms. | negotiations, underwriting |
| 4      Garber by this point in time with regard to | not relevant to any of |
| 5      precautions being taken? | Plaintiffs' claims for breach |
| 6  A.  I think, I can't say for sure, but | of the contract or duty of |
| 7      reading this, we must have at this point had an | good faith or damages; this |
| 8      assessment from risk control or we felt that the | testimony is a waste of time; |
| 9      information that we had gathered was sufficient, | causes confusion; is |
| 10     and we were okay with moving forward. We had | prejudicial. FRE 401; 403 |
| 11     conversations internally. Again, I recall | |
| 12     conversations with the idea of a suicide bomber | |
| 13     as one of the things that we thought could | __Plaintiff's Response:__ |
| 14     possibly happen in Israel, and with this policy | Negotiations, underwriting, |
| 15     beginning on a new term with a brand new SIR, we | communications re same |
| 16     felt that we were comfortable at that time with | relevant to bad faith and |
| 17     the risk for a day or two, if in fact there was | failure to investigate. See |
| 18     some kind of terrorist attack. | Oppo to MIL 2 (Dkt 201); |
| 19  Q.  So at this point in time, | UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 20　　December 13, you believed that the work of Mr.<br>21　　Reddington and Mr. Smith had been completed and a<br>22　　decision had been made by Atlantic to accept the<br>23　　risk, correct?<br>24　A.　Yes, at that point I would have had<br>25　　to have had information in order to do that, yes. | |
| Page 230<br>1　Q.　Okay. And you made reference to<br>2　　conversations internally with the idea of a<br>3　　suicide bomb or one of the things that could<br>4　　possibly happen in Israel.<br>5　A.　When you think of the risk or the<br>6　　exposures in Israel, that is what comes to mind.<br>7 | Defendant's Objections:<br>(230:1-25) Record objections.  Further Policy negotiations, underwriting not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. FRE 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 236<br>12　Q.　Did you have any conversations or<br>13　　communications with Danny Gutterman about the Dig<br>14　　claim?<br>15　A.　There is something that comes to mind<br>16　　with Danny, and it may have been him telling me<br>17　　also that there was a claim in, but I don't<br>18　　remember having conversations. I believe | Defendant's Objections:<br>(236:12-25)<br>Record Objections.  These communications are not relevant to any remaining issues; waste of time.  FRE 401; 403<br><br>Plaintiff's Response: |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 19      Danny was going to set up a call or something of that<br>20      nature and giving me a heads-up. Something of<br>21      that nature. I don't remember a lot about it.<br>22   Q.   Was the call going to involve you?<br>23   A.   No.<br>24   Q.   Did you have any conversations with<br>25      or communications with Pamela Johnson about the | Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| **Page 237**<br>1      claim?<br>2   A.   No.<br>3   Q.   Did Pamela Johnson ever convey to you<br>4      that she wanted to know any information about the<br>5      underwriting of the policy in terms of the war<br>6      exclusions during the time frame that the Dig<br>7      claim was being tendered?<br>8   A.   No, I don't recall anything like<br>9      that.<br>10   Q.   What about Mr. Gutterman?<br>11   A.   No.<br>12   Q.   I would like to show you a document<br>13      previously marked as Exhibit 29. The first<br>14      e-mail in time appears to be an e-mail on ATL<br>15      001549 which is from Danny Gutterman on<br>16      Wednesday, July 16, 2014 at 11:50 a.m. to you.<br>17      Do you see that?<br>18   A.   I do.<br>19   Q.   He asked you to confirm that Dig had<br>20      been declared. Do you see that?<br>21   A.   I do. | Defendant's Objections: (237:1-25)<br>Record Objections.  These communications are not relevant to any remaining issues; waste of time.  FRE 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 22  Q.   And he was also asking if the Israel<br>23          portion was approved. Do you see that?<br>24  A.   I do.<br>25  Q.   Why was he asking you those questions | |
| Page 238<br>1          to the best of your understanding?<br>2    A.   If he was asking, I think something<br>3          may have came in and he wanted to make<br>              sure we<br>4          had coverage or that their production was<br>5          declared.<br>6    Q.   Okay. Did you respond to Mr.<br>7          Gutterman?<br>8    A.   Looking at this e-mail, I did.<br>9    Q.   You are looking at the response sent<br>10         by you on the 16th at 9:49 a.m.?<br>11   A.   Yes.<br>12   Q.   You indicated that the production Dig<br>13         was declared and that the filming in Israel<br>              had<br>14         been approved with terms. Do you see<br>              that?<br>15   A.   Yes, I do.<br>16   Q.   Do you recall sending this e-mail?<br>17   A.   No.<br>18   Q.   Do you have any reason to believe you<br>19         did not?<br>20   A.   No.<br>21   Q.   The e-mail chain goes on and Mr.<br>22         Gutterman asks you about the terms. Is<br>              that<br>23         right?<br>24   A.   So, let's see. What were the terms?<br>25         Yes. | Defendant's Objections:<br>(238:1-25)<br>Record Objections.  These<br>communications are not<br>relevant to any remaining<br>issues; waste of time.  FRE<br>401; 403<br><br><br>Plaintiff's Response:<br>Negotiations, underwriting,<br>communications re same<br>relevant to bad faith and<br>failure to investigate. See<br>Oppo to MIL 2 (Dkt 201);<br>UCP v. Atlantic, 929 F.3d at<br>1150; CACI 2332. |
| Page 239<br>1    Q.   Okay. Did you advise Mr. Gutterman<br>2          what those terms were?<br>3    A.   This doesn't really advise terms. It | Defendant's Objections:<br>(239:1-18, 21-25)<br>Record Objections.  These<br>communications are not |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 4    says we approve filming. NBC security team is to<br>5    remain involved and we require the production<br>6    work with the local production company.<br>7  Q.  Okay. There is also some additional<br>8    items about coordinating with local police and<br>9    indicating that filming on public streets and<br>10    public areas could not involve any car chases or<br>11    chase scenes, pyro, fires or fighting in a public<br>12    area. Do you see that?<br>13  A.  Yes, I do.<br>14  Q.  When you indicated that filming in<br>15    Israel was approved with terms, were you thinking<br>16    of some terms other than what is set forth in the<br>17    e-mail in Exhibit 29 that you sent?<br>18  A.  The e-mail in Exhibit 29.<br><br>21  Q.  Okay. In your response e-mail to Mr.<br>22    Gutterman that you sent at 9:49 a.m., you tell<br>23    him "The production Dig was declared and we<br>24    approve the filming in Israel with terms." Mr.<br>25    Gutterman responded and asked you what were the | relevant to any remaining issues; waste of time.  FRE 401; 403<br><br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 240<br>1    terms. Correct?<br>2  A.  Yes.<br>3  Q.  You then sent him a response e-mail<br>4    that contains the information that is set forth | Defendant's Objections: (240:1-25)<br>Record Objections.  These communications are not relevant to any remaining issues; waste of time.  FRE |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 5     in the e-mail that you sent at 6:03 p.m. Do you<br>6     see that?<br>7   A.   Yes.<br>8   Q.   So you sent this information in<br>9     response to his request for information about the<br>10    terms. Do you see that?<br>11   A.   Yes.<br>12   Q.   Are these the terms that OneBeacon<br>13    was requiring with respect to the shooting of Dig<br>14    in Israel?<br>15   A.   It appears so.<br>16   Q.   Are there any other terms of which<br>17    you are aware?<br>18   A.   Not off the top of my head.<br>19   Q.   Did you have any conversations with<br>20    anyone internal to Atlantic or OneBeacon about<br>21    the denial of the Dig claim during the summer of<br>22    2014?<br>23   A.   I don't recall.<br>24   Q.   Did you have any conversations with<br>25    Mr. Williams about the fact that the Dig claim | 401; 403<br><br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 241<br>1     was being denied?<br>2   A.   I know we talked about it.<br>3   Q.   What were your discussions?<br>4   A.   There were two things that come to<br>5    mind. One was we denied it because war began,<br>6    but there was also a portion of it in which I<br>7    think, if I don't know for sure I guess I am<br>8    stuck because I don't know exactly. I know bits<br>9    and pieces, but I think there was a call that | Defendant's Objections: (241:1-25)<br>Record Objections.  These communications are not relevant to any remaining issues; waste of time.  FRE 401; 403<br><br><br>Plaintiff's Response:<br>Relevant to bad faith and |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 10    Peter was involved in when they first thought<br>11    there was an issue and they were still in<br>12    Jerusalem, and as to if they left, what would<br>13    happen. So there was some conversation that<br>14    Peter discussed with me on that, but I don't<br>15    remember the exact issues.<br>16  Q.  Okay. Well, with respect to<br>17    conversations with him about the topic of the<br>18    claim was denied because a war began, who told<br>19    you that the claim was denied because a war<br>20    began?<br>21  A.  Those were my conversations with<br>22    Peter, the same conversation that I'm not<br>23    100 percent. You know, I can't recall to the<br>24    fullest.<br>25  Q.  Did Mr. Williams discuss with you why | failure to investigate. See CACI 2332. |
| Page 242<br>1    Atlantic considered it to be a war?<br>2  A.  Not at that time. Later down the<br>3    line I heard more about it, but at that point, no.<br>4 | Defendant's Objections: (242:1-9)<br>Record Objections.  These communications are not relevant to any remaining issues; waste of time.  FRE 401; 403<br><br>Plaintiff's Response: Relevant to bad faith and failure to investigate. See CACI 2332. |
| Page 253<br>6  Q.  Ms. Phillips, were you involved in<br>7    any conversations or meetings or communications | Defendant's Objections: (253:1-25)<br>Policy negotiation, renewals, applications not |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 8      regarding the renewal of the NBC<br>          Universal policy<br>9      that was in place from January 1, 2014<br>          through<br>10     June 30, 2015?<br>11  A.  Yes.<br>12  Q.  What was your involvement?<br>13  A.  I was the underwriter.<br>14  Q.  Was there a decision made not to<br>15          renew the policy?<br>16  A.  Okay. So you mean at the end of that<br>17          policy term was there a decision made not to<br>18          renew?<br>19  Q.  Yes.<br>20  A.  Yes.<br>21  Q.  Who made that decision?<br>22  A.  Dennis Crosby.<br>23  Q.  What is your understanding as to the<br>24          reasons why the policy was not renewed?<br>25  A.  That there were multiple reasons, one | relevant; waste of time.<br>FRE 401; 403<br><br><br><br><br>Plaintiff's Response:<br>Relevant to bad faith and<br>failure to investigate. See<br>Oppo to MIL 2 (Dkt 201);<br>UCP v. Atlantic, 929 F.3d at<br>1150; CACI 2332. |
| Page 254<br>1      being that the entertainment division<br>          within<br>2      OneBeacon was being reevaluated, and the<br>          reason<br>3      for that is to improve upon profitability,<br>          and in<br>4      doing that NBC was identified as one of<br>          other<br>5      clients that was falling in the category of<br>          not<br>6      being profitable, and so we would need to<br>          make<br>7      some changes to the terms and conditions,<br>          rates,<br>8      et cetera, that we were currently offering to<br>9      NBC. | Defendant's Objections:<br>(254:1-9)<br>Policy negotiation,<br>renewals, applications not<br>relevant; waste of time.<br>FRE 401; 403<br><br><br>Plaintiff's Response:<br>Relevant to bad faith and<br>failure to investigate. See<br>Oppo to MIL 2 (Dkt 201);<br>UCP v. Atlantic, 929 F.3d at<br>1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| Page 256<br>2  Q.  When did you first advise Ms. Weiss<br>3       that that was the situation?<br>4  A.  Well, one, when they got the<br>5       nonrenewal notice, so we explained to them what<br>6       that meant just as a courtesy, this is what is<br>7       going on, this account is being looked at, and<br>8       they were very honest with us as well in letting<br>9       us know that they would be taking the account out<br>10     and shopping it to other markets. | Defendant's Objections:<br>256:2-10<br>Policy negotiation, renewals, applications not relevant; waste of time. FRE 401; 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 257<br>3  Q.  So I just want to make sure I am<br>4       clear. You believe that in March or April of<br>5       2015 that you sent a letter to Ms. Weiss<br>6       providing a notice of potential nonrenewal. Is<br>7       that correct?<br>8  A.  No. The letter doesn't go to Ms.<br>9       Weiss, it goes to the insured. It is a form<br>10     letter so it is not sent by me. It is a form<br>11     letter, but I had a conversation as to what that<br>12     letter meant or why we were sending that letter.<br>13  Q.  Okay. So you did not send the<br>14     letter. It was a form letter, but who did send<br>15     it?<br>16  A.  Whoever sends out those letters in<br>17     operations. I don't know.<br>18  Q.  To the best of your recollection,<br>19     that is a letter that went out in March or April<br>20     of 2015? | Defendant's Objections:<br>(257:3-25)<br><br>Plaintiff's Response:<br>No objection listed, just line and page numbers.<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 21   A.   Yes.<br>22   Q.   Prior to the letter going out in<br>23        March or April 2015, did you have any<br>24        conversations with anyone at OneBeacon or<br>25        Atlantic about the potential for nonrenewal? | |
| Page 258<br>1   A.   Prior to the letter going out, you<br>2        said?<br>3   Q.   Yes.<br>4   A.   That is what made the letter go out,<br>5        so yes, that was the reason for the letter going<br>6        out.<br>7   Q.   Who did you have conversations with?<br>8   A.   I would say senior management. There<br>9        was concerns about the profitability of this<br>10       account. | Defendant's Objections:<br>(258:1-10)<br>Policy negotiation, renewals, applications not relevant; waste of time. FRE 401; 403<br><br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 269<br>4        (Exhibit 428, Document bearing Bates<br>5        numbers ATL 006989 through 7020, was so<br>6        marked for identification, as of this<br>7        date.)<br>8        BY MS. COYOCA:<br>9   Q.   Ms. Phillips, have you seen this<br>10       document before?<br>11  A.   I believe I have.<br>12  Q.   When did you see it?<br>13  A.   I believe at an underwriting meeting.<br>14  Q.   When did the underwriting meeting<br>15       occur?<br>16  A.   I'm not exactly sure when in 2016.<br>17  Q.   Okay. You previously indicated that<br>18       there were discussions during the period in | Defendant's Objections:<br>269:4-25<br>Underwriting, non-renewal of Policy, profibility entertainment division not relevant; prejudicial; waste of time. FRE 401; 403<br><br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| which<br>19   the decisions were being made about nonrenewal of<br>20   the 2014 through June 30, 2015 policy that NBC<br>21   Universal account had not been profitable,<br>22   correct?<br>23   A.   I just want to be clear because you<br>24     said it a little different than I.<br>25   Q.   Okay. | |
| Page 270<br>5   Q.   During that same time period of the<br>6     nonrenewal in June 2015 or in that time frame,<br>7     were there then discussions ongoing about the<br>8     decisions to shift the focus of OneBeacon<br>9     Entertainment in terms of their business?<br>10   A.   Yes.<br>11   Q.   What shift was occurring?<br>12   A.   OneBeacon was getting out of certain<br>13     lines of business as well as looking at accounts<br>14     that may have been within the lines that they<br>15     would continue moving forward with but were not<br>16     considered to be profitable.<br>17   Q.   And to the best of your knowledge,<br>18     who made that decision to shift the business<br>19     strategy for that division?<br>20   A.   That was coming from Mr. Crosby as<br>21     well.<br>22   Q.   How did you first learn about that<br>23     shift in strategy?<br>24   A.   We were having various discussions<br>25     on, as I mentioned, different accounts that were | Defendant's Objections:<br>(270:5-25)<br>Underwriting, non-renewal of Policy, profibility entertainment division not relevant; prejudicial; waste of time.  FRE 401; 403.<br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| | |
| Page 271 | Defendant's Objections: |
| 1    not profitable, and there was a whole segment of | (271:1-25) |
| 2    business that was considered to not be | Underwriting, non-renewal of Policy, profibility |
| 3    profitable, so there was some business areas that | entertainment division not relevant; prejudicial; waste |
| 4    OneBeacon decided they were going to pull out of | of time.  FRE 401; 403 |
| 5    altogether, and then there were other accounts | |
| 6    within an area that they would continue, but take | Plaintiff's Response: Relevant to bad faith and |
| 7    a look at those accounts on what could be done to | motive. See Oppo to MIL 2 (Dkt 201). |
| 8    improve upon the loss ratios or could we improve | |
| 9    upon the loss ratio. | |
| 10  Q.  Was Exhibit 428, this power point, an | |
| 11        exhibit that was used at an underwriting meeting | |
| 12        that you attended? | |
| 13  A.  Yes. | |
| 14  Q.  Who presented the power point? | |
| 15  A.  I think it was a couple of people | |
| 16        speaking, but at this point it was Joe | |
| 17        Fitzgerald, who succeeded Peter Williams. | |
| 18  Q.  Had you put any of the information | |
| 19        together that is contained in the power point for | |
| 20        Mr. Fitzgerald or anyone else? | |
| 21  A.  No. | |
| 22  Q.  Can you turn to page 14 of the | |
| 23        document. It is page 7002. There is a reference | |
| 24        to NBC Universal three-year WP 4.4 million/losses | |
| 25        6.0. Do you see that? | |
| Page 272 | Defendant's Objections: |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 1   A.   Yes.<br>2   Q.   What is that a reference to?<br>3   A.   In reading it, it is saying, written<br>4       premium of 4.4 for three years with losses of<br>5       6.0.<br>6   Q.   On page 18, number 7006, this slide<br>7       is titled "Motion Picture TV Results Below<br>8       Average." Do you see that?<br>9   A.   Yes, I do.<br>10   Q.   The very last line says "Kelly,<br>11       Wanda, Joe F. to develop plan in first quarter."<br>12       Do you see that?<br>13   A.   Yes.<br>14   Q.   What is that a reference to?<br>15   A.   Coming out with new underwriting<br>16       guidelines.<br>17   Q.   Is that something that you were asked<br>18       to do?<br>19   A.   Yes, I was.<br>20   Q.   Who asked you to do it?<br>21   A.   Joe Fitzgerald.<br>22   Q.   When did you leave OneBeacon?<br>23   A.   In April or May of 2016.<br>24   Q.   Why did you leave?<br>25   A.   Primarily for these reasons here. | (272:1-25)<br>Underwriting, non-renewal of Policy, profibility entertainment division not relevant; prejudicial; waste of time.  FRE 401; 403<br><br><br>Plaintiff's Response:<br>Relevant to bad faith and motive. See Oppo to MIL 2 (Dkt 201). |
| Page 273<br>1       The company was going in a different direction,<br>2       and I felt at some point that there were going to<br>3       be changes that I may not have wanted to wait<br>4       around on.<br>5   Q.   Okay, so were you asked to leave?<br>6   A.   No.<br>7   Q.   You decided to leave because there<br>8       were changes that you felt could impact | Defendant's Objections:<br>(273:1-10)<br>Underwriting, non-renewal of Policy, profibility entertainment division not relevant; prejudicial; waste of time.  FRE 401; 403<br><br><br>Plaintiff's Response:<br>Relevant to bad faith and |

| Plaintiffs' Designation of Wanda Phillips | Objection & Response |
|---|---|
| 9      your work?<br>10  A.  That's correct. | motive. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|

Plaintiffs' Designation of Peter Williams, February 1, 2017, Vol. 1  - CONFIDENTIAL

Page 7
21   Q.   Good morning, Mr. Williams. As I
22          indicated, my name is Lucia Coyoca, and I represent
23          the plaintiffs in this matter.
24          Could you please state your full name and
25          address for the record.

Page 8
1    A.   Peter Donald Williams, 2047 Malcolm
2          Avenue, Los Angeles, 90025.

Page 12
4    Q.   Okay. Why don't you just briefly describe
5          your educational background.
6    A.   So I have a degree in insurance matters
7          which was obtained from the City of London
8          University. And I have other qualifications in
9          claims handling, which were obtained from the
10         Institute of Insurance Adjusters, which is placed in
11         London.

25   Q.   Did you obtain any kind of certificate or

Page 13
1          degree from the Institute of Insurance?
2    A.   Yes. I'm an associate of the Chartered
3          Institute of Loss Adjusters.

19   Q.   Your degree from -- in insurance from the
20         City of London University, is that a bachelor's
21         degree or the equivalent of a bachelor's degree
22         under the British system?
23   A.   It's actually equivalent of a master's
24         degree.
25   Q.   Okay. Can you -- I'm sorry. What year

325

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| <u>Page 14</u><br>7  Q.  What -- just briefly, going back to 1977<br>8       forward, can you please describe your work<br>9       experience.<br>10  A.  I started in London as an insurance<br>11      broker. I then transferred to claims as an<br>12      insurance loss adjuster. I traveled to various<br>13      parts of the world, the Middle East, Athens,<br>14      Belgium, New York, and eventually ended up in<br>15      Los Angeles. | |
| <u>Page 18</u><br>22  Q.  Now, you said in 2009 you went to work for<br>23      OneBeacon; is that correct?<br>24  A.  Yes.<br><br>DEFENDANT'S COUNTER:<br>25  Q. So what was your first position with<br><br>DEFENDANT'S COUNTER:<br><u>Page 19</u><br> 1 OneBeacon?<br> 2   **A. Claims manager for OneBeacon**<br>3 **Entertainment.**<br>END DEFENDANT'S COUNTER<br><br>Page 19 (cont.)<br>13  Q.  What were your responsibilities when you<br>14      worked as a claims manager for OneBeacon<br>15      Entertainment?<br>16  A.  I was in charge of overseeing the claims<br>17      made by the policies issued by OneBeacon<br>18      Entertainment and for negotiating and settling the<br>19      claims that were within my authority<br><br><u>Page 20</u> | <u>Defendant's Counter:</u><br>18:25, 19:1-3.<br><br><u>Plaintiffs' Response:</u><br>Not necessary for completeness. Counter is separate question and answer. |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 23 Q.  Now, you indicated that you would handle<br>24      claims and adjust claims and perhaps settle<br>        claims<br>25      that were within your authority; is that<br>        correct?<br><br>Page 21<br>1  A.  Yes.<br>2  Q.  So in that period in May, 2009, when you<br>3      initially began working for the company, what<br>        was<br>4      your level of authority?<br>5  A.  I can't specifically recall.<br>6      Approximately $50 million, I believe.<br>7  Q.  So you could make a decision to settle a<br>8      claim so long as it was below the amount of<br>9      $50 million on your own authority; is that<br>        correct?<br>10 A.  Correct. I should explain, that was<br>11      the -- in the beginning you don't get any<br>        authority,<br>12      and then they increase it. So it was increased<br>        in<br>13      incremental amounts, probably 10 initially,<br>        25, and<br>14      then subsequently higher.<br>15 Q.  So when you first began working for<br>16      OneBeacon in May of 2009, what was your<br>        level of<br>17      authority?<br>18 A.  That would have been low, as it always is<br>19      when you're new to a company, maybe 5 or<br>        10 million.<br>20 Q.  And subsequently it increased; is that<br>21      correct?<br>22 A.  Correct.<br>23 Q.  Until it rose to the level of 50 million?<br>24 A.  I think so. Yes. Not that we had any<br>25      claims of that level.<br>Page 22 | Defendant's Objections:<br>(21:2-25) Levels of<br>authority of adjusters is<br>not relevant, confusing,<br>prejudicial, and a waste of<br>time as it has no bearing<br>on whether ASIC acted<br>unreasonably or without<br>proper cause or any other<br>issue in this case.  FRE<br>401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith.<br>Relevant to reasonableness<br>of decision that adjusters<br>consulted someone with<br>far greater authority level<br>than needed.  Relevant to<br>background of witness.<br>See Oppo to MIL 3 (Dkt<br>202). |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 19  Q.  How long did you work as a claims manager<br>20        for OneBeacon?<br>21  A.  Just over a year, maybe 15 months. I was<br>22        promoted in October of 2010.<br>23  Q.  And what were you promoted to?<br>24  A.  Initially I was promoted to head of<br>25        underwriting for OneBeacon Entertainment<br>          and shortly<br><br>Page 23<br>1        thereafter to president of OneBeacon<br>          Entertainment.<br>2   Q.  When did you -- when were you promoted to<br>3        president of OneBeacon Entertainment?<br>4   A.  Towards the end of October, 2010.<br><br>Page 30<br>13  Q.  Now, when you became president of<br>14        OneBeacon Entertainment in approximately<br>          late<br>15        October of 2010, what were your<br>          responsibilities?<br>16  A.  I was then the president of the<br>17        underwriting division. I was in charge of the<br>18        administration of the division, the<br>          underwriting<br>19        function, supervising the underwriters,<br>          supervising<br>20        the administration of the -- of the division<br>          from an<br>21        underwriting perspective.<br>22  Q.  And what, if any, relationship did you<br>23        have with respect to claims adjustment?<br>24  A.  None. It's kept entirely separate between<br>25        claims and underwriting.<br><br>Page 31<br>1   Q.  Even if you didn't have any formal<br>2        oversight or formal interaction with claims, | Defendant's Designations:<br>(31:1-22)  Loss ratios not<br>relevant to whether ASIC |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 3 did you have a practice of keeping in touch with claims with<br>4 respect to the claims that were being adjusted for<br>5 OneBeacon Entertainment?<br>6 A. Oh, yes. Because that obviously has a<br>7 direct -- loss ratio has a direct effect on<br>8 profitability.<br>9 Q. So when you say "loss ratio has a direct<br>10 effect on profitability," first of all, what do you<br>11 mean by the term "loss ratio"?<br>12 A. The ratio between the claims you pay<br>13 versus the premium you bring in.<br>14 Q. And so that profitability analysis focuses<br>15 on the company's -- the insured's premium that<br>16 they're being charged and being paid versus the<br>17 claims that the insured is experiencing; is that<br>18 right?<br>19 A. Yes. That's one aspect of it.<br>20 Q. Okay. What are the other aspects of it?<br>21 A. The expenses, the expense ratio, the<br>22 expenses of running the company. | acted unreasonably or without proper cause, causes confusion, prejudicial; waste of time; FRE 401; 403.<br><br>Plaintiffs' Response: Relevant to bad faith and damages.  See Oppo to MIL 2 (Dkt 201). |
| Page 35<br>11 Q. Yeah. I'm asking you what the profit<br>12 ratio was.<br>13 A. We tried to operate at a -- what they call<br>14 a 95 percent combined ratio, thus giving a profit<br>15 ratio of 5 -- 5 percent.<br>16 Q. So to paraphrase -- and please correct me<br>17 if I'm getting this wrong -- when you were serving<br>18 as president, you were looking for a profit ratio of<br>19 5 percent above the amount of the premium | Defendant's Designations: (35:11-21, 23) Profit ratio not relevant to whether ASIC acted unreasonably or without proper cause or any other issue in case; causes confusion; prejudicial; waste of time.<br><br>Plaintiffs' Response: Relevant to bad faith and damages.  See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| when all<br>20    expenses, fixed and variable, were combined with the<br>21    loss; is that right?<br><br>23    THE WITNESS: Yes. That's correct.<br><br>Page 42<br>12  Q.  Would you characterize the need to conduct<br>13     a thorough investigation as being a best practice in<br>14     claims handling?<br>15  A.  Yes.<br><br>Page 43<br>1   Q.  At the end of your time with OneBeacon<br>2     when you were president of the company, was it your<br>3     understanding that OneBeacon claims handlers needed<br>4     to be thorough in their investigation of OneBeacon<br>5     Entertainment claims?<br>6  A.  Yes.<br>7  Q.  Just based on your years of experience in<br>8     the industry, what do you consider to be best<br>9     practices in terms of completing a thorough<br>10    investigation?<br><br>12    THE WITNESS: Well, yeah. That's an<br>13    open-ended question, depending on the type of claim.<br>14    So it can be a simple claim. It can be a<br>15    complicated claim. But to obtain a full<br>16    understanding of the circumstances of the loss and<br>17    the applicability of policy language.<br><br>Page 47 | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objections: |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 6　　When you're reviewing the policy language,<br>7　　do you make a determination -- for example, when you<br>8　　were claims manager at OneBeacon, would you make a<br>9　　determination as to the applicability of the policy<br>10　　language by yourself without consulting with anyone<br>11　　else?<br>12　A.　It would depend on the type and size of<br>13　　the claim. But I could.<br>14　Q.　What if you had a question about the<br>15　　language where you weren't sure whether or not it<br>16　　applied? What would you do in that circumstance?<br>17　A.　I could discuss it with my superior,<br>18　　Bonnie Henderson.<br>19　Q.　Any other options that you could exercise<br>20　　in order to try to determine the applicability of<br>21　　the policy language?<br>22　A.　Well, if we felt it necessary, we could<br>23　　request outside counsel for a legal opinion or<br>24　　inside counsel for a legal opinion. | (47:6-24)<br>Reference to retaining outside opinion not relevant; prejudicial; waste of time.  FRE 401; 403.<br><br>Plaintiffs' Response:<br>Relevant to bad faith and failure to investigate. CACI 2332. |
| Page 58<br>14　Q.　When did NBCUniversal begin to be insured<br>15　　for purposes of its production portfolio by<br>16　　OneBeacon?<br>17　A.　I believe that was 2010, as far as I<br>18　　recall.<br>19　Q.　Were you involved in the negotiations with<br>20　　NBCUniversal with respect to the coverage?<br>21　A.　Yes. | Defendant's Objections<br>(58:14-25)<br><br>Reference to Policy negotiations not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403 |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| | <u>Plaintiffs' Response:</u> Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| <u>Page 64</u><br>12  Q.  Okay. So the 2010 policy, the production<br>13       portfolio policy that was issued to NBCUniversal,<br>14       was that policy renewed?<br>15  A.  Yes.<br>16  Q.  For several years?<br>17  A.  Yes.<br>18  Q.  When was the last NBCUniversal OneBeacon<br>19       policy, to the best of your recollection?<br>20  A.  I have to backtrack because I think the<br>21       last one was an 18-month period. So that was a<br>22       little strange.<br>23       So '15, we would have renewed it in 2013,<br>24       I believe was the last one.<br>25  Q.  And it expired as of July, 2015?<br><br><u>Page 65</u><br>1  A.  I believe that was the case. Yes. | |
| <u>Page 66</u><br>8  Q.  What was your role in the renewal process?<br>9  A.  The broker would reach out primarily to<br>10      Wanda Phillips as the lead underwriter, indicate any<br>11      changes that they wanted to make to the policy<br>12      language, ask what we felt, in terms of terms and | <u>Defendant's Objections</u> (66:8-66:24) Renewal processes for the Policy not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 13 conditions. Invariably the broker would ask for a<br>14 reduction in the premium.<br>15 And so I would have discussions with Wanda<br>16 Phillips. We would run loss runs, talk with claims<br>17 to see where claims was going, how much of the SIR<br>18 was to be spent or expended, discuss any language<br>19 changes the broker was requesting.<br>20 Q. You indicated that Wanda Phillips would<br>21 run loss runs; is that correct?<br>22 A. Yes.<br>23 Q. And did you review those loss runs?<br>24 A. Yes. | a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response: Relevant to bad faith. See Oppo to MIL 2 (Dkt 201). |
| Page 74<br>6 Q. Okay. Turning to Exhibit 1, are you<br>7 familiar with this document?<br>8 A. Yes.<br>9 Q. What is it?<br>10 A. It's the insurance policy issued to<br>11 NBCUniversal Media for the period effective<br>12 January 1, 2014.<br>13 Q. So when you previously indicated that<br>14 there -- the last policy was an 18-month policy, is<br>15 this the policy to which you were referring?<br>16 A. Yes.<br>17 Q. Okay. This policy incepted on January 1,<br>18 2014.<br>19 Do you see that?<br>20 A. Yes.<br>21 Q. So to the best of your understanding, the<br>22 renegotiations as to the renewal of the policy would<br>23 have occurred approximately September 30, 2013?<br>24 A. Began probably. Yes. | Defendant's Objections (74:6-25)<br>Renewal process and negotiation of the Policy not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response: Relevant to bad faith. See Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 25  Q.   What involvement did you have with respect | |
| Page 75 | Defendant's Objections |
| 1        to the renegotiation of this policy, Exhibit 1? | (75:1-7) |
| 2   A.   Well, specifically I -- you know, I can't | Renewal process and |
| 3        recall. But as I testified, I would have been | negotiation of the Policy |
| 4        involved with discussions with the broker. | not relevant to any of |
|          Wanda -- | Plaintiffs' claims for |
| 5        and Wanda Phillips reviewed loss ratios, | breach of the contract or |
|          projected | duty of good faith or |
| 6        premiums, any changes in language that the | damages; this testimony is |
|          broker | a waste of time; causes |
| 7        requested. | confusion; is prejudicial. |
| | Fed. R. Evid. 401; 403 |
| | |
| | Plaintiffs' Response: |
| | Relevant to bad faith. See |
| | Oppo to MIL 2 (Dkt 201). |
| Page 76 | Defendant's Objections |
| 17  Q.   With respect to this particular policy, | (76:17-25) |
| 18       the 2014 to June, 2015 policy, did you meet | Policy negotiations, |
|          with | underwriting, profitability |
| 19       Ms. Garber and/or Ms. Weiss to discuss the | not relevant to any of |
|          policy | Plaintiffs' claims for |
| 20       terms? | breach of the contract or |
| 21  A.   Yes. I believe so. | duty of good faith or |
| 22  Q.   What meeting or meetings do you recall in | damages; this testimony is |
| 23       that regard? | a waste of time; causes |
| 24  A.   I remember we had a meeting at the offices | confusion; is prejudicial. |
| 25       of Aon in Los Angeles. | Fed. R. Evid. 401; 403 |
| | |
| | Plaintiffs' Response: |
| | Relevant to bad faith and |
| | failure to investigate. See |
| | Oppo to MIL 2 (Dkt 201); |
| | UCP v. Atlantic, 929 F.3d |
| | at 1150; CACI 2332. |
| Page 77 | Defendant's Objections |
| 1   Q.   Approximately when did that meeting occur? | (77:7-25) |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 2  A.  Sometime prior to renewal. So probably -- <br> 3  probably early on, September time, 2013, to the best <br> 4  I can recall. <br> 5  Q.  And who attended that meeting? <br> 6  A.  Myself; I believe Wanda Phillips was <br> 7  visiting; Andrea, Susan Weiss, and maybe one or two <br> 8  other people from Aon who worked on the account. <br> 9  Q.  To the best of your recollection, what was <br> 10  discussed? <br> 11  A.  The claims, the involvement of the SIR on <br> 12  the previous policy, what NBC intended to do in the <br> 13  future, level of production they intended to incur, <br> 14  what Aon was seeking for renewal terms. <br> 15  Q.  Let's break that apart. <br> 16  What was discussed with respect to claims? <br> 17  A.  What claims had occurred, what claims were <br> 18  still outstanding to be settled, what was the best <br> 19  estimate of those claims. <br> 20  Q.  At the time of renegotiations of the <br> 21  2014-15 policy, you had reviewed the loss runs for <br> 22  the prior year; is that right? <br> 23  A.  Yes. <br> 24  Q.  And did you have any concerns with respect <br> 25  to the level of loss that had been incurred during | Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403 <br><br> Plaintiffs' Response: <br> Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 78 <br> 1  the prior policy period? <br> 2  A.  I believe I did. There had been <br> 3  substantial claims, and we predicted the SIR was <br> 4  going to be exceeded. <br> 5  Q.  And that was for the 2013 policy; is that | Defendant's Objections (78:1-9) <br> Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 6        right? <br> 7    A.   I believe so. Yes. <br> 8    Q.   And, in fact, was it? <br> 9    A.   I believe it was. Yes. <br><br> 14   Q.   As you -- in your mind, as you track the <br> 15        performance of the policy from 2010 forward, do you <br> 16        recall whether or not the policy was not profitable <br> 17        from year to year? <br> 18   A.   I remember there was one year it was <br> 19        profitable. Maybe the first year. Then after that <br> 20        substantial losses were incurred. <br> 21   Q.   Every year? <br> 22   A.   Yes. <br> 23   Q.   That's your best recollection? <br> 24   A.   Yes. <br> 25   Q.   And how did you determine that? <br><br><br><br><br><br><br><br><br> Page 79 <br> 1    A.   I don't understand the question. Sorry. <br> 2    Q.   How did you determine whether or not it <br> 3         was profitable from year to year? <br> 4    A.   By the level of losses which occurred in <br> 5         relation to the premium. | duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403 <br><br> Plaintiffs' Response: <br> Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. <br><br> Defendant's Objections (78:14-25) <br> Losses, profitability of the account, premium not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403 <br><br> Plaintiffs' Response: <br> Relevant to bad faith. See Oppo to MIL 2 (Dkt 201) <br><br> Defendant's Objections (79:1-5) <br> Losses, profitability of the account, premium not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| | a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403 |
| | Plaintiffs' Response: Relevant to bad faith. See Oppo to MIL 2 (Dkt 201) |
| Page 80<br>3   Q.   Okay. So when you say that a policy was<br>4         not profitable, what dollar amount needs to be<br>5         experienced before you determine that it is not<br>6         profitable? For example, is it that it exceeds the<br>7         premium amount by $1, $10, $1 million? What's the<br>8         amount that demonstrates to you profitability or<br>9         unprofitability?<br>10   A.   If the losses exceed the premium by $1,<br>11         the policy is not profitable by definition. | Defendant's Objections (80:3-80:11) Losses/profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403 |
| | Plaintiffs' Response: Relevant to bad faith. See Oppo to MIL 2 (Dkt 201) |
| Page 82<br>18   Q.   Can you please turn to Bates control<br>19         ATL003103. That would be the Section III - Extra<br>20         Expense portion of the policy. And the Bates<br>21         numbers are those that are stamped on the right<br>22         corner.<br><br>Page 83<br>1   Q.   Are you familiar with this section of the<br>2         policy?<br>3   A.   Yes.<br>4   Q.   What is extra expense coverage?<br>5   A.   It grants coverage for the extra expense<br>6         to complete a production in the event of primarily | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 7    physical loss or damage to facilities or<br>       property.<br><br>Page 93<br>4   Q.  Okay. Is there a terrorism exclusion in<br>5       this policy?<br>6   A.  No.<br><br>Page 94<br>4   Q.  And in the entire policy, is there a<br>5       terrorism exclusion that appears and applies to any<br>6       of the coverage parts?<br>7   A.  No. I don't believe so.<br><br>Page 96<br>5   Q.  After 9/11, in your experience, was there<br>6       a growth of exclusions for terrorism being applied<br>7       in insurance policies by the insurance industry?<br>8   A.  Yes.<br><br><br><br><br><br><br><br><br><br><br><br><br>Page 98 | <br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objections<br>(96:5-8)<br>Whether there terrorism exclusions increased in insurance industry after 9/11 not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith; relevant to witness' knowledge of industry meaning of war exclusions; relevant to reasonable expectation of the parties |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 15 Q. Okay. Referring back to Exhibit 1. And<br>16    I'm on page 3083, Mr. Williams.<br>17    Are you there?<br>18 A. Yes.<br>19 Q. The section labeled III, "Exclusions<br>20    Applicable to All Sections of this Policy" --<br>21    Do you see that?<br>22 A. Yes.<br>23 Q. -- I want to ask you some questions about<br>24    this section.<br>25    First of all, what's your understanding of<br><br>Page 99<br>1    what this exclusion applies to?<br>2 A. Well, these -- these series of exclusions<br>3    apply to war, warlike action, insurrection,<br>4    rebellion, and radioactive war, nuclear war.<br><br>21 Q. I just want to use the terminology that<br>22    you're comfortable with.<br>23    Colloquially, do you refer to it as the<br>24    war exclusions?<br>25 A. These --<br><br>Page 100<br>1 Q. 1 through 5?<br>2 A. 1 through 5, yes, the war exclusions.<br>3 Q. Okay. Prior to the DIG claim, had you<br>4    ever been involved in considering whether one of the<br>5    five enumerated war exclusions should apply to a<br>6    claim at any point in your career?<br>7 A. Yes.<br>8 Q. When?<br>9 A. Following 9/11, the incidents in 9/11.<br>10 Q. And a series of incidents that arose out<br>11    of 9/11 -- or excuse me. A series of claims that<br>12    arose out of 9/11? | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objections<br>100:2-25:  reference to other claims not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith. Oppo to MIL 3 (Dkt 202) |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 13  A.  Yes.<br><br>21  Q.  Okay. Approximately how many such claims<br>22      were you involved in?<br>23  A.  10 or 12.<br>24  Q.  Generally, if it is common to all 10 or<br>25      12, were these claims relating to<br>        entertainment | |
| Page 101<br>1       productions that were stopped?<br>2   A.  Yes. Or music productions.<br><br>6   Q.  Was there a war exclusion or a series of<br>7       war exclusions in the insurance policies that<br>8       covered the losses that you're referring to<br>        right<br>9       now, if you recall, just generally?<br><br>11      THE WITNESS: Yes, there was.<br><br>13  Q.  And is it your recollection that there<br>14      was -- there were war exclusions in each of the<br>15      policies that concerned the 10 to 12 post 9/11<br>16      losses that you adjusted?<br>17  A.  Yes.<br>18  Q.  Was the war exclusion applied to any of<br>19      those losses?<br><br>21      THE WITNESS: Ultimately, no.<br><br>23  Q.  Were there any terrorism exclusions in any<br>24      of the policies that applied to the 10 to 11 [sic]<br>25      post 9/11 claims that you adjusted? | Defendant's Objections<br>(101:1-2, 6-9, 11, 13-18, 21)<br>reference to other claims not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401;<br><br>Plaintiffs' Response:<br>Relevant to bad faith. Oppo to MIL 3 (Dkt 202)<br><br>Defendant's Objection:<br>101:23-25<br>reference to other claims, not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response: |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| | Relevant to bad faith. Oppo to MIL 3 (Dkt 202) |
| Page 102<br>1  A.  No.<br>2  Q.  If you can answer generally as to all 10<br>3      to 12 of the delays in production that were a result<br>4      of the 9/11 situation, were -- was there a payout on<br>5      each of the claims?<br>6  A.  Yes. | Defendant's Objections 102:1-6 reference to other claims, not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response: Relevant to bad faith. Oppo to MIL 3 (Dkt 202) |
| Page 103<br>2  Q.  How is Atlantic Specialty Insurance<br>3      Company affiliated with OneBeacon Insurance?<br>4  A.  To my knowledge, they're a wholly owned<br>5      company.<br>6  Q.  And what is the relationship between<br>7      Atlantic Specialty Insurance and OneBeacon<br>8      Entertainment?<br>9  A.  OneBeacon Entertainment had authority to<br>10     write insurance policies on Atlantic Specialty<br>11     Insurance Company's paper.<br>12 Q.  And what do you mean by Atlantic's paper?<br>13     Their forms? Their forms of insurance?<br>14 A.  Yes. Their forms of insurance and -- and<br>15     OneBeacon owned several companies. So we had<br>16     authority to write on different companies. | Defendant's Objections (103:2-103:16) Corporate relationship between ASIC and One Beacon Defendant's Objections reference to other claims, not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial; additionally, lack of foundation. Fed. R. Evid. 401; 403; 602.<br><br>Plaintiffs' Response: |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| | Relevant to bad faith; statement of party opponent; foundation present. Witness is company high level executive. Oppo to MIL 3 (Dkt 202). |
| Page 104<br>2  Q.  And the relationship to Atlantic Specialty<br>3      Insurance Company to OneBeacon Entertainment, you've<br>4      indicated that OneBeacon Entertainment had the<br>5      authority to write policies on Atlantic's insurance<br>6      forms; is that correct?<br>7  A.  Yes. | Defendant's Objections (104:2-104:7) Corporate relationship between ASIC and One Beacon Defendant's Objections reference to other claims, not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial; additionally, lack of foundation.Fed. R. Evid. 401; 403; 602.<br><br>Plaintiffs' Response: Relevant to bad faith; statement of party opponent; foundation present. Witness is company high level executive. Oppo to MIL 3 (Dkt 202). |
| Page 111<br>10  Q.  What, if anything, stands out in your mind<br>11      with respect to that renewal process, the 2014-15 | Defendant's Objections 111:10-111:22 Renewal processes for Policy, losses, premium |

342

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 12     renewal process?<br>13  A.  There had been many claims on NBC, and so<br>14     an analysis of the losses, the types of losses we<br>15     were seeing and an analysis of whether we wanted to<br>16     do the 18-month policy and what level of premium and<br>17     SIR we needed to make that work.<br>18  Q.  At that point in time, discussions re<br>19     renewal for the 2014-15 policy, were you considering<br>20     non-renewing the policy?<br>21  A.  I don't -- no, I don't think we considered<br>22     non-renewing. No. | and SIR <u>Defendant's Objections</u><br>Corporate relationship between ASIC and One Beacon<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith; statement of party opponent; foundation present. Oppo to MIL 2 (Dkt 201).<br><br><u>Defendant's Objections</u><br>reference to other claims, not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial; additionally, lack of foundation.<br>Fed. R. Evid. 401; 403.<br><br><u>Plaintiffs' Response:</u><br>Relevant to bad faith; statement of party opponent; foundation present. Oppo to MIL 2 (Dkt 201). |
| <u>Page 140</u><br><br>21     MS. COYOCA: I'm going to mark as the next<br>22     exhibit, Exhibit 5, an e-mail chain that's labeled<br>23     ATL000794 through 796.<br>24     (Exhibit 5 was marked | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| Page 141<br>10  Q.  This e-mail chain, the entire thing,<br>11      appears to be about adding a new production to the<br>12      policy; is that right?<br>13  A.  Yes.<br>14  Q.  Okay. And it was a production that was<br>15      going to be filmed in Israel.<br>16      Do you see that?<br>17  A.  Yes.<br>18  Q.  Did each individual production need to be<br>19      added to the policy as an insured production?<br>20  A.  Yes. Yes. As a TV show. Yes.<br><br>Page 142<br>5  Q.  In the -- in the first e-mail from<br>6      Ms. Garber to Ms. Phillips, at the conclusion of the<br>7      e-mail she asked, "Please let me know what your<br>8      concerns may be on this."<br>9      Do you see that?<br>10  A.  Yes.<br>11  Q.  What concerns did OneBeacon have with<br>12      respect to the filming of a television production in<br>13      Israel?<br>14  A.  The safety of the cast and crew with<br>15      relation to any potential terrorist activities or<br>16      interruption to production, as well as the usual,<br>17      issues of filming overseas, travel delays,<br>18      et cetera.<br>19  Q.  But the first concern was the safety of<br>20      the cast and crew with relation to any potential<br>21      terrorism activities; is that right?<br>22  A.  Yes. Or interruption of production as a<br>23      result of that. | Defendant's Objections (142:5-25)<br>Discussions regarding addition of "Dig" to Policy not relevant to any of Plaintiffs' claims; "Dig" was added subject to terms and conditions of the Policy; not relevant to claim for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith. Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 24  Q.   Did you discuss those concerns with<br>25        Ms. Phillips?<br><br>Page 143<br>1   A.   Yes.<br>2   Q.   What did you discuss with her?<br>3   A.   We needed to know where they would be<br>4        filming, were they inside a studio, a<br>         controlled<br>5        environment, what security measures would<br>         they be<br>6        taking, how much filming would they be<br>         doing in<br>7        Jerusalem, what type of filming, to get an<br>8        understanding of exactly, you know, what this<br>9        production entailed in Israel, other than two<br>         lines<br>10       that they gave us in the e-mail.<br><br><br><br>Page 144<br>13  Q.   Okay. At the time that this initial<br>14       period of discussion about adding DIG as an<br>         insured<br>15       production, was there any discussion about<br>         any<br>16       increase in premium or increase in the SIR as<br>         a<br>17       result of shooting in a location, a foreign<br>18       location, where there would be the possibility<br>         of<br>19       terrorism?<br>20  A.   Not that I specifically recall.<br><br>Page 145<br>18  Q.   I understand you probably can't recall the | Defendant's Objections<br>(143:4-10)<br>Discussions regarding<br>addition of "Dig" to Policy<br>not relevant to any of<br>Plaintiffs' claims; "Dig"<br>was added subject to terms<br>and conditions of the<br>Policy; not relevant to<br>claim for breach of the<br>contract or duty of good<br>faith or damages; this<br>testimony is a waste of<br>time; causes confusion; is<br>prejudicial. Fed. R. Evid.<br>401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith.<br>Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 19   details of the timing of such conversations. But | |
| 20   generally can you describe for me what your | |
| 21   conversations were with Ms. Phillips about the | |
| 22   addition of a production that was going to be shot | |
| 23   in Israel. | |
| 24  A.  Yes. It didn't concern me too much as | |
| 25   long as it was going to be mainly in Tel Aviv, in a | |
| | |
| Page 146 | Defendant's Objections |
| 1   controlled environment such as a studio. They make | 146:23-25 Discussion regarding |
| 2   television shows in Israel all the time. So it was | addition of "Dig" to Policy not relevant to Plaintiffs' |
| 3   kind of, okay, if they're not going to the -- maybe | claims for breach of the contract or duty of good |
| 4   to the West Bank or close to the West Bank where the | faith or damages; this testimony is a waste of |
| 5   suicide bombers tend to be, Jerusalem, where the | time; causes confusion; is prejudicial. |
| 6   suicide bombers tend to be, it was -- it was find | Fed. R. Evid. 401; 403 |
| 7   out more information. This is not necessarily | |
| 8   something we would say, "Absolutely not. We can't | Plaintiffs' Response: Relevant to bad faith. |
| 9   do this." | Oppo to MIL 2 (Dkt 201). |
| 10  Q.  Okay. You've indicated that one of the | |
| 11   factors was that you were looking to whether or | |
| 12   not -- what the location was in terms of it being a | |
| 13   controlled environment. | |
| 14   And you wanted to assess whether or not it | |
| 15   was going to be an area where suicide bombers tend | |
| 16   to be, such as in the West Bank or possibly in | |
| 17   Jerusalem; is that correct? | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 18  A.   That was one of my concerns. Yes.<br>19  Q.   Okay. And were you -- were you aware of<br>20        the possibility of suicide bombers in Israel at this<br>21        point in time, at the end of 2013?<br>22  A.   Yes.<br>23  Q.   And what group or groups were you aware of<br>24        that were engaged in activities -- in suicide<br>25        bombing activities in Israel during that period?<br><br>Page 147<br>1   A.   Oh, I don't know that I knew the names of<br>2        the groups. I assume they were, in the general<br>3        term, Palestinians.<br><br>23        I want to mark as the next exhibit -- I<br>24        believe we're at Exhibit 6 -- an e-mail exchange,<br>25        and it's labeled AONNBCU0001478 through 1568. | Defendant's Objections<br>147:1-3<br>Discussion regarding addition of "Dig" to Policy not relevant to Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith.<br>Oppo to MIL 2 (Dkt 201).<br><br>Defendant's Objection:<br>147:19-25<br>Discussion regarding application for Policy/Dig not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; undisputed that "Dig" was added to Policy, subject to all terms and conditions; this testimony |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
|  | is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403 |
|  | Plaintiffs' Response: Relevant to bad faith. Oppo to MIL 2 (Dkt 201). |
| Page 148<br>21 Q.   And then the second sentence in the<br>22        paragraph says, begin quotes:<br>23        "This is the production that I briefly<br>24        discussed with Wanda and Peter the week before<br>25        last that is shooting in Israel. It has now | Defendant's Objections<br>(148:21-25)<br>Discussion regarding addition of "Dig" to Policy not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; undisputed that "Dig" was added to Policy, subject to all terms and conditions; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response: Relevant to bad faith. Oppo to MIL 2 (Dkt 201). |
| Page 149<br>1        been officially greenlit," period, close<br>2        quotes.<br>3        Do you see that?<br>4 A.   Yes.<br><br>16 Q.   She references an application that was<br>17        attached.<br>18 A.   Yes. | Defendant's Objections<br>149:1-4<br>Discussion regarding addition of "Dig" to Policy not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; undisputed that |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 19 Q. Do you see the reference?<br>20 A. Yes.<br>21 Q. And then there is an application as --<br>22     Television Insurance Application on an Aon form<br>23     that's at document page No. 1568.<br>24     Do you see that?<br>25 A. Yes. | "Dig" was added to Policy, subject to all terms and conditions; this testimony is a waste of time; causes confusion; is prejudicial.<br><br>Fed. R. Evid. 401; 403<br><br><br>Plaintiffs' Response:<br>Relevant to bad faith.<br>Oppo to MIL 2 (Dkt 201).<br><br><br>Defendant's Objection:<br>149:16-25<br>Discussion regarding application for Policy/Dig not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; undisputed that "Dig" was added to Policy, subject to all terms and conditions; this testimony is a waste of time; causes confusion; is prejudicial.<br><br>Fed. R. Evid. 401; 403<br><br><br>Plaintiffs' Response:<br>Relevant to bad faith.<br>Oppo to MIL 2 (Dkt 201). |
| Page 150<br>12 Q. Okay. In the paragraph that is the last<br>13     paragraph on page 1418, Ms. Garber --<br>14 A. Yes. | Defendant's Objections<br>(150:12-25)<br>Policy negotiation, potential terms, premiums |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 15 Q. -- indicates, begin quotes, "We would like<br>16    to avoid any deviation from our standard policy<br>17    terms, if possible," close quotes.<br>18    Do you see that?<br>19 A. Yes.<br>20 Q. Was there a mechanism pursuant to which<br>21    OneBeacon could have deviated from the policy terms<br>22    and sought more money from NBCUniversal for shooting<br>23    this DIG production in Israel?<br>24 A. Yes.<br>25 Q. What was that mechanism?<br><br>Page 151<br>1 A. Well, as each production is declared and<br>2    underwritten, which could seek to change or modify<br>3    the terms of the policy, applicable to that<br>4    production.<br>5 Q. And was there a discussion, do you recall,<br>6    about increasing the amount of the self-insured<br>7    retention as a result of shooting in Israel?<br>8 A. Not that I recall.<br>9 Q. So the only deviation that would have --<br>10    from the policy terms which would have been a<br>11    possibility would have been the higher charge in<br>12    premium for this particular production; is that<br>13    right?<br>14 A. No. I could have -- there could have been<br>15    a variety of things, increased deductibles, higher<br>16    premium, potential exclusion of filming in certain | not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; undisputed that "Dig" was added to Policy, subject to all terms and conditions; this testimony is a waste of time; causes confusion; is prejudicial.<br><br>Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith.<br>Oppo to MIL 2 (Dkt 201).<br><br>Defendant's Objections<br>(151:1-18)<br>Policy negotiation, potential terms, premiums not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; undisputed that "Dig" was added to Policy, subject to all terms and conditions; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith.<br>Oppo to MIL 2 (Dkt 201). |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 17　　　areas. I mean, there was a variety of ways we could<br>18　　　have discussed it.<br><br><u>Page 158</u><br>22　Q.　And then at the bottom of page 1418,<br>23　　　Ms. Garber indicates, "Please confirm coverage at<br>24　　　your earliest opportunity."<br>25　　　Do you see that?<br><br><u>Page 159</u><br>1　A.　Yes.<br>2　Q.　So she is asking for OneBeacon to confirm<br>3　　　that DIG will be added as an insured production, is<br>4　　　she not?<br>5　A.　Yes.<br><br>17　Q.　And then Ms. Milinovic responds in the<br>18　　　next e-mail to Andrea Garber on December 12 that it<br>19　　　was okay to declare DIG Season 1 to the current<br>20　　　policy.<br>21　　　Do you see that?<br>22　A.　Which one?<br>23　Q.　So if you go down to the bottom of<br>24　　　page 1480 --<br>25　A.　Yes.<br><br><u>Page 160</u><br>1　Q.　-- there is an e-mail from Bernadette<br>2　　　Milinovic to Andrea Garber dated December 12.<br>3　　　Do you see that?<br>4　A.　Oh. Yes. Yes. I have it.<br>5　Q.　And she indicates to Andrea that it was<br>6　　　okay to declare DIG Season 1 to the current | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| policy.<br>7    Do you see that?<br>8  A.  Yes.<br><br>Page 163<br>19  Q.  Do you recall there being any information<br>20       or assessment being done of the conditions in Israel<br>21       in December or -- 2013 or January, 2014, when DIG<br>22       was being added as an insured production?<br>23  A.  By whom? Sorry.<br>24  Q.  I want to know if you became aware from<br>25       any source, from anyone at OneBeacon, as to such an | Defendant's Objections<br><br>163:19-25<br>Communications regarding potential addition of "Dig" to Policy not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; undisputed that "Dig" was added to Policy, subject to all terms and conditions; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith. Oppo to MIL 2 (Dkt 201). |
| Page 164<br>1       assessment being done.<br>2  A.  Oh. No. I can't recall. | Defendant's Objections<br><br>164:1-7<br>Communications regarding potential addition of "Dig" to Policy not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; undisputed that "Dig" was added to Policy, subject to all terms and conditions; this testimony is a waste of time; causes confusion; is prejudicial. |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| | Fed. R. Evid. 401; 403 |
| | |
| | Plaintiffs' Response: |
| | Relevant to bad faith. |
| | Oppo to MIL 2 (Dkt 201). |

Page 185
7   Q.   With respect to that time frame, July 10,
8         when did you first hear about the DIG claim?
9   A.   Clarify "DIG claim."
10  Q.   The DIG claim that is the subject of this
11        lawsuit.
12  A.   Just -- the exact date, it was around
13        about that time. I believe it was a Friday
14        afternoon. So it would have been about then.
15  Q.   How did you become aware of it?
16  A.   I recall receiving a phone call, I
17        believe, from Susan Weiss. But it was Susan Weiss
          and Andrea Garber on the phone.
18
19  Q.   And what did they tell you?
20  A.   Well, specifically I can't recall the
21        exact language. But they told me they had had
22        advice from their security people that there was
23        some hostilities going on in Israel. The security
24        people could not guarantee the safety of the cast
25        and crew. And a decision had been made to delay

Page 186
1         sending the cast and crew back to Israel for one
2         week.
3   Q.   Do you recall any other specifics that
4         they told you about the situation?
5   A.   No.

353

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| Page 193 | |
| 9   Q.   Did you indicate to Ms. Garber and | |
| 10         Ms. Weiss that you believed that the one-week push | |
| 11         before production recommenced was reasonable or | |
| 12         justified based on the information that had been | |
| 13         provided? | |
| 14   A.   I believe I would have said, "It sounds | |
| 15         reasonable based on the information you're giving to | |
| 16         me." | |
| | |
| 23   Q.   What happened next with respect to this | |
| 24         DIG claim? | |
| 25   A.   As far as I recall, they sent in a formal | |
| | |
| Page 194 | |
| 1          notice of claim I believe a few days later, maybe | |
| 2          the Tuesday of the following week. | |
| | |
| Page 196 | |
| 11   Q.   You indicated that you believe the next | |
| 12         thing that happened after that Friday, late Friday | |
| 13         afternoon call, is that NBCUniversal submitted a | |
| 14         formal claim the following Tuesday; is that right? | |
| 15   A.   I believe so. | |
| 16   Q.   Okay. And that would put us at July 15; | |
| 17         is that right? | |
| 18   A.   Yes. | |
| | |
| Page 198 | |
| 4    Q.   After NBCUniversal submitted a claim, to | |
| 5          the best of your recollection, on the 15th, | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| what was<br>6      your next involvement?<br>7   A.  I think I had a discussion with Pamela<br>8      Johnson. I believe I would have told her about the<br>9      call on -- on Friday and discussed in general terms<br>10     the claim would have been submitted.<br>11  Q.  When did you have that call with<br>12     Ms. Johnson?<br>13  A.  I can't recall. I believe sometime that<br>14     day, maybe the next.<br>15  Q.  So to the best of your recollection, that<br>16     conversation took place either on the 15th or the<br>17     16th; is that correct?<br>18  A.  Yes. As best as I can recall.<br>19  Q.  What did you tell Ms. Johnson about the<br>20     potential claim -- or, actually, it was a claim at<br>21     that point.<br>22     What did you tell Ms. Johnson about the<br>23     claim?<br>24  A.  I think we had a discussion that they were<br>25     making the claim under imminent peril; that they had<br><br>Page 199<br>1      said they could not guarantee the safety of their<br>2      crew. It seemed like a sensible suggestion not to<br>3      send them back into Israel.<br>4      I think Ms. Johnson said, based on the<br>5      hostilities and where they were at at that point,<br>6      there was a possibility the war risk exclusions in<br>7      the policy could be -- could be applicable.<br>8   Q.  And what was your response, if any? | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 9  A.  I -- my response -- I can't recall the<br>10      exact words. My response would have been,<br>        "You need<br>11      to investigate the claim and -- and handle it<br>12      accordingly."<br><br>Page 200<br>10  Q.  Prior to Ms. Johnson mentioning it to you,<br>11      had you considered the applicability of the<br>        war<br>12      exclusion?<br>13  A.  I hadn't considered anything. No.<br>14  Q.  When you indicated to her that she needed<br>15      to investigate, what did you mean by that?<br>16  A.  Exactly that. She should investigate the<br>17      claim in the normal manner.<br>18  Q.  And when you say "investigate the claim in<br>19      the normal manner," what specific things are<br>        you<br>20      thinking of that would be part of the<br>        investigation<br>21      of a claim being conducted in the normal<br>        manner?<br>22  A.  The circumstances of the loss, the effect<br>23      of the loss to fully understand why the claim<br>        is<br>24      occurring, and the applicability of the policy<br>25      language.<br><br>Page 201<br>1  Q.  Okay. And we talked about this generally<br>2      this morning but I want to go through a little<br>        more<br>3      specifically.<br>4      When you say the "circumstances of the<br>5      loss," what do you believe would constitute a<br>6      thorough investigation to understand the<br>7      circumstances of the loss? What would need<br>        to be<br>8      done? | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 9  A.  We -- in general terms? | |
| 10  Q.  Uh-huh. | |
| 11  A.  We would need to understand what was | |
| 12      happening, what the effect of the hostilities were | |
| 13      on the production, why they were making the decision | |
| 14      they were. | |
| 15  Q.  And how would whoever was investigating | |
| 16      the claim, how would they obtain that information? | |
| 17  A.  They could talk with a representative of | |
| 18      NBC. | |
| 19  Q.  Anything else? | |
| 20  A.  Well, they could do general -- maybe | |
| 21      general Internet search, et cetera, of the -- of the | |
| 22      situation in Israel at that time. | |
| 23  Q.  Anything else? | |
| 24  A.  In general terms, no. | |
| 25  Q.  In order to gain a complete understanding | |
| | |
| Page 202 | |
| 1      of the circumstances of the loss, do you believe | |
| 2      that it would be necessary to consult with anyone | |
| 3      outside of OneBeacon if it concerned an area that | |
| 4      was not within the normal experience of loss, for | |
| 5      example, someone with expertise as to the Middle | |
| 6      East? | |
| 7  A.  Potentially. It would depend on the | |
| 8      research. | |
| | |
| Page 203 | |
| 22  Q.  So in that discussion about does it have | |
| 23      to be a sovereign power, during that first | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 24    conversation with Ms. Johnson, what did you<br>25    understand the word "sovereign power" to<br>       mean?<br><br>Page 204<br>1  A.  I -- a country.<br>2  Q.  A country.<br><br>13  Q.  Okay. But with respect to -- when you<br>14     said it does not, in reference to a sovereign<br>      power,<br>15     who, either you or Ms. Johnson, indicated that it<br>16     did not have to be a sovereign power, as between you<br>17     and Ms. Johnson?<br>18  A.  Yes. She indicated at that point her<br>19     understanding was it doesn't have to be a sovereign<br>20     power.<br>21  Q.  And did she explain to you how she came at<br>22     that conclusion?<br>23  A.  No. It was not that much of an in-depth<br>24     discussion.<br><br>Page 207<br>3  Q.  Okay. Is it your testimony that your best<br>4    recollection is that you asked, in response to her<br>5    indicating that the war risk exclusion applied, that<br>6    you asked the question of whether it had to be a<br>7    sovereign power?<br>8  A.  To the best of my recollection, I believe<br>9    I did.<br><br>Page 208<br>13  Q.  At any point in time during the period | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 14    that this claim was being investigated, did you look<br>15    at the war risk exclusions?<br>16  A.  Yes.<br>17  Q.  When is the first time you did that?<br>18  A.  The date, I don't recall. But when there<br>19    was a discussion that Ms. Johnson felt the war risk<br>20    exclusion did apply, then -- at least then I<br>21    reviewed the language more closely.<br><br>Page 210<br>6  Q.  Okay. During the conversation on the 15th<br>7    or 16th, when you and Ms. Johnson were discussing<br>8    whether it might apply, did you look at the war<br>9    exclusion language after that call?<br>10  A.  Not that I recall.<br>11  Q.  Did you -- so the discussion about<br>12    sovereign during that conversation on the 15th or<br>13    16th, sovereign power, when you asked that question<br>14    as to whether it needed to be a sovereign power,<br>15    what was Ms. Johnson's response?<br>16  A.  Oh, specifically, I don't know the words.<br>17    But the indication was she didn't believe it had to<br>18    be. And, you know, more research, more reading of<br>19    the policy and the language needed to be done.<br><br>Page 220<br>25      MS. COYOCA: Okay. I want to mark as<br><br>Page 221<br>1      Exhibit 11 a document labeled Bates control | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 2  ATL001132 through 1192. | |
| 3  (Exhibit 11 was marked | |
| | |
| 16  Q.  Okay. I want to ask you about an e-mail | |
| 17  that was sent by Daniel Gutterman on July 15 at | |
| 18  4:14 p.m. And it appears at the bottom of | |
| 19  page 1133. | |
| 20  Do you see the e-mail that begins "Hi | |
| 21  Peter"? | |
| 22  A.  Yes. | |
| 23  Q.  Could you please read that e-mail out | |
| 24  loud. | |
| 25  A.  "Hi Peter. | |
| | |
| Page 222 | |
| 1  "Per the below, you spoke with Andrea | |
| 2  Garber/Susan Weiss about this. | |
| 3  "Any chance you happen to suggest that | |
| 4  they push for more than just the week, since | |
| 5  the crew needs to be advised at least one week | |
| 6  in advance for a push and since a ground war | |
| 7  still might occur (per this report from CBS | |
| 8  news two days ago)." | |
| 9  Q.  Okay. Does this refresh your recollection | |
| 10  that Mr. Gutterman was sending you e-mails about the | |
| 11  claim? | |
| 12  A.  Yes. | |
| | |
| 19  Q.  What was your understanding as to why | |
| 20  Mr. Gutterman was asking you about advising the | |
| 21  client or recommending to the client that they push | |
| 22  for one more week since a ground war still might | |
| 23  occur? Why was he asking that? | |
| 24  A.  I don't know at the time. I mean, I can't | |
| 25  recall. | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| Page 223<br>1   Q.   Well, at this point in time on July 15,<br>2      2014, at 4:14 p.m., had you had a conversation yet<br>3      with Ms. Johnson, to the best of your recollection?<br>4   A.   I've got to look at the timeline.<br>5      Not to the best of my recollection.<br>6   Q.   Okay. At this point in time had you<br>7      considered the possibility of the application of the<br>8      war exclusion to the client?<br>9   A.   Me?<br>10   Q.   Yes.<br>11   A.   No.<br>12   Q.   So what was the context in which you<br>13      understood Mr. Gutterman would be raising the<br>14      possibility that a ground war might develop?<br><br>18   Q.   Your understanding.<br>19   A.   He was informing me that there could be a<br>20      ground war developing or developed, and he attached<br>21      a news report which supported that.<br>22   Q.   Okay. And why was Mr. Gutterman -- what<br>23      was your understanding as to why he was telling you<br>24      that?<br>25   A.   Well, he was asking me here if I gave them<br><br>Page 224<br>1      advice to push longer than one week.<br>2   Q.   Okay. What I'm trying -- what I'm trying<br>3      to understand is, for purposes of investigating the<br>4      claim, why would it be important to know that a | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 5       ground war might be developing? <br> 6   A.   For the application of the war risk <br> 7        exclusion, I assume. <br><br> <u>Page 225</u> <br> 17   Q.   Okay. When you said previously "for the <br> 18        application of the war risk exclusion, I <br>          assume," <br> 19        what did you mean by that? <br> 20   A.   That -- he was asking if the -- if -- in <br> 21        advance of a push, since a ground war might still <br> 22        occur. I mean, he's mentioning war. That's an <br> 23        excluded situation in the policy. <br> 24   Q.   Okay. But up to that point in time, was <br> 25        it your view that the war risk exclusion did not <br><br> <u>Page 226</u> <br> 1        apply? <br> 2   A.   Well, I had no view on the matter at all. <br><br> 7   Q.   Did you have any discussion with <br> 8        Mr. Gutterman about what he meant in terms of "since <br> 9        a ground war might still occur," what he meant by <br> 10        that? <br> 11   A.   Not that I recall. <br> 12   Q.   Did you have any conversations with him as <br> 13        to why that would be important for purposes of <br> 14        investigating the claim? <br> 15   A.   Not that I recall. <br> 16   Q.   You then responded that you had spoken to <br> 17        them on Friday night, and you told them to do what <br> 18        they felt was prudent. <br> 19        Do you see that e-mail? <br> 20   A.   Yes. | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 21  Q.   Okay. And in the subsequent e-mail | |
| 22         Ms. Johnson indicates that -- at 8:48 p.m. on | |
| 23         July 15 that there should be a call. | |
| 24         Do you see that? | |
| 25  A.   Yes. | |
| | |
| Page 227 | |
| 1   Q.   She also indicated, begin quotes: | |
| 2         "Danny and I had a conversation with Susan | |
| 3         and Andrea today about what the production's | |
| 4         plans were, but we didn't make any | |
| 5         representations about whether there was | |
| 6         coverage but we also did not alert them that | |
| 7         this might not be a covered claim," close | |
| 8         quotes. | |
| 9         Do you see that? | |
| 10  A.   Yes. | |
| 11  Q.   You then responded to Ms. Johnson with a | |
| 12         cc to Mr. Gutterman at 7:53 p.m., I'm assuming, | |
| 13         Pacific time, and -- could you please read your | |
| 14         response out loud. | |
| 15  A.   "Why is it not a covered claim they | |
| 16         have imminent peril. Unless you are going to | |
| 17         invoke the war exclusion. | |
| 18         "I am available between 1 and 3 my time." | |
| 19  Q.   Okay. So as of July 15 -- I'm sorry. | |
| 20         First of all, what did you mean by this | |
| 21         e-mail? | |
| 22  A.   Exactly what it says. I was asking if | |
| 23         they were raise -- if they had considerations of | |
| 24         coverage issues, I was asking them why. The only | |
| 25         thing I could think of was that the -- the war risk | |
| | |
| Page 228 | |
| 1         exclusions applied. | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 11  Q.  Okay. And I believe you indicated earlier<br>12      that you had not considered the potential<br>13      applicability of the war exclusion, at least as of<br>14      the point in time when Mr. Gutterman sent his e-mail<br>15      talking about a ground war developing; isn't that<br>16      correct?<br>17  A.  Yes. Based on what Andrea and Susan had<br>18      told me on Friday. The situation, there were<br>19      hostilities, but the indication was they hoped they<br>20      would settle down. So I had no understanding that a<br>21      war was going on in Israel or may have been going on<br>22      in Israel.<br>23      In fact, I just -- I think I may have<br>24      testified before that I was told rockets were going<br>25      backwards and forwards. I think the rockets were<br><br>Page 229<br>1        only going one way at that time. So there was every<br>2        indication based on what Andrea was telling me that<br>3        things were going to settle down. I told them they<br>4        should act prudently.<br><br>Page 231<br>11  Q.  As of the point in time that you sent the<br>12      e-mail on July 15 at 7:53, did you believe that the<br>13      war exclusion should apply to the claim?<br>14  A.  I didn't know. | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 15  Q.  Did you believe that it should not apply? | |
| 16  A.  No. I didn't know one way or the other. | |
| | |
| Page 232 | |
| 17  Q.  At any point in time during the time that | |
| 18       this claim was pending, prior to July 28, the time | |
| 19       of denial of the claim, did you voice an opinion to | |
| 20       anyone at OneBeacon that -- as to whether the war | |
| 21       exclusion should or should not apply? | |
| 22  A.  Yes. Pamela Johnson. | |
| 23  Q.  And what did you tell Ms. Johnson? | |
| 24  A.  When she concluded that the -- the war | |
| 25       risk exclusions should apply and that she told me | |
| | |
| Page 233 | |
| 1       she was going to deny, she explained why, and I | |
| 2       agreed it was reasonable to apply the exclusions. | |
| | |
| Page 242 | |
| 7   A.  On that specific point, I can't recall. | |
| 8       MS. COYOCA: Okay. I'd like to mark as | |
| 9       Exhibit 12 a document labeled ATL001101 through | |
| 10      1105. | |
| 11      (Exhibit 12 was marked | |
| 12      for identification.) | |
| | |
| 17  Q.  Just that the first e-mail that appears in | |
| 18      this document on the page is -- not in the chain is | |
| 19      an e-mail from Pamela Johnson to you and Danny | |
| 20      Gutterman. And she indicates, "Here is an | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| exclusion<br>21    listed under the general conditions of the policy."<br>22    Do you see that?<br>23  A.  Yes.<br>24  Q.  And is your understanding that this is the<br>25    war exclusions that were being considered in terms<br><br>Page 243<br>1    of whether or not they were applicable?<br>2  A.  Yes.<br>3  Q.  During your call with Ms. Johnson on<br>4    July 16, did you discuss the separate subparts of<br>5    the war exclusions?<br>6  A.  I -- I believe we did. Yes.<br>7  Q.  What was discussed in terms of each of the<br>8    four sections?<br>9  A.  I believe we went through or Pamela went<br>10    through the different exclusions. There was a<br>11    discussion as to which -- which ones of the<br>12    exclusions could apply.<br>13  Q.  And this is on -- this is on July 16;<br>14    correct?<br>15  A.  Yes.<br>16  Q.  And what was -- to your -- best of your<br>17    recollection, what was the discussion with respect<br>18    to Prong 1?<br>19  A.  It states that war, including undeclared<br>20    or civil war, is excluded.<br>21  Q.  Understood.<br>22    But what was discussed in terms of the<br>23    possible applicability or inapplicability of<br>24    Prong 1 --<br>25  A.  Well --<br><br>Page 244<br>1  Q.  -- to the DIG claim? | |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 2   A.   The war -- it doesn't have to be declared<br>3         as a war in order for the exclusion to apply.<br>4   Q.   Is that what was discussed?<br>5   A.   I believe so. Yes.<br>6   Q.   Was there any other discussion with<br>7         respect to whether there were other requirements in<br>8         order for the exclusion to apply?<br>9   A.   That -- well, there had to be a war first.<br>10        It doesn't matter. It didn't have to be declared or<br>11        declared as a war.<br>12  Q.   And what was your understanding as to the<br>13        definition of the term "war," if you had one at that<br>14        point in time?<br>15  A.   I don't think we had a definition of "war"<br>16        at that time.<br>17  Q.   And was there a discussion that you<br>18        need -- that OneBeacon needed to research what that<br>19        definition was in order to determine whether or not<br>20        it was applicable, Prong 1?<br>21  A.   Specifically, I can't recall -- don't know<br>22        because we went to No. 2.<br>23  Q.   No. No. I understand.<br>24        But what I'm asking you is: You indicated<br>25        you went through each of the prongs and had a | |
| Page 245<br>1         discussion; is that correct?<br>2   A.   Yes.<br>3   Q.   So -- so other than the discussion about<br>4         the war not needing to be declared, was there any<br>5         other discussion about the applicability or<br>6         inapplicability of Prong 1?<br>7   A.   Well, I believe I testified it has to be a | Defendant's Objections (245:9-22)<br>Discussion regarding deponent's understanding of Prong 1 not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 8     war.<br>9  Q.  Okay. And in your mind, as you were<br>10    talking about it, what did you understand that word<br>11    to mean?<br>12  A.  Widespread hostile actions.<br>13  Q.  And how did you form that understanding?<br>14  A.  I think that would be my general<br>15    understanding of what a war is.<br>16  Q.  Did you have any understanding as to<br>17    whether the participants in the hostilities, their<br>18    status, if it mattered?<br>19  A.  No. It could be -- no. No, I didn't.<br>20  Q.  So if two people are fighting, punching<br>21    each other and hitting each other, and a claim is<br>22    made, is that war?<br><br>25    THE WITNESS: Based on that simple | a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith; relevant to unreasonable denial of claim.<br><br>Defendant's Objections: (245:25-246:2) Discussion regarding deponent's understanding of whether hypothetical posed is "war" is not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith; relevant to unreasonable denial of claim. |
| Page 246<br>1    explanation, probably not a war. It's not<br>2    widespread hostilities.<br>4  Q.  Okay. Say there is a big brawl involving<br>5    25 men on a production who are fighting, is that a<br>6    war?<br>7  A.  No. I would not characterize that as a<br>8    war.<br>9  Q.  Okay. What do you mean by "widespread | Defendant's Objections (246:23-247:4) Discussion regarding deponent's understanding of whether hypothetical posed is "war" is not relevant to any of Plaintiffs' claims for breach of the contract or |

| Plaintiffs' Designation of Peter Williams Feb 2017 | Objection & Response |
|---|---|
| 10          hostilities"? What has to be -- what's the<br>11  extent<br>12          of widespread?<br>13     A.   Indiscriminate killing, bombing, action by<br>        armed forces, military weapons being<br>used.<br><br>23     Q.   Okay. So when you indicated that, to you,<br>24          the definition of "war" means widespread<br>25          hostilities, anything other than<br>widespread<br><br><br>Page 247<br>1          hostilities necessary in order for it to<br>qualify as<br>2          a war, in your mind?<br>3     A.   No. By definition, widespread hostilities<br>4          becomes -- becomes a war. | duty of good faith or<br>damages; this testimony is<br>a waste of time; causes<br>confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiffs' Response:<br>Relevant to bad faith;<br>relevant to unreasonable<br>denial of claim. |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| Plaintiffs' Designation of Peter Williams 30(b)(6), May 19, 2017 | |
| | |
| Page 7 | |
| 20 Q. Good afternoon, Mr. Williams. | |
| 21 A. Good afternoon. | |
| 22 Q. Please spell your name for the record. | |
| 23 A. Peter Williams, P-E-T-E-R W-I-L-L-I-A-M-S. | |
| 24   MR. HAYES: This is Exhibit 1. | |
| | |
| Page 8 | Defendant's Objections: |
| 4 Q. Do you recognize the document marked | 8:4-20 |
| 5   Exhibit 1? | Testimony regarding |
| 6 A. Yes. | underwriting, Policy |
| 7 Q. What is it? | negotiation, and addition of |
| 8 A. It's a lawsuit filed on behalf of | the "Dig" Production, topics |
| 9   Universal Cable vs. Atlantic Specialty | 15-18 of the Deposition |
|     Insurance | Notice, are not relevant to |
| 10   Company. | the issue of whether the |
| 11 Q. It's a document filed in connection with | "war" exclusions apply, |
| 12   that lawsuit? That's your understanding? | whether ASIC unreasonably |
| 13 A. Yes. | or without proper cause, or |
| 14 Q. I want you to turn to the page marked 6. | the alleged damages, is a |
| 15 A. Page 6? | waste of time, confuses the |
| 16 Q. Yeah. Page 6. | issues, and is prejudicial. |
| 17 A. Yes. | FRE 401; 403. |
| 18 Q. I want you to read the paragraphs marked | |
| 19   15, 16, 17, and 18, please, to yourself and | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| let me<br>20    know when you're done. | Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 9<br>2  Q.  Just let me know when you are finished,<br>3      please.<br><br>17  Q.  Mr. Williams, have you finished reading<br>18      topic Nos. 15 through 18?<br>19  A.  Yes.<br>20  Q.  Are you Atlantic's designee for topic 15?<br>21  A.  Yes.<br>22  Q.  Are you Atlantic's designee for topic 16?<br>23  A.  Yes.<br>24  Q.  Are you Atlantic's designee for topic 17?<br>25  A.  Yes. | Defendant's Objections:<br>(9:2-3)<br>Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403.<br><br>Plaintiffs' Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332.<br><br>Defendant's Objections:<br>(9:17-10:8)  Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| | the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403. |
| | Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 10<br>1  Q.  Are you Atlantic's designee for topic 18?<br>2  A.  Yes.<br>3  Q.  Are you Atlantic's designee for any of the<br>4      other topics in Exhibit 1?<br>5  A.  I don't believe so.<br>6  Q.  What did you do to prepare for your<br>7      deposition today?<br>8  A.  I met with counsel yesterday. | |
| Page 11<br>16  Q.  Did you review documents or not,<br>17      Mr. Williams?<br>18  A.  Yes.<br><br>23  Q.  Did any of the documents that you reviewed<br>24      refresh your recollection on the events to which<br>25      they referred? | Defendant's Objections: 11:16-18; 11:23-12:3 Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| | or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403.<br><br>Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

Page 12
1   A.   Yes.
2   Q.   Which ones?
3   A.   The policies.

16   Q.   Mr. Williams, do you recognize the
17        document marked Exhibit 2?
18   A.   Yes.
19   Q.   What is it?
20   A.   It's a copy of the insurance policy issued
21        to NBCUniversal Media effective January
          1, 2014.
22   Q.   It's your understanding that this is the
23        policy at issue in this lawsuit?
24   A.   Yes.

Page 13
22        So have you spoken to any person outside
23        the presence of your counsel in preparation
          for this
24        deposition?
25   A.   No.

Page 14
10   Q.   Mr. Williams, do you have an
          understanding

Defendant's Objections:
14:10-18        Testimony regarding underwriting is

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 11    of what underwriting is?<br>12  A.  Yes.<br>13  Q.  What is your understanding?<br>14  A.  It is the process of accepting an<br>15       insurance risk and agreeing the terms and conditions<br>16       for that risk.<br>17  Q.  And during your tenure at OneBeacon, how<br>18       did OneBeacon perform that function?<br><br>21       THE WITNESS: We had various underwriters<br>22       on staff who performed that function.<br><br>24  Q.  Was Wanda Phillips one of those<br>25       underwriters? | not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403.<br><br>Plaintiffs' Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332.<br><br>Defendant's Objections: 14:21-15:2  Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403.<br><br>Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and |

374

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| | failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| <u>Page 15</u><br>1  A.  Yes.<br>2  Q.  And what did they do specifically?<br><br>13  Q.  Go ahead, sir.<br>14  A.  The underwriters, in general terms, would<br>15      review the information submitted by the broker,<br>16      determine if a risk was acceptable, apply terms,<br>17      conditions, rates, agree the rates with the broker,<br>18      maybe prepare a quote if we were going to quote to<br>19      insure the risk.<br>20  Q.  And what factors would the underwriters<br>21      consider in determining whether the risk was<br>22      acceptable? | |
| <u>Page 16</u><br>1      THE WITNESS: Well, it would depend<br>2      largely on the matter being insured, whether it was<br>3      within our appetite, and then various factors that<br>4      would affect the risk in particular. It would<br>5      depend on what that risk was, where it was located,<br>6      what rates would apply, what deductibles would<br>7      apply, history of the insured. There would be<br>8      numerous factors that would be considered.<br><br>10  Q.  Why is where it was located relevant? | <u>Defendant's Objections</u>:<br>16:10-21, 24Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403. |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 11  A.  Two factors. It could be -- a physical<br>12       location could affect whether we wanted to insure a<br>13       risk and what rate we wanted to apply. Also within<br>14       the United States, you have to file in some states<br>15       terms and conditions with each state, and they can<br>16       vary from state to state.<br>17  Q.  Are you familiar with the DIG production?<br>18  A.  Yes.<br>19  Q.  Did NBCUniversal declare the DIG<br>20       production to the policy that you have in front of<br>21       you as Exhibit 1?<br><br>24  Q.  Exhibit 2. I'm sorry.<br><br>Page 17<br>2        THE WITNESS: Yes. In general terms, the<br>3        DIG production was declared to this -- to be insured<br>4        by this policy.<br><br>6   Q.  And did OneBeacon evaluate the DIG<br>7        production for purposes of determining whether to<br>8        accept the risks associated with it?<br>9   A.  Yes.<br>10  Q.  And what did OneBeacon do in connection<br>11       with that evaluation?<br>12  A.  We received the initial information from<br>13       NBC that they were at that time thinking about doing<br>14       the production in Israel. We asked numerous<br>15       questions about where, how, how long, what type of<br>16       production, what was the scenario for the script, | Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332.<br><br><br><br><br><br>Defendant's Objections:<br>17:2-18:19   Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403.<br><br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 17     who was in it, where it was going to be filmed, what | failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 18     precautions they were taking for the safety of their | |
| 19     cast and crew, travel arrangements. It was an | |
| 20     ongoing process backwards and forwards with NBC's | |
| 21     representatives. | |
| 22   Q.   Were you involved in that process? | |
| 23   A.   Yes. | |
| 24   Q.   In what capacity? | |
| 25   A.   As I was the head of underwriting at | |
| Page 18 | Defendant's Objections: |
| 1     OneBeacon at that time, I discussed the production | 18:22-19:23 Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403. |
| 2     with Wanda Phillips, requested information, | |
| 3     requested her to find out additional information. | |
| 4     We discussed that information that was provided by | |
| 5     the brokers and NBC. | |
| 6   Q.   What information did you tell Wanda to | |
| 7     gather? | |
| 8   A.   Well, specifically, I can't recall. But I | |
| 9     mean, the general thrust was Israel is not -- it's | |
| 10     not difficult to insure productions in Israel, | |
| 11     particularly if they're in Tel Aviv. I was | |
| 12     concerned about the shooting in Jerusalem. So I | Plaintiff's Response: |
| 13     wanted to know or at least obtain more details of | Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 14     the security in Jerusalem, what they intended to do | |
| 15     in Jerusalem, how long they would be filming, how | |
| 16     big a production it was. | |
| 17     In general, those were the issues. | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 18  Q.   Why were you concerned with the shooting | |
| 19       in Israel? | |
| | |
| 22       THE WITNESS: I wasn't concerned with the | |
| 23       shooting so much in Israel. Jerusalem can have | |
| 24       instances of violence that could have interrupted | |
| 25       filming. So we needed to know how much filming was | |
| | |
| Page 19 | Defendant's Objections: |
| 1        going to be done in Jerusalem, was it under | |
| 2        controlled conditions, was it every day, was it | |
| 3        every week, was it weeks of filming. | Plaintiff's Response: |
| 5   Q.   How did you know that instances of | |
| 6        violence in Jerusalem could interrupt filming? | |
| 7   A.   From my knowledge of the country, of my | |
| 8        knowledge of filming, and issues in the country. | |
| 9   Q.   And what did that knowledge consist of? | |
| 10  A.   I knew in Jerusalem that there were | |
| 11       instances of suicide bombers on buses, particularly | |
| 12       in crowded areas that would disrupt everyday life in | |
| 13       Jerusalem, and that could lead to interruption of | |
| 14       filming on the streets. I could see where maybe | |
| 15       local authorities would not want an American film | |
| 16       crew on the streets if there had been an incident | |
| 17       such as that in the area. | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 18     So I was generally aware Jerusalem, as<br>19     opposed to Tel Aviv, is a heightened<br>        security risk.<br>20  Q.  And why did that matter to OneBeacon?<br>21  A.  Well, if the film had been interrupted or<br>22     stopped from filming due to such an<br>        incident, there<br>23     could be coverage under the policy.<br><br>Page 20<br>2  Q.  So you stated that you were aware that<br>3     there were suicide bombings on occasion?<br>        Is that<br>4     what you said?<br>5  A.  Yes. Terrorist activity, likely.<br>6  Q.  So you're aware of the possibility of<br>7     terrorist activity in Jerusalem?<br>8  A.  Yes.<br><br>17  Q.  Do you have any other examples of<br>18     terrorist activity that you can recite?<br><br><br><br><br><br><br><br><br>Page 21<br>3  Q.  You've given one example.<br>4     Can you give me other examples?<br><br>8     THE WITNESS: A car bomb would be | <br><br><br><br><br><br><br>Defendant's Objections:<br>20:2-18     Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403.<br><br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332.<br><br>Defendant's Objections:<br>21:3-4, 8-9, 11-13 Testimony regarding underwriting, Policy negotiation, and addition of |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 9      another example. <br><br> 11   Q.   Any others? <br> 12   A.   A bomb in general, whether it's a pipe <br> 13       bomb, car bomb, suicide bomber with a vest. | the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403. <br><br> Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 22 <br> 20   Q.   When you say "terrorist activity," under <br> 21       your understanding of that word, that phrase, could <br> 22       terrorist activity be committed with a rocket? | Defendant's Objections: 22:20-22 Record Objections—beyond scope of designation; witness opinion of terrorist activity not relevant, prejudicial, and a waste of time; 401; 403; calls for speculation. <br><br> Plaintiff's Response: Relevant to bad faith; not beyond scope of designation. Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| | Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 23<br>8      THE WITNESS: Yeah. Potentially with a<br>9      rocket, a terrorist could commit an act. | Defendant's Objections: 23:5-6    Record Objections—beyond scope of designation; witness opinion of terrorist activity not relevant, prejudicial, and a waste of time; 401; 403; calls for speculation.<br><br>Plaintiff's Response: Relevant to bad faith; not beyond scope of designation. Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332.<br><br>Defendant's Objection: 23:8-9    Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| | 403. |
| | Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 25<br>22   Q.   I want to understand what you were<br>23         thinking at the time when the DIG<br>             production was<br>24         declared.<br>25         Do you understand? | Defendant's Objections: 25:22-26:4   Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403. |
| | Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 26<br>1   A.   Yes.<br>2   Q.   You said you were concerned with terrorist | Defendant's Objections: 26:8, 11-13, 15-16, 2, 26:23-27:2   Testimony |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 3      activities in Jerusalem.<br>4      Is that your understanding?<br><br>8   Q.   Is that what you said?<br><br>11      THE WITNESS: I was concerned with the<br>12      potential of everyday life being interrupted by<br>13      terrorist activity. Yes.<br>14   BY MR. HAYES:<br>15   Q.   Okay. And terrorist activity involves<br>16      violence? Is that your understanding?<br><br>21      THE WITNESS: Yes.<br>22   BY MR. HAYES:<br>23   Q.   And why Jerusalem? Why were you concerned<br>24      about terrorist activity in Jerusalem?<br>25   A.   Because, in my opinion, it occurs most | regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403.<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 27<br>1      often in Jerusalem and not in Tel Aviv, of the two<br>2      cities that DIG were going to visit.<br><br>13   Q.   Well, what was your concern?<br>14   A.   My concern was that an incident such as a<br>15      suicide bomber on a bus would interrupt filming for<br>16      a day of DIG. They would be prevented from filming<br>17      on the streets of Jerusalem. | Defendant's Objections:<br>27:13-17      Testimony regarding underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. FRE 401; 403. |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| | Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 28 | Defendant's Objections: |
| 3    Q.   And did you discuss that concern with Aon | 28:3-29:9       Testimony |
| 4         or NBCUniversal? | regarding underwriting, |
| 5    A.   Yes. I discussed it with Wanda Phillips, | Policy negotiation, and |
| 6         and at some point I was also on the phone with | addition of the "Dig" Production, topics 15-18 of |
| 7         representatives of Aon. | the Deposition Notice, are |
| 8    Q.   In which that was discussed? | not relevant to the issue of |
| 9    A.   The security in Jerusalem, yes. | whether the "war" |
| 10   Q.   Can you tell me everything that you recall | exclusions apply, whether |
| 11        about that conversation. | ASIC unreasonably or |
| 12   A.   Well, specifically I can't recall the | without proper cause, or the |
| 13        exact words of the conversation. But the gist of | alleged damages, is a waste of time, confuses the issues, |
| 14        the conversation was exactly that: How long were | and is prejudicial. Additionally, other claims |
| 15        they going to be in Jerusalem, why were they going | are not relevant, are a waste of time, are prejudicial, |
| 16        to film in Jerusalem, what was the security in | confuse the issues.  FRE |
| 17        Jerusalem. | 401; 403. |
| 18        We were concerned that if an incident | |
| 19        occurred, that filming would be interrupted for the | Plaintiff's Response: Negotiations, underwriting, |
| 20        day by local authorities that would prevent them | communications re same relevant to bad faith and |
| 21        from continuing to film. | failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. Other claims relevant. Oppo to |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| | MIL 3 (Dkt 202). |
| Page 29 | Defendant's Objections: |
| 3   Q.   Have you been involved in other claims | 29:15-19, 21          The |
| 4         involving terrorist activity? | events of 9/11 are not |
| 5   A.   Yes. | relevant to whether ASIC |
| 6   Q.   What other claims? | acted unreasonably or |
| 7   A.   Well, there was the 9/11 incidents, were | without proper cause |
| 8         the main ones. | regarding the "Dig" claim, |
| 9   Q.   Were those acts of war? | discussion and/or |
| | comparison of these events |
| 15        THE WITNESS: That's a very difficult | confuses the viable issues, is |
| 16        question to answer. At the time, the | prejudicial, and is beyond |
| | president, | the scope of the designation |
| 17        President Bush, declared them as acts of | of this witness. |
| | war. | |
| 18        Ultimately, from an insurance industry | |
| | perspective, | |
| 19        they were treated as acts of terrorism. | Plaintiff's Response: |
| | Relevant to bad faith; not |
| 21   Q.   Why? | beyond scope of |
| | designation. Relevant to |
| | unreasonable denial of |
| | coverage.  Relevant to |
| | reasonable expectations of |
| | the parties. |
| Page 31 | Defendant's Objections: |
| 4   Q.   Why, from the insurance industry | 31:4-6, 10, 12-22 |
| 5         perspective, were they treated as acts of | The events of 9/11 are not |
| | terrorism, | relevant to whether ASIC |
| 6         the 9/11 attacks -- | acted unreasonably or |
| | without proper cause |
| 10   Q.   -- as opposed to war? | regarding the "Dig" claim, |
| | discussion and/or |
| 12        THE WITNESS: Well, I mean, I don't | comparison of these events |
| | know | confuses the viable issues, is |
| 13        politically what discussions went on. But | prejudicial, and is beyond |
| | in | the scope of the designation |
| 14        general, I think the feeling was they were | of this witness. FRE 401; |
| | still | 403 |
| 15        isolated attacks. They were still short in -- | |

| Plaintiffs' Designation of P. Williams May 2017 | | Objection & Response |
|---|---|---|
| | | Plaintiff's Response: Relevant to bad faith; not beyond scope of designation. Relevant to unreasonable denial of coverage.  Relevant to reasonable expectations of the parties. |
| 16 | in duration. They were committed by hijacked aircraft, | |
| 17 | which is still a limited scope, even though it did | |
| 18 | cause substantial damage and unfortunate death and | |
| 19 | injury to numbers of people. | |
| 20 | And so ultimately it was decided they were | |
| 21 | acts of terrorism and treated as such by the | |
| 22 | insurance. | |
| 24 Q. | In any of your conversations with representatives of Aon or NBCUniversal in connection | |
| Page 32 | | Defendant's Objections: 31:24-32:7, 32:9-10, 32:12-14, 17, 19-24 underwriting, Policy negotiation, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. The terms of the Policy control.  FRE 401; 403. |
| 1 | with the addition of DIG to the insurance policy -- | |
| 2 | Do you have that in mind? | |
| 3 A. | Yes. | |
| 4 Q. | -- did you ever tell any of those | |
| 5 | representatives that, to the extent there was | |
| 6 | violence in the region, any interruption in the | |
| 7 | production would not be covered? | |
| 9 | THE WITNESS: No. I don't specifically | |
| 10 | recall having a conversation of that nature. | |
| 12 Q. | Did you ever tell anyone at NBCUniversal | |
| 13 | or Aon that, in the event of a terrorist attack, any | |
| 14 | interruption in production would not be covered? | |
| 16 | Assumes facts not in evidence. Lack of foundation. | Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); |
| 17 | THE WITNESS: No. | |
| 19 Q. | Did you ever tell anyone at Aon or | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 20　　NBCUniversal that in the event of a terrorist attack | UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 21　　and any interruption or postponement or relocation | |
| 22　　that followed, such expenses incurred in connection | |
| 23　　with such interruption, relocation, or postponement | |
| 24　　would be covered? | |
| Page 33 | Defendant's Objections: |
| 2　　THE WITNESS: No. I don't recall such a | 33:2-3, 5-6, 11-12, 14-24 |
| 3　　conversation. | Underwriting, Policy negotiation, pre-issuance |
| 5　Q.　Did you ever have a conversation with | discussions, and addition of the "Dig" Production, topics |
| 6　　NBCUniversal representatives or representatives of | 15-18 of the Deposition Notice, are not relevant to |
| 7　　Aon about what would happen in the event of a | the issue of whether the "war" exclusions apply, |
| 8　　terrorist attack? | whether ASIC unreasonably or without proper cause, or |
| 10　　Assumes facts not in evidence. Lack of foundation. | the alleged damages, is a waste of time, confuses the |
| 11　　THE WITNESS: Not specifically, no, I | issues, and is prejudicial. |
| 12　　don't recall such a conversation. | The terms of the Policy control. FRE 401; 403. |
| 14　Q.　What does that mean, "not specifically"? | |
| 15　A.　I don't recall a conversation where we | |
| 16　　specifically spoke about what would happen in the | |
| 17　　event of a terrorist -- terrorist activity. | Plaintiff's Response: |
| 18　Q.　Do you remember any conversations in which | Negotiations, underwriting, communications re same |
| 19　　you discussed whether or not there would be coverage | relevant to bad faith and failure to investigate. See |
| 20　　in the event of terrorist activity? | Oppo to MIL 2 (Dkt 201); |
| 21　A.　With Aon? | UCP v. Atlantic, 929 F.3d at |
| 22　Q.　Or NBCUniversal. | 1150; CACI 2332. |
| 23　A.　Oh. No, I don't recall. | |
| 24　Q.　Why didn't you discuss that with them? | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| Page 34 | Defendant's Objections: |
| 2　　　THE WITNESS: It's not excluded by the | 34:2-4, 6-7, 9 |
| 3　　　policy for the effects of a terrorist attack on the | 　　　Underwriting, Policy |
| 4　　　production, which wasn't my concern. | negotiation, pre-issuance |
| | discussions, and addition of |
| 6　Q.　Loss as a result of terrorist activity is | the "Dig" Production, topics |
| 7　　　not excluded by the policy; correct? | 15-18 of the Deposition |
| | Notice, are not relevant to |
| 9　　　THE WITNESS: Correct. | the issue of whether the |
| | "war" exclusions apply, |
| 11　Q.　You understand that in July of 2014 | whether ASIC unreasonably |
| 12　　　NBCUniversal moved the production of DIG out of | or without proper cause, or |
| | the alleged damages, is a |
| 13　　　Israel? | waste of time, confuses the |
| | issues, and is prejudicial. |
| 16　　　THE WITNESS: Yes. | The terms of the Policy |
| | control.  FRE 401; 403. |
| | |
| | Plaintiff's Response: |
| | Negotiations, underwriting, |
| | communications re same |
| | relevant to bad faith and |
| | failure to investigate. See |
| | Oppo to MIL 2 (Dkt 201); |
| | UCP v. Atlantic, 929 F.3d at |
| | 1150; CACI 2332. |
| | |
| Page 36 | Defendant's Objections: |
| 17　Q.　Did anyone ask you what your understanding | 36:24-37:13 Underwriting, |
| 18　　　of the policy was in any respect in connection with | Policy negotiation, pre-issuance discussions, and |
| 19　　　the evaluation of the DIG claim? | addition of the "Dig" |
| | Production, topics 15-18 of |
| 22　　　THE WITNESS: No. | the Deposition Notice, are |
| 23　BY MR. HAYES: | not relevant to the issue of |
| 24　Q.　You were involved in the evaluation of | whether the "war" |
| 25　　　whether or not to accept the DIG production as an | exclusions apply, whether ASIC unreasonably or |
| | without proper cause, or the |
| | alleged damages, is a waste |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| | of time, confuses the issues, and is prejudicial.  The terms of the Policy control.  FRE 401; 403. |
| | Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

Page 37

1       insured production; correct?
2   A.  Yes.
3   Q.  You made the ultimate decision to accept
4       it as an insured production; correct?
5   A.  Yes.
6   Q.  And OneBeacon performed a separate
7       underwriting evaluation in connection with the
8       decision whether to accept the DIG production as an
9       insured production; correct?
10  A.  Separate from what? I don't understand
11      the question.
12  Q.  Separate from the underwriting that it had
13      performed before that time.

15      THE WITNESS: Yes. The procedure was to
16      be -- each production was declared to us, and we
17      performed an underwriting function on each
18      production. Yes.

20  Q.  And pursuant to that underwriting
21      function, OneBeacon evaluated the risks

| | |
|---|---|
| | Defendant's Objections: 37:15-38:5   Underwriting, Policy negotiation, pre-issuance discussions, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial.  The terms of the Policy control.  FRE 401; 403. |
| | Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| associated | |
| 22    with the production? Is that accurate? | |
| 23   A.   Yes. | |
| 24   Q.   And in evaluating the risks associated | |
| 25    with that production, OneBeacon | |
|    evaluated whether or | |
| | |
| Page 38 | Defendant's Objections: |
| 1    not it would accept those risks? Is that | |
|    accurate? | |
| 2   A.   Yes. | |
| 3   Q.   And if so, on what terms? Is that | Plaintiff's Response: |
| 4    accurate? | |
| 5   A.   Yes. | |
| | |
| Page 47 | Defendant's Objections: |
| 10   Q.   At the time NBCUniversal declared the DIG | 47:10-13    Underwriting, Policy negotiation, pre-issuance discussions, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial.  The terms of the Policy control. FRE 401; 403. |
| 11    production to the policy, you were aware that there | |
| 12    was a history of terrorist activity in Jerusalem; is | |
| 13    that correct? | |
| | |
| 16    THE WITNESS: Yes. | |
| | |
| 18   Q.   And it was your understanding that under | |
| 19    the policy, a loss caused by terrorist activity in | |
| 20    Jerusalem would be covered; yes? | |
| | |
| 24    THE WITNESS: Yes. | |
| | Plaintiffs' Response: |
| | Relevant to bad faith; not beyond scope of designation. Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| | Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| | Defendant's Objection: 47:16, 18-20, 24   Record objections; Underwriting, Policy negotiation, pre-issuance discussions, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial.  The terms of the Policy control. FRE 401; 403. |
| | Plaintiff's Response: Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 48<br>2   Q.   And did NBCUniversal and Aon have that<br>3          understanding as well?<br><br>6          THE WITNESS: Yes. I would think so.<br><br>8   Q.   And did you ever tell NBCUniversal or Aon<br>9          that loss caused by war would not be | Defendant's Objections: 48:2-3, 6 48:8-49:4 Record objections; Underwriting, Policy negotiation, pre-issuance discussions, and addition of the "Dig" Production, topics 15-18 of the Deposition |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 10    covered under the policy? | Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. The terms of the Policy control. FRE 401; 403.<br><br><u>Plaintiff's Response:</u> Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 11   A.   No. They're fully aware of that. | |
| 12   Q.   How do you know? | |
| 13   A.   Well, firstly, Susan Weiss has been in the | |
| 14    business for many years, firstly as a senior | |
| 15    underwriter at Chubb before going on Aon. And | |
| 16    Andrea Garber was a senior underwriter at Gee | |
| 17    Insurance Company. | |
| 18    Aon is the second, if not the biggest, | |
| 19    insurance brokers in the world. So they were | |
| 20    actually aware of the terms and conditions of the | |
| 21    policy. | |
| 22   Q.   How do you know they were aware that loss | |
| 23    resulting from war in Israel would not be covered? | |
| 24   A.   Loss resulting from war anywhere is not | |
| 25    covered. It's a standard exclusion in every policy. | |
| <u>Page 49</u> | <u>Defendant's Objections:</u> |
| 1   Q.   And did you discuss with Aon or | 49:7-9, 11-14, 16-21Record objections; Underwriting, Policy negotiation, pre-issuance discussions, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. The |
| 2    NBCUniversal at any time what specific type of | |
| 3    violence in Israel would be considered a war under | |
| 4    the policy? | |
| 7    THE WITNESS: No. | |
| 9   Q.   Why not? | |
| 11    THE WITNESS: It wasn't warranted at the time. | |
| 13 BY MR. HAYES: | |
| 14   Q.   Why wasn't it warranted? | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 16    THE WITNESS: The war exclusion is in the<br>17    policy. It's a standard exclusion. We spoke about<br>18    the -- the risks that we were concerned about at the<br>19    time.<br>20  BY MR. HAYES:<br>21  Q.  Which were what?<br><br>Page 50<br>1  A.  Well, as I previously testified, as well<br>2    as the usual risks associated with filming, we were<br>3    concerned about Jerusalem and the safety of the cast<br>4    and crew in Jerusalem in particular, in Israel in<br>5    general.<br>6  Q.  And you specifically discussed terrorist<br>7    activity; isn't that right?<br><br>10    THE WITNESS: I don't know that we<br>11    specifically discussed terrorist activity. We<br>12    discussed safety of the cast and crew in Israel, and<br>13    particularly in Israel -- in Jerusalem. And I<br>14    certainly discussed with Wanda Phillips my concern<br>15    as to why we were concerned about where they were<br>16    filming, how they were filming, how many days they<br>17    were filming in Jerusalem.<br><br>19  Q.  But safety from what? I'm talking about<br>20    your communications with Aon and NBCUniversal. You | terms of the Policy control. FRE 401; 403.<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332.<br><br>Defendant's Objections:<br>50:1-7<br>Record objections; Underwriting, Policy negotiation, pre-issuance discussions, and addition of the "Dig" Production, topics 15-18 of the Deposition Notice, are not relevant to the issue of whether the "war" exclusions apply, whether ASIC unreasonably or without proper cause, or the alleged damages, is a waste of time, confuses the issues, and is prejudicial. The terms of the Policy control. FRE 401; 403.<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

393

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 21      said you discussed safety and security concerns. | |
| 22      Safety from what? | |
| 23  A.  Sorry. When I say "we," I mean OneBeacon. | |
| 24      I didn't particularly -- I was only involved, I | |
| 25      believe, in one, maybe two direct conversations. | |
| Page 51 | Defendant's Objections: |
| 1      Wanda Phillips had most of the conversations or | (51:1-21) Policy negotiations, |
| 2      communicated our concerns. | underwriting, profitability |
| 3  Q.  Safety and security from what? | not relevant to any of |
| 4  A.  From an isolated terrorist incident. | Plaintiffs' claims for breach |
| 5  Q.  That was specifically discussed? | of the contract or duty of |
| 6  A.  Yes. | good faith or damages; this |
| 7  Q.  And what was NBCU and Aon's concern, if | testimony is a waste of time; |
| 8      any? | causes confusion; is prejudicial. |
|  | Fed. R. Evid. 401; 403 |
| 11      THE WITNESS: Well, I think they had the | |
| 12      same general concern. They -- they gave us details | |
| 13      of the security's recommendations, where they were | Plaintiff's Response: |
| 14      staying, and how they were traveling. So they had | Negotiations, underwriting, communications re same |
| 15      similar concerns. | relevant to bad faith and |
| 16  BY MR. HAYES: | failure to investigate. See |
| 17  Q.  Regarding terrorist activity? | Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 20      THE WITNESS: Concerning the safety of | |
| 21      their cast and crew. Yes. | |
| Page 52 | Defendant's Objections: |
| 24  Q.  You testified that they were concerned | (52:24-25) Policy negotiations, |
| 25      about the same things you were; isn't that right? | underwriting, profitability not relevant to any of |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| | Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 53<br>3      THE WITNESS: No. I don't believe that's what I said.<br>4      what I said.<br>5      I said that I assume they were concerned<br>6      about what we had -- we asked our questions. They<br>7      gave us the answers. The answers came back to<br>8      satisfy our questions. So I'm assuming they had<br>9      similar concerns.<br><br>11   Q.   And those concerns were concerns relating<br>12        to loss resulting from terrorist activity; correct?<br><br>15        THE WITNESS: That was my concern. Yes.<br><br>17   Q.   And that's what you assumed their concern<br>18        went as well; right?<br>19   A.   Yeah.<br>20   Q.   And after all of these conversations with<br>21        NBCUniversal and Aon, NBCU and Aon | Defendant's Objections:<br>(53:3-24)<br>Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 22 understood that,<br>in the event of a terrorist attack, the loss<br>23 resulting from that terrorist attack would be<br>24 covered by the policy; correct? | |
| Page 54<br>5 THE WITNESS: There's no terror --<br>6 terror -- excuse me. There's no terror exclusion on<br>7 the policy. So I can only assume they would have<br>8 that conclusion.<br><br>10 Q. Mr. Williams, you've been designated to<br>11 testify as to the communications between Atlantic,<br>12 on the one hand, and any of plaintiffs, NBCUniversal<br>13 or Aon, on the other hand, that relate to the<br>14 addition of DIG as an insured production.<br>15 Do you understand that to be a topic that<br>16 you've been designated to testify about?<br>17 A. Yes.<br>18 Q. So what I would like to know is: Based on<br>19 all of the communications that Atlantic had with<br>20 NBCUniversal and Aon, did NBCUniversal and Aon<br>21 expect loss resulting from terrorist activity to be<br>22 covered under the policy? | Defendant's Objections: (54:5-22)<br>Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 55<br>1 THE WITNESS: Yes. It's a reasonable<br>2 conclusion on the basis terror activity is not<br>3 excluded by the policy.<br><br>5 Q. And what is the basis for that testimony? | Defendant's Objections: (55:1-23)<br>Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 8  THE WITNESS: Yeah. I mean, they -- we<br>9  never had a conversation about whether terror was<br>10  excluded by the policy. It's not excluded by the<br>11  policy. | testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403 |
| 13  Q.  What is the basis for your assumption that<br>14  NBCUniversal and Aon assumed that in the event of a<br>15  terrorist attack, the loss would be covered?<br><br>19  THE WITNESS: Yeah. I -- I don't<br>20  understand the question. Terror is not excluded by<br>21  the policy. Why would they assume otherwise?<br><br>23  Q.  They wouldn't; right? | Plaintiff's Response:<br>Negotiations, underwriting, communications re same relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| | Defendant's Objections: |
| | Plaintiff's Response: |
| | Defendant's Objections: |
| | Plaintiff's Response: |
| Page 58<br><br>11  Q.  Did you ever offer your opinion as to<br>12  whether or not the claim was covered?<br><br>15  THE WITNESS: To who? | Defendant's Objections:<br><br><br><br>Plaintiff's Response: |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 17  Q.  Danny Gutterman? | |
| 18  A.  No. | |
| 19  Q.  Pamela Johnson? | |
| | |
| 22      THE WITNESS: After she informed me of | |
| 23      what her conclusion was and she explained to me why | |
| 24      she reached that conclusion, I did not object to the | |
| 25      conclusion she formed. | |
| | |
| Page 59 | Defendant's Objections: |
| 2  Q.  You didn't ever offer your opinion as to | |
| 3      whether or not there was imminent peril, for | |
| 4      example? | Plaintiff's Response: |
| | |
| 7      THE WITNESS: No. | |
| | |
| Page 60 | Defendant's Objections: |
| 5  Q.  Okay. Did you ever ask Pamela or Danny | |
| 6      whether or not they would invoke the war exclusion? | |
| | Plaintiff's Response: |
| 9      THE WITNESS: Based on the way you're | |
| 10      asking that question, I -- when Pamela asked -- | |
| 11      sorry. When Pamela stated she was considering the | |
| 12      war risk exclusion, I said, "Okay. Do the research, | |
| 13      and let me know why -- why you think that would | |
| 14      apply." | |
| | |
| 16  Q.  Why were you involved in the claims | |
| 17      process, Mr. Williams? | |
| | |
| 20      THE WITNESS: Well, first of all, that's | |
| 21      not the claims process. That's the claims manager | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 22    telling me, as president of the company, that she | |
| 23    may be invoking an exclusion on a major client with | |
| 24    a major broker. It was simply a matter of courtesy | |
| 25    to give me a heads-up. | |
| Page 61 | Defendant's Objections: |
| 1    MR. HAYES: This is Exhibit 3. | |
| 2    (Exhibit 3 was marked | |
| 3    for identification.) | |
| | Plaintiff's Response: |
| 5  Q.  Do you recognize the document marked | |
| 6    Exhibit 3? | |
| 10    THE WITNESS: Yes. | |
| 12  Q.  I want you to read your e-mail dated | |
| 13    July 15, 2014, 7:53 p.m., into the record, please. | |
| 16    THE WITNESS: The entire thing or just | |
| 17    the -- or just the content? | |
| 18  BY MR. HAYES: | |
| 19  Q.  Do you see where it says why is it not | |
| 20    covered -- "Why is it not a covered claim . . ."? | |
| 21    Do you see that sentence? | |
| 22  A.  Yes. | |
| 23  Q.  Please read that sentence and the one that | |
| 24    follows into the record. | |
| Page 62 | Defendant's Objections: |
| 2    THE WITNESS: "Why is it not a covered | |
| 3    claim they have imminent peril. Unless you are | |
| 4    going to invoke the war exclusion. | Plaintiff's Response: |
| 5    "I am available between 1 and 3 my time." | |
| 7  Q.  So you introduced the idea of invoking the | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 8          war exclusion; isn't that right? | |
| 12          THE WITNESS: No. I don't think that's<br>13          what that -- that conveys. | |
| 15   Q.   What does it convey?<br>16   A.   I think it was Pamela Johnson who said the<br>17          hostilities in Israel may reach the definition of<br>18          "war" as -- in -- or the exclusion of war.<br>19   Q.   And did you express an opinion on that<br>20          question at any time? | |
| Page 63 | Defendant's Objections: |
| 2   Q.   Based on your understanding of what the<br>3          insured's expectations were? | |
| 6          THE WITNESS: No. | Plaintiff's Response: |
| 8   Q.   Why not? | |
| 11          THE WITNESS: Because this is a claims<br>12          process. So Pamela Johnson determines coverage<br>13          under the policy. | |
| 15   Q.   This e-mail refers to a call that you and<br>16          Daniel Gutterman and Pamela Johnson had.<br>17          Do you see that?<br>18   A.   Yes. | |
| 23   Q.   And if you had that call, why -- why? Why<br>24          did you have it? | |
| Page 64 | Defendant's Objections: |
| 1          THE WITNESS: So that Pamela could explain<br>2          to me how, why, what, where she was going to<br>3          investigate this claim. | Plaintiff's Response: |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 5   Q.  Why did you need to know all that if it<br>6      was a claim and you were the head of<br>        underwriting? | |
| 8     THE WITNESS: Because this was a claim<br>9     which involved NBC, a major client of<br>       OneBeacon, and<br>10    Aon, a major broker in the industry. | |
| 12  Q.  Did you approve the decision to deny the<br>13     claim? | |
| 15    THE WITNESS: Well, the word "approve" is<br>16    misleading. I was told of the final decision to<br>17    deny the claim. I didn't object to the -- the<br>18    reasons given. | |
| Page 65<br>11  Q.  And could you have objected to that<br>12     decision when you were told? | Defendant's Objections: |
| 15    THE WITNESS: I could have objected. It<br>16    wouldn't have changed the decision. | Plaintiff's Response: |
| 18  Q.  You couldn't have stopped it? | |
| 21  Q.  Is that what you're saying? | |
| 24    THE WITNESS: Correct. I couldn't have<br>25    stopped it. | |
| Page 67<br>2  Q.  Did you make the decision not to renew the<br>3     NBCUniversal account?<br><br>6    THE WITNESS: In discussion with -- with | Defendant's Objections:<br>(67: 2-25) Renewal process<br>and negotiation of the<br>Policy not relevant to any of<br>Plaintiffs' claims for breach<br>of the contract or duty of |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 7      others, yes. | good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. |
| 11     THE WITNESS: Dennis Crosby and, to a<br>12     certain extent, Wanda Phillips. | Fed. R. Evid. 401; 403 |
| 14   Q.   Dennis Crosby testified that it was your<br>15          decision; is that correct? | Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 19     THE WITNESS: Yeah. The decision -- it<br>20     was one of many decisions about policies non- -- to<br>21     be non-renewed. There was discussions with Dennis<br>22     Crosby as my superior as to why. There was<br>23     discussions with Wanda Phillips as to where we saw<br>24     the account going. And the decision was made,<br>25     "Yeah. I think we should non-renew this." | |
| Page 68<br>2   Q.   You made the decision not to renew it, and<br>3          Dennis Crosby agreed; right? | Defendant's Objections:<br>(68: 2-25)<br>Renewal process and negotiation of the Policy not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403 |
| 6     THE WITNESS: I don't know if it was that<br>7     black and white. It was in a discussion. We came<br>8     to the conclusion we should non-renew it. | |
| 16   Q.   Why did you decide not to renew the<br>17          policy? | Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 19     THE WITNESS: There were several reasons.<br>20     The business practice at NBC had -- had changed in<br>21     terms of the scope and nature of the productions<br>22     they were insuring. OneBeacon Entertainment, in | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 23    conjunction with discussions with Dennis Crosby, we | |
| 24    were taking a different direction in the way the | |
| 25    business was going to be run and the risks we were | |
| | |
| Page 69 | Defendant's Objections: |
| 1    going to insure. This was one of several insureds | (69: 1-25) Renewal process and negotiation of the |
| 2    that we had decided to non-renew. | Policy not relevant to any of Plaintiffs' claims for breach |
| 4  Q.  And in determining whether or not to renew | of the contract or duty of good faith or damages; this |
| 5    the NBCUniversal policy, did you evaluate how much | testimony is a waste of time; causes confusion; is |
| 6    in premiums OneBeacon would have to charge to recoup | prejudicial. |
| 7    its prior losses in claims paid to NBCUniversal? | Fed. R. Evid. 401; 403 |
| | |
| 10    THE WITNESS: That wasn't so much a factor | Plaintiff's Response: |
| 11    in the non-renewal of Universal. That was a factor | Relevant to bad faith and failure to investigate. See |
| 12    in if we decided to renew it, what terms and | Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at |
| 13    conditions we would want to offer NBC. | 1150; CACI 2332. |
| | |
| 15  Q.  What was a factor? | |
| | |
| 17    THE WITNESS: The loss ratio. | |
| | |
| 19  Q.  How much it would take in premiums to | |
| 20    recoup the losses that OneBeacon had already paid | |
| 21    out; right? | |
| | |
| 25    THE WITNESS: It's more along the lines | |
| Page 70 | Defendant's Objections: |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 1      what terms and conditions we would have been<br>2      prepared to offer NBC going forward.<br><br>4  Q.  And what terms and conditions were those?<br><br>7      THE WITNESS: If we had gone forward, yes,<br>8      we would have needed an increase in premium, and we<br>9      would have needed a substantial increase in the SIR. | (70: 1-9) Renewal process and negotiation of the Policy not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 72<br><br>20  Q.  And to recover and recoup the losses that<br>21      have been paid before; correct? | Defendant's Objections:<br>(72: 20-21) Losses, profitability of the account, premium not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 73<br><br>2  Q.  Correct?<br><br>5      THE WITNESS: No. You can't always | Defendant's Objections:<br>(73: 2-25) Losses, profitability of the account, premium not relevant to any |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| make | of Plaintiffs' claims for |
| 6    up the losses that you -- that you suffered. | breach of the contract or |
| 7    Otherwise the rate you charged the insured would be | duty of good faith or damages; this testimony is a |
| 8    ridiculous. | waste of time; causes confusion; is prejudicial. |
| 10  Q.  But it was something that was considered? | Fed. R. Evid. 401; 403 |
| 14     THE WITNESS: It can be considered, but | Plaintiff's Response: |
| 15     it's just not possible to make up losses that you've | Relevant to bad faith and failure to investigate. See |
| 16     incurred. | Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at |
| 18  Q.  It can be considered, and it was | 1150; CACI 2332. |
| 19     considered; right? | |
| 22     THE WITNESS: I don't think we could have | |
| 23     charged a rate enough. So it wasn't a factor in | |
| 24     what we were going to do going forward if we were | |
| 25     going to go forward. | |
| Page 74 | Defendant's Objections: |
| 2   Q.  When did you come to the conclusion that | (74: 2-20) Losses, |
| 3      you couldn't have charged a rate that was high | profitability of the account, premium not relevant to any |
| 4      enough to recoup those prior losses? | of Plaintiffs' claims for breach of the contract or |
| 8      THE WITNESS: When we began to look at | duty of good faith or damages; this testimony is a |
| 9      the -- the loss ratio. | waste of time; causes confusion; is prejudicial. |
| 11  Q.  And after you considered that, you decided | Fed. R. Evid. 401; 403 |
| 12     not to renew the policy; right? | |
| 15     THE WITNESS: No. That completely | Plaintiff's Response: |
| 16     misstates my testimony. We decided not to renew the | Relevant to bad faith and failure to investigate. See |
| 17     policy because OneBeacon Entertainment, | Oppo to MIL 2 (Dkt 201); |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| as a | UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 18    division of OneBeacon, was moving away from insuring | |
| 19    studios' large corporate risks. This was just one | |
| 20    of many on which non-renewal terms were offered. | |
| | |
| Page 76 | Defendant's Objections: |
| 17   Q.   And I want you to go back to the exhibit | |
| 18       marked 1. Sorry. The exhibit marked 2. | |
| 19   A.   Yes. | |
| 20   Q.   That's the insurance policy at issue in | Plaintiff's Response: |
| 21       this case; is that right? | |
| 22   A.   That's correct. | |
| 23   Q.   And I want you to turn to the page marked | |
| 24       ATL 3083. | |
| 25   A.   Yes. | |
| | |
| Page 77 | Defendant's Objections: (77:1-24) |
| 1   Q.   And I want you to read the exclusion Roman | Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial. |
| 2       numeral III, Arabic 1 into the record. | |
| 3   A.   "War, including undeclared or civil war; | |
| 4       or." | |
| | Fed. R. Evid. 401; 403 |
| 23   Q.   And looking at Exhibit 2, who drafted that | |
| 24       language? | |
| | Plaintiff's Response: |
| | Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 78 | Defendant's Objections: (78:2-3) |
| 2       THE WITNESS: The original policy | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| language<br>3　　　was provided by Aon. | Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 80<br>23　Q.　Who wrote it down in the policy? Who was<br>24　　　the scrivener?<br>25　A.　Well, you don't write it down. So Aon had | Defendant's Objections:<br>(80:23-25)<br>Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br>Plaintiff's Response:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| Page 81<br><br>1　　　given us a wording that they wished us to | Defendant's Objections:<br>(81:1-15) |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
|     use. | Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br><u>Plaintiff's Response</u>:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 2    During a proc- -- a long process that wording was | |
| 3    discussed. And eventually that wording was taken, | |
| 4    reformatted into the insurance policy here back in | |
| 5    2010. | |
| 6  Q.  When you say "reformatted," what do you mean? | |
| 8  A.  The document that Aon gave us, I believe, | |
| 9    was in one page format. Once the wording was agreed | |
| 10    with Aon, it was reformatted into the way that | |
| 11    OneBeacon issued their policies. | |
| 12  Q.  But what do you mean by "reformatted"? | |
| 13    Like a cut and paste into the format that OneBeacon | |
| 14    issues its policies? | |
| 15  A.  Yes. | |
| <u>Page 82</u> | <u>Defendant's Objections</u>:<br>(82:6-18)<br>Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br><u>Plaintiff's Response</u>:<br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| 6  Q.  And would they have literally performed a | |
| 7    cut-and-paste function, or would they have typed out | |
| 8    the language anew into the OneBeacon form? | |
| 10    THE WITNESS: That would be a | |
| 11    cut-and-paste. | |
| 13  Q.  Okay. And that applies with respect to | |
| 14    Roman numeral III(1), (2), (3), and (4) on | |
| 15    page 3083? | |
| 17    THE WITNESS: I have every reason to think | |
| 18    so. Yes. | |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| <u>Page 92</u><br>14  Q.  Did OneBeacon impose any terms in addition<br>15       to the terms already in the policy applicable only<br>16       to the DIG production at any time?<br>17  A.  I don't believe so. No.<br>18       MR. HAYES: This is Exhibit 5.<br>19       (Exhibit 5 was marked<br>20       for identification.) | <u>Defendant's Objections:</u><br>(92:14-20)<br>Policy negotiations, underwriting, profitability not relevant to any of Plaintiffs' claims for breach of the contract or duty of good faith or damages; this testimony is a waste of time; causes confusion; is prejudicial.<br>Fed. R. Evid. 401; 403<br><br><u>Plaintiff's Response:</u><br>Relevant to bad faith and failure to investigate. See Oppo to MIL 2 (Dkt 201); UCP v. Atlantic, 929 F.3d at 1150; CACI 2332. |
| <u>Page 93</u><br>2  Q.  Have you ever seen that document before, sir?<br>3<br>4  A.  I don't believe so.<br>5  Q.  Wanda Phillips tells Danny Gutterman:<br>6       "We approved filming in East Jerusalem & Tel Aviv. NBC Security team is to remain involved and continue working with production."<br>7<br>8<br>9       Is that something that OneBeacon required?<br>10  A.  I don't know that we required it. They told us they were going to do it. So we wouldn't<br>11<br>12       object to it.<br>13  Q.  Did you ask them to do it?<br>14  A.  They told us they were going to do it. | <u>Defendant's Objections:</u><br><br><br><br><u>Plaintiff's Response:</u> |
| <u>Page 131</u><br>11  Q.  Can a loss be caused by terrorism and war? | <u>Defendant's Objections:</u> |

| Plaintiffs' Designation of P. Williams May 2017 | Objection & Response |
|---|---|
| 15      THE WITNESS: At the same time? | |
| | Plaintiff's Response: |
| 17   Q.   Yes. | |
| 19      THE WITNESS: I don't think so. | |
| | |
| | Defendant's Objections: |
| | |
| | Plaintiff's Response: |
| | |
| Page 134 | Defendant's Objections: |
| 18   Q.   Based on all of that information OneBeacon | |
| 19      received, OneBeacon accepted DIG as an insured | |
| 20      production under the policy; right? | Plaintiff's Response: |
| 24      THE WITNESS: Yes. | |

# DEFENDANT'S DEPOSITION DESIGNATIONS

| Deposition Designation | Objection & Response |
|---|---|
| **Defendant's Designation of Malika Adams**<br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer. However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | Plaintiffs object to Defendant's designations as follows. |
| Page 4<br>6 BY MS. CRAPSTER:<br>7 Q. Ms. Adams, my name is Carla Crapster. I'm<br>8 here on behalf of Atlantic Specialty. First, I just<br>9 want to confirm you can hear me okay, correctly<br>10 correct?<br>11 A. Yeah. There's a little bit of an echo, so<br>12 going to turn it down a tad, and I think that might<br>13 help. Go ahead.<br>14 Q. Does it sound any better - -<br>15 A. Yeah.<br>16 Q. -- on your end?<br>17 A. It's a little bit better. You're okay. Yeah. | Plaintiff's Objections:<br>No objection – Page 4.<br><br>Defendant's Response: |
| Page 11<br>3 And what was your title when you were first<br>4 hired at Comcast?<br>5 A. When I was first hired in 2008, I was a risk<br>6 administrator for the content and technology programs.<br>10 a number of TV networks and technology joint ventures<br>11that Comcast either owned entirely or had a portion<br>12 thereof that did not fit the corporate programs, if you<br>13 will, so they were insured entirely separately from the<br>14 Comcast corporate insurance programs. I managed those<br>15 Insurance programs.<br>16 Q. And what do you mean by that when you say you<br>17 managed insurance programs?<br>18 A. Every little network and every technology<br>19 joint venture had an independent set of policies to<br>20 cover their needs that were very different from the<br>21 corporate needs.<br>22 Q. So would it be correct to say that it was your<br>23 job to make sure that these individual networks and<br>24 joint ventures had the insurance coverage that was<br>25 appropriate for them?<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br>Page 11 | Plaintiff's Objections:<br>Page 11:3-6, 10-25 – No objection if counter designation 11:7-9 included. Counter necessary to complete sentence.<br><br>Defendant's Response:<br><br>No objection to counter designation. |

| Deposition Designation | Objection & Response |
|---|---|
| 7 Q. And tell me, what exactly did that entail?<br>8 What were your responsibilities?<br>9 A. At the time I worked there in 2008, there were<br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | |
| Page 12<br>5 Yes. | Plaintiff's Objections:<br>No objection – Page 12.<br><br>Defendant's Response: |
| Page 14<br>12 BY MS. CRAPSTER:<br>13 Q. So what did your new responsibilities entail?<br>14 A. When I became a senior analyst, I worked a<br>15 little bit more closely with the director of risk<br>16 management at the time, and I helped through the<br>17gathering of underwriting information for some insurance<br>18 renewals<br>19 Q. And who was that director of risk management<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br>Page 14<br>20 that you worked under?<br>21 A. Her name was Kathy Coupe.<br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | Plaintiff's Objections:<br>Page 14:12-19 – no objection if counter is included.  Counter 14:20-21 necessary to complete partial question at line 19.<br><br>Defendant's Response:<br><br>No objection to counter designation. |
| Page 19<br>9 Q. Okay. So your -- going back to your work<br>10 history, you said you joined Comcast in 2008. In 2011<br>11 you became the senior analyst in connection with the<br>12 merger of NBCU and Comcast. How long did you hold the<br>13 role of senior analyst?<br>14 A. 2000 and -- the beginning of 2014.<br>15 Q. And what happened at that point?<br>16 A. I got promoted to supervisor.<br>17 Q. So you're still at Comcast at this point?<br>18 A. Yes.<br>19 Q. And what does your new role as a supervisor<br>20 entail?<br>21 A. The group underwent some changes at the<br>22beginning of 2014. And so individuals within the group<br>23were realigned by line of coverage, so having<br>24responsibilities for certain lines of coverage. The<br>L25ines of coverage I became responsible for included | Plaintiff's Objections:<br>No objection – Page 19.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| Page 20<br>1 global casualty, including umbrella and excess<br>2 liability, and the professional liability program, along<br>3 with a few ancillary, like railroad protective and<br>4 environmental liability.<br>5 Q. And you said that was in approximately 2014?<br>6 A. That's correct.<br>7 Q. Do you know when in 2014?<br>8 A. Beginning of the year. Whenever promotions<br>9 are announced.<br>10 Q. So probably January or February?<br>11 A. Probably | Plaintiff's Objections:<br>No objection – Page 20.<br><br>Defendant's Response: |
| Page 25<br>1 Q. Ms. Adams, you no longer work for Comcast; is<br>2 that correct?<br>3 A. That's correct.<br>4 Q. When did you leave?<br>5 A. January of this year.<br>6 Q. Of this year? Of 2017?<br>7 A. Correct.<br>19 Ms. Adams, what you did do to prepare for<br>20 today's deposition?<br>21 I spoke with NBCUniversal attorneys last week. | Plaintiff's Objections:<br>No objection – Page 25.<br><br>Defendant's Response: |
| Page 50<br>8 Are you familiar with the policy that's at<br>9 issue in this lawsuit?<br>10 A. Yes. With a -- yes.<br>17 Q. Ms. Adams, when was the last time you saw that<br>18 policy?<br>19 A. I don't remember.<br>20 Q. Okay. I'll represent to you that that policy<br>21 took effect in January of 2014.<br>22 A. Okay.<br>23 Q. Does that sound correct to you?<br>24 A. It sounds correct, yes. | Plaintiff's Objections:<br>No objection – Page 50.<br><br>Defendant's Response: |
| Page 60<br>1 Q. Ms. Adams, are you generally aware of the --<br>2 the facts of this lawsuit?<br>3 A. Yes, in general terms.<br>4 Q. Okay. Are you aware of the plaintiffs'<br>5 position in the case?<br>6. A. Not particularly, no.<br>18 Q. Yeah. Do you understand that the plaintiffs'<br>19 position in this case is that the loss is covered<br>20 because it results from acts of terrorism?<br>**21 A. Yes**<br>22 Q. Do you agree with that position?<br>23 A. I don't really have an opinion. | Plaintiff's Objections:<br>Calls for a legal conclusion;<br>witness's opinion not<br>relevant 402 – Page 60:18-<br>23.<br><br>Defendant's Response:<br>The question does not seek<br>or illicit a legal conclusion,<br>rather it merely asks that<br>the witness testify to facts<br>within her personal<br>knowledge. The witness'<br>understanding <u>of the</u><br><u>development of facts</u><br><u>bearing on claim decision</u> |

| Deposition Designation | Objection & Response |
|---|---|
| | relevant to reasonableness of claim decision, and the witness' lack of an opinion go to the credibility of the witness which is weighed by the jury and always relevant. |
| Page 72<br>1 MS. CRAPSTER: And we'll mark this as<br>2 Exhibit 240.<br>21 Q. Ms. Adams, before we get into the email, do<br>22 you remember the first time that you heard about the Dig<br>23 claim that's now at issue in this lawsuit?<br>24 A. No, I don't remember. | Plaintiff's Objections:<br>No objection – Page 72.<br><br>Defendant's Response: |
| Page 80<br>17 MS. CRAPSTER: We're going to mark this as<br>18 Exhibit 242. | Plaintiff's Objections:<br>No objection – Page 80.<br><br>Defendant's Response: |
| Page 82<br>21 Q. If we continue following up the email chain,<br>22 there's another email that appears above that sent from<br>23 Randi Richmond to Kurt on July 2nd. And it states, "The<br>24 other potential issue, Kurt, would be what if we had to<br>25 pull out of Israel entirely and re-up the whole show in | Plaintiff's Objections:<br>402, 403 – Page 82:21-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue.<br><br>Defendant's Response:<br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Defendant objects to Plaintiffs' counter |

| Deposition Designation | Objection & Response |
|---|---|
| | designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect.<br><br>Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony. |
| Page 83<br>1 the US? Does insurance cover that?"<br>2 And then it appears that Mr. Ford forwarded<br>3 you that email and sent another one for us to discuss.<br>4 And then you responded that same day, July 3rd, 2014.<br>5 Do you recall sending this email?<br>6 A. Not particularly, no. | Plaintiff's Objections:<br>402, 403 – Page 83:1-6. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue.<br><br>Defendant's Response:<br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Defendant objects to Plaintiffs' counter designations under Fed. R. |

| Deposition Designation | Objection & Response |
|---|---|
| | Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect.<br><br>Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony. |
| Page 84<br>2 Q. Okay. So your email states, "Unfortunately, I<br>3 don't think we would have coverage for a situation in<br>4 which we voluntarily pulled out of an area because of<br>5 security concerns. In order to trigger coverage under a<br>6 production policy, we would need a policy trigger as<br>7 Susan had mentioned, and even with that, we'd have to be<br>8 cautious because there's a war exclusion on the policy."<br>9 Do you recall what made you think that the<br>10 voluntary pulling out of an area because of security<br>11 concerns would not be covered?<br>17 THE WITNESS: I don't remember.<br>18 BY MS. CRAPSTER:<br>19 Q. Do you recall what made you state that you'd<br>20 need that you would need to be cautious about<br>21 coverage because there was a war exclusion on the<br>22 policy? | Plaintiff's Objections: 402, 403, 602 – Page 84:2-22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  No foundation or personal knowledge, improper opinion, and speculation—Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than probative and likely to confuse the jury. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue.<br><br>Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this |

| Deposition Designation | Objection & Response |
|---|---|
| | testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Defendant objects to Plaintiffs' counter designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect.<br><br>Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony. |
| Page 85<br>2 THE WITNESS: I don't remember specifically,<br>3 no.<br>4 BY MS. CRAPSTER:<br>5 Q. Do you have any general memory?<br>7 THE WITNESS: In general terms, I -- you know,<br>8 I was being asked to kind of spot check an issue.<br>9 And it was a -- kind of a hypothetical issue that<br>10 we may be facing down the road. So I was spot<br>11 checking and that was an exclusion that came to<br>12 mind.<br>13 BY MS. CRAPSTER:<br>14 Q. Okay. But to be clear, this wasn't a<br>15 hypothetical that was being presented to you. You<br>16 understood that this was a real situation, that Dig was<br>17 being filmed in Israel and they were coming to you,<br>18 asking your opinion on whether moving Dig out of | Plaintiff's Objections: 402, 403, 602 – Page 85:2-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. No foundation or personal knowledge, improper opinion, and speculation—Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than probative and likely to confuse the jury. Counters 95:3-16 and 99:16-100:5 necessary for |

| Deposition Designation | Objection & Response |
|---|---|
| Israel<br>19 would be a covered loss, correct?<br>25 THE WITNESS: I don't remember particularly. | completeness to inform jury that Adams did not review the policy at issue.<br><br><u>Defendant's Response:</u><br><u>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge.</u><br><br>Defendant objects to Plaintiffs' counter designations under  Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect.<br><br><u>Plaintiffs' Response to Objection to Counters:</u><br><u>Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony.</u> |
| Page 86<br>1 BY MS. CRAPSTER: | Plaintiff's Objections:<br>402, 403, 602 – Page 86:1- |

| Deposition Designation | Objection & Response |
|---|---|
| 2 Q. So that wasn't -- that wasn't my question to 3 you. It wasn't -- my question was, You understood that 4 this was not a hypothetical scenario that was being 5 presented to you, right? You understood that there was 6 a real TV show that was being filmed in Israel, correct? 7 A. I understood that there was a real TV show 8 being filmed in Israel. But where the scenario was 9 hypothetical was that at the time they asked me, "So 10 what if" -- "what if we decide to leave Israel?" To me, 11 that's a hypothetical situation on which I was providing 12 an opinion. | 12. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  No foundation or personal knowledge, improper opinion, and speculation—Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than probative and likely to confuse the jury. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue. Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Defendant objects to Plaintiffs' counter designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 89<br>7 Q. Ms. Adams, I'm asking you about 2866, which<br>8 we've stamped as Exhibit 243. I'm on the first page,<br>9 and I'm looking at the email that's dated July 7th, 8:11<br>10 p.m., sent from you to Randi Richmond with cc's to<br>11 others. Are you with me?<br>12 A. Yes.<br>13 Q. Okay. Thank you. Okay. So this is dated<br>14 July 7th, 2014, correct?<br>15 A. Yes.<br>16 Q. The email that we previously looked at and we<br>17 stamped as Exhibit 242 was dated July 3rd, 2014; is that<br>18 correct?<br>19 A.Yes.<br>20 Q. Okay. So we're now four days later in time.<br>21 And you are sending an email to Randi Richmond, stating<br>22 more or less what you had said in the earlier email to<br>23 Kurt Ford. Would you agree with that?<br>24 A. Generally speaking, I don't think it's exactly<br>25 the same but . | Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony.<br><br>Plaintiff's Objections: 402, 403, 602 – Page 89:7-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  No foundation or personal knowledge, improper opinion, and speculation—Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than probative and likely to confuse the jury. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue.<br><br>Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Defendant objects to Plaintiffs' counter designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy |

| Deposition Designation | Objection & Response |
|---|---|
| | at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect.<br><br>Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony. |
| Page 90<br>16 So you are reiterating the same position that<br>17 you stated four days earlier in what we marked as<br>18 Exhibit 242, correct?<br>22 THE WITNESS: Yes, generally speaking. I<br>23 don't think I used the exact same words but<br>24 generally the same intention.<br>25 BY MS. CRAPSTER: | Plaintiff's Objections: 402, 403, 602 – Page 90:16-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  No foundation or personal knowledge, improper opinion, and speculation—Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than probative and likely to confuse the jury. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review |

| Deposition Designation | Objection & Response |
|---|---|
| | the policy at issue.<br><br>Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Defendant objects to Plaintiffs' counter designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect.<br><br>Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony. |
| Page 91<br>1 Q. Okay. So four days later, it was still your<br>2 position that if there was an act of civil authority<br>3 shutting us down or if permits were pulled, then NBCU<br>4 might have some recourse, but even then you would say<br>5 that with caution because there's a war exclusion in | Plaintiff's Objections: 402, 403, 602 – Page 91:1-12. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  No foundation or personal knowledge. |

| Deposition Designation | Objection & Response |
|---|---|
| 10 THE WITNESS: Yes, ·that's correct. Again, I 11 was answering a - - kind of a hypothetical that was 12 put in front of me. | improper opinion, and speculation—Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than probative and likely to confuse the jury. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue. Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Defendant objects to Plaintiffs' counter designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect. Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 92**<br>1 MS. CRAPSTER: We'll mark this as Exhibit 244.<br>2 (Thereupon, Exhibit 244 was marked for<br>3 identification.)<br>4 BY MS. CRAPSTER:<br>5 Q. So, Ms. Adams, you're looking at the first<br>6 page of what we've marked as Exhibit 244. I think<br>7 there's an email kind of in the middle of the page dated<br>8 July 7th. It's sent from Randi Richmond to you. It<br>9 states, "Adding Binke, So if we pull out because<br>10 security advises us to, we have no coverage."<br>11 Did I read that right?<br>12 A. I see the email, yeah. | deponent's knowledge to designated testimony.<br><br>Plaintiff's Objections: 402, 403, 602 – Page 92:1-12. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  No foundation or personal knowledge, improper opinion, and speculation—Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than probative and likely to confuse the jury. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue.<br><br>Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Defendant objects to Plaintiffs' counter designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the |

| Deposition Designation | Objection & Response |
|---|---|
| Page 93<br>2 BY MS. CRAPSTER:<br>3 Q. So, Ms. Adams, does that appear to you to be<br>4 an email that Ms. Richmond wrote to you?<br>5 A. I have no reason to -- to believe it's not,<br>6 but I don't remember it specifically.<br>7 Q. Okay. And you -- it looks like you responded<br>8 to her. And it says, "Hi, Randi. 11 And then you went on<br>9 to reiterate the same position again, "I don't think we<br>10 can find coverage under the production policy. With<br>11 that said, if and when we have a clear idea of what we<br>12 may do, we can certainly bring it up to the carrier and<br>13 ask for a more formal opinion."<br>14 I just wanted to clarify. You're asking<br>15 your statement that you would be asking for a more<br>16 formal opinion. Had there been any conversations that<br>17 you know of with Atlantic at that point?<br>18 A.I don't remember.<br>19 Q. Okay. And then above that, Mr. Binke sends an<br>20 email to you and Randi Richmond with copies to others,<br>21 stating, "Let's discuss tomorrow. Please set a call."<br>22 Do you recall whether that telephone call that<br>23 he's asking to be set up ever did take place?<br>24 A. I don't remember. | jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect.<br><br>Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony.<br><br>Plaintiff's Objections: 402, 403, 602 – Page 93:2-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. No foundation or personal knowledge, improper opinion, and speculation—Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than probative and likely to confuse the jury. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue.<br><br>Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Defendant objects to Plaintiffs' |

| Deposition Designation | Objection & Response |
|---|---|
| | counter designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect.<br><br>Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony. |
| Page 94<br>5 Q. Was this -- I mean, they were coming to you<br>6 with a coverage question. Was that in the normal course<br>7 and scope of your duties, to have someone come to you<br>8 with a question about coverage like this?<br>13       THE WITNESS:  And so part of my role was<br>14       advisory in nature.  So it was very common for<br>15       productions or any other people working at Comcast<br>16       or NBCUniversal who had questions about scenarios<br>17       to call and say, Hey, we're thinking about doing<br>18       this.  What are the insurance implications?  Or,<br>19       you know, we -- this -- this is -- this is<br>20       happening.  What do you think about it?  So it was<br>21       very -- it's very -- it was very typical in the<br>22       course of my day to run hundreds of what-if<br>23       scenarios and what we would have to look at and<br>24       kind of spot check the issues that we may be facing<br>25       with -- so these kind of emails, yes, would have | Plaintiff's Objections: 402, 403, 602 – Page 94:5-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  No foundation or personal knowledge, improper opinion, and speculation—Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than probative and likely to confuse the jury.  Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue.<br><br>Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The |

| Deposition Designation | Objection & Response |
|---|---|
| | probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Defendant objects to Plaintiffs' counter designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect. |
| | Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony. |
| Page 95<br>1      been typical.<br><br>PLAINTIFFS' 106 COUNTER DESIGNATION:<br><br>Page 95<br>3· · · · Q.· ·Okay.· And what did you typically do in order<br>·4· ·to respond to a request like that?<br>·8· · · · · · ·THE WITNESS:· A lot of times it was very<br>·9· · · · general questions.· So using my general knowledge<br>10· · · · of the industry and of our programs, we would | Plaintiff's Objections: 402, 403, 602 – 95:1. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  No foundation or personal knowledge, improper opinion, and speculation— Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than |

| Deposition Designation | Objection & Response |
|---|---|
| be<br>11· · · · able to answer those questions, again in general<br>12· · · · terms.· If and when there was a situation that<br>13· · · · warranted a policy review or a policy review<br>was<br>14· · · · requested, then we would go ahead and pull the<br>15· · · · policy, but those generally didn't occur unless<br>16· · · · there was an actual claim.<br><br>END PLAINTIFFS' 106 COUNTER DESIGNATION | probative and likely to confuse the jury. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue.<br><br>Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Defendant objects to Plaintiffs' counter designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect.<br><br>Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 97<br>3      MS. CRAPSTER:  So let's mark that as<br>4      Exhibit 245.<br>5           (Thereupon, Exhibit 245 was marked for<br>6   identification.)<br>7   BY MS. CRAPSTER:<br>8      Q.   So at the very top of that page that we've<br>9   just marked as Exhibit 245 -- it's UPC708.  That's from<br>10   Kurt Ford to Mark Binke.  He says, "Right before the<br>11   holiday, I spoke to Susan Weiss with Aon and Malika.<br>12   Malika didn't believe there would be coverage under the<br>13   corporate program and suggested I speak with Susan to<br>14   check if there's any coverage under our TV portfolio<br>15   policy.<br>16   Did I read that correctly?<br>17      A.  Yes.  That's what I'm seeing too.<br><br>PLAINTIFFS' 106 COUNTER DESIGNATION:<br>Page 99<br>16· · · · Q.· ·Okay.· Were there multiple policies that you<br>17· ·considered in responding to -- in drafting the emails<br>18· ·that we marked as 242 and 243?· Are you -- is -- are you<br>19· ·analyzing coverage under multiple policies in those<br>20· ·emails?<br>21· · · · A.· ·No.<br>24· · · · · · ·THE WITNESS:· No.· As I explained before, I<br>25· · · · wasn't -- I wasn't analyzing policies.· I was spot<br><br>Page 100<br>1· · · · checking.· And when you spot check, I kind of think<br>·2· · · · about all the insurance programs that are in place.<br>·3· · · · And that's what I use to spot check an issue, but I<br>·4· · · · did not review any particular policies to answer<br>·5· · · · the hypothetical question I was asked.<br><br>END PLAINTIFFS' 106 COUNTER DESIGNATION | Plaintiff's Objections:<br>402, 403, 602, 802 – Page 97:3-17. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  No foundation or personal knowledge, improper opinion, and speculation—Ms. Adams testified she had no personal knowledge of policy at issue. Therefore, substantially more prejudicial than probative and likely to confuse the jury. Hearsay to the extent offered for truth of matter asserted. Counters 95:3-16 and 99:16-100:5 necessary for completeness to inform jury that Adams did not review the policy at issue.<br><br>Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and the subsequent actions of the witness after possessing said information. Defendant |

| Deposition Designation | Objection & Response |
|---|---|
| | objects to Plaintiffs' counter designations under Fed. R. Evid. 401 as it is irrelevant in light of the admission of this witness to familiarity with the Policy at issue in this case, at Page 50:8-24. Defendant further objects under Fed. R. Evid. 403, inclusion of Plaintiffs' counter designation would only serve to mislead the jury and any probative value this counter designation may have is substantially outweighed by its prejudicial effect.<br><br>Plaintiffs' Response to Objection to Counters: Counters 95:3-16 and 99:16-100:5 provide necessary context regarding deponent's knowledge to designated testimony. |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| Defendant's Designation of Mark Binke:<br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | Plaintiffs object to Defendant's designations as follows.  Where line numbers are not included with a page number, plaintiffs object to all designated testimony on the page cited. |
| Page 10<br>20 Q State your name for the record.<br>21 A Mark Binke. | Plaintiff's Objections:<br>No objection – Page 10.<br>Defendant's Response: |
| Page 11:<br>9 Q Okay. By whom are you employed, Mr. Binke?<br>10 A Universal Cable Productions.<br>11 Q What is your position with Universal Cable<br>12 Productions?<br>13 A Executive vice president of production.<br>14 Q What are your duties in that position?<br>15 A I guide and set the production strategy for<br>16 the studio. I oversee and manage the executives who<br>17 supervise the production of our shows. | Plaintiff's Objections:<br>No objection – Page 11.<br><br>Defendant's Response: |
| Page 12<br>3 Q And how long have you had the position of<br>4 executive vice president of production with UCP?<br>5 A Over five years. | Plaintiff's Objections:<br>No objection – Page 12.<br><br>Defendant's Response: |
| Page 14<br>18 And did you have any role in connection<br>19 with a television show called DIG?<br>20 A I did.<br>21 Q What was your role?<br>22 A I'm head of production, so I assigned it to<br>23 my executive, Randi Richmond.<br>24 Q Okay. And then as that project proceeded,<br>25 then would she update you on the status of it from | Plaintiff's Objections:<br>No objection – Page 14.<br><br>Defendant's Response: |
| Page 15<br>1 time to time?<br>2 A Yes. | Plaintiff's Objections:<br>No objection – Page 15.<br>Defendant's Response: |
| Page 17 | Plaintiff's Objections: |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| 24 A So the pilot was shot in Canada and Israel.<br>25 Q Okay. | No objection – Page 17.<br><br>Defendant's Response: |
| Page 18<br>3 Q Did you have any role in the decision to do<br>4 some of the shooting in Israel?<br>5 A Can you be a little more specific.<br>6 Q Yeah. Did you -- okay. Somebody had to<br>7 decide that some of the shooting would take place in<br>8 Israel on DIG, correct?<br>9 A It's a collective decision. It's driven by<br>10 creative, by cost, by what the buyer is willing to<br>11 spend, by the scope of what we're attempting to do.<br>12 So there were a number of people involved in the<br>13 decision.<br>14 Q Okay. And were you involved in that<br>15 decision somewhat?<br>16 A Yes.<br>17 Q Okay. What was -- what was your<br>18 participation in that decision?<br>19 A To assess and oversee that the plan and the<br>20 budget were realistic. And to ensure that my<br>21 executives were doing the due diligence on the<br>22 ground to make sure that the infrastructure and the<br>23 support teams were robust enough to support a show<br>24 of that scale and scope. | Plaintiff's Objections:<br>No objection – Page 18.<br><br>Defendant's Response: |
| Page 25<br>13 Q Okay. Let me ask you to take a look at<br>14 Exhibit 352. It was marked previously.<br>15 And the first Page is an email -- and I<br>16 realize you're not shown as a recipient, but what I<br>17 wanted to ask you was: There's an attachment to it<br>18 labeled "Crisis and Security Assessment April 2014."<br>19 And I just wanted to know if you remember seeing<br>20 this document.<br>21 A I don't. | Plaintiff's Objections:<br>104a, 403, MIL 2 (Dkt 209) – 25:13-24. Witness has no knowledge of document. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>No objection – 25:25.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| 22 Q By "this document," I'm talking about the<br>23 attachment to it.<br>24 A I don't recall.<br>25 Q Okay. Do you know who Stephen Smith is? | testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims and what information was available for their review at the time. As to preliminary question objection, it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets the 602. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 26<br>1 A Yes.<br>6 Who is Stephen Smith? And that's with a<br>7 p-h.<br>8 A He was our security point.<br>9 Q In connection with DIG?<br>10 A Yes.<br>14 Q During the production of DIG, did you<br>15 receive reports from Stephen Smith concerning<br>20 THE WITNESS: Over the course of it, yes. | Plaintiff's Objections:<br>No objection – Page 26:1, 6-20.<br><br>Defendant's Response: |
| Page 27<br>23 Q All right. Mr. Binke, are you looking at<br>24 what was marked previously as Exhibit 113?<br>25 A I am. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 27:23-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 28
8 Q And the top one, the top email is dated
9 June 15, 2014, from Randi Richmond to Stephen Smith
10 and yourself, correct?
14 THE WITNESS: Yes.

PLAINTIFFS' 106 COUNTER-DESIGNATION:
Page 28
15 BY MR. RIDDLE:
16 Q And also, one of the people it was
17 addressed to was Brian Brady, correct?
18 A That's what it says, yes.
19 Q With a copy to Erin Noordeloos, correct?
20 A Correct.
21 Q Okay. And then the email below is from
22 Stephen Smith to Randi Richmond also on | Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 28:8-10; 28:14. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Counter designation necessary to complete testimony to allow for proper identification of document.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| June 15, 23 2014, correct?<br>24 A Correct.<br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 29<br>7 Q Yeah. Do you have any reason to think you<br>8 did not receive this -- these emails?<br>9 A I do not.<br>18 Q And when -- when you received<br>19 communications such as this that contained reports<br>20 from Mr. Smith, did you generally make a practice of<br>21 reading those?<br>22 A Yes.<br>23 Q Okay. And did you, when you were reading<br>24 them, have any reason to doubt the accuracy of what<br>25 he was reporting to you? | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 29:7-9, 18-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| | value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 30<br>1 A No.<br>2 Q Did you rely on that information in<br>3 performing your job?<br>7 THE WITNESS: I'd look to Stephen to give<br>8 me guidance on how to keep our crew and cast safe.<br>9 That's what I read these for.<br>12 Exhibit 115, | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 30:1-3,7-9,12. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind. |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| | Plaintiff's Objections: 802 – 31:6-13. Hearsay to the extent offered for the truth of the matter asserted. |
| Page 31 6 Q And he says: 7 "The current advise from MAX 8 Security, which has come in overnight 9 and as a result of further 10 deterioration of security, is to avoid 11 all activity in the Old City." 12 Do you see that? 13 A Yes. 14 Q Do you have an understanding of who -- 15 who's being referred to by -- where it says 16 MAX Security? 17 MAX is in all caps. 18 A They were the local on-the-ground security 19 service that was ensuring the security and safety of 20 the crew. 21 Q In Israel? 22 A In Israel, yes. 23 Q Okay. And if you could take a look at 24 Exhibit 355. It's dated June 16. | 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 31:6-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| | Defendant's Response: The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony |

| **Deposition Designation:  Mark Binke** | **Objection & Response** |
|---|---|
| | regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 32<br>8 Q Is that a portion of an email that<br>9 Randi Richmond sent to you and Richard Rothstein on<br>10 June 16, 2014, "Subject: DIG Issues"?<br>14 THE WITNESS: Yes.<br>19 Q Okay. And Ms. Richmond begins the email by<br>20 saying:<br>21 "Security is getting more<br>22 concerned about our presence in the<br>23 old city for Thursday night."<br>24 Correct?<br>25 A Correct. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 32:8-10, 14 19-25. Wastes time; jury can be instructed that Plaintiffs moved production and why. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 33<br>7 Q Okay. And if you could take a look at<br>8 Exhibit 356.<br>9 A Okay.<br>10 Q The top email is -- is from Randi Richmond<br>11 to you on June 16, 2014, correct?<br>12 A Yes.<br>13 Q And below that is an email from<br>14 Stephen Smith to Ms. Richmond with a copy to<br>15 yourself and others, correct?<br>19 THE WITNESS: Yes.<br>20 BY MR. RIDDLE:<br>21 Q Okay. And the reference there is, "DIG,<br>22 Security Situation," correct? | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208– Page 33:7-22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 34<br>1 THE WITNESS: Yes.<br>2 BY MR. RIDDLE:<br>3 Q In the second paragraph, it says:<br>4 "There is significant Israeli<br>5 Defense Force activity in the West<br>6 Bank and there has been an escalation<br>7 in tension across the region including<br>8 multiple arrests/detentions of Hamas<br>9 members and supporters, mortar fire an<br>10 demonstrations which have turned<br>11 violent."<br>12 Did I read that correctly?<br>16 THE WITNESS: Yes. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208– Page 34. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 42<br>14 BY MR. RIDDLE: | Plaintiff's Objections:<br>402, 403, 802, MIL 2 (Dkt 209) – |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| 15 Q Mr. Binke, I'm going to hand you a document<br>16 that's labeled Exhibit 407. I apologize for that<br>17 highlighting, but it's just the names.<br>18 And does this contain several emails?<br>21 THE WITNESS: Yes. | Page 42:14-18, 21. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Hearsay to the extent offered for the truth of the matter asserted.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 43<br>7 Ms. Richmond in your email?<br>8 A What I wrote to her was, "Given the<br>9 escalating conflict on the ground, need to know"<br>10 tomorrow "morning what our insurance provides in the<br>11 event we have to shut down for safety/security<br>12 reasons. Who has been handling?" | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)– 43:7-12; 43:25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Counter designation 43:6 necessary to complete question.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| PLAINTIFFS' 106 COUNTER-DESIGNATION:<br>Page 43<br>6 Could you read for us what you said to<br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 44<br>1 you say "the escalating conflict on the ground"?<br>5 THE WITNESS: At that point in time, there<br>6 were mortars and rockets being fired out of Gaza,<br>7 so...<br>8 BY MR. RIDDLE:<br>9 Q And if you go two emails up on this<br>10 document, Exhibit 407, is that an email that you<br>11 sent on July 7, 2014, to Kurt Ford?<br>12 A Yes.<br>13 Q And you say, "Things are escalating in the<br>14 middle east and we have" senior team management" --<br>15 I'm sorry.<br>16 "Things are escalating in the middle east<br>17 and we have" senior team meeting tomorrow "am and | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)– Page 44:1, 5-20. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| 18 need to update the group. Thx."<br>19 Did I read that correctly?<br>20 A You did.<br><br><br><br><br><br><br><br><br><br><br><br>Page 46<br>23 BY MR. RIDDLE:<br>24 Q And if you can look at Exhibit 127.<br>25 Do you have that? | value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.<br><br>Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 46:23-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 47<br>1 A I do.<br>2 Q Okay. The -- and this is also a series of<br>3 emails, correct?<br>4 A Yes.<br>5 Q And the top email is from Stephen Smith<br>6 dated June 30, 2014, to Ms. Richmond with a copy to<br>7 you, correct?<br>11 THE WITNESS: Yes.<br>12 BY MR. RIDDLE:<br>13 Q And if you look at the third paragraph,<br>14 Mr. Smith says, "The delayed response to<br>15 this morning's attack may be an<br>16 indication that Israel is weighing a<br>17 potentially broader retaliation.<br>18 Which in turn will lead to targeting<br>19 of Israel from Gaza."<br>20 Is that what he stated?<br>23 THE WITNESS: That's what he wrote, yes. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 47:1-7, 11-20, 23. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 48<br>10 Q Yeah. Is this an example of a report that<br>11 you received in this -- reports you were receiving<br>12 in this time frame from Stephen Smith with his<br>13 updates on the security situation in Israel?<br>16 THE WITNESS: This is a report from<br>17 Stephen Smith's email.<br>19 Q And did you have any reason to doubt the<br>20 accuracy of what he was reporting to you at this<br>21 time?<br>22 A No. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 48:10-22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| **Page 50**<br>9 Q Okay. Well, let's take a look at<br>10 Exhibit 131, and if you would look at the first<br>11 email in particular.<br>12 A Yes. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 50:9-12. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| **Page 51**<br>4 Q Okay. Okay. Would you read what you said<br>5 in that email?<br>6 A Yes. "Stephen, Israel hit hamas in<br>7 Gaza with several targeted strikes.<br>8 Would like to hop on the phone today<br>9 to discuss the ongoing security and<br>10 safety of our cast and crew. Want to | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 51:4-13. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| 11 know what measures are being taken and 12 to ensure our employees are protected. 13 Thanks."<br><br><br><br><br><br><br><br><br>Page 57 | Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| 18 Q Okay. If you can take a look at 19 Exhibit 132, Mr. Binke. And does this document 20 contain an update from Stephen Smith dated July 1, 21 2014, that he provided to you and Ms. Richmond -- 24 Q -- concerning security in Israel? | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 57:18-21, 24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| | admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 58<br>3 THE WITNESS: Yes.<br>4 BY MR. RIDDLE:<br>5 Q If you'd look down under the heading,<br>6 "Assessments," it's toward the bottom of the Page,<br>7 do you see that?<br>8 A Yes.<br>16 Q Would -- would you read that sentence aloud<br>17 for us.<br>18 A "Overall, the potential escalation<br>19 in hostilities in both the West Bank<br>20 and Gaza significantly increases the<br>21 possibility that Israel's Security<br>22 Cabinet could decide to launch a<br>23 scaled aerial offensive against Hamas<br>24 over the coming days." | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 58:3-8,13-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 60<br>15 MS. COYOCA: 368?<br>16 MR. RIDDLE: Right.<br>17 Q Mr. Binke, is this an update on the<br>18 security situation from Mr. Binke -- I'm sorry.<br>19 Mr. Binke, is -- is this an update on the<br>20 security situation in Israel dated July 2nd, 2014,<br>21 that was provided to you and Ms. Richmond by<br>22 Stephen Smith? | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 60:15-22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.. |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 61<br>1 THE WITNESS: Yes.<br>9 Q Okay. Would you read the paragraph under<br>10 the heading, "Risk Implications" on the first Page<br>11 of Exhibit 368.<br>12 Would you read that for us.<br>13 A Sure.<br>14 "While both sides most likely want to<br>15 avoid a broad confrontation similar to<br>16 that of December 2012, the risk of<br>17 unintended escalation is now higher.<br>18 The most likely Israeli response to<br>19 the deaths of the teenagers includes<br>20 targeted killings of Hamas leaders, as<br>21 well as airstrikes on known weapon"<br>22 cache -- "caches and rocket launch<br>23 sites in Gaza. A broader Gaza war<br>24 would become more likely if Hamas and<br>25 other Gaza-based militants responded | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 61:1, 9-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 62<br>1 with several dozen rockets per day<br>2 into southern Israel over a sustained<br>3 period. A broader war" could -- | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 62. Not relevant to defendant's denial of coverage; not |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| 4 "would result in a much higher<br>5 likelihood of Hamas using Fajr-5<br>6 rockets, capable of reaching Tel Aviv.<br>7 It would also make it more difficult<br>8 for Palestinian Authority security<br>9 services to contain civil unrest in<br>10 the West Bank, and prevent Palestinian<br>11 civilians from protesting at the<br>12 Wall."<br>13 Q Did you attach any significance at the time<br>14 to the fact that Mr. Smith referred to "a broader<br>15 Gaza war" and "a broader war" in this email?<br>20 THE WITNESS: I was reading this to see<br>21 what -- what advice Stephen Smith was providing to<br>22 ensure that the crew and the cast would be safe.<br>23 BY MR. RIDDLE:<br>24 Q Did you ever ask him why he referred to<br>25 "war" in his update? | reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 63<br>1 A No.<br>9 And you've got 373? You're looking at that<br>10 now, correct?<br>11 A Yes.<br>12 Q Okay. If you look at the -- the email<br>13 that's at the top of the Page, is that one from<br>14 Ms. Richmond dated July 7, 2014, to yourself and<br>15 Malika Adams? | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)– Page 63:1,9-15,19-23. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she testified she lacked personal knowledge about the Policy and had never read it. Comments are speculation and |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| 19 THE WITNESS: Yes.<br>20 BY MR. RIDDLE:<br>21 Q Do you have any -- any understanding as to<br>22 who Malika Adams is?<br>23 A Here it has a -- she worked at Comcast. | improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 64<br>13 Q Okay. And then the one below that from<br>14 Ms. Adams to Ms. Richmond states in the -- that, "So<br>15 far if the only assumption is that we are<br>16 voluntarily pulling out of a certain area because of<br>17 security concerns, I don't think we would have<br>18 coverage for this."<br>19 Do you see that language?<br>20 A Yes. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)– Page 64:13-20. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she testified she lacked personal knowledge about the Policy and had never read it. Comments are speculation and improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | denying coverage and substantially more prejudicial than probative.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 68<br>14 Q Okay. If you can -- if we can have you<br>15 look at Exhibit 300.<br>16 And looking at the email on the top of the<br>17 first Page of the document, Mr. Binke, does this<br>18 indicate that you were copied on an email from<br>19 Malika Adams on July 7, 2014? | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)– Page 68:14-19, 22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she testified she lacked personal knowledge about the |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| 22 THE WITNESS: It does. | Policy and had never read it. Comments are speculation and improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 69<br>6 Q Okay. And Ms. Adams says, "Hi randi, if 7 it's purely" voluntary, "I don't think we can find | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)– Page 69:6-8, 12. Not relevant to defendant's denial of coverage: not |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| 8 coverage under the production policy," correct?<br>12 THE WITNESS: That's what's written. | reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she testified she lacked personal knowledge about the Policy and had never read it. Comments are speculation and improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| Page 72<br>1 Q If we can have you look at Exhibit 375.<br>2 The email at the top of the Page is from<br>3 Randi Richmond to yourself on July 8,<br>2014, correct?<br>4 A Correct.<br>16 Q And the email that was forwarded to you<br>17 from Mr. Smith, the subject is, "DIG Israel," and it<br>18 begins by saying, "The latest info," correct?<br>21 THE WITNESS: Yes. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 72:1-4, 16-18, 21. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | prejudicial. |
| Page 73<br>4 Q Would you read that first sentence for us.<br>5 A "Cross-border fire between the Israeli<br>6 Defense Forces (IDF) and Gaza-based<br>7 militants escalated during the evening<br>8 hours of July 7, as the Israeli<br>9 government reportedly instructed the<br>10 IDF to steadily intensify attacks in<br>11 the Gaza Strip to counter rocket and<br>12 mortar fire." | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 73. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 76 | Plaintiff's Objections: |

| **Deposition Designation: Mark Binke** | **Objection & Response** |
|---|---|
| 1 If you would -- if we can have you look at 2 Exhibit 382. Is that an email from Stephen Smith to 3 yourself and others including Ms. Richmond entitled, 4 "09 July Security Update"? 5 A Yes. 6 Q And there's some language that's in bold 7 print and underlined under, "Assessments," correct? 8 MS. COYOCA: Objection. The document 9 speaks for itself. 10 THE WITNESS: Yes. 11 BY MR. RIDDLE: 12 Q Would you read that language for us. 13 A "In this context, additional rockets 14 against Tel Aviv, Jerusalem, and other 15 major population centers in central 16 Israel should be expected for the 17 duration of July 9th. In line with 18 Israel's overnight response, Israel is 19 likely to view this morning's barrage 20 as a further escalation and will 21 likely continue to respond with more 22 extensive attacks against Gaza" -- 23 "against the Gaza Strip within the 24 next 24 to 48 hours." 25 Q And then above that Mr. Smith reported, | 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 76:1-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Includes attorney objection – 76:8-9 Defendant's Response: The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial |
| Page 77 1 "Overnight, Israel reportedly struck | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209), MIL 3 |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| 2 some 160 militant targets in the Gaza<br>3 Strip, in addition to killing a senior<br>4 Islamic Jihad leader and members of<br>5 his family," correct?<br>8 THE WITNESS: Yes. | (Dkt 208) – Page 77:1-5, 8. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 86<br>9 Nevertheless. Okay. You've got 392 now?<br>10 A I do. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 86.  Not relevant to |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| | defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 87
6 Q Okay. Looking down at the third email, do
7 you recall receiving that email from Stephen Smith | Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 87:6-18. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| 8 on July 10, 2014? It's the one that says 8:09 A.M.<br>9 A Yes, I do.<br>10 Q Okay. And then in the middle email, you<br>11 say, "The team will be working with you as they make<br>12 exit plans."<br>13 What do you -- what does that mean?<br>14 A It means the team on the ground would be<br>15 working with him as they made exit plans.<br>16 Q Was there a decision made by UCP at some<br>17 point to suspend production in Israel?<br>18 A Yes.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br>Page 87<br>20 A When you -- can you --<br>22 A -- be clear on "suspend."<br>23 Do you mean push?<br>24 Q That's -- I've seen that term used.<br>25 When you say "push," what do you mean by<br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why. Counter designation 87:20-25 necessary to complete testimony to explain meaning of "suspend."<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. No objection to counter designation. |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| Page 88<br>4 Q Okay. Was there a decision made to<br>5 push product -- is that how you say it, "push<br>6 production"?<br>7 A Yes.<br>8 Q Okay. Was there a decision made to push<br>9 production in the July 2014 time frame relating to<br>10 DIG, as far as Israel was concerned?<br>11 A There was.<br><br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br>106 counter:<br>Page 88<br>1 that, just so we're clear?<br>2 A It means that you are not shooting. You're<br>3 not in production shooting.<br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br>Page 91<br>19 Q Now, are you saying that there was a group<br>20 decision made to push the production?<br>24 THE WITNESS: Yeah, there was a collective<br>25 discussion about the situation.<br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | Plaintiff's Objections:<br>402, 403 – 88:4-11. Not relevant to defendant's denial of coverage. Wastes time; jury can be instructed that Plaintiffs moved production and why. Counter designation 88:1-3 necessary to complete testimony.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims.  No objection to counter designation. |
| Page 92<br>2 Q Okay. But what -- who was the -- well,<br>3 was -- who was the person or persons who made the<br>4 decision, okay, we're going to push production?<br>8 THE WITNESS: It was a recommendation made<br>9 to Jeff Wachtel advising him that we think it makes<br>10 sense to push.<br>11 BY MR. RIDDLE:<br>12 Q Who made that recommendation?<br>13 A That was me. | Plaintiff's Objections:<br>402, 403 – Page 92:2-13. Not relevant to defendant's denial of coverage. Wastes time; jury can be instructed that Plaintiffs moved production and why. Counter designation 91:19-20, 24-25 necessary to complete testimony.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| | outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims.  No objection to counter designation. |
| Page 94<br>18 Q Okay. This was previously marked as 19 Exhibit 311. | Plaintiff's Objections:<br>402, 403– Page 94:18-19. Not relevant to defendant's denial of coverage. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims.  The Witness' understanding and development of facts is relevant to |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 96<br>22 This is from Brian Brady to Kurt Ford. It<br>23 says:<br>24 "It looks like the filming is<br>25 going to be halted until things settle | Plaintiff's Objections:<br>402, 403 – Page 96:22-25. Not relevant to defendant's denial of coverage. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. |
| Page 97<br>1 down. Tom McCarthy, the chief<br>2 security officer for the company, will<br>3 be talking to production today." | Plaintiff's Objections:<br>402, 403 – Page 97:1-7. Not relevant to defendant's denial of coverage. Wastes time; jury can be instructed |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| 4 Does that jog your memory as to the date<br>5 that the decision made was -- to push production was<br>6 July 10, 2014?<br>7 A I believe it was on the 10th, yes. | that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. |
| Page 98<br>16 Q Okay. If you can look at Exhibit 181.<br>17 Is this an update on the security situation<br>18 in Israel from Stephen Smith to you and Ms. Richmond<br>19 on July 11, 2014?<br>22 THE WITNESS: Yeah, it is.<br>23 BY MR. RIDDLE:<br>24 Q Okay. And it starts off:<br>25 "Increased reports over imminent | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 98:16-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| | prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 99<br>1 ground incursion by Israeli troops,"<br>2 correct?<br>7 THE WITNESS: Yes.<br>8 BY MR. RIDDLE:<br>9 Q And if you look about halfway down the<br>10 Page, do you see where it says:<br>11 "The IDF continues to carry out<br>12 air strikes on targets in the Gaza<br>13 Strip ..."?<br>14 A Yes.<br>15 Q And then further on it says:<br>16 "Following a security cabinet<br>17 meeting, Prime Minister Benjamin<br>18 Netanyahu stated that operations will<br>19 escalate and continue until attacks on<br>20 Israeli citizens come to a halt,"<br>21 correct? | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 99:1-2, 7-21. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 100<br>4 THE WITNESS: That's what it says.<br>7 If you can look at Exhibit 29. Oh,<br>8 actually, I've got copies over here. Never mind.<br>9 There you go.<br>25 Q First, let me ask you: When the -- it was | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 100:4, 7-9, 25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further. F.R.E. 403 is conditional, and |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| | therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 101<br>1 decided to push the production, was -- was that for<br>2 a set period of time?<br>3 A Yes.<br>4 Q And how long was that?<br>5 A It was a one-week push.<br>6 Q In the middle email, you see that that's<br>7 from Ms. Garber to Ms. Richmond with a copy to<br>8 yourself and Kurt Ford?<br>9 A Yes.<br>10 Q And do you see in the middle -- well, I<br>11 guess it's the second paragraph in her email, she<br>12 says:<br>13 "If there is an actual<br>14 'declaration of war' we will have an<br>15 issue with coverage under the policy<br>16 because there is a broad exclusion for<br>17 acts of war. The exclusion includes | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 101:1-22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, |

| **Deposition Designation: Mark Binke** | **Objection & Response** |
|---|---|
| 18 'war-like acts' but the carrier did 19 not bring this up when I spoke to 20 them." 21 Do you see that? 22 A Yes. | and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 104 8 Q At some point did UCP make a decision to 9 move the production out of Israel as opposed to the 10 decision to have the one-week push? 11 A Yes. 12 Q Okay. And did you have any input into that 13 decision? 14 A I did. 15 Q Okay. Who -- who else -- who else was 16 involved in making that decision? 17 A Maya Windholz, our lawyer, was part of the | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 104:8-22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why. 106 counter designations 89:5-6, 9, 12-21 and 91:3-18 necessary to |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| 18 meeting. Richard Rothstein, Steve Dolcemaschio, <br> 19 Eric Gray, Andrea Garber, myself. <br> 20 Q Is it the same group that was involved in <br> 21 the discussion about the push? <br> 22 A More or less, yes. <br><br> PLAINTIFFS' 106 COUNTER-DESIGNATION: <br> Page 89 <br> 5 Q Were you -- were you involved in the <br> 6 decision to push production – <br> 9 Q -- in July 2014? <br> 12 THE WITNESS: Yes, I was one of the people <br> 13 involved. <br> 14 BY MR. RIDDLE: <br> 15 Q Okay. Who were the others that were <br> 16 involved? <br> 17 A Risk management, Richard Rothstein, legal <br> 18 was there, Steve Dolcemaschio, our CFO, is what I <br> 19 recall. <br> 20 Q Who was the CFO at that time? <br> 21 A Eric Gray. <br><br> Page 91 <br> 3 Q Okay. All right. Now, let me first ask: <br> 4 When you say "risk management," are you -- is that a <br> 5 particular person that was involved? <br> 6 A Andrea Garber. <br> 7 Q Okay. How about when you say "legal"? Who <br> 8 are you referring to there in particular, if you <br> 9 know? <br> 10 A Maya Windholz. <br> 11 Q And is she an in-house attorney for UCP, to <br> 12 your knowledge? <br> 16 Q At that point in time, what did you <br> 17 understand her position to be? <br> 18 A She was our legal point. <br> END PLAINTIFFS' 106 COUNTER-DESIGNATION | complete answer re individuals involved in decision to push production. <br><br> Defendant's Response: <br> The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. No objection to counter designation. |
| Page 114 <br> 7 Q Mr. Binke, this has been marked as | Plaintiff's Objections: <br> 402, 403, MIL 2 (Dkt 209), MIL 3 |

| Deposition Designation: Mark Binke | Objection & Response |
|---|---|
| 8 Exhibit 4- -- 409.<br>9 A Uh-huh.<br>10 Q And is this an email from Tom McCarthy to<br>11 you on July 17, 2014?<br>12 A Yes.<br>13 Q Okay. And he says, "Mark - We made the<br>14 right call. See below," correct?<br>18 THE WITNESS: Yes.<br>19 BY MR. RIDDLE:<br>20 Q Okay. And, at that time, was Tom McCarthy<br>21 the chief security officer and senior vice president<br>22 for NBCUniversal?<br>23 A That's what it says on his -- on his email.<br>24 Q Okay. You don't have any reason to think<br>25 that's not accurate, do you? | (Dkt 208) – Page 114:7-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 115<br>1 A I don't.<br>2 Q Okay. And then down below where he | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 115:1-6, 10. Not |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| says,<br>3 "See below," there's a forwarded message that says,<br>4 "Israeli" defenses "confirm in statement they have<br>5 initiated a ground operation within the Gaza Strip,"<br>6 correct?<br>10 THE WITNESS: Yes. | relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 116<br>1 Q Can -- would you take a look at<br>2 Exhibit 196. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 116:1-6. 10-25. Not |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| 3 A Okay.<br>4 Q Is that a -- is that a security update that<br>5 you received from Stephen Smith that was sent on<br>6 July 18, 2014?<br>10 THE WITNESS: Yes.<br>11 BY MR. RIDDLE:<br>12 Q Would you read the second paragraph out<br>13 loud.<br>14 A "Info from various sources; over<br>15 100 targets, including rocket<br>16 launching sites and underground<br>17 tunnels, were targeted throughout Gaza<br>18 during the overnight hours of July 17"<br>19 and "18 as more Israeli troops and<br>20 armor advanced into Gaza. Fourteen<br>21 Hamas militants were reportedly killed<br>22 in Israeli" air stri- -- "attacks,<br>23 while the Israeli Defense Forces (IDF)<br>24 sustained its first fatality after a<br>25 soldier was killed by light arms | relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 117<br>1 fire." | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| 2 Q And then can you look at Exhibit 220.<br>3 Is that a security update that was provided<br>4 to you by Stephen Smith that he sent on July 21,<br>5 2014?<br>8 THE WITNESS: Yes. | (Dkt 208) – Page 117:1-5, 8. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| Page 122<br>20 BY MR. RIDDLE:<br>21 Q And were -- did you have any involvement in<br>22 the decisions to resume shooting in Croatia and in<br>23 Albuquerque? | Plaintiff's Objections:<br>402, 403 – 122:20-25. Wastes time; jury can be instructed that Plaintiffs moved production and why. Not relevant to defendant's denial of coverage.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. |
| Page 123<br>2 THE WITNESS: Yeah, we didn't resume<br>3 shooting. We began shooting.<br>4 BY MR. RIDDLE:<br>5 Q Okay. Because that -- you're saying that<br>6 because you -- you did -- you completed the pilot in<br>7 Israel, correct?<br>8 A Yes.<br>9 Q And then you shifted to filming Episodes 2<br>10 through 6, correct?<br>11 A Yes.<br>12 Q Okay. So did you -- did you have any --<br>13 any involvement in the decision to choose Croatia<br>14 and Albuquerque to film Episodes 2 | Plaintiff's Objections:<br>402, 403– 123:2-25. Wastes time; jury can be instructed that Plaintiffs moved production and why. Not relevant to defendant's denial of coverage<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |

| Deposition Designation:  Mark Binke | Objection & Response |
|---|---|
| through 6?<br>15 A Yes, I was involved.<br>16 Q Okay. And why were those locations chosen?<br>17 A So Albuquerque had the infrastructure and<br>18 resources to support the scope and scale of what we<br>19 established in Israel. It has great infrastructure.<br>20 We've shot there successfully in the past. They had<br>21 stages that we could build, re-create the sets we<br>22 had already built.<br>23 Croatia, specifically, had the appropriate<br>24 stone that matched Jerusalem, and we were lucky<br>25 enough to be able to field a crew and shoot there. | Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. |
| Page 124<br>1 Q Do you -- do you recall when those<br>2 locations were chosen?<br>3 A Not exactly.<br>4 Q What's the closest you can pin it down?<br>5 A It was in July.<br>6 Q Of 2014?<br>7 A Correct. | Plaintiff's Objections:<br>402, 403 – Page 124:1-7. Wastes time; jury can be instructed that Plaintiffs moved production and why. Not relevant to defendant's denial of coverage.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. |

| Deposition Designation: Mark Binke | Objection & Response |
| --- | --- |
| | |

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Dennis Crosby 30 (b) (6) Deposition May 15, 2017:<br><br>**Defendant currently intends to submit the following testimony to be played on videotape or computer. However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.**<br><br><br>Page 5<br><br>3 Q Good afternoon, Mr. Crosby. 05:23<br>4 A Good afternoon, sir. 05:23<br>5 MR. HAYES: This is going to be 05:23<br>6 Exhibit 1. 05:23<br>7 (Deposition Exhibit 1 marked.) 05:24<br>8 BY MR. HAYES: 05:24<br>9 Q Do you recognize the document marked 05:24<br>10 Exhibit 1? 05:24<br>11 A I do not. I have never seen it. 05:24<br>12 Q I want you to turn to the pages marked 11 05:24<br>13 and 12. And I'd like you to read to yourself the 05:24<br>14 topics marked 48 and 49 and let me know when you're 05:24<br>15 done. 05:24<br>16 A (Witness reviews document.) 05:24<br>17 48 and 49, correct? 05:24<br>18 Q Yes. 05:24<br>19 A I've read them. 05:24<br>20 Q Have you been designated to testify on 05:25<br>21 behalf of Atlantic in response to those topics? 05:25<br>22 A Yes, I have. 05:25 | Plaintiff's Objections: No objection<br><br>Defendant's Response: |

| Deposition Designation of Dennis Crosby | Objection & Response |
|---|---|
| <u>Defendant's Designation of Dennis Crosby May 17, 2017</u><br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | Plaintiffs object to Defendants' designations as follows: |
| <u>Page 68</u><br>3 General responsibilities of a president and CEO?<br>4 A Yes.<br>5 Q And how long did you work in that<br>6 capacity at Ace Westchester?<br>7 A Seven years.<br>8 Q So since 2003?<br>9 A Roughly 2004, yeah. So it was end of '3<br>10 into '4. I don't recall exactly it.<br>11 Q What did you do before Ace Westchester?<br>12 A I worked for St. Paul Travelers.<br>13 Q What did you do at St. Paul Travelers?<br>14 A I was the president of the middle market<br>15 insurance group. | <u>Plaintiff's Objections:</u><br>No objection – 68:3-15<br><br><u>Defendant's Response:</u> |
| <u>Page 155</u><br>15 Q Can you recall any instance in which you<br>16 discussed the Dig claim with anyone other than<br>17 outside counsel?<br>18 A No.<br>19 MR. HAYES: This is going to be<br>20 Exhibit 5.<br>21 (Deposition Exhibit 5 marked.)<br>22 MR. HAYES: This is actually a document<br>23 you delivered to me today, Mr. Keeley, and I only<br>24 have two copies.<br>25 MR. KEELEY: Let me see what it is.<br><br><u>Page 156</u><br>1 BY MR. HAYES:<br>2 Q Do you recognize the document marked<br>3 Exhibit 5?<br>4 A It appears to be the same document as<br>5 Exhibit 4 without my forwarding, so, yes, I do<br>6 recognize this document.<br>7 Q Did you send the email at the top of<br>8 Exhibit 5 to Sean Duffy on July 23rd, 2014?<br>9 A Yes.<br>10 Q Here you say: Thanks, looks good to me.<br>11 What were you referring to? | <u>Plaintiff's Objections:</u><br>No objection – 155:15-25<br><br><u>Defendant's Response:</u> |

| Deposition Designation of Dennis Crosby | Objection & Response |
|---|---|
| 12 A Claim position.<br>13 Q So is it correct that you reviewed the<br>14 decision to deny the Dig claim?<br>15 A With the correspondence that you've given<br>16 me, yes.<br>17 Q And do you recall reviewing the decision<br>18 to deny the Dig claim?<br>19 A I recall reviewing these emails around<br>20 the decision to deny the Dig claim.<br>21 Q Do you recall reviewing anything else<br>22 other than the email chain marked Exhibit 5 and the<br>23 email chain marked Exhibit 4 and any attachments to<br>24 those emails?<br>25 A No, I do not. | |
| Page 157<br>1 Q When an insurance claim is made at<br>2 OneBeacon, do you ever have a say in whether or not<br>3 that claim is paid?<br>4 A No, I do not.<br>5 Q You never have a say --<br>6 A Never.<br>7 Q -- is that right?<br>8 A That's correct.<br>9 Q Does anyone in the underwriting group<br>10 ever have a say on whether or not an insurance<br>11 claim is paid?<br>12 A No, they do not.<br>13 Q Are underwriters consulted on whether or<br>14 not an insurance claim should be paid at<br>OneBeacon?<br>15 A No.<br><br>20 BY MR. HAYES:<br>21 Q Why not?<br><br>23 A No. 02:58<br>24 BY MR. HAYES:<br>25 Q Why not? | Plaintiff's Objections:<br>157:1-15, 20-21, 23-25 –<br>402, 403, 104a – lack of<br>foundation<br><br>Defendant's Response:<br><br>Objections removed to "IO"<br><br>Testimony is relevant to the<br>extent Plaintiffs' contend<br>improper involvement of<br>underwriters; rebuttal;<br>deponent has personal<br>knowledge and foundation<br>in light of the fact that<br>Plaintiffs contend ASIC's<br>underwriting practices<br>impact upon its alleged bad<br>faith claims handling. |
| Page 158<br>1 A Sorry, more specifics.<br>2 Q Insurance claim comes in --<br>3 A Uh-huh.<br>4 Q -- are you with me? Yes?<br>5 A Yes.<br>6 Q Is the underwriting group ever consulted<br>7 by the claims group in the evaluation of whether or 0<br>8 not to pay the claim?<br><br>11 A They are not. | Plaintiff's Objections:<br>158:1-8, 11-15, 13-18 –<br>402, 403, 104a lack of<br>foundation; witness not<br>aware of practice.<br><br>Defendant's Response:<br>"IO"s removed.<br><br>Testimony is relevant to the<br>extent Plaintiffs' contend |

| Deposition Designation of Dennis Crosby | Objection & Response |
|---|---|
| 12 BY MR. HAYES:<br>13 Q Is the underwriting group ever consulted<br>14 on the meaning of the insurance policy in the<br>15 context of an insurance claim?<br><br>18 A I'm not aware that that ever happens.<br><br><br>Page 232<br>20 Q Okay. So are you certain that the<br>21 overall profitability of the NBC Universal account<br>22 was not considered in deciding whether or not to<br>23 deny the Dig claim?<br>24 A 150 percent certain.<br>25 Q How are you certain?<br><br>Page 233<br>1 A I'm responsible for the P&L. My<br>2 reputation, what I do, yes, that would never, ever<br>3 happen.<br>4 Q Well, I thought you had nothing to do<br>5 with the decision to deny the Dig claim?<br>6 A I get paid for the P&L, not the claim<br>7 department. The claim department is responsible<br>8 for handling claims, that's what they do, right? I<br>9 don't exert influence or authority. Or anyone in<br>10 the underwriting organization doesn't assert any<br>11 amount of authority over the claim department.<br><br>21 Q My statement that you do not know what<br>22 was considered in deciding whether to deny the Dig<br>23 claim?<br>24 A You are absolutely --<br><br>Page 234<br>1 A You're absolutely correct. Because I'm<br>2 not in the claim department and I don't control<br>3 what the claim department does. | improper involvement of underwriters; rebuttal; deponent has personal knowledge and foundation in light of the fact that Plaintiffs contend ASIC's underwriting practices impact upon its alleged bad faith claims handling.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br><br>Defendant's Response:<br><br>"IO" removed. |

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Sean Duffy | Plaintiffs object to Defendants' designations as follows.  Where line numbers are not included with a page number, plaintiffs object to all designated testimony on the page cited. |
| **Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | |

Page 8
3 Where do you work? 10:00:54
4 A. OneBeacon Insurance Group. 10:00:55
5 Q. What is your title? 10:01:00
6 A. Senior vice-president and chief claims 10:01:01
7 officer. 10:01:04
8 Q. How long have you worked at OneBeacon? 10:01:06
9 A. I began in April of 2010. 10:01:08
10 Q. And what was your title in April 2010? 10:01:14
11 A. Same title. 10:01:16
12 Q. Have you had any other titles since being at 10:01:18
13 OneBeacon? 10:01:22
14 A. No. 10:01:23
15 Q. What are your job responsibilities? 10:01:23
16 A. I manage the claims operation. 10:01:25

Page 9

9 Q. Do you supervise any OneBeacon employees? 10:02:10
10 A. I do. 10:02:24
11 Q. Who do you supervisor? 10:02:25
12 A. The entire operation. 10:02:27
13 Q. What operation? 10:02:29
14 A. Claims. 10:02:30
15 Q. Do you know how many employees there are in
16 the claims operation? 10:02:43
17 A. It would be approximate, given openings, 10:02:46
18 approximately 205. 10:02:50
19 Q. In what locations? 10:02:54
20 A. Various locations throughout the country. 10:02:56

Page 13

25 Q. Underwriting is a separate department at 10:10:55

Page 14

1 OneBeacon, correct? 10:10:57
2 A. Correct. 10:10:58

| Deposition Designation | Objection & Response |
|---|---|
| 3 Q. Who is the head of underwriting? 10:10:58<br>4 A. Dennis Crosby. 10:11:00<br>5 Q. On the org chart, are you and Dennis Crosby 10:11:08<br>6 parallel to each other? 10:11:12<br>7 A. We are peers. 10:11:16<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br><u>Page 17</u><br><br>23 Q. IT and operations, Linda Fossing, does she 10:17:38<br>24 manage any employees? 10:17:41<br>25 A. She has a very large operation, yes, both in 10:17:42<br><u>Page 18</u><br><br>1 terms of operations and IT employees. 10:17:50<br>2 Q. Can you tell me generally the 10:17:52<br>3 responsibilities of the employees that she 10:17:54<br>4 manages? 10:17:57<br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br><u>Page 18</u><br><br>18 THE WITNESS: So Linda manages the 10:18:30<br>19 process of claims intake for the company, 10:18:32<br>20 where claims are reported. She manages 10:18:34<br>21 compliance, including regulatory compliance, 10:18:41<br>22 SOX compliance with our claims activities. 10:18:48<br>23 She manages IT projects that are done by the 10:18:52<br>24 IT department on behalf of claims.<br><br><u>Page 19</u><br><br>12 A. I don't know. 10:19:24<br>13 Q. You said the process of claims intake. 10:19:28<br>14 What did you mean? 10:19:32<br>15 A. People report claims. They are then assigned 10:19:33<br>16 to the correct adjusters. 10:19:39<br>17 Q. And Linda is responsible for that process? 10:19:41<br>18 A. Correct. 10:19:44<br>19 Q. And how is the correct adjuster determined? 10:19:46<br>20 A. It depends on the line of business, the 10:19:52<br>21 business unit, and the system assists us in 10:19:54<br>22 identifying the correct location, and if 10:19:57<br>23 necessary, consulting with the business line 10:20:01<br>24 leads or their managers. 10:20:03 | |

| Deposition Designation | Objection & Response |
|---|---|

Page 20

8 Q. So if the claim is on a policy written by the 10:20:27
9 entertainment unit, the system would assign 10:20:33
10 it to a claims adjuster within the 10:20:37
11 entertainment division; is that accurate? 10:20:40
12 A. The system would assist one of the intake 10:20:42
13 personnel in assigning the claim. 10:20:46
14 Q. So it's a human being who does the 10:20:48
15 assignment? 10:20:51
16 A. Correct. 10:20:51

Page 26

12 Q. Okay. So are you familiar with the Dig 10:27:26
13 claim? 10:27:29
14 A. Yes. 10:27:30

Page 27

14 Q. Okay. When a claim involves a specialized 10:28:28
15 product, how does OneBeacon determine what 10:28:30
16 adjuster to assign to the claim? 10:28:32
17 A. It varies by business unit. 10:28:34
18 Q. Let's talk about the entertainment unit. 10:28:35
19 A. So they have individuals within the unit who 10:28:37
20 are identified as handling those types of 10:28:40
21 claims. 10:28:42
22 Q. When you say, "Those types of claims," what 10:28:43
23 do you mean? 10:28:45
24 A. Specialized products. 10:28:46
25 Q. With respect to the entertainment unit, you 10:28:49

Page 28

1 mean adjusters have been identified who 10:28:52
2 handle specialized claims arising under 10:28:54
3 policies written by the entertainment unit, 10:29:02
4 right? 10:29:04
5 A. Correct. 10:29:04
6 Q. So considering that universe of adjusters who 10:29:05
7 handle claims within the entertainment 10:29:10
8 division, how is a particular adjuster 10:29:13

| Deposition Designation | Objection & Response |
|---|---|
| 9 assigned to work on a particular claim? 10:29:15<br>10 A. Because they've been identified as somebody 10:29:20<br>11 who would handle that claim by the leader of 10:29:23<br>12 that claims group. 10:29:27<br>13 Q. So a person within the group decides which 10:29:28<br>14 individual adjuster to assign to the claim? 10:29:32<br>15 A. Yes, usually the manager. 10:29:34<br>16 Q. And who is the manager of the entertainment 10:29:37<br>17 group in July of 2014? 10:29:41<br>18 A. Pamela Johnson. 10:29:44<br>19 Q. And who did Pamela Johnson choose as the 10:29:48<br>20 adjuster to work on the Dig claim? 10:29:51<br>21 A. I don't -- I don't recall. I don't know. 10:29:55<br>22 Danny Gutterman I assume, but I don't 10:29:57<br>23 remember. 10:30:00<br><br>Page 29<br>19 Q. Have you ever discussed the case with 10:30:58<br>20 Danny Gutterman? 10:31:01<br>21 A. No. 10:31:01<br>22 Q. Have you ever discussed this case with 10:31:03<br>23 Pamela Johnson? 10:31:05<br>24 A. Not to my recollection, other than an e-mail 10:31:06<br>25 I saw from Theresa Gooley. 10:31:09<br><br>Page 30<br>22 Q. Pamela Johnson is no longer with the company? 10:32:19<br>23 A. Correct. 10:32:23<br><br>Page 34<br>8 Q. Okay. And if the claim arises under a policy 10:35:57<br>9 written by the entertainment group, the claim 10:36:01<br>10 gets referred to the entertainment group; is 10:36:05<br>11 that correct? 10:36:07<br>12 A. Yes. 10:36:07<br>13 Q. And if this claim had come in in July of 10:36:08<br>14 2014, that referral would have been to 10:36:12<br>15 Pamela Johnson, correct? 10:36:14<br>16 A. Yes. 10:36:15<br>17 Q. Okay. Once Pamela Johnson gets that claim, 10:36:17<br>18 Pamela Johnson decides what adjuster within 10:36:22<br>19 the entertainment group to assign to the 10:36:24<br>20 claim; is that right? 10:36:27 | |

| Deposition Designation | Objection & Response |
|---|---|
| 21 A. Yes, and you would include her in that 10:36:28<br>22 category. Excuse me. 10:36:31<br><br>Page 103<br>17 Q. Mr. Gutterman testified that at OneBeacon he 12:13:20<br>18 has been taught to always look for coverage. 12:13:24<br>19 Is that -- 12:13:28<br>20 A. Yes. 12:13:28<br>21 Q. Is that correct? 12:13:29<br>22 A. That is correct. 12:13:30<br>23 Q. And is that what you tell your direct reports 12:13:34<br>24 to do -- 12:13:42<br>25 A. Absolutely. 12:13:43<br><br>Page 104<br><br>1 Q. -- always look for coverage? 12:13:44<br>2 A. Sorry, I didn't mean to interrupt. 12:13:46<br>3 Absolutely. 12:13:48<br>4 Q. What does that mean, "Always look for 12:13:49<br>5 coverage"? 12:13:51<br>6 A. That means that the objective is not to find 12:13:51<br>7 ways to deny coverage. The objective is to 12:13:55<br>8 take the facts and the policy, and if 12:13:58<br>9 coverage is apparent, to cover the claim. 12:14:00<br>10 Q. The objective is to find ways to find 12:14:04<br>11 coverage? 12:14:08<br>12 A. The objective is to find ways to pay the 12:14:09<br>13 claim if it is covered under the policy. 12:14:12<br>14 And it's important to understand 12:14:15<br>15 that over time in our industry some companies 12:14:17<br>16 have taken a different approach. 12:14:21<br>17 And so that mandate to my employees 12:14:22<br>18 is simply telling them, we write policies, we 12:14:25<br>19 care about our insureds, we accept premium, 12:14:29<br>20 and where there is coverage, you should pay 12:14:31<br>21 it. You should not find ways to deny it. 12:14:33<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 105<br><br>16 Q. And has OneBeacon ever been accused of trying 12:15:20<br>17 to find ways to deny claims? 12:15:24 | |

| Deposition Designation | Objection & Response |
|---|---|
| 18 A. We've certainly been accused of 12:15:27<br>19 inappropriately denying claims. 12:15:30<br>20 Q. Based on the application of exclusions, 12:15:31<br>21 right? 12:15:34<br>22 A. All kinds of different things, exclusions, 12:15:35<br>23 terms, conditions, recision. 12:15:38<br><br>Page 106<br><br>8 Q. Has a court ever found that? 12:15:55<br>9 A. Yes. 12:15:57<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 133<br><br>15 Q. Mr. Duffy, can you give me an overview of 13:35:29<br>16 your experience prior to your tenure at 13:35:32<br>17 OneBeacon? 13:35:38<br>18 A. Do you want me to -- where do you want me to 13:35:39<br>19 start? Go backwards in time or what would be<br>13:35:39<br>20 easiest? 13:35:42<br>21 Q. Backwards. 13:35:43<br>22 A. Okay. So, again, I joined OneBeacon in April 13:35:44<br>23 of 2010. 13:35:46<br>24 Prior to that, I spent three years 13:35:49<br>25 at Great American Insurance Company in 13:35:51<br><br>Page 134<br><br>1 Cincinnati, Ohio. 13:35:53<br>2 Q. Okay. How about before that? 13:35:59<br>3 A. Before that, I spent nine years at what was 13:36:03<br>4 originally The St. Paul Companies but became 13:36:05<br>5 St. Paul Travelers and then Travelers, so I 13:36:08<br>6 was there from 1998 to 2007 before I joined 13:36:11<br>7 Great American. 13:36:17<br>8 Q. And prior to that? 13:36:20<br>9 A. I was an associate attorney for three years 13:36:22<br>10 from '95 to '98. 13:36:25<br>11 Q. When did you graduate law school? 13:36:31<br>12 A. '94. 13:36:33<br>13 Q. When did you graduate college? 13:36:34<br>14 A. '89. 13:36:36<br>15 Q. Took two or three years off in between 13:36:39<br>16 college and law school? 13:36:41<br>17 A. Two years. 13:36:42<br>18 Q. Where did you go to law call? 13:36:43 | **Defendant's Objection to Counter p. 105-106:**<br><br>Other claims, lawsuits, findings, judgments, rulings, accusations not relevant; very prejudicial; waste of time; misleading and confusing to jury.  FRE 401; 403; necessarily involves hearsay 801; 802.<br><br>**Plaintiffs' Response to Objection to Counter p. 105-106:**<br>Other claims, lawsuits, findings, judgments, rulings, etc. relevant for the reasons stated in Plaintiffs' Opposition to Defendant's MIL #3, Dkt. 202. |

| Deposition Designation | Objection & Response |
|---|---|
| 19 A. Hamline University School of Law. 13:36:45<br>20 Q. And where did you go to work after you 13:36:48<br>21 graduated? 13:36:50<br>22 A. From law school? 13:36:52<br>23 Q. Yes. 13:36:53<br>24 A. I clerked at the Minnesota Supreme Court for 13:36:54<br>25 a year. 13:36:55<br><br>Page 135<br><br>1 Q. And then what? 13:37:01<br>2 A. We're sitting there. 13:37:03<br>3 Q. You worked at this law firm? 13:37:05<br>4 A. For three years, yup. 13:37:08<br>5 Q. What's the name of this law firm? 13:37:10<br>6 A. Meagher & Geer. 13:37:13<br>7 Q. What type of law did you practice? 13:37:14<br>8 A. Primarily environmental insurance coverage 13:37:21<br>9 litigation but also some litigation relative 13:37:25<br>10 to financial institutions, so employee 13:37:29<br>11 dishonesty, D&O, that kind of thing. 13:37:34<br>12 Q. What was your role at Travelers? 13:37:44<br>13 A. So I began in '98 as a position that's called 13:37:47<br>14 a claims attorney, which is an adjusting 13:37:52<br>15 position, so I adjusted claims. 13:37:54<br>16 Q. Did you have any other positions at 13:37:57<br>17 Travelers? 13:38:00<br>18 A. Yes. I was promoted to director of financial 13:38:00<br>19 institution claims, probably around 2000 or 13:38:03<br>20 2001, and then I became the -- I think they 13:38:10<br>21 call it second vice-president of financial 13:38:15<br>22 and professional services claims, which is 13:38:17<br>23 the position I held until I left. 13:38:19<br>24 Q. How about Great American Insurance Company? 13:38:23<br>25 What positions did you hold there? 13:38:26<br><br>Page 136<br><br>1 A. I had one position. I forget the term they 13:38:27<br>2 use. Divisional senior vice-president. 13:38:29<br>3 Basically I was in charge of home office 13:38:34<br>4 claims. 13:38:36<br><br>Page 191<br><br>6 Q. Were you responsible for the decision to deny 14:55:10<br>7 the Dig claim? 14:55:12<br>8 A. No. 14:55:13 | |

| Deposition Designation | Objection & Response |
|---|---|
| 9 Q. Were you responsible for the decision to deny 14:55:18<br>10 the Dig claim in any way? 14:55:21<br>11 A. Was I personally? 14:55:25<br>12 Q. Yes. 14:55:27<br>13 A. No. 14:55:27<br>14 Q. Were you responsible in some other capacity? 14:55:28<br>15 A. As the leader of the claims organization and 14:55:31<br>16 I have employees, I guess. 14:55:35<br>17 Q. So you are responsible for the decision to 14:55:37<br>18 deny the Dig claim? 14:55:39<br>19 A. Ultimately I am responsible for the things 14:55:43<br>20 that occur in the claims organization. 14:55:45<br>21 Q. Okay. So why didn't you approve it before it 14:55:47<br>22 was made? 14:55:50<br>23 A. So I've answered that question several times. 14:55:52<br>24 I'll answer it again. 14:55:55<br>25 As I said, Pamela had the authority 14:55:56<br><br>Page 192<br>1 to deny this claim. I do not get involved 14:55:59<br>2 with decisions to deny claims. 14:56:03<br>3 Q. Ever. Is that right? 14:56:04<br>4 A. Define what that means. 14:56:09<br>5 Q. Do you ever get involved in decisions to deny 14:56:11<br>6 claims? 14:56:13<br><br>9 We went through this, Dan. 14:56:16<br>10 THE WITNESS: People do not get my 14:56:17<br>11 authority to deny claims. I may be made 14:56:19<br>12 aware of the claim, but the decision to deny 14:56:21<br>13 rests with the adjusters and the people that 14:56:24<br>14 work for me. 14:56:26<br>15 BY MR. HAYES: 14:56:27<br>16 Q. So there aren't any circumstances wherein an 14:56:28<br>17 adjuster needs your authority to deny a 14:56:32<br>18 claim? 14:56:35<br>19 A. Correct. 14:56:35<br><br>Page 193<br><br>3 Q. Did you have any involvement in evaluating 14:57:00<br>4 and considering the Dig claim? 14:57:01<br>5 A. I received an e-mail from Theresa Gooley | |

| Deposition Designation | Objection & Response |
|---|---|
| 14:57:04<br>6 telling me about the status of their decision 14:57:05<br>7 to deny the claim. 14:57:08<br>8 Q. Did you have any involvement in evaluating 14:57:10<br>9 and considering the Dig claim? 14:57:15<br><br>12 THE WITNESS: I believe my e-mail 14:57:19<br>13 to Theresa said, "Looks good to me." 14:57:20<br>14 BY MR. HAYES: 14:57:23<br>15 Q. So is that a yes, you did? 14:57:23<br><br><br>18 BY MR. HAYES: 14:57:29<br>19 Q. I'm not asking what your e-mail says. I can 14:57:29<br>20 read your e-mail. 14:57:33<br>21 I want to know if you had any 14:57:34<br>22 involvement in evaluating and considering the 14:57:35<br>23 Dig claim. 14:57:37<br>24 A. To the extent I received an e-mail giving me 14:57:37<br>25 a heads-up, I responded and said, "Looks good 14:57:39 | <br><br><br><br><br><br><br>Defendant's Response:<br><br>Objection removed. |
| Page 194<br><br>1 to me," yes. 14:57:42<br>2 Q. And that's the extent of your involvement? 14:57:42<br>3 A. Correct. 14:57:45 | |
| Page 235<br><br>8 Q. Do you know why Pamela Johnson left 15:50:15<br>9 OneBeacon? 15:50:17<br>10 A. I do. 15:50:17<br>11 Q. Why? 15:50:18<br>12 A. Because I reorganized. 15:50:18 | <br><br><br><br><br><br>Defendant's Response:<br>Objection removed. |
| Page 236<br><br>9 THE WITNESS: Pamela was let go as 15:50:59<br>10 part of a reorganization. Pamela was not 15:51:01<br>11 fired for cause. Pamela was paid severance, 15:51:03<br>12 and it was not a -- not a negative parting of 15:51:04<br>13 the ways. 15:51:11<br>14 BY MR. HAYES: 15:51:11 | Defendant's Response:<br><br>Objection removed. |
| Page 237<br><br>7 Q. Theresa Gooley, was she fired? 15:51:42<br>8 A. No. Theresa was let go at the end of 2015 as | Plaintiff's Objections:<br>Page 235:8-12: No objection |

| Deposition Designation | Objection & Response |
|---|---|
| 15:51:44<br>9 a part of a significant reorganization. 15:51:48 | Defendant's Response:<br><br>Plaintiff's Objections:<br>Page 236:9-14 – No objection<br><br>Defendant's Response:<br><br>Plaintiff's Objections:<br>Page 237:7-9 – No objection<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Kurt Ford<br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer. However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | Plaintiffs object to Defendant's designations as follows. Where line numbers are not included with a page number, plaintiffs object to all designated testimony on the page cited. |
| Page 14<br><br>25 Q Would you state your full name for the | Plaintiff's Objections:<br>No objection – Page 14:25.<br><br>Defendant's Response: |
| Page 15<br><br>1 record, please, sir.<br>2 A Full name is Kurt Bannick Ford. | Plaintiff's Objections:<br>No objection – 15:1-2.<br><br>Defendant's Response: |
| Page 16<br><br>12 Would you state your current employer,<br>13 please, sir.<br>14 A NBCUniversal. | Plaintiff's Objections:<br>No objection – Page 16:12-15.<br><br>Defendant's Response: |
| Page 21<br><br>17 Q What are the types of services that you<br>18 provide?<br>19 A Sure. My title is senior vice president of<br>20 production services.<br>21 Production services is the department,<br>22 which I oversee, that facilitates the nuts and bolts<br>23 of producing television shows.<br>24 When we have a show that has been green-lit<br>25 to go into production -- I'm not on the creative | Plaintiff's Objections:<br>No objection – Page 20:17-25.<br><br>Defendant's Response:<br><br>Plaintiff's Objections:<br>No objection – Page 21:1-9.<br><br>Defendant's Response: |
| Page 22<br><br>1 side, we don't make those decisions -- but when a<br>2 show has been green-lit, then my team, production<br>3 services, works with all the crews that are hired to | Plaintiff's Objections:<br>22:1-9 – No objection if counter objection included. Counter objection 25:22-26:14 needed to complete |

| Deposition Designation | Objection & Response |
|---|---|
| 4 produce that TV show.<br>5 When a show is green-lit, there's about<br>6 150, 175 freelance employees that are brought on<br>7 board to produce that specific show. And my team<br>8 interacts with all those new hires on how to produce<br>9 a show for NBCUniversal.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><u>Page 25</u><br>22 Q As senior vice president of production<br>23 services, who is your direct boss or supervisor?<br>24 A Sure. I have a solid line to Jerry DiCanio<br>25 and I have a dotted line to Mark Binke.<br><br><u>Page 26</u><br>1 And as of just last week, there is a new<br>2 executive vice president that has been hired. I've<br>3 only shaken her hand once and had a 30-second<br>4 meeting with her, and I will have a dotted line to<br>5 her, as well. Linda -- and her last name is<br>6 Giambrone, but I do not know how to spell it. And<br>7 she is the new executive vice president of the<br>8 unscripted side of Universal Television.<br>9 Jerry DiCanio, my direct boss, used to<br>10 oversee unscripted, and they have now split scripted<br>11 and unscripted. And Linda will now oversee the<br>12 unscripted. So I will have -- I now have three<br>13 bosses, but I have not had any engagement with Linda<br>14 yet.<br><u>END PLAINTIFFS' 106 COUNTER-DESIGNATION.</u><br><br><u>Page 44</u><br><br>21 Q Are you aware that there are war exclusions<br>22 in your portfolio policy?<br>23 A Yes.<br><br><br><u>Page 45</u><br><br>17 Q Prior to the support services you provided<br>18 for DIG, were there other occasions where you were<br>19 called upon to do research or do work to support<br>20 another show that was being produced in the Middle<br>21 East?<br>22 A I don't do research. If a show is going<br>23 into a foreign country, all the departments that I<br>24 work with would have -- our tax department would<br>25 have had -- looked into tax. Labor relations would | testimony.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 44:21-23.<br><br>Defendant's Response:<br><br><br>Plaintiff's Objections:<br>402, 403 – 45:17-25. Not relevant to defendant's denial of coverage. Waste of time.<br><br>MIL 4 (Dkt 206) – 45:24-25. Tax credits/benefits not relevant per policy language and California law.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| | Directly relevant and admissible for reasons stated in ASIC's Response to Plaintiffs' Motion in Limine on this topic. Testimony discusses how policy, Plaintiffs, and ASIC considers tax credits to be component in determining amount of covered loss; not hypothetical or contingent upon anything other than the language of the policy and the facts at issue in this case. "MIL" is not a proper objection; background and tax issue is relevant to damages claimed. |
| Page 46<br><br>1 have looked into union.<br>2 And I would have -- from an insurance<br>3 standpoint, would have ensured that our corporate<br>4 liability policies would have extended into any<br>5 foreign country, general liability policies, auto<br>6 liability policies.<br>7 And I would have checked our portfolio to<br>8 make sure that there wasn't any country exclusions<br>9 that I was unaware of.<br>10 And I would have put that responsibility on<br>11 our broker, on an insurance broker.<br>12 Q And what do you mean by "insurance broker"?<br>13 A Sure. We have an insurance broker. The<br>14 broker at the time of DIG was Aon, and they're our<br>15 insurance broker making sure we have adequate<br>16 coverage for all of the exposures we have. | Plaintiff's Objections: 402, 403 – Page 46:1-16. Not relevant to defendant's denial of coverage. Waste of time.<br><br>Defendant's Response:<br><br>Background of witness is relevant and not prejudicial. The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative.. |
| Page 47<br><br>10 Can you remember how far back you started<br>11 working with Aon as a broker?<br>12 A Yes.<br>13 Q When was that?<br>14 A I started working with Aon in the fall of<br>15 2009. | Plaintiff's Objections: 402, 403 – Page 47:10-25. Not relevant to defendant's denial of coverage. Waste of time.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 16 Q Can you tell me how that initial phase of 17 that relationship occurred? 18 A Sure. 19 Our insurance policy in 2009 was with an 20 insurance company, and we were going through 21 renewals for the 2010 policy period, they were 22 annual policy periods. 23 And in 2009, the current insurance carrier 24 had given us their quote for the following year. 25 And I can't remember the specifics, but it was | Background of witness and general insurance context relevant; not prejudicial. The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |
| Page 48 1 enough to where I gave pause from a premium 2 standpoint and wondered if we should market the 3 program out into the insurance world. 4 The prior insurance company was a captive 5 of General Electric. 6 And so I spoke to GE risk manager, and we 7 were toying with marketing the program. 8 He thought that was an interesting approach 9 and, I got introduced to Aon through the GE risk 10 manager sometime in the fall of 2009. | Plaintiff's Objections: 402, 403 – Page 48:1-10. Not relevant to defendant's denial of coverage. Waste of time. Defendant's Response: General insurance context relevant; not prejudicial. The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |
| Page 60 9 Q For the DIG production in particular, who 10 within your structure was responsible for declaring 11 DIG to your television portfolio policy? 12 A I don't recall the exact person. 13 Q Were you involved in that? 14 A No. 15 Q Is declaring an individual production to 16 the TV portfolio policy something you delegate to 17 some -- one of your reports? 18 A That is correct. | Plaintiff's Objections: 104a – 60:9-14. Witness lacks foundation, personal knowledge. No objection – 60:15-18. Defendant's Response: The witness' understanding and development of facts bearing on claim decision |

| Deposition Designation | Objection & Response |
|---|---|
| | relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge and their rationally based perceptions. |
| Page 82<br><br>19 Q Was there a decision made to push<br>20 production at some point in time?<br>21 A Yes. | Plaintiff's Objections: 402, 403 – Page 82:19-21. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. knowledge.. |
| Page 86<br><br>17 Q When was the discussion -- when was the<br>18 decision to push production made, please, sir?<br>19 A Approximately July -- to push production,<br>20 July 16th.<br>21 No. No. No. May I -- I would like to<br>22 take that back.<br>23 Q Okay.<br>24 A That was incorrect.<br>25 Approximately July 11th. | Plaintiff's Objections: 402, 403 – Page 86:17-25. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision |

| Deposition Designation | Objection & Response |
|---|---|
| | relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |
| Page 88<br><br>14 Q After the decision to push production was<br>15 made, were there additional or continuing<br>16 discussions about the conditions where filming was<br>17 anticipated?<br>18 A Yes.<br>19 Q And what were those discussions, please,<br>20 sir?<br>21 A Initial discussion from security was they<br>22 hoped that the unrest situation would resolve<br>23 itself.<br>24 Q Were there any other discussions?<br>25 A And it was a very fluid situation. We had | Plaintiff's Objections: 402, 403, MIL – Page 88:14-25. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. "MIL" not proper objection; facts regarding decision to move production relevant. |
| Page 89<br><br>1 hoped that the one-week push was all we needed.<br><br>8 Q How many times do you believe that you were<br>9 involved personally in discussions after the push<br>10 decision was made?<br>11 A Several.<br><br>14 Q Was there a reassessment every day or on an<br>15 ongoing basis about the conditions? | Plaintiff's Objections: 402, 403 – Page 89. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by |

| Deposition Designation | Objection & Response |
|---|---|
| 20 THE WITNESS: It was a very fluid<br>21 situation. And because it was so important to<br>22 protect the staff and the crew, yes, security was<br>23 monitoring it every day. I was not privy to those<br>24 conversations. | its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |
| Page 90<br><br>6 Q At the time that the decision to push<br>7 production was made, what exactly was the status of<br>8 ongoing work or personnel onsite in Israel?<br>9 A I recall we had finished filming the pilot<br>10 and we were about to start Episode 2.<br><br>25 Q Were you involved in a discussion where a | Plaintiff's Objections:<br>No objection – Page 90:6-10.<br>402, 403 – Page 90:25.<br>Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |
| Page 91<br><br>1 decision to move production out of Israel was made?<br>2 A Yes.<br>3 Q Who was involved in that discussion?<br>4 A The same people I mentioned earlier in that<br>5 attorney-client privileged conversations.<br>6 Q Let me go back to the decision to push<br>7 production, please, sir.<br>8 Who was involved in that decision?<br><br>12 THE WITNESS: I know Mark Binke, Randi<br>13 Richmond, Andrea Garber, Susan Weiss, | Plaintiff's Objections:<br>402, 403 – Page 91. Wastes time; jury can be instructed that Plaintiffs moved production and why. Calls for privileged information. Counter designation 91:18-20 necessary to complete testimony.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts |

| Deposition Designation | Objection & Response |
|---|---|
| 14 BY MS. REED:<br>15 Q Those four people were involved in the<br>16 decision to push?<br>17 A It was a collective decision with -- yes.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br>Page 91<br>18 Q Were you involved in the decision to push<br>19 production?<br>20 A No. I don't make those decisions.<br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative.. No objection to the counter designation. |
| Page 101<br><br>16 Are you aware that Aon, as the insurance<br>17 broker for NBCUniversal, provided a notice of claim<br>18 to Atlantic Insurance?<br>19 A Yes.<br>20 Q And are you the person who asked them to<br>21 take that step?<br>22 A No.<br>Page 106<br><br>22 Do you have any formal education or<br>23 training in regard to insurance?<br>24 A No. | Plaintiff's Objections: No objection – Page 101:16-22<br><br>Defendant's Response: |
| Page 123<br><br>14 Q And when's the earliest point when you read<br>15 the war exclusions that are in the TV portfolio<br>16 policy?<br>17 A Prep for this deposition.<br>18 Q At any time prior to preparing for this<br>19 deposition, had you read the war exclusions in any<br>20 of the TV portfolio policies?<br>21 A Not that I recall.<br>22 Q Other than the DIG claim, have you ever had<br>23 occasion over the course of your career to need to<br>24 address any war exclusions in any TV portfolio<br>25 policies? | Plaintiff's Objections: 402, 403 – Page 123:14-25. Not relevant to defendant's denial of coverage. Waste of time.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 124**<br><br>1 A Not that I recall. | Plaintiff's Objections: 402, 403, MIL – Page 124:1. Not relevant to defendant's denial of coverage. Waste of time.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |
| **Page 131**<br><br>18 Q Let me hand you what was previously marked<br>19 as Exhibit 38. This is defense Exhibit 38.<br>20 Can you identify this document as the<br>21 motion picture television producers portfolio policy<br>22 issued to NBCUniversal Media, LLC for the policy<br>23 period January 1, 2014 to June 30, 2015?<br>24 A Yes.<br>25 Q And is this the policy that you were | Plaintiff's Objections: No objection – Page 131:18-25.<br><br>Defendant's Response: |
| **Page 132**<br><br>1 involved in -- in having secured on behalf of<br>2 NBCUniversal for TV productions for this period of<br>3 time?<br><br>7 THE WITNESS: Yes. | Plaintiff's Objections: No objection – Page 132:1-3, 7.<br><br>Defendant's Response: |
| **Page 135**<br><br>12 Q Can you tell me who was involved in the<br>13 discussion and development of the thinking about<br>14 whether the DIG facts would be submitted as an<br>15 insurance claim – | Plaintiff's Objections: 402, 403 – Page 135:12-15, 18, 22-24. Not relevant to defendant's denial of coverage. Waste of time.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 18 Q -- under the TV portfolio policy?<br><br>22 THE WITNESS: There were many people<br>23 involved throughout this DIG process. I don't<br>24 recall the specific conversations. | The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |
| Page 136<br><br>8 Q Were you party to some of those<br>9 discussions?<br><br>13 THE WITNESS: Yes. | Plaintiff's Objections: 402, 403 – Page 136:8-9, 13. Not relevant to defendant's denial of coverage. Waste of time.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |
| Page 137<br><br>14 Q Well, when you were talking specifically<br>15 about what may or may not be submitted under a TV<br>16 portfolio policy, who would have been the people<br>17 that you thought were necessary to involve in that<br>18 discussion, other than yourself?<br><br>22 THE WITNESS: My production executive,<br>23 Mark Binke.<br>25 Q Anyone else? | Plaintiff's Objections: 402, 403 – Page 137:14-18. Not relevant to defendant's denial of coverage. Waste of time.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 138<br><br>1 A The other production executive,<br>2 Randi Richmond and Andrea Garber. | Plaintiff's Objections:<br>402, 403 – Page 138:1-2. Not relevant to defendant's denial of coverage. Waste of time.<br><br>Defendant's Response:<br><br><u>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge.</u> "MIL" not proper objection; Knowledge of and involvement in "Dig" relevant to facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 141<br><br>7 Q Have you undertaken any formal or informal<br>8 education regarding commercial insurance?<br>9 A No. | Plaintiff's Objections:<br>No objection – Page 141:7-9.<br><br>Defendant's Response: |
| Page 241<br><br>4 Q Let me hand you 294, please, sir.<br>5 Can you identify this as an email string,<br>6 beginning December 6th and running through December<br>7 10th, in which you were involved?<br>8 A Yes. Yes.<br>9 Q I want to direct your attention to the<br>10 first page, sir.<br>11 A Can I -- can I have a quick second to<br>12 review?<br>13 Q Absolutely. | Plaintiff's Objections:<br>No objection – Page 241:4-22.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 14 A Thank you.<br>15 Okay.<br>16 Q Is this an email string in which you were<br>17 involved?<br>18 A Yes.<br>19 Q And was the overall purpose for this<br>20 providing information to Ms. Garber at Aon for the<br>21 purpose of allowing her to use it to seek to endorse<br>22 the DIG production? | |
| Page 242<br><br>1 THE WITNESS: Yes, that is my assumption,<br>2 uh-huh.<br><br>4 Q And is this the type of information that<br>5 you would have been used to providing to your broker<br>6 for purposes of endorsing a policy -- pardon me,<br>7 endorsing a production to your TV portfolio policy?<br><br>11 THE WITNESS: I think because this show was<br>12 going into a foreign country, rather than filming in<br>13 Los Angeles, additional questions were asked. And<br>14 so the underwriter wanted some more information<br>15 based on the show.<br><br>17 Q Is information such as a production<br>18 calendar and the number of episodes that you would<br>19 shoot, typical information that you would provide<br>20 for the purpose of requesting to endorse a<br>21 production to your portfolio policy?<br><br>24 THE WITNESS: Yes. | Plaintiff's Objections:<br>No objection – Page 242:1-2, 4-7, 11-15, 17-21, 24.<br><br>Defendant's Response: |
| Page 243<br><br>1 Q Is budget information, information that you<br>2 would typically provide if your broker were<br>3 attempting to endorse a production to your portfolio<br>4 policy?<br><br>6 THE WITNESS: To the best of my knowledge,<br>7 that's part of the process in declaring, yes. | Plaintiff's Objections:<br>No objection – Page 243:1-4, 6-7.<br><br>Defendant's Response: |
| PLAINTIFFS' 106 COUNTER DESIGNATION:<br>Page 244<br>3 Q Okay. Would you look at Exhibit 38. | Plaintiff's Objections:<br>402, 403, 104a – Page |

| Deposition Designation | Objection & Response |
|---|---|
| 4 please, sir.<br>5 A Yes.<br>6 Yes.<br>7 Q I'm going to direct your attention to the<br>8 page that's numbered ATL 1608.<br>9 A Okay.<br>10 Q There is a Roman numeral IX, "Definition of<br>11 Loss."<br>12 Do you see that?<br>13 A I do.<br>14 Q And under that there's a lead-in that says,<br>15 "The amount of your loss will be determined based<br>16 on:" And then No. 1, "All necessary, quote,<br>17 'insurable production cost,' end quote, you incur to<br>18 complete the, quote, 'insured production,' end<br>19 quote, that exceeds the amount of, quote, 'insurable<br>20 production cost,' end quote, you would have incurred<br>21 if the covered cause of loss had not occurred."<br>22 Do you see that?<br>23 A I do.<br><br>Page 245<br>14 Q And is your budget information which you<br>15 understand you're submitting to be the insured<br>16 production cost?<br><br>21 THE WITNESS: Yeah. I -- I don't quite<br>22 understand.<br>END PLAINTIFFS' 106 COUNTER DESIGNATION<br><br>Page 245<br><br>2 Q Is it your understanding that when you<br>3 endorse a production to your portfolio policy, that<br>4 you submit, as part of that submission, an insurable<br>5 production cost?<br><br><br>10 THE WITNESS: I am familiar that we provide<br>11 budget information to the underwriter when we're<br>12 declaring a production.<br><br>Page 246<br><br>10 Q Your colleagues provided an Andrea Garber<br>11 with the budget information of $25 million for the<br>12 DIG production on December the 10th?<br>13 A I see that, yes.<br>14 Q And your understanding was that that was<br>15 submitted to Ms. Garber as part of her process that<br>16 she was undertaking to attempt to endorse this to<br>17 your TV portfolio policy?<br><br>21 THE WITNESS: That would -- that would be | 245:2-5, 10-12. Witness lacks foundation. Not relevant to defendant's denial of coverage. Waste of time.<br>Counter designation 244:3-23, 245:14-16, 21-22 necessary to complete testimony re "insurable production cost."<br><br>Defendant's Response:<br><br>Fact of budget submission relevant to loss claimed. <u>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. No objections to counter designation.</u><br><br><br><br>Plaintiff's Objections:<br>No objection – 246:10-17; 246:21-25.<br><br><br>Defendant's Response:<br><br>IO will be removed. |

| Deposition Designation | Objection & Response |
|---|---|
| 22 my understanding.<br>23 BY MS. REED:<br>24 Q And let me hand you what's been previously<br>25 marked as Defendant's Exhibit 8, please, sir.<br><br>Page 247<br><br>1 This has been identified as a December 11th<br>2 email from Andrea Garber with an attachment that's<br>3 entitled, "Television Insurance Application."<br>4 Have you seen these pages before?<br>5 A I believe I have, yes.<br>6 Q Would you look at the third page, please,<br>7 sir.<br>8 A Yes.<br>9 Q Have you seen this document before?<br>10 A I believe I have, yes.<br>11 Q Is it your understanding that this was<br>12 submitted to Atlantic as its -- as NBCUniversal's<br>13 request to add the DIG production to the TV<br>14 portfolio policy?<br>15 A I believe that's what this is, yes.<br>16 Q Would you look at No. 6, please, sir, which<br>17 says, "Total Insurable Production Cost."<br>18 Do you see that?<br>19 A I do.<br>20 Q And it says, "$25 million estimated for<br>21 entire 6 episode order"?<br>22 A Yes, I see that.<br>23 Q And can you confirm that that's the<br>24 information that was submitted to Atlantic about<br>25 DIG? | Plaintiff's Objections:<br>No objection – 247:1-22.<br><br>104a – 247:23-25. Witness lacks foundation.<br><br>Defendant's Response:<br><br><u>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge.</u> Application potentially relevant, depending on MIL rulings regarding Policy negotiation and terms. |
| Page 248<br><br>3 THE WITNESS: I can confirm what's on this<br>4 document and -- yes.<br><br>6 Q And Ms. Garber had the authority to submit<br>7 this to Atlantic at this time on behalf of<br>8 NBCUniversal?<br>9 A Absolutely. | Plaintiff's Objections:<br>104a – 248:3-4. Witness lacks foundation<br><br>No objection – 248:6-9.<br><br>Defendant's Response:<br><br>Confirms authority of Ms. Garber to submit application and facts; relevant. |
| Page 259 | Plaintiff's Objections: |

| Deposition Designation | Objection & Response |
|---|---|
| 19 Q Let me hand you what was previously marked<br>20 as Defendant's 13, please, sir.<br>21 Can you identify this as an email string<br>22 which begins June the 15th and continues through<br>23 June the 16th in which you were involved?<br>24 A I do see that, and I would need some time<br>25 to read this. | 402, 403, MIL 2 (Dkt 209) – Page 259:19-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Includes discussion of irrelevant corporate terrorism policy. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.<br><br>Defendant's Response:<br><br><u>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge.</u> "MIL" not proper objection; |
| Page 261<br><br>12 Q So when Ms. Richmond wrote to you and<br>13 Mr. Williams on June the 16th and said to you,<br>14 "Kurt," K-u-r-t, "Please advise. Should the issue<br>15 in Israel heighten to a point security advises us<br>16 not to shoot anywhere in Israel, what is our<br>17 insurance coverage?"<br>18 Do you see that?<br>19 A I do.<br>20 Q And based upon the fact that she was asking<br>21 you for that input, did you go back and study the<br>22 underlying facts to understand exactly what was<br>23 going on in and around your shooting sites and in<br>24 Israel and Gaza in general?<br>25 A I don't believe – | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)– Page 261:12-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Exhibit includes discussion of irrelevant corporate terrorism policy. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.<br><br>Defendant's Response:<br>The witness' understanding |

| Deposition Designation | Objection & Response |
|---|---|
| | and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 262

5 THE WITNESS: I don't believe I did.

23 Q And do you believe that it was necessary to 24 understand the facts on the ground in order to 25 undertake that task? | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209)– Page 262:5, 23-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.

Defendant's Response:

The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and |

| Deposition Designation | Objection & Response |
|---|---|
| | not prejudicial. |
| **Page 263**<br><br>1 A No. Curt Williams, who works for me,<br>2 responded. It was his show. And what we do is, we<br>3 go to our broker to help us decipher coverage under<br>4 our policy.<br>5 We don't make -- I don't make any<br>6 assumptions under the policy.<br>7 Q Is it correct that you would need to take<br>8 the factual reports to your broker for your broker<br>9 to work with you to look at coverage language?<br>10 A We would always provide the information to<br>11 the broker to help us decipher if there was a claim,<br>12 of course. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)–<br>Page 263:1-12. Not relevant<br>to defendant's denial of<br>coverage; not reviewed by<br>defendant at the time of<br>denial. Exhibit includes<br>discussion of irrelevant<br>corporate terrorism policy.<br>Irrelevant to whether<br>Defendant acted in bad<br>faith in denying coverage<br>and substantially more<br>prejudicial than probative.<br><br>Defendant's Response:<br><br>The witness' understanding<br>and development of facts<br>bearing on claim decision<br>relevant to reasonableness<br>of claim decision. The<br>probative value of this<br>testimony is not<br>substantially outweighed by<br>its prejudicial effect, it will<br>not confuse the jury, waste<br>time, and is not<br>unnecessarily cumulative.<br>The witness has only<br>testified to facts within the<br>scope of her personal<br>knowledge. "MIL" not<br>proper objection; Facts and<br>circumstances leading to<br>making claim relevant and<br>not prejudicial. |
| PLAINTIFFS' 106 COUNTER-DESIGNATION:<br>Page 264<br>17 Q My question to you, sir, is whether<br>18 Curt Williams called upon Deborah Kizner to<br>19 undertake that amount of research and analysis in<br>20 order to then look at the questions that he was<br>21 raising about the policy?<br>Page 265<br>2 THE WITNESS: When we would have a<br>3 potential claim, we would deal with Susan and<br>4 Andrea. As mentioned, Debby was the initial point<br>5 person for Curt. So it would have been Susan and<br>6 Andrea as the senior folks at Aon to have assisted<br>7 us.<br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | |
| **Page 265**<br><br>8 BY MS. REED:<br>9 Q And it would have been their job to look at<br>10 and understand the facts so that they can then<br>11 analyze your policy language?<br>12 A Yes. If -- they would have had to have<br>13 known what was happening in order to work with the<br>14 underwriter on potential coverage. | Plaintiff's Objections:<br>402, 403 – Page 265:8-14.<br>Not relevant to defendant's<br>denial of coverage; waste of<br>time.<br>Counter designation<br>264:17-21 and 265:2-7<br>necessary for completeness<br>to explain "their" in 265:9.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| | The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. No objection to counter designation. |
| Page 280<br><br>17 Q Can you identify Exhibit 298 as a July 1st<br>18 email string in which you were involved?<br>19 A Yes.<br>20 Q And the bottom email, Ms. Richmond's<br>21 contacting you and saying she needs "...discuss<br>22 insurance issue if security tells me I can not shoot<br>23 in jerusalem..." I think that means "and continuity<br>24 locale"?<br>25 A I do see that. | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209)—The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Page 280:17-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicialDefendant's response: |

| Deposition Designation | Objection & Response |
|---|---|
| | The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge.<br> than probative.<br><br>Defendant's Response: |
| Page 284<br><br>19 Q Let me hand you what was previously marked<br>20 as Defendant's 18, please, sir.<br>21 Can you identify --<br>22 A I just had gotten to the new part. I<br>23 didn't know all that was an ongoing...<br>24 Okay.<br>25 Q Can you identify this as an email string, | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209)– Page 284:19-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she testified she lacked personal knowledge about the Policy and had never read it. Comments are speculation and improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness |

| Deposition Designation | Objection & Response |
|---|---|
| | of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 285

1 beginning June 15th and running through July 3rd, in 2 which you were involved? 3 A That's correct. 4 Q I want to direct your attention to the top 5 email, please, sir, from Malika Adams -- 6 A Yes. 7 Q -- with Comcast to you. 8 Do you see that one? 9 A Yes.

21 Q Would you direct your attention, please, 22 sir, to the second line of Ms. Adams's paragraph to 23 you. It begins, "In order to trigger coverage..." 24 Do you see that? 25 A Yes. | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209)– Page 285:1-9, 21-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she testified she lacked personal knowledge about the Policy and had never read it. Comments are speculation and improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.

Defendant's Response:

The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will |

| Deposition Designation | Objection & Response |
|---|---|
| | not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| **Page 286**<br><br>1 Q "In order to trigger coverage under the<br>2 production policy, we would need a policy trigger,<br>3 as Susan had mentioned, and even with that, we'd<br>4 have to be cautious because there is a war exclusion<br>5 on the policy."<br>6 Do you see her statement?<br>7 A I do.<br><br>11 Q She raised with you the issue of<br>12 applicability of a war exclusion.<br>13 Do you see that?<br><br>16 THE WITNESS: I do see what she says, yes. | Plaintiff's Objections: 402, 403, 802, MIL 2 (Dkt 209)– Page 286:1-7, 11-13, 16. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she testified she lacked personal knowledge about the Policy and had never read it. Comments are speculation and improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative. Hearsay to the extent article is offered for the truth of the matter asserted.<br><br>Defendant's Response: |
| **Page 288**<br><br>6 Q Based upon your interaction with Malika<br>7 Adams, was it your understanding that she does have<br>8 a background that would afford her the ability to<br>9 understand policy language?<br><br>11 THE WITNESS: Yes.<br><br>14 So as early as July the 3rd, people within | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209)– Page 288:6-9, 11, 14-16, 20-21, 23-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she |

| Deposition Designation | Objection & Response |
|---|---|
| 15 your organization were raising with you the issue of 16 a war exclusion, correct?<br><br>20 THE WITNESS: It's what the document says, 21 yes.<br><br>23 Q So as of July the 3rd, did you undertake 24 some more review or analysis to further understand 25 the war exclusion? | testified she lacked personal knowledge about the Policy and had never read it. Comments are speculation and improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 289<br><br>3 THE WITNESS: No. | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209)– Page 289:3. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Waste of time.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by |

| Deposition Designation | Objection & Response |
|---|---|
| | its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 290<br><br>25 Q When NBCUniversal made the decision to move | Plaintiff's Objections: 402, 403 – Page 290:25. Wastes time; jury can be instructed that Plaintiffs moved production and why. Already decided by the 9th Circuit opinion.<br><br>Defendant's Response:<br><br>The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 291<br><br>1 its production out of Israel, that was a voluntary<br>2 corporate decision that it made, correct?<br><br>7 THE WITNESS: The company made a decision | Plaintiff's Objections: 402, 403, 104a, MIL – 291:1-2; 291:7-17; 291:21. Wastes time; jury can be instructed that Plaintiffs moved production and why. |

| Deposition Designation | Objection & Response |
|---|---|
| 8 to relocate, yes.<br>9 BY MS. REED:<br>10 Q There was no government or civil authority<br>11 that cut off your ability to have production in<br>12 Israel, correct?<br>13 A I don't know that knowledge. I don't know<br>14 that.<br>15 Q It was NBC's decision as a -- NBCUniversal<br>16 as a corporate entity that made that election to<br>17 move the production, correct?<br><br>21 THE WITNESS: That's correct. | Already decided by the 9th Circuit opinion. Lack of foundation because witness testified that he did not make the decision to relocate.<br><br>Defendant's Response:<br><br>The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 292<br><br>14 BY MS. REED:<br>15 Q Let me hand you Exhibit 300, please, sir.<br>16 A Yes.<br>17 Q My question is going to be whether you can<br>18 identify that as an email string.<br>19 So go ahead and take a look, please, sir.<br>20 A Yes.<br>21 Okay.<br>22 Q Can you identify this as an email string<br>23 that runs from June 15th through July the 7th, in<br>24 which you were involved?<br>25 A Yes. | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209)– Page 292. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she testified she lacked personal knowledge about the Policy and had never read it. Comments are speculation and improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than |

| Deposition Designation | Objection & Response |
|---|---|
| | probative.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 293<br><br>1 Q I want to direct your attention, if I<br>2 could, please, sir, to the first page, second email<br>3 down from Malika Adams to Ms. Richmond and copied to<br>4 you and others.<br>5 Do you see that?<br>6 A Yes.<br><br>17 Q Well, she says, again, "If the only<br>18 assumption is that we are voluntarily pulling out of<br>19 a certain area because of security concerns, I don't<br>20 think we would have coverage for this."<br>21 That's similar to what she told you,<br>22 correct? | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)–<br>Page 293:1-6, 17-22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she testified she lacked personal knowledge about the Policy and had never read it. Comments are speculation and improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts |

| Deposition Designation | Objection & Response |
|---|---|
| | bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 294<br><br>3 THE WITNESS: I see that.<br><br>5 Q And she also says, "Again, I would say with 6 caution, since there is a war exclusion on the 7 policy, that may come into play."<br>8 That was similar to an issue that she 9 raised with you, correct?<br><br>14 THE WITNESS: I do see that, yes.<br><br>16 Q And then in the email at the top of the 17 page, she again says, "Hi Randi, if it's purely 18 voluntary, I don't think we can find coverage under 19 the production policy," doesn't she?<br>20 A I do see that. | Plaintiff's Objections: 402, 403, MIL – Page 294:3-9, 14, 16-20. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Ms. Adams, a Comcast employee, speculates about corporate terrorism policy; she testified she lacked personal knowledge about the Policy and had never read it. Comments are speculation and improper opinion and lack foundation. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will |

| Deposition Designation | Objection & Response |
|---|---|
| | not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 295<br><br>20 BY MS. REED:<br>21 Q Let me hand you Exhibit 301, please, sir.<br>22 Can you identify Exhibit 301 as an email<br>23 string, July 7 to July 8, in which you were<br>24 involved?<br>25 A Yes. And I need to read it. | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209)– Page 295:20-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Waste of time.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 296<br><br>1 Okay.<br>2 Q Mr. Binke says in the middle of the page,<br>3 "Hi, Kurt. Hope you are having a great time, and<br>4 sorry to bother you on -- bother you but this is<br>5 timely."<br>6 Do you see that? | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209) – Page 296:1-19, 23-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Waste of time. |

| Deposition Designation | Objection & Response |
|---|---|
| 7 A I do.<br>8 Q Had you been on vacation for July 4th or<br>9 something?<br>10 A To the best of my knowledge, family<br>11 vacation.<br>12 Q He writes to you further, "Things are<br>13 escalating in the Middle East and we have senior<br>14 team meeting tomorrow AM and need to update the<br>15 group. Thanks."<br>16 Do you see that?<br>17 A Yes.<br>18 Q Do you know what update he was looking for<br>19 you to provide?<br><br>23 THE WITNESS: It was on how insurance might<br>24 respond. | Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not proper objection; Facts and circumstances leading to making claim relevant and not prejudicial. |
| Page 317<br><br>23 Q Did you ever deal with anyone directly in<br>24 the claims department at Atlantic? | Plaintiff's Objections:<br>No objection – Page 317:23-24.<br><br>Defendant's Response: |
| Page 318<br><br>3 THE WITNESS: No.<br><br>15 Q Can you identify Exhibit 309 as an email<br>16 string of July 14th that you were involved in?<br>17 A Yes.<br>18 Q Ms. Richmond is writing to you about<br>19 questions if they decided to bring DIG to<br>20 Albuquerque.<br>21 Do you see that?<br>22 A Yes.<br>23 Q Did you start looking into bringing DIG to<br>24 Albuquerque as early as July the 14th?<br>25 A She was asking me questions about bringing | Plaintiff's Objections:<br>No objection – Page 318:3<br>402, 403, MIL 2 (Dkt 209)–<br>Page 318:15-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br><br>The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling |

| Deposition Designation | Objection & Response |
|---|---|
| | on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith "MIL" not a proper objection.  Facts and circumstances of decision to move production relevant to claim facts and loss claimed. |
| Page 319<br><br>1 foreigners in and what information and the -- I<br>2 responded the same day, minutes later, with the<br>3 information that I would need should it become<br>4 relevant.<br><br>8 MS. REED: Let me hand you Exhibit 310,<br>9 please, sir. This is UCP 454.<br>10 Q Is this a July 14th email string in which<br>11 you were involved?<br>12 A Yes.<br>13 Q Do you see at the bottom, Ms. Richmond is<br>14 asking Andrea Garber, "What do you need from me with<br>15 regard to details to start a claim?"<br>16 A Yes. | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 319:1-4, 8-16. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br><br>The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating |

| Deposition Designation | Objection & Response |
|---|---|
| | bad faith "MIL" not a proper objection.  Facts and circumstances of decision to move production relevant to claim facts and loss claimed. |
| Page 321<br><br>14 Q Ms. Richmond then asked Ms. Garber:<br>15 "Is there any risk of the<br>16 situation in Israel changing status;<br>17 i.e., declaration of war, that could<br>18 impede us getting a claim?"<br>19 Do you see that?<br>20 A I do.<br>21 Q So she was raising, again, this same common<br>22 theme we've seen in numerous discussions now in<br>23 emails about war? | Plaintiff's Objections:<br>402, 403, 104a, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 321:14-23. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Designation at 322 indicates that Richmond does not have understanding of insurance. |
| | Defendant's Response:<br><br>The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith "MIL" not a proper objection.  Facts and circumstances of decision |

| Deposition Designation | Objection & Response |
|---|---|
| | to move production relevant to claim facts and loss claimed. |
| Page 322 | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209)– Page 322. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| 3 THE WITNESS: I see what she has written 4 here. 5 BY MS. REED: 6 Q And she's bringing up this concept of war 7 yet again in more emails, right? 11 THE WITNESS: Randi Richmond doesn't 12 understand insurance. It's not her forte. It's not 13 something she -- I want to make sure you're still 14 with me. She -- it's not her forte. 15 I think it was common there was a war 16 exclusion. She's just asking a reasonable question. 19 Q She's bringing up the concept of war, yet 20 again, in another email, right? 24 THE WITNESS: Yes. That's what she says in 25 this email dated July 14th. | |
| | Defendant's Response: The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith "MIL" not a proper objection.  Facts and circumstances of decision to move production and pursue claim relevant to claim facts and loss claimed. |
| Page 326 | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209), |

| Deposition Designation | Objection & Response |
|---|---|
| 11 Q Let me hand you what's been previously<br>12 marked as Defendant's 30, please, sir.<br>13 A Okay.<br>14 Q Can you identify Exhibit 30 as an email<br>15 string from July 14th through July 14th in which you<br>16 were involved?<br>17 A Yes.<br>18 Q Let me direct your attention, please, sir,<br>19 toward the bottom of the page, to the message from<br>20 Andrea Garber to Randi Richmond, copied to you.<br>21 Do you see that one?<br>22 A Yes.<br>23 Q Second paragraph, "If there is an<br>24 actual, quote, 'declaration of war,'<br>25 end quote, we will have an issue with | MIL 3 (Dkt 208)– Page 326:11-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br><br>The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith "MIL" not a proper objection.  Facts and circumstances of decision to move production, make claim, discussion of claim relevant to claim facts and loss claimed. |
| Page 327<br><br>1 coverage under the policy because<br>2 there is a broad exclusion for acts of<br>3 war. The exclusion includes, quote,<br>4 'war-like acts,' close quote, but the<br>5 carrier did not bring this up when I<br>6 spoke to them." | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 327:1-17, 21-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. |

| Deposition Designation | Objection & Response |
|---|---|
| 7 Do you see that?<br>8 A Yes.<br>9 Q Did you have any conversations with<br>10 Ms. Garber about that statement?<br>11 A May or may not have.<br>12 Q You don't recall today?<br>13 A I don't recall.<br>14 Q Is it accurate to say that on July 14th,<br>15 Ms. Garber is yet another person who's bringing up<br>16 the concept of war in the context of discussion of<br>17 this claim or potential claim?<br><br>21 BY MS. REED:<br>22 Q And does Ms. Garber bring to everyone's<br>23 attention that there is not only a war exclusion,<br>24 but also a war-like acts exclusion? | Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br><br>The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith "MIL" not a proper objection.  Facts and circumstances of decision to move production, make claim, discussion of claim relevant to claim facts and loss claimed. |
| Page 328<br><br>2 THE WITNESS: Yes, that is what the<br>3 document says.<br><br>9 Q And Ms. Garber is raising it as an issue in<br>10 the context of this claim as of July the 14th,<br>11 right?<br><br>16 THE WITNESS: She's bringing up the<br>17 exclusion includes war-like acts, yes.<br>18 BY MS. REED:<br>19 Q And war, right? | Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 328:2-3, 9-11, 16-19, 22-23. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially more prejudicial than probative. To the extent |

| Deposition Designation | Objection & Response |
|---|---|
| 22 THE WITNESS: Correct. That's what the 23 document says. | used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| | Defendant's Response: |
| | The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith "MIL" not a proper objection. Facts and circumstances of decision to move production, make claim, discussion of claim relevant to claim facts and loss claimed. |
| Page 332 | Plaintiff's Objections: No objection – Page 332:7- |

| Deposition Designation | Objection & Response |
|---|---|
| 7 Q Let me hand you what was previously marked<br>8 as Defendant's 61, please, sir.<br>9 A Okay.<br>10 Q Can you identify this as an email string<br>11 that begins July 14th and continues through<br>12 July 15th?<br>13 A Yes. I do see that. | 13.<br><br>Defendant's Response: |
| Page 333<br><br>1 Let me direct your attention to the top of<br>2 the first page, if I may.<br>3 I want to look at the second email down<br>4 from Susan Weiss to Andrea Garber of July 15th.<br>5 She writes, "Andrea, just got<br>6 an email from Michael at OBI. He<br>7 confirmed receipt of my email and said<br>8 it was forwarded to the claims<br>9 department to start the process."<br>10 Do you see that?<br>11 A I do.<br>12 Q Does that refresh your recollection that<br>13 the submission of the claim to Atlantic was made on<br>14 July the 15th?<br><br>19 THE WITNESS: Yes. | Plaintiff's Objections:<br>No objection – Page 333:1-14, 19.<br><br>Defendant's Response: |
| Page 336<br><br>4 Q Let me hand you what's been previously<br>5 marked as Defendant's 35, please, sir.<br>6 A Okay.<br>7 Q Can you identify this as an email string of<br>8 July 18th, 2014, on which you were included?<br>9 A Yes.<br>10 Q At the top of the page, Joanne Quintal is<br>11 writing. Do you know who she is?<br>12 A I do not.<br>13 Q Notes that she's with Aon by her email<br>14 address; is that correct?<br>15 A That's what the document says, yes.<br>16 Q And Joanne says in her second sentence, "We<br>17 will need to understand details as property<br>18 policy" --<br>19 A I'm sorry. Now I know where you are. Say<br>20 that again, please.<br>21 Q Her second sentence reads, "We will need to<br>22 understand details as property policy also has a war<br>23 exclusion."<br>24 Do you see that?<br>25 A Yes. | Plaintiff's Objections:<br>402, 403, MIL – Page 336:4-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only |

| Deposition Designation | Objection & Response |
|---|---|
| | testified to facts within the scope of her personal knowledge. "MIL" not a proper objection.  Facts and circumstances of decision to move production, make claim, discussion of claim relevant to claim facts and loss claimed. |
| Page 337<br><br>1 Q So Ms. Quintal also raised a war exclusion<br>2 in her communication?<br><br>5 THE WITNESS: She does say that, yes. | Plaintiff's Objections: 402, 403, MIL – Page 337:1-2, 5. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br><br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not a proper objection.  Facts and circumstances of decision to move production, make claim, discussion of claim relevant to claim facts and loss claimed. |
| Page 368<br><br>1 (Exhibit 317 was marked for<br>2 identification by the court reporter<br>3 and is attached hereto.)<br>4 BY MS. REED:<br>5 Q Let me hand you Exhibit 317, please, sir. | Plaintiff's Objections: No objection – Page 368:1-22.<br><br>Defendant's Response:<br><br>Depending on MIL rulings, |

| Deposition Designation | Objection & Response |
|---|---|
| 6 A Yes.<br>7 Q Can you identify this as an email string<br>8 that runs from November 26, 2013 through December<br>9 10th, 2013, in which you were involved?<br>10 A Yes.<br>11 Q Would you look at the page that is<br>12 Bates-numbered AONNBCU 244, please, sir.<br>13 A I am there.<br>14 Q Do you see the email at the top of the page<br>15 from Susan Weiss to you dated December 4?<br>16 A Yes.<br>17 Q She says, "Kurt, Thank you for<br>18 arranging the call today with Jerry<br>19 DiCanio and Mark Binke to review the<br>20 upcoming renewal terms."<br>21 Do you see that?<br>22 A I do. | relevant to parties' relationship and good faith of ASIC in handling of NBC account. |
| **Page 369**<br><br>1 Q And do you recall that there would have<br>2 been a presentation made on the proposed terms for<br>3 the policy?<br>4 A Yes.<br>5 Q Would you turn back toward the front of the<br>6 exhibit, please, sir, to the numbered Page 243.<br>7 A Yes.<br>8 Q On December 5th, 2013, did Andrea Garber<br>9 write to you and to Malika Adams to report that<br>10 OneBeacon agreed to a further rate reduction to<br>11 $0.11 on the scripted TV program?<br>12 A I do see that.<br>13 Q And above that do you respond, "This is<br>14 great news"?<br>15 A Yes.<br>16 Q Were you happy to hear that particular rate<br>17 quote?<br>18 A I think I was probably happy -- happy to<br>19 know that we were staying with OneBeacon and we were<br>20 able to come to a mutual agreement.<br>21 I believe this was a one cent increase from<br>22 our prior year. So it's never good news or great<br>23 news when you have an additional cent increase, but<br>24 it was good news that the negotiations had started,<br>25 I believe, at a 25 cent rate down to 15 cent rate, | Plaintiff's Objections:<br>No objection – Page 369:1-25.<br><br>Defendant's Response:<br><br>Depending on MIL rulings, relevant to parties' relationship and good faith of ASIC in handling of NBC account. |
| **Page 370**<br><br>1 down to an 11 cent rate. So I think we were very<br>2 pleased that we got them down to a lower rate and<br>3 happy to have, again, stayed with them, not to have | Plaintiff's Objections:<br>No objection – Page 370:1-4. |

| Deposition Designation | Objection & Response |
|---|---|
| 4 to change carriers. | Defendant's Response: <br><br> Depending on MIL rulings, relevant to parties' relationship and good faith of ASIC in handling of NBC account. |

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Andrea Garber<br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.**<br><br><br>Page 12<br>21 BY MR. KEELEY:<br>22 Q Good morning, Ms. Garber. My name is Mike<br>23 Keeley. We met briefly off the record but just so<br>24 you know, I represent the defendant in this lawsuit,<br>25 Atlantic Specialty Insurance Company.<br><br>Page 13<br>1 A Okay. How do you do.<br><br><br><br><br><br>Page 44<br>18 Q So on December 31, 2009, you ended your<br>19 position with Electric Insurance Company; is that<br>20 right?<br>21 A Yes.<br>22 Q And you went to work with Aon?<br>23 A Yes.<br>24 Q What is Aon?<br>25 A Aon is an insurance broker.<br><br>Page 46<br>7 Q Is it one of the larger insurance brokers<br>8 in the country?<br>9 A It's my understanding, yes.<br>10 Q And what type of services does it provide,<br>11 generally?<br>12 A An insurance broker facilitates purchase<br>13 of insurance for a commercial client.  That's what<br>14 they do.<br><br>Page 48 | Plaintiffs object to Defendant's designations as follows: |

| Deposition Designation | Objection & Response |
|---|---|
| 1 Q So Aon would pay you but whatever they<br>2 paid you, NBC would reimburse Aon.<br>3 A Right<br><br>6 What exactly did you do?<br>7 A When I began in early 2010, I would get<br>8 information about new shows that were starting up,<br>9 and I would pass that information along to the<br>10 broker people at the Aon office, and I would get<br>11 documents back from them confirming coverage, and I<br>12 would make sure that the people that I was working<br>13 with at NBC had those documents.<br>14 And when there were claims, I would tell<br>15 the people at Aon that there was an event and assist<br>16 in working with the carrier to get the information<br>17 to them and facilitate any discussions that they<br>18 needed to have with the production folks.<br><br>Page 55<br>5 Q So as a liaison between Aon and<br>6 NBC/Universal, what were your responsibilities<br>7 during that first year?<br>8 A To pass information back and forth and<br>9 assist when there were questions to make sure that<br>10 they got appropriately answered and to make sure<br>11 that we had an appropriate claims response from the<br>12 carrier when needed.<br>13 Q Who at NBC/Universal were you primarily<br>14 dealing with?<br>15 A It would have been Kurt Ford.<br>16 Q What was Mr. Ford's position?<br>17 A He's Senior Vice President of Production<br>18 Services.<br>19 Q What were his responsibilities, generally?<br>20 A Generally, he takes care of all of the<br>21 sort of nitty-gritty things that have to do with<br>22 production.<br>23 It's such a wide ranging role. Insurance<br>24 is one of his responsibilities, to make sure that he<br>25 understands when people have questions about<br><br>Page 56<br>1 insurance on the -- from at the production level<br>16 Q You are currently employed by Comcast?<br>17 A Yes.<br>18 Q And are you the Risk Manager? | |

| Deposition Designation | Objection & Response |
|---|---|
| 19 A I am part of the Risk Management<br>20 Department.<br><br><br>Page 62<br>16 Q At what point in time did you go to work<br>17 for NBC/Universal?<br>18 A My employment with NBC/Universal began on<br>19 6/1/2014.<br><br>Page 65<br>4 Q So what was your role versus Ms. Weiss's<br>5 role with Atlantic?<br>6 A My role was really to take care of the<br>7 day-to-day flow of information that has to occur to<br>8 make sure we have appropriate coverage under the<br>9 terms of the policy, that the cast gets named, that<br>10 the cast gets approved, that the production is<br>11 declared to the policy, those sorts of day-to-day<br>12 things.<br>13 Susan oversaw that process and she became<br>14 more involved when it came to the policy's renewal<br>15 cycle.<br>16 And certainly if we had any problems or<br>17 questions, she would become involved.<br><br><br>Page 71<br><br>19 Q Did you have involvement in the various<br>20 policy renewal periods?<br><br>24 THE WITNESS: Yes, I did.<br><br>Page 73<br>5 BY MR. KEELEY:<br>6 Q Until the "Dig" claim was submitted by<br>7 NBC/Universal, had you ever had an experience with a<br>8 claim that involved the war exclusion?<br>9 A No. | |

| Deposition Designation | Objection & Response |
|---|---|
| 10 Q Had you ever had any experience<br>11 negotiating the terms of war exclusions?<br>12 A No.<br>13 Q Until the "Dig" claim was submitted, did<br>14 you have any discussions with anyone on behalf of<br>15 Atlantic concerning the war exclusions of any of the<br>16 polices?<br><br>Page 74<br>6 THE WITNESS: No.<br>8 Q Did you have any -- until the "Dig" claim<br>9 was submitted prior to that point in time, did you<br>10 have any discussions with anyone at Atlantic as to<br>11 whether or not there was coverage for acts of terror<br>12 or terrorism under the policies that Atlantic<br>13 issued?<br>14 A No, I didn't have any discussions, myself,<br>15 about that.<br>16 Q Do you think other persons had discussions<br>17 about terrorism with Atlantic?<br><br>21 THE WITNESS: I don't really know what the<br>22 context of the discussions were.<br><br>Page 75<br>2 Q Well, my question to you is do you have --<br>3 are you aware -- strike that.<br>4 My question is are you aware of any<br>5 discussions anyone at Aon or NBC had with anyone at<br>6 Atlantic regarding whether terrorism would be<br>7 covered under the Atlantic polices? And this is<br>8 prior to the "Dig" claim being submitted.<br>9 A I'm not aware of any of that.<br>10 Q Until the "Dig" claim was filed, did you<br>11 have any discussions with anyone at Atlantic<br>12 regarding the types of claims that would be covered<br>13 under the Atlantic polices in connection with<br>14 imminent peril?<br>15 A I didn't have any specific discussions<br>16 about that, giving examples or anything like that.<br><br>Page 88<br><br><br>12 THE WITNESS: Yes, we had.<br>13 BY MR. KEELEY:<br>14 Q But each time you decided to renew with | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiffs' Objections:<br>88:12-21 – No objection if counter designation 88:18 included to complete question. |

| Deposition Designation | Objection & Response |
|---|---|
| 15 OneBeacon; is that correct, or with Atlantic 16 Specialty? Excuse me. 17 A Yes. 19 bids from other insurers, correct? 20 A Yes. As documented here, that was the 21 decision. PLAINTIFFS' 106 COUNTER-DESIGNATION: Page 88 18 Q But this year, you decided not to seek END PLAINTIFFS' 106 COUNTER-DESIGNATION | Defendant's Response: Defendant objects to the Plaintiff's counter designation; information and evidence regarding policy negotiations, underwriting, renewal, or premiums paid is irrelevant to the issue of whether the Defendant acted in "bad faith" when reaching its coverage decision; evidence regarding the decision making process, the information relied upon when making the coverage determination, and research conducted is relevant, evidence within the counter designation is not. 401 and 403. |
| Page 102 20 Q Do you recall there came a point where 21 Wanda Phillips would have provided you and others at 22 Aon a copy of the 2014/15 policy for you all to 23 review? Page 103 4 THE WITNESS: I believe she would have 8 Q Do you recall reviewing the proposed 9 2014/15 policy before recommending it to 10 NBC/Universal? 14 THE WITNESS: My review would have been to 15 understand that the specific terms that we had 16 discussed during renewal would have been included. 17 BY MR. KEELEY: 18 Q So you would not have done a complete 19 policy review then 23 THE WITNESS: No, since the policy had 24 been in force for so long. Page 113 2 Q During the discussions concerning renewal 3 of the 2013 policy, did you have any discussions | Plaintiffs' Response to Objection to Counter: Plaintiffs' 88:18 counter is necessary to complete part of a sentence in Defendant's designation. Necessary for completeness. |

| Deposition Designation | Objection & Response |
|---|---|
| 4 with anyone at Atlantic concerning the war<br>5 exclusions of the policy?<br><br>9 THE WITNESS: No.<br><br>Page 114<br>2 Q Were you involved in having the production<br>3 of "Dig" declared to the policy?<br>4 A Yes, as an employee of Aon.<br>5 Q I'm sorry?<br>6 A Yes, as an employee of Aon.<br><br>Page 120<br><br><br><br><br><br><br>Page 157<br>20 Q Do you recall when you first learned about<br>21 that NBC might need to delay production of "Dig" in<br>22 Israel due to the circumstances over there?<br>23 A I really only remember being aware when I<br>24 got back from vacation in the first -- beginning of<br>25 July after the July 4 holiday.<br><br>Page 158<br>1 Q What do you recall learning?<br>2 A Well, by that time, there had been quite a<br>3 bit of back and forth and they were wondering what<br>4 they were going to do about resuming production in<br>5 Israel.  They were considering options at that<br>6 point.<br><br>18 Q What was your understanding as to the<br>19 reasons why production of "Dig" might be delayed?<br>20 A Well, there was hostilities going on in<br>21 the areas where they felt they needed to go.  We<br>22 were on hiatus, so we didn't have anything actively<br>23 involved in terms of production activity, but the | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 158:18-25 -- 402,403. Not relevant; jury can be instructed that Plaintiffs moved production and why; wastes time.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the |

| Deposition Designation | Objection & Response |
|---|---|
| 24 question to go back was an issue and some of the<br>25 cast and crew -- although we didn't send the entire<br><br><br><br><br><br><br><br><br><br><br><br><br>Page 159<br>1 crew, the people that we did send were hesitating.<br>2 They were concerned.<br>3 Q And when you saw there were hostilities,<br>4 what was your understanding as to the nature of the<br>5 hostilities?<br><br>9 THE WITNESS:  I think we were hearing --<br>10 at that time, my recollection is that there were<br>11 rockets and -- being fired into -- into Israel that<br>12 was creating issues on the street.<br><br>Page 160<br>4 BY MR. KEELEY:<br>5 Q But at some point, you came to learn that<br>6 Israel was retaliating and shooting rockets and<br>7 missiles into Palestinian territory, correct?<br><br>12 THE WITNESS:  At some point, I became<br>13 aware of that, yes. | underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.<br><br><u>Plaintiffs' Objections:</u><br>159:1-5, 9-12 – 402, 403. Not relevant; jury can be instructed that Plaintiffs moved production and why; wastes time.<br><br>Defendant's Response:<br>The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider |

| Deposition Designation | Objection & Response |
|---|---|
| | when evaluating bad faith claims. |
| | **Plaintiff's Objections:** Page 160:4-7; 160:12-13 MIL 3 (Dkt 208), 402,403 -- Not relevant to defendant's denial of coverage. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Not relevant; jury can be instructed that Plaintiffs moved production and why; wastes time. |
| | **Defendant's Response:** The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and |
| Page 161 5 Q So once you learned about it, were you 6 following the news stories on a daily basis? 7 A Pretty much, yes | |

| Deposition Designation | Objection & Response |
|---|---|
| | process surrounding the claim is relevant and not prejudicial.

Plaintiff's Objections:
Page 161:5-7 402,403. Not relevant to defendant's denial of coverage. Waste of time.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 162
14 Q So were you being asked earlier whether or
15 not you felt there was coverage into the Atlantic's
16 policy should NBC have to delay production?

20 THE WITNESS: Certainly, the production
21 folks were curious about what insurance we might
22 have available and so they were asking.
23 BY MR. KEELEY:
24 Q And what did you tell them?
25 A That it is very dependent on the | Plaintiff's Objections:
Page 162:14-16; 162:20-163:1 MIL 2 (Dkt 209), 402, 403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. |
| Page 163
1 circumstances. | Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The |

| Deposition Designation | Objection & Response |
|---|---|
| Page 168<br>15 Q And by "early on," I am talking about when<br>16 you first came back from vacation in early July and<br>17 learned there might be a problem, did you have any<br>18 discussions with Malika Adams concerning potential<br>19 coverage?<br>20 A I think there might have been some<br>21 discussions with Malika | probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.<br><br>Plaintiff's Objections:<br>Page 168:15-21<br>MIL 2 (Dkt 209), 402, 403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice |

| Deposition Designation | Objection & Response |
|---|---|
| | outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 170<br>11 BY MR. KEELEY:<br>12 Q So you do recall a point in time when<br>13 Ms. Adams thought there might not be coverage?<br><br>19 THE WITNESS:  When I got back from<br>20 vacation, I had a lot of E-mails about many things,<br>21 but about this situation, too, and I believe that in<br>22 some of -- there was a back-and-forth with Malika<br>23 that I had been CC'd on. That's why they were in my<br>24 inbox and there was some speculation on her part<br>25 earlier on when the full information was not | Plaintiff's Objections:<br>Page 170:11-13; 170:19-170:25 MIL 2 (Dkt 209), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; |

| Deposition Designation | Objection & Response |
|---|---|
| Page 171<br>1 available and things were still developing that she<br>2 questioned coverage under the production policy<br><br>15 Q Do you recall Ms. Adams raising concern<br>16 that the war exclusions -- one or more of the war<br>17 exclusions might apply?<br>18 A I believe in one of these E-mails, she<br>19 brought up the fact there was a war exclusion on the<br>20 policy. | description of the facts and process surrounding the claim is relevant and not prejudicial.<br><br>Plaintiff's Objections:<br>Page 171:1-2; 171:15-20<br>MIL 2 (Dkt 209), 402,403, 602. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Witness testified that statements from Adams were speculation when she did not have all the facts.  See 170:23-171:2. More prejudicial than probative.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought: |

| Deposition Designation | Objection & Response |
|---|---|
| Page 173<br>9 BY MR. KEELEY:<br>10 Q Anybody else besides Susan Weiss and<br>11 Malika Adams, who we have talked about already, is<br>12 there anybody else that you can recall expressing<br>13 doubt about there being coverage, and yes, other<br>14 than people at Atlantic.<br>15 A No, I don't recall talking to anybody else<br>16 about that or anybody else raising the issue.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><u>Page 167</u><br>19 Q Did you have discussions with Susan Weiss<br>20 early on about whether she felt there might or might<br>21 not be coverage?<br><br>25 THE WITNESS: I don't think that my<br><u>Page 168</u><br>1 discussions with her about specific coverage<br>2 happened until after I came back from vacation but I<br>3 am not a hundred percent clear.<br>4 BY MR. KEELEY:<br>5 Q Once you did have some discussions with<br>6 her, what do you recall her views being?<br>7 A My recollection is that she agreed that<br>8 it's an imminent peril situation and we would have<br>9 coverage.<br><u>END PLAINTIFFS' 106 COUNTER-DESIGNATION</u> | relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.<br><br>Plaintiff's Objections:<br>Page 173:9-16; 173:20-23 MIL, 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Witness testified that statements from Adams were speculation when she did not have all the facts. See 170:23-171:2. More prejudicial than probative. Misstates testimony; counter designation 167:19-21, 25, 168:1-9 necessary to complete testimony re Weiss.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative |

| Deposition Designation | Objection & Response |
|---|---|
| | value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims.<br><br>Plaintiffs' Response to Objection to Counters: Defendant does not appear to object to Plaintiffs' counter designation.  As such, no response is needed. |
| Page 174<br>20 BY MR. KEELEY:<br>21 Q Please, take a look at Exhibit 13 and once<br>22 you are done, let me know and I will ask you a<br>23 couple of questions about it. | Plaintiff's Objections:<br>Page 174:2-5, 20-23<br>MIL 2 (Dkt 209), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Exhibit includes discussion of separate corporate terrorism policy not relevant to this case. |
| Page 174<br>2 BY MR. KEELEY:<br>3 Q Having had a chance to review Exhibit 13,<br>4 do you recall the E-mails on this document?<br>5 A To the extent I am seeing them here, yes. | Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at |

| Deposition Designation | Objection & Response |
|---|---|
| | time of the facts giving rise to Plaintiffs' claims. |
| Page 179<br>23 BY MR. KEELEY:<br>24 Q So Exhibit 16 is a continuation of some of<br>25 the same chain | Plaintiff's Objections:<br>Page 179:23-25<br>MIL 2 (Dkt 209), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Exhibit includes discussion of separate corporate terrorism policy not relevant to this case.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 180<br>1 The middle E-mail is from Kurt Ford to<br>2 Susan Weiss dated July 1, 2:27 p.m.<br>3 Do you see that?<br>4 A Uh-huh. | Plaintiff's Objections:<br>Page 180:1-25<br>MIL 2 (Dkt 209), 402,403. Not relevant to defendant's denial of coverage; not reviewed by |

| Deposition Designation | Objection & Response |
|---|---|
| 5 Q He says,<br>6 "So under the current policies, you<br>7 don't think there is coverage?<br>8 "If not, should I loop in Malika?"<br>9 And Ms. Weiss responds with a call to you<br>10 at 2:32 p.m., that top E-mail.<br>11 Do you see that?<br>12 A Uh-huh.<br>13 Q She says,<br>14 "If it's your security detail that is<br>15 saying it's not safe and you are choosing<br>16 to shoot in a different location, it's<br>17 looking more like a possible terrorism<br>18 cover, but I don't know how that policy<br>19 works.<br>20 "Andrea and I discussed this briefly<br>21 when it first came up and we didn't see<br>22 how the policy would respond."<br>23 Do you see that?<br>24 A Uh-huh.<br>25 Q Do you disagree with that last statement | defendant at the time of denial. Exhibit includes discussion of separate corporate terrorism policy not relevant to this case.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 181<br>1 by Ms. Weiss?<br><br>7 THE WITNESS:  The information we had at<br>8 this point in time was based on these prior E-mails<br>9 that say they just couldn't go from one place to the<br>10 other, not because of a civil authority and not<br>11 necessarily because of anything unusual.  It was<br>12 just a security recommendation.<br>13 So under those circumstances, it was<br>14 doubtful coverage would apply and those are the<br>15 things that we would have discussed in the | Plaintiff's Objections:<br>Page 181:1; 181:7-22<br>MIL 2 (Dkt 209), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Exhibit includes discussion of separate corporate terrorism policy not relevant to this case.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the |

| Deposition Designation | Objection & Response |
|---|---|
| context<br>16 of these earlier E-mails before I went on vacation.<br>17 BY MR. KEELEY:<br>18 Q So you felt like civil authority coverage<br>19 might be doubtful without involvement of the<br>20 government and that it might it might be iffy under<br>21 imminent peril coverage because of the reasons you<br>22 explained previously? | underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 182<br>1 THE WITNESS:  Right.  Especially because<br>2 time had gone by and they continued to film. | Plaintiff's Objections:<br>Page 182:1-2<br>MIL 2 (Dkt 209), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Exhibit includes discussion of separate corporate terrorism policy not relevant to this case.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further. F.R.E. 403 is |

| **Deposition Designation** | **Objection & Response** |
|---|---|
| | conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 184<br>1 BY MR. KEELEY:<br>2 Q Exhibit 18 is, again, in the same family<br>3 of E-mails, and the very first E-mail is the one I<br>4 would like you to focus your attention on.  It's<br>5 from Malika Adams to Kurt Ford and Jessica Weiss<br>6 copied to you.<br>7 Do you see that?<br>8 A Uh-huh.<br><br>14 Q The third sentence reads,<br>15 "In order to trigger coverage under the<br>16 production policy, we would need a policy<br>17 trigger as Susan had mentioned, and even<br>18 with that, we'd have to be cautious<br>19 because there is a war exclusion on the<br>20 policy."<br>21 Did I read that correctly?<br>22 A Yes. | Plaintiff's Objections:<br>Page 184:1-8; 184:14-22<br>MIL 2 (Dkt 209), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Exhibit includes discussion of separate corporate terrorism policy not relevant to this case.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. |

| Deposition Designation | Objection & Response |
|---|---|
| | Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 185<br><br>18 Q And do you recall hearing or reading that<br>19 Malika Adams had raised concern about the possible<br>20 application of the war exclusion?<br>21 A It's clear in this E-mail that she had<br>22 those concerns.  I don't recall discussing them with<br>23 her directly. | Plaintiff's Objections:<br>Page 185:18-23<br>MIL 2 (Dkt 209), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Exhibit includes discussion of separate corporate terrorism policy not relevant to this case.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not |

| Deposition Designation | Objection & Response |
|---|---|
| | clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 189<br>4 Q Do you recall that Atlantic's production<br>5 policy has multiple war exclusions?  It's not just<br>6 one war exclusion but there are a number of<br>7 war-related exclusions?<br>8 A There is a section -- my understanding is<br>9 there is a section and it's with a broad term and it<br>10 includes many parts, if that's what you are<br>11 referring to. | Plaintiff's Objections:<br>Page 189:4-11<br>MIL 2 (Dkt 209), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Exhibit includes discussion of separate corporate terrorism policy not relevant to this case.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 190 | Plaintiff's Objections: |

| Deposition Designation | Objection & Response |
|---|---|
| 1 BY MR. KEELEY:<br>2 Q So do you recall that there was an<br>3 exclusion for loss caused by war?<br>4 A My recollection is the word "war" was<br>5 definitely one of the exclusions.<br>6 Q And do you recall there was an exclusion<br>7 for war-like actions?<br><br>14 THE WITNESS:  I am pretty sure that it<br>15 says "war-like actions," as well.<br>16 BY MR. KEELEY:<br>17 Q And do you recall there was an exclusion<br>18 for loss caused by weapons of war? | Page 190:1-7; 190:14-18<br>MIL 2 (Dkt 209), 402,403.<br>Not relevant to defendant's<br>denial of coverage; not<br>reviewed by defendant at the<br>time of denial.<br><br>Defendant's Response:<br>The witness' understanding of<br>the facts are relevant to the<br>underlying facts of loss and the<br>amount of loss. The probative<br>value of this testimony is not<br>substantially outweighed by its<br>prejudicial effect, it will not<br>confuse the jury, waste time,<br>and is not unnecessarily<br>cumulative. Further, F.R.E. 403<br>is conditional, and therefore not<br>binding as to general<br>admissibility. Objection also<br>fails to state why exhibit is<br>unfairly prejudicial; or why<br>such alleged unfair prejudice<br>outweighs its probative value;<br>or why exhibit confuses the<br>issue, misleads the jury, wastes<br>time, or is cumulative.<br>Furthermore, high probative<br>value re: state of mind of all<br>parties involved at the time of<br>the claim. The jury is entitled to<br>know what information NBC,<br>ASIC, and other parties had at<br>time of the facts giving rise to<br>Plaintiffs' claims. "MIL" not<br>clear what objection intended;<br>description of the facts and<br>process surrounding the claim<br>is relevant and not prejudicial. |
| Page 202<br>Page 205<br>19 Q What is the next thing you recall<br>20 happening in furtherance of the claim being<br>21 submitted to Atlantic?<br>22 A I believe there was a written<br>23 communication between Susan and OneBeacon.<br>And then<br>24 it I believe there was a subsequent phone call<br>with<br>25 Pamela and Danny. | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 206<br>1 Q Pamela Johnson and Danny Gutterman?<br>2 A Yes<br><br>6 Q It was just you on the telephone or it was<br>7 you and Ms. Weiss?<br>8 A It was Susan and I.<br><br>12 Q Tell me everything you recall being<br>13 discussed.<br>14 A We discussed what was happening with the<br>15 production.  It was clear that Peter had spoken and<br>16 relayed some information to Pamela and Danny and<br>17 Pamela's initial concern was how many people do we<br>18 have to get out.  And we didn't have to get out<br>19 anybody because we were on I had eight us at that<br>20 point and the issue was going back to Israel.<br>21 And because of these hostilities and our<br>22 security telling us that there was a potential for<br>23 the hostilities to die down and for everything to<br>24 gets back to normal, that we were delaying a week to<br>25 allow for the situation to neutralize<br><br>Page 207<br>13 Q All right so then written notice was<br>14 given.  And then this telephone conversation with<br>15 Pamela Johnson and Danny Guterman was after the<br>16 written notice was given?<br>17 A The initial written notice, yes.<br>18 Q Do you recall what you or Ms. Weiss told<br>19 Ms. Johnson and Mr. Guterman about the hostilities?<br>20 A Again the focus of the call was the<br>21 problem with production.  If we discussed the<br>22 specifics of the hostilities it was this rockets<br>23 coming over the border.  That was the obvious<br>24 problem with it being too dangerous to film in the<br>25 streets there.  So at this point because I think the<br><br>Page 208<br>1 of Tel Aviv airport had closed briefly, you know<br>2 these rockets were not only hitting Jerusalem but<br>3 they were going a little bit further because we had<br>4 Always felt that we could just number Tel Aviv for | |

| Deposition Designation | Objection & Response |
|---|---|
| 5 our filming if there was a problem we couldn't over<br>6 come in Jerusalem but the exact nature of the<br>7 hostilities and all of the details around that<br>8 particular thing was not the focus of the call the<br>9 are focus of the call was what is happening with<br>10 production what do they need to do what two we think<br>11 the costs will be.<br>12 Q What else do you recall being discussed<br>13 during that telephone conversation?<br>14 A That was -- you know the jest of it was<br>15 we're going to push a week and we are going to wait<br>16 and see what happens and we will keep you posted and<br>17 it was a day to day thing at that point based on<br>18 what we were hearing from security.<br>19 Q What do you recall happened next in<br>20 furtherance of the claim?<br>21 A Well, it was fairly shortly after that<br>22 that the situation didn't get better and because of<br>23 production timing and needing to make a decision,<br>24 they decided in fairly short order that security was<br>25 saying there is no indication when this is going to | |
| Page 209<br>1 get better at this point it had really gotten worse<br>2 and they decided they couldn't make plans to return<br>3 there at all they would have to make plans to finish<br>4 up somewhere else.<br><br>21 Q But what I am trying to figure out is by<br>22 that points when NBC made the decision that they had<br>23 to leave Israel and not shoot there did you still<br>24 think it was completely one sided or did you also,<br>25 understand that Israel was fighting back? | Plaintiff's Objections:<br>Page 209:21-25<br>MIL 2 (Dkt 209), MIL 3 (Dkt 208), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |

| Deposition Designation | Objection & Response |
|---|---|
| | Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. As to preliminary question objection, it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets the 602. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 210<br>5 THE WITNESS:  Well, what I recall is that<br>6 Israeli was trying to defend themselves.  But it<br>7 involved the border area as I recall, activities at<br>8 the border between the Palestinian area and Israel.<br>9 BY MR. KEELEY:<br>10 Q And so how did you understand they were<br>11 trying to defend themselves was it because they<br>12 remember fighting back?<br><br>17 THE WITNESS:  I don't really recall the<br>18 particulars of what I had heard.  There was a lot of<br>19 discussion in what I was reading about the shield<br>20 that Israel has.<br>21 BY MR. KEELEY:<br>22 Q The iron dome shield?<br>23 A Yes to deflect these rockets and that was<br>24 working that very you know that the situation was<br>25 not as bad as it could be for the people on the | Plaintiff's Objections:<br>Page 210:5-12; 210:17-25<br>MIL 2 (Dkt 209), MIL 3 (Dkt 208), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the |

| Deposition Designation | Objection & Response |
|---|---|
| | jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. As to preliminary question objection, it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets the 602. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 211<br>1 ground within Israel.  But and then there was this<br>2 issue of the tunnels at the border and that they<br>3 were trying to stop people from coming through the<br>4 tunnels. | Plaintiff's Objections:<br>Page 211:1-4<br>MIL 2 (Dkt 209), MIL 3 (Dkt 208), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at |

| Deposition Designation | Objection & Response |
|---|---|
| | the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process |

| Deposition Designation | Objection & Response |
|---|---|
| | surrounding the claim is relevant and not prejudicial.<br><br>Page 212<br>6 Q So by the time that NBC had decided to<br>7 mover out of Israel, I would like to know is did you<br>8 understand that Israel was in fact fighting back<br>9 through the use of war plane says, and other<br>10 military weapons?<br><br>19 THE WITNESS:  I can't recall at what point<br>20 I may or may not have become aware that planes were<br>21 being used.  My understanding was that Israel was<br>22 defending themselves.<br>23 BY MR. KEELEY:<br>24 Q How did you understand they were defending<br>25 themselves? | Plaintiff's Objections:<br>Page 212:6-10; 212:19-25 MIL 2 (Dkt 209), MIL 3 (Dkt 208), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind. |

| Deposition Designation | Objection & Response |
|---|---|
| | reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 213<br>5 THE WITNESS:  My understanding was through<br>6 the defensive mechanism of the dome and defending<br>7 the border. | Plaintiff's Objections:<br>Page 213:5-7<br>MIL 2 (Dkt 209), MIL 3 (Dkt 208), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>This evidence goes to the credibility of the witness specifically the credibility of the witness' ability to understand the context and development of facts bearing on the claim, which will be weighed by the jury and is always relevant to their determination of the facts. The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also |

| Deposition Designation | Objection & Response |
|---|---|
| | fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 224 16 Were you involved in the efforts to renew 17 the 2014/2015 policy? 18 A Yes, I was. 19 Q Did you apply to any other insurance 20 companies for policy -- for production policy for 21 the 2015/2016? 25 THE WITNESS:  Yes, we did go out to market Page 225 1 that year. 10 Were you involved in the decision to go 11 out to market? 12 A Yes. I was. | |

| Deposition Designation | Objection & Response |
|---|---|
| 13 Q Who else was involved in that situation?<br>14 A Susan Weiss, Debbie Kizner and Kurt Ford.<br>15 Q And by "go out to market," what you mean<br>16 is you were going to apply for coverage with other<br>17 insurance companies, correct?<br>18 A We were going to solicit bids.<br>19 Q And do you know when you started doing<br>20 that?<br>21 A That would have been sometime in the<br>22 spring of 2015.<br>23 Q Did anyone take the lead in soliciting<br>24 bids?<br>25 A Susan would have taken the lead.<br>Page 226<br>10 Q So just to give you the background, the<br>11 claim was in 2014.<br>12 A Right.<br>13 Q And so the 2014 policy ran through<br>14 June 2015?<br>15 A Right.<br><br><br>Page 242<br>18 BY MR. KEELEY:<br>19 Q Exhibit 22 is another document that has<br>20 been produced to us by Allianz for Fireman's Fund as<br>21 a document that was submitted to them by Ms. Weiss<br>22 in support of NBC's request for proposal for a<br>23 policy.<br>24 Are you able to tell what this document<br>25 represents?<br><br><br>Page 243<br>1 A Yes.<br>2 Q And what is that?<br>3 A This is a list of claims going back to<br>4 2005.<br>5 Q So if you look at the very top heading, it<br>6 says "Title," "Claim Type," "Total Claim Amount,"<br>7 "Deductible Paid By NBCU," "Net Claim" and<br>8 "Expenses," "Total Net Claim Expenses."<br>9 Do you see that?<br>10 A I do.<br>11 Q What is your understanding of the "Total<br>12 Claim Amount," what that figure represents? | |

| Deposition Designation | Objection & Response |
|---|---|
| 13 A This, the "Total Claim Amount," would be<br>14 the submission from the show of what the costs were<br>15 for the particular claim<br><br><br><br>Page 245<br>2 BY MR. KEELEY:<br>3 Q Let me have you turn to page -- the page<br>4 that is numbered 15 on the bottom right through the<br>5 Bates labeling.<br>6 I direct your attention to the column that<br>7 begins "2014."<br>8 So that would be for the policy year 2014;<br>9 is that correct?<br>10 A That would be my understanding, yes.<br>11 Q And if you will just look through that<br>12 column for 2014 for a moment.<br>I see two entries for<br>13 "Dig." the first one says "Dig S Season 1," extra<br>14 expense; is that right?<br>15 EXEXP"?  Does that stand for "extra<br>16 expense"?<br>17 A Yes.<br>18 Q And the total claim amount is $100,000; is<br>19 that right?<br>20 A Yes.<br><br>Page 247<br>25 Q So the first "Dig" one, "Dig" S1 season<br><br><br><br>Page 248<br>1 one, EX, period, EXP, extra expense, that would be<br>2 the "Dig" claim that is the subject of this lawsuit,<br>3 correct?<br><br>7 THE WITNESS:  It's not clear here whether<br>8 it represents what -- if it represents the full<br>9 claim.<br><br>11 Q Well, it represents that the total claim<br>12 amount is $100,000; is that right?<br>13 A That's what this says, yes.<br>14 Q And the purpose of that indication is to | |

| Deposition Designation | Objection & Response |
|---|---|
| 15 inform the Insurance Company here, Allianz, of the<br>16 amount of claims submitted over time by NBC,<br>17 correct?<br><br>22 THE WITNESS:  I believe this document was<br>23 submitted to give Allianz a broad overview of the<br>24 claim submitted.  It does not stand in a vacuum.<br><br>Page 251<br>1 Q And you think that this list provides<br>2 simply the first part of the one-week extension?<br><br>7 THE WITNESS:  Based on my further<br>8 knowledge of claim amounts, that is what I think<br>9 this is.<br>10 BY MR. KEELEY:<br>11 Q And then so you, also, think that this<br>12 chart completely lists -- leaves off NBC's claim for<br>13 moving out of Israel?<br><br>18 THE WITNESS:  I don't believe that this<br>19 includes the denied claim.<br><br><br>Page 273<br>2 Q Other than what you have -- what you have<br>3 already testified to, do you recall anything else<br>4 being discussed with Ms. Johnson and Mr. Gutterman<br>5 during that telephone conversation?<br>6 A At that point, it's possible that there<br>7 was a mention of the war exclusion and their<br>8 consideration of that<br>9 Q So do you recall that there were two<br>10 conversations two days apart with Ms. Johnson and<br>11 Mr. Gutterman?<br>12 A I do because we notified them of the push<br>13 and then we notified them of the pull out.<br>14 I know that there were two conversations.<br><br><br>Page 283 | |

| Deposition Designation | Objection & Response |
|---|---|
| 17 BY MR. KEELEY:<br>18 Q Do you recognize Exhibit 27 as an E-mail<br>19 from Randi Raymond to you dated July 14,<br>2014?<br>20 A Yes, I do.<br>21 Q And he says,<br>22 "Andrea, What do need from me with regard<br>23 to details to start a claim?"<br>24 Do you see that?<br>25 A I do<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 284:<br><br>1 Q So it doesn't sound like Mr. -- or<br>2 Ms. Richmond thought that the claim had already been<br>3 decided by that point, does it?<br><br>6 THE WITNESS: Randi is not an insurance<br>7 savvy person. So when she says "start a claim," I<br>8 believe she is referring to this previous E-mail<br>9 when I said I need further production information<br>10 and Mark says Rand is already working on the<br>11 requested production material. That is what I think<br>12 that she is referring to.<br><br>END PLAINTIFFS' 106 COUNTER-<br>DESIGNATION | Plaintiff's Objections:<br>Page 283:17-25<br>MIL 2 (Dkt 209), 402,403,<br>104a. Not relevant to<br>defendant's denial of coverage;<br>not reviewed by defendant at<br>the time of denial. Witness says<br>in counter designation that<br>Richmond is not an insurance<br>savvy person. Counter<br>designation 284:1-3, 6-12<br>necessary for completeness.<br><br>Defendant's Response:<br>No objection to this counter<br>designation. The witness's<br>understanding of the facts are<br>relevant to the underlying facts<br>of loss and the amount of the<br>loss. The probative value of this<br>testimony is not substantially<br>outweighed by its prejudicial<br>effect, it will not confuse the<br>jury, waste time, and is not<br>unnecessarily cumulative.<br>Further, F.R.E. 403 is<br>conditional, and therefore not<br>binding as to general<br>admissibility. Objection also<br>fails to state why exhibit is<br>unfairly prejudicial; or why<br>such alleged unfair prejudice<br>outweighs its probative value;<br>or why exhibit confuses the<br>issue, misleads the jury, wastes<br>time, or is cumulative.<br>Furthermore, high probative<br>value re: state of mind of all<br>parties involved at the time of<br>the claim. The jury is entitled to<br>know what information NBC,<br>ASIC, and other parties had at<br>time of the facts giving rise to<br>Plaintiffs' claims. As to<br>preliminary question objection,<br>it is clear from the facts that the<br>witness has personal<br>knowledge and therefore no<br>preliminary question exists<br>because the testimony meets<br>the 602. "MIL" not clear what<br>objection intended; description<br>of the facts and process<br>surrounding the claim is |

| Deposition Designation | Objection & Response |
|---|---|
| | relevant and not prejudicial. |
| Page 284<br>13 BY MR. KEELEY:<br>14 Q In the second sentence, she says,<br>15 "Is there any risk of a situation in<br>16 Israel changing status, i.e., declaration<br>17 of war that could impede us getting a<br>18 claim?"<br>19 Do you see that?<br>20 A I do.<br>21 Q Do you know what she meant by that? I'm<br>22 not asking you to speculate.<br>23 Do you know what she meant by that?<br>24 A No, I don't | Plaintiff's Objections:<br>Page 284:13-24<br>MIL 2 (Dkt 209), 402,403, 104a. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Witness says in counter designation that Richmond is not an insurance savvy person. Counter designation 284:1-3, 6-12 necessary for completeness.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. As to preliminary question objection, it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets |

| Deposition Designation | Objection & Response |
|---|---|
| | the 602. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 285<br>6 BY MR. KEELEY:<br>7 Q Do you recognize Exhibit 28 as an E-mail<br>8 from you to Randi Richmond dated July 14 at<br>9 9:41 am.?<br>10 A Yes.<br>11 Q And you're responding to her earlier<br>12 E-mail that we just read, right?<br>13 A Yes. | Plaintiff's Objections:<br>Page 285:6-13<br>MIL 2 (Dkt 209), MIL 3 (Dkt 208) 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why |

| Deposition Designation | Objection & Response |
|---|---|
| | such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. As to preliminary question objection, it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets the 602. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 286<br>13 In paragraph two, can you read that for<br>14 me, please.<br>15 A Aloud?<br>16 Q Please, yeah.<br>17 A (Reading):<br>18 "If there is an actual 'declaration<br>19 of war,' we will have an issue with<br>20 coverage under the policy because there is<br>21 a broad exclusion for acts of war.<br>The | Plaintiff's Objections:<br>Page 286:13-24<br>MIL 2 (Dkt 209), MIL 3 (Dkt 208), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. |

| Deposition Designation | Objection & Response |
|---|---|
| 22 exclusion includes 'war-like acts' but the 23 carrier did not bring this up when I spoke 24 to them." | **Defendant's Response:** The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 289 | Plaintiff's Objections: |

| Deposition Designation | Objection & Response |
|---|---|
| 1 BY MR. KEELEY:<br>2 Q And the potential issue is if -- if it is<br>3 determined that the conflict amounts to a war, then<br>4 there would be no coverage because of the war<br>5 exclusion?<br><br>9 THE WITNESS:  I believe if there was an<br>10 actual declaration of war, we would have a coverage<br>11 issue. | Page 289:1-5; 289:9-11<br>MIL 2 (Dkt 209), MIL 3 (Dkt 208), 402,403,701. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Improper opinion.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. This testimony is not opinion. The witness is permitted to testify to the facts and circumstances leading to a claim and the making of a claim, as they perceived them; and this testimony is relevant to the claim made and the facts of loss. The witness is testifying to |

| Deposition Designation | Objection & Response |
|---|---|
| | their own knowledge and basis their testimony on their experience in the industry and their role as an employee, they may provide their rationally based perceptions on this foundation. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 290<br>13 Q My point is in this E-mail, isn't it true<br>14 that what you were saying to Randi Richmond was that<br>15 if it was determined that the conflict between<br>16 Israel and Hamas was determined to be a war, that<br>17 there could be a problem with coverage?<br><br>20 THE WITNESS:  Yes, I think that if there<br>21 was actually determined to be a war, we would have a<br>22 problem with coverage. | Plaintiff's Objections:<br>Page 290:13-17; 290:20-22 MIL 2 (Dkt 209), MIL 3 (Dkt 208), 402,403,701. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Improper opinion.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is |

| Deposition Designation | Objection & Response |
|---|---|
|  | unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. This testimony is not opinion. The witness is permitted to testify to the facts and circumstances leading to a claim and the making of a claim, as they perceived them; and this testimony is relevant to the claim made and the facts of loss. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 300<br>4 Q Do you remember any discussions in or<br>5 around this time, that is, July 14, 2014, with<br>6 anyone where you expressed the view that there might<br>7 not be coverage if war was declared? | Plaintiff's Objections:<br>Page 300:4-7; 300:15-24<br>MIL 2 (Dkt 209), 402,403. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. |

| Deposition Designation | Objection & Response |
|---|---|
| 15 THE WITNESS:  So based on this<br>16 back-and-forth with Randi around the declaration of<br>17 war, I have to think that back then, it was<br>18 discussed at some level<br>19 I just can't recall the specific<br>20 discussions because right around this time, there<br>21 were phone calls, and there were also internal<br>22 meetings.  Many of them started to involve our<br>23 attorneys.   So I wish I could be more specific but I<br>24 can't. | More prejudicial than probative.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 311<br>14 Q Now, what do you recall being discussed on | Plaintiff's Objections: |

| Deposition Designation | Objection & Response |
|---|---|
| 15 that second conversation on Thursday?  You said by<br>16 this time the decision had been made to stop filming<br>17 in Israel.<br>18 So did you or Ms. Weiss inform Ms. Johnson<br>19 and Mr. Gutterman of that fact?<br>20 A Yes, that was the purpose of the call.<br>21 Q And they told you that the war exclusion<br>22 might apply?<br><br>25 THE WITNESS:  That was the conversation<br><br><br><br>Page 312<br>1 that the war exclusion was brought up.<br>2 BY MR. KEELEY:<br>3 Q Did they tell you that a final decision<br>4 had been made or simply that based upon their<br>5 analysis so far, it appeared to them that the war<br>6 exclusion might apply?<br><br>Page 333<br>10 Q Do you know who Teresa Gooley is?<br>11 A Yes, I do.<br>12 Q Who do you understand her to have been?<br><br>15 THE WITNESS:  When I met Teresa Gooley,<br>16 she was introduced to me as the head of the claims<br>17 department for OneBeacon.<br>18 BY MR. KEELEY:<br>19 Q And did you have a meeting with Ms. Gooley<br>20 and other representatives of Atlantic to discuss the<br>21 claim?<br><br>24 THE WITNESS:  There was a meeting with<br>25 Teresa Gooley and Peter Williams and others.<br><br>Page 334<br>5 Q Who do you recall was at that meeting?<br>6 A It was Peter and Danny and Teresa, Kurt<br>7 Ford, Mark Binke, Randi, myself, and I can't recall<br>8 whether Lucia and Tania were there or not.<br>9 Q What do you recall being discussed at that<br>10 meeting?<br>11 A The claim, the claim that we were<br>12 presenting and that had been denied.<br>13 Q What, in particular, can you recall being | Page 311:21-22; 311:25-312:6<br>Vague, unclear of timing of "Thursday", incomplete question<br><br>Defendant's Response:<br>This portion of testimony is not vague. |

| Deposition Designation | Objection & Response |
|---|---|
| 14 discussed?<br>15 A Certainly, what had happened to the<br>16 production, what had gone on, what our plans were,<br>17 what why we felt we -- we couldn't go back to<br>18 Israel.<br>19 The denial letter had already been issued,<br>20 is my understanding, because Teresa got involved<br>21 because we were seeking a higher level opinion about<br>22 the coverage.<br>23 So this was our opportunity to meet<br>24 Teresa, for her to hear what had been already told,<br>25 but it was a little further down the line. So we<br><br>Page 335<br>1 had a plan of what we were going to do and so forth.<br>2 So that was the gist of the meeting.<br>3 Q So Atlantic eventually did deny the claim<br>4 that was submitted by NBC; is that correct?<br><br>24 Q So Exhibit 36 is an E-mail from<br>25 Ms. Johnson to you forwarding Atlantic's or<br><br>Page 336<br>1 OneBeacon's coverage determination; is that correct?<br>2 A Yes.<br>3 Q And this was directed to you, right?<br>4 A To me and to Susan.<br>5 Q The letter is directed to you, though?<br>6 A Yes, it is.<br>7 Q And I take it you read it at the time you<br>8 received it.<br>9 A Yes.<br>10 Q And if you will turn to page 3 of the<br>11 letter for me.<br><br>18 Q And that section of the letter sets forth<br>19 various of the war exclusions.<br>20 Do you see that?<br>21 A I do.<br>22 Q Do you recognize that from the policy?<br>23 A Yes.<br>24 Q So did you understand that Ms. Johnson was<br>25 explaining to you that these exclusions were a basis | Plaintiff's Objections:<br>Page 336:18-337:1<br>Vague as to what "these exclusions" refers to<br><br>Defendant's Response:<br>This portion of testimony is not vague. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 337<br>1 for Atlantic to deny coverage for NBC's claim?<br><br>4 THE WITNESS:  It was my understanding that<br>5 this was the reason she was denying the claim, yes.<br>6 BY MR. KEELEY:<br>7 Q The exclusions that are set forth there on<br>8 page 3 of the letter.<br>9 A Yes.<br>10 Q Now, what did you<br><br>Page 338<br>19 BY MR. KEELEY:<br>20  Q So Exhibit 37 is an E-mail from<br>21 Ms. Johnson to you sending another copy of the<br>22 coverage letter in which she indicates that she<br>23 noticed that the automatic numbering -- page<br>24 numbering didn't work on the prior letter.<br>25 Do you recall that?<br><br>Page 339<br>1 A I think when I saw this, I don't think<br>2 that I really had recognized the fact that the<br>3 pagination was wrong.<br>4 Q But the letter -- the second letter that<br>5 she sent with Exhibit 37 was the same as the first<br>6 letter; is that correct?<br>7 A That is my understanding, yes | Plaintiff's Objections:<br>Page 337:7-9<br>Vague as to what "the exclusions" refers to<br><br>Defendant's Response:<br>This portion of testimony is not vague. |
| Page 367<br><br>Page 368<br>14 BY MR. KEELEY:<br>15 Q Having been through our discussions today,<br>16 in hindsight looking back on everything, do you feel<br>17 it was a mistake for you to not have obtained<br>18 additional insurance once "Dig" was declared to the<br>19 policy? | Plaintiff's Objections:<br>Page 368:14-19; 368:22-24<br>402,403,602. Irrelevant to defendant's denial of coverage. Speculation.<br><br>Defendant's Response:<br>The witness' understanding of |

| Deposition Designation | Objection & Response |
|---|---|
| 22 THE WITNESS:  In hindsight, it might have 23 been prudent to investigate if we could have 24 obtained additional coverage for this project. | the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The witness is testifying to their rational based perceptions, which she is permitted to do under the FRE. The witness is testifying to their rationally based perceptions. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Daniel Gutterman<br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | Plaintiffs object to Defendant's designation of Mr. Gutterman's testimony under FRE 802 (Hearsay). Mr. Gutterman lives in Los Angeles and is an employee of Defendant.  He is therefore available to testify live at trial. Plaintiffs further object to Defendants' designations as follows: |

Page 8

5 THE REPORTER: Raise your right hand,
6 please.
7 Do you solemnly swear or affirm the
8 testimony you are about to give in this deposition
9 will be the truth, the whole truth, and nothing but
10 the truth?
11 THE WITNESS: Yes.
12 THE REPORTER: Thank you

20 Q. Good morning, Mr. Gutterman.
21 A. Good morning.
22 Q. Please spell your full name for the
23 record.
24 A. Daniel Spencer Gutterman, D-A-N-I-E-L
25 S-P-E-N-C-E-R G-U-T-T-E-R-M-A-N.

Page 11

9 Q. Okay. Mr. Gutterman, do you have a
10 college degree?
11 A. I do.
12 Q. And what is that degree?
13 A. I'm a history major with a criminal
14 justice certificate.
15 Q. And is that your most advanced degree?
16 A. Yes.
17 Q. Is that a bachelor's of the arts?
18 A. Yes.
19 Q. And from what university?
20 A. University of Wisconsin, Madison.
21 Q. When did you graduate?
22 A. 1997.

| Deposition Designation | Objection & Response |
|---|---|
| **Page 31** <br><br> 22 Q. So Israel was at war with Hamas at the <br> 23 time period of this claim. <br> 24 Is that your opinion? <br> 25 A. Yes. | <u>Plaintiff's Objections:</u> <br> Page 31:22-34:10 <br> 402, 403, MIL 2 (Dkt 209), <br> MIL 3 (Dkt 208) – To the <br> extent used to suggest that <br> Israel's conduct matters, <br> not relevant for reasons <br> stated by the Ninth Circuit. <br> See MIL 3. Counter <br> designation: 47:4-14, <br> 52:11-13, 16-18, 20-22 <br> necessary to complete <br> testimony as to what <br> witness considered "war." <br><br> <u>Defendant's Response:</u> <br> "MIL" not clear objection; <br> ASIC's understanding and <br> development of facts is <br> relevant to reasonableness <br> of claim decision, defense <br> of "bad faith" allegation <br> and damages sought; <br> relevant to show state of <br> mind, reasonableness, and <br> good faith claims handling <br> on part of ASIC; ASIC did <br> not have 9th Circuit opinion <br> to consider at the time, and <br> testimony regarding ASIC <br> understanding in real time <br> is critical for jury to <br> consider when evaluating <br> bad faith claims. |
| **Page 32** <br><br> 1 Q. Has Israel ever been at war with Hamas <br> 2 before or after that time period? <br> 3 A. I don't know. <br> 4 Q. When did you formulate this opinion that <br> 5 Israel was at war with Hamas at the time period of <br> 6 the claim at issue in this case? <br> 7 A. During the claim. <br> 8 Q. And what was that opinion based on? <br> 9 A. Information provided by the insured, <br> 10 information provided by the broker, reviewing <br> 11 articles online, as well as -- yeah. <br> 12 Q. Anything else? <br> 13 A. No. Not that I can think of. <br> 14 Q. So your opinion that Israel was at war | <u>Plaintiffs' Objections:</u> <br> Page 32:4-25. <br> 402, 403, MIL 2 (Dkt 209), <br> MIL 3 (Dkt 208) – Plain <br> and ordinary meaning of <br> "war" not relevant. To the <br> extent used to suggest that <br> Israel's conduct matters, <br> not relevant for reasons <br> stated by the Ninth Circuit. <br> See MIL 3. Counter <br> designation: 47:4-14, <br> 52:11-13, 16-18, 20-22 <br> necessary to complete <br> testimony as to what <br> witness considered "war." |

| Deposition Designation | Objection & Response |
|---|---|
| 15 with Hamas during the time of the claim is based on, 16 No. 1, information provided by the insured; No.2 17 information by the broker; and No. 3, articles that 18 you researched online; is that correct? 19 A. Correct. 20 Q. Is it based on anything else? 21 A. Not that I can think of. 22 Q. Okay. Did you communicate that opinion to 23 anyone when you formed it? 24 A. I don't remember. 25 Q. Were you tasked with researching whether | Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding ASIC understanding in real time is critical for jury to consider when evaluating bad faith claims. |

Page 33

1 the conflict between Israel and Hamas at the time of
2 the claim was a war?
3 A. I was tasked with obtaining information
4 about what was going on over there.
5 Q. By who?
6 A. My supervisors.
7 Q. Who were they?
8 A. Pamela Johnson and Peter Williams.
9 Q. Anyone else?
10 A. No. Not that I can recall.
11 Q. Was there a chain of command among the
12 three of you?
13 A. Yes. Pam was my -- was my direct
14 supervisor.
15 Q. And did Peter supervise Pam?
16 A. No.
17 Q. Did Peter supervise you?
18 A. Yes. He more was a mentor.
19 Q. Why would you characterize him as a
20 mentor?
21 A. He has decades of experience in claims,
22 and I learned from him.
23 Q. Was Pamela Johnson a mentor?
24 A. Yes.
25 Q. Why?

Page 34

1 A. I appreciated her opinion, and she's very
2 educated and understands insurance very well.

| Deposition Designation | Objection & Response |
|---|---|
| 3 Q. So you said you formed an opinion that the 4 conflict between Israel and Hamas at the time of the 5 complaint -- I'm sorry. Let me start that over. 6 You said you formulated an opinion that 7 the conflict between Israel and Hamas at the time of 8 the claim was a war; right? 9 A. As we were progressing through the claim. 10 Yes. PLAINTIFFS' 106 COUNTER-DESIGNATION: Page 47 **4** Q. Okay. So we've got the research that you **5** did in connection with the DIG claim that's at issue **6** in this case as one of the bases for your current **7** understanding of what "war" means; right? **8 A. One of. Yes.** **9** Q. Okay. What are the others? **10 A. Being a history major, learning about** **11 World War II, learning about Desert Storm. Just** **12 curiosity throughout watching History Channel shows.** **13** Q. Anything else? **14 A. Not -- not off the top of my head.** Page 52 **11** Q. Prior to your involvement in the DIG **12** claim, what was your understanding of what "war" **13** meant? **16 THE WITNESS:** I don't know if I ever had a **17** definition of what "war" was. I think it's just -- **18** I know it when I see it. **20** Q. And how has that understanding changed **21** since the DIG claim, if at all? **22 A. I don't believe that it has.** END PLAINTIFFS' 106 COUNTER-DESIGNATION PLAINTIFFS' 106 COUNTER-DESIGNATION: Page 89 **6** All right. So let's -- we've talked about END PLAINTIFFS' 106 COUNTER-DESIGNATION Page 89 7 your education, you r prior employment. Let's start 8 talking now about your employment at OneBeacon. 9 Okay? | |

| Deposition Designation | Objection & Response |
|---|---|
| 10 A. Okay.<br>11 Q. What is your title today?<br>12 A. Senior entertainment investigator.<br>13 Q. What was your title when you began?<br>14 A. The same.<br>15 Q. Has it ever been different?<br>16 A. No.<br>17 Q. Do you have an understanding of what your<br>18 job duties are as senior entertainment claims<br>19 investigator?<br>20 A. Yes.<br>21 Q. Have those responsibilities changed at any<br>22 time from the beginning of your employment until<br>23 today?<br>24 A. Yes.<br>25 Q. When?<br><br>Page 90<br><br>1 A. Over the course of my employment.<br>2 Q. What do you mean by that?<br>3 A. A lot of it had to do with the<br>4 complexities of the claims as well as the type of<br>5 claims I was receiving. Initially it was -- it was<br>6 less complex claims like a camera gets broken.<br>7 Eventually it became claims like this or an actor<br>8 got sick or what- -- whatever it happens to be. And<br>9 then I've -- I've recently started taking on more --<br>10 other types of claims as well.<br>11 Q. So when you say that your role has<br>12 changed, what you mean is it's --<br>13 A. It's expanded. Sorry.<br>14 Q. -- it's expanded, your responsibility has<br>15 expanded, the complexity of the matters has<br>16 increased as you have gained experience.<br>17 Is that a fair statement?<br>18 A. That's a fair statement.<br>19 Q. But in terms of your process and what you<br>20 actually do today to day, has that changed since you<br>21 began at OneBeacon?<br>22 A. Well, every day is different. But the<br>23 general processes are very similar. Yes.<br>24 Q. Okay. You've been a claims adjuster since<br>25 you began through the present?<br><br>Page 91<br><br>1 A. Correct.<br><br>Page 145<br><br>7 BY MR. HAYES:<br>8 Q. Did you feel at the time you were involved<br>9 in the review of the DIG claim, did you feel at any | |

| Deposition Designation | Objection & Response |
|---|---|
| 10 time that you needed to consult anybody on the<br>11 question whether or not the loss was caused by a<br>12 war?<br>13 A. My supervisors.<br>14 Q. At one point you felt you needed to<br>15 consult your supervisors on the question whether or<br>16 not the loss was caused by a war?<br>17 A. I didn't need to consult with them. They<br>18 came up with that completely independent of me.<br>19 I'm sorry. I think I'm lost in the<br>20 questioning. I'm not sure I understand it.<br>21 Q. You were involved in the DIG claim; right?<br>22 A. Yes.<br>23 Q. You did research; right?<br>24 A. Yes.<br>25 Q. What research did you do?<br><br>Page 146<br><br>1 A. I had conversations with the broker, the<br>2 insured, reviewed the e-mail that was sent to us,<br>3 looked online at multiple different websites.<br>4 Q. Okay. At any point during that process,<br>5 did you feel the need to consult with somebody else<br>6 on the question whether or not the loss was caused<br>7 by a war?<br>8 A. I don't remember specific conversations.<br>9 But I'm sure I had conversations with Pamela and/or<br>10 Peter where they described -- I mean, we were all<br>11 discussing what had we found from our research.<br>12 Q. And what had you found from your research?<br>13 A. Primarily that this was a war. Everything<br>14 that we were seeing showed that there was missiles<br>15 that were being shot from Palestine into Israel;<br>16 that a ground offensive was a possibility and<br>17 eventually, I believe it occurred; that -- that<br>18 tanks were mobilizing. I mean, the ground -- the<br>19 armies were mobilizing at borders.<br>20 Q. Why did it matter that there was a ground<br>21 offensive?<br>22 MR. KEELEY: You didn't let him finish his<br>23 answer.<br>24 Are you finished with your answer?<br>25 THE WITNESS: Yeah. I guess so.<br><br>Page 147<br><br>1 BY MR. HAYES:<br>2 Q. Why did it matter that there was a ground<br>3 offensive possible?<br>4 A. Well, you asked me what -- what research I<br>5 had done. That was what we'd found.<br>6 Q. Right. You said that this was a war, and<br>7 then you started to list the reasons why; right? | |

582

| Deposition Designation | Objection & Response |
|---|---|
| 8 A. Why it's a war?<br>9 Q. Right.<br>10 A. Oh, I was just telling you this is some of<br>11 the research we'd found.<br>12 Q. Right. Well, what relevance does the fact<br>13 that there was a ground offensive possible have to<br>14 this determination of whether or not it's a war?<br>15 A. All those constitute a war, to me.<br>16 Q. All of what constitute a war to you?<br>17 A. All those examples that I lined up after I<br>18 said this is a war.<br>19 Q. Ground offensive; right?<br>20 A. (No audible response.)<br>21 Q. "Yes"?<br>22 A. Correct. Yes. Sorry.<br>23 Q. Tanks?<br>24 A. Yes.<br>25 Q. Missiles?<br><br>Page 148<br><br>1 A. Strikes. Yes.<br>2 Q. What else did you say? I'm sorry?<br>3 A. Armies mobilizing at borders.<br>4 Q. Anything else?<br>5 A. No. Not off the top of my head.<br>6 Q. All of those are indicia of war; is that<br>7 accurate?<br>8 A. I believe so. Yeah.<br>9 Q. Were you considering any other indicia of<br>10 war at the time?<br>11 A. Can you actually define "indicia."<br>12 Q. Were you considering any other facts that<br>13 might indicate what was going on was a war?<br>14 A. Yes. I'm -- I believe I even saw a<br>15 website on MSNBC specifically called it a war.<br>16 Q. Anything else?<br>17 A. Not off the top of my head.<br>18 Q. Okay. So based on all of that research,<br>19 in your opinion, at the time the DIG claim was made<br>20 and reviewed by OneBeacon, your opinion was the loss<br>21 was caused by a war?<br>22 A. No. Not instantaneously.<br>23 Q. I didn't say "instantaneously."<br>24 After you conducted the research before<br>25 OneBeacon denied the claim, at some point between<br><br>Page 149<br><br>1 the time you got notice of the claim and OneBeacon's<br>2 denial, your research led you to believe that the<br>3 loss was caused by a war.<br>4 A. Yes. | |

| Deposition Designation | Objection & Response |
|---|---|
| 5 Q. Okay. And you just identified all the<br>6 reasons why you came to that conclusion; right?<br>7 A. Yes.<br><br>Page 150<br><br>7 Q. Did you ever consider whether Hamas was in<br>8 any way like a sovereign nation in that research?<br>9 A. I did not.<br>10 Q. Why not?<br>11 A. My involvement in this claim was it was<br>12 assigned to me. But eventually this claim was<br>13 almost dealt with primarily by Pam- -- by Pamela.<br>14 And so that type of research would have been handled<br>15 at that point by her.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 152<br><br>**4** Q. Is Hamas a terrorist organization?<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 152<br><br>7 THE WITNESS: Are you asking my opinion?<br>8 BY MR. HAYES:<br>9 Q. Yes.<br>10 A. They perform terrorist acts. But they<br>11 certainly also have aspects of them that are very<br>12 sovereign, as sovereign states. I know that they<br>13 govern up to 1.7 million people. They have a<br>14 welfare section. They have their own military. So<br>15 I would certainly say that they -- I actually think<br>16 that they won votes in the Parliament, I think, in<br>17 like, the mid-2000s. So I definitely feel that<br>18 they're a sovereign state, if not a government.<br><br><br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 152<br><br>**19** Q. Where did you learn that?<br>**20 A. Wikipedia.**<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | Plaintiff's Objections:<br>Page 152:7-18<br>MIL 2 (Dkt 209), 402, 403,<br>701 - Not relevant to<br>defendant's denial of<br>coverage; not reviewed by<br>defendant at the time of<br>denial; Witness testified<br>that he did not consider<br>whether Hamas was<br>sovereign at the time.<br>150:7-9.<br>Counter objection: 152:4<br>necessary to complete<br>testimony. Designated<br>testimony does not include<br>the question asked.<br>Counter objection: 152:19-<br>20 necessary to compete<br>testimony to allow jury to<br>evaluate witness's<br>testimony.<br><br><br>Defendant's Response:<br>"MIL" not clear objection;<br>ASIC's understanding and |

| Deposition Designation | Objection & Response |
|---|---|
| | development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Testimony helps clarify the witness's testimony or a fact in issue as to the defense of "bad faith" allegation. |

Page 155

14 Q. What was your role, again, in connection
15 with the adjusting of the DIG claim?
16 A. It initially came to me. Pamela and I had
17 a conversation with the broker and the insured,
18 doing research online, sending that research back
19 and forth between Pamela and I, as well as Peter, I
20 believe; having another conversation thereafter.
21 But ultimate decisions of coverage were done by
22 Pamela.

Page 202

11 Q. Okay. So the DIG claim comes in on
12 July 15, 2014, as far as you know; right?
13 A. As far as I'm aware, yes.
14 Q. And you received that claim from the
15 Canton system, I think you said?
16 A. I don't remember exactly how I got it. I
17 think it came in -- there had been a process for a
18 long time where a -- the broker could send claims
19 directly to the claims department. So I think
20 that's what happened in this instance.
21 Q. Okay. But it was sent to you?
22 A. Eventually, yes.
23 Q. And when you received the claim, what did
24 you understand your role to be in terms of adjusting
25 the claim?

Page 203

1 A. Speaking with the insured, speaking with
2 the broker, reviewing the e-mail that had been sent
3 to them from the head of security at NBC,
4 investigating the claim, investigating and searching
5 online for what was going on over there, and help in
6 the determination of coverage. And if there --
7 yeah.
8 Q. And how was it that you were going to help
9 in the determination of coverage? What was your

585

| Deposition Designation | Objection & Response |
|---|---|
| 10 understanding at the time you received the claim?<br>11 A. Reviewing the facts of the loss, dealing<br>12 with the research that we had done, and then<br>13 applying it to the policy.<br>14 Q. You said "reviewing the facts of the<br>15 loss."<br>16 What were the facts of the loss in<br>17 connection with the DIG claim?<br>18 A. The e-mail that had been sent to us by the<br>19 head of NB- -- head of NBC security in Israel and<br>20 then the information that was eventually provided to<br>21 us by the broker and the insured.<br>22 Q. Anything else?<br>23 A. No.<br><br>Page 206<br><br>1 Q. You mean what physically was occurring on<br>2 the ground?<br>3 A. Yes.<br>4 Q. And what were you -- what kinds of things<br>5 were you looking for in your searches, in your<br>6 Google searches?<br>7 A. Just to gain knowledge of what was<br>8 occurring on the ground there.<br>9 Q. Okay. And why did it matter what was<br>10 occurring on the ground?<br>11 A. 'Cause we received a claim that involved<br>12 what was going on on the ground there.<br>13 Q. But did you have any sense of what you<br>14 would use that information for once you found it?<br>15 And by "information," I mean the information as to<br>16 what was going on on the ground in Israel.<br>17 A. To help my bosses and myself understand<br>18 more of what -- just knowledge, just plain<br>19 knowledge. We didn't -- I didn't have an under- --<br>20 what was your question? I did not know what I would<br>21 use that information for beyond just learning what<br>22 was going on.<br>23 Q. Why did you need to know what was going on<br>24 to evaluate the claim?<br>25 A. Research is always beneficial.<br><br>Page 207<br><br>24 Q. So you say that your initial understanding<br>25 of what your role would be was review the facts of<br><br>Page 208<br><br>1 the loss. We've talked about that; review research.<br>2 We've talked about that.<br>3 And then you said apply it to the policy; | |

| Deposition Designation | Objection & Response |
|---|---|
| 4 right?<br>5 A. I believe so. Yes.<br>6 Q. What did you mean when you said "apply it<br>7 to the policy"?<br>8 And by "it," you meant the facts of the<br>9 loss and the research; right?<br>10 A. Correct.<br>11 Q. Okay. So what did you mean when you said<br>12 "apply it to the policy"?<br>13 A. Determining what, if any, coverages the<br>14 facts of the loss could apply to.<br>15 Q. Again, through this lens of "we really<br>16 want to find coverage"; right?<br>17 A. I'm sorry. What's the question?<br>18 Q. You applied the facts and the research to<br>19 the policy with the guiding principle that, "we,"<br>20 meaning OneBeacon, "really want to find coverage."<br>21 A. Yes.<br>22 Q. Okay. Because this was not one of those<br>23 easy cases where coverage was obvious; right?<br>24 A. Yes.<br>25 Q. Okay. And then you also said you added<br><br>Page 209<br><br>1 speaking with the insured and the broker.<br>2 Was that just another part of your<br>3 fact-gathering --<br>4 A. Yes.<br>5 Q. -- function?<br>6 A. Yes. Yes.<br>7 Q. And then you applied whatever facts you<br>8 learned from the insured and/or the broker to the<br>9 policy; is that accurate?<br>10 A. Yes.<br>11 Q. And you applied it using that same guiding<br>12 principle, "we really want to find coverage"; right?<br>13 A. Yes.<br>14 Q. Okay. All right. Now, did your<br>15 understanding of what your role was in the context<br>16 of adjusting the DIG claim ever change at any time?<br>17 A. Yes.<br>18 Q. When did it change?<br>19 A. It is -- it basically became Pamela<br>20 Johnson's claim.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 305<br><br>**8** Q. Did you do anything to search for<br>**9** documents in connection with this case?<br>**10 A. What type of documents?**<br>**11** Q. Any documents, electronic or paper. | |

| Deposition Designation | Objection & Response |
|---|---|
| **12 A. Well, once again, once we got the claim 13 and it came in, I went on Google.**<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | |

| Deposition Designation | Objection & Response |
|---|---|
| <u>Defendant's Designation of Pamela Johnson May 8, 2017 Vol 1.</u><br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.**<br><br><br>Page 8<br>1 Could you please state your full 09:19:35<br>2 name and address for the record? 09:19:37<br>3 A. My name is Pamela Ann Johnson. 09:19:39<br>4 Q. And your address? 09:19:40<br>5 A. 385 Washington Street. 09:19:42<br>6 Q. And that's here in Minneapolis? 09:19:44<br>7 A. It's in St. Paul. 09:19:46<br><br>Page 11<br>12 Q. Ms. Johnson, did you go to college? 09:22:47<br>13 A. I did. 09:22:53<br>14 Q. Where did you go? 09:22:53<br>15 A. I graduated from the University of 09:22:54<br>16 St. Thomas. 09:22:56<br>17 Q. What year did you graduate? 09:22:57<br>18 A. 1986. 09:22:58<br>19 Q. What was your degree in? 09:22:59<br>20 A. My degree was in psychology. 09:23:02<br><br>Page 12<br>2 Q. Where did you go to law school? 09:23:23<br>3 A. I went to the University of Minnesota. 09:23:24<br>4 Q. Did you graduate? 09:23:27<br>5 A. I did. 09:23:28<br>6 Q. What year? 09:23:28<br>7 A. 1992. 09:23:29<br><br>Page 13<br>4 Q. Do you have a license to practice law? 09:24:04<br>5 A. I do not currently have an active license, 09:24:06<br>6     no. 09:24:08<br>7 Q. Have you ever had a license to practice law? 09:24:12<br>8 A. I have.09:24:15<br>9 Q. When did you first become licensed to 09:24:19<br>10    practice law? 09:24:16<br>11 A. In 1992. 09:24:19<br>12 Q. In what jurisdiction? 09:24:21<br>13 A. Texas. 09:24:22<br>14 Q. Did you become licensed in any other state? 09:24:25 | Plaintiffs object to Defendant's designations as follows: |

| Deposition Designation | Objection & Response |
|---|---|
| 15 A. I did. 09:24:27<br>16 Q. Where else? 09:24:28<br>17 A. Colorado and Minnesota. 09:24:30<br><br>Page 14<br>10 Q. Do you hold any other certificates or 09:25:30<br>11    licenses? 09:25:31<br>12 A. As I said before, I am licensed to act as a 09:25:33<br>13    claim professional. 09:25:39<br>14 Q. What license is that? 09:25:40<br>15 A. Well, it's the -- it's the license that you 09:25:44<br>16    get when you work for an insurance company in 09:25:47<br>17    a variety of states as an adjuster, it's a 09:25:50<br>18    property and casualty adjustment license. 09:25:54<br><br>Page 20<br>3 Q. And did you begin working after you moved to 09:32:25<br>4 St. Paul? 09:32:28<br>5 A. I did. 09:32:28<br>6 Q. Who did you work for? 09:32:29<br>7 A. Travelers Insurance Company. 09:32:30<br>8 Q. How long were you with Travelers the first 09:32:32<br>9    time? 09:32:37<br>10 A. I was with them for seven years. 09:32:37<br>11 Q. So until approximately 2012? 09:32:42<br>12 A. That's correct. 09:32:45<br>13 Q. What did you do for Travelers? 09:32:46<br>14 A. I handled intellectual property claims, other 09:32:49<br>15 kinds of complex claims, business torts 09:32:54<br>16 specifically. A lot of those were in the 09:32:59<br>17 entertainment area, so I handled a lot of 09:33:02<br>18 entertainment claims. And errors and 09:33:06<br>19 omissions coverage for some technology 09:33:10<br>20 companies if it involved some aspect of 09:33:12<br>21 intellectual property or complex contracts. 09:33:15<br><br>Page 21<br>3 Q. While you were at Travelers, did you ever 09:33:35<br>4 analyze a claim where the war exclusion was 09:33:48<br>5 potentially applicable? 09:33:53<br>6 A. I did not. 09:33:54<br>7 Q. While you were at Travelers, did you ever 09:34:00<br>8 analyze a claim where the terrorism exclusion 09:34:02<br>9 was potentially applicable? 09:34:05<br>10 A. I did not. 09:34:08<br>11 Q. When you left Travelers, where did you go to 09:34:17<br>12 work next? 09:34:19<br>13 A. I went to work for OneBeacon, or 09:34:19<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION: | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 21 | |

Page 21

3 Q. While you were at Travelers, did you ever 09:33:35
4 analyze a claim where the war exclusion was 09:33:48
5 potentially applicable? 09:33:53
6 A. I did not. 09:33:54
7 Q. While you were at Travelers, did you ever 09:34:00
8 analyze a claim where the terrorism exclusion 09:34:02
9 was potentially applicable? 09:34:05
10 A. I did not. 09:34:08

END PLAINTIFFS' 106 COUNTER-DESIGNATION

Page 22
1 needed with regard to legal matters to the 09:34:58
2 underwriters and handle complex claims. 09:35:01
3 Q. Did your responsibilities change over time? 09:35:06
4 A. They did. 09:35:08
5 Q. When did they change? 09:35:09
6 A. After I had been there for about a year. 09:35:12
7 Q. What did you do for OneBeacon entertainment 09:35:14
8 after about a year? 09:35:16
9 A. They reorganized the claim division within 09:35:17
10 OneBeacon and asked me to move into a 09:35:20
11 management role supervising specific claim 09:35:24
12 handlers working on OneBeacon entertainment 09:35:28
13 claims.

Page 24
1 Q. What was your position title when you first 09:37:49
2 began to work at OneBeacon entertainment? 09:37:51
3 A. Second vice-president. 09:37:54
4 Q. Did that title change over time? 09:37:57
5 A. No. 09:37:59
6 Q. Did your job responsibilities change after 09:38:02
7 you moved into the position where you were 09:38:06
8 supervising claims analysts? 09:38:09
9 A. No, I mean, that continued to be my job 09:38:15
10 during my tenure there. 09:38:18

18 Q. When did you leave OneBeacon entertainment? 09:38:34
19 A. I left OneBeacon entertainment in 2015. Is 09:38:35
20 that right? Yeah. 09:38:43
21 Q. So you were with OneBeacon entertainment from 09:38:46
22 2012 until approximately 2015; is that 09:38:50
23 correct? 09:38:53
24 A. Yes. 09:38:53

Page 26
23 Q. And you left -- why did you leave OneBeacon

| Deposition Designation | Objection & Response |
|---|---|
| 09:41:14<br>24 entertainment in 2015? 09:41:18<br>25 A. OneBeacon entertainment reorganized and they 09:41:19<br><br>Page 27<br>1 downsized, particularly in the entertainment 09:41:24<br>2 group, and they gave the claim lead 09:41:27<br>3 responsibilities to the same person who was 09:41:31<br>4 also acting as the claim lead and continued 09:41:33<br>5 to act as the claim lead for public sector. 09:41:35<br><br>13 Q. Where did you go to work after OneBeacon 09:42:00<br>14 entertainment? 09:42:03<br>15 A. I went back to Travelers. 09:42:03<br><br><br>Page 31<br>11 Q. Other than the one online course, did you 09:46:51<br>12 receive any instructions, attend any 09:46:54<br>13 in-person seminars where you were given 09:46:58<br>14 instructions with respect to OneBeacon's 09:47:00<br>15 claims handling practices? 09:47:03<br>16 A. Well, I actually taught some courses on that. 09:47:04<br>17 Q. I understand, but did you personally receive 09:47:07<br>18 any training in that regard? 09:47:09<br>19 A. Well, we had annual meeting for OneBeacon 09:47:10<br>20 entertainment, and at the annual meeting 09:47:17<br>21 there were several, you know, discussions and 09:47:20<br>22 trainings that you were involved and they 09:47:23<br>23 involved claim. 09:47:26<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 31<br><br>24 Q. Okay. When you say there were various 09:47:38<br>25 discussions and trainings that were involved, 09:47:40<br><br>Page 32<br><br>1 what types of trainings were involved? 09:47:43<br>2 A. You know, I can't remember specifically. 09:47:47<br>3 Q. You also indicated that you taught claims 09:47:51<br>4 handling practices; is that correct? 09:47:54<br>5 A. No. I gave instruction on it, certainly, to 09:47:56<br>6 the people that I supervised. But, also, at 09:47:59<br>7 the annual meeting we would give information 09:48:02<br>8 to the underwriters about specific -- 09:48:06<br>9 specific claims that had arisen, how the 09:48:09<br>10 policy had been interpreted and things that 09:48:15 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 they should think about in the underwriting 09:48:17<br>12 process. 09:48:19<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 32<br>23 Q. Are you familiar with California's Fair 09:48:55<br>24 Claims Settlement Practices regulations? 09:48:59<br>25 A. Of course I am. 09:49:00<br><br><br>Pages 37<br>16 (Whereupon, Exhibit 1 was 09:54:00<br>17 marked for identification.) 09:54:09<br>18 BY MS. COYOCA: 09:54:09<br>19 Q. Ms. Johnson, have you seen this document 09:54:10<br>20 before? 09:54:12<br>21 A. I have. 09:54:12<br>22 Q. What is it? 09:54:12<br>23 A. It says, "General Claims Practices," and it 09:54:13<br>24 is an explanation of claims processing and 09:54:17<br>25 general claims practices. 09:54:21<br><br>Page 38<br>1 Q. When did you first see this document? 09:54:26<br>2 A. I believe it was provided to me when I first 09:54:28<br>3 came to OneBeacon. I'm not absolutely sure, 09:54:32<br>4 but I think it was. 09:54:35<br>5 Q. Who provided it to you? 09:54:35<br>6 A. Judy Lamble. 09:54:37<br>7 Q. When you are reviewing claims, do you look at 09:54:39<br>8 all potential coverages that might apply to a 09:55:01<br>9 claim? 09:55:04<br>12 THE WITNESS: Yes, I try to do 09:55:11<br>13 that. 09:55:12<br>14 BY MS. COYOCA: 09:55:14<br>15 Q. When you are reviewing a claim, do you 09:55:15<br>16 consider -- just as your practice, do you 09:55:18<br>17 consider the position of the insurer and the 09:55:23<br>18 position of the insured and investigate both 09:55:25<br>19 positions in making a coverage determination? 09:55:31<br>23 THE WITNESS: I consider my job to 09:55:37<br>24 be to look for insurance coverage if it can 09:55:38<br>25 be found for the insured. And if there's an 09:55:41<br><br>Page 39<br>1 ambiguity in the policy, the tie goes to the 09:55:46<br>2 policyholder. My job is to find coverage if 09:55:50<br>3 it exists. 09:55:53<br><br>Page 91<br>1 That wasn't uncommon. I mean, if 11:08:54<br>2 there's a -- in entertainment claims, 11:08:56 | |

| Deposition Designation | Objection & Response |
|---|---|
| 3 especially first-party claims, things are 11:08:59<br>4 very fast moving. You can't allow a 11:09:00<br>5 production to sit around and wait. If they 11:09:03<br>6 have something that they have that they need 11:09:05<br>7 an answer to, you need to get on it as 11:09:07<br>8 quickly as possible. 11:09:10<br><br><u>Page 77</u><br>20 Q. I'd like to show you next, Ms. Johnson, a 10:53:57<br>21 document that previously was marked 10:54:01<br>22 Exhibit 16. Are you familiar with this 10:54:03<br>23 document? 10:54:16<br>24 A. I am. 10:54:17<br>25 Q. What is it? 10:54:17<br><u>Page 78</u><br>1 A. It's the core principals set forth for 10:54:18<br>2 OneBeacon claim handling. 10:54:21<br>3 Q. When did you first see it? 10:54:22<br>4 A. I think I saw it when I first came to the 10:54:26<br>5 company.10:54:28<br><br><u>Page 90</u><br>7 Q. Ms. Johnson, when is the first time you heard 11:07:47<br>8 about the Dig claim? 11:07:49<br>9 A. I think that it was on a telephone call 11:07:53<br>10 with Danny Gutterman, Andrea Garber and 11:07:56<br>11 Susan Weiss on July 10th, 2014. 11:08:00<br>12 Q. You believe that phone call took place on 11:08:19<br>13 July 10, 2014? 11:08:21<br>14 A. I think that's right. I could be mistaken 11:08:22<br>15 about the date. 11:08:24<br>16 Q. And the participants in the call were 11:08:25<br>17 Danny Gutterman, Andrea Garber, Susan Weiss11:08:27<br>18 and yourself? 11:08:34<br>19 A. That's correct. 11:08:34<br>20 Q. Why were you having the call? 11:08:37<br>21 A. Danny called me and he said that NBC had a 11:08:39<br>22 claim that they wanted to discuss and could 11:08:43<br>23 we talk about it, you know, in other words, 11:08:46<br>24 could he conference me in. Or he may have 11:08:50<br>25 already conferenced me in, I don't remember. 11:08:53<br><br><br><u>Page 91</u><br>1That wasn't uncommon. I mean, if 11:08:54<br>2 there's a -- in entertainment claims, 11:08:56<br>3 especially first-party claims, things are 11:08:59<br>4 very fast moving. You can't allow a 11:09:00<br>5 production to sit around and wait. If they 11:09:03<br>6 have something that they have that they need 11:09:05 | |

| Deposition Designation | Objection & Response |
|---|---|
| 7 an answer to, you need to get on it as 11:09:07<br>8 quickly as possible. 11:09:10<br><br>Page 92<br>1 Q. Was it your understanding during the course 11:09:48<br>2 of the call that the claim had previously 11:09:56<br>3 been discussed with anyone else at OneBeacon? 11:09:57<br>4 A. I think that either Andrea or Susan mentioned 11:10:00<br>5 that they had talked to Peter. 11:10:06<br>6 Q. What was discussed during the call? 11:10:15<br>7 A. They explained that the situation -- that -- 11:10:30<br>8 in Israel had become too dangerous for their 11:10:38<br>9 cast to resume filming there. They had been 11:10:43<br>10 on hiatus between the pilot and the shooting 11:10:47<br>11 of the initial season, which is not uncommon, 11:10:51<br>12 and they were supposed to start shooting 11:10:54<br>13 again and they wanted to push for a week. In 11:10:57<br>14 other words, they wanted to delay starting 11:10:59<br>15 production for a week to see whether or not 11:11:01<br>16 the situation deescalated. 11:11:05<br>17 Q. Did they explain to you why the situation in 11:11:08<br>18 Israel had become dangerous? 11:11:11<br>19 A. They told me that -- that Hamas was lobbing 11:11:12<br>20 rockets into Tel Aviv and Jerusalem, which 11:11:20<br>21 were the two cities in which they had 11:11:24<br>22 locations for shooting. 11:11:27<br>23 Q. Did they say anything further with respect to 11:11:28<br>24 the situation that was creating an unsafe 11:11:34<br>25 circumstance for the production to proceed? 11:11:38<br><br>Page 93<br>1 A. No, that's what we talked about in terms 11:11:40<br>2 of -- of safety or lack of safety, was that 11:11:43<br>3 the fact that there was increased rocket fire 11:11:47<br>4 and their security team had told them that it 11:11:54<br>5 had become unsafe. 11:11:58<br>6 Q. Who did the talking as between Ms. Garber or 11:12:07<br>7 Ms. Weiss, if there was one, that was the 11:12:10<br>8 predominant talker during the call? 11:12:12<br><br>11 THE WITNESS: I think both of them 11:12:18<br>12 participated, but Susan I think did most of 11:12:19<br>13 the talking. That's Susan Weiss, the broker. 11:12:35<br>14 BY MS. COYOCA: 11:12:35<br>15 Q. What, if anything, did they say about their 11:12:36<br>16 conversation with Mr. Williams? 11:12:38<br>17 A. I don't recall 11:12:38<br>18 Q. Did they indicate that they had spoken to 11:12:42<br>19 Mr. Williams about the push? 11:12:44 | |

| Deposition Designation | Objection & Response |
|---|---|
| 20 A. Yes.<br>21 Q. Did they indicate what Mr. Williams said in 11:12:51<br>22 response to their recitation of the facts? 11:12:54<br><br>Page 94<br>23 Q. It's your recollection that you asked for 11:14:04<br>24 that information as to the dollar amount? 11:14:05<br>25 A. I think we talked about that, yes, because we 11:14:09<br><br>Page 95<br>1 were talking about who was all -- who was 11:14:12<br>2 still on the ground, was everyone already 11:14:13<br>3 out, was -- you know, because we wanted to 11:14:16<br>4 make sure people were safe, was -- you know, 11:14:20<br>5 who had they been using, in other words, were 11:14:21<br>6 they using a local camera crew. 11:14:23<br>7 In a -- in a production situation 11:14:26<br>8 there are people that you can -- you know, if 11:14:28<br>9 you're going to push you have to think about 11:14:32<br>10 that there are people who have different 11:14:34<br>11 contracts with regard to a show. Some people 11:14:36<br>12 you need to give them 24 hours notice and say 11:14:38<br>13 with 24 hours notice we don't need you 11:14:41<br>14 anymore. There are other people who have 11:14:43<br>15 contracts that you cannot stop paying them. 11:14:45<br>16 And those are all things that are 11:14:47<br>17 taken into consideration when we're 11:14:49<br>18 evaluating, not coverage for the claim, but 11:14:51<br>19 the damages associated with that claim, and 11:14:53<br>20 so that's the reason we would ask questions 11:14:56<br>21 like that. 11:14:58<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 95<br><br>22 Q. My question, though, is: Did you ask them 11:15:02<br>23 the question as to what the estimated cost 11:15:06<br>24 would be for pushing production for one week? 11:15:10<br>25 A. I -- I don't remember. 11:15:13<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 96<br>1 Q. Did Ms. Weiss or Ms. Garber indicate what 11:15:14<br>2 would happen after one week? 11:15:28<br>3 A. As I recall, we were talking about whether or 11:15:29<br>4 not -- this was a fast-moving situation and 11:15:33<br>5 we wanted to see whether it would deescalate. 11:15:35<br>6 So we had -- we had agreed that we would talk 11:15:41 | |

| Deposition Designation | Objection & Response |
|---|---|
| 7 again shortly after seeing what -- what was 11:15:44<br>8 continuing to happen. 11:15:46<br>9 Q. Is there anything else that Ms. Garber or 11:15:50<br>10 Ms. Weiss told you during that July 10 phone 11:15:52<br>11 call? 11:15:56<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 96<br><br>12 A. I think that they told me that they already 11:15:56<br>13 had -- 11:15:58<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 96<br>21 I think what I recall is that 11:16:15<br>22 they -- that, you know, primarily what we 11:16:16<br>23 were talking about is is everybody safe. And 11:16:18<br>24 so I think what they were telling me is they 11:16:21<br>25 thought that everyone was already out, 11:16:24<br><br>Page 97<br>1 because that was our primary concern, is 11:16:25<br>2 everyone -- you know, have they left Israel, 11:16:28<br>3 are they still on the ground, if they need to 11:16:30<br>4 leave, you know, what -- what arrangements 11:16:33<br>5 have you made with regard to that. 11:16:35<br>6 And I think, because they were on 11:16:36<br>7 hiatus, that either everyone or almost 11:16:38<br>8 everyone was already gone or had not 11:16:41<br>9 returned, depending on how you look at it. 11:16:45<br><br>19 Q. What was your response, if any, to the 11:17:13<br>20 description of the need for a push? 11:17:18<br>21 A. Well, I don't think that I responded one way 11:17:23<br>22 or another. I agreed with them that given 11:17:26<br>23 the information they had, it sounded like a 11:17:29<br>24 dangerous situation and that we wanted to see 11:17:31<br>25 what was going to happen next. 11:17:34<br><br>Page 98<br>1 Q. Anything else? 11:17:41<br>2 A. No, other than the fact that we were going to 11:17:43<br>3 talk again very soon. 11:17:48<br>4 Q. All right. Did you ask Ms. Weiss or 11:17:51<br>5 Ms. Garber to provide any further 11:17:54<br>6 information? 11:17:56<br>7 A. I think they told me that they had a report 11:18:00<br>8 from their security person. I mean, we had 11:18:02<br>9 talked about that report, because it was that 11:18:07<br>10 report that said that it was -- that safety 11:18:09<br>11 could no longer be guaranteed. 11:18:15<br>12 MS. COYOCA: Okay. I'd like to 11:18:27 | |

| Deposition Designation | Objection & Response |
|---|---|
| 13 mark as Exhibit 2 to this deposition a 11:18:28<br>14 document that is a series of e-mails, and 11:18:32<br>15 it's labeled Bates control ATL000982 11:18:35<br>16 through 985. The top e-mail is from 11:18:40<br>17 Michael J. Arevalo to Pamela Johnson on 11:18:45<br>18 Tuesday, September 15, 2014. 11:19:11<br>19 (Whereupon, Exhibit 2 was 11:19:11<br>20 marked for identification.) 11:19:12<br>21 THE WITNESS: I'm sorry, I believe 11:19:12<br>22 you misspoke. I think you said September 11:19:14<br>23 15th. This indicates July 15th. 11:19:14<br>24 MS. COYOCA: You're right, I did. 11:19:16<br>25 Thank you for that. The record should 11:19:17<br><br>Page 99<br>1 reflect that the date is July 15th, 2015 11:19:18<br><br>7 Q. First of all, have you seen this document 11:20:42<br>8 before, Ms. Johnson? 11:20:45<br>9 A. Well, I've seen the e-mail that Michael sent 11:20:46<br>10  to me. Yes, I mean, I have      seen the 11:20:49<br>11 e-mail -- e-mail chain before, yes. 11:20:55<br>12 Q. Okay. The first e-mail in time is at the 11:20:57<br>13 very bottom of the document, and that's from 11:21:09<br>14 Randi Richmond to Andrea Garber with a cc to 11:21:10<br>15 Mark Binke and Kurt Ford, and it's dated 11:21:16<br>16 Monday, July 14, 2014. Do you see that? 11:21:19<br>17 A. I do. 11:21:23<br>18 Q. And the e-mail contains part A, "Summary of 11:21:23<br>19 where you are in the production schedule," 11:21:27<br>20 and B, "What you have been advised of by 11:21:28<br>21 security regarding the imminent peril to your 11:21:31<br>22 operations." Do you see that? 11:21:35<br>23 A. Yes. 11:21:41<br>24 Q. You previously testified about a report that 11:21:41<br>25 had been received by security indicating that 11:21:44<br><br>Page 100<br>1 they were no longer able to guarantee safety 11:21:47<br>2 and security of the employees in Israel; is 11:21:49<br>3 that right? 11:21:52<br>4 A. Yes. 11:21:52<br>5 Q. Is this the report that you were thinking of? 11:21:53<br>6 A. Yes. 11:21:56<br><br>Page 101<br>10 Q. The e-mail above the e-mail that we were 11:23:29<br>11 just discussing is from Andrea Garber to 11:23:33<br>12 Susan Weiss with a cc to Deborah Kizner dated 11:23:35<br>13 Monday, July 14, 2014, and the first sentence 11:23:39<br>14 reads, "Following our discussion on Friday 11:23:44 | |

| Deposition Designation | Objection & Response |
|---|---|
| 15 with Peter, below is the e-mail I received 11:23:46<br>16 from Randi Richmond, the production executive 11:23:48<br>17 on the show, outlining the situation in11:23:52<br>18 Israel on our production Dig, Season 1." Do 11:23:53<br>19 you see that sentence? 11:23:57<br>20 A. I do. 11:23:57<br>21 Q. You just testified that you believed that you 11:23:58<br>22 spoke with Ms. Garber and Ms. Weiss after one 11:24:00<br>23 or both of them had already spoken with 11:24:04<br>24 Mr. Williams; is that correct? 11:24:06<br>25 A. That's correct. 11:24:08<br><br>Page 102<br>6 Q. To the best of your recollection, had they 11:24:26<br>7 spoken with Mr. Williams more than one time 11:24:30<br>8 prior to the conversation they had with you 11:24:32<br>9 and Mr. Gutterman? 11:24:34<br>10 A. Not that I was aware of when we were having 11:24:35<br>11 our conversation, no. 11:24:38<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 103<br><br>19 Q. As you look at Ms. Weiss's e-mail below the 11:26:36<br>20 e-mail that was forwarded to you by 11:26:39<br>21 Mr. Arevalo, is it your understanding that 11:26:40<br>22 this was the tender of the claim, notice of 11:26:42<br>23 the claim being given to OneBeacon? 11:26:46<br>24 A. Well, this certainly is not the way you 11:26:49<br>25 usually would tender a claim. But, yes, I 11:26:51<br><br>Page 104<br><br>1 mean, I think that she was -- she was saying 11:26:56<br>2 that she was making us aware of the claim. 11:26:58<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 104<br>3 Q. How does the e-mail notification differ from 11:27:03<br>4 what would usually be the case in terms of 11:27:07<br>5 tender of a claim? 11:27:09<br>6 A. You usually would get an accord that would 11:27:10<br>7 have information, you know, here's what the 11:27:13<br>8 client contact is, here's -- you know, here's 11:27:16<br>9  the broker. It didn't always happen, because 11:27:19<br>10 we worked so closely with the brokers that 11:27:22<br>11 usually -- or not usually, but sometimes they 11:27:24 | |

| Deposition Designation | Objection & Response |
|---|---|
| 12 would simply give us a call and tell us about 11:27:28<br>13 a claim and then expect us to do the setup or 11:27:31<br>14 send us an e-mail. 11:27:34<br><br>22 Q. So typically you would receive an accord from 11:27:51<br>23 the broker or from the insured directly? 11:27:54<br>24 A. Not from the insured, from the broker. 11:27:57<br><br>Page105<br>4 Q. How were claims typically tendered to 11:28:16<br>5 OneBeacon entertainment during that 11:28:20<br>6 period of time that you were handling claims? 11:28:23<br><br>9 THE WITNESS: It would depend, I 11:28:27<br>10 think, on whether or not it was a first-party 11:28:28<br>11 or third-party claim. Certainly, the claims 11:28:30<br>12 that I dealt with them, it was always a first 11:28:35<br>13 party production claim, and I think that -- 11:28:38<br>14 you know, I don't know that I can speak to 11:28:42<br>15 exactly the form that they took. It wouldn't 11:28:46<br>16 surprise me if Susan called or sent an 11:28:49<br>17 e-mail, because a lot of the ones that I 11:28:52<br>18 dealt with were Sandy claims, for example, 11:28:55<br>19 and of course that was, again, a very 11:28:57<br>20 fast-moving situation.11:28:59<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 105<br><br>22 Q. Was there any requirement that claims be 11:29:00<br>23 tendered in a particular format? 11:29:04<br>24 A. Not that I'm aware of. 11:29:05<br>25 Q. After a claim was submitted to OneBeacon by 11:29:09<br><br>Page 106<br><br>1 NBCUniversal, what was the next step in terms 11:29:13<br>2 of setting up the file? 11:29:15<br>3 A. So Lucy Lopez, who also worked as my 11:29:18<br>4 assistant, would get the -- get the relevant 11:29:26<br>5 information for the broker to be able to fill 11:29:28<br>6 in all of the screens that we need -- needed 11:29:31<br>7 to set up the claim in our claim files 11:29:40<br>8 system. 11:29:42<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page110<br>12 Q. And Mr. Gutterman was officed in Los Angeles; 11:34:57<br>13 is that correct? 11:35:00 | |

| Deposition Designation | Objection & Response |
|---|---|
| 14 A. He was. 11:35:01<br>15 Q. Did you meet with him on a regular basis 11:35:01<br>16 in-person? 11:35:05<br>17 A. I did. 11:35:06<br>18 Q. How regularly? 11:35:08<br>19 A. I was going out to California at least once a 11:35:09<br>20 month, sometimes more often than that. I'm 11:35:13<br>21 sure there were time periods in which I was 11:35:17<br>22 traveling for other -- you know, to other 11:35:20<br>23 jurisdictions when I wouldn't get there 11:35:23<br>24 within a month, but it was -- it was pretty 11:35:25<br>25 close to that. It was often. And we talked 11:35:27<br><br>Page 111<br>1 on the phone almost every day. 11:35:30<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page111<br><br>5 Q. Before working for OneBeacon, what was your 11:35:42<br>6 understanding of what Mr. Gutterman did? 11:35:44<br>7 A. He worked as a production assistant on a 11:35:46<br>8 reality television show. 11:35:48<br>9 Q. Did you know if he had any insurance 11:35:52<br>10 expertise or experience prior to going to 11:35:56<br>11 work for OneBeacon? 11:35:58<br>12 A. Yes, he had worked at Progressive Insurance 11:35:59<br>13 at one period of time. 11:36:04<br>14 Q. And while at Progressive did he handle 11:36:05<br>15 entertainment-related claims? 11:36:08<br>16 A. Not that I'm aware of. 11:36:09<br>17 Q. What type of claims did he handle at 11:36:13<br>18 Progressive? 11:36:16<br>19 A. I think primarily auto, but I -- I don't 11:36:16<br>20 remember for sure. 11:36:19<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br><br>Page 115<br>5 Q. What training did OneBeacon entertainment 11:40:23<br>6 provide to Mr. Gutterman when he first came 11:40:27<br>7 onboard? 11:40:29<br>8 A. When he first came onboard he spent a great 11:40:30<br>9 deal of time with both me and Peter Williams 11:40:32<br>10 going through the first-party coverages and 11:40:36<br>11 the different policies that we used so that 11:40:39<br>12 he could gain an understanding of what it was11:40:42<br>13 that was covered and not covered under those 11:40:44<br>14 policies, generally speaking, so that we 11:40:47 | |

| Deposition Designation | Objection & Response |
|---|---|

15 would talk to him about, "Okay, so here's the 11:40:50
16 coverage grant, here are the exclusions that 11:40:53
17 apply," you know, give some examples of past 11:40:55
18 claims in which that information had been 11:40:58
19 used, and talk to him generally about 11:41:00
20 questions that he should ask. But as I said, 11:41:03
21 he worked very closely with both of us. 11:41:03
22 Q. Was there any kind of training program, 11:41:09
23 formal training program that OneBeacon 11:41:12
24 entertainment has for claims adjusters when 11:41:17
25 they're first hired? 11:41:17

Page 116
1 A. I'm sure that he did some online training. 11:41:18
2 Q. You've referenced online training a couple of 11:41:24
3 times now. Is that online training that's 11:41:28
4 provided by OneBeacon? 11:41:30
5 A. Yes. 11:41:31

PLAINTIFFS' 106 COUNTER-DESIGNATION:

Page 116

6 Q. Is the online training a specific number of 11:41:38
7 hours? 11:41:41
8 A. No, it's specific courses that you have to go 11:41:43
9 through. I have no idea how long it would 11:41:46
10 take. And, of course, he also needed to get 11:41:48
11 his adjusters license. 11:41:52
12 Q. What were the specific online courses that 11:41:55
13 Mr. Gutterman needed to complete? 11:41:58
14 A. I'm sorry, I don't remember. 11:42:00
15 Q. Were there more than ten courses? 11:42:02
16 A. I don't think so, but I can't recall for 11:42:05
17 sure. 11:42:08
18 Q. Were there more than five? 11:42:09
19 A. I'm sorry, I don't recall. 11:42:11
20 Q. Do you have an estimate as to how many 11:42:12
21 courses? 11:42:14
22 A. I don't. I know that for myself it took me a 11:42:14
23 couple of days, maybe a little bit longer to 11:42:23
24 complete them all, but I don't -- I don't 11:42:26
25 remember specifically. 11:42:28

END PLAINTIFFS' 106 COUNTER-DESIGNATION

Page 118
14 Q. You indicated that shortly after having that 11:44:32
15 phone call with Ms. Garber and Ms. Weiss, you 11:44:34
16 believe that you began researching; is that 11:44:37
17 correct? 11:44:39
18 A. Yes. 11:44:39
19 Q. What did you research? 11:44:40

| Deposition Designation | Objection & Response |
|---|---|
| 20  A. I wanted to know what was happening in 11:44:42<br>21 Israel. And they said that it was -- that, 11:44:46<br>22 you know, it was a dangerous situation and 11:44:47<br>23 they said that they thought it was imminent 11:44:49<br>24 peril, and so I needed to collect information 11:44:51<br>25 to see whether or not it actually did fall 11:44:54<br><br>Page 119<br>1 within the coverage grant for imminent peril 11:44:56<br>2  and whether there were any exclusions that 11:45:02<br>3  applied. 11:45:04<br>4 Q. What did you do to research the situation in 11:45:04<br>5 Israel? 11:45:06<br>6 A. I looked at news reports, I read articles, I 11:45:13<br>7 looked at newspaper articles and, you know, a 11:45:20<br>8 variety of -- of -- I don't know what you 11:45:24<br>9 would call them. Not academic articles, 11:45:29<br>10  because I don't think that's what they 11:45:31<br>11 would be called, but articles or -- or white 11:45:34<br>12 papers written by, for example – for 11:45:37<br>13 example, the CRS, the Congressional Research 11:45:39<br>14 Service that works specifically for 11:45:43<br>15 U.S. Congress. 11:45:45<br>16 Q. Did you begin that research the same day that 11:45:46<br>17 you had the conversation with Ms. Weiss and 11:45:49<br>18 Ms. Garber? 11:45:52<br>19 A. I think did, yes. 11:45:54<br>20 Q. Now, you indicated you were in a restaurant 11:45:55<br>21 parking lot when you first took that first 11:46:00<br>22 phone call and then you drove home; is that 11:46:02<br>23 correct? 11:46:04<br>24 A. I don't remember specifically where I went 11:46:04<br>25 after that, but I probably went home. 11:46:06<br><br>Page 120<br>1 Q. Was it an evening when you took the phone 11:46:08<br>2 call? 11:46:14<br>3 A. I don't remember the exact time. 11:46:16<br>4 Q. Did you begin your research, though, when you 11:46:17<br>5 went home or did you wait until the next day? 11:46:22<br>6 A. I think I actually started looking at stuff 11:46:27<br>7 that night. As I said, these are very 11:46:29<br>8 fast-moving claims, so you can't sit around 11:46:35<br>9 and wait. 11:46:38<br>10 Q. Now, you indicated you also had to review the 11:46:43<br>11 coverage; is that correct? 11:46:50<br>12 A. Yes. 11:46:51<br>13 Q. What did you do to review the coverage? 11:46:51<br>14 A. I looked at the policy. 11:46:54<br>15 Q. Anything else? 11:46:56 | |

| Deposition Designation | Objection & Response |
|---|---|
| 16 A. Well, the policy is what indicates what the 11:46:57<br>17 coverage is, so, no, that's what I did. I 11:47:05<br>18 looked at what the policy said.11:47:08<br>19 Q. Did you look at anything else, though, in 11:47:10<br>20 order to be able to analyze the coverage? 11:47:13<br>21 A. Well, I think I just told you a variety of 11:47:15<br>22 things that I did. 11:47:18<br><br>Page 122<br>8 Q. Did you look at the imminent peril coverage? 11:48:42<br>9 A. Yes. 11:48:44<br>10 Q. Under the extra expense portion of the 11:48:45<br>11 policy? 11:48:47<br>12 A. That's correct. 11:48:48<br>13 Q. Did you come to a conclusion as to whether or 11:48:49<br>14 not the situation that had been described 11:48:52<br>15 constituted imminent peril? 11:48:54<br>16 A. Based on the information that I had at the 11:48:56<br>17 time, what -- what you always try to 11:48:58<br>18 determine in an imminent peril situation is 11:49:00<br>19first was this unexpected. 11:49:02<br>20 In other words, based on the 11:49:04<br>21 information that the -- that the production 11:49:06<br>22 has before they go into the situation versus 11:49:11<br>23 what the situation is at the time that they 11:49:14<br>24 are saying that they have a claim, is the 11:49:16<br>25 behavior or whatever is going on, you know, 11:49:19<br><br> Page 123<br>1 has -- has that -- is that unexpected to the 11:49:23<br>2 degree that you think that keeping people 11:49:26<br>3 there would be unconscionable. 11:49:29<br>4 So that's what I was looking at, 11:49:35<br>5 what was the situation before we went in, and 11:49:37<br>6 then what was the situation at the time we 11:49:39<br>7 had the phone call and they decided to push. 11:49:41<br>8 Q. And did you reach a conclusion as to whether 11:49:44<br>9 it was? 11:49:46<br>10 A. It appeared to me that the situation had 11:49:46<br>11 grown decidedly more dangerous. 11:49:49<br>12 Q. Did you end up concluding that, in fact, 11:49:56<br>13 there was imminent peril? 11:50:02<br>14 A. Well, it appears -- 11:50:02<br>17 THE WITNESS: It appeared to me 11:50:08<br>18 there was a war, and certainly the war was 11:50:09<br>19 creating imminent peril. 11:50:11<br><br>Page 124<br>12 Q. When did you reach your conclusion that the 11:50:49<br>13 situation did in fact constitute imminent 11:50:52 | |

| Deposition Designation | Objection & Response |
|---|---|

14 peril? 11:51:02
15 A. Well, it didn't take me very long to reach 11:51:02
16 that conclusion. I mean, I don't think I 11:51:05
17 reached it that night. I continued to have 11:51:07
18 conversations with Danny. We both were doing 11:51:10
19 research and exchanging information with each 11:51:12
20 other with regard to what we had found. But 11:51:14
21 certainly within a few days. 11:51:18

Page 125
8 Q. Ms. Johnson, the day that you had that first 12:07:35
9 phone conversation with Ms. Garber and 12:07:38
10 Ms. Weiss, you said you believed that you 12:07:40
11 went back and did some research that evening. 12:07:42
12 Did you do that research online? 12:07:46
13 A. Yes. 12:07:48
14 Q. Did you also look at the policy that evening? 12:07:49
15 A. You know, I don't remember if I -- if I 12:07:52
16 looked at the policy that evening or not. I 12:07:54
17 don't remember whether or not it was in the 12:07:59
18 claim file at that point and if I had access 12:08:00
19 to it. I certainly looked at it very shortly 12:08:03
20 thereafter. 12:08:07

PLAINTIFFS' 106 COUNTER-DESIGNATION:

Page 125

21 Q. At the time that you had the conversation 12:08:11
22 with Ms. Weiss and Ms. Garber, was there a 12:08:14
23 claim already -- a file that had already been 12:08:18
24 set up? 12:08:21
25 A. I have no idea. 12:08:21

END PLAINTIFFS' 106 COUNTER-DESIGNATION

Page 126

1 Q. The same day that you had the conversation 12:08:28
2 after the call was over, did you have any 12:08:31
3 conversations with Mr. Gutterman separate 12:08:33
4 from the joint call? 12:08:36
5 A. On that same day? 12:08:38
6 Q. Yeah. After the joint call with Ms. Garber 12:08:39
7 and Ms. Weiss. 12:08:44
8 A. I -- I -- I don't remember. Possibly, but I 12:08:44
9 just don't remember. 12:08:47
10 Q. When is the next time you remember speaking 12:08:49
11 with Mr. Gutterman about the claim? 12:08:52
12 A. It probably would have been the next day, but 12:08:55

| Deposition Designation | Objection & Response |
|---|---|
| 13 I don't -- I can't tell you that for sure. 12:08:59<br>14 We spoke very often, and this was such a 12:09:01<br>15 fast-moving situation. NBC really wanted to 12:09:04<br>16 know whether or not the claim was covered and 12:09:07<br>17 what was going to happen pretty quickly, so 12:09:10<br>18 we were doing our best to be able to provide 12:09:15<br>19 them with an answer. 12:09:17<br>20 Q. Does the pace of the investigation suggest to 12:09<br>21 you that you were in frequent contact with 12:09:22<br>22 Mr. Gutterman shortly after the call? 12:09:25<br>23 A. I'm sorry, I just don't remember. 12:09:30<br>24 Q. Did you -- do you recall not speaking with 12:09:31<br>25 Mr. Gutterman about the claim? 12:09:36<br><br>Page 127<br>1 A. I don't have any recollection one way or the 12:09:37<br>2 other. 12:09:39<br>3 Q. Did you provide any guidance to Mr. Gutterman 12:09:40<br>4 as to the next steps to be taken in 12:09:44<br>5 investigating the claim? 12:09:48<br>6 A. Well, I'm sure that we discussed what we 12:09:50<br>7 needed to find out with regard to what was 12:09:53<br>8 happening. I don't remember in particular 12:09:55<br>9 what charge I gave him with regard to what he 12:10:00<br>10 should do. 12:10:03<br>11 Q. What did you discuss in terms of what you 12:10:10<br>12 needed to find out? 12:10:15<br>13 A. I don't recall specifically, but since it was 12:10:18<br>14 coverage that they were looking for under 12:10:26<br>15 imminent peril, which is what Susan Weiss had 12:10:28<br>16 said, we would have been looking at what was 12:10:31<br>17 the situation before they went there, what 12:10:32<br>18 was the situation at the time that they 12:10:36<br>19 submitted the claim and what had happened in 12:10:38<br>20 between. 12:10:41<br>21 Q. What, if anything, did you do to discover 12:10:48<br>22 what the situation had been before they went 12:10:51<br>23 there? 12:10:53<br>24 A. I think I've already answered that question. 12:10:53<br>25 Q. Unfortunately, you need to answer it again. 12:10:58<br><br>Page 128<br>1 A. I looked at a variety of newspaper articles, 12:11:03<br>2 videos, different websites that -- that 12:11:05<br>3 contained information. I read some white 12:11:10<br>4 papers. I read just a wide variety of things 12:11:13<br>5 that talked about what the situation was and 12:11:19<br>6 what the situation had been. 12:11:22<br>7 Q. So the same source material that you were 12:11:26<br>8 looking at to determine what was then ongoing 12:11:29<br>9 in Israel, you also looked at to determine 12:11:31 | |

| Deposition Designation | Objection & Response |
|---|---|
| 10 what the situation had been in Israel prior 12:11:33<br>11 to the commencement of the situation with 12:11:35<br>12 Hamas? 12:11:37<br>testimony, vague and ambiguous. 12:11:40<br><br>15 THE WITNESS: In order to 12:11:46<br>16 determine imminent peril, you have to make 12:11:46<br>17 sure that whatever is happening is 12:11:49<br>18 unexpected. In order to determine if 12:11:53<br>19 something is unexpected, you have to know 12:11:55<br>20 what happened before the production got there 12:11:57<br>21 and what was happening at the time that they 12:11:59<br>22 submitted the claim. 12:12:02<br>23 BY MS. COYOCA: 12:12:05<br>24 Q. My question to you, Ms. Johnson, is: Did you 12:12:05<br>25 look to the same set of materials to try to 12:12:08<br><br>Page 129<br>1 determine what the situation was before the 12:12:11<br>2 claim had arisen? 12:12:15<br>3 A. Well, some of the materials I looked --- 12:12:16<br>4 looked at was what is happening right now. 12:12:18<br>5 And then, yes, I did an investigation of what 12:12:21<br>6 had the situation been prior to that time. 12:12:23<br>7 Q. Did you -- to the best of your recollection, 12:12:34<br>8 did you consult any other materials in order 12:12:37<br>9 to determine what the situation was prior to 12:12:39<br>10 the time the claim arose? 12:12:42<br>11 A. I know I looked at travel warnings. 12:12:43<br>12 Q. Where did you get the travel warnings from? 12:12:51<br>13 A. I looked at the State Department's warnings 12:12:53<br>14 that they put out with regard to warning U.S. 12:12:58<br>15 citizens about dangerous areas of travel. 12:13:02<br>16 Q. Any other source other than U.S. State 12:13:05<br>17 Department? 12:13:08<br>18 A. Yup, I looked at a variety of other countries 12:13:08<br>19 as well. We looked at the United Kingdom. I 12:13:12<br>20 think I looked at Australia, and probably a 12:13:17<br>21 few more. 12:13:23<br>22 Q. How far back in time did you look in order to 12:13:24<br>23 look at the security situation prior to the 12:13:29<br>24 time the claim arose? 12:13:32<br>25 A. Well, I was looking most specifically what 12:13:33<br><br>Page 130<br>1 had happened, you know, in just the months 12:13:36<br>2 prior, but that didn't mean I didn't do a 12:13:39<br>3 more thorough investigation of, okay, so 12:13:42<br>4 what -- what is the current situation. I 12:13:45<br>5 knew something about that, but I didn't -- 12:13:47<br>6 you know. I wanted to make sure that the 12:13:50 | |

| Deposition Designation | Objection & Response |
|---|---|
| 7 information I had was correct and -- and to 12:13:52<br>8 be thorough. 12:13:54<br>9 Q. With respect to the communications you had 12:13:57<br>10 with Danny Gutterman about his investigation 12:14:02<br>11 of the claim, do you recall directing him to 12:14:04<br>12 look at any particular sources of 12:14:08<br>13 information? 12:14:10<br>14 A. As I sit here today, I don't remember. Maybe 12:14:12<br>15 I did. 12:14:15<br>16 Q. Maybe you did, maybe you didn't, you just 12:14:16<br>17 don't remember? 12:14:19<br>18 A. I don't recall. 12:14:20<br>19 Q. Did you and Mr. Gutterman develop an 12:14:27<br>20 investigation plan for the claim? 12:14:31<br>21 A. Well, when you say, "Develop an investigation 12:14:34<br>22 plan," we began an investigation, so it's not 12:14:38<br>23 as though we sat down and said, "This is what 12:14:41<br>24 we need to know." We already knew what we 12:14:44<br>25 needed to know when we started to investigate 12:14:47<br><br>Page 131<br>1 it, what happened prior to the time that the 12:14:52<br>2 shooting started and what happened in 12:14:53<br>3 shooting -- I mean, principal photography -- 12:14:55<br>4 and what happened in between the time that 12:15:01<br>5 they -- before they got there and what was 12:15:02<br>6 happening at the time they made the claim.12:15:03<br><br>12 A. Well, I think what I've already testified is 12:15:14<br>13 that I began the investigation myself that 12:15:16<br>14 night, and that I don't recall whether or not 12:15:20<br>15 I spoke with Mr. Gutterman before I started 12:15:22<br>16 doing that. 12:15:25<br>17 Q. Did you and Mr. Gutterman develop an 12:15:28<br>18 investigation plan before beginning the 12:15:28<br>19 investigation? 12:15:31<br>20 A. I think I've already told you. 12:15:35<br>21 Q. Please answer my question. 12:15:37<br>22 A. Did I sit down and --12:15:39<br>25 THE WITNESS: Did I sit down 12:15:43<br><br>Page 132<br>1 and -- and have a conversation about him, 12:15:44<br>2 "These are the steps we need to take," no, 12:15:46<br>3 "One, two, three," no, I did not do that. 12:15:48<br><br>Page 133<br>23 Q. Did you ever have a telephone call with him 12:18:04<br>24 to discuss it? 12:18:06<br>25 A. I'm sorry, I just don't remember. I mean, 12:18:13 | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 134<br>1 that would be likely because, you know, the 12:18:16<br>2 protocol was if you think that there's going 12:18:20<br>3 to be something that -- that is going to 12:18:22<br>4 have -- that is potentially not covered, you 12:18:24<br>5 want to tell Peter first, and then you want 12:18:26<br>6 to tell the broker. 12:18:30<br>7 Q. And when did you -- in relation to when the 12:18:36<br>8 first conversation took place with Ms. Garber 12:18:43<br>9 and Ms. Weiss, when did you have that 12:18:44<br>10 conversation with Mr. Williams to indicate 12:18:46<br>11 that there might not be coverage? 12:18:48<br>12 A. I think I've already told you I'm not sure 12:18:50<br>13 exactly when it took place. 12:18:53<br>14 Q. Was it a week later? 12:18:54<br>15 A. Oh, no. 12:18:55<br>16 Q. Was it five days later? 12:18:58<br>17 A. No. 12:19:00<br>18 Q. Was it three days later? 12:19:00<br>19 A. I don't think that we even waited that long. 12:19:03<br>20 It would have been within the next couple of 12:19:06<br>21 days. We spoke to Andrea and Susan, again, 12:19:10<br>22 within a couple of days of the first call, so 12:19:14<br>23 I would have talked to him in between those 12:19:22<br>24 times. 12:19:24<br>25 Q. Okay. Before that next conversation with 12:19:28<br><br>Page 135<br>1 Ms. Garber and Ms. Weiss when you were 12:19:31<br>2 investigating the claim, you've given me 12:19:35<br>3 certain materials that you consulted, 12:19:40<br>4 articles, white paper, et cetera, newspaper 12:19:45<br>5 articles, you've also indicated you looked at 12:19:47<br>6 the insurance policy. Are there any other 12:19:49<br>7 documents that you can recall reviewing? 12:19:52<br>8 A. I looked at case law. 12:19:54<br>9 Q. What case law did you look at? 12:19:56<br>10 A. I looked at any case that I could find that 12:19:57<br>11 interpreted the war exclusion. 12:20:01<br>12 Q. Do you recall the names of any of those 12:20:06<br>13 cases? 12:20:07<br>14 A. The Pan Am case, the Holiday Inn case. 12:20:08<br>15 Q. Other than Pan Am and Holiday Inn, do you 12:20:15<br>16 recall any other cases? 12:20:19<br>17 A. I think I had also looked at -- looked at 12:20:20<br>18 what had been said about the -- you know, the 12:20:24<br>19 9/11 attack. 12:20:25<br>20 Q. What did you look at with respect to what had 12:20:30<br>21 been said -- 12:20:33<br>22 MS. REED: Pardon me. Are you 12:20:34<br>23 finished with your answer? 12:20:36<br>24 THE WITNESS: I am. 12:20:37 | |

| **Deposition Designation** | **Objection & Response** |
|---|---|
| 25 BY MS. COYOCA: 12:20:38 | |

Page 136
1 Q. What did you look at with respect to what had 12:20:38
2 been said about the 9/11 attacks? 12:20:40
3 A. I can't tell you specifically as I sit here 12:20:42
4 today. 12:20:44
5 Q. Did you read any cases with respect to 9/11? 12:20:47
6 A. Perhaps. As I said, I looked at any case law 12:20:49
7 I could find that interpreted the war 12:20:54
8 exclusion. 12:20:57
9 Q. Did you review any articles that discussed 12:20:57
10 the insurance company's response -- excuse 12:21:01
11 me, the insurance industry's response to the 12:21:04
12 9/11 attacks in terms of application or 12:21:06
13 non-application of the war exclusion? 12:21:09
14 A. Well, I -- I don't recall if I -- if I 12:21:12
15 actually read anything about that. I just 12:21:14
16 don't remember. 12:21:16
17 Q. You said though -- 12:21:20
18 A. If it was included in case, law then I would 12:21:21
19 have seen it. But if you're saying did I 12:21:24
20 look at separate articles about that, I don't 12:21:26
21 recall whether I did or not. 12:21:29

Page 137
21 Q. Okay. Now, prior to beginning your 12:22:29
22 investigation of the factual circumstances in 12:22:42
23 Israel, did you know what Hamas was? 12:22:48
24 A. I knew of the existence of Hamas, yes. 12:22:51
25 Q. What did you understand Hamas to be? 12:22:54

Page 138
1 A. A Palestinian organization. 12:22:58
2 Q. Anything else that you understood at the time 12:23:02
3 the claim first came in? 12:23:06
4 A. Well, I know that Susan Weiss considered it 12:23:07
5 to be a terrorist organization, because 12:23:13
6 that's what she said. I didn't have an 12:23:16
7 opinion one way or another with regard to 12:23:18
8 that. 12:23:20

Page 140
24 As of July 15, 2014, did you have an 12:26:20
25 understanding as to whether Gaza was a 12:26:24

Page 141
1 separate state? 12:26:27
2 A. I think that that depends on who you ask. 12:26:28
3 Q. Okay. But what I'm asking for as of July 15, 12:26:31
4 2014, what was your understanding as to 12:26:35
5 whether Gaza was a separate state? 12:26:37

| Deposition Designation | Objection & Response |
|---|---|
| 12 Based on the information that I 12:26:43<br>13 gathered, I would say that it is a separate 12:26:44<br>14 state, yes. 12:26:47<br><br>Page 142<br>8 Q. As of July 15, 2014, did you have an 12:27:53<br>9 understanding as to what the Palestinian 12:27:55<br>10 Authority was? 12:28:04<br>11 A. I'm sorry, I'm not sure what you're asking. 12:28:04<br>12 Q. I want to know the state of your knowledge, 12:28:06<br>13 if you knew as of July 15, 2014, before you 12:28:10<br>14 began your investigation, did you know what 12:28:13<br>15 the Palestinian Authority was? 12:28:14<br>16 A. Well, I certainly knew that there was a 12:28:16<br>17 Palestinian government, an elected 12:28:18<br>18 Palestinian government, and that controlled 12:28:21<br>19 the region of Gaza and had for some time. 12:28:24<br><br>Page 144<br>7 Q. As of July 15, 2014, before you began any 12:30:25<br>8 research or investigation, what was your 12:30:28<br>9 understanding of what the Palestinian 12:30:32<br>10 parliament consisted of? 12:30:35<br>11 A. I -- you know, I can't separate what I knew 12:30:36<br>12 then from what I know now. So I wish I could 12:30:39<br>13 give you better information, but I can't. 12:30:41<br>14 Q. As of July 15, 2014, what was your 12:30:46<br>15 understanding as to what the Palestinian 12:30:48<br>16 parliament controlled in terms of geographic 12:30:52<br>17 territory? 12:30:55<br><br>20 THE WITNESS: Again, hard to 12:31:02<br>21 distinguish between what I know now and what 12:31:03<br>22 I knew then, but certainly Gaza. 12:31:05<br><br>24 Q. So it's your testimony that the Palestinian 12:31:10<br>25 parliament controlled Gaza -- 12:31:15<br><br>Page 145<br>2 BY MS. COYOCA: 12:31:15<br>3 Q. -- is that correct? 12:31:18<br><br>6 THE WITNESS: That's what they say 12:31:23<br>7 they govern. The Israelis obviously have a 12:31:24<br>8 different point of view. 12:31:29<br><br>Page 146<br>1 Q. And in -- as of 2014, July 15, 2014, when you 12:32:15<br>2 first began investigating the claim, was it 12:32:19<br>3 your understanding that the Palestinian 12:32:25<br>4 parliament consisted of just Hamas? 12:32:27 | |

| Deposition Designation | Objection & Response |
|---|---|
| 5 A. No. 12:32:29<br>6 Q. What other groups were in the Palestinian 12:32:33<br>7 parliament, to the best of your 12:32:40<br>8 understanding, before you began doing any 12:32:41<br>9 investigation as of July 15, 2014? 12:32:42<br>10 A. Hamas, Fatah, the PLO maybe, maybe not, I 12:32:44<br>11 just don't know. 12:32:49<br>12 Q. So Hamas, Fatah, and perhaps the PLO was your 12:32:54<br>13 understanding as of July 2014 comprised the 12:33:03<br>14 Palestinian parliament, and the Palestinian 12:33:07<br>15 parliament controlled at least, to the best 12:33:09<br>16 of your understanding, Gaza; is that right? 12:33:11<br>20 THE WITNESS: Well, I knew that 12:33:20<br>21 there was a Palestinian parliament that was 12:33:21<br>22 made up of more than just Hamas. I knew that 12:33:25<br>23 Fatah was one of the other parties, that 12:33:29<br>24 there may have been other parties, maybe, 12:33:30<br>25 maybe not. And the only reason I -- I think 12:33:32<br><br>Page 147<br>1 that they -- that they controlled at least 12:33:34<br>2 Gaza, is that I believe that the Israelis had 12:33:37<br>3 conceded that to them sometime before. I 12:33:42<br>4 just have that recollection from listening to 12:33:44<br>5 the news, so... 12:33:48<br><br>15 Q. What information did you learn that was in 12:34:20<br>16 addition to what you already knew about 12:34:23<br>17 Hamas? 12:34:25<br>18 A. Well, for example, I learned the amount of 12:34:26<br>19 social services that they provided to the 12:34:29<br>20 residents of Gaza. I learned more about the 12:34:34<br>21 number of people who lived in Gaza. In the 12:34:37<br>22 Gaza strip, I should say. And how Hamas had 12:34:41<br>23 responded to their needs. I looked at what 12:34:50<br>24 their charter was and learned more 12:34:54<br>25 information about that. 12:34:57<br><br>Page 148<br>1 Certainly gained more information 12:34:59<br>2 about difficulties between -- more recent 12:35:00<br>3 difficulties between Israel and the 12:35:07<br>4 Palestinians, some of whom are Hamas, that 12:35:12<br>5 sort of thing. 12:35:20<br><br>Page 150<br>2 Q. And after you began your investigation, did 12:37:30<br>3 that understanding change in any way? 12:37:32<br>4 A. Well, it certainly is clear to me -- it was 12:37:37<br>5 clear to me that the Palestinian people 12:37:40<br>6 believed that -- that Gaza was -- was part of 12:37:42<br>7 Palestine and not part of Israel, and that 12:37:48 | |

| Deposition Designation | Objection & Response |
|---|---|
| 8 the Israelis didn't hold the same opinion, 12:37:50<br>9 but weren't necessarily trying to overtake 12:37:54<br>10 Gaza on a constant level the way they were in 12:37:56<br>11 some other areas of the West Bank where they 12:37:59<br>12 were continuing to try to put in settlements 12:38:02<br>13 over the objections of the Palestinians. So 12:38:03<br>14 that's what understood. 12:38:07<br>15 Q. Okay. But after you began your investigation 12:38:09<br>16 of the claim and undertook your research with 12:38:10<br>17 respect to the situation in -- in Gaza and in 12:38:13<br>18 Israel, did your understanding as to Israel's 12:38:17<br>19 willingness to permit Gaza to be controlled 12:38:25<br>20 by Palestinians, did that change in any way? 12:38:29<br><br>23 vague and ambiguous on "permitting." 12:38:36<br>24 THE WITNESS: The Israelis would 12:38:39<br>25 never say, "Okay, Palestinian government, you 12:38:41<br><br>Page 151<br>1 can now rule Gaza." But in terms of what 12:38:48<br>2 they were doing, I mean, there had been -- 12:38:52<br>3 you know, I think there was a point in time 12:38:54<br>4 in 2008 where they also had some kind of big 12:38:56<br>5 kerfuffle over that. 12:38:59<br>6 But at specific points in time, you 12:39:01<br>7 know, that's not -- that's not the area they 12:39:05<br>8 were trying to -- to take over so completely 12:39:07<br>9 that the Palestinians did not have any place 12:39:13<br>10 to live. 12:39:17<br>11 BY MS. COYOCA: 12:39:21<br>12 Q. So in other words, they might not be 12:39:21<br>13 expressly permitting it, but it was at their 12:39:24<br>14 sufferance? 12:39:28<br><br>Page 156<br>2 Q. Okay. So at the time that you were 12:44:55<br>3 conducting your -- your investigation of the 12:44:56<br>4 claim, it was your understanding that Hamas 12:44:58<br>5 was the majority of the Palestinian 12:45:03<br>6 parliament; is that correct? 12:45:05<br>7 A. Yes. 12:45:06<br><br>11 Q. And how did you form that understanding? 12:45:16<br>12 A. The Congressional Research Service talked 12:45:21<br>13 about the elections that took place in 2006 12:45:24<br>14 in which Hamas was elected as the majority of 12:45:28<br>15 the parliament and said that those were free 12:45:32<br>16 and fair elections, that was their 12:45:35<br>17 designation of them, and that -- that based 12:45:37<br>18 on the things that I had read, it appeared to 12:45:42<br>19 me that they still had maintained that -- 12:45:44<br>20 that majority. 12:45:47 | |

| Deposition Designation | Objection & Response |
|---|---|
| 21 Although, there was -- there was 12:45:48<br>22 something that happened in 2008 where Hamas 12:45:49<br>23 and Fatah were also trying to get together, 12:45:51<br>24 and it's not clear to me that they actually 12:45:53<br>25 formed an alliance at that time, or if it was 12:45:55<br><br>Page 157<br>1 an alliance, it was very short-lived. And 12:45:58<br>2 they had also tried to form another alliance 12:46:02<br>3 just shortly before this war broke out back 12:46:05<br>4 in June, I believe. 12:46:07<br>5 Q. What about 2007, did you take a look at any 12:46:14<br>6 of the -- did you review the status of Hamas 12:46:16<br>7 in terms of its relationship with any of the 12:46:23<br>8 other Palestinian organizations as of 2007? 12:46:26<br><br>12 THE WITNESS: Well, based on what 12:46:37<br>13 I recall, in 2006 there had been the free and 12:46:38<br>14 fair elections as designated by the CRS in 12:46:42<br>15 which Hamas gained control of the Palestinian 12:46:46<br>16 parliament and that they actually took 12:46:49<br>17 control of Gaza in 2007. I don't know if 12:46:50<br>18 that was in cooperation with another part 12:46:53<br>19 of -- of other Palestinian protections or 12:46:57<br>20 not. 12:47:02<br><br>Page 159<br>16 Q. When you were conducting your investigation 12:49:21<br>17 as of July 2014, was it your understanding 12:49:23<br>18 that the Palestinian parliament was the 12:49:26<br>19 government of Gaza or whether the government 12:49:32<br>20 was Hamas? 12:49:38<br><br>24 THE WITNESS: Based on the 12:49:46<br>25 understanding that I had, Hamas was the party 12:49:47<br><br><br>Page 160<br>1 that was supplying the military and 12:49:50<br>2 governmental services was making -- was 12:49:54<br>3 communicating with other countries, and that 12:49:58<br>4 the parliament was also participating, so I 12:50:01<br>5 don't know that it was an either/or 12:50:06<br>6 situation. 12:50:07 | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 159:16-20;<br>159:24-25<br>Non-responsive.<br><br>Defendant's Response:<br><br>The witness directly<br>responded with her<br>understanding of the<br>question and the<br>information sought by<br>the question. The<br>witnesses answer is<br>appropriate and<br>responsive. .<br><br><br><br>Plaintiff's Objections:<br>Page 160:1-25<br>F.R.E. 402-03, 602, 701<br>Lack of foundation,<br>improper opinion. |

| Deposition Designation | Objection & Response |
|---|---|
| 7 BY MS. COYOCA: 12:50:11<br>8 Q. When you say that Hamas was communicating 12:50:11<br>9 with other countries, what do you mean by 12:50:15<br>10 that? 12:50:17<br>11 A. Well, I know that they -- they -- they got 12:50:17<br>12 assistance from Iran, they got assistance 12:50:20<br>13 from Turkey, they got assistance from Egypt, 12:50:23<br>14 they communicated with those countries with 12:50:26<br>15 regard to what their needs of their people 12:50:29<br>16 were, and that that's -- you know, there -- 12:50:30<br>17 there really was no way for them to make 12:50:31<br>18 money on their own. 12:50:34<br>19 There was no way to actually create 12:50:36<br>20 any kind of significant economic growth, 12:50:37<br>21 because it was such a small area and it was 12:50:40<br>22 such a large population and a very high 12:50:42<br>23 unemployment rate. So, primarily, a lot of 12:50:45<br>24 their resources came from other countries 12:50:48<br>25 that they negotiated with. 12:50:50 | Defendant's Response:<br><br> ASIC 's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and helpful to determining a fact in issue and admissible under 701; it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets the requirements of FRE 602. |
| Page 161<br>1 Q. As of July 2014 when you were doing your 12:50:51<br>2 research, was it your understanding that the 12:50:55<br>3 government of Egypt approved of and aided 12:50:59<br>4 Hamas? 12:51:09<br>5 A. Well, they were -- 12:51:10<br><br>9 THE WITNESS: I think that -- that 12:51:19<br>10 Egypt, at that particular point in time -- I 12:51:26<br>11 think that at that point in time they did 12:51:30<br>12 recognize Palestine as a separate state, 12:51:31<br>13 along with Iran, Turkey, Russia, I think 12:51:34<br>14 Iraq, several other countries. 12:51:39<br>15 As I said, in 2012, the UN had 12:51:40<br>16 already determined that Palestine was a 12:51:43<br>17 nonmember observer state, so they had already 12:51:49<br>18 designated it as a state. 12:51:52<br>19 And since Hamas was a large player 12:51:53<br>20 in the government in general, in the 12:51:55<br>21 Palestinian parliament, I would say that -- 12:52:00<br>22 that, you know, while they might not have 12:52:01<br>23 endorsed that specific organization, they 12:52:03<br>24 certainly endorsed the state itself. 12:52:05<br><br>Page 167<br>18 Q. What was your understanding as to what was in 14:10:16 | Plaintiff's Objections:<br>Page 161:1-25<br>MIL, 401,402,403,701<br><br>Defendant's Response:<br><br>"MIL" not clear objection; ASIC's understanding and development of facts and policy relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; not prejudicial to Plaintiffs but exclusion would be prejudicial to Defendant. |

| Deposition Designation | Objection & Response |
|---|---|
| 19 Hamas's charter that made the U.S. Government 14:10:18<br>20 consider it to be a terrorist organization? 14:10:20<br>21 A. Well, part of the charter of Hamas, as far as 14:10:23<br>22 I understand it, is that it wants the – it 14:10:26<br>23 will never acknowledge Israel and it wants 14:10:29<br>24 the destruction of Israel. 14:10:31<br>25 Q. Anything else? 14:10:35<br><br>Page 168<br>1 A. Well, it wants to reclaim its homeland. It 14:10:36<br>2 claims that Israel is actually Palestinian 14:10:39<br>3 territory. 14:10:45<br><br>Page 169<br>15 Q. During your investigation you came to a 14:12:37<br>16 conclusion that the U.S. considered Hamas to 14:12:39<br>17 be a terrorist organization; is that correct? 14:12:42<br>18 A. Yes.<br>22 Q. Did you do any investigation or perform any 14:12:47<br>23 analysis with respect to the impact of that 14:12:53<br>24 status as a terrorist organization on the 14:12:58<br>25 claim itself?<br><br>Page 170<br>3 THE WITNESS: Based on what was 14:13:10<br>4 happening in Israel and the Gaza strip at the 14:13:12<br>5 time of the claim, whether or not Hamas was a 14:13:16<br>6 terrorist organization was not relevant to my 14:13:18<br>7 analysis. 14:13:22<br>8 BY MS. COYOCA: 14:13:23<br>9 Q. Was there a terrorism exclusion on the 14:13:36<br>10 policy? 14:13:38<br>11 A. Well, I'm not sure what you mean by a 14:13:41<br>12 terrorism exclusion. There was nothing 14:13:44<br>13 specifically in the policy that said acts of 14:13:46<br>14 terrorism are excluded. 14:13:49<br>15 But, certainly, the fact that there 14:13:52<br>16 was a war exclusion if the terrorist act also 14:13:55<br>17 involved warlike weapons, was part of an 14:13:58<br>18 insurrection, I mean, war and terrorism are 14:14:02<br>19 not usually exclusive, you can have the same 14:14:05<br>20 things happening, you can have terrorist acts 14:14:08<br>21 during acts of war. So I didn't see those as 14:14:11<br>22 mutually exclusive things. 14:14:14<br>23 So if -- if the terrorist attack 14:14:15<br>24 also involved one of the criteria that is 14:14:17<br>25 found in the war exclusion, then the claim 14:14:19<br><br>Page 171<br>1 would be excluded. 14:14:21<br>2 If it did not, then there's a 14:14:22<br>3 potential for coverage depending on the other 14:14:26<br>4 surrounding circumstances and whether or not 14:14:29 | Plaintiff's Objections:<br>Page 170:15-171:6<br>Everything after "There was nothing specifically in the policy that said acts of terrorism are excluded" is non-responsive to the question "was there a terrorism exclusion on the policy." Everything after is also an improper opinion that lacks foundation and contradicts the Ninth Circuit's opinion.<br><br>Defendant's Response:<br><br>ASIC's understanding and evaluation of facts and Policy are relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job; |

| Deposition Designation | Objection & Response |
|---|---|
| 5 the circumstances fall within the coverage 14:14:31<br>6 grant in the first place. 14:14:33<br><br>Page 172<br>10 Q. When you were analyzing the claim and making 14:15:42<br>11 a claim determination, was it important to 14:15:47<br>12 your analysis that you understand the meaning 14:15:49<br>13 of the term, "War," as it's used in the war 14:15:51<br>14 exclusion? 14:15:54<br>15 A. Well, I mean, I think that -- yes, certainly 14:15:55<br>16 it is. Yes. 14:15:59 | helpful to determining a fact in issue and admissible under 701; not prejudicial to Plaintiff but exclusion would be prejudicial to Defendant. |
| Page 174<br>10 Q. So in the context of the analysis that you 14:17:35<br>11 were performing in July of 2014 with respect 14:17:38<br>12 to the Dig claim, did you look at whether the 14:17:40<br>13 acts that were taking place in Israel at the 14:17:44<br>14 time, whether or not those could be 14:17:48<br>15 considered acts of terrorism? 14:17:50<br><br>19 THE WITNESS: That was certainly 14:17:58<br>20 the position that Susan Weiss took. I didn't 14:17:59<br>21 see what was happening in Israel to be -- 14:18:03<br>22 whether it was defined as an act of 14:18:08<br>23 terrorism, it was still an act of war or 14:18:10<br>24 warlike actions or an insurrection, 14:18:13<br>25 rebellion, et cetera. It still fell within 14:18:17 | Plaintiff's Objections:<br>Page 174:19 – 175:3<br>F.R.E. 602, 701<br>Non-responsive; improper opinion that lacks foundation and contradicts the Ninth Circuit's order.<br><br>Defendant's Response:<br><br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and helpful to determining a fact in issue and admissible under 701. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion |

| Deposition Designation | Objection & Response |
|---|---|
| | to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims |
| Page 175<br>1 that definition based on the actions that 14:18:19<br>2 were taking place no matter what you called 14:18:21<br>3 it. 14:18:23<br>4 BY MS. COYOCA: 14:18:23<br>5 Q. Okay. But separate and apart from whether or 14:18:23<br>6 not the acts constituted, in your view, acts 14:18:27<br>7 of war or insurrection or any of the other 14:18:29<br>8 war exclusions, I'm just trying to focus on 14:18:34<br>9 whether, as part of your analysis, you also 14:18:37<br>9 looked at the issue of whether the acts that 14:18:39<br>10 were at issue, Hamas's conduct, whether or 14:18:42<br>11 not those were acts of terrorism? 14:18:45<br>12 A. Well, I think that -- that, again, it's going 14:18:47<br>13 to depend on your definition of terrorism<br>14. well, I think that that, again it's going 14:18:49<br>15 My understanding is that the reaction of 14:18:52<br>16 Hamas and its violence towards the Israeli 14:18:56<br>17 people, when it starts shooting, you know, a 14:19:04<br>18 number of rockets into areas that it did not 14:19:06<br>19 usually attack, was based on the fact that 14:19:08<br>20 there had been -- you know, there had been 14:19:11<br>21 kidnapping of Israeli students. 14:19:14<br>22 So I don't think that the act of 14:19:17<br>23 firing these rockets was meant to persuade 14:19:21<br>24 the Israeli people not to kidnap people 14:19:24<br>25 anymore. I mean, most Israelis would already 14:19:27 | Plaintiff's Objections:<br>Page 175:5-176:5<br>F.R.E. 602, 701<br>Non-responsive, improper opinion that lacks foundation.<br><br>Defendant's Response:<br><br>"MIL" not clear objection; ASIC 's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and helpful to determining a fact in issue and admissible under 701. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all |

| Deposition Designation | Objection & Response |
|---|---|
| | parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

Page 176
1 have that, and it was not an act of the 14:19:31
2 government in kidnapping these people, so I 14:19:33
3 don't think that they were trying to coerce 14:19:35
4 the Israeli people into necessarily adopting 14:19:37
5 a particular position. 14:19:40

Page 181
6 Q. You indicated in your research. Did you 14:25:30
7 perform research as to what constituted an 14:25:34
8 act of terrorism in connection with your 14:25:36
9 analysis of the Dig claim? 14:25:38
10 A. I believe I did. 14:25:39
11 Q. What did you do? 14:25:40
12 A. The same things that I've already described 14:25:41
13 to you. 14:25:43

PLAINTIFFS' 106 COUNTER-DESIGNATION:

Page 181

14 Q. Did you -- did you review cases that 14:25:45
15 specifically addressed the definition of 14:25:47
16 terrorism? 14:25:51
17 A. I'm sure I might have done that as a -- as a 14:25:53
18 Westlaw search. I don't recall as I sit here 14:25:57
19 today. 14:25:59
20 Q. Did you review cases that talked about the 14:26:02
21 intersection between terrorism and war? 14:26:05

24 THE WITNESS: Well, I think that 14:26:12
25 they talked about that in the Pan Am case. 14:26:13

Page 182

2 Q. Other than the Pan Am case? 14:26:16
3 A. And I think they talked about that in the -- 14:26:17
4 in the Twin Towers, the 9/11 cases as well. 14:26:21
5 Q. When you say, "The 9/11 cases," what cases 14:26:23
6 are you referring to? 14:26:26
7 A. I'm sorry, I don't remember their names. If 14:26:27
8 you'd like to show me a case and ask if I 14:26:29
9 looked at it, I'd be happy to tell you yes or 14:26:32
10 no. 14:26:35

| Deposition Designation | Objection & Response |
|---|---|
| 11 Q. Did you review any cases that you can 14:26:38<br>12 remember the specific name of in the context 14:26:41<br>13 of doing your research as to the Dig claim 14:26:43<br>14 that discussed the intersection between 14:26:47<br>15 terrorism and acts of war other than the 14:26:53<br>16 specific cases you've just referenced? 14:26:57<br>19 THE WITNESS: I may have. I don't 14:27:01<br>20 remember exactly what the Wilkinson case said 14:27:03<br>21 about that, and there may have been other 14:27:06<br>22 cases that I looked at. I mean, this was 14:27:08<br>23 quite a while ago, I don't remember every<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 183<br>1 Q. As part of your analysis, did you come to any 14:27:17<br>2 conclusions as to whether the acts of -- that 14:27:19<br>3 were in controversy in the summer of 2014, 14:27:24<br>4 did you come to any conclusions as to whether 14:27:26<br>5 they were acts of terrorism? 14:27:28<br><br>8 THE WITNESS: I don't know that I 14:27:37<br>9 reached a specific conclusion. I mean, the 14:27:38<br>10 reason that I was taking a look at that was 14:27:41<br>11 because Susan Weiss and Andrea Garber both 14:27:43<br>12 continued to say that this could not -- the 14:27:47<br>13 war exclusion could not apply because this 14:27:49<br>14 was an act of terrorism. What I determined 14:27:51<br>15 is whether it was an act of terrorism or not, 14:27:54<br>16 the war exclusion still applied. 14:27:58<br><br>Page 185<br>20 Q. Do you recall coming to a conclusion one way 14:30:20<br>21 or the other? 14:30:22<br>24 THE WITNESS: All I can do is tell 14:30:27<br>25 you that when I was doing my analysis, I 14:30:28<br><br>Page 186<br>1 looked at the definitions of terrorism 14:30:32<br>2 because Susan and Andrea were convinced that 14:30:34<br>3 if it was an act of terrorism, it could not 14:30:37<br>4 also be an act of war. And what I determined 14:30:39<br>5 is regardless of whether it was an act of 14:30:42<br>6 terrorism, the war exclusion still applied. 14:30:46<br><br>8 Q. In the context of coming to your conclusions 14:30:56<br>9 in the summer of 2014 that the claim was 14:31:00<br>10 excluded by the war exclusions, did you think 14:31:03<br>11 it was important to understand the status of 14:31:07<br>12 Hamas as it was viewed by the U.S. 14:31:11<br>13 Government? 14:31:13 | |

| Deposition Designation | Objection & Response |
|---|---|
| 18 THE WITNESS: As part of my 14:31:27<br>19 analysis, I did not specifically go out to 14:31:28<br>20 find whether or not the U.S. had defined 14:31:30<br>21 Hamas as a terrorist organization. 14:31:32<br>22 What I looked at was the activity 14:31:34<br>23 between Hamas and Israel, and then I made a 14:31:37<br>24 determination based on the activity between 14:31:43<br>25 these two entities that this was war, a 14:31:45<br><br>Page 187<br>1 warlike action or an insurrection or 14:31:48<br>2 rebellion. 14:31:53<br>3 BY MS. COYOCA: 14:31:54<br>4 Q. In the context of your analysis that you 14:31:54<br>5 performed in the summer of 2014, did you look 14:31:56<br>6 at whether Hamas was a sovereign entity? 14:31:58<br>9 THE WITNESS: Yes, I did. 14:32:11<br>10 BY MS. COYOCA: 14:32:12<br>11 Q. Did you come to a conclusion? 14:32:13<br>12 A. My conclusion was is that they were a 14:32:14<br>13 quasi-sovereign nation, and perhaps a 14:32:18<br>14 sovereign nation depending on how you define 14:32:21<br>15 that term. 14:32:24<br>16 Q. In the summer of 2014 when you were 14:32:35<br>17 performing your analysis, did you believe 14:32:37<br>18 that Hamas needed to be either a sovereign or 14:32:39<br>19 quasi-sovereign entity in order for the 14:32:42<br>20 hostilities between Israel and Hamas to 14:32:44<br>21 constitute war? 14:32:47<br>22 A. Not necessarily. 14:32:48<br>23 Q. Why not? 14:32:50<br>24 A. Well, we've been fighting a war in 14:32:51<br>25 Afghanistan for quite a long time against the 14:32:55<br><br>Page 188<br>1 Taliban. We call it a war. It's defined as 14:32:58<br>2 a war by our government and every other 14:33:01<br>3 government in the world. The Taliban do not 14:33:04<br>4 control any particular territory in 14:33:07<br>5 Afghanistan, they are not the government of 14:33:09<br>6 Afghanistan, they are not a sovereign nation, 14:33:12<br>7 and yet we still have a war. 14:33:15 | Plaintiff's Objections:<br>Page 188:1-7<br>F.R.E. 402-03, 602, 701<br>Improper opinion that<br>lacks foundation with<br>respect to Afghanistan.<br>In fact, the Taliban was<br>the de facto government<br>of Afghanistan, contrary<br>to Ms. Johnson's<br>improper opinion. *See*<br>*In re September 11*<br>*Litig.*, 931 F. Supp. 2d<br>496 (S.D.N.Y. 2013)<br>("In the wake of the<br>9/11 attacks, the<br>President and his<br>advisors drew a<br>distinction between al |

| Deposition Designation | Objection & Response |
|---|---|
| | Qaeda and the Taliban government, the de facto government of Afghanistan which had long harbored al Qaeda."). |
| | Defendant's Response: |
| | "MIL" not clear objection; ASIC 's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and helpful to determining a fact in issue and admissible under 701; it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets the requirements of FRE 602. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| Deposition Designation | Objection & Response |
|---|---|
| Pages 192<br>17 Q. When did you first consider the possibility 14:38:13<br>18 of application of the war exclusion to the 14:38:17<br>19 claim? 14:38:19<br>20 A. It was after the first conversation that we 14:38:21<br>21 had. And I can't tell you how far after that 14:38:23<br>22 it was, but when I had the initial 14:38:29<br>23 conversation with Danny and Andrea and Susan, 14:38:33<br>24 I certainly did not have a comprehensive view 14:38:37<br>25 of what was happening in Israel. So that was 14:38:40<br><br>Page 193<br>1 not, you know, until I actually got into the 14:38:44<br>2 meat of what was happening there. That was 14:38:47<br>3 not something that was at the forefront of my 14:38:48<br>4 mind certainly. 14:38:52<br>5 Q. Did you first begin considering the 14:38:53<br>6 application of the war exclusion a week after 14:38:56<br>7 the conversation with Ms. Garber and 14:38:59<br>8 Ms. Weiss? 14:39:02<br>9 A. No. 14:39:02<br>10 Q. Was it within five days? 14:39:04<br>11 A. Well, I think we talked on a Monday and then 14:39:08<br>12 we had -- we had said we were going to talk 14:39:12<br>13 again on a Friday, but instead we talked on 14:39:15<br>14 Thursday, because the matter had escalated to 14:39:19<br>15 such a degree. 14:39:21<br>16 And what Susan had previously -- 14:39:22<br>17 Susan and Andrea had previously wanted to do 14:39:24<br>18 is, "All right, let's wait until Friday, 14:39:27<br>19 let's see if things deescalate." Well, by 14:39:29<br>20 Thursday it was already clear that things 14:39:31<br>21 were escalating rather than deescalating, and 14:39:34<br>22 so the push for just a week was probably not 14:39:36<br>23 going to be sufficient in their minds to be 14:39:39<br>24 able to bring their people back, things were 14:39:42<br>25 getting more elevated rather than 14:39:44<br><br>Page 194<br>1 deescalated. 14:39:47<br>2 Q. Within that time period of you believe the 14:39:49<br>3 conversation that took place on a Monday you 14:39:53<br>4 indicated -- 14:39:56<br>5 A. I think it was on a Monday. 14:39:56<br>6 Q. -- and the Thursday when the next 14:39:58<br>7 conversation took place with Ms. Weiss and 14:40:01<br>8 Ms. Garber, when during that four-day time 14:40:03<br>9 period did you begin considering application 14:40:06<br>10 of the war exclusion? 14:40:07<br>11 A. I can't tell you that. I don't remember. 14:40:09 | |

| Deposition Designation | Objection & Response |
|---|---|
| PLAINTIFFS' 106 COUNTER-DESIGNATION: | |

PLAINTIFFS' 106 COUNTER-DESIGNATION:

Page 194

12 Q. Was it the following day? 14:40:11
13 A. I told you I don't remember. 14:40:13
14 Q. I understand that you may not recall, but I'm 14:40:15
15 entitled to probe your recollection and see 14:40:17
16 if I can obtain a better answer as to your 14:40:19
17 best recollection of the events. 14:40:22
18 Was it by the next -- by -- by 14:40:25
19 Wednesday? 14:40:27
20 A. I don't recall. 14:40:31

END PLAINTIFFS' 106 COUNTER-DESIGNATION

Page 194

21 Q. Do you believe that you first began analyzing 14:40:33
22 the war exclusion on the same day that you 14:40:36
23 had the conversation, the second conversation 14:40:38
24 with Ms. Weiss and Ms. Garber? 14:40:40
25 A. On the Thursday? 14:40:45

Page 195
1 Q. Uh-huh. 14:40:46
2 A. No. 14:40:47
3 Q. Was it before that? 14:40:48
4 A. Yes. 14:40:49
5 Q. Who first raised the war exclusion as between 14:40:57

PLAINTIFFS' 106 COUNTER-DESIGNATION:

Page 195

5 Q. Who first raised the war exclusion as between 14:40:57
6 yourself and Mr. Gutterman? 14:41:03
7 A. I don't remember. 14:41:07

END PLAINTIFFS' 106 COUNTER-DESIGNATION

Page 195

8 Q. Between the -- what you indicated was a 14:41:17
9 Monday when you believe you may have had the 14:41:21
10 first conversation with Ms. Weiss and 14:41:24
11 Ms. Garber, and the Thursday, did you have 14:41:25
12 any conversations with Mr. Williams with 14:41:27
13 respect to potential applicability of the war 14:41:30

| Deposition Designation | Objection & Response |
|---|---|
| 14 exclusion? 14:41:33<br>15 MS. REED: Objection; misstates 14:41:33<br>16 the witness's prior testimony. 14:41:34<br>17 THE WITNESS: Yes. 14:41:36<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 195<br><br>18 BY MS. COYOCA: 14:41:38<br>19 Q. When did you speak with him? 14:41:38<br>20 A. I don't remember specifically. 14:41:40<br>21 Q. Did you have more than one conversation? 14:41:44<br>22 A. Again, I don't remember specifically. I 14:41:47<br>23 think it's probable that we had more than one 14:41:50<br>24 conversation. 14:41:52<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 195<br><br>25 Q. What did you discuss? 14:41:54<br><br><br><br>Page 196<br>1 A. Whether or not the war exclusion applied. 14:41:55<br>2 Q. What did you tell Mr. Williams? 14:41:58<br>3 A. I don't remember specifically what I told 14:42:01<br>4 him. I'm sure that what I is relaying is 14:42:03<br>5 the information we had found in our research. 14:42:08<br>6 Q. Did you tell Mr. Williams that you believed 14:42:10<br>7 that the war exclusion applied? 14:42:13<br>8 A. Yes. 14:42:14<br><br>14 Q. Did you discuss with him -- well, what -- 14:42:31<br>15 what parts of the war exclusion did you -- do 14:42:34<br>16 you recall discussing with him? 14:42:36<br>17 A. I think that -- that we talked about whether 14:42:37<br>18 or not it was war, if it wasn't war, it was 14:42:41<br>19 at least warlike action, and if -- if in fact 14:42:44<br>20 that it was just an uprising within Israel, 14:42:50<br>21 it would still be considered an insurrection, 14:42:54<br>22 and that the weapons they were using were 14:42:59<br>23 weapons of war. 14:43:02<br>24 Q. And you recall discussing with Mr. Williams 14:43:03<br>25 that -- your position that the weapons that 14:43:06age 196 – 198<br><br>Page 197<br>1 were being used were weapons of war; is that 14:43:08<br>2 correct? 14:43:13 | Plaintiff's Objections:<br>Page 196:24-197:25<br>MIL 2; F.R.E. 402-03<br>Exclusions 3<br>("insurrection") and 4<br>("weapons of war<br>including atomic<br>fission") were not the<br>basis for denial of<br>coverage in the 7/28<br>denial letter and<br>therefore cannot be used<br>to defend against bad<br>faith. *See Century<br>Surety Co. v. Polisso*.<br>Therefore irrelevant,<br>substantially more<br>prejudicial than<br>probative, and wastes<br>time.<br><br>Defendant's Response:<br><br>"MIL" not clear<br>objection; ASIC 's work<br>to evaluate and<br>understand the facts is |

| Deposition Designation | Objection & Response |
|---|---|
| 3 A. Well, tanks, air bombings, rockets, yes, I 14:43:13<br>4 consider those to be weapons of war. 14:43:18<br>5 Q. My question to you is: Did you tell that to 14:43:20<br>6 Mr. Williams during that conversation? 14:43:23<br>7 A. Well, I think that I explained to him what 14:43:25<br>8 was happening in Israel. 14:43:28<br>9 Q. My question is: Did you specifically tell 14:43:30<br>10 Mr. Williams that you believed the weapons of 14:43:32<br>11 war, including atomic fission or radioactive 14:43:36<br>12 force, exclusion applied to the Dig claim? 14:43:41<br>13 A. I don't know if we specifically -- if I said 14:43:45<br>14 that to him specifically. I know that we 14:43:47<br>15 talked about the first four categories of the 14:43:49<br>16 war exclusion. 14:43:52<br>17 Q. Do you recall specifically discussing the 14:43:58<br>18 insurrection, rebellion or revolution, third 14:44:00<br>19 prong of the war exclusion, with Mr. Williams 14:44:04<br>20 during that period between the Monday when 14:44:07<br>21 you say the conversation first occurred and 14:44:09<br>22 the Thursday when the second conversation 14:44:12<br>23 occurred with Ms. Weiss and Ms. Garber? 14:44:13<br>24 A. I probably did, because I was looking at all 14:44:16<br>25 four of those -- those prongs of the war 14:44:19 | relevant to reasonableness of claim decision, defense of "bad faith" and damages sought.  No hearsay included.  The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision. |
| Page 198<br>1 exclusion, but I don't remember specifically. 14:44:21<br>2 Q. What did Mr. Williams tell you in response? 14:44:27<br>3 A. He didn't disagree with the analysis that we 14:44:30<br>4 had made. He agreed that the war exclusion 14:44:33<br>5 applied. 14:44:35<br><br>14 Q. Did you have -- during that four-day period 14:45:01<br>15 between the Monday and the Thursday, did you 14:45:03<br>16 have any conversations with Ms. Gooley about 14:45:05 | Plaintiff's Objections:<br>Page 198:2-5<br>F.R.E. 802<br>Defendants Response:<br>Not offered for the truth of the matter asserted but to show knowledge and information subsequently acted upon by the witness. |

| Deposition Designation | Objection & Response |
|---|---|
| 17 the potential application of the war 14:45:07<br>18 exclusion? 14:45:08<br>19 A. I probably did. I mean, I would not have 14:45:09<br>20 been raising it with the policyholder without 14:45:12<br>21 talking to her about it. I -- I -- I don't 14:45:19<br>22 think that I would have done that without 14:45:20<br>23 discussing it with her, because I would want 14:45:22<br>24 to know whether on an enterprise basis there 14:45:24<br>25 has been interpretations of that particular 14:45:28<br><br>Page 199<br>1 exclusion in other departments. 14:45:31<br>2 Q. What did Ms. Gooley tell you? 14:45:35<br>3 A. With regard to what? 14:45:39<br>4 Q. With respect to whether or not, on an 14:45:40<br>5 enterprise basis, there had been other 14:45:44<br>6 interpretations of the exclusion. 14:45:46<br>7 A. She didn't know. She was going to look into 14:45:47<br>8 it. 14:45:50<br>9 Q. Did she ever get back to you? 14:45:50<br>10 A. Yes. 14:45:51<br>11 Q. What did she tell you? 14:45:52<br>12 A. She said that there had not been any other 14:45:53<br>13 interpretations from the information she 14:45:55<br>14 could gather. You have to remember what 14:45:58<br>15 OneBeacon existed long before Theresa or I 14:46:01<br>16 ever came to that organization. It's a very 14:46:04<br>17 old company. 14:46:06<br><br>21 Q. Did you have more than one conversation with 14:46:18<br>22 Ms. Gooley? 14:46:24<br>23 A. At what period of time? 14:46:24<br>24 Q. During the period from the Monday when you 14:46:25<br>25 say the first conversation took place with 14:46:27<br><br>Page 200<br>1 Ms. Weiss and Ms. Garber -- 14:46:29<br>2 A. Yes. 14:46:29<br>3 Q. -- and the Thursday when the second 14:46:31<br>4 conversation took place. 14:46:32<br>5 A. Yes. 14:46:33<br>6 Q. How many conversations? 14:46:33<br>7 A. I don't know. And I'm not sure if they were 14:46:35<br>8 necessarily -- if there was necessarily more 14:46:38<br>9 than one conversation or if it was a 14:46:40<br>10 conversation, then a series of e-mails. I 14:46:42<br>11 just can't recall. But we certainly had 14:46:44<br>12 communication. 14:46:46<br>13 Q. Did Ms. Gooley ask you what you had done in 14:46:51<br>14 order to come to your conclusions? 14:46:54<br>15 A. I don't know if she asked me. I certainly 14:46:56 | |

| Deposition Designation | Objection & Response |
|---|---|
| 16 told her. 14:46:59 | |
| | |
| Page 201 | |
| | |
| Page 212 | |
| 1 I might have. I can't tell just by reading 15:01:03 | |
| 2 this e-mail where I was in my research and 15:01:05 | |
| 3 what my thought process was. I can't tell 15:01:08 | |
| 4 you just by looking at that, I can't tell. 15:01:12 | |
| | |
| 11 Q. In Mr. William's response to you, with a cc 15:01:43 | |
| 12 to Mr. Gutterman, he indicates, begin quotes, 15:01:49 | |
| 13 "Why it is not a covered claim? They have 15:01:51 | |
| 14 imminent peril, unless you are going to 15:01:54 | |
| 15 invoke the war exclusion," close quotes. 15:01:55 | |
| 16 What did you understand him to be saying in 15:01:59 | |
| 17 this e-mail to you? 15:02:01 | |
| 18 A. I -- what I understood him to be saying is 15:02:02 | |
| 19 that -- that he was misinterpreting what I 15:02:05 | |
| 20 had said in -- in my previous e-mail. I 15:02:07 | |
| 21 wasn't saying that it was not -- that it was 15:02:10 | |
| 22 necessarily not a covered claim. I was just 15:02:11 | |
| 23 relating to him what we had talked about in 15:02:14 | |
| 24 the conversation with Susan and Andrea. 15:02:17 | |
| | |
| Page 213 | |
| 10 Q. Did you write back to him and indicate that 15:02:37 | |
| 11 he had misinterpreted what you were saying in 15:02:39 | |
| 12 your e-mail? 15:02:41 | |
| 13 A. No. At that point we were setting up a call. 15:02:43 | |
| | |
| 21 Q. The next e-mail in the chain is from 15:03:10 | |
| 22 Daniel Gutterman to you and to Mr. Williams, 15 | |
| | |
| Page 215 | |
| 19 Q. The next e-mail in the chain is from you to 15:05:01 | |
| 20 Mr. Gutterman, and it appears to be 15:05:05 | |
| 21 forwarding a link to a U.S. Government site 15:05:07 | |
| 22 with respect to foreign travel advice. Do 15:05:11 | |
| 23 you see that? 15:05:14 | |
| 24 A. No, that's the UK Government site. 15:05:15 | |
| 25 Q. Oh, I'm sorry, UK Government site. 15:05:17 | |
| | |
| Page 216 | |
| 1 A. Yes, that's true. 15:05:20 | |
| 2 Q. Did you send that e-mail to Mr. Gutterman? 15:05:22 | |
| 3 A. I did. 15:05:24 | |
| 4 MS. COYOCA: I'd like to mark as 15:05:29 | |
| 5 Exhibit 4 a document that is labeled, 15:05:30 | |
| 6 "Internet Archive: Wayback Machine, Israel 15:05:38 | |
| 7 Travel Advice-gov.uk." 15:05:38 | |
| | |
| Page 217 | |
| 19 Q. Do you believe that what I marked as 15:07:29 | |

| Deposition Designation | Objection & Response |
|---|---|
| 20 Exhibit 4 is an accurate reflection of the UK 15:07:31<br>21 Israel travel advice that existed as of 15:07:36<br>22 July 2014? 15:07:40<br><br>24 THE WITNESS: It appears to be. I 15:07:44<br>25 have no reason to think it isn't. 15:07:45<br><br>Page 218<br>1 BY MS. COYOCA: 15:08:02<br>2 Q. Did you subsequently have a telephone 15:08:03<br>3 conversation with Mr. Williams and 15:08:04<br>4 Mr. Gutterman on the 16th? 15:08:06<br>5 A. I believe we did. 15:08:09<br>6 Q. Was there anyone on the call aside from 15:08:14<br>7 yourself and Mr. Gutterman and Mr. Williams? 15:08:16<br>8 A. Not that I recall. 15:08:18<br>9 Q. What did you discuss? 15:08:25<br>10 A. We discussed what was happening in -- in 15:08:29<br>11 Israel and we discussed the information that 15:08:34<br>12 both Danny, and I had researched with regard 15:08:42<br>13 to what was happening there, and I think we 15:08:46<br>14 discussed the war exclusion. 15:08:51<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 218<br><br>15 Q. When did the conversation take place, to the 15:08:59<br>16 best of your recollection, on the 16th? 15:09:04<br>17 A. I can't remember specifically. Based on the 15:09:07<br>18 e-mail string that you showed me before, it 15:09:09<br>19 looks like we set it up for 2 o'clock ET. I 15:09:11<br>20 don't know if it went forward at that 15:09:16<br>21 particular time or not. 15:09:17<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 219<br>4 Q. Do you recall generally? 15:09:38<br>5 A. Well, generally, we talked about what I just 15:09:39<br>6 told you, what was the situation in Israel, 15:09:41<br>7 and the fact that the policy contains the war 15:09:45<br>8 exclusion, and the information that we had 15:09:47<br>9 found about the situation in Israel both 15:09:50<br>10 before NBC went there and what the current 15:09:52<br>11 situation was. 15:09:56<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 219 | |

| Deposition Designation | Objection & Response |
|---|---|
| 12 Q. Did you tell Mr. Williams that you believed 15:09:58<br>13 the war exclusion applied? 15:10:01<br>14 A. I don't know if I said that specifically to 15:10:04<br>15 him then. I probably indicated that I 15:10:06<br>16 thought that it was probable. 15:10:08<br>17 Q. Did you tell him what part of the war 15:10:13<br>18 exclusions you thought were probably going to 15:10:15<br>19 apply? 15:10:17<br>20 A. I don't recall. I don't think I would have 15:10:18<br>21 been specific. 15:10:20<br>22 Q. Did you tell Mr. Williams anything else? 15:10:23<br>23 A. I'm sorry, I just don't remember. 15:10:27<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br><br>Page 220<br>7 Q. Did Mr. Williams respond to you during that 15:10:53<br>8 phone conversation in any way? 15:10:56<br>9 A. I'm sure he did. 15:11:00<br>10 Q. Do you recall anything about what he said to 15:11:03<br>11 you in response? 15:11:08<br>12 A. I don't recall specifically what he said in 15:11:10<br>13 that conversation, no. 15:11:12<br>14 Q. Do you recall his position generally with 15:11:14<br>15 respect to the application of the war 15:11:16<br>16 exclusion during this time period? 15:11:18<br>17 A. He thought that the war exclusion applied. 15:11:19<br><br>22 Q. What did you tell him that you had done in 15:11:40<br>23 order to form this conclusion that the war 15:11:44<br>24 exclusions applied? 15:11:47<br>25 A. I think I told him about the research that we 15:11:54<br><br><br>Page 221<br>1 had been conducting, what the situation was 15:11:57<br>2 on the ground, what the basis of the 15:12:00<br>3 situation was on the ground, what Israel was 15:12:02<br>4 saying with regard to Operation Protective 15:12:06<br>5 Edge, the actual activities of both the 15:12:11<br>6 Israeli Army and Hamas on the ground. 15:12:16<br>7 Q. What did you tell him with respect to what 15:12:20<br>8 Israel -- Israel was saying with regard to 15:12:23<br>9 Operation Protective Edge? 15:12:27<br>10 A. Well, I think that at this point in time -- 15:12:27<br>11 well, I can't be sure of the exact -- the 15:12:34<br>12 exact time. But at some point in time, I 15:12:37<br>13 know that they were readying their troops to 15:12:40<br>14 take tanks across the Gaza border, that they 15:12:42<br>15 had put 18,000 troops on the ground, that 15:12:46<br>16 they were conducting air strikes and there 15:12:49<br>17 was still rockets coming across in the other 15:12:52 | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 220:14-17<br>F.R.E. 802<br><br>Defendant's Response:<br><br>Not offered for the truth of the matter asserted but to show knowledge and information acted upon by the witness.<br><br><br><br><br><br>Plaintiff's Objections:<br>Page 221:1-25<br>MIL 3; F.R.E. 402-03<br>For the reasons in MIL No. 3, Israel's actions in Gaza are irrelevant and substantially more prejudicial than probative, given that the "efficient proximate cause" doctrine was well-established under California law since 2005 in the *Julian* decision.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 18 direction, some of which were being captured 15:12:56<br>19 by Iron Dome, others which were not, and that 15:12:57<br>20 a cease fire had been proposed by Egypt, that 15:13:00<br>21 Hamas had turned it down, and that the 15:13:04<br>22 Israeli prime -- Netanyahu had said, you 15:13:07<br>23 know, when the answer -- "When they won't 15:13:11<br>24 agree to a cease fire, our response is fire." 15:13:13 | "MIL" not clear objection; ASIC 's understanding and analysis of denial development is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and helpful to determining a fact in issue and admissible under 701. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 225<br>19 Q. Ultimately, when the claim was denied, did 15:18:06<br>20 you identify all four of these exclusions as 15:18:09<br>21 being directly applicable to the claim? 15:18:12<br>22 A. I did, and I think I also identified 15:18:14<br>23 Number 8. 15:18:16<br><br>Page 237<br>8 Q. Did you ever search for any other terms when 15:43:19<br>9 you were doing your research? 15:43:30<br>10 A. Oh, I'm sure I did. As I sit here today, I 15:43:32<br>11 can't tell you what they were. But, I mean, 15:43:35 | |

| Deposition Designation | Objection & Response |
|---|---|
| 12 I spent many hours looking at this and doing 15:43:37<br>13 searches online. 15:43:39<br>14 Q. And the many hours took place from what time 15:43:40<br>15 period, from when to when? 15:43:45<br>16 A. From when we first talked to Susan and Andrea 15:43:47<br>17 until we talked to them again and made them 15:43:54<br>18 aware that we thought that the war exclusion 15:43:58<br>19 might apply. I continued to do research 15:44:03<br>20 after that just to see if there were changes 15:44:04<br>21 in conditions, because, as you know, it was a 15:44:08<br>22 quickly moving situation. And, you know, I 15:44:10<br>23 can't tell you specifically when I stopped 15:44:16<br>24 doing research about it, but I continued to 15:44:17<br>25 do some for quite some time. 15:44:20 | |
| Page 238<br>1 Q. Were you continuing to do research in August 15:44:22<br>2 of 2014? 15:44:25<br>3 A. Well, I kept track of what was happening with 15:44:29<br>4 regard to the hostilities between -- between 15:44:31<br>5 Hamas and the Israelis throughout the entire 15:44:40<br>6 time that the conflict was going on. I can't 15:44:44<br>7 tell you specifically that I looked at it 15:44:46<br>8 every day, but I certainly wanted to stay 15:44:48<br>9 aware of it to see whether or not there was a 15:44:53<br>10 chance that they were going to resume 15:44:55<br>11 production there. 15:44:57<br>12 Q. Do you recall doing any additional research 15:44:57<br>13 or investigation in September of 2014? 15:44:59<br>14 A. I think that by then the hostilities had 15:45:01<br>15 ceased, or pretty close in time to that, 15:45:05<br>16 because it lasted for 50, 51 days. 15:45:08<br><br>21 Q. Why were you linking to an article in 15:45:17<br>22 Wikipedia with respect to Hamas? 15:45:21<br>23 A. Well, the one thing that Wikipedia is 15:45:22<br>24 particularly good for is it gives you all of 15:45:26<br>25 the cites from which they drew its 15:45:29 | Plaintiff's Objections:<br>Page 238:1-25<br>MILs 2-3, F.R.E. 402-03<br>For the reasons stated in MILs 2-3, Israel's actions in Gaza in August—a different location after Plaintiffs already decided to relocate—are irrelevant and substantially more prejudicial than probative.<br><br>Defendant's response:<br>The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real |

| Deposition Designation | Objection & Response |
|---|---|
| | time is critical for jury to consider when evaluating bad faith claims. |

Page 239
1 information -- they drew their information. 15:45:32
2 And in looking at the appendix, you know, all 15:45:33
3 the things that they cited, there you 15:45:37
4 certainly can find more authoritative 15:45:40
5 resources to look at. 15:45:45

Page 243
9 Q. And then the e-mail above Ms. Gooley asked 15:51:03
10 you to send her the policy. Do you see that? 15:51:07
11 A. Yes. 15:51:08
12 Q. And did you do that? 15:51:09
13 A. If she instructed me to, I'm sure I did. 15:51:10

Page 257
19 Q. I believe you've indicated you had a second 16:07:30
20 conversation with Ms. Garber and Ms. Weiss on 16:07:36
21 Thursday of the same week in which you had 16:07:41
22 talked? 16:07:44
23 A. That's correct. 16:07:45
24 Q. And based on the calendar that I looked at, 16:07:45
25 I'm going to represent to you that that was 16:07:50

Page 258
1 July 17. 16:07:52
2 A. Okay. 16:07:53
3 Q. Does that sound wrong to you in any way? 16:07:53
4 A. No. It's just a couple of days after our 16:07:56
5 first conversation and before our next 16:07:59
6 conversation was supposed to occur. 16:08:00
7 Q. Who was on the call? 16:08:03
8 A. Danny, myself, Susan and Andrea. I don't 16:08:05
9 think that Peter was on the call. He may 16:08:14
10 have been, but I -- I'm not sure if he was on 16:08:16
11 the call or not. 16:08:19
12 Q. What was discussed during the call? 16:08:33
13 A. We discussed the fact that given the fact 16:08:36
14 that the situation had not deescalated as NBC 16:08:40
15 had hoped, they had decided to move their 16:08:46
16 production. 16:08:49
17 In that conversation we also 16:08:51
18 informed them that we were looking at the 16:08:53
19 applicability of the war exclusion to the 16:08:56
20 situation. They objected to the idea that 16:08:59
21 this could be considered a war, because Hamas 16:09:04
22 is a terrorist organization and, therefore, 16:09:07

| Deposition Designation | Objection & Response |
|---|---|
| 23 you could not have a war with a terrorist 16:09:09<br>24 organization. 16:09:11<br>25 And they asked when we would have a 16:09:13<br><br>Page 259<br>1 final decision and we gave them -- I think 16:09:17<br>2 that we gave them a date as quickly as we 16:09:23<br>3 could. I don't remember if they asked for 16:09:26<br>4 the date or if -- if we just told them a 16:09:29<br>5 date. I know that they wanted a response as 16:09:33<br>6 quickly as humanly possible. 16:09:35<br>7 Q. Who explained to Ms. Garber and Ms. Weiss 16:09:43<br>8 that OneBeacon entertainment was looking at 16:09:46<br>9 the potential applicability of the war 16:09:50<br>10 exclusion? 16:09:51<br>11 A. I don't recall exactly. It was probably me. 16:09:53<br>12 Q. Did you identify the parts of the war 16:09:55<br>13 exclusion that you thought were going to 16:09:57<br>14 potentially be applied? 16:10:01<br>15 A. I don't remember. 16:10:02<br>16 Q. Did you indicate to Ms. Weiss and Ms. Garber<br>16:10:03<br>17 that there was a significant chance of the 16:10:07<br>18 war exclusion being applied? 16:10:11<br>19 A. I think -- I think that we told them that we 16:10:13<br>20 were considering it. 16:10:16<br>21 Q. Did you tell them that in all likelihood the 16:10:16<br>22 exclusion would be applied? 16:10:19<br>23 A. I probably didn't go that far, because we 16:10:20<br>24 were still taking a look at it. 16:10:23<br><br>Page 262<br>7 Q. Was there anything else discussed during the 16:12:51<br>8 call? 16:12:53<br>9 A. Yeah, we talked about if they were going to 16:12:54<br>10 move, where they would move. They told me 16:12:57<br>11 that they were considering I think Turkey and 16:13:00<br>12 New Mexico. I warned them about a specific 16:13:06<br>13 location scout in New Mexico that they might 16:13:11<br>14 want to avoid if they decided to go there. 16:13:17<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 262<br><br>15 Q. Did you talk about potential sites for 16:13:19<br>16 relocation before or after you told them that 16:13:21<br>17 the war exclusion would be -- 16:13:24<br>18 A. I don't remember. 16:13:26<br><br>21 MS. COYOCA: Can I please finish 16:13:29<br>22 my question before you answer it and before 16:13:30<br>23 you object? | |

| Deposition Designation | Objection & Response |
|---|---|
| 25 Q. Did you tell them about the New Mexico 16:13:33 | |

Page 263

1 concern before you told them that the war 16:13:36
2 exclusion potentially would apply to the 16:13:39
3 claim? 16:13:41
4 A. I'm sorry, Ms. Coyoca, I just -- I don't 16:13:42
5 remember. 16:13:44

END PLAINTIFFS' 106 COUNTER-DESIGNATION


Page 263
6 Q. Based on the documents that we've reviewed, 16:13:49
7 it looks like you first began doing work on 16:13:51
8 the claim as of Monday July 15; is that 16:13:53
9 right? Or, excuse me, Monday, July 14; is 16:13:56
10 that right? 16:13:59

15 Q. The e-mails and the initial submission of the 16:14:04
16 claim, I'll represent to you, was on Tuesday, 16:14:07
17 July 15, not on Monday. But you had 16:14:09
18 testified that you believed you had -- you 16:14:11
19 might have had conversations on Monday? 16:14:13
20 A. It sounds like I was confusing Monday. It 16:14:15
21 was Tuesday. 16:14:17
22 Q. All right. So having seen the documents, you 16:14:17
23 can't recall a conversation taking place 16:14:21
24 before Tuesday the job -- July 15 when the 16:14:23
25 claim was submitted, do you? 16:14:28

Page 264
1 A. The first conversation I recall is the one 16:14:29
2 that I related to you with Danny and Andrea 16:14:31
3 and Susan. 16:14:33
4 Q. Okay. So from Tuesday, July 15, to Thursday, 16:14:35
5 July 17 when you told the insured that the 16:14:39
6 war exclusion potentially would apply, did 16:14:43
7 you feel that that was enough time for you to 16:14:49
8 conduct your analysis of this issue? 16:14:51
9 A. Well, it would have to be, because they 16:14:53
10 wanted an answer. 16:14:55
11 Q. Did you feel pressured by the insured to do 16:14:56
12 the research and get an answer out as quickly 16:14:59
13 as possible? 16:15:03
14 A. I don't know that pressure is the correct 16:15:04
15 term. Whenever you're dealing with a 16:15:06
16 production that is going to shut down for any 16:15:08

| Deposition Designation | Objection & Response |
|---|---|
| 17 reason and for any period of time, time is of 16:15:11<br>18 the essence to them, because time is money. 16:15:13<br>19 They have to be -- they have to know what -- 16:15:16<br>20 if they're going to, you know, tell people 16:15:18<br>21 not the to come back to work. They have to 16:15:20<br>22 know exactly what the deal is. You know, and 16:15:22<br>23 what we always advise them is do what is 16:15:25<br>24 prudent even if you didn't have insurance, 16:15:28<br>25 what would you do in that situation. But 16:15:31<br><br>Page 265<br>1 they -- you know, in spite of the fact that 16:15:34<br>2 that's what we tell them, they still want to 16:15:36<br>3 know as quickly as possible if the money is 16:15:38<br>4 going to be coming from the insurance 16:15:42<br>5 company. So, yes, they said that they wanted 16:15:44<br>6 an answer and that they wanted it very 16:15:46<br>7 quickly. I -- I'm not sure that I would say 16:15:48<br>8 I felt pressured. I would say that I knew 16:15:50<br>9 that they wanted an answer quickly. 16:15:51<br>10 Q. Did you feel -- excuse me. 16:15:53<br>11 Did you feel you had sufficient time 16:15:54<br>12 to conduct the research and do the analysis 16:15:55<br>13 and give the insured a response in that 16:15:57<br>14 two-day period of time? 16:16:00<br>17 THE WITNESS: Yes. 16:16:06<br><br>19 Q. Did you feel that your analysis was rushed? 16:16:09<br><br>22 THE WITNESS: I wouldn't -- I 16:16:19<br>23 wouldn't define it as rushed. I would define 16:16:22<br>24 it as working very hard for many hours over a 16:16:25<br>25 short period of time. 16:16:31<br><br>Page 266<br>2 Q. But not withstanding the fact that you worked 16:16:32<br>3 hard for a short period of time to reach your 16:16:36<br>4 conclusion, you felt you had reached the 16:16:38<br>5 right conclusion; is that right? 16:16:41<br><br>8 THE WITNESS: I did. 16:16:45<br><br>10 Q. Did you feel that your analysis could have 16:16:51<br>11 benefitted from spending any additional time 16:16:53<br>12 on it? 16:16:56<br><br>15 THE WITNESS: I felt comfortable 16:17:03<br>16 with the decision we made. 16:17:05<br><br>18 Q. During that July 17 phone call with 16:17:13<br>19 Ms. Garber and Ms. Weiss, was there anything 16:17:16<br>20 else that was discussed aside from the topics 16:17:18<br>21 that you've described for me? 16:17:20 | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 266:13-14<br>IO,403<br><br>Defendant's Response:<br><br>Objection removed. |

| Deposition Designation | Objection & Response |
|---|---|
| 22 A. We discussed the conditions on the ground in 16:17:34<br>23 Israel and we discussed the war exclusion and 16:17:36<br>24 its applicability to that situation, I 16:17:50<br>25 believe, and their relocation efforts, and 16:17:51<br><br>Page 267<br>1 then they wanted to know when they would get 16:17:56<br>2 a letter giving them their final 16:17:58<br>3 determination. And even though under 16:18:00<br>4 California law I have 40 days to produce that 16:18:03<br>5 to them, that would not have been appropriate 16:18:06<br>6 in this situation. 16:18:10<br><br>Pages 273<br>20 Q. Did you have any conversations with 16:38:50<br>21 Ms. Gooley after the call on the 17th before 16:38:52<br>22 you told the insured that the claim was going 16:38:55<br>23 to be denied on the basis of the war 16:38:58<br>24 exclusion? 16:39:00<br>25 A. Before I gave them our final decision I'm 16:39:02<br><br>Page 274<br>1 sure I did. 16:39:07<br>2 Q. Who was responsible for the ultimate decision 16:39:07<br>3 to deny the claim? 16:39:10<br>4 A. Me. 16:39:11<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 274<br><br>2 Q. Who was responsible for the ultimate decision 16:39:07<br>3 to deny the claim? 16:39:10<br>4 A. Me. 16:39:11<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 274<br><br>5 Q. Why did you speak to Ms. Gooley about it? 16:39:11<br>6 A. Because NBC is an important client for 16:39:14<br>7 OneBeacon entertainment, and I knew given the 16:39:21<br>8 response that I got from Andrea and Susan 16:39:27<br>9 that it was likely that they were going to 16:39:30<br>10 want to escalate this matter. And, you know, 16:39:32<br>11 the last thing you ever want with someone 16:39:33<br>12 who -- with your supervisor, is a surprise. 16:39:36<br>13 So it's always best to have them apprised as 16:39:38<br>14 to the discontent of a client, the likelihood 16:39:43<br>15 that the client will call them directly. And 16:39:46<br>16 that's why I would also keep Peter Williams 16:39:49 | Plaintiff's Objections:<br>Page 274:19-23<br>F.R.E. 602,802<br>Lack of personal knowledge and speculation as to what Mr. Williams was thinking; alternatively, hearsay to the extent Ms. Johnson is stating Mr. Williams told her he agreed with her. |

| Deposition Designation | Objection & Response |
|---|---|
| 17 apprised, because he also likely was to get a 16:39:53<br>18 call. 16:39:56<br>19 Q. Did you have a call with Mr. Williams about 16:39:56<br>20 the decision before you conveyed it to the 16:39:58<br>21 insured? 16:40:01<br>22 A. Well, I'm sure we talked about it. I mean, 16:40:01<br>23 he was in agreement with the decision. 16:40:04<br><br>Page 279<br>10 Q. Who was on that call? 16:45:38<br><br>Page 284<br>21 Q. I want to direct your attention to the center 16:52:01<br>22 e-mail on page 3240 from you to Susan Weiss 16:52:10<br>23 with a cc to Andrea Garber and Daniel 16:52:15<br>24 Gutterman. It indicates, "Andrea and Susan, 16:52:18<br>25 Profuse apologies, but I will not be able to 16:52:23<br><br>Page 285<br>1 get the coverage letter to you until Monday. 16:52:26<br>2 Despite my best efforts, I could not complete 16:52:28<br>3 it today." Do you recall sending this 16:52:30<br>4 e-mail? 16:52:32<br>5 A. I do. 16:52:32<br>6 Q. Had you previously told Ms. Weiss and 16:52:36<br>7 Ms. Garber that you were going to get the 16:52:38<br>8 coverage denial letter out that week? 16:52:40<br>9 A. That's certainly what it appears from this 16:52:44<br>10 e-mail, yes. 16:52:46<br>11 Q. Did you receive -- receive Ms. Weiss's 16:52:47<br>12 response? 16:52:53<br>13 A. I did. She said, "It's imperative that we 16:52:54<br>14 receive this on Monday morning. NBCU has 16:53:02<br>15 been asking about this on a regular basis and 16:53:05<br>16 we told them they'd be receiving the opinion 16:53:08<br>17 letter by the end of this week. Thank you, 16:53:10<br>18 Susan." 16:53:12<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 285<br><br>19 Q. Did you feel that your analysis in the 16:53:13<br>20 coverage denial letter was being impaired by 16:53:20<br>21 the fact that you were being asked to 16:53:22<br>22 complete it in a short time frame? 16:53:24<br><br>25 THE WITNESS: No. 16:53:32<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Pages 293 | Defendant's Response: The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Not being offered for the truth of the matter asserted but to show knowledge and information acted upon by the witness. Testimony indicates witness has personal knowledge. |

| Deposition Designation | Objection & Response |
|---|---|
| 4 Q. Why did you send it? 17:15:25<br>5 A. Because it is our obligation to send a 17:15:31<br>6 written coverage determination to our 17:15:34<br>7 policyholders. 17:15:36<br><br><br>Page 294<br>3 Q. Was Atlantic denying the claim on the basis 17:16:27<br>4 of any exclusions other than war or warlike 17:16:31<br>5 action? 17:16:36<br>6 A. Well, I refer to four different -- five 17:16:36<br>7 different aspects of the war exclusion, "War, 17:16:39<br>8 including undeclared war or civil war or 17:16:50<br>9 warlike action by a military force including 17:16:53<br>10 action in hindering or defending against an 17:16:53<br>11 actual or unexpected attack by any 17:16:56<br>12 government, sovereign or other authority 17:16:59<br>13 using military personnel or other agents or 17:17:01<br>14 insurrection, rebellion, revolution, usurped 17:17:05<br>15 power or action taken by the governmental 17:17:09<br>16 authority in hindering or defending against 17:17:12<br>17 any of these. Such loss or damage is 17:17:15<br>18 excluded regardless of any other cause or 17:17:16<br>19 event that contributes concurrently in any 17:17:18<br>20 sequence to the loss." 17:17:20<br>21 Number 4, "Any weapon of war 17:17:22<br>22 including atomic fission or radioactive 17:17:24<br>23 force, whether in time or peace of war." And 17:17:28<br>24 then there's an ellipses and you drop down to 17:17:32<br>25 8, "Any uninsured event occurring before 17:17:35<br>Page 295<br>1 concurrently or with or happening after -- or 17:17:37<br>2 after the happening of an insured event which 17:17:42<br>3 directly or indirectly causes or in any way 17:17:44<br>4 contributes to the cause or increase of loss 17:17:48<br>5 under this policy but only with respect to 17:17:51<br>6 that portion of any such loss caused by or 17:17:52<br>7 contributed to by the uninsured event unless 17:17:56<br>8 the uninsured event would not have been a 17:18:00<br>9 factor had the insured event never occurred. 17:18:03<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 295<br><br>10 Q. Does it say had such insured event ever 17:18:06<br>11 occurred? 17:18:10<br>12 A. Yes, sorry. 17:18:10<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 295 | Plaintiff's Objections:<br>Pages 294:3- - 297:23<br>MIL 2; F.R.E. 402-403<br>For the reasons stated in<br>MIL No. 2, Defendant<br>cannot defend against<br>bad faith based on<br>Exclusions 3-4 because<br>the denial letter did not<br>explain that either was<br>the basis for denying<br>coverage.<br><br>Defendant's Response:<br><br>"MIL" not clear<br>objection; ASIC 's<br>understanding and basis<br>for claim decision is<br>relevant to<br>reasonableness of<br>decision, defense of<br>"bad faith", and<br>damages sought. The<br>Witness' understanding<br>of facts is relevant to<br>reasonableness of claim<br>decision, defense of<br>"bad faith" allegation<br>and damages sought;<br>relevant to show state of<br>mind, reasonableness,<br>and good faith claims<br>handling on part of<br>ASIC; ASIC did not<br>have 9th Circuit opinion<br>to consider at the time,<br>and testimony regarding<br>the facts available to all<br>parties to form an<br>understanding in real<br>time is critical for jury<br>to consider when<br>evaluating bad faith<br>claims. Further, there is<br>no authority purporting<br>to bar all evidence of |

| Deposition Designation | Objection & Response |
|---|---|
| 24 Q. Is it your position that notwithstanding the 17:18:42<br>25 fact that there is no discussion of those sub 17:18:47<br><br>Page 296<br>1 parts that you were in fact intending to 17:18:49<br>2 convey that the coverage was being denied on 17:18:51<br>3 the basis of application of subparts 3 and 4? 17:18:54<br>4 A. That it could be. 17:18:59<br>5 Q. Okay. I'm not asking if it could be I'm 17:19:00<br>6 asking were you? 17:19:03<br>7 A. Well, so when you look at -- at the war 17:19:03<br>8 exclusion so it could be war or in the 17:19:10<br>9 alternative if it's not war are if it's a war 17:19:13<br>10 like action it's covered or in the 17:19:17<br>11 alternative if you don't think it's a war 17:19:19<br>12 like action it could still be an insurrection 17:19:21<br>13 which is when one -- one -- part of the 17:19:24<br>14 population rises up against the country, so 17:19:27<br>15 in fact if you are saying Gaza is actually 17:19:31<br>16 part of Israel and is not separate and apart 17:19:34<br>17 as part of -- part of Palestine, then that 17:19:36<br>18 could be an insurrection and certainly that 17:19:42<br>19 there are weapons of war that what was used 17:19:44<br>20 were weapons of war. 17:19:47<br>21 Q. Ms. Johnson my question to you is were you, 17:19:49<br>22 on behalf of Atlantic, denying the claim on 17:19:54<br>23 the basis of inter alia subpart 3? 17:19:58<br>24 A. I was putting them on notice that any one of 17:20:04<br>25 those exclusions could apply to the 17:20:07<br><br><br>Page 297<br>1 situation. 17:20:09<br>2 Q. Did you feel in writing this coverage 17:20:09<br>3 determination letter that if you felt that 17:20:11<br>4 subpart 3 applied as to insurrection 17:20:13<br>5 rebellion that you needed to discuss it in 17:20:16<br>6 the letter itself? 17:20:20<br>7 A. Not necessarily. 17:20:21<br>8 Q. Were you on behalf of Atlantic denying the 17:20:22<br>9 claim on the basis of subpart 4 any weapon of 17:20:28<br>10 war including atomic fission or radio active 17:20:33<br>11 force? 17:20:36<br>12 A. Well it's an exclusion -- portion of the 17:20:36<br>13 exclusion that could apply because there were 17:20:39<br>14 weapons of war that were used. 17:20:42<br>15 Q. Were you on behalf of Atlantic denying the 17:20:44<br>16 claim on the basis of inter alia subpart 4? 17:20:46<br>17 A. That was one of the basis we looked at yes. 17:20:52<br>18 Q. Were you actually denying the claim separate 17:20:54<br>19 and apart from whether you looked at it were 17:20:57 | facts or data considered in a claims decision that was not specifically cited in the claim denial letter.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Pages 297:8-14<br>Objection stated above re MIL No. 2 and also non-responsive and an improper opinion that contradicts the Court's order. F.R.E. 403, 701.<br><br>Defendant's Response:<br>ASIC 's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and |

| Deposition Designation | Objection & Response |
|---|---|
| 20 you conveying a digs had been made to deny 17:21:00<br>21 the claim on the basis of subpart 4? 17:21:03<br>22 A. That's why it's included in the policy 17:21:06<br>23 language. 17:21:08<br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br><br><br><br><br><br><br>Page 350<br><br>25 Q. Did you write the letter? 18:34:47<br><br>Page 351<br><br>1 A. I did. 18:34:48<br>2 Q. When you had written the letter on 18:34:49<br>3 September 19th, did you send it to -- to me? 18:34:53<br>4 A. That was certainly my intent. I think I 18:34:56<br>5 actually did, yes. 18:34:58<br>6 Q. Huh. Do you have -- did you go back and 18:35:01<br>7 check to see whether you had any record of 18:35:07<br>8 having sent it to anyone other than 18:35:10<br>9 Ms. Weiss? 18:35:11<br>10 A. No. At the time this was brought to my 18:35:12<br>11 attention, it was not in a period that I 18:35:15<br>12 could review that, so I just sent it along. 18:35:18<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 351<br>13 Q. What work did you, if any, in order to 18:35:40<br>14 develop the analysis that's set forth in this 18:35:43<br>15 letter? 18:35:45<br>16 A. I reviewed your letter, I looked at the case 18:35:46<br>17 law that you included in your letter, I -- 18:35:51<br>18 that the war was ongoing, so I continued to 18:35:58<br>19 stay apprised of what had happened, I -- I 18:36:02<br>20 kept myself apprised of what had happened 18:36:07<br>21 through August, and that the -- these 18:36:10<br>22 specific facts that are contained in the 18:36:15<br>23 third paragraph of the letter that says that, 18:36:20<br>24 "During the conflict which extended until 18:36:23<br>25 August 26th, 2014, 2,143 Palestinians and 69 18:36:25 | helpful to determining a fact in issue and admissible under 701. ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 352<br>1 Israelis were killed, Israel struck 500" -- 18:36:34<br>2 "5,283 targets in Gaza, Hamas fired 4,564 18:36:35<br>3 rockets into Israel and more than 50,000 18:36:41<br>4 thousand buildings in Gaza were damaged or 18:36:43<br>5 destroyed," that's information that I 18:36:46<br>6 gathered after -- after the war had come to 18:36:49<br>7 its conclusion. 18:36:55<br>8 Q. Is it your position or was it your position 18:36:56<br>9 in September of 2014 that the size and scope 18:36:58<br>10 of the hostilities was a factor in 18:37:01<br>11 determining whether or not something 18:37:08<br>12 constituted a war? 18:37:10<br><br>15 THE WITNESS: Well, I think that 18:37:15<br>16 the fact that so much damage was done 18:37:16<br>17 certainly supports the idea that it was a 18:37:18<br>18 war. It is not the only factors to be 18:37:20<br>19 considered, however. 18:37:24 | |

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Johnson Vol 2 May 9, 2017<br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer. However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.**<br><br><br>Page 372<br><br>23 BY MS. REED: 10:05:06<br>24 Q. Good morning, Ms. Johnson. 10:05:07<br>25 A. Good morning. 10:05:09<br><br>Page 373<br><br>1 Q. Would you please state your full name for the<br>2 record. 10:05:12<br>3 A. Pamela Ann Johnson. 10:05:13<br>4 Q. Ms. Johnson, by whom were you employed in<br>5 July of 2014? 10:05:17<br>6 A. I was employed by OneBeacon, also known as<br>7 Atlantic Specialty Insurance Group. 10:05:21<br>8 Q. What was your title or position at that time?<br>10:05:23<br>9 A. I was the claims lead for the entertainment<br>10:05:26<br>10 group. The internal designation is second 10:05:28<br>11 vice-president. 10:05:33<br>12 Q. In what position, what were your job duties?<br>10:05:35<br>13 A. At that period of time I supervised other 10:05:37<br>14 claim handlers in the OneBeacon entertainment<br>10:05:39<br>15 claim group. I also interacted with brokers, 10:05:43<br>16 conducted trainings, et cetera. 10:05:47<br>17 Q. In the summer of 2014, how long had you been<br>10:05:50<br>18 employed by OneBeacon? 10:05:55<br>19 A. I joined OneBeacon in March of 2012. 10:05:56<br>20 Q. Were you recruited to work at OneBeacon?<br>10:05:59<br>21 A. I was, yes. 10:06:03<br>22 Q. Can you tell me what went into that process?<br>10:06:04<br>23 A. Well, they were looking for someone to be the<br>10:06:07<br>24 entertainment claim lead. And Sean Duffy, 10:06:12<br>25 who was the head of claim, got a 10:06:15<br><br>Page 374 | Plaintiffs object to Defendant's designations as follows: |

| Deposition Designation | Objection & Response |
|---|---|
| 1 recommendation from my former supervisor, 10:06:17<br>2 Aaron Latto, and Aaron recommended me for the 10:06:21<br>3 job. Sean asked Judy Lamble, who had been 10:06:27<br>4 one of my former coworkers, to approach me 10:06:28<br>5 and see if I was interested. I came in, I 10:06:29<br>6 interviewed with a wide variety of people, 10:06:31<br>7 and they subsequently hired me. 10:06:33<br>8 Q. What was the first position you held when you 10:06:36<br>9 took employment at OneBeacon? 10:06:38<br>10 A. I was always a second vice-president and a 10:06:39<br>11 claim lead. 10:06:42<br>12 Q. Did your job duties change over time? 10:06:42<br>13 A. Yes. When I was initially hired, I was hired 10:06:46<br>14 to handle high-profile claims or complex 10:06:49<br>15 claims and mass torts, that type of thing for 10:06:51<br>16 the entertainment group, and also to be the 10:06:54<br>17 face of OneBeacon entertainment and 10:06:56<br>18 interfacing with brokers. 10:06:59<br>19 After I had been there for about a 10:07:01<br>20 year, they reorganized the claim group and 10:07:02<br>21 asked me to become the manager of other claim 10:07:07<br>22 handlers in addition to handling some claims 10:07:09<br>23 of my own. 10:07:11<br>24 Q. By the summer of 2014, which claim division 10:07:12<br>25 or group did you oversee? 10:07:15<br><br>Page 375<br><br>1 A. The entertainment claim group. 10:07:18<br>2 Q. In the summer of 2014, did you handle 10:07:20<br>3 entertainment claims directly? 10:07:24<br>4 A. Some, yes. 10:07:25<br>5 Q. What types? 10:07:25<br>6 A. Mass torts, in other words, if there was an 10:07:28<br>7 incident for one of our entertainment clients 10:07:30<br>8 that resulted in several people being 10:07:33<br>9 injured, more than one. I would also handle 10:07:36<br>10 some complex claims involving the production 10:07:43<br>11 policies. 10:07:43<br>12 For example, if a -- if a production 10:07:44<br>13 company or network wanted to abandon a show, 10:07:50<br>14 that would be something that I would 10:07:50<br>15 investigate and handle personally. Sometimes | |

| Deposition Designation | Objection & Response |
|---|---|
| 10:07:51<br>16 there would be some kind of other complex<br>17 claims, defamation claims, that type of 10:07:59<br>18 thing. If it was for a very high-profile 10:08:01<br>19 person, then that's something that I would 10:08:04<br>20 handle, a disgrace claim. 10:08:05<br>21 Q. In the summer of 2014, did you supervise<br>22 others who were handling claims? 10:08:09<br>23 A. I did. 10:08:12<br>24 Q. How many people were reported to you at that 10:08:12<br>25 time? 10:08:14<br><br>Page 376<br><br>1 A. It was -- I think there were six. It was six 10:08:14<br>2 or seven. I don't recall exactly. 10:08:17<br>3 Q. Did Danny Gutterman report to you? 10:08:19<br>4 A. He did. 10:08:20<br>5 Q. What was his position at that time? 10:08:21<br>6 A. Danny Gutterman was a claim handler for the 10:08:22<br>7 OneBeacon entertainment group, and he handled 10:08:25<br>8 exclusive first-party claims for our 10:08:28<br>9 entertainment clients under production 10:08:32<br>10 policies. 10:08:34<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 376<br><br>11 Q. When you refer to first-party claims, what 10:08:34<br>12 does that mean, please, ma'am? 10:08:36<br>13 A. In other words, if it is -- if the insured, 10:08:38<br>14 which is, you know, a production company, a 10:08:40<br>15 network, et cetera, if they bring a claim 10:08:44<br>16 under their production policy, their 10:08:46<br>17 first-party coverage relating to a specific 10:08:48<br>18 production if it has to shut down, if a cast 10:08:52<br>19 member gets injured and creates a situation 10:08:54<br>20 in which they need to shut down, if there's 10:08:57<br>21 bad weather that causes the production to 10:09:01<br>22 shut down or damage to the set, that's the 10:09:03<br>23 kind of claim that he would handle. 10:09:05<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 376 | |

| Deposition Designation | Objection & Response |
|---|---|
| 24 Q. By the summer of 2014, how long had you 10:09:07<br>25 worked with Mr. Gutterman? 10:09:09<br><br>Page 377<br><br>1 A. About a year. 10:09:11<br>2 Q. Did you work with Mr. Gutterman on a 10:09:14<br>3 consistent basis? 10:09:16<br>4 A. I talked to him almost every day. 10:09:17<br>5 Q. Were you familiar with his background at that 10:09:19<br>6 time? 10:09:23<br>7 A. I was. 10:09:23<br>8 Q. What in particular about his background was 10:09:24<br>9 useful to his position at OneBeacon? 10:09:27<br>10 A. Well, the one thing that was very helpful 10:09:28<br>11 about Danny is that he had actually worked in 10:09:31<br>12 production himself. He had been a production 10:09:33<br>13 assistant on a few TV shows, and as a result, 10:09:36<br>14 he understood how the production world 10:09:38<br>15 worked, he understood how some of the -- the 10:09:40<br>16 contracts worked in terms of, you know, who 10:09:43<br>17 was a -- who had cast coverage on an A level, 10:09:47<br>18 B level, C level. 10:09:49<br>19 Q. Were you familiar by that time with his level 10:09:50<br>20 of experience in claims and his abilities? 10:09:53<br>21 A. Yes, I was. 10:09:54<br>22 Q. By the summer of 2014, how many years of work 10:09:55<br>23 experience did you have working directly for 10:10:04<br>24 an insurance company in total? 10:10:05<br>25 A. Working for an insurance company, I started<br><br>Page 378<br><br>1 working for an insurance company in 2005, so 10:10:13<br>2 approximately seven years. 10:10:17<br>3 Q. 2005 to 2014? 10:10:19<br>4 A. Oh. I'm sorry, nine years. I'm not great at | |

| Deposition Designation | Objection & Response |
|---|---|
| 5 math. 10:10:25<br>6 Q. And how many years of that experience had 10:10:25<br>7 handled -- had been handling entertainment 10:10:27<br>8 claims, please, ma'am? 10:10:30<br>9 A. About seven. 10:10:31<br>10 Q. Now, separate and apart from your work<br>11 history being employed directly by insurance 10:10:35<br>12 companies, did you have prior professional 10:10:39<br>13 experience that involved handling insurance<br>14 matters? 10:10:44<br>15 A. Yes, I had. 10:10:44<br>16 Q. What was that prior professional experience? 10:10:45<br>17 A. Well, I had been in private practice for 10:10:48<br>18 about 13 years before going in-house for an 10:10:51<br>19 insurance company. And in the course of 10:10:53<br>20 being in private practice, I had handled 10:10:55<br>21 coverage matters for insurance companies, I 10:10:59<br>22 had defended insureds under insurance 10:11:01<br>23 policies, and I had also sued insurance 10:11:04<br>24 companies on behalf of their policyholders. 10:11:07<br>25 Q. And when you refer to, "Private practice," 10:11:10<br><br>Page 379<br><br>1 that was in private practice as an attorney? 10:11:12<br>2 A. That's correct. 10:11:14<br>3 Q. Were you working for law firms during that 10:11:15<br>4 time? 10:11:17<br>5 A. I was. 10:11:17<br>6 Q. By 2014, turning back to your experience in 10:11:22<br>7 the insurance industry, approximately how 10:11:27<br>8 many claims had you been involved in over the 10:11:30<br>9 years either directly as a handler or as a 10:11:31<br>10 supervisor? 10:11:35<br>11 A. Oh, hundreds. 10:11:35<br>12 Q. What degrees do you hold, please, ma'am? 10:11:37<br>13 A. I have a bachelor's degree in psychology, and 10:11:40<br>14 I hold a Juris Doctor, which is the degree 10:11:44<br>15 you get when you graduate from law school. 10:11:48<br>16 Q. What year did you earn your Juris Doctor? 10:11:51<br>17 A. I graduated from law school in 1992, so my 10:11:54 | Plaintiff's Objections:<br>Page 379:6-25<br>F.R.E. 403.<br>Ms. Johnson was not acting as a lawyer in adjusting the claim here. Permitting Defendant to offer evidence of her legal training is unfairly prejudicial and would risk the jury construing her as an expert on legal issues or offering an improper legal opinion, which she may not do.<br><br>Defendant's Response:<br><br>Witness background is relevant to jury's assessment of credibility and knowledge regarding issues in dispute; not prejudicial to Plaintiffs but would be prejudicial to Defendant if not allowed. |

| Deposition Designation | Objection & Response |
|---|---|
| 18 Juris Doctor is 1992. 10:11:58<br>19 Q. Does your legal education help you perform 10:12:00<br>20 your duties working on insurance claims? 10:12:03<br>21 A. Certainly. 10:12:05<br>22 Q. And how is that? 10:12:05<br>23 A. Well, it informs how I conduct an analysis 10:12:06<br>24 and it helps me in my investigative skills 10:12:09<br>25 just as, you know, I would have to 10:12:12<br><br>Page 380<br><br>1 investigate cases when I was in private 10:12:13<br>2 practice. It certainly, you know, helps to 10:12:14<br>3 have that kind of analytical mind when you're 10:12:17<br>4 both investigating and interpreting insurance 10:12:22<br>5 policies. An insurance policy is a contract, 10:12:24<br>6 and, obviously, I know about contract law. 10:12:27<br>7 Q. Do you hold any licenses? 10:12:29<br>8 A. Yes, I hold many licenses to -- to be a 10:12:30<br>9 claims adjuster. There are several states 10:12:35<br>10 that actually require that you have a 10:12:37<br>11 license, and I hold a license, an adjuster's 10:12:40<br>12 license in every jurisdiction in which it is 10:12:43<br>13 required. 10:12:46<br>14 Q. Were you involved in a claim submitted by 10:12:47<br>15 NBCUniversal to OneBeacon on the production 10:12:49<br>16 called Dig? 10:12:52<br>17 A. Yes, I was. 10:12:53<br>18 Q. What was your understanding of what Dig was? 10:12:54<br>19 A. It was a scripted television show that was 10:12:57<br>20 being shot primarily in Israel. 10:13:00<br>21 Q. What involvement did you have with the Dig 10:13:02<br>22 claim? 10:13:04<br>23 A. Danny Gutterman received the claim and it was 10:13:06<br>24 assigned to him. And my first knowledge of 10:13:09<br>25 it came when he contacted me on a phone call 10:13:12<br><br>Page 381<br><br>1 with Andrea Garber, who was in-house at NBC, 10:13:14 | Plaintiff's Objections:<br>Page 380:1-6<br>F.R.E. 403.<br>Ms. Johnson was not acting as a lawyer in adjusting the claim here. Permitting Defendant to offer evidence of her legal training is unfairly prejudicial and would risk the jury construing her as an expert on legal issues or offering an improper legal opinion, which she may not do.<br><br>Defendant's Response:<br><br>The witness's background and ability are relevant to jury's assessment of credibility and knowledge regarding issues in dispute; not unfairly prejudicial to Plaintiffs, confusing, misleading or cumulative evidence.  Would be prejudicial to Defendant if now allowed. |

| Deposition Designation | Objection & Response |
|---|---|
| 2 and Susan Weiss, the broker at Aon for NBC, 10:13:19<br>3 when they were calling to say that they were 10:13:24<br>4 going to have to push production for a week, 10:13:26<br>5 in other words, they weren't going to go 10:13:29<br>6 forward with shooting for a week because the 10:13:30<br>7 situation on the ground in Israel had become 10:13:32<br>8 so dangerous that they thought it was a 10:13:34<br>9 danger to their personnel. 10:13:37<br>10 Q. After that call, did you play a direct role 10:13:38<br>11 in the handling of the claim? 10:13:40<br>12 A. I did. Danny and I worked collaboratively 10:13:41<br>13 together to investigate the claim and to 10:13:44<br>14 reach a coverage determination. The ultimate 10:13:46<br>15 coverage determination was made by me. 10:13:49<br>16 Q. Was this the type of complex claim that you 10:13:51<br>17 would work on directly? 10:13:54<br>18 A. Certainly in some circumstances. 10:13:55<br>19 Q. And in this circumstance, how do you describe 10:13:58<br>20 your overall role? 10:14:02<br>21 A. Well, I was supervising Danny and I was also 10:14:03<br>22 working closely with him to be able to 10:14:06<br>23 evaluate the exclusions in the policy, the 10:14:09<br>24 coverage in the policy. And then, of course, 10:14:11<br>25 I conducted legal research with regard to the 10:14:13<br><br>Page 382<br><br>1 policy -- the policy provisions to see how 10:14:16<br>2 other courts had interpreted the language 10:14:20<br>3 and -- and that sort of thing. 10:14:22<br>4 Q. Did you also participate in investigation of 10:14:25<br>5 the facts? 10:14:28<br>6 A. Absolutely. I investigated the facts very 10:14:28<br>7 thoroughly. And Danny also participated in 10:14:32<br>8 that. 10:14:34<br><br>Page 383<br><br>1 Q. In the summer of 2014, was there an 10:15:12<br>2 entertainment policy in place with 10:15:15<br>3 NBCUniversal? 10:15:19 | |

| Deposition Designation | Objection & Response |
|---|---|
| 4 A. There was. 10:15:19 | |

PLAINTIFFS' 106 COUNTER-DESIGNATION:

Page 383

5 Q. And were you familiar with that policy? 10:15:20
6 A. I don't know that I had specifically reviewed 10:15:21
7 that particular policy. I was certainly 10:15:26
8 familiar with their -- their previous 10:15:29
9 policies -- 10:15:31
10 Q. Do you know -- 10:15:33
11 A. -- since I had dealt with those before. 10:15:34
12 Q. Do you know about how long that NBCUniversal 10:15:37
13 had been an insured of OneBeacon? 10:15:39
14 A. I'm told that it was since 2010. 10:15:41

END PLAINTIFFS' 106 COUNTER-DESIGNATION

Page 383

15 Q. Let me hand you what was previously marked in 10:15:45
16 the case as Defendant's Exhibit 38, please, 10:15:47
17 ma'am. 10:15:50
18 A. Yes, I see the exhibit. 10:15:56
19 Q. Can you identify Exhibit 38 as a true and 10:15:57
20 correct copy of the insurance policy issued 10:16:00
21 to NBCUniversal Media, LLC, for the policy 10:16:03
22 period January 1, 2014 to June 30th, 2015? 10:16:07
23 A. Yes, it appears to be so. 10:16:26
24 Q. By the summer of 2014, were you familiar with 10:16:28
25 NBCUniversal and its business? 10:16:31

Page 384

1 A. Yes, I was. 10:16:33
2 Q. And what did you know about NBCUniversal and 10:16:34
3 its business? 10:16:37
4 A. Well, I knew that they were a production 10:16:39
5 company as well as, you know, that they had 10:16:41
6 formed a network, and that a lot of their 10:16:46
7 productions were done in-house. There are 10:16:48
8 other networks that actually outsource a lot 10:16:50
9 of the productions, but NBC, especially with 10:16:53
10 their scripted -- their scripted television 10:16:56
11 shows, did those in-house. 10:17:00

| Deposition Designation | Objection & Response |
|---|---|
| 12 Q. And directing your attention back to 10:17:02<br>13 Defendant's Exhibit 38, please, ma'am, is 10:17:06<br>14 there a general title or way that you refer 10:17:08<br>15 to this type of policy within OneBeacon? 10:17:10<br>16 A. Yes. It's a motion picture television 10:17:13<br>17 producer's portfolio. 10:17:16<br>18 Q. And was there a short -- 10:17:17<br>19 A. MPTP. 10:17:20<br>20 Q. -- shortcut name that you used for it? 10:17:21<br>21 A. Yeah, it's a production policy. 10:17:24<br>22 Q. Did you have particular contacts with whom 10:17:25<br>23 you worked within NBCUniversal? 10:17:29<br>24 A. Well, in the entertainment industry, 10:17:33<br>25 sometimes you work directly with the insured, 10:17:35<br><br>Page 385<br><br>1 but more often you work directly with the 10:17:37<br>2 broker, at least initially when a claim is 10:17:39<br>3 first submitted and the coverage 10:17:43<br>4 determination. And in this case I had 10:17:45<br>5 primarily worked with Andrea Garber and 10:17:47<br><br>7 Andrea Garber at that time actually worked 10:17:53<br>8 for Aon, and Susan Weiss was her supervisor. 10:17:56<br>9 Q. And subsequent to that, did their positions 10:17:59<br>10 change? 10:18:02<br>11 A. Well, Andrea went in-house for risk control 10:18:03<br>12 for NBC, and Susan Weiss remained as the 10:18:06<br>13 broker at Aon for NBC. 10:18:09<br>14 Q. Subsequent to that development, did 10:18:12<br>15 Ms. Garber become your contact within 10:18:14<br>16 NBCUniversal and Ms. Weiss become your 10:18:17<br>17 contact within Aon? 10:18:19<br>18 A. Yes, that's correct. 10:18:20<br>19 Q. Can you explain what the role of the broker 10:18:21<br>20 is in this type of policy? 10:18:25<br>21 A. Well, unlike other areas of insurance, 10:18:27<br>22 the broker plays a very key role in 10:18:31<br>23 entertainment -- in entertainment insurance. 10:18:34<br>24 There are only a handful of brokers who 10:18:38<br>25 handle, I would say, 90 percent of the 10:18:40<br><br>Page 386<br><br>1 entertainment business in the United States. 10:18:42 | |

| Deposition Designation | Objection & Response |
|---|---|
| 2 And the brokers act as an advocate for their 10:18:44<br>3 insureds and they play a vital role in the 10:18:47<br>4 investigation as well. 10:18:51<br>5 So, for example, if a broker submits 10:18:52<br>6 a claim to me, I don't call the insured 10:18:54<br>7 directly, I call the broker and the broker 10:18:56<br>8 supplies information. And if I say I need to 10:18:58<br>9 meet with the insured or talk to the insured 10:19:00<br>10 to gather information about the claim, at 10:19:03<br>11 least initially the broker will be involved 10:19:06<br>12 until at least there's a coverage 10:19:09<br>13 determination. 10:19:10<br>14 If it's determined that they -- the 10:19:11<br>15 claim is actually covered then frequently we 10:19:12<br>16 will deal specifically with the insured after 10:19:15<br>17 that unless there is some conflict between 10:19:18<br>18 what the insured thinks they should be paid 10:19:20<br>19 and what the insurer thinks they should be 10:19:22<br>20 paid, in which case the broker then gets 10:19:24<br>21 involved again. 10:19:26<br>22 Q. And on the NBCUniversal relationship in 10:19:29<br>23 particular, were you dealing with the broker? 10:19:33<br>24 A. Oh, yes, always. 10:19:37<br>25 Q. When the Dig claim was submitted, did you 10:19:40<br><br>Page 387<br><br>1 make a point to review the insurance policy 10:19:43<br>2 that was in place? 10:19:45<br>3 A. Yes, I did. 10:19:47<br>4 Q. And is Exhibit 38 the document that you 10:19:49<br>5 reviewed? 10:19:52<br>6 A. Yes, it is. 10:19:53<br>7 Q. How did you go about your review of the 10:19:53<br>8 policy? 10:19:57<br>9 A. When I get a claim, I start at the beginning 10:19:58<br>10 of the policy. And in this case I would look 10:20:01<br>11 at -- okay, so there -- there's a list of the 10:20:03<br>12 kinds of coverage that is involved in the 10:20:06<br>13 policy, and I want to look at what the -- 10:20:08<br>14 the -- the actual limits are on the policy. 10:20:11<br>15 And then I turn to the form list. 10:20:14<br>16 The form list tells me all of the forms that 10:20:17<br>17 are contained within the policy. In this 10:20:21<br>18 particular case, I would look at the common 10:20:23<br>19 policy provisions. I would look at the 10:20:25<br>20 motion picture portfolio general conditions, 10:20:27<br>21 because those apply to all of the different 10:20:29 | |

| Deposition Designation | Objection & Response |
|---|---|
| 22 coverages that are contained in the policy. 10:20:31<br>23 And then I would go through the 10:20:35<br>24 different forms. In this case there are a 10:20:37<br>25 variety of different forms. There's cast 10:20:39<br><br>Page 388<br><br>1 coverage. That wouldn't apply in this case, 10:20:42<br>2 because this didn't involve injury to a cast 10:20:43<br>3 member. There's broad form disgrace. Again, 10:20:48<br>4 there was no disgrace claim, so I wouldn't 10:20:51<br>5 look at that necessarily. Negative film and 10:20:53<br>6 faulty stock, nothing had gone wrong with the 10:20:53<br>7 film, so that's not applicable. 10:20:55<br>8 Extra expense, extra expense is what 10:20:57<br>9 you pay when a production company has to shut 10:20:59<br>10 down production, so that was clearly the 10:21:02<br>11 portion of the policy that would be relevant 10:21:05<br>12 in this situation. 10:21:07<br>13 Then there are a variety of other 10:21:08<br>14 types of coverage, animal/property, 10:21:11<br>15 property/animal, third-party property damage, 10:21:13<br>16 and a variety of other kinds of coverages, 10:21:17<br>17 but extra expense was the one at play here. 10:21:20<br>18 Q. Do you begin your review broadly by looking 10:21:23<br>19 at the policy as a whole? 10:21:26<br>20 A. Yes, I do. 10:21:27<br>21 Q. And do you have a personal practice in regard 10:21:28<br>22 to how you go about looking at the policy? 10:21:29<br>23 A. Yes, I think I just described it. I look at 10:21:31<br>24 the dec page, the declarations page that 10:21:35<br>25 describes what the limits are, and then I 10:21:37<br><br>Page 389<br><br>1 looked at the form sheet. I determine what 10:21:39<br>2 the relevant forms are that need to be 10:21:42<br>3 investigated or reviewed pursuant to the -- 10:21:44<br>4 the -- what I know about the claim at that 10:21:49<br>5 time, and then I review those portions of the 10:21:51<br>6 policy. 10:21:53<br>7 Q. And why is the review of the policy as a 10:21:54<br>8 whole important? 10:21:56<br>9 A. Well, you have to review the policy as a 10:21:58<br>10 whole because there are different portions of 10:22:01<br>11 the policy that might apply to a claim. And 10:22:03<br>12 so if you only zero in on one small part, you | |

| Deposition Designation | Objection & Response |
|---|---|
| 10:22:05<br>13 could be missing other -- other portions of 10:22:09<br>14 the contract that are applicable to the 10:22:12<br>15 situation. 10:22:13<br>16 Q. As you progressed in your review of the Dig 10:22:15<br>17 claim, did you determine that there were 10:22:17<br>18 certain parts of Exhibit 38 that were most 10:22:19<br>19 relevant to your work? 10:22:21<br>20 A. Yes, I did. 10:22:22<br>21 Q. What were those parts? 10:22:23<br>22 A. The general conditions page and the extra 10:22:24<br>23 expense form. 10:22:28<br>24 Q. How did you first learn of the existence of 10:22:32<br>25 the claim on the show Dig? 10:22:35<br>TSG Reporting - Worldwide 877-702-9580<br>8 (Pages 390 to 393)<br><br>Page 390<br><br>1 A. Danny Gutterman contacted me, and Susan Weiss 10:22:37<br>2 and Andrea Garber were also on the telephone, 10:22:41<br>3 and they discussed what was happening on the 10:22:44<br>4 ground in Israel. 10:22:47<br>5 Q. Did Ms. Garber and Ms. Weiss share factual 10:22:47<br>6 information with you in that call? 10:22:52<br>7 A. Well, what they told me was that they were -- 10:22:53<br>8 that there was heavy rocket fire coming from 10:22:58<br>9 Gaza into Israel, and that the amount of 10:23:01<br>10 rocket fire that was occurring made it 10:23:03<br>11 dangerous for them to try to continue to film 10:23:06<br>12 in Tel Aviv and Jerusalem, which were their 10:23:10<br>13 two filming locations. 10:23:13<br>14 Q. Can you recall any other information they 10:23:15<br>15 shared with you about the safety situation? 10:23:17<br>16 A. Well, they had been informed by their head of 10:23:19<br>17 security that they could no longer guarantee 10:23:22<br>18 the safety of the casting crew. 10:23:25<br>19 Q. Did you seek information from Ms. Weiss and 10:23:27<br>20 Ms. Garber in that call? 10:23:29 | |

| Deposition Designation | Objection & Response |
|---|---|
| 21 A. Absolutely. I mean, the first thing we 10:23:30<br>22 wanted to make sure is that everyone was 10:23:33<br>23 safe. That's the primary concern. So I 10:23:34<br>24 wanted to know, you know, who was still on 10:23:36<br>25 the ground, had they gotten them out. 10:23:38<br><br>Page 391<br><br>1 And in this particular case, they 10:23:42<br>2 were actually on hiatus, which is usual 10:23:44<br>3 between a pilot and primary shooting before a 10:23:46<br>4 season. And so most of the actors and the 10:23:49<br>5 crew were not located there. 10:23:52<br>6 There was, I think, some local crew 10:23:53<br>7 members that actually lived in Israel who 10:23:55<br>8 were still present, but the production was -- 10:23:57<br>9 was not trying to get them out of Israel 10:24:01<br>10 since that's where they lived. 10:24:03<br>11 Q. Did you discuss any issues about timing as 10:24:09<br>12 part of that call? 10:24:12<br>13 A. Well, one of the things that -- that -- you 10:24:12<br>14 know, in every kind of production situation 10:24:13<br>15 the insured wants to know as quickly as 10:24:15<br>16 humanly possible whether or not their claim 10:24:17<br>17 is covered, and that's understandable, 10:24:20<br>18 because they want to know whether or not 10:24:22<br>19 they're going to have insurance money to make 10:24:24<br>20 the determination about what they do next or 10:24:26<br>21 whether or not they're only relying on their 10:24:28<br>22 own funds. 10:24:31<br>23 So that's a perfectly understandable 10:24:31<br>24 need of theirs, to get a decision as quickly 10:24:35<br>25 as they possibly can. So Susan and Andrea 10:24:37<br><br>Page 392<br><br>1 both made us aware that they -- they wanted a 10:24:41<br>2 quick answer, but we also all agreed that 10:24:43<br>3 while it was certainly prudent for them to 10:24:47<br>4 push for a week, we were hoping that there 10:24:49<br>5 would be deescalation in the hostilities and 10:24:52<br>6 that they would be able to get up and running 10:24:56<br>7 again. 10:24:58<br>8 Q. Now, as a representative of the insurance 10:24:58<br>9 company, do you make any suggestions about 10:25:01 | |

| Deposition Designation | Objection & Response |
|---|---|
| 10 production decisions? 10:25:03<br>11 A. No, absolutely not. That's not my job. 10:25:05<br>12 Creative decisions are left to the -- to the 10:25:07<br>13 client, to the insured. It would be -- it 10:25:09<br>14 wouldn't be appropriate for me to be talking 10:25:13<br>15 to them about creative decisions. 10:25:15<br>16 Q. As a part of this initial conversation, did 10:25:16<br>17 you discuss your next steps with Ms. Weiss 10:25:21<br>18 and Ms. Garber? 10:25:24<br>19 A. Well, we all agreed that we wanted to have 10:25:25<br>20 another phone call very soon, and I think we 10:25:28<br>21 scheduled one -- I think the first call was 10:25:30<br>22 on a Tuesday, we scheduled another call for 10:25:32<br>23 Friday to see if there had been some 10:25:34<br>24 deescalation in the hostilities. 10:25:37<br>25 10:25:41<br><br>Page 393<br><br>1 (Whereupon, Exhibit 232 was 10:25:41<br>2 marked for identification.) 10:25:42<br>3 BY MS. REED: 10:25:42<br>4 Q. Let me hand you what's been marked as 10:25:42<br>5 Exhibit 232. Can you identify Exhibit 232 as 10:25:45<br>6 an e-mail string beginning with the earliest 10:25:56<br>7 e-mail on July 14th and running through 10:26:01<br>8 July 15th on an item that was cc'd to you? 10:26:04<br>9 A. Yes, that is exactly what this is. It looks 10:26:08<br>10 like this is also the first written notice 10:26:12<br>11 that -- that OneBeacon had of the claim, of 10:26:14<br>12 the Dig claim, and then there are some 10:26:18<br>13 subsequent e-mails, an e-mail from Danny to 10:26:20<br>14 Peter. 10:26:23<br>15 Q. Let me direct your attention -- 10:26:24<br>16 A. Peter Williams. 10:26:26<br>17 Q. -- if I can, ma'am, to the second page of 10:26:27<br>18 this exhibit. In the middle of the page do 10:26:31<br>19 you see an e-mail from Susan Weiss dated 10:26:34<br>20 July 15th, 2014, to Michael J. Arevalo? 10:26:36<br>21 A. I do. 10:26:40<br>22 Q. And is this what you're referring to as the 10:26:41<br>23 submission of the claim? 10:26:44<br>24 A. Yes. 10:26:44<br>25 Q. At some point in time during your involvement 10:26:47<br><br>Page 394 | |

| Deposition Designation | Objection & Response |
|---|---|
| 1 in the claim, did you review this? 10:26:49<br>2 A. I did, yes. 10:26:51<br>3 Q. Was this different information than what 10:26:53<br>4 Ms. Weiss or Ms. Garber had provided? 10:26:56<br>5 A. Well, there was more information, because 10:26:59<br>6 this -- the initial e-mail that Susan sent 10:27:01<br>7 also included an e-mail that Andrea had 10:27:05<br>8 received from their security person, so it 10:27:08<br>9 included information that he had given them 10:27:14<br>10 with regard to the hostilities that were 10:27:17<br>11 occurring in Israel and the fact that he 10:27:19<br>12 didn't think that the situation was likely to 10:27:23<br>13 change and that that increased the level of 10:27:26<br>14 risk. 10:27:28<br>15 Q. Do you recall receiving any other written 10:27:29<br>16 information about reports on safety and 10:27:31<br>17 security from NBCUniversal? 10:27:35<br>18 A. No, not that I'm aware of. 10:27:39<br>19 Q. Was this the totality of written information 10:27:43<br>20 that you had to begin your investigation? 10:27:46<br>21 A. Yes. 10:27:51<br>22 Q. Would you direct your attention to the final 10:27:58<br>23 e-mail, ma'am, that's on the first page, top 10:28:00<br>24 of the page. This is from Mr. Gutterman 10:28:03<br>25 directed to Peter Williams and copied to you. 10:28:05<br><br><br><br><br><br>Page 395<br><br>1 Do you see that? 10:28:08<br>2 A. I do. 10:28:08<br>3 Q. Mr. Gutterman makes reference to a report 10:28:09<br>4 from CBS News two days ago. Do you see that? 10:28:15<br>5 A. I do, yup. 10:28:18<br>6 Q. And at some point in your involvement in this 10:28:19<br>7 claim did you review that video? 10:28:21<br>8 A. Yes, I did. 10:28:22<br>9 Q. Let me turn back to the claim being submitted 10:28:25<br>10 to OneBeacon, please, ma'am. Was an actual 10:28:28 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 assignment of the claim made? 10:28:31<br>12 A. Yes, it was assigned to Danny. 10:28:33<br>13 Q. And who worked directly on the handling of 10:28:35<br>14 the claim? 10:28:38<br>15 A. Danny worked on the handling of the claim, 10:28:38<br>16 and I also worked on the handling of the 10:28:43<br>17 claim. My supervisor, Theresa Gooley, was 10:28:45<br>18 kept in the loop with regard to what we were 10:28:49<br>19 doing in investigating the claim, and we also 10:28:50<br>20 discussed that with Peter Williams. 10:28:51<br>21 Q. So what role did you play and what role did 10:28:53<br>22 Mr. Gutterman play? 10:28:55<br>23 A. So we were collaborating, because there was a 10:28:57<br>24 very short time frame here in which to get 10:28:59<br>25 information to the insured. And because it 10:29:02<br><br>Page 396<br><br>1 was a volatile situation and changing 10:29:06<br>2 quickly, we both were doing research on what 10:29:08<br>3 exactly was happening in Israel and what had 10:29:11<br>4 been happening in Israel and how that 10:29:13<br>5 situation was developing. 10:29:17<br>6 With regard to the coverage, we were 10:29:19<br>7 both evaluating the policy, I was doing the 10:29:21<br>8 legal research that was involved in 10:29:24<br>9 interpreting the -- the provisions of the 10:29:26<br>10 policy. 10:29:30<br>11 Q. Eventually, were others at OneBeacon also 10:29:30<br>12 involved in the work on this claim? 10:29:34<br>13 A. Well, as I said, I kept Theresa Gooley, my 10:29:35<br>14 supervisor, in the loop, and I think at some 10:29:40<br>15 point she talked to Sean Duffy about this. 10:29:42<br>16 Sean Duffy is the head of claim. 10:29:46<br>17 Q. And why did you keep Ms. Gooley in the loop? 10:29:48<br>18 A. Well, NBC is a very important client of ours. 10:29:51<br>19 I knew that -- that if there were going to be 10:29:53<br>20 a denial of the claim, that they would 10:29:55<br>21 certainly want to involve her and talk to 10:29:56<br>22 her, because that is usual in entertainment 10:29:58<br>23 claims, if you deny a claim, there's going to 10:30:00<br>24 be escalation to your supervisor and they are | |

| Deposition Designation | Objection & Response |
|---|---|
| 10:30:03<br>25 going to want to talk to them, and they would 10:30:05<br><br>Page 397<br><br>1 also be wanting to talk to Peter Williams, so 10:30:07<br>2 he was also kept in the loop. 10:30:11<br>3 Q. And what role was Peter Williams playing in 10:30:13<br>4 the overall process? 10:30:15<br>5 A. He was -- he was merely a sounding board. I 10:30:16<br>6 mean, we want to keep him in the loop because 10:30:18<br>7 we know that the client is ultimately going 10:30:21<br>8 to be contacting him. Peter also has 10:30:23<br>9 extensive experience in claims himself. In 10:30:26<br>10 fact, before I held the position of claim 10:30:29<br>11 lead, he had -- he had held that position 10:30:30<br>12 before himself before he became the president 10:30:32<br>13 of OneBeacon entertainment. But as the 10:30:35<br>14 president of OneBeacon entertainment, he was 10:30:37<br>15 actually on the underwriting side, not on the 10:30:39<br>16 claims side, and he did not have the power to 10:30:41<br>17 actually make a coverage determination. 10:30:43<br>18 Q. Did you view Mr. Williams' input and 10:30:45<br>19 experience as helpful in this process? 10:30:48<br>20 A. Absolutely. 10:30:50<br>21 Q. Was it typical at OneBeacon for so many 10:30:51<br>22 different people to be involved in the claim 10:30:54<br>23 process? 10:30:56<br>24 A. Well, I mean, it depends on the kind of claim 10:30:56<br>25 it is. If it's a car accident case, no, 10:30:59<br><br>Page 398<br><br>1 probably not. If it's a high-profile 10:31:01<br>2 insured, you know, a famous celebrity or 10:31:06<br>3 something like that, then, yes, we would 10:31:11<br>4 probably contact more people just to make 10:31:13<br>5 them aware. Not that they are necessarily 10:31:14<br>6 going to have input on the claim, but they 10:31:17<br>7 should -- they should definitely know that 10:31:19<br>8 the claim exists. So it would just depend on 10:31:19<br>9 the circumstances of the claim. 10:31:22<br>10 Q. Now, you mentioned involving Ms. Gooley in 10:31:24 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 the context of a situation where a claim 10:31:26<br>12 might be denied. When this claim first came 10:31:29<br>13 in, did you anticipate that it would be 10:31:32<br>14 denied? 10:31:33<br>15 A. I had no idea if it would be denied or not. 10:31:34<br>16 Q. Did this claim require some level of analysis 10:31:39<br>17 in order to make that determination? 10:31:44<br>18 A. It actually -- yes, it involved extensive 10:31:46<br>19 analysis. 10:31:47<br>20 Q. Was Tuesday, July the 15th, the first time 10:31:50<br>21 you can recall receiving information on the 10:31:53<br>22 Dig claim? 10:31:55<br>23 A. Yes. 10:31:55<br>24 Q. And you have indicated the information you 10:31:56<br>25 personally received by telephone today; is 10:32:02<br><br>Page 399<br><br>1 that right? 10:32:06<br>2 A. That's correct. 10:32:06<br>3 Q. Did you begin an investigation that same day 10:32:07<br>4 that you received the information from the 10:32:10<br>5 insured? 10:32:12<br>6 A. Yes. Actually, it was in the evening. I 10:32:12<br>7 think that the call on -- on my time took 10:32:15<br>8 place later in the day, and so I started my 10:32:19<br>9 investigation that evening. 10:32:23<br>10 Q. What steps did you take after the phone call? 10:32:24<br>11 A. Well, the first thing I wanted to do was 10:32:27<br>12 review the policy. The second thing I wanted 10:32:29<br>13 to do was to start gathering information, the 10:32:32<br>14 actual factual investigation of the claim, in 10:32:34<br>15 other words, what was actually happening in 10:32:36<br>16 Israel, and if -- to determine whether or not 10:32:38<br>17 what is -- was happening in Israel actually 10:32:42<br>18 was deescalating or whether the situation was 10:32:46<br>19 so dangerous that the production could not 10:32:49<br>20 continue, and what the circumstances had been 10:32:53<br>21 preceding this. 10:32:55<br>22 Q. So after the call did you formulate your own 10:32:56<br>23 plan about how you were going to proceed? | |

| Deposition Designation | Objection & Response |
|---|---|
| 10:32:58<br>24 A. Well, I was going to investigate the facts, I<br>10:33:00<br>25 was going to review the coverage, I was going<br>10:33:02<br><br>Page 400<br><br>1 to analyze the coverage, which could involve<br>10:33:03<br>2 legal research, and I was going to reach a 10:33:07<br>3 determination. 10:33:10<br>4 Q. So what steps did you actually begin to take<br>10:33:10<br>5 that evening? 10:33:13<br>6 A. I started researching what was happening on<br>10:33:14<br>7 the ground in Israel. That was the primary 10:33:17<br>8 focus of my -- of my research. I don't 10:33:22<br>9 remember specifically if I looked at the 10:33:26<br>10 policy that night or if I didn't look at the 10:33:27<br>11 policy until the next day. 10:33:30<br>12 Q. About how many hours of work did you spend in<br>10:33:31<br>13 researching the factual situation? 10:33:35<br>14 A. During what period of time? 10:33:38<br>15 Q. Over the, let's call it the initial period 10:33:39<br>16 that you were involved with the claim. 10:33:42<br>17 A. Well -- 10:33:44<br>18 Q. The first few days. 10:33:45<br>19 A. Yeah, the first few days I probably spent<br>10:33:46<br>20 over 20 hours doing research. 10:33:48<br>21 Q. And that's just looking at factual 10:33:50<br>22 information? 10:33:52<br>23 A. Yes, and looking at the policy also. 10:33:52<br>24 Q. And over what period of time did you continue<br>10:33:54<br>25 the factual information research? 10:33:56<br><br>Page 401<br><br>1 A. Well, for quite a long period of time. In 10:34:00<br>2 fact, I continued to gather information until 10:34:03<br>3 after the war had ended. 10:34:05<br>4 Q. And do you recall approximately when that<br>10:34:07<br>5 was? 10:34:09<br>6 A. The war ended at the end of August 2014.<br>10:34:09<br>7 When I say, "The war," I mean the -- the war<br>10:34:12<br>8 between Hamas and Israel. 10:34:15<br>9 Q. On Exhibit 232 Mr. Gutterman made reference | Plaintiff's Objections:<br>Page 401:1-8<br>F.R.E. 402-403, 602, 701<br>Ms. Johnson should not be<br>permitted to offer an<br>improper legal opinion that<br>the conflict constituted a<br>"war" or to casually refer to<br>it as being a "war"—an<br>opinion which is, in any<br>event, contrary to the Ninth<br>Circuit's ruling. Such<br>testimony, particularly |

| Deposition Designation | Objection & Response |
|---|---|
| 10:34:22<br>10 to a CBS News clip on July 15th to you and to 10:34:25<br>11 Mr. Williams; do you see that? 10:34:30<br>12 A. I do. 10:34:31<br>13 Q. And you indicated earlier that you did review 10:34:32<br>14 this? 10:34:35<br>15 A. I did. 10:34:35<br>16 MS. REED: Let me ask the 10:34:36<br>17 technician if we can play the video at this 10:34:38<br>18 point in time. 10:34:40<br>19 For the record, I will designate 10:34:46<br>20 this as Exhibit 233. It's produced in the 10:34:47<br>21 case as ATL 4496. 10:34:52<br>22 (Whereupon, Exhibit 233 was<br>23 marked for identification.)<br>24 (Video started.)<br>25 MS. REED: That's the incorrect | when offered by a lawyer, is substantially more prejudicial than probative and risks confusing the issues and misleading the jury.<br><br>Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims Not offered for the truth of the matter asserted. 801; 807. |
| Page 402<br><br>1 one.<br>2 THE VIDEOGRAPHER: That's the one<br>3 named ATL00498.<br>4 MS. REED: I need 6.<br>5 THE VIDEOGRAPHER: The other one<br>6 doesn't have a number.<br>7 "BOB SCHIEFFER: And good morning 10:35:26 | Plaintiff's Objections:<br>Pages 402:1 – 404:5<br>MIL No. 3; F.R.E. 402-03<br>Given the Ninth Circuit's order, this video is irrelevant and substantially more prejudicial than probative for the reasons in |

| Deposition Designation | Objection & Response |
|---|---|
| 8 again. To get that news on the overnight 10:35:27<br>9 developments, we go first to Holly Williams 10:35:29<br>10 in Gaza City. Holly. 10:35:33<br>11 "HOLLY WILLIAMS: Good morning, Bob. 10:35:36<br>12 Israeli commanders clashed with Palestinian 10:35:38<br>13 militants on the coast here early this 10:35:39<br>14 morning. It's the first gun fight since this 10:35:41<br>15 escalation began, and it comes as Israel 10:35:43<br>16 considers whether to mount a ground invasion. 10:35:46<br>17 "The Israeli military says four of 10:35:49<br>18 the soldiers were lightly wounded as they 10:35:52<br>19 attacked a site used to fire long range 10:35:53<br>20 rockets in what may be the first ground 10:35:57<br>21 incursion of this conflict. 10:35:59<br>22 "The militants have launched 10:36:00<br>23 hundreds of rockets into Israel over the last 10:36:02<br>24 week. They've caused some damage and 10:36:04<br>25 injuries, but so far no Israelis have been 10:36:06<br><br>Page 403<br><br>1 killed, and that's thanks in large part to 10:36:10<br>2 Israel's Iron Dome anti-missile defense 10:36:10<br>3 system which shoots those rockets down. 10:36:14<br>4 "Now, the Palestinians have no such 10:36:16<br>5 protection, and Israel bombarded them again 10:36:20<br>6 for a fifth night last night. One air strike 10:36:22<br>7 on the home of Gaza's police chief killed 18 10:36:25<br>8 people. 10:36:28<br>9 "The Israeli military says it's 10:36:28<br>10 targeting sites used by militants, but 10:36:31<br>11 Palestinian officials say more than 150 10:36:33<br>12 people have lost their lives, and they say 10:36:36<br>13 that includes scores of civilians. 10:36:38<br>14 "The Israeli military dropped 10:36:41<br>15 leaflets from the air in northern Gaza 10:36:43<br>16 warning residents to evacuate for their own 10:36:45<br>17 safety, and today hundreds of families have 10:36:48<br>18 fled their homes and taken refuge in school 10:36:49<br>19 buildings here in Gaza City. 10:36:53<br>20 "The Israeli military, meanwhile, 10:36:55<br>21 has called up more than 30,000 reservists and 10:36:56<br>22 has amassed troops on the border adding to 10:36:59<br>23 fears of a ground invasion. 10:37:02<br>24 "And despite calls for a cease fire 10:37:03<br>25 from the UN Security Council, so far both 10:37:06 | Plaintiffs' MIL No. 3.<br><br>The video focuses on Israel's actions in Gaza in the future—not Hamas's conduct directed toward Israel.<br><br>Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005.<br><br>Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative |

| Deposition Designation | Objection & Response |
|---|---|
| | evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| Page 404 | Plaintiff's Objections: Page 404:17-405:3 |
| 1 sides have resisted international pressure to 10:37:10 | MIL No. 3; F.R.E. 402-03 Given the Ninth Circuit's |
| 2 end the violence. 10:37:12 | order, Ms. Johnson's |
| 3 "Bob. 10:37:13 | testimony about Israel |
| 4 "BOB SCHIEFFER: Holly Williams. 10:37:14 | causing casualties in Gaza |
| 5 Thank you so much, Holly, and be careful." 10:37:16 | is irrelevant and |
| 6 BY MS. REED: 10:37:20 | substantially more |
| 7 Q. Did Mr. Gutterman indicate to you in his 10:37:21 | prejudicial than probative. |
| 8 e-mail that that was a clip from two days 10:37:23 | |
| 9 before July the 15th? 10:37:26 | The "efficient proximate |
| 10 A. Yes, so it would have been on July the 13th. 10:37:27 | cause" was Hamas's actions directed toward |
| 11 Q. Did the information in the video clip inform 10:37:32 | Israel. Defendant should not be permitted to mislead |
| 12 your investigation that you had ongoing? 10:37:37 | the jury into believing that it could reasonably have |
| 13 A. Yes, it did. 10:37:39 | denied the claim based on |
| 14 Q. Was this one of the sources that you reviewed 10:37:41 | Israel's "indirect" contribution or actions |
| 15 in the process of your factual investigation? 10:37:43 | directed toward Gaza. California's "efficient |
| 16 A. One of many. 10:37:45 | proximate cause" doctrine |
| 17 Q. What factual information from the video did 10:37:47 | was clearly established since the Supreme Court's |
| 18 you incorporate into your overall 10:37:51 | decision in *Julian* in 2005. |
| 19 investigation? 10:37:53 | |
| 20 A. Well, I mean, I thought about all of the 10:37:54 | |
| 21 information that was presented, the fact that 10:37:56 | Defendant's Response: |
| 22 there were rockets that were going into 10:37:59 | "MIL" not clear objection; |
| 23 Israel, and the fact that the Israelis were 10:38:00 | ASIC's understanding and development of facts is |
| 24 retaliating against the rocket fire by, you 10:38:04 | relevant to reasonableness of claim decision, defense |
| 25 know, conducting air strikes into Gaza that 10:38:07 | of "bad faith" allegation and damages sought. The |
| | Witness' understanding and development of facts is |
| | relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion |

| Deposition Designation | Objection & Response |
|---|---|
| | to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |

Page 405

1 was causing, you know, substantial physical 10:38:11
2 damage, property damage, but also that was 10:38:14
3 killing civilians. 10:38:16
4 Q. Were there other factual matters contained in 10:38:18
5 the video that you noted as part of your 10:38:22
6 overall investigation? 10:38:24
7 A. Well, from what they were saying, it appeared 10:38:25
8 to be the hostilities were ongoing and that 10:38:27
9 they were -- you know, it was back and forth, 10:38:30
10 the Hamas was participating and that the 10:38:34
11 Israelis were also participating, and that 10:38:39
12 they were using, you know, a variety of 10:38:43
13 different kinds of weaponry with regard to 10:38:45
14 what was happening both in Gaza and in 10:38:50
15 Israel. 10:38:53
16 Q. Did you review other source material that 10:38:54
17 conveyed similar information to you at this 10:38:56
18 time? 10:38:59
19 A. Yes, I did. 10:38:59
20 Q. Can you give an overview of the scope of the 10:39:01
21 research that you conducted on the facts? 10:39:03
22 A. Yes. I looked at a variety of newspaper 10:39:06
23 articles, both articles that were in 10:39:10
24 Israeli newspapers. I think I looked at 10:39:14
25 The Guardian, I looked at U.S. newspapers, 10:39:20

Page 406

1 The Washington Post, New York Times, 10:39:23
2 Wall Street Journal. 10:39:23

| | Plaintiff's Objections: |
|---|---|
| | Pages 406:21-407:2 |
| | MIL No. 2; F.R.E. 403. |
| | Ms. Johnson claims to have |

| Deposition Designation | Objection & Response |
|---|---|
| 3 I looked at -- oh, I don't know. 10:39:27<br>4 You know, I looked at White papers that had 10:39:28<br>5 been presented, not -- not with regard to 10:39:31<br>6 this specific situation, but with regard to 10:39:35<br>7 Israeli tensions with Hamas. I investigated 10:39:37<br>8 Hamas itself as an organization. I looked at 10:39:42<br>9 a lot of video clips, including video clips 10:39:47<br>10 by NBC. I don't know, I -- I did a lot of 10:39:50<br>11 research. 10:39:55<br>12 Q. How did you go about conducting the searches 10:39:56<br>13 to get the information that you reviewed? 10:40:00<br>14 A. Well, I -- I looked mostly online, and then 10:40:02<br>15 from -- from the research that I did online I 10:40:05<br>16 drilled down into different things that I 10:40:08<br>17 found. In other words, I could be looking at 10:40:10<br>18 one -- one article that could reference 10:40:12<br>19 another article, and I would look at that, 10:40:14<br>20 that kind of thing. 10:40:16<br>21 Q. How many different sources would you estimate 10:40:17<br>22 you reviewed as part of this process? 10:40:19<br>23 A. Oh, I couldn't even begin to tell you. It 10:40:21<br>24 was a lot. More than 50. 10:40:24<br>25 Q. Sitting here today, can you recall every 10:40:29 | relied on 50 sources. But only a handful of sources were cited in Defendant's denial letter, and none were included in the claim file. For the reasons set forth in Plaintiffs' Motion in Limine, Defendant cannot contradict its denial letter or go outside its scope in defending against bad faith. *Century Surety Co. v. Polisso*, 139 Cal. App. 4th 922, 953 (2006) ("Since Century did not cite permanent installation as a ground for denial of coverage when the claim was tendered, it was never the subject of a genuine dispute between the parties.").<br><br>It would be irrelevant and substantially more prejudicial than probative to permit Defendant to suggest that it can be found to have acted in good faith based on sources not cited in the denial letter.<br><br>Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties |

| Deposition Designation | Objection & Response |
|---|---|
| | to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

Page 407

1 source that you reviewed? 10:40:32
2 A. Not a chance. 10:40:35
3 Q. Was it your practice at the time to make a 10:40:36
4 physical printout or copy of every source 10:40:40
5 that you referenced? 10:40:43
6 A. No, I'd be killing a lot of trees. 10:40:45
7 Q. Was it your personal practice at that time to 10:40:47
8 document an electronic copy of every single 10:40:52
9 source you looked at? 10:40:56
10 A. No, not necessarily. It would depend on -- 10:40:57
11 on how important the source was in informing 10:40:59
12 what I looked at. You know, I looked at a 10:41:03
13 lot of stuff that I might not have considered 10:41:06
14 relevant in the long run or I was only -- you 10:41:08
15 know, was just providing me with the same 10:41:11
16 information that another source had provided 10:41:13
17 me with, so I wouldn't necessarily capture 10:41:14
18 that. You know, mostly what I was trying to 10:41:17
19 do is -- is -- is get a factual understanding 10:41:21
20 of exactly what was going on there. 10:41:23

| Deposition Designation | Objection & Response |
|---|---|
| 21 Q. Were you successful in getting a factual 10:41:25<br>22 understanding of what was going on? 10:41:28<br>23 A. I certainly thought so, yes. 10:41:30<br>24 Q. As part of this process, were you sharing 10:41:32<br>25 links to articles with Mr. Gutterman? 10:41:34<br><br>Page 408<br><br>1 A. Yes, I certainly sent him links of things to 10:41:37<br>2 look at. I certainly did not share every 10:41:40<br>3 single thing I was looking at, neither did he 10:41:42<br>4 share every single thing he was looking at. 10:41:45<br>5 He was doing a simultaneous investigation and 10:41:47<br>6 he wasn't sharing everything that he saw with 10:41:49<br>7 me either. 10:41:51<br>8 (Whereupon, Exhibit 234 was 10:41:52<br>9 marked for identification.) 10:41:53<br>10 BY MS. REED: 10:41:53<br>11 Q. Let me hand you what's been marked as 10:41:53<br>12 Defendant's Exhibit 234, please, ma'am. 10:41:56<br>13 Can you identify Exhibit 234 as an 10:41:58<br>14 e-mail string between yourself and 10:42:00<br>15 Mr. Gutterman over the course of July the 10:42:03<br>16 16th? 10:42:04<br>17 A. Yes, that's exactly what it was. 10:42:05<br>18 Q. Is this an example of the types of 10:42:07<br>19 information you were sharing with one 10:42:10<br>20 another? 10:42:11<br>21 A. Yes, it is. 10:42:11<br>22 Q. Let me ask you to look at the bottom e-mail 10:42:12<br>23 on the page, please, ma'am, from you to 10:42:15<br>24 Mr. Gutterman. Do you see that one? 10:42:17<br>25 A. Yes. 10:42:20<br><br><br>Page 409<br><br>1 Q. There are a number of sources identified 10:42:20<br>2 there. Can you tell us, generally speaking, 10:42:24<br>3 what those were? 10:42:28<br>4 A. Yes. They were newspaper articles primarily, 10:42:29<br>5 some from Global News organizations, some 10:42:32<br>6 from Middle East organizations, and some from 10:42:35<br>7 U.S. organizations. 10:42:37<br>8 Q. Did you actually make a review of the items 10:42:38 | Plaintiff's Objections:<br>Page 408:11-25<br>MIL,402,403,802<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807.<br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 409:1-25<br>MIL,402,403,802<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>The witness's knowledge, research and response to the claim are relevant; not |

| Deposition Designation | Objection & Response |
|---|---|
| 9 that are listed there? 10:42:40<br>10 A. Yes, that was my purpose in sending them to 10:42:41<br>11 him. 10:42:44<br>12 Q. Did you discuss any of these materials with 10:42:47<br>13 Mr. Gutterman? 10:42:49<br>14 A. I don't remember specifically talking about 10:42:50<br>15 each article, but we certainly discussed the 10:42:52<br>16 situation in general, yes. 10:42:55<br>17 (Whereupon, Exhibit 235 was 10:42:58<br>18 marked for identification.) 10:42:59<br>19 BY MS. REED: 10:42:59<br>20 Q. Let me hand you what's been marked as 10:43:06<br>21 Exhibit 235, please, ma'am, and ask you to 10:43:10<br>22 take a look at that. 10:43:12<br>23 A. (Reviews document.) 10:43:47<br>24 Q. Can you identify Exhibit 235 as the 10:44:39<br>25 Middle East Eye article that you had 10:44:42<br><br>Page 410<br><br>1 mentioned to Mr. Gutterman in your e-mail, 10:44:47<br>2 which is marked Exhibit 234? 10:44:50<br>3 A. Yes, that's what it is. 10:44:52<br>4 Q. And do you recall reading this article at the 10:44:54<br>5 time? 10:44:56<br>6 A. Yes, I do. 10:44:56<br>7 Q. Is there particular information in the 10:44:57<br>8 article that informed the overall 10:45:01<br>9 investigation that you were conducting? 10:45:03<br>10 A. I think that what was most important to me is 10:45:04<br>11 that there are a variety of quotes from each 10:45:08<br>12 side, so this is actually what the Israelis 10:45:10<br>13 are saying and actually what Hamas is saying. 10:45:17<br>14 And they are talking about the 10:45:20<br>15 number of rocket strikes, they are talking 10:45:21<br>16 about the fact that the Hamas is saying if 10:45:24<br>17 they don't stop attacking the civilian homes 10:45:27<br>18 that the hostilities are going to continue. 10:45:30<br>19 There's also a discussion of the 10:45:33<br>20 fact that for the first time since 2012 10:45:35<br>21 Tel Aviv and Jerusalem and Haifa were targets 10:45:38<br>22 for long-ranged rockets from Hamas. It says 10:45:45<br>23 that there are tanks. It's says -- so we 10:45:52<br>24 know that there are rockets, we know there 10:45:54<br>25 are air strikes, we know that there are 10:45:57 | unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 411 | |
| 1 tanks, from this article. 10:45:59<br>2 It looks like that there's -- 10:46:06<br>3 there's some discussion that's taking place 10:46:08<br>4 or attempts at discussion between the general 10:46:09<br>5 secretary of the Israelis -- of the Israeli 10:46:13<br>6 government and the Palestinian president, who 10:46:18<br>7 is Mahmoud Abbas, that there have been a long 10:46:22<br>8 string of attacks. 10:46:23<br>9 It's just -- it -- it -- it's 10:46:24<br>10 obvious that there is a lot of back and forth 10:46:26<br>11 and exchange of fire and hostilities, and 10:46:29<br>12 that it doesn't look as though, at least at 10:46:32<br>13 the time of this article, that -- that -- 10:46:36<br>14 that there is a good chance that it's going 10:46:41<br>15 to deescalate. 10:46:43<br>16 Q. Would you turn back to the second page of the 10:46:44<br>17 exhibit, please, ma'am. 10:46:46<br>18 A. Sure. 10:46:48<br>19 Q. Under the heavy black line, can you read the 10:46:48<br>20 first two paragraphs that appear under that? 10:46:52<br>21 A. "The armed wing of Hamas claimed that it 10:46:54<br>22 fired long-range rockets at Jerusalem, 10:46:57<br>23 Tel Aviv and Haifa on Tuesday. For the first 10:47:00<br>24 time the (Ezzedine al-) Qassam Brigades 10:47:03<br>25 strike Haifa with R160 rocket, and strike 10:47:09 | |
| Page 412 | Plaintiff's Objections:<br>Page 412:19 – 414:25<br>MIL3; F.R.E. 402-403 |
| 1 occupied Jerusalem with four M75 rockets, and 10:47:12<br>2 Tel Aviv with four M75 rockets, a statement 10:47:16<br>3 from" -- "by the group said. It was the 10:47:19<br>4 first time since a major 2012 conflict that 10:47:22<br>5 Gaza-based fighters had fired rockets at 10:47:25<br>6 Jerusalem. The rockets were intercepted by 10:47:29<br>7 Israel's Iron Dome defense system." 10:47:31<br>8 Q. As part of your research, did you become 10:47:34<br>9 familiar with what the armed wing of Hamas 10:47:39<br>10 was? 10:47:40<br>11 A. Yes. 10:47:41<br>12 Q. And what was that? 10:47:41<br>13 A. It's -- it's the Qassam brigades. 10:47:43<br>14 Q. And do you know what -- or did your research 10:47:45<br>15 indicate to you what role they played in this | Given the Ninth Circuit's order, this article and testimony regarding it is irrelevant and substantially more prejudicial than probative for the reasons in Plaintiffs' MIL No. 3.<br><br>This news article is focused on Israel's actions in Gaza—not Hamas's rocket fire toward Jerusalem. For the reasons in Plaintiffs' MIL No. 3, |

| Deposition Designation | Objection & Response |
|---|---|
| 10:47:48<br>16 overall conflict? 10:47:50<br>17 A. They were the group that was firing rockets 10:47:51<br>18 at -- at Israel, yes. 10:47:54<br>19 (Whereupon, Exhibit 236 was 10:48:05<br>20 marked for identification.) 10:48:11<br>21 BY MS. REED: 10:48:11<br>22 Q. Let me hand you what's been marked as 10:48:11<br>23 Exhibit 236, please, ma'am, and ask you to 10:48:13<br>24 review that document. 10:48:16<br>25 A. (Reviews document.) Okay. 10:48:19 | Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005.<br><br>Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.<br>Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to |

| Deposition Designation | Objection & Response |
|---|---|
| | Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| **Page 413** | **Plaintiff's Objections:** Page 413:1-25 MIL,402,403,701,802 |
| 1 Q. Can you identify Exhibit 236 as a Global News 10:51:04 2 article that you referred to in your e-mail 10:51:09 3 to Mr. Gutterman in your Exhibit 234? 10:51:12 4 A. Yes, that's what it is. 10:51:15 5 Q. Do you recall reading this article at the 10:51:17 6 time? 10:51:19 7 A. Yes, I did. 10:51:19 8 Q. And was there factual information in this 10:51:22 9 article that informed your overall 10:51:25 10 investigation process? 10:51:26 11 A. So the date of the article is on July 9th, 10:51:27 12 which was I think two days after Israel had 10:51:29 13 started Operation Protective Edge, and this 10:51:34 14 talks further about the hostilities. 10:51:38 15 It talks about the fact that there 10:51:40 16 are air strikes on more than 200 targets in 10:51:42 17 Gaza and hitting more than 50 targets just 10:51:47 18 on -- in one day. It talks about the fact 10:51:50 19 that the Israeli attacks on Hamas sites in 10:51:55 20 Gaza killed 14 people on Wednesday, including 10:51:59 21 an 80-year-old woman, that Hamas had fired 10:52:01 22 over 160 rockets at Israel after this whole 10:52:06 23 thing started with the death of some Israelis 10:52:11 24 teenagers. 10:52:17 25 And there are also some photos here, 10:52:20 | **Defendant's Response:** "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| **Page 414** | |
| 1 disturbing photos of some of the damage 10:52:24 2 that's been done. You can see where a 10:52:26 3 vehicle was targeted in an Israeli air strike 10:52:32 4 and the significant damage that was done not 10:52:37 5 just to the vehicle, but also to the 10:52:39 6 surrounding area. It says that it killed 10:52:41 7 four people. It shows a rocket being fired 10:52:44 8 and the Iron Dome defense system trying to 10:52:51 9 intercept it. 10:52:56 10 It also talks more about the fact 10:52:57 11 that they were trying to target Tel Aviv, 10:52:59 12 Jerusalem -- and Jerusalem. It shows images 10:53:02 | |

| Deposition Designation | Objection & Response |
|---|---|
| 13 of tanks. It talks about how the Israeli 10:53:05<br>14 Army is also going to try to attack by sea. 10:53:09<br>15 And I assume what they mean by that is to 10:53:12<br>16 bring gun boats in to fire long-range 10:53:14<br>17 missiles. 10:53:18<br>18 It says that Hamas had amassed about 10:53:19<br>19 10,000 rockets, including longer-range 10:53:21<br>20 rockets that could reach up to Tel Aviv and 10:53:25<br>21 beyond, which was a very -- it was a long 10:53:27<br>22 distance from -- from Gaza, it was at the 10:53:31<br>23 other side of the country going down to the 10:53:33<br>24 Mediterranean Sea. 10:53:36<br>25 The military had ordered thousands 10:53:40<br><br><br>Page 415<br><br>1 of Israelis within the 40 kilometer radius of 10:53:43<br>2 the Gaza strip to leave or to stay indoors or 10:53:47<br>3 near shelter. 10:53:50<br>4 So it -- it's -- it's showing that 10:53:55<br>5 there is significant fire in both directions, 10:53:56<br>6 that these parties are simultaneously 10:53:59<br>7 engaging in warlike behavior. 10:54:01<br>8 (Whereupon, Exhibit 237 was 10:54:10<br>9 marked for identification.) 10:54:11<br>10 BY MS. REED: 10:54:11<br>11 Q. Let me hand you what's been marked as 10:54:11<br>12 Exhibit 237, please, ma'am. I'll ask you to 10:54:13<br>13 review the document. 10:54:17<br>14 A. (Reviews document.) Okay. 10:54:18<br>15 Q. Can you identify Exhibit 237 as a July 15th, 10:56:04<br>16 2014, Global News article, one that was 10:56:07<br>17 referenced in your e-mail to Mr. Gutterman 10:56:13<br>18 that was labeled Exhibit 234? 10:56:16<br>19 A. Yes, that's what it is. 10:56:17<br>20 Q. Do you recall reviewing this article as part 10:56:19<br>21 of your ongoing research on the facts? 10:56:23<br>22 A. I do. 10:56:28<br>23 Q. Did information in this article inform your 10:56:29<br>24 overall factual gathering investigation? 10:56:32<br>25 A. It -- it did. This -- this article actually 10:56:35<br><br>Page 416<br><br>1 came out on the first day that -- that I 10:56:37<br>2 learned about NBC's claim. And, basically, 10:56:39<br>3 what it says is that even though Egypt had 10:56:43<br>4 been trying to negotiate a -- a cease fire. 10:56:48 | Plaintiff's Objections:<br>Page 415:1-9<br>MIL3; F.R.E. 402-403<br><br>Same objection as above re:<br>Israel's conduct directed<br>toward Gaza being<br>irrelevant and substantially<br>more prejudicial than<br>probative.<br><br>In addition, Ms. Johnson's<br>statement that these "parties<br>are simultaneously<br>engaging in warlike<br>behavior" is an improper<br>opinion and contrary to the<br>Ninth Circuit's order.<br>Therefore, the testimony is<br>substantially more<br>prejudicial than probative.<br><br>Plaintiff's Objections:<br>Page 415:12-417:6<br>MIL3; F.R.E. 402-403<br><br>This news article is focused<br>on Israel's actions in<br>Gaza—not Hamas's rocket<br>fire toward Jerusalem. For<br>the reasons in Plaintiffs'<br>MIL No. 3,<br><br>Given the Ninth Circuit's<br>order, this article is<br>irrelevant and substantially<br>more prejudicial than |

| Deposition Designation | Objection & Response |
|---|---|
| 5 that the negotiations quickly fell apart. 10:56:53<br>6 In particular, Prime Minister 10:56:56<br>7 Benjamin Netanyahu, who is the prime minister 10:57:01<br>8 of Israel said that -- that since Hamas would 10:57:04<br>9 not agree to a truce, that Israel had no 10:57:08<br>10 choice but to respond more forcefully. And 10:57:10<br>11 his exact quote was, "Hamas chose to continue 10:57:13<br>12 fighting, will pay the price for that 10:57:17<br>13 decision. When there is no cease fire, our 10:57:19<br>14 answer is fire." 10:57:22<br>15 It said that they had amassed 10:57:23<br>16 thousands of soldiers on the border between 10:57:24<br>17 Israel and Gaza, and that entering Gaza would 10:57:27<br>18 likely drive up the casualties, especially 10:57:32<br>19 because Gaza is very small, but it has a -- 10:57:36<br>20 it has a populated territory of about 1.7 10:57:39<br>21 million people, most of whom are actually 10:57:43<br>22 under the age of 18. 10:57:46<br>23 So they talked about how they want 10:57:49<br>24 to continue to focus to see if they have a 10:57:51<br>25 cease fire, but it doesn't look like that's 10:57:54<br><br>Page 417<br><br>1 going to happen, and that certainly on the 10:57:58<br>2 Israeli side that they plan to continue the 10:58:00<br>3 escalation and they -- I think specifically 10:58:02<br>4 what they said is that they were going to 10:58:08<br>5 continue until the Gaza militants had -- had 10:58:10<br>6 their military capabilities greatly reduced. 10:58:15<br>7 Q. Based on your research, was there a cease 10:58:18<br>8 fire negotiated during the month of July 10:58:21<br>9 2014? 10:58:23<br>10 A. No, there wasn't. Egypt was trying to 10:58:24<br>11 negotiate the cease fire, and they 10:58:26<br>12 actually -- the Israelis, at least, actually 10:58:28<br>13 held fire for a few brief hours until Hamas 10:58:30<br>14 rejected the truce, and then things continued 10:58:34<br>15 to escalate from there. 10:58:38<br>16 Q. After the discussion with Ms. Weiss and 10:58:42<br>17 Ms. Garber, did your review of the facts ever 10:58:44<br>18 indicate that there was a hoped-for 10:58:47<br>19 deescalation? 10:58:49<br>20 A. Well, I think that -- that in the brief 10:58:51<br>21 period of -- of the -- the 14th and 15th, and 10:58:55<br>22 maybe into the 16th, they continued to have 10:58:58 | probative for the reasons in Plaintiffs' MIL No. 3.<br><br>Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005<br><br>Defendant's Response:"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the |

| Deposition Designation | Objection & Response |
|---|---|
| 23 talked about how they wanted to try to -- to 10:59:00<br>24 have some kind of cease fire or a mediation 10:59:04<br>25 or that kind of thing, but at the same time, 10:59:07 | claim decision.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.<br><br><u>Defendant's Response:</u><br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| <u>Page 418</u><br><br>1 Israel was amassing troops and putting tanks 10:59:10<br>2 at the border and continuing with air strikes 10:59:17<br>3 after it had suspended the air strikes for a 10:59:20<br>4 short period of time, and Hamas continued to 10:59:23<br>5 lob rockets into Israel, so it did not appear 10:59:25<br>6 that a cease fire or any kind of truce was 10:59:28<br>7 going to be negotiated. 10:59:30<br>8 Q. Based upon the research that you continued to 10:59:30<br>9 do after July 15th, was there a deescalation 10:59:33<br>10 during the month of July at all? 10:59:36<br>11 A. No, there was not. 10:59:37<br>12 Q. Was it to the contrary? 10:59:39<br>13 A. Yes. Things continued to escalate. In fact, 10:59:41<br>14 there was a ground invasion of Gaza. There 10:59:44<br>15 was considerable damage. There were -- 10:59:48<br>16 although there were a few Israeli -- Israelis 10:59:50<br>17 killed, there were more than 2,000 10:59:53<br>18 Palestinians that were killed and, you know, 10:59:55 | <u>Plaintiff's Objections:</u><br>Pages 418:1- 419:5<br>This testimony is focused on Israel's actions in Gaza—not Hamas's rocket fire toward Jerusalem. For the reasons in Plaintiffs' MIL No. 3,<br><br>Given the Ninth Circuit's order, this testimony is irrelevant and substantially more prejudicial than probative for the reasons in Plaintiffs' MIL No. 3.<br><br>Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" |

| Deposition Designation | Objection & Response |
|---|---|
| 19 thousands more that were injured. 10:59:57<br>20 There was a great deal of property 10:59:58<br>21 damage, some in Israel, but the majority of 11:00:00<br>22 it was -- was in the Gaza strip, and that's 11:00:03<br>23 understandable, because the Israelis have 11:00:06<br>24 better weapons than the Palestinians do -- 11:00:09<br>25 Q. Let me -- 11:00:09 | contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| Page 419<br><br>1 A. -- and far more troops. 11:00:13<br>2 (Whereupon, Exhibit 238 was 11:00:15<br>3 marked for identification.) 11:00:15<br>4 MS. REED: Pardon me. 11:00:16<br>5 BY MS. REED: 11:00:16<br>6 Q. Let me hand you Exhibit 238, please, ma'am, 11:00:16<br>7 and ask you to take a look at it. 11:00:20<br>8 A. (Reviews document.) Okay. 11:00:23<br>9 Q. Can you identify Exhibit 238 as a 11:02:22<br>10 Washington Post article, which is one of the 11:02:24<br>11 references that you made to Mr. Gutterman in 11:02:27<br>12 your e-mail that's labeled Exhibit 234? 11:02:29<br>13 A. Yes. It was dated July 16th. 11:02:33<br>14 Q. Do you recall reviewing this Washington Post 11:02:35<br>15 article as part of your investigation? 11:02:37<br>16 A. Yes, I did. 11:02:39<br>17 Q. Did the information from this article inform 11:02:40<br>18 your overall factual investigation? 11:02:44 | Plaintiff's Objections:<br>Page 419:1 – 421:25<br>MIL No. 3; F.R.E. 402, 403<br>This news article is focused on Israel's actions in Gaza—not Hamas's rocket fire toward Jerusalem. For the reasons in Plaintiffs' MIL No. 3,<br><br>Given the Ninth Circuit's order, this article is irrelevant and substantially more prejudicial than probative for the reasons in Plaintiffs' MIL No. 3.<br><br>Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions |

| Deposition Designation | Objection & Response |
|---|---|
| 19 A. Yes, it did. 11:02:47<br>20 Q. How so? 11:02:48<br>21 A. Well, again, this article also repeats the 11:02:49<br>22 same quote by Netanyahu that, "When Hamas 11:02:52<br>23 chose to continue fighting, it will pay the 11:02:57<br>24 price for that decision. When there is no 11:02:59<br>25 cease fire, our answer is fire." 11:03:01 | directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| Page 420<br><br>1 It also talks about the fact that 11:03:03<br>2 they're amassing troops for a ground war. It 11:03:06<br>3 says that they have called up 40,000 troops 11:03:09<br>4 on the Israeli side, and that Netanyahu fired 11:03:11<br>5 his deputy defense minister for saying that 11:03:15<br>6 the cabinet wasn't moving aggressively enough 11:03:19<br>7 against Hamas, although it seems pretty 11:03:23<br>8 aggressive. 11:03:28<br>9 They also talked about the fact that 11:03:29<br>10 it didn't seem likely that there was going to 11:03:30<br>11 be a cease fire, mostly because Egypt was not 11:03:33<br>12 going to be able to broker it, because Hamas 11:03:36<br>13 didn't trust -- trust the current Egyptian 11:03:39<br>14 government at that time. 11:03:42<br>15 It talks about how the White House 11:03:50<br>16 press secretary said that it was Hamas's 11:03:53<br>17 responsibility to try to disengage, and that 11:03:56<br>18 there had been a heavy toll on the 11:04:02<br>19 Palestinians. By that time there were 1,500 11:04:05<br>20 injured and 204 killed. 11:04:08<br>21 There had also been a number -- 11:04:15 | |

| Deposition Designation | Objection & Response |
|---|---|
| 22 thousands of rockets they say had been fired 11:04:17<br>23 into Israel and that there were still 11:04:21<br>24 thousands more held by the -- by Hamas, and 11:04:23<br>25 that there had been a civilian, an Israeli 11:04:29<br><br>Page 421<br><br>1 civilian that was killed, but that the 11:04:34<br>2 Iron Dome missile defense system was helping. 11:04:38<br>3 In other words, it continued to show 11:04:39<br>4 that there was fire both back and forth, that 11:04:41<br>5 this was a back and forth situation. 11:04:45<br>6 Q. Do you recall that, as a part of your overall 11:04:47<br>7 investigation, you reviewed other articles or 11:04:50<br>8 news pieces that continued to inform your 11:04:53<br>9 overall fact investigation? 11:04:56<br>10 A. Yes, indeed. I looked at a lot of -- a lot 11:04:57<br>11 of news articles or, you know, even -- even 11:05:01<br>12 other information that was contained in 11:05:04<br>13 the -- on the Internet. And not just news 11:05:06<br>14 articles, but also videos and some White 11:05:08<br>15 papers, one specifically by the Congressional 11:05:13<br>16 Research Service, which -- which is -- does 11:05:19<br>17 research specifically for the U.S. Congress, 11:05:19<br>18 and a variety of other sources. 11:05:29<br>19 Q. In regard to your research on news articles 11:05:30<br>20 and publications and videos, did you continue 11:05:32<br>21 to read and review those types of materials 11:05:34<br>22 for the week following July the 15th? 11:05:40<br>23 A. I did. 11:05:42<br>24 Q. And did you continue to advance your 11:05:42<br>25 knowledge about the process and the current 11:05:44<br><br>Page 422<br><br>1 events? 11:05:46<br>2 A. I did. 11:05:46<br>3 (Whereupon, Exhibit 239 was 11:05:48<br>4 marked for identification.) 11:06:04<br>5 BY MS. REED: 11:06:04<br>6 Q. Let me hand you what's been marked as 11:06:04<br>7 Exhibit 239, please, ma'am. 11:06:07<br>8 Can you identify Exhibit 239 as an 11:06:08<br>9 e-mail that you sent to yourself on 11:06:11<br>10 July 16th, 2014? 11:06:13 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 A. Yes. 11:06:15<br>12 Q. Does this contain a reference to a website 11:06:16<br>13 about UK foreign travel advice? 11:06:21<br>14 A. Yes. 11:06:24<br>15 Q. Did you review that particular site? 11:06:24<br>16 A. I did. I wanted to see what other 11:06:27<br>17 governments and our own government was saying 11:06:30<br>18 about safety in Israel in terms of -- you 11:06:33<br>19 know, Israel is a huge tourist destination, 11:06:37<br>20 and about what they were advising people. 11:06:41<br>21 Q. Did you review multiple travel warnings? 11:06:42<br>22 A. I did. 11:06:45<br>23 Q. Do you know from which countries? 11:06:46<br>24 A. I know from -- obviously, from the UK, 11:06:47<br>25 because that's here. I know I reviewed the 11:06:50<br><br>Page 423<br><br>1 U.S. I think I reviewed one from Australia. 11:06:52<br>2 I seem to recall maybe one from a 11:06:56<br>3 Scandinavian country, but I don't recall 11:06:58<br>4 which one. So there were a variety of 11:07:01<br>5 different ones. 11:07:03<br>6 Q. What was the purpose of this e-mail that you 11:07:04<br>7 sent to yourself? 11:07:06<br>8 A. It -- it's just -- it was just to keep the 11:07:07<br>9 link for myself if I wanted to reference it 11:07:11<br>10 again with regard to what the UK foreign 11:07:14<br>11 travel site was saying. 11:07:16<br>12 Q. Is this an example of notes that you might 11:07:19<br>13 make to yourself on your ongoing work? 11:07:21<br>14 A. Yes, sometimes. I might also send that to 11:07:23<br>15 myself if I were reading something and I 11:07:27<br>16 didn't have a chance to finish it so that I 11:07:29<br>17 would keep the link that way. 11:07:32<br>18 Q. What's the next entry that appears in your 11:07:33<br>19 notes to yourself? 11:07:35<br>20 A. It's a link to a Wikipedia entry on Hamas. 11:07:36<br>21 Q. Do you recall reading that Wikipedia entry on 11:07:39<br>22 Hamas? 11:07:42<br>23 A. I did. 11:07:42<br>24 Q. What use did you make of that particular 11:07:43<br>25 group of materials? 11:07:47 | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 424 | |
| 1 A. Well, I don't look to Wikipedia as being an 11:07:47<br>2 authoritative source to gather information, 11:07:51<br>3 but what is really helpful about Wikipedia 11:07:55<br>4 articles is that they cite every place that 11:07:59<br>5 they get their information. And so if you go 11:08:03<br>6 to their cite list, frequently you could find 11:08:04<br>7 information that is -- that actually holds 11:08:09<br>8 the voice of authority that actually can be 11:08:11<br>9 considered reliable and review those 11:08:13<br>10 articles. 11:08:15<br>11 (Whereupon, Exhibit 240 was 11:08:17<br>12 marked for identification.) 11:08:17<br>13 BY MS. REED: 11:08:17<br>14 Q. Let me hand you what has been marked as 11:08:18<br>15 Exhibit 240 in the case, please, ma'am. 11:08:20<br>16 Can you identify Exhibit 240 as a 11:08:23<br>17 printout of the Hamas article that you 11:08:28<br>18 reviewed at or about the time of your note 11:08:30<br>19 that's contained in Exhibit 239? 11:08:33<br>20 A. Yes, this is what I looked like -- looked at. 11:08:36<br>21 Q. And do you recall any particular factual 11:08:39<br>22 information that you gained from this review, 11:08:42<br>23 overall review, that formed the basis of your 11:08:47<br>24 overall investigation? 11:08:50<br>25 A. Well, as I said, I don't rely upon this as an 11:08:52 | |
| Page 425 | Plaintiff's Objections:<br>Page 425:23 – 426:25<br>MIL No. 3; F.R.E. 402, 403, 602, 701. |
| 1 authoritative site, since it can be amended 11:08:56<br>2 by -- by a variety of different people and 11:08:59<br>3 sources, and so you can't -- you can't say 11:09:01<br>4 definitively that this information is 11:09:04<br>5 correct. But what I did do is go and look at 11:09:06<br>6 what their source materials were and I looked 11:09:08<br>7 at a variety of these source materials. 11:09:12<br>8 Q. Did you gain information in regard to the 11:09:20<br>9 overall review of source materials you 11:09:23<br>10 referenced about the role of Hamas in 11:09:26<br>11 parliamentary elections? 11:09:33<br>12 A. Well, I think I learned from -- from -- from 11:09:35<br>13 looking at some source materials that there 11:09:37<br>14 had been an election in 2006 for the -- for 11:09:39<br>15 seats in the Palestinian parliament. And at 11:09:44<br>16 that time, Hamas had won the majority of 11:09:49 | Ms. Johnson is not an expert on Middle East affairs and lacks expertise or foundation to offer the opinions expressed here, many of which are contrary to the Ninth Circuit's opinion (*i.e.*, that Hamas is a military, that Hamas controls Gaza). Lacks foundation, improper opinion, substantially more prejudicial than probative.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 17 seats in 2006, and that the Congressional 11:09:51<br>18 Research Service said that it was a free and 11:09:56<br>19 fair election. 11:09:57<br>20 Q. Did you make review of the governmental role 11:09:59<br>21 that Hamas was playing overall during the 11:10:03<br>22 relevant time period? 11:10:05<br>23 A. Well, starting in 2007, Hamas was controlling 11:10:06<br>24 the Gaza territory primarily. There was, at 11:10:10<br>25 that time, Fatah, which was another -- 11:10:18<br><br>Page 426<br><br>1 another part of the Palestinian authority, 11:10:21<br>2 another group, you know, sort of like we have 11:10:24<br>3 Democrats and Republicans, they have Hamas, 11:10:27<br>4 they have Fatah, they were controlling the 11:10:30<br>5 West Bank, Hamas had Gaza. 11:10:33<br>6 And Hamas was not just a military 11:10:34<br>7 organization. Although they had a military 11:10:37<br>8 wing, but the other thing they were trying to 11:10:39<br>9 do to -- to -- was to provide social services 11:10:42<br>10 for the 1.8 million people who lived there 11:10:44<br>11 and schools, health services when -- when 11:10:47<br>12 available, and also to negotiate with other 11:10:51<br>13 countries in order to get assistance for the 11:10:54<br>14 people who lived in the Gaza strip, because 11:10:57<br>15 they were in pretty desperate straights at 11:10:59<br>16 that point. 11:11:05<br>17 There wasn't a lot of ways to make 11:11:05<br>18 money, there wasn't -- there weren't a lot of 11:11:07<br>19 ways to get resources, because they weren't 11:11:09<br>20 allowed into Egypt, which was one of their 11:11:11<br>21 boundaries, and they weren't allowed into -- 11:11:14<br>22 into any other part of Israel, which was on 11:11:17<br>23 their other boundary. 11:11:19<br>24 So these 1.8 million people were 11:11:20<br>25 basically trapped within a very small area. 11:11:23<br><br>Page 427<br><br>1 So they got -- Hamas negotiated with Iran, 11:11:26<br>2 they negotiated with Russia, I think that 11:11:31<br>3 they also negotiated with Turkey and other 11:11:34<br>4 countries in order to get aid. 11:11:37<br>5 Q. Did part of your factual research include a 11:11:42<br>6 focus on studying the military wing of Hamas | "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 427:16-19<br>MIL No. 3; F.R.E. 402, 403, 602, 701.<br><br>Ms. Johnson is not an expert on Middle East affairs and lacks expertise or foundation to offer the |

| Deposition Designation | Objection & Response |
|---|---|
| 11:11:46<br>7 that you mentioned? 11:11:51<br>8 A. That's one of the things that I looked at, 11:11:52<br>9 yes. 11:11:55<br>10 Q. What information did you learn about the 11:11:55<br>11 military wing of Hamas? 11:11:56<br>12 A. Well, they had a particular name. As I said, 11:11:57<br>13 they were the -- the Al-Qassam Brigades, and 11:12:00<br>14 that they were primarily the group that was 11:12:04<br>15 launching targets at -- rockets at Israel. 11:12:07<br>16 But they were organized. They were 11:12:10<br>17 considered to be a militia or a military 11:12:12<br>18 force. And that -- yes, that's what they 11:12:19<br>19 were. 11:12:25<br>20 Q. As part of your overall review and study of 11:12:25<br>21 Hamas, did you focus on what social welfare 11:12:27<br>22 programming they were doing, as you 11:12:33<br>23 referenced? 11:12:34<br>24 A. Yes, and they were doing a considerable 11:12:34<br>25 amount. As I said, they were trying to -- to 11:12:38<br><br><br>Page 428<br><br>1 provide schooling for the -- the children 11:12:40<br>2 that lived in Gaza. And the majority of the 11:12:42<br>3 people who lived in Gaza were under the age 11:12:45<br>4 of 18. And they were also trying to provide 11:12:47<br>5 health care and other kinds of social welfare 11:12:49<br>6 to the people who lived there. 11:12:57<br>7 Q. Do you recall which of the primary sources 11:12:59<br>8 supporting the Hamas article that you looked 11:13:01<br>9 at as part of your research? 11:13:04<br>10 A. Well, one was from the Congressional Research 11:13:07<br>11 Service. It was an article by a guy whose 11:13:10<br>12 last name was Zanotti. I don't remember his 11:13:16<br>13 first name off the top of my head. But that 11:13:18<br>14 was not the only source. I looked at a lot 11:13:22<br>15 of different things. 11:13:27<br>16 Q. Would it have been your practice to print 11:13:29 | opinion expressed here that Hamas is a "military force"—which is contrary to the Ninth Circuit's decision. Lacks foundation, improper opinion, substantially more prejudicial than probative.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| 17 them all out? 11:13:31<br>18 A. No. 11:13:32<br>19 Q. Would it have been your practice to keep a 11:13:32<br>20 separate electronic copy of each one? 11:13:35<br>21 A. Not necessarily. If -- if -- I might have 11:13:36<br>22 kept an electronic copy in my -- my general 11:13:41<br>23 research file, if it was something I thought 11:13:43<br>24 I needed to refer to again. 11:13:45<br>25 But, also, a lot of what I was doing 11:13:51<br><br>Page 429<br><br>1 was simply gathering information, you know, 11:13:53<br>2 that informed my opinion, but wasn't 11:13:54<br>3 necessarily something I was going to 11:13:56<br>4 authoritatively cite again. 11:13:58<br>5 THE VIDEOGRAPHER: We have about 11:14:04<br>6 ten minutes left on the tape. 11:14:05<br>7 (Whereupon, Exhibit 241 was 11:14:08<br>8 marked for identification.) 11:14:08<br>9 BY MS. REED: 11:14:08<br>10 Q. Let me hand you what's been marked as 11:14:09<br>11 Exhibit 241, please, ma'am. 11:14:11<br>12 Can you identify Exhibit 241 as a 11:14:13<br>13 Congressional Research Service article that 11:14:19<br>14 you mentioned by Mr. Zanotti? 11:14:19<br>15 A. Yes, that's what it is. 11:14:22<br>16 Q. And is this a source of information that you 11:14:23<br>17 consulted as part of your factual research? 11:14:27<br>18 A. Yes, it was one of the things that -- that -- 11:14:29<br>19 that I looked at. This article was dated 11:14:32<br>20 December 2nd of 2010. I think I also looked 11:14:35<br>21 at some other Congressional Research Service 11:14:38<br>22 sources besides this one, but this one was 11:14:42<br>23 the most comprehensive with regard to Hamas. 11:14:46<br>24 Q. And why did you select this one? 11:14:48<br>25 A. As I said, because it was -- it was very 11:14:51<br>TSG Reporting - Worldwide 877-702-9580<br>18 (Pages 430 to 433)<br><br>Page 430<br><br>1 comprehensive in terms of the background and 11:14:54<br>2 it was specifically written to inform 11:14:57<br>3 Congress about Hamas. 11:14:59 | |

| Deposition Designation | Objection & Response |
|---|---|
| 4 Q. Let me ask you to turn, please, ma'am, 11:15:04<br>5 internally in that document to what's 11:15:07<br>6 numbered page 1 in the bottom right corner. 11:15:10<br>7 A. Okay. 11:15:17<br>8 Q. Do you see there's a section called, 11:15:18<br>9 "Introduction Issues for Congress"? 11:15:20<br>10 A. Yup. 11:15:20<br>11 Q. Did you review this particular section? 11:15:21<br>12 A. I read this entire document. It took me 11:15:23<br>13 quite a while. So, yes, I'm sure I did. 11:15:28<br>14 Q. And was there factual information that you 11:15:31<br>15 took out of this that informed your -- your 11:15:33<br>16 overall investigation you were conducting 11:15:35<br>17 into the Dig claim? 11:15:38<br>18 A. Well, it certainly gave me more background on 11:15:39<br>19 Hamas, yes. 11:15:42<br>20 Q. Did you learn more regarding elections to 11:15:44<br>21 parliament? 11:15:47<br>22 A. A lot of what I've stated before is, you 11:15:49<br>23 know, that they did have free and fair 11:15:53<br>24 elections. Hamas had the highest number of 11:15:56<br>25 seats in the Palestinian parliament. Part 11:16:01<br><br><br>Page 431<br><br>1 of -- part of the research, not from this 11:16:06<br>2 particular article, but that I also learned 11:16:10<br>3 is that -- that Hamas and Fatah were trying 11:16:12<br>4 to -- in June of 2014, they were trying to 11:16:13<br>5 unify their parties so that they could do 11:16:16<br>6 more, have greater power. 11:16:19<br>7 Q. Why were you researching Hamas? 11:16:23<br>8 A. Well, one of the things that -- that Andrea 11:16:26<br>9 and Susan had said, starting with our initial 11:16:29<br>10 conversation, but they followed it up in 11:16:34<br>11 subsequent conversations, was that -- was 11:16:37<br>12 that Hamas was a terrorist organization, and 11:16:38<br>13 therefore, any actions taken by Hamas needed 11:16:41<br>14 to be judged as terrorism. 11:16:44<br>15 So I did want to acquaint myself 11:16:47<br>16 with what is the history of this 11:16:52<br>17 organization, are they a terrorist 11:16:53<br>18 organization, if they are a terrorist 11:16:56<br>19 organization, is that relevant to my coverage 11:16:59<br>20 analysis, and why are they called a terrorist 11:17:01 | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 431:22-432:4<br>F.R.E. 402-03, 602, 701<br>Ms. Johnson is not an<br>expert on the Middle East<br>and lacks expertise or<br>foundation to opine that<br>Hamas's charter is "one of<br>the main reasons" why the<br>U.S. designates Hamas a<br>terrorist organization.<br>Improper opinion, lack of<br>foundation, substantially<br>more prejudicial than<br>probative.<br><br>Defendant's Response:<br>"MIL" not clear objection;<br>ASIC's understanding and<br>development of facts is<br>relevant to reasonableness<br>of claim decision, defense<br>of "bad faith" allegation<br>and damages sought.<br>Is not opinion testimony |

| Deposition Designation | Objection & Response |
|---|---|
| 21 organization. 11:17:05<br>22 Q. Did your research inform you on why they are 11:17:05<br>23 called a terrorist organization? 11:17:09<br>24 A. Well, Hamas's charter specifically says that 11:17:11<br>25 it's charter to -- to is destroy Israel and 11:17:13<br><br>Page 432<br><br>1 the Israeli people, so the base -- the fact 11:17:17<br>2 that their charter is one of the main reasons 11:17:19<br>3 why the United States says they're a 11:17:22<br>4 terrorist organization. But they don't just 11:17:24<br>5 engage in terroristic activities, they also 11:17:26<br>6 provide infrastructure and social services 11:17:32<br>7 and a variety of other things that are 11:17:34<br>8 beneficial to the people who live in Gaza. 11:17:36<br>9 Q. Would you turn back, please, ma'am, in 11:17:39<br>10 Exhibit 241 to the second page of the overall 11:17:41<br>11 document. It is not numbered, it's just 11:17:44<br>12 physically the second page. 11:17:46<br>13 A. Yes. 11:17:48<br>14 Q. Would you look at the second paragraph, 11:17:49<br>15 please, ma'am. 11:17:51<br>16 A. Yes. 11:17:52<br>17 Q. And start with the second sentence and read 11:17:53<br>18 that for the record. 11:17:55<br><br>Page 433<br><br>2 BY MS. REED: 11:18:16<br>3 Q. Ms. Johnson, may I direct you on Bates number 11:18:17<br>4 page 4320 to the second paragraph beginning 11:18:20<br>5 with the second sentence? 11:18:23 | The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 434**<br><br>6 THE WITNESS: So beginning with 11:19:13<br>7 the second paragraph, second line in the 11:19:14<br>8 paragraph, it states, "The United States, 11:19:16<br>9 Israel, the European Union and Canada, 11:19:20<br>10 consider Hamas a terrorist organization 11:19:24<br>11 because of, one, its violent resistance to 11:19:26<br>12 what it deems Israeli occupation of historic 11:19:29<br>13 Palestine constituting present day Israel, 11:19:32<br>14 the West Bank and Gaza, and, two, its 11:19:35<br>15 rejection of the on and off peace process 11:19:38<br>16 involving Israel and the Palestine liberation 11:19:42<br>17 organization, the PLO, since the early 11:19:45<br>18 1900s." 11:19:48<br>19 Do you want me to continue reading? 11:19:49<br>20 MS. REED: No, that's all right. 11:19:51<br>21 BY MS. REED: 11:19:51<br>22 Q. The -- is that early 1990s? 11:19:52<br>23 A. I'm sorry, 1990s. 11:19:53<br>24 Q. And was this information that you gathered as 11:19:55<br>25 part of your ongoing research on the factual 11:19:58<br><br>**Page 435**<br><br>1 side? 11:20:01<br>2 A. Yes. As I said, I read the entire document. 11:20:0<br><br>13 Q. Ms. Johnson, can I ask you please to refer to 11:32:03<br>14 page 8, what is internally numbered as page 8 11:32:06<br>15 of Exhibit 241. 11:32:10<br>16 A. (Complies.) 11:32:15<br>17 Q. Do you see a heading in the middle of the 11:32:18<br>18 page entitled, "Gaza Militias and Security 11:32:21<br>19 Forces"? 11:32:26<br>20 A. I do. 11:32:26<br>21 Q. Did you review this as part of your overall 11:32:27<br>22 investigation of Hamas? 11:32:30<br>23 A. I did. 11:32:30<br>24 Q. Did you learn facts from this report that is 11:32:31<br>25 from 2010 about military? 11:32:33<br><br>**Page 436** | |

| Deposition Designation | Objection & Response |
|---|---|
| 1 A. Yes. In fact, this particular portion of the 11:32:35<br>2 report talks about the size of Hamas's 11:32:39<br>3 military wing, and it says that it has 13 to 11:32:43<br>4 14,000 police security and intelligence 11:32:48<br>5 personnel, and that they assist the Al-Qassam 11:32:52<br>6 Brigades. I mean, it goes on to give a lot 11:33:01<br>7 more detail, but one of the things I was 11:33:05<br>8 looking at is, you know, sort of what is the 11:33:07<br>9 size of the military. 11:33:09<br>10 And it says, "Leadership and most of 11:33:10<br>11 the manpower estimated at 2,500 of Hamas's 11:33:12<br>12 military wing are in Gaza and that the Hamas 11:33:15<br>13 led government in Gaza maintains a robust 11:33:18<br>14 contingent of 13 to 14,000 police security 11:33:22<br>15 and intelligence personnel." 11:33:25<br>16 Q. Was part of your overall factual research 11:33:27<br>17 trying to understand the military wing of 11:33:29<br>18 Hamas? 11:33:31<br>19 A. Yes. I was trying to get a good sense of, 11:33:31<br>20 you know, how big it was, what they were 11:33:33<br>21 engaged in, that kind of thing. 11:33:36<br>22 Q. Would you look at internal page number 22 of 11:33:37<br>23 this document, please, ma'am. 11:33:43<br>24 A. Sure. 11:33:44<br>25 Q. It's entitled, "Sources of Assistance." 11:33:45<br><br>Page 437<br><br>1 A. Right. This information in this section of 11:33:50<br>2 the Zanotti report helped inform my 11:33:52<br>3 information about how Hamas engaged in 11:33:56<br>4 negotiations with other countries to get 11:34:00<br>5 financial and military support. And it says 11:34:03<br>6 here that they got most of their support from 11:34:05<br>7 Iran, Syria and Hezbollah, which is an 11:34:12<br>8 organization within Lebanon, usually -- 11:34:15<br>9 usually considered to be a terrorist 11:34:18<br>10 organization. 11:34:19<br>11 Q. As part of your overall research on the 11:34:20<br>12 factual side of the claim, did you undertake 11:34:22<br>13 to attempt to understand the countries or the 11:34:24<br>14 financial sources that Hamas used to support 11:34:29<br>15 itself or its military? 11:34:32<br>16 A. Yes. I mean, I wanted to know, you know, 11:34:34<br>17 sort of how much power does Hamas have, what 11:34:37 | |

| Deposition Designation | Objection & Response |
|---|---|
| 18 does it really do. 11:34:39<br>19 Q. Let me ask you to turn back to Exhibit 239 11:34:46<br>20 please, ma'am. These were notes to yourself. 11:34:49<br>21 A. (Complies.) 11:34:54<br>22 Q. Can you tell us what the third entry on your 11:34:54<br>23 notes is? 11:34:58<br>24 A. Yes. This is the exclusion. It says, 11:35:00<br>25 "Exclusions applicable to all sections of 11:35:06<br><br>Page 438<br><br>1 this policy. This is contained in the 11:35:07<br>2 general conditions of the policy." And then 11:35:09<br>3 it goes on to recite the war exclusion. 11:35:12<br>4 Q. What was the reason that you included this in 11:35:14<br>5 your notes to yourself? 11:35:16<br>6 A. Well, as I was doing my factual 11:35:17<br>7 investigation, it appeared to me that what 11:35:20<br>8 was happening here was a war. That's how it 11:35:22<br>9 was being defined by the media, including 11:35:25<br>10 NBC. It's also how newspapers were talking 11:35:27<br>11 about it. It's how, in fact, the Israeli 11:35:32<br>12 government was talking about it. So I was 11:35:39<br>13 trying to determine if this -- if this 11:35:40<br>14 exclusion applied. 11:35:41<br>15 Q. When you mentioned references to war that you 11:35:44<br>16 observed, did you see those as part of your 11:35:48<br>17 ongoing factual investigation? 11:35:51<br>18 A. Yes. Pretty much everyone was calling this a 11:35:52<br>19 war. 11:35:55<br>20 Q. What types of NBC or MSNBC coverage of the 11:35:55<br>21 conflict did you review? 11:35:59<br>22 A. I reviewed different clips. There was one 11:36:00<br>23 specifically that was talking about the fact 11:36:03<br>24 that there was a ground war in Gaza. That's 11:36:05<br>25 actually the heading that -- that they had on 11:36:08 | Plaintiff's Objections:<br>Page 438:9-438:25<br>MILs 2-3; F.R.E. 402-403, 602, 701<br><br>Defendant's denial letter acknowledged the special meaning of "war" requiring sovereignty. Defendant cannot rely on rationales not cited in their denial letter, including that war has a plain and ordinary meaning based on news articles. *See Century Surety Co. v. Polisso, supra.* Purported plain and ordinary meaning is therefore irrelevant and substantially more prejudicial than probative.<br><br>Israel's actions in Gaza irrelevant and substantially more prejudicial than probative for reasons in MIL No. 3. Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005. |

| Deposition Designation | Objection & Response |
|---|---|
| | Statement that "pretty much everyone was calling this a war" is also hearsay and lacks foundation.<br><br>Defendant's Response:"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| | "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |
| **Page 439** | |
| 1 the program. 11:36:11<br>2 MS. REED: At this point, let me 11:36:12<br>3 note for the record Exhibit 242 will be a 11:36:14<br>4 video that is produced in the case and is 11:36:18<br>5 Bates-numbered ATL 4498. 11:36:21<br>6 (Whereupon, Exhibit 242 was 11:36:21<br>7 marked for identification.) 11:36:21<br>8 I'd like to ask the video operator 11:36:26<br>9 to please play that video for the witness. 11:36:28<br>10 "CHRIS HAYES: The military said the 11:36:28<br>11 ground operation is aimed at, quote -- 11:36:28<br>12 "After days of threatening it, today 11:36:35<br>13 the Israeli government launched a ground 11:36:37<br>14 invasion into Gaza just after 10:00 p.m. 11:36:39<br>15 local time. 11:36:42<br>16 "The Israeli military said the 11:36:43<br>17 ground operation is aimed at, quote, 'Taking 11:36:44<br>18 over targets in Gaza, operating against 11:36:44<br>19 tunnels and terror activists and 11:36:47<br>20 infrastructure.' A spokesman for Hamas said, 11:36:50<br>21 quote, 'Hamas is ready for a confrontation.' 11:36:50<br>22 "Foreign journalists in Gaza have 11:36:55<br>23 reported electricity outages across Gaza City 11:36:56<br>24 and artillery fire from Israeli ground 11:36:59<br>25 troops, as well as fire from naval gun boats 11:37:01 | Plaintiff's Objections:<br>Page 439:1-447:25<br>MIL No. 3; F.R.E. 402-03<br>Given the Ninth Circuit's order, this video and testimony about it are irrelevant and substantially more prejudicial than probative for the reasons in Plaintiffs' MIL No. 3.<br><br>The video and testimony about it focus on Israel's actions in Gaza in the future—not Hamas's conduct directed toward Israel.<br><br>Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005. |

| Deposition Designation | Objection & Response |
|---|---|
| | Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

Page 440

1 and continued air strikes. 11:37:05
2 "The director of a Gaza hospital 11:37:07
3 reported the hospital was being shelled 11:37:07
4 Thursday. According to AFP, the hospital had 11:37:10
5 14 patients, some of whom are paralyzed or in 11:37:12
6 a comma. 11:37:14
7 "The ground invasion came after a 11:37:14
8 five-hour humanitarian cease fire agreement 11:37:17
9 expired. Just as that temporary cease fire 11:37:20
10 ended, the Israeli military says a Hamas 11:37:22
11 rocket struck a city in southern Israel. 11:37:23
12 "Hours before the ground invasion 11:37:26
13 got underway, Israel says it intercepted a 11:37:28
14 group of Hamas fighters who were trying to 11:37:31
15 sneak into Israel through a tunnel under the 11:37:33
16 border of Gaza. 11:37:33
17 "Israeli military launched an air 11:37:35
18 strike at the mouth of the tunnel. Hamas 11:37:37
19 dies -- denies any of its fighters were 11:37:39
20 killed in the operation. 11:37:41
21 "Joining me now by phone from 11:37:43
22 Tel Aviv is Amir Tibon. He's diplomatic 11:37:44
23 correspondent for Walla News in Israel. 11:37:44
24 "Amir, what is the reaction in 11:37:49
25 Israel to this latest escalation? 11:37:51

Page 441

1 "AMIR TIBON: Well, I have to say 11:37:58

| Deposition Designation | Objection & Response |
|---|---|
| 2 that right now in Israel not many people are 11:37:58<br>3 surprised by this ground incursion into Gaza. 11:38:01<br>4 It's something that we were expecting, 11:38:04<br>5 because over the last days there were just 11:38:07<br>6 endless attacks coming here from Gaza and 11:38:09<br>7 Jerusalem with rocket launches, but also 11:38:12<br>8 attempt after attempt by Hamas militants to 11:38:15<br>9 enter Israel through these tunnels that 11:38:17<br>10 they're digging underground into the Israeli 11:38:19<br>11 side of the border in order to try to carry 11:38:21<br>12 out terrorist attacks in Israeli villages and 11:38:24<br>13 towns. 11:38:24<br>14 "And the -- the reason I think many 11:38:25<br>15 people are just saying that this was 11:38:32<br>16 expected, that it was just a matter of time 11:38:32<br>17 before our prime minister would take such 11:38:36<br>18 a -- such a decision, so not -- not anybody 11:38:37<br>19 surprised. 11:38:37<br>20 "Of course, you have people who are 11:38:41<br>21 worried, because now we have our soldiers 11:38:42<br>22 in -- inside Gaza fighting the Hamas 11:38:45<br>23 terrorists and people are worried about it, 11:38:47<br>24 but it didn't come as a big surprise to 11:38:48<br>25 anybody. 11:38:50<br><br>Page 442<br><br>1 "CHRIS HAYES: There is a question, 11:38:51<br>2 you're looking at live pictures of Gaza, 11:38:52<br>3 what -- what kind of effect this will have on 11:38:55<br>4 Gaza civilians. There's not a lot of places 11:38:57<br>5 to go. We've been hearing reports out of 11:38:59<br>6 Gaza, children, women, noncombatants don't 11:39:02<br>7 have many places they can go. 11:39:06<br>8 "There was leaflets by the Israeli 11:39:08<br>9 government, there were warnings even on Hamas 11:39:09<br>10 television to evacuate, but it -- it's 11:39:11<br>11 unclear how any kind of ground incursion, any 11:39:13<br>12 kind of shelling can spare the lives of 11:39:17<br>13 noncombatants. 11:39:19<br>14 "AMIR TIBON: Absolutely. This is a 11:39:23<br>15 big worry also for Israel. Because, you 11:39:24<br>16 know, the more civilians get hurt, the less 11:39:26<br>17 legitimacy Israel will have to continue the 11:39:29<br>18 operation, which is really aimed at 11:39:31<br>19 terrorists and not at civilians and it is 11:39:34<br>20 something that I know that the Israeli 11:39:36<br>21 military is also very concerned about. 11:39:38<br>22 "Right now the plan that has been 11:39:40<br>23 presented by the government and the military | |

| Deposition Designation | Objection & Response |
|---|---|
| 11:39:42<br>24 is not to go deep into Gaza and get into the 11:39:45<br>25 city centers and fight in the allies and the 11:39:48<br><br>Page 443<br><br>1 streets, but it's actually to stay more on 11:39:50<br>2 the border to really take care of the 11:39:52<br>3 conflict, which is just the craziest thing, 11:39:56<br>4 you know, because it's -- these are tunnels 11:39:58<br>5 that -- that are dug for -- deep underground 11:40:03<br>6 with a lot of expertise, a lot of money 11:40:05<br>7 poured into it only in order to carry out 11:40:09<br>8 terrorist attacks. 11:40:12<br>9 "So I think right now there's not 11:40:12<br>10 going to be any -- any kind of big move into 11:40:14<br>11 the city center, but obviously civilians are 11:40:17<br>12 suffering. I have friends who are there, 11:40:21<br>13 journalists, but also civilians, people, I 11:40:24<br>14 talk to them, I hear very sad reports coming 11:40:25<br>15 in from there, and it's definitely very 11:40:29<br>16 disturbing. 11:40:31<br>17 "CHRIS HAYES: There is also a 11:40:33<br>18 question that there was -- Avigdor Lieberman, 11:40:33<br>19 the foreign minister in the Netanyahu 11:40:35<br>20 government, had basically said that Gaza 11:40:36<br>21 needed to be reoccupied, and the Israeli 11:40:38<br>22 defense forces have stated that they -- they 11:40:42<br>23 have this, essentially, limited goal in terms 11:40:43<br>24 of the tunnels, but there's a real question 11:40:47<br>25 of what is day two, what is day three here. 11:40:49<br><br>Page 444<br><br>1 "What is the understanding of what 11:40:52<br>2 that looks like? 11:40:54<br>3 "AMIR TIBON: Yeah, actually, the -- 11:40:58<br>4 the statement by our Foreign Minister 11:41:00<br>5 Lieberman, which you mentioned, I think it 11:41:02<br>6 doesn't represent right now the -- the 11:41:04<br>7 of our government. There was a big political 11:41:06<br>8 debate in the last days in Israel over our 11:41:09<br>9 Prime Minister Netanyahu, over his decision 11:41:14<br>10 to show some kind of restraint. 11:41:15<br>11 "I know it's hard, it sounds weird 11:41:17<br>12 when you see the pictures from Gaza, which 11:41:19<br>13 are terrible, you know, the families and the 11:41:21<br>14 civilians and children who were killed, and 11:41:23<br>15 it's -- and the Israelis are saying, 'No, we 11:41:26<br>16 are showing restraint,' actually, Netanyahu 11:41:28<br>17 waited for a long time while Israeli cities. 11:41:30 | |

| Deposition Designation | Objection & Response |
|---|---|
| 18 you know, from Tel Aviv to any other city in 11:41:34<br>19 the country were bombarded, he waited for a 11:41:36<br>20 long time before he decided to do this ground 11:41:39<br>21 operation, and he got a lot of criticism over 11:41:40<br>22 it from right wing members of his coalition, 11:41:43<br>23 including our foreign minister who said, 'No, 11:41:46<br>24 we need to act more forcefully, more 11:41:48<br>25 decisively.' 11:41:48<br><br>Page 445<br><br>1 "And his attitude was, 'No, let's 11:41:51<br>2 wait, let's try to reach a cease fire.' You 11:41:54<br>3 know, just two days ago he sort of agreed to 11:41:56<br>4 enter a cease fire agreement agreement over 11:41:58<br>5 by Egypt and Hamas refused, so he was 11:42:00<br>6 criticized for it. 11:42:02<br>7 "But I think it was a smart move by 11:42:03<br>8 him, because right now it allows him to act 11:42:06<br>9 and we don't see a lot of international 11:42:08<br>10 criticism over Israel, at least not from 11:42:12<br>11 foreign government. 11:42:13<br>12 "CHRIS HAYES: Amir Tibon, thank you 11:42:14<br>13 very much. 11:42:14<br>14 "AMIR TIBON: Thank you. 11:42:17<br>15 "CHRIS HAYES: And more on Malaysian 11:42:17<br>16 Airlines Flight 17 including the 11:42:17<br>17 revelatory" -- 11:42:17<br>18 "And good morning again to get that 11:42:17<br>19 news" -- 11:42:35<br>20 BY MS. REED: 11:42:35<br>21 Q. Ms. Johnson, was that a July 17th news video 11:42:35<br>22 that you watched at or about that time? 11:42:38<br>23 A. Yes. 11:42:40<br>24 Q. And do you recall watching that? 11:42:40<br>25 A. Yes, I do. 11:42:41<br><br>Page 446<br><br>1 Q. Was there information presented in that news 11:42:42<br>2 piece that informed your overall factual 11:42:46<br>3 investigation? 11:42:48<br>4 A. Yes, there was. 11:42:49<br>5 Q. Can you tell me what information that was? 11:42:50<br>6 A. Well, the fact that NBC itself was 11:42:52<br>7 identifying this as a ground war. The 11:42:54 | |

| Deposition Designation | Objection & Response |
|---|---|
| 8 description both of Chris Hayes and then the 11:42:58<br>9 other -- the Israeli journalist that he was 11:43:01<br>10 interviewing, they talked -- they both talked 11:43:04<br>11 a lot about how it seemed as though things 11:43:06<br>12 were escalating, that although Netanyahu had 11:43:09<br>13 wanted to show restraint, now that there 11:43:13<br>14 wasn't a chance of a cease fire or it didn't 11:43:16<br>15 appear that there was a chance of a cease 11:43:19<br>16 fire, that things were escalating. 11:43:21<br>17 Q. Did the label ground war that was put behind 11:43:25<br>18 the journalist inform your overall 11:43:28<br>19 investigation? 11:43:31<br>20 A. Well, the fact that NBC itself was labeling 11:43:32<br>21 it as a war, obviously was -- was something 11:43:35<br>22 that I took into consideration. But more 11:43:39<br>23 than that, it was also the fact that you 11:43:41<br>24 could see in this video that there were tanks 11:43:43<br>25 that were advancing, that they were trying to 11:43:45<br><br>Page 447<br><br>1 take out the tunnels that led between Gaza 11:43:47<br>2 and Israel, that basically, you know, Israel 11:43:51<br>3 was -- was saying that they wanted to 11:43:57<br>4 reoccupy Gaza, that this is clearly a 11:43:58<br>5 back-and-forth situation and that -- that 11:44:02<br>6 Israel was very, very serious about -- about 11:44:04<br>7 using all kinds of military weapons to 11:44:07<br>8 prevent -- to prevent the -- the Hamas from 11:44:11<br>9 doing further damage to Israel. 11:44:15<br>10 Q. After this report of the ground war beginning 11:44:19<br>11 on July the 17th, did you continue to monitor 11:44:23<br>12 the events that were occurring? 11:44:26<br>13 A. I did. 11:44:28<br>14 Q. Let me ask you to think forward a week from 11:44:29<br>15 the time that you began to review the factual 11:44:36<br>16 investigation and over the next approximately 11:44:39<br>17 seven days of developments. Can you describe 11:44:41<br>18 by then what sort of overall impressions you 11:44:45<br>19 had formed regarding the factual events? 11:44:49<br>20 A. Well, this looked like a war. I mean, there | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 447:22-448:25<br>MILs 2-3; F.R.E. 402, 403, 602, 701<br>Ms. Johnson lacks expertise and foundation and offers an improper opinion that this "had all the indicia of war."<br><br>Ms. Johnson, a lawyer, then offers an improper legal opinion about what the "case law" on the war exclusions says.<br><br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony<br>The witness's knowledge, research and response to the claim are relevant; not |

| Deposition Designation | Objection & Response |
|---|---|
| 11:44:52<br>21 was a lot of -- of fire back and forth. 11:44:55<br>22 There was definitely use of -- of a variety 11:44:56<br>23 of military weapons. The incursion into Gaza 11:44:59<br>24 continued to increase. The body count 11:45:03<br>25 continued to increase, less so on the Israeli 11:45:05<br><br>Page 448<br><br>1 side because -- because of the Iron Dome 11:45:09<br>2 defense system. 11:45:11<br>3 But certainly, you know, Hamas was 11:45:12<br>4 continuing to send rockets and try to 11:45:14<br>5 infiltrate Israel with a variety of different 11:45:18<br>6 military operations, few of which were 11:45:23<br>7 successful. And, I mean, it -- it had all 11:45:26<br>8 the indicia of war. 11:45:29<br>9 Q. Did you also conduct research on the policy 11:45:38<br>10 language and terms during this general time 11:45:41<br>11 frame? 11:45:43<br>12 A. I did. This was the first time that I had 11:45:43<br>13 dealt with the war exclusion, so one of the 11:45:47<br>14 things that I wanted to do was to see how 11:45:51<br>15 this exclusion had been interpreted by 11:45:54<br>16 courts. So I did research with regard to 11:45:58<br>17 what -- what did the case law say about this 11:46:02<br>18 exclusion. This is a very common exclusion 11:46:05<br>19 in -- in most insurance policies. 11:46:07<br>20 Q. And when you are referring generally to war 11:46:10<br>21 exclusion, are you referring to all the parts 11:46:14<br>22 that you included in your note to yourself 11:46:17<br>23 that was labeled Exhibit 239? 11:46:19<br>24 A. Yes. 11:46:22<br>25 11:46:25<br><br>Page 449<br><br>1 (Whereupon, Exhibit 243 was 11:46:26<br>2 Marked for identification.) 11:46:26<br>3 BY MS. REED: 11:46:26<br>4 Q. Let me hand you Exhibit 243, please, ma'am. 11:46:26<br>5 Can you identify Exhibit 243 as a 11:46:35<br>6 Westlaw printout indicating a Westlaw search 11:46:39<br>7 and an attached document? 11:46:43<br>8 A. Yes, that's what it is. 11:46:45<br>9 Q. Can you identify this as a portion of your 11:46:48<br>10 work product that you were conducting in the | unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| 11:46:50<br>11 course of looking at policy language and 11:46:54<br>12 terms? 11:46:57<br>13 A. Yes, it looks like I did this search on 11:46:57<br>14 July 17th. 11:47:00<br>15 Q. And can you read for us the initial search 11:47:03<br>16 that you have reported here? 11:47:07<br>17 A. I'm looking for the term insured or insurance 11:47:09<br>18 or insurer in the same paragraph as war or 11:47:13<br>19 warlike in the same paragraph as exclusion or 11:47:16<br>20 exclude or excluded in the same paragraph as 11:47:22<br>21 Israel. 11:47:25<br>22 Q. Do you recall at what point in the course of 11:47:26<br>23 your work, specifically focusing on 11:47:30<br>24 conducting research on the policy language 11:47:33<br>25 and terms, that you would have conducted this 11:47:35<br><br>Page 450<br><br>1 search? 11:47:39<br>2 A. I think that -- based on the specificity of 11:47:39<br>3 the search, this was probably -- this was 11:47:42<br>4 probably one of the -- the -- well, I don't 11:47:49<br>5 know. It was certainly where I was trying to 11:47:52<br>6 drill down to make -- to see if there was any 11:47:56<br>7 particular case that dealt with the Israeli 11:47:59<br>8 situation -- 11:48:01<br>9 Q. Can you -- 11:48:02<br>10 A. -- as opposed to the war exclusion for a war 11:48:03<br>11 in someplace else in -- in the world. 11:48:09<br>12 Q. Can you describe your overall research 11:48:10<br>13 approach that you took when you were looking 11:48:14<br>14 at policy language and terms, in a general 11:48:17<br>15 fashion? 11:48:19<br>16 A. Well, I wanted to read any -- any kind of 11:48:19<br>17 case law that was going to interpret this 11:48:23<br>18 exclusion, because that's important. This 11:48:25<br>19 was a New York policyholder, so I -- I did 11:48:28<br>20 want to look at New York law. However, I 11:48:30<br>21 know also that the policy was issued in 11:48:33<br>22 California and sent to -- you know, given to 11:48:35<br>23 the client in California, so I also wanted to 11:48:40<br>24 see what California law had to -- to say 11:48:43<br>25 about it. 11:48:44 | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 451 | |
| 1 But what I found is that there -- there 11:48:45<br>2 is not a broad amount of case law that 11:48:47<br>3 interprets this particular exclusion. So I 11:48:50<br>4 wanted to look at as many cases as I could to 11:48:54<br>5 get a general understanding of how the -- how 11:48:57<br>6 this exclusion is interpreted by the courts. 11:49:00<br>7 Q. And did you conduct as broad an analysis as 11:49:02<br>8 you felt you were able to about how the 11:49:07<br>9 policy terms might be interpreted by 11:49:09<br>10 different courts? 11:49:12<br>11 A. Yes. 11:49:12<br>12 Q. Did you print out all of your searches and 11:49:14<br>13 search results? 11:49:18<br>14 A. I'm sure that I didn't. I probably printed 11:49:19<br>15 out -- well, I didn't necessarily print them 11:49:24<br>16 out, but I certainly would send -- as you see 11:49:27<br>17 on this first page, I sent the case to 11:49:30<br>18 myself. In other words, I sent this under 11:49:32<br>19 the subject heading, "War exclusion," which 11:49:37<br>20 is the title that I put on it, and I sent 11:49:39<br>21 that to myself. 11:49:41<br>22 This particular case, the 11:49:42<br>23 Holiday Inn case, which is what this is, also 11:49:44<br>24 references a variety of different cases that 11:49:47<br>25 also deal with the war exclusion, and I 11:49:49 | |
| Page 452 | |
| 1 looked at all the cases that it referenced as 11:49:51<br>2 well, and then I looked at the cases that 11:49:54<br>3 those cases referenced, which is the usual 11:49:56<br>4 way you would do legal research, and I 11:49:58<br>5 conducted a variety of Westlaw searches to 11:50:00<br>6 see if there was other information there. 11:50:04<br>7 Q. Would it have been your practice at the time 11:50:06<br>8 to keep electronic copies of every search or 11:50:09<br>9 every case you looked at? 11:50:12<br>10 A. No. If the information is repetitive, in 11:50:14<br>11 other words, something that I've read in 11:50:17<br>12 another case, I probably wouldn't have 11:50:18<br>13 printed that case out. 11:50:21<br>14 If there was something new and 11:50:23<br>15 different that I thought was important to my | Plaintiffs' Objection:<br>Page 452:18-25<br>F.R.E. 402-03, 701<br>Improper legal opinion about application of case law to facts.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is |

| Deposition Designation | Objection & Response |
|---|---|
| 11:50:24<br>16 analysis, then I might print that case out, 11:50:26<br>17 probably I would. 11:50:31<br>18 But one of the things that I always 11:50:31<br>19 look at is how similar is the situation, the 11:50:35<br>20 factual situation that's set forth in the 11:50:38<br>21 case law to the factual situation I'm 11:50:40<br>22 investigating now. Because if the factual 11:50:43<br>23 situation is highly different than what the 11:50:45<br>24 court is saying about the exclusion, might 11:50:47<br>25 not apply to this situation, and -- and in 11:50:49<br><br>Page 453<br><br>1 that case there's a likelihood that I 11:50:52<br>2 wouldn't -- I wouldn't print it out, because 11:50:55<br>3 it's not the same situation, the same -- the 11:50:57<br>4 same language would not apply. 11:50:59<br>5 Q. Did you consult other sources besides case 11:51:01<br>6 law in your overall research about policy 11:51:03<br>7 language and terms? 11:51:07<br>8 A. Yes. I -- I know that I looked at Appleman 11:51:08<br>9 on Insurance, I looked at other -- I probably 11:51:13<br>10 looked at other treatises as well. There are 11:51:16<br>11 a variety of insurance treatises that are 11:51:19<br>12 also available through Westlaw and other 11:51:22<br>13 sources to find out as much as I could about 11:51:23<br>14 this exclusion. 11:51:25<br>15 Q. Did you refer to dictionary definitions or 11:51:31<br>16 other discussions of definitions? 11:51:34<br>17 A. Yes. I looked at dictionary definitions of 11:51:35<br>18 war and warlike, and probably of insurrection 11:51:37<br>19 and rebellion as well. 11:51:41<br>20 Q. Did you consult multiple different 11:51:43<br>21 dictionaries in order to do that? 11:51:44<br>22 A. I did. 11:51:47<br>23 Q. Can you describe any other aspects of your 11:51:56<br>24 overall research that you did as part of your 11:51:58<br>25 claim investigation? 11:52:00<br><br>Page 454<br><br>1 A. Well, it was a long time ago now, so I can't 11:52:03<br>2 remember with perfect specificity all of the 11:52:06<br>3 things that I did. But I spent hours and 11:52:09<br>4 hours at it and looked at as many sources as 11:52:12<br>5 I could. 11:52:17 | relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to |

| Deposition Designation | Objection & Response |
|---|---|
| 6 Q. At the same time that you were conducting 11:52:31<br>7 your factual research and legal research and 11:52:33<br>8 analysis of the policy, were you also 11:52:37<br>9 communicating internally at Atlantic? 11:52:38<br>10 A. Yes. Once I determined that the war 11:52:42<br>11 exclusion might come into play, I wanted to 11:52:44<br>12 know whether or not anyone else in the 11:52:48<br>13 company had interpreted this policy in doing 11:52:51<br>14 some kind of coverage analysis, so I asked 11:52:55<br>15 Theresa Gooley to see whether or not she 11:52:58<br>16 could check on that with other -- with other 11:53:01<br>17 units. 11:53:03<br>18 OneBeacon is a pretty old company, 11:53:05<br>19 so it was probably impossible to know 11:53:07<br>20 absolutely whether or not OneBeacon had 11:53:10<br>21 considered the war exclusion in the past. 11:53:11<br>22 But given the resources that we had currently 11:53:14<br>23 available internally, I wanted to know if 11:53:16<br>24 there was anyone who had interpreted this -- 11:53:19<br>25 this particular exclusion. 11:53:22<br><br>Page 455<br><br>1 It's important when you're dealing 11:53:23<br>2 with insurance policies that you want to have 11:53:26<br>3 a consistent interpretation of policy 11:53:28<br>4 provisions across the entire company. You 11:53:33<br>5 don't want, you know, the technology branch 11:53:36<br>6 to interpret a policy provision that's also 11:53:38<br>7 contained in an entertainment policy 11:53:41<br>8 differently than you would in entertainment. 11:53:43<br>9 (Whereupon, Exhibit 244 was 11:53:46<br>10 marked for identification.) 11:53:46<br>11 BY MS. REED: 11:53:46<br>12 Q. Let me hand you what's been marked as 11:53:47<br>13 Exhibit 244, please, ma'am. 11:53:49<br>14 Can you identify Exhibit 244 as an 11:53:50<br>15 e-mail that you sent to Theresa Gooley? 11:53:53<br>16 A. Yes. 11:53:55<br>17 Q. And what were you inquiring about in this 11:53:56<br>18 e-mail, please, ma'am? 11:54:00<br>19 A. It says, "I want to make sure that OBE takes 11:54:01<br>20 a position that is consistent with the rest 11:54:05<br>21 of OneBeacon in interpreting the exclusion 11:54:07<br>22 for warlike actions by a military force. I'm 11:54:09 | |

| Deposition Designation | Objection & Response |
|---|---|
| 23 thinking that tech or other business units 11:54:12<br>24 might also have had claims arising from the 11:54:14<br>25 Israeli/Hamas conflict. Do you have time for 11:54:17<br><br>Page 456<br><br>1 a quick call to discuss how to get continuity 11:54:19<br>2 among business units?" 11:54:20<br>3 Q. Did you follow up with Ms. Gooley about this 11:54:22<br>4 request? 11:54:24<br>5 A. I did. 11:54:25<br>6 Q. Did you receive a response? 11:54:26<br>7 A. She could not find any other group that had 11:54:28<br>8 interpreted this particular exclusion. 11:54:31<br>9 (Whereupon, Exhibit 245 was 11:54:38<br>10 marked for identification.) 11:54:46<br>11 BY MS. REED: 11:54:46<br>12 Q. Were you continuing to have internal 11:54:46<br>13 conversations and communications with 11:54:48<br>14 Mr. Gutterman on the claim? 11:54:50<br>15 A. Yes. 11:54:51<br>16 Q. Let me hand you what's been marked as 11:54:52<br>17 Exhibit 245, please, ma'am. 11:54:55<br>18 Can you identify Exhibit 245 as an 11:54:57<br>19 e-mail string which culminates in an e-mail 11:55:00<br>20 from you to Mr. Gutterman on Tuesday, July 11:55:06<br>21 the 15th? 11:55:09<br>22 A. Yes, that's what it is. 11:55:10<br>23 Q. Did Mr. Gutterman send you a note about 11:55:13<br>24 reviewing some particular policy language? 11:55:16<br>25 A. Yes, he did. 11:55:20<br><br>Page 457<br><br>1 Q. And did you respond to him? 11:55:21<br>2 A. Yes, I did. I told him that we needed to 11:55:24<br>3 have further discussion -- a lot more further 11:55:30<br>4 discussion about this and to call me in the 11:55:33<br>5 morning. 11:55:35<br>6 Q. And what did you mean by that? 11:55:35<br>7 A. Well, he was looking at the policy language 11:55:37<br>8 for extra expense. He was specifically 11:55:38<br>9 looking at the wording for civil unrest and 11:55:40<br>10 the exclusion for it, and he was saying that 11:55:42<br>11 this policy was different from other policies 11:55:46 | |

| Deposition Designation | Objection & Response |
|---|---|
| 12 that he had seen. And, I mean, I wanted to 11:55:48<br>13 talk to him about the claim in general based 11:55:55<br>14 on the information that I was also gathering. 11:55:57<br>15 Q. And do you recall having those types of 11:56:03<br>16 conversations with Mr. Gutterman? 11:56:05<br>17 A. Oh, we talked about this case a lot, yes. 11:56:06<br>18 (Whereupon, Exhibit 246 was 11:56:14<br>19 marked for identification.) 11:56:14<br>20 BY MS. REED: 11:56:14<br>21 Q. Let me hand you Exhibit 246, please, ma'am. 11:56:15<br>22 Can you identify Exhibit 246 as an e-mail 11:56:18<br>23 string which culminates in an e-mail that you 11:56:20<br>24 sent to Mr. Williams and Mr. Gutterman on 11:56:23<br>25 July the 15th? 11:56:27<br><br>Page 458<br><br>1 A. Yes, this is the e-mail string that -- that 11:56:31<br>2 reflects communications that we had. 11:56:38<br>3 Q. And were you asking, as early as July 15th, 11:56:40<br>4 to have a call with Mr. Williams and 11:56:43<br>5 Mr. Gutterman to be discussing the claim? 11:56:46<br>6 A. Yes. From the e-mail string and from other 11:56:49<br>7 information I had gathered, it was apparent 11:56:53<br>8 that Peter had also talked to Andrea and 11:56:54<br>9 Susan, so I wanted to know what information 11:56:57<br>10 he had gathered from his conversation and 11:57:00<br>11 also wanted to share with him the information 11:57:03<br>12 that I was gathering. 11:57:06<br><br>Page 459<br><br>9 Q. Are you reporting to Mr. Williams about the 11:57:55<br>10 conversation you had with Ms. Weiss and 11:57:57<br>11 Ms. Garber on July the 15th in this e-mail? 11:57:59<br>12 A. Yes. 11:58:03<br>13 Q. And why do you make the comments that you do, 11:58:04<br>14 please, ma'am? 11:58:06<br>15 A. Well, I was just relating what we had the 11:58:07<br>16 call about. It says that we had a 11:58:11<br>17 conversation -- "Danny and I had a 11:58:13<br>18 conversation with Susan and Andrea today 11:58:15 | |

| Deposition Designation | Objection & Response |
|---|---|
| 19 about what the production's plans were," 11:58:16<br>20 because he had already referenced that -- 11:58:18<br>21 that he had talked to them about the claim, 11:58:22<br>22 "But we didn't make any representations about 11:58:24<br>23 whether there was coverage, but we also 11:58:27<br>24 didn't alert" -- "did not the alert them that 11:58:29<br>25 there" -- "that this might not be a covered 11:58:31<br><br>Page 460<br><br>1 claim. If this is going to be an issue, we 11:58:32<br>2 need to alert them right away." And then I 11:58:34<br>3 said, "Peter" -- "Peter, when are you 11:58:37<br>4 available tomorrow." 11:58:38<br>5 Q. When you sent this e-mail on July 15th, did 11:58:39<br>6 you know whether there potentially would be 11:58:42<br>7 coverage or would not be coverage? 11:58:44<br>8 A. This was right at the beginning of my 11:58:45<br>9 investigation, so I didn't know for sure. 11:58:47<br>10 You know, I -- I could see from this e-mail 11:58:49<br>11 string and the previous one that Danny was 11:58:52<br>12 looking at the -- the civil unrest portion of 11:58:54<br>13 the policy. I had certainly, at that point, 11:58:57<br>14 probably started my investigation, at least 11:59:00<br>15 initially. 11:59:03<br>16 But as I previously explained, if 11:59:03<br>17 you think that there's going to be any kind 11:59:07<br>18 of a coverage issue, you need to get that -- 11:59:09<br>19 get in touch with the production right away. 11:59:11<br>20 But at this point all I was telling 11:59:14<br>21 him is that we didn't tell them one way or 11:59:16<br>22 another whether there was coverage, because I 11:59:19<br>23 wouldn't do that without doing some kind of 11:59:21<br>24 factual investigation unless the facts were 11:59:23<br>25 so patently clear that it was obvious that 11:59:25<br><br>Page 461<br><br>1 there was coverage. So I wanted to talk 11:59:28<br>2 through the entire situation. 11:59:31<br>3 Q. Based upon your experience in handling 11:59:33<br>4 entertainment claims, is there a certain 11:59:36<br>5 level of urgency that's typically 11:59:38<br>6 communicated to you by your insured? 11:59:40<br>7 A. They want everything and they want it right 11:59:42<br>8 now. 11:59:44 | |

| Deposition Designation | Objection & Response |
|---|---|
| 9 Q. And do you proceed with your investigation 11:59:44<br>10 knowing that they have a certain level of 11:59:48<br>11 urgency? 11:59:50<br>12 A. Of course I do. 11:59:51<br>13 Q. And what did you mean about your comments in 11:59:52<br>14 terms of alerting your insured as soon as you 11:59:57<br>15 could? 12:00:01<br>16 A. The one thing that is most important when you 12:00:01<br>17 handle a first-party entertainment claim is 12:00:04<br>18 that if you think that there is going to be 12:00:07<br>19 any issue with regard to coverage, you need 12:00:09<br>20 to let the production know immediately. 12:00:10<br>21 And the reason for that is, as I 12:00:12<br>22 previously explained, they want to know whose 12:00:14<br>23 money they're spending, are they going to be 12:00:16<br>24 spending the insurance company's money or are 12:00:19<br>25 they going to be spending their own money. 12:00:21<br><br>Page 462<br><br>1 Is this going to be something that is covered 12:00:22<br>2 or is this something they have to put in 12:00:24<br>3 their own internal budgets. So obviously 12:00:26<br>4 that's an important concern to them. 12:00:28<br>5 When we initially get a claim, you 12:00:30<br>6 know, if somebody says, "Is this covered," 12:00:32<br>7 what we always will tell them is, you know, 12:00:34<br>8 we have to do a factual investigation. 12:00:36<br>9 And I know that -- that Peter's 12:00:38<br>10 favorite thing to tell them is behave as 12:00:40<br>11 though you don't have any insurance and do 12:00:42<br>12 what is prudent in that situation, so that 12:00:45<br>13 they're not relying upon the fact that there 12:00:47<br>14 could be coverage in making their next 12:00:49<br>15 decision. 12:00:51<br>16 Q. Do you attempt to predetermine whether 12:00:52<br>17 there's going to be coverage or not before 12:00:54<br>18 you've done your full investigation? 12:00:56<br>19 A. Absolutely not. 12:00:58<br>20 Q. What is your process for analyzing coverage? 12:00:58<br>21 A. Well, I try to gather the facts that are 12:01:02<br>22 applicable to the situation. I then look at 12:01:06 | |

| Deposition Designation | Objection & Response |
|---|---|
| 23 the policy language and see how the facts 12:01:10<br>24 apply to the policy language, determine if 12:01:12<br>25 there are people that I need to interview at 12:01:14<br>Page 463<br><br>1 the insured. 12:01:17<br>2 For example, if you're dealing with 12:01:18<br>3 an abandonment claim, which means that the -- 12:01:20<br>4 the insured has abandon a production, decided 12:01:23<br>5 not to continue to film it, you want to 12:01:26<br>6 figure out, "Okay, well, what was your basis 12:01:28<br>7 for abandoning the claim." 12:01:29<br>8 So you would get together with 12:01:31<br>9 the -- the insured and talk through what 12:01:33<br>10 their thought process was with regard to 12:01:34<br>11 abandoning the claim and evaluate the fact 12:01:38<br>12 situation that applied to that, so you want 12:01:40<br>13 to be looking at a variety of different 12:01:42<br>14 facts. 12:01:44<br>15 Just like if you were handling a car 12:01:45<br>16 accident case, you would want to get medical 12:01:47<br>17 reports before you paid the claim, because 12:01:49<br>18 you want to know what has actually happened 12:01:50<br>19 to the person and have they reached their 12:01:53<br>20 healing plateau, you would want to get the 12:01:55<br>21 police report related to the car accident to 12:01:58<br>22 see who was found at fault, that sort of 12:01:59<br>23 thing. 12:02:01<br>24 Q. When you turn your attention to the policy 12:02:01<br>25 itself and you're applying the facts to the 12:02:03<br><br>Page 464<br><br>1 policy, do you look for coverage as your 12:02:05<br>2 initial step? 12:02:07<br>3 A. That is -- that is what we are supposed to 12:02:11<br>4 do. Always, the first thing that you do is 12:02:13<br>5 you see if you can find coverage. Our job is 12:02:16<br>6 to find coverage if coverage can be found. 12:02:17<br>7 (Whereupon, Exhibit 247 was 12:02:23<br>8 marked for identification.) 12:02:24<br>9 BY MS. REED: 12:02:24<br>10 Q. Let me hand you Exhibit 247, please, ma'am. 12:02:24<br>11 Can you identify Exhibit 247 as an 12:02:27<br>12 e-mail string that culminates an e-mail that 12:02:29<br>13 you sent July the 15th, 2014, to Mr. Williams 12:02:35<br>14 and Mr. Gutterman? 12:02:38 | |

| Deposition Designation | Objection & Response |
|---|---|
| 15 A. Yes, that's what it is. 12:02:41<br>16 Q. Why did you send this particular e-mail 12:02:45<br>17 raising the issue of the last travel warning 12:02:49<br>18 issued by the U.S.? 12:02:51<br>19 A. Because when I had dealt with extra expense 12:02:53<br>20 claims in other countries before, I want -- I 12:02:56<br>21 always -- you always want to see so what -- 12:03:00<br>22 what -- what -- what does the production know 12:03:03<br>23 before they even get to the country about 12:03:05<br>24 what the conditions are in that country. 12:03:07<br>25 Q. And does this indicate to you that you were 12:03:10<br><br>Page 465<br><br>1 already performing research and analysis on 12:03:13<br>2 July the 15th about the claim? 12:03:15<br>3 A. Yes. 12:03:17<br>4 Q. Does this indicate to you that Mr. Gutterman 12:03:18<br>5 had shared the policy with you and with 12:03:20<br>6 Mr. Williams as of July the 15th? 12:03:24<br>7 A. I don't know if he shared it with us or if it 12:03:26<br>8 was actually located in the claim file 12:03:29<br>9 already, but he was clearly forwarding it to 12:03:31<br>10 both of us at that time. 12:03:33<br>11 Q. So by July the 15th, it was at least 12:03:34<br>12 available for you to access? 12:03:37<br>13 A. Yes. 12:03:39<br>14 (Whereupon, Exhibit 248 was 12:03:49<br>15 marked for identification.) 12:03:49<br>16 BY MS. REED: 12:03:49<br>17 Q. Let me hand you Exhibit 248, please, ma'am. 12:03:50<br>18 A. Yes. 12:03:52<br>19 Q. Can you identify Exhibit 248 as an e-mail 12:03:52<br>20 string which culminates in an e-mail that you 12:03:57<br>21 sent to Mr. Williams and Mr. Gutterman on 12:04:00<br>22 July the 16th? 12:04:02<br>23 A. Yes, this is an e-mail exchange between us in 12:04:03<br>24 which I was conveying the first four 12:04:09<br>25 enumerated sections of the war exclusion 12:04:16<br><br>Page 466<br><br>1 contained in the general conditions of the 12:04:18<br>2 production policy. 12:04:21 | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 466:20-467:2<br>602, 802 |

| Deposition Designation | Objection & Response |
|---|---|
| 3 Q. And what was the purpose of you communicating 12:04:22<br>4 this to Mr. Williams and Mr. Gutterman? 12:04:24<br>5 A. It appears that at this point in my research 12:04:27<br>6 I was thinking that this might be an 12:04:30<br>7 exclusion that we needed to evaluate. 12:04:32<br>8 Q. Did you have some discussions with 12:04:33<br>9 Mr. Williams about the war exclusions that 12:04:35<br>10 were in this policy? 12:04:37<br>11 A. Well, certainly I did, yes. 12:04:40<br>12 Q. And did he ever make any indication to you 12:04:41<br>13 that he analyzed the applications of the 12:04:46<br>14 exclusions in a different way than you were 12:04:51<br>15 communicating with him? 12:04:53<br>16 A. No. I mean, we talked through what the facts 12:04:55<br>17 were, you know, because obviously I had done 12:04:57<br>18 an extensive investigation, was continuing to 12:05:00<br>19 investigate, and Danny was doing the same 12:05:02<br>20 thing. Peter, obviously, wasn't doing that 12:05:04<br>21 same investigation. That wasn't his job. So 12:05:06<br>22 I was relaying to him the facts as we knew 12:05:11<br>23 them and talking about whether or not the war 12:05:14<br>24 exclusion would apply to the facts as we knew 12:05:16<br>25 them. But, no, he did not disagree. He 12:05:20 | Lack of foundation and speculation (or, alternatively, hearsay) as to whether Peter Williams agreed that the war exclusion applied.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted 801, 807. |
| Page 467<br>1 agreed that the war conclusion was 12:05:22<br>2 potentially applicable. 12:05:24<br>3 Q. Did you and Mr. Gutterman and Mr. Williams 12:05:25<br>4 together have various conversations about the 12:05:29<br>5 analysis of the claim? 12:05:32<br>6 A. Yes, we did. 12:05:33<br>7 Q. By July the 16th, do you have any 12:05:44<br>8 recollection about your observation on the 12:05:46<br>9 potential applicability of the war exclusion? 12:05:50<br>10 A. Well, at that point I was clearly considering 12:05:53<br>11 them, because I wouldn't have sent them 12:05:56<br>12 otherwise. 12:05:58<br>13 Q. And do you recall your thought process by 12:05:59<br>14 that point in time? 12:06:02<br>15 A. Well, at that point I had already started 12:06:03<br>16 looking at what was actually happening in 12:06:05<br>17 Israel at this time and what had led up to 12:06:07 | Plaintiff's Objections:<br>Pages 467:21-468:17<br>MIL 2, F.R.E. 402-403<br>Exclusion 3 for "insurrection" and Exclusion 4 for "weapon of war including atomic fission" are irrelevant to bad faith and likely to confuse the issues and waste time, as they were not explained as a basis for denying coverage in the denial letter and therefore cannot serve as the basis of a good faith defense under California law. *See Century Surety Co. v. Polisso*, *supra*.<br><br>Defendant's Response:<br>"MIL" not clear objection; |

| Deposition Designation | Objection & Response |
|---|---|
| 18 the current conditions in Israel. And it 12:06:12<br>19 appeared to me that what was happening was a 12:06:15<br>20 war or warlike action certainly. 12:06:18<br>21 Q. Did you look at the insurrection language and 12:06:20<br>22 the weapon of war language around this time? 12:06:23<br>23 A. I did, yes. 12:06:26<br>24 Q. Can you recall any observations that you had 12:06:27<br>25 about either one of those? 12:06:29<br><br>Page 468<br><br>1 A. Well, you know, as is usual, when you're -- 12:06:30<br>2 when you're evaluating a coverage provision, 12:06:35<br>3 you want to look at all of the provisions 12:06:37<br>4 that could apply. In this case, it was 12:06:39<br>5 apparent that war or warlike actions clearly 12:06:43<br>6 applied, and that if you viewed Gaza as part 12:06:47<br>7 of Israel rather than -- than, you know, as 12:06:50<br>8 the Palestinian people regarded it as part of 12:06:56<br>9 Palestine, that this could also qualify as an 12:06:59<br>10 insurrection. 12:07:04<br>11 And if you didn't think that it was 12:07:04<br>12 an insurrection or rebellion, then there were 12:07:06<br>13 still weapons of war being used. That's why 12:07:08<br>14 I included all four of those. 12:07:10<br>15 Q. Did you discuss your ongoing analysis and 12:07:12<br>16 conclusions with your supervisor 12:07:16<br>17 Theresa Gooley? 12:07:18<br>18 A. I did. 12:07:18<br>19 Q. Did you discuss your work and your 12:07:19<br>20 conclusions with her before you communicated 12:07:22<br>21 your work and your conclusions to the insured 12:07:27<br>22 and its broker? 12:07:29<br>23 A. Oh, absolutely. 12:07:30<br>24 Q. And what did you and Ms. Gooley discuss in 12:07:31<br>25 that regard? 12:07:33 | ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.<br><br><br>Plaintiff's Objections:<br>Page 469:22-25 |

| Deposition Designation | Objection & Response |
|---|---|
| Page 469<br><br>1 A. We discussed the information that I had 12:07:34<br>2 gathered and that Danny had gathered. And we 12:07:36<br>3 discussed what I had learned from the case 12:07:41<br>4 law in interpreting this particular 12:07:44<br>5 provision, and then we discussed how the 12:07:47<br>6 facts and the case law applied to this 12:07:49<br>7 particular situation and determined that the 12:07:51<br>8 war exclusion did apply. 12:07:53<br>9 Q. When you were having these discussions with 12:07:55<br>10 Ms. Gooley, had your process advanced to the 12:07:58<br>11 point that you had at least tentative 12:08:02<br>12 conclusions that you had reached? 12:08:04<br>13 A. It looked to me at the -- well, I mean, I -- 12:08:08<br>14 I analyzed it with her, I talked to her about 12:08:10<br>15 it. But, yes, at the time that I was having 12:08:12<br>16 the discussion with her, it looked to me like 12:08:15<br>17 this -- like this policy provision probably 12:08:17<br>18 applied. 12:08:21<br>19 Q. And what facts had you gathered that caused 12:08:22<br>20 you to analyze the war, Part 1, exclusion in 12:08:24<br>21 the way that you did? 12:08:30<br>22 A. Well, I looked at definitions set forth in 12:08:30<br>23 case law. I also looked at practically what 12:08:33<br>24 was actually happening in Israel and how it 12:08:36<br>25 applied to how case law had interpreted it, 12:08:39<br><br>Page 470<br><br>1 and I also thought about how -- how 12:08:43<br>2 journalists were reporting it and how even 12:08:47<br>3 the U.S. Government uses the term war. 12:08:49<br>4 Q. What facts had you gathered that caused you 12:08:54<br>5 to analyze the warlike actions provision as 12:08:58<br>6 you did? 12:09:03<br>7 A. Does it look like a war, does it talk like a 12:09:03<br>8 war, does it walk like a war. All of these 12:09:08<br>9 indicia were there, so this was a warlike 12:09:12<br>10 action. 12:09:14<br>11 Q. Did you consider the provision about warlike 12:09:15<br>12 to be broader than war? 12:09:17<br>13 A. Yes. 12:09:19<br>14 Q. And why was that? 12:09:20<br>15 A. Because the way that -- the definition of 12:09:21<br>16 war, as set forth in a variety of -- of 12:09:26<br>17 places, sometimes means that you have to 12:09:30 | MIL 2; F.R.E. 402, 403, 602, 701<br>Improper legal opinion for Ms. Johnson, a lawyer, to suggest to the jury that the "case law" made clear this was a war because the "indicia of war" were there or because it "walks like a war" and "talks like a war." Substantially more prejudicial than probative.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. |

| Deposition Designation | Objection & Response |
|---|---|
| 18 actually have two separate sovereigns that 12:09:32<br>19 are -- are attacking each other. 12:09:37<br>20 And, clearly, in this situation, not 12:09:39<br>21 everyone would recognize Hamas as a sovereign 12:09:42<br>22 state or as a separate entity, in spite of 12:09:45<br>23 the fact that the UN Assembly in 2012 had 12:09:52<br>24 recognized Palestine as a nonmember observer 12:09:54<br>25 state. So, you know, there could be push 12:09:58<br><br>Page 471<br><br>1 back with regard to is this really a war. 12:10:01<br>2 It's not a declared war, but one of 12:10:03<br>3 the things that the case law talked about is 12:10:07<br>4 that it doesn't have to be a declared war. 12:10:10<br>5 For example, there's the Korean conflict, we 12:10:12<br>6 obviously talk about that as the Korean war 12:10:16<br>7 even though there was no declared war during 12:10:18<br>8 that conflict. 12:10:20<br>9 Q. Do all definitions of war require the 12:10:22<br>10 participation of a sovereign? 12:10:25<br>11 A. No, not necessarily. Or it could also -- it 12:10:26<br>12 could also mean a sovereign just on one side, 12:10:30<br>13 a quasi-sovereign on the other, or simply 12:10:33<br>14 another entity on the other side. 12:10:37<br>15 Q. What facts had you gathered that affected the 12:10:38<br>16 way that you were interpreting Part 3 of the 12:10:44<br>17 war exclusions? 12:10:46<br>18 A. Well, Part 3, insurrection, rebellion, 12:10:49<br>19 revolution, usurped power in some instances 12:10:53<br>20 are defined as sort of the ramping up to a 12:11:00<br>21 war by entities that are all contained in the 12:11:04<br>22 same country. So these are sort of what -- 12:11:07<br>23 what you're leading up to a civil war or 12:11:10<br>24 to a rebellion within the same country. 12:11:15<br>25 In other words, these are two -- the 12:11:19 | Plaintiff's Objections:<br>Page 471:3-25<br>MIL 2; F.R.E. 402, 403, 602, 701<br>Improper legal opinion about what the "case law" says.<br><br>As reflected in the Ninth Circuit's opinion, the Korean war and definition of undeclared war is irrelevant—that conflict indisputably involved two sovereign nations. Irrelevant and likely to confuse the issues and mislead the jury.<br><br>Improper legal opinion about whether "all definitions of war require the participation of a sovereign" and irrelevant to the extent not limited to the insurance industry's special meaning of war. Substantially more prejudicial than probative, likely to confuse the issues and mislead the jury.<br><br>Exclusion 3 for insurrection is irrelevant to bad faith because it was not cited in the denial letter. *See Century Surety Co. v. Polisso, supra.*<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and |

| Deposition Designation | Objection & Response |
|---|---|
| | development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 472** | **Plaintiff's Objections:** Page 472:1-18 MILs 2-3, F.R.E. 402, 403 Exclusion 3 ("insurrection") and 4 ("weapons of war including atomic fission") irrelevant to bad faith because not explained in the denial letter as a basis for denying coverage. Therefore, substantially more prejudicial than probative, waste of time, likely to confuse the issues and mislead the jury. *Century Surety Co. v. Polisso.* |
| 1 citizenry within the same country, one aspect 12:11:22<br>2 of the citizenry is rising up against the 12:11:26<br>3 government. 12:11:29<br>4 Q. What factual information had you gathered 12:11:30<br>5 that informed the way that you were looking 12:11:32<br>6 at Part 4 of the war exclusion? 12:11:34<br>7 A. Well, Part 4 is pretty broad. It says if 12:11:37<br>8 you're using weapons of war, this isn't 12:11:41<br>9 covered, it says including atomic fission or 12:11:43<br>10 radioactive force. But it says, "Including," 12:11:46<br>11 it doesn't say only. 12:11:48<br>12 And in this particular case, since 12:11:50<br>13 there were air strikes, there were gun boats, 12:11:52<br>14 there were tanks, there were infantry, all of 12:11:57<br>15 those things are weapons of war, so it 12:12:02<br>16 appeared to me that -- that this exclusion -- 12:12:04<br>17 that this portion of the exclusion could also 12:12:07<br>18 be brought to bear. 12:12:10<br>19 Q. Let me hand you what's been previously marked 12:12:15<br>20 as Defendant's Exhibit 62 in the case, 12:12:18<br>21 please, ma'am. 12:12:20<br>22 Can you identify Exhibit 62 as an 12:12:21<br>23 e-mail string which culminates in a message 12:12:22<br>24 from Susan Weiss to and to Mr. Gutterman 12:12:26<br>25 dated July the 17th, 2014? 12:12:28 | **Defendant's Response:** "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision. |
| **Page 473**<br><br>1 A. Yes. 12:12:29 | |

| Deposition Designation | Objection & Response |
|---|---|
| 2 Q. Did you receive this e-mail? 12:12:30<br>3 A. I did. 12:12:31<br>4 Q. What was Ms. Weiss reporting to you? 12:12:31<br>5 A. Well, we had a meeting scheduled for the 12:12:34<br>6 following day. This was on July 17th, which 12:12:37<br>7 was a Thursday, and we had a call already 12:12:40<br>8 scheduled for the 18th, and so she was 12:12:42<br>9 conveying that they wanted to talk to us 12:12:45<br>10 before the next day, that she wanted -- 12:12:48<br>11 that -- that things had transpired and they 12:12:50<br>12 wanted to talk now. 12:12:53<br>13 Q. And was that something you were prepared and 12:12:54<br>14 willing to do? 12:12:56<br>15 A. I'm always willing to talk to an insured any 12:12:58<br>16 time they want to talk to us, yes. 12:13:03<br>17 Q. Did she give any indication before the call 12:13:04<br>18 began about what sort of information she 12:13:07<br>19 wanted to share? 12:13:09<br>20 A. No. 12:13:10<br>21 (Whereupon, Exhibit 249 was 12:13:10<br>22 marked for identification.) 12:13:10<br>23 BY MS. REED: 12:13:18<br>24 Q. Let me hand you Exhibit 249, please, ma'am. 12:13:18<br>25 Can you identify Exhibit 249 as a string of 12:13:21<br><br>Page 474<br><br>1 e-mails culminating in a message from 12:13:24<br>2 Ms. Weiss to Ms. Garber and you and 12:13:27<br>3 Mr. Gutterman copied to Mr. Williams setting 12:13:32<br>4 up a call time? 12:13:37<br>5 A. Yes. 12:13:38<br>6 Q. And to the best of your recollection, is 12:13:38<br>7 4:00 p.m. pacific time on July the 17th the 12:13:41<br>8 time that you spoke with your insured and 12:13:45<br>9 broker? 12:13:47<br>10 A. Yes. 12:13:48<br>11 Q. What information did Ms. Weiss or Ms. Garber 12:13:58<br>12 share as part of the call? 12:14:01<br>13 A. At that time they shared with us that they 12:14:03<br>14 had decided to move the production altogether 12:14:05<br>15 based on the fact that there had been no 12:14:10<br>16 deescalation of hostilities between Hamas and 12:14:13<br>17 Israel, and because it did not appear that 12:14:16 | |

713

| Deposition Designation | Objection & Response |
|---|---|
| 18 there was going to be a deescalation any time 12:14:18<br>19 soon. 12:14:21<br>20 Q. Was the decision to move the production new 12:14:21<br>21 information to you? 12:14:24<br>22 A. I don't remember specifically if Ms. Garber 12:14:26<br>23 had mentioned it in our first call, she may 12:14:29<br>24 have, that if it didn't deescalate that they 12:14:31<br>25 might think about moving the production. I 12:14:34<br><br>Page 475<br><br>1 just don't remember. 12:14:38<br>2 If -- I think that I -- I wrote in 12:14:40<br>3 my coverage letter what was discussed in each 12:14:43<br>4 of those calls, so that would probably help 12:14:45<br>5 me remember. But she might have mentioned 12:14:48<br>6 it. 12:14:51<br>7 Q. Was the call on July 17th the first time it 12:14:51<br>8 was communicated to you that the insured had 12:14:54<br>9 made its decision that it absolutely would 12:14:56<br>10 move the production? 12:14:59<br>11 A. Yes, all we were talking about before was a 12:15:00<br>12 push. 12:15:03<br>13 Q. And did Ms. Weiss or Ms. Garber give you any 12:15:03<br>14 more factual detail about the reasons that 12:15:08<br>15 that decision was made? 12:15:10<br>16 A. Again, as I said, it was because there had 12:15:11<br>17 been no deescalation, that things continued 12:15:15<br>18 to be unsafe, it didn't look like things were 12:15:17<br>19 going to change any time soon, so they -- 12:15:20<br>20 they talked about where they would 12:15:23<br>21 potentially move the production. And I know 12:15:24<br>22 they were talking about moving it perhaps to 12:15:30<br>23 New Mexico, perhaps to another -- perhaps 12:15:32<br>24 another Middle Eastern country or -- or 12:15:38<br>25 another -- another foreign country for sure. 12:15:41<br><br>Page 476<br><br>1 Q. Did they share other details with you during 12:15:45<br>2 that call that you can remember? 12:15:48<br>3 A. Well, I know I shared with them that there | |

| Deposition Designation | Objection & Response |
|---|---|
| 12:15:53<br>4 was a location scout that they shouldn't use 12:15:56<br>5 in New Mexico, because I had had issues with 12:15:59<br>6 him before in another claim. And just that 12:16:02<br>7 they wanted to get it up and running as soon 12:16:07<br>8 as possible. They wanted to know if the 12:16:10<br>9 claim was going to be covered and they asked 12:16:11<br>10 me specifically if it was going to be 12:16:13<br>11 covered. 12:16:16<br>12 Q. Did you give a response? 12:16:16<br>13 A. I told them that we were considering the 12:16:17<br>14 applicability of the war exclusion and that 12:16:19<br>15 we were considering it, we hadn't made a 12:16:23<br>16 final determination. They wanted to know 12:16:25<br>17 when we were going to make the final 12:16:27<br>18 determination. 12:16:29<br>19 Susan Weiss specifically asked if we 12:16:30<br>20 had gotten an outside coverage determination, 12:16:33<br>21 I think. I'm not sure if she did that in 12:16:36<br>22 that phone call or in the following phone 12:16:40<br>23 call. 12:16:42<br>24 But neither one of them were happy 12:16:42<br>25 with the fact that we might apply the war 12:16:45<br><br>Page 477<br><br>1 exclusion. This was something that 12:16:48<br>2 distressed them. 12:16:50<br>3 They continued to emphasize that 12:16:51<br>4 Hamas was a terrorist organization, and if it 12:16:53<br>5 was a terrorist organization then this was an 12:16:56<br>6 act of terrorism, it was not a war, nor could 12:16:59<br>7 it be a war, nor could it be warlike actions 12:17:02<br>8 or any of the rest of the portions of the war 12:17:05<br>9 exclusion. 12:17:08<br>10 Q. As a part of that call, did you explain to 12:17:09<br>11 them the analysis that you had performed to 12:17:11<br>12 that point either in terms of the facts or 12:17:14<br>13 the policy language? 12:17:16<br>14 A. You know, they were pretty upset, so I'm not 12:17:18<br>15 sure how much detail I actually went into at 12:17:22<br>16 that point. I mean, I think that we did talk 12:17:24<br>17 about the fact that, you know, this looks 12:17:27<br>18 like a war, there are gun boats, there are 12:17:30<br>19 air strikes, there are tanks, there are -- 12:17:33<br>20 are all of these other things that are 12:17:35<br>21 happening, you know, they're -- they're 12:17:36<br>22 invading Gaza, there are, you know, thousands | |

| Deposition Designation | Objection & Response |
|---|---|
| 12:17:37<br>23 of troops on the ground, and that sort of 12:17:40<br>24 thing. 12:17:43<br>25 But they just continued to emphasize 12:17:44<br><br>Page 478<br><br>1 that they thought that because Hamas was a 12:17:45<br>2 terrorist organization, this couldn't 12:17:48<br>3 possibly be a war, a warlike action or any of 12:17:50<br>4 the rest of the exclusion. 12:17:53<br>5 Q. As of the time you had that conversation on 12:17:54<br>6 July the 17th with Ms. Weiss and Ms. Garber, 12:17:57<br>7 had OneBeacon made a final claim decision? 12:18:02<br>8 A. No. We were still considering it, we were 12:18:04<br>9 looking at it. 12:18:06<br>10 Q. What did you say about a final claim 12:18:07<br>11 decision, if anything? 12:18:09<br>12 A. Well, I think that they asked for a final 12:18:10<br>13 claim decision immediately, and I think that 12:18:12<br>14 we agreed that there would be a final 12:18:17<br>15 decision -- that I would give them a final 12:18:19<br>16 decision the following week. I don't 12:18:21<br>17 remember exactly what day we agreed upon, but 12:18:27<br>18 very shortly thereafter. 12:18:29<br>19 Q. And was it your intent after that call to 12:18:30<br>20 continue to work through the claim to get to 12:18:33<br>21 the point of making a final claim decision? 12:18:35<br>22 A. Yes. 12:18:36<br>23 Q. What additional fact analysis or -- pardon 12:18:37<br>24 me. 12:18:37<br>25 What additional fact research, if 12:18:46<br><br>Page 479<br><br>1 any, did you do after the call on the 17th? 12:18:48<br>2 A. Well, I think I continued to do the same 12:18:50<br>3 research that I had been doing in terms of 12:18:52<br>4 what exactly had gone on, what was currently 12:18:54<br>5 going on. I was just continuing the 12:18:56<br>6 research. 12:18:59<br>7 But I also was having discussions 12:18:59<br>8 internally to say, you know, this is what -- 12:19:01<br>9 this is my decision, this is what I think 12:19:04<br>10 we're going to do, as soon as I had reached 12:19:06 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 the conclusion that I was pretty sure that 12:19:09<br>12 that's what was going to happen. 12:19:11<br>13 You know, that's something that I 12:19:13<br>14 would want to inform other people of, again, 12:19:14<br>15 because the first thing that usually happens 12:19:16<br>16 if you deny an entertainment claim is that 12:19:19<br>17 they don't want to talk to you anymore, they 12:19:21<br>18 want to talk to everyone above you. That had 12:19:23<br>19 been my experience. 12:19:25<br>20 Q. Between the time that you had the telephone 12:19:26<br>21 call on July the 17th and when you 12:19:29<br>22 communicated a final decision on behalf of 12:19:32<br>23 OneBeacon, did you discuss your process with 12:19:35<br>24 other people within OneBeacon? 12:19:39<br>25 A. Yes, I did. 12:19:42<br><br>Page 480<br><br>1 Q. And who were those people? 12:19:43<br>2 A. I'm sure I talked to Danny and Peter and 12:19:45<br>3 Theresa. I know that Theresa wanted to talk 12:19:48<br>4 to Sean, and they had planned a meeting, but 12:19:51<br>5 I don't -- I don't think that that meeting 12:19:54<br>6 actually took place. At least not with me. 12:19:56<br>7 I think that she talked to him separately. 12:19:58<br>8 Q. Did you advise the people internally of your 12:20:00<br>9 anticipated decision for the purpose of 12:20:04<br>10 getting them to weigh in on the decision as 12:20:07<br>11 well? 12:20:10<br>12 A. Well, I'm the person who makes the decision. 12:20:10<br>13 But, certainly, if other people had other 12:20:12<br>14 views about how -- what -- about my decision 12:20:14<br>15 if they viewed it differently, you know, of 12:20:18<br>16 course I would welcome their feedback. This 12:20:21<br>17 is a collaborative process. I don't make 12:20:23<br>18 this decision in a vacuum. 12:20:25<br>19 Q. Did Mr. Gutterman ever indicate to you that 12:20:26<br>20 he disagreed with any of the analysis that 12:20:28<br>21 you performed? 12:20:31<br>22 A. No, he did agree. 12:20:31<br>23 Q. Did Mr. Williams ever indicate to you that he 12:20:33<br>24 disagreed with any of the analysis you 12:20:36<br>25 performed? 12:20:38 | Plaintiff's Objections:<br>Page 480:19-481:7<br>Lack of foundation and speculation as to what Mr. Gutterman and Mr. Williams and Ms. Gooley believed. Hearsay to the extent testimony conveys that they stated they agreed with Ms. Johnson.<br><br>Defendant's Response:<br>This is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|

Page 481

1 A. No, he also agreed. 12:20:39
2 Q. Did Ms. Gooley ever indicate to you that she 12:20:40
3 disagreed with any of the analysis you 12:20:44
4 performed? 12:20:46
5 A. No. All of us agreed that the war exclusion 12:20:46
6 applied. We did not even think this was a 12:20:49
7 close call. 12:20:51
8 Q. How confident did you feel in the analysis 12:20:52
9 that you performed? 12:20:54
10 A. I felt very confident. 12:20:54
11 Q. When the decision was eventually made to deny 12:20:58
12 the claim, are you the person who made the 12:21:01
13 decision? 12:21:03
14 A. I am. 12:21:03
15 Q. Do you know at about what date that final 12:21:04
16 decision was made? 12:21:08
17 A. No, I couldn't tell you exactly. I mean, 12:21:09
18 obviously, I was probably pretty close to the 12:21:14
19 decision if I was communicating to the 12:21:17
20 insured that we were seriously considering 12:21:19
21 it, because I wanted to alert them that, you 12:21:21
22 know, this could be coming down the pike and 12:21:24
23 you should be prepared for it. But there 12:21:26
24 were probably other things that I wanted to 12:21:29
25 look at, and certainly internal dialog that I 12:21:33

Page 482

1 wanted to have before I communicated the 12:21:36
2 final decision to them. 12:21:38
3 Q. Did you have the opportunity to pursue those 12:21:39
4 avenues before you did communicate the final 12:21:41
5 decision to them? 12:21:43
6 A. Yes. 12:21:44
7 (Whereupon, Exhibit 250 was 12:21:45
8 marked for identification.) 12:21:45
9 BY MS. REED: 12:21:45
10 Q. Let me hand you Exhibit 250, please, ma'am. 12:21:46
11 Can you identify Exhibit 250 as an 12:21:57
12 e-mail string which culminates in a message

| Deposition Designation | Objection & Response |
|---|---|
| 12:21:59<br>13 from you to Ms. Weiss, Ms. Garber and 12:22:02<br>14 Mr. Gutterman setting up arrangements for a 12:22:05<br>15 conference call on July the 22nd? 12:22:09<br>16 A. Yes. So this was the following Tuesday, and 12:22:12<br>17 we were setting up a conference call. 12:22:14<br>18 Q. So July the 22nd was one week since your 12:22:16<br>19 first interaction with Ms. Weiss and 12:22:20<br>20 Ms. Garber? 12:22:22<br>21 A. That's correct. 12:22:23<br>22 Q. Did you have an anticipated agenda to cover 12:22:27<br>23 on the July 22nd call? 12:22:29<br>24 A. Yes. I wanted to tell them that the claim 12:22:31<br>25 would not be covered. 12:22:34<br><br>Page 483<br><br>1 Q. And was that something that you would 12:22:35<br>2 communicate as part of your practice by 12:22:38<br>3 telephone rather than in a letter to begin 12:22:40<br>4 with? 12:22:42<br>5 A. Well, since -- since time is of the essence 12:22:42<br>6 with production claims, yes, we usually will 12:22:46<br>7 give an oral answer and say we're going to be 12:22:48<br>8 following up with a detailed letter. 12:22:51<br>9 Q. What did you cover when the call on July the 12:22:54<br>10 22nd occurred? 12:22:59<br>11 A. Well, again, we talked about the facts that 12:23:01<br>12 we had gathered, we talked about what our 12:23:04<br>13 process was in evaluating the claim. Both 12:23:07<br>14 Susan and Andrea were not happy with the 12:23:09<br>15 decision. And, again, at some point in time 12:23:12<br>16 Susan was asking me if we had gotten an 12:23:16<br>17 outside coverage opinion, and I don't 12:23:20<br>18 remember if it was in the previous call or if 12:23:21<br>19 it was in this call. But -- but that was 12:23:23<br>20 something that -- that she wanted to know, in 12:23:25<br>21 other words, was I only relaying upon my own 12:23:27<br>22 judgment or had I gotten additional advice 12:23:30<br>23 from outside coverage counsel. 12:23:34<br>24 Q. Did you discuss your analysis and the reasons 12:23:42<br>25 that you had reached your conclusions on that 12:23:49 | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 484 | |

1 call? 12:23:51
2 A. I believe so, yes. 12:23:51
3 Q. Did Ms. Weiss or Ms. Garber make any specific 12:23:52
4 responses to you about the specifics you 12:23:56
5 described? 12:23:58
6 A. No. They weren't happy with the decision and 12:23:59
7 it was not an extremely lengthy call. You 12:24:02
8 know, again, they emphasized that this 12:24:07
9 exclusion could not apply, because Hamas is a 12:24:08
10 terrorist organization. So they told me, you 12:24:10
11 know, that they did not agree with my 12:24:13
12 analysis, they did not agree that the war 12:24:15
13 exclusion had any applicability in this 12:24:17
14 situation, and that this was an act of 12:24:20
15 terrorism, that an act of terrorism is what 12:24:22
16 had caused them to move the production and, 12:24:24
17 therefore, the war exclusion could not apply. 12:24:27
18 Q. Did you discuss with them any research or 12:24:31
19 analysis that you had performed in regard to 12:24:34
20 Hamas or Hamas's actions? 12:24:36
21 A. I did, yes. 12:24:38
22 Q. And what did you say? 12:24:39
23 A. I can't tell you as I sit here today exactly 12:24:40
24 what I told them, but I'm sure I explained 12:24:43
25 how I had reached this conclusion. But as I 12:24:45

Page 485

1 said, it wasn't a very lengthy call. Once 12:24:48
2 they heard what my decision was and told me 12:24:53
3 that they thought I was wrong and we had some 12:24:55
4 discussion, they -- you know, they ended the 12:24:58
5 call. 12:25:00
6 Q. Did the call end with a to-do list for either 12:25:00
7 one of you? 12:25:02
8 A. Not that I recall. 12:25:05
9 Q. What was going to occur next? 12:25:06
10 A. They wanted a written decision and they 12:25:08
11 wanted a written decision as soon as 12:25:10
12 possible. 12:25:14
13 Q. And did you commit to get them a written 12:25:14

| Deposition Designation | Objection & Response |
|---|---|
| 14 decision as soon as you could? 12:25:16<br>15 A. I did. 12:25:17<br><br>25 Q. Ms. Johnson, did you prepare a written denial 12:43:19<br><br><u>Page 486</u><br><br>1 letter for the Dig claim? 12:43:22<br>2 A. I did. 12:43:23<br>3 Q. Did you endeavor to meet the requested timing 12:43:23<br>4 that the insured and its broker submitted to 12:43:26<br>5 you? 12:43:30<br>6 A. I did. 12:43:30<br>7 Q. Was there external circumstances that 12:43:31<br>8 prohibited you from doing that? 12:43:34<br>9 A. Yes. I don't recall exactly what was going 12:43:35<br>10 on, but there was also a fire in another 12:43:38<br>11 case, and so it took me an extra day to 12:43:40<br>12 finish the letter and get it to them. 12:43:44<br>13 (Whereupon, Exhibit 251 was 12:43:46<br>14 marked for identification.) 12:43:47<br>15 BY MS. REED: 12:43:47<br>16 Q. Let me hand you Exhibit 251, please, ma'am. 12:43:47<br>17 Did you advise the insured, "Profuse 12:43:51<br>18 apologies, but I will not be able to get the 12:43:53<br>19 coverage letter to you until Monday"? 12:43:57<br>20 A. Yes. 12:43:59<br>21 Q. And what response did you receive from 12:43:59<br>22 Ms. Weiss? 12:44:01<br>23 A. "It is imperative that we receive this on 12:44:02<br>24 Monday morning. NBCU has been asking about 12:44:04<br>25 this on a regular basis and we told them that 12:44:08<br><br><u>Page 487</u><br><br>1 they'd be receiving the opinion letter by the 12:44:10<br>2 end of this week." 12:44:12<br>3 Q. And did you continue to make your best 12:44:13<br>4 efforts to get that letter to them as quickly 12:44:15<br>5 as you could? 12:44:17<br>6 A. I did. 12:44:18<br>7 (Whereupon, Exhibit 252 was 12:44:24<br>8 marked for identification.) 12:44:25<br>9 BY MS. REED: 12:44:25<br>10 Q. Let me hand you Exhibit 252, please, ma'am. 12:44:25<br>11 Can you identify Exhibit 252 as an 12:44:32 | |

| Deposition Designation | Objection & Response |
|---|---|
| 12 e-mail from yourself to Ms. Gooley and 12:44:34 13 Mr. Williams copied to Christopher Paar? 12:44:37 14 A. Yes. 12:44:40 15 Q. What was the purpose of this e-mail, please, 12:44:41 16 ma'am? 12:44:43 17 A. I was sending them my letter that I had 12:44:43 18 planned to send to Susan Weiss, so I was 12:44:47 19 sending it to them to review in case they had 12:44:51 20 any questions or comments before I sent it on 12:44:55 21 to the insured. 12:44:58 22 Q. Was it part of your personal practice to seek 12:44:58 23 input about a denial letter from your 12:45:01 24 colleagues before it was sent out? 12:45:03 25 A. Yes, in most circumstances, and certainly 12:45:04

Page 488

1 in -- in a case like this with a client like 12:45:10 2 NBC. 12:45:15 3 Q. And thy were you seeking input from 12:45:15 4 Theresa Gooley? 12:45:18 5 A. Because she was my supervisor and I had 12:45:18 6 discussed this claim with her. 12:45:20 7 Q. And why were you seeking input from 12:45:22 8 Mr. Williams? 12:45:24 9 A. Because this was his insured as well, and he 12:45:25 10 would be the one who was hearing from the 12:45:27 11 insured after they received the letter, in 12:45:29 12 all likelihood. 12:45:31 13 Q. Did Ms. Gooley have any substantive changes 12:45:32 14 or comments? 12:45:36 15 A. She made one stylistic changes to the first 12:45:37 16 paragraph of the letter, and I do not think I 12:45:41 17 adopted the change. 12:45:43 18 Q. Was there a reason? 12:45:44 19 A. That I didn't adopt the change? 12:45:45 20 Q. Yes, ma'am. 12:45:47 21 A. Well if it's stylistic, you know, the letter 12:45:48 22 has to sound as though it's in my voice, 12:45:51 23 because it is my voice, so that's probably 12:45:54 24 why. 12:45:56 25 Q. Did Mr. Williams make any comments to the 12:45:56

Page 489 | |

| Deposition Designation | Objection & Response |
|---|---|
| 1 letter? 12:45:59<br>2 A. Not that I recall. 12:45:59<br>3 Q. Did Ms. Gooley indicate to you that she 12:46:01<br>4 agreed with the analysis that you were going 12:46:04<br>5 to provide to the insured? 12:46:06<br>6 A. She did. 12:46:08<br>7 Q. Did Mr. Williams indicate to you that he 12:46:08<br>8 agreed with the analysis you were going to 12:46:11<br>9 provide to the insured? 12:46:13<br>10 A. He did. 12:46:13<br>11 Q. Let me hand you what's been previously marked 12:46:27<br>12 as Defendant's Exhibit 36, please, ma'am. 12:46:29<br>13 Can you identify this as an e-mail 12:46:32<br>14 that you sent to Ms. Weiss and Ms. Garber 12:46:36<br>15 attaching a coverage determination letter? 12:46:38<br>16 A. Yes, it is -- it is sending them our coverage 12:46:40<br>17 determination. 12:46:45<br>18 Q. And let me also hand you what's been marked 12:46:45<br>19 as Defendant's Exhibit 37, please, ma'am. 12:46:48<br>20 Can you identify Exhibit 37 as a 12:46:53<br>21 corrected version of the coverage 12:46:56<br>22 determination letter you sent to Ms. Weiss 12:46:58<br>23 and Ms. Garber? 12:47:02<br>24 A. Yes, it appears that I noticed that the 12:47:02<br>25 automatic page numbering did not seem to be 12:47:05<br><br>Page 490<br><br>1 working, so I fixed it. 12:47:07<br>2 Q. All right. Let me ask you to refer to the 12:47:11<br>3 attachment to this letter, please, ma'am. 12:47:13<br>4 Is this the final version that you 12:47:15<br>5 provided to the insured and its broker? 12:47:16<br>6 A. Yes, it appears to be so. 12:47:19<br>7 Q. Did you write this letter? 12:47:25<br>8 A. I did. 12:47:27<br>9 Q. And is this your analysis that you were 12:47:28<br>10 providing to your insured? 12:47:32<br>11 A. Yes, it is. 12:47:34<br>12 Q. Did you provide notice to the insured of all 12:47:35<br>13 parts of the war exclusion having 12:47:41<br>14 applicability to the facts of the claim? 12:47:45<br>15 A. Yes. I cited in the letter the portions of 12:47:47<br>16 the war exclusion that I thought had 12:47:56<br>17 potential applicability here, yes. 12:47:57<br>18 Q. Was the discussion that you provided in the 12:47:59<br>19 written coverage letter consistent with the 12:48:03 | |

| Deposition Designation | Objection & Response |
|---|---|
| 20 information that you had previously shared 12:48:06<br>21 verbally? 12:48:07<br>22 A. Yes. 12:48:08<br>23 (Whereupon, Exhibit 253 was 12:48:22<br>24 marked for identification.) 12:48:26<br>25 BY MS. REED: 12:48:26<br><br>Page 491<br><br>1 Q. Let me hand you Exhibit 253, please, ma'am. 12:48:26<br>2 Can you identify Exhibit 253 as an 12:48:31<br>3 e-mail sent by Andrea Garber to you dated 12:48:35<br>4 July 31st, 2014? 12:48:38<br>5 A. Yes, it's a letter from her saying that they 12:48:41<br>6 disagree with my analysis and my conclusions 12:48:44<br>7 and they will prepare a substantive response 12:48:47<br>8 which they expect to provide to me within the 12:48:50<br>9 next week. 12:48:52<br>10 Q. Did you have any verbal conversations with 12:48:54<br>11 Ms. Garber or Ms. Weiss after you sent the 12:48:57<br>12 coverage determination letter? 12:49:00<br>13 A. Ever? 12:49:06<br>14 Q. In regard to your coverage determination 12:49:08<br>15 letter. 12:49:10<br>16 A. I don't recall having any conversations with 12:49:11<br>17 them after I had sent the letter and after 12:49:14<br>18 they sent me this e-mail. I mean, we were 12:49:17<br>19 waiting for their response. 12:49:21<br>20 (Whereupon, Exhibit 254 was 12:49:26<br>21 marked for identification.) 12:49:28<br>22 BY MS. REED: 12:49:28<br>23 Q. Let me hand you Exhibit 254, please, ma'am. 12:49:28<br>24 A. Yes. 12:49:34<br>25 Q. Can you identify Exhibit 254, please? 12:49:35<br><br>Page 492<br><br>1 A. Yes. It is an e-mail from Bertha Garcia to 12:49:39<br>2 me with a cc to Tania Hoff, Andrea Garber and 12:49:45<br>3 Lucia Coyoca. And it says, "Please see the 12:49:50<br>4 attached letter." She is attaching a letter 12:49:54<br>5 signed by Ms. Coyoca dated August 13th, 2014. 12:49:56<br>6 Q. Was this the response that the insured 12:50:02<br>7 indicated that you were going to be 12:50:06<br>8 receiving? 12:50:08 | |

| Deposition Designation | Objection & Response |
|---|---|
| 9 A. Yes. 12:50:08<br>10 Q. What did you do in terms of additional work 12:50:09<br>11 or analysis after receiving the letter 12:50:16<br>12 attached to Exhibit 254? 12:50:19<br>13 A. Well, it is my practice and the practice of 12:50:21<br>14 the people in the claims group that if you 12:50:25<br>15 get a letter from the insured stating that 12:50:27<br>16 they want you to reconsider your coverage 12:50:30<br>17 opinion and providing any further information 12:50:33<br>18 that they want you to consider, that you do a 12:50:36<br>19 reevaluation and consider the information 12:50:38<br>20 that they have set before you. 12:50:40<br>21 Q. Did you do a reevaluation after you received 12:50:42<br>22 the August 13th letter? 12:50:45<br>23 A. I did. I read her letter carefully and 12:50:46<br>24 looked at the case law that she cited in her 12:50:50<br>25 letter, and it did not change my -- my 12:50:53<br><br>Page 493<br><br>1 opinion. 12:51:00<br>2 Q. Do you recall reviewing each of the cases 12:51:01<br>3 that she cited? 12:51:03<br>4 A. I did. 12:51:04<br>5 Q. Do you believe that you had seen those cases 12:51:06<br>6 as part of your initial research that you 12:51:09<br>7 conducted into the case? 12:51:11<br>8 A. Certainly many of them were. The ones that 12:51:13<br>9 concerned the war exclusion were things that 12:51:23<br>10 I had looked at. I think that there were a 12:51:25<br>11 couple of cases that she had referred to not 12:51:28<br>12 concerning the war exclusion, but just in 12:51:40<br>13 terms of insurance contract interpretation 12:51:43<br>14 that I went back and read to make sure that I 12:51:50<br>15 was aware exactly what they said. 12:51:53<br>16 Q. Did you read the California statutes that 12:51:54<br>17 apply in regard to construction of insurance 12:51:59<br>18 contracts? 12:52:04<br>19 A. I did. 12:52:04<br>20 Q. Did you view the war exclusions as being 12:52:05<br>21 ambiguous in any way? 12:52:08<br>22 A. No. 12:52:10<br>23 Q. Did you analyze whether the language in the | Plaintiff's Objections:<br>Page 493:20-494:3<br>F.R.E. 602, 701<br>Improper legal opinion about whether exclusion is "ambiguous" and what the case law says regarding ambiguity.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant. |

| Deposition Designation | Objection & Response |
|---|---|
| 12:52:10<br>24 war exclusions has been determined to be 12:52:16<br>25 ambiguous by anyone, any court? 12:52:18<br><br><br><br>Page 494<br><br>1 A. I don't recall that there's any court that 12:52:21<br>2 said that there was ambiguity, or certainly 12:52:23<br>3 not in this kind of context. 12:52:36<br>4 Q. Did you continue to analyze factual 12:52:37<br>5 information and research factual information 12:52:39<br>6 as part of your reconsideration? 12:52:41<br>7 A. I did, yes. 12:52:43<br>8 Q. Were there additional factual developments 12:52:44<br>9 that occurred through August the 13th? 12:52:47<br>10 A. Things were not going well in Israel at all. 12:52:49<br>11 There was continued escalation, there was a 12:52:55<br>12 lot of damage in Gaza, and there continued to 12:52:57<br>13 be a lot of civilian deaths in -- in Gaza 12:53:03<br>14 and the -- the fighting continued. 12:53:07<br>15 Q. Did it continue to be a mutual exchange of 12:53:11<br>16 hostility? 12:53:15<br>17 A. It did, yes. 12:53:16<br>18 Q. When you conducted your research, were the 12:53:17<br>19 same types of weaponry being used as you had 12:53:21<br>20 noted the month before? 12:53:25<br>21 A. Yes. 12:53:26<br>22 Q. Did Ms. Coyoca raise any arguments that you 12:53:36<br>23 had not previously analyzed as part of your 12:53:41<br>24 initial work on the claim? 12:53:45<br>25 A. Ms. Coyoca was taking the same position, that 12:54:32<br><br><br><br>Page 495<br><br>1 if Hamas is defined as a terrorist 12:54:36<br>2 organization, then it can't possibly be a 12:54:39<br>3 semi-sovereign nation. And I did not agree 12:54:42<br>4 with that analysis. That was something that 12:54:45<br>5 I considered. 12:54:47<br>6 And I disagreed with her analysis 12:54:48 | Plaintiff's Objections:<br>Page 494:8-21<br>MIL 3; F.R.E. 402-403<br>For the reasons discussed in MIL No. 3, Israel's conduct in Gaza after Plaintiffs decided to relocate is irrelevant and substantially more prejudicial than probative, likely to confuse the issues and mislead the jury.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807.<br><br><br><br><br><br>Plaintiff's Objections:<br>Page 495:10-13<br>F.R.E. 402-403<br>Defendant has conceded that the TRIA endorsement for certified acts of |

| Deposition Designation | Objection & Response |
|---|---|
| 7 with regard to whether or not the hostilities 12:54:50<br>8 constituted a warlike action. She said that 12:54:52<br>9 they did not. 12:54:55<br>10 And I agreed with her that the 12:54:58<br>11 certified acts of terrorism did not apply to 12:55:02<br>12 this claim, because this was not a certified 12:55:04<br>13 act of terrorism. 12:55:07<br>14 Q. Did you prepare a letter to go back to the 12:55:18<br>15 insured to document your reconsideration of 12:55:21<br>16 the claim? 12:55:24<br>17 A. I did. 12:55:25<br>18 (Whereupon, Exhibit 255 was 12:55:33<br>19 marked for identification.) 12:55:35<br>20 BY MS. REED: 12:55:35<br>21 Q. Let me hand you Exhibit 255, please, ma'am. 12:55:36<br>22 Can you identify Exhibit 255? 12:55:39<br>23 A. Yes. 12:55:43<br>24 Q. What is it? 12:55:44<br>25 A. It is my supplemental coverage letter. And I 12:55:46 | terrorism in the U.S. is irrelevant—coverage for terrorism in this case falls under the imminent peril provision.<br><br>Testimony concerning this other provision for "certified acts of terror" is likely to confuse the issues and mislead the jury.<br><br>Defendant's Response: ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought and the witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. |
| Page 496<br><br>1 was sending it to Susan Weiss telling her 12:55:51<br>2 that I intended to send it to NBC's counsel, 12:55:53<br>3 because it is my practice that if you're 12:55:58<br>4 going to deny a claim, you let the broker 12:56:00<br>5 know and certainly you -- it's good to alert 12:56:02<br>6 them as to what your arguments are so if they 12:56:07<br>7 have pushback, they can give you that 12:56:11<br>8 pushback before you send it on to the 12:56:13<br>9 insured. 12:56:15<br>10 Q. Where did you obtain the factual information 12:56:28<br>11 that you recited in this letter in terms of 12:56:29<br>12 the conflict? 12:56:33<br>13 A. From news organizations, certainly. It looks 12:56:37<br>14 like I cite some case law. I cite the policy 12:56:41<br>15 again, and the Zanotti report again. So it 12:56:46<br>16 looks like I was referring to the same types 12:56:59<br>17 of research that I had done before. 12:57:01<br>18 Q. Does this indicate to you that you had also 12:57:05 | Plaintiff's Objections: Page 496:18- 497:18 MIL 3; F.R.E. 402-403 Given the Ninth Circuit's order, Israel's actions in Gaza after Plaintiffs decided to relocate is irrelevant and substantially more prejudicial than probative, for the reasons set forth in MIL No. 3.<br><br>Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The witness's knowledge, research and response to the claim are relevant; not |

| Deposition Designation | Objection & Response |
|---|---|
| 19 updated your research including through the 12:57:08<br>20 end of the conflict on August 26th, 2014? 12:57:11<br>21 A. Yes, this indicates that -- that -- I was 12:57:21<br>22 explaining to them the amount of -- or the 12:57:26<br>23 casualties from the conflict. It says that, 12:57:32<br>24 "The conflict extended until August 26th of 12:57:35<br>25 2014," that, "2,143 Palestinians and 69 12:57:37<br><br>Page 497<br>1 Israelis were killed," that, "Israel struck 12:57:42<br>2 5,283 targets in Gaza, Hamas fired 4,564 12:57:45<br>3 rockets into Israel, and more than 50,000 12:57:51<br>4 buildings in Gaza were damaged or destroyed." 12:57:54<br>5 Q. Did you do any research regarding the facts 12:57:58<br>6 of reconstruction or rebuilding that was 12:58:02<br>7 necessary in either territory? 12:58:05<br>8 A. Well, it was clear just from the facts that I 12:58:14<br>9 just recited there had been significant 12:58:16<br>10 damage to Gaza that was going to need 12:58:22<br>11 rebuilding. 12:58:24<br>12 Q. Did you gain an understanding about how or 12:58:24<br>13 why the conflict ended August 26th, 2014? 12:58:27<br>14 A. I believe that it ended due to a cease fire. 12:58:31<br>15 They certainly had not reached any particular 12:58:35<br>16 resolution. 12:58:37<br>17 (Whereupon, Exhibit 256 was 12:58:49<br>18 marked for identification.) 12:58:51<br>19 BY MS. REED: 12:58:51<br>20 Q. Let me hand you Exhibit 256, please, ma'am. 12:58:51<br>21 Can you identify Exhibit 256 as an 12:58:55<br>22 e-mail that you sent to Lucia Coyoca on 12:58:58<br>23 Tuesday, September the 30th, 2014? 12:59:01<br>24 A. Yes. It looks like I was sending the letter 12:59:04<br>25 on to Lucia at that time. And it says, "Many 12:59:11<br><br>Page 498<br>1 apologies. I thought I sent this letter to 12:59:13<br>2 the on the 19th, I apologize if it didn't 12:59:16<br>3 reach you." 12:59:18<br>4 Q. Had you received a contact indicating that 12:59:19 | unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. |

| Deposition Designation | Objection & Response |
|---|---|
| 5 she was requesting the letter? 12:59:22<br>6 A. Yes. 12:59:28<br><br>Page 500<br><br>24 Q. When plaintiff's counsel conducted your 13:02:23<br>25 examination in this case, she showed you a 13:02:25<br><br>Page 501<br><br>1 document entitled, "General Claims 13:02:29<br>2 Practices." Do you recall those? 13:02:32<br>3 A. I do. 13:02:33<br>4 Q. Are those requirements that are in effect? 13:02:34<br>5 A. No, they're not requirements. 13:02:38<br>6 Q. How do you describe them? 13:02:39<br>7 A. I would say that they're guidelines. They're 13:02:41<br>8 not something that -- they're not rules, 13:02:44<br>9 they're not hard and fast. They're -- 13:02:46<br>10 they're guidelines of things that claim 13:02:52<br>11 handlers should consider and think about with 13:02:54<br>12 regard to how to handle claims, but each 13:02:54<br>13 claim is fact specific, and therefore, you 13:02:56<br>14 know, there's no set of rules that you can 13:02:57<br>15 say that apply in absolutely every situation. 13:02:59<br>16 Q. In questioning by the plaintiff's counsel, 13:03:03<br>17 you discussed some general insurance theories 13:03:06<br>18 about contracts of adhesion. Do you recall 13:03:08<br>19 that? 13:03:10<br>20 A. I do. 13:03:10<br>21 Q. Were you describing the NBCUniversal 13:03:11<br>22 entertainment policy as a contract of 13:03:16<br>23 adhesion? 13:03:18<br>24 A. No, this is not a contract of adhesion. This 13:03:19<br>25 is a contract that was reached by very 13:03:22<br><br>Page 502<br><br>1 sophisticated parties. As I said before, 13:03:25<br>2 when Ms. Coyoca was taking my deposition, 13:03:27<br>3 it's my understanding that this policy was 13:03:32<br>4 actually supplied to us by the insured and by 13:03:35<br>5 Aon, that this is not a document that we 13:03:37<br>6 wrote or selected, that this was their choice 13:03:40<br>7 of policy. 13:03:42 | |

| Deposition Designation | Objection & Response |
|---|---|

PLAINTIFFS' 106 COUNTER-DESIGNATION:

Page 502

8 Q. When did you leave the employment of 13:03:43
9 OneBeacon? 13:03:45
10 A. May of 2015. 13:03:45
11 Q. Why did you leave? 13:03:50
12 A. They were reorganizing the claim division and 13:03:51
13 they were downsizing, and so my -- the duties 13:03:55
14 of being a claim lead for entertainment were 13:03:59
15 consolidated with another -- to another claim 13:04:01
16 lead who also headed up public sector, and so 13:04:04
17 I was let go and given a very good severance 13:04:09
18 package. 13:04:12
3 Q. How long did it take you from start to finish 14:15:14
4 to read the entire Congressional Research 14:15:17
5 Service report? 14:15:20
6 A. The Zanotti report? 14:15:20
7 Q. Yes. 14:15:22
8 A. Well, certainly more than a couple of hours. 14:15:22
9 Q. More than ten hours? 14:15:26
10 A. No. 14:15:28
11 Q. More than five hours? 14:15:30
12 A. Probably not, no. 14:15:32
13 Q. More than four hours? 14:15:33
14 A. I just don't know. 14:15:36
15 Q. So is your best estimate an amount of time in 14:15:37
16 between two to five hours? 14:15:42
17 A. Yes. 14:15:43
18 Q. You testified that you had pulled a Wikipedia 14:16:02
19 article with respect to Hamas and that you 14:16:06
20 looked at the citation of various authorities 14:16:11
21 and used that as a point of reference to gain 14:16:14
22 information about Hamas, the citations to the 14:16:18
23 various authorities that are listed in the 14:16:21
24 article; is that right? 14:16:23
25 A. That's correct. 14:16:24

Page 507

1 Q. Do you know who wrote the Hamas Wikipedia 14:16:24

| Deposition Designation | Objection & Response |
|---|---|
| 2 article? 14:16:28<br>3 A. As I sit here today, I couldn't tell you, and 14:16:29<br>4 it's probably a compilation of more than one 14:16:31<br>5 person. 14:16:35<br><br>Page 508<br><br>19 Q. Okay. And this article bears a print date, 14:20:04<br>20 Exhibit 240, of 1/5/2017, or it has a date at 14:20:07<br>21 the top of the page that says 1/5/2017. Did 14:20:14<br>22 the article that you reviewed in July of 2014 14:20:18<br>23 have a date of 1/5/2017 on it? 14:20:21<br>24 A. Well, I would doubt that it did. 14:20:26<br>25 Q. I would doubt it also. 14:20:28<br><br><br><br>Page 509<br><br>16 Q. Do you recall what version of the Wikipedia 14:21:04<br>17 article that you actually reviewed as you sit 14:21:06<br>18 here today? 14:21:09<br>19 A. I don't, no. It was whatever was available 14:21:09<br>20 on the day that I looked it up. 14:21:12<br>21 Q. And do you know -- you indicated that -- that 14:21:18<br>22 there may have been a group of individuals 14:21:23<br>23 that wrote the article. Do you know if the 14:21:25<br>24 group of individuals or the individual who 14:21:26<br>25 wrote the article, do you have any idea 14:21:28<br><br>Page 510<br><br>1 whether or not they have any type of 14:21:30<br>2 affiliation with the Palestinian cause? 14:21:31<br><br>5 THE WITNESS: I don't. But as I 14:21:38<br>6 said, I didn't rely upon the Wikipedia 14:21:39<br>7 article as an authoritative source. 14:21:42<br><br>Page 511<br><br>17 Q. To your knowledge, Ms. Johnson, was there any 14:23:24<br>18 filming of the television production Dig that 14:23:27<br>19 was scheduled to take place in the Gaza 14:23:30<br>20 strip? 14:23:32 | |

| Deposition Designation | Objection & Response |
|---|---|
| 21 A. No, not to my knowledge. 14:23:34<br>22 Q. To your knowledge, Ms. Johnson, was there a 14:23:42<br>23 unity government agreement entered into in 14:23:45<br>24 June of 2014 between Hamas and Fatah? 14:23:50<br><br>Page 512<br><br>2 THE WITNESS: Well, as I 14:23:56<br>3 previously testified, in -- in the research 14:23:58<br>4 that I did I did learn that Hamas and Fatah, 14:24:02<br>5 who were two separate factions within the 14:24:05<br>6 Palestinian government, had come together to 14:24:11<br>7 try to form some kind of agreement between 14:24:13<br>8 each other in June. 14:24:16<br><br>Page 513<br><br>1 Q. You did not spend a lot of time looking into 14:24:48<br>2 whether or not a unity agreement had been 14:24:50<br>3 entered into between Fatah and Hamas in June 14:24:54<br>4 of 2014; is that correct? 14:24:57<br><br>7 THE WITNESS: I did not spend a 14:25:02<br>8 lot of time looking at that, no. I knew 14:25:04<br>9 that -- had tensions had -- had increased 14:25:06<br>10 between Israel and -- and Hamas and Fatah 14:25:09<br>11 based on the fact that they were forming that 14:25:15<br>12 agreement, but -- but -- but beyond that, I 14:25:17<br>13 did not look at it with any specificity. 14:25:20<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 513<br><br>15 Q. During your direct examination -- or, excuse 14:25:32<br>16 me, during your cross-examination by Ms. Reed 14:25:34<br>17 this morning, you testified that you had 14:25:37<br>18 reviewed several articles and looked at 14:25:40<br>19 various types of information online by 14:25:45<br>20 performing Google searches; is that correct? 14:25:48<br>23 THE WITNESS: I did a lot of 14:25:53<br>24 online research. 14:25:54<br>25 BY MS. COYOCA: 14:25:55 | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 514 | |

1 Q. Did you also read articles? 14:25:55
2 A. Yes, I read a lot of articles. 14:25:57
3 Q. Did you obtain at least some of those 14:25:59
4 articles from an online source? 14:26:01
5 A. Yes. 14:26:04
6 Q. Did you obtain any articles from any print, 14:26:05
7 paper publications? 14:26:10
8 A. I'm sorry, I'm not sure what you mean. 14:26:14
9 Q. Did you perform all of your research in terms 14:26:17
10 of gathering articles and information, was 14:26:20
11 that all performed electronically or did you 14:26:22
12 look to paper, print publications for 14:26:24
13 articles or quarterly or -- or any other kind 14:26:27
14 of paper information? 14:26:31
15 A. No, I didn't go to the library and look up 14:26:33
16 various articles. I -- I looked at news 14:26:36
17 sources that are contained online, for 14:26:39
18 example, the -- the article that was cited to 14:26:41
19 by The Washington Post, that was an article 14:26:46
20 that I found online. 14:26:48
21 Q. Okay. What about the other articles that you 14:26:49
22 discussed this morning with Ms. Reed, the -- 14:26:54
23 the articles that are -- appeared in the 14:26:59
24 Global News and the Middle East Eye? 14:27:02
25 A. No, those are articles I found online. 14:27:09

Page 515

1 Q. What did you do in order to determine whether 14:27:11
2 or not the sources that you reviewed were 14:27:20
3 reliable? 14:27:23
4 A. Well, as you could see from my testimony 14:27:23
5 earlier today, I looked at a variety of 14:27:26
6 sources. And if -- if many of the sources 14:27:30
7 were citing the same information and that 14:27:32
8 same information was also being put forth by 14:27:35
9 a variety of news sources, including U.S. 14:27:37
10 news sources, then I deemed it to be 14:27:42
11 reliable. 14:27:44
12 Q. So for your purposes, reliability was 14:27:44
13 determined based on whether or not there was 14:27:49
14 a corollary U.S. publication that contained 14:27:51
15 the same information? 14:27:55

| Deposition Designation | Objection & Response |
|---|---|
| 16 A. Well -- 14:27:56<br>20 THE WITNESS: With regard to the 14:28:01<br>21 facts of -- as to what was actually happening 14:28:02<br>22 on the ground in Israel, if there were 14:28:04<br>23 several different news sources, for example, 14:28:07<br>24 if the Israeli newspaper is saying this is 14:28:09<br>25 what's happening, and The Washington Post is 14:28:11<br><br>Page 516<br><br>1 saying this is what's happening, and MSNBC is 14:28:14<br>2 saying that this is what's happening, if all 14:28:18<br>3 three are saying that the same behavior is 14:28:21<br>4 occurring, then, yes, I deemed that to be 14:28:23<br>5 reliable. 14:28:25<br>6 BY MS. COYOCA: 14:28:26<br>7 Q. What about with respect to the 14:28:26<br>8 Middle East Eye, what did you do to determine 14:28:28<br>9 whether or not that was a reliable source of 14:28:30<br>10 information? 14:28:32<br>13 beyond the scope. 14:28:35<br>14 THE WITNESS: I -- I think I just 14:28:37<br>15 explained how I determined the reliability of 14:28:39<br>16 the information that I got from the 14:28:43<br>17 Middle East Eye and other articles that I 14:28:44<br>18 read. I looked at what they said, I looked 14:28:46<br>19 to see whether or not the same thing was said 14:28:49<br>20 by another source and by several other 14:28:51<br>21 sources, and if they all were -- were 14:28:54<br>22 reporting the same facts as to what was 14:28:56<br>23 happening in Israel at that particular time, 14:28:58<br>24 then I determined that it was probably 14:29:00<br>25 reliable. 14:29:02<br><br>BEGIN PLAINTIFFS' 106 COUNTER-DESIGNATION<br>Page 517<br>2 Q. Did you do any investigation to determine<br>3 the -- the bias of any of the publications,<br>4 potential bias of any of the publications<br>5 that you were looking at?<br><br>9 THE WITNESS: Can you explain to<br>10 me what you mean by bias?<br><br>12 Q. Yes. Well, do you understand what the word<br>13 bias means? | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objection to Counter-Designation (Johnson Vol.2 at 517:2-20) – 401, 402, 403. Banter between deponent and counsel has no probative value in light of witness's answering of same question in subsequent lines.<br><br>Plaintiffs' Response to Objection to Counter: |

| Deposition Designation | Objection & Response |
|---|---|
| 15 THE WITNESS: I'm sorry, I asked 16 what your understanding of that word was, not 17 how you wanted me to interpret it. So why 18 don't you tell me how you want me to 19 interpret the word bias in terms of your 20 question.<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 517<br>22 Q. Ms. Johnson, you're -- you're a lawyer, 14:29:42 23 you're a very intelligent woman, obviously, 14:29:44 24 and I want to know if you have understanding 14:29:47 25 of the word bias, because I am sure that your 14:29:49<br><br>Page 518<br><br>1 understanding of the word bias will be 14:29:51 2 perfectly fine for purposes of my question. 14:29:54 5 THE WITNESS: When I think of the 14:30:00 6 word bias it means that a particular person 14:30:02 7 or organization is viewing facts from a 14:30:05 8 skewed angle that represents their own 14:30:08 9 opinion. 14:30:10 10 BY MS. COYOCA: 14:30:11 11 Q. That's a great definition of bias. 14:30:11 12 So my question to you is: Did you 14:30:13 13 review and try to determine the potential 14:30:15 14 bias of any of the publications that you 14:30:19 15 reviewed? 14:30:23 18 beyond the scope. 14:30:27 19 THE WITNESS: Well, I'm not sure 14:30:32 20 what you mean by did I undertake any means of 14:30:33 21 determining the bias. I mean, there are some 14:30:36 22 biases that are obvious. Obviously, there 14:30:39 23 are other states in -- or countries in the 14:30:42 24 Middle East that have a pro-Palestinian 14:30:44 25 slant, and there are other countries that 14:30:48<br><br>Page 519<br><br>1 have a pro-Israeli stance, the U.S., for 14:30:50 2 example. So if I was looking at a U.S. 14:30:53 3 source, you know, is it logical to assume 14:30:57 4 that there could be a pro-Israeli slant to 14:30:59 5 that, yes, but I trust that the U.S. -- well, 14:31:03 6 at least I hope that the U.S. news 14:31:06 7 organizations are trying to report the facts 14:31:10 | Necessary to complete testimony designated by Defendant at 517:22-521:14 re "bias." |

| Deposition Designation | Objection & Response |
|---|---|
| 8 as they occur and not with any kind of 14:31:12<br>9 particular political bias. 14:31:17<br>10 BY MS. COYOCA: 14:31:19<br>11 Q. So are you testifying that it's to the best 14:31:19<br>12 of your knowledge that any U.S. publication 14:31:22<br>13 that reports on the Hamas/Israeli conflict 14:31:27<br>14 would have a bias in favor of Israelis; is 14:31:32<br>15 that your testimony? 14:31:35<br>19 THE WITNESS: That's not what I 14:31:43<br>20 said. I said that I would hope and trust 14:31:44<br>21 that any U.S. organization, any reliable U.S. 14:31:47<br>22 organization and media would be giving us, 14:31:51<br>23 hopefully, an unbiased recitation of what is 14:31:54<br>24 actually happening. 14:31:59<br>25 And, for example, in the -- the clip 14:32:01<br><br>Page 520<br><br>1 that we looked at from Face the Nation from 14:32:03<br>2 CBS News, you know, Holly Williams was saying 14:32:06<br>3 this is exactly what was happening and behind 14:32:12<br>4 her you could actually see what was 14:32:14<br>5 happening. So, no, I did not think that that 14:32:16<br>6 was the source that was biassed towards the 14:32:18<br>7 Israelis. 14:32:21<br>8 BY MS. COYOCA: 14:32:21<br>9 Q. What do you consider to be a reliable source? 14:32:21<br>12 THE WITNESS: Well, a reliable 14:32:28<br>13 source is going to be one that has the 14:32:31<br>14 indicia of being at least fairly unbiassed, 14:32:33<br>15 for example, The Washington Post, New York 14:32:41<br>16 Times, Wall Street Journal, I would view all 14:32:44<br>17 of them to -- to be unbiassed news 14:32:46<br>18 organizations that are going to tell me what 14:32:49<br>19 is happening rather than what their opinion 14:32:51<br>20 is about what is happening. 14:32:54<br>21 I would also trust that MSNBC, CNN, 14:32:57<br>22 CBS and ABC would also be reporting on what 14:33:01<br>23 is actually happening rather than their 14:33:05<br>24 opinion about what is happening. 14:33:07<br>25 BY MS. COYOCA: 14:33:09<br><br>Page 521 | |

| Deposition Designation | Objection & Response |
|---|---|
| 1 Q. What about the Middle East Eye, do you 14:33:10<br>2 consider that to be a reliable source? 14:33:12<br>5 THE WITNESS: I don't know 14:33:19<br>6 anything about the background of the 14:33:22<br>7 Middle East Eye, so I don't know if -- if 14:33:23<br>8 it's a reliable or unreliable news 14:33:26<br>9 organization. But as I said, I did not rely 14:33:32<br>10 upon it specifically. I looked at the 14:33:35<br>11 information that was coming from that source 14:33:37<br>12 and went to look to see whether or not it was 14:33:40<br>13 also supported by other sources that I knew 14:33:43<br>14 to be reliable. 14:33:45<br>15 BY MS. COYOCA: 14:33:47<br>16 Q. The only news article from a U.S. based 14:33:47<br>17 publication that you printed out, or at least 14:33:52<br>18 that made its way into the file, is the 14:33:54<br>19 article from The Washington Post; is that 14:33:56<br>20 right? 14:33:59<br>23 THE WITNESS: I think that that's 14:34:03<br>24 the cite that I used in my coverage letter. 14:34:04<br>25 That certainly is not the only U.S. news 14:34:07<br><br><br>Page 522<br><br>1 article that I read. 14:34:11<br>2 BY MS. COYOCA: 14:34:12<br>3 Q. That was not my question to you, though, 14:34:12<br>4 Ms. Johnson. 14:34:14<br>5 My question to you is: Did you put 14:34:15<br>6 into your file or the file any articles or 14:34:17<br>7 publications -- let's just start with 14:34:21<br>8 articles, any articles that were from a U.S. 14:34:24<br>9 based media organization? 14:34:27<br>10 A. Well, Ms. Coyoca, I wasn't in charge of 14:34:31<br>11 keeping the file, so I don't think that I 14:34:34<br>12 necessarily put any article into the file. I 14:34:36<br>13 can tell you that I looked at a variety of 14:34:39<br>14 articles, not just the article that was 14:34:41<br>15 cited in -- in -- by -- not just the 14:34:44<br>16 Washington Post article. 14:34:48<br>17 I looked at a variety of U.S. 14:34:49<br>18 articles and a variety of articles from other 14:34:51<br>19 places. I looked at The Guardian, I looked 14:34:54<br>20 at the Israeli newspaper, I looked at a 14:34:58<br>21 variety of different articles, not just the 14:35:00<br>22 U.S. articles. And, again, what I was 14:35:03<br>23 looking for is is what is being reported in 14:35:06<br>24 each of these sources something close to or 14:35:09<br>25 identical to what is also being cited in 14:35:13 | |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 523**<br><br>1 other sources as to what is actually 14:35:15<br>2 happening on the ground. 14:35:17<br>3 Short of going to Israel, it was 14:35:18<br>4 pretty hard for me to make the determination 14:35:20<br>5 in any other way. 14:35:23<br>6 Q. So I just want to make sure I understand you 14:35:24<br>7 correctly. Is it your position that each of 14:35:27<br>8 the articles that you were reviewing for 14:35:32<br>9 purposes of your investigation, that they 14:35:35<br>10 were 100 percent in agreement with respect to 14:35:37<br>11 each of the facts that were set forth in the 14:35:40<br>12 article? 14:35:42<br>15 THE WITNESS: Ms. Coyoca, you know 14:35:50<br>16 that that is not what I said. What I said is 14:35:51<br>17 I looked for commonalities between all of the 14:35:53<br>18 articles that I was reading with regard to 14:35:56<br>19 what was happening on the ground. 14:35:58<br>20 Were they all reporting that there 14:35:59<br>21 were air strikes, were they all reporting 14:36:01<br>22 that there was rocket fire, were they 14:36:03<br>23 reporting that there were gun boats, were 14:36:05<br>24 they reporting that there were tanks on the 14:36:08<br>25 ground, you know, were they reporting that 14:36:10 | Plaintiff's Objections:<br>Page 523:1-25<br>MIL,402,403,701,802<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony other than that rationally based on the witness's perception and is helpful to clearly understanding the witness's testimony or determining a fact in issue. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807.<br><br><br>Plaintiff's Objections:<br>Page 523:20-25<br>MILs 2-3, F.R.E. 402-03<br>Ms. Johnson's discussion of Israeli "tanks" in Gaza is irrelevant and substantially more prejudicial than probative for the reasons in MIL No. 3. Ms. Johnson's discussion of news accounts re plain and ordinary meaning is irrelevant and substantially more prejudicial than probative for the reasons in MIL No. 2.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| | "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony other than that rationally based on the witness's perception and is helpful to clearly understanding the witness's testimony or determining a fact in issue. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

Page 524

1 Netanyahu was saying pretty much the same 14:36:13
2 thing, were they using exact quotes from 14:36:15
3 Israeli or Hamas officials, that sort of 14:36:18
4 thing. 14:36:21
5 BY MS. COYOCA: 14:36:28
6 Q. Ms. Johnson, did the article that you 14:36:28
7 reviewed that's set forth in Exhibit 236, 14:36:29
8 which is 4487 -- 14:36:33
9 A. I'm looking at the exhibit. 14:36:44
10 Q. -- did that article refer to the 14:36:45
11 Hamas/Israeli conflict as being a war? 14:36:49
12 A. So this was on July 9th, two days after 14:36:58
13 Israel had started Operation Protective Edge. 14:37:00
14 (Reviews document.) I do not see a reference 14:37:47
15 to it as being a war. 14:37:53
16 Q. Can you please take a look at page 5 of 9 in 14:37:54

PLAINTIFFS' 106 COUNTER-DESIGNATION:

| Deposition Designation | Objection & Response |
|---|---|

Page 524

17 the article that's Bates labeled ATL004491. 14:37:57
18 A. (Complies.) I'm looking at that page. 14:38:06
19 Q. Can you please read aloud the sentence that 14:38:09
20 appears right below the type in bold, "Read 14:38:12
21 more, Israel prepares for escalation amid 14:38:17
22 exchange of rocket fire"? 14:38:19
23 A. "The military said it was seeking to retrieve 14:38:21
24 stability to the residents of southern 14:38:24
25 Israel, eliminate Hamas's capabilities and 14:38:26

Page 525

1 destroy terror infrastructure operating 14:38:30
2 against the state of Israel and its 14:38:34
3 civilians." 14:38:34

15 Q. Well, you would agree with me, would you not, 14:38:57
16 that this indicates that the military said 14:38:59
17 that one of its goals was to destroy the 14:39:01
18 terror infrastructure? It says that, does it 14:39:07
19 not? 14:39:10

22 THE WITNESS: That's part of what 14:39:13
23 it says, certainly. 14:39:14

Page 526

12 Q. Could you please tell me where in this 14:39:48
13 article it refers to the Israeli/Hamas 14:39:50
14 conflict as constituting a war? 14:39:55

18 THE WITNESS: Well, I mean, I can 14:40:09
19 sit here and read this whole thing, but I'm 14:40:10
20 assuming that because you're asking me that, 14:40:12
21 that it does not say that it is a war. 14:40:14

23 Q. Well, I -- I would just like your knowledge. 14:40:17
24 As of July of 2014 when you were reviewing 14:40:19
25 the article, did you believe that this 14:40:22

Page 527

1 article made reference to a war? 14:40:24

| Deposition Designation | Objection & Response |
|---|---|
| 2 A. Well, I'll sit here and read the entire 14:40:26<br>3 article and we'll see. This is dated the 8th 14:40:29<br>4 of July, 2014. (Reviews document.) 14:40:41<br>5 This article states that with regard 14:42:58<br>6 to Israel, that, "The Army is preparing for 14:43:00<br>7 all possible scenarios, including an invasion 14:43:04<br>8 of a ground" -- "or a ground operation." 14:43:08<br>9 Hamas said that, "The massacre of 14:43:10<br>10 children is a horrendous war crime and all 14:43:14<br>11 Israelis have now become legitimate targets 14:43:19<br>12 for resistance." So in that sense, they were 14:43:22<br>13 referring to it as war in that quote. 14:43:24<br>14 But does the article itself 14:43:26<br>15 characterize it as a war, no, it does not. 14:43:28<br><br>Page 528<br><br>3 Q. Could you please take a look at Exhibit 237. 14:44:25<br>4 And that's the article that appears at 14:44:31<br>5 ATL00442. 14:44:34<br>6 A. Yes, I'm looking at it. 14:44:36<br>7 Q. Can you please tell me where in this article 14:45:00<br>8 it refers to the Israeli/Hamas conflict as 14:45:02<br>9 being a war? 14:45:07<br><br>14 This article refers to the fact that the 14:46:06<br>15 state department spokesman Jen Psaki said 14:46:09<br>16 that, "Israel has the right to defend itself, 14:46:12<br>17 but that no one wants to see a ground war." 14:46:15<br>18 (Reviews document.) 14:46:15<br>19 The article that we just referred to 14:47:43<br>20 is dated July 15th, 2014, so the reference 14:47:45<br>21 that I made to war is the only use of that 14:47:48<br>22 word in this article that I could find in my 14:47:50<br>23 brief review of it at this time. 14:47:56<br><br>25 Q. As of July 15, that was the date that 14:47:59<br><br>Page 529<br><br>1 NBCUniversal submitted the claim to Atlantic; 14:48:03<br>2 is that correct? 14:48:06<br>3 A. That's correct. 14:48:07<br><br>7 Q. On page 2 of 7 of that article, just slightly 14:48:18<br>8 past midway down there is a quote from the 14:48:25<br>9 Ezzedine Al-Qassam Brigades. It begins, 14:48:29<br>10 "They will not dream." Do you see that? 14:48:31<br>11 A. Yes. 14:48:34<br>12 Q. Could you please read that aloud? 14:48:34 | |

| Deposition Designation | Objection & Response |
|---|---|
| 13 A. It says, "They will not dream of a calm if 14:48:36 | |

13 A. It says, "They will not dream of a calm if 14:48:36
14 they do not stop their aggression towards our 14:48:40
15 people, said Ezzedine Al-Qassam" -- "said the 14:48:40
16 Ezzedine Al-Qassam Brigades statement, and 14:48:47
17 stop attempting to break our unity 14:48:48
18 government." 14:48:51
19 Q. Actually, I'm not sure that's exactly what 14:48:51
20 the quote reads. What I see the words 14:48:54
21 appearing as being, "They will dream of a 14:48:59
22 calm if they do not stop their aggression 14:49:00
23 towards our people," close quotes, "The 14:49:03
24 Ezzedine Al-Qassam Brigades statement said," 14:49:06
25 begin quotes, "And stop attempting to break 14:49:07

Page 530

1 our unity government," close quotes. Is that 14:49:10
2 correct? 14:49:13
3 A. Yes, you read it correctly. 14:49:13
4 Q. There's a reference here to the unity 14:49:15
5 government, is there not? 14:49:17
6 A. There is. 14:49:18
7 Q. So does this refresh your recollection that 14:49:19
8 as of the date of this article, there was in 14:49:22
9 fact a unity government that had been agreed 14:49:24
10 to between Hamas and Fatah? 14:49:28

14 THE WITNESS: That is what they 14:49:36
15 say the statement said. The previous article 14:49:38
16 that you had me look at referred to it as a 14:49:40
17 tentative agreement. 14:49:44

19 Q. Do you know one way or the other as to 14:49:45
20 whether the unity agreement had been -- 14:49:48
21 excuse me, a unity government had been agreed 14:49:51
22 to between Hamas and Fatah as of 14:49:53
23 June 30, 2014? 14:49:57

Page 531

1 THE WITNESS: I think I've already 14:50:04
2 answered that question. Can I tell you with 14:50:05
3 absolute certainty whether they had agreed to 14:50:07
4 that, no, I cannot. 14:50:10

| Deposition Designation | Objection & Response |
|---|---|
| 6 Q. In your direct testimony in discussing the 14:50:19<br>7 TRIA endorsement, you indicated that you had 14:50:21<br>8 agreed that TRIA did not apply and 14:50:27<br>9 specifically you said, begin quotes, "I 14:50:31<br>10 agreed with her that the certified acts of 14:50:34<br>11 terrorism did not apply to this claim, 14:50:36<br>12 because this was not a certified act of 14:50:38<br>13 terrorism," close quotes. Do you recall that 14:50:40<br>14 testimony? 14:50:43<br>15 A. I do. 14:50:43<br>16 Q. Who is the "her" that you were referring to? 14:50:44<br>17 A. You. 14:50:46<br>18 Q. Okay. In my August response letter, 14:50:46<br>19 August 13, 2014, response letter, did I 14:50:54<br>20 indicate to you that the TRIA endorsement did 14:50:57<br>21 not apply because the acts that were ongoing 14:51:02<br>22 in Israel did not constitute certified acts 14:51:06<br>23 of terrorism? 14:51:10<br>24 A. I don't remember exactly what you said, 14:51:11<br>25 except that you did not think that that 14:51:13<br><br>Page 532<br><br>1 endorsement applied. 14:51:16<br><br>9 Q. If you'd turn your attention to page 6 of the 14:53:27<br>10 letter, and that's ATL002031, if you look at 14:53:32<br>11 the paragraph that begins, "By citing the 14:53:40<br>12 endorsement to deny coverage, OBE 14:53:42<br>13 misinterprets the policy in three material 14:53:45<br>14 ways"; do you see that? 14:53:47<br>15 A. Yes. 14:53:53<br>16 Q. Is there any discussion herein that indicates 14:53:54<br>17 to you that the argument that I was asserting 14:53:59<br>18 was that the acts that were occurring in 14:54:03<br>19 Israel were not certified acts of terrorism? 14:54:10<br>20 A. You say, "Therefore, the endorsement is 14:54:38<br>21 completely inapplicable to this claim." 14:54:40<br>22 That's what I was referring when saying that 14:54:43<br>23 I agreed with you, I agree that the 14:54:45<br>24 endorsement is completely inapplicable. 14:54:47<br>25 Q. But that wasn't your testimony, is it? 14:54:50<br><br>Page 533 | |

| Deposition Designation | Objection & Response |
|---|---|
| 1 A. Well, I -- 14:54:53 | |
| 4 THE WITNESS: Ms. Coyoca, I'm 14:54:56<br>5 sorry if I mischaracterized what you said in 14:54:58<br>6 your letter. What I was trying to say is 14:55:01<br>7 that both of us agreed that the terrorism 14:55:03<br>8 endorsement, the TRIA endorsement was 14:55:05<br>9 inapplicable to this claim. 14:55:08 | |
| 11 Q. If it was inapplicable to the claim, then why 14:55:11<br>12 did you cite it in the original letter? 14:55:14<br>13 A. I cited it in the original letter because 14:55:17<br>14 Susan Weiss had continued to say that it was 14:55:19<br>15 terroristic act, that Hamas's conduct was a 14:55:19<br>16 terroristic act, and so I was referring to 14:55:25<br>17 the portion of the policy that referenced 14:55:26<br>18 terrorism. 14:55:28<br>19 Q. There is no terrorism exclusion under this 14:55:31<br>20 policy, though, is there? 14:55:34 | |
| 24 THE WITNESS: There is no specific 14:55:44<br>25 exclusion in the policy that is called a 14:55:47 | |
| Page 534 | |
| 1 terrorism exclusion, no. | |
| 20 Q. Ms. Johnson, my next question to you is: Is 14:56:39<br>21 it your position, was it your position in 14:56:42<br>22 July of 2014 that only certified acts of 14:56:45<br>23 terrorism are terrorism? 14:56:50 | |
| Page 535 | |
| 2 THE WITNESS: No | |
| Page 538 | |
| 19 Q. So in that clip from the Face the Nation, 15:00:38<br>20 does either Mr. Schieffer or Ms. Williams 15:00:41<br>21 characterize the conflict as being a war? 15:00:44<br>22 A. They don't. 15:00:46 | |
| END PLAINTIFFS' 106 COUNTER-DESIGNATION | |
| Page 545 | |
| 6 Q. Ms. Johnson, in that report does Mr. Hayes, 15:06:48 | |

| Deposition Designation | Objection & Response |
|---|---|
| 7 Chris Hayes, characterize the Hamas/Israeli 15:06:53<br>8 conflict, use the words war in his report? 15:06:57<br>9 A. Mr. Hayes specifically has a large screen in 15:07:00<br>10 back of him that says, "Ground war," and also 15:07:03<br>11 beneath him on the screen it says, "Ground 15:07:06<br>12 war," and he uses the term, "Reoccupation," 15:07:09<br>13 which is generally a term that is used in 15:07:13<br>14 times of war. 15:07:15 | |
| PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 545<br><br>15 Q. Ms. Johnson, you did not respond to my 15:07:17<br>16 question. 15:07:24<br>17 Did Mr. Hayes use the word "war" 15:07:25<br>18 during his report -- 15:07:29<br>19 A. No. 15:07:32<br>20 Q. -- in -- with reference to the conflict that 15:07:32<br>21 was ongoing? 15:07:34<br>22 A. No, he did not use the word "war." 15:07:37 | Plaintiff's Objections:<br>Page 545:6-14<br>MIL 3, F.R.E. 402-403<br>The video at issue discusses the potential for a "ground war" involving Israel's conduct in Gaza—and is therefore irrelevant and substantially more prejudicial than probative for the reasons in MIL No. 3. |
| END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 551<br><br>14 BY MS. COYOCA: 15:14:23<br>15 Q. What investigation did you undertake to 15:14:23<br>16 determine the meaning of the word "other 15:14:26<br>17 authority" in the second exclusion? 15:14:28<br>18 A. Well, I looked at what Hamas was doing, how 15:14:35<br>19 they were organized, whether or not they had 15:14:39<br>20 authority. I -- you know, I mean, I -- I 15:14:42<br>21 tried to make a determination about whether 15:14:48<br>22 they would qualify as an other authority. 15:14:51<br>23 Q. Ms. Johnson, that was not my question. 15:14:53<br>24 What I'm trying to find out from you 15:14:56<br>25 is: What research did you do in order to 15:14:59 | Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 552**<br><br>1 determine what the meaning of the phrase, 15:15:04<br>2 "Other authority," was as it's used in the 15:15:07<br>3 context of Exclusion 2? 15:15:11<br>4 A. Well -- 15:15:13<br>5 MS. REED: Lack of foundation. 15:15:13<br>6 THE WITNESS: As I previously 15:15:15<br>7 testified, I looked at case law that involved 15:15:16<br>8 or concerned the war exclusion. I cannot 15:15:20<br>9 tell you as I sit here today, without 15:15:25<br>10 reviewing all the cases again, whether there 15:15:27<br>11 was something that said specifically or 15:15:30<br>12 specifically defined what other authority 15:15:31<br>13 was. Not all of the cases that I looked at 15:15:33<br>14 had the exact same language that is contained 15:15:37<br>15 in this policy in the cases, so I -- I 15:15:40<br>16 can't -- I can't sit here today and tell you 15:15:43<br>17 definitively whether or not there was a case 15:15:45<br>18 that interpreted that. 15:15:47<br><br>**Page 567**<br><br>16 Q. Ms. Johnson, over the scope of time that you 15:38:05<br>17 conducted your factual investigation relating 15:38:07<br>18 to the Dig claim, did you read articles that 15:38:09<br>19 did refer to the conflict of summer of 2014 15:38:12<br>20 as a war? 15:38:15<br>21 A. Yes, I did. 15:38:17<br>22 Q. Can you put Exhibit 237 back in front of you, 15:38:18<br>23 please, ma'am. 15:38:23<br>24 A. (Complies.) 15:38:24<br>25 Q. Let me refer you to page 4 of 4 of that 15:38:29 | Plaintiff's Objections:<br>Page 567:16-569:4<br>MIL 2, F.R.E. 402-03<br>For the reasons in MIL No. 2, plain and ordinary meaning or colloquial use of "war" is irrelevant and substantially more prejudicial than probative. Defendant's denial letter was based on the insurance industry's special meaning of war. *Century Surety Co. v. Polisso, supra*.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>The witness's actions in researching and responding to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing. |

| Deposition Designation | Objection & Response |
|---|---|
| | misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

Page 568

1 document, please. 15:38:32
2 A. Yes, I see it in front of me. 15:38:35

21 into the hands of Hamas." 15:39:09
22 Q. Who wrote this article, please, ma'am? 15:39:11
23 A. The author is Heller, who reported from 15:39:15
24 Jerusalem, Associated Press writers 15:39:19
25 Ian Deitch, I think is how you pronounce that 15:39:25

Page 569

1 in Jerusalem, Ibrahim Barzak in Gaza City, 15:39:28
2 Mohammed -- oh, yikes -- Daraghmeh in 15:39:28
3 Ramallah, West Bank, and Matthew Lee in 15:39:39
4 Washington contributed to this report. 15:39:39

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Thomas McCarthy June 1, 2017<br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | Plaintiffs object to Defendant's designation of the deposition testimony of Thomas McCarthy.  Mr. McCarthy's testimony is a waste of time and largely irrelevant.  His only involvement in the facts giving rise to this case is monitoring the security situation in Israel.  The jury can and should be instructed that Plaintiffs postponed and later ceased production in Israel and why.  These issues have already been decided by the Ninth Circuit. There is no reason to present Mr. McCarthy's testimony at trial. Defendant's designations cover multiple sources Mr. McCarthy consulted to monitor safety in Israel – Defendants did not receive or consider these materials at the time they denied the Dig claim.  As such, they are irrelevant. Plaintiffs object to Defendant's designations as follows.  Where line numbers are not included with a page number, plaintiffs object to all designated testimony on the page cited. |
| Page 10<br>20 Q Could you state your name for the record,<br>21 please.<br>22 A Thomas McCarthy. | Plaintiff's Objections:<br>No objection – Page 10:20-22.<br><br>Defendant's Response: |
| Page 11<br>7 So let me start by asking you: By whom are<br>8 you employed?<br>9 A NBCUniversal?<br>10 Q What is your position currently with<br>11 NBCUniversal?<br>12 A The global chief security officer. | Plaintiff's Objections:<br>No objection – Page 11:7-12, 16-17, 19-20.<br><br>Defendant's Response: |

16 Q Going back to June and July of 2014, what
17 was your position with NBCUniversal?

19 THE WITNESS: Same title, global chief
20 security officer.

Page 13
5 Q Have you ever -- do you recall a TV series
6 named DIG, D-I-G?
7 A I do.

| | Plaintiff's Objections: No objection – 13:5-7. |

Page 22
4 MR. RIDDLE: Okay. If you can, take a look
5 at the next exhibit, No. 458.
6 (Exhibit 458 was marked for
7 identification by the court reporter
8 and is attached hereto.)
9 BY MR. RIDDLE:
10 Q And is this an email dated July 2, 2014,
11 from Erin Noordeloos to you?
12 A Yes.
13 Q And it says, "This is the latest update
14 from Stephen re DIG," correct?
15 A Yes.
16 Q And did you understand that to mean
17 Stephen Smith?
18 A I did.
19 Q And in the -- there's a -- the first
20 italicized paragraph, do you see that there's a
21 reference to the increase in rocket attacks?
22 A In the first paragraph?
23 Q Yes, sir. The first paragraph that's
24 got -- that's in italics.
25 A Okay. Yes, sir

Plaintiff's Objections:Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209)– Page 22:4-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Waste of time.

Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information

NBC, ASIC, and other
parties had at time of the
facts giving rise to Plaintiffs'
claims. "MIL" not clear what
objection intended;
description of general claim
process is relevant and not
prejudicial..

Page 29
1 A "I have advised the DIG production
2 based on the current security
3 situation and the intel analysis we
4 have from a variety of sources that if
5 the current security situation
6 persists or deteriorates further, we
7 should not be shooting in Jerusalem.
8 I have had a call with Mark and Randi
9 and subsequently with the production
10 team in Israel to explain the
11 rationale behind the advice. I am
12 providing Randi/Mark with regular
13 updates and the decision will be
14 reviewed every 24 hours."
15 Q In this time frame, were you relying on
16 Stephen Smith to give you accurate information
17 concerning the security situation in Israel?

20 THE WITNESS: Yes, sir.

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209)–
Page 29:1-17, 20.
Designation does not include
what exhibit or "time frame"
it is referencing.  Not
relevant to defendant's denial
of coverage; not reviewed by
defendant at the time of
denial. Waste of time.

Defendant's Response:
The witness' understanding
and development of facts
bearing on claim decision
relevant to reasonableness of
claim decision. The probative
value of this testimony is not
substantially outweighed by
its prejudicial effect, it will
not confuse the jury, waste
time, and is not unnecessarily
cumulative. Further, F.R.E.
403 is conditional, and
therefore not binding as to
general admissibility.
Objection also fails to state
why exhibit is unfairly
prejudicial; or why such
alleged unfair prejudice
outweighs its probative
value; or why exhibit
confuses the issue, misleads
the jury, wastes time, or is
cumulative. Furthermore,
high probative value re: state
of mind of all parties
involved at the time of the
claim. The jury is entitled to
know what information
NBC, ASIC, and other
parties had at time of the
facts giving rise to Plaintiffs'
claims. "MIL" not clear what

Page 32
4 BY MR. RIDDLE:
5 Q Okay. And can you flip to the second page,
6 please.
7 A Yes, sir.
8 Q And there's a -- there's like a box there
9 with a symbol in it. But, above that, it says:
10 "Significant increase in number of
11 mortar and rocket attacks resulting in
12 clashes in Jerusalem IDF and security
13 forces continued operations in the
14 West Bank again resulting in clashes
15 in Jerusalem."
16 Correct?

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 32:4-16, 19-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Designation does not include what exhibit it is referencing.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The Witness' understanding and development of facts is relevant to reasonableness of

claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

19 THE WITNESS: Yes, sir.
20 BY MR. RIDDLE:
21 Q And did that cause you concern for the
22 safety of the cast and crew in Israel?
23 A Yes, sir.
24 Q Why is that?
25 A Well, with Hamas launching rockets into

Page 33
1 Israel, there was no way that we would be able to
2 protect our personnel that were either coming back
3 or in Israel at the time.
4 Q And do you have an understanding as to
5 what -- who's being referenced there by the initials
6 IDF?

9 THE WITNESS: I would assume it's the
10 Israeli Defense Force.

Page 36
10 MR. RIDDLE: Okay. If you would, take a
11 look at Exhibit 461.
12 (Exhibit 461 was marked for
13 identification by the court reporter
14 and is attached hereto.)
15 THE WITNESS: Yes, sir.
16 BY MR. RIDDLE:
17 Q The top -- the email at the top of the
18 page, is that one from Stephen Smith to you dated

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 33:1-6, 9-10. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Designation does not include what exhibit it is referencing.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of

752

19 July 6, 2014?
20 A Yes, sir.
21 Q And this is from Stephen Smith. And he
22 references having just finished a call with the ops
23 director from MAX, correct?

claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Plaintiff's Objections: 402, 403, 802,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 36:10-23. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and the subsequent actions of the witness after possessing said

Page 37
1 THE WITNESS: Yes, sir.
2 BY MR. RIDDLE:
3 Q And then he -- do you see where further on
4 in this paragraph he references to -- he references
5 rockets?

8 THE WITNESS: Yes, sir.
9 BY MR. RIDDLE:
10 Q Is -- is it your understanding that at this
11 point in time that rockets were still being fired by
12 Hamas into Israel?

15 THE WITNESS: Yes, sir.
16 BY MR. RIDDLE:
17 Q And Mr. Smith goes on to state:
18 "Hamas are believed to be
19 attempting to draw Israel into a
20 conflict..."
21 Correct?

24 THE WITNESS: Yes, sir.

information. "MIL" not clear
what objection intended;
description of general claim
process is relevant and not
prejudicial.

Plaintiff's Objections:
402, 403, 802,  MIL 2 (Dkt
209), MIL 3 (Dkt 208) –
Page 37:1-5, 8-12, 15-21, 24.
Not relevant to defendant's
denial of coverage; not
reviewed by defendant at the
time of denial. To the extent
used to suggest that Israel's
conduct matters, not relevant
for reasons stated by the
Ninth Circuit. See MIL 3.
Hearsay to the extent offered
for the truth of the matter
asserted.

Defendant's Response:
The witness' understanding
and development of facts
bearing on claim decision
relevant to reasonableness of
claim decision. The probative
value of this testimony is not
substantially outweighed by
its prejudicial effect, it will
not confuse the jury, waste
time, and is not unnecessarily
cumulative. Further, F.R.E.
403 is conditional, and
therefore not binding as to
general admissibility.
Objection also fails to state
why exhibit is unfairly
prejudicial; or why such
alleged unfair prejudice
outweighs its probative
value; or why exhibit
confuses the issue, misleads
the jury, wastes time, or is
cumulative. Furthermore,
high probative value re: state
of mind of all parties
involved at the time of the
claim. The jury is entitled to
know what information
NBC, ASIC, and other
parties had at time of the

facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Finally, this statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 39
3 MR. RIDDLE: If you could take a look at
4 Exhibit 462, please.
5 (Exhibit 462 was marked for
6 identification by the court reporter
7 and is attached hereto.)
8 THE WITNESS: Yes, sir.
9 BY MR. RIDDLE:
10 Q Okay. And this is -- is this a series of
11 emails concerning the security issues in Israel?
12 A Yes, sir.
13 O And let's start from the bottom and work

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209)– 39:3-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.

802 – 39:25. Hearsay to the extent offered for the truth of the matter asserted.

14 our way up.
15 And by that I mean, if you look near the
16 bottom of the first page, do you see an email from
17 Stephen Smith dated July 8, 2014, to Randi Richmond
18 and Mark Binke with a copy to yourself and
19 Ms. Noordeloos?
20 (Reporter clarification.)
21 BY MR. RIDDLE:
22 Q Yourself, meaning Mr. McCarthy.
23 A Yes, sir.
24 Q Okay. And it says:
25 "Randi, as per our last call, I

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Finally, this statement is not being offered for the truth of the matter asserted, therefore, it is by

definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 40
1 have spoken to a contact in Tel Aviv
2 who believes there will be further
3 rockets targeting Tel Aviv and the
4 surrounding area overnight."
5 Correct?

8 THE WITNESS: Yes, sir.
9 BY MR. RIDDLE:
10 Q And if you could flip over to the next
11 page --
12 A Yes, sir.
13 Q -- you see that first full paragraph starts
14 out, "I am awaiting..."
15 Do you see that?
16 A Yes, sir.
17 Q Would you read that for us out loud.
18 A "I am awaiting on a further tactical
19 update and will circulate ASAP. I
20 have revived unconfirmed information
21 that Israel is readying itself for a
22 ground offensive with a further build
23 up of forces at the border. The view
24 from Israel is that with the previous
25 updates there is little appetite for

Plaintiff's Objections:
802 – 40:1-5; 40:8. Hearsay to the extent offered for the truth of the matter asserted.

402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 40:1-5; 40:8-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit

confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. Finally, jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Finally, this statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 41
1 any protracted conflict from all
2 sides."
3 Q In your position back in the first part of
4 July 2014, did you have any concern about the

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 41:1-5, 8-21, 24-25. Not relevant to defendant's denial

5 possibility of Israel initiating a ground offensive?

8 THE WITNESS: Yes, sir.
9 BY MR. RIDDLE:
10 Q Why is that?
11 A Well, if they activated a ground offensive,
12 I would be concerned with the Hamas launching back
13 at Israel. And, once again, my concern was not the
14 ground offensive but the reactions of Hamas as a
15 result of that, that we would be unable to protect
16 our people.
17 Q Okay. But if -- but if, in fact, Israel
18 did initiate a ground offensive with -- was it your
19 belief at that time that that would likely result in
20 Hamas retaliating, so to speak, and firing
21 additional rockets into Israel?

24 THE WITNESS: Yes, sir. That was my
25 concern, that Hamas's reaction to anything would put

of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. Finally, jury is entitled to know what information NBC, ASIC, and

other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 42
1 my people in jeopardy.
2 BY MR. RIDDLE:
3 Q And if we go up to the top of the first
4 page, is that an email that you received from
5 Stephen Smith dated July 8, 2014, with a security
6 update?

9 THE WITNESS: I believe it says, "DIG
10 update," correct.
11 BY MR. RIDDLE:
12 Q Okay.
13 And do you see where Mr. Smith makes
14 reference to the need to heed the following advice
15 and warnings?
16 A Yes, sir.
17 Q Okay. And the first item listed is:
18 "No travel within 20 kilometers of
19 the Gaza Strip at this time."
20 Correct?
21 A Yes, sir.

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 42:1-6, 9-21. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The Witness' understanding and

Page 43

22 BY MR. RIDDLE:
23 Q All right. Let's take a look at -- this
24 will be in the smaller stack, Exhibit 163.
25 A Okay. Yes, sir.

development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  Finally, jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 43:22-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste

| | |
|---|---|
| 1 | time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Finally, jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial. |

Page 44
1 Q Do you have that?
2 A Yes, sir.

24 Q You see that there's a heading that says,
25 "Current Situation Overview"?

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 44:1-2, 24-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of

denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 45
1 A Yes, sir.
2 Q And the first entry says:
3 "Reports indicate that five
4 rockets were fired from the Gaza Strip
5 toward Tel Aviv this morning, July 9."
6 Correct?
7 A Yes, sir.
8 Q And then Mr. Smith's report goes on to
9 state:
10 "Rockets fired towards central
11 Israel, including Jerusalem and
12 Tel Aviv, during the evening hours of
13 July 8. Long-range rockets also
14 impacted in Hadara, north of
15 Tel Aviv."
16 Do you see that?
17 A Yes, sir.
18 Q And then do you see where it says,
19 "Overnight, Israel reportedly struck some 160
20 militant targets in the Gaza Strip, in addition to
21 killing a senior Islamic Jihad leader and members of
22 his family"?
23 A Yes, sir.

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 45. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended:

description of general claim process is relevant and not prejudicial.

Page 46
21 BY MR. RIDDLE:
22 Q In the next paragraph, do you see where it
23 says:
24 "Following the firing of numerous
25 rockets towards central Israel on

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 46:21-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC: ASIC did not have

9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 47
1 July 8th, this morning's barrage
2 indicates that Gaza-based militants,
3 specifically Hamas and Islamic Jihad,
4 are intent on continuing such
5 longer-range attacks"?
6 A Yes, sir.
7 Q Do you see that?
8 A I do.
9 Q And do you also see where it says:
10 "In this context, additional
11 rockets against Tel Aviv, Jerusalem,
12 and other major population centers in
13 central Israel should be expected for
14 the duration of July 9."
15 Do you see that?
16 A I do.
17 Q And do you see where it says:
18 "In light of Israel's overnight
19 response, Israel is likely to view
20 this morning's barrage as a further
21 escalation and will likely continue to
22 respond with more extensive attacks
23 against the Gaza Strip within the next
24 24 to 48 hours"?
25 A Yes, sir.

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 47:1-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of

claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 48

1 Q And do you see where there's another
2 heading in this email that says, "Update from
3 contact based in Tel Aviv"?
4 A Yes, sir.
5 Q Do you see where it says:
6 "Likely escalation in Israel
7 response with air and missile attacks
8 targeting remotely operated and hidden
9 rocket launchers and targeted killings
10 of Hamas operatives"?
11 A Yes, sir.
12 Q And did you consider this information in
13 performing your duties for NBCUniversal back in July
14 of 2014?

17 THE WITNESS: Yes, sir.

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 48:1-14, 17. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads

the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 54
17 MR. RIDDLE: Mr. McCarthy, would you take a
18 look at Exhibit 465.
19 (Exhibit 465 was marked for
20 identification by the court reporter
21 and is attached hereto.)
22 THE WITNESS: Yes, sir.
23 BY MR. RIDDLE:
24 Q And at the top of the page, is that an
25 email from Ms. Noordeloos to you dated July 10,

Plaintiff's Objections: 402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 54:17-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state

why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 55
1 2014?
2 A Yes, sir.
3 Q And it says:
4 "FYI, Chris pulled this together
5 for us on the attack overnight in Gaza
6 so I could see where the location was
7 vis-a-vis the hotel."
8 Correct?
9 A Yes, sir.
10 Q And then underneath it, is there an email
11 from Chris Biggs to Erin Noordeloos dated July 10,
12 2014?
13 A Yes, sir.
14 Q Who is Chris Biggs?
15 A He's an analyst that is used out of the
16 London office.
17 Q For what purpose?
18 A General information, to put assessments
19 together, to help coordinate assessments so we

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 55:1-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will

| | | |
|---|---|---|
| 1 | get | not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial. |
| 2 | 20 to see as much as we can to evaluate the best we 21 can. | |
| 3 | 22 Q Okay. So he works in the area of security? 23 A Yes. | |
| 4 | 24 Q That you're responsible for? 25 A Yes, sir. | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | Page 56 | Plaintiff's Objections: |
| 22 | 1 Q Okay. And if you look at his email to 2 Ms. Noordeloos, does it appear that he is providing 3 Reuters story? | 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 56:1-3, 6-10, 12-25. Not relevant to defendant's denial |
| 23 | | of coverage; not reviewed by |
| 24 | 6 THE WITNESS: Yes, sir. 7 BY MR. RIDDLE: | defendant at the time of denial. Israel's conduct not |
| 25 | 8 Q Okay. Did -- did you read and consider 9 this information in assessing the security situation 10 around the time of July 10, 2014? | relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| 26 | | |
| 27 | 12 THE WITNESS: Yes, sir. 13 BY MR. RIDDLE: | Defendant's Response: |
| 28 | 14 Q I'm sorry. I didn't -- I didn't hear your 15 answer. | The witness' understanding and development of facts |

16 A I'm sorry. I said, "Yes, sir."
17 Q Okay. All right.
18 And if you can go down -- if you look at
19 that Reuters story, go down to the fifth -- looks
20 like the fifth paragraph. It starts out with the
21 words Shihab or Shihab, S-h-i-h-a-b.
22 Do you see that?
23 A I do.
24 Q Would you read that -- those two sentences
25 for us.

bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 57
1 A "Shihab was one of the dozens
2 of Palestinians who have been killed
3 by Israeli strikes in the last few
4 days, as violence intensifies
5 following weeks of mounting tension
6 between the two sides. Meanwhile,
7 Hamas has sent scores of rockets into
8 Israel."

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 57:1-10, 13-16, 19-25.  Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not

9 Q All right. So here we have a reference to
10 "Israeli strikes," correct?

13 THE WITNESS: Yes, sir.
14 BY MR. RIDDLE:
15 Q And also a reference to the violence
16 intensifying, correct?

19 THE WITNESS: Yes, sir.
20 BY MR. RIDDLE:
21 Q All right. And then if you go to the
22 second page, do you see there's a sentence
23 underneath the map. It starts with the word
24 "Supposedly"?
25 A Yes, sir.

relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 58
1 Q Would you read that out loud for us, that
2 sentence.
3 A "Supposedly, there have been

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 58:1-11, 14-20, 23.  Not

4 attacks on Gaza port, rocket attacks
5 from the jets/drones and
6 supposedly/unverified gun battles
7 taking place possibly from Israeli
8 soldiers on boats."
9 Q With reference to the attacks on Gaza ports
10 and rocket attacks from the jets and drones, did you
11 understand that to mean attacks by Israeli forces?

14 THE WITNESS: Yes, I'm assuming that.
15 BY MR. RIDDLE:
16 Q And -- and this is -- at this point in
17 time, again, you were -- you were taking into
18 account the fact that Israel was striking back
19 because you thought that might lead to further
20 attacks by Hamas, correct?

23 THE WITNESS: Yes, sir.

relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 60
4 Q And if you go to the next page of
5 Exhibit 466.
6 A Yes, sir.
7 Q Do you see where Stephen Smith, also on
8 July 2014 -- I'm sorry. Also on July 10, 2014,
9 forwarded to you and Ms. Noordeloos a security
10 update that he had gotten from Mark Binke,
correct?
13 THE WITNESS: Yes, sir.
14 BY MR. RIDDLE:
15 Q And looking in the -- going farther down in
16 that email, you see where it says:
17 "Continued rocket fire from Gaza
18 including two targeting Tel Aviv.
19 Approaching 400 rockets fired from
20 Gaza and 800 retaliatory strikes from
21 Israel. There has been no lull or
22 cessation"?
23 A Yes, sir.
24 Q Do you see that?
25 A I do.

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209),
MIL 3 (Dkt 208) – Page
60:4-25. Not relevant to
defendant's denial of
coverage; not reviewed by
defendant at the time of
denial. To the extent used to
suggest that Israel's conduct
matters, not relevant for
reasons stated by the Ninth
Circuit. See MIL 3.

Defendant's Response:
The witness' understanding
and development of facts
bearing on claim decision
relevant to reasonableness of
claim decision. The probative
value of this testimony is not
substantially outweighed by
its prejudicial effect, it will
not confuse the jury, waste
time, and is not unnecessarily
cumulative. Further, F.R.E.
403 is conditional, and
therefore not binding as to
general admissibility.
Objection also fails to state
why exhibit is unfairly
prejudicial; or why such
alleged unfair prejudice
outweighs its probative
value; or why exhibit
confuses the issue, misleads
the jury, wastes time, or is
cumulative.  The Witness'
understanding and
development of facts is
relevant to reasonableness of
claim decision, defense of
"bad faith" allegation and
damages sought; relevant to
show state of mind,
reasonableness, and good
faith claims handling on part
of ASIC; ASIC did not have
9th Circuit opinion to
consider at the time, and
testimony regarding the facts
available to all parties to

Page 61
1 Q And did you take into account this
2 information in assessing the security situation in
3 Israel on or about July 10, 2014?

6 THE WITNESS: Yes, sir.
7 BY MR. RIDDLE:
8 Q And if you'd go to the third page of
9 Exhibit 466, do you see near the top of the page
10 there are some bullet points listed?
11 A Yes, sir. It starts with, "Various
12 international..."?
13 Q I'm sorry? Say that again.
14 A It starts with, "Various international..."?
15 Is that the one you're looking at?
16 Q Yes, sir.
17 A Okay.
18 Q And then there's some bullet points
19 underneath that, right?
20 A Yes, sir.
21 Q And you see the first one starts out by
22 saying:
23 "Much of the analysis is pointing
24 to Israel being drawn into a ground
25 offensive"?

form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 61:1-3, 6-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, F.R.E. 403 is conditional, and therefore not binding as

to general admissibility.
Objection also fails to state
why exhibit is unfairly
prejudicial; or why such
alleged unfair prejudice
outweighs its probative
value; or why exhibit
confuses the issue, misleads
the jury, wastes time, or is
cumulative. "MIL" not clear
what objection intended;
description of general claim
process is relevant and not
prejudicial.

Page 62
1 A Yes, sir.
2 Q And then do you see that one of the bullet
3 points starts out, "Rafah border crossing..." but
4 then it continues:
5 "Most rockets continue to target
6 the southern region of Israel,
7 particularly those within the 20
8 kilometers range from the Gaza Strip.
9 An increasing amount of rockets has
10 also been fired towards cities in the
11 20 to 40 kilometer range from Gaza..."
12 Correct?

15 THE WITNESS: Yes, sir.
16 BY MR. RIDDLE:
17 Q And then -- and this is information that
18 was being reported by Stephen Smith, correct?

21 THE WITNESS: I would assume that here,
22 yes, sir. I believe they look like bullets from
23 Mark Binke.
24 BY MR. RIDDLE:
25 Q Well, isn't it where Mark Binke's basically

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209),
MIL 3 (Dkt 208) – Page
62:1-12, 15-18, 21-25. Not
relevant to defendant's denial
of coverage; not reviewed by
defendant at the time of
denial.  To the extent used to
suggest that Israel's conduct
matters, not relevant for
reasons stated by the Ninth
Circuit. See MIL 3.

Defendant's Response:
The witness' understanding
and development of facts
bearing on claim decision
relevant to reasonableness of
claim decision. The Witness'
understanding and
development of facts is
relevant to reasonableness of
claim decision, defense of
"bad faith" allegation and
damages sought; relevant to
show state of mind,
reasonableness, and good
faith claims handling on part
of ASIC; ASIC did not have
9th Circuit opinion to
consider at the time, and
testimony regarding the facts
available to all parties to
form an understanding in real
time is critical for jury to
consider when evaluating

bad faith claims. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 63

1 repeating what Stephen Smith said, plus he posed a
2 question to Stephen Smith?

5 THE WITNESS: I would assume that these
6 bullets were provided. I'm assuming this, to
7 Mark Binke from Stephen.
8 BY MR. RIDDLE:
9 Q Okay. Mr. Binke wasn't -- he wasn't
10 responsible for providing information about what was
11 transpiring in Israel, was he?
14 THE WITNESS: No, sir.
15 BY MR. RIDDLE:
16 Q And did you consider this -- the
17 information in this email, did you consider it in
18 performing your job duties around the time of July
19 10, 2014?

22 THE WITNESS: Yes, sir.


PLAINTIFFS' 106 COUNTER-DESIGNATION:
Page 66
14 Did you have any involvement in a decision to
15 move the production of DIG out of Israel?
16 A No, sir.
END PLAINTIFFS' 106 COUNTER-

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 63:1-2, 5-19, 22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Counter-designation 66:14-16 necessary to complete testimony to show lack of probative value of witness's testimony.


Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily

DESIGNATION

cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice

outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. As to preliminary question objection, it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets the 602.

Page 67
22 MR. RIDDLE: Okay. Let's -- let's go,
23 then, to Exhibit 469.

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 67:22-23. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by

its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility.  Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 68
1 (Exhibit 469 was marked for
2 identification by the court reporter
3 and is attached hereto.)
4 THE WITNESS: Yes, sir.
5 BY MR. RIDDLE:
6 Q And is this an email exchange between you
7 and Mr. Lon Austinberg [sic]? I'm sorry, Aust --
8 no --
9 A Augustenborg.
10 Q Augustenborg.
11 A Correct, sir.
12 Q Okay. Who was that?
13 A Lon is the station chief for the CIA based
14 out of New York, or was. He's retired now.

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 68:1-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

15 Q Okay. At this point in time he was the
16 station chief for --
17 A The CIA.
18 Q -- the CIA stationed in New York; is that
19 correct?
20 A That's correct.
21 Q And how did you know him?
22 A Through my working with the Secret Service.
23 Q Okay. And are you -- do you -- is your
24 office in New York?
25 A Yes, sir.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 69
1 Q And how long has that been the case?
2 A Since I came on the job four years ago.
3 Q Okay. And do you see that -- in -- in
4 Mr. Augustenborg's email to you on July 10, 2014, he
5 states that, "...likelihood of more rockets and
6 bombings are high..."?

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 69:1-6, 9-12. 20-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of

9 THE WITNESS: Yes, sir.
10 BY MR. RIDDLE:
11 Q Did you agree with that assessment at that
12 time?

20 THE WITNESS: It was his opinion. So I was
21 taking it in, as I take in all sorts of intelligence
22 that I can gather in order to help make a best
23 decision or provide the best information.
24 BY MR. RIDDLE:
25 Q And around this time, which was the first

denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 70
1 part of July 2014, who were you providing
2 information about security assessments in Israel
to?

5 THE WITNESS: We were putting as much
6 information as we could together to come up with a
7 recommendation for Mark Binke, Jeff Wachtel and that
8 crowd.
9 MR. RIDDLE: If you can take a look at
10 Exhibit 470.
11 (Exhibit 470 was marked for
12 identification by the court reporter
13 and is attached hereto.)
14 THE WITNESS: Yes, sir.
15 BY MR. RIDDLE:
16 Q All right. If you look at the -- the email
17 at the top of the page, is that from Erin Noordeloos
18 to you dated July 10, 2014?
19 A Yes, sir.
20 Q It says -- she says:
21 "This is the statement that Mark
22 requested after our conversation with
23 him."
24 Do you think she's referring to Mark Binke?

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209),
MIL 3 (Dkt 208) – Page
70:1-24. Not relevant to
defendant's denial of
coverage; not reviewed by
defendant at the time of
denial. To the extent used to
suggest that Israel's conduct
matters, not relevant for
reasons stated by the Ninth
Circuit. See MIL 3.  Wastes
time; jury can be instructed
that Plaintiffs moved
production and why.

Defendant's Response:
The witness' understanding
and development of facts
bearing on claim decision
relevant to reasonableness of
claim decision. The probative
value of this testimony is not
substantially outweighed by
its prejudicial effect, it will
not confuse the jury, waste
time, and is not unnecessarily
cumulative. Further, F.R.E.
403 is conditional, and
therefore not binding as to
general admissibility.
Objection also fails to state
why exhibit is unfairly
prejudicial; or why such
alleged unfair prejudice
outweighs its probative
value; or why exhibit
confuses the issue, misleads
the jury, wastes time, or is
cumulative.  The Witness'
understanding and
development of facts is
relevant to reasonableness of
claim decision, defense of
"bad faith" allegation and
damages sought; relevant to
show state of mind,
reasonableness, and good
faith claims handling on part
of ASIC; ASIC did not have
9th Circuit opinion to
consider at the time, and
testimony regarding the facts
available to all parties to

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 71
2 THE WITNESS: I would assume that, sir.
3 BY MR. RIDDLE:
4 Q Okay. And -- and it says:
5 "As you can see, Jeff Wachtel has
6 now been advised."
7 Correct?
8 A Yes, sir.
9 Q Advised as to what?

12 THE WITNESS: Advised of the intelligence
13 that we had gathered, reference the attacks from
14 Hamas into Israel.

form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 71:2-9, 12-14. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.  Wastes time; jury can be instructed that Plaintiffs moved production and why.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative.  The Witness' understanding and development of facts is

relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 72

5 Now, around this time, do you recall a
6 discussion with Mr. Wachtel concerning your
7 assessment of the security situation in Israel?

10 THE WITNESS: I remember having a
11 conversation with him. I guess, as we discussed,
12 it's three-and-a-half years ago, but I'm sure we --
13 I provided him the information that we have in front
14 of us here.
15 BY MR. RIDDLE:
16 Q Okay. And do you -- do you recall
17 generally what -- what you told him with that, the
18 security situation in Israel at that time?

21 THE WITNESS: I don't remember
22 specifically, but I'm sure it would have been that
23 as a result of Hamas sending rockets into Israel,
24 that I didn't feel comfortable with keeping our --
25 our employees safe in Israel.

Plaintiff's Objections: 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 72:5-7, 10-18, 21-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.  Wastes time; jury can be instructed that Plaintiffs moved production and why.

Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and

therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 73
2 Q Do you recall whether you mentioned that
3 the Israeli response would probably lead to further
4 rocket attacks by Hamas?

7 THE WITNESS: Yes, sir.
8 BY MR. RIDDLE:
9 Q What did you tell him in that regard?
10 A I don't remember specifically, but it's
11 pretty much what you just said, that I was concerned
12 for our production in Israel, as it was escalating.
13 And my concern was that a random rocket could cause
14 a devastating effect to our cast and crew in Israel.
15 Q It would have been also relevant to you at
16 this time that there might very well be a ground
17 offensive launched by the Israeli forces?

20 THE WITNESS: I was aware of the ground --

Plaintiff's Objections:
402, 403, MIL – Page 73:2-4, 7-17, 20-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.  Wastes time; jury can be instructed that Plaintiffs moved production and why.

Defendant's Response:
The witness' understanding and development of facts

21 possible ground forces moving. However, my concern
22 was not that. My concern was the reaction of Hamas
23 into Israel.
24 BY MR. RIDDLE:
25 Q And -- and part of that was that if, in

bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 74
1 fact, there was a ground offensive launched, that
2 would likely lead to further attacks by Hamas,
3 correct?

6 THE WITNESS: Yes, sir.
7 BY MR. RIDDLE:
8 Q I'm sorry -- can you repeat your answer?
9 A Oh, I'm sorry. Yes, sir.

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 74:1-3, 6-17, 22-14. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct

10 Q Okay. Sorry. Thanks.
11 And, then, if you look at the second page
12 of Exhibit 470, I want to look in particular at the
13 email from Stephen Smith on July 10, 2014 to
14 Mark Binke.
15 Do you recall ever reading this email?
16 A I don't recall reading it, but I'm sure I
17 did.

22 Q Okay. There's a statement by Stephen Smith
23 that says:
24 "NBCU Security have monitored and
25 evaluated the events in Israel, Gaza

matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.  Wastes time; jury can be instructed that Plaintiffs moved production and why.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 75
1 and the West Bank, since inception and
2 analyzed information from multiple
3 sources."
4 Do you see that?
5 A I do.
6 Q What is -- what does he mean by -- or what
7 is meant by "NBCU Security"?
10 THE WITNESS: That would be my -- myself,
11 Stephen Smith, Erin Noordeloos, anybody that was
12 involved in the monitoring of the information we
13 were getting about the Hamas -- Hamas in Israel.
14 BY MR. RIDDLE:
15 Q Okay. And would you read the rest of that
16 paragraph after that sentence.
17 A Yes, sir.
18 "All current intelligence and
19 activity in the country points to
20 events still being in escalation phase
21 without a predictable or realistic
22 timeframe for a reduction in
23 hostilities. We have looked at the
24 magnitude and range of current rocket
25 attacks (which appear to target

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 75:1-25.  Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.  Wastes time; jury can be instructed that Plaintiffs moved production and why.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and

testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 76
1 locations to be used in forthcoming
2 filming), the escalation of civil
3 disorder and potential for a further
4 increase in hostilities, including a
5 ground campaign, and acts of terrorism
6 within Israel, all of which mean there
7 is no short term and realistic
8 likelihood for positive changes to the
9 security landscape."

Plaintiff's Objections:
402, 403,  MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 76:1-9. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.  Wastes time; jury can be instructed that Plaintiffs moved production and why.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative.  The Witness' understanding and development of facts is relevant to reasonableness of

claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 81
1 Q Okay. And then let's go to -- this is one
2 that was marked before so it should be in that -- I
3 guess both stacks are small by now, but it's in the
4 stack of -- previously marked as Exhibit 409.
5 Let me know when you find that.
6 A Yes.
7 Q Okay. At the bottom, it says, "Begin
8 forwarded message:" From: NETDESK on July 17,
9 2014.
10 Would you read what it says under the
11 address part of the email.
12 A "Israeli Defense Forces
13 Confirm in statement they have
14 initiated a ground operation within
15 the Gaza Strip."
16 Q Do you see where it says, "NETDESK"?
17 A Yes, sir.
18 Q And then the address is
19 NBCNetdesk@nbcuni.com.
20 Do you have any understanding as to what
21 NETDESK is?

24 THE WITNESS: NETDESK, I believe, is a desk
25 at NBCUniversal that provides just quick updates to

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 81:1-21, 24-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.  Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative

value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 82
1 personnel in the field about news.
2 BY MR. RIDDLE:
3 Q Okay. And then above that we have an email
4 from you dated July 17, 2014, to Mark Binke,
5 correct?
6 A Yes, sir.
7 Q And you say, "Mark, we made the right call.
8 See below." Correct?
9 A Yes, sir.
10 Q And you're referring to the news update
11 that says:
12 "Israeli Defense Forces have
13 initiated a ground operation within
14 the Gaza Strip."
15 Correct?
16 A Yes, sir.
17 Q All right. So when you say, "We made the
18 right call," what are you referring to? Right call
19 concerning what?
20 A The right call that, you know, if there had
21 been a -- a ground operation, my concern would be
22 the immediate and devastating response from Hamas to
23 our people in Israel.

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 82:1-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and

24 And I was glad that we were -- had made the
25 call to -- to not continue there.

therefore not binding as to
general admissibility.
Objection also fails to state
why exhibit is unfairly
prejudicial; or why such
alleged unfair prejudice
outweighs its probative
value; or why exhibit
confuses the issue, misleads
the jury, wastes time, or is
cumulative. The Witness'
understanding and
development of facts is
relevant to reasonableness of
claim decision, defense of
"bad faith" allegation and
damages sought; relevant to
show state of mind,
reasonableness, and good
faith claims handling on part
of ASIC; ASIC did not have
9th Circuit opinion to
consider at the time, and
testimony regarding the facts
available to all parties to
form an understanding in real
time is critical for jury to
consider when evaluating
bad faith claims. "MIL" not
clear what objection
intended; description of
general claim process is
relevant and not prejudicial.

Page 85
3 BY MR. RIDDLE:
4 Q Did you provide any recommendation, you or
5 your group provide a recommendation concerning your
6 assessment of security in connection with a possible
7 decision to halt production or suspend production of
8 DIG in Israel?
9 A We advised them of the security situation
10 and how dangerous it was with Hamas being
11 unpredictable and us being unable to keep our people
12 safe. And we made that very clear to the production
13 side.
14 Q Okay. And what's -- what specific facts
15 were you relying on at the time you made that
16 recommendation?

Plaintiff's Objections:
402, 403 – Page 85:3-16, 19-
25. Not relevant to
defendant's denial of
coverage; not reviewed by
defendant at the time of
denial. Wastes time; jury can
be instructed that Plaintiffs
moved production and why.
Counter-designation 66:14-
16 necessary to complete
testimony to show witness
not involved in decision to
move production.

Defendant's Response:
No objection to counter
designation. The witness'

19 THE WITNESS: We were relying on daily
20 intelligence reports of multiple rocket attacks from
21 Hamas into Israel and the escalation of that. So
22 that's basically what it was primarily based on, is
23 that we were -- could not guarantee the safety of
24 our people in Israel. And it was getting more and
25 more volatile and it was not a time to have our

understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 86
1 people in Israel for this.

Plaintiff's Objections:
402, 403 – Page 86:1. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Wastes time; jury can be instructed that Plaintiffs moved production and why. Counter-designation 66:14-16 necessary to complete testimony to show witness not involved in decision to move production.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily

cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial. No objection to counter designation.

Page 89
13 Q Now, when you made your recommendations
14 about the security situation in Israel and whether
15 it would be prudent to continue with filming, were
16 you -- were you considering what you had learned
17 that had already happened in the past in this time
18 frame, June, July 2014?

21 THE WITNESS: Well, so I was taking all the
22 information I could and gather it together to make a
23 very educated assessment of what was happening over
24 there. So every piece of intelligence we put
25 together to try to be fair, in terms of our

Plaintiff's Objections:
402, 403 – Page 89:13-18, 21-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Wastes time; jury can be instructed that Plaintiffs moved production and why.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is

cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 90
1 assessment.
2 And we had, you know, a variety of
3 intelligence sources which were helpful to us in
4 coming to our assessment.
5 BY MR. RIDDLE:
6 Q And so you had -- you were trying -- you
7 were trying to basically make an assessment of what
8 the security risks would be in the near term going
9 forward, correct?

12 THE WITNESS: Yes, sir.
13 BY MR. RIDDLE:
14 Q And part of that was your concern that
15 Hamas would continue to fire rockets, missiles,
16 mortars, any or all of those, into Israel, correct?

19 THE WITNESS: Yes, sir.
20 BY MR. RIDDLE:
21 Q And you were -- you were also concerned
22 that there might be an escalation on the part of the
23 Israeli forces, in terms of a ground invasion,
24 because it would be reasonable to assume that that
25 would lead to further attacks by Hamas, correct?

Plaintiff's Objections:
402, 403 – Page 90:1-9, 12-16, 19- 25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Wastes time; jury can be instructed that Plaintiffs moved production and why.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 91
3 THE WITNESS: Yeah. My biggest concern was
4 not the ground invasion but Hamas's response to that

Plaintiff's Objections:
402, 403– Page 91:3-10, 12-20, 22-25. Not relevant to

5 and our people in Israel.
6 BY MR. RIDDLE:
7 Q Right. In other words, your concern was
8 with what Hamas would likely do if, in fact,
9 Israeli -- the Israelis escalated and started a
10 ground invasion, correct?

12 THE WITNESS: Yes, sir. My concern was
13 Hamas's response.
14 BY MR. RIDDLE:
15 Q Okay. And, again, you thought that the --
16 it was logical in your mind to assume that if, in
17 fact, the Israelis initiated a ground attack, that
18 would likely lead to Hamas continuing to fire
19 rockets, missiles, and perhaps mortars, into Israel,
20 correct?

22 THE WITNESS: Well, my concern was any type
23 of conflict escalation between Israel and Hamas
24 would result in Hamas, once again, launching rockets
25 into an area where our people were and I could
not

Page 92
1 keep them safe. That was my primary goal, is to
2 keep them safe.
3 BY MR. RIDDLE:
4 Q Okay. And is it your understanding that in
5 this time frame that Hamas had launched rockets and
6 missiles into Israel and had shot mortars into
7 Israel?

10 THE WITNESS: Yes, sir.

---

defendant's denial of coverage; not reviewed by defendant at the time of denial. Wastes time; jury can be instructed that Plaintiffs moved production and why.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Plaintiff's Objections:
402, 403– Page 92:1-7, 10. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Wastes time; jury can be instructed that Plaintiffs moved production and why.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of

claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

Page 94
6 BY MR. RIDDLE:
7 Q Well, I'll ask one, and that is: Would you
8 agree with me that rockets, missiles and mortars are
9 weapons?

12 THE WITNESS: Yes, I would say they're
13 weapons.
14 BY MR. RIDDLE:
15 Q Okay. And would you also agree that they
16 are weapons that have been used in warfare by
17 various parties?

20 THE WITNESS: I am sure they have.

Plaintiff's Objections:
402, 403, MIL 2 (Dkt 209)– Page 94:6-9, 12-17, 20. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Wastes time; jury can be instructed that Plaintiffs moved production and why. Exclusion 4 for "weapons of war" not relevant.  See MIL 2.

Defendant's Response:
The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to

general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of general claim process is relevant and not prejudicial.

| Deposition Designation | Objection & Response |
|---|---|
| <u>Defendant's Designation of Wanda Phillips</u><br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | Plaintiffs object to Defendant's designations as follows: |
| <u>Page 5</u><br>8 EXAMINATION BY MS. COYOCA:<br>9 Q. Good morning, Ms. Phillips.<br>10 A. Good morning.<br>11 Q. As I indicated, my name is Lucia 10:07<br>12 Coyoca, and I represent the plaintiffs in this<br>13 matter. Could you please state your full name<br>14 and address for the record.<br>15 A. My name is Wanda Lide Phillips. My<br>16 address is 56 Locust Street, Jersey City, New<br>       10:07<br>17 Jersey, 07305.<br>18 Q. Ms. Phillips, have you had your<br>19 deposition taken before today?<br>20 A. No. | <u>Plaintiff's Objections:</u><br><br><br><u>Defendant's Response:</u> |
| <u>Page 8</u><br>7 Q. Thank you. Ms. Phillips, where are<br>8 you currently employed?<br>9 A. Allianz Insurance Company.<br>10 Q. What do you do for Allianz Insurance?<br>11 A. I am an underwriter. 10:10<br>12 Q. What does an underwriter do?<br>13 A. We underwrite risks as they are<br>14 brought to our attention to decide if we will<br>15 place insurance for that risk. | <u>Plaintiff's Objections:</u><br><br><br><u>Defendant's Response:</u> |
| <u>Page 11</u><br>24 Q. When did you work at Aon<br>25 Entertainment? | |
| <u>Page 12</u> | <u>Plaintiff's Objections:</u> |

| Deposition Designation | Objection & Response |
|---|---|
| 1 A. I think I started, I don't know the 10:15<br>2 exact dates, but I think I started in early '89.<br>3 Q. And when did you leave Aon<br>4 Entertainment?<br>5 A. About '94.<br>6 Q. While you worked for Aon 10:16<br>7 Entertainment, was it Aon/Albert G. Ruben or just<br>8 Aon Entertainment at that point?<br>9 A. Just Aon Entertainment.<br>10 Q. While you worked at Aon<br>11 Entertainment, did you know Susan Weiss?10:16<br>12 A. Yes.<br><br>Page 13<br>18 Q. Where did you go after 1996?<br>19 A. Entertainment Brokers International.<br>20 Q. How long did you work at EBI?<br>21 A. Up until May of last year when EBI 10:18<br>22 became OneBeacon.<br><br>Page 14<br>1 Q. Okay. So you originally went to work 10:18<br>2 for EBI, and at some point EBI was purchased by<br>3 OneBeacon. Is that correct?<br>4 A. That's correct.<br>5 Q. When you first went to work for EBI,<br>6 what was your title? 10:19<br>7 A. I don't recall the exact title.<br>8 Q. What did you do for the company?<br>9 A. I was an underwriter there as well.<br>10 Q. Again specializing in entertainment<br>11 risks? 10:19<br>12 A. That's correct.<br>13 Q. What was your final position with<br>14 OneBeacon before you left?<br>15 A. Underwriting, senior underwriting<br>16 manager.<br><br>Page 19<br>21 Q. Did you work on the NBC Universal 10:27<br>22 matter? | Defendant's Response:<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections: |

| Deposition Designation | Objection & Response |
|---|---|
| 23 A. Yes.<br>24 Q. What was your role?<br>25 A. I was the underwriter.<br><br>Page 20<br>7 Q. How did you come to be involved in<br>8 the NBC Universal account?<br>9 A. I was approached by one of their<br>10 brokers at Aon/Albert G. Ruben.<br>11 Q. Who approached you? 10:28<br>12 A. George Walden.<br>13 Q. Approximately when did Mr. Walden<br>14 approach you?<br>15 A. Again, I can't be 100 percent sure of<br>16 the dates but around 2009. 10:28<br>17 Q. What did Mr. Walden talk to you about<br>18 when he first approached you about NBC<br>Universal?<br>19 A. The initial conversations were geared<br>20 to would we have an interest in taking a look at<br>21 their program from the standpoint of being the 10:28<br>22 underwriter or the carrier for the television<br>23 portfolio.<br><br>Page 24<br>10 Q. Did you work with Mr. Ridgers in<br>11 developing an insurance policy for NBC 10:34<br>12 Universal's television production insurance<br>13 needs?<br>14 A. I was part of that, yes.<br>15 Q. What was your role?<br>16 A. I was part of the discussions between 10:34<br>17 George and Martin. I was part of the<br>18 conversations or facilitating the different<br>19 coverage needs of NBC. I was a part of reviewing<br>20 the policy form in which George provided as a<br>21 template for coverage. | Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| Page 274<br>20 Earlier today Ms. Coyoca asked you<br>21 the following question: In calculating the loss,<br>    07:23<br>22 is the amount of any tax credit that the<br>23 production company might receive or does<br>    receive,<br>24 does that go into the equation at all in<br>25 calculating loss under the policy? Do you | Plaintiffs' Objection:<br>274:20-25 – Irrelevant and barred by California law for the reasons stated in MIL 4 (Dkt 206). Testimony is discussing a hypothetical; it is discussing production policies in general. See, e.g., 275:17-20 (discussing what other items an insured might insure). Counter designation 76:25-78:23 necessary to complete testimony to show that witness was not discussing the policy at issue, which did not insure tax credits. See 78:16-23.<br><br>Defendant's Response:<br><u>Directly relevant and admissible for reasons stated in ASIC's Response to Plaintiffs' Motion in Limine on this topic. Testimony discusses how policy, Plaintiffs, and ASIC considers tax credits to be component in determining amount of covered loss; not hypothetical or contingent upon anything other than the language of the policy and the facts at issue in this case.</u><br><br>Plaintiffs' Response to Objection to Counter:<br><u>Defendant does not appear to object to Plaintiffs' counter designation.  As such, no response is necessary.</u> |

| Deposition Designation | Objection & Response |
|---|---|
| Page 275<br>1 remember her asking you that question? 07:23<br>2 A. I recall.<br>3 Q. Okay. I want to make sure I<br>4 understood or understand your answer, so could<br>5 you please explain to me how tax credits that NBC<br>6 might receive in connection with a production<br>     07:23<br>7 would figure into a loss that it might incur?<br><br>12 A. So in a production budget, there are<br>13 several line items, and so you insure, for the<br>14 most part the production company will insure,<br>15 they can insure two parts. They can insure the<br>16 day-to-day cost, the production costs, insurable<br>     07:24<br>17 production cost. They can also insure items such<br>18 as story, scenario, script, tax credits, and all<br>19 of those things they would lose in the event of<br>20 an abandonment.<br>21 So if we have a budget, I will just 07:24<br>22 use $20 million as an example, and they are<br>23 receiving a 10 percent tax credit, that comes off<br>24 the budget pretty much so they don't spend that<br>25 money. It is a credit to the production company. | Plaintiffs' Objection:<br>275:1-7, 12-25 – Irrelevant and barred by California law for the reasons stated in MIL 4 (Dkt 206).  Testimony is discussing a hypothetical; it is discussing production policies in general.  See, e.g., 275:17-20 (discussing what other items an insured might insure).  Counter designation 76:25-78:23 necessary to complete testimony to show that witness was not discussing the policy at issue, which did not insure tax credits.  See 78:16-23.<br><br>Defendant's Response:<br><u>Directly relevant and admissible for reasons stated in ASIC's Response to Plaintiffs' Motion in Limine on this topic. Testimony discusses how policy, Plaintiffs, and ASIC considers tax credits to be component in determining amount of covered loss; not hypothetical or contingent upon anything other than the language of the policy and the facts at issue in this case.</u><br><br>Plaintiffs' Response to Objection to Counter:<br>Defendant does not appear to object to Plaintiffs' counter |

| Deposition Designation | Objection & Response |
|---|---|
| | designation.  As such, no response is necessary. |
| Page 276<br>1 Q. Okay. So let me ask you this. Tell 07:24<br>2 me what your understanding would be in a<br>3 situation such as the claim here where NBC has<br>4 claimed a loss because it left production in<br>5 Israel and moved to Croatia and New Mexico. In<br>6 calculating its loss, what effect would the fact 07:25<br>7 that NBC received tax credits for filming in New<br>8 Mexico have on the calculation of its loss?<br><br>12 A. So New Mexico is where they went<br>13 after the first filming where they actually<br>14 incurred the loss?<br>15 Q. Yes. That is one of the locations.<br>16 They went to New Mexico and to Croatia. 07:25<br>17 A. So an example would be, if it cost<br>18 them $5 million to move to New Mexico but they<br>19 received a million dollars of that in tax<br>20 credits, then they have actually only lost<br>21 $4 million. 07:26<br>22 Q. Okay. So, if the extra expense that<br>23 an insured such as NBC incurs in moving is<br>24 5 million, but they receive a $1 million tax<br>25 credit, then the loss they would be entitled to | Plaintiffs' Objection:<br>276:1-8, 12-25 – Irrelevant and barred by California law for the reasons stated in MIL 4 (Dkt 206).  Testimony is discussing a hypothetical; it is discussing production policies in general.  See, e.g., 275:17-20 (discussing what other items an insured might insure).  Counter designation 76:25-78:23 necessary to complete testimony to show that witness was not discussing the policy at issue, which did not insure tax credits.  See 78:16-23.<br><br>Defendant's Response: <u>Directly relevant and admissible for reasons stated in ASIC's Response to Plaintiffs' Motion in Limine on this topic. Testimony discusses how policy, Plaintiffs, and ASIC considers tax credits to be component in determining amount of covered loss; not hypothetical or contingent upon anything other than the language of the policy and the facts at issue in this case.</u><br><br>Plaintiffs' Response to Objection to Counter: |

| Deposition Designation | Objection & Response |
|---|---|
| | Defendant does not appear to object to Plaintiffs' counter designation.  As such, no response is necessary. |
| Page 277<br>1 collect under the policy would be $4 million?<br><br>4 Q. Is that correct?<br>5 A. $4 million would be the amount that<br>6 they actually lost. | Plaintiffs' Objection:<br>277:1, 4-6 – Irrelevant and barred by California law for the reasons stated in MIL 4 (Dkt 206).  Testimony is discussing a hypothetical; it is discussing production policies in general.  See, e.g., 275:17-20 (discussing what other items an insured might insure).  Counter designation 76:25-78:23 necessary to complete testimony to show that witness was not discussing the policy at issue, which did not insure tax credits.  See 78:16-23.<br><br>Defendant's Response:<br>Directly relevant and admissible for reasons stated in ASIC's Response to Plaintiffs' Motion in Limine on this topic. Testimony discusses how policy, Plaintiffs, and ASIC considers tax credits to be component in determining amount of covered loss; not hypothetical or contingent upon anything other than the language of the policy and the facts at issue in this case. |

| Deposition Designation | Objection & Response |
|---|---|
| | <u>Plaintiffs' Response to Objection to Counter: Defendant does not appear to object to Plaintiffs' counter designation. As such, no response is necessary.</u> |

<u>PLAINTIFFS' 106 COUNTER-DESIGNATION:</u>
<u>Page 76</u>
25  Q.   Okay. The question is just with

<u>PLAINTIFFS' 106 COUNTER-DESIGNATION:</u>
<u>Page 77</u>
1        respect to calculating a loss that may occur
2        under the terms of the policy, part of that
3        calculation of the loss depends on the amount of
4        insurable production costs that was incurred on
5        the show. Is that right?
6   A.   That's correct.
7   Q.   Okay. In calculating the loss, is
8        the amount of any tax credit that the production
9        company might receive or does receive, does that
10       go into the equation at all in calculating loss
11       under the policy?

15  A.   It can be, but again, that depends on
16       how you craft the policy. So if you are insuring
17       that tax credit, you have to insure that amount
18       as part of the production costs, thereby the rate
19       applied to the production costs to determine the
20       premium would also include that tax credit.
21  Q.   So if it were to be included, you

| Deposition Designation | Objection & Response |
|---|---|
| 22       would expect to see it addressed in the<br>23       calculation of the insurable production cost. Is<br>24       that right?<br>25   A.   It would be included.<br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><u>Page 78:</u><br>1   Q.   No, I'm sorry, my question to you is<br>2       you said it can be. If it is going to be, would<br>3       you see the tax credit specifically addressed in<br>4       the calculation of what constitutes an insurable<br>5       production cost?<br><br>9   A.   Again, you can add the tax credit,<br>10       and if you were adding it, you can add it as an<br>11       agreement that is part of your insurable costs or<br>12       if you don't charge the premium for it, then it<br>13       is not covered, so it can be done either way.<br>14   Q.   And you have seen it done either way?<br>15   A.   Yes.<br>16   Q.   Without looking at the policy, it is<br>17       not a memory test but do you recall how it was<br>18       handled under the NBC Universal policy?<br>19   A.   I don't believe tax credit was a part<br>20       of it, and clearly I don't think the interest on<br>21       the state's inability of paying the tax credit,<br>22       because that is what it refers to in number 8 was<br>23       a part of it as well<br><u>END PLAINTIFFS' 106 COUNTER-DESIGNATION</u> | |

| Deposition Designation of Stephen Smith Vol 1, April 18, 2017 |
|---|

| **Deposition Designation** | **Objection & Response** |
|---|---|
| Defendant's Designation of Stephen Smith Vol. 1<br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | Plaintiffs object to Defendant's designation of the deposition testimony of Stephen Smith.  Mr. Smith's testimony is a waste of time and largely irrelevant. Mr. Smith's only involvement in the facts giving rise to this case are monitoring the security situation in Israel and recommending to Plaintiffs that the area was unsafe for filming.  The jury can and should be instructed that Plaintiffs postponed and later ceased production in Israel and why.  These issues have already been decided by the Ninth Circuit. There is no reason to present Mr. Smith's testimony at trial. Defendant's designations cover multiple sources Mr. Smith consulted to monitor safety in Israel – Defendants did not receive or consider these materials at the time they denied the Dig claim.  As such, they are irrelevant.<br>Plaintiffs object to Defendant's particular designations as follows. |
| Page 22<br>20 Q. Would you please state your full name for<br>21 the record.<br>22 A. Stephen David Smith | Plaintiffs' Objections:<br>No objection – Page 22.<br><br>Defendant's Response: |
| Page 24<br>14 Q. And what was your part in this event?<br>15 A. I was the, at the time, the head of security<br>16 for NBCUniversal.<br>17 Q. Who's your current employer?<br>18 A. NBCUniversal. 25 Q. What is your current title, please, sir? | Plaintiffs' Objections:<br>Vague as to "this event" – 24:14-16.<br><br>No objection – 24:17-18; 24:25.<br><br>Defendant's Response:<br>It is clear the question is regarding the event that gave rise to this claim. |
| Page 25<br>1 A. Director international security.<br>2 Q. How long have you held that post?<br>3 A. For two years, approximately.<br>6 Q. What position did you hold before?<br>7 A. Head of security, Europe. | Plaintiffs' Objections:<br>No objection – Page 25.<br><br>Defendant's Response: |

810

| | |
|---|---|
| Page 30<br>20 Q. And can you tell me generally what you<br>21 believe your personal knowledge to be in terms of<br>22 subject matter, broad subject matter?<br>24 THE WITNESS: The security situation around<br>25 production in Israel. | Plaintiffs' Objections:<br>No objection – Page 30.<br><br>Defendant's Response: |
| Page 31<br>4 Q. Were you personally involved in monitoring<br>5 and reporting the security situation in and around<br>6 Israel?<br>7 A. I was<br>10 Q. And specifically, were you involved in<br>11 reviewing and reporting the security situation around<br>12 Israel associated with a production that's referred<br>13 to as "Dig"?<br>16 THE WITNESS: Yes. | Plaintiffs' Objections:<br>No objection – Page 31.<br><br>Defendant's Response: |
| Page 40<br>22 Q. And can you describe for the court more<br>23 particularly what that means you would actually do as<br>24 your work?<br>25 A. I had a fairly broad agreement that would | Plaintiffs' Objections:<br>No objection – Page 40.<br><br>Defendant's Response: |
| Page 41<br>1 include assessing risk to all of the categories I<br>2 previously mentioned, mitigating risk, writing<br>3 security protocols and policy, designing security<br>4 systems, producing security reports, conducting<br>5 security assessments.<br>6 Q. Anything else you can think of?<br>7 A. Identifying and mitigating risk is the<br>8 primary role, and responding to | Plaintiffs' Objections:<br>No objection – 41:1-11, 41:13-19.<br><br>Defendant's Response:<br>No Response. |

| | | |
|---|---|---|
| 1 | emergency and crisis<br>9 situations. | |
| 2 | 10 Q. Did you personally have involvement in the | |
| 3 | 11 decision to move the Dig production out of Israel? | |
| 4 | 13 THE WITNESS: I provided information to the | |
| 5 | 14 company regarding the security situation in Israel. | |
| 6 | 15 BY MS. SCOTT REED: | |
| 7 | 16 Q. Did you make any recommendations about what<br>17 should happen with production based upon the | |
| 8 | 18 information that you provided? | |
| 9 | 19 A. I did. | |
| 10 | | |
| 11 | Page 44<br>2 Q. So separate and apart from the particular | Plaintiffs' Objections:<br>402, 403 – Page 44:2-9. Wastes time; jury can be instructed that Plaintiffs moved production and why; wastes time. |
| 12 | 3 wording, let me ask you as a security professional, | |
| 13 | 4 what recommendations did you provide in connection | Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of |
| 14 | 5 with the decision to move Dig out of Israel? | loss. The probative value of this testimony is not substantially outweighed |
| 15 | 6 A. I stated to the company that we could not | by its prejudicial effect, it will not confuse the jury, waste time, and is not |
| 16 | 7 guarantee the safety of security of personnel in | unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not |
| 17 | 8 Israel given the security situation, and after | binding as to general admissibility. Objection also fails to state why exhibit is |
| 18 | 9 assessment from multiple sources of the risk. | unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative |
| 19 | | value; or why exhibit confuses the issue, misleads the jury, wastes time, or is |
| 20 | | cumulative. Furthermore, high probative value re: state of mind of all parties |
| 21 | | involved at the time of the claim. The jury is entitled to know what information |
| 22 | | NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' |
| 23 | | claims. "MIL" not clear what objection intended; description of the facts and |
| 24 | | process surrounding the claim is relevant and not prejudicial. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| 1 | Page 82 | Plaintiffs' Objections: |
| 2 | 5 Q. Do you have any education or training in the | No objection – Page 82. |
| 3 | 6 Middle East history? | Defendant's Response: |
| | 8 THE WITNESS: No. | |
| 4 | 9 BY MS. SCOTT REED: | |
| | 10 Q. Do you have any education or training in | |
| 5 | 11 modern Middle East politics or development? | |
| 6 | 14 THE WITNESS: No. | |
| 7 | Page 83 | Plaintiffs' Objections: |
| 8 | 3 Q. Were you in the process -- or were you in | No objection – Page 83. |
| 9 | 4 the -- in the habit of gathering that information | Defendant's Response: |
| 10 | 5before you were involved in the Dig production? | |
| | 8 THE WITNESS: I gather and review | |
| 11 | 9 information everywhere NBCUniversal has operations, | |
| 12 | 10 so the Middle East would have come into that. I | |
| 13 | 11 receive intelligence on a daily basis from multiple | |
| 14 | 12 sources regarding the security situation, | |
| 15 | 13 particularly relating to terrorism throughout the | |
| 16 | 14 world. | |
| 17 | 15 BY MS. SCOTT REED: 16 Q. So as just part of your general corporate | |
| 18 | 17 responsibilities, do you maintain a certain level of | |
| 19 | 18 reporting to you about security across all areas | |
| 20 | 19 where you may have an interest for NBC? | |
| 21 | 22 THE WITNESS: Yes. | |
| 22 | Page 84 | Plaintiffs' Objections: |
| 23 | 23 Q. So part of your ongoing job responsibilities | No objection – Page 84. |
| 24 | 24 is that you try to maintain a general awareness of | Defendant's Response: |
| 25 | 25 all sorts of situations anyplace NBCUniversal might | ⸜ |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| Page 85<br>1 have operations?<br>4 THE WITNESS: Yes.<br>5 BY MS. SCOTT REED:<br>6 Q. And separate and apart from that generalized<br>7 information gathering that you have, do you have a<br>8 more particularized approach when it comes to a<br>9 specific production that you're going to be working<br>10 with?<br>13 THE WITNESS: Yes.<br>14 BY MS. SCOTT REED:<br>15 Q. So before you knew that you would be working<br>16 in connection with the Dig production, were you<br>17 maintaining any kind of specific focus on reviewing<br>18 security issues associated with Israel?<br>19 A. I was maintaining focus on all locations<br>20 that NBCUniversal had personnel or assets, and Israel<br>21 is one of those locations. | Plaintiffs' Objections:<br>No objection – Page 85.<br><br>Defendant's Response: |
| Page 86<br>11 Q. So before the Dig production had been<br>12 mentioned to you and you knew that you would be<br>13 working with it, were you maintaining any particular<br>14 focus in regard to security updates on Israel?<br>17 THE WITNESS: I receive security updates on<br>18 all locations where NBC has personnel and assets and<br>19 travelers.<br>20 BY MS. SCOTT REED:<br>21 Q. And I'm asking you particular to the<br>22 timeframe before you were working on the Dig<br>23 production, were you doing some particular work that<br>24 focused on Israel? | Plaintiffs' Objections:<br>No objection – Page 86.<br><br>Defendant's Response: |

| | |
|---|---|
| Page 87<br>1 THE WITNESS: I wasn't doing particular work<br>2 focusing on Israel.<br>3 BY MS. SCOTT REED:<br>4 Q. Were you doing -- prior to the Dig<br>5 production, were you doing particular work focusing<br>6 on the Middle East?<br>8 THE WITNESS: I do general work and receive<br>9 multiple sources of information relating to locations<br>10 where NBCUniversal have personnel, productions, and<br>11 travelers, and that includes Israel and the Middle<br>12 East.<br>13 BY MS. SCOTT REED:<br>14 Q. So speaking about your -- your general<br>15 maintenance of information about Israel and the<br>16 Middle East, can you tell me the sources of the<br>17 information that you're talking about gathering?<br>20 THE WITNESS: The same organizations that I<br>21 mentioned earlier. So I have information from OSAC.<br>22 I receive information from Control Risk Group. I<br>23 receive information from, amongst others, a company<br>24 called Northcott Global Solutions. We review open<br>25 source information from media organizations. | Plaintiffs' Objections:<br>No objection – Page 87.<br><br>Defendant's Response: |
| Page 88<br>1 BY MS. SCOTT REED:<br>2 Q. Any others in your general information<br>3 gathering?<br>4 A. We receive information from the U.S. State<br>5 Department, the U.K. Foreign and Commonwealth Office,<br>6 and particularly from my own NBCU analysts prospects. | Plaintiffs' Objections:<br>No objection – Page 88.<br><br>Defendant's Response: |

| | | |
|---|---|---|
| 1 | Page 93 | Plaintiffs' Objections: |
| | 13 Q. So starting with my question: How was media | No objection – Page 93. |
| 2 | 14 information gathered in 2014; you recall that? | |
| 3 | | Defendant's Response: |
| | 15 A. Yes. | |
| 4 | 16 Q. And you told me that Mr. Biggs did that? | |
| 5 | 17 A. Yes. | |
| | 22 Q. Would NBC News be a source that you would | |
| 6 | 23 expect to be consulted? | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | Page 94 | Plaintiffs' Objections: |
| | 1 THE WITNESS: I would. | No objection – Page 94. |
| 11 | 2 BY MS. SCOTT REED: | |
| | 3 Q. Again, I'm talking about 2014 when you're | Defendant's Response: |
| 12 | 4 gathering media sources, would it have been your | |
| 13 | 5 expectation that NBC News would be a media source | |
| 14 | 6 that you would refer to? | |
| 15 | 9 THE WITNESS: It would be one of the sources | |
| 16 | 10 that we would gather information from. | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | Plaintiffs' Objections: |
| | Page 96 | No objection – Page 96. |
| 21 | 18 Q. All right. At this point I want to direct | |
| 22 | 19 your attention to the time period when the Dig | Defendant's Response: |
| | 20 production was brought to you to participate in. | |
| 23 | 21 A. Yep. | |
| 24 | 22 Q. Do you recall that occurring? | |
| 25 | 24 THE WITNESS: Yes. | Plaintiffs' Objections: |
| 26 | | No objection – 97:14-18; 97:21-23. |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| 1 | Page 97 | Defendant's Response: |
| 2 | 14 Q. Is the best of your recollection that the | |
| 3 | 15 production Dig was bought to your attention in the | |
| 4 | 16 early part of 2014? 17 A. To the best of my recollection. | |
| 5 | 18 Q. What were you asked to do? 21 THE WITNESS: I was asked if I would provide | |
| 6 | 22 very generally, security support. 23 BY MS. SCOTT REED: | |
| 7 | | |
| 8 | Page 100 | Plaintiffs' Objections: No objection – Page 100. |
| 9 | 15 And did you have any prior job experience | |
| 10 | 16 applying your skills in Israel? 17 A. No. | Defendant's Response: |
| 11 | 18 Q. What are the first steps you took after the | |
| 12 | 19 production of Dig was brought to your attention, in | |
| 13 | 20 terms of pursuing your work? 22 THE WITNESS: Gathering information from the | |
| 14 | 23 production company in terms of location, production | |
| 15 | 24 premise, numbers of personnel, length of time we | |
| 16 | 25 would be in country, relationships with other | |
| 17 | | |
| 18 | Page 101 | Plaintiffs' Objections: No objection – Page 101. |
| 19 | 1 production services companies, and gathering | |
| 20 | 2 information on the security situation specifically to | Defendant's Response: |
| 21 | 3 Israel and to the region in general. 4 BY MS. SCOTT REED: | |
| 22 | 5 Q. When you said gathering information from the | |
| 23 | 6 production company, who was that for Dig? | |
| 24 | 7 A. My contact was in the main Randi Richmond. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| 1 | Page 102<br>5 BY MS. SCOTT REED:<br>6 Q. And what was her particular role for Dig so<br>7 far as you understood?<br>8 A. She was one of the senior production team<br>9 who had oversight and management of the production.<br>10 Q. Was she your main contact in terms of<br>11 production?<br>12 A. Yes.<br>13 Q. Were there other members of the production<br>14 team that over time, you also communicated with or<br>15 interacted with?<br>16 A.Yes.<br>17 Q.With who were they?<br>18 A.Mark Binkie.<br>19 Q.Anyone else?<br>20 A.Kurt Ford, Kurt.<br>21 Q.C-O-T-T?<br>22 A.No.K-U-R-T.<br>23 Q.Oh, Kurt, pardon me.<br>24 A.Yeah.<br>25 Q.Kurt Ford? | Plaintiffs' Objections:<br>No objection – Page 102.<br><br>Defendant's Response: |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | Page 103<br>1 A.Yep.<br>9 Q.When you were describing -- pardon me,<br>10 initial steps you mentioned reviewing the --<br>11 situation -- security situation in Israel and the<br>12 region, what did you do particularly for that?<br>13 A. I asked Chris Biggs to gather information<br>14 from as many sources as possible. So paid for<br>15 sources, governmental sources.<br>16 THE REPORTER: So what sources?<br>17 THE WITNESS: Paid for, yes.<br>18 THE REPORTER: Paid for?<br>19 THE WITNESS:Yeah.<br>20 Governmental sources, open source<br>21 intelligence and to prepare information for me so we<br>22 could assess the risk.<br>23 BY MS. SCOTT REED:<br>24 Q. After you made that assignment | Plaintiffs' Objections:<br>No objection – Page 103<br><br>Defendant's Response: |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| to him, did<br>25 he prepare a report or wrap up or a summary for you? | |
| Page 104<br>1 A. He -- he supplied me with information.<br>12 Q.Was there information, and when I say<br>13 information, I'm talking about primary sources or<br>14 reports that you personally would review as opposed<br>15 to Mr. Biggs reviewing and providing to you?<br>18 THE WITNESS:Yes.<br>19 BY MS. SCOTT REED:<br>20 Q.Can you tell me in connection with the Dig<br>21 matter which primary sources you would look at,<br>22 yourself?<br>24 THE WITNESS:OSAC, the FCO, it's the<br>25 Foreign and Commonwealth Office of the United | Plaintiffs' Objections:<br>No objection – Page 104.<br><br>Defendant's Response: |
| Page 105<br>1 Kingdom.<br>2 BY MS. SCOTT REED:<br>3 Q.Any others?<br>4 A.I also consulted personally with the<br>5 regional security officer of the state department.<br>6 Q.Where was that person located?<br>7 A.I met with him in Jerusalem. | Plaintiffs' Objections:<br>No objection – Page 105.<br><br>Defendant's Response: |
| Page 106<br>17 Q. What was the result of this initial review<br>18 of the security situation in your mind? In other<br>19 words, what -- what general information or<br>20 observations did you make as a result of this initial<br>21 review?<br>24 THE WITNESS: We documented the security<br>25 threats from any number of sources and we also | Plaintiffs' Objections:<br>No objection – Page 106.<br><br>Defendant's Response: |

Page 107
1 documented the mitigation to those threats. We
2 investigated the security threats particular to each
3 location and took information from multiple sources
4 to compare and contrast.
5 BY MS. SCOTT REED:
6 Q. Did you draw conclusions as a result of that
7 initial review?
8 A. Yes.
9 Q. What were your conclusions?
10 A. That it was safe to proceed with the
11 production in the locations that they had proposed
12 with the security provision and mitigation that we
13 advised.
14 Q. After your initial reviews that you have
15 described, what were the next steps or work that you
16 engaged in in connection with Dig?
19 THE WITNESS: I had conversations and
20 communication with the production with organizations
21 who provide us with information on security, crisis
22 management, emergency response. I reviewed this and
23 I prepared documentation that would support the
24 security provision in country for the production and
25 also crisis management response.

**Plaintiffs' Objections:**
No objection – Page 107.

**Defendant's Response:**

Page 108
1 BY MS. SCOTT REED:
2 Q. What is Max Security Solutions?
3 A. They're our security vendor.
4 Q. Did you engage Max Security Solutions to
5 work with NBCUniversal in connection with the Dig
6 production?
7 A. I did.
8 Q. What was Max Security Solutions hired to do?
9 A. They were hired to provide

**Plaintiffs' Objections:**
No objection – Page 108.

**Defendant's Response:**

| | |
|---|---|
| security<br>10 personnel to support the production on the ground and<br>11 they also provided security intelligence.<br>12 Q.Did they provide security intelligence in a<br>13 written form?<br>14 A.Yes.<br>15 Q.And what sort of written form did those<br>16 take?<br>17 A.Reports.<br>18 Q.Were they provided to you on a regular<br>19 basis?<br>20 A. They were | |
| Page 120<br>5 Q. Over the course of your dealings with Max<br>6 Security Intelligence, did you find their<br>7 intelligence briefings to be reliable?<br>9 THE WITNESS:They were reliable, yes. | Plaintiffs' Objections:<br><br>No objection – Page 120.<br><br>Defendant's Response: |
| Page 122<br>16 Can you confirm for the court that you did<br>17 rely upon Max Security Intelligence reports as one of<br>18 the sources that you used to carry out your work for<br>19 NBCUniversal on Dig?<br>22 THE WITNESS:Yes. | Plaintiffs' Objections:<br>No objection – Page 122.<br><br>Defendant's Response: |

| | |
|---|---|
| Page 133<br>1 frequently interacted with between security and<br>2 production?<br>4 THE WITNESS: She was one of a number of<br>5 people I interacted with.<br>6 BY MS. SCOTT REED:<br>7 Q.Yes, sir. But in terms of either frequency<br>8 or main point of contact, would you say that was<br>9 Randi?<br>11THE WITNESS:Yes. | Plaintiffs' Objections:<br>No objection – Page 133.<br><br>Defendant's Response:<br>REMOVED FROM DESIGNATIONS |
| Page 139<br>8 Q.Were you securing security information from<br>9 those sources you've identified today specifically<br>10 for the purposes of Dig or generally on an ongoing<br>11 basis for your company?<br>14 THE WITNESS:I was gathering information<br>15 pertaining to the production and in my management of<br>16 security for the company and international, so I had<br>17 multiple sources of information relating to what was<br>18 happening in Israel and to what was happening in<br>19 other places.<br>20 BY MS. SCOTT REED:<br>21 Q.From a particular source would you get one<br>22 security update for Israel or Middle East and another<br>23 for general other areas or would it be a single<br>24 master report, so to speak? | Plaintiffs' Objections:<br>No objection – Page 139.<br><br>Defendant's Response: |
| Page 140<br>2 THE WITNESS: Intelligence reporting comes<br>3 in various forms depending on the source.<br>17 BY MS. SCOTT REED:<br>18 Q.As all of that generalized information is<br>19 coming in, was there a particular person who was<br>20 assigned to mine through it, so to | Plaintiffs' Objections:<br>No objection – Page 140.<br><br>Defendant's Response: |

| | |
|---|---|
| speak, and<br>21 synthesize information that was particular to Dig?<br>24 THE WITNESS: Particular to issues in<br>25 Israel, Chris Biggs is my analyst. It's his job to | |
| Page 141<br>1 gather the information and make it into workable and<br>2 actionable intelligence.<br>3 BY MS. SCOTT REED:<br>4 Q. So in 2014 was it part of his job<br>5 responsibilities to go through the various incoming<br>6 information that you were receiving and to highlight<br>7 for you issues that would be pertinent to the Dig<br>8 production?<br>11 THE WITNESS: Yes, he would provide me with<br>12 information from multiple sources.<br>13 BY MS. SCOTT REED:<br>14 Q. Did Mr. Biggs directly receive the Max<br>15 Security Intelligence written security reports?<br>16 A. I don't know if he received them directly or<br>17 I forwarded them on to him. I can't recall. He<br>18 certainly had sight of the Max Intelligence reports.<br>19 Q. Did you have Mr. Biggs review them in<br>20 addition to you reviewing the Max Security<br>21 Intelligence reports?<br>22 A. That's his job. He's an analyst. He<br>23 gathers information from multiple sources and, if<br>24 necessary, makes recommendations to me, points out<br>25 consistency or inconsistency, looks at sources of | <u>Plaintiffs' Objections:</u><br>No objection – Page 141.<br><br><u>Defendant's Response:</u> |

| | |
|---|---|
| Page 142<br>1 information.<br>2 THE REPORTER: Looks at what?<br>3 THE WITNESS: Sources. That's the role of<br>4 an analyst, really. | Plaintiffs' Objections:<br>No objection – Page 142.<br><br>Defendant's Response: |
| Page 170<br>6 Q.Were you engaging in ongoing monitoring of<br>7 the security situation in Israel on July the 9th?<br>8 A.Yes.<br>9 Q.Were you reviewing, among other things,<br>10 travel warnings that were being issued?<br>11 A.Yes.<br>12 Q.Were you aware that, according to sources<br>13 that were reporting, more than 200 rockets had been<br>14 fired from Gaza and targeted Israel since the IDF<br>15 launched operative -- Operation Protective Edge on<br>16 July the 8th?<br>18 THE WITNESS: I was reviewing all<br>19 information available.<br>20 BY MS. SCOTT REED:<br>21 Q.And do you recall reviewing information that<br>22 was reported from multiple sources that there had<br>23 been significant rockets fired from Gaza to target<br>24 Israel since the IDF launched Operation Protective<br>25 Edge on July 8 | Plaintiffs' Objections:<br>No objection – Page 170.<br><br>Defendant's Response: |
| Page 171<br>3 THE WITNESS: I was reviewing multiple<br>4 sources of information, and any escalation, any<br>5 direct evidence, would have been part of that review.<br>6 BY MS. SCOTT REED:<br>7 Q. Did you note escalation in the activity that<br>8 was aimed from Gaza to Israel and | Plaintiffs' Objections:<br>No objection – Page 171.<br><br>Defendant's Response: |

out of Israel back
9 toward Gaza in July of 2014?
12 THE WITNESS: Noting and assessing
13 escalation and conflict is part of the risk
14 management and security process, not just on this
15 date but throughout an event of production.


Page 176
9 MS. SCOTT REED: Let me hand you what's been
10 marked as Exhibit 104, please, sir.
11 (Exhibit 104 was marked for identification by
12 the court reporter and is attached hereto.)
13 MR. HAYES: Thanks.
14 BY MS. SCOTT REED:
15 Q. For the record this is Bates numbered
16 UCP2606 through 2607.
17 Mr. Smith, can you identify Exhibit 104 as
18 an April 21st, 2014 travel tracker proactive e-mail
19 directed to you via -- via e-mail?
20 A. Yes

**Plaintiffs' Objections:**
402, 403 – Page 176:9-20. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.

**Defendant's Response:**
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

| | | |
|---|---|---|
| 1 | Page 177 | Plaintiffs' Objections: |
| 2 | 7 Q. Over the course of all your work on Dig, | No objection – Page 177:7-19 |
| 3 | 8 were the travel tracker proactive e-mails one of the | 402, 403 – Page 177:20-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of |
| 4 | 9 various sources incoming to you that you would have | denial. |
| 5 | 10 reviewed | |
| | 13 THE WITNESS: Yes. | Defendant's Response: |
| 6 | 14 BY MS. SCOTT REED: | The witness' understanding of the facts are relevant to the underlying facts of |
| 7 | 15 Q. Did you pass these along to Mr. Biggs? | loss. The probative value of this testimony is not substantially outweighed |
| 8 | 18 THE WITNESS: To my knowledge, he receives | by its prejudicial effect, it will not confuse the jury, waste time, and is not |
| 9 | 19 them directly. | unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not |
| 10 | 20 BY MS. SCOTT REED: | binding as to general admissibility. Objection also fails to state why exhibit is |
| 11 | 21 Q.I want to ask you about the section that's | unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative |
| 12 | 22 entitled: Travel briefing, at the bottom of the | value; or why exhibit confuses the issue, misleads the jury, wastes time, or is |
| | 23 page, the last sentence of the paragraph. It says | cumulative. The Witnesses understanding and development of facts is relevant to |
| 13 | 24 (as read): | reasonableness of claim decision, defense |
| 14 | 25 The militant group opposes the | of "bad faith" allegation and damages sought; relevant to show state of mind, |
| 15 | | reasonableness, and good faith claims handling on part of ASIC; ASIC did not |
| 16 | | have 9th Circuit opinion to consider at the time, and testimony regarding the facts |
| 17 | | available to all parties to form an understanding in real time is critical for |
| 18 | | jury to consider when evaluating bad faith claims. Furthermore, high probative value |
| 19 | | re: state of mind of all parties involved at the time of the claim. The jury is entitled |
| 20 | | to know what information NBC, ASIC, and other parties had at time of the facts |
| 21 | | giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; |
| 22 | | description of the facts and process surrounding the claim is relevant and not |
| 23 | | prejudicial. |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| 1 | Page 178 | Plaintiffs' Objections: |
| 2 | 1 current ceasefire between Israel and<br>2 the Palestinian Islamic Movement, | 402, 403 – Page 178:1-5. Not relevant to<br>defendant's denial of coverage; not |
| 3 | 3 Hamas, which governs Gaza.<br>4 Do you see that? | reviewed by defendant at the time of<br>denial. |
| 4 | 5 A. Yes.<br>6 Q. Do you have a familiarity with | No objection – Page 178:6-16 |
| 5 | Hamas?<br>8 THE WITNESS: I have knowledge | Defendant's Response:<br>The witness' understanding of the facts |
| 6 | of Hamas.<br>9 BY MS. SCOTT REED: | are relevant to the underlying facts of<br>loss. The probative value of this |
| 7 | 10 Q. And have you gained that<br>knowledge as part | testimony is not substantially outweighed<br>by its prejudicial effect, it will not |
| 8 | 11 of your work providing corporate<br>security for | confuse the jury, waste time, and is not<br>unnecessarily cumulative. Further, F.R.E. |
| 9 | 12 NBCUniversal?<br>13 A. And other entities. | 403 is conditional, and therefore not<br>binding as to general admissibility. The |
| 10 | 14 Q. Did you study Hamas prior to<br>taking your job | Witnesses understanding and<br>development of facts is relevant to |
| 11 | 15 at NBCUniversal for any purpose?<br>16 A. No | reasonableness of claim decision, defense<br>of "bad faith" allegation and damages |
| 12 | | sought; relevant to show state of mind,<br>reasonableness, and good faith claims |
| 13 | | handling on part of ASIC; ASIC did not<br>have 9th Circuit opinion to consider at the |
| 14 | | time, and testimony regarding the facts<br>available to all parties to form an |
| 15 | | understanding in real time is critical for<br>jury to consider when evaluating bad faith |
| 16 | | claims. Objection also fails to state why<br>exhibit is unfairly prejudicial; or why |
| 17 | | such alleged unfair prejudice outweighs<br>its probative value; or why exhibit |
| 18 | | confuses the issue, misleads the jury,<br>wastes time, or is cumulative. |
| 19 | | Furthermore, high probative value re:<br>state of mind of all parties involved at the |
| 20 | | time of the claim. The jury is entitled to<br>know what information NBC, ASIC, and |
| 21 | | other parties had at time of the facts<br>giving rise to Plaintiffs' claims. |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| Page 203<br>4 MS. SCOTT REED: For the record, Exhibit 107<br>5 is UCP1873 through 1876.<br>6 (Exhibit 107 was marked for identification by<br>7 the court reporter and is attached hereto.)<br>15 Q. Mr. Smith, can you identify Exhibit 107 as<br>16 an e-mail string, the final of which was directed to<br>17 you by Randi Richmond, dated June 14th, 2014?<br>18 A. Yes.<br>19 Q. Did you receive this e-mail from 20 Ms. Richmond?<br>21 A. The e-mail was certainly sent to me and I'm<br>22 making a presumption that I received it.<br>23 Q. Do you have any reason to doubt that you<br>24 received this?<br>25 A. No. | Plaintiffs' Objections:<br>402, 403 – Page 203:4-7, 15-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.. |

| | |
|---|---|
| Page 204 | Plaintiffs' Objections: |
| 1 Q. Did Ms. Richmond forward to you information | 402, 403 – Page 204. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. |
| 2 out of a "Times of Israel" article regarding current | |
| 3 events in and around June the 13th, 2014? | Defendant's Response: |
| 4 A. I'll need some time just to review the | This evidence goes to the credibility of the witness specifically the credibility of the witness' ability to understand the context and development of facts bearing on the claim, which will be weighed by the jury and is always relevant to their determination of the facts. The witness' understanding of the facts are relevant to the underlying facts of loss. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. |
| 5 Paperwork. | |
| 19 THE WITNESS: Going from this e-mail, yes. | |
| 20 BY MS. SCOTT REED: | |
| 21 Q. And did you review the information that she | |
| 22 sent to you regarding abductions? | |
| 23 A. I wouldn't be able to say if I reviewed this | |
| 24 information or any other information, but I looked at | |
| 25 multiple streams of information. Whether I reviewed | |

| | | |
|---|---|---|
| 1 | Page 205 | Plaintiffs' Objections: |

Page 205
1 this, I wouldn't be able to tell you. I reviewed
2 multiple streams of information and I specifically
3 remember the abduction.
4 Q.You do?
5 A.Yes.
6 Q. And what about the abduction made it stand
7 out in your mind?
8 A. The fact that three teenagers, to my
9 recollection, had been abducted and eventually
10 Murdered
18 Q.Did you keep an eye on this situation and
19 advise Ms. Richmond and others in production about
20 it?
21 A.I advised throughout the production, post,
22 during, and preproduction, from a multitude of
23 Sources

Plaintiffs' Objections:
402, 403 – Page 205:1-5. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.
No objection – Page 205:6-23.

Defendant's Response:
This evidence goes to the credibility of the witness specifically the credibility of the witness' ability to understand the context and development of facts bearing on the claim, which will be weighed by the jury and is always relevant to their determination of the facts. The witness' understanding of the facts are relevant to the underlying facts of loss. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims.

| | |
|---|---|
| Page 206 | Plaintiffs' Objections: |
| 11 Q. All right. Would you look at Exhibit 108, | 402, 403, 802, MIL 2 (Dkt 209)– 206:11-15. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Hearsay to the extent article is offered for the truth of the matter asserted. |
| 12 please, sir, which for the record is the article | |
| 13 printed off of the link www.timesofisrael.com. | |
| 14 (Exhibit 108 was marked for identification by | 402, 403, MIL 2 (Dkt 209)– 206:22-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. |
| 15 the court reporter and is attached hereto.) | |
| 22 Q. Did you review security reports or | |
| 23 intelligence reports that included the information | Defendant's Response: |
| 24 about the teenagers being abducted? | The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and the subsequent actions of the witness after |
| 25 A.Yes, I did. | |

| | |
|---|---|
| Page 207<br>7 Q. Would you refer, please, sir, to the middle<br>8 of the page of Exhibit 107, that's the e-mail string<br>9 under the large heading that says (as read):<br>10 PM to carry, feared abductions as<br>11 a result of Hamas entry into<br>12 government.<br>13 Do you see that headline?<br>14 A.Yes.<br>15 Q. All right. Would you read the first<br>16 paragraph under that, please, sir.<br>17 A. (As read):<br>18 Prime Minister Benjamin Netanyahu<br>19 told U.S. Secretary of State John<br>20 Kerry on Friday that since the<br>21 announcement of a unity<br>22 government --<br>23 THE REPORTER: On Friday? Slow down a<br>24 little bit.<br>25 THE WITNESS: I'm sorry.(As read): | possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.<br><br>Plaintiffs' Objections:<br>402, 403, 802, MIL 2 (Dkt 209) – Page 207:7-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Hearsay to the extent article is offered for the truth of the matter asserted.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| | |
|---|---|
| Page 208<br>1 That since the announcement of a<br>2 unity government between the Fatah<br>3 led PLO and Hamas in April, "the<br>4 situation on the ground has been<br>5 destructive."<br>16 Q. Did you look into whether the announcement<br>17 of a unity government between that Fatah led PLO and<br>18 Hamas was having an impact on security situation in<br>19 Israel?<br>22 THE WITNESS: I would receive information<br>23 from a variety of sources and I also, as discussed<br>24 previously, I employ an analyst to look at this type<br>25 of information very generally. | Plaintiffs' Objections:<br>402, 403, 802, MIL 2 (Dkt 209) – Page 208:1-5, 16-19, 22-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Hearsay to the extent article is offered for the truth of the matter asserted.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 210<br>19 Q. After this kidnapping of the teenagers<br>20 became public, did the security situation in Israel<br>21 change in any way that you observed?<br>23 THE WITNESS: The security situation did<br>24 change and I received multiple reports regarding the<br>25 changes, and -- and uptick in an unpredictable | Plaintiffs' Objections:<br>No objection – Page 210.<br><br>Defendant's Response: |

| | |
|---|---|
| Page 211<br>1 security landscape.<br>2 BY MS. SCOTT REED:<br>3 Q. What was the uptick?<br>4 A. There was an increase in Israeli military<br>5 and police activity across the country, and there was<br>6 also the threat of increased terrorist activity and<br>7 further kidnappings.<br>8 Q. Committed by whom, or suspected that could<br>9 be committed by whom?<br>10 A. Well, to be quite frank either side.<br>11 Q. Was there -- I'm sorry.<br>12 A. Terrorist organizations and individuals on<br>13 the Israeli side, not Israeli military and police,<br>14 but also talking about attacks, kidnappings, and<br>15 revenge.<br>16 Q. And what about from the Palestinian side,<br>17 was there a reporting of an uptick of that potential<br>18 possibility?<br>21 THE WITNESS: There was an increase across<br>22 the country and threats of further activity was<br>23 obvious, and we were receiving information to that<br>24 effect. | Plaintiffs' Objections:<br>No objection – Page 211:1<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 211:2-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. *See* MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| | | |
|---|---|---|
| 1 | Page 212 | Plaintiffs' Objections: |
| 2 | 20 Q. Did you note over the weeks following | No objection – Page 212. |
| 3 | 21 June 14th that there was increased activity in terms | Defendant's Response: |
| 4 | 22 of missiles and other bombing materials being | |
| 5 | 23 launched out of Gaza or Palestine and into Israel? | |
| 6 | . | |
| 7 | | |
| 8 | Page 213 | Plaintiffs' Objections: |
| 9 | 1 THE WITNESS: There was an increase | 402, 403 – Page 213. Wastes time; jury can be instructed that Plaintiffs moved |
| 10 | 2 throughout the time the production was in Israel in | production and why. |
| 11 | 3 terms of the risk from terrorism and the risk from 4 further conflict. | Defendant's Response: The witness' understanding of the facts are relevant to the underlying facts of |
| 12 | 5 BY MS. SCOTT REED: 6 Q. Yes, sir. | loss. The probative value of this testimony is not substantially outweighed |
| 13 | 7 And specifically was there increased missile | by its prejudicial effect, it will not confuse the jury, waste time, and is not |
| 14 | 8 fire out of Gaza or Palestine directed into Israel? | unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not |
| 15 | 9 A. I would -- I would have to check the exact | binding as to general admissibility. Objection also fails to state why exhibit is |
| 16 | 10 dates, but throughout the production, yes, this | unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative |
| 17 | 11 increased. | value; or why exhibit confuses the issue, misleads the jury, wastes time, or is |
| 18 | 12 Q. Yes, sir. 13 And did it continue even after production | cumulative. Furthermore, high probative value re: state of mind of all parties |
| 19 | 14 was moved? 15 A. Yes. | involved at the time of the claim. The jury is entitled to know what information |
| 20 | 16 Q. And when I said "it," I'm referring to | NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' |
| 21 | 17 missile fire out of Gaza or Palestine into Israel. | claims. |
| 22 | 18 Is that what continued even after production moved | |
| 23 | 19 out of Israel? | |
| 24 | 20 A. Yes, that's my understanding. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| 1 | Page 215 | Plaintiffs' Objections: |
| 2 | 21 BY MS. SCOTT REED:<br>22 Q. Well, I don't mean one side stronger than | 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 215:21-25. Not relevant to defendant's denial of coverage; not |
| 3 | 23 the other. I mean that both sides were participating | reviewed by defendant at the time of denial. Israel's conduct not relevant for |
| 4 | 24 in -- is it accurate that Israel was taking offensive | reasons stated by the Ninth Circuit. See MIL 3. |
| 5 | 25 strikes against Palestine or Gaza? | Defendant's Response: |
| 6 | | The witness' understanding of the facts are relevant to the underlying facts of |
| 7 | | loss. The probative value of this testimony is not substantially outweighed |
| 8 | | by its prejudicial effect, it will not confuse the jury, waste time, and is not |
| 9 | | unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not |
| 10 | | binding as to general admissibility. Objection also fails to state why exhibit is |
| 11 | | unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative |
| 12 | | value; or why exhibit confuses the issue, misleads the jury, wastes time, or is |
| 13 | | cumulative. Furthermore, high probative value re: state of mind of all parties |
| 14 | | involved at the time of the claim. The jury is entitled to know what information |
| 15 | | NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' |
| 16 | | claims The Witnesses understanding and development of facts is relevant to |
| 17 | | reasonableness of claim decision, defense of "bad faith" allegation and damages |
| 18 | | sought; relevant to show state of mind, reasonableness, and good faith claims |
| 19 | | handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the |
| 20 | | time, and testimony regarding the facts available to all parties to form an |
| 21 | | understanding in real time is critical for jury to consider when evaluating bad faith |
| 22 | | claims |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| Page 216<br>3 THE WITNESS: What time period are you<br>4 talking about here?<br>5 BY MS. SCOTT REED:<br>6 Q. Summer of 2014.<br>8 THE WITNESS: Israel certainly responded to<br>9 the attacks.<br>10 BY MS. SCOTT REED:<br>11 Q. And they did so by offensive action directed<br>12 at Palestine and/or Gaza?<br>15 THE WITNESS: They took offensive action.<br>16 BY MS. SCOTT REED:<br>17 Q. And did Palestine and Gaza take offensive<br>18 action against Israel during this same timeframe?<br>21 THE WITNESS: Yes, that's my understanding.<br>22 But it's not my area of expertise.<br>23 BY MS. SCOTT REED:<br>24 Q. Was there escalation over the period of the<br>25 summer of 2014? | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 216:3-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims |

| | | |
|---|---|---|
| 1 | Page 217<br>3 THE WITNESS: Can you be more specific?<br>4 Escalation in?<br>5 BY MS. SCOTT REED:<br>6 Q. Escalation of the violent activity directed<br>7 out of Israel into Gaza and/or Palestine and violent<br>8 activity out of Palestine or Gaza into Israel.<br>11 THE WITNESS: Yes. | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)  – Page 217:3-8, 11. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | Page 219<br>10 Q. Did the activity offensive both ways<br>11 continue even after the move out of Israel?<br>14 THE WITNESS: Yes. | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)  – Page 219:10-11, 14. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.

Page 222
5 Q. Would you look at Exhibit 111, please, sir,
6 for the record, Bates UCP2524 through 2529.
7 (Exhibit 111 was marked for identification by
8 the court reporter and is attached hereto.)
9 BY MS. SCOTT REED:
10 Q. Can you identify this, please, sir, as a
11 June 15th, 2014, Max Security Analysis sent to you by
12 e-mail?
13 A. Yes.

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)  – Page 222:5-13. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is

| | | |
|---|---|---|
| 1 | | unfairly prejudicial; or why such alleged |
| 2 | | unfair prejudice outweighs its probative value; or why exhibit confuses the issue, |
| 3 | | misleads the jury, wastes time, or is cumulative. Furthermore, high probative |
| 4 | | value re: state of mind of all parties involved at the time of the claim. The |
| 5 | | jury is entitled to know what information NBC, ASIC, and other parties had at time |
| 6 | | of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and |
| 7 | | development of facts is relevant to reasonableness of claim decision, defense |
| 8 | | of "bad faith" allegation and damages sought; relevant to show state of mind, |
| 9 | | reasonableness, and good faith claims handling on part of ASIC; ASIC did not |
| 10 | | have 9th Circuit opinion to consider at the time, and testimony regarding the facts |
| 11 | | available to all parties to form an understanding in real time is critical for |
| 12 | | jury to consider when evaluating bad faith claims. |
| 13 | Page 223<br>4 Q. Is this report from Max Security | Plaintiffs' Objections: |
| 14 | Analysis<br>5 something that you would have | 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 223:4-6, 9-25. Not relevant |
| 15 | expected to receive<br>6 from them based upon these | to defendant's denial of coverage; not reviewed by defendant at the time of |
| 16 | conditions on the ground? | denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See |
| 17 | 9 THE WITNESS: Yes.<br>10 BY MS. SCOTT REED: | MIL 3. |
| 18 | 11 Q. Is this report providing information to you | Defendant's Response:<br>The witness' understanding of the facts |
| 19 | 12 in regard to the kidnapping of the three teenagers | are relevant to the underlying facts of loss. The probative value of this |
| 20 | 13 and the aftermath of it?<br>16 THE WITNESS: The report | testimony is not substantially outweighed by its prejudicial effect, it will not |
| 21 | mentions that<br>17 particular incident. | confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. |
| 22 | 18 BY MS. SCOTT REED:<br>19 Q. Yes, sir. | 403 is conditional, and therefore not binding as to general admissibility. |
| 23 | 20 And does it also mention that the Israeli | Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged |
| 24 | 21 Defense Forces, IDF, initiated a broad search and | unfair prejudice outweighs its probative value; or why exhibit confuses the issue, |
| 25 | 22 rescue operation with significant troop deployments? | misleads the jury, wastes time, or is cumulative. Furthermore, high probative |
| 26 | 23 A. The information in front of me states that, | value re: state of mind of all parties involved at the time of the claim. The |
| 27 | 24 yes.<br>25 Q. On the second page, was there | jury is entitled to know what information NBC, ASIC, and other parties had at time |
| 28 | also | of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and |

| | | |
|---|---|---|
| 1 | | development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

Page 224
1 discussion about rockets being fired from the Gaza
2 Strip toward Israeli territory?
.
5 THE WITNESS: That's information contained
6 within the document.
25 Q. All right. And will you also put

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 224:1-6. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the

Page 225

1 Exhibit 112, newly marked, in front of you, please,
2 sir?
3 (Exhibit 112 was marked for identification by
4 the court reporter and is attached hereto.)
5 MS. SCOTT REED: For the record 112 is
6 UPC2160 through 2161.
7 Q. Can you identify Exhibit 112 as an e-mail
8 string dated June 15th between you and Ms. Randi
9 Richmond?
10 A. Yes.
11 Q. I want to refer you, please, sir, to the
12 middle e-mail, which is from you to Ms. Richmond,
13 it's stamped 7:28 a.m. Pacific Standard Time.
14 Do you see what I'm referring to?
15 A. Yes.
16 Q. And is this a report or update that you
17 provided to Ms. Richmond?
18 A. Yes.
19 Q. Will you look please, sir, under the heading
20 that says: Current situation? I'm going to ask you
21 to look at those four paragraphs next to Exhibit 111,
22 please, sir.
23 Can you verify that you have quoted
24 Exhibit 111, it's first four paragraphs, verbatim,
25 into your Exhibit 112 message?

time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 225:1-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent offered to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.

| | |
|---|---|
| Page 226<br>1 A. Yes.<br>2 Q. Did you rely upon the information provided<br>3 to you in Exhibit 111 in order to report that to your<br>4 client?<br>7 THE WITNESS: Yes.<br>21 Q. All right. Sir. Let me ask you to put<br>22 Exhibit 113 in front of you.<br>23 (Exhibit 113 was marked for identification by<br>24 the court reporter and is attached hereto.)<br>25 MS. SCOTT REED: For the record this is | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 226:1-4, 7, 21-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent offered to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 227<br>1 UCP1091 through 1092.<br>2 Q. Can you identify this as an e-mail string<br>3 between you and Ms. Richmond, dated June 15th, 2014?<br>4 A. Yes.<br>5 Q. Is this a further report and update | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 227:1-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent offered to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. |

| | |
|---|---|
| that you<br>6 provided to Ms. Richmond?<br>7 A. Yes.<br>8 Q. Will you look at the last paragraph on that<br>9 first page, sir, please, that begins in the past<br>10 48 hours.<br>11 Do you have it?<br>12 A. Yes.<br>13 Q. All right. And will you also look at<br>14 Exhibit 111, the second page under the title:<br>15 Assessments, which also begins in the past 48 hours.<br>16 Do you see it?<br>17 A. I do.<br>18 Q. Have you quoted verbatim out of Exhibit 111<br>19 from Max Security Analysis and put that into your<br>20 report to Ms. Richmond of June 15th?<br>21 A. That forms part of the report, and it's --<br>24 THE WITNESS: Yes, and it's the same. | See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 229<br>20 Let me hand you what's been marked as<br>21 deposition Exhibit 114.<br>22 (Exhibit 114 was marked for identification by<br>23 the court reporter and is attached hereto.)<br>24 BY MS. SCOTT REED:<br>25 Q. Can you identify this as a June 15th Max | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 229:20-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent offered to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not |

| | |
|---|---|
| | confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 230<br>1 Security Intelligence report, and an e-mail from<br>2 Mr. Kenion directed to you on June 15th, 2014?<br>3 A. Yes.<br>4 Q. And for the record, Exhibit 114 is UCP2491<br>5 through 2495.<br>6 Did you receive Exhibit 114 from Mr. Kenion<br>7 and Max Security?<br>8 A. Yes.<br>18 Q. Would you look at page 2 of Exhibit 114,<br>19 please, sir, under: Assessments. The first sentence<br>20 under assessments says (as read):<br>21 While an uptick in incidents of<br>22 rocket fire from the Gaza Strip has<br>23 been recorded during the past week,<br>24 tonight's attacks represent a<br>25 notable escalation given the | **Plaintiffs' Objections:**<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 230:1-8, 18-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>**Defendant's Response:**<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is |

| | | |
|---|---|---|
| 1 | | cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| 11 | Page 231<br>1 targeting of a major southern city.<br>2 Do you see that?<br>3 A. Yes. | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 231:1-3. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| | | Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages |

sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.

Page 238
11 MS. SCOTT REED: Let me hand you
12 Exhibit 117, please, sir.
13 (Exhibit 117 was marked for identification by
14 the court reporter and is attached hereto.)
15 MS. SCOTT REED: For the record UCP2237
16 through 2340.
17 Q. Can you identify this as a June 16th, 2014
18 Max Security Intelligence report sent to you via
19 e-mail?
20 A. Yes.

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 238:11-20. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for

| | | |
|---|---|---|
| 1 | | jury to consider when evaluating bad faith claims.. |
| 2 | | |
| 3 | Page 239 | Plaintiffs' Objections: |
| 4 | 18 Q. Would you look at the second page, please, | 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 239:18-25. Not relevant to |
| 5 | 19 sir, under: Assessments. And the second sentence | defendant's denial of coverage; not reviewed by defendant at the time of |
| 6 | 20 that begins (as read): | denial. To the extent used to suggest that Israel's conduct matters, not relevant for |
| 7 | 21 As a result, the potential for 22 additional rocket strikes into | reasons stated by the Ninth Circuit. See MIL 3. |
| 8 | 23 Israel from Gaza-based militants 24 will remain elevated as Hamas is | |
| 9 | 25 unlikely to take significant | Defendant's Response: The witness' understanding of the facts |
| 10 | | are relevant to the underlying facts of loss. The probative value of this |
| 11 | | testimony is not substantially outweighed by its prejudicial effect, it will not |
| 12 | | confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. |
| 13 | | 403 is conditional, and therefore not binding as to general admissibility. |
| 14 | | Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged |
| 15 | | unfair prejudice outweighs its probative value; or why exhibit confuses the issue, |
| 16 | | misleads the jury, wastes time, or is cumulative. Furthermore, high probative |
| 17 | | value re: state of mind of all parties involved at the time of the claim. The |
| 18 | | jury is entitled to know what information NBC, ASIC, and other parties had at time |
| 19 | | of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and |
| 20 | | development of facts is relevant to reasonableness of claim decision, defense |
| 21 | | of "bad faith" allegation and damages sought; relevant to show state of mind, |
| 22 | | reasonableness, and good faith claims handling on part of ASIC; ASIC did not |
| 23 | | have 9th Circuit opinion to consider at the time, and testimony regarding the facts |
| 24 | | available to all parties to form an understanding in real time is critical for |
| 25 | | jury to consider when evaluating bad faith claims. |
| 26 | | |
| 27 | | |
| 28 | | |

Page 240
1 measures to prevent or may encourage
2 fringe groups including PIJ
3 militants from staging such attacks.
4 Do you see that?
5 A. Yes.
6 Q. And it goes on to discuss rocket launches,
7 particularly those toward Israeli urban centers, are
8 likely to be met with retaliation.
9 Do you see that reference?
10 A. Yes.

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 240:1-10. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.

Page 242
11 Q. Did you notice offensive activity by both
12 sides of this conflict occurring?
15 THE WITNESS: There was an increase in
16 activity detrimental to the security situation in
17 Israel.

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 242:11-12, 15-17. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.

| | |
|---|---|
| Page 243<br>17 Q. Through June and July was there an uptick in<br>18 the number of rockets which were being fired at<br>19 Israel?<br>21 THE WITNESS: Yes.<br>22 BY MS. SCOTT REED:<br>23 Q. During June and July, was there an uptick in<br>24 mortars being fired at Israel? | Plaintiffs' Objections:<br>No objection – Page 243:17-19, 21-24.<br><br>Defendant's Response: |
| Page 244<br>1 THE WITNESS: I'm not an expert on what type<br>2 of weaponry was used, whether it was rockets,<br>3 mortars, hand grenades, whatever, that's not my area<br>4 of expertise, what type of weaponry was used.<br>5 BY MS. SCOTT REED:<br>6 Q. Do you know the difference between rockets<br>7 and mortars?<br>8 A. No. | Plaintiffs' Objections:<br>104a – Page 244. No foundation.<br><br>Defendant's Response:<br>The witness is testifying as to his knowledge at the time, his personal knowledge of the fact surrounding the claims decision, and his rationally based perceptions, therefore, he may provide this testimony. As to preliminary question objection, it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets the 602. |
| Page 245<br>17 Q. Did you, in doing all this review and study<br>18 that you're talking about of the sources coming in,<br>19 gain an understanding, or form an understanding of<br>20 what weaponry was being fired out of Gaza or<br>21 Palestine and into Israel?<br>22 A. No. I just knew there was a variety of<br>23 weaponry being used.<br>24 Q. And is it accurate that some of the weaponry<br>25 was actually landing in Israel? | Plaintiffs' Objections:<br>104a – Page 245:17-23. No foundation.<br>No objection – Page 245:24-25<br><br>Defendant's Response:<br>The witness is testifying as to his knowledge at the time, his personal knowledge of the fact surrounding the claims decision, and his rationally based perceptions, therefore, he may provide this testimony. |

| | |
|---|---|
| Page 246<br>3 THE WITNESS: To my knowledge.<br>13 Q. Were there occasions when that airport was<br>14 closed as a result of incoming fire or threatened<br>15 incoming fire?<br>16 A. Yes. | Plaintiffs' Objections:<br>No objection – Page 246.<br><br>Defendant's Response: |
| Page 250<br>1 BY MS. SCOTT REED:<br>2 Q. Would you look, please, sir, at the fifth<br>3 bullet point that begins in the past 48 hours, you're<br>4 reporting to your colleagues at NBCUniversal that the<br>5 extent of Israeli military operations in Hebron and<br>6 its environments had significantly increased.<br>7 Do you see that?<br>8 A. Yes.<br>9 Q. And it was highlighted by the deployment of<br>10 over 2500 IDF soldiers to the area.<br>11 Do you see that?<br>12 A. I do. | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 250:1-12. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for |

| | |
|---|---|
| | jury to consider when evaluating bad faith claims. |
| Page 252<br>8 So was one of your points to communicate<br>9 here the increasing level of military activity that<br>10 was occurring?<br>11 A. Yes. | <u>Plaintiffs' Objections:</u><br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 252:8-11. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br><u>Defendant's Response:</u><br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| | |
|---|---|
| Page 253<br>23 MS. SCOTT REED: I'm going to hand you<br>24 Exhibit 121, please, sir. | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 253:23-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| | |
|---|---|
| Page 254<br>10 Q. Would you look down under: Hi Randi, down<br>11 to the second paragraph where you report (as read):<br>12 Two rockets fired from Gaza Strip<br>13 towards Israel during the morning<br>14 hours of June 22. Israeli Air Force<br>15 fighter jets target four militant<br>16 sites in Gaza Strip.<br>17 Do you see that?<br>18 A. Yes.<br>19 Q. Was this information you were gathering from<br>20 the various sources that you were reviewing on an<br>21 ongoing basis?<br>22 A. Yes. | **Plaintiffs' Objections:**<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 254:10-22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>**Defendant's Response:**<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| | | |
|---|---|---|
| 1 | Page 255<br>2 THE WITNESS: It's contained within this<br>3 document, yes.<br>4 BY MS. SCOTT REED:<br>5 Q. And do you also report to her that these<br>6 reported incidents are amidst an ongoing military<br>7 operation that was an effort to retrieve the<br>8 kidnapped teens?<br>11 THE WITNESS: Yes.<br>12 BY MS. SCOTT REED:<br>13 Q. You say this is -- you're referring to the<br>14 military operation which is entering into tenth day.<br>18 THE WITNESS: Yes. | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 255:2-8,11-14, 18. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| | |
|---|---|
| Page 257<br>6 MS. SCOTT REED: Let me hand you<br>7 Exhibit 123, please, sir.<br>8 (Exhibit 123 was marked for identification by<br>9 the court reporter and is attached hereto.)<br>10 MS. SCOTT REED: UCP2205 through 2207.<br>11 Q. Can you identify Exhibit 123 as a June 24th,<br>12 2014 Max Security Intelligence report provided to you<br>13 via e-mail?<br>14 A. Yes.<br>15 Q. Under the solid line, sir, after: "Please<br>16 be advised," do you see the introductory statement<br>17 which says (as read):<br>18 Reports indicate that the Iron<br>19 Dome Missile Defense System<br>20 intercepted to rockets fired from<br>21 the Gaza Strip toward the southern<br>22 city of Ashkelon, while a third<br>23 rocket landed in an open field in<br>24 the Hof Ashkelon Regional Council on<br>25 June 24th, with no damage being | Plaintiffs' Objections:<br>No objection – Page 257.<br><br>Defendant's Response: |
| Page 258<br>1 reported?<br>2 A. Yes. | Plaintiffs' Objections:<br>No objection – Page 258.<br><br>Defendant's Response: |

| | | |
|---|---|---|
| 1 | Page 263 | Plaintiffs' Objections: |
| 2 | 2 Q. I'd like to refer you, please, sir, down to | 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 263:2-14. Not relevant to |
| 3 | 3 the bottom this assessments paragraph, the last | defendant's denial of coverage; not reviewed by defendant at the time of |
| 4 | 4 sentence that's on that page. (As read): | denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See |
| 5 | 5 In such a scenario there remains 6 an increased potential for an | MIL 3. |
| 6 | 7 escalation between Gaza militants 8 and the IDF, which could result in | Defendant's Response: |
| 7 | 9 air strikes on Hamas infrastructure 10 in Gaza, as well as an increased | The witness' understanding of the facts are relevant to the underlying facts of |
| 8 | 11 frequency of rocket fire from the 12 Gaza Strip. | loss. The probative value of this testimony is not substantially outweighed |
| 9 | 13 Do you see that reference? 14 A. Yes. | by its prejudicial effect, it will not confuse the jury, waste time, and is not |
| 10 | | unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not |
| 11 | | binding as to general admissibility. Objection also fails to state why exhibit is |
| 12 | | unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative |
| 13 | | value; or why exhibit confuses the issue, misleads the jury, wastes time, or is |
| 14 | | cumulative. Furthermore, high probative value re: state of mind of all parties |
| 15 | | involved at the time of the claim. The jury is entitled to know what information |
| 16 | | NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' |
| 17 | | claims. The Witnesses understanding and development of facts is relevant to |
| 18 | | reasonableness of claim decision, defense of "bad faith" allegation and damages |
| 19 | | sought; relevant to show state of mind, reasonableness, and good faith claims |
| 20 | | handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the |
| 21 | | time, and testimony regarding the facts available to all parties to form an |
| 22 | | understanding in real time is critical for jury to consider when evaluating bad faith |
| 23 | | claims.  . |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| Page 266<br>17 Q. What's the Iron Dome Antimissile Battery<br>18 System?<br>19 A. Without trying to appear facetious, it's<br>20 kind of in the title.<br>21 Q. What does it do?<br>22 A. It stops missiles, brings missiles down.<br>23 It's an antimissile system, that's what it says.<br>24 That's how -- that's the kind of definitive<br>25 description of exactly what it is. | Plaintiffs' Objections:<br>No objection – Page 266.<br><br>Defendant's Response: |
| Page 267<br>1 It's referred to as the Iron Dome, and it's<br>2 an antimissile battery system so it brings missiles<br>3 down.<br>21 Q. The second paragraph of this report states<br>22 that (as read):<br>23 During the overnight hours of<br>24 June 28 to 29 the Israeli Air Force,<br>25 IAF, conducted air strikes against | Plaintiffs' Objections:<br>No objection – Page 267:1-3.<br>402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 267:21-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for truth of matter asserted.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense |

of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 268
1  12 militant sites in the Gaza Strip
2  in response to a rocket barrage
3  earlier on June 28th.
4  Do you see that?
5  A. I do.
6  Q. Was that reporting that you received on or
7  about June the 29th?
8  A. As contained within this document.

Plaintiffs' Objections:
402, 403, 802, MIL – Page 268:1-8. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for truth of matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and

development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 269
2 BY MS. SCOTT REED:
3 Q. Was the assessment provided to you on
4 June 29th by Max Security that there was a continued
5 concern or potential for broader escalation between
6 Israel on one side and Gaza-based militants on the
7 other?
10 THE WITNESS: Yes.

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 269:2-7, 10. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The

jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 301
22 MS. SCOTT REED: Let me hand you
23 Exhibit 130, please, sir.
24 (Exhibit 130 was marked for identification by
25 the court reporter and is attached hereto.)

Plaintiffs' Objections:
No objection – Page 301:22-25.

Defendant's Response:

Page 302
1 MS. SCOTT REED: For the record UCP2473
2 through 2476.
3 Q. Can you identify Exhibit 130 as a July 1st,
4 2014 Max Security Intelligence report directed to you
5 via e-mail?
6 A. Yes.
7 Q. Did you receive this report as part of your
8 job in gathering information regarding security for
9 Dig?
10 A. Yes.
11 Q. Does this report include factual
12 descriptions addressing rockets fired from the Gaza
13 Strip toward Israel?
14 A. Yes. Paragraph 2, it mentions it.
15 Q. Is it a further description overall of
16 intensification of the conflict?
19 THE WITNESS: Yes.
20 BY MS. SCOTT REED:
21 Q. Upon your review of this document did you
22 continue to hold the view or concern that the
23 security situation would continue to deteriorate?
24 A. Yes.
25 MS. SCOTT REED: Let me hand you

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 302:1-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 302:25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   This statement is not being offered for the truth of the matter

asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209) , MIL 3 (Dkt 208)  – Page 303:1-22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for

Page 303
1 Exhibit 131, please, sir. For the record UCP1971
2 through 1972.
3 (Exhibit 131 was marked for identification by
4 the court reporter and is attached hereto.)
5 BY MS. SCOTT REED:
6 Q. Can you identify this as an e-mail string
7 between you and Ms. Randi Richmond and others
8 culminating with a July 1st, 2014 e-mail?
9 A. Yes.
10 Q. The top e-mail is the one I'd like to direct
11 your attention to, please, sir. Mr. Binkie writes to
12 you (as read):
13 Stephen, Israel hit Hamas and
14 Gaza with several targeted strikes.
15 Would like to hop on the phone today
16 to discuss the ongoing security and
17 safety of our cast and crew. Want
18 to know what measures are being
19 taken to ensure our employees are
20 protected. Thanks.
21 Do you see that?
22 A. Yes.

jury to consider when evaluating bad faith claims.  .

Page 304
14 MS. SCOTT REED: I've handed you
15 Exhibit 132, sir, which is UCP1065 through 1067.
16 (Exhibit 132 was marked for identification by
17 the court reporter and is attached hereto.)
18 BY MS. SCOTT REED:
19 Q. Do you see that?
20 A. Yes.
21 Q. Is this an e-mail that you sent to
22 Mr. Binkie and Ms. Richmond on July 1, 2004?
23 A. Yes.
24 Q. Have you changed your recommendations on
25 travel as of this communication?

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 304:14-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.

| | |
|---|---|
| Page 305<br>1 A. Yes.<br>2 Q. And how did your recommendations change?<br>3 A. I've advised not to travel unless it's<br>4 absolutely necessary and business imperative.<br>5 Q. What are you waiting to learn further about<br>6 the full extent of the Israeli response?<br>9 THE WITNESS: The Israeli response in<br>10 particular?<br>11 BY MS. SCOTT REED:<br>12 Q. Yes, sir.<br>13 A. I'm -- is it contained within this document?<br>14 Q. You said -- I'm referring to your second<br>15 paragraph: Do not travel to Israel.<br>16 Do you see that?<br>17 A. Yes.<br>18 Q. And then your next phrase is (as read):<br>19 Until the full extent of the<br>20 Israeli response is clearer.<br>21 What extent of the Israeli response were you<br>22 waiting to know more about?<br>23 A. I wanted to understand how they were going<br>24 to respond in kind and if it was -- happened to be<br>25 the introduction of a ground offensive, that would | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 305:1-6, 9-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. . |

| | | |
|---|---|---|
| 1 | Page 306 | Plaintiffs' Objections: |
| 2 | 1 have implications in terms of the response and an | 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 306. Not relevant to defendant's denial of coverage; not |
| 3 | 2 uptick in terrorist activity, incursions into Israel | reviewed by defendant at the time of |
| 4 | 3 from terrorist groups. 4 THE REPORTER: And what into Israel? | denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| 5 | 5 THE WITNESS: Incursions. 6 THE REPORTER: Incursions? | Defendant's Response: |
| 6 | 7 THE WITNESS: Yes. | The witness' understanding of the facts are relevant to the underlying facts of |

1 | Page 306
2 | 1 have implications in terms of the response and an
3 | 2 uptick in terrorist activity, incursions into Israel
4 | 3 from terrorist groups.
  | 4 THE REPORTER: And what into Israel?
5 | 5 THE WITNESS: Incursions.
6 | 6 THE REPORTER: Incursions?
  | 7 THE WITNESS: Yes.

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 306. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.

Page 314
21 MS. SCOTT REED: Let me hand you
22 Exhibit 135, please, sir.
23 (Exhibit 135 was marked for identification by
24 the court reporter and is attached hereto.)
25 MS. SCOTT REED: UCP2363 through 2365 --

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 314:21-23. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

| | |
|---|---|
| Page 315 | Plaintiffs' Objections: |
| 1 pardon me -- UCP2363 through 2367. | 402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 315:1-16. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| 2 Q. Can you identify this as an e-mail Chris | |
| 3 Biggs provided to you July 2nd, 2014? | |
| 4 A. Yes. | |
| 5 Q. Was this in the nature of a compilation of | |
| 6 security information that Mr. Biggs was providing to | Defendant's Response: |
| 7 you as part of his responsibilities on Dig? | The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the |
| 8 A. Yes, appears so from the information in | |
| 9 front of me. | |
| 10 Q. At the top in bold it says, IHS (as read): | |
| 11 Killing of Israeli abductees | |
| 12 increases pressure on Israeli | |
| 13 government to retaliate militarily | |
| 14 raising war and unrest risk. | |
| 15 Do you see that? | |
| 16 A. I do. | |

Page 316
11 Q. Is it your understanding that Mr. Biggs was
12 summarizing for you information that he drew from
13 IHS, Reuters, and Al Jazeera as sources?
16 THE WITNESS: Yeah. I wouldn't say
17 summarizing. What he's done here is provided me with
18 information, and the information from IHS is not a
19 summary. And he hasn't, to my knowledge, added or
20 subtracted from this. It is information that they've
21 provided.

claim is relevant and not prejudicial.

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 316. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not

Page 318
2 BY MS. SCOTT REED:
3 Q. Would you look at the IHS
section, please,
4 sir, under: Risk implications.
Halfway through the
5 paragraph the sentence is (as read):
6 A broader Gaza war would become
7 more likely if Hamas or other
8 Gaza-based militants responded with
9 several dozen rockets per day into
10 southern Israel over a sustained
11 period.
12 Do you see that?
13 A. Yes.
14 Q. And the next sentence (as read):
15 A broader war would result in a
16 much higher likelihood of Hamas
17 using FAJR-5 rockets capable of
18 reaching Tel Aviv.
19 Do you see that sentence?
20 A. Yes.

clear what objection intended; description
of the facts and process surrounding the
claim is relevant and not prejudicial.

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3
(Dkt 208) – Page 318:2-20. Not relevant
to defendant's denial of coverage; not
reviewed by defendant at the time of
denial. Israel's conduct not relevant for
reasons stated by the Ninth Circuit. See
MIL 3. Hearsay to the extent offered for
the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts
are relevant to the underlying facts of loss
and the amount of the loss. The probative
value of this testimony is not substantially
outweighed by its prejudicial effect, it
will not confuse the jury, waste time, and
is not unnecessarily cumulative. Further,
F.R.E. 403 is conditional, and therefore
not binding as to general admissibility.
Objection also fails to state why exhibit is
unfairly prejudicial; or why such alleged
unfair prejudice outweighs its probative
value; or why exhibit confuses the issue,
misleads the jury, wastes time, or is
cumulative. Furthermore, high probative
value re: state of mind of all parties
involved at the time of the claim. The
jury is entitled to know what information
NBC, ASIC, and other parties had at time
of the facts giving rise to Plaintiffs'
claims. The Witnesses understanding and
development of facts is relevant to
reasonableness of claim decision, defense
of "bad faith" allegation and damages
sought; relevant to show state of mind,
reasonableness, and good faith claims
handling on part of ASIC; ASIC did not
have 9th Circuit opinion to consider at the
time, and testimony regarding the facts
available to all parties to form an
understanding in real time is critical for
jury to consider when evaluating bad faith
claims.  This statement is not being
offered for the truth of the matter
asserted, therefore, it is by definition not
hearsay. The statement is not offered for
the purpose of demonstrating the
truthfulness of any assertion, it is only
being offered to show information

available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 320
10 MS. SCOTT REED: Let me hand you
11 Exhibit 126, please, sir, UCP3672 through 3674.
12 THE WITNESS: Thank you.
13 (Exhibit 136 was marked for identification by
14 the court reporter and is attached hereto.)
15 BY MS. SCOTT REED:
16 Q. Can you identify Exhibit 136 as an e-mail
17 string between you and Ms. Richmond and Mr. Binkie on
18 July the 2nd, 2014?
19 A. Yes.

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 320:10-19. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages

| | |
|---|---|
| | sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 321<br>6 Q. All right. Down in the section that says:<br>7 Risk implications, do you include a discussion that<br>8 (as read):<br>9 A broader Gaza war would become<br>10 more likely if Hamas or other<br>11 Gaza-based militants responded with<br>12 several dozen rockets per day into<br>13 southern Israel over a sustained<br>14 period?<br>15 A. I -- I wouldn't use the word "discussion."<br>16 I've put in information that I believe has been taken<br>17 from the IHS report, one -- in Exhibit 135.<br>18 Q. All right. Sir. And is the next sentence<br>19 that (as read):<br>20 A broader war would result in a<br>21 much higher likelihood of Hamas<br>22 using FAJR-5 rockets capable of<br>23 reaching Tel Aviv.<br>24 Also something you took out of Exhibit 135,<br>25 specifically the IHS portion? | Plaintiffs' Objections:<br>402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 321:6-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   This statement is not being offered for the truth of the matter |

873

| | |
|---|---|
| | asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. |
| Page 322<br>1 A. Yes.<br>2 Q. Why did you choose to include these<br>3 sentences about a broader Gaza war or a broader war<br>4 in your discussion that you provided to Mr. Binkie<br>5 and Ms. Richmond?<br>8 THE WITNESS: The information needed to be<br>9 shared.<br>10 BY MS. SCOTT REED:<br>11 Q. You felt it was of a -- a character or type<br>12 that it was important to bring it to NBCUniversal<br>13 attention?<br>14 A. Yes. | Plaintiffs' Objections:<br>402, 403, 802, (Dkt 209), MIL 3 (Dkt 208)– Page 322:1-14. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  This statement is not being offered for the truth of the matter |

asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 323
7 MS. SCOTT REED: Let me direct you to
8 Exhibit 138, please, sir, UCP2219 through 2223.
9 (Exhibit 138 was marked for identification by
10 the court reporter and is attached hereto.)
11 BY MS. SCOTT REED:
12 Q. Can you identify Exhibit 138 as a July 3rd,
13 2014 Max Security Intelligence report provided to you
14 via e-mail?
15 A. Yes.

Plaintiffs' Objections:
402, 403, 802, (Dkt 209), MIL 3 (Dkt 208)– Page 323:7-15. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an

| | |
|---|---|
| | understanding in real time is critical for jury to consider when evaluating bad faith claims.  This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 324<br>5 Q. Upon receipt of information such as this on<br>6 July the 3rd, did you continue to conclude the<br>7 escalation was going to continue?<br>8 A. Yes. | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 324. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

Page 329
10 MS. SCOTT REED: I hand you Exhibit 141,
11 please, sir.
12 (Exhibit 141 was marked for identification by
13 the court reporter and is attached hereto.)
14 MS. SCOTT REED: This is UCP2727 through
15 2731.
16 Q. Can you identify Exhibit 141 as a July 3rd,
17 2014 report from Max Security Intelligence forwarded
18 to you via e-mail including by e-mail of Mr. Kenion?
19 A. Yes.
20 Q. Is this one of the sources of information
21 that you would have received in carrying out your
22 work on the Dig production?
23 A. Yes.
24 Q. Did this report continue to indicate to you
25 an increase in hostilities?

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 329:10-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 330
1 A. Yes.
2 Q. Did it report an uptick in the number of
3 rockets fired toward Israel?
6 BY MS. SCOTT REED:
7 Q. Can you answer?
8 A. Oh, sorry, yes.

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 330:1. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.
No objection – Page 330:2-8.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 331
7 Q. And what information had you processed in
8 order to lead you to make the recommendation at this
9 point in time that there should not being filming in
10 Jerusalem?
11 A. The security environment in Jerusalem was
12 very, very unstable and unpredictable in nature.
13 Activity, terrorist, demonstration, is extremely
14 difficult to predict and also to secure against.
15 Many of the areas that we were going to film in
16 Jerusalem were in areas where conflicts were taking
17 place. There was demonstrations. There was people
18 being stopped. There was rocks being thrown, etc.
19 It wasn't a safe environment.
24 Q. Did you have reports that there were sirens
25 going off in Jerusalem by this time?

Plaintiffs' Objections:
No objection – Page 331.

Defendant's Response:

| | |
|---|---|
| Page 332<br>1 A. Certainly around this time.<br>2 Q. And what would the sirens indicate from a<br>3 security standpoint?<br>6 THE WITNESS: That there's -- that was going<br>7 to be an incoming rocket attack and people were to<br>8 shelter in place or go to a place, a shelter -- a<br>9 place of safety, shelter.<br>10 MS. SCOTT REED: Let me hand you<br>11 Exhibit 143, please, sir.<br>12 (Exhibit 143 was marked for identification by<br>13 the court reporter and is attached hereto.)<br>14 MS. SCOTT REED: UCP1975 through 1976.<br>15 Q. Can you identify this as an e-mail entitled<br>16 security message from Dig on July 3rd, 2014, that's<br>17 directed to you from Penelope Kennedy?<br>18 A. Yes. | Plaintiffs' Objections:<br>No objection – Page 332:1-9<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 332:10-18. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

Page 333
7 Q. So is it your recollection that you wrote
8 this security message to be distributed?
9 A. It would appear so. It's my signature
10 blocks on page 2.
11 Q. Who would be the intended audience for this
12 type of security message?
13 A. This would be for the -- the crew.
14 Q. And you're warning about the deterioration
15 of the situation affecting Jerusalem in this, among
16 other things?
17 A. Yes.
18 Q. Your third bullet point states (as read):
19 Increase in rocket attacks on
20 Southern Israel emanating from Gaza.
21 Do you see that?
22 A. Yes.
23 Q. Was that information that you'd gathered
24 from your various incoming sources of intel?
25 A. Yes.

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 333:7-25.  Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

| | |
|---|---|
| Page 334<br>1 Q. And the forth bullet point says (as read):<br>2 General increase in security and<br>3 military activity.<br>4 Do you see that?<br>5 A. Yes.<br>6 Q. Was that information you'd gathered from the<br>7 various sources you had incoming?<br>8 A. Yes. | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 334:1-8. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

Page 336
6 MS. SCOTT REED: Let me show you
7 Exhibit 146, please, sir.
8 (Exhibit 146 was marked for identification by
9 the court reporter and is attached hereto.)
10 MS. SCOTT REED: UCP2149 through 2154.
11 Q. Can you identify Exhibit 146 as a July 5th,
12 2014 Max Security report sent to you via e-mail?
13 A. Yes.
23 Q. The first part of the text indicates
24 (as read):
25 Ground sources reported on

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 336:6-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not

|  |  |
|---|---|
|  | clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 337<br>1 July 5th that an Iron Dome<br>2 Antimissile Battery has been<br>3 deployed by Israel Defense Forces,<br>4 IDF, to the Tel Aviv area.<br>5 Do you see that?<br>6 A. Yes.<br>10 Q. Do you recall attempted attacks or attacks<br>11 spreading to the Tel Aviv area at some point during<br>12 your monitoring?<br>13 A. Yes.<br>14 Q. And would that have been an expansion of the<br>15 areas that Hamas was targeting within Israel?<br>16 A. Yes.<br>17 Q. Were those areas farther away for Hamas to<br>18 strike out of Gaza?<br>21 THE WITNESS: It is my understanding, yes.<br>22 MS. SCOTT REED: Let me hand you<br>23 Exhibit 147, sir.<br>24 (Exhibit 147 was marked for identification by<br>25 the court reporter and is attached hereto.) | Plaintiffs' Objections:<br>402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 337:1-25.<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for |

|  |  |  |
|---|---|---|
| 1 |  | the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| 2 |  | |
| 3 |  | |
| 4 |  | |
| 5 |  | |
| 6 |  | |
| 7 |  | |
| 8 | Page 338<br>1 MS. SCOTT REED: UCP2422 through 2426.<br>2 Q. Can you identify Exhibit 147 as a July 7th,<br>3 2014 security report from Max Security Intelligence<br>4 directed to you via e-mail?<br>5 A. Yes. | Plaintiffs' Objections:<br>402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 338:1-5. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted. |
| 9 |  | |
| 10 |  | |
| 11 |  | |
| 12 |  | |
| 13 |  | Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not |
| 14 |  | |
| 15 |  | |
| 16 |  | |
| 17 |  | |
| 18 |  | |
| 19 |  | |
| 20 |  | |
| 21 |  | |
| 22 |  | |
| 23 |  | |
| 24 |  | |
| 25 |  | |
| 26 |  | |
| 27 |  | |
| 28 |  | |

| | | |
|---|---|---|
| 1 | | clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| 2 | | |
| 3 | | |
| 4 | Page 341 | **Plaintiffs' Objections:** |
| 5 | 19 MS. SCOTT REED: Let me hand you 20 Exhibit 150, please, sir. | 402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 341:19-25. Not relevant to defendant's denial of coverage; not |
| 6 | 21 (Exhibit 150 was marked for identification by | reviewed by defendant at the time of denial. To the extent used to suggest that |
| 7 | 22 the court reporter and is attached hereto.) | Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See |
| 8 | 23 MS. SCOTT REED: UCP2816 through 2820. | MIL 3. Hearsay to the extent offered for the truth of the matter asserted. |
| 9 | 24 Q. Can you identify Exhibit 150 as a July 7th | **Defendant's Response:** |
| 10 | 25 Max Security Intelligence report sent to you via | The witness' understanding of the facts are relevant to the underlying facts of loss |
| 11 | | and the amount of the loss. The probative value of this testimony is not substantially |
| 12 | | outweighed by its prejudicial effect, it will not confuse the jury, waste time, and |
| 13 | | is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore |
| 14 | | not binding as to general admissibility. Objection also fails to state why exhibit is |
| 15 | | unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative |
| 16 | | value; or why exhibit confuses the issue, misleads the jury, wastes time, or is |
| 17 | | cumulative. Furthermore, high probative value re: state of mind of all parties |
| 18 | | involved at the time of the claim. The jury is entitled to know what information |
| 19 | | NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' |
| 20 | | claims. This statement is not being offered for the truth of the matter |
| 21 | | asserted, therefore, it is by definition not hearsay. The statement is not offered for |
| 22 | | the purpose of demonstrating the truthfulness of any assertion, it is only |
| 23 | | being offered to show information available to the witness and/or the |
| 24 | | subsequent actions of the witness after possessing said information. "MIL" not |
| 25 | | clear what objection intended; description of the facts and process surrounding the |
| 26 | | claim is relevant and not prejudicial. |
| 27 | | |
| 28 | | |

Page 342
1 e-mail?
2 A. Yes.
3 Q. Did you receive this Max Security report on
4 or about July the 7th?
5 A. Yes.
6 Q. Would you have reviewed this information on
7 receiving it from Max Security?
8 A. I have no reason to doubt that I did.
13 Q. Does part of this report indicate that
14 cross-border fire between the Israel defense forces,
15 IDF, and Gaza-based militants escalated during the
16 evening hours of July 7?
19 THE WITNESS: Yes.
20 BY MS. SCOTT REED:
21 Q. In the next paragraph did Max Security
22 report to you as part of its work for NBCUniversal
23 that on the ground dozens of rockets and mortars have
24 been fired toward Southern Israeli communities
25 bordering the Gaza Strip while numerous Israeli air

**Plaintiffs' Objections:**
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 342:1-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

**Defendant's Response:**
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 343
1 strikes were reported into Gaza as well?
4 THE WITNESS: Yes.
5 BY MS. SCOTT REED:
6 Q. Did this report of July 7th indicate to you
7 that there continued to be an intensification of the
8 mutual activity back and forth between Palestine or
9 Hamas on one side and Israel on the other?
12 THE WITNESS: Yes.
17 MS. SCOTT REED: Let me hand you
18 Exhibit 151, sir, UCP1855 through 1856.

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 343:1; 343:4-9; 343:12-16. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 343:17-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. This statement is not being

offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 345
1 (as read):
2 Summarizing the info below, there
3 is significant risk of an escalation
4 as conditions for a ceasefire are
5 unlikely to be acceptable.
6 Do you see that?
7 A. Yes.
8 Q. Was that your conclusion as of July the 8th?
9 A. Yes.
19 MS. SCOTT REED: Let me hand you
20 Exhibit 152, please, sir.
21 (Exhibit 152 was marked for identification by
22 the court reporter and is attached hereto.)
23 MS. SCOTT REED: UCP1845 through 1849.
24 Q. Can you identify Exhibit 152 as a July 8th,
25 2014 Max Security Intelligence report sent to you via

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 345:1-13. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3.

402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 345:19-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Israel's conduct not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to

| | | |
|---|---|---|
| 1 | | reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| 14 | Page 346<br>1 e-mail?<br>2 A. Yes.<br>18 Q. Did this report to you that the rocket fire<br>19 into southern Israel was continuing?<br>22 THE WITNESS: The information is in the<br>23 document, yes.<br>24 BY MS. SCOTT REED:<br>25 Q. And at the bottom of the first page did Max | **Plaintiffs' Objections:**<br>402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 346:1-2,18-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.<br><br>**Defendant's Response:**<br>The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties |

involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– 347:1-3; 347:6. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– 347:13-16; 347:20-22. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative

Page 347
1 Security report to you that on July 7th,
2 approximately 100 rockets and mortars were fired into
3 Israel, primarily targeting border communities?
6 THE WITNESS: Yes, that's in the document.
13 MS. SCOTT REED: Let me hand you
14 Exhibit 153, please, sir.
15 (Exhibit 153 was marked for identification by
16 the court reporter and is attached hereto.)
20 Q. Can you identify Exhibit 153 as an e-mail to
21 you from Mr. Biggs on July 8th, 2014?
22 A. Yes.

value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 348
17 Q. He notes to you a report with a time on it
18 (as read):
19 4:36 p.m., Tel Aviv Municipality
20 instructed by the Home Front Command
21 begins opening bomb shelters.
22 Do you see that?
23 A. Yes.
24 Q. And was that a -- evidence of a further
25 escalation that was occurring?

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 348:17-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and

| | |
|---|---|
| | process surrounding the claim is relevant and not prejudicial. |
| Page 349<br>3 THE WITNESS: Yes. | <u>Plaintiffs' Objections:</u><br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 349:3. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br><u>Defendant's Response:</u><br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

Page 350
1 BY MS. SCOTT REED:
2 Q. Mr. Smith, may I direct your attention back
3 to the UCP2813. Mr. Biggs also notes to you
4 something that's denominated (as read):
5 4:16 p.m., flights coming in and
6 leaving Ben Gurion Airport diverted.
7 Do you see that?
8 A. Yes.
9 Q. And was that further evidence to you of an
10 escalation?
11 A. Yes. This is information that's been picked
12 up on Twitter.

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– – Page 350:1-12. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 352
22 MS. SCOTT REED: Let me hand you
23 Exhibit 156, please, sir, UCP2681 through 2682.
24 (Exhibit 156 was marked for identification by
25 the court reporter and is attached hereto.)

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 352. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an

| | | |
|---|---|---|
| 1 | | understanding in real time is critical for jury to consider when evaluating bad faith claims.  "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

Page 353
1 BY MS. SCOTT REED:
2 Q. Can you identify Exhibit 156 as the travel
3 tracker proactive e-mail sent to you on July 8th,
4 2014?
5 A. Yes.
6 Q. And does this report air raid warnings were
7 sounding in various areas in Israel?
8 A. Yes.
9 Q. Is this further evidence of escalation to
10 you in part of your gathering information on the Dig
11 production?
12 A. Yes.
13 Q. And was Exhibit 156 an example of the type
14 of information that was coming into you as part of
15 your work in connection with the Dig production?
16 A. Yes.

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 353:1-16. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense

of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Page 357
8 MS. SCOTT REED: Let me hand you
9 Exhibit 161, please, sir.
10 (Exhibit 161 was marked for identification by
11 the court reporter and is attached hereto.)
12 MS. SCOTT REED: UCP913 to 914.
13 Q. Can you identify this as an e-mail string
14 beginning with an e-mail from you of July 9th, 2014?
15 A. Yes.
16 Q. And are you reporting that additional
17 rockets against Tel Aviv, Jerusalem, and other major
18 population centers in central Israel should be
19 expected?
22 THE WITNESS: Yes.
23 BY MS. SCOTT REED:
24 Q. Is this information that you were
25 considering as part of your ongoing work on assessing

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 357:8-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

| | |
|---|---|
| Page 358<br>1 security for the Dig production?<br>2 A. Yes. | Plaintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 358:1-2. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

| | |
|---|---|
| Page 364 | Plaintiffs' Objections: |
| 8 MS. SCOTT REED: Here's 169, please, sir, | 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 364:8-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| 9 UCP2324. | |
| 10 (Exhibit 169 was marked for identification by | |
| 11 the court reporter and is attached hereto.) | |
| 12 BY MS. SCOTT REED: | |
| 13 Q. Can you identify this as a July 9th, 2014 | Defendant's Response: |
| 14 e-mail you sent to Brian Brady to report further | The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| 15 events and summaries? | |
| 16 A. Yes. | |
| 17 Q. And did you report that you were still in an | |
| 18 escalation phase? | |
| 21 THE WITNESS: Yes. | |
| 22 BY MS. SCOTT REED: | |
| 23 Q. Were you expecting on July 9th a continuing | |
| 24 intensification of the two-sided interactive activity | |
| 25 that was going on? | |
| | |
| Page 365 | Plaintiffs' Objections: |
| 3 THE WITNESS: I expected an escalation; an | 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 365:3-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| 4 escalation of the conflict and a deterioration in the | |
| 5 security situation. | |
| 6 MS. SCOTT REED: Let me hand you 170, | |
| 7 please, sir, UCP2372 through 2376. | |
| 8 (Exhibit 170 was marked for identification by | |
| 9 the court reporter and is attached hereto.) | Defendant's Response: |
| 10 BY MS. SCOTT REED: | The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. |
| 11 Q. Can you identify this as a July 9th, 2014 | |
| 12 Max analysis that was sent to you by e-mail? | |

| | |
|---|---|
| 13 A. Yes.<br>14 Q. What's Operation Protective Edge?<br>15 A. It's the name given by the Israeli Defense<br>16 Force to their operations in this conflict.<br>17 Q. And do you see the indication that Israel<br>18 launched Operation Protective Edge on July the 7th?<br>19 A. On the first line, yes.<br>20 Q. Yes, sir.<br>21 And was this information that you received<br>22 from the Max analysis report the type that you were<br>23 gathering and incorporating into your assessment of<br>24 security for Dig?<br><br>Page 366<br>2 THE WITNESS: Yes. | 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.<br><br>Paintiffs' Objections:<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 366:2. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

| | |
|---|---|
| Page 371<br>8 MS. SCOTT REED: And let me show you<br>9 Exhibit 177, sir.<br>10 (Exhibit 177 was marked for identification by<br>11 the court reporter and is attached hereto.)<br>12 BY MS. SCOTT REED:<br>13 Q. Is this the actual written form that went to<br>14 Mr. Binkie as part of production?<br>17 THE WITNESS: Yes.<br>18 BY MS. SCOTT REED:<br>19 Q. And is this the final recommendation that<br>20 you made in connection with security at this time?<br>22 THE WITNESS: This was my recommendation<br>23 then. There were other recommendations over a period<br>24 of time on whether to return, whether the security<br>25 situation had changed, whether there had been a | Plaintiffs' Objections:<br>402, 403 – Page 371:8-25. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| | | |
|---|---|---|
| 1 | Page 372 | Plaintiffs' Objections: |
| 2 | 1 cessation, an escalation. But on this particular | 402, 403 – Page 372:1-14. Wastes time; jury can be instructed that Plaintiffs moved production and why. |
| 3 | 2 day, this was my advice to the production. | |
| 4 | 3 BY MS. SCOTT REED: 4 Q. In the first full paragraph, it's stated | Defendant's Response: The witness' understanding of the facts are relevant to the underlying facts of |
| 5 | 5 (as read): 6 This is to advise you that the | loss. The probative value of this testimony is not substantially outweighed |
| 6 | 7 security environment in Israel 8 currently prohibits NBCU security | by its prejudicial effect, it will not confuse the jury, waste time, and is not |
| 7 | 9 from being able to guarantee the 10 safety and security of our | unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not |
| 8 | 11 employees, production partners, and | binding as to general admissibility. Objection also fails to state why exhibit is |
| 9 | 12 associated crew and talent. 13 Is that your recommendation, so to | unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative |
| 10 | speak? 14 A. Yes. | value; or why exhibit confuses the issue, misleads the jury, wastes time, or is |
| 11 | | cumulative. Furthermore, high probative value re: state of mind of all parties |
| 12 | | involved at the time of the claim. The jury is entitled to know what information |
| 13 | | NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' |
| 14 | | claims. The Witnesses understanding and development of facts is relevant to |
| 15 | | reasonableness of claim decision, defense of "bad faith" allegation and damages |
| 16 | | sought; relevant to show state of mind, reasonableness, and good faith claims |
| 17 | | handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the |
| 18 | | time, and testimony regarding the facts available to all parties to form an |
| 19 | | understanding in real time is critical for jury to consider when evaluating bad faith |
| 20 | | claims. |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| Page 374<br>16 Q. Did you continue to gauge the security<br>17 situation even after you provided your assessment on<br>18 July the 10th?<br>19 A. Yes.<br>20 Q. Did you continue to provide analysis or<br>21 assessment on whether hostilities were ramping up or<br>22 not?<br>23 A. I did.<br>24 Q. And what sort of conclusions did you reach<br>25 after July 10th about whether hostilities were | Plaintiffs' Objections:<br>402, 403 – Page 374. Wastes time; jury can be instructed that Plaintiffs moved production and why; wastes time.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.  . |
| Page 375<br>1 ramping up?<br>3 THE WITNESS: Hostilities were ramping up.<br>4 There was no cessation. At that time there was no<br>5 long-term prospect of a ceasefire, and the security<br>6 situation hadn't changed enough for the production to<br>7 continue, in my opinion.<br>8 MS. SCOTT REED: Let me hand | Plaintiffs' Objections:<br>402, 403– Page 375:1-7. Wastes time; jury can be instructed that Plaintiffs moved production and why; wastes time. 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) - 375:8-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. |

| | |
|---|---|
| you<br>9 Exhibit 179, please, sir.<br>10 (Exhibit 179 was marked for identification by<br>11 the court reporter and is attached hereto.)<br>12 BY MS. SCOTT REED:<br>13 Q. Can you identify 179 as a July 11th, 2014<br>14 Max Security Intelligence report that you received<br>15 via e-mail?<br>16 A. Yes.<br>17 Q. Does this contain information that you were<br>18 gathering as part of your process of assessing<br>19 security for the Dig production?<br>20 A. Yes.<br>21 Q. Did this continue to inform your assessment<br>22 that you had on an ongoing basis after July the 10th?<br>25 THE WITNESS: Yes. | **Defendant's Response:**<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 376<br>25 Q. Did you ever change your assessment that you | **Plaintiffs' Objections:**<br>402, 403 – Page 376:25. Wastes time; jury can be instructed that Plaintiffs moved production and why; wastes time<br><br>**Defendant's Response:**<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, |

misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.

Page 377
1 issued on July 10th to say that you could guarantee
2 safety for actual production?
3 A. No, not -- that's not my recollection, no.

Plaintiffs' Objections:
402, 403 – Page 377:1-3. Wastes time; jury can be instructed that Plaintiffs moved production and why; wastes time

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims

| | |
|---|---|
| | handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 384<br>25 Q. Can you identify Exhibit 192 as a July 16th, | **Plaintiffs' Objections:**<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 384:25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. |
| | **Defendant's Response:**<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

Page 385
1 2014 e-mail from you to Mr. Binkie copied to
2 Ms. Richmond?
3 (Exhibit 192 was marked for identification by
4 the court reporter and is attached hereto.)
5 THE WITNESS: Yes, I can.
6 BY MS. SCOTT REED:
7 Q. And is this a communication that you were
8 asked to provide to the production side?
9 A. I'm -- I'm not sure if I was asked to
10 provide a further statement or I just provided it of
11 my own volition.
12 Q. And in this you're communicating that the
13 current attempts to broker a ceasefire have stalled.
14 Do you see that?
15 A. Yes.
16 Q. And was that significant to your assessment
17 on your ongoing review of safety and security for
18 Dig?
19 A. Yes.
20 Q. Why was that, sir?
21 A. Because it meant that there was no cessation
22 in the violence. There was no long-term or even
23 short-term/medium-term prospect that the security
24 situation would -- would change to allow the safe and
25 secure protection of our assets.

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 385:1-25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.

| | |
|---|---|
| Page 386<br>1 Q. You report here that (as read):<br>2 During the period of Israeli<br>3 acceptance, it is estimated that<br>4 47 rockets were fired from Gaza<br>5 toward Israel.<br>6 Do you see that?<br>7 A. Yes.<br>8 Q. And did that inform the assessment that you<br>9 were providing at this point?<br>10 A. That was part of the assessment, yes --<br>11 Q. So as of -- pardon me.<br>12 A. Yes, sorry.<br>13 Q. As of July the 16th, 2014 were you still<br>14 providing a security assessment that you could not<br>15 guarantee the safety and security of personnel for<br>16 production in Israel?<br>17 A. Yes.<br>22 Q. Is your overall feeling that after your<br>23 recommendation on July 10th, things were either at a<br>24 sustained level or increasing in hostility? | **Plaintiffs' Objections:**<br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – Page 386. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>**Defendant's Response:**<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

Page 387
2 THE WITNESS: My -- my assessment was that
3 there was no cessation of violence and the situation
4 had not improved.
5 BY MS. SCOTT REED:
6 Q. Did you predict that there was or assess
7 that there was not a likelihood of cessation either?
8 A. Yes.
9 Q. Can you identify Exhibit 193 as a July 16th,
10 2014 security alert that you received via e-mail?
11 (Exhibit 193 was marked for identification by
12 the court reporter and is attached hereto.)
13 THE WITNESS: Yes, I can.
22 BY MS. SCOTT REED:
23 Q. You're reporting in this that -- or pardon
24 me -- Max Security is stating in this that (as read):

Plaintiffs' Objections:
402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 387:2-8. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.

402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 387:9-13; 387:22-24. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an

Page 388
1 call-up of an additional
2 8,000 reservists, bringing the total
3 number of troops called up to
4 50,000.
5 Do you see that?
6 A. I do.
12 BY MS. SCOTT REED:
13 Q. Did that information affect the assessment
14 that you were providing on an ongoing basis about
15 safety and security for Dig?
16 A. That would have formed part of my assessment
17 and how I came to the conclusions; that and other
18 information sources.
19 BY MS. SCOTT REED:
20 Q. And did that fact continue to cause you to
21 conclude that you could not assure safety or security
22 for production in Israel?
25 THE WITNESS: That was a -- a number of

understanding in real time is critical for jury to consider when evaluating bad faith claims.  This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

Plaintiffs' Objections:
402, 403, 802, MIL 2 (Dkt 209), MIL 3 (Dkt 208) – 388:1-6.  Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– 388:12-22; 388:25. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.

Defendant's Response:
The witness' understanding of the facts are relevant to the underlying facts of loss and the amount of the loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The

| | |
|---|---|
| | jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.   This statement is not being offered for the truth of the matter asserted, therefore, it is by definition not hearsay. The statement is not offered for the purpose of demonstrating the truthfulness of any assertion, it is only being offered to show information available to the witness and/or the subsequent actions of the witness after possessing said information. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 389<br>1 factors that were taken into conversation.<br>2 BY MS. SCOTT REED:<br>3 Q. Yes, sir.<br>4 And was that one of them?<br>5 A. Yes. | <u>Plaintiffs' Objections:</u><br>402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)– Page 389:1-5. Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Hearsay to the extent offered for the truth of the matter asserted.<br><br><u>Defendant's Response:</u><br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative |

value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Stephen Smith Vol. 2<br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer. However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | Plaintiffs object to Defendant's designation of the deposition testimony of Stephen Smith. Mr. Smith's testimony is a waste of time and largely irrelevant. Mr. Smith's only involvement in the facts giving rise to this case are monitoring the security situation in Israel and recommending to Plaintiffs that the area was unsafe for filming. The jury can and should be instructed that Plaintiffs postponed and later ceased production in Israel and why. These issues have already been decided by the Ninth Circuit. There is no reason to present Mr. Smith's testimony at trial. Defendant's designations cover multiple sources Mr. Smith consulted to monitor safety in Israel – Defendants did not receive or consider these materials at the time they denied the Dig claim. As such, they are irrelevant. Plaintiffs object to Defendants' designations as follows: |
| Page 410<br>12Q What was the purpose of providing<br>13 Exhibit 192 to Mr. Binke and Ms. Richmond? | Plaintiffs' Objections:<br>410:12-13 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters. |

| Deposition Designation | Objection & Response |
|---|---|
| | not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 410<br>17 THE WITNESS: This was a statement of<br>18 information that I had gathered around the security<br>19 situation in Israel at the time to make them aware<br>20 of what was happening and what we were advising.<br>21 BY MS. REED:<br>22 Q Did you understand what use this statement<br>23 would -- further use this statement would be put<br>24 to?<br>25 A Yes, I did. | Plaintiffs' Objections:<br>410:17-25 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not |

| Deposition Designation | Objection & Response |
|---|---|
| | prejudicial. |
| **Page 411**<br>1 Q What was that?<br>2 A It was to inform the weight of business to<br>3 enable them to make a decision. | Plaintiffs' Objections:<br>411:1-3 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| **Page 411**<br>25 Q What recommendations did you make, please, | Plaintiffs' Objections:<br>411:25 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, |

| Deposition Designation | Objection & Response |
|---|---|
| | misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 412<br>1 sir?<br>2 A My recommendation was that it was not<br>3 safe, and we could not guarantee the safety or the<br>4 security of NBCU personnel or assets at that time.<br>5 Q And at what time are you discussing?<br>6 A I'm discussing the time through June and<br>7 into July, and I presented information on July the<br>8 10th. | Plaintiffs' Objections:<br>412:1-8 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 412<br>14 Q So between July 10th and July 16th, did<br>15 you adjust your recommendation in any way to NBC<br>16 Universal?<br>17 A No, my recommendation was that it was<br>18 still not safe or secure and we could not guarantee<br>19 the safety of our employees | Plaintiffs' Objections:<br>412:14-19 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value |

| Deposition Designation | Objection & Response |
|---|---|
| and assets. | of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 412<br>24 BY MS. REED:<br>25 Q I asked you to put Exhibit 177 in front of | Plaintiffs' Objections:<br>412:24-25 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 413<br>1 you as well, sir. Is Exhibit 177 the documentation<br>2 that reflects the position that | Plaintiffs' Objections:<br>413:1-3 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the |

| Deposition Designation | Objection & Response |
|---|---|
| you had taken as of 3 July the 10th, 2014, to NBC Universal? | extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 413<br>5 THE WITNESS: Yes.<br>6 BY MS. REED:<br>7 Q And was the written information you<br>8 provided in Exhibit 177 based upon your entire<br>9 assessment of all the information that had been<br>10 received to that point?<br>11 A It was based upon a continuous assessment<br>12 pre-production, during, and at this moment in time.<br>13 Q Yes, sir. And on July 10th when you made<br>14 this recommendation, was that a culmination based<br>15 upon the entire assessment you had made up until<br>16 July the 10th? | Plaintiffs' Objections:<br>413:5-16 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and |

| Deposition Designation | Objection & Response |
|---|---|
| | process surrounding the claim is relevant and not prejudicial. |
| **Page 413**<br>18 THE WITNESS: Yes.<br>19 BY MS. REED:<br>20 Q All right. And turning back to<br>21 Exhibit 192, your statement on July 16th, was this<br>22 recommendation and statement a culmination of all<br>23 the information that you had reviewed and assessed<br>24 up until July the 16th? | **Plaintiffs' Objections:**<br>413:18-24 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>**Defendant's Response:**<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| **Page 414**<br>2 THE WITNESS: Yes. | **Plaintiffs' Objections:**<br>414:2 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>**Defendant's Response:**<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its |

| Deposition Designation | Objection & Response |
|---|---|
| | probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 415<br>8 Was July the 10th the date that you concluded you<br>9 could not guarantee safety or security for the DIG<br>10 production in Israel as a whole? | Plaintiffs' Objections:<br>415:8-10 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 415<br>12 THE WITNESS: Yes.<br>13 BY MS. REED:<br>14 Q Had you formed that assessment prior to<br>15 July the 10th, please, sir?<br>16 A On or around July the 10th. It was a<br>17 continuous assessment of --<br>18 Q Yes.<br>19 A -- for the security | Plaintiffs' Objections:<br>415:12-22 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant |

| Deposition Designation | Objection & Response |
|---|---|
| situation.<br>20 Q And was July the 10th the date that you<br>21 actually articulated that assessment to the<br>22 production side at NBC Universal? | to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| | **Plaintiffs' Objections:**<br>415:25 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why. |
| Page 415<br>25 THE WITNESS: It was the date I provided | **Defendant's Response:**<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| | **Plaintiffs' Objections:**<br>416:1-23 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt |

| Deposition Designation | Objection & Response |
|---|---|
| Page 416<br>1 the statement of the information that I had been<br>2 conveyed throughout this process.<br>3 (Defendant's Exhibit 194 was marked for<br>4 identification by the Certified Shorthand Reporter;<br>5 a copy of which is attached hereto.)<br>6 BY MS. REED:<br>7 Q Let me hand you Exhibit 194, please, sir.<br>8 Can you identify that as July 17, 2004, e-mail from<br>9 you to Mr. Binke?<br>10 A Yes.<br>11 Q Will you look under assessment, please,<br>12 the last sentence. Will you read that for the<br>13 record. Begins "at this time."<br>14 A "At this time there has been no<br>15 deescalation in the conflict and the threat to<br>16 personnel resulting in serious injury or loss of<br>17 life remains, and there are no current security<br>18 controls that would allow NBCU Security to<br>19 guarantee the safety and security of our personnel<br>20 without the prospect of serious injury or loss of<br>21 life."<br>22 Q Is that the assessment or conclusion that<br>23 you had reached by July the 17th, please, sir? | 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 416<br>25 THE WITNESS: Yes. | Plaintiffs' Objections:<br>416:25 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 417<br>1 BY MS. REED:<br>2 Q What was the purpose in you communicating<br>3 this particular written assessment to Mr. Binke? | Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.<br><br>Plaintiffs' Objections:<br>417:1-3 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.<br><br>Plaintiffs' Objections: |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 417**<br>5 THE WITNESS: This was an update of<br>6 information gathered regarding the security<br>7 Situation in Israel and our ability to protect our<br>8 assets, personnel, and reputation.<br>9 BY MS. REED:<br>10 Q Did this reflect any change in your<br>11 assessment since your July 10th written statement<br>12 on this subject? | 417:5-12 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| **Page 417**<br>14 THE WITNESS: No. | Plaintiffs' Objections:<br>416:14 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Wastes time; jury can be instructed that Plaintiffs moved production and why.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The |

| Deposition Designation | Objection & Response |
|---|---|
| | jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| **Page 438** <br> 15 (Defendant's Exhibit 222 was marked for <br> 16 identification by the Certified Shorthand Reporter; <br> 17 a copy of which is attached hereto.) <br> 18 BY MS. REED: <br> 19 Q Let me hand you Exhibit 222, sir. Can you <br> 20 please identify this as a July 28, 2014, e-mail you <br> 21 sent to Mr. Binke and Ms. Richmond entitled Israel <br> 22 Update? <br> 23 A Yes. <br> 24 Q Would you look under the bold heading <br> 25 Security Update to the second paragraph, sir, which | Plaintiffs' Objections: <br> 438:15-25 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) <br> Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. <br><br> Defendant's Response: <br> The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| **Page 439** <br> 1 says, "No change to NBC security position." Do you <br> 2 see that? <br> 3 A Yes. <br> 4 Q What were you communicating here? | Plaintiffs' Objections: <br> 439:1-4 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) <br> Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. <br><br> Defendant's Response: <br> The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also |

| Deposition Designation | Objection & Response |
|---|---|
| | fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 439<br>7 THE WITNESS: Exactly as it states here.<br>8 There was no change in our security position in<br>9 being able to safeguard the safety.<br>10 BY MS. REED:<br>11 Q Was that consistent with your<br>12 communications of July 10th and July 17th? | Plaintiffs' Objections:<br>439:7-12 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of the claim. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 439<br>16 THE WITNESS: Yes.<br>17 (Defendant's Exhibit 223 was marked for<br>18 identification by the Certified Shorthand Reporter;<br>19 a copy of which is attached hereto.)<br>20 BY MS. REED:<br>21 Q Can you identify Exhibit | Plaintiffs' Objections:<br>439:16-25 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant |

| Deposition Designation | Objection & Response |
|---|---|
| 223 as the<br>22 July 29th, 2014, e-mail from you to Mr. Binke and<br>23 Ms. Richmond entitled Israel Update 29 July?<br>24 A Yes.<br>25 Q At the very bottom, sir, do you see the | to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 440<br>1 statement, "No change to NBCU Security Advice"?<br>2 A Yes.<br>3 Q Was that your assessment of the security<br>4 situation as of July the 29th? | Plaintiffs' Objections:<br>440:1-4 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 440<br>8 THE WITNESS: Yes.<br>9 BY MS. REED:<br>10 Q Is that consistent with the | Plaintiffs' Objections:<br>440:8-11 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the |

| Deposition Designation | Objection & Response |
|---|---|
| reports that<br>11 you had provided July 10th and July 17th? | extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| | Plaintiffs' Objections:<br>440:13 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) |
| Page 440<br>13 THE WITNESS: Yes. | Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 441<br>18 (Defendant's Exhibit 224 was marked for<br>19 identification by the Certified Shorthand Reporter;<br>20 a copy of which is attached hereto.)<br>21 BY MS. REED:<br>22 Q Can you identify Exhibit 224, please, sir,<br>23 as an August 5th, 2014, e-mail you sent to<br>24 Mr. Binke entitled Israel Security Update?<br>25 A Yes. | Plaintiffs' Objections:<br>441:18-25 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 442<br>1 Q And in the second line down in bold you<br>2 state, "No change to NBCU security advice"; do you<br>3 see that?<br>4 A Yes.<br>5 Q Is it accurate that between July 10th and<br>6 August 5th you did not change your assessment in<br>7 regard to safety and security in Israel for<br>8 production? | Plaintiffs' Objections:<br>442:1-8 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 442**<br>12 THE WITNESS: Yes. | ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.<br><br>Plaintiffs' Objections:<br>442:12 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| **Page 442**<br>14 Q Were you continuing to receive information<br>15 and assess the safety and security situation in<br>16 Israel? | Plaintiffs' Objections:<br>442:14-16 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or |

| Deposition Designation | Objection & Response |
|---|---|
| | why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 442<br>20 THE WITNESS: Yes.<br>21 BY MS. REED:<br>22 Q What was the purpose of you communicating<br>23 the factual information in Exhibit 224 to Mr. Binke<br>24 on August 5th? | Plaintiffs' Objections:<br>442:20-24 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 443<br>3 THE WITNESS: To address the current<br>4 security situation in Israel.<br>5 (Defendant's Exhibit 225 was marked for<br>6 identification by the Certified Shorthand Reporter;<br>7 a copy of which is attached hereto.)<br>8 BY MS. REED: | Plaintiffs' Objections:<br>443:3-12 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value |

| Deposition Designation | Objection & Response |
|---|---|
| 9 Q Can you identify Exhibit 225 as an<br>10 August 8, 2014, e-mail from you to Mr. Binke<br>11 entitled Israel Security Update?<br>12 A Yes | of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 443<br>15 THE WITNESS: Yes.<br>16 BY MS. REED:<br>17 Q It begins, "Mark, FYI," bold, "no change<br>18 to NBCU security advice"; do you see that?<br>19 A Yes.<br>20 Q Why were you providing that report to<br>21 Mr. Binke on August 8th, 2014?<br>Page 443<br>24 THE WITNESS: To advise of the security<br>25 situation in Israel. | Plaintiffs' Objections:<br>443:15-21, 24-25 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208)<br>Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by |

| Deposition Designation | Objection & Response |
|---|---|
| | its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 444<br>1 BY MS. REED:<br>2 Q Was it your understanding that that was an<br>3 ongoing part of your job responsibilities as of<br>4 August the 8th, 2014? | Plaintiffs' Objections:<br>444:1-4 – 402, 403 Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 444<br>7 THE WITNESS: My job responsibilities<br>8 include assessing the security situation anywhere<br>9 we had interest or people wanted to know my advice<br>10 and opinion.<br>11 BY MS. REED: | Plaintiffs' Objections:<br>444:7-14 – 402, 403 Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. |

| Deposition Designation | Objection & Response |
|---|---|
| 12 Q All right. Sir, was Mr. Binke continuing 13 to seek your advice and opinion as of August 8th, 14 2014? | Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 444 18 THE WITNESS: On August the 8th, 2014, 19 yes. 20 BY MS. REED: 21 Q Was there any change in your assessment of 22 the safety and security situation between July 10th 23 and August 8th, 2014? | Plaintiffs' Objections: 444:18-23 – 402, 403 Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. Defendant's Response: The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 445 2 THE WITNESS: No. 3 (Defendant's Exhibit 231 was marked for 4 identification by the Certified Shorthand Reporter; 5 a copy of which is attached hereto.) 6 BY MS. REED: 7 Q Can you identify Exhibit 231 as an | Plaintiffs' Objections: 445:2-15 – 402, 403, MIL 2 (Dkt 209), MIL 3 (Dkt 208) Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial. To the extent used to suggest that Israel's conduct matters, not relevant for reasons stated by the Ninth Circuit. See MIL 3. Defendant's Response: The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by |

934

| Deposition Designation | Objection & Response |
|---|---|
| 8 August 19, 2014, e-mail from you to Mr. Binke<br>9 entitled Israel Update?<br>10 A Yes.<br>11 Q Your cover e-mail says, "Mark, FYI, no<br>12 change to NBCU security advice"; do you see that?<br>13 A Yes.<br>14 Q What was the purpose for you communicating<br>15 that to Mr. Binke on August 19, 2014? | its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 445<br>18 THE WITNESS: To make him aware of the<br>19 advice of NBC security.<br>20 BY MS. REED:<br>21 Q Were you continuing to gather information<br>22 and assess the safety and security situation as of<br>23 August 19th, 2014? | Plaintiffs' Objections:<br>445:18-23 – 402, 403 Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 446<br>1 THE WITNESS: Yes.<br>2 BY MS. REED:<br>3 Q Was there any change to your advice to NBC | Plaintiffs' Objections:<br>446:1-4 – 402, 403 Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 4 Universal as of August 19, 2014. | The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |
| Page 446<br>7 THE WITNESS: No. | Plaintiffs' Objections:<br>446:7 – 402, 403 Not relevant to defendant's denial of coverage; not reviewed by defendant at the time of denial.<br><br>Defendant's Response:<br>The witness' understanding of the facts are relevant to the underlying facts of loss. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. Further, F.R.E. 403 is conditional, and therefore not binding as to general admissibility. Objection also fails to state why exhibit is unfairly prejudicial; or why such alleged unfair prejudice outweighs its probative value; or why exhibit confuses the issue, misleads the jury, wastes time, or is cumulative. Furthermore, high probative value re: state of mind of all parties involved at the time of the claim. The jury is entitled to know what information NBC, ASIC, and other parties had at time of the facts giving rise to Plaintiffs' claims. "MIL" not clear what objection intended; description of the facts and process surrounding the claim is relevant and not prejudicial. |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| **Defendant currently intends to submit the following testimony to be played on videotape or a computer. However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | Plaintiffs object to Defendant's designations as follows: |

Page 15
2 BY MR. KEELEY:
3 Q State your name for the record, please.
4 A Susan Mindy Weiss.

Page 24
16 Q Have you remained employed with Aon since
17 1997?
18 A Yes.
19 Q All right. What positions have you held
20 with Aon during that time?
21 A I was an account executive. I was an
22 assistant vice president. I was a senior vice
23 president.
24 And now I'm still an officer of the
25 company, but I am the national contingency director.

Page 27

15 So you're aware that Aon was involved in
16 negotiating a motion picture TV policy between
17 Atlantic Insurance Company and NBCUniversal?
18 A Yes.
19 Q Did you have any involvement in the
20 discussions about that policy?
21 A Yes.

PLAINTIFFS' 106 COUNTER-DESIGNATION:

Page 27

22 Q What was your involvement, generally?
23 A I worked with individuals within the
24 company and with the carrier to negotiate terms and
25 conditions for a policy with Atlantic Mutual.

END PLAINTIFFS' 106 COUNTER-DESIGNATION

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| Page 30<br>1 Aon/Ruben."<br>2 Do you see that?<br>3 A Yes.<br><br>Page 31<br>10 Q Do you recall any discussions with anyone<br>11 at Atlantic about the imminent peril provision of<br>12 the policy?<br>13 And time period-wise, this would be before<br>14 the DIG claim was submitted by NBCUniversal.<br>15 A No.<br>16 Q Before the DIG claim arose, do you recall<br>17 any discussions with Atlantic about the war<br>18 exclusions of the policy?<br>19 A No.<br>20 Q Do you know whether there -- anyone on<br>21 behalf of Aon had discussions with Atlantic about<br>22 the war exclusions of the policy before the DIG<br>23 claim arose?<br>24 A No.<br>25 Q Before the DIG claim arose, do you know<br><br>Page 34<br>2 Q Eventually, Atlantic issued a policy to<br>3 NBCUniversal, correct?<br>4 A Yes.<br>5 Q And that was for the 2010-2011 policy year?<br>6 A Yes.<br>7 Q And it was renewed from 2011 to 2012,<br>8 correct?<br>9 A Yes.<br>10 Q And then from 2012 to 2013, correct?<br>11 A Yes.<br>12 Q And then from 2013 to 2014?<br>13 A Yes.<br>14 Q And then for the 2014 policy year, it was<br>15 actually renewed for an 18-month period; is that<br>16 correct?<br>17 A Yes.<br>18 Q And then after that policy expired,<br>19 2014-2015, Aon assisted NBC in taking the policy to<br>20 the market; is that right?<br>21 A We marketed the program.<br>22 Q All right. And do you recall what<br>23 insurance companies you marketed it to?<br>24 A Yes. | Plaintiffs' Objection:<br>Sentence cut-off |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| Page 102<br>10 BY MR. KEELEY:<br>11 Q What is your understanding of NBC's DIG<br>12 claim?<br><br>Page 102<br>15 THE WITNESS: NBC was filming a production<br>16 in Israel. They'd filmed the pilot episode. They<br>17 were on hiatus. They were getting ready to start<br>18 back up and tensions in Israel with Hamas became so<br>19 great that they had to push the production back to<br>20 wait until tensions died down.<br>21 And when they still didn't, they ended up<br>22 having to move and relocate the production<br>23 elsewhere.<br>24 BY MR. KEELEY:<br>25 Q How did you first learn that NBC would have<br><br>Page 103<br>1 to push production by a week because of the tensions<br>2 between Israel and Hamas?<br>3 A With a phone call.<br>4 Q From whom?<br>5 A Andrea Garber.<br>6 Q And what did Ms. Garber tell you?<br>7 A She advised that they were getting ready to<br>8 start back up and tensions were building with Hamas<br>9 and they didn't feel it was safe to continue at that<br>10 point based on advice from their security detail.<br>11 Q Do you know when that telephone call<br>12 occurred?<br>13 A I believe it was around July 11.<br><br>Page 103<br>20 Q Other than Ms. Garber telling you they were<br>21 getting ready to start back up filming and that<br>22 tensions were building up with Hamas, what else do<br>23 you recall her telling you?<br>24 A That they wanted to -- they were -- they<br>25 were considering pushing the production out about a<br><br>Page 104<br>1 week and were hoping that things would die down.<br><br>Page 104<br>12 Q Do you recall what you said to her in<br>13 response?<br>14 A I said, "Let's call Peter Williams and get<br>15 his thoughts on this."<br><br>Page 105 | |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| 10 Q Did you and she, then, call Peter Williams?<br>11 A Yes.<br>12 Q That same day?<br>13 A Yes.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 105<br><br>19 Q Okay. And so sitting here today, you<br>20 cannot recall any details that Ms. Garber told you<br>21 about the tensions that were building up between<br>22 Hamas and Israel, only that tensions were building<br>23 up?<br>24 A Yes<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br><br>Page 112<br>14 Q All right. And, in fact, you did -- you<br>15 being Aon and NBC -- submit a formal claim the<br>16 following Tuesday, correct?<br>17 A Yes.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 112<br><br>18 Q And from that point on, you began dealing<br>19 with people in the claims department as opposed to<br>20 Mr. Williams, correct?<br>21 A No.<br>22 Q You primarily dealt with Pamela Johnson and<br>23 Danny Gutterman as opposed to Mr. Williams; isn't<br>24 that correct?<br>25 A Yes.<br><br><br>Page 122<br>6 MR. KEELEY: Let me show you what has been<br>7 marked Exhibit 38, and it's previously been<br>8 identified as the 2014-2015 policy issued by<br>9 Atlantic to NBCUniversal.<br>10 Do you recognize it as such?<br>11 THE WITNESS: Yes –<br><br>Page 122<br>17 I think you said "Yes," but now that you've<br>18 had an opportunity to review the document, do you<br>19 recognize Exhibit 38 as the 2014-2015 Motion Picture<br>20 Television Producers Portfolio policy issued by | |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| 21 Atlantic to NBCUniversal?<br>22 A Yes.<br><br>Page 123<br>8 Q So, to the best of your recollection, prior<br>9 to July 11, you did not know that NBC was concerned<br>10 about the buildup of tensions between Hamas and<br>11 Israel and how they might potentially affect the<br>12 production of DIG?<br>13 A I actually do remember a short while before<br>14 that having some discussions on things might be<br>15 getting a little heated --<br>16 Q Who did you --<br>17 A -- with the -- it was with the client, I<br>18 believe.<br>19 Q Kurt Ford?<br>20 A Perhaps.<br>21 Q Tell me what you can recall about those<br>22 discussions.<br>23 A They had reached out and asked if -- they<br>24 said production was getting a little concerned with<br>25 some of the mounting tension and -- God, I'm trying<br><br>Page 124<br>1 to remember exactly what it was.<br>2 They -- they thought that they might want<br>3 to rearrange the schedule, I think. I can't be<br>4 100 percent certain, but they had asked if we<br>5 thought this might be a covered type of claim.<br><br>Page 124<br>11 Q All right. And what did you say when you<br>12 asked -- were asked whether you thought it might be<br>13 a claim that would be covered under the policy?<br>14 A Well, we discussed imminent peril. We<br>15 discussed civil authority. And at that point in<br>16 time, I didn't believe there was a trigger under<br>17 this policy for coverage.<br>18 Q Why did you not think there was a trigger<br>19 for coverage for civil authority?<br>20 A Because there wasn't anyone that I would<br>21 deem a civil authority saying, "This is way too<br>22 dangerous. We're going to pull your permits, and<br>23 you can't go there."<br>24 Q Why did you think that it was doubtful<br>25 there would be coverage for imminent peril?<br><br>Page 125<br>1 A Because at that point, they couldn't<br>2 definitively say it was so dangerous that it would<br>3 be unconscionable to continue.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION: | Plaintiff's Objections:<br>Page 123:8-<br>MIL,402,403<br><br>Defendant's Response:<br>"MIL" not proper<br>objection; the witness's<br>knowledge and experience<br>prior to the claim are<br>relevant; not unfairly<br>prejudicial to Plaintiffs, not<br>confusing, misleading or<br>cumulative evidence. The<br>witness is testifying to her<br>person knowledge and her<br>rationally based perceptions<br>of the facts and information<br>available during the claim<br>investigation. The<br>Witnesses understanding<br>and development of facts is<br>relevant to reasonableness<br>of claim decision, defense<br>of "bad faith" allegation<br>and damages sought;<br>relevant to show state of<br>mind, reasonableness, and<br>good faith claims handling<br>on part of ASIC; ASIC did<br>not have 9th Circuit opinion<br>to consider at the time, and<br>testimony regarding the<br>facts available to all parties<br>to form an understanding in<br>real time is critical for jury<br>to consider when evaluating<br>bad faith claims. |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| Page 125 | |
| 4 Q Does it have to be unconscionable to<br>5 continue for there to be coverage for imminent<br>6 peril? | |
| 12 THE WITNESS: I believe there is some<br>13 language in the policy that stated the damage to<br>14 person or property needs to be so great that it<br>15 would be unconscionable to continue, but I would<br>16 have to check the policy language.<br>17 BY MR. KEELEY:<br>18 Q When's the last time you reviewed the<br>19 policy?<br>20 A I don't recall. | |
| END PLAINTIFFS' 106 COUNTER-DESIGNATION<br>Page 126<br>3 Q All right. You've got the policy in front<br>4 of you, Exhibit 38. The extra expense, imminent<br>5 peril provision is at page ATL 001605.<br>6 A "...unreasonable or unconscionable to<br>7 ignore."<br>8 Q Where are you reading from?<br>9 A I am reading from Section 1(g).<br>10 Q So Insuring Agreement, 1, is the general<br>11 extra expense insuring agreement.<br>12 And then it has multiple subinsurance<br>13 agreements under A through H; is that correct?<br>14 A Yes. | |
| Page 149<br>10 Q Have you had a chance to review Exhibit 13,<br>11 Ms. Weiss?<br>12 A Yes.<br>13 Q Do you recognize that as a true and<br>14 accurate copy of a series of emails between yourself<br>15 and others at NBC and Aon concerning the increase in<br>16 intentions between Israel and Hamas in around<br>17 June 16th, 2014?<br>18 A Yes.<br>19 Q In the email that begins on the bottom of<br>20 the first page of Exhibit 13, it is an email from<br>21 Curt Williams to Debbie Kizner, cc'd to you.<br>22 And among other things, he asked whether or<br>23 not we have insurance coverage for the delay or a<br>24 shutdown.<br>25 Do you see that? | Plaintiff's Objections:<br>Pages 149:10 – 150:18<br>MIL 2; FRE 402-403<br><br>E-mail discussion among<br>Aon and UCP concerning<br>potential civil authority<br>shut-down over one month<br>before decision to leave<br>Israel. Irrelevant to<br>damages and whether<br>Defendant acted in bad faith<br>for denying a claim over<br>one month later.<br>Substantially more<br>prejudicial than probative<br>and likely to confuse the<br>issues. |
| Page 150<br>1 A Yes. | Defendant's Response:<br>"MIL" not proper |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| 2 Q And in response, you emailed Ms. Garber on 3 June 16th at 10:00 A.M. 4 Do you see that email? 5 A Yes. 6 Q And at the end of the email you say, "I 7 don't see coverage responding, unless permits were 8 pulled, etc." 9 Do you see that? 10 A Yes. 11 Q And the pulling of permits, I assume, 12 refers to the civil authority cover we reviewed 13 previously in the policy. 14 Is that correct? 15 A Yes. 16 Q Now, you don't mention anything about 17 imminent peril there, correct? 18 A No. <br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION: <br><br>Page 150 <br><br>19 Q Why is that? 20 A I don't recall. <br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | objection; the witness's knowledge and experience prior to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. The witness is testifying to her person knowledge and her rationally based perceptions of the facts and information available during the claim investigation. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| Page 151<br>1 Q Ms. Weiss, do you recognize Exhibit 55 as<br>2 containing some of the same emails from 13? And<br>3 then there were a couple of more recent ones<br>4 including one from Kurt Ford to you at the top of 55<br>5 dated July 1, 2:27.<br>6 Do you see that?<br>7 A Yes.<br>8 Q And in it he says to you, "So, under the<br>9 current portfolio, you don't think there is<br>10 coverage? If not, should I loop in Malika?"<br>11 Do you see that?<br>12 A Yes.<br>13 Q And Malika is Malika Adams, I take it.<br>14 A Yes.<br>15 Q And was she eventually looped in?<br>16 A Yes. | Plaintiff's Objections:<br>Page 151:1-16<br>MIL 2; FRE 402-403<br><br>E-mail discussion among Aon and UCP concerning potential civil authority shut-down weeks before decision to leave Israel. Discussing potential coverage under a different corporate policy held by Comcast. Irrelevant to damages and whether Defendant acted in bad faith for denying a claim based on the situation in Israel weeks later. Substantially more prejudicial than probative and likely to confuse the issues.<br><br>Defendant's Response:<br>"MIL" not proper objection; the witness's knowledge and experience prior to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. The witness is testifying to her person knowledge and her rationally based perceptions of the facts and information available during the claim investigation. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| | bad faith claims. |
| | |
| Page 152 | Plaintiff's Objections: |
| 15 Q Let me show you what's previously been | Page 152:15-154:18 |
| 16 marked Exhibit 16 and ask if you recognize that as a | MIL 2; FRE 402-403, 602 |
| 17 series of emails between you and others at Aon and | |
| 18 NBC during the period July 1 dating back to the | E-mail among Aon and |
| 19 earlier emails of June 15th. | UCP—not Atlantic—in |
| 20 Is that a true and accurate copy of the | which Ms. Weiss |
| 21 emails? | admittedly speculates as to |
| 22 A Yes. | whether there would be |
| 23 Q Okay. The very -- you'll see the middle | terrorism coverage under a |
| 24 email on Exhibit 16 is the one we just looked at on | separate policy held by |
| 25 Exhibit 55. It's the email from Kurt Ford asking | Comcast (about which she |
| | lacked personal knowledge) |
| Page 153 | and not the Atlantic policy |
| 1 whether you should loop in Malika Adams, correct? | at issue in this case. |
| 2 A Yes. | Therefore, irrelevant to |
| 3 Q And then you respond by saying, "If it's | whether Atlantic acted in |
| 4 your security detail that's saying it's not safe and | bad faith in denying |
| 5 you're choosing to shoot in a different location, | coverage under the Policy, |
| 6 this is looking more like a possible terrorism | substantially more |
| 7 coverage." | prejudicial than probative, |
| 8 Do you see that? | likely to confuse the jury |
| 9 A Yes. | and waste time. |
| 10 Q So in your view, it looked more like | |
| 11 coverage would be, if at all, under a terrorism | |
| 12 policy as opposed to the policy issued by Atlantic; | Defendant's Response: |
| 13 is that accurate? | The witness's knowledge |
| | and experience regarding |
| Page 153 | the claim and policy |
| 17 THE WITNESS: Not necessarily. | exclusions are relevant; not |
| 18 BY MR. KEELEY: | unfairly prejudicial to |
| 19 Q Is that not what you're saying there? | Plaintiffs, not confusing, |
| 20 A I'm saying terrorism cover not necessarily | misleading or cumulative |
| 21 terrorism policy. | evidence. The witness is |
| 22 Q I beg your pardon. | testifying to her person |
| 23 A Yeah. | knowledge and her |
| 24 Q Comcast had a property policy that included | rationally based perceptions |
| 25 terrorism coverage; is that correct? | of the facts and information |
| | available during the claim |
| Page 154 | investigation. The Witness' |
| 1 A Yes. | understanding and |
| 2 Q And is that what you were thinking about | development of facts is |
| 3 here? | relevant to reasonableness |
| 4 A I don't recall which -- terrorism under | of claim decision, defense |
| 5 which policy I was referring to here. | of "bad faith" allegation |
| 6 I think I might have been making a general | and damages sought; |
| 7 statement. I'm not sure. | relevant to show state of |
| 8 Q You say, "But I don't know how that policy | mind, reasonableness, and |
| 9 works." | good faith claims handling |
| 10 So you were referring to a policy other | on part of ASIC; ASIC did |
| 11 than the Atlantic policy? | |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| 12 A Most probably, yes.<br>13 Q Okay. So essentially what you were saying<br>14 is it looked like if there was coverage, it would be<br>15 under the terrorism cover of the Comcast property<br>16 policy; is that correct?<br>17 A I think that was very loose speculation on<br>18 my part.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 154<br><br>19 Q Speculation because you didn't know how the<br>20 other policy operated?<br>21 A Correct<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 156<br>1 Q Okay. I'm going to show you what's<br>2 previously been marked Exhibit 18.<br>3 Okay. I'd like to direct your attention to<br>4 the very first email on Exhibit 18. It's from<br>5 Malika Adams to Kurt Ford.<br>6 Do you see that email?<br>7 A Yes.<br>8 Q And she says, "In order to trigger coverage<br>9 under the production policy" --<br>10 That's the Atlantic policy, correct?<br><br>Page 156<br>15 THE WITNESS: I believe so.<br>16 BY MR. KEELEY:<br>17 Q -- "We would need a policy trigger as Susan<br>18 has mentioned. And even with that, we'd have to be<br>19 cautious because there is a war exclusion on the<br>20 policy."<br>21 Do you see that?<br>22 A Yes. | not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.<br><br>.<br><br>Plaintiff's Objections:<br>Page 156:1-22<br>MIL 2; FRE 402-403, 602<br><br>E-mail among Aon and UCP—not Atlantic—in which Ms. Weiss admittedly speculates as to whether there would be terrorism coverage under a separate policy held by Comcast (about which she lacked personal knowledge) and not the Atlantic policy at issue in this case. Therefore, irrelevant to whether Atlantic acted in bad faith in denying coverage under the Policy, substantially more prejudicial than probative, likely to confuse the jury and waste time.<br><br>Ms. Adams, a Comcast employee, speculates about the production policy—she testified she lacked personal knowledge about the Policy and had never read it. Speculation, lack of foundation, improper opinion. Irrelevant to whether Defendant acted in bad faith in denying coverage and substantially |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| | more prejudicial than probative. |
| | Defendant's Response: The witness's knowledge and experience regarding the claim and policy exclusions are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. The witness is testifying to her person knowledge and her rationally based perceptions of the facts and information available during the claim investigation. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| PLAINTIFFS' 106 COUNTER-DESIGNATION: Page 156 23 Q Does that refresh your memory that 24 Ms. Adams was concerned that the war exclusion might 25 apply to DIG's claim? Page 157 3 THE WITNESS: I don't know that she truly 4 had a concern. I think she was just pointing out 5 all the facts. END PLAINTIFFS' 106 COUNTER-DESIGNATION | Defendant's Objection: 156:23-25; 157:3-5 602, 701 Plaintiffs' Response: Necessary for under the Rule of Completeness if Defendant is permitted to offer Ms. Adams' speculation. Permissible lay opinion, not hearsay. |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| Page 157<br>3 THE WITNESS: I don't know that she truly<br>4 had a concern. I think she was just pointing out<br>5 all the facts.<br>6 (Exhibit 57 was marked for<br>7 identification by the court reporter<br>8 and is attached hereto.)<br>9 THE REPORTER: That is Exhibit 57.<br>10 BY MR. KEELEY:<br>11 Q Do you recognize Exhibit 57 as an email<br>12 from yourself to Andrea Garber -- a couple of emails<br>13 back and forth between yourselves -- and which is<br>14 attached an article on the conflict between Israel<br>15 and the Palestinians?<br>16 A Yes. | |
| Page 157<br>20 Did you periodically do research on the<br>21 conflict that was taking place between Israel and<br>22 Hamas?<br>23 A Yes.<br>24 Q And is this an example of one of the<br>25 articles you would have reviewed?<br><br>Page 158<br>1 A No.<br>2 Q No?<br>3 A I get notices from Variety, and they come<br>4 in regularly.<br>5 Q Okay.<br>6 A So it will just pop into my email. And if<br>7 I see something that involves one of my clients'<br>8 shows, I will forward it on.<br>9 Q Okay. And is that what happened here with<br>10 Exhibit 57, this email --<br>11 A Yes.<br>12 Q -- was sent to you that way?<br>13 A Yes.<br><br>Page 159<br>2 BY MR. KEELEY:<br>3 Q And if you look at the actual news article<br>4 from Variety, the third page, it says,<br>5 "Tensions are running high across<br>6 Israel as the worst fighting in years<br>7 between Israelis and Palestinians<br>8 shows no signs of abating, and<br>9 relentless rocket fire from Gaza has<br>10 sent citizens of every major city,<br>11 including Tel Aviv and Jerusalem,<br>12 routinely running for cover." | Plaintiff's Objections:<br>Pages 157:20-160:20<br>MIL 2; FRE 402-403, 602<br><br>Ms. Weiss's reaction to reading a Variety article about the situation in Israel is irrelevant to Defendant's bad faith in denying coverage. Defendant did not deny coverage based on the Variety article, or based on the plain and ordinary meaning of war. Defendant's denial letter admitted the special meaning requiring sovereignty.<br><br>Ms. Weiss was employed by a third-party, not Defendant. Likely to confuse the issues and waste of time.<br><br>Defendant's Response:<br>"MIL" not proper objection; the witness's knowledge and experience prior to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. The witness is testifying to her |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| 13 Do you see that?<br>14 A Yes, yes.<br><br>Page 159<br>25 Q What were you doing to try to determine<br><br>Page 160<br>1 whether there was coverage under the policy for the<br><br>Page 160<br>8 THE WITNESS: I think, as with any claim,<br>9 it would be a matter of reviewing policy language,<br>10 it would be speaking with carriers, it would be<br>11 gathering facts from the insured like we did in this<br>12 scenario.<br>13 BY MR. KEELEY:<br>14 Q And I take it you did review the policy<br>15 language, correct? You've testified to that<br>16 already?<br>17 A Yes.<br>18 Q Okay. And you spoke with Atlantic. You've<br>19 testified to that, in part?<br>20 A Yes. | person knowledge and her rationally based perceptions of the facts and information available during the claim investigation. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 165<br>13 BY MR. KEELEY:<br>14 Q Do you recognize Exhibit 60 as a series of<br>15 emails including one that you sent to Michael<br>16 Arevalo at Atlantic providing formal written notice<br>17 of the DIG claim?<br>18 A Yes.<br>19 Q And is this exhibit a true and accurate<br>20 copy of your communications with Mr. Arevalo and the<br>21 surrounding emails accompanying it?<br>22 A Yes.<br>23 Q So the first official written notification<br>24 you gave to Atlantic was on Tuesday, July 15th; is<br>25 that correct?<br>Page 166<br>3 THE WITNESS: Yes.<br><br>Page 166<br>5 Q The first written notification that you<br>6 provided to Atlantic of the DIG claim was on<br>7 July 15th, 2014; is that correct?<br>8 A Yes. | Plaintiff's Objections:<br>Pages 165:23-166:8<br>FRE 402-403<br><br>Notice is an element of liability for breach of the Policy. Defendant abandoned any affirmative defense to liability based on lack of proper notice in failing to raise it in opposition to summary judgment. Whether notice was "official" or "written" is irrelevant to Defendant's bad faith and substantially more prejudicial than probative and likely to confuse the issues.<br>Facts regarding ASIC's knowledge of the claim and the moments when ASIC was first informed of the |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| **Page 168**<br>1 Q And we previously established you spoke to<br>2 Mr. Williams on Friday the 11th -- 12th -- Friday,<br>3 the 11th, correct?<br>4 A Yes.<br><br>**Page 169**<br>13 Q So sitting here today, the first call you<br>14 remember having with Pamela Johnson and<br>15 Danny Gutterman was one in which you informed them<br>16 that NBC had made the decision to pull out of<br>17 Israel?<br>18 A Yes.<br><br>**Page 173**<br>1 Q How did you learn that it was looking like<br>2 they were going to pull out?<br>3 I assume you spoke with somebody at NBC.<br>4 A Yes.<br><br>**Page 173**<br>7 Q Who were you having your conversations with<br>8 at NBC primarily?<br>9 A Andrea Garber.<br><br>**Page 174**<br>7 Q So the next day, you and Ms. Garber decided<br>8 to call Ms. Johnson and Mr. Gutterman; is that<br>9 right?<br>10 A Yes.<br>11 Q And is that because you had learned that<br>12 NBC had made the decision to pull out of Israel, no<br>13 longer shoot DIG there?<br>14 A Yes.<br>15 Q And so you sent an email to Ms. Johnson and<br>16 Mr. Gutterman to schedule a call, correct?<br>17 A Yes.<br>18 Q And the call was scheduled for that<br>19 Thursday at 4:00 P.M.; is that correct?<br>20 A Yes.<br><br>**Page 175**<br>2 Q Do you recall anything that was said during<br>3 the call?<br>4 A I don't recall specifics.<br>5 Q What do you generally recall being<br>6 discussed?<br>7 A How the claim was transpiring and that<br>8 production was looking to shut down and relocate.<br>9 Q Did you explain why NBC had decided to move<br>10 out of Israel as opposed to postponing production?<br>11 A Yes. | claim are relevant for the jury's consideration of ASIC's actions because it demonstrates that the investigation proceeded reasonably and in good faith. The witness is testifying to her person knowledge and her rationally based perceptions of the facts and information available during the claim investigation. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| 12 Q What did you tell them was the reason?<br>13 A I recall that we discussed that Hamas had<br>14 been lobbing mortars and rockets into Israel and<br>15 there was severe risk of people being injured, and<br>16 it didn't look like the situation was going to<br>17 improve.<br>18 Q Did you tell them anything else?<br>19 A I don't recall.<br><br>Page 176<br>1 Q Do you recall anything that Mr. Gutterman<br>2 said on that call?<br>3 A I don't recall.<br>4 Q Do you recall anything that Pamela Johnson<br>5 said on that call?<br>6 A Yes.<br>7 Q What do you recall Ms. Johnson saying?<br>8 A We -- we touched on the fact that they may<br>9 be looking to invoke the war exclusion. It was<br>10 looking as though they were going to.<br>11 Q Okay. Do you recall exactly what she told<br>12 you?<br>13 A I do not.<br>14 Q But sitting here today, your impression is<br>15 she explained to you that it was looking as though<br>16 Atlantic would invoke the war exclusion?<br>17 A Yes.<br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 176<br><br>18 Q She didn't say, "We have decided to."<br>19 Instead it was, "It looks like we may invoke the war<br>20 exclusion"?<br>21 A I don't recall the exact words, but when a<br>22 carrier talks to you about exclusions, it's a good<br>23 sign that they're going to invoke an exclusion.<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br><br>Page 177<br>3 So to the best of your recollection,<br>4 sitting here today, did she say, "We're denying the<br>5 claim because of the war exclusion" or, "It's<br>6 looking like the war exclusion might apply"?<br>7 A She did not definitively say, "The<br>8 exclusion will apply."<br><br>Page 177<br>19 THE WITNESS: No.<br>20 BY MR. KEELEY:<br>21 Q Do you recall anything else being said | |

| **Deposition Designation of Susan Weiss** | **Objection & Response** |
|---|---|
| 22 during that call by Ms. Johnson?<br>23 A I don't.<br>24 Q Do you recall any timetable being discussed<br>25 for Ms. Johnson getting back to you with a<br><br>Page 178<br>1 definitive coverage opinion?<br>2 A Yes. She -- she gave us some -- I don't<br>3 recall the exact date, but she did give us a time<br>4 frame that she would get back to us.<br><br>Page 197<br>9 Q So the call with Danny Gutterman and Pamela<br>10 Johnson was on Thursday, July 17th.<br>11 And do you recall having a follow-up<br>12 conversation with them the following Tuesday in<br>13 which they informed you that they were denying<br>14 coverage?<br>15 A Yes.<br><br>Page 197<br>25 Q Tell me everything you can recall being<br><br>Page 198<br>1 discussed.<br>2 A That they were going to be sending out a<br>3 coverage opinion -- or the declination letter for<br>4 the coverage, and that's really all I remember.<br>5 Q Do you remember them telling you that they<br>6 had concluded that there was no coverage because of<br>7 the war exclusions?<br>8 A Yes.<br><br>Page 199<br>25 Q So you submitted the claim in writing on<br><br>Page 200<br>1 Tuesday, and the following Tuesday they informed you<br>2 that they were denying the claim.<br><br>Page 200<br>5 BY MR. KEELEY:<br>6 Q So, in light of that, is it your view that<br>7 Atlantic provided a coverage determination within a<br>8 reasonable period of time or did they take too long?<br><br>Page 200<br>14 THE WITNESS: They had already advised me<br>15 on I believe it was the 17th that they were going to<br>16 invoke the war exclusion.<br>17 I would have -- I would have expected the | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Pages 200:1-20<br>FRE 402-403, 602<br>Improper expert opinion by<br>a lay witness regarding<br>whether coverage<br>determination was offered<br>in a "reasonable period."<br><br>The witness is testifying to<br>the facts she has within her |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| 18 letter to have come at that time, if they had<br>19 already decided that the war exclusion was going to<br>20 apply. | personal knowledge, and the rationally based perceptions she formed as to those facts and the context of the claim decision. This type of testimony from a fact witness is proper.<br><br>Defendant's Response:<br>The witness's knowledge and experience prior to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. The witness is testifying to her person knowledge and her rationally based perceptions of the facts and information available during the claim investigation. The Witnesses understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| 21 BY MR. KEELEY:<br>22 Q Are you changing your testimony from<br>23 earlier in the day as to what Ms. Johnson told you<br>24 on Thursday the 17th?<br>25 Previously you testified that she told you<br><br>Page 201<br><br>1 the war exclusion might apply, but you acknowledged<br>2 that she did not tell you for certain that they were<br>3 denying the claim on the basis of the war exclusion.<br>4 So are you changing your testimony?<br>5 A No.<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 201<br><br>6 Q Okay. So she did not inform you that<br>7 Atlantic was denying the claim on Thursday,<br>8 July 17th, correct?<br><br>12 THE WITNESS: It was implied that they<br>13 were<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION | Plaintiff's Objections:<br>Pages 200:22-201:5:<br>Argumentative, assumes<br>facts not in evidence.<br><br>Counsel improperly and<br>inaccurately<br>summarizes/characterizes<br>Ms. Weiss's earlier<br>testimony in his question;<br>argumentative as to whether<br>her testimony is a "change"<br>from her earlier testimony.<br><br>The question was proper<br>and not misleading.<br><br>Defendant Response:<br>Testimony speaks for itself.<br>Implication is perceived by<br>witness, and it is up to the<br>trier of fact to determine<br>credibility of this<br>testimony; witness clearly<br>states that it was not told to<br>her that ASIC would deny<br>the claim, so the question is<br>proper characterization of<br>witness's testimony. |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| Page 201<br>14 BY MR. KEELEY:<br>15 Q It was implied because she told you that<br>16 they might apply the war exclusion.<br>17 So, from that, you concluded that they<br>18 would apply the war exclusion?<br>19 A Yes.<br><br>Page 201<br>24 But my question is: Do you think they took<br>25 too long from the time you submitted the claim in<br><br>Page 202<br>1 writing on Tuesday the 15th to the time they advised<br>2 you orally in that telephone conversation on the<br>3 22nd that they were denying the claim?<br><br>Page 202<br>8 THE WITNESS: I think a claim such as this<br>9 requires immediate notification. And I -- if they<br>10 already knew they were going down that path of<br>11 declining the claim due to the war exclusion, I<br>12 would have thought it might have come sooner.<br>13 BY MR. KEELEY:<br>14 Q Did you express to them in the beginning<br>15 that there was some urgency in getting a coverage<br>16 decision?<br>17 A Yes.<br>18 Q When did you express that? Was that on the<br>19 original call?<br>20 A That was probably expressed to them on<br>21 numerous occasions.<br><br>Page 203<br>10 Q So your best recollection today is from the<br>11 beginning, you informed Ms. Johnson and<br>12 Mr. Gutterman that there was some urgency in<br>13 reaching a claims decision?<br>14 A Yes.<br>15 Q And you made it clear to them that you<br>16 needed Atlantic to make a decision as soon as<br>17 possible so that NBC would know their view on<br>18 coverage?<br>19 A Yes. | Plaintiff's Objections:<br>Pages 200:1-20<br>FRE 402-403, 602<br>Improper expert opinion by a lay witness regarding whether it "took too long" for Atlantic to notify whether it was denying the claim. Irrelevant.<br><br>Defendant's response: The witness is testifying to the facts she has within her personal knowledge, and the rationally based perceptions she formed as to those facts and the context of the claim decision. This type of testimony from a fact witness is proper. The witness is testifying to her person knowledge and her rationally based perceptions of the facts and information available during the claim investigation. As to relevance, the Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| Page 206<br>3 Q Either you prepared it or you had someone<br>4 go back and obtain the information to put into the<br>5 document?<br>6 A Yes.<br>7 Q And would you have reviewed it before<br>8 providing it to Allianz?<br>9 A Yes.<br>10 Q And so do I understand correctly on the<br>11 first page of Exhibit 22, for instance, you've<br>12 listed all the claims that NBC had submitted for<br>13 coverage during the year 2005?<br>14 A Yes.<br>15 Q And so that would have totaled $1,424,978;<br>16 is that correct?<br>17 A Gross claims, yes.<br>18 Q And then for 2006, there's a list beginning<br>19 with teachers and ending with Las Vegas. And the<br>20 total claim amount was two point two six three<br>21 million five hundred seventy-three dollars, correct?<br>22 A Yes.<br>23 Q So if you turn to the page Bates labeled 15<br>24 for the policy year 2014, you've listed the claims<br>25 and the value of the claims NBC submitted during<br>the<br><br>Page 207<br>1 2014 policy year, correct?<br>2 A Yes.<br>3 Q All right. And there's two entries for<br>4 DIG. The first one is the extra expense entry; is<br>5 that correct?<br>6 A Yes.<br>7 Q And it's in the amount of $100,000; is that<br>8 right?<br>9 A Yes.<br>10 Q Now, when Atlantic asked you the value of<br>11 that claim, did you not tell them it was 250- to<br>12 $300,000?<br><br>Page 207<br>16 THE WITNESS: I didn't state a specific<br>17 amount.<br>18 BY MR. KEELEY:<br>19 Q Were you on the telephone when Andrea<br>20 Garber told them that NBC was estimating it at<br>21 250,000 to $300,000?<br><br>Page 207<br>25 THE WITNESS: I was on the call.<br><br>Page 208<br>1 BY MR. KEELEY: | Plaintiff's Objections:<br>Pages 206:3-208:15<br>FRE 402-403, 802<br><br>Statements by Ms. Weiss, a third-party, to a different carrier, Allianz, about Plaintiffs' various insurance claims dating back to 2005 are irrelevant to damages and Defendant's bad faith; also hearsay if offered to prove the truth of the matter asserted.<br><br>Defendant's Response:<br>The Witness' understanding and development of facts, the procedure applied while claim handling is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The statements are being used to show knowledge on behalf of the witness, not being offered for the truth of the matter asserted. |

| Deposition Designation of Susan Weiss | Objection & Response |
|---|---|
| 2 Q When she told them it was approximately 3 250- to $300,000? <br><br> <u>Page 208</u> <br> 6 THE WITNESS: I didn't recall the amount. <br> 7 She gave them the range. <br> 8 BY MR. KEELEY: <br> 9 Q You recall it was over $100,000? <br> 10 A Yes. <br> 11 Q So in this loss run that you submitted to <br> 12 Allianz, you've indicated the claim amount is only <br> 13 $100,000. <br> 14 Do you see that? <br> 15 A Yes. <br><br> PLAINTIFFS' 106 COUNTER-DESIGNATION: <br><br> <u>Page 208</u> <br><br> 16 Q Do you know why there's a discrepancy <br> 17 between what Ms. Garber indicated to Atlantic and <br> 18 what you provided on this loss run? <br> 19 A If a claim is open, they may insert a <br> 20 placeholder amount if they're not sure what the <br> 21 claim could be. <br><br> END PLAINTIFFS' 106 COUNTER-DESIGNATION | |

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Peter Williams, February 1, 2017 , Vol. 1  - CONFIDENTIAL | |
| **Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | |

Page 7
21  Q.  Good morning, Mr. Williams. As I
22       indicated, my name is Lucia Coyoca, and I
          represent
23       the plaintiffs in this matter.
24       Could you please state your full name and
25       address for the record.
Page 8
1   A.  Peter Donald Williams, 2047 Malcolm
2       Avenue, Los Angeles, 90025.

Page 11
8   Q.  Okay. Can you think of any reason why you
9       would not be able to answer my questions
         accurately
10      today?
11  A.  No.

Page 12
4   Q.  Okay. Why don't you just briefly describe
5       your educational background.
6   A.  So I have a degree in insurance matters
7       which was obtained from the City of London
8       University. And I have other qualifications in
9       claims handling, which were obtained from the
10      Institute of Insurance Adjusters, which is
         placed in
11      London.

25  Q.  Did you obtain any kind of certificate or

Page 13
1       degree from the Institute of Insurance?
2   A.  Yes. I'm an associate of the Chartered
3       Institute of Loss Adjusters.

| Deposition Designation | Objection & Response |
|---|---|
| 19 Q.  Your degree from -- in insurance from the<br>20       City of London University, is that a bachelor's<br>21       degree or the equivalent of a bachelor's degree<br>22       under the British system?<br>23 A.   It's actually equivalent of a master's<br>24       degree.<br>25 Q.   Okay. Can you -- I'm sorry. What year | |
| Page 14<br>7  Q.   What -- just briefly, going back to 1977<br>8       forward, can you please describe your work<br>9       experience.<br>10 A.   I started in London as an insurance<br>11      broker. I then transferred to claims as an<br>12      insurance loss adjuster. I traveled to various<br>13      parts of the world, the Middle East, Athens,<br>14      Belgium, New York, and eventually ended up in<br>15      Los Angeles. | |
| Page 18<br>22 Q.   Now, you said in 2009 you went to work for<br>23      OneBeacon; is that correct?<br>24 A.   Yes. | Plaintiff's Objections:<br><br><br>Defendant's Response: |
| Page 19<br>13 Q.   What were your responsibilities when you<br>14      worked as a claims manager for OneBeacon<br>15      Entertainment?<br>16 A.   I was in charge of overseeing the claims<br>17      made by the policies issued by OneBeacon<br>18      Entertainment and for negotiating and settling the<br>19      claims that were within my authority | |
| Page 22<br>19 Q.   How long did you work as a claims manager<br>20      for OneBeacon?<br>21 A.   Just over a year, maybe 15 months. I was<br>22      promoted in October of 2010.<br>23 Q.   And what were you promoted to?<br>24 A.   Initially I was promoted to head of<br>25      underwriting for OneBeacon Entertainment and shortly | |
| Page 23<br>1       thereafter to president of OneBeacon<br>        Entertainment.<br>2  Q.   When did you -- when were you promoted to<br>3       president of OneBeacon Entertainment? | |

| Deposition Designation | Objection & Response |
|---|---|
| 4    A.   Towards the end of October, 2010.<br><br>Page 30<br>13   Q.   Now, when you became president of<br>14         OneBeacon Entertainment in approximately late<br>15         October of 2010, what were your responsibilities?<br>16   A.   I was then the president of the<br>17         underwriting division. I was in charge of the<br>18         administration of the division, the underwriting<br>19         function, supervising the underwriters, supervising<br>20         the administration of the -- of the division from an<br>21         underwriting perspective.<br>22   Q.   And what, if any, relationship did you<br>23         have with respect to claims adjustment?<br>24   A.   None. It's kept entirely separate between<br>25         claims and underwriting.<br><br>Page 31<br>1    Q.   Even if you didn't have any formal<br>2          oversight or formal interaction with claims, did you<br>3          have a practice of keeping in touch with claims with<br>4          respect to the claims that were being adjusted for<br>5          OneBeacon Entertainment?<br>6    A.   Oh, yes. Because that obviously has a<br>7          direct -- loss ratio has a direct effect on<br>8          profitability.<br>9    Q.   So when you say "loss ratio has a direct<br>10         effect on profitability," first of all, what do you<br>11         mean by the term "loss ratio"?<br>12   A.   The ratio between the claims you pay<br>13         versus the premium you bring in.<br>14   Q.   And so that profitability analysis focuses<br>15         on the company's -- the insured's premium that<br>16         they're being charged and being paid versus the<br>17         claims that the insured is experiencing; is that<br>18         right?<br>19   A.   Yes. That's one aspect of it.<br>20   Q.   Okay. What are the other aspects of it?<br>21   A.   The expenses, the expense ratio, the<br>22         expenses of running the company. | |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 43**<br>1  Q.  At the end of your time with OneBeacon<br>2      when you were president of the company, was it your<br>3      understanding that OneBeacon claims handlers needed<br>4      to be thorough in their investigation of OneBeacon<br>5      Entertainment claims?<br>6  A.  Yes.<br>7  Q.  Just based on your years of experience in<br>8      the industry, what do you consider to be best<br>9      practices in terms of completing a thorough<br>10    investigation?<br><br>12    THE WITNESS: Well, yeah. That's an<br>13    open-ended question, depending on the type of claim.<br>14    So it can be a simple claim. It can be a<br>15    complicated claim. But to obtain a full<br>16    understanding of the circumstances of the loss and<br>17    the applicability of policy language.<br><br>**Page 58**<br>14  Q.  When did NBCUniversal begin to be insured<br>15      for purposes of its production portfolio by<br>16      OneBeacon?<br>17  A.  I believe that was 2010, as far as I<br>18      recall.<br>19  Q.  Were you involved in the negotiations with<br>20      NBCUniversal with respect to the coverage?<br>21  A.  Yes.<br>22  Q.  What was your role?<br>23  A.  They were represented by the brokers,<br>24      Aon/Ruben in New York. So through my New York<br>25      office, obviously it was a big client, a big policy,<br><br>**Page 59**<br>1      we negotiated backwards and forwards on the terms<br>2      and conditions of the policy. Aon actually produced<br>3      the wording and wanted us to use their wording for<br>4      NBC, which was based primarily on the previous<br>5      carrier. So there was some negotiation on that | Defendant'sResponse: |

| Deposition Designation | Objection & Response |
|---|---|

6    wording, also price level of SIR.

13  Q.  And who from OneBeacon Entertainment was
14      primarily responsible for negotiating the
       policy?
15  A.  Well, myself and, to a lesser extent,
16      Wanda Phillips, our OneBeacon underwriter in
17      New York.
18  Q.  Wanda Phillips, you indicated, is the
19      OneBeacon underwriter in New York; is that
       correct?
20  A.  She was. Correct.

Page 65
12  Q.  Okay. So the 2010 policy, the production
13      portfolio policy that was issued to
       NBCUniversal,
14      was that policy renewed?
15  A.  Yes.
16  Q.  For several years?
17  A.  Yes.
18  Q.  When was the last NBCUniversal OneBeacon
19      policy, to the best of your recollection?
20  A.  I have to backtrack because I think the
21      last one was an 18-month period. So that was a
22      little strange.
23      So '15, we would have renewed it in 2013,
24      I believe was the last one.
25  Q.  And it expired as of July, 2015?

Page 66
1   A.  I believe that was the case. Yes.

Page 66
8   Q.  What was your role in the renewal process?
9   A.  The broker would reach out primarily to
10     Wanda Phillips as the lead underwriter,
      indicate any
11     changes that they wanted to make to the policy
12     language, ask what we felt, in terms of terms
      and
13     conditions. Invariably the broker would ask for
      a
14     reduction in the premium.
15     And so I would have discussions with Wanda
16     Phillips. We would run loss runs, talk with
      claims
17     to see where claims was going, how much of
      the SIR
18     was to be spent or expended, discuss any

| Deposition Designation | Objection & Response |
|---|---|
| language changes the broker was requesting.<br>19<br>20 Q. You indicated that Wanda Phillips would<br>21 run loss runs; is that correct?<br>22 A. Yes.<br>23 Q. And did you review those loss runs?<br>24 A. Yes.<br><br>Page 76<br>17 Q. With respect to this particular policy,<br>18 the 2014 to June, 2015 policy, did you meet with<br>19 Ms. Garber and/or Ms. Weiss to discuss the policy<br>20 terms?<br>21 A. Yes. I believe so.<br>22 Q. What meeting or meetings do you recall in<br>23 that regard?<br>24 A. I remember we had a meeting at the offices<br>25 of Aon in Los Angeles.<br><br>Page 77<br>1 Q. Approximately when did that meeting occur?<br>2 A. Sometime prior to renewal. So probably --<br>3 probably early on, September time, 2013, to the best<br>4 I can recall.<br>5 Q. And who attended that meeting?<br>6 A. Myself; I believe Wanda Phillips was<br>7 visiting; Andrea, Susan Weiss, and maybe one or two<br>8 other people from Aon who worked on the account.<br>9 Q. To the best of your recollection, what was<br>10 discussed?<br>11 A. The claims, the involvement of the SIR on<br>12 the previous policy, what NBC intended to do in the<br>13 future, level of production they intended to incur,<br>14 what Aon was seeking for renewal terms.<br>15 Q. Let's break that apart.<br>16 What was discussed with respect to claims?<br>17 A. What claims had occurred, what claims were<br>18 still outstanding to be settled, what was the best<br>19 estimate of those claims.<br>20 Q. At the time of renegotiations of the<br>21 2014-15 policy, you had reviewed the loss runs for<br>22 the prior year; is that right? | |

| Deposition Designation | Objection & Response |
|---|---|
| 23　A.　Yes.<br>24　Q.　And did you have any concerns with respect<br>25　　　to the level of loss that had been incurred during<br><br>Page 78<br>1　　　the prior policy period?<br>2　A.　I believe I did. There had been<br>3　　　substantial claims, and we predicted the SIR was<br>4　　　going to be exceeded.<br>5　Q.　And that was for the 2013 policy; is that<br>6　　　right?<br>7　A.　I believe so. Yes.<br>8　Q.　And, in fact, was it?<br>9　A.　I believe it was. Yes.<br><br>14　Q.　As you -- in your mind, as you track the<br>15　　　performance of the policy from 2010 forward, do you<br>16　　　recall whether or not the policy was not profitable<br>17　　　from year to year?<br>18　A.　I remember there was one year it was<br>19　　　profitable. Maybe the first year. Then after that<br><br>Page 111<br>10　Q.　What, if anything, stands out in your mind<br>11　　　with respect to that renewal process, the 2014-15<br>12　　　renewal process?<br>13　A.　There had been many claims on NBC, and so<br>14　　　an analysis of the losses, the types of losses we<br>15　　　were seeing and an analysis of whether we wanted to<br>16　　　do the 18-month policy and what level of premium and<br>17　　　SIR we needed to make that work.<br>18　Q.　At that point in time, discussions re<br>19　　　renewal for the 2014-15 policy, were you considering<br>20　　　non-renewing the policy?<br>21　A.　I don't -- no, I don't think we considered<br>22　　　non-renewing. No.<br><br>Page 185<br>7　Q.　With respect to that time frame, July 10,<br>8　　　when did you first hear about the DIG claim? | |

| Deposition Designation | Objection & Response |
|---|---|
| 9  A.  Clarify "DIG claim." | |
| 10  Q.  The DIG claim that is the subject of this | |
| 11      lawsuit. | |
| 12  A.  Just -- the exact date, it was around | |
| 13      about that time. I believe it was a Friday | |
| 14      afternoon. So it would have been about then. | |
| 15  Q.  How did you become aware of it? | |
| 16  A.  I recall receiving a phone call, I | |
| 17      believe, from Susan Weiss. But it was Susan Weiss | |
| 18      and Andrea Garber on the phone. | |
| 19  Q.  And what did they tell you? | |
| 20  A.  Well, specifically I can't recall the | |
| 21      exact language. But they told me they had had | |
| 22      advice from their security people that there was | |
| 23      some hostilities going on in Israel. The security | |
| 24      people could not guarantee the safety of the cast | |
| 25      and crew. And a decision had been made to delay | |
|  | |
| Page 186 | |
| 1      sending the cast and crew back to Israel for one | |
| 2      week. | |
|  | |
| Page 187 | |
| 6  Q.  Okay. So let's just take that apart for a | |
| 7      minute. | |
| 8      First of all, then, at that point in time, | |
| 9      did you know if the rockets were coming from a | |
| 10     location outside of Israel? | |
| 11  A.  Yes. | |
| 12  Q.  Did you know who was responsible for | |
| 13     sending those rockets into Israel? | |
| 14  A.  I don't know if I knew then on that day. | |
| 15  Q.  Did you have an understanding generally | |
| 16     that it was a group that was some subset of what you | |
| 17     referred to earlier as "Palestinians"? | |
| 18  A.  From a general understanding of the | |
| 19     politics of that part of the world, yes. | |
| 20  Q.  Okay. So as of that Friday afternoon when | |
| 21     you were having the initial conversation, it was | |
| 22     your general understanding that rockets were being | |
| 23     fired into Israel by some group of Palestinians; is | |
| 24     that correct? | |
| 25  A.  Yes. | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 196 | |
| 24   Q.   Who was the head of claims for OneBeacon | |
| 25         Entertainment as of July, 2015, if you know? | |
| | |
| Page 197 | |
| 1    A.   Pamela Johnson. | |
| | |
| Page 198 | |
| 4    Q.   After NBCUniversal submitted a claim, to | |
| 5         the best of your recollection, on the 15th, what was | |
| 6         your next involvement? | |
| 7    A.   I think I had a discussion with Pamela | |
| 8         Johnson. I believe I would have told her about the | |
| 9         call on -- on Friday and discussed in general terms | |
| 10        the claim would have been submitted. | |
| 11   Q.   When did you have that call with | |
| | |
| 19   Q.   What did you tell Ms. Johnson about the | |
| 20        potential claim -- or, actually, it was a claim at | |
| 21        that point. | |
| 22        What did you tell Ms. Johnson about the | |
| 23        claim? | |
| 24   A.   I think we had a discussion that they were | |
| 25        making the claim under imminent peril; that they had | |
| | |
| Page 199 | |
| 1         said they could not guarantee the safety of their | |
| 2         crew. It seemed like a sensible suggestion not to | |
| 3         send them back into Israel. | |
| 4         I think Ms. Johnson said, based on the | |
| 5         hostilities and where they were at at that point, | |
| 6         there was a possibility the war risk exclusions in | |
| 7         the policy could be -- could be applicable. | |
| 8    Q.   And what was your response, if any? | |
| 9    A.   I -- my response -- I can't recall the | |
| 10        exact words. My response would have been, "You need | |
| 11        to investigate the claim and -- and handle it | |
| 12        accordingly." | |
| | |
| Page 200 | |
| 10   Q.   Prior to Ms. Johnson mentioning it to you, | |
| 11        had you considered the applicability of the war | |
| 12        exclusion? | |
| 13   A.   I hadn't considered anything. No. | |

| Deposition Designation | Objection & Response |
|---|---|
| 14 Q. When you indicated to her that she needed<br>15      to investigate, what did you mean by that?<br>16 A. Exactly that. She should investigate the<br>17      claim in the normal manner.<br>18 Q. And when you say "investigate the claim in<br>19      the normal manner," what specific things are you<br>20      thinking of that would be part of the investigation<br>21      of a claim being conducted in the normal manner?<br>22 A. The circumstances of the loss, the effect<br>23      of the loss to fully understand why the claim is<br>24      occurring, and the applicability of the policy<br>25      language.<br><br>Page 201<br>1 Q. Okay. And we talked about this generally<br>2      this morning but I want to go through a little more<br>3      specifically.<br>4      When you say the "circumstances of the<br>5      loss," what do you believe would constitute a<br>6      thorough investigation to understand the<br>7      circumstances of the loss? What would need to be<br>8      done?<br>9 A. We -- in general terms?<br>10 Q. Uh-huh.<br>11 A. We would need to understand what was<br>12      happening, what the effect of the hostilities were<br>13      on the production, why they were making the decision<br>14      they were.<br>15 Q. And how would whoever was investigating<br>16      the claim, how would they obtain that information?<br>17 A. They could talk with a representative of<br>18      NBC.<br>19 Q. Anything else?<br>20 A. Well, they could do general -- maybe<br>21      general Internet search, et cetera, of the -- of the<br>22      situation in Israel at that time.<br>23 Q. Anything else?<br>24 A. In general terms, no.<br>25 Q. In order to gain a complete understanding<br><br>Page 223<br>1 Q. Well, at this point in time on July 15,<br>2      2014, at 4:14 p.m., had you had a conversation yet | |

| Deposition Designation | Objection & Response |
|---|---|
| 3      with Ms. Johnson, to the best of your recollection? | |

3      with Ms. Johnson, to the best of your recollection?
4   A.   I've got to look at the timeline.
5      Not to the best of my recollection.
6   Q.   Okay. At this point in time had you
7      considered the possibility of the application of the
8      war exclusion to the client?
9   A.   Me?
10   Q.   Yes.
11   A.   No.
12   Q.   So what was the context in which you
13      understood Mr. Gutterman would be raising the
14      possibility that a ground war might develop?

18   Q.   Your understanding.
19   A.   He was informing me that there could be a
20      ground war developing or developed, and he attached
21      a news report which supported that.
22   Q.   Okay. And why was Mr. Gutterman -- what
23      was your understanding as to why he was telling you
24      that?
25   A.   Well, he was asking me here if I gave them

Page 224
1      advice to push longer than one week.
2   Q.   Okay. What I'm trying -- what I'm trying
3      to understand is, for purposes of investigating the
4      claim, why would it be important to know that a
5      ground war might be developing?
6   A.   For the application of the war risk
7      exclusion, I assume.

Page 225
17   Q.   Okay. When you said previously "for the
18      application of the war risk exclusion, I assume,"
19      what did you mean by that?
20   A.   That -- he was asking if the -- if -- in
21      advance of a push, since a ground war might still
22      occur. I mean, he's mentioning war. That's an
23      excluded situation in the policy.
24   Q.   Okay. But up to that point in time, was
25      it your view that the war risk exclusion did not

Page 226
1      apply?
2   A.   Well, I had no view on the matter at all.

| Deposition Designation | Objection & Response |
|---|---|
| 7   Q.  Did you have any discussion with<br>8         Mr. Gutterman about what he meant in terms of "since<br>9         a ground war might still occur," what he meant by<br>10        that?<br>11  A.  Not that I recall.<br>12  Q.  Did you have any conversations with him as<br>13        to why that would be important for purposes of<br>14        investigating the claim?<br>15  A.  Not that I recall.<br>16  Q.  You then responded that you had spoken to<br>17        them on Friday night, and you told them to do what<br>18        they felt was prudent.<br>19        Do you see that e-mail?<br>20  A.  Yes.<br>21  Q.  Okay. And in the subsequent e-mail<br>22        Ms. Johnson indicates that -- at 8:48 p.m. on<br>23        July 15 that there should be a call.<br>24        Do you see that?<br>25  A.  Yes.<br><br>Page 227<br>1    Q.  She also indicated, begin quotes:<br>2         "Danny and I had a conversation with Susan<br>3         and Andrea today about what the production's<br>4         plans were, but we didn't make any<br>5         representations about whether there was<br>6         coverage but we also did not alert them that<br>7         this might not be a covered claim," close<br>8         quotes.<br>9         Do you see that?<br>10  A.  Yes.<br>11  Q.  You then responded to Ms. Johnson with a<br>12        cc to Mr. Gutterman at 7:53 p.m., I'm assuming,<br>13        Pacific time, and -- could you please read your<br>14        response out loud.<br>15  A.  "Why is it not a covered claim they<br>16        have imminent peril. Unless you are going to<br>17        invoke the war exclusion.<br>18        "I am available between 1 and 3 my time."<br>19  Q.  Okay. So as of July 15 -- I'm sorry.<br>20        First of all, what did you mean by this<br>21        e-mail?<br>22  A.  Exactly what it says. I was asking if<br>23        they were raise -- if they had considerations of<br>24        coverage issues, I was asking them why. The only<br>25        thing I could think of was that the -- the war risk | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 228 | |
| 1          exclusions applied. | |
| 11   Q.   Okay. And I believe you indicated earlier | |
| 12          that you had not considered the potential | |
| 13          applicability of the war exclusion, at least as of | |
| 14          the point in time when Mr. Gutterman sent his e-mail | |
| 15          talking about a ground war developing; isn't that | |
| 16          correct? | |
| 17   A.   Yes. Based on what Andrea and Susan had | |
| 18          told me on Friday. The situation, there were | |
| 19          hostilities, but the indication was they hoped they | |
| 20          would settle down. So I had no understanding that a | |
| 21          war was going on in Israel or may have been going on | |
| 22          in Israel. | |
| 23          In fact, I just -- I think I may have | |
| 24          testified before that I was told rockets were going | |
| 25          backwards and forwards. I think the rockets were | |
| | |
| Page 229 | |
| 1          only going one way at that time. So there was every | |
| 2          indication based on what Andrea was telling me that | |
| 3          things were going to settle down. I told them they | |
| 4          should act prudently. | |
| | |
| Page 232 | |
| 17   Q.   At any point in time during the time that | |
| 18          this claim was pending, prior to July 28, the time | |
| 19          of denial of the claim, did you voice an opinion to | |
| 20          anyone at OneBeacon that -- as to whether the war | |
| 21          exclusion should or should not apply? | |
| 22   A.   Yes. Pamela Johnson. | |
| 23   Q.   And what did you tell Ms. Johnson? | |
| 24   A.   When she concluded that the -- the war | |
| 25          risk exclusions should apply and that she told me | |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 233**<br>1      she was going to deny, she explained why, and I<br>2      agreed it was reasonable to apply the exclusions.<br><br>**Page 234**<br>13  Q.  Did you ask to see any of the work or<br>14      analysis that she had performed?<br>15  A.  No. No. You mean a physical notes or<br>16      work? No.<br>17  Q.  Did she describe to you what she had done<br>18      in order to come to that conclusion?<br>19  A.  I believe so. Yes.<br>20  Q.  What did she tell you?<br>21  A.  She explained some of the research she had<br>22      done into the hostilities that were going on, the<br>23      extent of the hostilities, Hamas, what Hamas was<br>24      considered to be, the territory they governed. In<br>25      general, that's -- that's what she explained. | |

| Deposition Designation | Objection & Response |
|---|---|
| <u>Defendant's Designation of Peter Williams</u> | |
| **Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | |
| <u>Page 7</u><br>20   Q.   Good afternoon, Mr. Williams.<br>21   A.   Good afternoon.<br>22   Q.   Please spell your name for the record.<br>23   A.   Peter Williams, P-E-T-E-R W-I-L-L-I-A-M-S.<br>24         MR. HAYES: This is Exhibit 1.<br><br><u>Page 8</u><br>4   Q.   Do you recognize the document marked<br>5         Exhibit 1?<br>6   A.   Yes.<br>7   Q.   What is it?<br>8   A.   It's a lawsuit filed on behalf of<br>9         Universal Cable vs. Atlantic Specialty Insurance<br>10        Company.<br>11  Q.   It's a document filed in connection with<br>12        that lawsuit? That's your understanding?<br>13  A.   Yes.<br>14  Q.   I want you to turn to the page marked 6.<br>15  A.   Page 6?<br>16  Q.   Yeah. Page 6.<br>17  A.   Yes.<br>18  Q.   I want you to read the paragraphs marked<br>19        15, 16, 17, and 18, please, to yourself and let me<br>20        know when you're done. | Plaintiff's Objections:<br><br><br>Defendant's Response: |
| <u>Page 9</u><br>2   Q.   Just let me know when you are finished,<br>3         please.<br><br>17  Q.   Mr. Williams, have you finished reading<br>18        topic Nos. 15 through 18? | Plaintiff's Objections:<br><br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 19   A.   Yes.<br>20   Q.   Are you Atlantic's designee for topic 15?<br>21   A.   Yes.<br>22   Q.   Are you Atlantic's designee for topic 16?<br>23   A.   Yes.<br>24   Q.   Are you Atlantic's designee for topic 17?<br>25   A.   Yes.<br><br>Page 10<br>1   Q.   Are you Atlantic's designee for topic 18?<br>2   A.   Yes.<br><br><br><br>Page 12<br>1   A.   Yes.<br>2   Q.   Which ones?<br>3   A.   The policies.<br><br>16   Q.   Mr. Williams, do you recognize the<br>17          document marked Exhibit 2?<br>18   A.   Yes.<br>19   Q.   What is it?<br>20   A.   It's a copy of the insurance policy issued<br>21          to NBCUniversal Media effective January<br>              1, 2014.<br>22   Q.   It's your understanding that this is the<br>23          policy at issue in this lawsuit?<br>24   A.   Yes.<br><br><br>Page 14<br>10   Q.   Mr. Williams, do you have an<br>         understanding<br>11          of what underwriting is?<br>12   A.   Yes.<br>13   Q.   What is your understanding?<br>14   A.   It is the process of accepting an<br>15          insurance risk and agreeing the terms and<br>              conditions<br>16          for that risk.<br>17   Q.   And during your tenure at OneBeacon, how<br>18          did OneBeacon perform that function?<br><br>21          THE WITNESS: We had various<br>         underwriters<br>22          on staff who performed that function.<br><br>24   Q.   Was Wanda Phillips one of those<br>25          underwriters? | Plaintiff's Objections:<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br><br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 15** | Plaintiff's Objections: |
| 1  A.  Yes. | |
| 2  Q.  And what did they do specifically? | |
| | Defendant's Response: |
| 13  Q.  Go ahead, sir. | |
| 14  A.  The underwriters, in general terms, would | |
| 15      review the information submitted by the broker, | |
| 16      determine if a risk was acceptable, apply terms, | |
| 17      conditions, rates, agree the rates with the broker, | |
| 18      maybe prepare a quote if we were going to quote to | |
| 19      insure the risk. | |
| 20  Q.  And what factors would the underwriters | |
| 21      consider in determining whether the risk was | |
| 22      acceptable? | |
| **Page 16** | |
| 1      THE WITNESS: Well, it would depend | |
| 2      largely on the matter being insured, whether it was | |
| 3      within our appetite, and then various factors that | |
| 4      would affect the risk in particular. It would | |
| 5      depend on what that risk was, where it was located, | |
| 6      what rates would apply, what deductibles would | |
| 7      apply, history of the insured. There would be | |
| 8      numerous factors that would be considered. | |
| 10  Q.  Why is where it was located relevant? | |
| 11  A.  Two factors. It could be -- a physical | |
| 12      location could affect whether we wanted to insure a | |
| 13      risk and what rate we wanted to apply. Also within | |
| 14      the United States, you have to file in some states | |
| 15      terms and conditions with each state, and they can | |
| 16      vary from state to state. | |
| 17  Q.  Are you familiar with the DIG production? | |
| 18  A.  Yes. | |
| 19  Q.  Did NBCUniversal declare the DIG | |
| 20      production to the policy that you have in front of | |
| 21      you as Exhibit 1? | |
| 24  Q.  Exhibit 2. I'm sorry. | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 17 | |
| 2    THE WITNESS: Yes. In general terms, the | |
| 3    DIG production was declared to this -- to be insured | |
| 4    by this policy. | |
| 6  Q.  And did OneBeacon evaluate the DIG | |
| 7    production for purposes of determining whether to | |
| 8    accept the risks associated with it? | |
| 9  A.  Yes. | |
| 10  Q.  And what did OneBeacon do in connection | |
| 11    with that evaluation? | |
| 12  A.  We received the initial information from | |
| 13    NBC that they were at that time thinking about doing | |
| 14    the production in Israel. We asked numerous | |
| 15    questions about where, how, how long, what type of | |
| 16    production, what was the scenario for the script, | |
| 17    who was in it, where it was going to be filmed, what | |
| 18    precautions they were taking for the safety of their | |
| 19    cast and crew, travel arrangements. It was an | |
| 20    ongoing process backwards and forwards with NBC's | |
| 21    representatives. | |
| 22  Q.  Were you involved in that process? | |
| 23  A.  Yes. | |
| 24  Q.  In what capacity? | |
| 25  A.  As I was the head of underwriting at | |
| Page 18 | Plaintiff's Objections: |
| 1    OneBeacon at that time, I discussed the production | |
| 2    with Wanda Phillips, requested information, | Defendant's Response: |
| 3    requested her to find out additional information. | |
| 4    We discussed that information that was provided by | |
| 5    the brokers and NBC. | |
| 6  Q.  What information did you tell Wanda to | |
| 7    gather? | |
| 8  A.  Well, specifically, I can't recall. But I | |
| 9    mean, the general thrust was Israel is not -- it's | |
| 10    not difficult to insure productions in Israel, | |
| 11    particularly if they're in Tel Aviv. I was | |
| 12    concerned about the shooting in Jerusalem. | |

| Deposition Designation | | Objection & Response |
|---|---|---|
| 13 | So I wanted to know or at least obtain more details of | |
| 14 | the security in Jerusalem, what they intended to do | |
| 15 | in Jerusalem, how long they would be filming, how | |
| 16 | big a production it was. | |
| 17 | In general, those were the issues. | |
| 18 | Q. Why were you concerned with the shooting | |
| 19 | in Israel? | |
| 22 | THE WITNESS: I wasn't concerned with the | |
| 23 | shooting so much in Israel. Jerusalem can have | |
| 24 | instances of violence that could have interrupted | |
| 25 | filming. So we needed to know how much filming was | |

Page 19

| | | |
|---|---|---|
| 1 | going to be done in Jerusalem, was it under | |
| 2 | controlled conditions, was it every day, was it | |
| 3 | every week, was it weeks of filming. | |
| 5 | Q. How did you know that instances of | |
| 6 | violence in Jerusalem could interrupt filming? | |
| 7 | A. From my knowledge of the country, of my | |
| 8 | knowledge of filming, and issues in the country. | |
| 9 | Q. And what did that knowledge consist of? | |
| 10 | A. I knew in Jerusalem that there were | |
| 11 | instances of suicide bombers on buses, particularly | |
| 12 | in crowded areas that would disrupt everyday life in | |
| 13 | Jerusalem, and that could lead to interruption of | |
| 14 | filming on the streets. I could see where maybe | |
| 15 | local authorities would not want an American film | |
| 16 | crew on the streets if there had been an incident | |
| 17 | such as that in the area. | |
| 18 | So I was generally aware Jerusalem, as | |
| 19 | opposed to Tel Aviv, is a heightened security risk. | |
| 20 | Q. And why did that matter to OneBeacon? | |
| 21 | A. Well, if the film had been interrupted or | |
| 22 | stopped from filming due to such an | |

| Deposition Designation | Objection & Response |
|---|---|
| 23     incident, there<br>        could be coverage under the policy. | |

Page 20
2   Q.   So you stated that you were aware that
3        there were suicide bombings on occasion?
         Is that
4        what you said?
5   A.   Yes. Terrorist activity, likely.
6   Q.   So you're aware of the possibility of
7        terrorist activity in Jerusalem?
8   A.   Yes.

17  Q.   Do you have any other examples of
18       terrorist activity that you can recite?

Page 21
3   Q.   You've given one example.
4        Can you give me other examples?

8        THE WITNESS: A car bomb would be
         another
9        example.

11  Q.   Any others?
12  A.   A bomb in general, whether it's a pipe
13       bomb, car bomb, suicide bomber with a
         vest.

Page 22
20  Q.   When you say "terrorist activity," under
21       your understanding of that word, that
         phrase, could
22       terrorist activity be committed with a
         rocket?

Page 23
8        THE WITNESS: Yeah. Potentially with a
9        rocket, a terrorist could commit an act.

Page 25
22  Q.   I want to understand what you were
23       thinking at the time when the DIG
         production was
24       declared.
25       Do you understand?

Page 26
1   A.   Yes.
2   Q.   You said you were concerned with terrorist
3        activities in Jerusalem.
4        Is that your understanding?

8   Q.   Is that what you said?

| Deposition Designation | Objection & Response |
|---|---|

11     THE WITNESS: I was concerned with the
12     potential of everyday life being interrupted by
13     terrorist activity. Yes.
14  BY MR. HAYES:
15  Q.  Okay. And terrorist activity involves
16     violence? Is that your understanding?

21     THE WITNESS: Yes.
22  BY MR. HAYES:
23  Q.  And why Jerusalem? Why were you concerned
24     about terrorist activity in Jerusalem?
25  A.  Because, in my opinion, it occurs most

Page 27
1     often in Jerusalem and not in Tel Aviv, of the two
2     cities that DIG were going to visit.

13  Q.  Well, what was your concern?
14  A.  My concern was that an incident such as a
15     suicide bomber on a bus would interrupt filming for
16     a day of DIG. They would be prevented from filming
17     on the streets of Jerusalem.

Page 28
3  Q.  And did you discuss that concern with Aon
4     or NBCUniversal?
5  A.  Yes. I discussed it with Wanda Phillips,
6     and at some point I was also on the phone with
7     representatives of Aon.
8  Q.  In which that was discussed?
9  A.  The security in Jerusalem, yes.
10  Q.  Can you tell me everything that you recall
11     about that conversation.
12  A.  Well, specifically I can't recall the
13     exact words of the conversation. But the gist of
14     the conversation was exactly that: How long were
15     they going to be in Jerusalem, why were they going
16     to film in Jerusalem, what was the security in
17     Jerusalem.
18     We were concerned that if an incident
19     occurred, that filming would be interrupted for the
20     day by local authorities that would prevent

| Deposition Designation | Objection & Response |
|---|---|
| 21   them<br>from continuing to film. | |

PLAINTIFFS' 106 COUNTER-DESIGNATION:
Page 32
12 Q.  Did you ever tell anyone at NBCUniversal
13 or Aon that, in the event of a terrorist attack, any
14 interruption in production would not be covered?

17 THE WITNESS: No.
END PLAINTIFFS' 106 COUNTER-
     DESIGNATION

Page 33
18  Q.  Do you remember any conversations in which
19    you discussed whether or not there would be coverage
20    in the event of terrorist activity?
21  A.  With Aon?
22  Q.  Or NBCUniversal.
23  A.  Oh. No, I don't recall.
24  Q.  Why didn't you discuss that with them?

Page 34
2
3    THE WITNESS: It's not excluded by the
policy for the effects of a terrorist attack on the
4    production, which wasn't my concern.

6  Q.  Loss as a result of terrorist activity is
7    not excluded by the policy; correct?
8
9    THE WITNESS: Correct.

11  Q.  You understand that in July of 2014
12    NBCUniversal moved the production of DIG out of
13    Israel?

16    THE WITNESS: Yes.

Page 36
17  Q.  Did anyone ask you what your understanding
18    of the policy was in any respect in connection with
19    the evaluation of the DIG claim?

22    THE WITNESS: No.

**Objection & Response column:**

Plaintiffs' Objections:
33:18-24 – No objection if counter designation 32:12-14, 17 is included.  Counter is necessary to complete testimony that witness did not tell insured that terrorism would not be covered.

Defendant's Response:
No objection to counter designation.

Plaintiffs' Objections:
34:8 – includes attorney objection

Defendant's Response:
In depo objection removed.

| Deposition Designation | Objection & Response |
|---|---|
| 23  BY MR. HAYES:<br>24  Q.  You were involved in the evaluation of<br>25      whether or not to accept the DIG production<br>        as an<br><br>Page 37<br>1       insured production; correct?<br>2   A.  Yes.<br><br>20  Q.  And pursuant to that underwriting<br>21      function, OneBeacon evaluated the risks associated<br>22      with the production? Is that accurate?<br>23  A.  Yes.<br>24  Q.  And in evaluating the risks associated<br>25      with that production, OneBeacon evaluated whether or<br><br>Page 38<br>1       not it would accept those risks? Is that accurate?<br>2   A.  Yes.<br>3   Q.  And if so, on what terms? Is that accurate?<br>4<br>5   A.  Yes.<br><br>Page 48<br>8   Q.  And did you ever tell NBCUniversal or Aon<br>9       that loss caused by war would not be covered under<br>10      the policy?<br>11  A.  No. They're fully aware of that.<br>12  Q.  How do you know?<br>13  A.  Well, firstly, Susan Weiss has been in the<br>14      business for many years, firstly as a senior<br>15      underwriter at Chubb before going on Aon. And<br>16      Andrea Garber was a senior underwriter at Gee<br>17      Insurance Company.<br>18      Aon is the second, if not the biggest,<br>19      insurance brokers in the world. So they were<br>20      actually aware of the terms and conditions of the<br>21      policy.<br>22  Q.  How do you know they were aware that loss<br>23      resulting from war in Israel would not be covered?<br>24  A.  Loss resulting from war anywhere is not<br>25      covered. It's a standard exclusion in every policy. | Plaintiff's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| Page 49<br>1   Q.   And did you discuss with Aon or<br>2         NBCUniversal at any time what specific type of<br>3         violence in Israel would be considered a war under<br>4         the policy?<br><br>7         THE WITNESS: No.<br><br>9   Q.   Why not?<br><br>11        THE WITNESS: It wasn't warranted at the<br>12        time.<br>13  BY MR. HAYES:<br>14  Q.   Why wasn't it warranted?<br><br>16        THE WITNESS: The war exclusion is in the<br>17        policy. It's a standard exclusion. We spoke about<br>18        the -- the risks that we were concerned about at the<br>19        time.<br>20  BY MR. HAYES:<br>21  Q.   Which were what?<br><br>Page 50<br>1   A.   Well, as I previously testified, as well<br>2         as the usual risks associated with filming, we were<br>3         concerned about Jerusalem and the safety of the cast<br>4         and crew in Jerusalem in particular, in Israel in<br>5         general.<br><br><br>Page 54<br>10  Q.   Mr. Williams, you've been designated to<br>11        testify as to the communications between Atlantic,<br>12        on the one hand, and any of plaintiffs, NBCUniversal<br>13        or Aon, on the other hand, that relate to the<br>14        addition of DIG as an insured production.<br>15        Do you understand that to be a topic that<br>16        you've been designated to testify about?<br>17  A.   Yes.<br>18  Q.   So what I would like to know is: Based on<br>19        all of the communications that Atlantic had with | |

| Deposition Designation | Objection & Response |
|---|---|
| 20 NBCUniversal and Aon, did NBCUniversal and Aon<br>21 expect loss resulting from terrorist activity to be<br>22 covered under the policy?<br><br>Page 55<br>1 THE WITNESS: Yes. It's a reasonable<br>2 conclusion on the basis terror activity is not<br>3 excluded by the policy.<br><br>5 Q. And what is the basis for that testimony?<br><br>8 THE WITNESS: Yeah. I mean, they -- we<br>9 never had a conversation about whether terror was<br>10 excluded by the policy. It's not excluded by the<br>11 policy.<br><br><br>Page 57<br>21 Q. Why were you involved in the claim process<br>22 at all?<br><br>25 THE WITNESS: I don't know what you mean<br><br>Page 58<br>1 by claims process.<br><br>3 Q. The evaluation of the DIG claim, the<br>4 adjustment of the DIG claim.<br><br>8 THE WITNESS: I wasn't involved in either<br>9 of those activities.<br><br>11 Q. Did you ever offer your opinion as to<br>12 whether or not the claim was covered?<br><br>15 THE WITNESS: To who?<br><br>17 Q. Danny Gutterman?<br>18 A. No.<br>19 Q. Pamela Johnson?<br><br>22 THE WITNESS: After she informed me of<br>23 what her conclusion was and she explained to me why<br>24 she reached that conclusion, I did not object to the<br>25 conclusion she formed. | |

| Deposition Designation | Objection & Response |
|---|---|

Page 59
2   Q.   You didn't ever offer your opinion as to
3        whether or not there was imminent peril, for
4        example?

7        THE WITNESS: No.

Page 60
5   Q.   Okay. Did you ever ask Pamela or Danny
6        whether or not they would invoke the war
         exclusion?

9        THE WITNESS: Based on the way you're
10       asking that question, I -- when Pamela
         asked --
11       sorry. When Pamela stated she was
         considering the
12       war risk exclusion, I said, "Okay. Do the
         research,
13       and let me know why -- why you think that
         would
14       apply."

16   Q.  Why were you involved in the claims
17       process, Mr. Williams?

20       THE WITNESS: Well, first of all, that's
21       not the claims process. That's the claims
         manager
22       telling me, as president of the company, that
         she
23       may be invoking an exclusion on a major
         client with
24       a major broker. It was simply a matter of
         courtesy
25       to give me a heads-up.

Page 61
1        MR. HAYES: This is Exhibit 3.
2        (Exhibit 3 was marked
3        for identification.)

5    Q.  Do you recognize the document marked
6        Exhibit 3?

10       THE WITNESS: Yes.

12   Q.  I want you to read your e-mail dated
13       July 15, 2014, 7:53 p.m., into the record,
         please.

16       THE WITNESS: The entire thing or just
17       the -- or just the content?

| Deposition Designation | Objection & Response |
|---|---|
| 18  BY MR. HAYES:<br>19  Q.  Do you see where it says why is it not<br>20      covered -- "Why is it not a covered claim . . ."?<br>21      Do you see that sentence?<br>22  A.  Yes.<br>23  Q.  Please read that sentence and the one that<br>24      follows into the record. | |
| Page 62<br>2      THE WITNESS: "Why is it not a covered<br>3      claim they have imminent peril. Unless you are<br>4      going to invoke the war exclusion.<br>5      "I am available between 1 and 3 my time." | Plaintiff's Objections:<br><br>Defendant's Response: |
| 7  Q.  So you introduced the idea of invoking the<br>8      war exclusion; isn't that right? | |
| 12     THE WITNESS: No. I don't think that's<br>13     what that -- that conveys. | |
| 15  Q.  What does it convey?<br>16  A.  I think it was Pamela Johnson who said the<br>17      hostilities in Israel may reach the definition of<br>18      "war" as -- in -- or the exclusion of war.<br>19  Q.  And did you express an opinion on that<br>20      question at any time? | |
| Page 63<br>2  Q.  Based on your understanding of what the<br>3      insured's expectations were? | |
| 6      THE WITNESS: No. | |
| 8  Q.  Why not? | |
| 11     THE WITNESS: Because this is a claims<br>12     process. So Pamela Johnson determines coverage<br>13     under the policy. | |
| 15  Q.  This e-mail refers to a call that you and<br>16      Daniel Gutterman and Pamela Johnson had.<br>17      Do you see that?<br>18  A.  Yes. | |
| 23  Q.  And if you had that call, why -- why? Why<br>24      did you have it? | |
| Page 64<br>1      THE WITNESS: So that Pamela could explain | |

| Deposition Designation | Objection & Response |
|---|---|
| 2    to me how, why, what, where she was going to<br>3    investigate this claim. | |
| 5  Q.  Why did you need to know all that if it<br>6    was a claim and you were the head of underwriting? | |
| 8    THE WITNESS: Because this was a claim<br>9    which involved NBC, a major client of OneBeacon, and<br>10   Aon, a major broker in the industry. | |
| 12  Q.  Did you approve the decision to deny the<br>13   claim? | |
| 15   THE WITNESS: Well, the word "approve" is<br>16   misleading. I was told of the final decision to<br>17   deny the claim. I didn't object to the -- to the<br>18   reasons given. | |
| Page 65<br>11  Q.  And could you have objected to that<br>12   decision when you were told? | Plaintiff's Objections: |
| 15   THE WITNESS: I could have objected. It<br>16   wouldn't have changed the decision. | Defendant's Response: |
| 18  Q.  You couldn't have stopped it? | |
| 21  Q.  Is that what you're saying? | |
| 24   THE WITNESS: Correct. I couldn't have<br>25   stopped it. | |
| Page 67<br>2  Q.  Did you make the decision not to renew the<br>3   NBCUniversal account? | |
| 6   THE WITNESS: In discussion with -- with<br>7   others, yes. | |
| 11   THE WITNESS: Dennis Crosby and, to a<br>12   certain extent, Wanda Phillips. | |
| 14  Q.  Dennis Crosby testified that it was your<br>15   decision; is that correct? | |
| 19   THE WITNESS: Yeah. The decision -- it<br>20   was one of many decisions about policies non- -- to<br>21   be non-renewed. There was discussions | |

| Deposition Designation | Objection & Response |
|---|---|

22    with Dennis
23    Crosby as my superior as to why. There was
        discussions with Wanda Phillips as to where we saw
24    the account going. And the decision was made,
25    "Yeah. I think we should non-renew this."

Page 68
2   Q.   You made the decision not to renew it, and
3         Dennis Crosby agreed; right?

6    THE WITNESS: I don't know if it was that
7    black and white. It was in a discussion. We came
8    to the conclusion we should non-renew it.

16   Q.   Why did you decide not to renew the
17         policy?

19    THE WITNESS: There were several reasons.
20    The business practice at NBC had -- had changed in
21    terms of the scope and nature of the productions
22    they were insuring. OneBeacon Entertainment, in
23    conjunction with discussions with Dennis Crosby, we
24    were taking a different direction in the way the
25    business was going to be run and the risks we were

Page 69
1    going to insure. This was one of several insureds
2    that we had decided to non-renew.

4   Q.   And in determining whether or not to renew
5         the NBCUniversal policy, did you evaluate how much
6    in premiums OneBeacon would have to charge to recoup
7    its prior losses in claims paid to NBCUniversal?

10    THE WITNESS: That wasn't so much a factor
11    in the non-renewal of Universal. That was a factor
12    in if we decided to renew it, what terms and
13    conditions we would want to offer NBC.

| Deposition Designation | Objection & Response |
|---|---|

15  Q.  What was a factor?

17       THE WITNESS: The loss ratio.

19  Q.  How much it would take in premiums to
20       recoup the losses that OneBeacon had
         already paid
21       out; right?

25       THE WITNESS: It's more along the lines

Page 70
1        what terms and conditions we would have
         been
2        prepared to offer NBC going forward.

4   Q.  And what terms and conditions were those?

7        THE WITNESS: If we had gone forward,
         yes,
8        we would have needed an increase in
         premium, and we
9        would have needed a substantial increase in
         the SIR.

Page 72

20  Q.  And to recover and recoup the losses that
21       have been paid before; correct?

Page 73
2   Q.  Correct?

5        THE WITNESS: No. You can't always
         make
6        up the losses that you -- that you suffered.
7        Otherwise the rate you charged the insured
         would be
8        ridiculous.

10  Q.  But it was something that was considered?

14       THE WITNESS: It can be considered, but
15       it's just not possible to make up losses that
         you've
16       incurred.

18  Q.  It can be considered, and it was
19       considered; right?

22       THE WITNESS: I don't think we could
         have
23       charged a rate enough. So it wasn't a factor

987

| Deposition Designation | Objection & Response |
|---|---|
| 24    in what we were going to do going forward if we were | |
| 25    going to go forward. | |
| **Page 74** | |
| 2   Q.   When did you come to the conclusion that | |
| 3    you couldn't have charged a rate that was high | |
| 4    enough to recoup those prior losses? | |
| 8    THE WITNESS: When we began to look at | |
| 9    the -- the loss ratio. | |
| 11   Q.   And after you considered that, you decided | |
| 12    not to renew the policy; right? | |
| 15    THE WITNESS: No. That completely | |
| 16    misstates my testimony. We decided not to renew the | |
| 17    policy because OneBeacon Entertainment, as a | |
| 18    division of OneBeacon, was moving away from insuring | |
| 19    studios' large corporate risks. This was just one | |
| 20    of many on which non-renewal terms were offered. | |
| **Page 76** | Plaintiff's Objections: |
| 17   Q.   And I want you to go back to the exhibit | |
| 18    marked 1. Sorry. The exhibit marked 2. | |
| 19   A.   Yes. | |
| 20   Q.   That's the insurance policy at issue in | Defendant's Response: |
| 21    this case; is that right? | |
| 22   A.   That's correct. | |
| 23   Q.   And I want you to turn to the page marked | |
| 24    ATL 3083. | |
| 25   A.   Yes. | |
| **Page 77** | |
| 1   Q.   And I want you to read the exclusion Roman | |
| 2    numeral III, Arabic 1 into the record. | |
| 3   A.   "War, including undeclared or civil war; | |
| 4    or." | |
| 23   Q.   And looking at Exhibit 2, who drafted that | |
| 24    language? | |
| **Page 78** | |
| 2    THE WITNESS: The original policy language | |
| 3    was provided by Aon. | |

| Deposition Designation | Objection & Response |
|---|---|

Page 80
23  Q.  Who wrote it down in the policy? Who was
24       the scrivener?
25  A.  Well. you don't write it down. So Aon had
Page 81

1        given us a wording that they wished us to use.
2        During a proc- -- a long process that wording was
3        discussed. And eventually that wording was taken,
4        reformatted into the insurance policy here back in
5        2010.
6  Q.  When you say "reformatted," what do you
7       mean?
8  A.  The document that Aon gave us, I believe,
9       was in one page format. Once the wording was agreed
10      with Aon, it was reformatted into the way that
11      OneBeacon issued their policies.
12  Q.  But what do you mean by "reformatted"?
13      Like a cut and paste into the format that OneBeacon
14      issues its policies?
15  A.  Yes.

Page 82
6  Q.  And would they have literally performed a
7       cut-and-paste function, or would they have typed out
8       the language anew into the OneBeacon form?

10      THE WITNESS: That would be a
11      cut-and-paste.

13  Q.  Okay. And that applies with respect to
14      Roman numeral III(1), (2), (3), and (4) on
15      page 3083?

17      THE WITNESS: I have every reason to think
18      so. Yes.

Page 96
2  Q.  And this policy with a period of

| Deposition Designation | Objection & Response |
|---|---|
| 3      January 1, 2014, to June 30, 2015, referenced in<br>4      paragraph 4, that's Exhibit 2; is that right?<br>5   A.  Yes. | |

Page 128
2   Q.  Mr. Williams, when NBCUniversal notified
3        Atlantic that it wanted to add the DIG insured
4        production to the policy at issue in this case, did
5        you consider whether or not Atlantic should add a
6        terrorism exclusion to the policy?
7   A.  No.
8   Q.  Why not?
9   A.  The terrorism risk on a film or
10       entertainment policy is not that great compared to
11       other perils or claims that can occur. It has to be
12       pretty unlucky if a terrorist actually detonates a
13       bomb on -- on the film set or goes after a film set.
14       Until events in Paris where the terrorist actually
15       attacked a musical -- a music venue, there hadn't
16       been a terrorist attack specifically against an
17       entertainment risk.

Page 129
8   Q.  So Atlantic was okay accepting the risk of
9        loss caused by terrorism; right?

12       THE WITNESS: Yes.

Page 131
11   Q.  Can a loss be caused by terrorism and war?

15       THE WITNESS: At the same time?

17   Q.  Yes.

19       THE WITNESS: I don't think so.

21   Q.  Did you consider that when NBCUniversal

| Deposition Designation | Objection & Response |
|---|---|
| 22        proposed adding DIG to the policy?<br><br>Page 132<br>2   Q.   Whether or not a loss can be caused by<br>3         terrorism and war at the same time, did you consider<br>4         that, or anyone else at OneBeacon?<br><br>8         THE WITNESS: No. I don't think we<br>9         considered that --<br><br>Page 134<br>18  Q.   Based on all of that information OneBeacon<br>19        received, OneBeacon accepted DIG as an insured<br>20        production under the policy; right?<br><br>24        THE WITNESS: Yes. | |

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Teresa Gooley Wolf | Plaintiffs object to Defendants' designations as follows.  Where line numbers are not included with a page number, plaintiffs object to all designated testimony on the page cited. |
| **Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | |
| Page 6 | Plaintiff's Objections: No objection – Page 6:19-24. |
| 19 EXAMINATION<br>20 BY MS. COYOCA:<br>21 Q. Good morning, Ms. Gooley. Could you please<br>22 state your full name and address for the<br>23 record.<br>24 A. Sure. It's Theresa Anne, A-N-N-E, Gooley | Defendant's Response: |
| Page 9 | |
| 9 Could you please describe your<br>10 educational background starting from college<br>11 moving forward?<br>12 A. I graduated from the University of Minnesota,<br>13 Minneapolis, from the Carlson School of<br>14 Management with a finance degree, and then I<br>15 worked for a year, and then I went to law<br>16 school at Drake Law School in Iowa and<br>17 graduated in 1994. And then I -- let's see,<br>18 I'm trying -- yup, that's -- that is it.<br>19 Q. When did you receive your undergraduate<br>20 degree?<br>21 A. Nineteen ninety.<br>22 Q. And you indicated you worked for a year in<br>23 between undergrad and law school; is that<br>24 correct?<br>25 A. That's correct. | Plaintiff's Objections: No objection – Page 9:9-25.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 10**<br><br>1 Q. Where did you work?<br>2 A. I worked at Medtronic.<br>3 Q. Doing what?<br>4 A. More accounting-related things.<br>5 Q. Do you have any degrees beyond your JD from<br>6 Drake Law School?<br>7 A. No.<br>8 Q. No LLMs or anything like that?<br>9 A. No.<br>10 Q. Do you have any kind of certificates or<br>11 specializations in any particular legal area?<br>12 A. No.<br>13 Q. Have you attended any continuing legal<br>14 education that specifically focused on<br>15 insurance?<br>16 A. Yes.<br>17 Q. Can you please describe for me the nature of<br>18 such continuing legal education just<br>19 generally?<br>20 A. I've attended Tort Trial Insurance, they have<br>21 different events and I've attended those,<br>22 they focus primarily on first-party fidelity<br>23 coverage. I've, you know, just attended CLEs<br>24 here and there that may have addressed, like,<br>25 directors and officers insurance, | **Plaintiff's Objections:**<br>No objection – Page 10:1-25.<br><br>**Defendant's Response:** |
| **Page 11**<br><br>1 employment-related insurance, coverage<br>2 insurance in general.<br>3 Q. Okay. With respect to continuing legal<br>4 education, have you taken any seminars or any<br>5 kind of courses with respect to best<br>6 practices in terms of claims handling?<br>7 A. We -- at OneBeacon they did -- they had -- we<br>8 had training for different states, so I know<br>9 that I did some in California and -- but like<br>10 best practices just consistent with what the | **Plaintiff's Objections:**<br>No objection – Page 11:1-10.<br><br>**Defendant's Response:** |
| **Page 14**<br><br>12 Q. And can you please describe your employment<br>13 background just generally from graduation<br>14 from law school forward?<br>15 A. So after I graduated from law school, I<br>16 clerked for the District Court here in<br>17 Minneapolis for former Judge Sean Rice, and<br>18 then former Judge Kathleen Blatz, and I also | **Plaintiff's Objections:**<br>No objection – Page 14:12-25.<br><br>**Defendant's Response:** |

| Deposition Designation | Objection & Response |
|---|---|
| 19 did a rotation with -- she's a current judge, <br> 20 Lancaster, Joan Lancaster, Joan Ericksen <br> 21 Lancaster, it might be Joan Ericksen now. <br> 22 Then I worked at the Department of <br> 23 Commerce, the Minnesota Department of <br> 24 Commerce for, I want to say, maybe nine <br> 25 months, maybe a year, and then came over to <br><br> Page 15 <br><br> 1 Meagher & Geer, and worked at Meagher & Geer <br> 2 until I went over to what was St. Paul <br> 3 Companies, and that would have been in about <br> 4 2001. <br> 5 And at some point, I think it was <br> 6 2004, 2005, St. Paul and Travelers merged, <br> 7 and so I worked for what is now Travelers <br> 8 through two thousand -- November 2010, and <br> 9 then went to OneBeacon in two thousand -- <br> 10 November 2010, and left OneBeacon in December <br> 11 2015. I worked -- and I started at Travelers <br> 12 again in -- excuse me, June of 2016 and am <br> 13 currently at Travelers. <br> 14 Q. Okay. And the work that you did for the <br> 15 Minnesota Department of Commerce for <br> 16 approximately nine months to one year, what <br> 17 did you do while you were there? <br> 18 A. I worked in the division that -- that worked <br> 19 with the underground storage tanks and <br> 20 environmental cleanup of -- of, you know, <br> 21 underground storage-related tanks. <br> 22 Q. And you worked as a lawyer? <br> 23 A. Yes. <br> 24 Q. Your work for St. Paul Travelers the first <br> 25 time that you worked for them, what did you <br><br> Page 16 <br><br> 1 do for St. Paul Travelers? <br> 2 A. I was a claim handler. <br> 3 Q. Did you have any particular area of industry <br> 4 focus? <br> 5 A. When I initially started, I handled directors <br> 6 and officers, errors and omissions, <br> 7 employment and fidelity-related matters, and <br> 8 that was for about the first five years. And <br> 9 then thereafter I was the managing director <br> 10 for financial institutions, so focused on <br> 11 claims that our financial institution <br> 12 insureds had, so it could be anything from a <br> 13 community bank to a U.S. Bank to a former <br> 14 Lehman Brothers. <br> 15 Q. And what was your last position when you left <br> 16 Travelers? | <br><br><br><br><br><br><br><br> Plaintiff's Objections: <br> No objection – Page 15:1-25. <br><br> Defendant's Response: <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> Plaintiff's Objections: <br> No objection – 16:1-20; 16:23-25. <br><br><br><br> Defendant's Response: <br> Objection deleted. |

| Deposition Designation | Objection & Response |
|---|---|
| 17 A. Managing director.<br>18 Q. Okay. I believe you indicated you joined<br>19 OneBeacon entertainment in November of 2010;<br>20 is that correct?<br><br>23 THE WITNESS: Yeah, I went -- yes,<br>24 I went to OneBeacon in November 2010.<br>25 MS. COYOCA: Okay.<br><br>Page 17<br><br>1 BY MS. COYOCA:<br>2 Q. And what was your position when you were<br>3 first hired at OneBeacon?<br>4 A. Again in claims. I was the vice-president of<br>5 claims, so initially I oversaw the -- the<br>6 financial institution group and what --<br>7 what -- what is called the government risk<br>8 group and then the energy group.<br>9 Q. And how long did you handle that position<br>10 overseeing the financial institution group,<br>11 the government group and the energy group?<br>12 A. The government group I -- I've -- my whole<br>13 tenure at -- at OneBeacon I -- I oversaw.<br>14 Energy I oversaw -- OneBeacon ultimately<br>15 moved out of the -- out of energy, and so I<br>16 oversaw that up through the time that they<br>17 moved out of the energy in -- I'm trying to<br>18 think. I can't remember the exact date. I<br>19 want to say it probably was sometime in 2013,<br>20 but I don't remember the exact date.<br>21 Q. What about the financial institutions group?<br>22 A. So the financial institutions group, I<br>23 oversaw that group probably for about four<br>24 years, and then it transitioned over to<br>25 somebody else within OneBeacon.<br><br>Page 18<br><br>1 Q. And when you say you oversaw the financial<br>2 institution group or the energy group,<br>3 et cetera, what do you mean by the words<br>4 "oversaw"?<br>5 A. Each of -- each of those divisions within<br>6 OneBeacon had a claim manager and so I<br>7 oversaw that claim manager.<br>8 Q. What position, if -- if there were any<br>9 different positions other than a<br>10 vice-president of claims, did you hold while<br>11 you were employed by OneBeacon?<br>12 A. I think my position at all times was<br>13 vice-president of claims. I think -- strike<br>14 that. My -- it is -- my position at all | Plaintiff's Objections:<br>No objection – Page 17:1-25.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 18:1-25.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 15 times was vice-president of claims. The<br>16 groups that I oversaw changed during the<br>17 course of my tenure at OneBeacon.<br>18 Q. Other than the three groups that you've<br>19 already mentioned, what other groups did you<br>20 oversee?<br>21 A. I oversaw the technology group, and the<br>22 accident and health group, and the<br>23 entertainment group. I just want to make<br>24 sure I'm not missing one. And the<br>25 environmental group or excess and surplus. | |
| <u>Page 19</u> | <u>Plaintiff's Objections:</u><br>No objection – Page 19:1-6. |
| 1 Q. Did you oversee more than one claims manager<br>2 when you were overseeing the technology<br>3 group?<br>4 A. Yes.<br>5 Q. How many?<br>6 A. About five or six | <u>Defendant's Response:</u> |
| <u>Page 20</u> | <u>Plaintiff's Objections:</u><br>No objection – Page 20:18-25. |
| 18 Q. Okay. Focusing on the entertainment group --<br>19 A. Perfect.<br>20 Q. -- what was the -- who did you oversee at the<br>21 entertainment group?<br>22 A. Pamela Johnson.<br>23 Q. Okay. What was Pamela Johnson?<br>24 A. She was the -- the claim manager, I'm not<br>25 sure if that was the exact title, but the | <u>Defendant's Response:</u> |
| <u>Page 21</u> | <u>Plaintiff's Objections:</u><br>No objection – Page 21:1-25. |
| 1 claim manager of the entertainment group.<br>2 Q. Was there more than one claims manager for<br>3 the entertainment group while you were<br>4 overseeing it?<br>5 A. She was the head claim person. At some point<br>6 just before I left, we had another individual<br>7 come in and was a claim manager, but not<br>8 parallel -- it wouldn't have been a parallel<br>9 position to Pamela Johnson.<br>10 Q. When you say not a parallel position, what do<br>11 you mean?<br>12 A. Pamela -- Pamela oversaw the -- the whole<br>13 entertainment group and then reported up to<br>14 me. Her oversight included all the<br>15 individual claim handlers that handled the<br>16 entertainment claims and then loosely the<br>17 other groups that handled other -- that<br>18 handled other entertainment claims.<br>19 After Pamela's departure we had -- | <u>Defendant's Response:</u> |

| Deposition Designation | Objection & Response |
|---|---|
| 20 we hired a claim manager but he did not -- he<br>21 didn't have the experience Pamela did, so he<br>22 wasn't brought in at the level Pamela was.<br>23 Q. And Pamela Johnson, when she was the claims<br>24 manager, you indicated that there were<br>25 various claims handlers that reported to her;<br><br><br>Page 22<br><br>1 is that correct?<br>2 A. That's correct.<br>3 Q. How many?<br>4 A. I think about five or six.<br>5 Q. And how long did you oversee the<br>6 entertainment group, from what period of time<br>7 until the end?<br>8 A. I oversaw it through December of 2015. When<br>9 I started -- let's see, Pamela came in 2012.<br>10 I think I started probably in 2013.<br><br>22 Q. And who were the five or six claims handlers,<br>23 if you can recall, that Pamela oversaw in the<br>24 entertainment group?<br>25 A. Danny Gutterman, Lucy, and I apologize I | Plaintiff's Objections:<br>No objection – Page 22:1-10, 22-25.<br><br>Defendant's Response: |
| Page 23<br><br>1 can't remember Lucy's last name right now,<br>2 Elyse Reinke, Ryan, and I believe her name is<br>3 Christine, she sits out in Boston, and then<br>4 at one point also Jill, and I can't remember<br>5 Jill's last name either, sorry.<br>6 Q. Are any of these individuals that you just<br>7 identified, are any of them lawyers?<br>8 A. No, no.<br><br>19 Q. As the VP and over -- of claims and<br>20 overseeing, let's just focus on the<br>21 entertainment group, what did your<br>22 responsibilities entail?<br>23 A. I worked directly with Pamela. To the extent<br>24 I had questions about any claims or she had<br>25 questions, that would be something we talked | Plaintiff's Objections:<br>No objection – Page 23:1-8, 19-25.<br><br>Defendant's Response: |
| Page 24<br><br>1 about. We would talk generally about what<br>2 was going on within entertainment, you know,<br>3 what we were seeing based on claim -- claim<br>4 volume, types of claims. My oversight would<br>5 include staffing, you know, appropriate | Plaintiff's Objections:<br>No objection – 24:1-12; 24:15-25. |

| Deposition Designation | Objection & Response |
|---|---|
| 6 staffing, monitoring volume, assisting with<br>7 broker relationships, things like that.<br>8 Q. When an entertainment claim would come in,<br>9 would you receive notice of it?<br>10 A. No.<br>11 Q. When did you receive notice, if ever, that an<br>12 entertainment claim had been asserted? | Defendant's Response:<br>Objection deleted. |
| 15 THE WITNESS: At OneBeacon, with<br>16 the entertainment, the claims, it depended on<br>17 when they came in in terms of the time<br>18 period, but generally the claims were<br>19 supposed to be reported up through our<br>20 central reporting and that's when the claims<br>21 were set up.<br>22 Pamela Johnson would assign the<br>23 claims. There may be occasions where Lucy<br>24 would or Lucy would get a claim and then<br>25 she'd direct it to be set up. I would find | |
| Page 25 | |
| 1 out about particular claims if Pamela was<br>2 gone or if Pamela let me know about the<br>3 particular claim.<br>4 BY MS. COYOCA:<br>5 Q. But as a matter of routine course, you did<br>6 not necessarily receive notice of each<br>7 entertainment claim that was filed with<br>8 OneBeacon; is that correct?<br>9 A. That's correct. | Plaintiff's Objections:<br>No objection – Page 25:1-9.<br><br>Defendant's Response: |
| Page 38 | |
| 23 Q. In terms of overseeing Ms. Johnson's<br>24 management of entertainment-related claims,<br>25 what specifically were your duties? | Plaintiff's Objections:<br>No objection – Page 38:23-25.<br><br>Defendant's Response: |
| Page 39 | |
| 1 A. Again, I worked with Pamela on any<br>2 particularly large claims, any particular<br>3 claims that had significant coverage issues,<br>4 and then worked with her on staffing issues,<br>5 you know, reviewed claims, claim loads,<br>6 things of that nature.<br>7 Q. When you say you worked with her on large<br>8 claims, what specifically did that entail?<br>9 A. Well, if she had -- if we had any particular<br>10 large claims, she would flag -- flag them up<br>11 to me and we would generally have a<br>12 conversation about the particular claims, and<br>13 depending on the nature of the claim, may | Plaintiff's Objections:<br>No objection – Page 39:1-25.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 14 have several conversations.<br>15 Q. Did you review the work that Ms. Johnson had<br>16 done in investigating claims?<br>17 A. Generally, no.<br>18 Q. Would you -- when discussing particular<br>19 claims with Ms. Johnson, would you question<br>20 her with respect to the steps that she had<br>21 taken to investigate a claim?<br>22 A. I -- I may question her to make sure that I<br>23 understood what we had done and what her<br>24 conclusions were and, you know, what she<br>25 based those conclusions on.<br><br><u>Page 40</u><br><br>1 Q. Were there any occasions that you can recall<br>2 where you would direct Ms. Johnson to go back<br>3 and do additional work in investigating a<br>4 claim?<br>5 A. No.<br>6 Q. While you were overseeing Ms. Johnson's work,<br>7 did you provide any type of guidance with<br>8 respect to the steps that should be<br>9 undertaken when investigating a claim?<br>10 A. Generally, no. Pamela is an expert in the<br>11 area. To the extent we have a discussion and<br>12 we think of something that we would want to<br>13 probe further, we'd go forward with that, but<br>14 I trusted Pamela's judgment.<br>15 Q. You indicated that Ms. Johnson was an expert<br>16 in the area; is that correct?<br>17 A. Yes.<br>18 Q. What did you base that conclusion on?<br>19 A. She has significant experience handling<br>20 entertainment claims. She also was a trial<br>21 lawyer, has significant trial experience.<br>22 She's very bright, very articulate, and she<br>23 knows a lot of the players in the industry.<br>24 Q. And when you say, "She knows a lot of players<br>25 in the industry," what industry are you<br><br><u>Page 41</u><br><br>1 referring to?<br>2 A. Entertainment<br><br><u>Page 44</u><br><br>1 entertainment industry?<br>2 A. I'm not aware, no. | Plaintiff's Objections:<br>No objection – Page 40:1-25.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 41:1-2.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 3 Q. Okay. I'd like to show you a document,<br>4 Ms. Gooley, that has previously been<br>5 identified as an exhibit to Danny Gutterman's<br>6 deposition. So I'm going to go ahead and<br>7 give you that. (Hands document.)<br>8 And for the record, this document is<br>9 titled, "General Claims Practices," and it's<br>10 labeled Bates control numbers ATL000735<br>11 through 743. Could you please take a moment<br>12 to familiarize yourself with this document?<br>13 A. Yes.<br>14 Q. Please let me know when you're ready for<br>15 questions.<br>16 A. Okay. (Reviews document.) I'm done<br>17 reviewing the document.<br>18 Q. Thank you. Are you familiar with this<br>19 document?<br>20 A. Yes.<br>21 Q. What is it?<br>22 A. It's called the General Claims Practices.<br>23 Q. Were you familiar with it before you just<br>24 read through it?<br>25 A. Yes, I've seen it before. | Plaintiff's Objections:<br>No objection – Page 44:1-25.<br><br>Defendant's Response: |
| Page 45<br><br>1 Q. When did you see it?<br>2 A. When I was at OneBeacon.<br>3 Q. Was it the General Claims Practice --<br>4 practices that were in effect at the time<br>5 that you were working for OneBeacon?<br>6 A. Yes, it was. | Plaintiff's Objections:<br>No objection – Page 45:1-6.<br><br>Defendant's Response: |
| Page 68<br><br>12 BY MS. COYOCA:<br>13 Q. Ms. Gooley, was it necessary for you to be<br>14 informed as to every claim that Ms. Johnson<br>15 was going to deny before the denial was<br>16 conveyed to the client?<br><br>19 THE WITNESS: No, she -- she had<br>20 the authority to deny a claim.<br>21 BY MS. COYOCA:<br>22 Q. Were there particular parameters pursuant to<br>23 which Ms. Johnson was required to report to<br>24 you before she denied a claim?<br>25 A. We never had any express parameters. We had | Plaintiff's Objections:<br>No objection – 68:12-16;<br>68:19-25.<br><br>Defendant's Response:<br>Objection deleted. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 69 | |
| 1 worked together long enough, you just know<br>2 when you need to flag something up and talk<br>3 about it and when you -- you know, you can go<br>4 forward, so...<br>5 Q. When Ms. Johnson came to you to discuss a<br>6 claim and the fact that her recommendation<br>7 was going to be to deny the claim, did you<br>8 have any process that you would go through<br>9 with her in order to review the<br>10 determination? | Plaintiff's Objections:<br>No objection – 69:1-10;<br>69:13-25.<br><br><br>Defendant's Response:<br>Objection deleted. |
| 13 THE WITNESS: If Pamela and I were<br>14 talking about a denial, I would always want<br>15 to see the policy first and then I'd -- you<br>16 know, and then we'd have a discussion about<br>17 the facts of the claim and everything that<br>18 she knew and, you know, she'd outline why she<br>19 felt there was or was not coverage, and then<br>20 I'd ask any questions that I may have and,<br>21 you know, it really depended on the nature of<br>22 the claim, how many -- how many questions I<br>23 may or may not have had.<br>24 BY MS. COYOCA:<br>25 Q. Were there ever circumstances pursuant to | |
| Page 70 | Plaintiff's Objections:<br>No objection – 70:1-9;<br>70:11-20. |
| 1 which you would send Ms. Johnson back in<br>2 order to obtain additional facts or further<br>3 investigate the claim?<br>4 A. I can't recall any, no.<br>5 Q. You indicated that she'd outline the -- why<br>6 she felt there was or was not coverage. Did<br>7 you require that Ms. Johnson provide the<br>8 reasons why she felt there was or was not<br>9 coverage in writing? | Defendant's Response:<br>Objection deleted. |
| 11 THE WITNESS: No, not necessarily.<br>12 Again, you know, we'd have a conversation and<br>13 I'd want -- you know, we'd talk about the<br>14 facts, I'd want to look at the policy, we'd<br>15 talk through the coverage issues, whether<br>16 there was or was not coverage, and it may be<br>17 at the end of the day when the letter -- when<br>18 we're ready to issue a letter I may want to<br>19 look at it. But, generally, that was not<br>20 common practice. | |
| Page 93 | Plaintiff's Objections:<br>No objection – Page 93:10- |

| Deposition Designation | Objection & Response |
|---|---|
| 10 MS. COYOCA: I actually want to<br>11 move on to a new exhibit number, and I<br>12 believe we're on Exhibit 31. So Exhibit 31<br>13 will be an e-mail chain, and it's labeled<br>14 Bates control ATL001571 through 1572.<br>15 (Whereupon, Exhibit 31 was<br>16 marked for identification.)<br>17 THE WITNESS: (Reviews document.)<br>18 I've finished looking at it.<br>19 MS. COYOCA: Okay.<br>20 BY MS. COYOCA:<br>21 Q. Actually, before you -- I ask you about this<br>22 document, when is the first time you heard<br>23 about the Dig claim?<br>24 A. I think that -- I'm trying to remember if<br>25 it -- I think it was the day after Aon | 25.<br><br>Defendant's Response: |
| Page 94 | |
| 1 provided OneBeacon with formal notice of the<br>2 claim.<br>3 Q. And how did you hear about it?<br>4 A. From Pamela.<br>5 Q. Did she call you, send you an e-mail, ask for<br>6 a meeting?<br>7 A. I think -- I think this might have been how<br>8 she let me know about it.<br>9 Q. Okay. And by, "This," you mean Exhibit 31,<br>10 the e-mail exchange?<br>11 A. Yes.<br>12 Q. Okay. So do you recall any conversations or<br>13 communications with Ms. Johnson prior to<br>14 receipt of the e-mail exchange that's<br>15 contained in Exhibit 31?<br>16 A. I don't recall any conversations before this<br>17 e-mail, no. | Plaintiff's Objections:<br>No objection – Page 94:1-17.<br><br>Defendant's Response: |
| Page 103 | |
| 1 Q. At any point in time that you were involved<br>2 with the claim, did you gain an understanding<br>3 of what it exactly is that Mr. Gutterman was<br>4 doing?<br>5 A. I know that he was looking at different<br>6 outside, you know, articles, things like<br>7 that. But my primary correspondence --<br>8 communication -- my communication was with<br>9 Pamela.<br>10 Q. Did you have any conversations with<br>11 Ms. Johnson about the work that Mr. Gutterman<br>12 was doing?<br>13 A. I -- I don't recall.<br>14 Q. Did you have any conversations with her | Plaintiff's Objections:<br>No objection – Page 103:1-25.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 15 specifically about the outside sources, the<br>16 articles that Mr. Gutterman was consulting<br>17 with?<br>18 A. No.<br>19 Q. Did you provide any direction to Ms. Johnson<br>20 in terms of the use of Mr. Gutterman as a<br>21 resource to locate sources of information?<br>22 A. No, I did not.<br>23 Q. Directing your attention to the first e-mail<br>24 in the chain of Exhibit 31, which is the<br>25 July 16 e-mail from Pamela Johnson to<br><br>Page 104<br><br>1 Theresa Gooley, "Active War Exclusion, Are<br>2 you available for a short call," it indicates<br>3 that it was sent at 1:44 p.m. Do you see the<br>4 e-mail?<br>5 A. I do.<br>6 Q. Do you recall receiving the e-mail?<br>7 A. I do now. I mean, I wouldn't have remembered<br>8 an e-mail that long ago, but...<br>9 Q. Do you have any reason to believe that you<br>10 didn't receive it at or about the time it<br>11 indicates it was sent?<br>12 A. No.<br>13 Q. In the e-mail Ms. Johnson makes reference to<br>14 the fact that, "An imminent peril claim has<br>15 been made by NBC stemming from a production<br>16 that was shut down due to the rocket fire<br>17 into Tel Aviv and Jerusalem." Do you see<br>18 that?<br>19 A. I do.<br>20 Q. First of all, at that point in time did you<br>21 know what an imminent peril claim was?<br>22 A. I had heard of it, yes.<br>23 Q. What was your understanding of what an<br>24 imminent peril claim was?<br>25 A. Just that there was some immediate danger.<br><br>Page 105<br><br>1 Q. And what was your understanding as to what<br>2 the coverage would be?<br>3 A. I'd have to see the policy.<br>4 Q. There's a reference in the e-mail in the<br>5 second to the last line to the, "Israeli<br>6 Hamas conflict." Do you see that?<br>7 A. I do.<br>8 Q. At or about this time frame in July 2014,<br>9 what was your understanding of what Hamas was<br>10 or is?<br>11 A. It's an organization or a -- in the<br>12 Middle East in the Gaza Strip. | Plaintiff's Objections:<br>No objection – Page 104:1-25.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 105:1-25.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 13 Q. And, again, just focusing back on July 16, 14 did you know anything further about Hamas 15 other than it was an organization in the 16 Middle East in Gaza Strip? 17 A. I mean, you know, just general things that 18 you hear in the news, et cetera. 19 Q. Right. That's what I'm trying to get at. 20 What was your general understanding based on 21 news sources of what Hamas is? 22 A. Well, just what I said, it's in the 23 Middle East, I mean... 24 Q. Okay. Did you -- did you know what kind of 25 activities Hamas engaged in? Page 106 3 THE WITNESS: They -- I mean, 4 yeah, generally, they engage in quite a few 5 different activities. 6 BY MS. COYOCA: 7 Q. What activities were you aware of as of July 8 2014 that Hamas engaged in? 9 A. Just, you know, the bombing and the conflict 10 back and forth within Israel. 11 Q. And what was your understanding as to what 12 the conflict was with Israel? 13 A. At that time? 14 Q. Uh-huh. 15 A. Well, I think there's a whole number -- a 16 whole number of issues as to what the 17 conflict is, I guess. But, you know, at that 18 time I just -- I understood that, you know, 19 they were -- they were launching missiles 20 back and forth at each other. 21 Q. Okay. So it was your understanding that the 22 conflict involved Hamas and Israel launching 23 missiles back and forth at each other; is 24 that correct? 25 A. That's part of it. I mean, this is just an Page 107 1 initial e-mail, so I wanted to have a 2 conversation with Pamela. 3 Q. I completely understand, but -- 4 A. Yeah. 5 Q. -- I'm just asking for your -- your baseline 6 level of knowledge prior to getting into the 7 claim, I want -- I'd like to know what -- 8 gain your understanding of Hamas is and what 9 the conflict was about, so that's the reason 10 for the questions. | Plaintiff's Objections: No objection – 106:3-25. Defendant's Response: Objection deleted. Plaintiff's Objections: No objection – Page 107:1-25. Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 11 The -- the -- I'd like to focus on<br>12 the missiles going back and forth. Was it<br>13 your understanding that Israel was launching<br>14 missiles at Hamas in Gaza?<br>15 A. That's my understanding, yes.<br>16 Q. What was your understanding as to the reasons<br>17 why there was the conflict?<br>18 A. You mean generally why there's a conflict<br>19 between the two or the express reasons at<br>20 this time?<br>21 Q. Generally.<br>22 A. Generally? I -- I mean, there's a whole host<br>23 of reasons. I mean, it goes back to, you<br>24 know, thousands of years ago. But first and<br>25 foremost, it's over the -- over the land, | |
| Page 108 | |
| 1 over...<br>2 Q. And what land would that be?<br>3 A. Well, it's Israel.<br>4 Q. And this is not meant to be a history test, I<br>5 really just would like to understand your<br>6 base level of knowledge prior to getting into<br>7 the investigation of the land. What -- what<br>8 was the -- of the claim.<br>9 When you say there was a conflict<br>10 over the land and a conflict over the land of<br>11 Israel, what was that conflict?<br>12 A. Well, again, you know, there's -- there's --<br>13 they're fighting back and forth, there's<br>14 Gaza, there's the west bank, I mean, there --<br>15 and that's my understanding of what was going<br>16 on.<br>17 Q. And you consider Gaza to be separate, you<br>18 knew that it was separate from the West<br>19 Bank --<br><br>21 BY MS. COYOCA:<br>22 Q. -- at the time in July 2014 when this claim<br>23 first surfaced; is that right? | Plaintiff's Objections:<br>No objection – 108:1-19;<br>108:21-23.<br><br>Defendant's Response:<br>Objection deleted. |
| Page 109 | |
| 2 THE WITNESS: Yes. I mean, the<br>3 West Bank is up in this part of Israel,<br>4 (indicating), and the Gaza Strip is down --<br>5 down in the lower part, (indicating), so...<br>6 MS. COYOCA: Okay. And let the<br>7 record reflect that the witness was using her<br>8 hands to distinguish that there were two<br>9 different areas where the two land groups | Plaintiff's Objections:<br>No objection – 109:2-25.<br><br>Defendant's Response:<br>Objection deleted. |

| Deposition Designation | Objection & Response |
|---|---|
| 10 were located.<br>11 BY MS. COYOCA:<br>12 Q. Is that right?<br>13 A. That's correct.<br>14 Q. Okay. Now, as to the -- as to your<br>15 understanding of the reason why this<br>16 particular July 2014 conflict came into<br>17 existence, what was your understanding as to<br>18 that?<br>19 A. At this time?<br>20 Q. Uh-huh.<br>21 A. At this time I -- I had just -- Pamela had<br>22 just let me know, so I -- I needed to talk to<br>23 her. I didn't have any particular<br>24 understanding at that time.<br>25 Q. Got it. You responded the next day on<br><br>Page 110<br><br>1 July 17; is that correct?<br>2 A. Yes.<br>3 Q. Between your written response, the e-mail<br>4 response on July 17, and the time Ms. Johnson<br>5 sent the e-mail on July 16, did you have any<br>6 communications with her about the Dig claim?<br>7 A. My guess is that we did.<br>8 Q. Your guess. Do you specifically recall<br>9 having communications with her about it?<br>10 A. I know that we talked about it.<br>11 Q. So it's your belief that prior to the time<br>12 that you sent the July 17 e-mail, you had a<br>13 conversation with Ms. Johnson about the Dig<br>14 claim; is that correct?<br>15 A. I -- I would -- yes, that would be my belief<br>16 based on -- based on the type of claim that<br>17 she's talking about, yes.<br>18 Q. Okay. And do you recall specifically having<br>19 the conversation?<br>20 A. I -- I can't recall specifically, no.<br>21 Q. But it's your best estimate that, because of<br>22 the nature of the claim, you think it's<br>23 likely that you did have such a conversation?<br>24 A. Yes.<br>25 Q. Do you recall meeting with her or did you<br><br>Page 111<br><br>1 have a conversation by telephone, if you<br>2 recall?<br>3 A. Again, I don't recall. Most likely, it was a<br>4 telephone call.<br>5 Q. And what did Ms. Johnson tell you about the<br>6 claim during that call? | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 110:1-25.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 111:1-25. |

| Deposition Designation | Objection & Response |
|---|---|
| 7 A. Again, we would have discussed kind of 8 the -- the facts surrounding the initial -- 9 when the initial notice came in. We would 10 have talked about what she understood today. 11 We would have talked about anything that -- 12 any additional information that she had 13 gathered since the initial notice, things 14 like that, that would have been typical. 15 Q. Okay. What do you recall specifically as to 16 the facts surrounding the claim when the 17 initial notice came in that she told you? 18 A. I mean, the initial notice, I think the -- 19 was whether or not NBC was deciding whether 20 or not they were going to continue filming in 21 Israel. 22 Q. Anything else? 23 A. Well, they were -- the decision -- or they 24 were -- they were considering whether or not 25 to continue filming based on what was going<br><br>Page 112<br><br>1 on between Hamas and Israel. 2 Q. Did she tell you specifically any facts about 3 what was going on in -- in Israel at the 4 time? 5 A. I'm sure that she did. 6 Q. Do you recall any of the specifics as to what 7 she told you? 8 A. I mean, I'm sure that she -- that she would 9 have mentioned just the rocket fire, she 10 would have mentioned just the -- you know, 11 the ground troops, the bombings, you know, 12 the -- what was going on that made, you know, 13 the area unsafe, what Israel was doing, what 14 Hamas was doing. 15 Q. So during this initial phone conference or 16 conversation, you believe that Ms. -- 17 Ms. Johnson talked about ground troops? 18 A. I said that we probably would have talked 19 about what was going on. So, again, I don't 20 have the express recollection of exactly what 21 she told me two years ago, but... 22 Q. Okay. Did this conversation, to the best of 23 your recollection, did it take place on 24 the -- on the 16th when you first received 25 the e-mail at about 1:44 p.m.?<br><br>Page 113<br><br>1 A. My guess is it either would have taken place 2 that evening or early the next morning. 3 Q. And, again, focusing specifically on 4 ground -- the question of ground troops, do | Defendant's Response:<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections: No objection – Page 112:1-25.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 5 you have a specific recollection that<br>6 Ms. Johnson spoke to you about ground troops<br>7 at the time that you had that first telephone<br>8 call?<br>9 A. Not on the first -- I mean, I'm just -- no,<br>10 specifically, I can't remember exactly what.<br>11 Q. What did she tell you -- I understand it may<br>12 not have been on the first conversation, but<br>13 what did she tell you about ground troops?<br>14 A. Again, I mean, when we would have had our<br>15 conversations over the course of the claim,<br>16 she would have told me everything that she<br>17 had gained, all the information she gathered<br>18 based on her investigation.<br>19 Q. Right. I'm focusing, though, specifically on<br>20 ground troops. What did Ms. Johnson tell<br>21 you, if anything, about ground troops?<br>22 A. I would -- that -- that Israel is putting<br>23 together ground troops and calling, you know,<br>24 together their military arm.<br>25 Q. And when's the first time that you can | Plaintiff's Objections:<br>No objection – Page 113:1-25.<br><br>Defendant's Response: |
| Page 114<br><br>1 recollect that Ms. Johnson spoke with you<br>2 about ground troops?<br>3 A. Again, it would have been sometime during the<br>4 course of our conversations.<br>5 Q. But you don't know whether or not it was at<br>6 this very initial stage when you first<br>7 received notice about the claim on July 16 or<br>8 at some later point --<br>9 A. I don't.<br>10 Q. -- is that right?<br>11 A. That's correct. | Plaintiff's Objections:<br>No objection – Page 114:1-11.<br><br>Defendant's Response: |
| Page 116<br><br>23 Q. And -- and do you recall, as you sit here<br>24 today, any of the specific things that she<br>25 told you that were going on? | Plaintiff's Objections:<br>No objection – Page 116:23-25.<br><br>Defendant's Response: |
| Page 117<br><br>1 A. Again, like I said, she would have mentioned<br>2 all the different things that were going on<br>3 in terms of military weapons, you know,<br>4 tanks, ground troops, airplanes, missiles,<br>5 things of that nature.<br>6 Q. Anything else aside from military weapons,<br>7 tanks, ground troops, airplanes, missiles, | Plaintiff's Objections:<br>No objection – Page 117:1-15.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 8 things of that nature, anything else?<br>9 A. We would have talked about the policy, of<br>10 course. We would have talked about anything<br>11 that she had further gleaned -- further<br>12 understood from NBC. We would have again<br>13 talked about what -- again, the conclusion,<br>14 what -- what she had found, what research she<br>15 had done, what she had looked at.<br><br>Page 118<br><br>5 right now.<br>6 Q. Okay. Now, you indicated that you believe<br>7 that she told you about all the resources<br>8 that she had looked at; is that correct?<br>9 A. That's correct.<br>10 Q. What resources did she tell you she had<br>11 looked at?<br>12 A. My understanding is that she looked at news<br>13 clippings, news articles, resources available<br>14 online and -- and -- yeah, those were things<br>15 that she looked at.<br>16 Q. News clippings, articles and online articles;<br>17 is that right?<br>18 A. Online broadcasts as well, broadcasts, and<br>19 then I think she tried also to get<br>20 multitude -- kind of multiple different<br>21 sources as well.<br>22 Q. What are the other multiple different<br>23 resources?<br>24 A. Well, I think we wanted to look at what, you<br>25 know, CBS, NBC, CNN, to the extent, you know,<br><br><br>Page 119<br><br>1 the BBC, things like that.<br>2 Q. So just so I understand, Ms. Johnson told you<br>3 that she was looking at, she, Ms. Johnson,<br>4 was looking at these various news sources,<br>5 CBS, NBC, CNN, to see what they were saying<br>6 about the conflict?<br>7 A. She said she was doing -- yeah, doing<br>8 significant research, yes.<br>9 Q. Did she tell you that she was doing the<br>10 research or that Danny Gutterman was doing<br>11 the research?<br>12 A. I don't think she distinguished for me, no.<br>13 Q. Did Ms. Johnson provide you with copies of<br>14 any of the news clippings or articles that<br>15 she had indicated she was looking at<br>16 reviewing? | Plaintiff's Objections:<br>No objection – Page 118:5-25.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 119:1-17.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 17 A. I don't recall.<br><br>Page 126<br><br>9 Q. Do you generally recall that you discussed<br>10 the war exclusions with Ms. Johnson in the<br>11 context of the Dig claim?<br>12 A. Yes.<br>13 Q. Generally, what do you recall?<br>14 A. I think we would have discussed what she --<br>15 you know, what research she had done, what --<br>16 you know, what she -- what she had received<br>17 from NBC, we would have looked at the policy,<br>18 and given those facts we would have, you<br>19 know, discussed whether or not we thought<br>20 there was coverage based on the -- the war,<br>21 warlike exclusions in the policy.<br>22 Q. Do you believe any of those discussions in<br>23 the context of what research had been done,<br>24 what she had received from NBC, her look at<br>25 the policy, had any of that occurred at the<br><br>Page 127<br><br>1 time you initially spoke to her on the 16th<br>2 or 17th?<br>3 A. We probably would have had initial<br>4 conversations. I don't know how far along<br>5 she would have -- I mean, she -- how much<br>6 information she would have put together by<br>7 that point.<br>8 Q. What, if anything, do you recall in terms of<br>9 the specifics as to what Ms. Johnson had for<br>10 you with respect to the claim the first time<br>11 you talked?<br>12 A. Again, I -- I can't recall the express<br>13 conversation. All I can remember is over the<br>14 course of the -- you know, over the course of<br>15 the life of the claim what we would have --<br>16 what we talked about.<br>17 Q. Were you at all surprised by Ms. Johnson's<br>18 invocation of the potential applicability of<br>19 the war exclusion coming so shortly after the<br>20 claim having been tendered?<br>21 A. I don't know that I would say I was<br>22 necessarily surprised. I think that -- I<br>23 think that you always look at the coverages,<br>24 and given the nature of -- you know, given<br>25 the nature of what was going on at that time,<br><br>Page 128 | Plaintiff's Objections:<br>No objection – Page 126:9-25.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 127:1-25.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections: |

| Deposition Designation | Objection & Response |
|---|---|
| 1 that necessarily would have been an issue 2 that we would have considered. 3 Q. After you received -- or did you eventually 4 look at the policy in the context of this 5 claim? 6 A. Yes. 7 Q. Okay. And the policy has previously been 8 marked as Exhibit 1 at the Peter Williams 9 deposition. Can you take a look at the 10 policy? 11 A. You want me to look at the entire policy? 12 Q. No, I just want to -- want you to assure 13 yourself that this is indeed the policy that 14 you reviewed in the context of the Dig claim. 15 A. (Reviews document.) Yes, this would have 16 been the policy. 17 Q. Okay. It's for the policy period from 18 January 1, 2014, through June 30, 2015? 19 A. Correct. 20 Q. Okay. I want to direct your attention to 21 page ATL003083. When you -- when you 22 indicate that you discussed the war exclusion 23 or the war exclusions with Ms. Johnson, are 24 you referring to the exclusions that are set 25 forth in section 3, exclusions applicable to | No objection – Page 128:1-25. Defendant's Response: |
| Page 129 | |
| 1 all sections of this policy? 2 A. That -- that would be my recollection, but I 3 would like to just look through the policy 4 quickly. (Reviews document.) 5 Yes, that's -- I think that's 6 correct. 7 Q. All right. I want to -- I want to talk about 8 section 3-1 on page 3083, "War, Including 9 Undeclared or Civil War." Do you see that 10 exclusion? 11 A. Yes. Yes, I do. 12 Q. Did you have conversations with Ms. Johnson 13 about the potential applicability of 14 exclusion 3 -- section 3.1? 15 A. Yes. 16 Q. What were your discussions? 17 A. Again, to the best of my recollection, our 18 discussions would have been based on what 19 information she had, what was going on 20 between Hamas and Israel and all the -- you 21 know, all the facts surrounding the -- what 22 was -- in July and early June -- or mid June, 23 and whether or not we believed that amounted 24 to war, including undeclared or civil war. 25 So we would have talked about exclusion 1 and | Plaintiff's Objections: No objection – Page 129:1-6. 402, 403, MIL 2 (Dkt 209) – Page 129:6-25. Exclusions 3 and 4 not relevant. Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 130** | |
| 1 along with the exclusion 2, 3 and 4 as well.<br>2 Not 4, not the atomic fission, so...<br>3 Q. So as to exclusion 4, you did not discuss it<br>4 and you did not -- is that correct?<br>5 A. I think we -- I mean, we would have looked at<br>6 it, "Any weapon of war including atomic<br>7 fission" -- or excuse me, we did. I was<br>8 looking at the, "Atomic fission or<br>9 radioactive force," so I apologize, I<br>10 misspoke.<br>11 Q. I want to -- I want to go through this a<br>12 little more slowly.<br>13 With respect to exclusion 1, "War,<br>14 Including Undeclared or Civil War," you<br>15 reviewed that exclusion with Ms. Johnson; is<br>16 that correct?<br>17 A. That's correct.<br>18 Q. And did you -- you conclude personally that<br>19 exclusion 1 applied to the Dig claim?<br>20 A. Yes, I believe it does.<br>21 Q. And did you make the decision that the claim<br>22 should be denied on the basis of exclusion 1?<br>23 A. We made the decision that the claim should be<br>24 denied based on the exclusions, that was one<br>25 of them. | Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)<br>– Page 130:1-10.<br>Exclusions 3 and 4 not<br>relevant.<br>No objection – Page<br>130:11-25.<br><br><u>Defendant's Response:</u><br><u>The witness' understanding<br>and development of facts<br>bearing on claim decision<br>relevant to reasonableness<br>of claim decision. The<br>probative value of this<br>testimony is not<br>substantially outweighed by<br>its prejudicial effect, it will<br>not confuse the jury, waste<br>time, and is not<br>unnecessarily cumulative.<br>The witness has only<br>testified to facts within the<br>scope of her personal<br>knowledge.</u> |
| **Page 131** | |
| 1 Q. Okay. When you say, "We," who is we?<br>2 A. Pamela and I.<br>3 Q. Anyone else?<br>4 A. Ultimately, Sean signed off on it as well.<br>5 Q. And by Sean do you mean Sean Duffy?<br>6 A. Yes. Excuse me. Yes.<br>7 Q. And did you involve Mr. Duffy in the review<br>8 of the claim?<br>9 A. No.<br>10 Q. Were you the one who brought it to his<br>11 attention?<br>12 A. Yes.<br>13 Q. When you say that he was also involved in the<br>14 decision, what was his involvement?<br>15 A. I -- I simply flagged it for him and he had<br>16 an opportunity to agree or disagree.<br>17 Q. Now, in terms of deciding whether or not<br>18 exclusion 1 -- I'm just going to call them 1,<br>19 2, 3, 4 as they're set forth on page 3083.<br>20 In terms of exclusion 1 and making the<br>21 decision that it applied, did you look at<br>22 whether or not Hamas was a sovereign entity? | Plaintiff's Objections:<br>No objection – Page 131:1-<br>25.<br><br><u>Defendant's Response:</u> |

| Deposition Designation | Objection & Response |
|---|---|
| 23 A. Pamela looked at -- at Hamas and what -- how 24 Hamas was considered, in what -- in terms of, 25 you know, it being part of the government, | |
| Page 132 | |
| 1 governing the Gaza Strip, the activities it 2 was involved in, including, you know, 3 providing social services, having its own 4 military, political office, things of that 5 nature. 6 Q. But my question to you is, specifically, did 7 you come to a conclusion that Hamas was a 8 sovereign entity? 9 A. Hamas governs Gaza. 10 Q. Okay. But I'm asking you for the -- the 11 label, if you -- if you put one on it, did 12 you conclude that Hamas was a sovereign 13 entity? 14 A. We didn't put a sovereign label on it. 15 Q. Did you conclude that it was a 16 quasi-sovereign entity? 17 A. We concluded that it was an entity that 18 governed Gaza. 19 Q. Was it your understanding that Hamas needed 20 to govern Gaza in order for the war exclusion 21 to apply? 22 A. No. | Plaintiff's Objections: No objection – 132:1-22, 25. Defendant's Response: Objection deleted. |
| 25 BY MS. COYOCA: | |
| Page 133 | |
| 1 Q. Why was that not necessary, in your view? 2 A. Well, because I think when you think about 3 war, war is between -- I mean, the war is 4 between entities, it doesn't have to be 5 between Greece and France, it can be -- like 6 in this case, we had Gaza -- we had the 7 Gaza Strip and we had the action going on 8 between Hamas and Israel. 9 Q. But in your view, is it sufficient to invoke 10 the war exclusion if there is a course of 11 hostilities between a sovereign government 12 and some other entity that has some 13 authority? 14 A. It depends on the facts. 15 Q. Okay. What is it about Hamas that, in your 16 view, made it sufficient to conclude that it 17 had sufficient control or governmental 18 authority that it was appropriate to invoke 19 the war exclusion? | Plaintiff's Objections: No objection – 133:1-19; 133:23-25. Defendant's Response: Objection deleted. |

| Deposition Designation | Objection & Response |
|---|---|
| 23 THE WITNESS: Again, I mentioned<br>24 Hamas having its own, you know, holding<br>25 political office, having different branches<br><br>Page 134<br><br>1 that are consistent with the government, but<br>2 then you couple that with what was going on,<br>3 that invokes the war exclusion, the missiles<br>4 being exchanged between Israel and Hamas, the<br>5 ground fighting, you know, the war planes,<br>6 all those things, that is war.<br>7 BY MS. COYOCA:<br>8 Q. Do you believe that in order for a course of<br>9 hostilities to be characterized as war, that<br>10 it is necessary for both entities to be a<br>11 sovereign government?<br><br>14 THE WITNESS: I don't believe it<br>15 is necessary.<br>16 BY MS. COYOCA:<br>17 Q. Do you believe that it is necessary in order<br>18 for the war exclusion, prong 1, to be<br>19 invoked, that it is necessary for the<br>20 activities, the hostile activities between<br>21 the two forces, that they occur between a<br>22 sovereign and a quasi-sovereign government?<br><br>25 THE WITNESS: Again, it could be a<br><br><br><br><br>Page 135<br><br>1 quasi -- a sovereign or a quasi-sovereign.<br>2 But it's -- again, we're talking about war,<br>3 what the actions are between the two parties.<br>4 MS. COYOCA: Right. I'm asking<br>5 you, though, a different question.<br>6 BY MS. COYOCA:<br>7 Q. What I'm asking you is, in your view, in<br>8 order to find that this exclusion, the term<br>9 war has been met, is it necessary that those<br>10 hostilities that you referenced, do they have<br>11 to occur between a sovereign government and<br>12 another sovereign government or a sovereign | Plaintiff's Objections:<br>No objection – 134:1-11;<br>134:14-22; 134:25.<br><br>Defendant's Response:<br>Objections deleted.<br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – 135:1-14;<br>135:17; 135:20-25.<br><br>Includes objection –<br>135:18-19.<br><br>Defendant's Response:<br>Objections deleted. |

| Deposition Designation | Objection & Response |
|---|---|
| 13 government and a quasi-sovereign government?<br>14 A. No.<br><br>17 THE WITNESS: No.<br>18 MS. SCOTT REED: -- legal<br>19 conclusion.<br>20 BY MS. COYOCA:<br>21 Q. Now, you indicated that part of your<br>22 conclusion that it was appropriate to invoke<br>23 the war exclusions was the type and nature of<br>24 the hostilities that were occurring, the<br>25 missiles, the war planes, the ground troops;<br><br>Page 136<br><br>1 is that correct?<br>2 A. That's correct --<br><br>5 THE WITNESS: -- that is a<br>6 consideration.<br>7 MS. SCOTT REED: Misstates the<br>8 full character of her prior testimony.<br>9 BY MS. COYOCA:<br>10 Q. Where did you learn the information or how<br>11 did you learn the information that war planes<br>12 were involved?<br>13 A. From Pamela.<br>14 Q. How did you learn that missiles were<br>15 involved?<br>16 A. That would probably be from Pamela and also<br>17 just from the news.<br>18 Q. Any other source aside from Pamela?<br>19 A. Pamela or the news.<br>20 Q. In -- in approving the decision to deny the<br>21 war exclusion or not raising an objection to<br>22 it being invoked, were you relying on your<br>23 personal viewing of news reports?<br>24 A. I relied on Pamela's research and also my<br>25 understanding and my own personal viewing of<br><br>Page 137<br><br>1 different news.<br>2 Q. And what news reports did you review?<br>3 A. I mean, every -- A, I watch the general local<br>4 news. I specifically remember watching the<br>5 NBC clip on what was going on in -- in Israel<br>6 and how it referred to it as war. And then,<br>7 you know, discussions with Pamela, of course.<br><br>Page 147 | <br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – 136:1-2;<br>136:5-6; 136:9-25.<br><br>Includes objection – 136:7-8<br><br>Defendant's Response:<br>Objections deleted.<br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 137:1-7.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 8 Q. Going to the second prong of the war 9 exclusions, number 2, the one that begins, 10 "Warlike action by a military force," do 11 you -- do you see that exclusion? 12 A. Yes. 13 Q. Did you have specific discussions with 14 Ms. Johnson about prong 2? 15 A. I -- I'm sure that we did, yes. 16 Q. What did you discuss? 17 A. We would have discussed what the -- you know, 18 what the investigation, what we had found out 19 through our factual investigation and 20 whether, you know, the fact that what was 21 going on between Hamas and Israel and -- 22 including the -- again, the -- you know, the 23 hostility, the ground crews, the missiles, 24 airplanes, things of that nature, whethe | Plaintiff's Objections: No objection – Page 147:8-24. Defendant's Response: |
| Page 148 | |
| 1 military force. 2 Q. In -- in reviewing, in your mind, the factual 3 investigation that occurred, do you 4 differentiate between the events that were -- 5 that were part of the investigation for the 6 first prong of the exclusion versus events 7 that occurred to investigate the second prong 8 of the war claim -- excuse me, the war 9 exclusion? 10 A. I think we looking at all the -- excuse me -- 11 all the events and took all of the 12 information in totality and then look at the 13 application of the exclusions. 14 Q. Okay. When you indicated previously that 15 Ms. Johnson looked at news reports, was she 16 looking at those news reports in order to 17 inform her decision about the potential 18 applicability of prong 2, as well as prong 1? 21 THE WITNESS: When Pamela was 22 looking at the news reports throughout the 23 time period in doing her research, she wanted 24 to get a better understanding of what the 25 claim was. And based on that information, | Plaintiff's Objections: No objection – 148:1-18; 148:21-25. Defendant's Response: Objection deleted. |
| Page 149 | Plaintiff's Objections: |

| Deposition Designation | Objection & Response |
|---|---|
| 1 then we looked at the policy and the<br>2 exclusions, which would include these<br>3 exclusions.<br><br>12 Q. Did you discuss with Ms. Johnson -- I<br>13 understand you can't recall specifics of time<br>14 frame of discussions, but did you discuss<br>15 with Ms. Johnson at any time that OneBeacon<br>16 was considering the Dig claim, whether there<br>17 was a difference between prongs 1 and<br>18 prongs 2 of the war exclusions?<br>19 A. I'm sure that we did discuss it, because they<br>20 are different.<br><br>Page 150<br><br>14 Q. If you can't recall the specifics then, if<br>15 you think you discussed it, then, yes, please<br>16 tell me what you think you discussed as to<br>17 those differences.<br>18 A. When you look at the second prong, it's,<br>19 "Warlike action by military force, including<br>20 action in hindering or defending against<br>21 actual or suspected attacks by a government,<br>22 sovereign or other authority using military<br>23 personnel or other agents."<br>24 Warlike action by a military force.<br>25 What was going on in Israel between Hamas and<br><br>Page 151<br><br>1 Israel was warlike action. Hamas is a<br>2 military force, Israel has a military force.<br>3 At a minimum, it's an other -- Hamas is an,<br>4 "Other authority using military personnel or<br>5 agents."<br>6 Q. Did you discuss -- when you say you think you<br>7 discussed it, do you think that you discussed<br>8 the fact that exclusion 2 was broader than<br>9 exclusion 1, narrower, the exact same in<br>10 scope?<br>11 A. It's -- it's a different -- it's not the --<br>12 it's not the exact same exclusion, it's<br>13 warlike action by a military force. That<br>14 would suggest to me that it has even broader<br>15 implication.<br><br>Page 152<br><br>14 Q. Did OneBeacon end up concluding that prong 4<br>15 applied?<br>16 A. I think, yeah, prong -- excuse me, prong 4 | No objection – Page 149:1-3, 12-20.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 150:14-25.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 151:1-15.<br><br>Defendant's Response:<br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)–Page 152:14-20.  Exclusion 4 not relevant. See MIL 2.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 17 would apply, any weapon of war, whether in<br>18 time of peace or war. I mean, I think we --<br>19 I think missiles, ground troops, war planes,<br>20 those are weapons of war. | The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. |
| Page 154<br><br>3   Q.  Before you approved the denial of the claim,<br>4      what did you do to assure yourself that all<br>5      facts -- all factual investigation that<br>6      needed to be done had been done?<br><br>10          THE WITNESS:  When Pamela and I<br>11     decided to go forward with the denial, I --<br>12     we -- you know, I looked at everything that<br>13     had been done, I talked to -- or I talked to<br>14     Pamela, we talked about what had been done,<br>15     we talked about what the conclusions were,<br>16     and I think, yes, a thorough investigation<br>17     was completed by Pamela.<br>18   BY MS. COYOCA:<br><br>19 Q. Did you ask to see any of the research or<br>20 analysis that she had been -- that she had<br>21 done in coming to her conclusions?<br>22 A. I know that I -- I -- I saw the NBC clip, so<br>23 I imagine that she provided that to me. I<br>24 know that I saw some of the other<br>25 information, but today I can't tell you what | Plaintiff's Objections:<br>602, 701 – 154:3-6; 154:10-25. Witness does not know what research or analysis Johnson performed; witness lacks personal knowledge. Improper opinion re whether investigation was "thorough".<br><br><br>Defendant's Response:<br>The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. Witness |

| Deposition Designation | Objection & Response |
|---|---|
| | testifying as to personal knowledge or their rationally based perceptions of the information known to them; is not opinion testimony.<br><br>Objection deleted. |
| Page 155<br><br>1 I saw expressly.<br>2 Q. When you indicate you saw other information,<br>3 did you see other news reports?<br>4 A. It would have been news reports or articles<br>5 or things of that nature. | Plaintiff's Objections:<br>602, 701 – Page 155. Witness does not know what research or analysis Johnson performed; witness lacks personal knowledge. Improper opinion re whether investigation was "thorough".<br><br>Defendant's Response: The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Witness testifying as to personal knowledge or their rationally based perceptions; is not opinion testimony.<br><br>Plaintiff's Objections: |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 158** | No objection – 158:21-23. |
| 21 Q. How early in the process, if at all, did you<br>22 involve Mr. Duffy in the -- in the claim<br>23 review? | Defendant's Response:<br>Objection deleted. |
| | Plaintiff's Objections:<br>No objection – 159:2-17. |
| **Page 159** | Defendant's Response:<br>Objection deleted. |
| 2 THE WITNESS: Sean didn't do the<br>3 claim review. I just flagged him about the<br>4 claim so he knew about it and its existence,<br>5 and then I flagged him when we were at a<br>6 position where we were going to decline<br>7 coverage.<br>8 BY MS. COYOCA:<br>9 Q. When you say you flagged him, what do you<br>10 mean by that?<br>11 A. I just let him know.<br>12 Q. Why were you letting him know?<br>13 A. Because NBC is a big client, because there is<br>14 a possibility that NBC would call Sean or an<br>15 agent of NBC, and because, generally, as a<br>16 practice, if there's a bigger claim I like to<br>17 let Sean know. | |
| **Page 162** | Plaintiff's Objections:<br>802 – 162:3-5; 162:9-21. |
| 3 Q. When did Ms. Johnson tell you that she had<br>4 made a decision to deny the Dig claim based<br>5 on the war exclusion? | Defendant's Response:<br>801; 807. |
| 9 THE WITNESS: Pamela didn't tell<br>10 me she decided to deny the claim, we talked<br>11 about what her investigation was, what her<br>12 conclusions were, and then we made a decision<br>13 whether or not to deny the claim.<br>14 BY MS. COYOCA:<br>15 Q. So the decision was made jointly?<br>16 A. She recommended it and I approved it.<br>17 Q. When did Ms. Johnson first recommend to you<br>18 that the claim should be denied?<br>19 A. It would have been sometime in late July,<br>20 around the 22nd, I think, sometime in that<br>21 range. | Objection deleted. |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 166**<br><br>1 Q. Now, you indicated that you reviewed the<br>2 coverage opinion letter before it went out;<br>3 is that right?<br>4 A. I reviewed the letter drafted by Pamela?<br>5 Q. Yes.<br>6 A. Yes, I reviewed that before it went out.<br>7 Q. Did you have any changes that you wanted made<br>8 to the letter?<br>9 A. I think I had one minor change that was<br>10 non-substantive. | Plaintiff's Objections:<br>No objection – Page 166:1-10.<br><br>Defendant's Response: |
| **Page 168**<br><br>16 Q. Okay. Now, as of July 28, was the insured,<br>17 NBC Universal, had they already been told<br>18 that the claim was going to be denied on the<br>19 basis of the war exclusion?<br>20 A. Yes, that's my understanding.<br>21 Q. And how did you -- how did you learn that the<br>22 exclusion that Ms. Johnson was going to tell<br>23 NBC Universal that the exclusion had been<br>24 denied on the basis of the -- let's start all<br>25 over again. | Plaintiff's Objections:<br>No objection – Page 168:16-25.<br><br>Defendant's Response: |
| **Page 169**<br><br>1 How did you learn that Ms. Johnson<br>2 had told NBC Universal that the Dig claim was<br>3 going to be denied on the basis of the war<br>4 exclusion?<br>5 A. I -- Pamela would have told me that she was<br>6 going to reach out to NBC and Aon and let<br>7 them know that our position was that the<br>8 exclusion precluded coverage. | Plaintiff's Objections:<br>No objection – Page 169:1-8.<br><br>Defendant's Response: |
| **Page 177**<br><br>6 Q. Did you flag the claim for Mr. Duffy because<br>7 you considered the coverage call to be a<br>8 close one?<br><br>11 THE WITNESS: No, that's not why I<br>12 flagged it for Sean.<br>13 BY MS. COYOCA:<br>14 Q. Did you believe that the coverage call to be<br>15 made on this claim, did you think it was a<br>16 close one? | Plaintiff's Objections:<br>No objection – 177:6-8;<br>177:11-25.<br><br>Defendant's Response:<br>Objection deleted. |

| Deposition Designation | Objection & Response |
|---|---|
| 17 A. No, I didn't.<br>18 Q. You thought it was a hundred percent clear<br>19 that the war exclusion applied?<br>20 A. I don't think anything is a hundred percent,<br>21 but given the facts, yes, I think the war<br>22 exclusions apply and preclude coverage.<br>23 Q. How confident were you in the correctness of<br>24 the decision based on a percentage, was it<br>25 95 percent, 85 percent?<br><br>Page 178<br><br>  THE WITNESS: On -- from<br>5 OneBeacon's perspective and my perspective as<br>6 well, we don't deny a claim unless we believe<br>7 it's not covered. So when I say a hundred<br>8 percent, there's always a chance someone can<br>9 disagree, but it's 99 percent that we don't<br>10 deny a claim unless we believe it's not<br>11 covered. We don't enter that decision<br>12 lightly.<br>13 BY MS. COYOCA:<br>14 Q. Were you concerned at all in terms of the<br>15 short time frame that -- in which the<br>16 analysis, the investigation, the review of<br>17 information and the legal analysis that was<br>18 performed, the short time frame in which it<br>19 was done?<br><br>22 THE WITNESS: My -- we can -- we<br>23 moved as quickly as we could on this<br>24 particular claim. I know that NBC wanted an<br>25 answer right away. Aon had pushed OneBeacon<br><br>Page 179<br><br>1 very hard to get an answer as soon as<br>2 possible and so that's why there's this --<br>3 why everything was turned around. We did it<br>4 to accommodate the insured, but we did do a<br>5 thorough investigation.<br><br>Page 220<br><br>18 The fourth paragraph is applicable,<br>19 but based on the analysis of the application<br>20 of war, including undeclared or civil war and<br>21 warlike actions by a military force, that<br>22 would include the use of any weapon of war. | <br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – 178:4-19; 178:22-25.<br><br>Defendant's Response:<br>Objections deleted.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 179:1-5.<br><br>Defendant's Response:<br><br><br>Plaintiff's Objections:<br>402, 403, MIL 2 (Dkt 209)– Page 220:18-22. Exclusion 4 not relevant.  See MIL 2.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| | The witness' understanding and development of facts bearing on claim decision relevant to reasonableness of claim decision. The probative value of this testimony is not substantially outweighed by its prejudicial effect, it will not confuse the jury, waste time, and is not unnecessarily cumulative. The witness has only testified to facts within the scope of her personal knowledge. "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. |
| Page 221<br><br>14 BY MS. COYOCA:<br>15 Q. I want to show you a document that's already<br>16 previously been marked as Exhibit 19 to the<br>17 Gutterman deposition. Please let me know<br>18 when you're ready for questions.<br>19 A. Okay. Thank you. I'll read through it.<br>20 Q. Thanks.<br>21 A. (Reviews document.)<br>22 Q. Are you ready for questions?<br>23 A. Yes.<br>24 Q. Have you seen this letter before?<br>25 A. Yes. | Plaintiff's Objections:<br>No objection – Page 221:14-25.<br><br>Defendant's Response: |
| Page 222<br><br>1 Q. When did you see it?<br>2 A. I would have seen it after Pamela received<br>3 it.<br>4 Q. Did you ever discuss it with Pamela?<br>5 A. I'm sure that we did discuss it, yes.<br>6 Q. Do you recall any of your discussions about<br>7 the letter?<br>8 A. I don't specifically recall the discussions.<br>9 Q. Do you have any general recollections of your<br>10 discussions?<br>11 A. My general recollection would be we would | Plaintiff's Objections:<br>No objection – 222:1-23.<br><br>Defendant's Response:<br>Objection deleted. |

| Deposition Designation | Objection & Response |
|---|---|
| 12 have -- we would have gone through the<br>13 arguments and that Pamela would have pulled<br>14 the cases and read the case law and looked at<br>15 the arguments raised in the letter.<br>16 Q. With respect to the second paragraph of the<br>17 letter, talking about OneBeacon's willingness<br>18 to cover expenses associated with the initial<br>19 one-week postponement; do you see that?<br>20 A. I do.<br>21 Q. Were you aware that OneBeacon had agreed to<br>22 cover the first one week push cost -- or<br>23 postponement costs? | |
| Page 223<br><br>1 misstates the record.<br>2 THE WITNESS: I -- I knew that<br>3 OneBeacon had agreed to offer 3 to 350 for<br>4 the first -- first week.<br>5 BY MS. COYOCA:<br>6 Q. How did you become aware of that?<br>7 A. Pamela would have told me.<br>8 Q. What did she tell you about that?<br>9 A. I just recall when it initially came in, it<br>10 came in as a postponement claim and that --<br>11 that initially, you know, to the extent that<br>12 NBC only postponed it for a week estimate and<br>13 then began -- or resumed filming, estimated<br>14 losses associated with that were between 3<br>15 and 350.<br>16 Q. And what did she tell you with regard to<br>17 OneBeacon's willingness to cover 300 to<br>18 350,000 of those costs?<br><br>22 THE WITNESS: Again, I -- I think<br>23 that it was initially based on the<br>24 understanding that it was a postponement<br>25 claim, that it would only be a one-week | Plaintiff's Objections:<br>Includes attorney objection – 223:1<br><br>No objection – 223:2-18; 223:22-25.<br><br>Defendant's Response:<br>Objections deleted. |
| Page 224<br><br>1 postponement of shooting, and then thereafter<br>2 when it became clear, I think OneBeacon<br>3 simply wanted to make a concession to NBC and<br>4 continue to offer the 3 to 350 for the claim.<br>5 BY MS. COYOCA:<br>6 Q. Specifically, did Ms. Johnson tell you how<br>7 OneBeacon's willingness to pay 3 to 350 for<br>8 the initial one-week postponement, how that | Plaintiff's Objections:<br>No objection – 224:1-9; 224:13-15.<br><br>Defendant's Response:<br>Objections deleted. |

| Deposition Designation | Objection & Response |
|---|---|
| 9 was ever conveyed to the client?<br><br>13 THE WITNESS: I -- I don't<br>14 remember or recall how that was conveyed to<br>15 NBC. | |
| Page 225<br><br>2 Q. Was it your understanding that Ms. Johnson<br>3 had indicated to NBC Universal and Aon that<br>4 OneBeacon would cover 300 to 350,000 of the<br>5 initial one-week postponement costs?<br><br>9 THE WITNESS: I understand that<br>10 Pamela offered to -- to cover 300 to 350 for<br>11 the initial week postponement.<br>12 BY MS. COYOCA:<br>13 Q. When was that offer conveyed?<br>14 A. I don't remember.<br>15 Q. Why was --<br>16 MS. SCOTT REED: Are you -- are<br>17 you referring to something to answer the<br>18 question?<br>19 THE WITNESS: Yes. Sorry. I -- I<br>20 said I don't remember. I just -- I don't --<br>21 I'm just referring to the letter that -- that<br>22 Pamela sent out dated July 28th and the<br>23 conclusion. She states, "Although we cannot<br>24 cover the extra expense associated with the<br>25 production move to another country to | Plaintiff's Objections:<br>No objection – 225:2-5;<br>225:9-15; 225:19-25.<br><br>Includes attorney objection<br>– 225:16-18.<br><br>Defendant's Response:<br>Objections deleted. |
| Page 226<br><br>1 complete the production, based on our long<br>2 relationship with NBC, we're willing to cover<br>3 the expenses associated with the initial<br>4 postponement as a courtesy," and then she<br>5 references a budget and the costs associated<br>6 with the initial postponement.<br>7 BY MS. COYOCA:<br>8 Q. Is it your understanding that this was the<br>9 first time that there was ever any indication<br>10 by OneBeacon that it would cover the initial<br>11 one-week postponement costs?<br>12 A. I think that it -- there was an indication<br>13 before that, but I don't have a -- a specific<br>14 recollection as to when.<br>15 Q. And do you know who provided that indication<br>16 to Aon or NBC Universal? | Plaintiff's Objections:<br>No objection – 226:1-20;<br>226:25.<br><br>Defendant's Response:<br>Objection deleted. |

| Deposition Designation | Objection & Response |
|---|---|
| 17 A. I don't.<br>18 Q. On what basis did OneBeacon decide that it<br>19 was willing to pay the one-week initial<br>20 postponement costs?<br>25 THE WITNESS: Again, I'm just | |
| Page 227<br><br>1 going to -- I -- I don't know the earlier<br>2 conversations, but as detailed in the<br>3 July 28th letter, Pamela indicates that based<br>4 on our long relationship, we're willing to<br>5 cover the expenses associated -- associated,<br>6 excuse me, with the initial postponement as a<br>7 courtesy. So at least as of July 28th, that<br>8 was the basis, as a courtesy given the<br>9 existing relationship with NBC.<br>10 BY MS. COYOCA:<br>11 Q. Are you aware of any other grounds as to why<br>12 OneBeacon was willing to pay the initial --<br>13 or to cover, to cover the expenses associated<br>14 with the initial postponement?<br>18 THE WITNESS: Again, I think<br>19 when -- when the claim initially claim to<br>20 Peter it -- he thought it would be simply a<br>21 postponement for a week and then reconvene or<br>22 resume the filming. And based on that, it's<br>23 my understanding we thought potentially 3 to<br>24 350 would be the expenses incurred by NBC to<br>25 postpone the production. | Plaintiff's Objections:<br>No objection – 227:1-14;<br>227:18-25.<br><br><br>Defendant's Response:<br>Objection deleted. |
| Page 228<br><br>1 BY MS. COYOCA:<br>2 Q. Was it OneBeacon's position that the initial<br>3 postponement costs of 300 to 350, whatever<br>4 the original estimate was, that those were a<br>5 covered expense under extra -- under the<br>6 extra expense coverage of the policy?<br>7 A. I think initially when the claim first came<br>8 in, it appeared that it might be based on the<br>9 postponement. But then, clearly, by<br>10 July 28th when the letter was issued,<br>11 OneBeacon took the position that those<br>12 weren't covered, but again, as a courtesy<br>13 would -- would provide NBC with reimbursement<br>14 for those expenses it incurred during that<br>15 first week.<br>16 Q. What do you base your understanding that<br>17 initially when the claim first came in it<br>18 appeared that it might be based on the<br>19 postponement? What do you -- what do you<br>20 base your understanding of that statement?<br>21 A. My understanding is that when it initially | Plaintiff's Objections:<br>No objection – Page 228:1-<br>25.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 22 came in, that's how -- that's how it was<br>23 described by NBC.<br>24 Q. I'm actually directing your attention to the<br>25 statement that -- that it appeared the claim<br><br>Page 229<br><br>1 might be covered based on the postponement.<br>4 Do you -- do you want to go back and<br>5 read her answer --<br>6 MS. COYOCA: Yeah.<br>7 MS. SCOTT REED: -- so she knows<br>8 what you're saying?<br>9 BY MS. COYOCA:<br>10 Q. You indicated previously that I asked you was<br>11 it OneBeacon's position that the initial<br>12 postponement costs of 300 to 350, whatever<br>13 the original estimate was that those were a<br>14 covered expense under extra -- under the<br>15 extra expense coverage of the policy. And<br>16 you indicated, "I think initially when the<br>17 first came" -- "when the claim first came in,<br>18 it appeared that it might be based on the<br>19 postponement, but then clearly by July 28th<br>20 when the letter was issued, OneBeacon took<br>21 the position that those weren't covered, but<br>22 again as a courtesy would -- would provide<br>23 NBC with reimbursement for those expenses it<br>24 incurred during that first week."<br>25 And my question to you is: As that<br>TSG Reporting - Worldwide 877-702-9580<br>59 (Pages 230 to 233)<br><br>Page 230<br><br>1 first portion of your response when you say,<br>2 "I think initially when the claim first claim<br>3 in, it appeared that it might be based on the<br>4 postponement," what did you base that<br>5 statement on?<br>6 A. I -- I'm looking back at the letter, but I<br>7 also -- my recollection was that, again, it<br>8 was a moving -- kind of a moving target, and<br>9 NBC postponed it and wanted to see how -- how<br>10 the -- how it went forward between Israel and<br>11 Hamas before making -- you know, and then<br>12 ultimately decided that for the safety of NBC<br>13 they needed to pull out of -- pull out of<br>14 Israel. | Plaintiff's Objections:<br>No objection – 229:1;<br>229:9-25.<br><br>Includes attorney objection<br>– 229:4-8.<br><br>Defendant's Response:<br>Objection deleted.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>No objection – Page 230:1-<br>14.<br><br>Defendant's Response: |