MARC J. SHRAKE (SBN 219331)
mshrake@fmglaw.com
FREEMAN MATHIS & GARY, LLP
550 South Hope Street, Suite 2200
Los Angeles, California 90071
Telephone: (213) 615-7019
Facsimile: (213) 615-7000

CHRISTOPHER W. MARTIN *(Pro Hac Vice)*
martin@mdjwlaw.com
MELINDA R. BURKE *(Pro Hac Vice)*
burke@mdjwlaw.com
WILLIAM E. McMICHAEL *(Pro Hac Vice)*
mcmichael@mdiwlaw.com
MARTIN, DISIERE, JEFFERSON
& WISDOM LLP
9111 Cypress Waters Blvd., Suite 250
Dallas, Texas 75019
Telephone: (214) 420-5500
Facsimile: (214) 420-5501

Attorneys for Defendant
Atlantic Specialty Insurance Company

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company,<br><br>            Plaintiffs,<br>    vs.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company,<br><br>            Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>**DEFENDANT'S PROFFER FOR DKT. 265**<br><br>Judge: Honorable Percy Anderson<br>Place: Courtroom 9A<br>Trial: Possibly March 3, 2020 |

The Court has directed Atlantic Specialty Insurance Company ("ASIC") to provide the Court with a witness proffer on the second point requested in Plaintiffs' Motion in Limine No. 3. Dkt. 265. That Motion seeks to bar ASIC "from arguing that its denial of coverage was reasonable because (1) Israel is a sovereign nation that retaliated against Hamas in Gaza or (2) Israel's 'invasion' of Gaza, which post-dated

Plaintiffs' decision to relocate, was reasonably construed as a 'war' or 'warlike action by a military force.'" *See* Plaintiffs' Motion in Limine No.3 at pp.1.

The Ninth Circuit of course stated in its 2019 decision that "the record demonstrates that the efficient proximate cause for the relocation was Hamas' rocket fire from Gaza into Israel." *Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.*, 929, F.3d 1143, 1161 (9th Cir. 2019). The Ninth Circuit also concluded in its 2019 decision that "Atlantic provides no evidence that Israeli retaliation was the predominant cause of Universal's losses." *Id.*

Although ASIC reserves its rights to appeal the Ninth Circuit's decision, at trial ASIC will not advance any argument to contradict the determinations by the Ninth Circuit.

Rather, ASIC will advance argument and evidence on a question expressly left open by the Ninth Circuit and by this Court's subsequent summary judgment ruling: Whether the ASIC's investigation, analysis, conclusions, and decisions undertaken and reached in 2014, although determined to be a breach of the contract, were reasonable.

The Ninth Circuit's and this Court's decisions thus far have made findings and ruled only on what the evidence shows to have actually occurred, including that ASIC's conduct breached the insurance contract. The Courts have left for the factfinder the questions of the reasonableness of ASIC's conduct.

In order to defend itself on this issue at trial, ASIC must present evidence of what it actually did regarding its investigation, analysis, conclusions, and decisions in 2014, and then attempt to convince the jury that, even though later found to be wrong as a matter of law, they were reasonable.

"The reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made." *Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co.*, 90 Cal. App. 4th 335, 338 (2001). In other words, in order to evaluate whether an insurer acted in good faith, the fact finder must consider all

-2-

DEFENDANT'S PROFFER FOR DKT. 265

facts that existed when the carrier made its claim decision, even if wrong. One cannot properly assess reasonableness without knowing all the facts. *Id.*

ASIC therefore intends to introduce evidence of the information it considered in making its claims decision, evidence to attest to its subjective belief in the reasonableness of its decision, and other information that existed at the time so as to validate the objective reasonableness of its decision (again, even though that decision for purposes of this trial was wrong as a matter of law).

To deny the jury the ability to understand the facts as they existed in real time would violate California law regarding bad faith claims. Indeed, "[t]he mistaken [or erroneous] withholding of policy benefits, if reasonable or if based on a legitimate dispute…does not expose the insurer to bad faith liability." *Id.*

Accordingly, ASIC plans to offer evidence and argument about its investigation, analysis, conclusions, and decisions to support its good faith handling of Plaintiffs' insurance claim, including the deposition testimony of ASIC's claims handling personnel, documents and information in their files, and ASIC's communications relating to its investigation, analysis, conclusions, and decisions. Such evidence is reflected in ASIC's deposition designations of Pamela Johnson, Theresa Gooley Wolf, and ASIC's other witnesses and corporate designees filed in this case, as well as their respective files, and the letter written by Pamela Johnson to Plaintiffs on July 28, 2014. Such evidence will include, but is not limited to, the following:

ASIC's claim denial letter, dated July 28, 2014, provided, in part, as follows regarding Plaintiffs' decision to relocate:

- "Claiming that its personnel were in 'imminent peril,' the producers advised that they would push production by one week. This decision was based on reports from personnel in Tel Aviv and an email to the production [team] dated July 10, 2014, from Stephen Smith, the head of NBCU security for Europe, stating:

    \* \* \*

NBCU Security have monitored and evaluated <u>the events in</u> Israel, <u>Gaza</u> and the West Bank, since inception and analyzed information from multiple sources. All current intelligence and activity in country points to <u>events still being in escalation phase</u> without a predictable or realistic timeframe for a reduction in hostilities. We have looked at <u>the magnitude and range,</u> of current rocket attacks (which appear to target locations to be used in forthcoming filming), the escalation of civil disorder and <u>potential for a further increase in hostilities</u> including <u>a ground campaign</u> and acts of terrorism within Israel, all of which mean there is no short term and realistic likelihood for positive changes to the security landscape."

                \*   \*   \*

- "On <u>Monday, July 14th</u>, NBCU finalized its decision to <u>push the production for one week</u> . . . ."
- "<u>In that conversation</u>, you also mentioned that <u>if the hostilities did not deescalate, there was a chance</u> that NBCU <u>would decide to move</u> the production to another country or back to the United States. . . ."
- "<u>In the meantime</u>, the hostilities between Israel and Hamas <u>worsened</u>."
- "On <u>Tuesday, July 15th</u>, Hamas <u>refused to agree to a cease-fire</u> suggested by Egypt."
- "<u>In response, Israeli President Netanyahu</u> gave the <u>military authorization</u> to use <u>'full force'</u> <u>against militants in Gaza</u> stating, 'Hamas chose to continue fighting and will pay the price for that decision. . . . When there is no cease-fire, <u>our answer is fire</u>.'"
- "According to the Washington Post, citing Israeli news reports, 'by <u>early Wednesday morning [July 16, 2014], Israel had struck at least 25 targets inside Gaza</u>, including the home of a senior Hamas leader, Mahmoud Al Zahar.'"

- "'Hamas militants fired at least 13 rockets into southern Israel, seven of which were intercepted by Israel's Iron Dome air defense system.'"
- "Israel then called up an additional 18,000 reservists and announced plans for a <u>ground attack on Gaza</u>."
- "Israel dropped leaflets <u>into Gaza</u> warning the population to evacuate."
- "On Thursday, Israel began <u>a ground invasion into Gaza</u>, <u>including</u> the <u>use of tanks and gunboats</u>."
- "On Thursday afternoon [<u>July 17, 2014</u>], we had another telephone conversation . . . ."
- "<u>In this conversation</u>, you informed us that NBCU had decided to move the production <u>due to the ongoing hostilities</u> which were creating dangerous conditions in Tel Aviv and Jerusalem."
- "I informed you that we were seriously considering whether the exclusion for war and warlike actions would preclude coverage for the claim. Peter Williams had informed Susan Weiss the night before that we were evaluating whether the exclusion would apply to the situation in Israel."
- "The key question is whether the hostilities causing the imminent peril will be considered to be a war, or warlike action by military force. Case law and other treatises indicate that this would be the likely finding. Therefore, the war exclusion should apply."

<u>See</u> Declaration of Marc Shrake, Exh. 1.

In addition, Pamela Johnson testified as follows during her deposition:

Q.  Based upon the research that you continued to do after July 15th, was there a de-escalation during the month of July at all?

A.  No, there was not.

Q.  Was it to the contrary?

| | | |
|---|---|---|
| 1 | A. | Yes. Things continued to escalate. In fact, there was a ground invasion of |
| 2 | | Gaza. There was considerable damage. There were -- although there were |
| 3 | | a few Israeli -- Israelis killed, there were more than 2,000 Palestinians |
| 4 | | that were killed and, you know, thousands more that were injured. There |
| 5 | | was a great deal of property damage, some in Israel, but the majority of it |
| 6 | | was -- was in the Gaza strip, and that's understandable, because the |
| 7 | | Israelis have better weapons than the Palestinians do -- and far more |
| 8 | | troops. |
| 9 | Q. | Let me hand you Exhibit 238, please, ma'am, and ask you to take a look |
| 10 | | at it. |
| 11 | A. | (Reviews document.) Okay. |
| 12 | Q. | Can you identify Exhibit 238 as a Washington Post article, which is one |
| 13 | | of the references that you made to Mr. Gutterman in your e-mail that's |
| 14 | | labeled Exhibit 234? |
| 15 | A. | Yes. It was dated July 16th. |
| 16 | Q. | Do you recall reviewing this Washington Post article as part of your |
| 17 | | investigation? |
| 18 | A. | Yes, I did. |
| 19 | Q. | Did the information from this article inform your overall factual |
| 20 | | investigation? |
| 21 | A. | Yes, it did. |
| 22 | Q. | How so? |
| 23 | A. | Well, again, this article also repeats the same quote by Netanyahu that, |
| 24 | | "When Hamas chose to continue fighting, it will pay the price for that |
| 25 | | decision. When there is no cease fire, our answer is fire." |
| 26 | | It also talks about the fact that they're amassing troops for a ground war. |
| 27 | | It says that they have called up 40,000 troops on the Israeli side, and that |
| 28 | | Netanyahu fired his deputy defense minister for saying that the cabinet |

Freeman Mathis & Gary, LLP Attorneys at Law

| | |
|---|---|
| 1 | wasn't moving aggressively enough against Hamas, although it seems |
| 2 | pretty aggressive. They also talked about the fact that it didn't seem likely |
| 3 | that there was going to be a cease fire, mostly because Egypt was not |
| 4 | going to be able to broker it, because Hamas didn't trust -- trust the |
| 5 | current Egyptian government at that time. |
| 6 | It talks about how the White House press secretary said that it was |
| 7 | Hamas's responsibility to try to disengage, and that there had been a heavy |
| 8 | toll on the Palestinians. By that time there were 1,500 injured and 204 |
| 9 | killed. There had also been a number -- thousands of rockets they say had |
| 10 | been fired into Israel and that there were still thousands more held by the |
| 11 | -- by Hamas, and that there had been a civilian, an Israeli civilian that was |
| 12 | killed, but that the Iron Dome missile defense system was helping. In |
| 13 | other words, it continued to show that there was fire both back and forth, |
| 14 | that… |
| 15 | * * * |
| 16 | Q. Was there information presented in that news piece that informed your |
| 17 | overall factual investigation? |
| 18 | A. Yes, there was. |
| 19 | Q. Can you tell me what information that was? |
| 20 | A. Well, the fact that NBC itself was identifying this as a ground war. The |
| 21 | description both of Chris Hayes and then the other -- the Israeli journalist |
| 22 | that he was interviewing, they talked -- they both talked a lot about how |
| 23 | it seemed as though things were escalating, that although Netanyahu had |
| 24 | wanted to show restraint, now that there wasn't a chance of a cease fire or |
| 25 | it didn't appear that there was a chance of a cease fire, that things were |
| 26 | escalating. |
| 27 | Q. Did the label ground war that was put behind the journalist inform your |
| 28 | overall investigation? |

| | | |
|---|---|---|
| 1 | A. | Well, the fact that NBC itself was labeling it as a war, obviously was -- was something that I took into consideration. But more than that, it was also the fact that you could see in this video that there were tanks that were advancing, that they were trying to take out the tunnels that led between Gaza and Israel, that basically, you know, Israel was -- was saying that they wanted to reoccupy Gaza, that this is clearly a back-and-forth situation and that -- that Israel was very, very serious about -- about using all kinds of military weapons to prevent -- to prevent the -- the Hamas from doing further damage to Israel. |
| 10 | Q. | After this report of the ground war beginning on July the 17th, did you continue to monitor the events that were occurring? |
| 12 | A. | I did. |
| 13 | Q. | Let me ask you to think forward a week from the time that you began to review the factual investigation and over the next approximately seven days of developments. Can you describe by then what sort of overall impressions you had formed regarding the factual events? |
| 17 | A. | Well, this looked like a war. I mean, there was a lot of -- of fire back and forth. There was definitely use of -- of a variety of military weapons. The incursion into Gaza continued to increase. The body count continued to increase, less so on the Israeli side because -- because of the Iron Dome defense system. But certainly, you know, Hamas was continuing to send rockets and try to infiltrate Israel with a variety of different military operations, few of which were successful. And, I mean, it -- it had all the indicia of war. |

See Declaration of Marc Shrake, Exh. 2 (Deposition of Pamela Johnson at pp. 417:8 – 421:4, 446:1 – 488:8).

Additionally, Theresa Gooley-Wolf testified as follows:

| | | |
|---|---|---|
| 1 | Q. | Because in your view, is it sufficient to invoke the war exclusion if there |
| 2 | | is a course of hostilities between a sovereign government and some other |
| 3 | | entity that has some authority? |
| 4 | A. | It depends on the facts. |
| 5 | Q. | Okay. What is it about Hamas that, in your view, made it sufficient to |
| 6 | | conclude that it had sufficient control or governmental authority that it |
| 7 | | was appropriate to invoke the war exclusion? |
| 8 | A. | Again, I mentioned Hamas having its own, you know, holding political |
| 9 | | office, having different branches that are consistent with the government, |
| 10 | | but then you couple that with what was going on, that invokes the war |
| 11 | | exclusion, the missiles being exchanged between Israel and Hamas, the |
| 12 | | ground fighting, you know, the war planes, all those things, that is war. |
| 13 | Q. | Now, you indicated that part of your conclusion that it was appropriate to |
| 14 | | invoke the war exclusions was the type and nature of the hostilities that |
| 15 | | were occurring, the missiles, the war planes, the ground troops; is that |
| 16 | | correct? |
| 17 | A. | That's correct -- that is a a consideration. |

See Declaration of Marc Shrake, Exh. 3, Deposition of Theresa Gooley at pp.133:9 – 134:6, 135:21 – 136:2.

This proffer is not intended to be exhaustive, but rather illustrative of the evidence that ASIC intends to introduce to show that it reached its claims decision in good faith. ASIC believes that this evidence tends to make facts at issue in this case more or less probable on the question of whether ASIC's investigation, analysis, conclusions, and decisions were reasonable, even if determined to be wrong by the Courts. *See* Fed. R. Evid. 401, 402.

///

///

///

| | |
|---|---|
| DATED: February 14, 2020 | MARC J. SHRAKE<br>FREEMAN MATHIS & GARY, LLP<br><br>-and-<br><br>CHRISTOPHER W. MARTIN *(Pro Hac Vice)*<br>MELINDA R. BURKE *(Pro Hac Vice)*<br>WILLIAM E. McMICHAEL *(Pro Hac Vice)*<br>MARTIN, DISIERE, JEFFERSON<br>& WISDOM LLP<br><br>By: */s/ Christopher W. Martin*<br>Attorneys for Defendant ATLANTIC SPECIALTY INSURANCE COMPANY |

# DECLARATION OF MARC J. SHRAKE

I, Marc J. Shrake, declare as follows:

1. I am an attorney authorized to practice before all California courts and before this Court and am a partner with the law firm of Freeman Mathis & Gary, LLP, attorneys for Defendant Atlantic Specialty Insurance Company.

2. I have personal knowledge of the matters set forth in this Declaration, and if called upon to testify to them, could and would do so.

3. I make this Declaration in conjunction with, and in support of, Atlantic Specialty's Proffer For Dkt. 265.

4. Attached as Exhibit 1 is a true and correct copy of Exhibit 12 to the Deposition of Pamela Johnson in this case, bates numbered AONNBCU0003085-3093.

5. Attached as Exhibit 2 is a true and correct copy of an excerpt from Dkt. 257, which are the pages of Defendant's designations of the deposition of Pamela Johnson to introduce at trial.

6. Attached as Exhibit 3 is a true and correct copy of an excerpt from Dkt. 257, which are the pages of Defendant's designations of the deposition of Teresa Gooley Wolf to introduce at trial.

I declare under penalty of perjury of the laws of the United States of America and the laws of the State of California that the foregoing is true and correct and that this declaration is executed this 14th day of February 2020 at Los Angeles, California.

DATED: February 14, 2019    MARC J. SHRAKE

By: */s/ Marc J. Shrake*
Marc J. Shrake