# EXHIBIT 2

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Pamela Johnson May 8, 2017 Vol 1. | Plaintiffs object to Defendant's designations as follows: |
| **Defendant currently intends to submit the following testimony to be played on videotape or a computer.  However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.** | |

Page 8
1 Could you please state your full 09:19:35
2 name and address for the record? 09:19:37
3 A. My name is Pamela Ann Johnson. 09:19:39
4 Q. And your address? 09:19:40
5 A. 385 Washington Street. 09:19:42
6 Q. And that's here in Minneapolis? 09:19:44
7 A. It's in St. Paul. 09:19:46

Page 11
12 Q. Ms. Johnson, did you go to college? 09:22:47
13 A. I did. 09:22:53
14 Q. Where did you go? 09:22:53
15 A. I graduated from the University of 09:22:54
16 St. Thomas. 09:22:56
17 Q. What year did you graduate? 09:22:57
18 A. 1986. 09:22:58
19 Q. What was your degree in? 09:22:59
20 A. My degree was in psychology. 09:23:02

Page 12
2 Q. Where did you go to law school? 09:23:23
3 A. I went to the University of Minnesota. 09:23:24
4 Q. Did you graduate? 09:23:27
5 A. I did. 09:23:28
6 Q. What year? 09:23:28
7 A. 1992. 09:23:29

Page 13
4 Q. Do you have a license to practice law? 09:24:04
5 A. I do not currently have an active license, 09:24:06
6     no. 09:24:08
7 Q. Have you ever had a license to practice law? 09:24:12
8 A. I have.09:24:15
9 Q. When did you first become licensed to 09:24:19
10    practice law? 09:24:16
11 A. In 1992. 09:24:19
12 Q. In what jurisdiction? 09:24:21
13 A. Texas. 09:24:22
14 Q. Did you become licensed in any other state? 09:24:25

| Deposition Designation | Objection & Response |
|---|---|
| 15 A. I did. 09:24:27<br>16 Q. Where else? 09:24:28<br>17 A. Colorado and Minnesota. 09:24:30<br><br>Page 14<br>10 Q. Do you hold any other certificates or 09:25:30<br>11    licenses? 09:25:31<br>12 A. As I said before, I am licensed to act as a 09:25:33<br>13    claim professional. 09:25:39<br>14 Q. What license is that? 09:25:40<br>15 A. Well, it's the -- it's the license that you 09:25:44<br>16    get when you work for an insurance company in 09:25:47<br>17    a variety of states as an adjuster, it's a 09:25:50<br>18    property and casualty adjustment license. 09:25:54<br><br>Page 20<br>3 Q. And did you begin working after you moved to 09:32:25<br>4 St. Paul? 09:32:28<br>5 A. I did. 09:32:28<br>6 Q. Who did you work for? 09:32:29<br>7 A. Travelers Insurance Company. 09:32:30<br>8 Q. How long were you with Travelers the first 09:32:32<br>9    time? 09:32:37<br>10 A. I was with them for seven years. 09:32:37<br>11 Q. So until approximately 2012? 09:32:42<br>12 A. That's correct. 09:32:45<br>13 Q. What did you do for Travelers? 09:32:46<br>14 A. I handled intellectual property claims, other 09:32:49<br>15 kinds of complex claims, business torts 09:32:54<br>16 specifically. A lot of those were in the 09:32:59<br>17 entertainment area, so I handled a lot of 09:33:02<br>18 entertainment claims. And errors and 09:33:06<br>19 omissions coverage for some technology 09:33:10<br>20 companies if it involved some aspect of 09:33:12<br>21 intellectual property or complex contracts. 09:33:15<br><br>Page 21<br>3 Q. While you were at Travelers, did you ever 09:33:35<br>4 analyze a claim where the war exclusion was 09:33:48<br>5 potentially applicable? 09:33:53<br>6 A. I did not. 09:33:54<br>7 Q. While you were at Travelers, did you ever 09:34:00<br>8 analyze a claim where the terrorism exclusion 09:34:02<br>9 was potentially applicable? 09:34:05<br>10 A. I did not. 09:34:08<br>11 Q. When you left Travelers, where did you go to 09:34:17<br>12 work next? 09:34:19<br>13 A. I went to work for OneBeacon, or 09:34:19<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION: | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 21 | |

Page 21

3 Q. While you were at Travelers, did you ever 09:33:35
4 analyze a claim where the war exclusion was 09:33:48
5 potentially applicable? 09:33:53
6 A. I did not. 09:33:54
7 Q. While you were at Travelers, did you ever 09:34:00
8 analyze a claim where the terrorism exclusion 09:34:02
9 was potentially applicable? 09:34:05
10 A. I did not. 09:34:08

END PLAINTIFFS' 106 COUNTER-DESIGNATION

Page 22
1 needed with regard to legal matters to the 09:34:58
2 underwriters and handle complex claims. 09:35:01
3 Q. Did your responsibilities change over time? 09:35:06
4 A. They did. 09:35:08
5 Q. When did they change? 09:35:09
6 A. After I had been there for about a year. 09:35:12
7 Q. What did you do for OneBeacon entertainment 09:35:14
8 after about a year? 09:35:16
9 A. They reorganized the claim division within 09:35:17
10 OneBeacon and asked me to move into a 09:35:20
11 management role supervising specific claim 09:35:24
12 handlers working on OneBeacon entertainment 09:35:28
13 claims.

Page 24
1 Q. What was your position title when you first 09:37:49
2 began to work at OneBeacon entertainment? 09:37:51
3 A. Second vice-president. 09:37:54
4 Q. Did that title change over time? 09:37:57
5 A. No. 09:37:59
6 Q. Did your job responsibilities change after 09:38:02
7 you moved into the position where you were 09:38:06
8 supervising claims analysts? 09:38:09
9 A. No, I mean, that continued to be my job 09:38:15
10 during my tenure there. 09:38:18

18 Q. When did you leave OneBeacon entertainment? 09:38:34
19 A. I left OneBeacon entertainment in 2015. Is 09:38:35
20 that right? Yeah. 09:38:43
21 Q. So you were with OneBeacon entertainment from 09:38:46
22 2012 until approximately 2015; is that 09:38:50
23 correct? 09:38:53
24 A. Yes. 09:38:53

Page 26
23 Q. And you left -- why did you leave OneBeacon

| Deposition Designation | Objection & Response |
|---|---|
| 09:41:14<br>24 entertainment in 2015? 09:41:18<br>25 A. OneBeacon entertainment reorganized and they 09:41:19<br><br>Page 27<br>1 downsized, particularly in the entertainment 09:41:24<br>2 group, and they gave the claim lead 09:41:27<br>3 responsibilities to the same person who was 09:41:31<br>4 also acting as the claim lead and continued 09:41:33<br>5 to act as the claim lead for public sector. 09:41:35<br><br>13 Q. Where did you go to work after OneBeacon 09:42:00<br>14 entertainment? 09:42:03<br>15 A. I went back to Travelers. 09:42:03<br><br><br>Page 31<br>11 Q. Other than the one online course, did you 09:46:51<br>12 receive any instructions, attend any 09:46:54<br>13 in-person seminars where you were given 09:46:58<br>14 instructions with respect to OneBeacon's 09:47:00<br>15 claims handling practices? 09:47:03<br>16 A. Well, I actually taught some courses on that. 09:47:04<br>17 Q. I understand, but did you personally receive 09:47:07<br>18 any training in that regard? 09:47:09<br>19 A. Well, we had annual meeting for OneBeacon 09:47:10<br>20 entertainment, and at the annual meeting 09:47:17<br>21 there were several, you know, discussions and 09:47:20<br>22 trainings that you were involved and they 09:47:23<br>23 involved claim. 09:47:26<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 31<br><br>24 Q. Okay. When you say there were various 09:47:38<br>25 discussions and trainings that were involved, 09:47:40<br><br>Page 32<br><br>1 what types of trainings were involved? 09:47:43<br>2 A. You know, I can't remember specifically. 09:47:47<br>3 Q. You also indicated that you taught claims 09:47:51<br>4 handling practices; is that correct? 09:47:54<br>5 A. No. I gave instruction on it, certainly, to 09:47:56<br>6 the people that I supervised. But, also, at 09:47:59<br>7 the annual meeting we would give information 09:48:02<br>8 to the underwriters about specific -- 09:48:06<br>9 specific claims that had arisen, how the 09:48:09<br>10 policy had been interpreted and things that 09:48:15 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 they should think about in the underwriting 09:48:17<br>12 process. 09:48:19<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 32<br>23 Q. Are you familiar with California's Fair 09:48:55<br>24 Claims Settlement Practices regulations? 09:48:59<br>25 A. Of course I am. 09:49:00<br><br>Pages 37<br>16 (Whereupon, Exhibit 1 was 09:54:00<br>17 marked for identification.) 09:54:09<br>18 BY MS. COYOCA: 09:54:09<br>19 Q. Ms. Johnson, have you seen this document 09:54:10<br>20 before? 09:54:12<br>21 A. I have. 09:54:12<br>22 Q. What is it? 09:54:12<br>23 A. It says, "General Claims Practices," and it 09:54:13<br>24 is an explanation of claims processing and 09:54:17<br>25 general claims practices. 09:54:21<br><br>Page 38<br>1 Q. When did you first see this document? 09:54:26<br>2 A. I believe it was provided to me when I first 09:54:28<br>3 came to OneBeacon. I'm not absolutely sure, 09:54:32<br>4 but I think it was. 09:54:35<br>5 Q. Who provided it to you? 09:54:35<br>6 A. Judy Lamble. 09:54:37<br>7 Q. When you are reviewing claims, do you look at 09:54:39<br>8 all potential coverages that might apply to a 09:55:01<br>9 claim? 09:55:04<br>12 THE WITNESS: Yes, I try to do 09:55:11<br>13 that. 09:55:12<br>14 BY MS. COYOCA: 09:55:14<br>15 Q. When you are reviewing a claim, do you 09:55:15<br>16 consider -- just as your practice, do you 09:55:18<br>17 consider the position of the insurer and the 09:55:23<br>18 position of the insured and investigate both 09:55:25<br>19 positions in making a coverage determination? 09:55:31<br>23 THE WITNESS: I consider my job to 09:55:37<br>24 be to look for insurance coverage if it can 09:55:38<br>25 be found for the insured. And if there's an 09:55:41<br><br>Page 39<br>1 ambiguity in the policy, the tie goes to the 09:55:46<br>2 policyholder. My job is to find coverage if 09:55:50<br>3 it exists. 09:55:53<br><br>Page 91<br>1 That wasn't uncommon. I mean, if 11:08:54<br>2 there's a -- in entertainment claims, 11:08:56 | |

| Deposition Designation | Objection & Response |
|---|---|
| 3 especially first-party claims, things are 11:08:59<br>4 very fast moving. You can't allow a 11:09:00<br>5 production to sit around and wait. If they 11:09:03<br>6 have something that they have that they need 11:09:05<br>7 an answer to, you need to get on it as 11:09:07<br>8 quickly as possible. 11:09:10<br><br>Page 77<br>20 Q. I'd like to show you next, Ms. Johnson, a 10:53:57<br>21 document that previously was marked 10:54:01<br>22 Exhibit 16. Are you familiar with this 10:54:03<br>23 document? 10:54:16<br>24 A. I am. 10:54:17<br>25 Q. What is it? 10:54:17<br>Page 78<br>1 A. It's the core principals set forth for 10:54:18<br>2 OneBeacon claim handling. 10:54:21<br>3 Q. When did you first see it? 10:54:22<br>4 A. I think I saw it when I first came to the 10:54:26<br>5 company.10:54:28<br><br>Page 90<br>7 Q. Ms. Johnson, when is the first time you heard 11:07:47<br>8 about the Dig claim? 11:07:49<br>9 A. I think that it was on a telephone call 11:07:53<br>10 with Danny Gutterman, Andrea Garber and 11:07:56<br>11 Susan Weiss on July 10th, 2014. 11:08:00<br>12 Q. You believe that phone call took place on 11:08:19<br>13 July 10, 2014? 11:08:21<br>14 A. I think that's right. I could be mistaken 11:08:22<br>15 about the date. 11:08:24<br>16 Q. And the participants in the call were 11:08:25<br>17 Danny Gutterman, Andrea Garber, Susan<br>Weiss11:08:27<br>18 and yourself? 11:08:34<br>19 A. That's correct. 11:08:34<br>20 Q. Why were you having the call? 11:08:37<br>21 A. Danny called me and he said that NBC had a 11:08:39<br>22 claim that they wanted to discuss and could 11:08:43<br>23 we talk about it, you know, in other words, 11:08:46<br>24 could he conference me in. Or he may have 11:08:50<br>25 already conferenced me in, I don't remember. 11:08:53<br><br>Page 91<br>1That wasn't uncommon. I mean, if 11:08:54<br>2 there's a -- in entertainment claims, 11:08:56<br>3 especially first-party claims, things are 11:08:59<br>4 very fast moving. You can't allow a 11:09:00<br>5 production to sit around and wait. If they 11:09:03<br>6 have something that they have that they need 11:09:05 | |

| Deposition Designation | Objection & Response |
|---|---|
| 7 an answer to, you need to get on it as 11:09:07<br>8 quickly as possible. 11:09:10<br><br>Page 92<br>1 Q. Was it your understanding during the course 11:09:48<br>2 of the call that the claim had previously 11:09:56<br>3 been discussed with anyone else at OneBeacon? 11:09:57<br>4 A. I think that either Andrea or Susan mentioned 11:10:00<br>5 that they had talked to Peter. 11:10:06<br>6 Q. What was discussed during the call? 11:10:15<br>7 A. They explained that the situation -- that -- 11:10:30<br>8 in Israel had become too dangerous for their 11:10:38<br>9 cast to resume filming there. They had been 11:10:43<br>10 on hiatus between the pilot and the shooting 11:10:47<br>11 of the initial season, which is not uncommon, 11:10:51<br>12 and they were supposed to start shooting 11:10:54<br>13 again and they wanted to push for a week. In 11:10:57<br>14 other words, they wanted to delay starting 11:10:59<br>15 production for a week to see whether or not 11:11:01<br>16 the situation deescalated. 11:11:05<br>17 Q. Did they explain to you why the situation in 11:11:08<br>18 Israel had become dangerous? 11:11:11<br>19 A. They told me that -- that Hamas was lobbing 11:11:12<br>20 rockets into Tel Aviv and Jerusalem, which 11:11:20<br>21 were the two cities in which they had 11:11:24<br>22 locations for shooting. 11:11:27<br>23 Q. Did they say anything further with respect to 11:11:28<br>24 the situation that was creating an unsafe 11:11:34<br>25 circumstance for the production to proceed? 11:11:38<br><br>Page 93<br>1 A. No, that's what we talked about in terms 11:11:40<br>2 of -- of safety or lack of safety, was that 11:11:43<br>3 the fact that there was increased rocket fire 11:11:47<br>4 and their security team had told them that it 11:11:54<br>5 had become unsafe. 11:11:58<br>6 Q. Who did the talking as between Ms. Garber or 11:12:07<br>7 Ms. Weiss, if there was one, that was the 11:12:10<br>8 predominant talker during the call? 11:12:12<br><br>11 THE WITNESS: I think both of them 11:12:18<br>12 participated, but Susan I think did most of 11:12:19<br>13 the talking. That's Susan Weiss, the broker. 11:12:35<br>14 BY MS. COYOCA: 11:12:35<br>15 Q. What, if anything, did they say about their 11:12:36<br>16 conversation with Mr. Williams? 11:12:38<br>17 A. I don't recall 11:12:42<br>18 Q. Did they indicate that they had spoken to 11:12:42<br>19 Mr. Williams about the push? 11:12:44 | |

| Deposition Designation | Objection & Response |
|---|---|
| 20 A. Yes.<br>21 Q. Did they indicate what Mr. Williams said in 11:12:51<br>22 response to their recitation of the facts? 11:12:54<br><br>Page 94<br>23 Q. It's your recollection that you asked for 11:14:04<br>24 that information as to the dollar amount? 11:14:05<br>25 A. I think we talked about that, yes, because we 11:14:09<br><br>Page 95<br>1 were talking about who was all -- who was 11:14:12<br>2 still on the ground, was everyone already 11:14:13<br>3 out, was -- you know, because we wanted to 11:14:16<br>4 make sure people were safe, was -- you know, 11:14:20<br>5 who had they been using, in other words, were 11:14:21<br>6 they using a local camera crew. 11:14:23<br>7 In a -- in a production situation 11:14:26<br>8 there are people that you can -- you know, if 11:14:28<br>9 you're going to push you have to think about 11:14:32<br>10 that there are people who have different 11:14:34<br>11 contracts with regard to a show. Some people 11:14:36<br>12 you need to give them 24 hours notice and say 11:14:38<br>13 with 24 hours notice we don't need you 11:14:41<br>14 anymore. There are other people who have 11:14:43<br>15 contracts that you cannot stop paying them. 11:14:45<br>16 And those are all things that are 11:14:47<br>17 taken into consideration when we're 11:14:49<br>18 evaluating, not coverage for the claim, but 11:14:51<br>19 the damages associated with that claim, and 11:14:53<br>20 so that's the reason we would ask questions 11:14:56<br>21 like that. 11:14:58<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 95<br><br>22 Q. My question, though, is: Did you ask them 11:15:02<br>23 the question as to what the estimated cost 11:15:06<br>24 would be for pushing production for one week? 11:15:10<br>25 A. I -- I don't remember. 11:15:13<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 96<br>1 Q. Did Ms. Weiss or Ms. Garber indicate what 11:15:14<br>2 would happen after one week? 11:15:28<br>3 A. As I recall, we were talking about whether or 11:15:29<br>4 not -- this was a fast-moving situation and 11:15:33<br>5 we wanted to see whether it would deescalate. 11:15:35<br>6 So we had -- we had agreed that we would talk 11:15:41 | |

| Deposition Designation | Objection & Response |
|---|---|
| 7 again shortly after seeing what -- what was 11:15:44<br>8 continuing to happen. 11:15:46<br>9 Q. Is there anything else that Ms. Garber or 11:15:50<br>10 Ms. Weiss told you during that July 10 phone 11:15:52<br>11 call? 11:15:56<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 96<br><br>12 A. I think that they told me that they already 11:15:56<br>13 had -- 11:15:58<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 96<br>21 I think what I recall is that 11:16:15<br>22 they -- that, you know, primarily what we 11:16:16<br>23 were talking about is is everybody safe. And 11:16:18<br>24 so I think what they were telling me is they 11:16:21<br>25 thought that everyone was already out, 11:16:24<br><br>Page 97<br>1 because that was our primary concern, is 11:16:25<br>2 everyone -- you know, have they left Israel, 11:16:28<br>3 are they still on the ground, if they need to 11:16:30<br>4 leave, you know, what -- what arrangements 11:16:33<br>5 have you made with regard to that. 11:16:35<br>6 And I think, because they were on 11:16:36<br>7 hiatus, that either everyone or almost 11:16:38<br>8 everyone was already gone or had not 11:16:41<br>9 returned, depending on how you look at it. 11:16:45<br><br>19 Q. What was your response, if any, to the 11:17:13<br>20 description of the need for a push? 11:17:18<br>21 A. Well, I don't think that I responded one way 11:17:23<br>22 or another. I agreed with them that given 11:17:26<br>23 the information they had, it sounded like a 11:17:29<br>24 dangerous situation and that we wanted to see 11:17:31<br>25 what was going to happen next.11:17:34<br><br>Page 98<br>1 Q. Anything else? 11:17:41<br>2 A. No, other than the fact that we were going to 11:17:43<br>3 talk again very soon. 11:17:48<br>4 Q. All right. Did you ask Ms. Weiss or 11:17:51<br>5 Ms. Garber to provide any further 11:17:54<br>6 information? 11:17:56<br>7 A. I think they told me that they had a report 11:18:00<br>8 from their security person. I mean, we had 11:18:02<br>9 talked about that report, because it was that 11:18:07<br>10 report that said that it was -- that safety 11:18:09<br>11 could no longer be guaranteed. 11:18:15<br>12 MS. COYOCA: Okay. I'd like to 11:18:27 | |

| Deposition Designation | Objection & Response |
|---|---|
| 13 mark as Exhibit 2 to this deposition a 11:18:28<br>14 document that is a series of e-mails, and 11:18:32<br>15 it's labeled Bates control ATL000982 11:18:35<br>16 through 985. The top e-mail is from 11:18:40<br>17 Michael J. Arevalo to Pamela Johnson on 11:18:45<br>18 Tuesday, September 15, 2014. 11:19:11<br>19 (Whereupon, Exhibit 2 was 11:19:11<br>20 marked for identification.) 11:19:12<br>21 THE WITNESS: I'm sorry, I believe 11:19:12<br>22 you misspoke. I think you said September 11:19:14<br>23 15th. This indicates July 15th. 11:19:14<br>24 MS. COYOCA: You're right, I did. 11:19:16<br>25 Thank you for that. The record should 11:19:17<br><br>Page 99<br>1 reflect that the date is July 15th, 2015 11:19:18<br><br>7 Q. First of all, have you seen this document 11:20:42<br>8 before, Ms. Johnson? 11:20:45<br>9 A. Well, I've seen the e-mail that Michael sent 11:20:46<br>10  to me. Yes, I mean, I have      seen the 11:20:49<br>11 e-mail -- e-mail chain before, yes. 11:20:55<br>12 Q. Okay. The first e-mail in time is at the 11:20:57<br>13 very bottom of the document, and that's from 11:21:09<br>14 Randi Richmond to Andrea Garber with a cc to 11:21:10<br>15 Mark Binke and Kurt Ford, and it's dated 11:21:16<br>16 Monday, July 14, 2014. Do you see that? 11:21:19<br>17 A. I do. 11:21:23<br>18 Q. And the e-mail contains part A, "Summary of 11:21:23<br>19 where you are in the production schedule," 11:21:27<br>20 and B, "What you have been advised of by 11:21:28<br>21 security regarding the imminent peril to your 11:21:31<br>22 operations." Do you see that? 11:21:35<br>23 A. Yes. 11:21:41<br>24 Q. You previously testified about a report that 11:21:41<br>25 had been received by security indicating that 11:21:44<br><br>Page 100<br>1 they were no longer able to guarantee safety 11:21:47<br>2 and security of the employees in Israel; is 11:21:49<br>3 that right? 11:21:52<br>4 A. Yes. 11:21:52<br>5 Q. Is this the report that you were thinking of? 11:21:53<br>6 A. Yes. 11:21:56<br><br>Page 101<br>10 Q. The e-mail above the e-mail that we were 11:23:29<br>11 just discussing is from Andrea Garber to 11:23:33<br>12 Susan Weiss with a cc to Deborah Kizner dated 11:23:35<br>13 Monday, July 14, 2014, and the first sentence 11:23:39<br>14 reads, "Following our discussion on Friday 11:23:44 | |

| Deposition Designation | Objection & Response |
|---|---|
| 15 with Peter, below is the e-mail I received 11:23:46<br>16 from Randi Richmond, the production executive 11:23:48<br>17 on the show, outlining the situation in11:23:52<br>18 Israel on our production Dig, Season 1." Do 11:23:53<br>19 you see that sentence? 11:23:57<br>20 A. I do. 11:23:57<br>21 Q. You just testified that you believed that you 11:23:58<br>22 spoke with Ms. Garber and Ms. Weiss after one 11:24:00<br>23 or both of them had already spoken with 11:24:04<br>24 Mr. Williams; is that correct? 11:24:06<br>25 A. That's correct. 11:24:08<br><br>Page 102<br>6 Q. To the best of your recollection, had they 11:24:26<br>7 spoken with Mr. Williams more than one time 11:24:30<br>8 prior to the conversation they had with you 11:24:32<br>9 and Mr. Gutterman? 11:24:34<br>10 A. Not that I was aware of when we were having 11:24:35<br>11 our conversation, no. 11:24:38<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 103<br><br>19 Q. As you look at Ms. Weiss's e-mail below the 11:26:36<br>20 e-mail that was forwarded to you by 11:26:39<br>21 Mr. Arevalo, is it your understanding that 11:26:40<br>22 this was the tender of the claim, notice of 11:26:42<br>23 the claim being given to OneBeacon? 11:26:46<br>24 A. Well, this certainly is not the way you 11:26:49<br>25 usually would tender a claim. But, yes, I 11:26:51<br><br>Page 104<br><br>1 mean, I think that she was -- she was saying 11:26:56<br>2 that she was making us aware of the claim. 11:26:58<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 104<br>3 Q. How does the e-mail notification differ from 11:27:03<br>4 what would usually be the case in terms of 11:27:07<br>5 tender of a claim? 11:27:09<br>6 A. You usually would get an accord that would 11:27:10<br>7 have information, you know, here's what the 11:27:13<br>8 client contact is, here's -- you know, here's 11:27:16<br>9  the broker. It didn't always happen, because 11:27:19<br>10 we worked so closely with the brokers that 11:27:22<br>11 usually -- or not usually, but sometimes they 11:27:24 | |

| Deposition Designation | Objection & Response |
|---|---|
| 12 would simply give us a call and tell us about 11:27:28<br>13 a claim and then expect us to do the setup or 11:27:31<br>14 send us an e-mail. 11:27:34<br><br>22 Q. So typically you would receive an accord from 11:27:51<br>23 the broker or from the insured directly? 11:27:54<br>24 A. Not from the insured, from the broker. 11:27:57<br><br>Page105<br>4 Q. How were claims typically tendered to 11:28:16<br>5 OneBeacon entertainment by Aon during that 11:28:20<br>6 period of time that you were handling claims? 11:28:23<br><br>9 THE WITNESS: It would depend, I 11:28:27<br>10 think, on whether or not it was a first-party 11:28:28<br>11 or third-party claim. Certainly, the claims 11:28:30<br>12 that I dealt with them, it was always a first 11:28:35<br>13 party production claim, and I think that -- 11:28:38<br>14 you know, I don't know that I can speak to 11:28:42<br>15 exactly the form that they took. It wouldn't 11:28:46<br>16 surprise me if Susan called or sent an 11:28:49<br>17 e-mail, because a lot of the ones that I 11:28:52<br>18 dealt with were Sandy claims, for example, 11:28:55<br>19 and of course that was, again, a very 11:28:57<br>20 fast-moving situation. 11:28:59<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 105<br><br>22 Q. Was there any requirement that claims be 11:29:00<br>23 tendered in a particular format? 11:29:04<br>24 A. Not that I'm aware of. 11:29:05<br>25 Q. After a claim was submitted to OneBeacon by 11:29:09<br><br>Page 106<br><br>1 NBCUniversal, what was the next step in terms 11:29:13<br>2 of setting up the file? 11:29:15<br>3 A. So Lucy Lopez, who also worked as my 11:29:18<br>4 assistant, would get the -- get the relevant 11:29:26<br>5 information for the broker to be able to fill 11:29:28<br>6 in all of the screens that we need -- needed 11:29:31<br>7 to set up the claim in our claim files 11:29:40<br>8 system. 11:29:42<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page110<br>12 Q. And Mr. Gutterman was officed in Los Angeles; 11:34:57<br>13 is that correct? 11:35:00 | |

| Deposition Designation | Objection & Response |
|---|---|
| 14 A. He was. 11:35:01<br>15 Q. Did you meet with him on a regular basis 11:35:01<br>16 in-person? 11:35:05<br>17 A. I did. 11:35:06<br>18 Q. How regularly? 11:35:08<br>19 A. I was going out to California at least once a 11:35:09<br>20 month, sometimes more often than that. I'm 11:35:13<br>21 sure there were time periods in which I was 11:35:17<br>22 traveling for other -- you know, to other 11:35:20<br>23 jurisdictions when I wouldn't get there 11:35:23<br>24 within a month, but it was -- it was pretty 11:35:25<br>25 close to that. It was often. And we talked 11:35:27<br><br>Page 111<br>1 on the phone almost every day. 11:35:30<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page111<br><br>5 Q. Before working for OneBeacon, what was your 11:35:42<br>6 understanding of what Mr. Gutterman did? 11:35:44<br>7 A. He worked as a production assistant on a 11:35:46<br>8 reality television show. 11:35:48<br>9 Q. Did you know if he had any insurance 11:35:52<br>10 expertise or experience prior to going to 11:35:56<br>11 work for OneBeacon? 11:35:58<br>12 A. Yes, he had worked at Progressive Insurance 11:35:59<br>13 at one period of time. 11:36:04<br>14 Q. And while at Progressive did he handle 11:36:05<br>15 entertainment-related claims? 11:36:08<br>16 A. Not that I'm aware of. 11:36:09<br>17 Q. What type of claims did he handle at 11:36:13<br>18 Progressive? 11:36:16<br>19 A. I think primarily auto, but I -- I don't 11:36:16<br>20 remember for sure. 11:36:19<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br><br>Page 115<br>5 Q. What training did OneBeacon entertainment 11:40:23<br>6 provide to Mr. Gutterman when he first came 11:40:27<br>7 onboard? 11:40:29<br>8 A. When he first came onboard he spent a great 11:40:30<br>9 deal of time with both me and Peter Williams 11:40:32<br>10 going through the first-party coverages and 11:40:36<br>11 the different policies that we used so that 11:40:39<br>12 he could gain an understanding of what it was 11:40:42<br>13 that was covered and not covered under those 11:40:44<br>14 policies, generally speaking, so that we 11:40:47 | |

| Deposition Designation | Objection & Response |
|---|---|
| 15 would talk to him about, "Okay, so here's the 11:40:50<br>16 coverage grant, here are the exclusions that 11:40:53<br>17 apply," you know, give some examples of past 11:40:55<br>18 claims in which that information had been 11:40:58<br>19 used, and talk to him generally about 11:41:00<br>20 questions that he should ask. But as I said, 11:41:03<br>21 he worked very closely with both of us. 11:41:09<br>22 Q. Was there any kind of training program, 11:41:09<br>23 formal training program that OneBeacon 11:41:12<br>24 entertainment has for claims adjusters when 11:41:17<br>25 they're first hired? 11:41:17<br><br>Page 116<br>1 A. I'm sure that he did some online training. 11:41:18<br>2 Q. You've referenced online training a couple of 11:41:24<br>3 times now. Is that online training that's 11:41:28<br>4 provided by OneBeacon? 11:41:30<br>5 A. Yes. 11:41:31<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 116<br><br>6 Q. Is the online training a specific number of 11:41:38<br>7 hours? 11:41:41<br>8 A. No, it's specific courses that you have to go 11:41:43<br>9 through. I have no idea how long it would 11:41:46<br>10 take. And, of course, he also needed to get 11:41:48<br>11 his adjusters license. 11:41:52<br>12 Q. What were the specific online courses that 11:41:55<br>13 Mr. Gutterman needed to complete? 11:41:58<br>14 A. I'm sorry, I don't remember. 11:42:00<br>15 Q. Were there more than ten courses? 11:42:02<br>16 A. I don't think so, but I can't recall for 11:42:05<br>17 sure. 11:42:08<br>18 Q. Were there more than five? 11:42:09<br>19 A. I'm sorry, I don't recall. 11:42:11<br>20 Q. Do you have an estimate as to how many 11:42:12<br>21 courses? 11:42:14<br>22 A. I don't. I know that for myself it took me a 11:42:14<br>23 couple of days, maybe a little bit longer to 11:42:23<br>24 complete them all, but I don't -- I don't 11:42:26<br>25 remember specifically. 11:42:28<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 118<br>14 Q. You indicated that shortly after having that 11:44:32<br>15 phone call with Ms. Garber and Ms. Weiss, you 11:44:34<br>16 believe that you began researching; is that 11:44:37<br>17 correct? 11:44:39<br>18 A. Yes. 11:44:39<br>19 Q. What did you research? 11:44:40 | |

| Deposition Designation | Objection & Response |
|---|---|
| 20  A. I wanted to know what was happening in 11:44:42<br>21 Israel. And they said that it was -- that, 11:44:46<br>22 you know, it was a dangerous situation and 11:44:47<br>23 they said that they thought it was imminent 11:44:49<br>24 peril, and so I needed to collect information 11:44:51<br>25 to see whether or not it actually did fall 11:44:54<br><br>Page 119<br>1 within the coverage grant for imminent peril 11:44:56<br>2  and whether there were any exclusions that 11:45:02<br>3  applied. 11:45:04<br>4 Q. What did you do to research the situation in 11:45:04<br>5 Israel? 11:45:06<br>6 A. I looked at news reports, I read articles, I 11:45:13<br>7 looked at newspaper articles and, you know, a 11:45:20<br>8 variety of -- of -- I don't know what you 11:45:24<br>9 would call them. Not academic articles, 11:45:29<br>10  because I don't think that that's what they 11:45:31<br>11 would be called, but articles or -- or white 11:45:34<br>12 papers written by, for example – for 11:45:37<br>13 example, the CRS, the Congressional Research 11:45:39<br>14 Service that works specifically for 11:45:43<br>15 U.S. Congress. 11:45:45<br>16 Q. Did you begin that research the same day that 11:45:46<br>17 you had the conversation with Ms. Weiss and 11:45:49<br>18 Ms. Garber? 11:45:52<br>19 A. I think did, yes. 11:45:54<br>20 Q. Now, you indicated you were in a restaurant 11:45:55<br>21 parking lot when you first took that first 11:46:00<br>22 phone call and then you drove home; is that 11:46:02<br>23 correct? 11:46:04<br>24 A. I don't remember specifically where I went 11:46:04<br>25 after that, but I probably went home. 11:46:06<br><br>Page 120<br>1 Q. Was it an evening when you took the phone 11:46:08<br>2 call? 11:46:14<br>3 A. I don't remember the exact time. 11:46:16<br>4 Q. Did you begin your research, though, when you 11:46:17<br>5 went home or did you wait until the next day? 11:46:22<br>6 A. I think I actually started looking at stuff 11:46:27<br>7 that night. As I said, these are very 11:46:29<br>8 fast-moving claims, so you can't sit around 11:46:35<br>9 and wait. 11:46:38<br>10 Q. Now, you indicated you also had to review the 11:46:43<br>11 coverage; is that correct? 11:46:50<br>12 A. Yes. 11:46:51<br>13 Q. What did you do to review the coverage? 11:46:51<br>14 A. I looked at the policy. 11:46:54<br>15 Q. Anything else? 11:46:56 | |

| Deposition Designation | Objection & Response |
|---|---|
| 16 A. Well, the policy is what indicates what the 11:46:57<br>17 coverage is, so, no, that's what I did. I 11:47:05<br>18 looked at what the policy said.11:47:08<br>19 Q. Did you look at anything else, though, in 11:47:10<br>20  order to be able to analyze the coverage? 11:47:13<br>21 A. Well, I think I just told you a variety of 11:47:15<br>22 things that I did. 11:47:18<br><br>Page 122<br>8 Q. Did you look at the imminent peril coverage?<br>11:48:42<br>9 A. Yes. 11:48:44<br>10 Q. Under the extra expense portion of the 11:48:45<br>11 policy? 11:48:47<br>12 A. That's correct. 11:48:48<br>13 Q. Did you come to a conclusion as to whether or<br>11:48:49<br>14 not the situation that had been described 11:48:52<br>15 constituted imminent peril? 11:48:54<br>16 A. Based on the information that I had at the 11:48:56<br>17 time, what -- what you always try to 11:48:58<br>18 determine in an imminent peril situation is 11:49:00<br>19first was this unexpected. 11:49:02<br>20 In other words, based on the 11:49:04<br>21 information that the -- that the production 11:49:06<br>22 has before they go into the situation versus 11:49:11<br>23 what the situation is at the time that they 11:49:14<br>24 are saying that they have a claim, is the 11:49:16<br>25 behavior or whatever is going on, you know, 11:49:19<br><br> Page 123<br>1 has -- has that -- is that unexpected to the 11:49:23<br>2 degree that you think that keeping people 11:49:26<br>3 there would be unconscionable. 11:49:29<br>4 So that's what I was looking at, 11:49:35<br>5 what was the situation before we went in, and 11:49:37<br>6 then what was the situation at the time we 11:49:39<br>7 had the phone call and they decided to push. 11:49:41<br>8 Q. And did you reach a conclusion as to whether<br>11:49:44<br>9 it was? 11:49:46<br>10 A. It appeared to me that the situation had 11:49:46<br>11 grown decidedly more dangerous. 11:49:49<br>12 Q. Did you end up concluding that, in fact, 11:49:56<br>13 there was imminent peril? 11:50:02<br>14 A. Well, it appears -- 11:50:02<br>17 THE WITNESS: It appeared to me 11:50:08<br>18 there was a war, and certainly the war was 11:50:09<br>19 creating imminent peril. 11:50:11<br><br>Page 124<br>12 Q. When did you reach your conclusion that the<br>11:50:49<br>13 situation did in fact constitute imminent 11:50:52 | |

| Deposition Designation | Objection & Response |
|---|---|
| 14 peril? 11:51:02<br>15 A. Well, it didn't take me very long to reach 11:51:02<br>16 that conclusion. I mean, I don't think I 11:51:05<br>17 reached it that night. I continued to have 11:51:07<br>18 conversations with Danny. We both were doing 11:51:10<br>19 research and exchanging information with each 11:51:12<br>20 other with regard to what we had found. But 11:51:14<br>21 certainly within a few days. 11:51:18<br><br>Page 125<br>8 Q. Ms. Johnson, the day that you had that first 12:07:35<br>9 phone conversation with Ms. Garber and 12:07:38<br>10 Ms. Weiss, you said you believed that you 12:07:40<br>11 went back and did some research that evening. 12:07:42<br>12 Did you do that research online? 12:07:46<br>13 A. Yes. 12:07:48<br>14 Q. Did you also look at the policy that evening? 12:07:49<br>15 A. You know, I don't remember if I -- if I 12:07:52<br>16 looked at the policy that evening or not. I 12:07:54<br>17 don't remember whether or not it was in the 12:07:59<br>18 claim file at that point and if I had access 12:08:00<br>19 to it. I certainly looked at it very shortly 12:08:03<br>20 thereafter. 12:08:07<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 125<br><br>21 Q. At the time that you had the conversation 12:08:11<br>22 with Ms. Weiss and Ms. Garber, was there a 12:08:14<br>23 claim already -- a file that had already been 12:08:18<br>24 set up? 12:08:21<br>25 A. I have no idea. 12:08:21<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 126<br>1 Q. The same day that you had the conversation 12:08:28<br>2 after the call was over, did you have any 12:08:31<br>3 conversations with Mr. Gutterman separate 12:08:33<br>4 from the joint call? 12:08:36<br>5 A. On that same day? 12:08:38<br>6 Q. Yeah. After the joint call with Ms. Garber 12:08:39<br>7 and Ms. Weiss. 12:08:44<br>8 A. I -- I -- I don't remember. Possibly, but I 12:08:44<br>9 just don't remember. 12:08:47<br>10 Q. When is the next time you remember speaking 12:08:49<br>11 with Mr. Gutterman about the claim? 12:08:52<br>12 A. It probably would have been the next day, but 12:08:55 | |

| Deposition Designation | Objection & Response |
|---|---|
| 13 I don't -- I can't tell you that for sure. 12:08:59<br>14 We spoke very often, and this was such a 12:09:01<br>15 fast-moving situation. NBC really wanted to 12:09:04<br>16 know whether or not the claim was covered and<br>12:09:07<br>17 what was going to happen pretty quickly, so 12:09:10<br>18 we were doing our best to be able to provide 12:09:15<br>19 them with an answer. 12:09:17<br>20 Q. Does the pace of the investigation suggest to 12:09<br>21 you that you were in frequent contact with 12:09:22<br>22 Mr. Gutterman shortly after the call? 12:09:25<br>23 A. I'm sorry, I just don't remember. 12:09:30<br>24 Q. Did you -- do you recall not speaking with 12:09:31<br>25 Mr. Gutterman about the claim? 12:09:36<br><br>Page 127<br>1 A. I don't have any recollection one way or the 12:09:37<br>2 other. 12:09:39<br>3 Q. Did you provide any guidance to Mr. Gutterman<br>12:09:40<br>4 as to the next steps to be taken in 12:09:44<br>5 investigating the claim? 12:09:48<br>6 A. Well, I'm sure that we discussed what we 12:09:50<br>7 needed to find out with regard to what was 12:09:53<br>8 happening. I don't remember in particular 12:09:55<br>9 what charge I gave him with regard to what he 12:10:00<br>10 should do. 12:10:03<br>11 Q. What did you discuss in terms of what you 12:10:10<br>12 needed to find out? 12:10:15<br>13 A. I don't recall specifically, but since it was 12:10:18<br>14 coverage that they were looking for under 12:10:26<br>15 imminent peril, which is what Susan Weiss had<br>12:10:28<br>16 said, we would have been looking at what was 12:10:31<br>17 the situation before they went there, what 12:10:32<br>18 was the situation at the time that they 12:10:36<br>19 submitted the claim and what had happened in 12:10:38<br>20 between. 12:10:41<br>21 Q. What, if anything, did you do to discover 12:10:48<br>22 what the situation had been before they went 12:10:51<br>23 there? 12:10:53<br>24 A. I think I've already answered that question. 12:10:53<br>25 Q. Unfortunately, you need to answer it again. 12:10:58<br><br>Page 128<br>1 A. I looked at a variety of newspaper articles, 12:11:03<br>2 videos, different websites that -- that 12:11:05<br>3 contained information. I read some white 12:11:10<br>4 papers. I read just a wide variety of things 12:11:13<br>5 that talked about what the situation was and 12:11:19<br>6 what the situation had been. 12:11:22<br>7 Q. So the same source material that you were 12:11:26<br>8 looking at to determine what was then ongoing 12:11:29<br>9 in Israel, you also looked at to determine 12:11:31 | |

| Deposition Designation | Objection & Response |
|---|---|
| 10 what the situation had been in Israel prior 12:11:33<br>11 to the commencement of the situation with 12:11:35<br>12 Hamas? 12:11:37<br>testimony, vague and ambiguous. 12:11:40<br><br>15 THE WITNESS: In order to 12:11:46<br>16 determine imminent peril, you have to make 12:11:46<br>17 sure that whatever is happening is 12:11:49<br>18 unexpected. In order to determine if 12:11:53<br>19 something is unexpected, you have to know 12:11:55<br>20 what happened before the production got there 12:11:57<br>21 and what was happening at the time that they 12:11:59<br>22 submitted the claim. 12:12:02<br>23 BY MS. COYOCA: 12:12:05<br>24 Q. My question to you, Ms. Johnson, is: Did you 12:12:05<br>25 look to the same set of materials to try to 12:12:08<br><br>Page 129<br>1 determine what the situation was before the 12:12:11<br>2 claim had arisen? 12:12:15<br>3 A. Well, some of the materials I looked --- 12:12:16<br>4 looked at was what is happening right now. 12:12:18<br>5 And then, yes, I did an investigation of what 12:12:21<br>6 had the situation been prior to that time. 12:12:23<br>7 Q. Did you -- to the best of your recollection, 12:12:34<br>8 did you consult any other materials in order 12:12:37<br>9 to determine what the situation was prior to 12:12:39<br>10 the time the claim arose? 12:12:42<br>11 A. I know I looked at travel warnings. 12:12:43<br>12 Q. Where did you get the travel warnings from? 12:12:51<br>13 A. I looked at the State Department's warnings 12:12:53<br>14 that they put out with regard to warning U.S. 12:12:58<br>15 citizens about dangerous areas of travel. 12:13:02<br>16 Q. Any other source other than U.S. State 12:13:05<br>17 Department? 12:13:08<br>18 A. Yup, I looked at a variety of other countries 12:13:08<br>19 as well. We looked at the United Kingdom. I 12:13:12<br>20 think I looked at Australia, and probably a 12:13:17<br>21 few more. 12:13:23<br>22 Q. How far back in time did you look in order to 12:13:24<br>23 look at the security situation prior to the 12:13:29<br>24 time the claim arose? 12:13:32<br>25 A. Well, I was looking most specifically what 12:13:33<br><br>Page 130<br>1 had happened, you know, in just the months 12:13:36<br>2 prior, but that didn't mean I didn't do a 12:13:39<br>3 more thorough investigation of, okay, so 12:13:42<br>4 what -- what is the current situation. I 12:13:45<br>5 knew something about that, but I didn't -- 12:13:47<br>6 you know. I wanted to make sure that the 12:13:50 | |

| Deposition Designation | Objection & Response |
|---|---|
| 7 information I had was correct and -- and to 12:13:52<br>8 be thorough. 12:13:54<br>9 Q. With respect to the communications you had 12:13:57<br>10 with Danny Gutterman about his investigation 12:14:02<br>11 of the claim, do you recall directing him to 12:14:04<br>12 look at any particular sources of 12:14:08<br>13 information? 12:14:10<br>14 A. As I sit here today, I don't remember. Maybe 12:14:12<br>15 I did. 12:14:15<br>16 Q. Maybe you did, maybe you didn't, you just 12:14:16<br>17 don't remember? 12:14:19<br>18 A. I don't recall. 12:14:20<br>19 Q. Did you and Mr. Gutterman develop an 12:14:27<br>20 investigation plan for the claim? 12:14:31<br>21 A. Well, when you say, "Develop an investigation 12:14:34<br>22 plan," we began an investigation, so it's not 12:14:38<br>23 as though we sat down and said, "This is what 12:14:41<br>24 we need to know." We already knew what we 12:14:44<br>25 needed to know when we started to investigate 12:14:47<br><br>Page 131<br>1 it, what happened prior to the time that the 12:14:52<br>2 shooting started and what happened in 12:14:53<br>3 shooting -- I mean, principal photography -- 12:14:55<br>4 and what happened in between the time that 12:15:01<br>5 they -- before they got there and what was 12:15:02<br>6 happening at the time they made the claim.12:15:03<br><br>12 A. Well, I think what I've already testified is 12:15:14<br>13 that I began the investigation myself that 12:15:16<br>14 night, and that I don't recall whether or not 12:15:20<br>15 I spoke with Mr. Gutterman before I started 12:15:22<br>16 doing that. 12:15:25<br>17 Q. Did you and Mr. Gutterman develop an 12:15:28<br>18 investigation plan before beginning the 12:15:28<br>19 investigation? 12:15:31<br>20 A. I think I've already told you. 12:15:35<br>21 Q. Please answer my question. 12:15:37<br>22 A. Did I sit down and --12:15:39<br>25 THE WITNESS: Did I sit down 12:15:43<br><br>Page 132<br>1 and -- and have a conversation about him, 12:15:44<br>2 "These are the steps we need to take," no, 12:15:46<br>3 "One, two, three," no, I did not do that. 12:15:48<br><br>Page 133<br>23 Q. Did you ever have a telephone call with him 12:18:04<br>24 to discuss it? 12:18:06<br>25 A. I'm sorry, I just don't remember. I mean, 12:18:13 | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 134<br>1 that would be likely because, you know, the 12:18:16<br>2 protocol was if you think that there's going 12:18:20<br>3 to be something that -- that is going to 12:18:22<br>4 have -- that is potentially not covered, you 12:18:24<br>5 want to tell Peter first, and then you want 12:18:26<br>6 to tell the broker. 12:18:30<br>7 Q. And when did you -- in relation to when the 12:18:36<br>8 first conversation took place with Ms. Garber 12:18:43<br>9 and Ms. Weiss, when did you have that 12:18:44<br>10 conversation with Mr. Williams to indicate 12:18:46<br>11 that there might not be coverage? 12:18:48<br>12 A. I think I've already told you I'm not sure 12:18:50<br>13 exactly when it took place. 12:18:53<br>14 Q. Was it a week later? 12:18:54<br>15 A. Oh, no. 12:18:55<br>16 Q. Was it five days later? 12:18:58<br>17 A. No. 12:19:00<br>18 Q. Was it three days later? 12:19:00<br>19 A. I don't think that we even waited that long. 12:19:03<br>20 It would have been within the next couple of 12:19:06<br>21 days. We spoke to Andrea and Susan, again, 12:19:10<br>22 within a couple of days of the first call, so 12:19:14<br>23 I would have talked to him in between those 12:19:22<br>24 times. 12:19:24<br>25 Q. Okay. Before that next conversation with 12:19:28<br><br>Page 135<br>1 Ms. Garber and Ms. Weiss when you were 12:19:31<br>2 investigating the claim, you've given me 12:19:35<br>3 certain materials that you consulted, 12:19:40<br>4 articles, white paper, et cetera, newspaper 12:19:45<br>5 articles, you've also indicated you looked at 12:19:47<br>6 the insurance policy. Are there any other 12:19:49<br>7 documents that you can recall reviewing? 12:19:52<br>8 A. I looked at case law. 12:19:54<br>9 Q. What case law did you look at? 12:19:56<br>10 A. I looked at any case that I could find that 12:19:57<br>11 interpreted the war exclusion. 12:20:01<br>12 Q. Do you recall the names of any of those 12:20:06<br>13 cases? 12:20:07<br>14 A. The Pan Am case, the Holiday Inn case. 12:20:08<br>15 Q. Other than Pan Am and Holiday Inn, do you 12:20:15<br>16 recall any other cases? 12:20:19<br>17 A. I think I had also looked at -- looked at 12:20:20<br>18 what had been said about the -- you know, the 12:20:24<br>19 9/11 attack. 12:20:25<br>20 Q. What did you look at with respect to what had 12:20:30<br>21 been said -- 12:20:33<br>22 MS. REED: Pardon me. Are you 12:20:34<br>23 finished with your answer? 12:20:36<br>24 THE WITNESS: I am. 12:20:37 | |

| Deposition Designation | Objection & Response |
|---|---|
| 25 BY MS. COYOCA: 12:20:38 | |

Page 136
1 Q. What did you look at with respect to what had 12:20:38
2 been said about the 9/11 attacks? 12:20:40
3 A. I can't tell you specifically as I sit here 12:20:42
4 today. 12:20:44
5 Q. Did you read any cases with respect to 9/11? 12:20:47
6 A. Perhaps. As I said, I looked at any case law 12:20:49
7 I could find that interpreted the war 12:20:54
8 exclusion. 12:20:57
9 Q. Did you review any articles that discussed 12:20:57
10 the insurance company's response -- excuse 12:21:01
11 me, the insurance industry's response to the 12:21:04
12 9/11 attacks in terms of application or 12:21:06
13 non-application of the war exclusion? 12:21:09
14 A. Well, I -- I don't recall if I -- if I 12:21:12
15 actually read anything about that. I just 12:21:14
16 don't remember. 12:21:16
17 Q. You said though -- 12:21:20
18 A. If it was included in case, law then I would 12:21:21
19 have seen it. But if you're saying did I 12:21:24
20 look at separate articles about that, I don't 12:21:26
21 recall whether I did or not. 12:21:29

Page 137
21 Q. Okay. Now, prior to beginning your 12:22:29
22 investigation of the factual circumstances in 12:22:42
23 Israel, did you know what Hamas was? 12:22:48
24 A. I knew of the existence of Hamas, yes. 12:22:51
25 Q. What did you understand Hamas to be? 12:22:54

Page 138
1 A. A Palestinian organization. 12:22:58
2 Q. Anything else that you understood at the time 12:23:02
3 the claim first came in? 12:23:06
4 A. Well, I know that Susan Weiss considered it 12:23:07
5 to be a terrorist organization, because 12:23:13
6 that's what she said. I didn't have an 12:23:16
7 opinion one way or another with regard to 12:23:18
8 that. 12:23:20

Page 140
24 As of July 15, 2014, did you have an 12:26:20
25 understanding as to whether Gaza was a 12:26:24

Page 141
1 separate state? 12:26:27
2 A. I think that that depends on who you ask. 12:26:28
3 Q. Okay. But what I'm asking for as of July 15, 12:26:31
4 2014, what was your understanding as to 12:26:35
5 whether Gaza was a separate state? 12:26:37

| Deposition Designation | Objection & Response |
|---|---|
| 12 Based on the information that I 12:26:43<br>13 gathered, I would say that it is a separate 12:26:44<br>14 state, yes. 12:26:47<br><br>Page 142<br>8 Q. As of July 15, 2014, did you have an 12:27:53<br>9 understanding as to what the Palestinian 12:27:55<br>10 Authority was? 12:28:04<br>11 A. I'm sorry, I'm not sure what you're asking. 12:28:04<br>12 Q. I want to know the state of your knowledge, 12:28:06<br>13 if you knew as of July 15, 2014, before you 12:28:10<br>14 began your investigation, did you know what 12:28:13<br>15 the Palestinian Authority was? 12:28:14<br>16 A. Well, I certainly knew that there was a 12:28:16<br>17 Palestinian government, an elected 12:28:18<br>18 Palestinian government, and that controlled 12:28:21<br>19 the region of Gaza and had for some time. 12:28:24<br><br>Page 144<br>7 Q. As of July 15, 2014, before you began any 12:30:25<br>8 research or investigation, what was your 12:30:28<br>9 understanding of what the Palestinian 12:30:32<br>10 parliament consisted of? 12:30:35<br>11 A. I -- you know, I can't separate what I knew 12:30:36<br>12 then from what I know now. So I wish I could 12:30:39<br>13 give you better information, but I can't. 12:30:41<br>14 Q. As of July 15, 2014, what was your 12:30:46<br>15 understanding as to what the Palestinian 12:30:48<br>16 parliament controlled in terms of geographic 12:30:52<br>17 territory? 12:30:55<br><br>20 THE WITNESS: Again, hard to 12:31:02<br>21 distinguish between what I know now and what 12:31:03<br>22 I knew then, but certainly Gaza. 12:31:05<br><br>24 Q. So it's your testimony that the Palestinian 12:31:10<br>25 parliament controlled Gaza -- 12:31:15<br><br>Page 145<br>2 BY MS. COYOCA: 12:31:15<br>3 Q. -- is that correct? 12:31:18<br><br>6 THE WITNESS: That's what they say 12:31:23<br>7 they govern. The Israelis obviously have a 12:31:24<br>8 different point of view. 12:31:29<br><br>Page 146<br>1 Q. And in -- as of 2014, July 15, 2014, when you 12:32:15<br>2 first began investigating the claim, was it 12:32:19<br>3 your understanding that the Palestinian 12:32:25<br>4 parliament consisted of just Hamas? 12:32:27 | |

| Deposition Designation | Objection & Response |
|---|---|
| 5 A. No. 12:32:29<br>6 Q. What other groups were in the Palestinian 12:32:33<br>7 parliament, to the best of your 12:32:40<br>8 understanding, before you began doing any 12:32:41<br>9 investigation as of July 15, 2014? 12:32:42<br>10 A. Hamas, Fatah, the PLO maybe, maybe not, I 12:32:44<br>11 just don't know. 12:32:49<br>12 Q. So Hamas, Fatah, and perhaps the PLO was your 12:32:54<br>13 understanding as of July 2014 comprised the 12:33:03<br>14 Palestinian parliament, and the Palestinian 12:33:07<br>15 parliament controlled at least, to the best 12:33:09<br>16 of your understanding, Gaza; is that right? 12:33:11<br>20 THE WITNESS: Well, I knew that 12:33:20<br>21 there was a Palestinian parliament that was 12:33:21<br>22 made up of more than just Hamas. I knew that 12:33:25<br>23 Fatah was one of the other parties, that 12:33:29<br>24 there may have been other parties, maybe, 12:33:30<br>25 maybe not. And the only reason I -- I think 12:33:32<br><br>Page 147<br>1 that they -- that they controlled at least 12:33:34<br>2 Gaza, is that I believe that the Israelis had 12:33:37<br>3 conceded that to them sometime before. I 12:33:42<br>4 just have that recollection from listening to 12:33:44<br>5 the news, so... 12:33:48<br><br>15 Q. What information did you learn that was in 12:34:20<br>16 addition to what you already knew about 12:34:23<br>17 Hamas? 12:34:25<br>18 A. Well, for example, I learned the amount of 12:34:26<br>19 social services that they provided to the 12:34:29<br>20 residents of Gaza. I learned more about the 12:34:34<br>21 number of people who lived in Gaza. In the 12:34:37<br>22 Gaza strip, I should say. And how Hamas had 12:34:41<br>23 responded to their needs. I looked at what 12:34:50<br>24 their charter was and learned more 12:34:54<br>25 information about that. 12:34:57<br><br>Page 148<br>1 Certainly gained more information 12:34:59<br>2 about difficulties between -- more recent 12:35:00<br>3 difficulties between Israel and the 12:35:07<br>4 Palestinians, some of whom are Hamas, that 12:35:12<br>5 sort of thing. 12:35:20<br><br>Page 150<br>2 Q. And after you began your investigation, did 12:37:30<br>3 that understanding change in any way? 12:37:32<br>4 A. Well, it certainly is clear to me -- it was 12:37:37<br>5 clear to me that the Palestinian people 12:37:40<br>6 believed that -- that Gaza was -- was part of 12:37:42<br>7 Palestine and not part of Israel, and that 12:37:48 | |

| Deposition Designation | Objection & Response |
|---|---|
| 8 the Israelis didn't hold the same opinion, 12:37:50<br>9 but weren't necessarily trying to overtake 12:37:54<br>10 Gaza on a constant level the way they were in 12:37:56<br>11 some other areas of the West Bank where they 12:37:59<br>12 were continuing to try to put in settlements 12:38:02<br>13 over the objections of the Palestinians. So 12:38:03<br>14 that's what understood. 12:38:07<br>15 Q. Okay. But after you began your investigation 12:38:09<br>16 of the claim and undertook your research with 12:38:10<br>17 respect to the situation in -- in Gaza and in 12:38:13<br>18 Israel, did your understanding as to Israel's 12:38:17<br>19 willingness to permit Gaza to be controlled 12:38:25<br>20 by Palestinians, did that change in any way? 12:38:29<br><br>23 vague and ambiguous on "permitting." 12:38:36<br>24 THE WITNESS: The Israelis would 12:38:39<br>25 never say, "Okay, Palestinian government, you 12:38:41<br><br>Page 151<br>1 can now rule Gaza." But in terms of what 12:38:48<br>2 they were doing, I mean, there had been -- 12:38:52<br>3 you know, I think there was a point in time 12:38:54<br>4 in 2008 where they also had some kind of big 12:38:56<br>5 kerfuffle over that. 12:38:59<br>6 But at specific points in time, you 12:39:01<br>7 know, that's not -- that's not the area they 12:39:05<br>8 were trying to -- to take over so completely 12:39:07<br>9 that the Palestinians did not have any place 12:39:13<br>10 to live. 12:39:17<br>11 BY MS. COYOCA: 12:39:21<br>12 Q. So in other words, they might not be 12:39:21<br>13 expressly permitting it, but it was at their 12:39:24<br>14 sufferance? 12:39:28<br><br>Page 156<br>2 Q. Okay. So at the time that you were 12:44:55<br>3 conducting your -- your investigation of the 12:44:56<br>4 claim, it was your understanding that Hamas 12:44:58<br>5 was the majority of the Palestinian 12:45:03<br>6 parliament; is that correct? 12:45:05<br>7 A. Yes. 12:45:06<br><br>11 Q. And how did you form that understanding? 12:45:16<br>12 A. The Congressional Research Service talked 12:45:21<br>13 about the elections that took place in 2006 12:45:24<br>14 in which Hamas was elected as the majority of 12:45:28<br>15 the parliament and said that those were free 12:45:32<br>16 and fair elections, that was their 12:45:35<br>17 designation of them, and that -- that based 12:45:37<br>18 on the things that I had read, it appeared to 12:45:42<br>19 me that they still had maintained that -- 12:45:44<br>20 that majority. 12:45:47 | |

| Deposition Designation | Objection & Response |
|---|---|
| 21 Although, there was -- there was 12:45:48<br>22 something that happened in 2008 where Hamas 12:45:49<br>23 and Fatah were also trying to get together, 12:45:51<br>24 and it's not clear to me that they actually 12:45:53<br>25 formed an alliance at that time, or if it was 12:45:55<br><br>Page 157<br>1 an alliance, it was very short-lived. And 12:45:58<br>2 they had also tried to form another alliance 12:46:02<br>3 just shortly before this war broke out back 12:46:05<br>4 in June, I believe. 12:46:07<br>5 Q. What about 2007, did you take a look at any 12:46:14<br>6 of the -- did you review the status of Hamas 12:46:16<br>7 in terms of its relationship with any of the 12:46:23<br>8 other Palestinian organizations as of 2007? 12:46:26<br><br>12 THE WITNESS: Well, based on what 12:46:37<br>13 I recall, in 2006 there had been the free and 12:46:38<br>14 fair elections as designated by the CRS in 12:46:42<br>15 which Hamas gained control of the Palestinian 12:46:46<br>16 parliament and that they actually took 12:46:49<br>17 control of Gaza in 2007. I don't know if 12:46:50<br>18 that was in cooperation with another part 12:46:53<br>19 of -- of other Palestinian protections or 12:46:57<br>20 not. 12:47:02<br><br>Page 159<br>16 Q. When you were conducting your investigation 12:49:21<br>17 as of July 2014, was it your understanding 12:49:23<br>18 that the Palestinian parliament was the 12:49:26<br>19 government of Gaza or whether the government 12:49:32<br>20 was Hamas? 12:49:38<br><br>24 THE WITNESS: Based on the 12:49:46<br>25 understanding that I had, Hamas was the party 12:49:47 | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 159:16-20;<br>159:24-25<br>Non-responsive.<br><br>Defendant's Response:<br><br>The witness directly responded with her understanding of the question and the information sought by the question. The witnesses answer is appropriate and responsive. . |
| Page 160<br>1 that was supplying the military and 12:49:50<br>2 governmental services was making -- was 12:49:54<br>3 communicating with other countries, and that 12:49:58<br>4 the parliament was also participating, so I 12:50:01<br>5 don't know that it was an either/or 12:50:06<br>6 situation. 12:50:07 | Plaintiff's Objections:<br>Page 160:1-25<br>F.R.E. 402-03, 602, 701<br>Lack of foundation, improper opinion. |

| Deposition Designation | Objection & Response |
|---|---|
| 7 BY MS. COYOCA: 12:50:11<br>8 Q. When you say that Hamas was communicating 12:50:11<br>9 with other countries, what do you mean by 12:50:15<br>10 that? 12:50:17<br>11 A. Well, I know that they -- they -- they got 12:50:17<br>12 assistance from Iran, they got assistance 12:50:20<br>13 from Turkey, they got assistance from Egypt, 12:50:23<br>14 they communicated with those countries with 12:50:26<br>15 regard to what their needs of their people 12:50:29<br>16 were, and that that's -- you know, there -- 12:50:30<br>17 there really was no way for them to make 12:50:31<br>18 money on their own. 12:50:34<br>19 There was no way to actually create 12:50:36<br>20 any kind of significant economic growth, 12:50:37<br>21 because it was such a small area and it was 12:50:40<br>22 such a large population and a very high 12:50:42<br>23 unemployment rate. So, primarily, a lot of 12:50:45<br>24 their resources came from other countries 12:50:48<br>25 that they negotiated with. 12:50:50 | Defendant's Response:<br><br> ASIC 's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and helpful to determining a fact in issue and admissible under 701; it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets the requirements of FRE 602. |
| Page 161<br>1 Q. As of July 2014 when you were doing your 12:50:51<br>2 research, was it your understanding that the 12:50:55<br>3 government of Egypt approved of and aided 12:50:59<br>4 Hamas? 12:51:09<br>5 A. Well, they were -- 12:51:10<br><br>9 THE WITNESS: I think that -- that 12:51:19<br>10 Egypt, at that particular point in time -- I 12:51:26<br>11 think that at that point in time they did 12:51:30<br>12 recognize Palestine as a separate state, 12:51:31<br>13 along with Iran, Turkey, Russia, I think 12:51:34<br>14 Iraq, several other countries. 12:51:39<br>15 As I said, in 2012, the UN had 12:51:40<br>16 already determined that Palestine was a 12:51:43<br>17 nonmember observer state, so they had already 12:51:49<br>18 designated it as a state. 12:51:52<br>19 And since Hamas was a large player 12:51:53<br>20 in the government in general, in the 12:51:55<br>21 Palestinian parliament, I would say that -- 12:52:00<br>22 that, you know, while they might not have 12:52:01<br>23 endorsed that specific organization, they 12:52:03<br>24 certainly endorsed the state itself. 12:52:05<br><br>Page 167<br>18 Q. What was your understanding as to what was in 14:10:16 | Plaintiff's Objections:<br>Page 161:1-25<br>MIL, 401,402,403,701<br><br>Defendant's Response:<br><br>"MIL" not clear objection; ASIC's understanding and development of facts and policy relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; not prejudicial to Plaintiffs but exclusion would be prejudicial to Defendant. |

| Deposition Designation | Objection & Response |
|---|---|
| 19 Hamas's charter that made the U.S. Government 14:10:18<br>20 consider it to be a terrorist organization? 14:10:20<br>21 A. Well, part of the charter of Hamas, as far as 14:10:23<br>22 I understand it, is that it wants the – it 14:10:26<br>23 will never acknowledge Israel and it wants 14:10:29<br>24 the destruction of Israel. 14:10:31<br>25 Q. Anything else? 14:10:35<br><br>Page 168<br>1 A. Well, it wants to reclaim its homeland. It 14:10:36<br>2 claims that Israel is actually Palestinian 14:10:39<br>3 territory. 14:10:45<br><br>Page 169<br>15 Q. During your investigation you came to a 14:12:37<br>16 conclusion that the U.S. considered Hamas to 14:12:39<br>17 be a terrorist organization; is that correct? 14:12:42<br>18 A. Yes.<br>22 Q. Did you do any investigation or perform any 14:12:47<br>23 analysis with respect to the impact of that 14:12:53<br>24 status as a terrorist organization on the 14:12:58<br>25 claim itself?<br><br>Page 170<br>3 THE WITNESS: Based on what was 14:13:10<br>4 happening in Israel and the Gaza strip at the 14:13:12<br>5 time of the claim, whether or not Hamas was a 14:13:16<br>6 terrorist organization was not relevant to my 14:13:18<br>7 analysis. 14:13:22<br>8 BY MS. COYOCA: 14:13:23<br>9 Q. Was there a terrorism exclusion on the 14:13:36<br>10 policy? 14:13:38<br>11 A. Well, I'm not sure what you mean by a 14:13:41<br>12 terrorism exclusion. There was nothing 14:13:44<br>13 specifically in the policy that said acts of 14:13:46<br>14 terrorism are excluded. 14:13:49<br>15 But, certainly, the fact that there 14:13:52<br>16 was a war exclusion if the terrorist act also 14:13:55<br>17 involved warlike weapons, was part of an 14:13:58<br>18 insurrection, I mean, war and terrorism are 14:14:02<br>19 not usually exclusive, you can have the same 14:14:05<br>20 things happening, you can have terrorist acts 14:14:08<br>21 during acts of war. So I didn't see those as 14:14:11<br>22 mutually exclusive things. 14:14:14<br>23 So if -- if the terrorist attack 14:14:15<br>24 also involved one of the criteria that is 14:14:17<br>25 found in the war exclusion, then the claim 14:14:19<br><br>Page 171<br>1 would be excluded. 14:14:21<br>2 If it did not, then there's a 14:14:22<br>3 potential for coverage depending on the other 14:14:26<br>4 surrounding circumstances and whether or not 14:14:29 | Plaintiff's Objections:<br>Page 170:15-171:6<br>Everything after "There was nothing specifically in the policy that said acts of terrorism are excluded" is non-responsive to the question "was there a terrorism exclusion on the policy." Everything after is also an improper opinion that lacks foundation and contradicts the Ninth Circuit's opinion.<br><br>Defendant's Response:<br><br>ASIC's understanding and evaluation of facts and Policy are relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job: |

| Deposition Designation | Objection & Response |
|---|---|
| 5 the circumstances fall within the coverage 14:14:31<br>6 grant in the first place. 14:14:33<br><br>Page 172<br>10 Q. When you were analyzing the claim and making 14:15:42<br>11 a claim determination, was it important to 14:15:47<br>12 your analysis that you understand the meaning 14:15:49<br>13 of the term, "War," as it's used in the war 14:15:51<br>14 exclusion? 14:15:54<br>15 A. Well, I mean, I think that -- yes, certainly 14:15:55<br>16 it is. Yes. 14:15:59 | helpful to determining a fact in issue and admissible under 701; not prejudicial to Plaintiff but exclusion would be prejudicial to Defendant. |
| Page 174<br>10 Q. So in the context of the analysis that you 14:17:35<br>11 were performing in July of 2014 with respect 14:17:38<br>12 to the Dig claim, did you look at whether the 14:17:40<br>13 acts that were taking place in Israel at the 14:17:44<br>14 time, whether or not those could be 14:17:48<br>15 considered acts of terrorism? 14:17:50<br><br>19 THE WITNESS: That was certainly 14:17:58<br>20 the position that Susan Weiss took. I didn't 14:17:59<br>21 see what was happening in Israel to be -- 14:18:03<br>22 whether it was defined as an act of 14:18:08<br>23 terrorism, it was still an act of war or 14:18:10<br>24 warlike actions or an insurrection, 14:18:13<br>25 rebellion, et cetera. It still fell within 14:18:17 | Plaintiff's Objections:<br>Page 174:19 – 175:3<br>F.R.E. 602, 701<br>Non-responsive;<br>improper opinion that lacks foundation and contradicts the Ninth Circuit's order.<br><br>Defendant's Response:<br><br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and helpful to determining a fact in issue and admissible under 701. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion |

| Deposition Designation | Objection & Response |
|---|---|
| | to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims |
| Page 175<br>1 that definition based on the actions that 14:18:19<br>2 were taking place no matter what you called 14:18:21<br>3 it. 14:18:23<br>4 BY MS. COYOCA: 14:18:23<br>5 Q. Okay. But separate and apart from whether or 14:18:23<br>6 not the acts constituted, in your view, acts 14:18:27<br>7 of war or insurrection or any of the other 14:18:29<br>8 war exclusions, I'm just trying to focus on 14:18:34<br>9 whether, as part of your analysis, you also 14:18:37<br>9 looked at the issue of whether the acts that 14:18:39<br>10 were at issue, Hamas's conduct, whether or 14:18:42<br>11 not those were acts of terrorism? 14:18:45<br>12 A. Well, I think that -- that, again, it's going 14:18:47<br>13 to depend on your definition of terrorism<br>14. well, I think that that, again it's going 14:18:49<br>15 My understanding is that the reaction of 14:18:52<br>16 Hamas and its violence towards the Israeli 14:18:56<br>17 people, when it starts shooting, you know, a 14:19:04<br>18 number of rockets into areas that it did not 14:19:06<br>19 usually attack, was based on the fact that 14:19:08<br>20 there had been -- you know, there had been 14:19:11<br>21 kidnapping of Israeli students. 14:19:14<br>22 So I don't think that the act of 14:19:17<br>23 firing these rockets was meant to persuade 14:19:21<br>24 the Israeli people not to kidnap people 14:19:24<br>25 anymore. I mean, most Israelis would already 14:19:27 | Plaintiff's Objections:<br>Page 175:5-176:5<br>F.R.E. 602, 701<br>Non-responsive, improper opinion that lacks foundation.<br><br>Defendant's Response:<br><br>"MIL" not clear objection; ASIC 's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and helpful to determining a fact in issue and admissible under 701. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all |

| Deposition Designation | Objection & Response |
|---|---|
| | parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |
| Page 176<br>1 have that, and it was not an act of the 14:19:31<br>2 government in kidnapping these people, so I 14:19:33<br>3 don't think that they were trying to coerce 14:19:35<br>4 the Israeli people into necessarily adopting 14:19:37<br>5 a particular position. 14:19:40<br><br>Page 181<br>6 Q. You indicated in your research. Did you 14:25:30<br>7 perform research as to what constituted an 14:25:34<br>8 act of terrorism in connection with your 14:25:36<br>9 analysis of the Dig claim? 14:25:38<br>10 A. I believe I did. 14:25:39<br>11 Q. What did you do? 14:25:40<br>12 A. The same things that I've already described 14:25:41<br>13 to you. 14:25:43<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 181<br><br>14 Q. Did you -- did you review cases that 14:25:45<br>15 specifically addressed the definition of 14:25:47<br>16 terrorism? 14:25:51<br>17 A. I'm sure I might have done that as a -- as a 14:25:53<br>18 Westlaw search. I don't recall as I sit here 14:25:57<br>19 today. 14:25:59<br>20 Q. Did you review cases that talked about the 14:26:02<br>21 intersection between terrorism and war? 14:26:05<br><br>24 THE WITNESS: Well, I think that 14:26:12<br>25 they talked about that in the Pan Am case. 14:26:13<br><br>Page 182<br><br>2 Q. Other than the Pan Am case? 14:26:16<br>3 A. And I think they talked about that in the -- 14:26:17<br>4 in the Twin Towers, the 9/11 cases as well. 14:26:21<br>5 Q. When you say, "The 9/11 cases," what cases 14:26:23<br>6 are you referring to? 14:26:26<br>7 A. I'm sorry, I don't remember their names. If 14:26:27<br>8 you'd like to show me a case and ask if I 14:26:29<br>9 looked at it, I'd be happy to tell you yes or 14:26:32<br>10 no. 14:26:35 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 Q. Did you review any cases that you can 14:26:38<br>12 remember the specific name of in the context 14:26:41<br>13 of doing your research as to the Dig claim 14:26:43<br>14 that discussed the intersection between 14:26:47<br>15 terrorism and acts of war other than the 14:26:53<br>16 specific cases you've just referenced? 14:26:57<br>19 THE WITNESS: I may have. I don't 14:27:01<br>20 remember exactly what the Wilkinson case said 14:27:03<br>21 about that, and there may have been other 14:27:06<br>22 cases that I looked at. I mean, this was 14:27:08<br>23 quite a while ago, I don't remember every<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 183<br>1 Q. As part of your analysis, did you come to any 14:27:17<br>2 conclusions as to whether the acts of -- that 14:27:19<br>3 were in controversy in the summer of 2014, 14:27:24<br>4 did you come to any conclusions as to whether 14:27:26<br>5 they were acts of terrorism? 14:27:28<br><br>8 THE WITNESS: I don't know that I 14:27:37<br>9 reached a specific conclusion. I mean, the 14:27:38<br>10 reason that I was taking a look at that was 14:27:41<br>11 because Susan Weiss and Andrea Garber both 14:27:43<br>12 continued to say that this could not -- the 14:27:47<br>13 war exclusion could not apply because this 14:27:49<br>14 was an act of terrorism. What I determined 14:27:51<br>15 is whether it was an act of terrorism or not, 14:27:54<br>16 the war exclusion still applied. 14:27:58<br><br>Page 185<br>20 Q. Do you recall coming to a conclusion one way 14:30:20<br>21 or the other? 14:30:22<br>24 THE WITNESS: All I can do is tell 14:30:27<br>25 you that when I was doing my analysis, I 14:30:28<br><br>Page 186<br>1 looked at the definitions of terrorism 14:30:32<br>2 because Susan and Andrea were convinced that 14:30:34<br>3 if it was an act of terrorism, it could not 14:30:37<br>4 also be an act of war. And what I determined 14:30:39<br>5 is regardless of whether it was an act of 14:30:42<br>6 terrorism, the war exclusion still applied. 14:30:46<br><br>8 Q. In the context of coming to your conclusions 14:30:56<br>9 in the summer of 2014 that the claim was 14:31:00<br>10 excluded by the war exclusions, did you think 14:31:03<br>11 it was important to understand the status of 14:31:07<br>12 Hamas as it was viewed by the U.S. 14:31:11<br>13 Government? 14:31:13 | |

| Deposition Designation | Objection & Response |
|---|---|
| 18 THE WITNESS: As part of my 14:31:27<br>19 analysis, I did not specifically go out to 14:31:28<br>20 find whether or not the U.S. had defined 14:31:30<br>21 Hamas as a terrorist organization. 14:31:32<br>22 What I looked at was the activity 14:31:34<br>23 between Hamas and Israel, and then I made a 14:31:37<br>24 determination based on the activity between 14:31:43<br>25 these two entities that this was war, a 14:31:45<br><br>Page 187<br>1 warlike action or an insurrection or 14:31:48<br>2 rebellion. 14:31:53<br>3 BY MS. COYOCA: 14:31:54<br>4 Q. In the context of your analysis that you 14:31:54<br>5 performed in the summer of 2014, did you look 14:31:56<br>6 at whether Hamas was a sovereign entity? 14:31:58<br>9 THE WITNESS: Yes, I did. 14:32:11<br>10 BY MS. COYOCA: 14:32:12<br>11 Q. Did you come to a conclusion? 14:32:13<br>12 A. My conclusion was is that they were a 14:32:14<br>13 quasi-sovereign nation, and perhaps a 14:32:18<br>14 sovereign nation depending on how you define 14:32:21<br>15 that term. 14:32:24<br>16 Q. In the summer of 2014 when you were 14:32:35<br>17 performing your analysis, did you believe 14:32:37<br>18 that Hamas needed to be either a sovereign or 14:32:39<br>19 quasi-sovereign entity in order for the 14:32:42<br>20 hostilities between Israel and Hamas to 14:32:44<br>21 constitute war? 14:32:47<br>22 A. Not necessarily. 14:32:48<br>23 Q. Why not? 14:32:50<br>24 A. Well, we've been fighting a war in 14:32:51<br>25 Afghanistan for quite a long time against the 14:32:55<br><br>Page 188<br>1 Taliban. We call it a war. It's defined as 14:32:58<br>2 a war by our government and every other 14:33:01<br>3 government in the world. The Taliban do not 14:33:04<br>4 control any particular territory in 14:33:07<br>5 Afghanistan, they are not the government of 14:33:09<br>6 Afghanistan, they are not a sovereign nation, 14:33:12<br>7 and yet we still have a war. 14:33:15 | Plaintiff's Objections:<br>Page 188:1-7<br>F.R.E. 402-03, 602, 701<br>Improper opinion that<br>lacks foundation with<br>respect to Afghanistan.<br>In fact, the Taliban was<br>the de facto government<br>of Afghanistan, contrary<br>to Ms. Johnson's<br>improper opinion. *See*<br>*In re September 11*<br>*Litig.*, 931 F. Supp. 2d<br>496 (S.D.N.Y. 2013)<br>("In the wake of the<br>9/11 attacks, the<br>President and his<br>advisors drew a<br>distinction between al |

621

| Deposition Designation | Objection & Response |
|---|---|
| | Qaeda and the Taliban government, the de facto government of Afghanistan which had long harbored al Qaeda."). |
| | Defendant's Response: |
| | "MIL" not clear objection; ASIC 's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and helpful to determining a fact in issue and admissible under 701; it is clear from the facts that the witness has personal knowledge and therefore no preliminary question exists because the testimony meets the requirements of FRE 602. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| Deposition Designation | Objection & Response |
|---|---|
| <u>Pages 192</u><br>17 Q. When did you first consider the possibility 14:38:13<br>18 of application of the war exclusion to the 14:38:17<br>19 claim? 14:38:19<br>20 A. It was after the first conversation that we 14:38:21<br>21 had. And I can't tell you how far after that 14:38:23<br>22 it was, but when I had the initial 14:38:29<br>23 conversation with Danny and Andrea and Susan, 14:38:33<br>24 I certainly did not have a comprehensive view 14:38:37<br>25 of what was happening in Israel. So that was 14:38:40<br><br><u>Page 193</u><br>1 not, you know, until I actually got into the 14:38:44<br>2 meat of what was happening there. That was 14:38:47<br>3 not something that was at the forefront of my 14:38:48<br>4 mind certainly. 14:38:52<br>5 Q. Did you first begin considering the 14:38:53<br>6 application of the war exclusion a week after 14:38:56<br>7 the conversation with Ms. Garber and 14:38:59<br>8 Ms. Weiss? 14:39:02<br>9 A. No. 14:39:02<br>10 Q. Was it within five days? 14:39:04<br>11 A. Well, I think we talked on a Monday and then 14:39:08<br>12 we had -- we had said we were going to talk 14:39:12<br>13 again on a Friday, but instead we talked on 14:39:15<br>14 Thursday, because the matter had escalated to 14:39:19<br>15 such a degree. 14:39:21<br>16 And what Susan had previously -- 14:39:22<br>17 Susan and Andrea had previously wanted to do 14:39:24<br>18 is, "All right, let's wait until Friday, 14:39:27<br>19 let's see if things deescalate." Well, by 14:39:29<br>20 Thursday it was already clear that things 14:39:31<br>21 were escalating rather than deescalating, and 14:39:34<br>22 so the push for just a week was probably not 14:39:36<br>23 going to be sufficient in their minds to be 14:39:39<br>24 able to bring their people back, things were 14:39:42<br>25 getting more elevated rather than 14:39:44<br><br><u>Page 194</u><br>1 deescalated. 14:39:47<br>2 Q. Within that time period of you believe the 14:39:49<br>3 conversation that took place on a Monday you 14:39:53<br>4 indicated -- 14:39:56<br>5 A. I think it was on a Monday. 14:39:56<br>6 Q. -- and the Thursday when the next 14:39:58<br>7 conversation took place with Ms. Weiss and 14:40:01<br>8 Ms. Garber, when during that four-day time 14:40:03<br>9 period did you begin considering application 14:40:06<br>10 of the war exclusion? 14:40:07<br>11 A. I can't tell you that. I don't remember. 14:40:09 | |

| Deposition Designation | Objection & Response |
|---|---|
| <u>PLAINTIFFS' 106 COUNTER-DESIGNATION:</u> | |

<u>Page 194</u>

12 Q. Was it the following day? 14:40:11
13 A. I told you I don't remember. 14:40:13
14 Q. I understand that you may not recall, but I'm 14:40:15
15 entitled to probe your recollection and see 14:40:17
16 if I can obtain a better answer as to your 14:40:19
17 best recollection of the events. 14:40:22
18 Was it by the next -- by -- by 14:40:25
19 Wednesday? 14:40:27
20 A. I don't recall. 14:40:31

<u>END PLAINTIFFS' 106 COUNTER-DESIGNATION</u>

<u>Page 194</u>

21 Q. Do you believe that you first began analyzing 14:40:33
22 the war exclusion on the same day that you 14:40:36
23 had the conversation, the second conversation 14:40:38
24 with Ms. Weiss and Ms. Garber? 14:40:40
25 A. On the Thursday? 14:40:45

<u>Page 195</u>
1 Q. Uh-huh. 14:40:46
2 A. No. 14:40:47
3 Q. Was it before that? 14:40:48
4 A. Yes. 14:40:49
5 Q. Who first raised the war exclusion as between 14:40:57

<u>PLAINTIFFS' 106 COUNTER-DESIGNATION:</u>

<u>Page 195</u>

5 Q. Who first raised the war exclusion as between 14:40:57
6 yourself and Mr. Gutterman? 14:41:03
7 A. I don't remember. 14:41:07

<u>END PLAINTIFFS' 106 COUNTER-DESIGNATION</u>

<u>Page 195</u>

8 Q. Between the -- what you indicated was a 14:41:17
9 Monday when you believe you may have had the 14:41:21
10 first conversation with Ms. Weiss and 14:41:24
11 Ms. Garber, and the Thursday, did you have 14:41:25
12 any conversations with Mr. Williams with 14:41:27
13 respect to potential applicability of the war 14:41:30

| Deposition Designation | Objection & Response |
|---|---|
| 14 exclusion? 14:41:33<br>15 MS. REED: Objection; misstates 14:41:33<br>16 the witness's prior testimony. 14:41:34<br>17 THE WITNESS: Yes. 14:41:36<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 195<br><br>18 BY MS. COYOCA: 14:41:38<br>19 Q. When did you speak with him? 14:41:38<br>20 A. I don't remember specifically. 14:41:40<br>21 Q. Did you have more than one conversation? 14:41:44<br>22 A. Again, I don't remember specifically. I 14:41:47<br>23 think it's probable that we had more than one 14:41:50<br>24 conversation. 14:41:52<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 195<br><br>25 Q. What did you discuss? 14:41:54<br><br><br>Page 196<br>1 A. Whether or not the war exclusion applied. 14:41:55<br>2 Q. What did you tell Mr. Williams? 14:41:58<br>3 A. I don't remember specifically what I told 14:42:01<br>4 him. I'm sure that what I was relaying is 14:42:03<br>5 the information we had found in our research. 14:42:08<br>6 Q. Did you tell Mr. Williams that you believed 14:42:10<br>7 that the war exclusion applied? 14:42:13<br>8 A. Yes. 14:42:14<br><br>14 Q. Did you discuss with him -- well, what -- 14:42:31<br>15 what parts of the war exclusion did you -- do 14:42:34<br>16 you recall discussing with him? 14:42:36<br>17 A. I think that -- that we talked about whether 14:42:37<br>18 or not it was war, if it wasn't war, it was 14:42:41<br>19 at least warlike action, and if -- if in fact 14:42:44<br>20 that it was just an uprising within Israel, 14:42:50<br>21 it would still be considered an insurrection, 14:42:54<br>22 and that the weapons they were using were 14:42:59<br>23 weapons of war. 14:43:02<br>24 Q. And you recall discussing with Mr. Williams 14:43:03<br>25 that -- your position that the weapons that 14:43:06age 196 – 198<br><br>Page 197<br>1 were being used were weapons of war; is that 14:43:08<br>2 correct? 14:43:13 | Plaintiff's Objections:<br>Page 196:24-197:25<br>MIL 2; F.R.E. 402-03<br>Exclusions 3<br>("insurrection") and 4<br>("weapons of war<br>including atomic<br>fission") were not the<br>basis for denial of<br>coverage in the 7/28<br>denial letter and<br>therefore cannot be used<br>to defend against bad<br>faith. *See Century<br>Surety Co. v. Polisso*.<br>Therefore irrelevant,<br>substantially more<br>prejudicial than<br>probative, and wastes<br>time.<br><br>Defendant's Response:<br><br>"MIL" not clear<br>objection; ASIC 's work<br>to evaluate and<br>understand the facts is |

| Deposition Designation | Objection & Response |
|---|---|
| 3 A. Well, tanks, air bombings, rockets, yes, I 14:43:13<br>4 consider those to be weapons of war. 14:43:18<br>5 Q. My question to you is: Did you tell that to 14:43:20<br>6 Mr. Williams during that conversation? 14:43:23<br>7 A. Well, I think that I explained to him what 14:43:25<br>8 was happening in Israel. 14:43:28<br>9 Q. My question is: Did you specifically tell 14:43:30<br>10 Mr. Williams that you believed the weapons of 14:43:32<br>11 war, including atomic fission or radioactive 14:43:36<br>12 force, exclusion applied to the Dig claim? 14:43:41<br>13 A. I don't know if we specifically -- if I said 14:43:45<br>14 that to him specifically. I know that we 14:43:47<br>15 talked about the first four categories of the 14:43:49<br>16 war exclusion. 14:43:52<br>17 Q. Do you recall specifically discussing the 14:43:58<br>18 insurrection, rebellion or revolution, third 14:44:00<br>19 prong of the war exclusion, with Mr. Williams 14:44:04<br>20 during that period between the Monday when 14:44:07<br>21 you say the conversation first occurred and 14:44:09<br>22 the Thursday when the second conversation 14:44:12<br>23 occurred with Ms. Weiss and Ms. Garber? 14:44:13<br>24 A. I probably did, because I was looking at all 14:44:16<br>25 four of those -- those prongs of the war 14:44:19 | relevant to reasonableness of claim decision, defense of "bad faith" and damages sought. No hearsay included. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision. |
| Page 198<br>1 exclusion, but I don't remember specifically. 14:44:21<br>2 Q. What did Mr. Williams tell you in response? 14:44:27<br>3 A. He didn't disagree with the analysis that we 14:44:30<br>4 had made. He agreed that the war exclusion 14:44:33<br>5 applied. 14:44:35<br><br>14 Q. Did you have -- during that four-day period 14:45:01<br>15 between the Monday and the Thursday, did you 14:45:03<br>16 have any conversations with Ms. Gooley about 14:45:05 | Plaintiff's Objections:<br>Page 198:2-5<br>F.R.E. 802<br>Defendants Response:<br>Not offered for the truth of the matter asserted but to show knowledge and information subsequently acted upon by the witness. |

| Deposition Designation | Objection & Response |
|---|---|
| 17 the potential application of the war 14:45:07<br>18 exclusion? 14:45:08<br>19 A. I probably did. I mean, I would not have 14:45:09<br>20 been raising it with the policyholder without 14:45:12<br>21 talking to her about it. I -- I -- I don't 14:45:19<br>22 think that I would have done that without 14:45:20<br>23 discussing it with her, because I would want 14:45:22<br>24 to know whether on an enterprise basis there 14:45:24<br>25 has been interpretations of that particular 14:45:28<br><br>Page 199<br>1 exclusion in other departments. 14:45:31<br>2 Q. What did Ms. Gooley tell you? 14:45:35<br>3 A. With regard to what? 14:45:39<br>4 Q. With respect to whether or not, on an 14:45:40<br>5 enterprise basis, there had been other 14:45:44<br>6 interpretations of the exclusion. 14:45:46<br>7 A. She didn't know. She was going to look into 14:45:47<br>8 it. 14:45:50<br>9 Q. Did she ever get back to you? 14:45:50<br>10 A. Yes. 14:45:51<br>11 Q. What did she tell you? 14:45:52<br>12 A. She said that there had not been any other 14:45:53<br>13 interpretations from the information she 14:45:55<br>14 could gather. You have to remember what 14:45:58<br>15 OneBeacon existed long before Theresa or I 14:46:01<br>16 ever came to that organization. It's a very 14:46:04<br>17 old company. 14:46:06<br><br>21 Q. Did you have more than one conversation with 14:46:18<br>22 Ms. Gooley? 14:46:24<br>23 A. At what period of time? 14:46:24<br>24 Q. During the period from the Monday when you 14:46:25<br>25 say the first conversation took place with 14:46:27<br><br>Page 200<br>1 Ms. Weiss and Ms. Garber -- 14:46:29<br>2 A. Yes. 14:46:29<br>3 Q. -- and the Thursday when the second 14:46:31<br>4 conversation took place. 14:46:32<br>5 A. Yes. 14:46:33<br>6 Q. How many conversations? 14:46:33<br>7 A. I don't know. And I'm not sure if they were 14:46:35<br>8 necessarily -- if there was necessarily more 14:46:38<br>9 than one conversation or if it was a 14:46:40<br>10 conversation, then a series of e-mails. I 14:46:42<br>11 just can't recall. But we certainly had 14:46:44<br>12 communication. 14:46:46<br>13 Q. Did Ms. Gooley ask you what you had done in 14:46:51<br>14 order to come to your conclusions? 14:46:54<br>15 A. I don't know if she asked me. I certainly 14:46:56 | |

627

| Deposition Designation | Objection & Response |
|---|---|
| 16 told her. 14:46:59 | |
| Page 201 | |
| Page 212<br>1 I might have. I can't tell just by reading 15:01:03<br>2 this e-mail where I was in my research and 15:01:05<br>3 what my thought process was. I can't tell 15:01:08<br>4 you just by looking at that, I can't tell. 15:01:12 | |
| 11 Q. In Mr. William's response to you, with a cc 15:01:43<br>12 to Mr. Gutterman, he indicates, begin quotes, 15:01:49<br>13 "Why it is not a covered claim? They have 15:01:51<br>14 imminent peril, unless you are going to 15:01:54<br>15 invoke the war exclusion," close quotes. 15:01:55<br>16 What did you understand him to be saying in 15:01:59<br>17 this e-mail to you? 15:02:01<br>18 A. I -- what I understood him to be saying is 15:02:02<br>19 that -- that he was misinterpreting what I 15:02:05<br>20 had said in -- in my previous e-mail. I 15:02:07<br>21 wasn't saying that it was not -- that it was 15:02:10<br>22 necessarily not a covered claim. I was just 15:02:11<br>23 relating to him what we had talked about in 15:02:14<br>24 the conversation with Susan and Andrea. 15:02:17 | |
| Page 213<br>10 Q. Did you write back to him and indicate that 15:02:37<br>11 he had misinterpreted what you were saying in 15:02:39<br>12 your e-mail? 15:02:41<br>13 A. No. At that point we were setting up a call. 15:02:43 | |
| 21 Q. The next e-mail in the chain is from 15:03:10<br>22 Daniel Gutterman to you and to Mr. Williams, 15 | |
| Page 215<br>19 Q. The next e-mail in the chain is from you to 15:05:01<br>20 Mr. Gutterman, and it appears to be 15:05:05<br>21 forwarding a link to a U.S. Government site 15:05:07<br>22 with respect to foreign travel advice. Do 15:05:11<br>23 you see that? 15:05:14<br>24 A. No, that's the UK Government site. 15:05:15<br>25 Q. Oh, I'm sorry, UK Government site. 15:05:17 | |
| Page 216<br>1 A. Yes, that's true. 15:05:20<br>2 Q. Did you send that e-mail to Mr. Gutterman? 15:05:22<br>3 A. I did. 15:05:24<br>4 MS. COYOCA: I'd like to mark as 15:05:29<br>5 Exhibit 4 a document that is labeled, 15:05:30<br>6 "Internet Archive: Wayback Machine, Israel 15:05:38<br>7 Travel Advice-gov.uk." 15:05:38 | |
| Page 217<br>19 Q. Do you believe that what I marked as 15:07:29 | |

| Deposition Designation | Objection & Response |
|---|---|
| 20 Exhibit 4 is an accurate reflection of the UK 15:07:31<br>21 Israel travel advice that existed as of 15:07:36<br>22 July 2014? 15:07:40<br><br>24 THE WITNESS: It appears to be. I 15:07:44<br>25 have no reason to think it isn't. 15:07:45<br><br>Page 218<br>1 BY MS. COYOCA: 15:08:02<br>2 Q. Did you subsequently have a telephone 15:08:03<br>3 conversation with Mr. Williams and 15:08:04<br>4 Mr. Gutterman on the 16th? 15:08:06<br>5 A. I believe we did. 15:08:09<br>6 Q. Was there anyone on the call aside from 15:08:14<br>7 yourself and Mr. Gutterman and Mr. Williams? 15:08:16<br>8 A. Not that I recall. 15:08:18<br>9 Q. What did you discuss? 15:08:25<br>10 A. We discussed what was happening in -- in 15:08:29<br>11 Israel and we discussed the information that 15:08:34<br>12 both Danny, and I had researched with regard 15:08:42<br>13 to what was happening there, and I think we 15:08:46<br>14 discussed the war exclusion. 15:08:51<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 218<br><br>15 Q. When did the conversation take place, to the 15:08:59<br>16 best of your recollection, on the 16th? 15:09:04<br>17 A. I can't remember specifically. Based on the 15:09:07<br>18 e-mail string that you showed me before, it 15:09:09<br>19 looks like we set it up for 2 o'clock ET. I 15:09:11<br>20 don't know if it went forward at that 15:09:16<br>21 particular time or not. 15:09:17<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 219<br>4 Q. Do you recall generally? 15:09:38<br>5 A. Well, generally, we talked about what I just 15:09:39<br>6 told you, what was the situation in Israel, 15:09:41<br>7 and the fact that the policy contains the war 15:09:45<br>8 exclusion, and the information that we had 15:09:47<br>9 found about the situation in Israel both 15:09:50<br>10 before NBC went there and what the current 15:09:52<br>11 situation was. 15:09:56<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 219 | |

| Deposition Designation | Objection & Response |
|---|---|
| 12 Q. Did you tell Mr. Williams that you believed 15:09:58<br>13 the war exclusion applied? 15:10:01<br>14 A. I don't know if I said that specifically to 15:10:04<br>15 him then. I probably indicated that I 15:10:06<br>16 thought that it was probable. 15:10:08<br>17 Q. Did you tell him what part of the war 15:10:13<br>18 exclusions you thought were probably going to 15:10:15<br>19 apply? 15:10:17<br>20 A. I don't recall. I don't think I would have 15:10:18<br>21 been specific. 15:10:20<br>22 Q. Did you tell Mr. Williams anything else? 15:10:23<br>23 A. I'm sorry, I just don't remember. 15:10:27<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br><br>Page 220<br>7 Q. Did Mr. Williams respond to you during that 15:10:53<br>8 phone conversation in any way? 15:10:56<br>9 A. I'm sure he did. 15:11:00<br>10 Q. Do you recall anything about what he said to 15:11:03<br>11 you in response? 15:11:08<br>12 A. I don't recall specifically what he said in 15:11:10<br>13 that conversation, no. 15:11:12<br>14 Q. Do you recall his position generally with 15:11:14<br>15 respect to the application of the war 15:11:16<br>16 exclusion during this time period? 15:11:18<br>17 A. He thought that the war exclusion applied. 15:11:19<br><br>22 Q. What did you tell him that you had done in 15:11:40<br>23 order to form this conclusion that the war 15:11:44<br>24 exclusions applied? 15:11:47<br>25 A. I think I told him about the research that we 15:11:54 | <br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 220:14-17<br>F.R.E. 802<br><br>Defendant's Response:<br><br>Not offered for the truth<br>of the matter asserted<br>but to show knowledge<br>and information acted<br>upon by the witness. |
| Page 221<br>1 had been conducting, what the situation was 15:11:57<br>2 on the ground, what the basis of the 15:12:00<br>3 situation was on the ground, what Israel was 15:12:02<br>4 saying with regard to Operation Protective 15:12:06<br>5 Edge, the actual activities of both the 15:12:11<br>6 Israeli Army and Hamas on the ground. 15:12:16<br>7 Q. What did you tell him with respect to what 15:12:20<br>8 Israel -- Israel was saying with regard to 15:12:23<br>9 Operation Protective Edge? 15:12:27<br>10 A. Well, I think that at this point in time -- 15:12:27<br>11 well, I can't be sure of the exact -- the 15:12:34<br>12 exact time. But at some point in time, I 15:12:37<br>13 know that they were readying their troops to 15:12:40<br>14 take tanks across the Gaza border, that they 15:12:42<br>15 had put 18,000 troops on the ground, that 15:12:46<br>16 they were conducting air strikes and there 15:12:49<br>17 was still rockets coming across in the other 15:12:52 | Plaintiff's Objections:<br>Page 221:1-25<br>MIL 3; F.R.E. 402-03<br>For the reasons in MIL<br>No. 3, Israel's actions in<br>Gaza are irrelevant and<br>substantially more<br>prejudicial than<br>probative, given that the<br>"efficient proximate<br>cause" doctrine was<br>well-established under<br>California law since<br>2005 in the *Julian*<br>decision.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 18 direction, some of which were being captured 15:12:56<br>19 by Iron Dome, others which were not, and that 15:12:57<br>20 a cease fire had been proposed by Egypt, that 15:13:00<br>21 Hamas had turned it down, and that the 15:13:04<br>22 Israeli prime -- Netanyahu had said, you 15:13:07<br>23 know, when the answer -- "When they won't 15:13:11<br>24 agree to a cease fire, our response is fire." 15:13:13<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Page 225<br>19 Q. Ultimately, when the claim was denied, did 15:18:06<br>20 you identify all four of these exclusions as 15:18:09<br>21 being directly applicable to the claim? 15:18:12<br>22 A. I did, and I think I also identified 15:18:14<br>23 Number 8. 15:18:16<br><br>Page 237<br>8 Q. Did you ever search for any other terms when 15:43:19<br>9 you were doing your research? 15:43:30<br>10 A. Oh, I'm sure I did. As I sit here today, I 15:43:32<br>11 can't tell you what they were. But, I mean, 15:43:35 | "MIL" not clear objection; ASIC 's understanding and analysis of denial development is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and helpful to determining a fact in issue and admissible under 701. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| Deposition Designation | Objection & Response |
|---|---|
| 12 I spent many hours looking at this and doing 15:43:37<br>13 searches online. 15:43:39<br>14 Q. And the many hours took place from what time 15:43:40<br>15 period, from when to when? 15:43:45<br>16 A. From when we first talked to Susan and Andrea 15:43:47<br>17 until we talked to them again and made them 15:43:54<br>18 aware that we thought that the war exclusion 15:43:58<br>19 might apply. I continued to do research 15:44:03<br>20 after that just to see if there were changes 15:44:04<br>21 in conditions, because, as you know, it was a 15:44:08<br>22 quickly moving situation. And, you know, I 15:44:10<br>23 can't tell you specifically when I stopped 15:44:16<br>24 doing research about it, but I continued to 15:44:17<br>25 do some for quite some time. 15:44:20 | |
| Page 238<br>1 Q. Were you continuing to do research in August 15:44:22<br>2 of 2014? 15:44:25<br>3 A. Well, I kept track of what was happening with 15:44:29<br>4 regard to the hostilities between -- between 15:44:31<br>5 Hamas and the Israelis throughout the entire 15:44:40<br>6 time that the conflict was going on. I can't 15:44:44<br>7 tell you specifically that I looked at it 15:44:46<br>8 every day, but I certainly wanted to stay 15:44:48<br>9 aware of it to see whether or not there was a 15:44:53<br>10 chance that they were going to resume 15:44:55<br>11 production there. 15:44:57<br>12 Q. Do you recall doing any additional research 15:44:57<br>13 or investigation in September of 2014? 15:44:59<br>14 A. I think that by then the hostilities had 15:45:01<br>15 ceased, or pretty close in time to that, 15:45:05<br>16 because it lasted for 50, 51 days. 15:45:08<br><br>21 Q. Why were you linking to an article in 15:45:17<br>22 Wikipedia with respect to Hamas? 15:45:21<br>23 A. Well, the one thing that Wikipedia is 15:45:22<br>24 particularly good for is it gives you all of 15:45:26<br>25 the cites from which they drew its 15:45:29 | Plaintiff's Objections:<br>Page 238:1-25<br>MILs 2-3, F.R.E. 402-03<br>For the reasons stated in MILs 2-3, Israel's actions in Gaza in August—a different location after Plaintiffs already decided to relocate—are irrelevant and substantially more prejudicial than probative.<br><br>Defendant's response:<br>The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real |

| Deposition Designation | Objection & Response |
|---|---|
| | time is critical for jury to consider when evaluating bad faith claims. |

Page 239
1 information -- they drew their information. 15:45:32
2 And in looking at the appendix, you know, all 15:45:33
3 the things that they cited, there you 15:45:37
4 certainly can find more authoritative 15:45:40
5 resources to look at. 15:45:45

Page 243
9 Q. And then the e-mail above Ms. Gooley asked 15:51:03
10 you to send her the policy. Do you see that? 15:51:07
11 A. Yes. 15:51:08
12 Q. And did you do that? 15:51:09
13 A. If she instructed me to, I'm sure I did. 15:51:10

Page 257
19 Q. I believe you've indicated you had a second 16:07:30
20 conversation with Ms. Garber and Ms. Weiss on 16:07:36
21 Thursday of the same week in which you had 16:07:41
22 talked? 16:07:44
23 A. That's correct. 16:07:45
24 Q. And based on the calendar that I looked at, 16:07:45
25 I'm going to represent to you that that was 16:07:50

Page 258
1 July 17. 16:07:52
2 A. Okay. 16:07:53
3 Q. Does that sound wrong to you in any way? 16:07:53
4 A. No. It's just a couple of days after our 16:07:56
5 first conversation and before our next 16:07:59
6 conversation was supposed to occur. 16:08:00
7 Q. Who was on the call? 16:08:03
8 A. Danny, myself, Susan and Andrea. I don't 16:08:05
9 think that Peter was on the call. He may 16:08:14
10 have been, but I -- I'm not sure if he was on 16:08:16
11 the call or not. 16:08:19
12 Q. What was discussed during the call? 16:08:33
13 A. We discussed the fact that given the fact 16:08:36
14 that the situation had not deescalated as NBC 16:08:40
15 had hoped, they had decided to move their 16:08:46
16 production. 16:08:49
17 In that conversation we also 16:08:51
18 informed them that we were looking at the 16:08:53
19 applicability of the war exclusion to the 16:08:56
20 situation. They objected to the idea that 16:08:59
21 this could be considered a war, because Hamas 16:09:04
22 is a terrorist organization and, therefore, 16:09:07

| Deposition Designation | Objection & Response |
|---|---|
| 23 you could not have a war with a terrorist 16:09:09<br>24 organization. 16:09:11<br>25 And they asked when we would have a 16:09:13<br><br>Page 259<br>1 final decision and we gave them -- I think 16:09:17<br>2 that we gave them a date as quickly as we 16:09:23<br>3 could. I don't remember if they asked for 16:09:26<br>4 the date or if -- if we just told them a 16:09:29<br>5 date. I know that they wanted a response as 16:09:33<br>6 quickly as humanly possible. 16:09:35<br>7 Q. Who explained to Ms. Garber and Ms. Weiss 16:09:43<br>8 that OneBeacon entertainment was looking at 16:09:46<br>9 the potential applicability of the war 16:09:50<br>10 exclusion? 16:09:51<br>11 A. I don't recall exactly. It was probably me. 16:09:53<br>12 Q. Did you identify the parts of the war 16:09:55<br>13 exclusion that you thought were going to 16:09:57<br>14 potentially be applied? 16:10:01<br>15 A. I don't remember. 16:10:02<br>16 Q. Did you indicate to Ms. Weiss and Ms. Garber 16:10:03<br>17 that there was a significant chance of the 16:10:07<br>18 war exclusion being applied? 16:10:11<br>19 A. I think -- I think that we told them that we 16:10:13<br>20 were considering it. 16:10:16<br>21 Q. Did you tell them that in all likelihood the 16:10:16<br>22 exclusion would be applied? 16:10:19<br>23 A. I probably didn't go that far, because we 16:10:20<br>24 were still taking a look at it. 16:10:23<br><br>Page 262<br>7 Q. Was there anything else discussed during the 16:12:51<br>8 call? 16:12:53<br>9 A. Yeah, we talked about if they were going to 16:12:54<br>10 move, where they would move. They told me 16:12:57<br>11 that they were considering I think Turkey and 16:13:00<br>12 New Mexico. I warned them about a specific 16:13:06<br>13 location scout in New Mexico that they might 16:13:11<br>14 want to avoid if they decided to go there. 16:13:17<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 262<br>15 Q. Did you talk about potential sites for 16:13:19<br>16 relocation before or after you told them that 16:13:21<br>17 the war exclusion would be -- 16:13:24<br>18 A. I don't remember. 16:13:26<br><br>21 MS. COYOCA: Can I please finish 16:13:29<br>22 my question before you answer it and before 16:13:30<br>23 you object? | |

| Deposition Designation | Objection & Response |
|---|---|
| 25 Q. Did you tell them about the New Mexico 16:13:33<br><br>Page 263<br><br>1 concern before you told them that the war 16:13:36<br>2 exclusion potentially would apply to the 16:13:39<br>3 claim? 16:13:41<br>4 A. I'm sorry, Ms. Coyoca, I just -- I don't 16:13:42<br>5 remember. 16:13:44<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br><br>Page 263<br>6 Q. Based on the documents that we've reviewed, 16:13:49<br>7 it looks like you first began doing work on 16:13:51<br>8 the claim as of Monday July 15; is that 16:13:53<br>9 right? Or, excuse me, Monday, July 14; is 16:13:56<br>10 that right? 16:13:59<br><br>15 Q. The e-mails and the initial submission of the 16:14:04<br>16 claim, I'll represent to you, was on Tuesday, 16:14:07<br>17 July 15, not on Monday. But you had 16:14:09<br>18 testified that you believed you had -- you 16:14:11<br>19 might have had conversations on Monday? 16:14:13<br>20 A. It sounds like I was confusing Monday. It 16:14:15<br>21 was Tuesday. 16:14:17<br>22 Q. All right. So having seen the documents, you 16:14:17<br>23 can't recall a conversation taking place 16:14:21<br>24 before Tuesday the job -- July 15 when the 16:14:23<br>25 claim was submitted, do you? 16:14:28<br><br>Page 264<br>1 A. The first conversation I recall is the one 16:14:29<br>2 that I related to you with Danny and Andrea 16:14:31<br>3 and Susan. 16:14:33<br>4 Q. Okay. So from Tuesday, July 15, to Thursday, 16:14:35<br>5 July 17 when you told the insured that the 16:14:39<br>6 war exclusion potentially would apply, did 16:14:43<br>7 you feel that that was enough time for you to 16:14:49<br>8 conduct your analysis of this issue? 16:14:51<br>9 A. Well, it would have to be, because they 16:14:53<br>10 wanted an answer. 16:14:55<br>11 Q. Did you feel pressured by the insured to do 16:14:56<br>12 the research and get an answer out as quickly 16:14:59<br>13 as possible? 16:15:03<br>14 A. I don't know that pressure is the correct 16:15:04<br>15 term. Whenever you're dealing with a 16:15:06<br>16 production that is going to shut down for any 16:15:08 | |

| Deposition Designation | Objection & Response |
|---|---|
| 17 reason and for any period of time, time is of 16:15:11<br>18 the essence to them, because time is money. 16:15:13<br>19 They have to be -- they have to know what -- 16:15:16<br>20 if they're going to, you know, tell people 16:15:18<br>21 not the to come back to work. They have to 16:15:20<br>22 know exactly what the deal is. You know, and 16:15:22<br>23 what we always advise them is do what is 16:15:25<br>24 prudent even if you didn't have insurance, 16:15:28<br>25 what would you do in that situation. But 16:15:31<br><br>Page 265<br>1 they -- you know, in spite of the fact that 16:15:34<br>2 that's what we tell them, they still want to 16:15:36<br>3 know as quickly as possible if the money is 16:15:38<br>4 going to be coming from the insurance 16:15:42<br>5 company. So, yes, they said that they wanted 16:15:44<br>6 an answer and that they wanted it very 16:15:46<br>7 quickly. I -- I'm not sure that I would say 16:15:48<br>8 I felt pressured. I would say that I knew 16:15:50<br>9 that they wanted an answer quickly. 16:15:51<br>10 Q. Did you feel -- excuse me. 16:15:53<br>11 Did you feel you had sufficient time 16:15:54<br>12 to conduct the research and do the analysis 16:15:55<br>13 and give the insured a response in that 16:15:57<br>14 two-day period of time? 16:16:00<br>17 THE WITNESS: Yes. 16:16:06<br><br>19 Q. Did you feel that your analysis was rushed? 16:16:09<br><br>22 THE WITNESS: I wouldn't -- I 16:16:19<br>23 wouldn't define it as rushed. I would define 16:16:22<br>24 it as working very hard for many hours over a 16:16:25<br>25 short period of time. 16:16:31<br><br>Page 266<br>2 Q. But not withstanding the fact that you worked 16:16:32<br>3 hard for a short period of time to reach your 16:16:36<br>4 conclusion, you felt you had reached the 16:16:38<br>5 right conclusion; is that right? 16:16:41<br><br>8 THE WITNESS: I did. 16:16:45<br><br>10 Q. Did you feel that your analysis could have 16:16:51<br>11 benefitted from spending any additional time 16:16:53<br>12 on it? 16:16:56<br><br>15 THE WITNESS: I felt comfortable 16:17:03<br>16 with the decision we made. 16:17:05<br><br>18 Q. During that July 17 phone call with 16:17:13<br>19 Ms. Garber and Ms. Weiss, was there anything 16:17:16<br>20 else that was discussed aside from the topics 16:17:18<br>21 that you've described for me? 16:17:20 | Plaintiff's Objections:<br>Page 266:13-14<br>IO,403<br><br>Defendant's Response:<br><br>Objection removed. |

| Deposition Designation | Objection & Response |
|---|---|
| 22 A. We discussed the conditions on the ground in 16:17:34<br>23 Israel and we discussed the war exclusion and 16:17:36<br>24 its applicability to that situation, I 16:17:50<br>25 believe, and their relocation efforts, and 16:17:51<br><br>Page 267<br>1 then they wanted to know when they would get 16:17:56<br>2 a letter giving them their final 16:17:58<br>3 determination. And even though under 16:18:00<br>4 California law I have 40 days to produce that 16:18:03<br>5 to them, that would not have been appropriate 16:18:06<br>6 in this situation. 16:18:10<br><br>Pages 273<br>20 Q. Did you have any conversations with 16:38:50<br>21 Ms. Gooley after the call on the 17th before 16:38:52<br>22 you told the insured that the claim was going 16:38:55<br>23 to be denied on the basis of the war 16:38:58<br>24 exclusion? 16:39:00<br>25 A. Before I gave them our final decision I'm 16:39:02<br><br>Page 274<br>1 sure I did. 16:39:07<br>2 Q. Who was responsible for the ultimate decision 16:39:07<br>3 to deny the claim? 16:39:10<br>4 A. Me. 16:39:11<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 274<br><br>2 Q. Who was responsible for the ultimate decision 16:39:07<br>3 to deny the claim? 16:39:10<br>4 A. Me. 16:39:11<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 274<br><br>5 Q. Why did you speak to Ms. Gooley about it? 16:39:11<br>6 A. Because NBC is an important client for 16:39:14<br>7 OneBeacon entertainment, and I knew given the 16:39:21<br>8 response that I got from Andrea and Susan 16:39:27<br>9 that it was likely that they were going to 16:39:30<br>10 want to escalate this matter. And, you know, 16:39:32<br>11 the last thing you ever want with someone 16:39:33<br>12 who -- with your supervisor, is a surprise. 16:39:36<br>13 So it's always best to have them apprised as 16:39:38<br>14 to the discontent of a client, the likelihood 16:39:43<br>15 that the client will call them directly. And 16:39:46<br>16 that's why I would also keep Peter Williams 16:39:49 | Plaintiff's Objections:<br>Page 274:19-23<br>F.R.E. 602,802<br>Lack of personal knowledge and speculation as to what Mr. Williams was thinking; alternatively, hearsay to the extent Ms. Johnson is stating Mr. Williams told her he agreed with her. |

| Deposition Designation | Objection & Response |
|---|---|
| 17 apprised, because he also likely was to get a 16:39:53<br>18 call. 16:39:56<br>19 Q. Did you have a call with Mr. Williams about 16:39:56<br>20 the decision before you conveyed it to the 16:39:58<br>21 insured? 16:40:01<br>22 A. Well, I'm sure we talked about it. I mean, 16:40:01<br>23 he was in agreement with the decision. 16:40:04<br><br>Page 279<br>10 Q. Who was on that call? 16:45:38<br><br>Page 284<br>21 Q. I want to direct your attention to the center 16:52:01<br>22 e-mail on page 3240 from you to Susan Weiss 16:52:10<br>23 with a cc to Andrea Garber and Daniel 16:52:15<br>24 Gutterman. It indicates, "Andrea and Susan, 16:52:18<br>25 Profuse apologies, but I will not be able to 16:52:23<br><br>Page 285<br>1 get the coverage letter to you until Monday. 16:52:26<br>2 Despite my best efforts, I could not complete 16:52:28<br>3 it today." Do you recall sending this 16:52:30<br>4 e-mail? 16:52:32<br>5 A. I do. 16:52:32<br>6 Q. Had you previously told Ms. Weiss and 16:52:36<br>7 Ms. Garber that you were going to get the 16:52:38<br>8 coverage denial letter out that week? 16:52:40<br>9 A. That's certainly what it appears from this 16:52:44<br>10 e-mail, yes. 16:52:46<br>11 Q. Did you receive -- receive Ms. Weiss's 16:52:47<br>12 response? 16:52:53<br>13 A. I did. She said, "It's imperative that we 16:52:54<br>14 receive this on Monday morning. NBCU has 16:53:02<br>15 been asking about this on a regular basis and 16:53:05<br>16 we told them they'd be receiving the opinion 16:53:08<br>17 letter by the end of this week. Thank you, 16:53:10<br>18 Susan." 16:53:12<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 285<br><br>19 Q. Did you feel that your analysis in the 16:53:13<br>20 coverage denial letter was being impaired by 16:53:20<br>21 the fact that you were being asked to 16:53:22<br>22 complete it in a short time frame? 16:53:24<br><br>25 THE WITNESS: No. 16:53:32<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Pages 293 | Defendant's Response:<br>The Witness'<br>understanding of facts is<br>relevant to<br>reasonableness of claim<br>decision, defense of<br>"bad faith" allegation<br>and damages sought;<br>relevant to show state of<br>mind, reasonableness,<br>and good faith claims<br>handling on part of<br>ASIC; ASIC did not<br>have 9th Circuit opinion<br>to consider at the time,<br>and testimony regarding<br>the facts available to all<br>parties to form an<br>understanding in real<br>time is critical for jury<br>to consider when<br>evaluating bad faith<br>claims. Not being<br>offered for the truth of<br>the matter asserted but<br>to show knowledge and<br>information acted upon<br>by the witness.<br>Testimony indicates<br>witness has personal<br>knowledge. |

| Deposition Designation | Objection & Response |
|---|---|
| 4 Q. Why did you send it? 17:15:25<br>5 A. Because it is our obligation to send a 17:15:31<br>6 written coverage determination to our 17:15:34<br>7 policyholders. 17:15:36<br><br><br>Page 294<br>3 Q. Was Atlantic denying the claim on the basis 17:16:27<br>4 of any exclusions other than war or warlike 17:16:31<br>5 action? 17:16:36<br>6 A. Well, I refer to four different -- five 17:16:36<br>7 different aspects of the war exclusion, "War, 17:16:39<br>8 including undeclared war or civil war or 17:16:50<br>9 warlike action by a military force including 17:16:53<br>10 action in hindering or defending against an 17:16:53<br>11 actual or unexpected attack by any 17:16:56<br>12 government, sovereign or other authority 17:16:59<br>13 using military personnel or other agents or 17:17:01<br>14 insurrection, rebellion, revolution, usurped 17:17:05<br>15 power or action taken by the governmental 17:17:09<br>16 authority in hindering or defending against 17:17:12<br>17 any of these. Such loss or damage is 17:17:15<br>18 excluded regardless of any other cause or 17:17:16<br>19 event that contributes concurrently in any 17:17:18<br>20 sequence to the loss." 17:17:20<br>21 Number 4, "Any weapon of war 17:17:22<br>22 including atomic fission or radioactive 17:17:24<br>23 force, whether in time or peace of war." And 17:17:28<br>24 then there's an ellipses and you drop down to 17:17:32<br>25 8, "Any uninsured event occurring before 17:17:35<br>Page 295<br>1 concurrently or with or happening after -- or 17:17:37<br>2 after the happening of an insured event which 17:17:42<br>3 directly or indirectly causes or in any way 17:17:44<br>4 contributes to the cause or increase of loss 17:17:48<br>5 under this policy but only with respect to 17:17:51<br>6 that portion of any such loss caused by or 17:17:52<br>7 contributed to by the uninsured event unless 17:17:56<br>8 the uninsured event would not have been a 17:18:00<br>9 factor had the insured event never occurred. 17:18:03<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 295<br><br>10 Q. Does it say had such insured event ever 17:18:06<br>11 occurred? 17:18:10<br>12 A. Yes, sorry. 17:18:10<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 295 | Plaintiff's Objections:<br>Pages 294:3- - 297:23<br>MIL 2; F.R.E. 402-403<br>For the reasons stated in<br>MIL No. 2, Defendant<br>cannot defend against<br>bad faith based on<br>Exclusions 3-4 because<br>the denial letter did not<br>explain that either was<br>the basis for denying<br>coverage.<br><br>Defendant's Response:<br><br>"MIL" not clear<br>objection; ASIC 's<br>understanding and basis<br>for claim decision is<br>relevant to<br>reasonableness of<br>decision, defense of<br>"bad faith", and<br>damages sought. The<br>Witness' understanding<br>of facts is relevant to<br>reasonableness of claim<br>decision, defense of<br>"bad faith" allegation<br>and damages sought;<br>relevant to show state of<br>mind, reasonableness,<br>and good faith claims<br>handling on part of<br>ASIC; ASIC did not<br>have 9th Circuit opinion<br>to consider at the time,<br>and testimony regarding<br>the facts available to all<br>parties to form an<br>understanding in real<br>time is critical for jury<br>to consider when<br>evaluating bad faith<br>claims. Further, there is<br>no authority purporting<br>to bar all evidence of |

| Deposition Designation | Objection & Response |
|---|---|
| 24 Q. Is it your position that notwithstanding the 17:18:42<br>25 fact that there is no discussion of those sub 17:18:47<br><br>**Page 296**<br>1 parts that you were in fact intending to 17:18:49<br>2 convey that the coverage was being denied on 17:18:51<br>3 the basis of application of subparts 3 and 4? 17:18:54<br>4 A. That it could be. 17:18:59<br>5 Q. Okay. I'm not asking if it could be I'm 17:19:00<br>6 asking were you? 17:19:03<br>7 A. Well, so when you look at -- at the war 17:19:03<br>8 exclusion so it could be war or in the 17:19:10<br>9 alternative if it's not war are if it's a war 17:19:13<br>10 like action it's covered or in the 17:19:17<br>11 alternative if you don't think it's a war 17:19:19<br>12 like action it could still be an insurrection 17:19:21<br>13 which is when one -- one -- part of the 17:19:24<br>14 population rises up against the country, so 17:19:27<br>15 in fact if you are saying Gaza is actually 17:19:31<br>16 part of Israel and is not separate and apart 17:19:34<br>17 as part of -- part of Palestine, then that 17:19:36<br>18 could be an insurrection and certainly that 17:19:42<br>19 there are weapons of war that what was used 17:19:44<br>20 were weapons of war. 17:19:47<br>21 Q. Ms. Johnson my question to you is were you, 17:19:49<br>22 on behalf of Atlantic, denying the claim on 17:19:54<br>23 the basis of inter alia subpart 3? 17:19:58<br>24 A. I was putting them on notice that any one of 17:20:04<br>25 those exclusions could apply to the 17:20:07<br><br><br>**Page 297**<br>1 situation. 17:20:09<br>2 Q. Did you feel in writing this coverage 17:20:09<br>3 determination letter that if you felt that 17:20:11<br>4 subpart 3 applied as to insurrection 17:20:13<br>5 rebellion that you needed to discuss it in 17:20:16<br>6 the letter itself? 17:20:20<br>7 A. Not necessarily. 17:20:21<br>8 Q. Were you on behalf of Atlantic denying the 17:20:22<br>9 claim on the basis of subpart 4 any weapon of 17:20:28<br>10 war including atomic fission or radio active 17:20:33<br>11 force? 17:20:36<br>12 A. Well it's an exclusion -- portion of the 17:20:36<br>13 exclusion that could apply because there were 17:20:39<br>14 weapons of war that were used. 17:20:42<br>15 Q. Were you on behalf of Atlantic denying the 17:20:44<br>16 claim on the basis of inter alia subpart 4? 17:20:46<br>17 A. That was one of the basis we looked at yes. 17:20:52<br>18 Q. Were you actually denying the claim separate 17:20:54<br>19 and apart from whether you looked at it were 17:20:57 | facts or data considered in a claims decision that was not specifically cited in the claim denial letter.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><u>Plaintiff's Objections:</u><br>Pages 297:8-14 Objection stated above re MIL No. 2 and also non-responsive and an improper opinion that contradicts the Court's order. F.R.E. 403, 701.<br><br><u>Defendant's Response:</u><br>ASIC 's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" and damages sought; testimony rationally based on witness' perception and job responsibilities and |

| Deposition Designation | Objection & Response |
|---|---|
| 20 you conveying a digs had been made to deny 17:21:00<br>21 the claim on the basis of subpart 4? 17:21:03<br>22 A. That's why it's included in the policy 17:21:06<br>23 language. 17:21:08<br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br><br><br><br><br><br>Page 350<br><br>25 Q. Did you write the letter? 18:34:47<br><br>Page 351<br><br>1 A. I did. 18:34:48<br>2 Q. When you had written the letter on 18:34:49<br>3 September 19th, did you send it to -- to me? 18:34:53<br>4 A. That was certainly my intent. I think I 18:34:56<br>5 actually did, yes. 18:34:58<br>6 Q. Huh. Do you have -- did you go back and 18:35:01<br>7 check to see whether you had any record of 18:35:07<br>8 having sent it to anyone other than 18:35:10<br>9 Ms. Weiss? 18:35:11<br>10 A. No. At the time this was brought to my 18:35:12<br>11 attention, it was not in a period that I 18:35:15<br>12 could review that, so I just sent it along. 18:35:18<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 351<br>13 Q. What work did you, if any, in order to 18:35:40<br>14 develop the analysis that's set forth in this 18:35:43<br>15 letter? 18:35:45<br>16 A. I reviewed your letter, I looked at the case 18:35:46<br>17 law that you included in your letter, I -- 18:35:51<br>18 that the war was ongoing, so I continued to 18:35:58<br>19 stay apprised of what had happened, I -- I 18:36:02<br>20 kept myself apprised of what had happened 18:36:07<br>21 through August, and that the -- these 18:36:10<br>22 specific facts that are contained in the 18:36:15<br>23 third paragraph of the letter that says that, 18:36:20<br>24 "During the conflict which extended until 18:36:23<br>25 August 26th, 2014, 2,143 Palestinians and 69 18:36:25 | helpful to determining a fact in issue and admissible under 701. ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 352<br>1 Israelis were killed, Israel struck 500" -- 18:36:34<br>2 "5,283 targets in Gaza, Hamas fired 4,564 18:36:35<br>3 rockets into Israel and more than 50,000 18:36:41<br>4 thousand buildings in Gaza were damaged or 18:36:43<br>5 destroyed," that's information that I 18:36:46<br>6 gathered after -- after the war had come to 18:36:49<br>7 its conclusion. 18:36:55<br>8 Q. Is it your position or was it your position 18:36:56<br>9 in September of 2014 that the size and scope 18:36:58<br>10 of the hostilities was a factor in 18:37:01<br>11 determining whether or not something 18:37:08<br>12 constituted a war? 18:37:10<br><br>15 THE WITNESS: Well, I think that 18:37:15<br>16 the fact that so much damage was done 18:37:16<br>17 certainly supports the idea that it was a 18:37:18<br>18 war. It is not the only factors to be 18:37:20<br>19 considered, however. 18:37:24 | |

| Deposition Designation | Objection & Response |
|---|---|
| Defendant's Designation of Johnson Vol 2 May 9, 2017<br><br>**Defendant currently intends to submit the following testimony to be played on videotape or a computer. However, its trial preparation continues and it reserves the right to either read the testimony or present the witness live.**<br><br><br>Page 372<br><br>23 BY MS. REED: 10:05:06<br>24 Q. Good morning, Ms. Johnson. 10:05:07<br>25 A. Good morning. 10:05:09<br><br>Page 373<br><br>1 Q. Would you please state your full name for the<br>2 record. 10:05:12<br>3 A. Pamela Ann Johnson. 10:05:13<br>4 Q. Ms. Johnson, by whom were you employed in<br>5 July of 2014? 10:05:17<br>6 A. I was employed by OneBeacon, also known as<br>7 Atlantic Specialty Insurance Group. 10:05:21<br>8 Q. What was your title or position at that time?<br>10:05:23<br>9 A. I was the claims lead for the entertainment<br>10:05:26<br>10 group. The internal designation is second 10:05:28<br>11 vice-president. 10:05:33<br>12 Q. In what position, what were your job duties?<br>10:05:35<br>13 A. At that period of time I supervised other 10:05:37<br>14 claim handlers in the OneBeacon entertainment<br>10:05:39<br>15 claim group. I also interacted with brokers, 10:05:43<br>16 conducted trainings, et cetera. 10:05:47<br>17 Q. In the summer of 2014, how long had you been<br>10:05:50<br>18 employed by OneBeacon? 10:05:55<br>19 A. I joined OneBeacon in March of 2012. 10:05:56<br>20 Q. Were you recruited to work at OneBeacon?<br>10:05:59<br>21 A. I was, yes. 10:06:03<br>22 Q. Can you tell me what went into that process?<br>10:06:04<br>23 A. Well, they were looking for someone to be the<br>10:06:07<br>24 entertainment claim lead. And Sean Duffy, 10:06:12<br>25 who was the head of claim, got a 10:06:15<br><br>Page 374 | Plaintiffs object to Defendant's designations as follows: |

| Deposition Designation | Objection & Response |
|---|---|
| 1 recommendation from my former supervisor, 10:06:17<br>2 Aaron Latto, and Aaron recommended me for the 10:06:21<br>3 job. Sean asked Judy Lamble, who had been 10:06:27<br>4 one of my former coworkers, to approach me 10:06:28<br>5 and see if I was interested. I came in, I 10:06:29<br>6 interviewed with a wide variety of people, 10:06:31<br>7 and they subsequently hired me. 10:06:33<br>8 Q. What was the first position you held when you 10:06:36<br>9 took employment at OneBeacon? 10:06:38<br>10 A. I was always a second vice-president and a 10:06:39<br>11 claim lead. 10:06:42<br>12 Q. Did your job duties change over time? 10:06:42<br>13 A. Yes. When I was initially hired, I was hired 10:06:46<br>14 to handle high-profile claims or complex 10:06:49<br>15 claims and mass torts, that type of thing for 10:06:51<br>16 the entertainment group, and also to be the 10:06:54<br>17 face of OneBeacon entertainment and 10:06:56<br>18 interfacing with brokers. 10:06:59<br>19 After I had been there for about a 10:07:01<br>20 year, they reorganized the claim group and 10:07:02<br>21 asked me to become the manager of other claim 10:07:07<br>22 handlers in addition to handling some claims 10:07:09<br>23 of my own. 10:07:11<br>24 Q. By the summer of 2014, which claim division 10:07:12<br>25 or group did you oversee? 10:07:15<br><br>Page 375<br><br>1 A. The entertainment claim group. 10:07:18<br>2 Q. In the summer of 2014, did you handle 10:07:20<br>3 entertainment claims directly? 10:07:24<br>4 A. Some, yes. 10:07:25<br>5 Q. What types? 10:07:25<br>6 A. Mass torts, in other words, if there was an 10:07:28<br>7 incident for one of our entertainment clients 10:07:30<br>8 that resulted in several people being 10:07:33<br>9 injured, more than one. I would also handle 10:07:36<br>10 some complex claims involving the production 10:07:43<br>11 policies. 10:07:43<br>12 For example, if a -- if a production 10:07:44<br>13 company or network wanted to abandon a show, 10:07:50<br>14 that would be something that I would 10:07:50<br>15 investigate and handle personally. Sometimes | |

| Deposition Designation | Objection & Response |
|---|---|
| 10:07:51<br>16 there would be some kind of other complex<br>17 claims, defamation claims, that type of 10:07:59<br>18 thing. If it was for a very high-profile 10:08:01<br>19 person, then that's something that I would 10:08:04<br>20 handle, a disgrace claim. 10:08:05<br>21 Q. In the summer of 2014, did you supervise<br>22 others who were handling claims? 10:08:09<br>23 A. I did. 10:08:12<br>24 Q. How many people were reported to you at that 10:08:12<br>25 time? 10:08:14<br><br>Page 376<br><br>1 A. It was -- I think there were six. It was six 10:08:14<br>2 or seven. I don't recall exactly. 10:08:17<br>3 Q. Did Danny Gutterman report to you? 10:08:19<br>4 A. He did. 10:08:20<br>5 Q. What was his position at that time? 10:08:21<br>6 A. Danny Gutterman was a claim handler for the 10:08:22<br>7 OneBeacon entertainment group, and he handled 10:08:25<br>8 exclusive first-party claims for our 10:08:28<br>9 entertainment clients under production 10:08:32<br>10 policies. 10:08:34<br><br>PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 376<br><br>11 Q. When you refer to first-party claims, what 10:08:34<br>12 does that mean, please, ma'am? 10:08:36<br>13 A. In other words, if it is -- if the insured, 10:08:38<br>14 which is, you know, a production company, a 10:08:40<br>15 network, et cetera, if they bring a claim 10:08:44<br>16 under their production policy, their 10:08:46<br>17 first-party coverage relating to a specific 10:08:48<br>18 production if it has to shut down, if a cast 10:08:52<br>19 member gets injured and creates a situation 10:08:54<br>20 in which they need to shut down, if there's 10:08:57<br>21 bad weather that causes the production to 10:09:01<br>22 shut down or damage to the set, that's the 10:09:03<br>23 kind of claim that he would handle. 10:09:05<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 376 | |

| Deposition Designation | Objection & Response |
|---|---|
| 24 Q. By the summer of 2014, how long had you 10:09:07<br>25 worked with Mr. Gutterman? 10:09:09<br><br>Page 377<br><br>1 A. About a year. 10:09:11<br>2 Q. Did you work with Mr. Gutterman on a 10:09:14<br>3 consistent basis? 10:09:16<br>4 A. I talked to him almost every day. 10:09:17<br>5 Q. Were you familiar with his background at that 10:09:19<br>6 time? 10:09:23<br>7 A. I was. 10:09:23<br>8 Q. What in particular about his background was 10:09:24<br>9 useful to his position at OneBeacon? 10:09:27<br>10 A. Well, the one thing that was very helpful 10:09:28<br>11 about Danny is that he had actually worked in 10:09:31<br>12 production himself. He had been a production 10:09:33<br>13 assistant on a few TV shows, and as a result, 10:09:36<br>14 he understood how the production world 10:09:38<br>15 worked, he understood how some of the -- the 10:09:40<br>16 contracts worked in terms of, you know, who 10:09:43<br>17 was a -- who had cast coverage on an A level, 10:09:47<br>18 B level, C level. 10:09:49<br>19 Q. Were you familiar by that time with his level 10:09:50<br>20 of experience in claims and his abilities? 10:09:53<br>21 A. Yes, I was. 10:09:54<br>22 Q. By the summer of 2014, how many years of work 10:09:55<br>23 experience did you have working directly for 10:10:04<br>24 an insurance company in total? 10:10:05<br>25 A. Working for an insurance company, I started<br><br>Page 378<br><br>1 working for an insurance company in 2005, so 10:10:13<br>2 approximately seven years. 10:10:17<br>3 Q. 2005 to 2014? 10:10:19<br>4 A. Oh. I'm sorry, nine years. I'm not great at | |

| Deposition Designation | Objection & Response |
|---|---|
| 5 math. 10:10:25<br>6 Q. And how many years of that experience had 10:10:25<br>7 handled -- had been handling entertainment 10:10:27<br>8 claims, please, ma'am? 10:10:30<br>9 A. About seven. 10:10:31<br>10 Q. Now, separate and apart from your work<br>11 history being employed directly by insurance 10:10:35<br>12 companies, did you have prior professional 10:10:39<br>13 experience that involved handling insurance<br>14 matters? 10:10:44<br>15 A. Yes, I had. 10:10:44<br>16 Q. What was that prior professional experience? 10:10:45<br>17 A. Well, I had been in private practice for 10:10:48<br>18 about 13 years before going in-house for an 10:10:51<br>19 insurance company. And in the course of 10:10:53<br>20 being in private practice, I had handled 10:10:55<br>21 coverage matters for insurance companies, I 10:10:59<br>22 had defended insureds under insurance 10:11:01<br>23 policies, and I had also sued insurance 10:11:04<br>24 companies on behalf of their policyholders. 10:11:07<br>25 Q. And when you refer to, "Private practice," 10:11:10<br><br>Page 379<br><br>1 that was in private practice as an attorney? 10:11:12<br>2 A. That's correct. 10:11:14<br>3 Q. Were you working for law firms during that 10:11:15<br>4 time? 10:11:17<br>5 A. I was. 10:11:17<br>6 Q. By 2014, turning back to your experience in 10:11:22<br>7 the insurance industry, approximately how 10:11:27<br>8 many claims had you been involved in over the 10:11:30<br>9 years either directly as a handler or as a 10:11:31<br>10 supervisor? 10:11:35<br>11 A. Oh, hundreds. 10:11:35<br>12 Q. What degrees do you hold, please, ma'am? 10:11:37<br>13 A. I have a bachelor's degree in psychology, and 10:11:40<br>14 I hold a Juris Doctor, which is the degree 10:11:44<br>15 you get when you graduate from law school. 10:11:48<br>16 Q. What year did you earn your Juris Doctor? 10:11:51<br>17 A. I graduated from law school in 1992, so my 10:11:54 | Plaintiff's Objections:<br>Page 379:6-25<br>F.R.E. 403.<br>Ms. Johnson was not acting as a lawyer in adjusting the claim here. Permitting Defendant to offer evidence of her legal training is unfairly prejudicial and would risk the jury construing her as an expert on legal issues or offering an improper legal opinion, which she may not do.<br><br>Defendant's Response:<br><br>Witness background is relevant to jury's assessment of credibility and knowledge regarding issues in dispute; not prejudicial to Plaintiffs but would be prejudicial to Defendant if not allowed. |

| Deposition Designation | Objection & Response |
|---|---|
| 18 Juris Doctor is 1992. 10:11:58<br>19 Q. Does your legal education help you perform 10:12:00<br>20 your duties working on insurance claims? 10:12:03<br>21 A. Certainly. 10:12:05<br>22 Q. And how is that? 10:12:05<br>23 A. Well, it informs how I conduct an analysis 10:12:06<br>24 and it helps me in my investigative skills 10:12:09<br>25 just as, you know, I would have to 10:12:12<br><br><br>Page 380<br><br>1 investigate cases when I was in private 10:12:13<br>2 practice. It certainly, you know, helps to 10:12:14<br>3 have that kind of analytical mind when you're 10:12:17<br>4 both investigating and interpreting insurance 10:12:22<br>5 policies. An insurance policy is a contract, 10:12:24<br>6 and, obviously, I know about contract law. 10:12:27<br>7 Q. Do you hold any licenses? 10:12:29<br>8 A. Yes, I hold many licenses to -- to be a 10:12:30<br>9 claims adjuster. There are several states 10:12:35<br>10 that actually require that you have a 10:12:37<br>11 license, and I hold a license, an adjuster's 10:12:40<br>12 license in every jurisdiction in which it is 10:12:43<br>13 required. 10:12:46<br>14 Q. Were you involved in a claim submitted by 10:12:47<br>15 NBCUniversal to OneBeacon on the production 10:12:49<br>16 called Dig? 10:12:52<br>17 A. Yes, I was. 10:12:53<br>18 Q. What was your understanding of what Dig was? 10:12:54<br>19 A. It was a scripted television show that was 10:12:57<br>20 being shot primarily in Israel. 10:13:00<br>21 Q. What involvement did you have with the Dig 10:13:02<br>22 claim? 10:13:04<br>23 A. Danny Gutterman received the claim and it was 10:13:06<br>24 assigned to him. And my first knowledge of 10:13:09<br>25 it came when he contacted me on a phone call 10:13:12<br><br>Page 381<br><br>1 with Andrea Garber, who was in-house at NBC, 10:13:14 | **Plaintiff's Objections:**<br>Page 380:1-6<br>F.R.E. 403.<br>Ms. Johnson was not acting as a lawyer in adjusting the claim here. Permitting Defendant to offer evidence of her legal training is unfairly prejudicial and would risk the jury construing her as an expert on legal issues or offering an improper legal opinion, which she may not do.<br><br>**Defendant's Response:**<br><br>The witness's background and ability are relevant to jury's assessment of credibility and knowledge regarding issues in dispute; not unfairly prejudicial to Plaintiffs, confusing, misleading or cumulative evidence. Would be prejudicial to Defendant if now allowed. |

| Deposition Designation | Objection & Response |
|---|---|
| 2 and Susan Weiss, the broker at Aon for NBC, 10:13:19<br>3 when they were calling to say that they were 10:13:24<br>4 going to have to push production for a week, 10:13:26<br>5 in other words, they weren't going to go 10:13:29<br>6 forward with shooting for a week because the 10:13:30<br>7 situation on the ground in Israel had become 10:13:32<br>8 so dangerous that they thought it was a 10:13:34<br>9 danger to their personnel. 10:13:37<br>10 Q. After that call, did you play a direct role 10:13:38<br>11 in the handling of the claim? 10:13:40<br>12 A. I did. Danny and I worked collaboratively 10:13:41<br>13 together to investigate the claim and to 10:13:44<br>14 reach a coverage determination. The ultimate 10:13:46<br>15 coverage determination was made by me. 10:13:49<br>16 Q. Was this the type of complex claim that you 10:13:51<br>17 would work on directly? 10:13:54<br>18 A. Certainly in some circumstances. 10:13:55<br>19 Q. And in this circumstance, how do you describe 10:13:58<br>20 your overall role? 10:14:02<br>21 A. Well, I was supervising Danny and I was also 10:14:03<br>22 working closely with him to be able to 10:14:06<br>23 evaluate the exclusions in the policy, the 10:14:09<br>24 coverage in the policy. And then, of course, 10:14:11<br>25 I conducted legal research with regard to the 10:14:13<br><br><br>Page 382<br><br>1 policy -- the policy provisions to see how 10:14:16<br>2 other courts had interpreted the language 10:14:20<br>3 and -- and that sort of thing. 10:14:22<br>4 Q. Did you also participate in investigation of 10:14:25<br>5 the facts? 10:14:28<br>6 A. Absolutely. I investigated the facts very 10:14:28<br>7 thoroughly. And Danny also participated in 10:14:32<br>8 that. 10:14:34<br><br>Page 383<br><br>1 Q. In the summer of 2014, was there an 10:15:12<br>2 entertainment policy in place with 10:15:15<br>3 NBCUniversal? 10:15:19 | |

| Deposition Designation | Objection & Response |
|---|---|
| 4 A. There was. 10:15:19 | |

PLAINTIFFS' 106 COUNTER-DESIGNATION:

Page 383

5 Q. And were you familiar with that policy? 10:15:20
6 A. I don't know that I had specifically reviewed 10:15:21
7 that particular policy. I was certainly 10:15:26
8 familiar with their -- their previous 10:15:29
9 policies -- 10:15:31
10 Q. Do you know -- 10:15:33
11 A. -- since I had dealt with those before. 10:15:34
12 Q. Do you know about how long that NBCUniversal 10:15:37
13 had been an insured of OneBeacon? 10:15:39
14 A. I'm told that it was since 2010. 10:15:41

END PLAINTIFFS' 106 COUNTER-DESIGNATION

Page 383

15 Q. Let me hand you what was previously marked in 10:15:45
16 the case as Defendant's Exhibit 38, please, 10:15:47
17 ma'am. 10:15:50
18 A. Yes, I see the exhibit. 10:15:56
19 Q. Can you identify Exhibit 38 as a true and 10:15:57
20 correct copy of the insurance policy issued 10:16:00
21 to NBCUniversal Media, LLC, for the policy 10:16:03
22 period January 1, 2014 to June 30th, 2015? 10:16:07
23 A. Yes, it appears to be so. 10:16:26
24 Q. By the summer of 2014, were you familiar with 10:16:28
25 NBCUniversal and its business? 10:16:31

Page 384

1 A. Yes, I was. 10:16:33
2 Q. And what did you know about NBCUniversal and 10:16:34
3 its business? 10:16:37
4 A. Well, I knew that they were a production 10:16:39
5 company as well as, you know, that they had 10:16:41
6 formed a network, and that a lot of their 10:16:46
7 productions were done in-house. There are 10:16:48
8 other networks that actually outsource a lot 10:16:50
9 of the productions, but NBC, especially with 10:16:53
10 their scripted -- their scripted television 10:16:56
11 shows, did those in-house. 10:17:00

| Deposition Designation | Objection & Response |
|---|---|
| 12 Q. And directing your attention back to 10:17:02<br>13 Defendant's Exhibit 38, please, ma'am, is 10:17:06<br>14 there a general title or way that you refer 10:17:08<br>15 to this type of policy within OneBeacon? 10:17:10<br>16 A. Yes. It's a motion picture television 10:17:13<br>17 producer's portfolio. 10:17:16<br>18 Q. And was there a short -- 10:17:17<br>19 A. MPTP. 10:17:20<br>20 Q. -- shortcut name that you used for it? 10:17:21<br>21 A. Yeah, it's a production policy. 10:17:24<br>22 Q. Did you have particular contacts with whom 10:17:25<br>23 you worked within NBCUniversal? 10:17:29<br>24 A. Well, in the entertainment industry, 10:17:33<br>25 sometimes you work directly with the insured, 10:17:35<br><br>Page 385<br><br>1 but more often you work directly with the 10:17:37<br>2 broker, at least initially when a claim is 10:17:39<br>3 first submitted and the coverage 10:17:43<br>4 determination. And in this case I had 10:17:45<br>5 primarily worked with Andrea Garber and 10:17:47<br><br>7 Andrea Garber at that time actually worked 10:17:53<br>8 for Aon, and Susan Weiss was her supervisor. 10:17:56<br>9 Q. And subsequent to that, did their positions 10:17:59<br>10 change? 10:18:02<br>11 A. Well, Andrea went in-house for risk control 10:18:03<br>12 for NBC, and Susan Weiss remained as the 10:18:06<br>13 broker at Aon for NBC. 10:18:09<br>14 Q. Subsequent to that development, did 10:18:12<br>15 Ms. Garber become your contact within 10:18:14<br>16 NBCUniversal and Ms. Weiss become your 10:18:17<br>17 contact within Aon? 10:18:19<br>18 A. Yes, that's correct. 10:18:20<br>19 Q. Can you explain what the role of the broker 10:18:21<br>20 is in this type of policy? 10:18:25<br>21 A. Well, unlike other areas of insurance, 10:18:27<br>22 the broker plays a very key role in 10:18:31<br>23 entertainment -- in entertainment insurance. 10:18:34<br>24 There are only a handful of brokers who 10:18:38<br>25 handle, I would say, 90 percent of the 10:18:40<br><br>Page 386<br><br>1 entertainment business in the United States. 10:18:42 | |

651

| Deposition Designation | Objection & Response |
|---|---|
| 2 And the brokers act as an advocate for their 10:18:44<br>3 insureds and they play a vital role in the 10:18:47<br>4 investigation as well. 10:18:51<br>5 So, for example, if a broker submits 10:18:52<br>6 a claim to me, I don't call the insured 10:18:54<br>7 directly, I call the broker and the broker 10:18:56<br>8 supplies information. And if I say I need to 10:18:58<br>9 meet with the insured or talk to the insured 10:19:00<br>10 to gather information about the claim, at 10:19:03<br>11 least initially the broker will be involved 10:19:06<br>12 until at least there's a coverage 10:19:09<br>13 determination. 10:19:10<br>14 If it's determined that they -- the 10:19:11<br>15 claim is actually covered then frequently we 10:19:12<br>16 will deal specifically with the insured after 10:19:15<br>17 that unless there is some conflict between 10:19:18<br>18 what the insured thinks they should be paid 10:19:20<br>19 and what the insurer thinks they should be 10:19:22<br>20 paid, in which case the broker then gets 10:19:24<br>21 involved again. 10:19:26<br>22 Q. And on the NBCUniversal relationship in 10:19:29<br>23 particular, were you dealing with the broker? 10:19:33<br>24 A. Oh, yes, always. 10:19:37<br>25 Q. When the Dig claim was submitted, did you 10:19:40<br><br>Page 387<br><br>1 make a point to review the insurance policy 10:19:43<br>2 that was in place? 10:19:45<br>3 A. Yes, I did. 10:19:47<br>4 Q. And is Exhibit 38 the document that you 10:19:49<br>5 reviewed? 10:19:52<br>6 A. Yes, it is. 10:19:53<br>7 Q. How did you go about your review of the 10:19:53<br>8 policy? 10:19:57<br>9 A. When I get a claim, I start at the beginning 10:19:58<br>10 of the policy. And in this case I would look 10:20:01<br>11 at -- okay, so there -- there's a list of the 10:20:03<br>12 kinds of coverage that is involved in the 10:20:06<br>13 policy, and I want to look at what the -- 10:20:08<br>14 the -- the actual limits are on the policy. 10:20:11<br>15 And then I turn to the form list. 10:20:14<br>16 The form list tells me all of the forms that 10:20:17<br>17 are contained within the policy. In this 10:20:21<br>18 particular case, I would look at the common 10:20:23<br>19 policy provisions. I would look at the 10:20:25<br>20 motion picture portfolio general conditions, 10:20:27<br>21 because those apply to all of the different 10:20:29 | |

| Deposition Designation | Objection & Response |
|---|---|
| 22 coverages that are contained in the policy. 10:20:31<br>23 And then I would go through the 10:20:35<br>24 different forms. In this case there are a 10:20:37<br>25 variety of different forms. There's cast 10:20:39<br><br>Page 388<br><br>1 coverage. That wouldn't apply in this case, 10:20:42<br>2 because this didn't involve injury to a cast 10:20:43<br>3 member. There's broad form disgrace. Again, 10:20:48<br>4 there was no disgrace claim, so I wouldn't 10:20:51<br>5 look at that necessarily. Negative film and 10:20:53<br>6 faulty stock, nothing had gone wrong with the 10:20:53<br>7 film, so that's not applicable. 10:20:55<br>8 Extra expense, extra expense is what 10:20:57<br>9 you pay when a production company has to shut 10:20:59<br>10 down production, so that was clearly the 10:21:02<br>11 portion of the policy that would be relevant 10:21:05<br>12 in this situation. 10:21:07<br>13 Then there are a variety of other 10:21:08<br>14 types of coverage, animal/property, 10:21:11<br>15 property/animal, third-party property damage, 10:21:13<br>16 and a variety of other kinds of coverages, 10:21:17<br>17 but extra expense was the one at play here. 10:21:20<br>18 Q. Do you begin your review broadly by looking 10:21:23<br>19 at the policy as a whole? 10:21:26<br>20 A. Yes, I do. 10:21:27<br>21 Q. And do you have a personal practice in regard 10:21:28<br>22 to how you go about looking at the policy? 10:21:29<br>23 A. Yes, I think I just described it. I look at 10:21:31<br>24 the dec page, the declarations page that 10:21:35<br>25 describes what the limits are, and then I 10:21:37<br><br>Page 389<br><br>1 looked at the form sheet. I determine what 10:21:39<br>2 the relevant forms are that need to be 10:21:42<br>3 investigated or reviewed pursuant to the -- 10:21:44<br>4 the -- what I know about the claim at that 10:21:49<br>5 time, and then I review those portions of the 10:21:51<br>6 policy. 10:21:53<br>7 Q. And why is the review of the policy as a 10:21:54<br>8 whole important? 10:21:56<br>9 A. Well, you have to review the policy as a 10:21:58<br>10 whole because there are different portions of 10:22:01<br>11 the policy that might apply to a claim. And 10:22:03<br>12 so if you only zero in on one small part, you | |

| **Deposition Designation** | **Objection & Response** |
|---|---|
| 10:22:05<br>13 could be missing other -- other portions of 10:22:09<br>14 the contract that are applicable to the 10:22:12<br>15 situation. 10:22:13<br>16 Q. As you progressed in your review of the Dig 10:22:15<br>17 claim, did you determine that there were 10:22:17<br>18 certain parts of Exhibit 38 that were most 10:22:19<br>19 relevant to your work? 10:22:21<br>20 A. Yes, I did. 10:22:22<br>21 Q. What were those parts? 10:22:23<br>22 A. The general conditions page and the extra 10:22:24<br>23 expense form. 10:22:28<br>24 Q. How did you first learn of the existence of 10:22:32<br>25 the claim on the show Dig? 10:22:35<br>TSG Reporting - Worldwide 877-702-9580<br>8 (Pages 390 to 393)<br><br>Page 390<br><br>1 A. Danny Gutterman contacted me, and Susan Weiss 10:22:37<br>2 and Andrea Garber were also on the telephone, 10:22:41<br>3 and they discussed what was happening on the 10:22:44<br>4 ground in Israel. 10:22:47<br>5 Q. Did Ms. Garber and Ms. Weiss share factual 10:22:47<br>6 information with you in that call? 10:22:52<br>7 A. Well, what they told me was that they were -- 10:22:53<br>8 that there was heavy rocket fire coming from 10:22:58<br>9 Gaza into Israel, and that the amount of 10:23:01<br>10 rocket fire that was occurring made it 10:23:03<br>11 dangerous for them to try to continue to film 10:23:06<br>12 in Tel Aviv and Jerusalem, which were their 10:23:10<br>13 two filming locations. 10:23:13<br>14 Q. Can you recall any other information they 10:23:15<br>15 shared with you about the safety situation? 10:23:17<br>16 A. Well, they had been informed by their head of 10:23:19<br>17 security that they could no longer guarantee 10:23:22<br>18 the safety of the casting crew. 10:23:25<br>19 Q. Did you seek information from Ms. Weiss and 10:23:27<br>20 Ms. Garber in that call? 10:23:29 | |

| Deposition Designation | Objection & Response |
|---|---|
| 21 A. Absolutely. I mean, the first thing we 10:23:30<br>22 wanted to make sure is that everyone was 10:23:33<br>23 safe. That's the primary concern. So I 10:23:34<br>24 wanted to know, you know, who was still on 10:23:36<br>25 the ground, had they gotten them out. 10:23:38<br><br>Page 391<br><br>1 And in this particular case, they 10:23:42<br>2 were actually on hiatus, which is usual 10:23:44<br>3 between a pilot and primary shooting before a 10:23:46<br>4 season. And so most of the actors and the 10:23:49<br>5 crew were not located there. 10:23:52<br>6 There was, I think, some local crew 10:23:53<br>7 members that actually lived in Israel who 10:23:55<br>8 were still present, but the production was -- 10:23:57<br>9 was not trying to get them out of Israel 10:24:01<br>10 since that's where they lived. 10:24:03<br>11 Q. Did you discuss any issues about timing as 10:24:09<br>12 part of that call? 10:24:12<br>13 A. Well, one of the things that -- that -- you 10:24:12<br>14 know, in every kind of production situation 10:24:13<br>15 the insured wants to know as quickly as 10:24:15<br>16 humanly possible whether or not their claim 10:24:17<br>17 is covered, and that's understandable, 10:24:20<br>18 because they want to know whether or not 10:24:22<br>19 they're going to have insurance money to make 10:24:24<br>20 the determination about what they do next or 10:24:26<br>21 whether or not they're only relying on their 10:24:28<br>22 own funds. 10:24:31<br>23 So that's a perfectly understandable 10:24:31<br>24 need of theirs, to get a decision as quickly 10:24:35<br>25 as they possibly can. So Susan and Andrea 10:24:37<br><br>Page 392<br><br>1 both made us aware that they -- they wanted a 10:24:41<br>2 quick answer, but we also all agreed that 10:24:43<br>3 while it was certainly prudent for them to 10:24:47<br>4 push for a week, we were hoping that there 10:24:49<br>5 would be deescalation in the hostilities and 10:24:52<br>6 that they would be able to get up and running 10:24:56<br>7 again. 10:24:58<br>8 Q. Now, as a representative of the insurance 10:24:58<br>9 company, do you make any suggestions about 10:25:01 | |

| Deposition Designation | Objection & Response |
|---|---|
| 10 production decisions? 10:25:03<br>11 A. No, absolutely not. That's not my job. 10:25:05<br>12 Creative decisions are left to the -- to the 10:25:07<br>13 client, to the insured. It would be -- it 10:25:09<br>14 wouldn't be appropriate for me to be talking 10:25:13<br>15 to them about creative decisions. 10:25:15<br>16 Q. As a part of this initial conversation, did 10:25:16<br>17 you discuss your next steps with Ms. Weiss 10:25:21<br>18 and Ms. Garber? 10:25:24<br>19 A. Well, we all agreed that we wanted to have 10:25:25<br>20 another phone call very soon, and I think we 10:25:28<br>21 scheduled one -- I think the first call was 10:25:30<br>22 on a Tuesday, we scheduled another call for 10:25:32<br>23 Friday to see if there had been some 10:25:34<br>24 deescalation in the hostilities. 10:25:37<br>25 10:25:41<br><br>Page 393<br><br>1 (Whereupon, Exhibit 232 was 10:25:41<br>2 marked for identification.) 10:25:42<br>3 BY MS. REED: 10:25:42<br>4 Q. Let me hand you what's been marked as 10:25:42<br>5 Exhibit 232. Can you identify Exhibit 232 as 10:25:45<br>6 an e-mail string beginning with the earliest 10:25:56<br>7 e-mail on July 14th and running through 10:26:01<br>8 July 15th on an item that was cc'd to you? 10:26:04<br>9 A. Yes, that is exactly what this is. It looks 10:26:08<br>10 like this is also the first written notice 10:26:12<br>11 that -- that OneBeacon had of the claim, of 10:26:14<br>12 the Dig claim, and then there are some 10:26:18<br>13 subsequent e-mails, an e-mail from Danny to 10:26:20<br>14 Peter. 10:26:23<br>15 Q. Let me direct your attention -- 10:26:24<br>16 A. Peter Williams. 10:26:26<br>17 Q. -- if I can, ma'am, to the second page of 10:26:27<br>18 this exhibit. In the middle of the page do 10:26:31<br>19 you see an e-mail from Susan Weiss dated 10:26:34<br>20 July 15th, 2014, to Michael J. Arevalo? 10:26:36<br>21 A. I do. 10:26:40<br>22 Q. And is this what you're referring to as the 10:26:41<br>23 submission of the claim? 10:26:44<br>24 A. Yes. 10:26:44<br>25 Q. At some point in time during your involvement 10:26:47<br><br>Page 394 | |

| Deposition Designation | Objection & Response |
|---|---|
| 1 in the claim, did you review this? 10:26:49<br>2 A. I did, yes. 10:26:51<br>3 Q. Was this different information than what 10:26:53<br>4 Ms. Weiss or Ms. Garber had provided? 10:26:56<br>5 A. Well, there was more information, because 10:26:59<br>6 this -- the initial e-mail that Susan sent 10:27:01<br>7 also included an e-mail that Andrea had 10:27:05<br>8 received from their security person, so it 10:27:08<br>9 included information that he had given them 10:27:14<br>10 with regard to the hostilities that were 10:27:17<br>11 occurring in Israel and the fact that he 10:27:19<br>12 didn't think that the situation was likely to 10:27:23<br>13 change and that that increased the level of 10:27:26<br>14 risk. 10:27:28<br>15 Q. Do you recall receiving any other written 10:27:29<br>16 information about reports on safety and 10:27:31<br>17 security from NBCUniversal? 10:27:35<br>18 A. No, not that I'm aware of. 10:27:39<br>19 Q. Was this the totality of written information 10:27:43<br>20 that you had to begin your investigation? 10:27:46<br>21 A. Yes. 10:27:51<br>22 Q. Would you direct your attention to the final 10:27:58<br>23 e-mail, ma'am, that's on the first page, top 10:28:00<br>24 of the page. This is from Mr. Gutterman 10:28:03<br>25 directed to Peter Williams and copied to you. 10:28:05<br><br><br><br><br><br>Page 395<br><br>1 Do you see that? 10:28:08<br>2 A. I do. 10:28:08<br>3 Q. Mr. Gutterman makes reference to a report 10:28:09<br>4 from CBS News two days ago. Do you see that? 10:28:15<br>5 A. I do, yup. 10:28:18<br>6 Q. And at some point in your involvement in this 10:28:19<br>7 claim did you review that video? 10:28:21<br>8 A. Yes, I did. 10:28:22<br>9 Q. Let me turn back to the claim being submitted 10:28:25<br>10 to OneBeacon, please, ma'am. Was an actual 10:28:28 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 assignment of the claim made? 10:28:31<br>12 A. Yes, it was assigned to Danny. 10:28:33<br>13 Q. And who worked directly on the handling of 10:28:35<br>14 the claim? 10:28:38<br>15 A. Danny worked on the handling of the claim, 10:28:38<br>16 and I also worked on the handling of the 10:28:43<br>17 claim. My supervisor, Theresa Gooley, was 10:28:45<br>18 kept in the loop with regard to what we were 10:28:49<br>19 doing in investigating the claim, and we also 10:28:50<br>20 discussed that with Peter Williams. 10:28:51<br>21 Q. So what role did you play and what role did 10:28:53<br>22 Mr. Gutterman play? 10:28:55<br>23 A. So we were collaborating, because there was a 10:28:57<br>24 very short time frame here in which to get 10:28:59<br>25 information to the insured. And because it 10:29:02<br><br>Page 396<br><br>1 was a volatile situation and changing 10:29:06<br>2 quickly, we both were doing research on what 10:29:08<br>3 exactly was happening in Israel and what had 10:29:11<br>4 been happening in Israel and how that 10:29:13<br>5 situation was developing. 10:29:17<br>6 With regard to the coverage, we were 10:29:19<br>7 both evaluating the policy, I was doing the 10:29:21<br>8 legal research that was involved in 10:29:24<br>9 interpreting the -- the provisions of the 10:29:26<br>10 policy. 10:29:30<br>11 Q. Eventually, were others at OneBeacon also 10:29:30<br>12 involved in the work on this claim? 10:29:34<br>13 A. Well, as I said, I kept Theresa Gooley, my 10:29:35<br>14 supervisor, in the loop, and I think at some 10:29:40<br>15 point she talked to Sean Duffy about this. 10:29:42<br>16 Sean Duffy is the head of claim. 10:29:46<br>17 Q. And why did you keep Ms. Gooley in the loop? 10:29:48<br>18 A. Well, NBC is a very important client of ours. 10:29:51<br>19 I knew that -- that if there were going to be 10:29:53<br>20 a denial of the claim, that they would 10:29:55<br>21 certainly want to involve her and talk to 10:29:56<br>22 her, because that is usual in entertainment 10:29:58<br>23 claims, if you deny a claim, there's going to 10:30:00<br>24 be escalation to your supervisor and they are | |

| Deposition Designation | Objection & Response |
|---|---|
| 10:30:03<br>25 going to want to talk to them, and they would 10:30:05<br><br>Page 397<br><br>1 also be wanting to talk to Peter Williams, so 10:30:07<br>2 he was also kept in the loop. 10:30:11<br>3 Q. And what role was Peter Williams playing in 10:30:13<br>4 the overall process? 10:30:15<br>5 A. He was -- he was merely a sounding board. I 10:30:16<br>6 mean, we want to keep him in the loop because 10:30:18<br>7 we know that the client is ultimately going 10:30:21<br>8 to be contacting him. Peter also has 10:30:23<br>9 extensive experience in claims himself. In 10:30:26<br>10 fact, before I held the position of claim 10:30:29<br>11 lead, he had -- he had held that position 10:30:30<br>12 before himself before he became the president 10:30:32<br>13 of OneBeacon entertainment. But as the 10:30:35<br>14 president of OneBeacon entertainment, he was 10:30:37<br>15 actually on the underwriting side, not on the 10:30:39<br>16 claims side, and he did not have the power to 10:30:41<br>17 actually make a coverage determination. 10:30:43<br>18 Q. Did you view Mr. Williams' input and 10:30:45<br>19 experience as helpful in this process? 10:30:48<br>20 A. Absolutely. 10:30:50<br>21 Q. Was it typical at OneBeacon for so many 10:30:51<br>22 different people to be involved in the claim 10:30:54<br>23 process? 10:30:56<br>24 A. Well, I mean, it depends on the kind of claim 10:30:56<br>25 it is. If it's a car accident case, no, 10:30:59<br><br>Page 398<br><br>1 probably not. If it's a high-profile 10:31:01<br>2 insured, you know, a famous celebrity or 10:31:06<br>3 something like that, then, yes, we would 10:31:11<br>4 probably contact more people just to make 10:31:13<br>5 them aware. Not that they are necessarily 10:31:14<br>6 going to have input on the claim, but they 10:31:17<br>7 should -- they should definitely know that 10:31:19<br>8 the claim exists. So it would just depend on 10:31:19<br>9 the circumstances of the claim. 10:31:22<br>10 Q. Now, you mentioned involving Ms. Gooley in 10:31:24 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 the context of a situation where a claim 10:31:26<br>12 might be denied. When this claim first came 10:31:29<br>13 in, did you anticipate that it would be 10:31:32<br>14 denied? 10:31:33<br>15 A. I had no idea if it would be denied or not. 10:31:34<br>16 Q. Did this claim require some level of analysis 10:31:39<br>17 in order to make that determination? 10:31:44<br>18 A. It actually -- yes, it involved extensive 10:31:46<br>19 analysis. 10:31:47<br>20 Q. Was Tuesday, July the 15th, the first time 10:31:50<br>21 you can recall receiving information on the 10:31:53<br>22 Dig claim? 10:31:55<br>23 A. Yes. 10:31:55<br>24 Q. And you have indicated the information you 10:31:56<br>25 personally received by telephone today; is 10:32:02<br><br>Page 399<br><br>1 that right? 10:32:06<br>2 A. That's correct. 10:32:06<br>3 Q. Did you begin an investigation that same day 10:32:07<br>4 that you received the information from the 10:32:10<br>5 insured? 10:32:12<br>6 A. Yes. Actually, it was in the evening. I 10:32:12<br>7 think that the call on -- on my time took 10:32:15<br>8 place later in the day, and so I started my 10:32:19<br>9 investigation that evening. 10:32:23<br>10 Q. What steps did you take after the phone call? 10:32:24<br>11 A. Well, the first thing I wanted to do was 10:32:27<br>12 review the policy. The second thing I wanted 10:32:29<br>13 to do was to start gathering information, the 10:32:32<br>14 actual factual investigation of the claim, in 10:32:34<br>15 other words, what was actually happening in 10:32:36<br>16 Israel, and if -- to determine whether or not 10:32:38<br>17 what is -- was happening in Israel actually 10:32:42<br>18 was deescalating or whether the situation was 10:32:46<br>19 so dangerous that the production could not 10:32:49<br>20 continue, and what the circumstances had been 10:32:53<br>21 preceding this. 10:32:55<br>22 Q. So after the call did you formulate your own 10:32:56<br>23 plan about how you were going to proceed? | |

| Deposition Designation | Objection & Response |
|---|---|
| 10:32:58<br>24 A. Well, I was going to investigate the facts, I<br>10:33:00<br>25 was going to review the coverage, I was going<br>10:33:02<br><br>Page 400<br><br>1 to analyze the coverage, which could involve<br>10:33:03<br>2 legal research, and I was going to reach a 10:33:07<br>3 determination. 10:33:10<br>4 Q. So what steps did you actually begin to take<br>10:33:10<br>5 that evening? 10:33:13<br>6 A. I started researching what was happening on<br>10:33:14<br>7 the ground in Israel. That was the primary 10:33:17<br>8 focus of my -- of my research. I don't 10:33:22<br>9 remember specifically if I looked at the 10:33:26<br>10 policy that night or if I didn't look at the 10:33:27<br>11 policy until the next day. 10:33:30<br>12 Q. About how many hours of work did you spend in<br>10:33:31<br>13 researching the factual situation? 10:33:35<br>14 A. During what period of time? 10:33:38<br>15 Q. Over the, let's call it the initial period 10:33:39<br>16 that you were involved with the claim. 10:33:42<br>17 A. Well -- 10:33:44<br>18 Q. The first few days. 10:33:45<br>19 A. Yeah, the first few days I probably spent<br>10:33:46<br>20 over 20 hours doing research. 10:33:48<br>21 Q. And that's just looking at factual 10:33:50<br>22 information? 10:33:52<br>23 A. Yes, and looking at the policy also. 10:33:52<br>24 Q. And over what period of time did you continue<br>10:33:54<br>25 the factual information research? 10:33:56<br><br>Page 401<br><br>1 A. Well, for quite a long period of time. In 10:34:00<br>2 fact, I continued to gather information until 10:34:03<br>3 after the war had ended. 10:34:05<br>4 Q. And do you recall approximately when that<br>10:34:07<br>5 was? 10:34:09<br>6 A. The war ended at the end of August 2014.<br>10:34:09<br>7 When I say, "The war," I mean the -- the war<br>10:34:12<br>8 between Hamas and Israel. 10:34:15<br>9 Q. On Exhibit 232 Mr. Gutterman made reference | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 401:1-8<br>F.R.E. 402-403, 602, 701<br>Ms. Johnson should not be<br>permitted to offer an<br>improper legal opinion that<br>the conflict constituted a<br>"war" or to casually refer to<br>it as being a "war"—an<br>opinion which is, in any<br>event, contrary to the Ninth<br>Circuit's ruling. Such<br>testimony, particularly |

| Deposition Designation | Objection & Response |
|---|---|
| 10:34:22<br>10 to a CBS News clip on July 15th to you and to 10:34:25<br>11 Mr. Williams; do you see that? 10:34:30<br>12 A. I do. 10:34:31<br>13 Q. And you indicated earlier that you did review 10:34:32<br>14 this? 10:34:35<br>15 A. I did. 10:34:35<br>16 MS. REED: Let me ask the 10:34:36<br>17 technician if we can play the video at this 10:34:38<br>18 point in time. 10:34:40<br>19 For the record, I will designate 10:34:46<br>20 this as Exhibit 233. It's produced in the 10:34:47<br>21 case as ATL 4496. 10:34:52<br>22 (Whereupon, Exhibit 233 was<br>23 marked for identification.)<br>24 (Video started.)<br>25 MS. REED: That's the incorrect | when offered by a lawyer, is substantially more prejudicial than probative and risks confusing the issues and misleading the jury.<br><br>Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. The Witness' understanding of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims Not offered for the truth of the matter asserted. 801; 807. |
| Page 402<br><br>1 one.<br>2 THE VIDEOGRAPHER: That's the one<br>3 named ATL00498.<br>4 MS. REED: I need 6.<br>5 THE VIDEOGRAPHER: The other one<br>6 doesn't have a number.<br>7 "BOB SCHIEFFER: And good morning 10:35:26 | Plaintiff's Objections:<br>Pages 402:1 – 404:5<br>MIL No. 3; F.R.E. 402-03<br>Given the Ninth Circuit's order, this video is irrelevant and substantially more prejudicial than probative for the reasons in |

| Deposition Designation | Objection & Response |
|---|---|
| 8 again. To get that news on the overnight 10:35:27<br>9 developments, we go first to Holly Williams 10:35:29<br>10 in Gaza City. Holly. 10:35:33<br>11 "HOLLY WILLIAMS: Good morning, Bob. 10:35:36<br>12 Israeli commanders clashed with Palestinian 10:35:38<br>13 militants on the coast here early this 10:35:39<br>14 morning. It's the first gun fight since this 10:35:41<br>15 escalation began, and it comes as Israel 10:35:43<br>16 considers whether to mount a ground invasion. 10:35:46<br>17 "The Israeli military says four of 10:35:49<br>18 the soldiers were lightly wounded as they 10:35:52<br>19 attacked a site used to fire long range 10:35:53<br>20 rockets in what may be the first ground 10:35:57<br>21 incursion of this conflict. 10:35:59<br>22 "The militants have launched 10:36:00<br>23 hundreds of rockets into Israel over the last 10:36:02<br>24 week. They've caused some damage and 10:36:04<br>25 injuries, but so far no Israelis have been 10:36:06<br><br>Page 403<br><br>1 killed, and that's thanks in large part to 10:36:10<br>2 Israel's Iron Dome anti-missile defense 10:36:10<br>3 system which shoots those rockets down. 10:36:14<br>4 "Now, the Palestinians have no such 10:36:16<br>5 protection, and Israel bombarded them again 10:36:20<br>6 for a fifth night last night. One air strike 10:36:22<br>7 on the home of Gaza's police chief killed 18 10:36:25<br>8 people. 10:36:28<br>9 "The Israeli military says it's 10:36:28<br>10 targeting sites used by militants, but 10:36:31<br>11 Palestinian officials say more than 150 10:36:33<br>12 people have lost their lives, and they say 10:36:36<br>13 that includes scores of civilians. 10:36:38<br>14 "The Israeli military dropped 10:36:41<br>15 leaflets from the air in northern Gaza 10:36:43<br>16 warning residents to evacuate for their own 10:36:45<br>17 safety, and today hundreds of families have 10:36:48<br>18 fled their homes and taken refuge in school 10:36:49<br>19 buildings here in Gaza City. 10:36:53<br>20 "The Israeli military, meanwhile, 10:36:55<br>21 has called up more than 30,000 reservists and 10:36:56<br>22 has amassed troops on the border adding to 10:36:59<br>23 fears of a ground invasion. 10:37:02<br>24 "And despite calls for a cease fire 10:37:03<br>25 from the UN Security Council, so far both 10:37:06 | Plaintiffs' MIL No. 3.<br><br>The video focuses on Israel's actions in Gaza in the future—not Hamas's conduct directed toward Israel.<br><br>Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005.<br><br>Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative |

| Deposition Designation | Objection & Response |
|---|---|
| | evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| Page 404 | Plaintiff's Objections: |
| 1 sides have resisted international pressure to 10:37:10 | Page 404:17-405:3 |
| 2 end the violence. 10:37:12 | MIL No. 3; F.R.E. 402-03 |
| 3 "Bob. 10:37:13 | Given the Ninth Circuit's |
| 4 "BOB SCHIEFFER: Holly Williams. 10:37:14 | order, Ms. Johnson's |
| 5 Thank you so much, Holly, and be careful." 10:37:16 | testimony about Israel |
| 6 BY MS. REED: 10:37:20 | causing casualties in Gaza |
| 7 Q. Did Mr. Gutterman indicate to you in his 10:37:21 | is irrelevant and |
| 8 e-mail that that was a clip from two days 10:37:23 | substantially more |
| 9 before July the 15th? 10:37:26 | prejudicial than probative. |
| 10 A. Yes, so it would have been on July the 13th. 10:37:27 | |
| 11 Q. Did the information in the video clip inform 10:37:32 | The "efficient proximate cause" was Hamas's actions directed toward |
| 12 your investigation that you had ongoing? 10:37:37 | Israel. Defendant should |
| 13 A. Yes, it did. 10:37:39 | not be permitted to mislead |
| 14 Q. Was this one of the sources that you reviewed 10:37:41 | the jury into believing that it could reasonably have |
| 15 in the process of your factual investigation? 10:37:43 | denied the claim based on Israel's "indirect" |
| 16 A. One of many. 10:37:45 | contribution or actions |
| 17 Q. What factual information from the video did 10:37:47 | directed toward Gaza. California's "efficient |
| 18 you incorporate into your overall 10:37:51 | proximate cause" doctrine |
| 19 investigation? 10:37:53 | was clearly established |
| 20 A. Well, I mean, I thought about all of the 10:37:54 | since the Supreme Court's decision in *Julian* in 2005. |
| 21 information that was presented, the fact that 10:37:56 | |
| 22 there were rockets that were going into 10:37:59 | Defendant's Response: |
| 23 Israel, and the fact that the Israelis were 10:38:00 | "MIL" not clear objection; |
| 24 retaliating against the rocket fire by, you 10:38:04 | ASIC's understanding and development of facts is |
| 25 know, conducting air strikes into Gaza that 10:38:07 | relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion |

| Deposition Designation | Objection & Response |
|---|---|
| | to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |

Page 405

1 was causing, you know, substantial physical 10:38:11
2 damage, property damage, but also that was 10:38:14
3 killing civilians. 10:38:16
4 Q. Were there other factual matters contained in 10:38:18
5 the video that you noted as part of your 10:38:22
6 overall investigation? 10:38:24
7 A. Well, from what they were saying, it appeared 10:38:25
8 to be the hostilities were ongoing and that 10:38:27
9 they were -- you know, it was back and forth, 10:38:30
10 the Hamas was participating and that the 10:38:34
11 Israelis were also participating, and that 10:38:39
12 they were using, you know, a variety of 10:38:43
13 different kinds of weaponry with regard to 10:38:45
14 what was happening both in Gaza and in 10:38:50
15 Israel. 10:38:53
16 Q. Did you review other source material that 10:38:54
17 conveyed similar information to you at this 10:38:56
18 time? 10:38:59
19 A. Yes, I did. 10:38:59
20 Q. Can you give an overview of the scope of the 10:39:01
21 research that you conducted on the facts? 10:39:03
22 A. Yes. I looked at a variety of newspaper 10:39:06
23 articles, both articles that were in 10:39:10
24 Israeli newspapers. I think I looked at 10:39:14
25 The Guardian, I looked at U.S. newspapers, 10:39:20

Page 406

1 The Washington Post, New York Times, 10:39:23
2 Wall Street Journal. 10:39:23

Plaintiff's Objections:
Pages 406:21-407:2
MIL No. 2; F.R.E. 403.
Ms. Johnson claims to have

| Deposition Designation | Objection & Response |
|---|---|
| 3 I looked at -- oh, I don't know. 10:39:27<br>4 You know, I looked at White papers that had 10:39:28<br>5 been presented, not -- not with regard to 10:39:31<br>6 this specific situation, but with regard to 10:39:35<br>7 Israeli tensions with Hamas. I investigated 10:39:37<br>8 Hamas itself as an organization. I looked at 10:39:42<br>9 a lot of video clips, including video clips 10:39:47<br>10 by NBC. I don't know, I -- I did a lot of 10:39:50<br>11 research. 10:39:55<br>12 Q. How did you go about conducting the searches 10:39:56<br>13 to get the information that you reviewed? 10:40:00<br>14 A. Well, I -- I looked mostly online, and then 10:40:02<br>15 from -- from the research that I did online I 10:40:05<br>16 drilled down into different things that I 10:40:08<br>17 found. In other words, I could be looking at 10:40:10<br>18 one -- one article that could reference 10:40:12<br>19 another article, and I would look at that, 10:40:14<br>20 that kind of thing. 10:40:16<br>21 Q. How many different sources would you estimate 10:40:17<br>22 you reviewed as part of this process? 10:40:19<br>23 A. Oh, I couldn't even begin to tell you. It 10:40:21<br>24 was a lot. More than 50. 10:40:24<br>25 Q. Sitting here today, can you recall every 10:40:29 | relied on 50 sources. But only a handful of sources were cited in Defendant's denial letter, and none were included in the claim file. For the reasons set forth in Plaintiffs' Motion in Limine, Defendant cannot contradict its denial letter or go outside its scope in defending against bad faith. *Century Surety Co. v. Polisso*, 139 Cal. App. 4th 922, 953 (2006) ("Since Century did not cite permanent installation as a ground for denial of coverage when the claim was tendered, it was never the subject of a genuine dispute between the parties.").<br><br>It would be irrelevant and substantially more prejudicial than probative to permit Defendant to suggest that it can be found to have acted in good faith based on sources not cited in the denial letter.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties |

| Deposition Designation | Objection & Response |
|---|---|
| | to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

Page 407

1 source that you reviewed? 10:40:32
2 A. Not a chance. 10:40:35
3 Q. Was it your practice at the time to make a 10:40:36
4 physical printout or copy of every source 10:40:40
5 that you referenced? 10:40:43
6 A. No, I'd be killing a lot of trees. 10:40:45
7 Q. Was it your personal practice at that time to 10:40:47
8 document an electronic copy of every single 10:40:52
9 source you looked at? 10:40:56
10 A. No, not necessarily. It would depend on -- 10:40:57
11 on how important the source was in informing 10:40:59
12 what I looked at. You know, I looked at a 10:41:03
13 lot of stuff that I might not have considered 10:41:06
14 relevant in the long run or I was only -- you 10:41:08
15 know, was just providing me with the same 10:41:11
16 information that another source had provided 10:41:13
17 me with, so I wouldn't necessarily capture 10:41:14
18 that. You know, mostly what I was trying to 10:41:17
19 do is -- is -- is get a factual understanding 10:41:21
20 of exactly what was going on there. 10:41:23

| Deposition Designation | Objection & Response |
|---|---|
| 21 Q. Were you successful in getting a factual 10:41:25<br>22 understanding of what was going on? 10:41:28<br>23 A. I certainly thought so, yes. 10:41:30<br>24 Q. As part of this process, were you sharing 10:41:32<br>25 links to articles with Mr. Gutterman? 10:41:34<br><br>Page 408<br><br>1 A. Yes, I certainly sent him links of things to 10:41:37<br>2 look at. I certainly did not share every 10:41:40<br>3 single thing I was looking at, neither did he 10:41:42<br>4 share every single thing he was looking at. 10:41:45<br>5 He was doing a simultaneous investigation and 10:41:47<br>6 he wasn't sharing everything that he saw with 10:41:49<br>7 me either. 10:41:51<br>8 (Whereupon, Exhibit 234 was 10:41:52<br>9 marked for identification.) 10:41:53<br>10 BY MS. REED: 10:41:53<br>11 Q. Let me hand you what's been marked as 10:41:53<br>12 Defendant's Exhibit 234, please, ma'am. 10:41:56<br>13 Can you identify Exhibit 234 as an 10:41:58<br>14 e-mail string between yourself and 10:42:00<br>15 Mr. Gutterman over the course of July the 10:42:03<br>16 16th? 10:42:04<br>17 A. Yes, that's exactly what it was. 10:42:05<br>18 Q. Is this an example of the types of 10:42:07<br>19 information you were sharing with one 10:42:10<br>20 another? 10:42:11<br>21 A. Yes, it is. 10:42:11<br>22 Q. Let me ask you to look at the bottom e-mail 10:42:12<br>23 on the page, please, ma'am, from you to 10:42:15<br>24 Mr. Gutterman. Do you see that one? 10:42:17<br>25 A. Yes. 10:42:20<br><br>Page 409<br><br>1 Q. There are a number of sources identified 10:42:20<br>2 there. Can you tell us, generally speaking, 10:42:24<br>3 what those were? 10:42:28<br>4 A. Yes. They were newspaper articles primarily, 10:42:29<br>5 some from Global News organizations, some 10:42:32<br>6 from Middle East organizations, and some from 10:42:35<br>7 U.S. organizations. 10:42:37<br>8 Q. Did you actually make a review of the items 10:42:38 | Plaintiff's Objections:<br>Page 408:11-25<br>MIL,402,403,802<br><br>Defendant's Response:<br>"MIL" not clear objection;<br>ASIC's understanding and<br>development of facts is<br>relevant to reasonableness<br>of claim decision, defense<br>of "bad faith" allegation<br>and damages sought.<br>The witness's knowledge,<br>research and response to the<br>claim are relevant; not<br>unfairly prejudicial to<br>Plaintiffs, not confusing,<br>misleading or cumulative<br>evidence.  Not offered for<br>the truth of the matter<br>asserted. 801; 807.<br><br><br><br>Plaintiff's Objections:<br>Page 409:1-25<br>MIL,402,403,802<br><br>Defendant's Response:<br>"MIL" not clear objection;<br>ASIC's understanding and<br>development of facts is<br>relevant to reasonableness<br>of claim decision, defense<br>of "bad faith" allegation<br>and damages sought.<br>The witness's knowledge,<br>research and response to the<br>claim are relevant; not |

| Deposition Designation | Objection & Response |
|---|---|
| 9 that are listed there? 10:42:40<br>10 A. Yes, that was my purpose in sending them to 10:42:41<br>11 him. 10:42:44<br>12 Q. Did you discuss any of these materials with 10:42:47<br>13 Mr. Gutterman? 10:42:49<br>14 A. I don't remember specifically talking about 10:42:50<br>15 each article, but we certainly discussed the 10:42:52<br>16 situation in general, yes. 10:42:55<br>17 (Whereupon, Exhibit 235 was 10:42:58<br>18 marked for identification.) 10:42:59<br>19 BY MS. REED: 10:42:59<br>20 Q. Let me hand you what's been marked as 10:43:06<br>21 Exhibit 235, please, ma'am, and ask you to 10:43:10<br>22 take a look at that. 10:43:12<br>23 A. (Reviews document.) 10:43:47<br>24 Q. Can you identify Exhibit 235 as the 10:44:39<br>25 Middle East Eye article that you had 10:44:42<br><br>Page 410<br><br>1 mentioned to Mr. Gutterman in your e-mail, 10:44:47<br>2 which is marked Exhibit 234? 10:44:50<br>3 A. Yes, that's what it is. 10:44:52<br>4 Q. And do you recall reading this article at the 10:44:54<br>5 time? 10:44:56<br>6 A. Yes, I do. 10:44:56<br>7 Q. Is there particular information in the 10:44:57<br>8 article that informed the overall 10:45:01<br>9 investigation that you were conducting? 10:45:03<br>10 A. I think that what was most important to me is 10:45:04<br>11 that there are a variety of quotes from each 10:45:08<br>12 side, so this is actually what the Israelis 10:45:10<br>13 are saying and actually what Hamas is saying. 10:45:17<br>14 And they are talking about the 10:45:20<br>15 number of rocket strikes, they are talking 10:45:21<br>16 about the fact that the Hamas is saying if 10:45:24<br>17 they don't stop attacking the civilian homes 10:45:27<br>18 that the hostilities are going to continue. 10:45:30<br>19 There's also a discussion of the 10:45:33<br>20 fact that for the first time since 2012 10:45:35<br>21 Tel Aviv and Jerusalem and Haifa were targets 10:45:38<br>22 for long-ranged rockets from Hamas. It says 10:45:45<br>23 that there are tanks. It's says -- so we 10:45:52<br>24 know that there are rockets, we know there 10:45:54<br>25 are air strikes, we know that there are 10:45:57 | unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 411 | |
| 1 tanks, from this article. 10:45:59<br>2 It looks like that there's -- 10:46:06<br>3 there's some discussion that's taking place 10:46:08<br>4 or attempts at discussion between the general 10:46:09<br>5 secretary of the Israelis -- of the Israeli 10:46:13<br>6 government and the Palestinian president, who 10:46:18<br>7 is Mahmoud Abbas, that there have been a long 10:46:22<br>8 string of attacks. 10:46:23<br>9 It's just -- it -- it -- it's 10:46:24<br>10 obvious that there is a lot of back and forth 10:46:26<br>11 and exchange of fire and hostilities, and 10:46:29<br>12 that it doesn't look as though, at least at 10:46:32<br>13 the time of this article, that -- that -- 10:46:36<br>14 that there is a good chance that it's going 10:46:41<br>15 to deescalate. 10:46:43<br>16 Q. Would you turn back to the second page of the 10:46:44<br>17 exhibit, please, ma'am. 10:46:46<br>18 A. Sure. 10:46:48<br>19 Q. Under the heavy black line, can you read the 10:46:48<br>20 first two paragraphs that appear under that? 10:46:52<br>21 A. "The armed wing of Hamas claimed that it 10:46:54<br>22 fired long-range rockets at Jerusalem, 10:46:57<br>23 Tel Aviv and Haifa on Tuesday. For the first 10:47:00<br>24 time the (Ezzedine al-) Qassam Brigades 10:47:03<br>25 strike Haifa with R160 rocket, and strike 10:47:09 | |
| Page 412 | Plaintiff's Objections:<br>Page 412:19 – 414:25<br>MIL3; F.R.E. 402-403 |
| 1 occupied Jerusalem with four M75 rockets, and 10:47:12<br>2 Tel Aviv with four M75 rockets, a statement 10:47:16<br>3 from" -- "by the group said. It was the 10:47:19<br>4 first time since a major 2012 conflict that 10:47:22<br>5 Gaza-based fighters had fired rockets at 10:47:25<br>6 Jerusalem. The rockets were intercepted by 10:47:29<br>7 Israel's Iron Dome defense system." 10:47:31<br>8 Q. As part of your research, did you become 10:47:34<br>9 familiar with what the armed wing of Hamas 10:47:39<br>10 was? 10:47:40<br>11 A. Yes. 10:47:41<br>12 Q. And what was that? 10:47:41<br>13 A. It's -- it's the Qassam brigades. 10:47:43<br>14 Q. And do you know what -- or did your research 10:47:45<br>15 indicate to you what role they played in this | Given the Ninth Circuit's order, this article and testimony regarding it is irrelevant and substantially more prejudicial than probative for the reasons in Plaintiffs' MIL No. 3.<br><br>This news article is focused on Israel's actions in Gaza—not Hamas's rocket fire toward Jerusalem. For the reasons in Plaintiffs' MIL No. 3, |

| Deposition Designation | Objection & Response |
|---|---|
| 10:47:48<br>16 overall conflict? 10:47:50<br>17 A. They were the group that was firing rockets 10:47:51<br>18 at -- at Israel, yes. 10:47:54<br>19 (Whereupon, Exhibit 236 was 10:48:05<br>20 marked for identification.) 10:48:11<br>21 BY MS. REED: 10:48:11<br>22 Q. Let me hand you what's been marked as 10:48:11<br>23 Exhibit 236, please, ma'am, and ask you to 10:48:13<br>24 review that document. 10:48:16<br>25 A. (Reviews document.) Okay. 10:48:19 | Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.<br>Is not opinion testimony<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to |

| Deposition Designation | Objection & Response |
|---|---|
| | Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| **Page 413** | Plaintiff's Objections: Page 413:1-25 MIL,402,403,701,802 |
| 1 Q. Can you identify Exhibit 236 as a Global News 10:51:04<br>2 article that you referred to in your e-mail 10:51:09<br>3 to Mr. Gutterman in your Exhibit 234? 10:51:12<br>4 A. Yes, that's what it is. 10:51:15<br>5 Q. Do you recall reading this article at the 10:51:17<br>6 time? 10:51:19<br>7 A. Yes, I did. 10:51:19<br>8 Q. And was there factual information in this 10:51:22<br>9 article that informed your overall 10:51:25<br>10 investigation process? 10:51:26<br>11 A. So the date of the article is on July 9th, 10:51:27<br>12 which was I think two days after Israel had 10:51:29<br>13 started Operation Protective Edge, and this 10:51:34<br>14 talks further about the hostilities. 10:51:38<br>15 It talks about the fact that there 10:51:40<br>16 are air strikes on more than 200 targets in 10:51:42<br>17 Gaza and hitting more than 50 targets just 10:51:47<br>18 on -- in one day. It talks about the fact 10:51:50<br>19 that the Israeli attacks on Hamas sites in 10:51:55<br>20 Gaza killed 14 people on Wednesday, including 10:51:59<br>21 an 80-year-old woman, that Hamas had fired 10:52:01<br>22 over 160 rockets at Israel after this whole 10:52:06<br>23 thing started with the death of some Israelis 10:52:11<br>24 teenagers. 10:52:17<br>25 And there are also some photos here, 10:52:20 | Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| **Page 414** | |
| 1 disturbing photos of some of the damage 10:52:24<br>2 that's been done. You can see where a 10:52:26<br>3 vehicle was targeted in an Israeli air strike 10:52:32<br>4 and the significant damage that was done not 10:52:37<br>5 just to the vehicle, but also to the 10:52:39<br>6 surrounding area. It says that it killed 10:52:41<br>7 four people. It shows a rocket being fired 10:52:44<br>8 and the Iron Dome defense system trying to 10:52:51<br>9 intercept it. 10:52:56<br>10 It also talks more about the fact 10:52:57<br>11 that they were trying to target Tel Aviv, 10:52:59<br>12 Jerusalem -- and Jerusalem. It shows images 10:53:02 | |

| Deposition Designation | Objection & Response |
|---|---|
| 13 of tanks. It talks about how the Israeli 10:53:05<br>14 Army is also going to try to attack by sea. 10:53:09<br>15 And I assume what they mean by that is to 10:53:12<br>16 bring gun boats in to fire long-range 10:53:14<br>17 missiles. 10:53:18<br>18 It says that Hamas had amassed about 10:53:19<br>19 10,000 rockets, including longer-range 10:53:21<br>20 rockets that could reach up to Tel Aviv and 10:53:25<br>21 beyond, which was a very -- it was a long 10:53:27<br>22 distance from -- from Gaza, it was at the 10:53:31<br>23 other side of the country going down to the 10:53:33<br>24 Mediterranean Sea. 10:53:36<br>25 The military had ordered thousands 10:53:40<br><br><br>Page 415<br><br>1 of Israelis within the 40 kilometer radius of 10:53:43<br>2 the Gaza strip to leave or to stay indoors or 10:53:47<br>3 near shelter. 10:53:50<br>4 So it -- it's -- it's showing that 10:53:55<br>5 there is significant fire in both directions, 10:53:56<br>6 that these parties are simultaneously 10:53:59<br>7 engaging in warlike behavior. 10:54:01<br>8 (Whereupon, Exhibit 237 was 10:54:10<br>9 marked for identification.) 10:54:11<br>10 BY MS. REED: 10:54:11<br>11 Q. Let me hand you what's been marked as 10:54:11<br>12 Exhibit 237, please, ma'am. I'll ask you to 10:54:13<br>13 review the document. 10:54:17<br>14 A. (Reviews document.) Okay. 10:54:18<br>15 Q. Can you identify Exhibit 237 as a July 15th, 10:56:04<br>16 2014, Global News article, one that was 10:56:07<br>17 referenced in your e-mail to Mr. Gutterman 10:56:13<br>18 that was labeled Exhibit 234? 10:56:16<br>19 A. Yes, that's what it is. 10:56:17<br>20 Q. Do you recall reviewing this article as part 10:56:19<br>21 of your ongoing research on the facts? 10:56:23<br>22 A. I do. 10:56:28<br>23 Q. Did information in this article inform your 10:56:29<br>24 overall factual gathering investigation? 10:56:32<br>25 A. It -- it did. This -- this article actually 10:56:35<br><br>Page 416<br><br>1 came out on the first day that -- that I 10:56:37<br>2 learned about NBC's claim. And, basically, 10:56:39<br>3 what it says is that even though Egypt had 10:56:43<br>4 been trying to negotiate a -- a cease fire. 10:56:48 | Plaintiff's Objections:<br>Page 415:1-9<br>MIL3; F.R.E. 402-403<br><br>Same objection as above re:<br>Israel's conduct directed<br>toward Gaza being<br>irrelevant and substantially<br>more prejudicial than<br>probative.<br><br>In addition, Ms. Johnson's<br>statement that these "parties<br>are simultaneously<br>engaging in warlike<br>behavior" is an improper<br>opinion and contrary to the<br>Ninth Circuit's order.<br>Therefore, the testimony is<br>substantially more<br>prejudicial than probative.<br><br>Plaintiff's Objections:<br>Page 415:12-417:6<br>MIL3; F.R.E. 402-403<br><br>This news article is focused<br>on Israel's actions in<br>Gaza—not Hamas's rocket<br>fire toward Jerusalem. For<br>the reasons in Plaintiffs'<br>MIL No. 3,<br><br>Given the Ninth Circuit's<br>order, this article is<br>irrelevant and substantially<br>more prejudicial than |

| Deposition Designation | Objection & Response |
|---|---|
| 5 that the negotiations quickly fell apart. 10:56:53<br>6 In particular, Prime Minister 10:56:56<br>7 Benjamin Netanyahu, who is the prime minister 10:57:01<br>8 of Israel said that -- that since Hamas would 10:57:04<br>9 not agree to a truce, that Israel had no 10:57:08<br>10 choice but to respond more forcefully. And 10:57:10<br>11 his exact quote was, "Hamas chose to continue 10:57:13<br>12 fighting, will pay the price for that 10:57:17<br>13 decision. When there is no cease fire, our 10:57:19<br>14 answer is fire." 10:57:22<br>15 It said that they had amassed 10:57:23<br>16 thousands of soldiers on the border between 10:57:24<br>17 Israel and Gaza, and that entering Gaza would 10:57:27<br>18 likely drive up the casualties, especially 10:57:32<br>19 because Gaza is very small, but it has a -- 10:57:36<br>20 it has a populated territory of about 1.7 10:57:39<br>21 million people, most of whom are actually 10:57:43<br>22 under the age of 18. 10:57:46<br>23 So they talked about how they want 10:57:49<br>24 to continue to focus to see if they have a 10:57:51<br>25 cease fire, but it doesn't look like that's 10:57:54<br><br>Page 417<br><br>1 going to happen, and that certainly on the 10:57:58<br>2 Israeli side that they plan to continue the 10:58:00<br>3 escalation and they -- I think specifically 10:58:02<br>4 what they said is that they were going to 10:58:08<br>5 continue until the Gaza militants had -- had 10:58:10<br>6 their military capabilities greatly reduced. 10:58:15<br>7 Q. Based on your research, was there a cease 10:58:18<br>8 fire negotiated during the month of July 10:58:21<br>9 2014? 10:58:23<br>10 A. No, there wasn't. Egypt was trying to 10:58:24<br>11 negotiate the cease fire, and they 10:58:26<br>12 actually -- the Israelis, at least, actually 10:58:28<br>13 held fire for a few brief hours until Hamas 10:58:30<br>14 rejected the truce, and then things continued 10:58:34<br>15 to escalate from there. 10:58:38<br>16 Q. After the discussion with Ms. Weiss and 10:58:42<br>17 Ms. Garber, did your review of the facts ever 10:58:44<br>18 indicate that there was a hoped-for 10:58:47<br>19 deescalation? 10:58:49<br>20 A. Well, I think that -- that in the brief 10:58:51<br>21 period of -- of the -- the 14th and 15th, and 10:58:55<br>22 maybe into the 16th, they continued to have 10:58:58 | probative for the reasons in Plaintiffs' MIL No. 3.<br><br>Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005<br><br>Defendant's Response:"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the |

| Deposition Designation | Objection & Response |
|---|---|
| 23 talked about how they wanted to try to -- to 10:59:00<br>24 have some kind of cease fire or a mediation 10:59:04<br>25 or that kind of thing, but at the same time, 10:59:07 | claim decision.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |
| Page 418<br><br>1 Israel was amassing troops and putting tanks 10:59:10<br>2 at the border and continuing with air strikes 10:59:17<br>3 after it had suspended the air strikes for a 10:59:20<br>4 short period of time, and Hamas continued to 10:59:23<br>5 lob rockets into Israel, so it did not appear 10:59:25<br>6 that a cease fire or any kind of truce was 10:59:28<br>7 going to be negotiated. 10:59:30<br>8 Q. Based upon the research that you continued to 10:59:30<br>9 do after July 15th, was there a deescalation 10:59:33<br>10 during the month of July at all? 10:59:36<br>11 A. No, there was not. 10:59:37<br>12 Q. Was it to the contrary? 10:59:39<br>13 A. Yes. Things continued to escalate. In fact, 10:59:41<br>14 there was a ground invasion of Gaza. There 10:59:44<br>15 was considerable damage. There were -- 10:59:48<br>16 although there were a few Israeli -- Israelis 10:59:50<br>17 killed, there were more than 2,000 10:59:53<br>18 Palestinians that were killed and, you know, 10:59:55 | Plaintiff's Objections:<br>Pages 418:1- 419:5<br>This testimony is focused on Israel's actions in Gaza—not Hamas's rocket fire toward Jerusalem. For the reasons in Plaintiffs' MIL No. 3,<br><br>Given the Ninth Circuit's order, this testimony is irrelevant and substantially more prejudicial than probative for the reasons in Plaintiffs' MIL No. 3.<br><br>Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" |

| Deposition Designation | Objection & Response |
|---|---|
| 19 thousands more that were injured. 10:59:57<br>20 There was a great deal of property 10:59:58<br>21 damage, some in Israel, but the majority of 11:00:00<br>22 it was -- was in the Gaza strip, and that's 11:00:03<br>23 understandable, because the Israelis have 11:00:06<br>24 better weapons than the Palestinians do -- 11:00:09<br>25 Q. Let me -- 11:00:09 | contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |
| Page 419<br><br>1 A. -- and far more troops. 11:00:13<br>2 (Whereupon, Exhibit 238 was 11:00:15<br>3 marked for identification.) 11:00:15<br>4 MS. REED: Pardon me. 11:00:16<br>5 BY MS. REED: 11:00:16<br>6 Q. Let me hand you Exhibit 238, please, ma'am, 11:00:16<br>7 and ask you to take a look at it. 11:00:20<br>8 A. (Reviews document.) Okay. 11:00:23<br>9 Q. Can you identify Exhibit 238 as a 11:02:22<br>10 Washington Post article, which is one of the 11:02:24<br>11 references that you made to Mr. Gutterman in 11:02:27<br>12 your e-mail that's labeled Exhibit 234? 11:02:29<br>13 A. Yes. It was dated July 16th. 11:02:33<br>14 Q. Do you recall reviewing this Washington Post 11:02:35<br>15 article as part of your investigation? 11:02:37<br>16 A. Yes, I did. 11:02:39<br>17 Q. Did the information from this article inform 11:02:40<br>18 your overall factual investigation? 11:02:44 | Plaintiff's Objections:<br>Page 419:1 – 421:25<br>MIL No. 3; F.R.E. 402, 403<br>This news article is focused on Israel's actions in Gaza—not Hamas's rocket fire toward Jerusalem. For the reasons in Plaintiffs' MIL No. 3,<br><br>Given the Ninth Circuit's order, this article is irrelevant and substantially more prejudicial than probative for the reasons in Plaintiffs' MIL No. 3.<br><br>Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions |

| Deposition Designation | Objection & Response |
|---|---|
| 19 A. Yes, it did. 11:02:47<br>20 Q. How so? 11:02:48<br>21 A. Well, again, this article also repeats the 11:02:49<br>22 same quote by Netanyahu that, "When Hamas 11:02:52<br>23 chose to continue fighting, it will pay the 11:02:57<br>24 price for that decision. When there is no 11:02:59<br>25 cease fire, our answer is fire." 11:03:01 | directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005<br><br>Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |
| Page 420<br><br>1 It also talks about the fact that 11:03:03<br>2 they're amassing troops for a ground war. It 11:03:06<br>3 says that they have called up 40,000 troops 11:03:09<br>4 on the Israeli side, and that Netanyahu fired 11:03:11<br>5 his deputy defense minister for saying that 11:03:15<br>6 the cabinet wasn't moving aggressively enough 11:03:19<br>7 against Hamas, although it seems pretty 11:03:23<br>8 aggressive. 11:03:28<br>9 They also talked about the fact that 11:03:29<br>10 it didn't seem likely that there was going to 11:03:30<br>11 be a cease fire, mostly because Egypt was not 11:03:33<br>12 going to be able to broker it, because Hamas 11:03:36<br>13 didn't trust -- trust the current Egyptian 11:03:39<br>14 government at that time. 11:03:42<br>15 It talks about how the White House 11:03:50<br>16 press secretary said that it was Hamas's 11:03:53<br>17 responsibility to try to disengage, and that 11:03:56<br>18 there had been a heavy toll on the 11:04:02<br>19 Palestinians. By that time there were 1,500 11:04:05<br>20 injured and 204 killed. 11:04:08<br>21 There had also been a number -- 11:04:15 | |

| Deposition Designation | Objection & Response |
|---|---|
| 22 thousands of rockets they say had been fired 11:04:17<br>23 into Israel and that there were still 11:04:21<br>24 thousands more held by the -- by Hamas, and 11:04:23<br>25 that there had been a civilian, an Israeli 11:04:29<br><br>Page 421<br><br>1 civilian that was killed, but that the 11:04:34<br>2 Iron Dome missile defense system was helping. 11:04:38<br>3 In other words, it continued to show 11:04:39<br>4 that there was fire both back and forth, that 11:04:41<br>5 this was a back and forth situation. 11:04:45<br>6 Q. Do you recall that, as a part of your overall 11:04:47<br>7 investigation, you reviewed other articles or 11:04:50<br>8 news pieces that continued to inform your 11:04:53<br>9 overall fact investigation? 11:04:56<br>10 A. Yes, indeed. I looked at a lot of -- a lot 11:04:57<br>11 of news articles or, you know, even -- even 11:05:01<br>12 other information that was contained in 11:05:04<br>13 the -- on the Internet. And not just news 11:05:06<br>14 articles, but also videos and some White 11:05:08<br>15 papers, one specifically by the Congressional 11:05:13<br>16 Research Service, which -- which is -- does 11:05:19<br>17 research specifically for the U.S. Congress, 11:05:19<br>18 and a variety of other sources. 11:05:29<br>19 Q. In regard to your research on news articles 11:05:30<br>20 and publications and videos, did you continue 11:05:32<br>21 to read and review those types of materials 11:05:34<br>22 for the week following July the 15th? 11:05:40<br>23 A. I did. 11:05:42<br>24 Q. And did you continue to advance your 11:05:42<br>25 knowledge about the process and the current 11:05:44<br><br>Page 422<br><br>1 events? 11:05:46<br>2 A. I did. 11:05:46<br>3 (Whereupon, Exhibit 239 was 11:05:48<br>4 marked for identification.) 11:06:04<br>5 BY MS. REED: 11:06:04<br>6 Q. Let me hand you what's been marked as 11:06:04<br>7 Exhibit 239, please, ma'am. 11:06:07<br>8 Can you identify Exhibit 239 as an 11:06:08<br>9 e-mail that you sent to yourself on 11:06:11<br>10 July 16th, 2014? 11:06:13 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 A. Yes. 11:06:15<br>12 Q. Does this contain a reference to a website 11:06:16<br>13 about UK foreign travel advice? 11:06:21<br>14 A. Yes. 11:06:24<br>15 Q. Did you review that particular site? 11:06:24<br>16 A. I did. I wanted to see what other 11:06:27<br>17 governments and our own government was saying 11:06:30<br>18 about safety in Israel in terms of -- you 11:06:33<br>19 know, Israel is a huge tourist destination, 11:06:37<br>20 and about what they were advising people. 11:06:41<br>21 Q. Did you review multiple travel warnings? 11:06:42<br>22 A. I did. 11:06:45<br>23 Q. Do you know from which countries? 11:06:46<br>24 A. I know from -- obviously, from the UK, 11:06:47<br>25 because that's here. I know I reviewed the 11:06:50<br><br>Page 423<br><br>1 U.S. I think I reviewed one from Australia. 11:06:52<br>2 I seem to recall maybe one from a 11:06:56<br>3 Scandinavian country, but I don't recall 11:06:58<br>4 which one. So there were a variety of 11:07:01<br>5 different ones. 11:07:03<br>6 Q. What was the purpose of this e-mail that you 11:07:04<br>7 sent to yourself? 11:07:06<br>8 A. It -- it's just -- it was just to keep the 11:07:07<br>9 link for myself if I wanted to reference it 11:07:11<br>10 again with regard to what the UK foreign 11:07:14<br>11 travel site was saying. 11:07:16<br>12 Q. Is this an example of notes that you might 11:07:19<br>13 make to yourself on your ongoing work? 11:07:21<br>14 A. Yes, sometimes. I might also send that to 11:07:23<br>15 myself if I were reading something and I 11:07:27<br>16 didn't have a chance to finish it so that I 11:07:29<br>17 would keep the link that way. 11:07:32<br>18 Q. What's the next entry that appears in your 11:07:33<br>19 notes to yourself? 11:07:35<br>20 A. It's a link to a Wikipedia entry on Hamas. 11:07:36<br>21 Q. Do you recall reading that Wikipedia entry on 11:07:39<br>22 Hamas? 11:07:42<br>23 A. I did. 11:07:42<br>24 Q. What use did you make of that particular 11:07:43<br>25 group of materials? 11:07:47 | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 424 | |
| 1 A. Well, I don't look to Wikipedia as being an 11:07:47<br>2 authoritative source to gather information, 11:07:51<br>3 but what is really helpful about Wikipedia 11:07:55<br>4 articles is that they cite every place that 11:07:59<br>5 they get their information. And so if you go 11:08:03<br>6 to their cite list, frequently you could find 11:08:04<br>7 information that is -- that actually holds 11:08:09<br>8 the voice of authority that actually can be 11:08:11<br>9 considered reliable and review those 11:08:13<br>10 articles. 11:08:15<br>11 (Whereupon, Exhibit 240 was 11:08:17<br>12 marked for identification.) 11:08:17<br>13 BY MS. REED: 11:08:17<br>14 Q. Let me hand you what has been marked as 11:08:18<br>15 Exhibit 240 in the case, please, ma'am. 11:08:20<br>16 Can you identify Exhibit 240 as a 11:08:23<br>17 printout of the Hamas article that you 11:08:28<br>18 reviewed at or about the time of your note 11:08:30<br>19 that's contained in Exhibit 239? 11:08:33<br>20 A. Yes, this is what I looked like -- looked at. 11:08:36<br>21 Q. And do you recall any particular factual 11:08:39<br>22 information that you gained from this review, 11:08:42<br>23 overall review, that formed the basis of your 11:08:47<br>24 overall investigation? 11:08:50<br>25 A. Well, as I said, I don't rely upon this as an 11:08:52 | |
| Page 425 | Plaintiff's Objections:<br>Page 425:23 – 426:25<br>MIL No. 3; F.R.E. 402, 403, 602, 701. |
| 1 authoritative site, since it can be amended 11:08:56<br>2 by -- by a variety of different people and 11:08:59<br>3 sources, and so you can't -- you can't say 11:09:01<br>4 definitively that this information is 11:09:04<br>5 correct. But what I did do is go and look at 11:09:06<br>6 what their source materials were and I looked 11:09:08<br>7 at a variety of these source materials. 11:09:12<br>8 Q. Did you gain information in regard to the 11:09:20<br>9 overall review of source materials you 11:09:23<br>10 referenced about the role of Hamas in 11:09:26<br>11 parliamentary elections? 11:09:33<br>12 A. Well, I think I learned from -- from -- from 11:09:35<br>13 looking at some source materials that there 11:09:37<br>14 had been an election in 2006 for the -- for 11:09:39<br>15 seats in the Palestinian parliament. And at 11:09:44<br>16 that time, Hamas had won the majority of 11:09:49 | Ms. Johnson is not an expert on Middle East affairs and lacks expertise or foundation to offer the opinions expressed here, many of which are contrary to the Ninth Circuit's opinion (*i.e.*, that Hamas is a military, that Hamas controls Gaza). Lacks foundation, improper opinion, substantially more prejudicial than probative.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| 17 seats in 2006, and that the Congressional 11:09:51<br>18 Research Service said that it was a free and 11:09:56<br>19 fair election. 11:09:57<br>20 Q. Did you make review of the governmental role 11:09:59<br>21 that Hamas was playing overall during the 11:10:03<br>22 relevant time period? 11:10:05<br>23 A. Well, starting in 2007, Hamas was controlling 11:10:06<br>24 the Gaza territory primarily. There was, at 11:10:10<br>25 that time, Fatah, which was another -- 11:10:18<br><br>Page 426<br><br>1 another part of the Palestinian authority, 11:10:21<br>2 another group, you know, sort of like we have 11:10:24<br>3 Democrats and Republicans, they have Hamas, 11:10:27<br>4 they have Fatah, they were controlling the 11:10:30<br>5 West Bank, Hamas had Gaza. 11:10:33<br>6 And Hamas was not just a military 11:10:34<br>7 organization. Although they had a military 11:10:37<br>8 wing, but the other thing they were trying to 11:10:39<br>9 do to -- to -- was to provide social services 11:10:42<br>10 for the 1.8 million people who lived there 11:10:44<br>11 and schools, health services when -- when 11:10:47<br>12 available, and also to negotiate with other 11:10:51<br>13 countries in order to get assistance for the 11:10:54<br>14 people who lived in the Gaza strip, because 11:10:57<br>15 they were in pretty desperate straights at 11:10:59<br>16 that point. 11:11:05<br>17 There wasn't a lot of ways to make 11:11:05<br>18 money, there wasn't -- there weren't a lot of 11:11:07<br>19 ways to get resources, because they weren't 11:11:09<br>20 allowed into Egypt, which was one of their 11:11:11<br>21 boundaries, and they weren't allowed into -- 11:11:14<br>22 into any other part of Israel, which was on 11:11:17<br>23 their other boundary. 11:11:19<br>24 So these 1.8 million people were 11:11:20<br>25 basically trapped within a very small area. 11:11:23<br><br>Page 427<br><br>1 So they got -- Hamas negotiated with Iran, 11:11:26<br>2 they negotiated with Russia, I think that 11:11:31<br>3 they also negotiated with Turkey and other 11:11:34<br>4 countries in order to get aid. 11:11:37<br>5 Q. Did part of your factual research include a 11:11:42<br>6 focus on studying the military wing of Hamas | "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 427:16-19<br>MIL No. 3; F.R.E. 402, 403, 602, 701.<br><br>Ms. Johnson is not an expert on Middle East affairs and lacks expertise or foundation to offer the |

| Deposition Designation | Objection & Response |
|---|---|
| 11:11:46<br>7 that you mentioned? 11:11:51<br>8 A. That's one of the things that I looked at, 11:11:52<br>9 yes. 11:11:55<br>10 Q. What information did you learn about the 11:11:55<br>11 military wing of Hamas? 11:11:56<br>12 A. Well, they had a particular name. As I said, 11:11:57<br>13 they were the -- the Al-Qassam Brigades, and 11:12:00<br>14 that they were primarily the group that was 11:12:04<br>15 launching targets at -- rockets at Israel. 11:12:07<br>16 But they were organized. They were 11:12:10<br>17 considered to be a militia or a military 11:12:12<br>18 force. And that -- yes, that's what they 11:12:19<br>19 were. 11:12:25<br>20 Q. As part of your overall review and study of 11:12:25<br>21 Hamas, did you focus on what social welfare 11:12:27<br>22 programming they were doing, as you 11:12:33<br>23 referenced? 11:12:34<br>24 A. Yes, and they were doing a considerable 11:12:34<br>25 amount. As I said, they were trying to -- to 11:12:38<br><br><br>Page 428<br><br>1 provide schooling for the -- the children 11:12:40<br>2 that lived in Gaza. And the majority of the 11:12:42<br>3 people who lived in Gaza were under the age 11:12:45<br>4 of 18. And they were also trying to provide 11:12:47<br>5 health care and other kinds of social welfare 11:12:49<br>6 to the people who lived there. 11:12:57<br>7 Q. Do you recall which of the primary sources 11:12:59<br>8 supporting the Hamas article that you looked 11:13:01<br>9 at as part of your research? 11:13:04<br>10 A. Well, one was from the Congressional Research 11:13:07<br>11 Service. It was an article by a guy whose 11:13:10<br>12 last name was Zanotti. I don't remember his 11:13:16<br>13 first name off the top of my head. But that 11:13:18<br>14 was not the only source. I looked at a lot 11:13:22<br>15 of different things. 11:13:27<br>16 Q. Would it have been your practice to print 11:13:29 | opinion expressed here that Hamas is a "military force"—which is contrary to the Ninth Circuit's decision. Lacks foundation, improper opinion, substantially more prejudicial than probative.<br><br><u>Defendant's Response:</u><br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| 17 them all out? 11:13:31<br>18 A. No. 11:13:32<br>19 Q. Would it have been your practice to keep a 11:13:32<br>20 separate electronic copy of each one? 11:13:35<br>21 A. Not necessarily. If -- if -- I might have 11:13:36<br>22 kept an electronic copy in my -- my general 11:13:41<br>23 research file, if it was something I thought 11:13:43<br>24 I needed to refer to again. 11:13:45<br>25 But, also, a lot of what I was doing 11:13:51<br><br>Page 429<br><br>1 was simply gathering information, you know, 11:13:53<br>2 that informed my opinion, but wasn't 11:13:54<br>3 necessarily something I was going to 11:13:56<br>4 authoritatively cite again. 11:13:58<br>5 THE VIDEOGRAPHER: We have about 11:14:04<br>6 ten minutes left on the tape. 11:14:05<br>7 (Whereupon, Exhibit 241 was 11:14:08<br>8 marked for identification.) 11:14:08<br>9 BY MS. REED: 11:14:08<br>10 Q. Let me hand you what's been marked as 11:14:09<br>11 Exhibit 241, please, ma'am. 11:14:11<br>12 Can you identify Exhibit 241 as a 11:14:13<br>13 Congressional Research Service article that 11:14:19<br>14 you mentioned by Mr. Zanotti? 11:14:19<br>15 A. Yes, that's what it is. 11:14:22<br>16 Q. And is this a source of information that you 11:14:23<br>17 consulted as part of your factual research? 11:14:27<br>18 A. Yes, it was one of the things that -- that -- 11:14:29<br>19 that I looked at. This article was dated 11:14:32<br>20 December 2nd of 2010. I think I also looked 11:14:35<br>21 at some other Congressional Research Service 11:14:38<br>22 sources besides this one, but this one was 11:14:42<br>23 the most comprehensive with regard to Hamas. 11:14:46<br>24 Q. And why did you select this one? 11:14:48<br>25 A. As I said, because it was -- it was very 11:14:51<br>TSG Reporting - Worldwide 877-702-9580<br>18 (Pages 430 to 433)<br><br>Page 430<br><br>1 comprehensive in terms of the background and 11:14:54<br>2 it was specifically written to inform 11:14:57<br>3 Congress about Hamas. 11:14:59 | |

| Deposition Designation | Objection & Response |
|---|---|
| 4 Q. Let me ask you to turn, please, ma'am, 11:15:04<br>5 internally in that document to what's 11:15:07<br>6 numbered page 1 in the bottom right corner. 11:15:10<br>7 A. Okay. 11:15:17<br>8 Q. Do you see there's a section called, 11:15:18<br>9 "Introduction Issues for Congress"? 11:15:20<br>10 A. Yup. 11:15:20<br>11 Q. Did you review this particular section? 11:15:21<br>12 A. I read this entire document. It took me 11:15:23<br>13 quite a while. So, yes, I'm sure I did. 11:15:28<br>14 Q. And was there factual information that you 11:15:31<br>15 took out of this that informed your -- your 11:15:33<br>16 overall investigation you were conducting 11:15:35<br>17 into the Dig claim? 11:15:38<br>18 A. Well, it certainly gave me more background on 11:15:39<br>19 Hamas, yes. 11:15:42<br>20 Q. Did you learn more regarding elections to 11:15:44<br>21 parliament? 11:15:47<br>22 A. A lot of what I've stated before is, you 11:15:49<br>23 know, that they did have free and fair 11:15:53<br>24 elections. Hamas had the highest number of 11:15:56<br>25 seats in the Palestinian parliament. Part 11:16:01 | |
| Page 431<br><br>1 of -- part of the research, not from this 11:16:06<br>2 particular article, but that I also learned 11:16:10<br>3 is that -- that Hamas and Fatah were trying 11:16:12<br>4 to -- in June of 2014, they were trying to 11:16:13<br>5 unify their parties so that they could do 11:16:16<br>6 more, have greater power. 11:16:19<br>7 Q. Why were you researching Hamas? 11:16:23<br>8 A. Well, one of the things that -- that Andrea 11:16:26<br>9 and Susan had said, starting with our initial 11:16:29<br>10 conversation, but they followed it up in 11:16:34<br>11 subsequent conversations, was that -- was 11:16:37<br>12 that Hamas was a terrorist organization, and 11:16:38<br>13 therefore, any actions taken by Hamas needed 11:16:41<br>14 to be judged as terrorism. 11:16:44<br>15 So I did want to acquaint myself 11:16:47<br>16 with what is the history of this 11:16:52<br>17 organization, are they a terrorist 11:16:53<br>18 organization, if they are a terrorist 11:16:56<br>19 organization, is that relevant to my coverage 11:16:59<br>20 analysis, and why are they called a terrorist 11:17:01 | Plaintiff's Objections:<br>Page 431:22-432:4<br>F.R.E. 402-03, 602, 701<br>Ms. Johnson is not an<br>expert on the Middle East<br>and lacks expertise or<br>foundation to opine that<br>Hamas's charter is "one of<br>the main reasons" why the<br>U.S. designates Hamas a<br>terrorist organization.<br>Improper opinion, lack of<br>foundation, substantially<br>more prejudicial than<br>probative.<br><br>Defendant's Response:<br>"MIL" not clear objection;<br>ASIC's understanding and<br>development of facts is<br>relevant to reasonableness<br>of claim decision, defense<br>of "bad faith" allegation<br>and damages sought.<br>Is not opinion testimony |

| Deposition Designation | Objection & Response |
|---|---|
| 21 organization. 11:17:05<br>22 Q. Did your research inform you on why they are 11:17:05<br>23 called a terrorist organization? 11:17:09<br>24 A. Well, Hamas's charter specifically says that 11:17:11<br>25 it's charter to -- to is destroy Israel and 11:17:13<br><br><u>Page 432</u><br><br>1 the Israeli people, so the base -- the fact 11:17:17<br>2 that their charter is one of the main reasons 11:17:19<br>3 why the United States says they're a 11:17:22<br>4 terrorist organization. But they don't just 11:17:24<br>5 engage in terroristic activities, they also 11:17:26<br>6 provide infrastructure and social services 11:17:32<br>7 and a variety of other things that are 11:17:34<br>8 beneficial to the people who live in Gaza. 11:17:36<br>9 Q. Would you turn back, please, ma'am, in 11:17:39<br>10 Exhibit 241 to the second page of the overall 11:17:41<br>11 document. It is not numbered, it's just 11:17:44<br>12 physically the second page. 11:17:46<br>13 A. Yes. 11:17:48<br>14 Q. Would you look at the second paragraph, 11:17:49<br>15 please, ma'am. 11:17:51<br>16 A. Yes. 11:17:52<br>17 Q. And start with the second sentence and read 11:17:53<br>18 that for the record. 11:17:55<br><br><u>Page 433</u><br><br>2 BY MS. REED: 11:18:16<br>3 Q. Ms. Johnson, may I direct you on Bates number 11:18:17<br>4 page 4320 to the second paragraph beginning 11:18:20<br>5 with the second sentence? 11:18:23 | The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| | |

Page 434

6 THE WITNESS: So beginning with 11:19:13
7 the second paragraph, second line in the 11:19:14
8 paragraph, it states, "The United States, 11:19:16
9 Israel, the European Union and Canada, 11:19:20
10 consider Hamas a terrorist organization 11:19:24
11 because of, one, its violent resistance to 11:19:26
12 what it deems Israeli occupation of historic 11:19:29
13 Palestine constituting present day Israel, 11:19:32
14 the West Bank and Gaza, and, two, its 11:19:35
15 rejection of the on and off peace process 11:19:38
16 involving Israel and the Palestine liberation 11:19:42
17 organization, the PLO, since the early 11:19:45
18 1900s." 11:19:48
19 Do you want me to continue reading? 11:19:49
20 MS. REED: No, that's all right. 11:19:51
21 BY MS. REED: 11:19:51
22 Q. The -- is that early 1990s? 11:19:52
23 A. I'm sorry, 1990s. 11:19:53
24 Q. And was this information that you gathered as 11:19:55
25 part of your ongoing research on the factual 11:19:58

Page 435

1 side? 11:20:01
2 A. Yes. As I said, I read the entire document. 11:20:0

13 Q. Ms. Johnson, can I ask you please to refer to 11:32:03
14 page 8, what is internally numbered as page 8 11:32:06
15 of Exhibit 241. 11:32:10
16 A. (Complies.) 11:32:15
17 Q. Do you see a heading in the middle of the 11:32:18
18 page entitled, "Gaza Militias and Security 11:32:21
19 Forces"? 11:32:26
20 A. I do. 11:32:26
21 Q. Did you review this as part of your overall 11:32:27
22 investigation of Hamas? 11:32:30
23 A. I did. 11:32:30
24 Q. Did you learn facts from this report that is 11:32:31
25 from 2010 about military? 11:32:33

Page 436

686

| Deposition Designation | Objection & Response |
|---|---|
| 1 A. Yes. In fact, this particular portion of the 11:32:35<br>2 report talks about the size of Hamas's 11:32:39<br>3 military wing, and it says that it has 13 to 11:32:43<br>4 14,000 police security and intelligence 11:32:48<br>5 personnel, and that they assist the Al-Qassam<br>11:32:52<br>6 Brigades. I mean, it goes on to give a lot 11:33:01<br>7 more detail, but one of the things I was 11:33:05<br>8 looking at is, you know, sort of what is the 11:33:07<br>9 size of the military. 11:33:09<br>10 And it says, "Leadership and most of 11:33:10<br>11 the manpower estimated at 2,500 of Hamas's<br>11:33:12<br>12 military wing are in Gaza and that the Hamas<br>11:33:15<br>13 led government in Gaza maintains a robust 11:33:18<br>14 contingent of 13 to 14,000 police security 11:33:22<br>15 and intelligence personnel." 11:33:25<br>16 Q. Was part of your overall factual research<br>11:33:27<br>17 trying to understand the military wing of 11:33:29<br>18 Hamas? 11:33:31<br>19 A. Yes. I was trying to get a good sense of, 11:33:31<br>20 you know, how big it was, what they were 11:33:33<br>21 engaged in, that kind of thing. 11:33:36<br>22 Q. Would you look at internal page number 22 of<br>11:33:37<br>23 this document, please, ma'am. 11:33:43<br>24 A. Sure. 11:33:44<br>25 Q. It's entitled, "Sources of Assistance." 11:33:45<br><br>Page 437<br><br>1 A. Right. This information in this section of 11:33:50<br>2 the Zanotti report helped inform my 11:33:52<br>3 information about how Hamas engaged in 11:33:56<br>4 negotiations with other countries to get 11:34:00<br>5 financial and military support. And it says 11:34:03<br>6 here that they got most of their support from 11:34:05<br>7 Iran, Syria and Hezbollah, which is an 11:34:12<br>8 organization within Lebanon, usually -- 11:34:15<br>9 usually considered to be a terrorist 11:34:18<br>10 organization. 11:34:19<br>11 Q. As part of your overall research on the 11:34:20<br>12 factual side of the claim, did you undertake 11:34:22<br>13 to attempt to understand the countries or the<br>11:34:24<br>14 financial sources that Hamas used to support<br>11:34:29<br>15 itself or its military? 11:34:32<br>16 A. Yes. I mean, I wanted to know, you know,<br>11:34:34<br>17 sort of how much power does Hamas have, what<br>11:34:37 | |

| Deposition Designation | Objection & Response |
|---|---|
| 18 does it really do. 11:34:39<br>19 Q. Let me ask you to turn back to Exhibit 239 11:34:46<br>20 please, ma'am. These were notes to yourself. 11:34:49<br>21 A. (Complies.) 11:34:54<br>22 Q. Can you tell us what the third entry on your 11:34:54<br>23 notes is? 11:34:58<br>24 A. Yes. This is the exclusion. It says, 11:35:00<br>25 "Exclusions applicable to all sections of 11:35:06<br><br>Page 438<br><br>1 this policy. This is contained in the 11:35:07<br>2 general conditions of the policy." And then 11:35:09<br>3 it goes on to recite the war exclusion. 11:35:12<br>4 Q. What was the reason that you included this in 11:35:14<br>5 your notes to yourself? 11:35:16<br>6 A. Well, as I was doing my factual 11:35:17<br>7 investigation, it appeared to me that what 11:35:20<br>8 was happening here was a war. That's how it 11:35:22<br>9 was being defined by the media, including 11:35:25<br>10 NBC. It's also how newspapers were talking 11:35:27<br>11 about it. It's how, in fact, the Israeli 11:35:32<br>12 government was talking about it. So I was 11:35:39<br>13 trying to determine if this -- if this 11:35:40<br>14 exclusion applied. 11:35:41<br>15 Q. When you mentioned references to war that you 11:35:44<br>16 observed, did you see those as part of your 11:35:48<br>17 ongoing factual investigation? 11:35:51<br>18 A. Yes. Pretty much everyone was calling this a 11:35:52<br>19 war. 11:35:55<br>20 Q. What types of NBC or MSNBC coverage of the 11:35:55<br>21 conflict did you review? 11:35:59<br>22 A. I reviewed different clips. There was one 11:36:00<br>23 specifically that was talking about the fact 11:36:03<br>24 that there was a ground war in Gaza. That's 11:36:05<br>25 actually the heading that -- that they had on 11:36:08 | Plaintiff's Objections:<br>Page 438:9-438:25<br>MILs 2-3; F.R.E. 402-403, 602, 701<br><br>Defendant's denial letter acknowledged the special meaning of "war" requiring sovereignty. Defendant cannot rely on rationales not cited in their denial letter, including that war has a plain and ordinary meaning based on news articles. *See Century Surety Co. v. Polisso, supra.* Purported plain and ordinary meaning is therefore irrelevant and substantially more prejudicial than probative.<br><br>Israel's actions in Gaza irrelevant and substantially more prejudicial than probative for reasons in MIL No. 3. Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005. |

| Deposition Designation | Objection & Response |
|---|---|
| | Statement that "pretty much everyone was calling this a war" is also hearsay and lacks foundation.<br><br>Defendant's Response:"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| | "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| **Page 439**<br><br>1 the program. 11:36:11<br>2 MS. REED: At this point, let me 11:36:12<br>3 note for the record Exhibit 242 will be a 11:36:14<br>4 video that is produced in the case and is 11:36:18<br>5 Bates-numbered ATL 4498. 11:36:21<br>6 (Whereupon, Exhibit 242 was 11:36:21<br>7 marked for identification.) 11:36:21<br>8 I'd like to ask the video operator 11:36:26<br>9 to please play that video for the witness. 11:36:28<br>10 "CHRIS HAYES: The military said the 11:36:28<br>11 ground operation is aimed at, quote -- 11:36:28<br>12 "After days of threatening it, today 11:36:35<br>13 the Israeli government launched a ground 11:36:37<br>14 invasion into Gaza just after 10:00 p.m. 11:36:39<br>15 local time. 11:36:42<br>16 "The Israeli military said the 11:36:43<br>17 ground operation is aimed at, quote, 'Taking 11:36:44<br>18 over targets in Gaza, operating against 11:36:44<br>19 tunnels and terror activists and 11:36:47<br>20 infrastructure.' A spokesman for Hamas said, 11:36:50<br>21 quote, 'Hamas is ready for a confrontation.' 11:36:50<br>22 "Foreign journalists in Gaza have 11:36:55<br>23 reported electricity outages across Gaza City 11:36:56<br>24 and artillery fire from Israeli ground 11:36:59<br>25 troops, as well as fire from naval gun boats 11:37:01 | Plaintiff's Objections:<br>Page 439:1-447:25<br>MIL No. 3; F.R.E. 402-03 Given the Ninth Circuit's order, this video and testimony about it are irrelevant and substantially more prejudicial than probative for the reasons in Plaintiffs' MIL No. 3.<br><br>The video and testimony about it focus on Israel's actions in Gaza in the future—not Hamas's conduct directed toward Israel.<br><br>Defendant should not be permitted to mislead the jury into believing that it could reasonably have denied the claim based on Israel's "indirect" contribution or actions directed toward Gaza. California's "efficient proximate cause" doctrine was clearly established since the Supreme Court's decision in *Julian* in 2005. |

| Deposition Designation | Objection & Response |
|---|---|
| | **Defendant's Response:** "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |

Page 440

1 and continued air strikes. 11:37:05
2 "The director of a Gaza hospital 11:37:07
3 reported the hospital was being shelled 11:37:07
4 Thursday. According to AFP, the hospital had 11:37:10
5 14 patients, some of whom are paralyzed or in 11:37:12
6 a coma. 11:37:14
7 "The ground invasion came after a 11:37:14
8 five-hour humanitarian cease fire agreement 11:37:17
9 expired. Just as that temporary cease fire 11:37:20
10 ended, the Israeli military says a Hamas 11:37:22
11 rocket struck a city in southern Israel. 11:37:23
12 "Hours before the ground invasion 11:37:26
13 got underway, Israel says it intercepted a 11:37:28
14 group of Hamas fighters who were trying to 11:37:31
15 sneak into Israel through a tunnel under the 11:37:33
16 border of Gaza. 11:37:33
17 "Israeli military launched an air 11:37:35
18 strike at the mouth of the tunnel. Hamas 11:37:37
19 dies -- denies any of its fighters were 11:37:39
20 killed in the operation. 11:37:41
21 "Joining me now by phone from 11:37:43
22 Tel Aviv is Amir Tibon. He's diplomatic 11:37:44
23 correspondent for Walla News in Israel. 11:37:44
24 "Amir, what is the reaction in 11:37:49
25 Israel to this latest escalation? 11:37:51

Page 441

1 "AMIR TIBON: Well, I have to say 11:37:58

| Deposition Designation | Objection & Response |
|---|---|
| 2 that right now in Israel not many people are 11:37:58<br>3 surprised by this ground incursion into Gaza. 11:38:01<br>4 It's something that we were expecting, 11:38:04<br>5 because over the last days there were just 11:38:07<br>6 endless attacks coming here from Gaza and 11:38:09<br>7 Jerusalem with rocket launches, but also 11:38:12<br>8 attempt after attempt by Hamas militants to 11:38:15<br>9 enter Israel through these tunnels that 11:38:17<br>10 they're digging underground into the Israeli 11:38:19<br>11 side of the border in order to try to carry 11:38:21<br>12 out terrorist attacks in Israeli villages and 11:38:24<br>13 towns. 11:38:24<br>14 "And the -- the reason I think many 11:38:25<br>15 people are just saying that this was 11:38:32<br>16 expected, that it was just a matter of time 11:38:32<br>17 before our prime minister would take such 11:38:36<br>18 a -- such a decision, so not -- not anybody 11:38:37<br>19 surprised. 11:38:37<br>20 "Of course, you have people who are 11:38:41<br>21 worried, because now we have our soldiers 11:38:42<br>22 in -- inside Gaza fighting the Hamas 11:38:45<br>23 terrorists and people are worried about it, 11:38:47<br>24 but it didn't come as a big surprise to 11:38:48<br>25 anybody. 11:38:50<br><br>Page 442<br><br>1 "CHRIS HAYES: There is a question, 11:38:51<br>2 you're looking at live pictures of Gaza, 11:38:52<br>3 what -- what kind of effect this will have on 11:38:55<br>4 Gaza civilians. There's not a lot of places 11:38:57<br>5 to go. We've been hearing reports out of 11:38:59<br>6 Gaza, children, women, noncombatants don't 11:39:02<br>7 have many places they can go. 11:39:06<br>8 "There was leaflets by the Israeli 11:39:08<br>9 government, there were warnings even on Hamas 11:39:09<br>10 television to evacuate, but it -- it's 11:39:11<br>11 unclear how any kind of ground incursion, any 11:39:13<br>12 kind of shelling can spare the lives of 11:39:17<br>13 noncombatants. 11:39:19<br>14 "AMIR TIBON: Absolutely. This is a 11:39:23<br>15 big worry also for Israel. Because, you 11:39:24<br>16 know, the more civilians get hurt, the less 11:39:26<br>17 legitimacy Israel will have to continue the 11:39:29<br>18 operation, which is really aimed at 11:39:31<br>19 terrorists and not at civilians and it is 11:39:34<br>20 something that I know that the Israeli 11:39:36<br>21 military is also very concerned about. 11:39:38<br>22 "Right now the plan that has been 11:39:40<br>23 presented by the government and the military | |

692

| Deposition Designation | Objection & Response |
|---|---|
| 11:39:42<br>24 is not to go deep into Gaza and get into the 11:39:45<br>25 city centers and fight in the allies and the 11:39:48<br><br>Page 443<br><br>1 streets, but it's actually to stay more on 11:39:50<br>2 the border to really take care of the 11:39:52<br>3 conflict, which is just the craziest thing, 11:39:56<br>4 you know, because it's -- these are tunnels 11:39:58<br>5 that -- that are dug for -- deep underground 11:40:03<br>6 with a lot of expertise, a lot of money 11:40:05<br>7 poured into it only in order to carry out 11:40:09<br>8 terrorist attacks. 11:40:12<br>9 "So I think right now there's not 11:40:12<br>10 going to be any -- any kind of big move into 11:40:14<br>11 the city center, but obviously civilians are 11:40:17<br>12 suffering. I have friends who are there, 11:40:21<br>13 journalists, but also civilians, people, I 11:40:24<br>14 talk to them, I hear very sad reports coming 11:40:25<br>15 in from there, and it's definitely very 11:40:29<br>16 disturbing. 11:40:31<br>17 "CHRIS HAYES: There is also a 11:40:33<br>18 question that there was -- Avigdor Lieberman, 11:40:33<br>19 the foreign minister in the Netanyahu 11:40:35<br>20 government, had basically said that Gaza 11:40:36<br>21 needed to be reoccupied, and the Israeli 11:40:38<br>22 defense forces have stated that they -- they 11:40:42<br>23 have this, essentially, limited goal in terms 11:40:43<br>24 of the tunnels, but there's a real question 11:40:47<br>25 of what is day two, what is day three here. 11:40:49<br><br>Page 444<br><br>1 "What is the understanding of what 11:40:52<br>2 that looks like? 11:40:54<br>3 "AMIR TIBON: Yeah, actually, the -- 11:40:58<br>4 the statement by our Foreign Minister 11:41:00<br>5 Lieberman, which you mentioned, I think it 11:41:02<br>6 doesn't represent right now the -- the line 11:41:04<br>7 of our government. There was a big political 11:41:06<br>8 debate in the last days in Israel over our 11:41:09<br>9 Prime Minister Netanyahu, over his decision 11:41:14<br>10 to show some kind of restraint. 11:41:15<br>11 "I know it's hard, it sounds weird 11:41:17<br>12 when you see the pictures from Gaza, which 11:41:19<br>13 are terrible, you know, the families and the 11:41:21<br>14 civilians and children who were killed, and 11:41:23<br>15 it's -- and the Israelis are saying, 'No, we 11:41:26<br>16 are showing restraint,' actually, Netanyahu 11:41:28<br>17 waited for a long time while Israeli cities. 11:41:30 | |

| Deposition Designation | Objection & Response |
|---|---|
| 18 you know, from Tel Aviv to any other city in 11:41:34<br>19 the country were bombarded, he waited for a 11:41:36<br>20 long time before he decided to do this ground 11:41:39<br>21 operation, and he got a lot of criticism over 11:41:40<br>22 it from right wing members of his coalition, 11:41:43<br>23 including our foreign minister who said, 'No, 11:41:46<br>24 we need to act more forcefully, more 11:41:48<br>25 decisively.' 11:41:48<br><br>Page 445<br><br>1 "And his attitude was, 'No, let's 11:41:51<br>2 wait, let's try to reach a cease fire.' You 11:41:54<br>3 know, just two days ago he sort of agreed to 11:41:56<br>4 enter a cease fire agreement agreement over 11:41:58<br>5 by Egypt and Hamas refused, so he was 11:42:00<br>6 criticized for it. 11:42:02<br>7 "But I think it was a smart move by 11:42:03<br>8 him, because right now it allows him to act 11:42:06<br>9 and we don't see a lot of international 11:42:08<br>10 criticism over Israel, at least not from 11:42:12<br>11 foreign government. 11:42:13<br>12 "CHRIS HAYES: Amir Tibon, thank you 11:42:14<br>13 very much. 11:42:14<br>14 "AMIR TIBON: Thank you. 11:42:17<br>15 "CHRIS HAYES: And more on Malaysian 11:42:17<br>16 Airlines Flight 17 including the 11:42:17<br>17 revelatory" -- 11:42:17<br>18 "And good morning again to get that 11:42:17<br>19 news" -- 11:42:35<br>20 BY MS. REED: 11:42:35<br>21 Q. Ms. Johnson, was that a July 17th news video 11:42:35<br>22 that you watched at or about that time? 11:42:38<br>23 A. Yes. 11:42:40<br>24 Q. And do you recall watching that? 11:42:40<br>25 A. Yes, I do. 11:42:41<br><br>Page 446<br><br>1 Q. Was there information presented in that news 11:42:42<br>2 piece that informed your overall factual 11:42:46<br>3 investigation? 11:42:48<br>4 A. Yes, there was. 11:42:49<br>5 Q. Can you tell me what information that was? 11:42:50<br>6 A. Well, the fact that NBC itself was 11:42:52<br>7 identifying this as a ground war. The 11:42:54 | |

| Deposition Designation | Objection & Response |
|---|---|
| 8 description both of Chris Hayes and then the 11:42:58<br>9 other -- the Israeli journalist that he was 11:43:01<br>10 interviewing, they talked -- they both talked 11:43:04<br>11 a lot about how it seemed as though things 11:43:06<br>12 were escalating, that although Netanyahu had 11:43:09<br>13 wanted to show restraint, now that there 11:43:13<br>14 wasn't a chance of a cease fire or it didn't 11:43:16<br>15 appear that there was a chance of a cease 11:43:19<br>16 fire, that things were escalating. 11:43:21<br>17 Q. Did the label ground war that was put behind 11:43:25<br>18 the journalist inform your overall 11:43:28<br>19 investigation? 11:43:31<br>20 A. Well, the fact that NBC itself was labeling 11:43:32<br>21 it as a war, obviously was -- was something 11:43:35<br>22 that I took into consideration. But more 11:43:39<br>23 than that, it was also the fact that you 11:43:41<br>24 could see in this video that there were tanks 11:43:43<br>25 that were advancing, that they were trying to 11:43:45 | |
| Page 447<br><br>1 take out the tunnels that led between Gaza 11:43:47<br>2 and Israel, that basically, you know, Israel 11:43:51<br>3 was -- was saying that they wanted to 11:43:57<br>4 reoccupy Gaza, that this is clearly a 11:43:58<br>5 back-and-forth situation and that -- that 11:44:02<br>6 Israel was very, very serious about -- about 11:44:04<br>7 using all kinds of military weapons to 11:44:07<br>8 prevent -- to prevent the -- the Hamas from 11:44:11<br>9 doing further damage to Israel. 11:44:15<br>10 Q. After this report of the ground war beginning 11:44:19<br>11 on July the 17th, did you continue to monitor 11:44:23<br>12 the events that were occurring? 11:44:26<br>13 A. I did. 11:44:28<br>14 Q. Let me ask you to think forward a week from 11:44:29<br>15 the time that you began to review the factual 11:44:36<br>16 investigation and over the next approximately 11:44:39<br>17 seven days of developments. Can you describe 11:44:41<br>18 by then what sort of overall impressions you 11:44:45<br>19 had formed regarding the factual events? 11:44:49<br>20 A. Well, this looked like a war. I mean, there | Plaintiff's Objections:<br>Page 447:22-448:25<br>MILs 2-3; F.R.E. 402, 403, 602, 701<br>Ms. Johnson lacks expertise and foundation and offers an improper opinion that this "had all the indicia of war."<br><br>Ms. Johnson, a lawyer, then offers an improper legal opinion about what the "case law" on the war exclusions says.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not |

| Deposition Designation | Objection & Response |
|---|---|
| 11:44:52<br>21 was a lot of -- of fire back and forth. 11:44:55<br>22 There was definitely use of -- of a variety 11:44:56<br>23 of military weapons. The incursion into Gaza 11:44:59<br>24 continued to increase. The body count 11:45:03<br>25 continued to increase, less so on the Israeli 11:45:05<br><br>Page 448<br><br>1 side because -- because of the Iron Dome 11:45:09<br>2 defense system. 11:45:11<br>3 But certainly, you know, Hamas was 11:45:12<br>4 continuing to send rockets and try to 11:45:14<br>5 infiltrate Israel with a variety of different 11:45:18<br>6 military operations, few of which were 11:45:23<br>7 successful. And, I mean, it -- it had all 11:45:26<br>8 the indicia of war. 11:45:29<br>9 Q. Did you also conduct research on the policy 11:45:38<br>10 language and terms during this general time 11:45:41<br>11 frame? 11:45:43<br>12 A. I did. This was the first time that I had 11:45:43<br>13 dealt with the war exclusion, so one of the 11:45:47<br>14 things that I wanted to do was to see how 11:45:51<br>15 this exclusion had been interpreted by 11:45:54<br>16 courts. So I did research with regard to 11:45:58<br>17 what -- what did the case law say about this 11:46:02<br>18 exclusion. This is a very common exclusion 11:46:05<br>19 in -- in most insurance policies. 11:46:07<br>20 Q. And when you are referring generally to war 11:46:10<br>21 exclusion, are you referring to all the parts 11:46:14<br>22 that you included in your note to yourself 11:46:17<br>23 that was labeled Exhibit 239? 11:46:19<br>24 A. Yes. 11:46:22<br>25 11:46:25<br><br>Page 449<br><br>1 (Whereupon, Exhibit 243 was 11:46:26<br>2 Marked for identification.) 11:46:26<br>3 BY MS. REED: 11:46:26<br>4 Q. Let me hand you Exhibit 243, please, ma'am. 11:46:26<br>5 Can you identify Exhibit 243 as a 11:46:35<br>6 Westlaw printout indicating a Westlaw search 11:46:39<br>7 and an attached document? 11:46:43<br>8 A. Yes, that's what it is. 11:46:45<br>9 Q. Can you identify this as a portion of your 11:46:48<br>10 work product that you were conducting in the | unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| 11:46:50 | |
| 11 course of looking at policy language and 11:46:54 | |
| 12 terms? 11:46:57 | |
| 13 A. Yes, it looks like I did this search on 11:46:57 | |
| 14 July 17th. 11:47:00 | |
| 15 Q. And can you read for us the initial search 11:47:03 | |
| 16 that you have reported here? 11:47:07 | |
| 17 A. I'm looking for the term insured or insurance 11:47:09 | |
| 18 or insurer in the same paragraph as war or 11:47:13 | |
| 19 warlike in the same paragraph as exclusion or 11:47:16 | |
| 20 exclude or excluded in the same paragraph as 11:47:22 | |
| 21 Israel. 11:47:25 | |
| 22 Q. Do you recall at what point in the course of 11:47:26 | |
| 23 your work, specifically focusing on 11:47:30 | |
| 24 conducting research on the policy language 11:47:33 | |
| 25 and terms, that you would have conducted this 11:47:35 | |
| | |
| Page 450 | |
| | |
| 1 search? 11:47:39 | |
| 2 A. I think that -- based on the specificity of 11:47:39 | |
| 3 the search, this was probably -- this was 11:47:42 | |
| 4 probably one of the -- the -- well, I don't 11:47:49 | |
| 5 know. It was certainly where I was trying to 11:47:52 | |
| 6 drill down to make -- to see if there was any 11:47:56 | |
| 7 particular case that dealt with the Israeli 11:47:59 | |
| 8 situation -- 11:48:01 | |
| 9 Q. Can you -- 11:48:02 | |
| 10 A. -- as opposed to the war exclusion for a war 11:48:03 | |
| 11 in someplace else in -- in the world. 11:48:09 | |
| 12 Q. Can you describe your overall research 11:48:10 | |
| 13 approach that you took when you were looking 11:48:14 | |
| 14 at policy language and terms, in a general 11:48:17 | |
| 15 fashion? 11:48:19 | |
| 16 A. Well, I wanted to read any -- any kind of 11:48:19 | |
| 17 case law that was going to interpret this 11:48:23 | |
| 18 exclusion, because that's important. This 11:48:25 | |
| 19 was a New York policyholder, so I -- I did 11:48:28 | |
| 20 want to look at New York law. However, I 11:48:30 | |
| 21 know also that the policy was issued in 11:48:33 | |
| 22 California and sent to -- you know, given to 11:48:35 | |
| 23 the client in California, so I also wanted to 11:48:40 | |
| 24 see what California law had to -- to say 11:48:43 | |
| 25 about it. 11:48:44 | |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 451**<br><br>1 But what I found is that there -- there 11:48:45<br>2 is not a broad amount of case law that 11:48:47<br>3 interprets this particular exclusion. So I 11:48:50<br>4 wanted to look at as many cases as I could to 11:48:54<br>5 get a general understanding of how the -- how 11:48:57<br>6 this exclusion is interpreted by the courts. 11:49:00<br>7 Q. And did you conduct as broad an analysis as 11:49:02<br>8 you felt you were able to about how the 11:49:07<br>9 policy terms might be interpreted by 11:49:09<br>10 different courts? 11:49:12<br>11 A. Yes. 11:49:12<br>12 Q. Did you print out all of your searches and 11:49:14<br>13 search results? 11:49:18<br>14 A. I'm sure that I didn't. I probably printed 11:49:19<br>15 out -- well, I didn't necessarily print them 11:49:24<br>16 out, but I certainly would send -- as you see 11:49:27<br>17 on this first page, I sent the case to 11:49:30<br>18 myself. In other words, I sent this under 11:49:32<br>19 the subject heading, "War exclusion," which 11:49:37<br>20 is the title that I put on it, and I sent 11:49:39<br>21 that to myself. 11:49:41<br>22 This particular case, the 11:49:42<br>23 Holiday Inn case, which is what this is, also 11:49:44<br>24 references a variety of different cases that 11:49:47<br>25 also deal with the war exclusion, and I 11:49:49<br><br>**Page 452**<br><br>1 looked at all the cases that it referenced as 11:49:51<br>2 well, and then I looked at the cases that 11:49:54<br>3 those cases referenced, which is the usual 11:49:56<br>4 way you would do legal research, and I 11:49:58<br>5 conducted a variety of Westlaw searches to 11:50:00<br>6 see if there was other information there. 11:50:04<br>7 Q. Would it have been your practice at the time 11:50:06<br>8 to keep electronic copies of every search or 11:50:09<br>9 every case you looked at? 11:50:12<br>10 A. No. If the information is repetitive, in 11:50:14<br>11 other words, something that I've read in 11:50:17<br>12 another case, I probably wouldn't have 11:50:18<br>13 printed that case out. 11:50:21<br>14 If there was something new and 11:50:23<br>15 different that I thought was important to my | **Plaintiffs' Objection:**<br>Page 452:18-25<br>F.R.E. 402-03, 701<br>Improper legal opinion about application of case law to facts.<br><br>**Defendant's Response:**<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is |

| Deposition Designation | Objection & Response |
|---|---|
| 11:50:24<br>16 analysis, then I might print that case out, 11:50:26<br>17 probably I would. 11:50:31<br>18 But one of the things that I always 11:50:31<br>19 look at is how similar is the situation, the 11:50:35<br>20 factual situation that's set forth in the 11:50:38<br>21 case law to the factual situation I'm 11:50:40<br>22 investigating now. Because if the factual 11:50:43<br>23 situation is highly different than what the 11:50:45<br>24 court is saying about the exclusion, might 11:50:47<br>25 not apply to this situation, and -- and in 11:50:49<br><br>Page 453<br><br>1 that case there's a likelihood that I 11:50:52<br>2 wouldn't -- I wouldn't print it out, because 11:50:55<br>3 it's not the same situation, the same -- the 11:50:57<br>4 same language would not apply. 11:50:59<br>5 Q. Did you consult other sources besides case 11:51:01<br>6 law in your overall research about policy 11:51:03<br>7 language and terms? 11:51:07<br>8 A. Yes. I -- I know that I looked at Appleman 11:51:08<br>9 on Insurance, I looked at other -- I probably 11:51:13<br>10 looked at other treatises as well. There are 11:51:16<br>11 a variety of insurance treatises that are 11:51:19<br>12 also available through Westlaw and other 11:51:22<br>13 sources to find out as much as I could about 11:51:23<br>14 this exclusion. 11:51:25<br>15 Q. Did you refer to dictionary definitions or 11:51:31<br>16 other discussions of definitions? 11:51:34<br>17 A. Yes. I looked at dictionary definitions of 11:51:35<br>18 war and warlike, and probably of insurrection 11:51:37<br>19 and rebellion as well. 11:51:41<br>20 Q. Did you consult multiple different 11:51:43<br>21 dictionaries in order to do that? 11:51:44<br>22 A. I did. 11:51:47<br>23 Q. Can you describe any other aspects of your 11:51:56<br>24 overall research that you did as part of your 11:51:58<br>25 claim investigation? 11:52:00<br><br>Page 454<br><br>1 A. Well, it was a long time ago now, so I can't 11:52:03<br>2 remember with perfect specificity all of the 11:52:06<br>3 things that I did. But I spent hours and 11:52:09<br>4 hours at it and looked at as many sources as I could 11:52:12<br>5 I could. 11:52:17 | relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Is not opinion testimony The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to |

| Deposition Designation | Objection & Response |
|---|---|
| 6 Q. At the same time that you were conducting 11:52:31<br>7 your factual research and legal research and 11:52:33<br>8 analysis of the policy, were you also 11:52:37<br>9 communicating internally at Atlantic? 11:52:38<br>10 A. Yes. Once I determined that the war 11:52:42<br>11 exclusion might come into play, I wanted to 11:52:44<br>12 know whether or not anyone else in the 11:52:48<br>13 company had interpreted this policy in doing 11:52:51<br>14 some kind of coverage analysis, so I asked 11:52:55<br>15 Theresa Gooley to see whether or not she 11:52:58<br>16 could check on that with other -- with other 11:53:01<br>17 units. 11:53:03<br>18 OneBeacon is a pretty old company, 11:53:05<br>19 so it was probably impossible to know 11:53:07<br>20 absolutely whether or not OneBeacon had 11:53:10<br>21 considered the war exclusion in the past. 11:53:11<br>22 But given the resources that we had currently 11:53:14<br>23 available internally, I wanted to know if 11:53:16<br>24 there was anyone who had interpreted this -- 11:53:19<br>25 this particular exclusion. 11:53:22<br><br>Page 455<br><br>1 It's important when you're dealing 11:53:23<br>2 with insurance policies that you want to have 11:53:26<br>3 a consistent interpretation of policy 11:53:28<br>4 provisions across the entire company. You 11:53:33<br>5 don't want, you know, the technology branch 11:53:36<br>6 to interpret a policy provision that's also 11:53:38<br>7 contained in an entertainment policy 11:53:41<br>8 differently than you would in entertainment. 11:53:43<br>9 (Whereupon, Exhibit 244 was 11:53:46<br>10 marked for identification.) 11:53:46<br>11 BY MS. REED: 11:53:46<br>12 Q. Let me hand you what's been marked as 11:53:47<br>13 Exhibit 244, please, ma'am. 11:53:49<br>14 Can you identify Exhibit 244 as an 11:53:50<br>15 e-mail that you sent to Theresa Gooley? 11:53:53<br>16 A. Yes. 11:53:55<br>17 Q. And what were you inquiring about in this 11:53:56<br>18 e-mail, please, ma'am? 11:54:00<br>19 A. It says, "I want to make sure that OBE takes 11:54:01<br>20 a position that is consistent with the rest 11:54:05<br>21 of OneBeacon in interpreting the exclusion 11:54:07<br>22 for warlike actions by a military force. I'm 11:54:09 | |

| Deposition Designation | Objection & Response |
|---|---|
| 23 thinking that tech or other business units 11:54:12<br>24 might also have had claims arising from the 11:54:14<br>25 Israeli/Hamas conflict. Do you have time for 11:54:17<br><br>Page 456<br><br>1 a quick call to discuss how to get continuity 11:54:19<br>2 among business units?" 11:54:20<br>3 Q. Did you follow up with Ms. Gooley about this 11:54:22<br>4 request? 11:54:24<br>5 A. I did. 11:54:25<br>6 Q. Did you receive a response? 11:54:26<br>7 A. She could not find any other group that had 11:54:28<br>8 interpreted this particular exclusion. 11:54:31<br>9 (Whereupon, Exhibit 245 was 11:54:38<br>10 marked for identification.) 11:54:46<br>11 BY MS. REED: 11:54:46<br>12 Q. Were you continuing to have internal 11:54:46<br>13 conversations and communications with 11:54:48<br>14 Mr. Gutterman on the claim? 11:54:50<br>15 A. Yes. 11:54:51<br>16 Q. Let me hand you what's been marked as 11:54:52<br>17 Exhibit 245, please, ma'am. 11:54:55<br>18 Can you identify Exhibit 245 as an 11:54:57<br>19 e-mail string which culminates in an e-mail 11:55:00<br>20 from you to Mr. Gutterman on Tuesday, July 11:55:06<br>21 the 15th? 11:55:09<br>22 A. Yes, that's what it is. 11:55:10<br>23 Q. Did Mr. Gutterman send you a note about 11:55:13<br>24 reviewing some particular policy language? 11:55:16<br>25 A. Yes, he did. 11:55:20<br><br>Page 457<br><br>1 Q. And did you respond to him? 11:55:21<br>2 A. Yes, I did. I told him that we needed to 11:55:24<br>3 have further discussion -- a lot more further 11:55:30<br>4 discussion about this and to call me in the 11:55:33<br>5 morning. 11:55:35<br>6 Q. And what did you mean by that? 11:55:35<br>7 A. Well, he was looking at the policy language 11:55:37<br>8 for extra expense. He was specifically 11:55:38<br>9 looking at the wording for civil unrest and 11:55:40<br>10 the exclusion for it, and he was saying that 11:55:42<br>11 this policy was different from other policies 11:55:46 | |

| Deposition Designation | Objection & Response |
|---|---|
| 12 that he had seen. And, I mean, I wanted to 11:55:48<br>13 talk to him about the claim in general based 11:55:55<br>14 on the information that I was also gathering. 11:55:57<br>15 Q. And do you recall having those types of 11:56:03<br>16 conversations with Mr. Gutterman? 11:56:05<br>17 A. Oh, we talked about this case a lot, yes. 11:56:06<br>18 (Whereupon, Exhibit 246 was 11:56:14<br>19 marked for identification.) 11:56:14<br>20 BY MS. REED: 11:56:14<br>21 Q. Let me hand you Exhibit 246, please, ma'am. 11:56:15<br>22 Can you identify Exhibit 246 as an e-mail 11:56:18<br>23 string which culminates in an e-mail that you 11:56:20<br>24 sent to Mr. Williams and Mr. Gutterman on 11:56:23<br>25 July the 15th? 11:56:27<br><br><br>Page 458<br><br>1 A. Yes, this is the e-mail string that -- that 11:56:31<br>2 reflects communications that we had. 11:56:38<br>3 Q. And were you asking, as early as July 15th, 11:56:40<br>4 to have a call with Mr. Williams and 11:56:43<br>5 Mr. Gutterman to be discussing the claim? 11:56:46<br>6 A. Yes. From the e-mail string and from other 11:56:49<br>7 information I had gathered, it was apparent 11:56:53<br>8 that Peter had also talked to Andrea and 11:56:54<br>9 Susan, so I wanted to know what information 11:56:57<br>10 he had gathered from his conversation and 11:57:00<br>11 also wanted to share with him the information 11:57:03<br>12 that I was gathering. 11:57:06<br><br>Page 459<br><br>9 Q. Are you reporting to Mr. Williams about the 11:57:55<br>10 conversation you had with Ms. Weiss and 11:57:57<br>11 Ms. Garber on July the 15th in this e-mail? 11:57:59<br>12 A. Yes. 11:58:03<br>13 Q. And why do you make the comments that you do, 11:58:04<br>14 please, ma'am? 11:58:06<br>15 A. Well, I was just relating what we had the 11:58:07<br>16 call about. It says that we had a 11:58:11<br>17 conversation -- "Danny and I had a 11:58:13<br>18 conversation with Susan and Andrea today 11:58:15 | |

| Deposition Designation | Objection & Response |
|---|---|
| 19 about what the production's plans were," 11:58:16<br>20 because he had already referenced that -- 11:58:18<br>21 that he had talked to them about the claim, 11:58:22<br>22 "But we didn't make any representations about 11:58:24<br>23 whether there was coverage, but we also 11:58:27<br>24 didn't alert" -- "did not the alert them that 11:58:29<br>25 there" -- "that this might not be a covered 11:58:31<br><br>Page 460<br><br>1 claim. If this is going to be an issue, we 11:58:32<br>2 need to alert them right away." And then I 11:58:34<br>3 said, "Peter" -- "Peter, when are you 11:58:37<br>4 available tomorrow." 11:58:38<br>5 Q. When you sent this e-mail on July 15th, did 11:58:39<br>6 you know whether there potentially would be 11:58:42<br>7 coverage or would not be coverage? 11:58:44<br>8 A. This was right at the beginning of my 11:58:45<br>9 investigation, so I didn't know for sure. 11:58:47<br>10 You know, I -- I could see from this e-mail 11:58:49<br>11 string and the previous one that Danny was 11:58:52<br>12 looking at the -- the civil unrest portion of 11:58:54<br>13 the policy. I had certainly, at that point, 11:58:57<br>14 probably started my investigation, at least 11:59:00<br>15 initially. 11:59:03<br>16 But as I previously explained, if 11:59:03<br>17 you think that there's going to be any kind 11:59:07<br>18 of a coverage issue, you need to get that -- 11:59:09<br>19 get in touch with the production right away. 11:59:11<br>20 But at this point all I was telling 11:59:14<br>21 him is that we didn't tell them one way or 11:59:16<br>22 another whether there was coverage, because I 11:59:19<br>23 wouldn't do that without doing some kind of 11:59:21<br>24 factual investigation unless the facts were 11:59:23<br>25 so patently clear that it was obvious that 11:59:25<br><br>Page 461<br><br>1 there was coverage. So I wanted to talk 11:59:28<br>2 through the entire situation. 11:59:31<br>3 Q. Based upon your experience in handling 11:59:33<br>4 entertainment claims, is there a certain 11:59:36<br>5 level of urgency that's typically 11:59:38<br>6 communicated to you by your insured? 11:59:40<br>7 A. They want everything and they want it right 11:59:42<br>8 now. 11:59:44 | |

| Deposition Designation | Objection & Response |
|---|---|
| 9 Q. And do you proceed with your investigation 11:59:44<br>10 knowing that they have a certain level of 11:59:48<br>11 urgency? 11:59:50<br>12 A. Of course I do. 11:59:51<br>13 Q. And what did you mean about your comments in 11:59:52<br>14 terms of alerting your insured as soon as you 11:59:57<br>15 could? 12:00:01<br>16 A. The one thing that is most important when you 12:00:01<br>17 handle a first-party entertainment claim is 12:00:04<br>18 that if you think that there is going to be 12:00:07<br>19 any issue with regard to coverage, you need 12:00:09<br>20 to let the production know immediately. 12:00:10<br>21 And the reason for that is, as I 12:00:12<br>22 previously explained, they want to know whose 12:00:14<br>23 money they're spending, are they going to be 12:00:16<br>24 spending the insurance company's money or are 12:00:19<br>25 they going to be spending their own money. 12:00:21<br><br>Page 462<br><br>1 Is this going to be something that is covered 12:00:22<br>2 or is this something they have to put in 12:00:24<br>3 their own internal budgets. So obviously 12:00:26<br>4 that's an important concern to them. 12:00:28<br>5 When we initially get a claim, you 12:00:30<br>6 know, if somebody says, "Is this covered," 12:00:32<br>7 what we always will tell them is, you know, 12:00:34<br>8 we have to do a factual investigation. 12:00:36<br>9 And I know that -- that Peter's 12:00:38<br>10 favorite thing to tell them is behave as 12:00:40<br>11 though you don't have any insurance and do 12:00:42<br>12 what is prudent in that situation, so that 12:00:45<br>13 they're not relying upon the fact that there 12:00:47<br>14 could be coverage in making their next 12:00:49<br>15 decision. 12:00:51<br>16 Q. Do you attempt to predetermine whether 12:00:52<br>17 there's going to be coverage or not before 12:00:54<br>18 you've done your full investigation? 12:00:56<br>19 A. Absolutely not. 12:00:58<br>20 Q. What is your process for analyzing coverage? 12:00:58<br>21 A. Well, I try to gather the facts that are 12:01:02<br>22 applicable to the situation. I then look at 12:01:06 | |

704

| Deposition Designation | Objection & Response |
|---|---|
| 23 the policy language and see how the facts 12:01:10<br>24 apply to the policy language, determine if 12:01:12<br>25 there are people that I need to interview at 12:01:14<br>Page 463<br><br>1 the insured. 12:01:17<br>2 For example, if you're dealing with 12:01:18<br>3 an abandonment claim, which means that the -- 12:01:20<br>4 the insured has abandon a production, decided 12:01:23<br>5 not to continue to film it, you want to 12:01:26<br>6 figure out, "Okay, well, what was your basis 12:01:28<br>7 for abandoning the claim." 12:01:29<br>8 So you would get together with 12:01:31<br>9 the -- the insured and talk through what 12:01:33<br>10 their thought process was with regard to 12:01:34<br>11 abandoning the claim and evaluate the fact 12:01:38<br>12 situation that applied to that, so you want 12:01:40<br>13 to be looking at a variety of different 12:01:42<br>14 facts. 12:01:44<br>15 Just like if you were handling a car 12:01:45<br>16 accident case, you would want to get medical 12:01:47<br>17 reports before you paid the claim, because 12:01:49<br>18 you want to know what has actually happened 12:01:50<br>19 to the person and have they reached their 12:01:53<br>20 healing plateau, you would want to get the 12:01:55<br>21 police report related to the car accident to 12:01:58<br>22 see who was found at fault, that sort of 12:01:59<br>23 thing. 12:02:01<br>24 Q. When you turn your attention to the policy 12:02:01<br>25 itself and you're applying the facts to the 12:02:03<br><br>Page 464<br><br>1 policy, do you look for coverage as your 12:02:05<br>2 initial step? 12:02:07<br>3 A. That is -- that is what we are supposed to 12:02:11<br>4 do. Always, the first thing that you do is 12:02:13<br>5 you see if you can find coverage. Our job is 12:02:16<br>6 to find coverage if coverage can be found. 12:02:17<br>7 (Whereupon, Exhibit 247 was 12:02:23<br>8 marked for identification.) 12:02:24<br>9 BY MS. REED: 12:02:24<br>10 Q. Let me hand you Exhibit 247, please, ma'am. 12:02:24<br>11 Can you identify Exhibit 247 as an 12:02:27<br>12 e-mail string that culminates an e-mail that 12:02:29<br>13 you sent July the 15th, 2014, to Mr. Williams 12:02:35<br>14 and Mr. Gutterman? 12:02:38 | |

| Deposition Designation | Objection & Response |
|---|---|
| 15 A. Yes, that's what it is. 12:02:41<br>16 Q. Why did you send this particular e-mail 12:02:45<br>17 raising the issue of the last travel warning 12:02:49<br>18 issued by the U.S.? 12:02:51<br>19 A. Because when I had dealt with extra expense 12:02:53<br>20 claims in other countries before, I want -- I 12:02:56<br>21 always -- you always want to see so what -- 12:03:00<br>22 what -- what -- what does the production know 12:03:03<br>23 before they even get to the country about 12:03:05<br>24 what the conditions are in that country. 12:03:07<br>25 Q. And does this indicate to you that you were 12:03:10<br><br>Page 465<br><br>1 already performing research and analysis on 12:03:13<br>2 July the 15th about the claim? 12:03:15<br>3 A. Yes. 12:03:17<br>4 Q. Does this indicate to you that Mr. Gutterman 12:03:18<br>5 had shared the policy with you and with 12:03:20<br>6 Mr. Williams as of July the 15th? 12:03:24<br>7 A. I don't know if he shared it with us or if it 12:03:26<br>8 was actually located in the claim file 12:03:29<br>9 already, but he was clearly forwarding it to 12:03:31<br>10 both of us at that time. 12:03:33<br>11 Q. So by July the 15th, it was at least 12:03:34<br>12 available for you to access? 12:03:37<br>13 A. Yes. 12:03:39<br>14 (Whereupon, Exhibit 248 was 12:03:49<br>15 marked for identification.) 12:03:49<br>16 BY MS. REED: 12:03:49<br>17 Q. Let me hand you Exhibit 248, please, ma'am. 12:03:50<br>18 A. Yes. 12:03:52<br>19 Q. Can you identify Exhibit 248 as an e-mail 12:03:52<br>20 string which culminates in an e-mail that you 12:03:57<br>21 sent to Mr. Williams and Mr. Gutterman on 12:04:00<br>22 July the 16th? 12:04:02<br>23 A. Yes, this is an e-mail exchange between us in 12:04:03<br>24 which I was conveying the first four 12:04:09<br>25 enumerated sections of the war exclusion 12:04:16<br><br>Page 466<br><br>1 contained in the general conditions of the 12:04:18<br>2 production policy. 12:04:21 | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Plaintiff's Objections:<br>Page 466:20-467:2<br>602, 802 |

| Deposition Designation | Objection & Response |
|---|---|
| 3 Q. And what was the purpose of you communicating 12:04:22<br>4 this to Mr. Williams and Mr. Gutterman? 12:04:24<br>5 A. It appears that at this point in my research 12:04:27<br>6 I was thinking that this might be an 12:04:30<br>7 exclusion that we needed to evaluate. 12:04:32<br>8 Q. Did you have some discussions with 12:04:33<br>9 Mr. Williams about the war exclusions that 12:04:35<br>10 were in this policy? 12:04:37<br>11 A. Well, certainly I did, yes. 12:04:40<br>12 Q. And did he ever make any indication to you 12:04:41<br>13 that he analyzed the applications of the 12:04:46<br>14 exclusions in a different way than you were 12:04:51<br>15 communicating with him? 12:04:53<br>16 A. No. I mean, we talked through what the facts 12:04:55<br>17 were, you know, because obviously I had done 12:04:57<br>18 an extensive investigation, was continuing to 12:05:00<br>19 investigate, and Danny was doing the same 12:05:02<br>20 thing. Peter, obviously, wasn't doing that 12:05:04<br>21 same investigation. That wasn't his job. So 12:05:06<br>22 I was relaying to him the facts as we knew 12:05:11<br>23 them and talking about whether or not the war 12:05:14<br>24 exclusion would apply to the facts as we knew 12:05:16<br>25 them. But, no, he did not disagree. He 12:05:20 | Lack of foundation and speculation (or, alternatively, hearsay) as to whether Peter Williams agreed that the war exclusion applied.<br><br>Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted 801, 807. |
| Page 467<br>1 agreed that the war conclusion was 12:05:22<br>2 potentially applicable. 12:05:24<br>3 Q. Did you and Mr. Gutterman and Mr. Williams 12:05:25<br>4 together have various conversations about the 12:05:29<br>5 analysis of the claim? 12:05:32<br>6 A. Yes, we did. 12:05:33<br>7 Q. By July the 16th, do you have any 12:05:44<br>8 recollection about your observation on the 12:05:46<br>9 potential applicability of the war exclusion? 12:05:50<br>10 A. Well, at that point I was clearly considering 12:05:53<br>11 them, because I wouldn't have sent them 12:05:56<br>12 otherwise. 12:05:58<br>13 Q. And do you recall your thought process by 12:05:59<br>14 that point in time? 12:06:02<br>15 A. Well, at that point I had already started 12:06:03<br>16 looking at what was actually happening in 12:06:05<br>17 Israel at this time and what had led up to 12:06:07 | Plaintiff's Objections: Pages 467:21-468:17 MIL 2, F.R.E. 402-403 Exclusion 3 for "insurrection" and Exclusion 4 for "weapon of war including atomic fission" are irrelevant to bad faith and likely to confuse the issues and waste time, as they were not explained as a basis for denying coverage in the denial letter and therefore cannot serve as the basis of a good faith defense under California law. *See Century Surety Co. v. Polisso*, *supra*.<br><br>Defendant's Response: "MIL" not clear objection; |

| Deposition Designation | Objection & Response |
|---|---|
| 18 the current conditions in Israel. And it 12:06:12<br>19 appeared to me that what was happening was a 12:06:15<br>20 war or warlike action certainly. 12:06:18<br>21 Q. Did you look at the insurrection language and 12:06:20<br>22 the weapon of war language around this time? 12:06:23<br>23 A. I did, yes. 12:06:26<br>24 Q. Can you recall any observations that you had 12:06:27<br>25 about either one of those? 12:06:29<br><br>Page 468<br><br>1 A. Well, you know, as is usual, when you're -- 12:06:30<br>2 when you're evaluating a coverage provision, 12:06:35<br>3 you want to look at all of the provisions 12:06:37<br>4 that could apply. In this case, it was 12:06:39<br>5 apparent that war or warlike actions clearly 12:06:43<br>6 applied, and that if you viewed Gaza as part 12:06:47<br>7 of Israel rather than -- than, you know, as 12:06:50<br>8 the Palestinian people regarded it as part of 12:06:56<br>9 Palestine, that this could also qualify as an 12:06:59<br>10 insurrection. 12:07:04<br>11 And if you didn't think that it was 12:07:04<br>12 an insurrection or rebellion, then there were 12:07:06<br>13 still weapons of war being used. That's why 12:07:08<br>14 I included all four of those. 12:07:10<br>15 Q. Did you discuss your ongoing analysis and 12:07:12<br>16 conclusions with your supervisor 12:07:16<br>17 Theresa Gooley? 12:07:18<br>18 A. I did. 12:07:18<br>19 Q. Did you discuss your work and your 12:07:19<br>20 conclusions with her before you communicated 12:07:22<br>21 your work and your conclusions to the insured 12:07:27<br>22 and its broker? 12:07:29<br>23 A. Oh, absolutely. 12:07:30<br>24 Q. And what did you and Ms. Gooley discuss in 12:07:31<br>25 that regard? 12:07:33 | ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.<br><br><br>Plaintiff's Objections:<br>Page 469:22-25 |

| Deposition Designation | Objection & Response |
|---|---|
| Page 469<br><br>1 A. We discussed the information that I had 12:07:34<br>2 gathered and that Danny had gathered. And we 12:07:36<br>3 discussed what I had learned from the case 12:07:41<br>4 law in interpreting this particular 12:07:44<br>5 provision, and then we discussed how the 12:07:47<br>6 facts and the case law applied to this 12:07:49<br>7 particular situation and determined that the 12:07:51<br>8 war exclusion did apply. 12:07:53<br>9 Q. When you were having these discussions with 12:07:55<br>10 Ms. Gooley, had your process advanced to the 12:07:58<br>11 point that you had at least tentative 12:08:02<br>12 conclusions that you had reached? 12:08:04<br>13 A. It looked to me at the -- well, I mean, I -- 12:08:08<br>14 I analyzed it with her, I talked to her about 12:08:10<br>15 it. But, yes, at the time that I was having 12:08:12<br>16 the discussion with her, it looked to me like 12:08:15<br>17 this -- like this policy provision probably 12:08:17<br>18 applied. 12:08:21<br>19 Q. And what facts had you gathered that caused 12:08:22<br>20 you to analyze the war, Part 1, exclusion in 12:08:24<br>21 the way that you did? 12:08:30<br>22 A. Well, I looked at definitions set forth in 12:08:30<br>23 case law. I also looked at practically what 12:08:33<br>24 was actually happening in Israel and how it 12:08:36<br>25 applied to how case law had interpreted it, 12:08:39<br><br>Page 470<br><br>1 and I also thought about how -- how 12:08:43<br>2 journalists were reporting it and how even 12:08:47<br>3 the U.S. Government uses the term war. 12:08:49<br>4 Q. What facts had you gathered that caused you 12:08:54<br>5 to analyze the warlike actions provision as 12:08:58<br>6 you did? 12:09:03<br>7 A. Does it look like a war, does it talk like a 12:09:03<br>8 war, does it walk like a war. All of these 12:09:08<br>9 indicia were there, so this was a warlike 12:09:12<br>10 action. 12:09:14<br>11 Q. Did you consider the provision about warlike 12:09:15<br>12 to be broader than war? 12:09:17<br>13 A. Yes. 12:09:19<br>14 Q. And why was that? 12:09:20<br>15 A. Because the way that -- the definition of 12:09:21<br>16 war, as set forth in a variety of -- of 12:09:26<br>17 places, sometimes means that you have to 12:09:30 | MIL 2; F.R.E. 402, 403, 602, 701<br>Improper legal opinion for Ms. Johnson, a lawyer, to suggest to the jury that the "case law" made clear this was a war because the "indicia of war" were there or because it "walks like a war" and "talks like a war." Substantially more prejudicial than probative.<br><br>Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. |

709

| Deposition Designation | Objection & Response |
|---|---|
| 18 actually have two separate sovereigns that 12:09:32<br>19 are -- are attacking each other. 12:09:37<br>20 And, clearly, in this situation, not 12:09:39<br>21 everyone would recognize Hamas as a sovereign 12:09:42<br>22 state or as a separate entity, in spite of 12:09:45<br>23 the fact that the UN Assembly in 2012 had 12:09:52<br>24 recognized Palestine as a nonmember observer 12:09:54<br>25 state. So, you know, there could be push 12:09:58<br><br>Page 471<br><br>1 back with regard to is this really a war. 12:10:01<br>2 It's not a declared war, but one of 12:10:03<br>3 the things that the case law talked about is 12:10:07<br>4 that it doesn't have to be a declared war. 12:10:10<br>5 For example, there's the Korean conflict, we 12:10:12<br>6 obviously talk about that as the Korean war 12:10:16<br>7 even though there was no declared war during 12:10:18<br>8 that conflict. 12:10:20<br>9 Q. Do all definitions of war require the 12:10:22<br>10 participation of a sovereign? 12:10:25<br>11 A. No, not necessarily. Or it could also -- it 12:10:26<br>12 could also mean a sovereign just on one side, 12:10:30<br>13 a quasi-sovereign on the other, or simply 12:10:33<br>14 another entity on the other side. 12:10:37<br>15 Q. What facts had you gathered that affected the 12:10:38<br>16 way that you were interpreting Part 3 of the 12:10:44<br>17 war exclusions? 12:10:46<br>18 A. Well, Part 3, insurrection, rebellion, 12:10:49<br>19 revolution, usurped power in some instances 12:10:53<br>20 are defined as sort of the ramping up to a 12:11:00<br>21 war by entities that are all contained in the 12:11:04<br>22 same country. So these are sort of what -- 12:11:07<br>23 what you're leading up to a civil war or 12:11:10<br>24 to a rebellion within the same country. 12:11:15<br>25 In other words, these are two -- the 12:11:19 | Plaintiff's Objections:<br>Page 471:3-25<br>MIL 2; F.R.E. 402, 403, 602, 701<br>Improper legal opinion about what the "case law" says.<br><br>As reflected in the Ninth Circuit's opinion, the Korean war and definition of undeclared war is irrelevant—that conflict indisputably involved two sovereign nations. Irrelevant and likely to confuse the issues and mislead the jury.<br><br>Improper legal opinion about whether "all definitions of war require the participation of a sovereign" and irrelevant to the extent not limited to the insurance industry's special meaning of war. Substantially more prejudicial than probative, likely to confuse the issues and mislead the jury.<br><br>Exclusion 3 for insurrection is irrelevant to bad faith because it was not cited in the denial letter. *See Century Surety Co. v. Polisso, supra.*<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and |

| Deposition Designation | Objection & Response |
|---|---|
| | development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The Witness' understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought; relevant to show state of mind, reasonableness, and good faith claims handling on part of ASIC; ASIC did not have 9th Circuit opinion to consider at the time, and testimony regarding the facts available to all parties to form an understanding in real time is critical for jury to consider when evaluating bad faith claims. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 472** | Plaintiff's Objections: Page 472:1-18 MILs 2-3, F.R.E. 402, 403 Exclusion 3 ("insurrection") and 4 ("weapons of war including atomic fission") irrelevant to bad faith because not explained in the denial letter as a basis for denying coverage. Therefore, substantially more prejudicial than probative, waste of time, likely to confuse the issues and mislead the jury. *Century Surety Co. v. Polisso.* |
| 1 citizenry within the same country, one aspect 12:11:22 2 of the citizenry is rising up against the 12:11:26 3 government. 12:11:29 4 Q. What factual information had you gathered 12:11:30 5 that informed the way that you were looking 12:11:32 6 at Part 4 of the war exclusion? 12:11:34 7 A. Well, Part 4 is pretty broad. It says if 12:11:37 8 you're using weapons of war, this isn't 12:11:41 9 covered, it says including atomic fission or 12:11:43 10 radioactive force. But it says, "Including," 12:11:46 11 it doesn't say only. 12:11:48 12 And in this particular case, since 12:11:50 13 there were air strikes, there were gun boats, 12:11:52 14 there were tanks, there were infantry, all of 12:11:57 15 those things are weapons of war, so it 12:12:02 16 appeared to me that -- that this exclusion -- 12:12:04 17 that this portion of the exclusion could also 12:12:07 18 be brought to bear. 12:12:10 19 Q. Let me hand you what's been previously marked 12:12:15 20 as Defendant's Exhibit 62 in the case, 12:12:18 21 please, ma'am. 12:12:20 22 Can you identify Exhibit 62 as an 12:12:21 23 e-mail string which culminates in a message 12:12:22 24 from Susan Weiss to and to Mr. Gutterman 12:12:26 25 dated July the 17th, 2014? 12:12:28 | |
|  | Defendant's Response: "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Further, *Century* does not stand for and has never before been applied to prohibit the introduction of all evidence not specifically cited in a claim decision letter, it does not operate to prohibit testimony or introduction of evidence considered in the claim decision. |
| **Page 473** | |
| 1 A. Yes. 12:12:29 | |

| Deposition Designation | Objection & Response |
|---|---|
| 2 Q. Did you receive this e-mail? 12:12:30<br>3 A. I did. 12:12:31<br>4 Q. What was Ms. Weiss reporting to you? 12:12:31<br>5 A. Well, we had a meeting scheduled for the 12:12:34<br>6 following day. This was on July 17th, which 12:12:37<br>7 was a Thursday, and we had a call already 12:12:40<br>8 scheduled for the 18th, and so she was 12:12:42<br>9 conveying that they wanted to talk to us 12:12:45<br>10 before the next day, that she wanted -- 12:12:48<br>11 that -- that things had transpired and they 12:12:50<br>12 wanted to talk now. 12:12:53<br>13 Q. And was that something you were prepared and 12:12:54<br>14 willing to do? 12:12:56<br>15 A. I'm always willing to talk to an insured any 12:12:58<br>16 time they want to talk to us, yes. 12:13:03<br>17 Q. Did she give any indication before the call 12:13:04<br>18 began about what sort of information she 12:13:07<br>19 wanted to share? 12:13:09<br>20 A. No. 12:13:10<br>21 (Whereupon, Exhibit 249 was 12:13:10<br>22 marked for identification.) 12:13:10<br>23 BY MS. REED: 12:13:18<br>24 Q. Let me hand you Exhibit 249, please, ma'am. 12:13:18<br>25 Can you identify Exhibit 249 as a string of 12:13:21<br><br>Page 474<br><br>1 e-mails culminating in a message from 12:13:24<br>2 Ms. Weiss to Ms. Garber and you and 12:13:27<br>3 Mr. Gutterman copied to Mr. Williams setting 12:13:32<br>4 up a call time? 12:13:37<br>5 A. Yes. 12:13:38<br>6 Q. And to the best of your recollection, is 12:13:38<br>7 4:00 p.m. pacific time on July the 17th the 12:13:41<br>8 time that you spoke with your insured and 12:13:45<br>9 broker? 12:13:47<br>10 A. Yes. 12:13:48<br>11 Q. What information did Ms. Weiss or Ms. Garber 12:13:58<br>12 share as part of the call? 12:14:01<br>13 A. At that time they shared with us that they 12:14:03<br>14 had decided to move the production altogether 12:14:05<br>15 based on the fact that there had been no 12:14:10<br>16 deescalation of hostilities between Hamas and 12:14:13<br>17 Israel, and because it did not appear that 12:14:16 | |

| Deposition Designation | Objection & Response |
|---|---|
| 18 there was going to be a deescalation any time 12:14:18 19 soon. 12:14:21 20 Q. Was the decision to move the production new 12:14:21 21 information to you? 12:14:24 22 A. I don't remember specifically if Ms. Garber 12:14:26 23 had mentioned it in our first call, she may 12:14:29 24 have, that if it didn't deescalate that they 12:14:31 25 might think about moving the production. I 12:14:34

Page 475

1 just don't remember. 12:14:38 2 If -- I think that I -- I wrote in 12:14:40 3 my coverage letter what was discussed in each 12:14:43 4 of those calls, so that would probably help 12:14:45 5 me remember. But she might have mentioned 12:14:48 6 it. 12:14:51 7 Q. Was the call on July 17th the first time it 12:14:51 8 was communicated to you that the insured had 12:14:54 9 made its decision that it absolutely would 12:14:56 10 move the production? 12:14:59 11 A. Yes, all we were talking about before was a 12:15:00 12 push. 12:15:03 13 Q. And did Ms. Weiss or Ms. Garber give you any 12:15:03 14 more factual detail about the reasons that 12:15:08 15 that decision was made? 12:15:10 16 A. Again, as I said, it was because there had 12:15:11 17 been no deescalation, that things continued 12:15:15 18 to be unsafe, it didn't look like things were 12:15:17 19 going to change any time soon, so they -- 12:15:20 20 they talked about where they would 12:15:23 21 potentially move the production. And I know 12:15:24 22 they were talking about moving it perhaps to 12:15:30 23 New Mexico, perhaps to another -- perhaps 12:15:32 24 another Middle Eastern country or -- or 12:15:38 25 another -- another foreign country for sure. 12:15:41

Page 476

1 Q. Did they share other details with you during 12:15:45 2 that call that you can remember? 12:15:48 3 A. Well, I know I shared with them that there | |

| Deposition Designation | Objection & Response |
|---|---|
| 12:15:53<br>4 was a location scout that they shouldn't use 12:15:56<br>5 in New Mexico, because I had had issues with 12:15:59<br>6 him before in another claim. And just that 12:16:02<br>7 they wanted to get it up and running as soon 12:16:07<br>8 as possible. They wanted to know if the 12:16:10<br>9 claim was going to be covered and they asked 12:16:11<br>10 me specifically if it was going to be 12:16:13<br>11 covered. 12:16:16<br>12 Q. Did you give a response? 12:16:16<br>13 A. I told them that we were considering the 12:16:17<br>14 applicability of the war exclusion and that 12:16:19<br>15 we were considering it, we hadn't made a 12:16:23<br>16 final determination. They wanted to know 12:16:25<br>17 when we were going to make the final 12:16:27<br>18 determination. 12:16:29<br>19 Susan Weiss specifically asked if we 12:16:30<br>20 had gotten an outside coverage determination, 12:16:33<br>21 I think. I'm not sure if she did that in 12:16:36<br>22 that phone call or in the following phone 12:16:40<br>23 call. 12:16:42<br>24 But neither one of them were happy 12:16:42<br>25 with the fact that we might apply the war 12:16:45<br><br>Page 477<br><br>1 exclusion. This was something that 12:16:48<br>2 distressed them. 12:16:50<br>3 They continued to emphasize that 12:16:51<br>4 Hamas was a terrorist organization, and if it 12:16:53<br>5 was a terrorist organization then this was an 12:16:56<br>6 act of terrorism, it was not a war, nor could 12:16:59<br>7 it be a war, nor could it be warlike actions 12:17:02<br>8 or any of the rest of the portions of the war 12:17:05<br>9 exclusion. 12:17:08<br>10 Q. As a part of that call, did you explain to 12:17:09<br>11 them the analysis that you had performed to 12:17:11<br>12 that point either in terms of the facts or 12:17:14<br>13 the policy language? 12:17:16<br>14 A. You know, they were pretty upset, so I'm not 12:17:18<br>15 sure how much detail I actually went into at 12:17:22<br>16 that point. I mean, I think that we did talk 12:17:24<br>17 about the fact that, you know, this looks 12:17:27<br>18 like a war, there are gun boats, there are 12:17:30<br>19 air strikes, there are tanks, there are -- 12:17:33<br>20 are all of these other things that are 12:17:35<br>21 happening, you know, they're -- they're 12:17:36<br>22 invading Gaza, there are, you know, thousands | |

| Deposition Designation | Objection & Response |
|---|---|
| 12:17:37<br>23 of troops on the ground, and that sort of 12:17:40<br>24 thing. 12:17:43<br>25 But they just continued to emphasize 12:17:44<br><br>Page 478<br><br>1 that they thought that because Hamas was a 12:17:45<br>2 terrorist organization, this couldn't 12:17:48<br>3 possibly be a war, a warlike action or any of 12:17:50<br>4 the rest of the exclusion. 12:17:53<br>5 Q. As of the time you had that conversation on 12:17:54<br>6 July the 17th with Ms. Weiss and Ms. Garber, 12:17:57<br>7 had OneBeacon made a final claim decision? 12:18:02<br>8 A. No. We were still considering it, we were 12:18:04<br>9 looking at it. 12:18:06<br>10 Q. What did you say about a final claim 12:18:07<br>11 decision, if anything? 12:18:09<br>12 A. Well, I think that they asked for a final 12:18:10<br>13 claim decision immediately, and I think that 12:18:12<br>14 we agreed that there would be a final 12:18:17<br>15 decision -- that I would give them a final 12:18:19<br>16 decision the following week. I don't 12:18:21<br>17 remember exactly what day we agreed upon, but 12:18:27<br>18 very shortly thereafter. 12:18:29<br>19 Q. And was it your intent after that call to 12:18:30<br>20 continue to work through the claim to get to 12:18:33<br>21 the point of making a final claim decision? 12:18:35<br>22 A. Yes. 12:18:36<br>23 Q. What additional fact analysis or -- pardon 12:18:37<br>24 me. 12:18:37<br>25 What additional fact research, if 12:18:46<br><br>Page 479<br><br>1 any, did you do after the call on the 17th? 12:18:48<br>2 A. Well, I think I continued to do the same 12:18:50<br>3 research that I had been doing in terms of 12:18:52<br>4 what exactly had gone on, what was currently 12:18:54<br>5 going on. I was just continuing the 12:18:56<br>6 research. 12:18:59<br>7 But I also was having discussions 12:18:59<br>8 internally to say, you know, this is what -- 12:19:01<br>9 this is my decision, this is what I think 12:19:04<br>10 we're going to do, as soon as I had reached 12:19:06 | |

| Deposition Designation | Objection & Response |
|---|---|
| 11 the conclusion that I was pretty sure that 12:19:09<br>12 that's what was going to happen. 12:19:11<br>13 You know, that's something that I 12:19:13<br>14 would want to inform other people of, again,<br>12:19:14<br>15 because the first thing that usually happens 12:19:16<br>16 if you deny an entertainment claim is that 12:19:19<br>17 they don't want to talk to you anymore, they<br>12:19:21<br>18 want to talk to everyone above you. That had<br>12:19:23<br>19 been my experience. 12:19:25<br>20 Q. Between the time that you had the telephone<br>12:19:26<br>21 call on July the 17th and when you 12:19:29<br>22 communicated a final decision on behalf of 12:19:32<br>23 OneBeacon, did you discuss your process with<br>12:19:35<br>24 other people within OneBeacon? 12:19:39<br>25 A. Yes, I did. 12:19:42<br><br>Page 480<br><br>1 Q. And who were those people? 12:19:43<br>2 A. I'm sure I talked to Danny and Peter and 12:19:45<br>3 Theresa. I know that Theresa wanted to talk 12:19:48<br>4 to Sean, and they had planned a meeting, but 12:19:51<br>5 I don't -- I don't think that that meeting 12:19:54<br>6 actually took place. At least not with me. 12:19:56<br>7 I think that she talked to him separately. 12:19:58<br>8 Q. Did you advise the people internally of your<br>12:20:00<br>9 anticipated decision for the purpose of 12:20:04<br>10 getting them to weigh in on the decision as 12:20:07<br>11 well? 12:20:10<br>12 A. Well, I'm the person who makes the decision.<br>12:20:10<br>13 But, certainly, if other people had other 12:20:12<br>14 views about how -- what -- about my decision<br>12:20:14<br>15 if they viewed it differently, you know, of 12:20:18<br>16 course I would welcome their feedback. This<br>12:20:21<br>17 is a collaborative process. I don't make 12:20:23<br>18 this decision in a vacuum. 12:20:25<br>19 Q. Did Mr. Gutterman ever indicate to you that<br>12:20:26<br>20 he disagreed with any of the analysis that 12:20:28<br>21 you performed? 12:20:31<br>22 A. No, he did agree. 12:20:31<br>23 Q. Did Mr. Williams ever indicate to you that he<br>12:20:33<br>24 disagreed with any of the analysis you 12:20:36<br>25 performed? 12:20:38 | Plaintiff's Objections:<br>Page 480:19-481:7<br>Lack of foundation and<br>speculation as to what Mr.<br>Gutterman and Mr.<br>Williams and Ms. Gooley<br>believed. Hearsay to the<br>extent testimony conveys<br>that they stated they agreed<br>with Ms. Johnson.<br><br>Defendant's Response:<br>This is not opinion<br>testimony. The witness's<br>knowledge, research and<br>response to the claim are<br>relevant; not unfairly<br>prejudicial to Plaintiffs, not<br>confusing, misleading or<br>cumulative evidence. Not<br>offered for the truth of the<br>matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| Page 481<br><br>1 A. No, he also agreed. 12:20:39<br>2 Q. Did Ms. Gooley ever indicate to you that she 12:20:40<br>3 disagreed with any of the analysis you 12:20:44<br>4 performed? 12:20:46<br>5 A. No. All of us agreed that the war exclusion 12:20:46<br>6 applied. We did not even think this was a 12:20:49<br>7 close call. 12:20:51<br>8 Q. How confident did you feel in the analysis 12:20:52<br>9 that you performed? 12:20:54<br>10 A. I felt very confident. 12:20:54<br>11 Q. When the decision was eventually made to deny 12:20:58<br>12 the claim, are you the person who made the 12:21:01<br>13 decision? 12:21:03<br>14 A. I am. 12:21:03<br>15 Q. Do you know at about what date that final 12:21:04<br>16 decision was made? 12:21:08<br>17 A. No, I couldn't tell you exactly. I mean, 12:21:09<br>18 obviously, I was probably pretty close to the 12:21:14<br>19 decision if I was communicating to the 12:21:17<br>20 insured that we were seriously considering 12:21:19<br>21 it, because I wanted to alert them that, you 12:21:21<br>22 know, this could be coming down the pike and 12:21:24<br>23 you should be prepared for it. But there 12:21:26<br>24 were probably other things that I wanted to 12:21:29<br>25 look at, and certainly internal dialog that I 12:21:33<br><br>Page 482<br><br>1 wanted to have before I communicated the 12:21:36<br>2 final decision to them. 12:21:38<br>3 Q. Did you have the opportunity to pursue those 12:21:39<br>4 avenues before you did communicate the final 12:21:41<br>5 decision to them? 12:21:43<br>6 A. Yes. 12:21:44<br>7 (Whereupon, Exhibit 250 was 12:21:45<br>8 marked for identification.) 12:21:45<br>9 BY MS. REED: 12:21:45<br>10 Q. Let me hand you Exhibit 250, please, ma'am. 12:21:46<br>11 Can you identify Exhibit 250 as an 12:21:57<br>12 e-mail string which culminates in a message | |

| Deposition Designation | Objection & Response |
|---|---|
| 12:21:59<br>13 from you to Ms. Weiss, Ms. Garber and 12:22:02<br>14 Mr. Gutterman setting up arrangements for a 12:22:05<br>15 conference call on July the 22nd? 12:22:09<br>16 A. Yes. So this was the following Tuesday, and 12:22:12<br>17 we were setting up a conference call. 12:22:14<br>18 Q. So July the 22nd was one week since your 12:22:16<br>19 first interaction with Ms. Weiss and 12:22:20<br>20 Ms. Garber? 12:22:22<br>21 A. That's correct. 12:22:23<br>22 Q. Did you have an anticipated agenda to cover 12:22:27<br>23 on the July 22nd call? 12:22:29<br>24 A. Yes. I wanted to tell them that the claim 12:22:31<br>25 would not be covered. 12:22:34<br><br>Page 483<br><br>1 Q. And was that something that you would 12:22:35<br>2 communicate as part of your practice by 12:22:38<br>3 telephone rather than in a letter to begin 12:22:40<br>4 with? 12:22:42<br>5 A. Well, since -- since time is of the essence 12:22:42<br>6 with production claims, yes, we usually will 12:22:46<br>7 give an oral answer and say we're going to be 12:22:48<br>8 following up with a detailed letter. 12:22:51<br>9 Q. What did you cover when the call on July the 12:22:54<br>10 22nd occurred? 12:22:59<br>11 A. Well, again, we talked about the facts that 12:23:01<br>12 we had gathered, we talked about what our 12:23:04<br>13 process was in evaluating the claim. Both 12:23:07<br>14 Susan and Andrea were not happy with the 12:23:09<br>15 decision. And, again, at some point in time 12:23:12<br>16 Susan was asking me if we had gotten an 12:23:16<br>17 outside coverage opinion, and I don't 12:23:20<br>18 remember if it was in the previous call or if 12:23:21<br>19 it was in this call. But -- but that was 12:23:23<br>20 something that -- that she wanted to know, in 12:23:25<br>21 other words, was I only relaying upon my own 12:23:27<br>22 judgment or had I gotten additional advice 12:23:30<br>23 from outside coverage counsel. 12:23:34<br>24 Q. Did you discuss your analysis and the reasons 12:23:42<br>25 that you had reached your conclusions on that 12:23:49 | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 484 | |

1 call? 12:23:51
2 A. I believe so, yes. 12:23:51
3 Q. Did Ms. Weiss or Ms. Garber make any specific 12:23:52
4 responses to you about the specifics you 12:23:56
5 described? 12:23:58
6 A. No. They weren't happy with the decision and 12:23:59
7 it was not an extremely lengthy call. You 12:24:02
8 know, again, they emphasized that this 12:24:07
9 exclusion could not apply, because Hamas is a 12:24:08
10 terrorist organization. So they told me, you 12:24:10
11 know, that they did not agree with my 12:24:13
12 analysis, they did not agree that the war 12:24:15
13 exclusion had any applicability in this 12:24:17
14 situation, and that this was an act of 12:24:20
15 terrorism, that an act of terrorism is what 12:24:22
16 had caused them to move the production and, 12:24:24
17 therefore, the war exclusion could not apply. 12:24:27
18 Q. Did you discuss with them any research or 12:24:31
19 analysis that you had performed in regard to 12:24:34
20 Hamas or Hamas's actions? 12:24:36
21 A. I did, yes. 12:24:38
22 Q. And what did you say? 12:24:39
23 A. I can't tell you as I sit here today exactly 12:24:40
24 what I told them, but I'm sure I explained 12:24:43
25 how I had reached this conclusion. But as I 12:24:45

Page 485

1 said, it wasn't a very lengthy call. Once 12:24:48
2 they heard what my decision was and told me 12:24:53
3 that they thought I was wrong and we had some 12:24:55
4 discussion, they -- you know, they ended the 12:24:58
5 call. 12:25:00
6 Q. Did the call end with a to-do list for either 12:25:00
7 one of you? 12:25:02
8 A. Not that I recall. 12:25:05
9 Q. What was going to occur next? 12:25:06
10 A. They wanted a written decision and they 12:25:08
11 wanted a written decision as soon as 12:25:10
12 possible. 12:25:14
13 Q. And did you commit to get them a written 12:25:14

| Deposition Designation | Objection & Response |
|---|---|
| 14 decision as soon as you could? 12:25:16<br>15 A. I did. 12:25:17<br><br>25 Q. Ms. Johnson, did you prepare a written denial 12:43:19<br><br>Page 486<br><br>1 letter for the Dig claim? 12:43:22<br>2 A. I did. 12:43:23<br>3 Q. Did you endeavor to meet the requested timing 12:43:23<br>4 that the insured and its broker submitted to 12:43:26<br>5 you? 12:43:30<br>6 A. I did. 12:43:30<br>7 Q. Was there external circumstances that 12:43:31<br>8 prohibited you from doing that? 12:43:34<br>9 A. Yes. I don't recall exactly what was going 12:43:35<br>10 on, but there was also a fire in another 12:43:38<br>11 case, and so it took me an extra day to 12:43:40<br>12 finish the letter and get it to them. 12:43:44<br>13 (Whereupon, Exhibit 251 was 12:43:46<br>14 marked for identification.) 12:43:47<br>15 BY MS. REED: 12:43:47<br>16 Q. Let me hand you Exhibit 251, please, ma'am. 12:43:47<br>17 Did you advise the insured, "Profuse 12:43:51<br>18 apologies, but I will not be able to get the 12:43:53<br>19 coverage letter to you until Monday"? 12:43:57<br>20 A. Yes. 12:43:59<br>21 Q. And what response did you receive from 12:43:59<br>22 Ms. Weiss? 12:44:01<br>23 A. "It is imperative that we receive this on 12:44:02<br>24 Monday morning. NBCU has been asking about 12:44:04<br>25 this on a regular basis and we told them that 12:44:08<br><br>Page 487<br><br>1 they'd be receiving the opinion letter by the 12:44:10<br>2 end of this week." 12:44:12<br>3 Q. And did you continue to make your best 12:44:13<br>4 efforts to get that letter to them as quickly 12:44:15<br>5 as you could? 12:44:17<br>6 A. I did. 12:44:18<br>7 (Whereupon, Exhibit 252 was 12:44:24<br>8 marked for identification.) 12:44:25<br>9 BY MS. REED: 12:44:25<br>10 Q. Let me hand you Exhibit 252, please, ma'am. 12:44:25<br>11 Can you identify Exhibit 252 as an 12:44:32 | |

| Deposition Designation | Objection & Response |
|---|---|
| 12 e-mail from yourself to Ms. Gooley and 12:44:34<br>13 Mr. Williams copied to Christopher Paar? 12:44:37<br>14 A. Yes. 12:44:40<br>15 Q. What was the purpose of this e-mail, please, 12:44:41<br>16 ma'am? 12:44:43<br>17 A. I was sending them my letter that I had 12:44:43<br>18 planned to send to Susan Weiss, so I was 12:44:47<br>19 sending it to them to review in case they had 12:44:51<br>20 any questions or comments before I sent it on 12:44:55<br>21 to the insured. 12:44:58<br>22 Q. Was it part of your personal practice to seek 12:44:58<br>23 input about a denial letter from your 12:45:01<br>24 colleagues before it was sent out? 12:45:03<br>25 A. Yes, in most circumstances, and certainly 12:45:04<br><br>Page 488<br><br>1 in -- in a case like this with a client like 12:45:10<br>2 NBC. 12:45:15<br>3 Q. And thy were you seeking input from 12:45:15<br>4 Theresa Gooley? 12:45:18<br>5 A. Because she was my supervisor and I had 12:45:18<br>6 discussed this claim with her. 12:45:20<br>7 Q. And why were you seeking input from 12:45:22<br>8 Mr. Williams? 12:45:24<br>9 A. Because this was his insured as well, and he 12:45:25<br>10 would be the one who was hearing from the 12:45:27<br>11 insured after they received the letter, in 12:45:29<br>12 all likelihood. 12:45:31<br>13 Q. Did Ms. Gooley have any substantive changes 12:45:32<br>14 or comments? 12:45:36<br>15 A. She made one stylistic changes to the first 12:45:37<br>16 paragraph of the letter, and I do not think I 12:45:41<br>17 adopted the change. 12:45:43<br>18 Q. Was there a reason? 12:45:44<br>19 A. That I didn't adopt the change? 12:45:45<br>20 Q. Yes, ma'am. 12:45:47<br>21 A. Well if it's stylistic, you know, the letter 12:45:48<br>22 has to sound as though it's in my voice, 12:45:51<br>23 because it is my voice, so that's probably 12:45:54<br>24 why. 12:45:56<br>25 Q. Did Mr. Williams make any comments to the 12:45:56<br><br>Page 489 | |

| Deposition Designation | Objection & Response |
|---|---|
| 1 letter? 12:45:59<br>2 A. Not that I recall. 12:45:59<br>3 Q. Did Ms. Gooley indicate to you that she 12:46:01<br>4 agreed with the analysis that you were going 12:46:04<br>5 to provide to the insured? 12:46:06<br>6 A. She did. 12:46:08<br>7 Q. Did Mr. Williams indicate to you that he 12:46:08<br>8 agreed with the analysis you were going to 12:46:11<br>9 provide to the insured? 12:46:13<br>10 A. He did. 12:46:13<br>11 Q. Let me hand you what's been previously marked 12:46:27<br>12 as Defendant's Exhibit 36, please, ma'am. 12:46:29<br>13 Can you identify this as an e-mail 12:46:32<br>14 that you sent to Ms. Weiss and Ms. Garber 12:46:36<br>15 attaching a coverage determination letter? 12:46:38<br>16 A. Yes, it is -- it is sending them our coverage 12:46:40<br>17 determination. 12:46:45<br>18 Q. And let me also hand you what's been marked 12:46:45<br>19 as Defendant's Exhibit 37, please, ma'am. 12:46:48<br>20 Can you identify Exhibit 37 as a 12:46:53<br>21 corrected version of the coverage 12:46:56<br>22 determination letter you sent to Ms. Weiss 12:46:58<br>23 and Ms. Garber? 12:47:02<br>24 A. Yes, it appears that I noticed that the 12:47:02<br>25 automatic page numbering did not seem to be 12:47:05<br><br>Page 490<br><br>1 working, so I fixed it. 12:47:07<br>2 Q. All right. Let me ask you to refer to the 12:47:11<br>3 attachment to this letter, please, ma'am. 12:47:13<br>4 Is this the final version that you 12:47:15<br>5 provided to the insured and its broker? 12:47:16<br>6 A. Yes, it appears to be so. 12:47:19<br>7 Q. Did you write this letter? 12:47:25<br>8 A. I did. 12:47:27<br>9 Q. And is this your analysis that you were 12:47:28<br>10 providing to your insured? 12:47:32<br>11 A. Yes, it is. 12:47:34<br>12 Q. Did you provide notice to the insured of all 12:47:35<br>13 parts of the war exclusion having 12:47:41<br>14 applicability to the facts of the claim? 12:47:45<br>15 A. Yes. I cited in the letter the portions of 12:47:47<br>16 the war exclusion that I thought had 12:47:56<br>17 potential applicability here, yes. 12:47:57<br>18 Q. Was the discussion that you provided in the 12:47:59<br>19 written coverage letter consistent with the 12:48:03 | |

| Deposition Designation | Objection & Response |
|---|---|
| 20 information that you had previously shared 12:48:06<br>21 verbally? 12:48:07<br>22 A. Yes. 12:48:08<br>23 (Whereupon, Exhibit 253 was 12:48:22<br>24 marked for identification.) 12:48:26<br>25 BY MS. REED: 12:48:26<br><br>Page 491<br><br>1 Q. Let me hand you Exhibit 253, please, ma'am. 12:48:26<br>2 Can you identify Exhibit 253 as an 12:48:31<br>3 e-mail sent by Andrea Garber to you dated 12:48:35<br>4 July 31st, 2014? 12:48:38<br>5 A. Yes, it's a letter from her saying that they 12:48:41<br>6 disagree with my analysis and my conclusions 12:48:44<br>7 and they will prepare a substantive response 12:48:47<br>8 which they expect to provide to me within the 12:48:50<br>9 next week. 12:48:52<br>10 Q. Did you have any verbal conversations with 12:48:54<br>11 Ms. Garber or Ms. Weiss after you sent the 12:48:57<br>12 coverage determination letter? 12:49:00<br>13 A. Ever? 12:49:06<br>14 Q. In regard to your coverage determination 12:49:08<br>15 letter. 12:49:10<br>16 A. I don't recall having any conversations with 12:49:11<br>17 them after I had sent the letter and after 12:49:14<br>18 they sent me this e-mail. I mean, we were 12:49:17<br>19 waiting for their response. 12:49:21<br>20 (Whereupon, Exhibit 254 was 12:49:26<br>21 marked for identification.) 12:49:28<br>22 BY MS. REED: 12:49:28<br>23 Q. Let me hand you Exhibit 254, please, ma'am. 12:49:28<br>24 A. Yes. 12:49:34<br>25 Q. Can you identify Exhibit 254, please? 12:49:35<br><br>Page 492<br><br>1 A. Yes. It is an e-mail from Bertha Garcia to 12:49:39<br>2 me with a cc to Tania Hoff, Andrea Garber and 12:49:45<br>3 Lucia Coyoca. And it says, "Please see the 12:49:50<br>4 attached letter." She is attaching a letter 12:49:54<br>5 signed by Ms. Coyoca dated August 13th, 2014. 12:49:56<br>6 Q. Was this the response that the insured 12:50:02<br>7 indicated that you were going to be 12:50:06<br>8 receiving? 12:50:08 | |

| Deposition Designation | Objection & Response |
|---|---|
| 9 A. Yes. 12:50:08<br>10 Q. What did you do in terms of additional work 12:50:09<br>11 or analysis after receiving the letter 12:50:16<br>12 attached to Exhibit 254? 12:50:19<br>13 A. Well, it is my practice and the practice of 12:50:21<br>14 the people in the claims group that if you 12:50:25<br>15 get a letter from the insured stating that 12:50:27<br>16 they want you to reconsider your coverage 12:50:30<br>17 opinion and providing any further information 12:50:33<br>18 that they want you to consider, that you do a 12:50:36<br>19 reevaluation and consider the information 12:50:38<br>20 that they have set before you. 12:50:40<br>21 Q. Did you do a reevaluation after you received 12:50:42<br>22 the August 13th letter? 12:50:45<br>23 A. I did. I read her letter carefully and 12:50:46<br>24 looked at the case law that she cited in her 12:50:50<br>25 letter, and it did not change my -- my 12:50:53<br><br>Page 493<br><br>1 opinion. 12:51:00<br>2 Q. Do you recall reviewing each of the cases 12:51:01<br>3 that she cited? 12:51:03<br>4 A. I did. 12:51:04<br>5 Q. Do you believe that you had seen those cases 12:51:06<br>6 as part of your initial research that you 12:51:09<br>7 conducted into the case? 12:51:11<br>8 A. Certainly many of them were. The ones that 12:51:13<br>9 concerned the war exclusion were things that 12:51:23<br>10 I had looked at. I think that there were a 12:51:25<br>11 couple of cases that she had referred to not 12:51:28<br>12 concerning the war exclusion, but just in 12:51:40<br>13 terms of insurance contract interpretation 12:51:43<br>14 that I went back and read to make sure that I 12:51:50<br>15 was aware exactly what they said. 12:51:53<br>16 Q. Did you read the California statutes that 12:51:54<br>17 apply in regard to construction of insurance 12:51:59<br>18 contracts? 12:52:04<br>19 A. I did. 12:52:04<br>20 Q. Did you view the war exclusions as being 12:52:05<br>21 ambiguous in any way? 12:52:08<br>22 A. No. 12:52:10<br>23 Q. Did you analyze whether the language in the | Plaintiff's Objections:<br>Page 493:20-494:3<br>F.R.E. 602, 701<br>Improper legal opinion about whether exclusion is "ambiguous" and what the case law says regarding ambiguity.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant. |

| Deposition Designation | Objection & Response |
|---|---|
| 12:52:10<br>24 war exclusions has been determined to be 12:52:16<br>25 ambiguous by anyone, any court? 12:52:18 | |
| Page 494<br><br>1 A. I don't recall that there's any court that 12:52:21<br>2 said that there was ambiguity, or certainly 12:52:23<br>3 not in this kind of context. 12:52:36<br>4 Q. Did you continue to analyze factual 12:52:37<br>5 information and research factual information 12:52:39<br>6 as part of your reconsideration? 12:52:41<br>7 A. I did, yes. 12:52:43<br>8 Q. Were there additional factual developments 12:52:44<br>9 that occurred through August the 13th? 12:52:47<br>10 A. Things were not going well in Israel at all. 12:52:49<br>11 There was continued escalation, there was a 12:52:55<br>12 lot of damage in Gaza, and there continued to 12:52:57<br>13 be a lot of civilian deaths in -- in Gaza 12:53:03<br>14 and the -- the fighting continued. 12:53:07<br>15 Q. Did it continue to be a mutual exchange of 12:53:11<br>16 hostility? 12:53:15<br>17 A. It did, yes. 12:53:16<br>18 Q. When you conducted your research, were the 12:53:17<br>19 same types of weaponry being used as you had 12:53:21<br>20 noted the month before? 12:53:25<br>21 A. Yes. 12:53:26<br>22 Q. Did Ms. Coyoca raise any arguments that you 12:53:36<br>23 had not previously analyzed as part of your 12:53:41<br>24 initial work on the claim? 12:53:45<br>25 A. Ms. Coyoca was taking the same position, that 12:54:32 | Plaintiff's Objections:<br>Page 494:8-21<br>MIL 3; F.R.E. 402-403<br>For the reasons discussed in MIL No. 3, Israel's conduct in Gaza after Plaintiffs decided to relocate is irrelevant and substantially more prejudicial than probative, likely to confuse the issues and mislead the jury.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807. |
| Page 495<br><br>1 if Hamas is defined as a terrorist 12:54:36<br>2 organization, then it can't possibly be a 12:54:39<br>3 semi-sovereign nation. And I did not agree 12:54:42<br>4 with that analysis. That was something that 12:54:45<br>5 I considered. 12:54:47<br>6 And I disagreed with her analysis 12:54:48 | Plaintiff's Objections:<br>Page 495:10-13<br>F.R.E. 402-403<br>Defendant has conceded that the TRIA endorsement for certified acts of |

| Deposition Designation | Objection & Response |
|---|---|
| 7 with regard to whether or not the hostilities 12:54:50<br>8 constituted a warlike action. She said that 12:54:52<br>9 they did not. 12:54:55<br>10 And I agreed with her that the 12:54:58<br>11 certified acts of terrorism did not apply to 12:55:02<br>12 this claim, because this was not a certified 12:55:04<br>13 act of terrorism. 12:55:07<br>14 Q. Did you prepare a letter to go back to the 12:55:18<br>15 insured to document your reconsideration of 12:55:21<br>16 the claim? 12:55:24<br>17 A. I did. 12:55:25<br>18 (Whereupon, Exhibit 255 was 12:55:33<br>19 marked for identification.) 12:55:35<br>20 BY MS. REED: 12:55:35<br>21 Q. Let me hand you Exhibit 255, please, ma'am. 12:55:36<br>22 Can you identify Exhibit 255? 12:55:39<br>23 A. Yes. 12:55:43<br>24 Q. What is it? 12:55:44<br>25 A. It is my supplemental coverage letter. And I 12:55:46 | terrorism in the U.S. is irrelevant—coverage for terrorism in this case falls under the imminent peril provision.<br><br>Testimony concerning this other provision for "certified acts of terror" is likely to confuse the issues and mislead the jury.<br><br><u>Defendant's Response:</u> ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought and the witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. |
| Page 496<br><br>1 was sending it to Susan Weiss telling her 12:55:51<br>2 that I intended to send it to NBC's counsel, 12:55:53<br>3 because it is my practice that if you're 12:55:58<br>4 going to deny a claim, you let the broker 12:56:00<br>5 know and certainly you -- it's good to alert 12:56:02<br>6 them as to what your arguments are so if they 12:56:07<br>7 have pushback, they can give you that 12:56:11<br>8 pushback before you send it on to the 12:56:13<br>9 insured. 12:56:15<br>10 Q. Where did you obtain the factual information 12:56:28<br>11 that you recited in this letter in terms of 12:56:29<br>12 the conflict? 12:56:33<br>13 A. From news organizations, certainly. It looks 12:56:37<br>14 like I cite some case law. I cite the policy 12:56:41<br>15 again, and the Zanotti report again. So it 12:56:46<br>16 looks like I was referring to the same types 12:56:59<br>17 of research that I had done before. 12:57:01<br>18 Q. Does this indicate to you that you had also 12:57:05 | <u>Plaintiff's Objections:</u> Page 496:18- 497:18 MIL 3; F.R.E. 402-403 Given the Ninth Circuit's order, Israel's actions in Gaza after Plaintiffs decided to relocate is irrelevant and substantially more prejudicial than probative, for the reasons set forth in MIL No. 3.<br><br><u>Defendant's Response:</u> "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. The witness's knowledge, research and response to the claim are relevant; not |

| Deposition Designation | Objection & Response |
|---|---|
| 19 updated your research including through the 12:57:08<br>20 end of the conflict on August 26th, 2014? 12:57:11<br>21 A. Yes, this indicates that -- that -- I was 12:57:21<br>22 explaining to them the amount of -- or the 12:57:26<br>23 casualties from the conflict. It says that, 12:57:32<br>24 "The conflict extended until August 26th of 12:57:35<br>25 2014," that, "2,143 Palestinians and 69 12:57:37<br><br><br>Page 497<br>1 Israelis were killed," that, "Israel struck 12:57:42<br>2 5,283 targets in Gaza, Hamas fired 4,564 12:57:45<br>3 rockets into Israel, and more than 50,000 12:57:51<br>4 buildings in Gaza were damaged or destroyed." 12:57:54<br>5 Q. Did you do any research regarding the facts 12:57:58<br>6 of reconstruction or rebuilding that was 12:58:02<br>7 necessary in either territory? 12:58:05<br>8 A. Well, it was clear just from the facts that I 12:58:14<br>9 just recited there had been significant 12:58:16<br>10 damage to Gaza that was going to need 12:58:22<br>11 rebuilding. 12:58:24<br>12 Q. Did you gain an understanding about how or 12:58:24<br>13 why the conflict ended August 26th, 2014? 12:58:27<br>14 A. I believe that it ended due to a cease fire. 12:58:31<br>15 They certainly had not reached any particular 12:58:35<br>16 resolution. 12:58:37<br>17 (Whereupon, Exhibit 256 was 12:58:49<br>18 marked for identification.) 12:58:51<br>19 BY MS. REED: 12:58:51<br>20 Q. Let me hand you Exhibit 256, please, ma'am. 12:58:51<br>21 Can you identify Exhibit 256 as an 12:58:55<br>22 e-mail that you sent to Lucia Coyoca on 12:58:58<br>23 Tuesday, September the 30th, 2014? 12:59:01<br>24 A. Yes. It looks like I was sending the letter 12:59:04<br>25 on to Lucia at that time. And it says, "Many 12:59:11<br><br>Page 498<br><br>1 apologies. I thought I sent this letter to 12:59:13<br>2 the on the 19th, I apologize if it didn't 12:59:16<br>3 reach you." 12:59:18<br>4 Q. Had you received a contact indicating that 12:59:19 | unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. |

| Deposition Designation | Objection & Response |
|---|---|
| 5 she was requesting the letter? 12:59:22<br>6 A. Yes. 12:59:28<br><br>Page 500<br><br>24 Q. When plaintiff's counsel conducted your 13:02:23<br>25 examination in this case, she showed you a 13:02:25<br><br>Page 501<br><br>1 document entitled, "General Claims 13:02:29<br>2 Practices." Do you recall those? 13:02:32<br>3 A. I do. 13:02:33<br>4 Q. Are those requirements that are in effect? 13:02:34<br>5 A. No, they're not requirements. 13:02:38<br>6 Q. How do you describe them? 13:02:39<br>7 A. I would say that they're guidelines. They're 13:02:41<br>8 not something that -- they're not rules, 13:02:44<br>9 they're not hard and fast. They're -- 13:02:46<br>10 they're guidelines of things that claim 13:02:52<br>11 handlers should consider and think about with 13:02:54<br>12 regard to how to handle claims, but each 13:02:54<br>13 claim is fact specific, and therefore, you 13:02:56<br>14 know, there's no set of rules that you can 13:02:57<br>15 say that apply in absolutely every situation. 13:02:59<br>16 Q. In questioning by the plaintiff's counsel, 13:03:03<br>17 you discussed some general insurance theories 13:03:06<br>18 about contracts of adhesion. Do you recall 13:03:08<br>19 that? 13:03:10<br>20 A. I do. 13:03:10<br>21 Q. Were you describing the NBCUniversal 13:03:11<br>22 entertainment policy as a contract of 13:03:16<br>23 adhesion? 13:03:18<br>24 A. No, this is not a contract of adhesion. This 13:03:19<br>25 is a contract that was reached by very 13:03:22<br><br>Page 502<br><br>1 sophisticated parties. As I said before, 13:03:25<br>2 when Ms. Coyoca was taking my deposition, 13:03:27<br>3 it's my understanding that this policy was 13:03:32<br>4 actually supplied to us by the insured and by 13:03:35<br>5 Aon, that this is not a document that we 13:03:37<br>6 wrote or selected, that this was their choice 13:03:40<br>7 of policy. 13:03:42 | |

| Deposition Designation | Objection & Response |
|---|---|
| PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 502<br><br>8 Q. When did you leave the employment of 13:03:43<br>9 OneBeacon? 13:03:45<br>10 A. May of 2015. 13:03:45<br>11 Q. Why did you leave? 13:03:50<br>12 A. They were reorganizing the claim division and 13:03:51<br>13 they were downsizing, and so my -- the duties 13:03:55<br>14 of being a claim lead for entertainment were 13:03:59<br>15 consolidated with another -- to another claim 13:04:01<br>16 lead who also headed up public sector, and so 13:04:04<br>17 I was let go and given a very good severance 13:04:09<br>18 package. 13:04:12<br>3 Q. How long did it take you from start to finish 14:15:14<br>4 to read the entire Congressional Research 14:15:17<br>5 Service report? 14:15:20<br>6 A. The Zanotti report? 14:15:20<br>7 Q. Yes. 14:15:22<br>8 A. Well, certainly more than a couple of hours. 14:15:22<br>9 Q. More than ten hours? 14:15:26<br>10 A. No. 14:15:28<br>11 Q. More than five hours? 14:15:30<br>12 A. Probably not, no. 14:15:32<br>13 Q. More than four hours? 14:15:33<br>14 A. I just don't know. 14:15:36<br>15 Q. So is your best estimate an amount of time in 14:15:37<br>16 between two to five hours? 14:15:42<br>17 A. Yes. 14:15:43<br>18 Q. You testified that you had pulled a Wikipedia 14:16:02<br>19 article with respect to Hamas and that you 14:16:06<br>20 looked at the citation of various authorities 14:16:11<br>21 and used that as a point of reference to gain 14:16:14<br>22 information about Hamas, the citations to the 14:16:18<br>23 various authorities that are listed in the 14:16:21<br>24 article; is that right? 14:16:23<br>25 A. That's correct. 14:16:24<br><br>Page 507<br>1 Q. Do you know who wrote the Hamas Wikipedia 14:16:24 | |

| Deposition Designation | Objection & Response |
|---|---|
| 2 article? 14:16:28<br>3 A. As I sit here today, I couldn't tell you, and 14:16:29<br>4 it's probably a compilation of more than one 14:16:31<br>5 person. 14:16:35<br><br>Page 508<br><br>19 Q. Okay. And this article bears a print date, 14:20:04<br>20 Exhibit 240, of 1/5/2017, or it has a date at 14:20:07<br>21 the top of the page that says 1/5/2017. Did 14:20:14<br>22 the article that you reviewed in July of 2014 14:20:18<br>23 have a date of 1/5/2017 on it? 14:20:21<br>24 A. Well, I would doubt that it did. 14:20:26<br>25 Q. I would doubt it also. 14:20:28<br><br><br><br>Page 509<br><br>16 Q. Do you recall what version of the Wikipedia 14:21:04<br>17 article that you actually reviewed as you sit 14:21:06<br>18 here today? 14:21:09<br>19 A. I don't, no. It was whatever was available 14:21:09<br>20 on the day that I looked it up. 14:21:12<br>21 Q. And do you know -- you indicated that -- that 14:21:18<br>22 there may have been a group of individuals 14:21:23<br>23 that wrote the article. Do you know if the 14:21:25<br>24 group of individuals or the individual who 14:21:26<br>25 wrote the article, do you have any idea 14:21:28<br><br>Page 510<br><br>1 whether or not they have any type of 14:21:30<br>2 affiliation with the Palestinian cause? 14:21:31<br><br>5 THE WITNESS: I don't. But as I 14:21:38<br>6 said, I didn't rely upon the Wikipedia 14:21:39<br>7 article as an authoritative source. 14:21:42<br><br>Page 511<br><br>17 Q. To your knowledge, Ms. Johnson, was there any 14:23:24<br>18 filming of the television production Dig that 14:23:27<br>19 was scheduled to take place in the Gaza 14:23:30<br>20 strip? 14:23:32 | |

731

| Deposition Designation | Objection & Response |
|---|---|
| 21 A. No, not to my knowledge. 14:23:34<br>22 Q. To your knowledge, Ms. Johnson, was there a 14:23:42<br>23 unity government agreement entered into in 14:23:45<br>24 June of 2014 between Hamas and Fatah? 14:23:50<br><br>Page 512<br><br>2 THE WITNESS: Well, as I 14:23:56<br>3 previously testified, in -- in the research 14:23:58<br>4 that I did I did learn that Hamas and Fatah, 14:24:02<br>5 who were two separate factions within the 14:24:05<br>6 Palestinian government, had come together to 14:24:11<br>7 try to form some kind of agreement between 14:24:13<br>8 each other in June. 14:24:16<br><br>Page 513<br><br>1 Q. You did not spend a lot of time looking into 14:24:48<br>2 whether or not a unity agreement had been 14:24:50<br>3 entered into between Fatah and Hamas in June 14:24:54<br>4 of 2014; is that correct? 14:24:57<br><br>7 THE WITNESS: I did not spend a 14:25:02<br>8 lot of time looking at that, no. I knew 14:25:04<br>9 that -- that tensions had -- had increased 14:25:06<br>10 between Israel and -- and Hamas and Fatah 14:25:09<br>11 based on the fact that they were forming that 14:25:15<br>12 agreement, but -- but -- but beyond that, I 14:25:17<br>13 did not look at it with any specificity. 14:25:20<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 513<br><br>15 Q. During your direct examination -- or, excuse 14:25:32<br>16 me, during your cross-examination by Ms. Reed 14:25:34<br>17 this morning, you testified that you had 14:25:37<br>18 reviewed several articles and looked at 14:25:40<br>19 various types of information online by 14:25:45<br>20 performing Google searches; is that correct? 14:25:48<br>23 THE WITNESS: I did a lot of 14:25:53<br>24 online research. 14:25:54<br>25 BY MS. COYOCA: 14:25:55 | |

| Deposition Designation | Objection & Response |
|---|---|
| Page 514 | |

Page 514

1 Q. Did you also read articles? 14:25:55
2 A. Yes, I read a lot of articles. 14:25:57
3 Q. Did you obtain at least some of those 14:25:59
4 articles from an online source? 14:26:01
5 A. Yes. 14:26:04
6 Q. Did you obtain any articles from any print, 14:26:05
7 paper publications? 14:26:10
8 A. I'm sorry, I'm not sure what you mean. 14:26:14
9 Q. Did you perform all of your research in terms 14:26:17
10 of gathering articles and information, was 14:26:20
11 that all performed electronically or did you 14:26:22
12 look to paper, print publications for 14:26:24
13 articles or quarterly or -- or any other kind 14:26:27
14 of paper information? 14:26:31
15 A. No, I didn't go to the library and look up 14:26:33
16 various articles. I -- I looked at news 14:26:36
17 sources that are contained online, for 14:26:39
18 example, the -- the article that was cited to 14:26:41
19 by The Washington Post, that was an article 14:26:46
20 that I found online. 14:26:48
21 Q. Okay. What about the other articles that you 14:26:49
22 discussed this morning with Ms. Reed, the -- 14:26:54
23 the articles that are -- appeared in the 14:26:59
24 Global News and the Middle East Eye? 14:27:02
25 A. No, those are articles I found online. 14:27:09

Page 515

1 Q. What did you do in order to determine whether 14:27:11
2 or not the sources that you reviewed were 14:27:20
3 reliable? 14:27:23
4 A. Well, as you could see from my testimony 14:27:23
5 earlier today, I looked at a variety of 14:27:26
6 sources. And if -- if many of the sources 14:27:30
7 were citing the same information and that 14:27:32
8 same information was also being put forth by 14:27:35
9 a variety of news sources, including U.S. 14:27:37
10 news sources, then I deemed it to be 14:27:42
11 reliable. 14:27:44
12 Q. So for your purposes, reliability was 14:27:44
13 determined based on whether or not there was 14:27:49
14 a corollary U.S. publication that contained 14:27:51
15 the same information? 14:27:55

| Deposition Designation | Objection & Response |
|---|---|
| 16 A. Well -- 14:27:56<br>20 THE WITNESS: With regard to the 14:28:01<br>21 facts of -- as to what was actually happening 14:28:02<br>22 on the ground in Israel, if there were 14:28:04<br>23 several different news sources, for example, 14:28:07<br>24 if the Israeli newspaper is saying this is 14:28:09<br>25 what's happening, and The Washington Post is 14:28:11<br><br>Page 516<br><br>1 saying this is what's happening, and MSNBC is 14:28:14<br>2 saying that this is what's happening, if all 14:28:18<br>3 three are saying that the same behavior is 14:28:21<br>4 occurring, then, yes, I deemed that to be 14:28:23<br>5 reliable. 14:28:25<br>6 BY MS. COYOCA: 14:28:26<br>7 Q. What about with respect to the 14:28:26<br>8 Middle East Eye, what did you do to determine 14:28:28<br>9 whether or not that was a reliable source of 14:28:30<br>10 information? 14:28:32<br>13 beyond the scope. 14:28:35<br>14 THE WITNESS: I -- I think I just 14:28:37<br>15 explained how I determined the reliability of 14:28:39<br>16 the information that I got from the 14:28:43<br>17 Middle East Eye and other articles that I 14:28:44<br>18 read. I looked at what they said, I looked 14:28:46<br>19 to see whether or not the same thing was said 14:28:49<br>20 by another source and by several other 14:28:51<br>21 sources, and if they all were -- were 14:28:54<br>22 reporting the same facts as to what was 14:28:56<br>23 happening in Israel at that particular time, 14:28:58<br>24 then I determined that it was probably 14:29:00<br>25 reliable. 14:29:02<br><br>BEGIN PLAINTIFFS' 106 COUNTER-<br>DESIGNATION<br>Page 517<br>2 Q. Did you do any investigation to determine<br>3 the -- the bias of any of the publications,<br>4 potential bias of any of the publications<br>5 that you were looking at?<br><br>9 THE WITNESS: Can you explain to<br>10 me what you mean by bias?<br><br>12 Q. Yes. Well, do you understand what the word<br>13 bias means? | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Defendant's Objection to Counter-Designation (Johnson Vol.2 at 517:2-20) – 401, 402, 403. Banter between deponent and counsel has no probative value in light of witness's answering of same question in subsequent lines.<br><br>Plaintiffs' Response to Objection to Counter: |

| Deposition Designation | Objection & Response |
|---|---|
| 15 THE WITNESS: I'm sorry, I asked<br>16 what your understanding of that word was, not<br>17 how you wanted me to interpret it. So why<br>18 don't you tell me how you want me to<br>19 interpret the word bias in terms of your<br>20 question.<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 517<br>22 Q. Ms. Johnson, you're -- you're a lawyer, 14:29:42<br>23 you're a very intelligent woman, obviously, 14:29:44<br>24 and I want to know if you have understanding 14:29:47<br>25 of the word bias, because I am sure that your 14:29:49<br><br>Page 518<br><br>1 understanding of the word bias will be 14:29:51<br>2 perfectly fine for purposes of my question. 14:29:54<br>5 THE WITNESS: When I think of the 14:30:00<br>6 word bias it means that a particular person 14:30:02<br>7 or organization is viewing facts from a 14:30:05<br>8 skewed angle that represents their own 14:30:08<br>9 opinion. 14:30:10<br>10 BY MS. COYOCA: 14:30:11<br>11 Q. That's a great definition of bias. 14:30:11<br>12 So my question to you is: Did you 14:30:13<br>13 review and try to determine the potential 14:30:15<br>14 bias of any of the publications that you 14:30:19<br>15 reviewed? 14:30:23<br>18 beyond the scope. 14:30:27<br>19 THE WITNESS: Well, I'm not sure 14:30:32<br>20 what you mean by did I undertake any means of 14:30:33<br>21 determining the bias. I mean, there are some 14:30:36<br>22 biases that are obvious. Obviously, there 14:30:39<br>23 are other states in -- or countries in the 14:30:42<br>24 Middle East that have a pro-Palestinian 14:30:44<br>25 slant, and there are other countries that 14:30:48<br><br>Page 519<br><br>1 have a pro-Israeli stance, the U.S., for 14:30:50<br>2 example. So if I was looking at a U.S. 14:30:53<br>3 source, you know, is it logical to assume 14:30:57<br>4 that there could be a pro-Israeli slant to 14:30:59<br>5 that, yes, but I trust that the U.S. -- well, 14:31:03<br>6 at least I hope that the U.S. news 14:31:06<br>7 organizations are trying to report the facts 14:31:10 | Necessary to complete testimony designated by Defendant at 517:22-521:14 re "bias." |

| Deposition Designation | Objection & Response |
|---|---|
| 8 as they occur and not with any kind of 14:31:12<br>9 particular political bias. 14:31:17<br>10 BY MS. COYOCA: 14:31:19<br>11 Q. So are you testifying that it's to the best 14:31:19<br>12 of your knowledge that any U.S. publication 14:31:22<br>13 that reports on the Hamas/Israeli conflict 14:31:27<br>14 would have a bias in favor of Israelis; is 14:31:32<br>15 that your testimony? 14:31:35<br>19 THE WITNESS: That's not what I 14:31:43<br>20 said. I said that I would hope and trust 14:31:44<br>21 that any U.S. organization, any reliable U.S. 14:31:47<br>22 organization and media would be giving us, 14:31:51<br>23 hopefully, an unbiassed recitation of what is 14:31:54<br>24 actually happening. 14:31:59<br>25 And, for example, in the -- the clip 14:32:01<br><br>Page 520<br><br>1 that we looked at from Face the Nation from 14:32:03<br>2 CBS News, you know, Holly Williams was saying 14:32:06<br>3 this is exactly what was happening and behind 14:32:12<br>4 her you could actually see what was 14:32:14<br>5 happening. So, no, I did not think that that 14:32:16<br>6 was the source that was biassed towards the 14:32:18<br>7 Israelis. 14:32:21<br>8 BY MS. COYOCA: 14:32:21<br>9 Q. What do you consider to be a reliable source? 14:32:21<br>12 THE WITNESS: Well, a reliable 14:32:28<br>13 source is going to be one that has the 14:32:31<br>14 indicia of being at least fairly unbiassed, 14:32:33<br>15 for example, The Washington Post, New York 14:32:41<br>16 Times, Wall Street Journal, I would view all 14:32:44<br>17 of them to -- to be unbiassed news 14:32:46<br>18 organizations that are going to tell me what 14:32:49<br>19 is happening rather than what their opinion 14:32:51<br>20 is about what is happening. 14:32:54<br>21 I would also trust that MSNBC, CNN, 14:32:57<br>22 CBS and ABC would also be reporting on what 14:33:01<br>23 is actually happening rather than their 14:33:05<br>24 opinion about what is happening. 14:33:07<br>25 BY MS. COYOCA: 14:33:09<br><br>Page 521 | |

| Deposition Designation | Objection & Response |
|---|---|
| 1 Q. What about the Middle East Eye, do you 14:33:10<br>2 consider that to be a reliable source? 14:33:12<br>5 THE WITNESS: I don't know 14:33:19<br>6 anything about the background of the 14:33:22<br>7 Middle East Eye, so I don't know if -- if 14:33:23<br>8 it's a reliable or unreliable news 14:33:26<br>9 organization. But as I said, I did not rely 14:33:32<br>10 upon it specifically. I looked at the 14:33:35<br>11 information that was coming from that source 14:33:37<br>12 and went to look to see whether or not it was 14:33:40<br>13 also supported by other sources that I knew 14:33:43<br>14 to be reliable. 14:33:45<br>15 BY MS. COYOCA: 14:33:47<br>16 Q. The only news article from a U.S. based 14:33:47<br>17 publication that you printed out, or at least 14:33:52<br>18 that made its way into the file, is the 14:33:54<br>19 article from The Washington Post; is that 14:33:56<br>20 right? 14:33:59<br>23 THE WITNESS: I think that's 14:34:03<br>24 the cite that I used in my coverage letter. 14:34:04<br>25 That certainly is not the only U.S. news 14:34:07<br><br><br>Page 522<br><br>1 article that I read. 14:34:11<br>2 BY MS. COYOCA: 14:34:12<br>3 Q. That was not my question to you, though, 14:34:12<br>4 Ms. Johnson. 14:34:14<br>5 My question to you is: Did you put 14:34:15<br>6 into your file or the file any articles or 14:34:17<br>7 publications -- let's just start with 14:34:21<br>8 articles, any articles that were from a U.S. 14:34:24<br>9 based media organization? 14:34:27<br>10 A. Well, Ms. Coyoca, I wasn't in charge of 14:34:31<br>11 keeping the file, so I don't think that I 14:34:34<br>12 necessarily put any article into the file. I 14:34:36<br>13 can tell you that I looked at a variety of 14:34:39<br>14 articles, not just the article that was 14:34:41<br>15 cited in -- in -- by -- not just the 14:34:44<br>16 Washington Post article. 14:34:48<br>17 I looked at a variety of U.S. 14:34:49<br>18 articles and a variety of articles from other 14:34:51<br>19 places. I looked at The Guardian, I looked 14:34:54<br>20 at the Israeli newspaper, I looked at a 14:34:58<br>21 variety of different articles, not just the 14:35:00<br>22 U.S. articles. And, again, what I was 14:35:03<br>23 looking for is is what is being reported in 14:35:06<br>24 each of these sources something close to or 14:35:09<br>25 identical to what is also being cited in 14:35:13 | |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 523**<br><br>1 other sources as to what is actually 14:35:15<br>2 happening on the ground. 14:35:17<br>3 Short of going to Israel, it was 14:35:18<br>4 pretty hard for me to make the determination 14:35:20<br>5 in any other way. 14:35:23<br>6 Q. So I just want to make sure I understand you 14:35:24<br>7 correctly. Is it your position that each of 14:35:27<br>8 the articles that you were reviewing for 14:35:32<br>9 purposes of your investigation, that they 14:35:35<br>10 were 100 percent in agreement with respect to 14:35:37<br>11 each of the facts that were set forth in the 14:35:40<br>12 article? 14:35:42<br>15 THE WITNESS: Ms. Coyoca, you know 14:35:50<br>16 that that is not what I said. What I said is 14:35:51<br>17 I looked for commonalities between all of the 14:35:53<br>18 articles that I was reading with regard to 14:35:56<br>19 what was happening on the ground. 14:35:58<br>20 Were they all reporting that there 14:35:59<br>21 were air strikes, were they all reporting 14:36:01<br>22 that there was rocket fire, were they 14:36:03<br>23 reporting that there were gun boats, were 14:36:05<br>24 they reporting that there were tanks on the 14:36:08<br>25 ground, you know, were they reporting that 14:36:10 | Plaintiff's Objections:<br>Page 523:1-25<br>MIL,402,403,701,802<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>Is not opinion testimony other than that rationally based on the witness's perception and is helpful to clearly understanding the witness's testimony or determining a fact in issue. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence.  Not offered for the truth of the matter asserted. 801; 807.<br><br><br><br>Plaintiff's Objections:<br>Page 523:20-25<br>MILs 2-3, F.R.E. 402-03<br>Ms. Johnson's discussion of Israeli "tanks" in Gaza is irrelevant and substantially more prejudicial than probative for the reasons in MIL No. 3. Ms. Johnson's discussion of news accounts re plain and ordinary meaning is irrelevant and substantially more prejudicial than probative for the reasons in MIL No. 2.<br><br>Defendant's Response: |

| Deposition Designation | Objection & Response |
|---|---|
| | "MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought. Is not opinion testimony other than that rationally based on the witness's perception and is helpful to clearly understanding the witness's testimony or determining a fact in issue. The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |

Page 524

1 Netanyahu was saying pretty much the same 14:36:13
2 thing, were they using exact quotes from 14:36:15
3 Israeli or Hamas officials, that sort of 14:36:18
4 thing. 14:36:21
5 BY MS. COYOCA: 14:36:28
6 Q. Ms. Johnson, did the article that you 14:36:28
7 reviewed that's set forth in Exhibit 236, 14:36:29
8 which is 4487 -- 14:36:33
9 A. I'm looking at the exhibit. 14:36:44
10 Q. -- did that article refer to the 14:36:45
11 Hamas/Israeli conflict as being a war? 14:36:49
12 A. So this was on July 9th, two days after 14:36:58
13 Israel had started Operation Protective Edge. 14:37:00
14 (Reviews document.) I do not see a reference 14:37:47
15 to it as being a war. 14:37:53
16 Q. Can you please take a look at page 5 of 9 in 14:37:54

PLAINTIFFS' 106 COUNTER-DESIGNATION:

| Deposition Designation | Objection & Response |
|---|---|
| Page 524<br><br>17 the article that's Bates labeled ATL004491. 14:37:57<br>18 A. (Complies.) I'm looking at that page. 14:38:06<br>19 Q. Can you please read aloud the sentence that 14:38:09<br>20 appears right below the type in bold, "Read 14:38:12<br>21 more, Israel prepares for escalation amid 14:38:17<br>22 exchange of rocket fire"? 14:38:19<br>23 A. "The military said it was seeking to retrieve 14:38:21<br>24 stability to the residents of southern 14:38:24<br>25 Israel, eliminate Hamas's capabilities and 14:38:26<br><br>Page 525<br><br>1 destroy terror infrastructure operating 14:38:30<br>2 against the state of Israel and its 14:38:34<br>3 civilians." 14:38:34<br><br>15 Q. Well, you would agree with me, would you not, 14:38:57<br>16 that this indicates that the military said 14:38:59<br>17 that one of its goals was to destroy the 14:39:01<br>18 terror infrastructure? It says that, does it 14:39:07<br>19 not? 14:39:10<br><br>22 THE WITNESS: That's part of what 14:39:13<br>23 it says, certainly. 14:39:14<br><br>Page 526<br><br>12 Q. Could you please tell me where in this 14:39:48<br>13 article it refers to the Israeli/Hamas 14:39:50<br>14 conflict as constituting a war? 14:39:55<br><br>18 THE WITNESS: Well, I mean, I can 14:40:09<br>19 sit here and read this whole thing, but I'm 14:40:10<br>20 assuming that because you're asking me that, 14:40:12<br>21 that it does not say that it is a war. 14:40:14<br><br>23 Q. Well, I -- I would just like your knowledge. 14:40:17<br>24 As of July of 2014 when you were reviewing 14:40:19<br>25 the article, did you believe that this 14:40:22<br><br><br>Page 527<br><br>1 article made reference to a war? 14:40:24 | |

| Deposition Designation | Objection & Response |
|---|---|
| 2 A. Well, I'll sit here and read the entire 14:40:26<br>3 article and we'll see. This is dated the 8th 14:40:29<br>4 of July, 2014. (Reviews document.) 14:40:41<br>5 This article states that with regard 14:42:58<br>6 to Israel, that, "The Army is preparing for 14:43:00<br>7 all possible scenarios, including an invasion 14:43:04<br>8 of a ground" -- "or a ground operation." 14:43:08<br>9 Hamas said that, "The massacre of 14:43:10<br>10 children is a horrendous war crime and all 14:43:14<br>11 Israelis have now become legitimate targets 14:43:19<br>12 for resistance." So in that sense, they were 14:43:22<br>13 referring to it as war in that quote. 14:43:24<br>14 But does the article itself 14:43:26<br>15 characterize it as a war, no, it does not. 14:43:28<br><br>Page 528<br><br>3 Q. Could you please take a look at Exhibit 237. 14:44:25<br>4 And that's the article that appears at 14:44:31<br>5 ATL00442. 14:44:34<br>6 A. Yes, I'm looking at it. 14:44:36<br>7 Q. Can you please tell me where in this article 14:45:00<br>8 it refers to the Israeli/Hamas conflict as 14:45:02<br>9 being a war? 14:45:07<br><br>14 This article refers to the fact that the 14:46:06<br>15 state department spokesman Jen Psaki said 14:46:09<br>16 that, "Israel has the right to defend itself, 14:46:12<br>17 but that no one wants to see a ground war." 14:46:15<br>18 (Reviews document.) 14:46:15<br>19 The article that we just referred to 14:47:43<br>20 is dated July 15th, 2014, so the reference 14:47:45<br>21 that I made to war is the only use of that 14:47:48<br>22 word in this article that I could find in my 14:47:50<br>23 brief review of it at this time. 14:47:56<br><br>25 Q. As of July 15, that was the date that 14:47:59<br><br>Page 529<br><br>1 NBCUniversal submitted the claim to Atlantic; 14:48:03<br>2 is that correct? 14:48:06<br>3 A. That's correct. 14:48:07<br><br>7 Q. On page 2 of 7 of that article, just slightly 14:48:18<br>8 past midway down there is a quote from the 14:48:25<br>9 Ezzedine Al-Qassam Brigades. It begins, 14:48:29<br>10 "They will not dream." Do you see that? 14:48:31<br>11 A. Yes. 14:48:34<br>12 Q. Could you please read that aloud? 14:48:34 | |

| Deposition Designation | Objection & Response |
|---|---|
| 13 A. It says, "They will not dream of a calm if 14:48:36 <br> 14 they do not stop their aggression towards our 14:48:40 <br> 15 people, said Ezzedine Al-Qassam" -- "said the 14:48:40 <br> 16 Ezzedine Al-Qassam Brigades statement, and 14:48:47 <br> 17 stop attempting to break our unity 14:48:48 <br> 18 government." 14:48:51 <br> 19 Q. Actually, I'm not sure that's exactly what 14:48:51 <br> 20 the quote reads. What I see the words 14:48:54 <br> 21 appearing as being, "They will dream of a 14:48:59 <br> 22 calm if they do not stop their aggression 14:49:00 <br> 23 towards our people," close quotes, "The 14:49:03 <br> 24 Ezzedine Al-Qassam Brigades statement said," 14:49:06 <br> 25 begin quotes, "And stop attempting to break 14:49:07 <br><br> Page 530 <br><br> 1 our unity government," close quotes. Is that 14:49:10 <br> 2 correct? 14:49:13 <br> 3 A. Yes, you read it correctly. 14:49:13 <br> 4 Q. There's a reference here to the unity 14:49:15 <br> 5 government, is there not? 14:49:17 <br> 6 A. There is. 14:49:18 <br> 7 Q. So does this refresh your recollection that 14:49:19 <br> 8 as of the date of this article, there was in 14:49:22 <br> 9 fact a unity government that had been agreed 14:49:24 <br> 10 to between Hamas and Fatah? 14:49:28 <br><br> 14 THE WITNESS: That is what they 14:49:36 <br> 15 say the statement said. The previous article 14:49:38 <br> 16 that you had me look at referred to it as a 14:49:40 <br> 17 tentative agreement. 14:49:44 <br><br> 19 Q. Do you know one way or the other as to 14:49:45 <br> 20 whether the unity agreement had been -- 14:49:48 <br> 21 excuse me, a unity government had been agreed 14:49:51 <br> 22 to between Hamas and Fatah as of 14:49:53 <br> 23 June 30, 2014? 14:49:57 <br><br> Page 531 <br><br> 1 THE WITNESS: I think I've already 14:50:04 <br> 2 answered that question. Can I tell you with 14:50:05 <br> 3 absolute certainty whether they had agreed to 14:50:07 <br> 4 that, no, I cannot. 14:50:10 | |

| Deposition Designation | Objection & Response |
|---|---|
| 6 Q. In your direct testimony in discussing the 14:50:19<br>7 TRIA endorsement, you indicated that you had 14:50:21<br>8 agreed that TRIA did not apply and 14:50:27<br>9 specifically you said, begin quotes, "I 14:50:31<br>10 agreed with her that the certified acts of 14:50:34<br>11 terrorism did not apply to this claim, 14:50:36<br>12 because this was not a certified act of 14:50:38<br>13 terrorism," close quotes. Do you recall that 14:50:40<br>14 testimony? 14:50:43<br>15 A. I do. 14:50:43<br>16 Q. Who is the "her" that you were referring to? 14:50:44<br>17 A. You. 14:50:46<br>18 Q. Okay. In my August response letter, 14:50:46<br>19 August 13, 2014, response letter, did I 14:50:54<br>20 indicate to you that the TRIA endorsement did 14:50:57<br>21 not apply because the acts that were ongoing 14:51:02<br>22 in Israel did not constitute certified acts 14:51:06<br>23 of terrorism? 14:51:10<br>24 A. I don't remember exactly what you said, 14:51:11<br>25 except that you did not think that that 14:51:13<br><br>Page 532<br><br>1 endorsement applied. 14:51:16<br><br>9 Q. If you'd turn your attention to page 6 of the 14:53:27<br>10 letter, and that's ATL002031, if you look at 14:53:32<br>11 the paragraph that begins, "By citing the 14:53:40<br>12 endorsement to deny coverage, OBE 14:53:42<br>13 misinterprets the policy in three material 14:53:45<br>14 ways"; do you see that? 14:53:47<br>15 A. Yes. 14:53:53<br>16 Q. Is there any discussion herein that indicates 14:53:54<br>17 to you that the argument that I was asserting 14:53:59<br>18 was that the acts that were occurring in 14:54:03<br>19 Israel were not certified acts of terrorism? 14:54:10<br>20 A. You say, "Therefore, the endorsement is 14:54:38<br>21 completely inapplicable to this claim." 14:54:40<br>22 That's what I was referring when saying that 14:54:43<br>23 I agreed with you, I agree that the 14:54:45<br>24 endorsement is completely inapplicable. 14:54:47<br>25 Q. But that wasn't your testimony, is it? 14:54:50<br><br>Page 533 | |

| Deposition Designation | Objection & Response |
|---|---|
| 1 A. Well, I -- 14:54:53 | |
| 4 THE WITNESS: Ms. Coyoca, I'm 14:54:56<br>5 sorry if I mischaracterized what you said in 14:54:58<br>6 your letter. What I was trying to say is 14:55:01<br>7 that both of us agreed that the terrorism 14:55:03<br>8 endorsement, the TRIA endorsement was 14:55:05<br>9 inapplicable to this claim. 14:55:08 | |
| 11 Q. If it was inapplicable to the claim, then why 14:55:11<br>12 did you cite it in the original letter? 14:55:14<br>13 A. I cited it in the original letter because 14:55:17<br>14 Susan Weiss had continued to say that it was 14:55:19<br>15 terroristic act, that Hamas's conduct was a 14:55:19<br>16 terroristic act, and so I was referring to 14:55:25<br>17 the portion of the policy that referenced 14:55:26<br>18 terrorism. 14:55:28<br>19 Q. There is no terrorism exclusion under this 14:55:31<br>20 policy, though, is there? 14:55:34 | |
| 24 THE WITNESS: There is no specific 14:55:44<br>25 exclusion in the policy that is called a 14:55:47 | |
| Page 534 | |
| 1 terrorism exclusion, no. | |
| 20 Q. Ms. Johnson, my next question to you is: Is 14:56:39<br>21 it your position, was it your position in 14:56:42<br>22 July of 2014 that only certified acts of 14:56:45<br>23 terrorism are terrorism? 14:56:50 | |
| Page 535 | |
| 2 THE WITNESS: No | |
| Page 538 | |
| 19 Q. So in that clip from the Face the Nation, 15:00:38<br>20 does either Mr. Schieffer or Ms. Williams 15:00:41<br>21 characterize the conflict as being a war? 15:00:44<br>22 A. They don't. 15:00:46 | |
| END PLAINTIFFS' 106 COUNTER-DESIGNATION | |
| Page 545 | |
| 6 Q. Ms. Johnson, in that report does Mr. Hayes, 15:06:48 | |

| Deposition Designation | Objection & Response |
|---|---|
| 7 Chris Hayes, characterize the Hamas/Israeli 15:06:53<br>8 conflict, use the words war in his report? 15:06:57<br>9 A. Mr. Hayes specifically has a large screen in 15:07:00<br>10 back of him that says, "Ground war," and also 15:07:03<br>11 beneath him on the screen it says, "Ground 15:07:06<br>12 war," and he uses the term, "Reoccupation," 15:07:09<br>13 which is generally a term that is used in 15:07:13<br>14 times of war. 15:07:15 | |
| PLAINTIFFS' 106 COUNTER-DESIGNATION:<br><br>Page 545<br><br>15 Q. Ms. Johnson, you did not respond to my 15:07:17<br>16 question. 15:07:24<br>17 Did Mr. Hayes use the word "war" 15:07:25<br>18 during his report -- 15:07:29<br>19 A. No. 15:07:32<br>20 Q. -- in -- with reference to the conflict that 15:07:32<br>21 was ongoing? 15:07:34<br>22 A. No, he did not use the word "war." 15:07:37<br><br>END PLAINTIFFS' 106 COUNTER-DESIGNATION<br><br>Page 551<br><br>14 BY MS. COYOCA: 15:14:23<br>15 Q. What investigation did you undertake to 15:14:23<br>16 determine the meaning of the word "other 15:14:26<br>17 authority" in the second exclusion? 15:14:28<br>18 A. Well, I looked at what Hamas was doing, how 15:14:35<br>19 they were organized, whether or not they had 15:14:39<br>20 authority. I -- you know, I mean, I -- I 15:14:42<br>21 tried to make a determination about whether 15:14:48<br>22 they would qualify as an other authority. 15:14:51<br>23 Q. Ms. Johnson, that was not my question. 15:14:53<br>24 What I'm trying to find out from you 15:14:56<br>25 is: What research did you do in order to 15:14:59 | Plaintiff's Objections:<br>Page 545:6-14<br>MIL 3, F.R.E. 402-403<br>The video at issue discusses the potential for a "ground war" involving Israel's conduct in Gaza—and is therefore irrelevant and substantially more prejudicial than probative for the reasons in MIL No. 3.<br><br>Defendant's Response:<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>The witness's knowledge, research and response to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |

| Deposition Designation | Objection & Response |
|---|---|
| **Page 552** | |
| 1 determine what the meaning of the phrase, 15:15:04<br>2 "Other authority," was as it's used in the 15:15:07<br>3 context of Exclusion 2? 15:15:11<br>4 A. Well -- 15:15:13<br>5 MS. REED: Lack of foundation. 15:15:13<br>6 THE WITNESS: As I previously 15:15:15<br>7 testified, I looked at case law that involved 15:15:16<br>8 or concerned the war exclusion. I cannot 15:15:20<br>9 tell you as I sit here today, without 15:15:25<br>10 reviewing all the cases again, whether there 15:15:27<br>11 was something that said specifically or 15:15:30<br>12 specifically defined what other authority 15:15:31<br>13 was. Not all of the cases that I looked at 15:15:33<br>14 had the exact same language that is contained 15:15:37<br>15 in this policy in the cases, so I -- I 15:15:40<br>16 can't -- I can't sit here today and tell you 15:15:43<br>17 definitively whether or not there was a case 15:15:45<br>18 that interpreted that. 15:15:47 | |
| **Page 567** | **Plaintiff's Objections:**<br>Page 567:16-569:4<br>MIL 2, F.R.E. 402-03<br>For the reasons in MIL No. 2, plain and ordinary meaning or colloquial use of "war" is irrelevant and substantially more prejudicial than probative. Defendant's denial letter was based on the insurance industry's special meaning of war. *Century Surety Co. v. Polisso, supra.* |
| 16 Q. Ms. Johnson, over the scope of time that you 15:38:05<br>17 conducted your factual investigation relating 15:38:07<br>18 to the Dig claim, did you read articles that 15:38:09<br>19 did refer to the conflict of summer of 2014 15:38:12<br>20 as a war? 15:38:15<br>21 A. Yes, I did. 15:38:17<br>22 Q. Can you put Exhibit 237 back in front of you, 15:38:18<br>23 please, ma'am. 15:38:23<br>24 A. (Complies.) 15:38:24<br>25 Q. Let me refer you to page 4 of 4 of that 15:38:29 | **Defendant's Response:**<br>"MIL" not clear objection; ASIC's understanding and development of facts is relevant to reasonableness of claim decision, defense of "bad faith" allegation and damages sought.<br>The witness's actions in researching and responding to the claim are relevant; not unfairly prejudicial to Plaintiffs, not confusing, |

| Deposition Designation | Objection & Response |
|---|---|
| | misleading or cumulative evidence. Not offered for the truth of the matter asserted. 801; 807. |

Page 568

1 document, please. 15:38:32
2 A. Yes, I see it in front of me. 15:38:35

21 into the hands of Hamas." 15:39:09
22 Q. Who wrote this article, please, ma'am? 15:39:11
23 A. The author is Heller, who reported from 15:39:15
24 Jerusalem, Associated Press writers 15:39:19
25 Ian Deitch, I think is how you pronounce that 15:39:25

Page 569

1 in Jerusalem, Ibrahim Barzak in Gaza City, 15:39:28
2 Mohammed -- oh, yikes -- Daraghmeh in 15:39:28
3 Ramallah, West Bank, and Matthew Lee in 15:39:39
4 Washington contributed to this report. 15:39:39