**EXHIBIT 5**



MARC J. SHRAKE (SBN 219331)
mshrake@fmglaw.com
FREEMAN MATHIS & GARY, LLP
550 South Hope Street, Suite 2200
Los Angeles, California 90071
Telephone: (213) 615-7019
Facsimile: (213) 615-7000

CHRISTOPHER W. MARTIN *(Pro Hac Vice)*
martin@mdjwlaw.com
MELINDA R. BURKE *(Pro Hac Vice)*
burke@mdjwlaw.com
WILLIAM E. McMICHAEL *(Pro Hac Vice)*
mcmichael@mdiwlaw.com
MARTIN, DISIERE, JEFFERSON
& WISDOM LLP
9111 Cypress Waters Blvd., Suite 250
Dallas, Texas 75019
Telephone: (214) 420-5500
Facsimile: (214) 420-5501

Attorneys for Defendant
Atlantic Specialty Insurance Company

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company,<br><br>          Plaintiffs,<br><br>     vs.<br><br>ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company,<br><br>          Defendant. | CASE NO. 2:16-cv-4435-PA-MRW<br><br>**DEFENDANT'S SUPPLEMENTAL RULE 26 DISCLOSURE OF EXPERT WITNESS PETER EVANS**<br><br>Judge: Honorable Percy Anderson<br>Place: Courtroom 9A<br>Trial: Possibly March 3, 2020 |

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, ASIC hereby discloses the following expert witness that Defendant currently anticipates will testify at trial and/or any other hearing or proceedings in the above-referenced matter.

Peter Evans

119, Underhill Road,

1   Mill Valley, CA 94941

2   Phone: 415-381-9223

3   Fax: 415-388-6510

4   PSEvans@comcast. net

5   Mr. Evans' report, his CV, list of testimony provided during the past ten years,

6   and his compensation were previously provided to Plaintiffs on February 7, 2020 but

7   are also set forth herein.

8   Mr. Evans is anticipated to testify regarding ASIC's handling of Plaintiffs'

9   claim and in rebuttal to Plaintiffs' expert, Ty Sagalow, as more fully set forth in the

10  Evans' report.  Mr. Evans' opinions are based upon his review of the information and

11  documentation set forth in his report, and more than 40 years of experience handling

12  first party insurance claims of all types in various states and internationally, and

13  accepted standards of claims practice within the insurance industry.

14  A copy of Mr. Evans' Report is attached hereto as Exhibit 1 ("Evans' Report)

15  and is incorporated in this Designation, the same as if set forth herein. Mr. Evans' CV

16  is provided as Exhibit 2; his deposition and trial testimony are attached hereto as

17  Exhibits 3 and 4.

18  Without limitation, it is anticipated that Mr. Evans will testify that ASIC's

19  handling of the claim in issue in this litigation was consistent with and met industry

20  custom and practice, and standards, all as set forth more fully in detail in the Evan's

21  Report.  He agrees with the conclusions of Mr. Clark and disagrees with those of Mr.

22  Sagalow.

23  **(i)    Opinions**

24  A complete statement of the opinions and the basis and reasons for them are set

25  forth in the Evans' Report, Exhibit 1, which is attached hereto and incorporated herein.

26  In summary, his opinions are as follows:

27

28

Freeman Mathis
& Gary, LLP
Attorneys at Law

DEFENDANT'S SUPPLEMENTAL RULE 26 DISCLOSURE OF EXPERT PETER EVANS

1    In this case Universal Cable Productions LLC (Universal) and others have sued
2  their insurer, Atlantic Specialty Insurance Company (ASIC), following a claim
3  submitted under the terms and conditions of ASIC Policy MP00163-04.

4  The Policy:

5    ASIC policy MP00163-03 was issued to insured NBCUniversal Media LLC for
6  a period of eighteen months expiring June 30, 2015 and providing coverage, inter alia,
7  for television productions as proposed and agreed. Coverage included that for Extra
8  Expense, written subject to the terms and conditions of the policy, as amended by
9  endorsement, including Motion Picture Television Portfolio General Conditions Form
10 NS 100 0110. The coverage was written following negotiations between the insured,
11 represented by its brokers, AON, and ASIC, with the first policy period beginning in
12 2010, with subsequent renewals.

13   The policy was subject to a self insured Retention of $3,100,000 Aggregate
14 (including Paid Losses and Adjustment Expenses) (ATL003073-127). The Extra
15 Expense limit was $10,000,000, itself subject to individual deductibles.

16   In December 2013 Universal, through its broker, advised ASIC that it was
17 proposing to film a new series called "Dig", at least in part in Israel. After some
18 negotiation ASIC confirmed coverage for the project with filming of the pilot episode
19 to commence on or about June 1, 2014. Coverage was agreed subject to the terms and
20 conditions of the policy in place.  Policy form NS 100 0110, the General Conditions,
21 contained several Exclusions that are relevant to this matter (ATL003083):

22 **III. EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY**

23 This policy does not insure against loss or damage caused directly or indirectly by:

24 1. War, including undeclared war or civil war; or

25 2. Warlike action by a military force, including action in hindering or defending

26 against an actual or expected attack, by any government, sovereign or other authority

27 using military personnel or other agents; or

28

Freeman Mathis
& Gary, LLP
Attorneys at Law

3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war.

<u>The Events:</u>

The underlying facts surrounding the claim appear not to be in dispute and the following narratives are drawn from the reports of the parties' retained experts Clark and Sagalow, the ASIC/OneBeacon letter of July 28,2014 and in the other documents cited above.

While conditions in Israel were considered safe as filming began, three Israeli teenagers were kidnapped on June 12, 2014 and Hamas was suspected of being involved in the kidnapping. After completion of the pilot episode of Dig and on or about June 30, 2014, prior to the filming of the next five episodes of Dig, the bodies of the missing teenagers were found and there were further allegations of the involvement of Hamas.

Hamas began launching rockets into Israel and Israel began to take action to protect its interests and to stop the attacks. Due to deteriorating security conditions, on July 8, 2014 the United States Department of State issued advisories concerning the safety and security of civilians in Israel.

On July 10, 2014 the head of security at NBCUniversal advised that "the security environment in Israel currently prohibits NBCU security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent ....... personnel based in country in relation to this production should make arrangements to leave." On the following day, July 11, 2014, NBCUniversal informed ASIC of its decision to postpone the production of episodes two and three of Dig for a period of one week from its scheduled commencement on July 20.

DEFENDANT'S SUPPLEMENTAL RULE 26 DISCLOSURE OF EXPERT PETER EVANS

On July 14, 2014 the insured finalized its decision to push the production for one week and so advised ASIC. NBCUniversal also suggested the possibility that, if hostilities did not deescalate, production might be moved to another country or back to the United States. Hostilities between Hamas and Israel worsened and on July 15 Hamas refused to agree to a cease-fire that had been suggested by Egypt.

Israeli military were then given authorization to use full force against militants in Gaza. NBCUniversal then relocated production of the series to Croatia and to New Mexico and the insured incurred extra expense as a result of the delay and relocation.

During the conflict which extended until August 26, 2014, 2143 Palestinians and 69 Israelis were killed. Israel struck 5283 targets in Gaza. Hamas fired 4564 rockets into Israel and more than 50,000 buildings in Gaza with damaged or destroyed (Johnson letter, September 19, 2014, ATL000705).

The Claim:

Following the initial inquiry to ASIC on July 11, 2014 (though shown as July 10 in the insurer's correspondence ATL000094 ), and involving a potential Extra Expense claim relating to the planned "push" of production for one week, claim was submitted by the broker to ASIC on July 15 (ATL000104).

The claim was assigned to examiner Daniel Gutterman, supervised by Assistant Vice President, OneBeacon Entertainment, Pamela Johnson, and on Thursday, July 17, Ms. Johnson and Mr. Gutterman spoke with Andrea Garber of the insured and Susan Weiss of AON, learning that the decision had been made to move the production from Israel. Ms. Johnson reiterated a prior discussion between Peter Williams, President of OneBeacon Entertainment and the broker wherein the insurer had advised that it was "seriously considering whether the exclusion for war and warlike actions would preclude coverage for the claim." Ms. Garber and Ms. Weiss protested, asserting that the situation in Israel did not constitute war because Hamas was a terrorist organization, not a governmental authority and that there had been no formal

Freeman Mathis
& Gary, LLP
Attorneys at Law

DEFENDANT'S SUPPLEMENTAL RULE 26 DISCLOSURE OF EXPERT PETER EVANS

declaration of war. Ms. Johnson confirmed that the insurer was still considering the matter and would respond on Monday, July 21 with its final decision (ATL000096).

The insurer's investigation included searches by Mr. Gutterman and Ms. Johnson as to the facts, news reports, the status of Hamas, Appleman on Insurance and Black's Law Dictionary. Ms. Johnson, an attorney herself (Johnson Deposition, Page 12), also carried out legal research (Sagalow Report, Page 10). On July 21, 2014 Ms. Johnson advised the insured that the insurer's final decision was to exclude the claim based upon the applicable exclusions though, as a courtesy, it would provide coverage for the expenses related to the initial push in production.

By letter of July 28, 2014 Ms. Johnson set out in detail the sequence of events, the nature and extent of the insurer's investigation, applicable exclusions and the coverage decision. The insurer had concluded, among other things, that "Hamas has become the government of the Gaza Strip. Hamas has a military wing, the Qassam Brigades, as well as a force of police, security and intelligence personnel.  Our understanding is that it is Hamas' s military wing that has carried out the attacks on Israel that led to NBCU's claim. 'Hamas direct the Gaza government and security forces through a self-appointed cabinet of Hamas ministers ... '", (quoting from Zanotti, Hamas: Background and Issues for Congress (Congressional Research Service 2010)).

As a result of its investigation the insurer had concluded, among other things, that:

"although Gaza or Palestine is not a recognized nation, at least by most of the world, it does have some indicia of sovereignty. It governs territory and it is this territory from which the attacks on Israel have come. Hamas has a stated goal of destroying Israel and is using weapons in its quest. Although the rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law, this is not a situation where a single civilian, or group of civilians, is the target. This conflict involves sophisticated military weapons fired from one territory into another country, Israel. We

Freeman Mathis
& Gary, LLP
Attorneys at Law

DEFENDANT'S SUPPLEMENTAL RULE 26 DISCLOSURE OF EXPERT PETER EVANS

believe that the only reasonable interpretation of what is occurring, and that has led to NBCU's action, is war or warlike action.

We note that NBCU affiliated company, MSNBC, has referred to the conflict as a war for the past several days. This should be considered in taking into account the insured's reasonable expectations.

Even if what occurred, and is occurring, would not be found to be a war, it is nevertheless a "warlike action". However, if this is the case, to be excluded under Subparagraph 2 of the exclusion, the warlike action must be by a "military force". There is no question that one side of the conflict, the Israeli side, is a military force of a sovereign nation. But if it is necessary that the military force must be the one firing rockets at the areas where the filming was occurred, we must determine whether Hamas is a military force. As to this question, we believe that Hamas is a military force of a government, the government of Gaza. Even though many, including Israel and the United States consider Hamas to be a terrorist group, it is the government of a territory that is involved in the conflict. Hamas operates as a military command in the Gaza Strip, a territory that it has controlled since 2007. It operates its military force through self-appointed ministers. In light of the governmental structure within Gaza, the Hamas military in Gaza fits the definition of a military force. The current structure represents a considerable evolution from the Hamas that carried out the isolated terrorist attacks in the 1990s and the first few years of the 21st century. (citations omitted)

Thus, the only reasonable interpretation of the situation that led to NBCU's decision to postpone the Dig production and its ultimate decision to move the production from Israel is that the imminent peril that led to these decisions was caused by war, or warlike action by a military force. As a result, we believe the war exclusion applies to this claim."

Freeman Mathis
& Gary, LLP
Attorneys at Law

1    The letter set out all four exclusions (ATL000097) and concluded by requesting
2    further contact in the event that the insured had further questions (ATL000094-101).

3    On August 13, 2014 counsel for the insured wrote to Ms. Johnson confirming
4    appreciation of OneBeacon's willingness to cover the expenses associated with the
5    initial one week postponement of the Dig production, but disputing the coverage
6    decision (ATL000087 -93 ).

7    After carefully considering the issues raised, Ms. Johnson responded by letter
8    of September 19, 2014, advising that it remained the conclusion of the insurer that the
9    insurance policy did not insure the claim. Again, Ms. Johnson set out all four of the
10   applicable exclusions and explained the insurer's reasoning. (ATL000705-08).
11   Following the filing of suit and discovery, cross-motions for summary judgment were
12   filed and, on October 6, 2017 the Court issued its decision, holding that "Atlantic
13   (ASIC is entitled to summary judgment on both of Plaintiffs' causes of action in the
14   First Amended Complaint and Plaintiffs' motion for summary judgment must be
15   denied. The Court will enter a judgment consistent with this order." (Document 128)

16   The decision was appealed to the United States Court of Appeals for the Ninth
17   Circuit which filed its Opinion on July 12, 2019, reversing in part and vacating in part
18   the district court's summary judgment in favor of ASIC in respect of policy exclusions
19   1. and 2., Holding that Exclusions 1 and 2 were not applicable and remanding to the
20   Trial Court the remaining issues.

21   The Trial Court then ruled that Exclusions 3 and 4 did not apply to preclude
22   coverage and set for trial issues of damages and whether Atlantic acted in bad faith.
23   <u>Standards:</u>

24   Standards governing the conduct of insurers and insureds are generated by
25   industrywide custom and practice, policy provisions, the application of uniform acts
26   such as the National Association of Insurance Commissioners' Model Unfair Claims
27   Settlement Practices Act, and regulations of the applicable administrative agency.
28   Here, suit was filed in California and the relevant regulations are contained within the

Department of Insurance Fair Claims Practices Regulations and Insurance Code §790.03(h).

In Mr. Evans' experience, apart from those areas discussed above, claims must be reviewed individually since each is likely to require its own level of investigation and coverage analysis. A principal obligation is to match the facts of the loss with experienced and qualified Claims personnel. After completion of the investigation the insurer is then able to review results and other available information to assist in its coverage and adjustment determinations, bearing in mind the detail of the coverage provided and any applicable limits and/or exclusionary language in the policy. Policy interpretation is based upon the plain meaning of policy wordings and definitions, subject to any special meanings imposed by legal precedent.

The Clark Reports:

Anthony Clark, an experienced and respected insurance claim professional, was retained by counsel for ASIC to form opinions regarding the denial of the claim and whether the denial of the claim by the insurance company would be considered reasonable given the circumstances from which the claim arose and related issues. He provided his report on March 17, 2017 and subsequently a rebuttal report to that of plaintiffs. expert Ty Sagalow. Mr. Clark also provided deposition testimony.

Mr. Clark summarized his opinions on page 4 of his first report, stating:

Based on my experience in the handling, review, and denial of claims, it is my opinion that Atlantic Specialty Insurance Company (Atlantic) properly conducted a thorough and timely investigation into the circumstances surrounding the Extra Expense claim as presented by the plaintiffs and made a reasonable determination under the terms and conditions of the applicable policy of insurance that the war exclusion applied and therefore could make no payment to the insured. Atlantic acted as a reasonable carrier would by staying in communication with its insured during the investigation stage of the claim, and by providing updates on its analysis on coverage. Atlantic then proceeded

Freeman Mathis
& Gary, LLP
Attorneys at Law

to provide the insured with a clear and detailed explanation of the denial in an expedited manner as requested by the·insured. Atlantic also responded in a complete and timely manner to a request by the insured for reconsideration. Atlantic continued to communicate with its insured and efforts to discuss the coverage issues and reach some negotiated resolution, including through an in person meeting and a settlement offer.

It is my opinion that this determination - that coverage was precluded by applicable exclusions in the policy -was made solely from the specific circumstances as they were made known to, investigated by, and considered by Atlantic Specialty Insurance Company, and those circumstances were considered in light of the policy contract wording. Nothing in the claim file or in any other actions of Atlantic Specialty indicates that any other extraneous·motives affected the ultimate claim decision.

The report then provides discussion concerning the actions and activity leading up to the circumstances surrounding the loss and the investigation carried out by ASIC, as summarized above.

Following review of the report of Ty Sagalow, retained on behalf of plaintiffs, Mr. Clark issued his rebuttal report, disagreeing with Mr. Sagalow's opinions, including as to the reasonableness and timeliness of the investigation and coverage decisions; Mr. Sagalow's views concerning "customs and practice in the insurance industry"; as discussed in more detail below.

Mr. Evans agrees with and incorporates Mr. Clark's opinions and conclusions within his own. While the relevant Exclusions as set out above have been referred to as the "War Exclusions", they are not headed as such. Rather, while Exclusions 1. and 2. relate to war or warlike actions and 4. speaks to weapons of war, Exclusion 3. does not mention "war" but deals with other forms of aggression.  Mr. Evans would refer to the Standards section of his report as it refers to policy interpretation.

The Sagalow Reports:

Freeman Mathis & Gary, LLP Attorneys at Law

1      Mr. Sagalow is an insurance executive and attorney, apparently with little direct
2  first party commercial property claims experience. (Sagalow CV, Report Pages 44-
3  47). He was retained on behalf of plaintiffs to provide his opinions and conclusions
4  concerning the claims handling in the matter at hand. He also provided two reports,
5  the first on March 17, 2017 and the second, and rebuttal to Mr. Clark's first report, on
6  April 28, 2017. Mr. Sagalow also provided deposition testimony.

7      Mr. Sagalow's two opinions, as set out on page 41 of his first report were:

8      a. Atlantic was acting against industry custom and practice when it applied the
9      War Exclusion to the claim at issue, and

10      b. Atlantic violated a number of industry customs and practices in its claims
11      process and handling of the claim at issue.

12  As did Mr. Clark, Mr. Evans disagrees with Mr. Sagalow's opinions and conclusions.

13      Per the report of Mr. Evans, Mr. Sagalow sets out his view of custom and
14  practice in the insurance industry in paragraphs 36 through 43 of the Sagalow report.
15  The policy, and those that preceded it resulted from negotiations between a
16  sophisticated insured, part of the NBC Organization and with its own risk management
17  department of which Andrea Garber was Senior Director, Risk Management (Sagalow
18  Report, Page 8) worked through its broker, AON, to negotiate terms and conditions
19  with ASIC. AON is a sophisticated multinational insurance brokerage self described
20  on its website as "a leading global professional services firm providing a broad range
21  of risk, retirement and health solutions. Our 50,000 colleagues and 120 countries
22  empower results for clients .... " There is not evidence of ambiguity in the policy
23  wording and the US Court of Appeals for the Ninth Circuit declined to apply contra
24  proferentem either in favor of the insured's interpretation, or in favor of ASIC
25  (Appellate Opinion Pages 2-3).

26      The evidence was, at the time when the Dig risk was accepted by ASIC, that
27  conditions in Israel were considered safe (MSJ SUF 29 & 30), and AON had
28  specifically requested no deviation from its standard policy terms (Sagalow Report,

Freeman Mathis
& Gary, LLP
Attorneys at Law

Page 6). While the ASIC underwriter was clearly aware that at least part of the production would take place in Israel, there was not evidence of impending military action.

Mr. Evans (and Mr. Clark) disagree with Mr. Sagalow as to his discussion concerning industry custom and practice regarding the application of reasonable expectations and of "the war exclusion" and his ready conclusion of terrorist activity rather than as described in the four exclusions quoted above.

Mr. Evans described, claims handling standards, based on his experience and industry custom and practice. While insurers are obliged to carry out a prompt and thorough investigation of claims prior to making coverage decisions, each loss must be judged by its own merits. Here, ASIC was able to determine the basic underlying facts rapidly and they appear not to be in dispute.

In Mr. Evans' experience, there is inherent conflict in the obligations of insurers, in that they are open to criticism for the making of decisions following thorough investigations too quickly or, when taking time following the investigation, too slowly. ASIC did carry out considerable investigation and the retention of "experts", as suggested by Mr. Sagalow, would not appear to have been helpful given the decades of political and other differences and apparently hardened political attitudes of individual Nations and commentators.

Mr. Sagalow discusses in detail the background of industry custom and practice concerning the terrorist exclusion and the war exclusion, beginning on page 18 of his report. The terrorism issue appears to be moot since there was no such exclusion contained within the ASIC policy and thus the question was whether or not any of the exclusions set out above were applicable. ASIC, after carrying out its thorough investigation, determined that one or more of the exclusions would apply and thus issued its letter of denial, having previously provided indication as to its thinking.

The Trial Court, in its Summary Judgment determination, accepted and agreed

Freeman Mathis & Gary, LLP
Attorneys at Law

1  with ASIC's position though that decision was overturned insofar as Exclusions 1 and
2  2 were concerned. Following issuance of the appellate court decision, the Trial Court
3  issued its ruling as to Exclusions 3 and 4.

4       On page 20 of his report, Mr. Sagalow expounds upon the status of Hamas. The
5  Courts have made their rulings. The issue remains that ASIC carried out a
6  comprehensive investigation, including legal and other research conducted by Mr.
7  Gutterman and Ms. Johnson, an experienced claims manager and an attorney.

8       Following that investigation ASIC made its coverage determination, reasonably
9  both in the opinion of Mr. Evans and that of Mr. Clark.

10      Mr. Sagalow, apparently mixing legal opinion with the balance of his report,
11  discusses "the war exclusion" in Section VIII of the report, beginning on page 29,
12  apparently not taking into account the fact that the excluded areas of coverage extend
13  beyond war itself. Both Mr. Evans and Mr. Clark disagree with him, as described in
14  the Clark reports and in the Evans' report.

15      Section IX of the Sagalow report (Page 32) deals with claims handling issues.
16  Again, Mr. Evans disagrees with him and with his conclusions relating to the
17  thoroughness of the ASIC investigation and the reasonableness of its decision. As
18  discussed above, the retention of "experts" would not have been useful, given
19  aggressively divergent views. In Mr. Evans' experience, war claims are extremely rare
20  and the issue here is one of coverage interpretation based on facts that are not in
21  dispute.

22      Mr. Sagalow suggests discussions with the underwriter as to coverage but, again
23  in Mr. Evan's experience and as stated by Mr. Clark on page 6 of his rebuttal report,
24  the policy form was provided by the broker, AON, and it contained a war exclusion as
25  well as those others shown. Notwithstanding this, Ms. Johnson did confer with Peter
26  Williams.

27      There was error in the ASIC letter of July 28, 2014 concerning its discussion
28  regarding terrorism coverage. This error was rectified in Ms. Johnson's letter to

Freeman Mathis
& Gary, LLP
Attorneys at Law

DEFENDANT'S SUPPLEMENTAL RULE 26 DISCLOSURE OF EXPERT PETER EVANS

counsel for the insured on September 19, 2014 (ATL000708), where it was confirmed that the Terrorism Endorsement did not apply. There is not evidence of misrepresentation on the part of ASIC or that the insurer failed to disclose benefits, coverages and limitations and, as stated, ASIC was dealing with coverage forms presented to it by the insured's broker, AON.

The Sagalow rebuttal to Mr. Clark's report is lengthy and argumentative but, in Mr. Evans' opinion does not add to or otherwise affect Mr. Clark's opinions or those of Mr. Evans. Mr. Evans disagrees with Mr. Sagalow's opinions and conclusions.

Mr. Evans' opinions and conclusions are based upon more than 40 years' experience in the investigation, adjustment, supervision and management of first party property claims in the United States and elsewhere, based in California where he has been licensed adjuster for at least 20 years. Prior to obtaining his California license he worked under the license of his then employer. He has also been employed as an adjuster in. the United Kingdom, has worked as a broker, including at Lloyd's, and was first employed by an insurer.

Mr. Evans agrees with the opinions and conclusions of Anthony Clark and, for the reasons expressed in the Evans' report, disagrees with those of Mr. Sagalow. He concludes, as did Mr. Clark, that ASIC conducted a reasonable, prompt and thorough investigation, maintaining contact with the insured and advising NBCUniversal of the progress of the investigation, providing indications of its potential coverage position prior to issuing its letter of denial. The ASIC investigation included research of the facts and legal and coverage issues. Subsequently ASIC then acted reasonably in continuing its contacts with the insured and its representatives.

Neither ASIC's investigation process nor its coverage determination was unreasonable and it was not inconsistent with industry custom and practice. It was reasonable, in Mr. Evans' opinion, for ASIC to conclude that the claim fell within the Exclusions following Ms. Johnson's research and analysis, as set out in the insurer's

letters of July 28 and September 19, 2014, and the investigation was both prompt and thorough, with consideration having been given to the insured's arguments.

**(ii)       The Facts and Data Considered by Mr. Evans**

The facts and data considered by Mr. Evans in forming his opinion are fully set forth in the Evans' Report [Exhibit 1 hereto], and include:

ASIC Policy MP00163-04

Complaint

First Amended Complaint

Defendant's Answer to First Amended Complaint

Defendant's Third Amended Responses to Plaintiffs' First Set of Interrogatories

Protective Order

ASIC File Documents -ATL.000001-161

Deposition Transcript, Pamela Johnson, Vol. 1, with exhibits

Deposition Transcript, Pamela Johnson, Vol 2, with exhibits

Deposition Transcript, Theresa Gooley Wolf, with exhibits

Deposition Transcripts, Daniel Gutterman, Vols 1 & 2, with exhibits

Deposition Transcript, Susan Weiss, with exhibits

Deposition Transcript, Peter Williams, with exhibits

Letter from OneBeacon to Andrea Garber, July 28, 2014

Letter from Lucia Coyoca to Pamela Johnson, August 13, 2014

Letter from OneBeacon to Lucia Coyoca, September 19, 2014

Expert Report, Anthony Clark

Rebuttal Report, Anthony Clark

Deposition Transcript, Anthony Clark, with exhibits

Expert Report, Ty Sagalow

Rebuttal Report Ty Sagalow

Deposition Transcript, Ty Sagalow, with Exhibits

District Court Summary Judgment Order

Freeman Mathis
& Gary, LLP
Attorneys at Law

9th. Circuit Opinion: US Court of Appeals

Order for Trial

ASIC's Memorandum of Contentions of Fact and Law

Revised Joint List of Deposition Testimony to be Offered at Trial

Written Expert Proffer of Plaintiff's Expert, Ty Sagalow

California Insurance Code§ 790.03(h)

California Code of Regulations, Fair Claims Settlement Practice Regulations

**(iii)   Exhibits That Will Be Used to Support or Summarize Mr. Evans' Opinions**

Exhibits that will be used to support or summarize Mr. Evans' opinions are those identified in the Evans' Report, attached hereto as Exhibit 1, and the documents referenced in (ii) above.

**(iv)   Mr. Evans' Qualifications, Including a List of Publications Authored in the Previous 10 Years**

Mr. Evans' qualifications are set forth in the Evans' Report and CV, a copy of which is attached hereto as Exhibit 2.  Mr. Evans' CV summarizes his career in the insurance industry from 1963 to the present. He has been employed by an insurance company; insurance brokers, including brokers at Lloyd's; and independent loss adjusters, and is now self-employed as an independent loss adjuster and consultant, currently licensed in California and in Washington State.

He has been involved in the handling of first party insurance claims since 1967 and has worked in the United States since 1978, investigating, adjusting, supervising and managing first party insurance claims of all types, both in the United States and internationally. He has been retained as a consultant or expert witness on numerous occasions, qualifying to testify at trial in state courts in California and New Mexico and in federal courts in California, Louisiana, Mississippi, Nevada, Colorado and Washington State.

DEFENDANT'S SUPPLEMENTAL RULE 26 DISCLOSURE OF EXPERT PETER EVANS

1

2

**(v)     List of All Other Cases In Which, During the Previous 4 Years in Which Mr. Evans Has Testified as an Expert at Trial or By Deposition**

3

4

A list of all other cases in which, during the previous 4 years Mr. Evans has testified as an expert at trial or by deposition is attached hereto as Exhibits 3 and 4.

5

6

**(vi)     Statement of the Compensation to Be Paid For the Study and Testimony in This Case**

7

Mr. Evans' billing rate is $375 per hour, plus expenses.

8

9

10

DATED:  January 17, 2020          MARC J. SHRAKE
                                                       FREEMAN MATHIS & GARY, LLP

11

                                                                -and-

12

13

14

                                                       CHRISTOPHER W. MARTIN (*Pro Hac Vice*)
                                                       MELINDA R. BURKE (*Pro Hac Vice*)
                                                       WILLIAM E. McMICHAEL *(Pro Hac Vice)*
                                                       MARTIN, DISIERE, JEFFERSON
                                                       & WISDOM LLP

15

16

                                                       By:     */s/ Christopher W. Martin*
                                                       Attorneys for Defendant ATLANTIC
                                                       SPECIALTY INSURANCE COMPANY

17

18

19

20

21

22

23

24

25

26

27

28

Freeman Mathis
& Gary, LLP
Attorneys at Law

Exhibit 1:  Report of Peter Evans

# EVANS ADJUSTERS

119, Underhill Road,
Mill Valley, CA 94941
Phone: 415-381-9223
Fax: 415-388-6510
PSEvans@comcast.net

CA License #2D26665

February 7, 2020

## EXPERT OPINION REPORT
### Peter S. Evans

### Universal Cable Productions LLC et al.
### vs.
### Atlantic Specialty Insurance Company
### US District Court,
### Central District of California
### Case No. 2:16-cv-4435-PA-MRW

In this case Universal Cable Productions LLC (Universal) and others have sued their insurer, Atlantic Specialty Insurance Company (ASIC), following a claim submitted under the terms and conditions of ASIC Policy MP00163-04.

Following the recent passing of expert Anthony Clark I have been engaged by the insurer to review various documents and to form opinions regarding the handling of the claim arising from aggressions between Israel and Hamas in July 2014 and to rebut the opinions of Plaintiffs' expert, Ty Sagalow

My opinions are based upon my review of the information and documentation provided to date, more than 40 years of experience handling first party insurance claims of all types in various states and internationally, and accepted standards of claims practice within the insurance industry.

## Compensation and Prior Testimony:

My billing rate is $375 per hour, plus expenses. I have not authored or published any articles or documents that are relevant to insurance claims handling. Attached are lists of cases in which I have testified at trial and at deposition within the past four years.

Universal Cable Productions vs. ASIC
February 7, 2020
Page 2

## Documents Considered in Forming Opinions:

ASIC PolicyMP00163-04
Complaint
First Amended Complaint
Defendant's Answer to First Amended Complaint
Defendant's Third Amended Responses to Plaintiffs' First Set of Interrogatories
Protective Order
ASIC File Documents – ATL 000001-161
Deposition Transcript, Pamela Johnson, Vol 1, with exhibits
Deposition Transcript, Pamela Johnson, Vol 2, with exhibits
Deposition Transcript, Theresa Gooley Wolf, with exhibits
Deposition Transcripts, Daniel Gutterman, Vols 1 & 2, with exhibits
Deposition Transcript, Susan Weiss, with exhibits
Deposition Transcript, Peter Willaims, with exhibits
Letter from OneBeacon to Andrea Garber, July 28, 2014
Letter from Lucia Coyoca to Pamela Johnson, August 13, 2014
Letter from OneBeacon to Lucia Coyoca, September19, 2014
Expert Report, Anthony Clark
Rebuttal Report, Anthony Clark
Deposition Transcript, Anthony Clark, with exhibits
Expert Report, Ty Sagalow
Rebuttal Report, Ty Sagalow
Deposition Transcript, Ty Sagalow, with Exhibits
District Court Summary Judgment Order
9th. Circuit Opinion: US Court of Appeals
Order for Trial
ASIC's Memorandum of Contentions of Fact and Law
Revised Joint List of Deposition Testimony to be Offered at Trial
Written Expert Proffer of Plaintiff's Expert, Ty Sagalow
Califonia Insurance Code § 790.03(h)
California Code of Regulations, Fair Claims Settlement Practice Regulations

## Qualifications:

I am attaching a copy of my current curriculum vitae which will summarize my
career in the insurance industry from 1963 to the present. I have been employed by
an insurance company; insurance brokers, including brokers at Lloyd's; and
independent loss adjusters, and am now self-employed as an independent loss
adjuster and consultant, currently licensed in California and in Washington State.

Universal Cable Productions vs. ASIC
February 7, 2020
Page 3

I have been involved in the handling of first party insurance claims since 1967 and
have worked in the United States since 1978, investigating, adjusting, supervising
and managing first party insurance claims of all types, both in the United States
and internationally. I have been retained as a consultant or expert witness on
numerous occasions, qualifying to testify at trial in state courts in California and
New Mexico and in federal courts in California, Louisiana, Mississippi, Nevada,
Colorado and Washington State.

## The Policy:

ASIC policy MP00163-03 was issued to insured NBCUniversal Media LLC for a
period of eighteen months expiring June 30, 2015 and providing coverage, inter
alia, for television productions as proposed and agreed. Coverage included that for
Extra Expense written subject to the terms and conditions of form NS 103 0110, as
amended by endorsement, including Motion Picture Television Portfolio General
Conditions Form NS 100 0110. The coverage was written following negotiations
between the insured, represented by its brokers, AON, and ASIC, with the first
policy period beginning in 2010, with subsequent renewals.

The policy was subject to a Self Insured Retention of $3,100,000 Aggregate
(including Paid Losses and Adjustment Expenses) (ATL003073-127). The Extra
Expense limit was $10,000,000, itself subject to individual deductibles.

In December 2013 Universal, through its broker, advised ASIC that it was
proposing to film a new series called "Dig", at least in part in Israel. After some
negotiation ASIC confirmed coverage for the project with filming of the pilot
episode to commence on or about June 1, 2014. Coverage was agreed subject to
the terms and conditions of the policy in place.

Policy form NS 100 0110, the General Conditions, contained several Exclusions
that are relevant to this matter (ATL003083) :

## III. EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY

This policy does not insure against loss or damage caused directly or indirectly by:
1. War, including undeclared war or civil war; or
2. Warlike action by a military force, including action in hindering or
   defending against an actual or expected attack, by any government,
   sovereign or other authority using military personnel or other agents; or
3. Insurrection, rebellion, revolution, usurped power, or action taken by
   governmental authority in hindering or defending against any of these. Such

Universal Cable Productions vs. ASIC
February 7, 2020
Page 4

       loss or damage is excluded regardless of any other cause or event that
       contributes concurrently or in any sequence to the loss.

4. Any weapon of war including atomic fission or radioactive force, whether in
   time of peace or war;

## The Events:

The underlying facts surrounding the claim appear not to be in dispute and the
following narratives are drawn from the reports of the parties' retained experts
Clark and Sagalow, the ASIC/OneBeacon letter of July 28, 2014 and in the other
documents cited above

While conditions in Israel were considered safe as filming began, three Israeli
teenagers were kidnapped on June 12, 2014 and Hamas was suspected of being
involved in the kidnapping. After completion of the pilot episode of Dig and on or
about June 30, 2014, prior to the filming of the next five episodes of Dig, the
bodies of the missing teenagers were found and there were further allegations of
the involvement of Hamas.

Hamas began launching rockets into Israel and Israel began to take action to
protect its interests and to stop the attacks. Due to deteriorating security conditions,
on July 8, 2014 the United States Department of State issued advisories concerning
the safety and security of civilians in Israel.

On July 10, 2014 the head of security at NBCUniversal advised that "the security
environment in Israel currently prohibits NBCU security from being able to
guarantee the safety and security of our employees, production partners and
associated crew and talent ……. personnel based in country in relation to this
production should make arrangements to leave." On the following day, July 11,
2014, NBCUniversal informed ASIC of its decision to postpone the production of
episodes two and three of Dig for a period of one week from its scheduled
commencement on July 20.

On July 14, 2014 the insured finalized its decision to push the production for one
week and so advised ASIC. NBCUniversal also suggested the possibility that, if
hostilities did not deescalate, production might be moved to another country or
back to the United States. Hostilities between Hamas and Israel worsened and on
July 15 Hamas refused to agree to a cease-fire that had been suggested by Egypt.

Israeli military were then given authorization to use full force against militants in
Gaza. NBCUniversal then relocated production of the series to Croatia and to New

Universal Cable Productions vs. ASIC
February 7, 2020
Page 5

Mexico and the insured incurred extra expense as a result of the delay and
relocation.

During the conflict which extended until August 26, 2014, 2143 Palestinians and
69 Israelis were killed. Israel struck 5283 targets in Gaza. Hamas fired 4564
rockets into Israel and more than 50,000 buildings in Gaza with damaged or
destroyed (Johnson letter, September 19, 2014, ATL000705)

## The Claim:

Following the initial inquiry to ASIC on July 11, 2014 (though shown as July 10 in
the insurer's correspondence ATL000094), and involving a potential Extra
Expense claim relating to the planned "push" of production for one week, claim
was submitted by the broker to ASIC on July 15 (ATL000104).

The claim was assigned to examiner Daniel Gutterman, supervised by Assistant
Vice President, OneBeacon Entertainment, Pamela Johnson, and on Thursday, July
17, Ms. Johnson and Mr. Gutterman spoke with Andrea Garber of the insured and
Susan Weiss of AON, learning that the decision had been made to move the
production from Israel. Ms. Johnson reiterated a prior discussion between Peter
Williams, President of OneBeacon Entertainment and the broker wherein the
insurer had advised that it was "seriously considering whether the exclusion for
war and warlike actions would preclude coverage for the claim." Ms. Garber and
Ms. Weiss protested, asserting that the situation in Israel did not constitute war
because Hamas was a terrorist organization, not a governmental authority and that
there had been no formal declaration of war. Ms. Johnson confirmed that the
insurer was still considering the matter and would respond on Monday, July 21
with its final decision (ATL000096).

The insurer's investigation included searches by Mr. Gutterman and Ms. Johnson
as to the facts, news reports, the status of Hamas, Appleman on Insurance and
Black's Law Dictionary. Ms. Johnson, an attorney herself (Johnson Deposition,
Page 12), also carried out legal research (Sagalow Report, Page 10). On July 21,
2014 Ms. Johnson advised the insured that the insurer's final decision was to
exclude the claim based upon the applicable exclusions though, as a courtesy, it
would provide coverage for the expenses related to the initial push in production.

By letter of July 28, 2014 Ms. Johnson set out in detail the sequence of events, the
nature and extent of the insurer's investigation, applicable exclusions and the
coverage decision. The insurer had concluded, among other things, that "Hamas

Universal Cable Productions vs. ASIC
February 7, 2020
Page 6

has become the government of the Gaza Strip. Hamas has a military wing, the Qassam Brigades, as well as a force of police, security and intelligence personnel. Our understanding is that it is Hamas's military wing that has carried out the attacks on Israel that led to NBCU's claim. 'Hamas direct the Gaza government and security forces through a self-appointed cabinet of Hamas ministers...'", (quoting from Zanotti, Hamas: Background and Issues for Congress (Congressional Research Service 2010)).

As a result of its investigation the insurer had concluded, among other things, that:

"although Gaza or Palestine is not a recognized nation, at least by most of the world, it does have some indicia of sovereignty. It governs territory and it is this territory from which the attacks on Israel have come. Hamas has a stated goal of destroying Israel and is using weapons in its quest. Although the rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law, this is not a situation where a single civilian, or group of civilians, is the target. This conflict involves sophisticated military weapons fired from one territory into another country, Israel. We believe that the only reasonable interpretation of what is occurring, and that has led to NBCU's action, is war or warlike action.

We note that NBCU affiliated company, MSNBC, has referred to the conflict as a war for the past several days. This should be considered in taking into account the insured's reasonable expectations.

Even if what occurred, and is occurring, would not be found to be a war, it is nevertheless a "warlike action". However, if this is the case, to be excluded under Subparagraph 2 of the exclusion, the warlike action must be by a "military force".. There is no question that one side of the conflict, the Israeli side, is a military force of a sovereign nation. But if it is necessary that the military force must be the one firing rockets at the areas where the filming was occurred, we must determine whether Hamas is a military force. As to this question, we believe that Hamas is a military force of a government, the government of Gaza. Even though many, including Israel and the United States consider Hamas to be a terrorist group, it is the government of a territory that is involved in the conflict. Hamas operates as a military command in the Gaza Strip, a territory that it has controlled since 2007. It operates its military force through self-appointed ministers. In light of the governmental structure within Gaza, the Hamas military in Gaza fits the definition of a military force. The current structure represents a considerable evolution from the Hamas that

Universal Cable Productions vs. ASIC
February 7, 2020
Page 7

> Gaza, the Hamas military in Gaza fits the definition of a military force. The
> current structure represents a considerable evolution from the Hamas that
>
> carried out the isolated terrorist attacks in the 1990s and the first few years of
> the 21st century. (citations omitted)
>
> Thus, the only reasonable interpretation of the situation that led to NBCU's
> decision to postpone the Dig production and its ultimate decision to move the
> production from Israel is that the imminent peril that led to these decisions was
> caused by war, or warlike action by a military force. As a result, we believe the
> war exclusion applies to this claim."

The letter set out all four exclusions (ATL000097) and concluded by requesting
further contact in the event that the insured had further questions (ATL000094-
101).

On August 13, 2014 counsel for the insured wrote to Ms. Johnson confirming
appreciation of OneBeacon's willingness to cover the expenses associated with the
initial one week postponement of the Dig production, but disputing the coverage
decision (ATL000087-93).

After carefully considering the issues raised, Ms. Johnson responded by letter of
September 19, 2014, advising that it remained the conclusion of the insurer that the
insurance policy did not insure the claim. Again, Ms. Johnson set out all four of the
applicable exclusions and explained the insurer's reasoning. (ATL000705-08).

Following the filing of suit and discovery, cross-motions for summary judgment
were filed and, on October 6, 2017 the Court issued its decision, holding that
"Atlantic (ASIC) is entitled to summary judgment on both of Plaintiffs' causes of
action in the First Amended Complaint and Plaintiffs' motion for summary
judgment must be denied. The Court will enter a judgment consistent with this
order." (Document 128)

The decision was appealed to the United States Court of Appeals for the Ninth
Circuit which filed its Opinion on July 12, 2019, reversing in part and vacating in
part the district court's summary judgment in favor of ASIC in respect of policy
exclusions 1. and 2., Holding that Exclusions 1 and 2 were not applicable and
remanding to the Trial Court the remaining issues.

Universal Cable Productions vs. ASIC
February 7, 2020
Page 8

The Trial Court then ruled that Exclusions 3 and 4 did not apply to preclude
coverage and set for trial issues of damages and whether Atlantic acted in bad
faith.

**Standards:**

Standards governing the conduct of insurers and insureds are generated by
industrywide custom and practice, policy provisions, the application of uniform
acts such as the National Association of Insurance Commissioners' Model Unfair
Claims Settlement Practices Act, and regulations of the applicable administrative
agency. Here, suit was filed in California and the relevant regulations are contained
within the Department of Insurance Fair Claims Practices Regulations and
Insurance Code §790.03(h).

In my experience, apart from those areas discussed above, claims must be
reviewed individually since each is likely to require its own level of investigation
and coverage analysis. A principal obligation is to match the facts of the loss with
experienced and qualified claims personnel. After completion of the investigation
the insurer is then able to review results and other available information to assist in
its coverage and adjustment determinations, bearing in mind the detail of the
coverage provided and any applicable limits and/or exclusionary language in the
policy. Policy interpretation is based upon the plain meaning of policy wordings
and definitions, subject to any special meanings imposed by legal precedent.

**The Clark Reports:**

Anthony Clark, an experienced and respected insurance claim professional, was
retained by counsel for ASIC to form opinions regarding the denial of the claim
and whether the denial of the claim by the insurance company would be considered
reasonable given the circumstances from which the claim arose and related issues.
He provided his report on March 17 2017 and subsequently a rebuttal report to that
of plaintiff's expert Ty Sagalow. Mr. Clark also provided deposition testimony.

Mr. Clark summarized his opinions on page 4 of his first report, stating:

> Based on my experience in the handling, review, and denial of claims, it is
> my opinion that Atlantic Specialty Insurance Company (Atlantic) properly
> conducted a thorough and timely investigation into the circumstances
> surrounding the Extra Expense claim as presented by the plaintiffs and made a
> reasonable determination under the terms and conditions of the applicable
> policy of insurance that the war exclusion applied and therefore could make no

Universal Cable Productions vs. ASIC
February 7, 2020
Page 9

payment to the insured. Atlantic acted as a reasonable carrier would by staying
in communication with its insured during the investigation stage of the claim,
and by providing updates on its analysis on coverage. Atlantic then proceeded

to provide the insured with a clear and detailed explanation of the denial in an
expedited matter as requested by the insured. Atlantic also responded in a
complete and timely manner to a request by the insured for reconsideration.
Atlantic continued to communicate with its insured and efforts to discuss the
coverage issues and reach some negotiated resolution, including through an in
person meeting and a settlement offer.

It is my opinion that this determination – that coverage was precluded by
applicable exclusions in the policy – was made solely from the specific
circumstances as they were made known to, investigated by, and considered by
Atlantic Specialty Insurance Company, and those circumstances were
considered in light of the policy contract wording. Nothing in the claim file or
in any other actions of Atlantic Specialty indicates that any other extraneous
motives affected the ultimate claim decision.

The report then provides discussion concerning the actions and activity leading up
to the circumstances surrounding the loss and the investigation carried out by
ASIC, as summarized above.

Following review of the report of Ty Sagalow, retained on behalf of plaintiffs, Mr.
Clark issued his rebuttal report, disagreeing with Mr. Sagalow's opinions,
including as to the reasonableness and timeliness of the investigation and coverage
decisions; Mr. Sagalow's views concerning "customs and practice in the insurance
industry"; as discussed in more detail below.

I agree with and incorporate Mr. Clark's opinions and conclusions within my own.

While the relevant Exclusions as set out above have been referred to as the "War
Exclusions", they are not headed as such. Rather, while Exclusions 1. and 2. relate
to war or warlike actions and 4. speaks to weapons of war, Exclusion 3. does not
mention "war" but deals with other forms of aggression.

I would refer to the Standards section of my report as it refers to policy
interpretation.

**<u>The Sagalow Reports:</u>**

Universal Cable Productions vs. ASIC
February 7, 2020
Page 10

## **The Sagalow Reports:**

Mr. Sagalow is an insurance executive and attorney, apparently with little direct
first party commercial property claims experience. (Sagalow CV, Report Pages 44-
47). He was retained on behalf of plaintiffs to provide his opinions and conclusions
concerning the claims handling in the matter at hand. He also provided two reports,
the first on March 17, 2017 and the second, and rebuttal to Mr. Clark's first report,
on April 28, 2017. Mr. Sagalow also provided deposition testimony.

Mr. Sagalow's two opinions, as set out on page 41 of his first report were:

  a. Atlantic was acting against industry custom and practice when it applied the
     War Exclusion to the claim at issue, and
  b. Atlantic violated a number of industry customs and practices in its claims
     process and handling of the claim at issue.

As did Mr. Clark, I disagree with Mr. Sagalow's opinions and conclusions as
explained below.

Mr. Sagalow sets out his view of custom and practice in the insurance industry in
paragraphs 36 through 43 of his report. The policy, and those that preceded it
resulted from negotiations between a sophisticated insured, part of the NBC
Organization and with its own risk management department of which Andrea
Garber was Senior Director, Risk Management (Sagalow Report, Page 8) worked
through its broker, AON, to negotiate terms and conditions with ASIC. AON is a
sophisticated multinational insurance brokerage self described on its website as "a
leading global professional services firm providing a broad range of risk,
retirement and health solutions. Our 50,000 colleagues and 120 countries empower
results for clients...." There is not evidence of ambiguity in the policy wording and
the US Court of Appeals for the Ninth Circuit declined to apply contra proferentem
either in favor of the insured's interpretation, or in favor of ASIC (Appellate
Opinion Pages 2-3)

The evidence was, at the time when the Dig risk was accepted by ASIC, that
conditions in Israel were considered safe (MSJ SUF 29 & 30), and AON had
specifically requested no deviation from its standard policy terms (Sagalow Report,
Page 6). While the ASIC underwriter was clearly aware that at least part of the
production would take place in Israel, there was not evidence of impending
military action.

Universal Cable Productions vs. ASIC
February 7, 2020
Page 11

Mr. Clark and I disagree with Mr. Sagalow as to his discussion concerning industry
custom and practice regarding the application of reasonable expectations and of
"the war exclusion" and his ready conclusion of terrorist activity rather than as
described in the four exclusions quoted above.

I have described above claims handling standards based on my experience and
industry custom and practice. While insurers are obliged to carry out a prompt and
thorough investigation of claims prior to making coverage decisions, each loss
must be judged by its own merits. Here, ASIC was able to determine the basic
underlying facts rapidly and they appear not to be in dispute.

In my experience there is inherent conflict in the obligations of insurers, in that
they are open to criticism for the making of decisions following thorough
investigations too quickly or, when taking time following the investigation, too
slowly. ASIC did carry out considerable investigation and the retention of
"experts", as suggested by Mr. Sagalow, would not appear to have been helpful
given the decades of political and other differences and apparently hardened
political attitudes of individual Nations and commentators.

Mr. Sagalow discusses in detail the background of industry custom and practice
concerning the terrorist exclusion and the war exclusion, beginning on page 18 of
his report. The terrorism issue appears to be moot since there was no such
exclusion contained within the ASIC policy and thus the question was whether or
not any of the exclusions set out above were applicable. ASIC, after carrying out
its thorough investigation, determined that one or more of the exclusions would
apply and thus issued its letter of denial, having previously provided indication as
to its thinking.

The Trial Court, in its Summary Judgment determination, accepted and agreed
with ASIC's position though that decision was overturned insofar as Exclusions 1
and 2 were concerned. Following issuance of the appellate court decision, the Trial
Court issued its ruling as to Exclusions 3 and 4.

On page 20 of his report, Mr. Sagalow expounds upon the status of Hamas. The
Courts have made their rulings. The issue remains that ASIC carried out a
comprehensive investigation, including legal and other research conducted by Mr.
Gutterman and Ms. Johnson, an experienced claims manager and an attorney,.
Following that investigation ASIC made its coverage determination, reasonably
both in my opinion and that of Mr. Clark.

Universal Cable Productions vs. ASIC
February 7, 2020
Page 12

Mr. Sagalow, apparently mixing legal opinion with the balance of his report, discusses "the war exclusion" in Section VIII of the report, beginning on page 29, apparently not taking into account the fact that the excluded areas of coverage extend beyond war itself. Both Mr. Clark and I disagree with him, as described in the Clark reports and in mine.

Section IX of the Sagalow report (Page 32) deals with claims handling issues. Again, Mr. Clark and I disagree with him and with his conclusions relating to the thoroughness of the ASIC investigation and the reasonableness of its decision. As discussed above, the retention of "experts" would not have been useful, given aggressively divergent views. In my experience, war claims are extremely rare and the issue here is one of coverage interpretation based on facts that are not in dispute.

Mr. Sagalow suggests discussions with the underwriter as to coverage but, again in my experience and as stated by Mr. Clark on page 6 of his rebuttal report, the policy form was provided by the broker, AON, and it contained a war exclusion as well as those others shown. Notwithstanding this, Ms. Johnson did confer with Peter Williams.

There was error in the ASIC letter of July 28, 2014 concerning its discussion regarding terrorism coverage. This error was rectified in Ms. Johnson's letter to counsel for the insured on September 19, 2014 (ATL000708), where it was confirmed that the Terrorism Endorsement did not apply. There is not evidence of misrepresentation on the part of ASIC or that the insurer failed to disclose benefits, coverages and limitations and, as stated, ASIC was dealing with coverage forms presented to it by the insured's broker, AON.

The Sagalow rebuttal to Mr. Clark's report is lengthy and argumentative but, in my opinion does not does not add to or otherwise affect Mr. Clark's opinions or my own. I disagree with his opinions and conclusions.

## Evans Opinions and Conclusions:

My opinions and conclusions are based upon more than 40 years experience in the investigation, adjustment, supervision and management of first party property claims in the United States and elsewhere, based in California where I have been licensed adjuster for at least 20 years. Prior to obtaining my California license I worked under the license of my then employer. I have also been employed as an adjuster in the United Kingdom, have worked as a broker, including at Lloyd's, and was first employed by an insurer.

Universal Cable Productions vs. ASIC
February 7, 2020
Page 13


Having reviewed the information and documentation provided to me in this matter
I confirm my agreement with the opinions and conclusions of Anthony Clark and,
for the reasons expressed in this report, disagree with those of Mr. Sagalow.

I conclude, as did Mr. Clark, that ASIC conducted a reasonable, prompt and
thorough investigation, maintaining contact with the insured and advising
NBCUniversal of the progress of the investigation, providing indications of its
potential coverage position prior to issuing its letter of denial. The ASIC
investigation included research of the facts and legal and coverage issues.
Subsequently ASIC then acted reasonably in continuing its contacts with the
insured and its representatives.

Neither ASIC's investigation process nor its coverage determination was
unreasonable and it was not inconsistent with industry custom and practice.

It was reasonable, in my opinion, for ASIC to conclude that the claim fell within
the Exclusions following Ms. Johnson's research and analysis, as set out in the
insurer's letters of July 28 and September 19, 2014, and the investigation was both
prompt and thorough, with consideration having been given to the insured's
arguments.

Exhibit 2:  CV of Peter Evans

# EVANS ADJUSTERS

119, Underhill Road,
Mill Valley, CA 94941
Phone: 415-381-9223
Fax: 415-388-6510
PSEvans@comcast.net

---

## PETER S. EVANS
Curriculum Vitae

## PROFESSIONAL EXPERIENCE

Evans Adjusters                                                                                        2003 -

*Executive General Adjuster/Owner*
Large/complex loss adjuster, First party claims
Appraiser or Umpire for Policy Appraisals
Consultant/Expert Witness in disputed matters.
California License #2D26665
Washington License #749072
Arizona License #1094830
Texas License #1759390 (Lapsed 2014)

The ASU Group, Novato, CA (Successor to D.L. Glaze Co.)                          1999-2003

*Vice President General Adjuster Operations/Executive General Adjuster*
Responsible for supervision of adjusters and promotion of all aspects of the business, with special emphasis on property lines.
Executive General Adjuster involved in property related losses of all types.
Director, ASU Group General Adjuster program
Consultation with attorneys and retention as expert for file review, deposition and testimony on claims handling practices in First Party and Concurrent Causation cases.
Appraiser or Umpire when selected for Insurance Code 2071 Appraisals.

Speaker/panelist at educational Seminars and Conferences, including the following groups:
Loss Executives Association
National Forum for Property Loss Professionals
Property Loss Research Bureau
California Association of Independent Insurance Adjusters
Property Claims Association of the Pacific
San Francisco Insurance Claims Forum
R.I.M.S. Santa Clara Valley Chapter
Defense Research Institute
A.B.A. – T.I.P.S. Section
Claims Conference of Northern California
U.S. Dept of Commerce, Hurricane Mitch Insurance Conference, El Salvador
U.S. Delegate to OECD Insurance Committee, Paris, France

D. L. Glaze Company, Inc., Mill Valley, CA                                                  1978-1999
*Executive Vice President/Executive General Adjuster*
Duties and responsibilities as above.

# PETER S. EVANS
Curriculum Vitae
Page Two

| | |
|---|---|
| Cunningham, Hart & Co., Chartered Loss Adjusters, London, England | 1975-1978 |

*Senior adjuster*
   Involved predominantly with First Party and Bond Losses.

| | |
|---|---|
| Chandler, Hargreaves, Whittall & Co., Lloyds' Brokers, London, England | 1974-1975 |

*Senior Claims Broker*

| | |
|---|---|
| Bishop, Skinner & Co., Ltd, Insurance Brokers, London, England | 1972-1974 |

*Account/Claims Executive*

| | |
|---|---|
| Hart & Co., Chartered Loss Adjusters, London, England | 1967-1972 |

*First Party Claims Adjuster*

| | |
|---|---|
| Bland Welch & Co., Lloyds' Brokers, London, England | 1964-1967 |

*Placing Broker at Lloyds'*

| | |
|---|---|
| General Accident Fire & Life Assurance Corporation, London, England | 1963-1964 |

*Insurance Trainee*

## EDUCATION

General Certificate of Education – Advanced Level, Ardingly College, Sussex, England

## PROFESSIONAL AFFILIATIONS

   Registered Professional Adjusters (Founding Director)
   Leading International Property Adjusters
   Loss Executives Association (Associate Member)
   Property Claims Association of the Pacific (President 1994-1995)
   California Association of Independent Insurance Adjusters (President 1999-2000)
   National Association of Independent Insurance Adjusters (2004 – 2014)
   Federation of Defense & Corporate Counsel (Associate Member)

## PERSONAL

   Married, two sons
   Interests – outdoor sports, sailing and yacht racing.

Exhibit 3:  Deposition Testimony of Peter Evans

**RECENT DEPOSITION TESTIMONY**


March, 2015            Imperial Beach Palm vs. Travelers
Federal Court, Southern District, CA, Case No. 3:14-cv-00639-JLS-JLB
Defense Counsel Weston & McElvain, Los Angeles, CA

March, 2015            Ingenco vs. ACE American Insurance
Federal Court, Western District, WA, Case No. C13-543RAJ
Defense Counsel Foran Glennon, Chicago, IL

March, 2015            SST Hospitality vs. Gordon Associates
San Mateo County, CA, Case No. CIV521502
Defense Counsel Cresswell, Echeguren et al., Oakland, CA

July, 2015            U.C. Regents vs. Factory Mutual Insurance
San Francisco County, CA, Case No. CGC-13-534008
Defense Counsel Yates Law Firm, Denver, CO.

September, 2015       Allstate vs. Broan Nutone et al.
Federal Court, NV, Case No. 2:14-cv-01062-JCM-VCF
Defense Counsel Cooper Levenson, Las Vegas, NV.

October, 2015         La Jolla SPA M.D. Inc. vs. Transportation Insurance
County of San Diego CA, Case No: 37-2013-00075909-CU-BC-CTL
Defense Counsel Cummins & White, Newport Beach, CA

November, 2015        The Abbey Companies LLC vs. Affiliated FM Insurance
Los Angeles County CA, Case No: MC024568
Defense Counsel Yates Law Firm, Denver, CO

December, 2015        Rosalie Smith vs. Travelers
County of Salt Lake, UT, Case No: 120903959
Defense Counsel Snell & Wilmer, Salt Lake City, UT

February, 2016
Harvey Property Management vs. Travelers
Federal Court, AZ, Case No: 2:12-CV-01536-SLG
Defense Counsel Foran, Glennon et al., Phoenix, AZ

March, 2016
Shultz Steel vs. Continental Casualty
Federal Court, Central District of CA, Case No: 2:14-cv-08044-RSWL-RZ
Defense Counsel Dentons, Atlanta, GA

May, 2016
Comey vs. State Farm
Orange County, CA, Case No:30-2014-00745930-CU-IC-CJC
Defense Counsel Sedgwick LLP., Los Angeles, CA

July, 2016
Bear River Mutual Insurance Company vs. Ford Motor Company
Federal Court, District of Utah, Case No: 2:12-cv-00731DB
Defense Counsel Snell & Wilmer, Salt Lake City, UT

October, 2016
Alta Grove LLC vs. Travelers
District Court, El Paso County, CO, Case No: 2015 CV 30879
Defense Counsel Foran Glennon et al., Denver, CO

October, 2016
11333, Inc vs. Certain Underwriters at Lloyds'
Federal Court, District of Arizona, Case No: 2:14-CV-02001-NVW
Defense Counsel Clyde & Co., San Francisco, CA

January, 2017
Ohio Security Insurance Co. vs. Pelican Bay Townhomes Assn. et al.
District Court, Arapahoe County, CO, Case No: 2015CV030797
Plaintiff Counsel Yates Law Firm, Denver, CO

May, 2017
City of Chula Vista vs. Lexington Insurance Company
Federal Court, Southern District of CA, Case No: 3-16-cv-01105-BTM-BGS
Defense Counsel Selvin Wraith Harman, Oakland, CA

September, 2018
Johnston vs. Pelandale Self Storage, et al.
Stanislaus County, CA, Case No: 2023038
Defense Counsel Yempuku, Wetters & McNamara, Sacramento, CA

September, 2018
Thunderbutte Enterprises LLC vs. Deatsch Insurance Agency
El Dorado County, CA, Case No: PC 20160539
Defense Counsel Cresswell, Acheguren, Rodgers & Harvey, Oakland, CA

October, 2018
Ali vs. Mid-Century Insurance
Alameda County, CA, Case No: RG16838714
Defense Counsel Hansen, Kohls, Sommer & Jacob, Roseville, CA

January, 2019
Shanley vs. Crestbrook Insurance
Los Angeles County, CA, Case No: BC645454
Defense Counsel Cozen O'Connor, Los Angeles, CA

January, 2019
Utica Mutual Insurance vs. Cincinnati Insurance
Federal Court, Eastern District of PA, Case No: 18-cv-1646
Defense Counsel Litchfield Cavo, Chicago IL

February, 2019
Argonaut Great Central vs. Basuta et al.
San Joaquin County CA, Case No: STK-CV-UIC-2014-0008605
Plaintiff Counsel Cummins & White, Newport Beach, CA

February, 2019
Monitor Rockrimmon vs. Cincinnati Insurance
Federal Court, District of CO, Case No: 1:17-cv-01270-RBJ
Defense Counsel Litchfield Cavo, Chicago, IL

June, 2019
Persian Carpet Warehouse vs. Covington Specialty Insurance
Los Angeles County CA, Case No: LC106302
Defense Counsel Cummins & White, Newport Beach, CA

September, 2019
Sentry Select Insurance vs. Murray Family Trust
Monterey County CA, Case No: M130649
Defense Counsel Cresswell Echeguren, Oakland, CA

October, 2019
Rigsby vs. State Farm
Federal Court, Southern District of MS, Case No. 1:06-cv-433-HSO-RHW
Defense Counsel Butler Snow, Gulfport, MS

October, 2019
Kelnhofer/7th Floor LLC vs. Evanston Insurance
Federal Court, District of CO, Case No: 1:18-cv-02222-MSK-STV
Defense Counsel Wheeler Trigg O'Donnell, Denver CO

January, 2020
Lynnwood Health Services Inc. vs. Affiliated FM Insurance
Federal Court, Central District of CA., Case No: 8:19-cv-0543-JVS (KESx)
Defense Counsel Robins Kaplan, Los Angeles CA

Exhibit 4:  Trial Testimony of Peter Evans

**PETER EVANS – TRIAL TESTIMONY IN THE PAST FOUR YEARS**

MKB Constructors vs American Zurich – Federal Court, Seattle, Washington, Case #CV-12-1811-NC, Defense Counsel Mound Cotton, et al, Emeryville, CA

Star Insurance vs. Sunwest Metals – Federal Court, Orange County, CA, Case No. SACV 13-1930 DOC (DFMx), Plaintiff Counsel Woolls & Peer, Los Angeles, CA

SST Hospitality vs. Gordon Associates – San Mateo County, CA, Case No. CIV521502, Defense Counsel Cresswell, Echeguren et al., Oakland, CA

Action Response Team Inc. vs. Big Bear Enterprises Inc. – San Bernardino, CA Case No. CIVDS 1413192, Defense Counsel (for Western Heritage Insurance Company) Cozen O'Connor, Los Angeles, CA