# EXHIBIT 7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
CASE NO: 2:16-cv-04435-PA-MRW

UNIVERSAL CABLE PRODUCTIONS LLC, and
NORTHERN ENTERTAINMENT PRODUCTIONS LLC,
Plaintiffs,

v.

ATLANTIC SPECIALTY INSURANCE COMPANY,
Defendant

## EXPERT REPORT OF ANTHONY CLARK, AIC

I am the Principal of Clark Insurance Arbitration & Consulting, LLC located in Plainfield, Illinois. Strasburger & Price, LLP, on behalf of Atlantic Specialty Insurance Company, has engaged me as an expert witness for the purpose of forming an opinion in the above referenced case regarding the denial of the claim and whether the denial of the claim by the insurance company would be considered reasonable given the circumstances from which the claim arose.

I have over 40 years of experience as a property insurance adjuster, supervisor, claims officer, and property insurance consultant. I retired from the position of Vice President of Property Claims for a major international insurance carrier in 2014 and am now engaged as a consultant. During the first fifteen years of my career I was a field adjuster progressing from a trainee, initially involved in homeowners and small commercial losses, to the level of Executive General Adjuster handling significant commercial losses exclusively. I was then promoted to the position of Assistant Vice President of property claims with responsibility for the direct supervision of a staff of General Adjusters located throughout the United States as well as conducting extensive training regarding the handling of commercial losses. In addition, I had responsibility for the set up and field supervision of the catastrophe response team during major natural disaster events that included

1

tornadoes, hurricanes, hailstorms, and earthquakes. As a result of this experience, I am very familiar with the handling, supervision, and management of first party property claims in many jurisdictions. During my career I have directly handled and supervised claims in California. My experience includes the internal audit and review of claim files for an independent adjusting firm. Thus I was required to be familiar with the statutory requirements of multiple jurisdictions. Throughout my career, both as an adjuster and in supervision, I have been involved in claims where there were allegations of bad faith handling of claims and was required to respond to those allegations. I have prepared industry presentations and taught classes related to the appropriate handling of first party property claims for the past 30 years of my career.

My background and experience is fully described in the C.V. attached to this report. I have not testified as an expert at trial in the past four years. I have testified in deposition on three matters within the past four years as noted on the C.V. I have not authored any publications within the past 10 years.

My fee for consultation, review, and reporting is $350 per hour and for deposition or testimony time is $400 per hour. Expenses are reimbursed on an actual incurred basis and travel time is $150 per hour.

**Documents Reviewed**

1. Plaintiffs' First Amended Complaint for (1) Breach of Insurance Contract; and (2) Breach of Implied Covenant of Good Faith and Fair Dealing, Filed 07/07/16.
2. Defendant's Original Answer to Plaintiffs' First Amended Complaint, Filed 08/05/16.
3. Plaintiffs' Response to Defendant's First Set of Interrogatories, Filed June 20, 2016.
4. Defendant's Second Amended Responses to Plaintiffs' First Set of Interrogatories, served on February 22, 2017.
5. Atlantic Specialty Insurance Company Policy Number MP 00163-04.
6. Letter of July 28, 2014 from Pamela A. Johnson of OneBeacon Entertainment to Andrea Garber of NBC Universal Media, LLC.
7. Letter of August 13, 2014 from Lucia E. Coyoca, A Professional Corporation of Mitchell Silberberg & Knupp LLP to Pamela A. Johnson as a response to her letter of July 28, 2014.
8. Letter of September 13, 2014 from Pamela A Johnson to Lucia E. Coyoca as a response to the letter of August 13, 2014.
9. Atlantic Specialty Insurance Company documents encompassing the following Bates reference numbers: ATL000001 through ATL000161, ATL000294 through ATL000319, ATL000322 through ATL000328, and ATL000393 through ATL000399.
10. Atlantic Specialty Insurance Company production of claim correspondence and documents for the DIG claim.
11. Deposition Testimony of Daniel Gutterman, with exhibits.
12. Deposition Testimony of Theresa Gooley, with exhibits.
13. Deposition Testimony of Peter Williams, with exhibits.

## Summary of Opinions

Based on my experience in the handling, review, and denial of claims, it is my opinion that Atlantic Specialty Insurance Company (Atlantic) properly conducted a thorough and timely investigation into the circumstances surrounding the Extra Expense claim as presented by the plaintiffs and made a reasonable determination under the terms and conditions of the applicable policy of insurance that the war exclusion applied and therefore could make no payment to the insured. Atlantic acted as a reasonable carrier would by staying in communication with its insured during the investigation stage of the claim, and by providing updates on its analysis on coverage. Atlantic then proceeded to provide the insured with a clear and detailed explanation of the denial in an expedited manner as requested by the insured. Atlantic also responded in a complete and timely manner to a request by the insured for reconsideration. Atlantic continued to communicate with its insured in efforts to discuss the coverage issues and reach some negotiated resolution, including through an in-person meeting and a settlement offer.

It is my opinion that this determination—that coverage was precluded by applicable exclusions in the policy—was made solely from the specific circumstances as they were made known to, investigated by, and considered by Atlantic Specialty Insurance Company, and those circumstances were considered in light of the policy contract wording. Nothing in the claim file or in any other actions of Atlantic Specialty indicates that any other extraneous motives affected the ultimate claim decision.

## Discussion

The actions and activity leading up to the various circumstances that came into focus in early July of 2014 between Israel and Hamas in the Gaza Strip has been

documented through many sources and news reports. Following is a small sample of the reporting, which according to the claim file materials were reviewed and considered by Atlantic:

https://www.washingtonpost.com/news/worldviews/wp/2014/09/03/heres-what-really-happened-in-the-gaza-war-according-to-the-israelis/?utm_term=.e7ccbabd8102

http://www.msnbc.com/msnbc/scenes-war-and-heartbreak-israel-hamas-conflict-intensifies

http://www.nbcnews.com/storyline/middle-east-unrest/how-technology-intensifying-gaza-war-between-israel-hamas-n158536

https://www.nytimes.com/2014/08/30/world/middleeast/50-days-of-war-leave-israelis-and-palestinians-only-more-entrenched.html

http://time.com/3076594/israel-gaza-cease-fire-hamas-netanyahu/

According to the claim materials maintained by Atlantic, the insured notified Atlantic Specialty Insurance Company by telephone call on July 11, 2014 that due to the outbreak of hostilities they believed that the Imminent Peril portion of the Extra Expense coverage in the policy could be applicable and that they would delay the resumption of filming one of their productions, namely *DIG*, in Israel for one week. Within a very short time period, due to the ongoing conflict, the production was ultimately moved to Croatia and New Mexico.

It is my understanding that the insured sought Extra Expense coverage, in connection with its position that the Imminent Peril condition would apply. Due to

5

the facts that were presented to Atlantic, Atlantic quickly began to review the facts in the context of the several war exclusions in the policy, which are set out here:

> III. EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY
>
> This policy does not insure against loss or damage caused directly or indirectly by:
>
> 1. War, including undeclared or civil war, or
>
> 2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents, or
>
> 3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> 4. Any weapon of war including atomic fission or radioactive force, whether in time of peace or war;

In considering all the factors that are entering into an analysis at the time of a coverage determination, it is my understanding from the custom and practice of the industry that unless a term is specifically defined in a policy, it is to be viewed as it is commonly used or ordinarily understood.

In looking at the entire political situation in the Middle East and the historical perspective of the Israeli and Palestinian relationship, the claim materials indicate that Atlantic noted some points and some research that appeared to be important to understanding the reasonable application of the terms and conditions of the contract at issue here, and the application of the common use and understanding of the terms in the contract.

1. Hamas directed its military force to engage in rocket attacks on Israel in June and July 2014.
2. Israel engaged in not only air strikes directed to the Gaza Strip but also a ground invasion into the Gaza Strip.

6

3. This ongoing action between the parties continued for a period of time until late August when the Israelis withdrew from Gaza.
4. During the conflict, 2,143 Palestinians and 69 Israelis were killed, Israel struck 5,283 targets in Gaza, Hamas fired 4,564 rockets into Israel, and more than 50,000 buildings in Gaza were damaged or destroyed.
5. Hamas is the de facto governing entity in the Gaza Strip and is known to have a military force at its disposal.
6. The action between the Hamas and Israeli forces was clearly warlike and a majority of the reputable news and media outlets clearly labeled this activity as a "war" including affiliates of the insured, MSNBC and NBC News.

Atlantic, in the analysis of the applicable exclusions noted above, appears to have concluded that the common understanding and ordinary meaning given to the activities that caused the move of the production and any Extra Expense to be incurred by the insured was clearly a "war." In addition, Atlantic appears to have concluded that war occurred between a "government, sovereign," namely Israel, and an "other authority," namely Hamas, the controlling entity in the Gaza Strip. Both entities used military forces as well as "weapons of war," namely: rockets, war planes, and tanks. In regard to its process of research and its analysis of the facts, I found that Atlantic followed a reasonable approach to its analysis and ultimate conclusion.

Communications from the insured make clear that the insured preferred that Atlantic consider this to be a terrorist action merely because the United States has designated Hamas as a terrorist organization. Atlantic's writings communicated the concept that such a designation does not change the fact that the events leading up to and precipitating the moving of the filming were not terrorist attacks but rather

7

an outbreak and continuation of ongoing hostilities that amounted to a war or warlike actions. Based upon all of its research, which appears to have been comprehensive, especially for the time involved, Atlantic concluded that all the activity involved in these events lead one to the conclusion: that this was a war.

On Friday, July 11, 2014, after hostilities had escalated earlier in the week and security reports seemed to indicate that the production could not be protected, Atlantic was provided with a verbal notice by telephone call to the President of the Entertainment division that a claim would be filed. On Tuesday, July 15, 2014, Atlantic received a written submission of a claim through the ordinary claims-reporting channels. It included a security notice from July 10, 2014, reporting conditions as of that date. At the time of the written notice and on several occasions until a final and detailed, written coverage determination was communicated to the insured, it was made clear through the insured's broker, Aon, that the insured wanted a determination of coverage as soon as possible. Time was of the essence and that was impressed upon Atlantic. In response to this request, Atlantic began its own investigation of the circumstances surrounding the hostilities as well as reviewing all the materials as supplied by the insured on an expedited basis as requested.

Using numerous reliable and authoritative sources, Atlantic thoroughly investigated the circumstances as reported and considered pertinent data in order to produce a substantiated coverage position quickly as the insured had requested. Furthermore, over the period immediately following the notice of loss, Atlantic continued to monitor the ongoing hostilities between Hamas and Israel, including the reporting of a ground invasion of Gaza by Israeli armed forces. It was during this period of time that Atlantic analyzed the information and stayed in contact with its insured (and its broker), communicating its belief, based upon its analysis, that the war exclusions appeared to apply to these facts. In addition to conducting its own

independent analysis and reaching a coverage decision, which was made relying on the various news articles and up-to-date reports as the hostilities were unfolding, as well as information provided to it by the insured, Atlantic separately sought legal advice by requesting a coverage opinion to add to the overall process. Ultimately, Atlantic communicated its final conclusion in writing that the war exclusions in the policy would be applicable.

Atlantic continued to stay in communication with its insured and the insured's broker, including through telephone calls of July 15, July 17, and July 22. The file materials indicate that Atlantic provided updates on its ongoing process and its analysis that the war exclusions could apply here in the calls of July 17 and July 22. The file materials also indicate that Pamela Johnson involved her supervisor in the claim review process, and that the ultimate decision of Atlantic was approved by additional supervisory personnel within Atlantic.

After Atlantic arrived at its final conclusion, it provided NBCUniversal Media LLC (NBCU) with a letter on July 28, 2014 that fully explained their reasoning in denying the claim. The letter clearly laid out all the facts as Atlantic came to understand them, and in detail, enumerated the results of their investigation and the reasoning for the application of the exclusion and thus the denial of the claim. The denial was made in an expeditious and timely manner, as the insured had requested, as well as providing a reasonable and complete explanation for the conclusion. The denial documented the prior verbal discussions of the matter as well.

In a response letter dated August 13, 2014, Mitchell Silberberg & Knupp LLP as a representative for NBCU responded to the July 28, 2014 denial letter by presenting their view and requested a reconsideration of the denial. Upon receipt of the letter, Atlantic proceeded to give careful consideration to the points raised. After this consideration, Atlantic still felt that they had reached the proper conclusion in

denying the claim. On September 19, 2014 Atlantic responded to the request for reconsideration with a letter that set forth the position that it remained their conclusion that the insurance policy did not insure the claim. Furthermore, Atlantic proceeded in this letter to once again address all the points as they were raised in the response letter and provide a complete and timely response.

All the activity undertaken by Atlantic in response to the claim as presented and the requests for coverage determination leads me to the opinion that Atlantic acted in compliance with all reasonable insurance industry claim standards and fully and timely communicated the results of their investigation and their conclusion to the insured. Upon receipt of a request for reconsideration, Atlantic gave serious consideration to the request and responded to it promptly and completely, restating all their reasoning for the continued denial of the claim.

Even after there was disagreement regarding application of the war exclusions, Atlantic continued to make efforts to resolve the claim. Atlantic met in person with its insured (and the insured's outside counsel) in November 2014, continuing its efforts to discuss the claim and the exclusions. As a show of good faith, even though it was not obligated to do so, Atlantic made a settlement offer in an effort to resolve the disputed claim.

Atlantic reviewed this claim in the context of a long-standing relationship with this insured, where Atlantic had reviewed and paid many other claims. This was not a single or isolated incident whereby a single claim was submitted on this policy and not paid. Atlantic demonstrated in the ongoing relationship that it certainly would pay covered claims under the policy. It seems clear from what I have reviewed that, while Atlantic was willing to make very significant payments to the insureds in the past, exceeding $4 million in a prior single policy period, it was not willing to pay

this claim only because it, in good faith, had concluded the claim was excluded under the policy.

Atlantic in the handling of this claim took all steps that a reasonable insurer and claim handler would take to determine the pertinent facts and circumstances surrounding this claim. They relied on reputable and trustworthy sources for background information and real-time reporting regarding the hostilities that ultimately caused the insured to make the decision to move the production out of Israel. By expediting their thorough investigation as requested by the insured, Atlantic acted in a manner that reflected best practices as recognized in the insurance industry and made their coverage determination based on the circumstances surrounding this individual claim and the applicable terms and conditions of the policy contract at issue. Atlantic communicated fully and clearly, and continued to do so over the course of the claim's existence.

No facts demonstrate a lack of good faith or failure on the part of Atlantic to act in a reasonable fashion.

*Anthony Clark*

Anthony Clark, AIC
March 17, 2017

# EXHIBIT '1'

## Curriculum Vitae

Anthony "Tony" Clark
Clark Insurance Arbitration & Consulting, LLC
2100 Pebble Beach Drive
Plainfield, IL 60586-8384
815-260-3140
tclark112@sbcglobal.net

Tony has experience as a field adjuster, claim management officer, and insurance instructor. Additional experience has been gained through active participation in claim industry trade associations. Tony is also a certified arbitrator with ARIAS-US.

Tony retired as Head of the Property Claims Division for Allianz Global Corporate & Specialty North America where he managed claims arising from Property, Energy, and Engineering (Builder's Risk) lines of business for large multinational corporate insureds.

Besides being a certified arbitrator with ARIAS-US, he is available to act as a consultant to the claims industry either as an auditor, coverage and claim handling expert or consultant, appraisal umpire, or arbitrator in various other matters where he has a particular interest and feels that he can contribute. The practice is not limited to representation of either the client or company side of the business.

History:

February 2014 to Present – Self-employed as Principal, Clark Insurance Arbitration and Consulting, LLC.

Tony has been retained in sixteen litigation matters as an expert providing opinions regarding industry custom and practice in the application of coverage provisions and the appropriateness of the claim handling activity. He has also been retained as a party arbitrator in three reinsurance disputes. One matter, a boiler and machinery reinsurance coverage dispute, has been concluded with an award. Another boiler and machinery matter is still open. A third reinsurance dispute recently settled just prior to the scheduled arbitration hearings. Finally, he was retained as a party arbitrator in a direct insurance arbitration regarding application of code issues, building valuations, and business interruption value and coverage, but that matter settled prior to any action by the arbitration panel. Tony will be providing lessons plans and seminars for an independent adjusting company as well.

Expert report and deposition for defendants. United States District Court for the Western District of Missouri at Kansas City, Case No. 4:13-cv-00945-ODS, Performing Arts Community Improvement District, Plaintiff v. Ace American Insurance Company, Defendant.

Expert deposition for defendant. Superior Court of the State of California, County of Los Angeles, Case No. BC45397. Northrop Grumman Corp., Plaintiff vs. Aon Risk Insurance Services West, Inc., Defendant. (Matter settled before deposition was transcribed.)

Expert report and deposition for defendant. United States District Court for the Northern District of Illinois, Eastern Division, Case No. 13-CV-03482, PQ Corporation, Plaintiff, vs. Lexington Insurance Company, Defendant.

October 2003 to January 2014 - Vice President Property Claims - Allianz Global Corporate & Specialty (AGCS)
 Head of Property Claims Department for Americas
  Included US, Canada, Mexico, Brazil
  Responsible for Property/Energy/Engineering (Builders Risk and Power Generation) Lines of Business
  Member of Executive Management Team
  Manage claims staff
  Manage litigation
  Negotiate and conclude claims with clients, brokers, and representative counsel
  Interact with Underwriting Department on coverage and lessons learned
  Provide Local/Global Management reports
  Participate in Global projects and Global Claims Council
  Participate in Market Management Client/Broker Meetings
  Presenter at Global Managers meetings – Business Income 2010 and Thailand Flood Lessons Learned Supply Chain Coverage 2012

May, 1999 to Sept. 2003 - Manager Professional Development – VeriClaim (formerly McLarens Toplis)
 Conduct Educational Seminars for all level of adjusters, internal and client
  Basic Adjusting Skills, e.g., estimating, investigating, reporting
  Advanced Commercial Adjusting
  Business Income, incl., Gross Earnings, Loss of Profits, Extra Expense, Expediting Expense, Rental Income and Value, Stated Value Forms
  Specialized Coverage, e.g., Boiler and Machinery, Inland Marine

Conduct Internal Audits and Client External Audits
Function as Executive General Adjuster on assigned losses

July 1976 – April 1999 - Progression from Adjuster Trainee to Assistant Vice President
Property, Continental Insurance Company – CNA purchased Continental 1996

Supervision of 18 member General Adjusting Staff
Home Office Supervision Responsibility for claims over $5M for marine and international divisions.
Home Office responsibility for subrogation/salvage recovery 1993 - 1994
Catastrophe Coordinator – Responsibility for initial survey, set-up, and supervision of major losses. (Andrew, Northridge Earthquake, various Hurricanes / Catastrophes 1990 through 1999)
Setup Project for evaluation of third party business income losses resulting from Exxon Valdez oil spill on behalf of Trans-Alaska Pipeline Fund - 1991. Evaluated claims for lost income presented by Native American Tribes and several major fishing/canning operations.
Primary Developer and Instructor for Advanced Property Training Program 1984 - 1999
  Eight week course of study over two year period covering over 20 topics relating to Commercial Adjusting – Trained over 60 participants

Industry Involvement:

AIC designation granted June 1981
RPA (Registered Professional Adjuster) designation granted December 1998, Retired 2014
Member RPA Board of Directors 2007 to 2013
Member RPA Education Committee 2000 to 2005
Member – LEA (Loss Executives Association) – 1996 to 2013 (Retired 2014)
Panelist LEA Education Conference
  Response to Dirty Bomb Attack - 2005
  Appraisal in Major Losses - 2007
Member PLRB Claims Conference Planning Committee 2000 to 2007
PLRB Claims Conference Vice-Chairman - 2006, Chairman - 2007
Member PLRB Regional Advisory Board 2004 to 2005
Member PLRB Property and Liability Advisory Board 2006 to 2013
Workshop Panelist PLRB Claims Conference
  Catastrophe Review 1986 through 1998 inclusive
  Most Asked Coverage Questions 1999 & 2000
  Property Communication 2003
  Appraising Large Commercial Losses 2008-2009
  Equipment Losses, A Different Adjustment Challenge 2011
  Dram Shop Mock Trial – Role as the Judge 2014
  Mediation – Removing the Mystique 2015 and 2016

Business Income Presentation
    NJ Chapter of CPCU Society – 1994
    Chicago Chapter of IMUA - 2005
Ethics Presentation
    RPA meeting - 2000 and 2004
    ISO Catastrophe Conference – 2001
    Combined Claims Conference in California – 2002
    Combined regional meeting NAIIA & RPA – 2007
Earthquake Preparation Seminar Memphis I-Day – 1995
Panelist – IFAA (International Federation of Adjusting Associations),
    Educational Conference – Catastrophe Claims - 2015
Panelist on Inland Marine Insurance topic at CPCU annual meeting 2004
Faculty Member at ARIAS-US Spring Conference – Supply Chain Coverage Issues – 2013
Vericlaim Inc., Instructor, Generation Next development seminars, 2016 through 2017
Member – Boiler and Machinery Association of Chicago 1996 - 2003
Member – Western Loss Association - 2010 - 2013
Member Arbitration Panel (5 member) for two arbitrations representing Boiler and Machinery aspect – Boiler and Machinery vs. Property – 1993
Party Arbitration (3 member) representing property carrier – Boiler and Machinery vs. Property – 2002

Education:
    St. Mary's Seminary, Perryville, MO
        Bachelor of Science - 1971
        Major - Philosophy
        Minors – Mathematics and Education
    Catholic University, Washington, DC
        Graduate Studies in Philosophy
    DeAndreis Seminary, Lemont, IL
        Graduate Studies in Theology