1   MARC J. SHRAKE (SBN 219331)
    mshrake@fmglaw.com
2   WAYNE H. HAMMACK (SBN 202709)
    whammack@fmglaw.com
3   FREEMAN MATHIS & GARY, LLP
    550 South Hope Street, Suite 2200
4   Los Angeles, California 90071
    Telephone: (213) 615-7019
5   Facsimile: (213) 615-7000

6   CHRISTOPHER W. MARTIN (Pro Hac Vice)
    martin@mdjwlaw.com
7   MELINDA R. BURKE (Pro Hac Vice)
    burke@mdjwlaw.com
8   WILLIAM E. McMICHAEL (Pro Hac Vice)
    mcmichael@mdiwlaw.com
9   MARTIN, DISIERE, JEFFERSON
    & WISDOM LLP
10  9111 Cypress Waters Blvd., Suite 250
    Dallas, Texas 75019
11  Telephone: (214) 420-5500
    Facsimile: (214) 420-5501

12
    Attorneys for Defendant
13  Atlantic Specialty Insurance Company

14

15

16              **UNITED STATES DISTRICT COURT**

17       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| UNIVERSAL CABLE PRODUCTIONS LLC, a Delaware limited liability company, and NORTHERN ENTERTAINMENT PRODUCTIONS LLC, a Delaware limited liability company, | CASE NO. 2:16-cv-4435-PA-MRW |
| Plaintiffs, | **WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS** |
| vs. | File Date: 6/20/2016 |
| ATLANTIC SPECIALTY INSURANCE COMPANY, a New York insurance company, | Trial Date: anticipated 3/3/2020 |
| Defendant. | |

Atlantic Specialty Insurance Company provides this written proffer of Expert Testimony of:

Peter Evans

119 Underhill Road

Mill Valley, California 94941

Telephone: (415) 381-9223

Facsimile: (415) 388-6510

Email: PSEvans@comcast.net

Plaintiffs allege that ASIC breached the implied covenant of good faith and fair dealing in failing to properly investigate Plaintiffs' *Dig* claim and in denying coverage of Plaintiffs' *Dig* claim under the Policy. Peter Evans was engaged by ASIC to evaluate these claims and the Expert Witness Report and Rebuttal Expert Witness Report of Ty R. Sagalow, who concluded that ASIC violated industry customs and practices in its claims process and handling of the claim at issue. Mr. Evans is expected testify regarding ASIC's handling of Plaintiffs' claim and in rebuttal to Plaintiffs' expert, Ty Sagalow. [Disclosure of Evans at pp.2].

Mr. Evans prepared an Expert Report. The Evans Expert Report was incorporated by reference in ASIC's Expert Witness Disclosure as Exhibit 1. [Disclosure of Evans at pp.2].

Without limitation, it is anticipated that Mr. Evans will testify that ASIC's handling of Plaintiffs' claim was consistent with and met industry custom and practice, and standards. Mr. Evans' opinions are set forth in his Disclosure and Expert Report and are provided in this proffer. Mr. Evans has not been deposed by Plaintiffs. Moreover, ASIC reserves its questions of Mr. Evans until the time of trial. [Disclosure of Evans at pp.2]. ASIC now files this proffer.

Freeman Mathis
& Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

**I.** **Exhibits to Proffer**

Exhibit 1:  Mr. Evans' Expert Report is relied upon and incorporated in this proffer with supporting schedules, documents, and statements, as though fully set forth here.

Exhibit 2:  Mr. Evans' curriculum vitae.

Exhibit 3:  Mr. Evans' deposition testimony history.

Exhibit 4:  Mr. Evans' trial testimony history.

Exhibit 5:  ASIC's Expert Witness Disclosure for Mr. Evans.

Exhibit 6:  Mr. Clark's curriculum vitae.

Exhibit 7:  Mr. Clark's Expert Report.

Exhibit 8:  Mr. Clark's Rebuttal Expert Report.

Exhibit 9:  ASIC's Expert Witness Disclosure for Mr. Clark.

Exhibit 10:  ASIC's Rebuttal Expert Witness Disclosure for Mr. Clark.

Exhibit 11:  ASIC's Proffer for Mr. Clark.

Exhibit 12:  Documents Relied Upon by Mr. Evans.

**II.** **Opinions of Peter Evans and Citation to Expert Witness Disclosure**

    **A.** **Opinion and Citation to Expert Witness Disclosure.** ASIC properly conducted a reasonable, prompt and thorough investigation of Plaintiffs' claim, maintaining contact with the insured and advising NBCUniversal of the progress of the investigation, providing indications of its potential coverage position prior to issuing of its denial letter. ASIC's investigation included research of the facts and level and coverage issues.

        **1.** **Relevance of Opinion.** Mr. Evans' opinion directly rebuts Plaintiffs' claims of bad faith in the investigation and denial of the *Dig* claim and responds to the criticisms raised by Plaintiffs' expert witness, Mr. Sagalow.

        **2.** **Bases for Opinion.** Mr. Evans' opinions and conclusions are based upon his review of the information and documentation set forth in

Freeman Mathis
& Gary, LLP
Attorneys at Law

his report, accepted standards of claims practice within the insurance industry, and his more than 40 years' experience in the investigation, adjustment, supervision and management of first party property claims in the Unites States and elsewhere. The full breadth of his experience and documents relied upon/reviewed are identified in his Expert Report on p.1-3.

a.  ASIC policy MP00163-03 was issued to insured NBCUniversal Media LLC for a period of eighteen months expiring June 30, 2015 and providing coverage, inter alia, for television productions as proposed and agreed. Coverage included that for Extra Expense, written subject to the terms and conditions of the policy, as amended by endorsement, including Motion Picture Television Portfolio General Conditions Form NS 100 0110. The coverage was written following negotiations between the insured, represented by its brokers, AON, and ASIC, with the first policy period beginning in 2010, with subsequent renewals. [Disclosure of Evans at pp.3]

b.  The policy was subject to a self insured Retention of $3,100,000 Aggregate (including Paid Losses and Adjustment Expenses) (ATL003073-127). The Extra Expense limit was $10,000,000, itself subject to individual deductibles. [Disclosure of Evans at pp.3].

c.  In December 2013 Universal, through its broker, advised ASIC that it was proposing to film a new series called "Dig", at least in part in Israel. After some negotiation ASIC confirmed coverage for the project with filming of the pilot episode to commence on or about June 1, 2014. Coverage

Freeman Mathis
& Gary, LLP
Attorneys at Law

was agreed subject to the terms and conditions of the policy in place. Policy form NS 100 0110, the General Conditions, contained several Exclusions that are relevant to this matter (ATL003083):

## III.   EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY

This policy does not insure against loss or damage caused directly or indirectly by:

1.   War, including undeclared war or civil war; or

2.   Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3.   Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss; or

4.   Any weapon of war including atomic fission or radioactive force, whether in time of peace or war.

[Disclosure of Evans at p.3-4].

d.   While conditions in Israel were considered safe as filming began, three Israeli teenagers were kidnapped on June 12, 2014 and Hamas was suspected of being involved in the

Freeman Mathis
& Gary, LLP
Attorneys at Law

kidnapping. After completion of the pilot episode of Dig and on or about June 30, 2014, prior to the filming of the next five episodes of Dig, the bodies of the missing teenagers were found and there were further allegations of the involvement of Hamas. [Disclosure of Evans at pp.4, Report of Evans at pp.4].

e.  Hamas began launching rockets into Israel and Israel began to take action to protect its interests and to stop the attacks. Due to deteriorating security conditions, on July 8, 2014 the United States Department of State issued advisories concerning the safety and security of civilians in Israel. [Disclosure of Evans at pp.4; Report of Evans at pp.4]

f.  On July 10, 2014 the head of security at NBCUniversal advised that "the security environment in Israel currently prohibits NBCU security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent ....... personnel based in country in relation to this production should make arrangements to leave." On the following day, July 11, 2014, NBCUniversal informed ASIC of its decision to postpone the production of episodes two and three of Dig for a period of one week from its scheduled commencement on July 20. [Disclosure of Evans at pp.4; Report of Evans at pp.4].

g.  On July 14, 2014 the insured finalized its decision to push the production for one week and so advised ASIC. NBCUniversal also suggested the possibility that, if hostilities did not deescalate, production might be moved to another country or back to the United States. Hostilities

Freeman Mathis
& Gary, LLP
Attorneys at Law

16294657.1  11775-83955

between Hamas and Israel worsened and on July 15 Hamas refused to agree to a cease-fire that had been suggested by Egypt. [Disclosure of Evans at pp.5; Report of Evans at pp.4]

**h.** Israeli military were then given authorization to use full force against militants in Gaza. NBCUniversal then relocated production of the series to Croatia and to New Mexico and the insured incurred extra expense as a result of the delay and relocation. [Disclosure of Evans at pp.5; Report of Evans at pp.4-5]

**i.** During the conflict which extended until August 26, 2014, 2143 Palestinians and 69 Israelis were killed. Israel struck 5283 targets in Gaza. Hamas fired 4564 rockets into Israel and more than 50,000 buildings in Gaza with damaged or destroyed (Johnson letter, September 19, 2014, ATL000705). [Disclosure of Evans at pp.5; Report of Evans at pp.5]

**j.** Following the initial inquiry to ASIC on July 11, 2014 (though shown as July 10 in the insurer's correspondence ATL000094 ), and involving a potential Extra Expense claim relating to the planned "push" of production for one week, claim was submitted by the broker to ASIC on July 15 (ATL000104). [Disclosure of Evans at pp.5; Report of Evans at pp.5].

**k.** The claim was assigned to examiner Daniel Gutterman, supervised by Assistant Vice President, OneBeacon Entertainment, Pamela Johnson, and on Thursday, July 17, Ms. Johnson and Mr. Gutterman spoke with Andrea Garber of the insured and Susan Weiss of AON, learning that the

decision had been made to move the production from Israel. Ms. Johnson reiterated a prior discussion between Peter Williams, President of OneBeacon Entertainment and the broker wherein the insurer had advised that it was "seriously considering whether the exclusion for war and warlike actions would preclude coverage for the claim." Ms. Garber and Ms. Weiss protested, asserting that the situation in Israel did not constitute war because Hamas was a terrorist organization, not a governmental authority and that there had been no formal declaration of war. Ms. Johnson confirmed that the insurer was still considering the matter and would respond on Monday, July 21 with its final decision (ATL000096). [Disclosure of Evans at pp.5-6l Report of Evans at pp.5]

l.  The insurer's investigation included searches by Mr. Gutterman and Ms. Johnson as to the facts, news reports, the status of Hamas, Appleman on Insurance and Black's Law Dictionary. Ms. Johnson, an attorney herself (Johnson Deposition, Page 12), also carried out legal research (Sagalow Report, Page 10). On July 21, 2014 Ms. Johnson advised the insured that the insurer's final decision was to exclude the claim based upon the applicable exclusions though, as a courtesy, it would provide coverage for the expenses related to the initial push in production. [Disclosure of Evans at pp.6; Report of Evans at pp.5]

m.  By letter of July 28, 2014 Ms. Johnson set out in detail the sequence of events, the nature and extent of the insurer's investigation, applicable exclusions and the coverage

-8-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

decision. ASIC had concluded, among other things, that ''Hamas has become the government of the Gaza Strip. Hamas has a military wing, the Qassam Brigades, as well as a force of police, security and intelligence personnel. Our understanding is that it is Hamas' s military wing that has carried out the attacks on Israel that led to NBCU's claim. 'Hamas direct the Gaza government and security forces through a self-appointed cabinet of Hamas ministers ... '", (quoting from Zanotti, Hamas: Background and Issues for Congress (Congressional Research Service 2010)). [Disclosure of Evans at pp.6; Report of Evans at pp.5-6]

n.   As a result of its investigation, ASIC had concluded, among other things, that:

"although Gaza or Palestine is not a recognized nation, at least by most of the world, it does have some indicia of sovereignty. It governs territory and it is this territory from which the attacks on Israel have come. Hamas has a stated goal of destroying Israel and is using weapons in its quest. Although the rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law, this is not a situation where a single civilian, or group of civilians, is the target. This conflict involves sophisticated military weapons fired from one territory into another country, Israel. We believe that the only reasonable interpretation of what is occurring, and that has led to NBCU's action, is war or warlike action. We note that NBCU affiliated company, MSNBC, has

Freeman Mathis
& Gary, LLP
Attorneys at Law

referred to the conflict as a war for the past several days. This should be considered in taking into account the insured's reasonable expectations.

Even if what occurred, and is occurring, would not be found to be a war, it is nevertheless a "warlike action". However, if this is the case, to be excluded under Subparagraph 2 of the exclusion, the warlike action must be by a "military force". There is no question that one side of the conflict, the Israeli side, is a military force of a sovereign nation. But if it is necessary that the military force must be the one firing rockets at the areas where the filming was occurred, we must determine whether Hamas is a military force. As to this question, we believe that Hamas is a military force of a government, the government of Gaza.

Even though many, including Israel and the United States consider Hamas to be a terrorist group, it is the government of a territory that is involved in the conflict. Hamas operates as a military command in the Gaza Strip, a territory that it has controlled since 2007. It operates its military force through self-appointed ministers. In light of the governmental structure within Gaza, the Hamas military in Gaza fits the definition of a military force. The current structure represents a considerable evolution from the Hamas that carried out the isolated terrorist attacks in the 1990s and the first few years of the 21st century. (citations omitted)

Freeman Mathis
& Gary, LLP
Attorneys at Law

Thus, the only reasonable interpretation of the situation that led to NBCU's decision to postpone the Dig production and its ultimate decision to move the production from Israel is that the imminent peril that led to these decisions was caused by war, or warlike action by a military force. As a result, we believe the war exclusion applies to this claim."

[Disclosure of Evans at pp.6-7; Report of Evans at pp.6-7].

o.  The denial of coverage letter set out all four exclusions (ATL000097) and concluded by requesting further contact in the event that the insured had further questions (ATL000094 101). [Disclosure of Evans pp.8; Report of Evans at pp.7]

p.  On August 13, 2014 counsel for the insured wrote to Ms. Johnson confirming appreciation of OneBeacon's willingness to cover the expenses associated with the initial one week postponement of the Dig production, but disputing the coverage decision (ATL000087-93). [Disclosure of Evans at pp.8; Report of Evans at pp.7]

q.  After carefully considering the issues raised, Ms. Johnson responded by letter of September 19, 2014, advising that it remained the conclusion of the insurer that the insurance policy did not insure the claim. Again, Ms. Johnson set out all four of the applicable exclusions and explained the insurer's reasoning. (ATL000705-08). [Disclosure of Evans pp.8; Report of Evans at pp.7]

Freeman Mathis
& Gary, LLP
Attorneys at Law

-11-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

**r.**   Following the filing of suit and discovery, cross-motions for summary judgment were filed and, on October 6, 2017 the Court issued its decision, holding that "Atlantic (ASIC) is entitled to summary judgment on both of Plaintiffs' causes of action in the First Amended Complaint and Plaintiffs' motion for summary judgment must be denied. The Court will enter a judgment consistent with this order." (Dkt. 128). [Disclosure of Evans pp.8]

**s.**   The decision was appealed to the United States Court of Appeals for the Ninth Circuit which filed its Opinion on July 12, 2019, reversing in part and vacating in part the district court's summary judgment in favor of ASIC in respect of policy exclusions 1. and 2., Holding that Exclusions 1 and 2 were not applicable and remanding to the Trial Court the remaining issues. [Disclosure of Evans pp.8]

**t.**   The Trial Court then ruled that Exclusions 3 and 4 did not apply to preclude coverage and set for trial issues of damages and whether Atlantic acted in bad faith. [Disclosure of Evans pp.8]

**u.**   Standards governing the conduct of insurers and insureds are generated by industrywide custom and practice, policy provisions, the application of uniform acts such as the National Association of Insurance Commissioners' Model Unfair Claims Settlement Practices Act, and regulations of the applicable administrative agency. Here, suit was filed in California and the relevant regulations are contained within the Department of Insurance Fair Claims Practices

Freeman Mathis
& Gary, LLP
Attorneys at Law

Regulations and Insurance Code §790.03(h). [Disclosure of Evans pp.8-9; Report of Evans at pp.8].

v. In Mr. Evans' experience, apart from those areas discussed above, claims must be reviewed individually since each is likely to require its own level of investigation and coverage analysis. A principal obligation is to match the facts of the loss with experienced and qualified Claims personnel. After completion of the investigation the insurer is then able to review results and other available information to assist in its coverage and adjustment determinations, bearing in mind the detail of the coverage provided and any applicable limits and/or exclusionary language in the policy. Policy interpretation is based upon the plain meaning of policy wordings and definitions, subject to any special meanings imposed by legal precedent. [Disclosure of Evans pp.9].

w. Anthony Clark, an experienced and respected insurance claim professional, was retained by counsel for ASIC to form opinions regarding the denial of the claim and whether the denial of the claim by the insurance company would be considered reasonable given the circumstances from which the claim arose and related issues. He provided his report on March 17, 2017 and subsequently a rebuttal report to that of plaintiffs. expert Ty Sagalow. Mr. Clark also provided deposition testimony. [Disclosure of Evans pp.9; Report of Evans at pp.8]

x. Mr. Clark summarized his opinions on page 4 of his first report, stating:

Freeman Mathis
& Gary, LLP
Attorneys at Law

Based on my experience in the handling, review, and denial of claims, it is my opinion that Atlantic Specialty Insurance Company (Atlantic) properly conducted a thorough and timely investigation into the circumstances surrounding the Extra Expense claim as presented by the plaintiffs and made a reasonable determination under the terms and conditions of the applicable policy of insurance that the war exclusion applied and therefore could make no payment to the insured. Atlantic acted as a reasonable carrier would by staying in communication with its insured during the investigation stage of the claim, and by providing updates on its analysis on coverage. Atlantic then proceeded to provide the insured with a clear and detailed explanation of the denial in an expedited manner as requested by the insured. Atlantic also responded in a complete and timely manner to a request by the insured for reconsideration. Atlantic continued to communicate with its insured and efforts to discuss the coverage issues and reach some negotiated resolution, including through an in person meeting and a settlement offer.

It is my opinion that this determination - that coverage was precluded by applicable exclusions in the policy - was made solely from the specific circumstances as they were made known to, investigated by, and considered by Atlantic Specialty Insurance Company, and those circumstances were considered in light of the policy

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

Freeman Mathis
& Gary, LLP
Attorneys at Law

16294657.1   11775-83955

contract wording. Nothing in the claim file or in any other actions of Atlantic Specialty indicates that any other extraneous motives affected the ultimate claim decision.

The report then provides discussion concerning the actions and activity leading up to the circumstances surrounding the loss and the investigation carried out by ASIC, as summarized above.

[Disclosure of Evans pp. 9-10; Report of Evans at pp.8-9].

y.  Following review of the report of Ty Sagalow, retained on behalf of plaintiffs, Mr. Clark issued his rebuttal report, disagreeing with Mr. Sagalow's opinions, including as to the reasonableness and timeliness of the investigation and coverage decisions; Mr. Sagalow's views concerning "customs and practice in the insurance industry"; as discussed in more detail below. [Disclosure of Evans pp.10; Report of Evans at pp.9].]

z.  Mr. Clark made certain findings and reached certain conclusions during his review of the relevant materials, including all those offered in his prior expert proffer. [Disclosure of Evans pp.10; Report of Evans at pp.9].]

aa.  Mr. Evans agrees with and incorporates Mr. Clark's opinions and conclusions within his own. While the relevant Exclusions as set out above have been referred to as the "War Exclusions", they are not headed as such. Rather, while Exclusions 1. And 2. relate to war or warlike actions and 4. speaks to weapons of war, Exclusion 3. Does not

Freeman Mathis
& Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

mention "war" but deals with other forms of aggression. Mr. Evans would refer to the Standards section of his report as it refers to policy interpretation. [Disclosure of Evans pp.10; Report of Evans at pp.9]

**bb.** Plaintiffs' expert, Mr. Sagalow, is an insurance executive and attorney, apparently with little direct first party commercial property claims experience. (Sagalow CV, Report Pages 44-47). He was retained on behalf of plaintiffs to provide his opinions and conclusions concerning the claims handling in the matter at hand. He also provided two reports, the first on March 17, 2017 and the second, and rebuttal to Mr. Clark's first report, on April 28, 2017. Mr. Sagalow also provided deposition testimony. [Disclosure of Evans pp.10-11; Report of Evans at pp.9-10].

**cc.** Mr. Sagalow's two opinions, as set out on page 41 of his first report were: a. Atlantic was acting against industry custom and practice when it applied the War Exclusion to the claim at issue, and b. Atlantic violated a number of industry customs and practices in its claims process and handling of the claim at issue. [Disclosure of Evans pp.11; Report of Evans at pp.10].

**dd.** As did Mr. Clark, Mr. Evans disagrees with Mr. Sagalow's opinions and conclusions. [Disclosure of Evans pp.11; Report of Evans at pp.10].

**ee.** Per the report of Mr. Evans, Mr. Sagalow sets out his view of custom and practice in the insurance industry in paragraphs 36 through 43 of the Sagalow Report. The policy, and those that preceded it resulted from negotiations

Freeman Mathis & Gary, LLP
Attorneys at Law

-16-

between a sophisticated insured, part of the NBC Organization and with its own risk management department of which Andrea Garber was Senior Director, Risk Management (Sagalow Report, Page 8) worked through its broker, AON, to negotiate terms and conditions with ASIC. AON is a sophisticated multinational insurance brokerage self-described on its website as "a leading global professional services firm providing a broad range of risk, retirement and health solutions. Our 50,000 colleagues and 120 countries empower results for clients .... " There is not evidence of ambiguity in the policy wording and the US Court of Appeals for the Ninth Circuit declined to apply contra proferentem either in favor of the insured's interpretation, or in favor of ASIC (Appellate Opinion Pages 2-3). [Disclosure of Evans pp.11; Report of Evans at pp.10].

**ff.** The evidence was, at the time when the Dig risk was accepted by ASIC, that conditions in Israel were considered safe (MSJ SUF 29 & 30), and AON had specifically requested no deviation from its standard policy terms (Sagalow Report, Page 6). While the ASIC underwriter was clearly aware that at least part of the production would take place in Israel, there was not evidence of impending military action. [Disclosure of Evans pp.11-12; Report of Evans at pp.10].

**gg.** Mr. Evans (and Mr. Clark) disagree with Mr. Sagalow as to his discussion concerning industry custom and practice regarding the application of reasonable expectations and of "the war exclusion" and his ready conclusion of terrorist

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

activity rather than as described in the four exclusions quoted above. [Disclosure of Evans pp.12; Report of Evans at pp.11].

**hh.**   Mr. Evans described, claims handling standards, based on his experience and industry custom and practice. While insurers are obliged to carry out a prompt and thorough investigation of claims prior to making coverage decisions, each loss must be judged by its own merits. Here, ASIC was able to determine the basic underlying facts rapidly and they appear not to be in dispute. [Disclosure of Evans at pp.12; Report of Evans at pp.11].

**ii.**   In Mr. Evans' experience, there is inherent conflict in the obligations of insurers, in that they are open to criticism for the making of decisions following thorough investigations too quickly or, when taking time following the investigation, too slowly. ASIC did carry out considerable investigation and the retention of "experts", as suggested by Mr. Sagalow, would not appear to have been helpful given the decades of political and other differences and apparently hardened political attitudes of individual Nations and commentators. [Disclosure pp.12; Report of Evans at pp.11].

**jj.**   Mr. Sagalow discusses in detail the background of industry custom and practice concerning the terrorist exclusion and the war exclusion, beginning on page 18 of his report. The terrorism issue appears to be moot since there was no such exclusion contained within the ASIC policy and thus the question was whether any of the exclusions set out above were applicable. ASIC, after carrying out its thorough

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

investigation, determined that one or more of the exclusions would apply and thus issued its letter of denial, having previously provided indication as to its thinking. [Disclosure of Evans pp.12; Report of Evans at pp.11].

kk. On page 20 of his report, Mr. Sagalow expounds upon the status of Hamas. The Courts have made their rulings. The issue remains that ASIC carried out a comprehensive investigation, including legal and other research conducted by Mr. Gutterman and Ms. Johnson, an experienced claims manager and an attorney. [Disclosure of Evans pp.13; Report of Evans at pp.11].

ll. Following that investigation ASIC made its coverage determination, reasonably both in the opinion of Mr. Evans and that of Mr. Clark. [Disclosure of Evans pp.13; Report of Evans at pp.11].

mm. Mr. Sagalow, apparently mixing legal opinion with the balance of his report, discusses "the war exclusion" in Section VIII of the report, beginning on page 29, apparently not taking into account the fact that the excluded areas of coverage extend beyond war itself. Both Mr. Evans and Mr. Clark disagree with him, as described in the Clark reports and in the Evans' report. [Disclosure of Evans pp.13; Report of Evans at pp.12].

nn. Section IX of the Sagalow report (Page 32) deals with claims handling issues. Again, Mr. Evans disagrees with him and with his conclusions relating to the thoroughness of the ASIC investigation and the reasonableness of its decision. As discussed above, the retention of "experts" would not

have been useful, given aggressively divergent views. In Mr. Evans' experience, war claims are extremely rare and the issue here is one of coverage interpretation based on facts that are not in dispute. [Disclosure of Evans pp.13; Report of Evans at pp.12].

**oo.** Mr. Sagalow suggests discussions with the underwriter as to coverage but, again in Mr. Evan's experience and as stated by Mr. Clark on page 6 of his rebuttal report the policy form was provided by the broker, AON, and it contained a war exclusion as well as those others shown. Notwithstanding this, Ms. Johnson did confer with Peter Williams. [Disclosure pp.13; Report of Evans at pp.12].

**pp.** There was error in the ASIC letter of July 28, 2014 concerning its discussion regarding terrorism coverage. This error was rectified in Ms. Johnson's letter to counsel for the insured on September 19, 2014 (ATL000708), where it was confirmed that the Terrorism Endorsement did not apply. There is not evidence of misrepresentation on the part of ASIC or that the insurer failed to disclose benefits, coverages and limitations and, as stated, ASIC was dealing with coverage forms presented to it by the insured's broker, AON. [Disclosure pp.13-14; Report of Evans at pp.12].

**qq.** The Sagalow rebuttal to Mr. Clark's report is lengthy and argumentative but, in Mr. Evans' opinion does not add to or otherwise affect Mr. Clark's opinions or those of Mr. Evans. Mr. Evans disagrees with Mr. Sagalow's opinions and conclusions. [Disclosure pp.14; Report of Evans at pp.12].

Freeman Mathis & Gary, LLP
Attorneys at Law

3. **Statements Relied Upon.** Mr. Evans' opinions and conclusions rely on the following statements:

- Depsition of Daniel Gutterman, with Exhibits
- Deposition of Theresa Gooley-Wolf, with Exhibits
- Deposition of Pamela Johnson, with Exhibits
- Deposition of Peter Williams, with Exhibits
- Deposition of Ty Sagalow, with Exhibits
- Deposition of Anthony Clark, with Exhibits
- Deposition of Andrea Garber, with Exhibits

4. **Documents Relied Upon.** Please see Exhibit 12 for a complete list of documents relied upon by Mr. Evans, which are also set forth in his report.

B. **Opinion and Citation to Expert Witness Disclosure.** After this investigation, ASIC acted reasonably in continuing its contacts with the insured and its representatives.

1. **Relevance of Opinion.** Mr. Evans' opinion directly rebuts Plaintiffs' claims of bad faith in the investigation and denial of the *Dig* claim and responds to the criticisms raised by Plaintiffs' expert witness, Mr. Sagalow.

2. **Bases for Opinion.** Mr. Evans' opinions and conclusions are based upon his review of the information and documentation set forth in his report, accepted standards of claims practice within the insurance industry, and his more than 40 years' experience in the investigation, adjustment, supervision and management of first party property claims in the Unites States and elsewhere. The full breadth of his experience and documents relied upon/reviewed are identified in his Expert Report on p.1-3. Please also refer to those bases stated above in Section A.2 of Mr. Evans' proffer.

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

a.     ASIC policy MP00163-03 was issued to insured NBCUniversal Media LLC for a period of eighteen months expiring June 30, 2015 and providing coverage, inter alia, for television productions as proposed and agreed. Coverage included that for Extra Expense, written subject to the terms and conditions of the policy, as amended by endorsement, including Motion Picture Television Portfolio General Conditions Form NS 100 0110. The coverage was written following negotiations between the insured, represented by its brokers, AON, and ASIC, with the first policy period beginning in 2010, with subsequent renewals. [Disclosure of Evans at pp.3]

b.     The policy was subject to a self insured Retention of $3,100,000 Aggregate (including Paid Losses and Adjustment Expenses) (ATL003073-127). The Extra Expense limit was $10,000,000, itself subject to individual deductibles. [Disclosure of Evans at pp.3].

c.     In December 2013 Universal, through its broker, advised ASIC that it was proposing to film a new series called "Dig", at least in part in Israel. After some negotiation ASIC confirmed coverage for the project with filming of the pilot episode to commence on or about June 1, 2014. Coverage was agreed subject to the terms and conditions of the policy in place. Policy form NS 100 0110, the General Conditions, contained several Exclusions that are relevant to this matter (ATL003083):

Freeman Mathis & Gary, LLP
Attorneys at Law

-22-

## III.   EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY

This policy does not insure against loss or damage caused directly or indirectly by:

1.   War, including undeclared war or civil war; or

2.   Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3.   Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss; or

4.   Any weapon of war including atomic fission or radioactive force, whether in time of peace or war.

[Disclosure of Evans at p.3-4].

d.   While conditions in Israel were considered safe as filming began, three Israeli teenagers were kidnapped on June 12, 2014 and Hamas was suspected of being involved in the kidnapping. After completion of the pilot episode of Dig and on or about June 30, 2014, prior to the filming of the next five episodes of Dig, the bodies of the missing teenagers

Freeman Mathis
& Gary, LLP
Attorneys at Law

were found and there were further allegations of the involvement of Hamas. [Disclosure of Evans at pp.4, Report of Evans at pp.4].

e.   Hamas began launching rockets into Israel and Israel began to take action to protect its interests and to stop the attacks. Due to deteriorating security conditions, on July 8, 2014 the United States Department of State issued advisories concerning the safety and security of civilians in Israel. [Disclosure of Evans at pp.4; Report of Evans at pp.4]

f.   On July 10, 2014 the head of security at NBCUniversal advised that "the security environment in Israel currently prohibits NBCU security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent ....... personnel based in country in relation to this production should make arrangements to leave." On the following day, July 11, 2014, NBCUniversal informed ASIC of its decision to postpone the production of episodes two and three of Dig for a period of one week from its scheduled commencement on July 20. [Disclosure of Evans at pp.4; Report of Evans at pp.4].

g.   On July 14, 2014 the insured finalized its decision to push the production for one week and so advised ASIC. NBCUniversal also suggested the possibility that, if hostilities did not deescalate, production might be moved to another country or back to the United States. Hostilities between Hamas and Israel worsened and on July 15 Hamas refused to agree to a cease-fire that had been suggested by Egypt. [Disclosure of Evans at pp.5; Report of Evans at pp.4]

Freeman Mathis
& Gary, LLP
Attorneys at Law

-24-

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

h.   Israeli military were then given authorization to use full force against militants in Gaza. NBCUniversal then relocated production of the series to Croatia and to New Mexico and the insured incurred extra expense as a result of the delay and relocation. [Disclosure of Evans at pp.5; Report of Evans at pp.4-5]

i.   During the conflict which extended until August 26, 2014, 2143 Palestinians and 69 Israelis were killed. Israel struck 5283 targets in Gaza. Hamas fired 4564 rockets into Israel and more than 50,000 buildings in Gaza with damaged or destroyed (Johnson letter, September 19, 2014, ATL000705). [Disclosure of Evans at pp.5; Report of Evans at pp.5]

j.   Following the initial inquiry to ASIC on July 11, 2014 (though shown as July 10 in the insurer's correspondence ATL000094 ), and involving a potential Extra Expense claim relating to the planned "push" of production for one week, claim was submitted by the broker to ASIC on July 15 (ATL000104). [Disclosure of Evans at pp.5; Report of Evans at pp.5].

k.   The claim was assigned to examiner Daniel Gutterman, supervised by Assistant Vice President, OneBeacon Entertainment, Pamela Johnson, and on Thursday, July 17, Ms. Johnson and Mr. Gutterman spoke with Andrea Garber of the insured and Susan Weiss of AON, learning that the decision had been made to move the production from Israel. Ms. Johnson reiterated a prior discussion between Peter Williams, President of OneBeacon Entertainment and the

Freeman Mathis
& Gary, LLP
Attorneys at Law

broker wherein the insurer had advised that it was "seriously considering whether the exclusion for war and warlike actions would preclude coverage for the claim." Ms. Garber and Ms. Weiss protested, asserting that the situation in Israel did not constitute war because Hamas was a terrorist organization, not a governmental authority and that there had been no formal declaration of war. Ms. Johnson confirmed that the insurer was still considering the matter and would respond on Monday, July 21 with its final decision (ATL000096). [Disclosure of Evans at pp.5-6l Report of Evans at pp.5]

l.   The insurer's investigation included searches by Mr. Gutterman and Ms. Johnson as to the facts, news reports, the status of Hamas, Appleman on Insurance and Black's Law Dictionary. Ms. Johnson, an attorney herself (Johnson Deposition, Page 12), also carried out legal research (Sagalow Report, Page 10). On July 21, 2014 Ms. Johnson advised the insured that the insurer's final decision was to exclude the claim based upon the applicable exclusions though, as a courtesy, it would provide coverage for the expenses related to the initial push in production. [Disclosure of Evans at pp.6; Report of Evans at pp.5]

m.   By letter of July 28, 2014 Ms. Johnson set out in detail the sequence of events, the nature and extent of the insurer's investigation, applicable exclusions and the coverage decision. ASIC had concluded, among other things, that ''Hamas has become the government of the Gaza Strip. Hamas has a military wing, the Qassam Brigades, as well as

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

Freeman Mathis
& Gary, LLP
Attorneys at Law

16294657.1   11775-83955

a force of police, security and intelligence personnel. Our understanding is that it is Hamas' s military wing that has carried out the attacks on Israel that led to NBCU's claim. 'Hamas direct the Gaza government and security forces through a self-appointed cabinet of Hamas ministers ... '", (quoting from Zanotti, Hamas: Background and Issues for Congress (Congressional Research Service 2010)). [Disclosure of Evans at pp.6; Report of Evans at pp.5-6]

n.   As a result of its investigation, ASIC had concluded, among other things, that:

"although Gaza or Palestine is not a recognized nation, at least by most of the world, it does have some indicia of sovereignty. It governs territory and it is this territory from which the attacks on Israel have come. Hamas has a stated goal of destroying Israel and is using weapons in its quest. Although the rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law, this is not a situation where a single civilian, or group of civilians, is the target. This conflict involves sophisticated military weapons fired from one territory into another country, Israel. We believe that the only reasonable interpretation of what is occurring, and that has led to NBCU's action, is war or warlike action."

We note that NBCU affiliated company, MSNBC, has referred to the conflict as a war for the past several days. This should be considered in taking into account the

Freeman Mathis
& Gary, LLP
Attorneys at Law

1    insured's reasonable expectations.

2

3    Even if what occurred, and is occurring, would not be found
4    to be a war, it is nevertheless a "warlike action". However,
5    if this is the case, to be excluded under Subparagraph 2 of
6    the exclusion, the warlike action must be by a "military
7    force". There is no question that one side of the conflict, the
8    Israeli side, is a military force of a sovereign nation. But if it
9    is necessary that the military force must be the one firing
10   rockets at the areas where the filming was occurred, we must
11   determine whether Hamas is a military force. As to this
12   question, we believe that Hamas is a military force of a
13   government, the government of Gaza.

14

15   Even though many, including Israel and the United States
16   consider Hamas to be a terrorist group, it is the government
17   of a territory that is involved in the conflict. Hamas operates
18   as a military command in the Gaza Strip, a territory that it
19   has controlled since 2007. It operates its military force
20   through   self-appointed   ministers.   In   light   of   the
21   governmental structure within Gaza, the Hamas military in
22   Gaza fits the definition of a military force. The current
23   structure   represents   a   considerable   evolution   from   the
24   Hamas that carried out the isolated terrorist attacks in the
25   1990s and the first few years of the 21st century. (citations
26   omitted)

27

28

Freeman Mathis
& Gary, LLP
Attorneys at Law

-28-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

Thus, the only reasonable interpretation of the situation that led to NBCU's decision to postpone the Dig production and its ultimate decision to move the production from Israel is that the imminent peril that led to these decisions was caused by war, or warlike action by a military force. As a result, we believe the war exclusion applies to this claim."

[Disclosure of Evans at pp.6-7; Report of Evans at pp.6-7].

o.     The denial of coverage letter set out all four exclusions (ATL000097) and concluded by requesting further contact in the event that the insured had further questions (ATL000094 101). [Disclosure of Evans pp.8; Report of Evans at pp.7]

p.     On August 13, 2014 counsel for the insured wrote to Ms. Johnson confirming appreciation of OneBeacon's willingness to cover the expenses associated with the initial one week postponement of the Dig production, but disputing the coverage decision (ATL000087-93). [Disclosure of Evans at pp.8; Report of Evans at pp.7]

q.     After carefully considering the issues raised, Ms. Johnson responded by letter of September 19, 2014, advising that it remained the conclusion of the insurer that the insurance policy did not insure the claim. Again, Ms. Johnson set out all four of the applicable exclusions and explained the insurer's reasoning. (ATL000705-08). [Disclosure of Evans pp.8; Report of Evans at pp.7]

Freeman Mathis
& Gary, LLP
Attorneys at Law

**r.**   Following the filing of suit and discovery, cross-motions for summary judgment were filed and, on October 6, 2017 the Court issued its decision, holding that "Atlantic (ASIC) is entitled to summary judgment on both of Plaintiffs' causes of action in the First Amended Complaint and Plaintiffs' motion for summary judgment must be denied. The Court will enter a judgment consistent with this order." (Dkt. 128). [Disclosure of Evans pp.8]

**s.**   The decision was appealed to the United States Court of Appeals for the Ninth Circuit which filed its Opinion on July 12, 2019, reversing in part and vacating in part the district court's summary judgment in favor of ASIC in respect of policy exclusions 1. and 2., Holding that Exclusions 1 and 2 were not applicable and remanding to the Trial Court the remaining issues. [Disclosure of Evans pp.8]

**t.**   The Trial Court then ruled that Exclusions 3 and 4 did not apply to preclude coverage and set for trial issues of damages and whether Atlantic acted in bad faith. [Disclosure of Evans pp.8]

**u.**   Standards governing the conduct of insurers and insureds are generated by industrywide custom and practice, policy provisions, the application of uniform acts such as the National Association of Insurance Commissioners' Model Unfair Claims Settlement Practices Act, and regulations of the applicable administrative agency. Here, suit was filed in California and the relevant regulations are contained within the Department of Insurance Fair Claims Practices

Freeman Mathis
& Gary, LLP
Attorneys at Law

Regulations and Insurance Code §790.03(h). [Disclosure of Evans pp.8-9; Report of Evans at pp.8].

v.  In Mr. Evans' experience, apart from those areas discussed above, claims must be reviewed individually since each is likely to require its own level of investigation and coverage analysis. A principal obligation is to match the facts of the loss with experienced and qualified Claims personnel. After completion of the investigation the insurer is then able to review results and other available information to assist in its coverage and adjustment determinations, bearing in mind the detail of the coverage provided and any applicable limits and/or exclusionary language in the policy. Policy interpretation is based upon the plain meaning of policy wordings and definitions, subject to any special meanings imposed by legal precedent. [Disclosure of Evans pp.9].

w.  Anthony Clark, an experienced and respected insurance claim professional, was retained by counsel for ASIC to form opinions regarding the denial of the claim and whether the denial of the claim by the insurance company would be considered reasonable given the circumstances from which the claim arose and related issues. He provided his report on March 17, 2017 and subsequently a rebuttal report to that of plaintiffs. expert Ty Sagalow. Mr. Clark also provided deposition testimony. [Disclosure of Evans pp.9; Report of Evans at pp.8]

x.  Mr. Clark summarized his opinions on page 4 of his first report, stating:

Freeman Mathis
& Gary, LLP
Attorneys at Law

Based on my experience in the handling, review, and denial of claims, it is my opinion that Atlantic Specialty Insurance Company (Atlantic) properly conducted a thorough and timely investigation into the circumstances surrounding the Extra Expense claim as presented by the plaintiffs and made a reasonable determination under the terms and conditions of the applicable policy of insurance that the war exclusion applied and therefore could make no payment to the insured. Atlantic acted as a reasonable carrier would by staying in communication with its insured during the investigation stage of the claim, and by providing updates on its analysis on coverage. Atlantic then proceeded to provide the insured with a clear and detailed explanation of the denial in an expedited manner as requested by the insured. Atlantic also responded in a complete and timely manner to a request by the insured for reconsideration. Atlantic continued to communicate with its insured and efforts to discuss the coverage issues and reach some negotiated resolution, including through an in person meeting and a settlement offer.

It is my opinion that this determination - that coverage was precluded by applicable exclusions in the policy -was made solely from the specific circumstances as they were made known to, investigated by, and considered by Atlantic Specialty Insurance Company, and those circumstances were considered in light of the policy contract wording. Nothing in the claim file or in any other actions of Atlantic

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

Freeman Mathis
& Gary, LLP
Attorneys at Law

Specialty indicates that any other extraneous motives affected the ultimate claim decision.

The report then provides discussion concerning the actions and activity leading up to the circumstances surrounding the loss and the investigation carried out by ASIC, as summarized above.

[Disclosure of Evans pp. 9-10; Report of Evans at pp.8-9].

y.     Following review of the report of Ty Sagalow, retained on behalf of plaintiffs, Mr. Clark issued his rebuttal report, disagreeing with Mr. Sagalow's opinions, including as to the reasonableness and timeliness of the investigation and coverage decisions; Mr. Sagalow's views concerning "customs and practice in the insurance industry"; as discussed in more detail below. [Disclosure of Evans pp.10; Report of Evans at pp.9].]

z.     Mr. Clark made certain findings and reached certain conclusions during his review of the relevant materials, including all those offered in his prior expert proffer. [Disclosure of Evans pp.10; Report of Evans at pp.9].]

aa.    Mr. Evans agrees with and incorporates Mr. Clark's opinions and conclusions within his own. While the relevant Exclusions as set out above have been referred to as the "War Exclusions", they are not headed as such. Rather, while Exclusions 1. And 2. relate to war or warlike actions and 4. speaks to weapons of war, Exclusion 3. Does not

Freeman Mathis
& Gary, LLP
Attorneys at Law

-33-

mention "war" but deals with other forms of aggression. Mr. Evans would refer to the Standards section of his report as it refers to policy interpretation. [Disclosure of Evans pp.10; Report of Evans at pp.9]

**bb.**   Plaintiffs' expert, Mr. Sagalow, is an insurance executive and attorney, apparently with little direct first party commercial property claims experience. (Sagalow CV, Report Pages 44-47). He was retained on behalf of plaintiffs to provide his opinions and conclusions concerning the claims handling in the matter at hand. He also provided two reports, the first on March 17, 2017 and the second, and rebuttal to Mr. Clark's first report, on April 28, 2017. Mr. Sagalow also provided deposition testimony. [Disclosure of Evans pp.10-11; Report of Evans at pp.9-10].

**cc.**   Mr. Sagalow's two opinions, as set out on page 41 of his first report were: a. Atlantic was acting against industry custom and practice when it applied the War Exclusion to the claim at issue, and b. Atlantic violated a number of industry customs and practices in its claims process and handling of the claim at issue. [Disclosure of Evans pp.11; Report of Evans at pp.10].

**dd.**   As did Mr. Clark, Mr. Evans disagrees with Mr. Sagalow's opinions and conclusions. [Disclosure of Evans pp.11; Report of Evans at pp.10].

**ee.**   Per the report of Mr. Evans, Mr. Sagalow sets out his view of custom and practice in the insurance industry in paragraphs 36 through 43 of the Sagalow Report. The policy, and those that preceded it resulted from negotiations

Freeman Mathis
& Gary, LLP
Attorneys at Law

-34-

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

between a sophisticated insured, part of the NBC Organization and with its own risk management department of which Andrea Garber was Senior Director, Risk Management (Sagalow Report, Page 8) worked through its broker, AON, to negotiate terms and conditions with ASIC. AON is a sophisticated multinational insurance brokerage self-described on its website as "a leading global professional services firm providing a broad range of risk, retirement and health solutions. Our 50,000 colleagues and 120 countries empower results for clients .... " There is not evidence of ambiguity in the policy wording and the US Court of Appeals for the Ninth Circuit declined to apply contra proferentem either in favor of the insured's interpretation, or in favor of ASIC (Appellate Opinion Pages 2-3). [Disclosure of Evans pp.11; Report of Evans at pp.10].

ff. The evidence was, at the time when the Dig risk was accepted by ASIC, that conditions in Israel were considered safe (MSJ SUF 29 & 30), and AON had specifically requested no deviation from its standard policy terms (Sagalow Report, Page 6). While the ASIC underwriter was clearly aware that at least part of the production would take place in Israel, there was not evidence of impending military action. [Disclosure of Evans pp.11-12; Report of Evans at pp.10].

gg. Mr. Evans (and Mr. Clark) disagree with Mr. Sagalow as to his discussion concerning industry custom and practice regarding the application of reasonable expectations and of "the war exclusion" and his ready conclusion of terrorist

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

activity rather than as described in the four exclusions quoted above. [Disclosure of Evans pp.12; Report of Evans at pp.11].

**hh.**  Mr. Evans described, claims handling standards, based on his experience and industry custom and practice. While insurers are obliged to carry out a prompt and thorough investigation of claims prior to making coverage decisions, each loss must be judged by its own merits. Here, ASIC was able to determine the basic underlying facts rapidly and they appear not to be in dispute. [Disclosure of Evans at pp.12; Report of Evans at pp.11].

**ii.**  In Mr. Evans' experience, there is inherent conflict in the obligations of insurers, in that they are open to criticism for the making of decisions following thorough investigations too quickly or, when taking time following the investigation, too slowly. ASIC did carry out considerable investigation and the retention of "experts", as suggested by Mr. Sagalow, would not appear to have been helpful given the decades of political and other differences and apparently hardened political attitudes of individual Nations and commentators. [Disclosure pp.12; Report of Evans at pp.11].

**jj.**  Mr. Sagalow discusses in detail the background of industry custom and practice concerning the terrorist exclusion and the war exclusion, beginning on page 18 of his report. The terrorism issue appears to be moot since there was no such exclusion contained within the ASIC policy and thus the question was whether any of the exclusions set out above were applicable. ASIC, after carrying out its thorough

Freeman Mathis & Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

investigation, determined that one or more of the exclusions would apply and thus issued its letter of denial, having previously provided indication as to its thinking. [Disclosure of Evans pp.12; Report of Evans at pp.11].

**kk.** On page 20 of his report, Mr. Sagalow expounds upon the status of Hamas. The Courts have made their rulings. The issue remains that ASIC carried out a comprehensive investigation, including legal and other research conducted by Mr. Gutterman and Ms. Johnson, an experienced claims manager and an attorney. [Disclosure of Evans pp.13; Report of Evans at pp.11].

**ll.** Following that investigation ASIC made its coverage determination, reasonably both in the opinion of Mr. Evans and that of Mr. Clark. [Disclosure of Evans pp.13; Report of Evans at pp.11].

**mm.** Mr. Sagalow, apparently mixing legal opinion with the balance of his report, discusses "the war exclusion" in Section VIII of the report, beginning on page 29, apparently not taking into account the fact that the excluded areas of coverage extend beyond war itself. Both Mr. Evans and Mr. Clark disagree with him, as described in the Clark reports and in the Evans' report. [Disclosure of Evans pp.13; Report of Evans at pp.12].

**nn.** Section IX of the Sagalow report (Page 32) deals with claims handling issues. Again, Mr. Evans disagrees with him and with his conclusions relating to the thoroughness of the ASIC investigation and the reasonableness of its decision. As discussed above, the retention of "experts" would not

Freeman Mathis
& Gary, LLP
Attorneys at Law

16294657.1   11775-83955

have been useful, given aggressively divergent views. In Mr. Evans' experience, war claims are extremely rare and the issue here is one of coverage interpretation based on facts that are not in dispute. [Disclosure of Evans pp.13; Report of Evans at pp.12].

**oo.**   Mr. Sagalow suggests discussions with the underwriter as to coverage but, again in Mr. Evan's experience and as stated by Mr. Clark on page 6 of his rebuttal report the policy form was provided by the broker, AON, and it contained a war exclusion as well as those others shown. Notwithstanding this, Ms. Johnson did confer with Peter Williams. [Disclosure pp.13; Report of Evans at pp.12].

**pp.**   There was error in the ASIC letter of July 28, 2014 concerning its discussion regarding terrorism coverage. This error was rectified in Ms. Johnson's letter to counsel for the insured on September 19, 2014 (ATL000708), where it was confirmed that the Terrorism Endorsement did not apply. There is not evidence of misrepresentation on the part of ASIC or that the insurer failed to disclose benefits, coverages and limitations and, as stated, ASIC was dealing with coverage forms presented to it by the insured's broker, AON. [Disclosure pp.13-14; Report of Evans at pp.12].

**qq.**   The Sagalow rebuttal to Mr. Clark's report is lengthy and argumentative but, in Mr. Evans' opinion does not add to or otherwise affect Mr. Clark's opinions or those of Mr. Evans. Mr. Evans disagrees with Mr. Sagalow's opinions and conclusions. [Disclosure pp.14; Report of Evans at pp.12].

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1  11775-83955

Freeman Mathis & Gary, LLP
Attorneys at Law

3. **Statements Relied Upon.** Mr. Evans' opinions and conclusions rely on the following statements:

- Depsition of Daniel Gutterman, with Exhibits
- Deposition of Theresa Gooley-Wolf, with Exhibits
- Deposition of Pamela Johnson, with Exhibits
- Deposition of Peter Williams, with Exhibits
- Deposition of Ty Sagalow, with Exhibits
- Deposition of Anthony Clark, with Exhibits
- Deposition of Andrea Garber, with Exhibits

4. **Documents Relied Upon.** Please see Exhibit 12 for a complete list of documents relied upon by Mr. Evans, which are also set forth in his report.

C. **Opinion and Citation to Expert Witness Disclosure.** Neither ASIC's investigation process nor its coverage determination was unreasonable, and it was not inconsistent with industry custom and practice.

A. **Opinion and Citation to Expert Witness Disclosure.** ASIC properly conducted a reasonable, prompt and thorough investigation of Plaintiffs' claim, maintaining contact with the insured and advising NBCUniversal of the progress of the investigation, providing indications of its potential coverage position prior to issuing of its denial letter.

1. **Relevance of Opinion.** Mr. Evans' opinion directly rebuts Plaintiffs' claims of bad faith in the investigation and denial of the *Dig* claim and responds to the criticisms raised by Plaintiffs' expert witness, Mr. Sagalow.

2. **Bases for Opinion.** Mr. Evans' opinions and conclusions are based upon his review of the information and documentation set forth in his report, accepted standards of

Freeman Mathis
& Gary, LLP
Attorneys at Law

16294657.1   11775-83955

claims practice within the insurance industry, and his more than 40 years' experience in the investigation, adjustment, supervision and management of first party property claims in the Unites States and elsewhere. The full breadth of his experience and documents relied upon/reviewed are identified in his Expert Report on p.1-3. Please also refer to those bases stated above in Section A.2 of Mr. Evans' proffer.

a. ASIC policy MP00163-03 was issued to insured NBCUniversal Media LLC for a period of eighteen months expiring June 30, 2015 and providing coverage, inter alia, for television productions as proposed and agreed. Coverage included that for Extra Expense, written subject to the terms and conditions of the policy, as amended by endorsement, including Motion Picture Television Portfolio General Conditions Form NS 100 0110. The coverage was written following negotiations between the insured, represented by its brokers, AON, and ASIC, with the first policy period beginning in 2010, with subsequent renewals. [Disclosure of Evans at pp.3]

b. The policy was subject to a self insured Retention of $3,100,000 Aggregate (including Paid Losses and Adjustment Expenses) (ATL003073-127). The Extra Expense limit was $10,000,000, itself subject to individual deductibles. [Disclosure of Evans at pp.3].

c. In December 2013 Universal, through its broker, advised ASIC that it was proposing to film a new

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

series called "Dig", at least in part in Israel. After some negotiation ASIC confirmed coverage for the project with filming of the pilot episode to commence on or about June 1, 2014. Coverage was agreed subject to the terms and conditions of the policy in place. Policy form NS 100 0110, the General Conditions, contained several Exclusions that are relevant to this matter (ATL003083):

## III.   EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY

This policy does not insure against loss or damage caused directly or indirectly by:

1.    War, including undeclared war or civil war; or

2.    Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3.    Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss; or

4.    Any weapon of war including atomic fission

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

or radioactive force, whether in time of peace or war.

[Disclosure of Evans at p.3-4].

**d.**     While conditions in Israel were considered safe as filming began, three Israeli teenagers were kidnapped on June 12, 2014 and Hamas was suspected of being involved in the kidnapping. After completion of the pilot episode of Dig and on or about June 30, 2014, prior to the filming of the next five episodes of Dig, the bodies of the missing teenagers were found and there were further allegations of the involvement of Hamas. [Disclosure of Evans at pp.4, Report of Evans at pp.4].

**e.**     Hamas began launching rockets into Israel and Israel began to take action to protect its interests and to stop the attacks. Due to deteriorating security conditions, on July 8, 2014 the United States Department of State issued advisories concerning the safety and security of civilians in Israel. [Disclosure of Evans at pp.4; Report of Evans at pp.4]

**f.**     On July 10, 2014 the head of security at NBCUniversal advised that "the security environment in Israel currently prohibits NBCU security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent ....... personnel based in country in relation

Freeman Mathis
& Gary, LLP
Attorneys at Law

-42-

to this production should make arrangements to leave." On the following day, July 11, 2014, NBCUniversal informed ASIC of its decision to postpone the production of episodes two and three of Dig for a period of one week from its scheduled commencement on July 20. [Disclosure of Evans at pp.4; Report of Evans at pp.4].

g.  On July 14, 2014 the insured finalized its decision to push the production for one week and so advised ASIC. NBCUniversal also suggested the possibility that, if hostilities did not deescalate, production might be moved to another country or back to the United States. Hostilities between Hamas and Israel worsened and on July 15 Hamas refused to agree to a cease-fire that had been suggested by Egypt. [Disclosure of Evans at pp.5; Report of Evans at pp.4]

h.  Israeli military were then given authorization to use full force against militants in Gaza. NBCUniversal then relocated production of the series to Croatia and to New Mexico and the insured incurred extra expense as a result of the delay and relocation. [Disclosure of Evans at pp.5; Report of Evans at pp.4-5]

i.  During the conflict which extended until August 26, 2014, 2143 Palestinians and 69 Israelis were killed. Israel struck 5283 targets in Gaza. Hamas fired 4564 rockets into Israel and more than 50,000 buildings in Gaza with damaged or destroyed (Johnson letter,

Freeman Mathis
& Gary, LLP
Attorneys at Law

September 19, 2014, ATL000705). [Disclosure of Evans at pp.5; Report of Evans at pp.5]

j. Following the initial inquiry to ASIC on July 11, 2014 (though shown as July 10 in the insurer's correspondence ATL000094 ), and involving a potential Extra Expense claim relating to the planned "push" of production for one week, claim was submitted by the broker to ASIC on July 15 (ATL000104). [Disclosure of Evans at pp.5; Report of Evans at pp.5].

k. The claim was assigned to examiner Daniel Gutterman, supervised by Assistant Vice President, OneBeacon Entertainment, Pamela Johnson, and on Thursday, July 17, Ms. Johnson and Mr. Gutterman spoke with Andrea Garber of the insured and Susan Weiss of AON, learning that the decision had been made to move the production from Israel. Ms. Johnson reiterated a prior discussion between Peter Williams, President of OneBeacon Entertainment and the broker wherein the insurer had advised that it was "seriously considering whether the exclusion for war and warlike actions would preclude coverage for the claim." Ms. Garber and Ms. Weiss protested, asserting that the situation in Israel did not constitute war because Hamas was a terrorist organization, not a governmental authority and that there had been no formal declaration of war. Ms. Johnson confirmed that the insurer was still considering the matter and

Freeman Mathis & Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

would respond on Monday, July 21 with its final decision (ATL000096). [Disclosure of Evans at pp.5-6l Report of Evans at pp.5]

**l.**     The insurer's investigation included searches by Mr. Gutterman and Ms. Johnson as to the facts, news reports, the status of Hamas, Appleman on Insurance and Black's Law Dictionary. Ms. Johnson, an attorney herself (Johnson Deposition, Page 12), also carried out legal research (Sagalow Report, Page 10). On July 21, 2014 Ms. Johnson advised the insured that the insurer's final decision was to exclude the claim based upon the applicable exclusions though, as a courtesy, it would provide coverage for the expenses related to the initial push in production. [Disclosure of Evans at pp.6; Report of Evans at pp.5]

**m.**     By letter of July 28, 2014 Ms. Johnson set out in detail the sequence of events, the nature and extent of the insurer's investigation, applicable exclusions and the coverage decision. ASIC had concluded, among other things, that ''Hamas has become the government of the Gaza Strip. Hamas has a military wing, the Qassam Brigades, as well as a force of police, security and intelligence personnel. Our understanding is that it is Hamas's military wing that has carried out the attacks on Israel that led to NBCU's claim. 'Hamas direct the Gaza government and security forces through a self-appointed cabinet of Hamas ministers ... '', (quoting from Zanotti, Hamas: Background and

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

Freeman Mathis & Gary, LLP
Attorneys at Law

Issues for Congress (Congressional Research Service 2010)). [Disclosure of Evans at pp.6; Report of Evans at pp.5-6]

n. As a result of its investigation, ASIC had concluded, among other things, that:

"although Gaza or Palestine is not a recognized nation, at least by most of the world, it does have some indicia of sovereignty. It governs territory and it is this territory from which the attacks on Israel have come. Hamas has a stated goal of destroying Israel and is using weapons in its quest. Although the rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law, this is not a situation where a single civilian, or group of civilians, is the target. This conflict involves sophisticated military weapons fired from one territory into another country, Israel. We believe that the only reasonable interpretation of what is occurring, and that has led to NBCU's action, is war or warlike action.

We note that NBCU affiliated company, MSNBC, has referred to the conflict as a war for the past several days. This should be considered in taking into account the insured's reasonable expectations.

Freeman Mathis & Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

Even if what occurred, and is occurring, would not be found to be a war, it is nevertheless a "warlike action". However, if this is the case, to be excluded under Subparagraph 2 of the exclusion, the warlike action must be by a "military force". There is no question that one side of the conflict, the Israeli side, is a military force of a sovereign nation. But if it is necessary that the military force must be the one firing rockets at the areas where the filming was occurred, we must determine whether Hamas is a military force. As to this question, we believe that Hamas is a military force of a government, the government of Gaza.

Even though many, including Israel and the United States consider Hamas to be a terrorist group, it is the government of a territory that is involved in the conflict. Hamas operates as a military command in the Gaza Strip, a territory that it has controlled since 2007. It operates its military force through self-appointed ministers. In light of the governmental structure within Gaza, the Hamas military in Gaza fits the definition of a military force. The current structure represents a considerable evolution from the Hamas that carried out the isolated terrorist attacks in the 1990s and the first few years of the 21st century. (citations omitted)

16294657.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

Thus, the only reasonable interpretation of the situation that led to NBCU's decision to postpone the Dig production and its ultimate decision to move the production from Israel is that the imminent peril that led to these decisions was caused by war, or warlike action by a military force. As a result, we believe the war exclusion applies to this claim."

[Disclosure of Evans at pp.6-7; Report of Evans at pp.6-7].

o.   The denial of coverage letter set out all four exclusions (ATL000097) and concluded by requesting further contact in the event that the insured had further questions (ATL000094 101). [Disclosure of Evans pp.8; Report of Evans at pp.7]

p.   On August 13, 2014 counsel for the insured wrote to Ms. Johnson confirming appreciation of OneBeacon's willingness to cover the expenses associated with the initial one week postponement of the Dig production, but disputing the coverage decision (ATL000087-93). [Disclosure of Evans at pp.8; Report of Evans at pp.7]

q.   After carefully considering the issues raised, Ms. Johnson responded by letter of September 19, 2014, advising that it remained the conclusion of the insurer that the insurance policy did not insure the claim. Again, Ms. Johnson set out all four of the applicable exclusions and explained the insurer's reasoning.

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

(ATL000705-08). [Disclosure of Evans pp.8; Report of Evans at pp.7]

    **r.**    Following the filing of suit and discovery, cross-motions for summary judgment were filed and, on October 6, 2017 the Court issued its decision, holding that "Atlantic (ASIC) is entitled to summary judgment on both of Plaintiffs' causes of action in the First Amended Complaint and Plaintiffs' motion for summary judgment must be denied. The Court will enter a judgment consistent with this order." (Dkt. 128). [Disclosure of Evans pp.8]

    **s.**    The decision was appealed to the United States Court of Appeals for the Ninth Circuit which filed its Opinion on July 12, 2019, reversing in part and vacating in part the district court's summary judgment in favor of ASIC in respect of policy exclusions 1. and 2., Holding that Exclusions 1 and 2 were not applicable and remanding to the Trial Court the remaining issues. [Disclosure of Evans pp.8]

    **t.**    The Trial Court then ruled that Exclusions 3 and 4 did not apply to preclude coverage and set for trial issues of damages and whether Atlantic acted in bad faith. [Disclosure of Evans pp.8]

    **u.**    Standards governing the conduct of insurers and insureds are generated by industrywide custom and practice, policy provisions, the application of uniform acts such as the National Association of Insurance Commissioners' Model Unfair Claims Settlement

Freeman Mathis
& Gary, LLP
Attorneys at Law

-49-

Practices Act, and regulations of the applicable administrative agency. Here, suit was filed in California and the relevant regulations are contained within the Department of Insurance Fair Claims Practices Regulations and Insurance Code §790.03(h). [Disclosure of Evans pp.8-9; Report of Evans at pp.8].

v.  In Mr. Evans' experience, apart from those areas discussed above, claims must be reviewed individually since each is likely to require its own level of investigation and coverage analysis. A principal obligation is to match the facts of the loss with experienced and qualified Claims personnel. After completion of the investigation the insurer is then able to review results and other available information to assist in its coverage and adjustment determinations, bearing in mind the detail of the coverage provided and any applicable limits and/or exclusionary language in the policy. Policy interpretation is based upon the plain meaning of policy wordings and definitions, subject to any special meanings imposed by legal precedent. [Disclosure of Evans pp.9].

w.  Anthony Clark, an experienced and respected insurance claim professional, was retained by counsel for ASIC to form opinions regarding the denial of the claim and whether the denial of the claim by the insurance company would be considered reasonable

16294657.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

given the circumstances from which the claim arose and related issues. He provided his report on March 17, 2017 and subsequently a rebuttal report to that of plaintiffs. expert Ty Sagalow. Mr. Clark also provided deposition testimony. [Disclosure of Evans pp.9; Report of Evans at pp.8]

x.   Mr. Clark summarized his opinions on page 4 of his first report, stating:

Based on my experience in the handling, review, and denial of claims, it is my opinion that Atlantic Specialty Insurance Company (Atlantic) properly conducted a thorough and timely investigation into the circumstances surrounding the Extra Expense claim as presented by the plaintiffs and made a reasonable determination under the terms and conditions of the applicable policy of insurance that the war exclusion applied and therefore could make no payment to the insured. Atlantic acted as a reasonable carrier would by staying in communication with its insured during the investigation stage of the claim, and by providing updates on its analysis on coverage. Atlantic then proceeded to provide the insured with a clear and detailed explanation of the denial in an expedited manner as requested by the insured. Atlantic also responded in a complete and timely manner to a request by the insured for reconsideration. Atlantic

Freeman Mathis & Gary, LLP
Attorneys at Law

-51-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

continued to communicate with its insured and efforts to discuss the coverage issues and reach some negotiated resolution, including through an in person meeting and a settlement offer.

It is my opinion that this determination - that coverage was precluded by applicable exclusions in the policy -was made solely from the specific circumstances as they were made known to, investigated by, and considered by Atlantic Specialty Insurance Company, and those circumstances were considered in light of the policy contract wording. Nothing in the claim file or in any other actions of Atlantic Specialty indicates that any other extraneous motives affected the ultimate claim decision.

The report then provides discussion concerning the actions and activity leading up to the circumstances surrounding the loss and the investigation carried out by ASIC, as summarized above.

[Disclosure of Evans pp. 9-10; Report of Evans at pp.8-9].

y.   Following review of the report of Ty Sagalow, retained on behalf of plaintiffs, Mr. Clark issued his rebuttal report, disagreeing with Mr. Sagalow's opinions, including as to the reasonableness and

Freeman Mathis
& Gary, LLP
Attorneys at Law

timeliness of the investigation and coverage decisions; Mr. Sagalow's views concerning "customs and practice in the insurance industry"; as discussed in more detail below. [Disclosure of Evans pp.10; Report of Evans at pp.9].]

z.  Mr. Clark made certain findings and reached certain conclusions during his review of the relevant materials, including all those offered in his prior expert proffer. [Disclosure of Evans pp.10; Report of Evans at pp.9].]

aa.  Mr. Evans agrees with and incorporates Mr. Clark's opinions and conclusions within his own. While the relevant Exclusions as set out above have been referred to as the "War Exclusions", they are not headed as such. Rather, while Exclusions 1. And 2. relate to war or warlike actions and 4. speaks to weapons of war, Exclusion 3. Does not mention "war" but deals with other forms of aggression. Mr. Evans would refer to the Standards section of his report as it refers to policy interpretation. [Disclosure of Evans pp.10; Report of Evans at pp.9]

bb.   Plaintiffs' expert, Mr. Sagalow, is an insurance executive and attorney, apparently with little direct first party commercial property claims experience. (Sagalow CV, Report Pages 44-47). He was retained on behalf of plaintiffs to provide his opinions and conclusions concerning the claims handling in the matter at hand. He also provided two reports, the first

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

on March 17, 2017 and the second, and rebuttal to Mr. Clark's first report, on April 28, 2017. Mr. Sagalow also provided deposition testimony. [Disclosure of Evans pp.10-11; Report of Evans at pp.9-10].

cc.  Mr. Sagalow's two opinions, as set out on page 41 of his first report were: a. Atlantic was acting against industry custom and practice when it applied the War Exclusion to the claim at issue, and b. Atlantic violated a number of industry customs and practices in its claims process and handling of the claim at issue. [Disclosure of Evans pp.11; Report of Evans at pp.10].

dd.  As did Mr. Clark, Mr. Evans disagrees with Mr. Sagalow's opinions and conclusions. [Disclosure of Evans pp.11; Report of Evans at pp.10].

ee.  Per the report of Mr. Evans, Mr. Sagalow sets out his view of custom and practice in the insurance industry in paragraphs 36 through 43 of the Sagalow Report. The policy, and those that preceded it resulted from negotiations between a sophisticated insured, part of the NBC Organization and with its own risk management department of which Andrea Garber was Senior Director, Risk Management (Sagalow Report, Page 8) worked through its broker, AON, to negotiate terms and conditions with ASIC. AON is a sophisticated multinational insurance brokerage self-described on its website as "a leading global professional services firm providing a broad range of

Freeman Mathis & Gary, LLP
Attorneys at Law

-54-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

risk, retirement and health solutions. Our 50,000 colleagues and 120 countries empower results for clients .... " There is not evidence of ambiguity in the policy wording and the US Court of Appeals for the Ninth Circuit declined to apply contra proferentem either in favor of the insured's interpretation, or in favor of ASIC (Appellate Opinion Pages 2-3). [Disclosure of Evans pp.11; Report of Evans at pp.10].

ff.     The evidence was, at the time when the Dig risk was accepted by ASIC, that conditions in Israel were considered safe (MSJ SUF 29 & 30), and AON had specifically requested no deviation from its standard policy terms (Sagalow Report, Page 6). While the ASIC underwriter was clearly aware that at least part of the production would take place in Israel, there was not evidence of impending military action. [Disclosure of Evans pp.11-12; Report of Evans at pp.10].

gg.     Mr. Evans (and Mr. Clark) disagree with Mr. Sagalow as to his discussion concerning industry custom and practice regarding the application of reasonable expectations and of "the war exclusion" and his ready conclusion of terrorist activity rather than as described in the four exclusions quoted above. [Disclosure of Evans pp.12; Report of Evans at pp.11].

hh.     Mr. Evans described, claims handling standards, based on his experience and industry custom and

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

Freeman Mathis
& Gary, LLP
Attorneys at Law

16294657.1   11775-83955

practice. While insurers are obliged to carry out a prompt and thorough investigation of claims prior to making coverage decisions, each loss must be judged by its own merits. Here, ASIC was able to determine the basic underlying facts rapidly and they appear not to be in dispute. [Disclosure of Evans at pp.12; Report of Evans at pp.11].

ii.   In Mr. Evans' experience, there is inherent conflict in the obligations of insurers, in that they are open to criticism for the making of decisions following thorough investigations too quickly or, when taking time following the investigation, too slowly. ASIC did carry out considerable investigation and the retention of "experts", as suggested by Mr. Sagalow, would not appear to have been helpful given the decades of political and other differences and apparently hardened political attitudes of individual Nations and commentators. [Disclosure pp.12; Report of Evans at pp.11].

jj.   Mr. Sagalow discusses in detail the background of industry custom and practice concerning the terrorist exclusion and the war exclusion, beginning on page 18 of his report. The terrorism issue appears to be moot since there was no such exclusion contained within the ASIC policy and thus the question was whether any of the exclusions set out above were applicable. ASIC, after carrying out its thorough investigation, determined that one or more of the

Freeman Mathis
& Gary, LLP
Attorneys at Law

exclusions would apply and thus issued its letter of denial, having previously provided indication as to its thinking. [Disclosure of Evans pp.12; Report of Evans at pp.11].

kk. On page 20 of his report, Mr. Sagalow expounds upon the status of Hamas. The Courts have made their rulings. The issue remains that ASIC carried out a comprehensive investigation, including legal and other research conducted by Mr. Gutterman and Ms. Johnson, an experienced claims manager and an attorney. [Disclosure of Evans pp.13; Report of Evans at pp.11].

ll. Following that investigation ASIC made its coverage determination, reasonably both in the opinion of Mr. Evans and that of Mr. Clark. [Disclosure of Evans pp.13; Report of Evans at pp.11].

mm. Mr. Sagalow, apparently mixing legal opinion with the balance of his report, discusses "the war exclusion" in Section VIII of the report, beginning on page 29, apparently not taking into account the fact that the excluded areas of coverage extend beyond war itself. Both Mr. Evans and Mr. Clark disagree with him, as described in the Clark reports and in the Evans' report. [Disclosure of Evans pp.13; Report of Evans at pp.12].

nn. Section IX of the Sagalow report (Page 32) deals with claims handling issues. Again, Mr. Evans disagrees with him and with his conclusions relating to the

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS
16294657.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

thoroughness of the ASIC investigation and the reasonableness of its decision. As discussed above, the retention of "experts" would not have been useful, given aggressively divergent views. In Mr. Evans' experience, war claims are extremely rare and the issue here is one of coverage interpretation based on facts that are not in dispute. [Disclosure of Evans pp.13; Report of Evans at pp.12].

oo.    Mr. Sagalow suggests discussions with the underwriter as to coverage but, again in Mr. Evan's experience and as stated by Mr. Clark on page 6 of his rebuttal report the policy form was provided by the broker, AON, and it contained a war exclusion as well as those others shown. Notwithstanding this, Ms. Johnson did confer with Peter Williams. [Disclosure pp.13; Report of Evans at pp.12].

pp.    There was error in the ASIC letter of July 28, 2014 concerning its discussion regarding terrorism coverage. This error was rectified in Ms. Johnson's letter to counsel for the insured on September 19, 2014 (ATL000708), where it was confirmed that the Terrorism Endorsement did not apply. There is not evidence of misrepresentation on the part of ASIC or that the insurer failed to disclose benefits, coverages and limitations and, as stated, ASIC was dealing with coverage forms presented to it by the insured's broker, AON. [Disclosure pp.13-14; Report of Evans at pp.12].

Freeman Mathis
& Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

**qq.** The Sagalow rebuttal to Mr. Clark's report is lengthy and argumentative but, in Mr. Evans' opinion does not add to or otherwise affect Mr. Clark's opinions or those of Mr. Evans. Mr. Evans disagrees with Mr. Sagalow's opinions and conclusions. [Disclosure pp.14; Report of Evans at pp.12].

**3.** **Statements Relied Upon.** Mr. Evans' opinions and conclusions rely on the following statements:

- Depsition of Daniel Gutterman, with Exhibits
- Deposition of Theresa Gooley-Wolf, with Exhibits
- Deposition of Pamela Johnson, with Exhibits
- Deposition of Peter Williams, with Exhibits
- Deposition of Ty Sagalow, with Exhibits
- Deposition of Anthony Clark, with Exhibits
- Deposition of Andrea Garber, with Exhibits

**4.** **Documents Relied Upon.** Please see Exhibit 12 for a complete list of documents relied upon by Mr. Evans, which are also set forth in his report.

**D.** **Opinion and Citation to Expert Witness Disclosure.** It was reasonable for ASIC to conclude that the claim fell within the Exclusions following its research and analysis, as set out in ASIC's letters of July 28 and September 19, 2014, and the investigation was both prompt and thorough, with consideration having been given to the insured's arguments.

**A.** **Opinion and Citation to Expert Witness Disclosure.** ASIC properly conducted a reasonable, prompt and thorough investigation of Plaintiffs' claim, maintaining contact with the insured and advising NBCUniversal of the progress of the

Freeman Mathis & Gary, LLP
Attorneys at Law

-59-

investigation, providing indications of its potential coverage position prior to issuing of its denial letter.

1.   **Relevance of Opinion.** Mr. Evans' opinion directly rebuts Plaintiffs' claims of bad faith in the investigation and denial of the *Dig* claim and responds to the criticisms raised by Plaintiffs' expert witness, Mr. Sagalow.

2.   **Bases for Opinion.** Mr. Evans' opinions and conclusions are based upon his review of the information and documentation set forth in his report, accepted standards of claims practice within the insurance industry, and his more than 40 years' experience in the investigation, adjustment, supervision and management of first party property claims in the Unites States and elsewhere. The full breadth of his experience and documents relied upon/reviewed are identified in his Expert Report on p.1-3. Please also refer to those bases stated above in Section A.2 of Mr. Evans' proffer.

     a.   ASIC policy MP00163-03 was issued to insured NBCUniversal Media LLC for a period of eighteen months expiring June 30, 2015 and providing coverage, inter alia, for television productions as proposed and agreed. Coverage included that for Extra Expense, written subject to the terms and conditions of the policy, as amended by endorsement, including Motion Picture Television Portfolio General Conditions Form NS 100 0110. The coverage was written following negotiations between the insured, represented by its brokers, AON, and ASIC,

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

with the first policy period beginning in 2010, with subsequent renewals. [Disclosure of Evans at pp.3]

**b.**   The policy was subject to a self insured Retention of $3,100,000 Aggregate (including Paid Losses and Adjustment Expenses) (ATL003073-127). The Extra Expense limit was $10,000,000, itself subject to individual deductibles. [Disclosure of Evans at pp.3].

**c.**   In December 2013 Universal, through its broker, advised ASIC that it was proposing to film a new series called "Dig", at least in part in Israel. After some negotiation ASIC confirmed coverage for the project with filming of the pilot episode to commence on or about June 1, 2014. Coverage was agreed subject to the terms and conditions of the policy in place. Policy form NS 100 0110, the General Conditions, contained several Exclusions that are relevant to this matter (ATL003083):

## III.   EXCLUSIONS APPLICABLE TO ALL SECTIONS OF THIS POLICY

This policy does not insure against loss or damage caused directly or indirectly by:

1.   War, including undeclared war or civil war; or

2.   Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military

1    personnel or other agents; or

2    3.    Insurrection, rebellion, revolution, usurped

3          power, or action taken by governmental

4          authority in hindering or defending against

5          any of these. Such loss or damage is excluded

6          regardless of any other cause or event that

7          contributes concurrently or in any sequence to

8          the loss; or

9    4.    Any weapon of war including atomic fission

10         or radioactive force, whether in time of peace

11         or war.

12

13   [Disclosure of Evans at p.3-4].

14

15   **d.**    While conditions in Israel were considered safe as

16          filming began, three Israeli teenagers were kidnapped

17          on June 12, 2014 and Hamas was suspected of being

18          involved in the kidnapping. After completion of the

19          pilot episode of Dig and on or about June 30, 2014,

20          prior to the filming of the next five episodes of Dig,

21          the bodies of the missing teenagers were found and

22          there were further allegations of the involvement of

23          Hamas. [Disclosure of Evans at pp.4, Report of Evans

24          at pp.4].

25   **e.**    Hamas began launching rockets into Israel and Israel

26          began to take action to protect its interests and to stop

27          the attacks. Due to deteriorating security conditions,

28          on July 8, 2014 the United States Department of State

Freeman Mathis
& Gary, LLP
Attorneys at Law

-62-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

issued advisories concerning the safety and security of civilians in Israel. [Disclosure of Evans at pp.4; Report of Evans at pp.4]

**f.**   On July 10, 2014 the head of security at NBCUniversal advised that "the security environment in Israel currently prohibits NBCU security from being able to guarantee the safety and security of our employees, production partners and associated crew and talent ....... personnel based in country in relation to this production should make arrangements to leave." On the following day, July 11, 2014, NBCUniversal informed ASIC of its decision to postpone the production of episodes two and three of Dig for a period of one week from its scheduled commencement on July 20. [Disclosure of Evans at pp.4; Report of Evans at pp.4].

**g.**   On July 14, 2014 the insured finalized its decision to push the production for one week and so advised ASIC. NBCUniversal also suggested the possibility that, if hostilities did not deescalate, production might be moved to another country or back to the United States. Hostilities between Hamas and Israel worsened and on July 15 Hamas refused to agree to a cease-fire that had been suggested by Egypt. [Disclosure of Evans at pp.5; Report of Evans at pp.4]

**h.**   Israeli military were then given authorization to use full force against militants in Gaza. NBCUniversal then relocated production of the series to Croatia and

to New Mexico and the insured incurred extra expense as a result of the delay and relocation. [Disclosure of Evans at pp.5; Report of Evans at pp.4-5]

i.   During the conflict which extended until August 26, 2014, 2143 Palestinians and 69 Israelis were killed. Israel struck 5283 targets in Gaza. Hamas fired 4564 rockets into Israel and more than 50,000 buildings in Gaza with damaged or destroyed (Johnson letter, September 19, 2014, ATL000705). [Disclosure of Evans at pp.5; Report of Evans at pp.5]

j.   Following the initial inquiry to ASIC on July 11, 2014 (though shown as July 10 in the insurer's correspondence ATL000094 ), and involving a potential Extra Expense claim relating to the planned "push" of production for one week, claim was submitted by the broker to ASIC on July 15 (ATL000104). [Disclosure of Evans at pp.5; Report of Evans at pp.5].

k.   The claim was assigned to examiner Daniel Gutterman, supervised by Assistant Vice President, OneBeacon Entertainment, Pamela Johnson, and on Thursday, July 17, Ms. Johnson and Mr. Gutterman spoke with Andrea Garber of the insured and Susan Weiss of AON, learning that the decision had been made to move the production from Israel. Ms. Johnson reiterated a prior discussion between Peter Williams, President of OneBeacon Entertainment and the broker wherein the insurer had advised that it was

Freeman Mathis & Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

"seriously considering whether the exclusion for war and warlike actions would preclude coverage for the claim." Ms. Garber and Ms. Weiss protested, asserting that the situation in Israel did not constitute war because Hamas was a terrorist organization, not a governmental authority and that there had been no formal declaration of war. Ms. Johnson confirmed that the insurer was still considering the matter and would respond on Monday, July 21 with its final decision (ATL000096). [Disclosure of Evans at pp.5-6l Report of Evans at pp.5]

l.    The insurer's investigation included searches by Mr. Gutterman and Ms. Johnson as to the facts, news reports, the status of Hamas, Appleman on Insurance and Black's Law Dictionary. Ms. Johnson, an attorney herself (Johnson Deposition, Page 12), also carried out legal research (Sagalow Report, Page 10). On July 21, 2014 Ms. Johnson advised the insured that the insurer's final decision was to exclude the claim based upon the applicable exclusions though, as a courtesy, it would provide coverage for the expenses related to the initial push in production. [Disclosure of Evans at pp.6; Report of Evans at pp.5]

m.    By letter of July 28, 2014 Ms. Johnson set out in detail the sequence of events, the nature and extent of the insurer's investigation, applicable exclusions and the coverage decision. ASIC had concluded, among other things, that "Hamas has become the government of

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

Freeman Mathis & Gary, LLP
Attorneys at Law

the Gaza Strip. Hamas has a military wing, the Qassam Brigades, as well as a force of police, security and intelligence personnel. Our understanding is that it is Hamas's military wing that has carried out the attacks on Israel that led to NBCU's claim. 'Hamas direct the Gaza government and security forces through a self-appointed cabinet of Hamas ministers ... '", (quoting from Zanotti, Hamas: Background and Issues for Congress (Congressional Research Service 2010)). [Disclosure of Evans at pp.6; Report of Evans at pp.5-6]

n.   As a result of its investigation, ASIC had concluded, among other things, that:

"although Gaza or Palestine is not a recognized nation, at least by most of the world, it does have some indicia of sovereignty. It governs territory and it is this territory from which the attacks on Israel have come. Hamas has a stated goal of destroying Israel and is using weapons in its quest. Although the rockets are being fired into civilian areas, which may violate established norms of warfare and armed conflict under international law, this is not a situation where a single civilian, or group of civilians, is the target. This conflict involves sophisticated military weapons fired from one territory into another country, Israel. We believe that the only reasonable interpretation of what

Freeman Mathis
& Gary, LLP
Attorneys at Law

-66-

is occurring, and that has led to NBCU's action, is war or warlike action.

We note that NBCU affiliated company, MSNBC, has referred to the conflict as a war for the past several days. This should be considered in taking into account the insured's reasonable expectations.

Even if what occurred, and is occurring, would not be found to be a war, it is nevertheless a "warlike action". However, if this is the case, to be excluded under Subparagraph 2 of the exclusion, the warlike action must be by a "military force". There is no question that one side of the conflict, the Israeli side, is a military force of a sovereign nation. But if it is necessary that the military force must be the one firing rockets at the areas where the filming was occurred, we must determine whether Hamas is a military force. As to this question, we believe that Hamas is a military force of a government, the government of Gaza.

Even though many, including Israel and the United States consider Hamas to be a terrorist group, it is the government of a territory that is involved in the conflict. Hamas operates as a military command in the Gaza Strip, a territory that it has controlled since 2007. It operates its military force through self-

Freeman Mathis & Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

appointed ministers. In light of the governmental structure within Gaza, the Hamas military in Gaza fits the definition of a military force. The current structure represents a considerable evolution from the Hamas that carried out the isolated terrorist attacks in the 1990s and the first few years of the 21st century. (citations omitted)

Thus, the only reasonable interpretation of the situation that led to NBCU's decision to postpone the Dig production and its ultimate decision to move the production from Israel is that the imminent peril that led to these decisions was caused by war, or warlike action by a military force. As a result, we believe the war exclusion applies to this claim."

[Disclosure of Evans at pp.6-7; Report of Evans at pp.6-7].

o.   The denial of coverage letter set out all four exclusions (ATL000097) and concluded by requesting further contact in the event that the insured had further questions (ATL000094 101). [Disclosure of Evans pp.8; Report of Evans at pp.7]

p.   On August 13, 2014 counsel for the insured wrote to Ms. Johnson confirming appreciation of OneBeacon's willingness to cover the expenses associated with the initial one week postponement of the Dig production,

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

but disputing the coverage decision (ATL000087-93). [Disclosure of Evans at pp.8; Report of Evans at pp.7]

q.    After carefully considering the issues raised, Ms. Johnson responded by letter of September 19, 2014, advising that it remained the conclusion of the insurer that the insurance policy did not insure the claim. Again, Ms. Johnson set out all four of the applicable exclusions and explained the insurer's reasoning. (ATL000705-08). [Disclosure of Evans pp.8; Report of Evans at pp.7]

r.    Following the filing of suit and discovery, cross-motions for summary judgment were filed and, on October 6, 2017 the Court issued its decision, holding that "Atlantic (ASIC) is entitled to summary judgment on both of Plaintiffs' causes of action in the First Amended Complaint and Plaintiffs' motion for summary judgment must be denied. The Court will enter a judgment consistent with this order." (Dkt. 128). [Disclosure of Evans pp.8]

s.    The decision was appealed to the United States Court of Appeals for the Ninth Circuit which filed its Opinion on July 12, 2019, reversing in part and vacating in part the district court's summary judgment in favor of ASIC in respect of policy exclusions 1. and 2., Holding that Exclusions 1 and 2 were not applicable and remanding to the Trial Court the remaining issues. [Disclosure of Evans pp.8]

Freeman Mathis & Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

**t.**     The Trial Court then ruled that Exclusions 3 and 4 did not apply to preclude coverage and set for trial issues of damages and whether Atlantic acted in bad faith. [Disclosure of Evans pp.8]

**u.**     Standards governing the conduct of insurers and insureds are generated by industrywide custom and practice, policy provisions, the application of uniform acts such as the National Association of Insurance Commissioners' Model Unfair Claims Settlement Practices Act, and regulations of the applicable administrative agency. Here, suit was filed in California and the relevant regulations are contained within the Department of Insurance Fair Claims Practices Regulations and Insurance Code §790.03(h). [Disclosure of Evans pp.8-9; Report of Evans at pp.8].

**v.**     In Mr. Evans' experience, apart from those areas discussed above, claims must be reviewed individually since each is likely to require its own level of investigation and coverage analysis. A principal obligation is to match the facts of the loss with experienced and qualified Claims personnel. After completion of the investigation the insurer is then able to review results and other available information to assist in its coverage and adjustment determinations, bearing in mind the detail of the coverage provided and any applicable limits and/or exclusionary language in the policy. Policy

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

interpretation is based upon the plain meaning of policy wordings and definitions, subject to any special meanings imposed by legal precedent. [Disclosure of Evans pp.9].

w.   Anthony Clark, an experienced and respected insurance claim professional, was retained by counsel for ASIC to form opinions regarding the denial of the claim and whether the denial of the claim by the insurance company would be considered reasonable given the circumstances from which the claim arose and related issues. He provided his report on March 17, 2017 and subsequently a rebuttal report to that of plaintiffs. expert Ty Sagalow. Mr. Clark also provided deposition testimony. [Disclosure of Evans pp.9; Report of Evans at pp.8]

x.   Mr. Clark summarized his opinions on page 4 of his first report, stating:

Based on my experience in the handling, review, and denial of claims, it is my opinion that Atlantic Specialty Insurance Company (Atlantic) properly conducted a thorough and timely investigation into the circumstances surrounding the Extra Expense claim as presented by the plaintiffs and made a reasonable determination under the terms and conditions of the applicable policy of insurance that the war exclusion applied and therefore could make no payment to the insured. Atlantic acted as a

Freeman Mathis
& Gary, LLP
Attorneys at Law

-71-
WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

reasonable carrier would by staying in communication with its insured during the investigation stage of the claim, and by providing updates on its analysis on coverage. Atlantic then proceeded to provide the insured with a clear and detailed explanation of the denial in an expedited manner as requested by the insured. Atlantic also responded in a complete and timely manner to a request by the insured for reconsideration. Atlantic continued to communicate with its insured and efforts to discuss the coverage issues and reach some negotiated resolution, including through an in person meeting and a settlement offer.

It is my opinion that this determination - that coverage was precluded by applicable exclusions in the policy -was made solely from the specific circumstances as they were made known to, investigated by, and considered by Atlantic Specialty Insurance Company, and those circumstances were considered in light of the policy contract wording. Nothing in the claim file or in any other actions of Atlantic Specialty indicates that any other extraneous motives affected the ultimate claim decision.

The report then provides discussion concerning the actions and activity leading up to the circumstances surrounding the loss and the investigation carried out

-72-

16294657.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

by ASIC, as summarized above.

[Disclosure of Evans pp. 9-10; Report of Evans at pp.8-9].

y.    Following review of the report of Ty Sagalow, retained on behalf of plaintiffs, Mr. Clark issued his rebuttal report, disagreeing with Mr. Sagalow's opinions, including as to the reasonableness and timeliness of the investigation and coverage decisions; Mr. Sagalow's views concerning "customs and practice in the insurance industry"; as discussed in more detail below. [Disclosure of Evans pp.10; Report of Evans at pp.9].]

z.    Mr. Clark made certain findings and reached certain conclusions during his review of the relevant materials, including all those offered in his prior expert proffer. [Disclosure of Evans pp.10; Report of Evans at pp.9].]

aa.   Mr. Evans agrees with and incorporates Mr. Clark's opinions and conclusions within his own. While the relevant Exclusions as set out above have been referred to as the "War Exclusions", they are not headed as such. Rather, while Exclusions 1. And 2. relate to war or warlike actions and 4. speaks to weapons of war, Exclusion 3. Does not mention "war" but deals with other forms of aggression. Mr. Evans would refer to the Standards section of his report as it

Freeman Mathis
& Gary, LLP
Attorneys at Law

refers to policy interpretation. [Disclosure of Evans pp.10; Report of Evans at pp.9]

**bb.**  Plaintiffs' expert, Mr. Sagalow, is an insurance executive and attorney, apparently with little direct first party commercial property claims experience. (Sagalow CV, Report Pages 44-47). He was retained on behalf of plaintiffs to provide his opinions and conclusions concerning the claims handling in the matter at hand. He also provided two reports, the first on March 17, 2017 and the second, and rebuttal to Mr. Clark's first report, on April 28, 2017. Mr. Sagalow also provided deposition testimony. [Disclosure of Evans pp.10-11; Report of Evans at pp.9-10].

**cc.**  Mr. Sagalow's two opinions, as set out on page 41 of his first report were: a. Atlantic was acting against industry custom and practice when it applied the War Exclusion to the claim at issue, and b. Atlantic violated a number of industry customs and practices in its claims process and handling of the claim at issue. [Disclosure of Evans pp.11; Report of Evans at pp.10].

**dd.**  As did Mr. Clark, Mr. Evans disagrees with Mr. Sagalow's opinions and conclusions. [Disclosure of Evans pp.11; Report of Evans at pp.10].

**ee.**  Per the report of Mr. Evans, Mr. Sagalow sets out his view of custom and practice in the insurance industry in paragraphs 36 through 43 of the Sagalow Report. The policy, and those that preceded it resulted from

Freeman Mathis
& Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1  11775-83955

negotiations between a sophisticated insured, part of the NBC Organization and with its own risk management department of which Andrea Garber was Senior Director, Risk Management (Sagalow Report, Page 8) worked through its broker, AON, to negotiate terms and conditions with ASIC. AON is a sophisticated multinational insurance brokerage self-described on its website as "a leading global professional services firm providing a broad range of risk, retirement and health solutions. Our 50,000 colleagues and 120 countries empower results for clients .... " There is not evidence of ambiguity in the policy wording and the US Court of Appeals for the Ninth Circuit declined to apply contra proferentem either in favor of the insured's interpretation, or in favor of ASIC (Appellate Opinion Pages 2-3). [Disclosure of Evans pp.11; Report of Evans at pp.10].

ff.   The evidence was, at the time when the Dig risk was accepted by ASIC, that conditions in Israel were considered safe (MSJ SUF 29 & 30), and AON had specifically requested no deviation from its standard policy terms (Sagalow Report, Page 6). While the ASIC underwriter was clearly aware that at least part of the production would take place in Israel, there was not evidence of impending military action. [Disclosure of Evans pp.11-12; Report of Evans at pp.10].

Freeman Mathis & Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

**gg.** Mr. Evans (and Mr. Clark) disagree with Mr. Sagalow as to his discussion concerning industry custom and practice regarding the application of reasonable expectations and of "the war exclusion" and his ready conclusion of terrorist activity rather than as described in the four exclusions quoted above. [Disclosure of Evans pp.12; Report of Evans at pp.11].

**hh.** Mr. Evans described, claims handling standards, based on his experience and industry custom and practice. While insurers are obliged to carry out a prompt and thorough investigation of claims prior to making coverage decisions, each loss must be judged by its own merits. Here, ASIC was able to determine the basic underlying facts rapidly and they appear not to be in dispute. [Disclosure of Evans at pp.12; Report of Evans at pp.11].

**ii.** In Mr. Evans' experience, there is inherent conflict in the obligations of insurers, in that they are open to criticism for the making of decisions following thorough investigations too quickly or, when taking time following the investigation, too slowly. ASIC did carry out considerable investigation and the retention of "experts", as suggested by Mr. Sagalow, would not appear to have been helpful given the decades of political and other differences and apparently hardened political attitudes of individual Nations and commentators. [Disclosure pp.12; Report of Evans at pp.11].

Freeman Mathis
& Gary, LLP
Attorneys at Law

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1  11775-83955

**jj.** Mr. Sagalow discusses in detail the background of industry custom and practice concerning the terrorist exclusion and the war exclusion, beginning on page 18 of his report. The terrorism issue appears to be moot since there was no such exclusion contained within the ASIC policy and thus the question was whether any of the exclusions set out above were applicable. ASIC, after carrying out its thorough investigation, determined that one or more of the exclusions would apply and thus issued its letter of denial, having previously provided indication as to its thinking. [Disclosure of Evans pp.12; Report of Evans at pp.11].

**kk.** On page 20 of his report, Mr. Sagalow expounds upon the status of Hamas. The Courts have made their rulings. The issue remains that ASIC carried out a comprehensive investigation, including legal and other research conducted by Mr. Gutterman and Ms. Johnson, an experienced claims manager and an attorney. [Disclosure of Evans pp.13; Report of Evans at pp.11].

**ll.** Following that investigation ASIC made its coverage determination, reasonably both in the opinion of Mr. Evans and that of Mr. Clark. [Disclosure of Evans pp.13; Report of Evans at pp.11].

**mm.** Mr. Sagalow, apparently mixing legal opinion with the balance of his report, discusses "the war exclusion" in Section VIII of the report, beginning on

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1  11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law

page 29, apparently not taking into account the fact that the excluded areas of coverage extend beyond war itself. Both Mr. Evans and Mr. Clark disagree with him, as described in the Clark reports and in the Evans' report. [Disclosure of Evans pp.13; Report of Evans at pp.12].

**nn.** Section IX of the Sagalow report (Page 32) deals with claims handling issues. Again, Mr. Evans disagrees with him and with his conclusions relating to the thoroughness of the ASIC investigation and the reasonableness of its decision. As discussed above, the retention of "experts" would not have been useful, given aggressively divergent views. In Mr. Evans' experience, war claims are extremely rare and the issue here is one of coverage interpretation based on facts that are not in dispute. [Disclosure of Evans pp.13; Report of Evans at pp.12].

**oo.** Mr. Sagalow suggests discussions with the underwriter as to coverage but, again in Mr. Evan's experience and as stated by Mr. Clark on page 6 of his rebuttal report the policy form was provided by the broker, AON, and it contained a war exclusion as well as those others shown. Notwithstanding this, Ms. Johnson did confer with Peter Williams. [Disclosure pp.13; Report of Evans at pp.12].

**pp.** There was error in the ASIC letter of July 28, 2014 concerning its discussion regarding terrorism coverage. This error was rectified in Ms. Johnson's

Freeman Mathis & Gary, LLP
Attorneys at Law

-78-

letter to counsel for the insured on September 19, 2014 (ATL000708), where it was confirmed that the Terrorism Endorsement did not apply. There is not evidence of misrepresentation on the part of ASIC or that the insurer failed to disclose benefits, coverages and limitations and, as stated, ASIC was dealing with coverage forms presented to it by the insured's broker, AON. [Disclosure pp.13-14; Report of Evans at pp.12].

**qq.** The Sagalow rebuttal to Mr. Clark's report is lengthy and argumentative but, in Mr. Evans' opinion does not add to or otherwise affect Mr. Clark's opinions or those of Mr. Evans. Mr. Evans disagrees with Mr. Sagalow's opinions and conclusions. [Disclosure pp.14; Report of Evans at pp.12].

**3.** **Statements Relied Upon.** Mr. Evans' opinions and conclusions rely on the following statements:

- Depsition of Daniel Gutterman, with Exhibits
- Deposition of Theresa Gooley-Wolf, with Exhibits
- Deposition of Pamela Johnson, with Exhibits
- Deposition of Peter Williams, with Exhibits
- Deposition of Ty Sagalow, with Exhibits
- Deposition of Anthony Clark, with Exhibits
- Deposition of Andrea Garber, with Exhibits

**4.** **Documents Relied Upon.** Please see Exhibit 12 for a complete list of documents relied upon by Mr. Evans, which are also set forth in his report.

Freeman Mathis
& Gary, LLP
Attorneys at Law

-79-

**III.     Affirmative Statement That No Statements or Documents Were Relied On**

Not applicable; Mr. Evans relied on documents and deposition testimony, as noted herein.

DATED:  February 24, 2020          By:  /s/ Christopher W. Martin

MARC J. SHRAKE
FREEMAN MATHIS & GARY, LLP

-and-

CHRISTOPHER W. MARTIN *(Pro Hac Vice)*
MELINDA R. BURKE *(Pro Hac Vice)*
WILLIAM E. McMICHAEL *(Pro Hac Vice)*
MARTIN, DISIERE, JEFFERSON
& WISDOM LLP

Attorneys for Defendant ATLANTIC
SPECIALTY INSURANCE COMPANY

WRITTEN PROFFER OF EXPERT OPINION OF ASIC CLAIM HANDLING EXPERT PETER EVANS

16294657.1   11775-83955

Freeman Mathis
& Gary, LLP
Attorneys at Law